UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| VANDERBILT MORTGAGE AND | § | |
| FINANCE, INC., | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. C-09-312 |
| | § | |
| CESAR FLORES, *et al*, | § | |
| | § | |
| Defendants. | § | |

**ORDER**

On this day came on to be considered Intervention-Defendants Vanderbilt Mortgage and Finance and CMH Homes' joint Motion to Dismiss the claims of Intervenors Maria and Arturo Trevino pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "Motion to Dismiss").  (D.E. 100.)  For the reasons stated herein, Defendants' Motion to Dismiss is GRANTED IN PART and DENIED IN PART.

**I.      Jurisdiction**

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) as Intervenors bring a cause of action under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 ("RICO").

**II.     Background**

**A.      The Parties**

Intervention-Defendants, Clayton Homes, CMH Homes, and Kevin T. Clayton, sell manufactured homes to customers across the United States.  (D.E.  98 at 18-19.)  CMH is the retailer with a network of nearly 400 stores across the country, including the Corpus Christi store involved in this action.   Clayton Homes is the holding company with its principal place of

business in Delaware.  Kevin Clayton is the CEO of Clayton Homes and member of its Board of

Directors.   Intervention-Defendant Vanderbilt Mortgage and Finance, Inc. is the "sister

company" to CMH and provides financing to CMH customers. Intervention-Defendant John

Wells is an individual residing in Texas.    Intervention-Defendant Benjamin Frazier is an

individual residing in Texas.  (D.E. 98 at 18-19.)  Both Wells and Frazier were employees of

CMH Homes' Corpus Christi store when the alleged transactions took place.  (D.E. 98 at 5, 17.)

Maria and Arturo Trevino are a married couple residing in Texas who, at the time of the

events that are the subject of this action, owned two vacant lots located in Jim Wells County,

Texas.  (D.E. 98 at 18-19, 4.)  Defendants and Counter-Plaintiffs Cesar Flores and Alvin E. King

are the owners of a mobile home purchased from CMH Homes in Corpus Christi, Texas.  (D.E.

98 at 2.)

### B.        Factual and Procedural Background

On August 4, 2009, Vanderbilt brought suit in state court against Flores and King,

seeking to repossess and foreclose a mobile home they purchased from Defendant CMH Homes.

(D.E. 1, Exhibit B.)  On September 18, 2009, Flores and King counter-sued, bringing various

state law causes of action and a federal claim under RICO.  (D.E. 1, Ex. B.)  On October 26,

2009, Maria and Arturo Trevino intervened in the state court action, bringing identical claims

against Vanderbilt and joining additional Third-Party Defendants, Clayton Homes, Inc., CMH

Homes, Inc., Kevin T. Clayton, John Wells and Benjamin Joseph Frazier.  (D.E. 11, Exhibit C;

D.E. 98.)  The Trevinos allege various causes of action against the Intervention-Defendants

under Texas and Federal law.  (D.E. 98.)  Following the Trevino's intervention, Intervention-

Defendant CMH Homes, Inc. removed the entire state court action to this Court based on this

Court's federal question jurisdiction under R.I.C.O. and 28 U.S.C. § 1331.  (D.E. 1.)   As alleged

in the Trevino's original Intervention Complaint, (D.E. 11, Exhibit B), and in their Second
Amended Intervention Complaint (D.E. 98), the facts on record are as follows.

On or about January 5, 2002, Counter-Plaintiffs, Cesar Flores and Alvin E. King and
Defendants[1] Clayton Homes, Inc. ("Clayton") and CMH Homes, Inc. ("CMH") entered into a
manufactured home purchase and financing contract (the "Contract"), for which Vanderbilt
Mortgage and Finance ("Vanderbilt") provided the financing.  (D.E. 98, p. 2.)  On January 7,
2002, two days after the closing, CMH, Clayton Homes and Vanderbilt filed a Deed of Trust and
a Builder's & Mechanic's Lien Contract containing the signatures of Maria and Arturo Trevino
and purporting to create liens on real property owned by the Trevinos in order to secure the
Flores and King's mobile home purchase.  (D.E. 98, p. 2.)  The documents also contained the
signature of Benjamin Frazier, who was a notary public and a former employee of CMH Homes.
(D.E. 98, p. 2.)  Allegedly, all of these signatures were forged.  According to the Intervenors,
Christopher Lance Kimball, the CMH sales associate responsible for the sale of the mobile home
to Flores and King, "knowingly forged" Maria Trevino and Arturo Trevino's names on the lien
documents and then proceeded to notarize the forged signatures "by impersonating [and forging
the signature of] a notary public of the State of Texas [i.e. Frazier.]"  (D.E. 98, p. 5.)  Kimball
allegedly used Frazier's notary stamp when notarizing the documents.  (D.E. 98, p. 5.)  The
Intervenors contend that they never executed any of these documents and never intended their
property to be encumbered to secure the mobile home purchase of someone else.  (D.E. 98, p. 4-
6.)  The Intervenors contend that the purpose of forging documents creating liens on their
property was to create the appearance that the Contract was secured by real property, and thus

---

[1] The "Defendants" referred to in this Order are the Intervention-Defendants: Vanderbilt Finance and
Mortgage and CMH Homes.

making the Contract easier to package into securities and sell on the secondary market.  (D.E. 98, p. 4.)

 In addition, the Intervenors allege that Lance Kimball falsely represented to Flores and King that they had been approved for a financing interest rate of 10.99%, when in fact the interest rate was around 4% higher.  (D.E. 98, p. 3-4.)  The increase in the rate allegedly represented a Yield Spread Premium ("YSP"), which Intervenors state is an additional portion added to the finance rate that serves as a commission or kickback for CMH, Clayton, and its sales personnel.  (D.E. 98, p. 4.)  This YSP was allegedly not disclosed to Flores and King. (D.E. 98, p. 3.)  Intervenors state that this enterprise worked because Vanderbilt was not an independent mortgage finance company, but rather worked in unison with the other Defendants. Intervenors state that the loan documents were sent from Texas to Tennessee and processed by CMH.  (D.E. 98, p. 4.)

 After previous litigation from 2003 to 2005, Defendants discovered the fraud outlined above and allegedly attempted to conceal the fraud by filing releases of the Deeds of Trust and Mechanic's Liens in the real property records of various counties.  Such releases were filed in relation to the Trevino's real property.  (D.E. 98, p. 7.) The releases were signed by VMF and filed with the Jim Wells County Clerk on October 14, 2005.  (D.E. 98, p. 7.)  The Mechanic's Lien release indicated that the Contract had been "paid in full" and the Deed of Trust Release "expressly released the mortgage[.]"  (D.E. 98, p. 7.)  As such, the Intervenors state that Vanderbilt released and extinguished Counter-Plaintiffs' Flores' and King's mortgage obligation on their mobile home.  (D.E. 98, p. 7-8.)

 Defendants allegedly failed to disclose that these releases were filed with the County Clerk, and continued to fraudulently enforce the loans and collect payments from Counter-

Plaintiff Flores and King, even though the mortgage obligation had been paid in full, as represented in the releases.  (D.E. 98, p. 8.)  Defendants allegedly filed the releases in secret and instructed the County Clerk to return the documents to Defendants' Tennessee offices rather than the purchaser or landowner.  The end result, according to the Intervenors, was that the landowner and purchaser were entirely unaware that their obligations had been released.  (D.E. 98, p. 8.)  The Intervenors contend that after filing the secret releases, Defendants continued to collect payments for a debt that was no longer due, including payments from Counter-Plaintiffs Flores and King.  (D.E. 98, p. 8.)

The Intervenors allege that the ultimate purpose behind creating and filing the fraudulent documents was to defraud investors.  Vanderbilt allegedly issued false prospectus statements to potential investors, and to attract more investors Defendants represented that many of the contracts at issue were backed by secured interests in land that were fraudulently obtained.  (D.E. 98, p. 12.)   Intervenors claim that some of these loans were sold to the Federal National Mortgage Association, or Fannie Mae, without any disclosure of the fraud described above. (DE. 98, p. 14.)  Intervenors state that Berkshire Hathaway, the parent company of Defendants, owned a percentage of Fannie Mae when it purchased the fraudulent loans.  Intervenors argue that Berkshire Hathaway, as the parent company, knew or should have known that Fannie Mae paid hundreds of millions of dollars for nearly worthless interests.  (D.E. 98, p. 12.)

On April 19, 2010, Defendants filed a petition with the Texas Department of Housing and Community Affairs that, according to Intervenors, contained false statements in order to obtain certain guidance from the agency as to the meaning of the "paid in full" terminology in the releases.  Specifically, the petition states that several landowners entered into agreements with the Defendants for the lien and deed of trust contract, when in fact their signatures were forged.

As a related matter, the petition allegedly falsely states that the purchaser's manufactured homes were perfected as personal property when in fact Defendants already represented to investors that these transactions created a present interest in real property through the Deeds of Trust, which were not to secure an interest just in the manufactured homes, but were for the purpose of securing an interest in the real estate referenced in the deed of trust and mechanic's lien.  (D.E. 98, p. 14-15.)

The Intervenors allege that Defendants performed the above actions while acting as a single enterprise.  Moreover, many of the alleged actions were performed by employees at Clayton's Corpus Christi store.  John Wells, manager of the store and a business partner of the Defendants, was allegedly aware of and assisted in the fraud that occurred at his store.  (D.E. 98, p. 16.)

Based on the foregoing allegations, Intervenors state the following causes of action: (1) fraudulent documents related to land, pursuant to Texas Civil Practice and Remedies Code § 12.002; (2) declaratory judgment that amounts due under the Contract with Flores and King has been released or "paid in full," or that the Contract is not enforceable; (3) common law unfair debt collection; (4) Texas Debt Collection Practices Act; (5) money had and received; (6) fraud, including fraud of investors, (7) civil conspiracy, and (8) the Racketeer Influenced and Corrupt Organizations Act ("R.I.C.O.").  (D.E. 98, p. 19-33.)

Defendants Vanderbilt and CMH Homes filed their joint Motion to Dismiss on June 3, 2010.  ( D.E. 100.)  Defendants ask this Court to dismiss Intervenors' claims for: (1) fraudulent documents related to land; (2) common law fraud; (3) fraud by non-disclosure; (4) civil

conspiracy; and (5) declaratory relief.[2]  The Intervenors filed their Response on June 24, 2010.  (D.E. 107).  Defendants filed their Reply on July 7, 2010.  (D.E. 116.)

## III.    Discussion

### A.    Rule 12(b)(6) Standard

To survive a Rule 12(b)(6) motion to dismiss, the Intervenors' Intervention Complaint need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "'[D]etailed factual allegations' are not required." <u>Ashcroft v. Iqbal</u>, __ U.S. __, 129 S.Ct. 1937, 1949 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007)).

However, the complaint must allege "sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" <u>Id.</u> at 1949 (quoting <u>Twombly</u>, 550 U.S. at 570). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u> at 1949 (citing <u>Twombly</u>, 550 U.S. at 556).  A court should not accept "threadbare recitals of a cause of action's elements, supported by mere conclusory statements," which "do not permit the court to infer more than the mere possibility of misconduct." <u>Id.</u> at 1949-50.

### B.    Analysis

Defendants raise their Rule 12(b)(6) argument with respect to several different causes of action.  Specifically, Defendants seek dismissal due to failure to state a claim with respect to Intervenors' claims for (1) fraudulent documents related to land, (2) common law fraud, (3) fraud

---

[2] The Intervenors' claims of common law unfair debt collection, Texas Debt Collection Practices Act, and their claims under R.I.C.O. are not at issue in the Motion to Dismiss filed by Defendants Vanderbilt and CMH Homes.  (D.E. 100.)

by non-disclosure, (4) civil conspiracy, and (5) declaratory judgment relief.  The Court addresses each argument in turn.

### 1.        Fraudulent Documents Related to Land

Section 12.002(a) of the Texas Civil Practice and Remedies Code establishes the requirements for a fraudulent lien cause of action.  The Section provides:

> A person may not make, present, or use a document or other record with:
>
> (1)   knowledge that the document or other record is a fraudulent court record or a fraudulent lien or claim against real or personal property or an interest in real or personal property;
>
> (2)  intent that the document or other record be given the same legal effect as a court record or document of a court created by or established under the constitution or laws of this state or the United States or another entity listed in Section 37.01, Penal Code, evidencing a valid lien or claim against real or personal property or an interest in real or personal property; and
>
> (3)  intent to cause another person to suffer:
> (A)  physical injury;
> (B)  financial injury; or
> (C)  mental anguish or emotional distress.

Tex. Civ. Prac. & Rem. Code § 12.002(a); see Aland v. Martin, 271 S.W.3d 424, 430 (Tex. App. – Dallas 2008).

Defendants argue that Intervenors have failed to state the third element of the cause of action (intent).  ( D.E. 100, p. 4-5.)  Defendants argue that to state a claim under this third element, a plaintiff must plead facts "establishing that the defendant intended to cause harm *to the plaintiff*," and it is insufficient to allege only that a defendant intended to file a fraudulent document.  ( D.E. 100, p. 4.)  At most, Defendants argue, Intervenors have alleged that a CMH sales person intended to file forged documents.  The ultimate purpose of the filing was not to harm Intervenors, but rather to defraud investors.  Defendants contend that this is insufficient to

state a fraudulent lien claim under Section 12.002. ( D.E. 100, p. 4-5.)  Intervenors contend that they have in fact sufficiently alleged the intent element of the cause of action.  ( D.E. 100, p. 5.)

In enacting Section 12.002, "the Legislature intended to provide a civil action for injunctive relief and monetary damages to all persons owning an interest in real or personal property against which a fraudulent lien is filed."  Centurion Planning Corp., Inc. v. Seabrook Venture II, 176 S.W.3d 498, 506 (Tex. App. – Houston 2004).  Consistent with this purpose, Section 12.002(a)(3) requires "intent" to cause "another person" to suffer, inter alia, "financial injury" or "mental anguish or emotional distress."   Tex. Civ. Prac. & Rem. Code § 12.002(a)(3). The person "who owns an interest in the real or personal property" may bring a cause of action under this section.  Tex. Civ. Prac. & Rem. Code § 12.003(a)(8).

In this case, Defendants contend that Intervenors have failed to allege intent because Intervenors claim that the purpose behind Defendants' alleged actions was to harm investors, not Intervenors themselves.   While this may be an accurate characterization of the Intervention Complaint, this confuses Defendants' alleged *motive* with their *intent*.   The term "intent" generally means that "the actor desires to cause the consequences of his act or that he believes the consequences are substantially certain to result from his act."  Gavrel v. Lieberman, 2010 WL 1270334, at *2 (Tex. App. – Ft. Worth Apr. 1, 2010) (citing Reed Tool Co. v. Copelin, 689 S.W.2d 404, 406 (Tex. 1985).)   In contrast, "motive" is generally defined as "[s]omething, esp[ecially] willful desire, that leads one to act."  Black's Law Dictionary at 1039 (8th ed. 2004); see, e.g., Behringer v. Behringer, 884 S.W.2d 839, 841-42 (Tex. App. – Ft. Worth 1994) ("Motive and intent are two different things.  Intent, in its legal sense, is quite distinct from motive. It is defined as the purpose to use a particular means to effect a certain result. Motive is the reason which leads the mind to desire that result.") (citing James Stewart & Co. v. Law, 149

Tex. 392, 233 (1950)).  In the context of Section 12.002(a)(3), Texas courts have interpreted the "intent" element to require only that the person filing the fraudulent lien be aware of the harmful effect that filing such a lien could have on a landowner.  Taylor Elec. Services, Inc. v. Armstrong Elec. Supply Co., 167 S.W.3d 522, 531-32 (Tex. App. – Ft. Worth 2005).  In Taylor, the court found the requisite intent based partially on a letter written by the defendant to the plaintiff "that on one hand threaten[ed] the filing of the liens yet state[d], '[w]e do not wish you any harm in your business.'"  167 S.W.3d at 531.  Because this letter demonstrated that the defendant was aware of the potential harm that filing a lien could inflict on the plaintiff's property, this supported the intent requirement.  Id. at 531-32.

As applied here, Defendants' purpose for acting may have ultimately been to defraud investors (motive), but the allegations sufficiently establish that Defendants were aware that financial injury to the landowner was a natural consequence of their actions (intent).  In other words, while Intervenors allege that the "ultimate purpose behind creating and filing these fraudulent and forged documents was to defraud investors," ( D.E. 100, p. 5),  Intervenors allege that Defendants' employees acted with intent to place a cloud on their title to land.  Specifically, Intervenors allege that CMH employees "knowingly forged" the Trevinos signatures to a Mechanic's Lien and Deed for Trust for their real property and "fraudulently notarize[d] the forged signatures on these documents."   After this forgery, Intervenors allege that CMH employees secretly filed these documents with the county clerk.  (D.E. 98, p. 2.)  As industry professionals, the employees at the very least understood that the Intervenors were likely to incur financial injury (and perhaps mental anguish or emotional distress) as a result of their actions, even if their ultimate purpose was to cause harm to investors.  This conclusion is supported by Defendants' actions, namely filing the fraudulent liens in secret, then subsequently releasing the

fraudulent liens in 2005.  (D.E. 98, p. 7.)  The secretive nature of Defendants' alleged actions supports the inference that they knew the negative impact those actions would have upon the landowner.

In sum, while the alleged purpose or motive behind Defendants' actions may have been to defraud investors, Defendants clearly had the requisite intent to at the very least cause financial injury to the Intervenors, as such injury is a natural consequence of secretly filing a fraudulent lien.  For these reasons, Defendants' Motion to Dismiss Intervenors' fraudulent documents related to land claim under Section 12.002(a) of the Texas Civil Practice and Remedies Code is denied.[3]

### 2.    Common Law Fraud Claims

#### a.    Common Law Fraud

To establish common law fraud under Texas law, a plaintiff "bears the burden to prove the existence of the following: '[1] a material misrepresentation, [2] which was false, and [3] which was either known to be false when made or was asserted without knowledge of the truth, [4] which was intended to be acted upon, [5] which was relied upon, and [6] which caused injury.'" Johnson & Johnson Med., Inc. v. Sanchez, 924 S.W.2d 925, 929-30 (Tex. 1996); see also GeoSurveys, Inc. v. State Nat'l Bank, 143 S.W.3d 220, 226 (Tex. App. Eastland 2004).

Defendants argue broadly that Intervenors fail to state a claim for "any type of fraud."  ( D.E. 100, p. 5.)  They claim that the following allegations Intervenors rely upon to support their fraud claim are insufficient: (1) alleged securities fraud and misrepresentations to investors (2) filing of allegedly fraudulent liens, (3) alleged release of Flores and King's obligation to

---

[3] Defendants also argue that Intervenors lack standing to maintain such a claim on behalf of investors.  (D.E. 100, p. 5.)  Intervenors support their claim by their own injury, not those of investors.  The Intervenors are owners of the property that was the subject of the allegedly fraudulent liens.

Vanderbilt, and (4) the interest rate to which Flores and King agreed in their Contract.  ( D.E. 100, p. 5.)  The Court considers each separately.

### i.      Securities Fraud

Defendants argue that Intervenors' common law fraud claim based upon securities fraud fails for two primary reasons.  ( D.E. 100, p. 6)  First, Intervenors lack standing, as the fraud allegations relate to misrepresentations made to investor-purchasers of securitized interests in pooled contracts or loans, not to Intervenors themselves.   Second, Intervenors have failed to allege that any misrepresentation in connection with a securities transaction was made to them, that they relied upon any such misrepresentation, and that generalized allegations of intent to defraud investors and the public does not meet the Twombly pleading standard.  ( D.E. 100, p. 6-7.)  Intervenors do not specifically respond to Defendants' argument on this ground.

It is well established under Blue Chip Stamps v. Manor Drug Stores that "only purchasers and sellers of securities have standing to assert a claim of securities fraud under Section 10(b) [of the Securities Exchange Act of 1934]."  Powers v. British Vita, P.L.C., 57 F.3d 176, 187 (2d Cir. 1995) (citing Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 731-32 (1975)); see also Klein v. Autek Corp., 2004 WL 3635650, at *4 (D.N.J. June 30, 2004) ("Only those plaintiffs who actually purchased or sold securities have standing to bring a securities fraud claim under Section 10(b).").  However, because Intervenors bring a common law fraud claim rather than a claim under Section 10(b), the standing limitations of the Securities Exchange Act do not apply by their own terms.  Arnlund v. Deloitte & Touche LLP, 199 F. Supp. 2d 461, 486 (E.D. Va. 2003) ("Because common law fraud is not governed by the 1934 Act, its 'purchasers or sellers' requirement does not foreclose standing.").   Nevertheless, without being investors in the allegedly fraudulent securities, Intervenors cannot allege that they were directly injured by any

alleged securities fraud, a required element of standing.  Rather, any injury would be incurred by investors.

To meet the standing requirements of Article III, "[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief. . . .  [The Court] ha[s] consistently stressed that a plaintiff's complaint must establish that he has a 'personal stake' in the alleged dispute, and that the alleged injury suffered is particularized as to him."  Raines v. Byrd, 521 U.S. 811, 818-19 (1997); see also Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 n.1 (1992) ("By particularized, we mean that the injury must affect the plaintiff in a personal and individual way.").  Intervenors simply cannot meet the standing test when they allege securities fraud or other harms visited upon investors or financial institutions, rather than themselves.  Such allegations cannot form the basis of any cause of action.  The Court concludes that Intervenors lack standing to assert a fraud cause of action based upon securities fraud.  All common law fraud claims based upon securities fraud are dismissed.

### ii.    Fraudulent Liens

Defendants argue that Intervenors' allegations regarding the filing of fraudulent liens cannot form the basis of a common law fraud claim, because (1) the alleged misrepresentation was not made directly to Intervenors; and (2) Intervenors do not allege that Defendants intended that they would learn of the misrepresentation and act in reliance upon that misrepresentation. Intervenors in fact allege that the liens were filed without their knowledge, and thus cannot demonstrate that they relied upon the documents containing the purported misrepresentations. ( D.E. 100, p. 7.)  Thus, Defendants argue, if the lien documents were "forged and filed without

Intervenors' knowledge or consent, then Intervenors have failed to allege facts showing that they relied on documents containing purported misrepresentations." ( D.E. 100 at 7.)

Under Texas law, "[o]ne who makes a fraudulent misrepresentation may be liable to a third person, to whom the misrepresentation was not directly made, if the person making the misrepresentation had intent or knowledge that it should be exhibited or repeated to a third person and intended or had reason to expect the third person would act or refrain from acting in reliance upon the misrepresentation.  In other words, a misrepresentation does not have to be made directly to the particular person seeking relief.   It is sufficient to show that the misrepresentation was intended or expected to reach the third person and was made with the intent or expectation the third person would rely on it."  Burroughs v. APS Int'l, Ltd., 93 S.W.3d 155, 162 (Tex. App. – Houston [14th Dist.] 2002) (internal citations omitted).   The Texas Supreme Court has explained, "[o]ur fraud jurisprudence has traditionally focused not on whether a misrepresentation is directly transmitted to a known person alleged to be in privity with the fraudfeasor, but on whether the misrepresentation was intended to reach a third person and induce reliance."  Ernst & Young, L.L.P. v. Pacific Mut. Life Ins. Co., 51 S.W.3d 573, 578 (Tex. 2001).

Under this rule, even though Defendants did not expressly make misrepresentations to Intervenors regarding the fraudulent liens, Defendants may still be liable if they had "intent or knowledge" that the fraudulent documents "should be exhibited or repeated" to Intervenors and "intended or had reason to expect the third person would act or refrain from acting in reliance upon the misrepresentation."  93 S.W.3d at 162.  As the Court stated in its discussion of "intent" above, "intent" requires only that the actor "desires to cause the consequences of his act or that

he believes the consequences are substantially certain to result from his act."  <u>Gavrel</u>, 2010 WL 1270334, at *2.  Intervenors have satisfied this requirement here.

Intervenors have alleged that the fraudulent liens and deeds of trust were filed with the County Clerk, as part of the public record.   One of the main functions behind filing liens with the County Clerk is to establish an accurate record of clouds on title so that landowners, purchasers, or other members of the public can determine the value and any legal encumbrances on property.  <u>See, e.g.,</u> Texas Jurisprudence (3d ed.), Records and Recording Laws § 19 (May 2010) ("The primary purpose of the recording laws and of the recording of instruments pursuant thereto is to give notice of the contents of the recorded writings.  The object of these laws is to place within the reach of those dealing with land information with respect to the title thereto, and thus to protect those persons from fraud and imposition.  The recording laws notify subsequent purchasers of the rights that the recorded instruments are intended to convey, not to give protection to perpetrators of fraud.").   Based upon the allegations, Defendants would certainly intend that the fraudulent liens would be exhibited to the Intervenors, the owners of the property on which the liens were placed, during a title search.  <u>See</u> Texas Local Gov't Code § 191.006 ("All records belonging to the office of the county clerk to which access is not otherwise restricted by law or by court order shall be open to the public at all reasonable times.  A member of the public may make a copy of any of the records.").   It is also apparent that, under Intervenors' allegations, Defendants intended that the landowners, the mobile home purchasers (and anyone else) would rely upon the representation to the County Clerk and would not challenge the liens should they be discovered during a title search, as such a challenge would undermine the alleged scheme.  These allegations are sufficient at the pleading stage.  Thus, Intervenors' common law fraud claims based upon alleged fraudulent liens may proceed.

### iii.    Release of Obligation

Defendants argue that Intervenors have failed to state a common law fraud claim with respect to the alleged release of Intervenors' obligation to Vanderbilt.  They claim that Intervenors' theory as to the function of the "paid in full" language in the Mechanic's Lien Release is "merely a conclusion regarding the disputed legal effect of the release documents and cannot support a common law fraud claim."   The representation as to the legal effect of a document is regarded as a statement of opinion, not fact, and thus will not support an action for fraud, Defendants argue.  ( D.E. 100 at 7-8.)

In response, Intervenors assert that an opinion can rise to a level of fraud if a party having superior knowledge, such as Defendants, takes advantage of another's ignorance of the law to deceive him by misrepresentation.  Moreover, the alleged fraud here was not the "opinion" as to the legal effect of the releases, but rather the "fraudulent activity by Defendants in continuing to enforce loans Defendants knew had been released and in knowingly failing to disclose to Intervenors that the debts had been released as "paid in full."  By continuing to enforce the debt against Intervenors, they argue that Defendants had a duty to inform Intervenors that the debt had already been released, and a failure to do so is fraud.  ( D.E. 107 at 9-12.)

Defendants' arguments must be rejected.  The characterization of the "paid in full" language in the release as a "legal conclusion" is tenuous at best.  The Court understands Intervenors' fraud allegations with respect to "paid in full" as twofold: (1) the releases were filed in secret and the landowner was never informed, and (2) Defendants continued to collect on the debt despite the release.  (D.E. 98 at 7-8.)  Defendants may, and in fact do, contend that Intervenors have simply misunderstood the meaning of "paid in full," but whether in fact Defendants intended "paid in full" to relate only to the landowner and not the homeowner is a

question of fact.  Intervenors have alleged that Defendants intended the language "paid in full" to extinguish all obligations in order to limit liability, but nevertheless continued to collect on the debt.  These facts, taken as true, establish a claim for common law fraud.[4]

In sum, the Court dismisses Intervenors' claims of common law fraud based upon securities fraud, but retains the common law fraud claims based upon the filing of allegedly fraudulent liens and upon the alleged release of the Counter-Plaintiffs' obligation to Vanderbilt.

### 3.      Fraud by Non-Disclosure

Defendants contend that Intervenors fail to state a claim for fraud by non-disclosure with respect to their allegations as to the Defendants' misrepresentation of Flores' and King's approved interest rates.  First, they state that Intervenors have not pled facts sufficient to demonstrate that Defendants have a duty to disclose information. ( D.E. 100, p. 8-9.)  Generally, no duty to disclose exists absent a confidential or fiduciary relationship, which is necessary when claiming non-disclosure in a business relationship.  Second, Defendants contend that Intervenors cannot transform a claim under the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601 et seq. into a claim for fraud by non-disclosure under Texas law, since RESPA does not impose a duty to disclose any alleged scheme to induce, through YSPs, mortgage brokers to sell above-par loans for the purposes of state law claims premised on non-disclosure.

---

[4] Even if the "paid in full" language were fairly characterized as a legal conclusion, there are well established exceptions to the "general rule that misrepresentations involving a point of law or the legal effect of a document will not support an action for fraud."  Fina Supply, Inc. v. Abilene Nat'l Bank, 726 S.W.2d 537, 540 (Tex. 1987).  As Intervenors have recognized, "[a] party having superior knowledge, who takes advantage of another's ignorance of the law to deceive him by studied concealment or misrepresentation, can be held responsible for this conduct."  Id. Texas courts have applied this exception in cases involving interactions between real estate professionals and laypeople.  For instance, in Rader v. Danny Darby Real Estate, Inc., the court found that a real estate agents' comments to buyers as to financing were actionable as fraud, stating "[i]n advising the [buyers], [the real estate agent] clearly was in a position of superior knowledge on [the financing of the house] and accordingly any misrepresentations may be actionable."  2001 WL 1029355, at *6 (Tex. App. – Dallas Sep. 10, 2001).  Here, Intervenors have sufficiently alleged the necessary elements to support this exception.  Defendants certainly have "superior knowledge" as to the effect of any "paid in full" releases, and Intervenors have alleged that Defendants have taken advantage of Intervenors' lack of legal knowledge in this area, and concealed the true meaning or effect of the release.

Moreover, even if some duty did exist, Defendants argue that a RESPA claim would be barred by a one year limitations period.   ( D.E. 100 at 9-10.)  This Court first addresses the RESPA claim.

The Intervenors allege that "the Defendants fraudulently represented that Cesar Flores and Alvin E. King had been approved by VMF [Vanderbilt] for an interest rate that was actually higher than the rate for which they were actually approved, and actively concealed from that that the interest rate included a YSP in violation of applicable RESPA regulations, with intent [to induce Flores and King] into financing the purchase through VMF at a higher interest rate, rather than seeking financing through a third-party lender [.]" (D.E. 98, p. 23.)   As both parties acknowledge, there is a one year limitations period for RESPA claims brought under 12 U.S.C. § 2607, running from the "date of the occurrence of the violation."  12 U.S.C. § 2614.  Here, the alleged misrepresentation upon which Intervenors' action is based occurred on January 5, 2001 ( D.E. 100 at 2), and thus the action should have been brought no later than January 5, 2002.  The Intervenors do not include the date on which they claim to have discovered the alleged concealment.  Nor do they specifically allege in their response to Defendants' Motion to dismiss that equitable tolling should apply given concealment of the fraud.   In any case, such an argument would fail.

As an initial matter, several Circuits have held that the statute of limitations in 12 U.S.C. § 2614 is jurisdictional, and not subject to equitable tolling.  Hardin v. City Title & Escrow Co., 797 F.2d 1037, 1041 (D.C. Cir. 1986) ("Section 2614 provides no grounds for tolling its time limitation, nor does the Act's legislative history suggest any.  Moreover . . . where . . . a time limitation is jurisdictional, the doctrine of equitable tolling does not apply."); Zaremski v. Keystone Title Assoc., Inc., 884 F.2d 1391, 1989 WL 100656, at *1 (4th Cir. 1989) (applying

Hardin); but see Lawyers Title Ins. Corp. v. Dearborn Title Corp., 118 F.3d 1157, 1166-67 (7th Cir. 1997) (declining to follow Hardin).  The Fifth Circuit has not yet ruled on this issue.  Snow v. First Am. Title Ins. Co., 332 F.3d 356, 361 n.7 (5th Cir. 2003) ("We therefore express no opinion on[] the question whether Section 2614 is subject to equitable tolling.").

Regardless of whether equitable tolling is applicable to the RESPA statute of limitations, the Intervenors have not set forth facts demonstrating that equitable tolling is applicable.  It is well established in this Circuit that "[e]quitable tolling applies principally where the plaintiff is actively misled by the defendant about the cause of action or is prevented in some extraordinary way from asserting his rights."  Rashidi v. Am. President Lines, 93 F.3d 127, 128 (5th Cir. 1998).  Equitable tolling applies only in "rare and exceptional circumstances."  Davis v. Johnson, 158 F.3d 806, 811 (5th Cir. 1998).  The Intervenors have alleged nothing to suggest that equitable tolling should apply to the RESPA claim.   The Intervenors fail to state when they actually discovered their RESPA claim.  Such information would be critical to calculating the period of limitations, even if equitable tolling were applicable.  Thus, the Court will not apply equitable tolling, even if it is applicable under RESPA.  The Intervenors' claims based upon RESPA violations (D.E. 98, p. 23) are therefore dismissed as time-barred under the applicable one year limitations period.  12 U.S.C. § 2614.

To the extent Intervenors seek to allege a common law fraud by non-disclosure claim based on alleged misrepresentations of interest rates to Flores and King, this claim also fails. "Courts in Texas have consistently held that fraud by nondisclosure or concealment requires proof of all of the elements of fraud by affirmative misrepresentation, including fraudulent intent, with the exception that the misrepresentation element can be proven by the nondisclosure or concealment of a material fact in light of a duty to disclose."  United Teacher Assocs. Ins. Co.

v. Union Labor Life Ins. Co., 414 F.3d 558, 567 (5th Cir. 2005).  "As a general rule, a failure to disclose information does not constitute fraud unless there is a duty to disclose the information." Bradford v. Vento, 48 S.W.3d 749, 755 (Tex. 2001).  Under Texas law, "no general duty of disclosure arises between parties contemplating a contract.  Generally a duty to disclose arises only where there is a fiduciary or confidential relationship between the parties."  Texas Technical Institute, Inc. v. Silicon Valley, Inc., 2006 WL 237027, at *6 (S.D. Tex. Jan. 31, 2006) (internal citations omitted).   "There are two types of fiduciary relationships.  The first is a formal fiduciary relationship which arises as a matter of law, typified by such relationships as a partnership, attorney-client, and principal-agent.   The second is an informal fiduciary relationship which may arise from a moral, social, domestic or purely personal relationship of trust and confidence, generally called a confidential relationship.  To impose an informal fiduciary duty in a business transaction, the special relationship of trust and confidence must exist prior to, and apart from, the agreement made the basis of the suit."  Id. (internal citations omitted).  Intervenors do not allege the existence of any fiduciary or confidential relationship between the parties that would give rise to a duty to disclose; rather, the parties were at arm's length.  As such, Intervenors may not bring a common law fraud by non-disclosure claim.  These claims are dismissed.

### 3.   Civil Conspiracy

The elements for civil conspiracy are: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as a proximate result."  Chon Tri v. J.T.T., 162 S.W.3d 552, 556 (Tex. 2005).  Defendants argue that Intervenors have failed to show the third and fourth elements of civil conspiracy, a meeting of the minds and the unlawful acts, or torts, underlying

the conspiracy.  ( D.E. 100 at 10-11.)  Intervenors respond that the necessary elements have been established as "without a meeting of the minds, all of the numerous players in this scheme would not have been able to successfully carry out their fraudulent transactions."  ( D.E. 107 at 13-14.) After reviewing the Amended Intervention Complaint, this Court finds that Intervenors have alleged every element of civil conspiracy.

Intervenors' Second Amended Complaint, as detailed above, goes into great length about how multiple corporations and parties knowingly worked "in unison" to profit from manufactured home sales transactions involving fraudulent liens.  (D.E. 98 at, e.g., 2, 9, 31-32.) These allegations satisfy the first four elements of civil conspiracy: that there was an agreement by more than one person or entity to accomplish an objective (profit), with a meeting of the minds (knowingly worked in unison), and with one conspirator engaging in one or more unlawful acts (fraudulently filing liens).  Thus, Defendants are incorrect that Intervenors failed to allege a meeting of the minds or the underlying tort of the conspiracy.  Intervenors' allegations that Defendants knowingly acted in unison sufficiently pleads that there was a "meeting of the minds" to participate in a fraudulent scheme of selling manufactured homes to make a profit. See Pasley v. Pasley, 2005 Tex. App. LEXIS 6680, *12 (Tex. App. Amarillo Aug. 18, 2005) (finding that defendant "knowingly participating" in scheme sufficient to find "meeting of the minds"); also see Pairett v. Gutierrez, 969 S.W.2d 512, 516 (Tex. App. Austin 1998).

The Amended Intervention Complaint also clearly indicates that the underlying tort of the conspiracy is fraud.  Intervenors' Amended Complaint alleges fraud by specifying several overt acts furthering the conspiracy, including the forging of the Tervinos' names on the lien documents, secretly releasing the lien as "paid in full," and continuing to accept payments under the allegedly released contract.  (D.E. 98 at 27-28.)  Intervenors also allege the final element of

civil conspiracy, damages, by pleading that Defendants "caus[ed] Intervenors to suffer physical injury, financial injury, mental anguish, and emotional distress[]" by executing and filing the documents creating a lien on their property.  (D.E. 98 at 28.)[5]  Thus, Intervenors' Amended Complaint sufficiently alleges civil conspiracy to defeat Defendants' Motion to Dismiss.

### 4.    Declaratory Relief Claim

In their Amended Intervention Complaint, Intervenors seek a declaratory judgment that "the amounts due on the finance contract between Cesar Flores and Alvin E. King and Defendants have been released in their entirety or otherwise 'paid in full' as indicated by Defendants in their releases filed in the real property records of Jim Wells County, Texas," or alternatively Intervenors "seeks a declaration that the finance contract is not enforceable against [Flores and King] because of release, waiver, estoppel and/or the doctrine of unclean hands." (D.E. 98 at 20.)

Defendants contend that the declaratory relief claim is "both improper and redundant," as Intervenors are seeking declaratory relief on the same cause of action that they have already brought before the Court.  ( D.E. 100 at 11.)  Intervenors respond that they seek a declaratory judgment "concerning the effect of the lien releases filed by Defendants," specifically the effect of the "paid in full" language.  This is a threshold issue, necessary for determination of other issues in the case.  ( D.E. 107 at 14-15.)

The Declaratory Judgment Act provides, "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration,

---

[5] While Defendants argue that Intervenors lack standing to bring a conspiracy claim based upon securities fraud ( D.E. 100 at 11), the Court finds that Intervenors' conspiracy claim is based upon their own injuries, not injuries to investors, and any such allegations are provided for background only.

whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." 28 U.S.C. § 2201(a).

The Court finds that the declaratory judgment request is appropriate in this case. The declaratory relief sought is not duplicative or redundant, but is an important predicate issue in this case. Defendants themselves have implicitly acknowledged this, having recently filed a Petition for Declaratory Relief with the Manufactured Housing Division of the Texas Department of Housing and Community Affairs. (D.E. 98, p. 14-15.) It is certainly reasonable to allow Intervenors to seek declaratory relief on this issue in this Court, given Defendants' activities at the state level.

In addition to their objections to a declaratory judgment based on the "paid in full" language, Defendants also argue that Intervenors have "failed to allege the facts necessary to sustain a declaratory judgment action based on waiver, equitable estoppel, or unclean hands." ( D.E. 100 at 11, n.7.) Intervenors do not specifically respond to this argument.

Considering first waiver, "[t]he affirmative defense of waiver can be asserted against a party who intentionally relinquishes a known right or engages in intentional conduct inconsistent with claiming that right." Tenneco Inc. v. Enterprise Products Co., 925 S.W.2d 640, 643 (Tex. 1996). No allegations suggest that Defendants waived any right; rather the allegations rest on Defendants' decision to continue collecting on the Contract even after the filing of the "paid in full" releases. The waiver defense does not appear applicable.

The Court finds reliance on the doctrine of equitable estoppel equally misplaced, as the doctrine lets "a promisee enforce an otherwise unenforceable contract." Sullivan v. Leor Energy, LLC, 600 F.3d 542, 549 (5th Cir. 2010). As Intervenors seek to have the Contract be deemed

unenforceable, not enforceable (D.E. 98 at 20), the doctrine of equitable estoppel would not appear useful in this case.

Finally, "[u]nder the doctrine of unclean hands, a court may refuse to grant equitable relief to a plaintiff who has been guilty of unlawful or inequitable conduct regarding the issue in dispute. . . . Under Texas law, the doctrine should not be applied unless the party asserting the doctrine has been seriously harmed and the wrong complained of cannot be corrected without the application of the doctrine."   Bollier v. Austin Gurdwara Sahib, Inc., 2010 WL 2698765, at *6 (Tex. App. – Austin 2010).  In this case, Intervenors seek actual and punitive damages.  (D.E. 98 at 33-34.)  As equitable relief is not sought, the doctrine of unclean hands is not applicable. Further, any wrong that Intervenors have incurred may be corrected without application of the doctrine, i.e., through monetary damages.

In sum, Intervenors may seek a declaratory judgment as to the meaning of "paid in full," but not as to waiver, equitable estoppel, or unclean hands.

## IV.    Conclusion

For the reasons stated above, Defendants' Motion to Dismiss Intervenors' claims (D.E. 100) is DENIED IN PART and GRANTED IN PART.

The Court GRANTS Defendants' Motion to Dismiss (D.E. 100) as to the following causes of action: (1) common law fraud based upon securities fraud or fraud by non-disclosure; (2) RESPA (12 U.S.C. §§ 2601 et seq.); and (3) declaratory judgment as to waiver, estoppel, and doctrine of unclean hands (28 U.S.C. § 2201(a)).

The following causes of action remain against Defendants: (1) fraudulent documents related to land (Tex. Civ. Prac. & Rem. Code § 12.002); (2) declaratory judgment as to meaning of "paid in full" (28 U.S.C. § 2201(a)); (3) common law unfair debt collection; (4) Texas Debt

Collection Practices Act (Tex. Fin. Code § 392.001 <u>et seq.</u>); (5) money had and received; (6) fraud (other than fraud based upon securities fraud or fraud by non-disclosure); (7) civil conspiracy; and (8) Intervenors' RICO claims.

SIGNED and ORDERED this 25th day of August, 2010.

Janis Graham Jack
United States District Judge