UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| VANDERBILT MORTGAGE AND | § | |
| FINANCE, INC., | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. C-09-312 |
| | § | |
| CESAR FLORES, *et al*, | § | |
| | § | |
| Defendants. | § | |

## ORDER

On this day came on to be considered Intervention-Defendants Clayton Homes and Kevin T. Clayton's joint Motion to Dismiss the claims of Intervenors Maria and Arturo Trevino pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "Motion to Dismiss"). (D.E. 101.) For the reasons stated herein, Defendants' Motion to Dismiss is GRANTED IN PART and DENIED IN PART.

**I.      Jurisdiction**

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) as Intervenors bring a cause of action under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 ("RICO").

**II.      Background**

**A.      The Parties**

Intervention-Defendants, Clayton Homes, CMH Homes, and Kevin T. Clayton, sell manufactured homes to customers across the United States.  (D.E. 98 at 18-19.)  CMH is the retailer with a network of nearly 400 stores across the country, including the Corpus Christi store involved in this action.  Clayton Homes is the holding company with its principal place of

business in Delaware.  Kevin Clayton is the CEO of Clayton Homes and member of its Board of Directors.  Intervention-Defendant, Vanderbilt Mortgage and Finance, Inc. is the "sister company" to CMH and provides financing to CMH customers. Intervention-Defendant John Wells is an individual residing in Texas.  Intervention-Defendant Benjamin Frazier is an individual residing in Texas.  (D.E. 98 at 18-19.)  Both Wells and Frazier were employees of CMH Homes' Corpus Christi store when the alleged transactions took place.  (D.E. 98 at 5, 17.)

Maria and Arturo Trevino are a married couple residing in Texas who, at the time of the events that are the subject of this action, owned two vacant lots located in Jim Wells County, Texas.  (D.E. 98 at 4, 18-19.)  Defendants and Counter-Plaintiffs Cesar Flores and Alvin E. King are the owners of a mobile home purchased from CMH Homes in Corpus Christi, Texas.  (D.E. 98 at 2.)

### B.       Factual and Procedural Background

On August 4, 2009, Vanderbilt brought suit in state court against Flores and King, seeking to repossess and foreclose a mobile home they purchased from Defendant CMH Homes. (D.E. 1, Exhibit B.)  On September 18, 2009, Flores and King counter-sued, brining various state law causes of action and a federal claim under the R.I.C.O. statute.  (D.E. 1, Ex. B.)  On October 26, 2009, Maria and Arturo Trevino intervened in the state court action, brining identical claims against Vanderbilt and joining additional Third-Party Defendants, Clayton Homes, Inc., CMH Homes, Inc., Kevin T. Clayton, John Wells and Benjamin Joseph Frazier.  (D.E. 11, Exhibit C; D.E. 98.)  The Trevinos allege various causes of action against the Intervention-Defendants under Texas and Federal law.  (D.E. 98.)  Following the Trevinos' intervention, Intervention-Defendant CMH Homes, Inc. removed the entire state court action to this Court based on this Court's federal question jurisdiction under R.I.C.O. and 28 U.S.C. § 1331.  (D.E. 1.)   As alleged

in the Trevinos' Original Intervention Complaint (D.E. 11, Exhibit B), and in their Second Amended Intervention Complaint (D.E. 98), the facts on record are as follows:

On or about January 5, 2002, Counter-Plaintiffs, Cesar Flores and Alvin E. King and Defendants[1] Clayton Homes, Inc. ("Clayton") and CMH Homes, Inc. ("CMH") entered into a manufactured home purchase and financing contract (the "Contract"), for which Vanderbilt Mortgage and Finance ("Vanderbilt") provided the financing. (D.E. 98, p. 2.) On January 7, 2002, two days after the closing, CMH, Clayton Homes and Vanderbilt filed a Deed of Trust and a Builder's & Mechanic's Lien Contract containing the signatures of Maria and Arturo Trevino and purporting to create liens on real property owned by the Trevinos in order to secure the Flores and King's mobile home purchase. (D.E. 98, p. 2.) The documents also contained the signature of Benjamin Frazier, who was a notary public and a former employee of CMH Homes. (D.E. 98, p. 2.) Allegedly, all of these signatures were forged. According to the Intervenors, Christopher Lance Kimball, the CMH sales associate responsible for the sale of the mobile home to Flores and King, "knowingly forged" Maria Trevino and Arturo Trevino's names on the lien documents and then proceeded to notarize the forged signatures "by impersonating [and forging the signature of] a notary public of the State of Texas [i.e. Frazier.]" (D.E. 98, p. 5.) Kimball allegedly used Frazier's notary stamp when notarizing the documents. (D.E. 98, p. 5.) The Intervenors contend that they never executed any of these documents and never intended their property to be encumbered to secure the mobile home purchase of someone else. (D.E. 98, p. 4-6.) The Intervenors contend that the purpose of forging documents creating liens on their property was to create the appearance that the Contract was secured by real property, and thus

---

[1] **The "Defendants" referred to in this Order are the Intervention-Defendants: Clayton Homes and Kevin T. Clayton.**

making the Contract easier to package into securities and sell on the secondary market.  (D.E. 98, p. 4.)

In addition, the Intervenors allege that Lance Kimball falsely represented to Flores and King that they had been approved for a financing interest rate of 10.99%, when in fact the interest rate was around 4% higher.  (D.E. 98, p. 3-4.)  The increase in the rate allegedly represented a Yield Spread Premium ("YSP"), which Intervenors state is an additional portion added to the finance rate that serves as a commission or kickback for CMH, Clayton, and its sales personnel.  (D.E. 98, p. 4.)  This YSP was allegedly not disclosed to Flores and King. (D.E. 98, p. 3.)  Intervenors state that this enterprise worked because Vanderbilt was not an independent mortgage finance company, but rather worked in unison with the other Defendants. Intervenors state that the loan documents were sent from Texas to Tennessee and processed by CMH.  (D.E. 98, p. 4.)

After previous litigation from 2003 to 2005, Defendants discovered the fraud outlined above and allegedly attempted to conceal the fraud by filing releases of the Deeds of Trust and Mechanic's Liens in the real property records of various counties.  Such releases were filed in relation to the Trevino's real property.  (D.E. 98, p. 7.) The releases were signed by VMF and filed with the Jim Wells County Clerk on October 14, 2005.  (D.E. 98, p. 7.)  The Mechanic's Lien release indicated that the Contract had been "paid in full" and the Deed of Trust Release "expressly released the mortgage[.]"  (D.E. 98, p. 7.)  As such, the Intervenors state that Vanderbilt released and extinguished Counter-Plaintiffs' Flores' and King's mortgage obligation on their mobile home.  (D.E. 98, p. 7-8.)

Defendants allegedly failed to disclose that these releases were filed with the County Clerk, and continued to fraudulently enforce the loans and collect payments from Counter-

Plaintiff Flores and King, even though the mortgage obligation had been paid in full, as represented in the releases. (D.E. 98, p. 8.) Defendants allegedly filed the releases in secret and instructed the County Clerk to return the documents to Defendants' Tennessee offices rather than the purchaser or landowner. The end result, according to the Intervenors, was that the landowner and purchaser were entirely unaware that their obligations had been released. (D.E. 98, p. 8.) The Intervenors contend that after filing the secret releases, Defendants continued to collect payments for a debt that was no longer due, including payments from Counter-Plaintiffs Flores and King. (D.E. 98, p. 8.)

The Intervenors allege that the ultimate purpose behind creating and filing the fraudulent documents was to defraud investors. Vanderbilt allegedly issued false prospectus statements to potential investors, and to attract more investors Defendants represented that many of the contracts at issue were backed by secured interests in land that were fraudulently obtained. (D.E. 98, p. 12.) Intervenors claim that some of these loans were sold to the Federal National Mortgage Association, or Fannie Mae, without any disclosure of the fraud described above. (DE. 98, p. 14.) Intervenors state that Berkshire Hathaway, the parent company of Defendants, owned a percentage of Fannie Mae when it purchased the fraudulent loans. Intervenors argue that Berkshire Hathaway, as the parent company, knew or should have known that Fannie Mae paid hundreds of millions of dollars for nearly worthless interests. (D.E. 98, p. 12.)

On April 19, 2010, Defendants filed a petition with the Texas Department of Housing and Community Affairs that, according to Intervenors, contained false statements in order to obtain certain guidance from the agency as to the meaning of the "paid in full" terminology in the releases. Specifically, the petition states that several landowners entered into agreements with the Defendants for the lien and deed of trust contract, when in fact their signatures were forged.

As a related matter, the petition allegedly falsely states that the purchaser's manufactured homes were perfected as personal property when in fact Defendants already represented to investors that these transactions created a present interest in real property through the Deeds of Trust, which were not to secure an interest just in the manufactured homes, but were for the purpose of securing an interest in the real estate referenced in the deed of trust and mechanic's lien.  (D.E. 98, p. 14-15.)

The Intervenors allege that Defendants performed the above actions while acting as a single enterprise.  Moreover, many of the alleged actions were performed by employees at Clayton's Corpus Christi store.  John Wells, manager of the store and a business partner of the Defendants, was allegedly aware of and assisted in the fraud that occurred at his store.  (D.E. 98, p. 16.)

Based on the foregoing allegations, Intervenors state the following causes of action: (1) fraudulent documents related to land, pursuant to Texas Civil Practice and Remedies Code § 12.002; (2) declaratory judgment that amounts due under the Contract with Flores and King has been released or "paid in full," or that the Contract is not enforceable; (3) common law unfair debt collection; (4) Texas Debt Collection Practices Act; (5) money had and received; (6) fraud, including fraud of investors, (7) civil conspiracy, and (8) the Racketeer Influenced and Corrupt Organizations Act ("R.I.C.O.").  (D.E. 98, p. 19-33.)

Defendants Clayton Homes and Kevin T. Clayton filed their joint Motion to Dismiss on June 3, 2010.  (D.E. 101.)  The Intervenors filed their Response on June 24, 2010.  (D.E. 106). Defendants filed their Reply on July 7, 2010.  (D.E. 118.)

### III.    Discussion

####     A.    Rule 12(b)(6) Standard

To survive a Rule 12(b)(6) motion to dismiss, the Intervenors' Intervention Complaint need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "'[D]etailed factual allegations' are not required." Ashcroft v. Iqbal, __ U.S. __, 129 S.Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

However, the complaint must allege "sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" Id. at 1949 (quoting Twombly, 550 U.S. at 570). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 1949 (citing Twombly, 550 U.S. at 556). A court should not accept "threadbare recitals of a cause of action's elements, supported by mere conclusory statements," which "do not permit the court to infer more than the mere possibility of misconduct." Id. at 1949-50.

####     B.    Analysis

Defendants raise their Rule 12(b)(6) argument with respect to several different causes of action. Defendants seek dismissal due to failure to state a claim with respect to Intervenors' claims for (1) fraudulent documents related to land, (2) common law fraud, (3) fraud by non-disclosure, (4) R.I.C.O., (5) civil conspiracy, and (6) declaratory judgment relief. The Court addresses each argument in turn.

####     1.    Fraudulent Documents Related to Land

Section 12.002(a) of the Texas Civil Practice and Remedies Code establishes the requirements for a fraudulent lien cause of action. The Section provides:

A person may not make, present, or use a document or other record with:

> (1)   knowledge that the document or other record is a fraudulent court record or a fraudulent lien or claim against real or personal property or an interest in real or personal property;

> (2)   intent that the document or other record be given the same legal effect as a court record or document of a court created by or established under the constitution or laws of this state or the United States or another entity listed in Section 37.01, Penal Code, evidencing a valid lien or claim against real or personal property or an interest in real or personal property; and

> (3)   intent to cause another person to suffer:
> (A)   physical injury;
> (B)   financial injury; or
> (C)   mental anguish or emotional distress.

Tex. Civ. Prac. & Rem. Code § 12.002(a); see Aland v. Martin, 271 S.W.3d 424, 430 (Tex. App. – Dallas 2008).

Defendants argue that Intervenors have failed to state the third element of the cause of action (intent).  (D.E. 101, p. 4-5.)  Defendants argue that to state a claim under this third element, a plaintiff must plead facts "establishing that the defendant intended to cause harm *to the plaintiff*," and it is insufficient to allege only that a defendant intended to file a fraudulent document.  (D.E. 101, p. 4.)  At most, Defendants argue, Intervenors have alleged that a CMH sales person intended to file forged documents.  The ultimate purpose of the filing was not to harm Intervenors, but rather to defraud investors.  Defendants contend that this is insufficient to state a fraudulent lien claim under Section 12.002. (D.E. 101, p. 4-5.)  Intervenors contend that they have in fact sufficiently alleged the intent element of the cause of action.  (D.E. 101, p. 5.)

In enacting Section 12.002, "the Legislature intended to provide a civil action for injunctive relief and monetary damages to all persons owning an interest in real or personal property against which a fraudulent lien is filed."  Centurion Planning Corp., Inc. v. Seabrook

Venture II, 176 S.W.3d 498, 506 (Tex. App. – Houston 2004).   Consistent with this purpose, Section 12.002(a)(3) requires "intent" to cause "another person" to suffer, inter alia, "financial injury" or "mental anguish or emotional distress."   Tex. Civ. Prac. & Rem. Code § 12.002(a)(3). The person "who owns an interest in the real or personal property" may bring a cause of action under this section.  Tex. Civ. Prac. & Rem. Code § 12.003(a)(8).

In this case, Defendants contend that Intervenors have failed to allege intent because Intervenors claim that the purpose behind Defendants' alleged actions was to harm investors, not Intervenors themselves.   While this may be an accurate characterization of the Intervention Complaint, this confuses Defendants' alleged *motive* with their *intent*.   The term "intent" generally means that "the actor desires to cause the consequences of his act or that he believes the consequences are substantially certain to result from his act."   Gavrel v. Lieberman, 2010 WL 1270334, at *2 (Tex. App. – Ft. Worth Apr. 1, 2010) (citing Reed Tool Co. v. Copelin, 689 S.W.2d 404, 406 (Tex. 1985).)   In contrast, "motive" is generally defined as "[s]omething, esp[ecially] willful desire, that leads one to act."  Black's Law Dictionary at 1039 (8th ed. 2004); see, e.g., Behringer v. Behringer, 884 S.W.2d 839, 841-42 (Tex. App. – Ft. Worth 1994) ("Motive and intent are two different things.   Intent, in its legal sense, is quite distinct from motive. It is defined as the purpose to use a particular means to effect a certain result. Motive is the reason which leads the mind to desire that result.") (citing James Stewart & Co. v. Law, 149 Tex. 392, 233 (1950)).  In the context of Section 12.002(a)(3), Texas courts have interpreted the "intent" element to require only that the person filing the fraudulent lien be aware of the harmful effect that filing such a lien could have on a landowner.  Taylor Elec. Services, Inc. v. Armstrong Elec. Supply Co., 167 S.W.3d 522, 531-32 (Tex. App. – Ft. Worth 2005).  In Taylor, the court found the requisite intent based partially on a letter written by the defendant to the plaintiff "that

on one hand threaten[ed] the filing of the liens yet state[d], '[w]e do not wish you any harm in your business.'"   167 S.W.3d at 531.   Because this letter demonstrated that the defendant was aware of the potential harm that filing a lien could inflict on the plaintiff's property, this supported the intent requirement.   Id. at 531-32.

As applied here, Defendants' purpose for acting may have ultimately been to defraud investors (motive), but the allegations sufficiently establish that Defendants were aware that financial injury to the landowner was a natural consequence of their actions (intent).   In other words, while Intervenors allege that the "ultimate purpose behind creating and filing these fraudulent and forged documents was to defraud investors," (D.E. 101, p. 5),   Intervenors allege that Defendants' employees acted with intent to place a cloud on their title to land.   Specifically, Intervenors allege that CMH employees "knowingly forged" the Trevinos signatures to a Mechanic's Lien and Deed for Trust for their real property and "fraudulently notarize[d] the forged signatures on these documents."   After this forgery, Intervenors allege that CMH employees secretly filed these documents with the county clerk.   (D.E. 98, p. 2.)   As industry professionals, the employees at the very least understood that the Intervenors were likely to incur financial injury (and perhaps mental anguish or emotional distress) as a result of their actions, even if their ultimate purpose was to cause harm to investors.   This conclusion is supported by Defendants' actions, namely filing the fraudulent liens in secret, then subsequently releasing the fraudulent liens in 2005.   (D.E. 98, p. 7.)   The secretive nature of Defendants' alleged actions supports the inference that they knew the negative impact those actions would have upon the landowner.

In sum, while the alleged purpose or motive behind Defendants' actions may have been to defraud investors, Defendants clearly had the requisite intent to at the very least cause

financial injury to the Intervenors, as such injury is a natural consequence of secretly filing a fraudulent lien.   For these reasons, Defendants' Motion to Dismiss Intervenors' fraudulent documents related to land claim under Section 12.002(a) of the Texas Civil Practice and Remedies Code is denied.[2]

### 2.    Common Law Fraud Claims

#### a.    Common Law Fraud

To establish common law fraud under Texas law, a plaintiff "bears the burden to prove the existence of the following: '[1] a material misrepresentation, [2] which was false, and [3] which was either known to be false when made or was asserted without knowledge of the truth, [4] which was intended to be acted upon, [5] which was relied upon, and [6] which caused injury.'" Johnson & Johnson Med., Inc. v. Sanchez, 924 S.W.2d 925, 929-30 (Tex. 1996); see also GeoSurveys, Inc. v. State Nat'l Bank, 143 S.W.3d 220, 226 (Tex. App. Eastland 2004).

Defendants argue broadly that Intervenors fail to state a claim for "any type of fraud." (D.E. 101, p. 5.)  They claim that the following allegations Intervenors rely upon to support their fraud claim are insufficient: (1) alleged securities fraud and misrepresentations to investors (2) filing of allegedly fraudulent liens, (3) alleged release of Flores and King's obligation to Vanderbilt, and (4) the interest rate to which Flores and King agreed in their Contract.  (D.E. 101, p. 5.)  The Court considers each separately.

#### i.    Securities Fraud

Defendants argue that Intervenors' common law fraud claim based upon securities fraud fails for two primary reasons.  (D.E. 101, p. 6)  First, Intervenors lack standing, as the fraud allegations relate to misrepresentations made to investor-purchasers of securitized interests in

---

[2] Defendants also argue that Intervenors lack standing to maintain such a claim on behalf of investors.  (D.E. 101, p. 5.)  Intervenors support their claim by their own injury, not those of investors.  The Intervenors are owners of the property that was the subject of the allegedly fraudulent liens.

pooled contracts or loans, not to Intervenors themselves.  Second, Intervenors have failed to allege that any misrepresentation in connection with a securities transaction was made to them, that they relied upon any such misrepresentation, and that generalized allegations of intent to defraud investors and the public does not meet the <u>Twombly</u> pleading standard.  (D.E. 101, p. 6.) Intervenors do not specifically respond to Defendants' argument on this ground.

It is well established under <u>Blue Chip Stamps v. Manor Drug Stores</u> that "only purchasers and sellers of securities have standing to assert a claim of securities fraud under Section 10(b) [of the Securities Exchange Act of 1934]." <u>Powers v. British Vita, P.L.C.,</u> 57 F.3d 176, 187 (2d Cir. 1995) (citing <u>Blue Chip Stamps v. Manor Drug Stores</u>, 421 U.S. 723, 731-32 (1975)); <u>see also</u> <u>Klein v. Autek Corp.</u>, 2004 WL 3635650, at *4 (D.N.J. June 30, 2004) ("Only those plaintiffs who actually purchased or sold securities have standing to bring a securities fraud claim under Section 10(b).").  However, because Intervenors bring a common law fraud claim rather than a claim under Section 10(b), the standing limitations of the Securities Exchange Act do not apply by their own terms.  <u>Arnlund v. Deloitte & Touche LLP</u>, 199 F. Supp. 2d 461, 486 (E.D. Va. 2003) ("Because common law fraud is not governed by the 1934 Act, its 'purchasers or sellers' requirement does not foreclose standing.").  Nevertheless, without being investors in the allegedly fraudulent securities, Intervenors cannot allege that they were directly injured by any alleged securities fraud, a required element of standing.  Rather, any injury would be incurred by investors.

To meet the standing requirements of Article III, "[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief. . . .  [The Court] ha[s] consistently stressed that a plaintiff's complaint must establish that he has a 'personal stake' in the alleged dispute, and that the alleged injury suffered

is particularized as to him." Raines v. Byrd, 521 U.S. 811, 818-19 (1997); see also Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 n.1 (1992) ("By particularized, we mean that the injury must affect the plaintiff in a personal and individual way.").  Intervenors simply cannot meet the standing test when they allege securities fraud or other harms visited upon investors or financial institutions, rather than themselves.  Such allegations cannot form the basis of any cause of action.  The Court concludes that Intervenors lack standing to assert a fraud cause of action based upon securities fraud.  All common law fraud claims based upon securities fraud are dismissed.

### ii.    Fraudulent Liens

Defendants argue that Intervenors' allegations regarding the filing of fraudulent liens cannot form the basis of a common law fraud claim, because (1) the alleged misrepresentation was not made directly to Intervenors; and (2) Intervenors do not allege that Defendants intended that they would learn of the misrepresentation and act in reliance upon that misrepresentation. Intervenors in fact allege that the liens were filed without their knowledge, and thus cannot demonstrate that they relied upon the documents containing the purported misrepresentations. (D.E. 101 at 6-7.)  Thus, Defendants argue, if the lien documents were "forged and filed without Intervenors' knowledge or consent, then Intervenors have failed to allege facts showing that they relied on documents containing purported misrepresentations."  (D.E. 101 at 7.)

Under Texas law, "[o]ne who makes a fraudulent misrepresentation may be liable to a third person, to whom the misrepresentation was not directly made, if the person making the misrepresentation had intent or knowledge that it should be exhibited or repeated to a third person and intended or had reason to expect the third person would act or refrain from acting in reliance upon the misrepresentation.  In other words, a misrepresentation does not have to be

made directly to the particular person seeking relief.   It is sufficient to show that the misrepresentation was intended or expected to reach the third person and was made with the intent or expectation the third person would rely on it."  Burroughs v. APS Int'l, Ltd., 93 S.W.3d 155, 162 (Tex. App. – Houston [14th Dist.] 2002) (internal citations omitted).   The Texas Supreme Court has explained, "[o]ur fraud jurisprudence has traditionally focused not on whether a misrepresentation is directly transmitted to a known person alleged to be in privity with the fraudfeasor, but on whether the misrepresentation was intended to reach a third person and induce reliance."  Ernst & Young, L.L.P. v. Pacific Mut. Life Ins. Co., 51 S.W.3d 573, 578 (Tex. 2001).

Under this rule, even though Defendants did not expressly make misrepresentations to Intervenors regarding the fraudulent liens, Defendants may still be liable if they had "intent or knowledge" that the fraudulent documents "should be exhibited or repeated" to Intervenors and "intended or had reason to expect the third person would act or refrain from acting in reliance upon the misrepresentation."  93 S.W.3d at 162.   As the Court stated in its discussion of "intent" above, "intent" requires only that the actor "desires to cause the consequences of his act or that he believes the consequences are substantially certain to result from his act."  Gavrel, 2010 WL 1270334, at *2.  Intervenors have satisfied this requirement here.

Intervenors have alleged that the fraudulent liens and deeds of trust were filed with the County Clerk, as part of the public record.   One of the main functions behind filing liens with the County Clerk is to establish an accurate record of clouds on title so that landowners, purchasers, or other members of the public can determine the value and any legal encumbrances on property.  See, e.g., Texas Jurisprudence (3d ed.), Records and Recording Laws § 19 (May 2010) ("The primary purpose of the recording laws and of the recording of instruments pursuant

thereto is to give notice of the contents of the recorded writings.  The object of these laws is to place within the reach of those dealing with land information with respect to the title thereto, and thus to protect those persons from fraud and imposition.  The recording laws notify subsequent purchasers of the rights that the recorded instruments are intended to convey, not to give protection to perpetrators of fraud.").  Based upon the allegations, Defendants would certainly intend that the fraudulent liens would be exhibited to the Intervenors, the owners of the property on which the liens were placed, during a title search.  See Texas Local Gov't Code § 191.006 ("All records belonging to the office of the county clerk to which access is not otherwise restricted by law or by court order shall be open to the public at all reasonable times.  A member of the public may make a copy of any of the records.").  It is also apparent that, under Intervenors' allegations, Defendants intended that the landowners, the mobile home purchasers (and anyone else) would rely upon the representation to the County Clerk and would not challenge the liens should they be discovered during a title search, as such a challenge would undermine the alleged scheme.  These allegations are sufficient at the pleading stage.  Thus, Intervenors' common law fraud claims based upon alleged fraudulent liens may proceed.

### iii.      Release of Obligation

Defendants argue that Intervenors have failed to state a common law fraud claim with respect to the alleged release of Intervenors' obligation to Vanderbilt.  They claim that Intervenors' theory as to the function of the "paid in full" language in the Mechanic's Lien Release is "merely a conclusion regarding the disputed legal effect of the release documents and cannot support a common law fraud claim."  The representation as to the legal effect of a document is regarded as a statement of opinion, not fact, and thus will not support an action for fraud, Defendants argue.  (D.E. 101 at 8.)

In response, Intervenors assert that an opinion can rise to a level of fraud if a party having superior knowledge, such as Defendants, takes advantage of another's ignorance of the law to deceive him by misrepresentation.  Moreover, the alleged fraud here was not the "opinion" as to the legal effect of the releases, but rather the "fraudulent activity by Defendants in continuing to enforce loans Defendants knew had been released and in knowingly failing to disclose to Intervenors that the debts had been released as "paid in full."  By continuing to enforce the debt against Intervenors, they argue that Defendants had a duty to inform Intervenors that the debt had already been released, and a failure to do so is fraud.  (D.E. 106 at 9-12.)

Defendants' arguments must be rejected.  The characterization of the "paid in full" language in the release as a "legal conclusion" is tenuous at best.  The Court understands Intervenors' fraud allegations with respect to "paid in full" as twofold: (1) the releases were filed in secret and the landowner was never informed, and (2) Defendants continued to collect on the debt despite the release.  (D.E. 98 at 7-8.)  Defendants may, and in fact do, contend that Intervenors have simply misunderstood the meaning of "paid in full," but whether in fact Defendants intended "paid in full" to relate only to the landowner and not the homeowner is a question of fact.  Intervenors have alleged that Defendants intended the language "paid in full" to extinguish all obligations in order to limit liability, but nevertheless continued to collect on the debt.  These facts, taken as true, establish a claim for common law fraud.[3]

---

[3] Even if the "paid in full" language were fairly characterized as a legal conclusion, there are well established exceptions to the "general rule that misrepresentations involving a point of law or the legal effect of a document will not support an action for fraud."  Fina Supply, Inc. v. Abilene Nat'l Bank, 726 S.W.2d 537, 540 (Tex. 1987).  As Intervenors have recognized, "[a] party having superior knowledge, who takes advantage of another's ignorance of the law to deceive him by studied concealment or misrepresentation, can be held responsible for this conduct."  Id. Texas courts have applied this exception in cases involving interactions between real estate professionals and laypeople.  For instance, in Rader v. Danny Darby Real Estate, Inc., the court found that a real estate agents' comments to buyers as to financing were actionable as fraud, stating "[i]n advising the [buyers], [the real estate agent] clearly was in a position of superior knowledge on [the financing of the house] and accordingly any misrepresentations may be actionable."  2001 WL 1029355, at *6 (Tex. App. – Dallas Sep. 10, 2001).  Here, Intervenors have sufficiently alleged the necessary elements to support this exception.  Defendants certainly have

In sum, the Court dismisses Intervenors' claims of common law fraud based upon securities fraud, but retains the common law fraud claims based upon the filing of allegedly fraudulent liens and upon the alleged release of the Counter-Plaintiffs' obligation to Vanderbilt.

### 3.     Fraud by Non-Disclosure

Defendants contend that Intervenors fail to state a claim for fraud by non-disclosure with respect to their allegations as to the Defendants' misrepresentation of Flores' and King's approved interest rates.   First, they state that Intervenors have not pled facts sufficient to demonstrate that Defendants have a duty to disclose information. (D.E. 101, p. 8-10.)  Generally, no duty to disclose exists absent a confidential or fiduciary relationship, which is necessary when claiming non-disclosure in a business relationship.  Second, Defendants contend that Intervenors cannot transform a claim under the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601 et seq. into a claim for fraud by non-disclosure under Texas law, since RESPA does not impose a duty to disclose any alleged scheme to induce, through YSPs, mortgage brokers to sell above-par loans for the purposes of state law claims premised on non-disclosure. Moreover, even if some duty did exist, Defendants argue that a RESPA claim would be barred by a one year limitations period.   (D.E. 101 at 10.)  This Court first addresses the RESPA claim.

The Intervenors allege that "the Defendants fraudulently represented that Cesar Flores and Alvin E. King had been approved by VMF [Vanderbilt] for an interest rate that was actually higher than the rate for which they were actually approved, and actively concealed from that that the interest rate included a YSP in violation of applicable RESPA regulations, with intent [to induce Flores and King] into financing the purchase through VMF at a higher interest rate, rather than seeking financing through a third-party lender [.]" (D.E. 98, p. 23.)  As both parties

---

"superior knowledge" as to the effect of any "paid in full" releases, and Intervenors have alleged that Defendants have taken advantage of Intervenors' lack of legal knowledge in this area, and concealed the true meaning or effect of the release.

acknowledge, there is a one year limitations period for RESPA claims brought under 12 U.S.C. § 2607, running from the "date of the occurrence of the violation."  12 U.S.C. § 2614.  Here, the alleged misrepresentation upon which Intervenors' action is based occurred on January 5, 2001 (D.E. 101 at 2), and thus the action should have been brought no later than January 5, 2002.  The Intervenors do not include the date on which they claim to have discovered the alleged concealment.  Nor do they specifically allege in their response to Defendants' Motion to dismiss that equitable tolling should apply given concealment of the fraud.  In any case, such an argument would fail.

As an initial matter, several Circuits have held that the statute of limitations in 12 U.S.C. § 2614 is jurisdictional, and not subject to equitable tolling.  Hardin v. City Title & Escrow Co., 797 F.2d 1037, 1041 (D.C. Cir. 1986) ("Section 2614 provides no grounds for tolling its time limitation, nor does the Act's legislative history suggest any.  Moreover . . . where . . . a time limitation is jurisdictional, the doctrine of equitable tolling does not apply."); Zaremski v. Keystone Title Assoc., Inc., 884 F.2d 1391, 1989 WL 100656, at *1 (4th Cir. 1989) (applying Hardin); but see Lawyers Title Ins. Corp. v. Dearborn Title Corp., 118 F.3d 1157, 1166-67 (7th Cir. 1997) (declining to follow Hardin).  The Fifth Circuit has not yet ruled on this issue.  Snow v. First Am. Title Ins. Co., 332 F.3d 356, 361 n.7 (5th Cir. 2003) ("We therefore express no opinion on[] the question whether Section 2614 is subject to equitable tolling.").

Regardless of whether equitable tolling is applicable to the RESPA statute of limitations, the Intervenors have not set forth facts demonstrating that equitable tolling is applicable.  It is well established in this Circuit that "[e]quitable tolling applies principally where the plaintiff is actively misled by the defendant about the cause of action or is prevented in some extraordinary way from asserting his rights."  Rashidi v. Am. President Lines, 93 F.3d 127, 128 (5th Cir.

1998).  Equitable tolling applies only in "rare and exceptional circumstances."  Davis v. Johnson, 158 F.3d 806, 811 (5th Cir. 1998).  The Intervenors have alleged nothing to suggest that equitable tolling should apply to the RESPA claim.   The Intervenors fail to state when they actually discovered their RESPA claim.  Such information would be critical to calculating the period of limitations, even if equitable tolling were applicable.  Thus, the Court will not apply equitable tolling, even if it is applicable under RESPA.  The Intervenors' claims based upon RESPA violations (D.E. 98, p. 23) are therefore dismissed as time-barred under the applicable one year limitations period.  12 U.S.C. § 2614.

To the extent Intervenors seek to allege a common law fraud by non-disclosure claim based on alleged misrepresentations of interest rates to Flores and King, this claim also fails. "Courts in Texas have consistently held that fraud by nondisclosure or concealment requires proof of all of the elements of fraud by affirmative misrepresentation, including fraudulent intent, with the exception that the misrepresentation element can be proven by the nondisclosure or concealment of a material fact in light of a duty to disclose."  United Teacher Assocs. Ins. Co. v. Union Labor Life Ins. Co., 414 F.3d 558, 567 (5th Cir. 2005).  "As a general rule, a failure to disclose information does not constitute fraud unless there is a duty to disclose the information." Bradford v. Vento, 48 S.W.3d 749, 755 (Tex. 2001).  Under Texas law, "no general duty of disclosure arises between parties contemplating a contract.  Generally a duty to disclose arises only where there is a fiduciary or confidential relationship between the parties."  Texas Technical Institute, Inc. v. Silicon Valley, Inc., 2006 WL 237027, at *6 (S.D. Tex. Jan. 31, 2006) (internal citations omitted).   "There are two types of fiduciary relationships.  The first is a formal fiduciary relationship which arises as a matter of law, typified by such relationships as a partnership, attorney-client, and principal-agent.   The second is an informal fiduciary

relationship which may arise from a moral, social, domestic or purely personal relationship of trust and confidence, generally called a confidential relationship.  To impose an informal fiduciary duty in a business transaction, the special relationship of trust and confidence must exist prior to, and apart from, the agreement made the basis of the suit."  Id. (internal citations omitted).  Intervenors do not allege the existence of any fiduciary or confidential relationship between the parties that would give rise to a duty to disclose; rather, the parties were at arm's length.  As such, Intervenors may not bring a common law fraud by non-disclosure claim.  These claims are dismissed.

### 4.    RICO Claims

The bulk of Defendants' Motion to Dismiss challenges Intervenors' RICO claims. Defendants contend that nearly every element of Intervenors' RICO allegations are deficient in some manner.  Intervenors have alleged violations of each subsection of RICO, 18 U.S.C. §§ 1962(a) – (d).  According to the Fifth Circuit, these subsections, in their simplest terms, state that:

> (a) a person who has received income from a pattern of racketeering activity cannot invest that income in an enterprise;

> (b) a person cannot acquire or maintain an interest in an enterprise through a pattern of racketeering activity;

> (c) a person who is employed by or associated with an enterprise cannot conduct the affairs of the enterprise through a pattern of racketeering activity; and

> (d) a person cannot conspire to violate subsections (a), (b), or (c).

Crowe v. Henry, 43 F.3d 198, 203 (5th Cir. 1995).  RICO claims under all four subsections require: "(1) a person who engages in (2) a pattern of racketeering activity (3) connected to the acquisition, establishment, conduct, or control of an enterprise."  Id.; In re Mastercard Int'l, Inc., 313 F.3d 257, 261 (5th Cir. 2002) (citing Crowe).  "As to the second element, a RICO plaintiff

may show that the defendant engaged in the collection of unlawful debt as an alternative to showing the defendant engaged in a pattern or racketeering activity."  313 F.3d at 261; 18 U.S.C. § 1962(a), (b), (c).

### a.    Prerequisites

Before turning to the particular Section 1962 subsections, the Court considers Defendants' argument that Intervenors have alleged neither "unlawful debt collection" nor a "pattern of racketeering activity."  (D.E. 101 at 15-16.)

### i.    "Unlawful debt collection"

Defendants correctly contend that Intervenors have failed to allege that Defendants engaged in "unlawful debt collection," as that term is used in RICO.  (D.E. 101 at 15-16.)  Under RICO, "unlawful debt" is defined as:

> a debt (A) incurred or contracted in gambling activity which was in violation of the law of the United States, a State or political subdivision thereof, or which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and (B) which was incurred in connection with the business of gambling in violation of the law of the United States, a State or political subdivision thereof, or the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate.

18 U.S.C. § 1961(6).  Intervenors do not plead that any debt at issue was a result of "gambling." The same is true of "usury."  Under Texas law, a "usury" claim has three elements: "(1) a loan of money; (2) an absolute obligation to repay the principal; and (3) the exaction of a greater compensation than allowed by law for use of the money by the borrower."  First Bank v. Tony's Tortilla Factory, Inc., 877 S.W.2d 285, 287 (Tex. 1994).   While Intervenors allege that Defendants' loan to Flores and King was above the rate for which he was approved (D.E. 98, p. 3-4), there is no allegation that the interest rate charged was usurious or otherwise illegal.

Thus, Intervenors fail to allege a RICO violation on an "unlawful debt collection" theory. The Court now turns to whether Intervenors have alleged a "pattern of racketeering activity."

### ii.     "Pattern of Racketeering Activity"

RICO provides an exhaustive definition of "racketeering activity," which includes numerous federal crimes.  18 U.S.C. § 1961(1) ("'racketeering activity' means . . . ."); Johnson v. Hoffa, 196 Fed. Appx. 88, 90 n.3 (3d Cir. 2006) ("18 U.S.C. § 1961(1) catalogues an exhaustive list of 'racketeering activities' RICO encompasses.").  Intervenors allege multiple violations in support of their RICO "racketeering activity" allegations, including: 18 U.S.C. § 1028 (fraudulent identification documents), 1341 (mail fraud), 1343 (wire fraud), 1344 (bank fraud), 1956 (money laundering), and securities fraud.  (D.E. 98, p. 30.)  Defendants contend that Intervenors' predicate acts are deficient in several respects. (D.E. 101, p. 16-19.)

### 1.     Bank Fraud

First, Defendants contend that only financial institutions have standing to allege bank fraud under 18 U.S.C. § 1344 as a predicate act for RICO purposes.  (D.E. 101 at 17.)  Although there is no prevailing case law in the Fifth Circuit, courts have consistently found that only financial institutions may claim bank fraud under 18 U.S.C. § 1344 as a predicate act for RICO purposes.  See, e.g., Starfish Inv. Corp. v. Hansen, 370 F. Supp. 2d 759, 773 (N.D. Ill. 2005) ("[O]nly financial institutions have standing to allege violations of the financial institution fraud statute, 18 U.S.C. § 1344, as predicate acts for RICO purposes."); see also Bivens v. Roberts, 2009 WL 891859, at *7 n.8 (S.D. Ga. Mar. 31, 2009) (same); Best Deals on TV, Inc. v. Naveed, 2007 WL 2825652, at *10 (N.D. Cal. Sept. 26, 2007) (same).  As Intervenors are not financial institutions, they may not allege a violation of 18 U.S.C. § 1344 as a RICO predicate.

## 2.      Securities Fraud

Second, Intervenors' allegations of securities fraud violations as RICO predicates also fail.  Section 1964(c) makes clear that "no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of Section 1962."  18 U.S.C. § 1964(c).  An exception applies only to "an action against any person that is criminally convicted in connection with the fraud."  18 U.S.C. § 1964(c); see Powers v. Wells Fargo Bank NA, 439 F.3d 1043, 1046 (9th Cir. 2006) ("§ 1964(c) by its terms only permits RICO claims against a defendant convicted in connection with the securities fraud.").  As there is no allegation that any of the Defendants have been convicted of securities fraud, Intervenors' RICO predicate acts may not be based upon securities fraud allegations.

### 3.      Fraud   in   Connection   with   Identification Documents

Third, Defendants contend that Intervenors fail to allege a violation of 18 U.S.C. § 1028. (D.E. 101 at 17.)  This statute addresses "[f]raud and related activity in connection with identification documents, authentication features, and information."  Generally, the statute prohibits possession without lawful authority of "identification document[s], authentication feature[s], or a false identification document[s]."  18 U.S.C. § 1028(a).  "Identification document" is defined as "a document made or issued by or under the authority of the United States Government, a State, political subdivision of a State, . . . which, when completed with information concerning a particular individual, is of a type intended or commonly accepted for the purpose of identification of individuals."  § 1028(d)(3).  The term "authentication feature" means "any hologram, watermark, certification, symbol, code, image, sequence of numbers or letters, or other feature that either individually or in combination with another feature is used by the issuing authority on an identification document, document-making implement, or means of

identification to determine if the document is counterfeit, altered, or otherwise falsified." § 1028(d)(1).

The only allegations that could conceivably relate to Section 1028 concern Defendants' use of forged signatures on deeds and false notarization. Nevertheless, the deeds or any other related property documents do not qualify as "identification documents" under the plain language of the statute. The notary stamp also cannot be considered an "authentication feature" because it is not a symbol used on an "identification document," as that term is defined by statute. The Court has failed to find a single case to have applied Section 1028 to forgery of deeds or false notarization. Intervenors have failed to cite any case law or include any allegations to support the conclusion that Section 1028 is applicable in this case. As such, Intervenors may not use 18 U.S.C. § 1028 as a predicate act.

### 4.  Money Laundering

Fourth, Defendants contend that Intervenors fail to state a money laundering claim under 18 U.S.C. § 1956 because they fail to allege that Defendants knowingly used proceeds from a "specified unlawful activity" in a proscribed transaction. Spending unlawfully obtained money is not in itself money laundering. (D.E. 101 at 18-19.)

Section 1956(a)(1) provides, in relevant part:

Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity:

(A)(i) with the intent to promote the carrying on of specified unlawful activity; or

(ii) with intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986; or

(B) knowing that the transaction is designed in whole or in  part--

> (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or
> (ii) to avoid a transaction reporting requirement under State or Federal law,

shall be sentenced [as provided].

18 U.S.C. § 1956(a).  To establish the substantive offense of money laundering under 18 U.S.C. § 1956(a)(1)(A)(i), it must be shown that the defendant "(1) knowingly conducted a financial transaction; (2) which involved the proceeds of an unlawful activity; and (3) with the intent to promote or further unlawful activity."  U.S. v. Dovalina, 262 F.3d 472, 475 (5th Cir. 2001).  "To satisfy the promotion element of a money laundering conviction, [plaintiff] must show that a defendant conducted the financial transaction in question with the specific intent of promoting the specified unlawful activity.  **Payment to co-conspirators for their participation in the conspiracy for the purpose of continuing the unlawful activity amounts to 'promoting the carrying on of the unlawful activity**.'"  U.S. v. Lozano, 158 Fed. Appx. 632, 639 (5th Cir. 2005) (citing U.S. v. Valuck, 286 F.3d 221, 226 (5th Cir. 2002); U.S. v. Wilson, 249 F.3d 366, 378 (5th Cir. 2001)) (emphasis added).   The term "specified unlawful activity" includes all offenses listed in Section 1961(1), including mail and wire fraud.  18 U.S.C. § 1956(c)(7)(A).

The Court finds that Intervenors have sufficiently alleged 18 U.S.C § 1956(a)(1)(A)(i) as a RICO predicate.  Intervenors allege that Defendants have used proceeds obtained from their allegedly unlawful activity to pay "many of the co-conspirators huge bonuses and investing the rest of the proceeds of these unlawful activities in their enterprise."  (D.E. 98 at 31.)  It can also been gathered from the other allegations that the money obtained was used to conduct other activities, such as the drafting and filing of the releases at issue (D.E. 98 at 6-7), payment of costs associated with operation of the business, and other aspects of the alleged widespread fraud (D.E. 98 at 9).  This evidences the intent to promote Defendants' alleged unlawful activity.

These allegations are sufficient to state a claim; Intervenors need not fully allege every manner in which Defendants committed money laundering.   Money laundering under 18 U.S.C. § 1956(a) can form a RICO predicate in this action.

### 5.     Mail and Wire Fraud

Finally, Defendants argue that Intervenors' mail and wire fraud predicate act claims fail because Intervenors have not alleged that any of these transmissions "proximately caused them to suffer concrete financial losses in their business or property," as is required for standing to bring a civil RICO claim under Section 1964(c).  (D.E. 101 at 19-21.)  Intervenors argue that they have in fact alleged significant injuries to property.  (D.E. 106 at 19.)  The Amended Intervention Complaint states that several fraudulently executed documents "regarding the credit application and approval and conditions for the financing [of Flores' and King's mobile home] were sent via electronic means from Corpus Christi to Tennessee through the Internet by use of CMH/VMF's "Links" computer system."  (D.E. 98 at 4.)  It specifically identifies several employees at Defendant Clayton's Corpus Christi store, including "Benjamin Frazier, Bruce Robin Moore, John Wells, Eric Chappel, and Christopher Lance Kimball[,]" and states that they were responsible for "fraudulently notarizing, mailing and illegally filing" fraudulently executed documents related to CMH Homes mobile home transactions.  (D.E. 98 at 16.)

At issue here is whether the Amended Intervention Complaint "state[s] sufficient facts to establish that any mail or wire fraud based on the forgery and filing of liens proximately caused Intervenors' injury," or that the "lien releases or credit application proximately caused Plaintiff any actual injuries to their property."  (D.E. 101 at 20.)[4]

---

[4] To state a claim for mail or wire fraud, a plaintiff must establish three elements: (1) a scheme or artifice to defraud or to obtain money or property by means of false pretenses, representations, or promises; (2) a use of the interstate mails or wires for the purpose of executing the scheme; and (3) a specific intent to defraud either by revising,

Section 1964(c) requires an injury to "business or property," for a plaintiff to bring a civil action.  18 U.S.C. § 1964(c).  This means that "a plaintiff must suffer an economic injury which is concrete and particular and not speculative."   Beta Health Alliance MD PA v. Kelley Witherspoon LLP, 2009 WL 2195882, at *5 (N.D. Tex. July 22, 2009).  "An 'injury to business or property' cannot result from personal injuries," but rather "be a concrete financial loss rather than a speculative property interest."   Fisher v. Halliburton, 2009 WL 5170280, at *6 (S.D. Tex. Dec. 17, 2009).

The Court finds that Intervenors have sufficiently alleged the injury to "business or property" element.  The Intervenors have alleged injury to their property due to the filing of the fraudulent liens; the Court finds no authority that requires an additional allegation that Plaintiff was further harmed by the fraudulent lien due to an effort to sell the property or obtain credit. (D.E. 98 at 4-5.)  In addition, Counter-Plaintiffs Flores and King allegedly suffered a concrete financial injury by paying interest higher than that for which they were approved, (D.E. 98 at 3), and by continuing to make payments on the Contract, although the debt had allegedly been paid in full.  (D.E. 98 at 7-8.)  Needless to say, none of these injuries would have occurred if the documents at issue were not transmitted in some manner.  As such, the wire and mail fraud were the proximate cause of Intervenors' injury to property.

In sum, the Court finds that Intervenors have sufficiently alleged the predicates for a RICO cause of action.

**b.      Sections 1962(a), (b), (c), (d)**

Having discussed the necessary predicates for a RICO action, the Court now turns to the particular RICO subsections at issue.  As a preliminary matter, the Court notes that Sections

---

participating in, or abetting the scheme."   Hewlett-Packard Co. v. Byd:Sign, Inc., 2007 WL 275476, at *3 (E.D. Tex. Jan. 25, 2007).  These particular elements are not in dispute in this Motion to Dismiss.

1962(a) and 1962(b) are "rarely used," and Section 1962(c) is "the most commonly invoked RICO provision." Mark v. J.I. Racing, Inc., 1997 WL 403179, at *3 (E.D.N.Y. July 9, 1997). "The basic purpose of section 1962(a) was to prevent racketeers from using their ill-gotten gains to operate, or purchase a controlling interest in, legitimate businesses. The purpose of section 1962(b) was to prohibit the takeover of a legitimate business through racketeering, typically extortion or loansharking. Section 1962(c), the most often charged RICO offense, was intended to prevent the operation of a legitimate business or union through racketeering." Id. (citing David B. Smith & Terrance G. Reed, Civil RICO, ¶ 5.01, p. 5-2 (1997).)  With this in mind, the Court turns to the particular subsections at issue.

### i.      Section 1962(a)

To prove a violation of § 1962(a), the plaintiff must establish (1) the existence of an enterprise, (2) the defendant's derivation of income from a pattern of racketeering activity, and (3) the use of any part of that income in operating the enterprise. St. Paul Mercury Ins. Co. v. Williamson, 224 F.3d 425, 441 (5th Cir. 2000); see also Abraham v. Singh, 480 F.3d 351, 356 (5th Cir. 2007).  The definition of "use" in Section 1962(a) has been defined by courts to mean that a plaintiff "need prove only that illegally derived funds flowed into the enterprise." Ducote Jax Holdings, L.L.C. v. Bradley, 2007 WL 2008505, at *6 (E.D. La. July 5, 2007) (citing St. Paul, 224 F.3d at 442). Additionally, a nexus must exist between the claimed violation and the plaintiff's injury. St. Paul, 224 at 441.  "In other words, for a viable § 1962(a) claim, any injury must flow from the use or investment of racketeering income." Id.  An injury cannot flow simply from the predicate acts themselves.  St. Paul Mercury, 224 F.3d at 443.

Although the Fifth Circuit has not specifically ruled on this issue, courts within the circuit have generally rejected Section 1962(a) claims based upon allegations that the defendant merely

reinvested the proceeds into its business for purposes of perpetuation or expansion.  As one court

has stated, "[i]t is not sufficient to merely show that a defendant invested or used the income

derived from its pattern of racketeering activity to facilitate its own operations and that the

continuing operation of the enterprise injured the Intervenors."  Turner v. Union Planters Bank of

Southern Miss., 974 F. Supp. 890, 894 (S.D. Miss. 1997); see also In re Sunpoint Securities, Inc.,

350 B.R. 741, 748 (Bkrtcy. E.D. Tex. 2006) ("the use and investment of racketeering income

[which] keeps the [enterprise] alive so that it may continue to injure plaintiff is insufficient to

meet the injury requirement of section 1962(a)."); Bellizan v. Easy Money of Louisiana, Inc.,

2001 WL 121909, at *3 (E.D. La. Feb. 12, 2001) ("The harm experienced by Plaintiffs has

resulted from Defendants' collection of payments on the allegedly usurious loans; the fact that

Defendants have reinvested their profits in the business for the purposes of expansion does not

suffice to sustain a Section 1962(a) claim."); Am. Millworks v. Mellon Bank Corp., 1991 WL

112015, at *4 (E.D. La. June 13, 1991) ("The injuries to their business or property alleged by

Plaintiffs, however, were results of the defendants' . . . scheme, and not results of the use or

investment of that income by the defendants.  Plaintiffs' claim alleging a violation of § 1962(a)

is therefore insufficient as a matter of law.").   Section 1962(a) is "primarily directed at halting

the investment of racketeering proceeds into legitimate businesses, including the practice of

money laundering."  Brittingham v. Mobil Corp., 943 F.2d 297, 303 (3d Cir. 1991) (citing

legislative history); see also Mark, 1997 WL 403179, at *3 ("The basic purpose of section

1962(a) was to prevent racketeers from using their ill-gotten gains to operate, or purchase a

controlling interest in, legitimate businesses.").

Defendants argue that Intervenors have failed to state a claim under Section 1962(a)

because Intervenors fail to allege that they were injured by Defendants' investment in an

enterprise. Any investment injury must be separate and apart from injury due to Defendants' alleged predicate acts. Defendants contend that Intervenors have not alleged such a separate "investment injury." (D.E. 101 at 11.)

Upon review of the Intervention Complaint, the Court concludes that Intervenors have not sufficiently stated a claim under Section 1962(a). Rather, Intervenors only allege that Defendants used the funds obtained from the predicate acts of fraud and reinvested it in the enterprise, thus allowing the enterprise to continue and causing further injury to Intervenors. (See D.E. 98 at 30 (stating that Defendants used proceeds from unlawful activities to "pay[] many of the co-conspirators huge bonuses and invest[] the rest of the proceeds of these unlawful activities in their enterprise."). The Court does not find any injury that flows from the use or investment of racketeering income, as distinguished from the alleged injury caused by the various predicate acts. As such, Intervenors have failed to state a claim under Section 1962(a).

### ii.     Section 1962(b)

The Fifth Circuit "ha[s] interpreted subsection (b) as stating that a person cannot acquire or maintain an interest in an enterprise through a pattern of racketeering. Intervenors must show that their injuries were proximately caused by a RICO person gaining an interest in, or control of, the enterprise through a pattern of racketeering activity." Abraham, 480 F.3d at 357 (internal citations and quotations omitted).

Section 1962(b)'s "acquisition requirement" necessitates that "the plaintiff's alleged injury be caused by the alleged RICO defendants acquiring or maintaining an interest or control in the alleged enterprise. The injury caused by the acquisition or maintenance must be distinct from the injury caused by the predicate acts under Section 1962(b)." Blanchard & Co., Inc. v. Contursi, 2000 WL 574590, at *2 (E.D. La. May 11, 2000). "[T]he gravamen of a § 1962(b)

violation is that, through a pattern of racketeering, the defendant acquires or maintains an interest

in or control of an enterprise; therefore, . . . a civil RICO claim alleging a violation of § 1962(b)

must allege an injury resulting from the acquisition or maintenance of an interest in or control of

the enterprise."  Am. Millworks v. Mellon Bank Corp., 1991 WL 112015, at *3 (E.D. La. June

13, 1991).  As noted above, the purpose of Section 1962(b) is "to prohibit the takeover of a

legitimate business through racketeering, typically extortion or loansharking."  Wood v.

Incorporated Village of Patchogue of New York, 311 F.Supp.2d 344, 356 (E.D.N.Y. 2004).

An injury under Section 1962(b) "may be shown, for example, where the owner of an

enterprise infiltrated by the defendant as a result of racketeering activities is injured by the

defendant's acquisition or control of his enterprise." Lightning Lube, Inc. v. Witco Corp., 4 F.3d

1153, 1190 (3d Cir. 1993) (citations omitted).  A claim under Section 1962(b) will be dismissed

if the allegations "indicate[] . . . injury resulting from the commission of the predicate acts," and

"do not suggest a distinct injury to the plaintiff **by virtue of acquiring or maintaining an**

**enterprise**."  Id. (emphasis added); see also Berhow v. The Peoples Bank, 2006 WL 839527, at

*3 (S.D. Miss. Mar. 28, 2006) ("[Plaintiff] fails to identify an injury that flowed from

[defendant] gaining an interest in or control of the Bank through his fraud and forgery. [The

plaintiff] has merely identified the injury she sustained from the predicate acts themselves. . .

Therefore, her claim under § 1962(b) must be dismissed.")

With this background, the Court concludes that Intervenors have failed to allege a

violation of Section 1962(b).  Intervenors make the conclusory allegation that each Defendant

"either participated in or directed the enterprise in violation of RICO under 18 U.S.C. § 1962(b)

[by] maintaining an interest in or control of an enterprise … through a pattern of racketeering

activity or through collection of an unlawful debt or associating with any enterprise engaged in,

or the activities of which affect, interstate or foreign commerce, to conduct or participate … in the conduct of such enterprise's affairs through a pattern of racketeering activity of unlawful debt." (D.E. 98 at 32.)  Intervenors fail to allege that their injuries "were proximately caused by a RICO person gaining an interest in, or control of, the enterprise through a pattern of racketeering activity." <u>Abraham</u>, 480 F.3d at 357.  Simply put, Section 1962(b) is not designed to address the conduct at issue in this case.  Intervenors' RICO claim based upon Section 1962(b) is dismissed.

### iii.    Section 1962(c)

Section 1962(c) prohibits any person employed by or associated with any enterprise from participating in or conducting the affairs of the enterprise through a pattern of racketeering activity.  <u>Abraham</u>, 480 F.3d at 357.   "For purposes of § 1962(c) . . . the plaintiff must demonstrate not only that the enterprise is distinct from the series of predicate acts constituting racketeering activity, but also that the RICO 'person' who commits the predicate acts is distinct from the enterprise.  It is not enough to establish that a defendant corporation through its agents committed the predicate acts in the conduct of its own business."  <u>Whelan v. Winchester Production Co.</u>, 319 F.3d 225, 229 (5th Cir. 2003) (internal citations omitted); <u>see also</u> <u>Abraham</u>, 480 F.3d at 357.  In <u>Abraham</u>, the Fifth Circuit found that allegations identifying a company president as the RICO person distinct from the RICO enterprise, his company, were sufficient for purposes of Section 1962(c).  <u>Id</u>. at 357 ("In this case, Intervenors have identified Chandler as the RICO person and Falcon Steel as the RICO enterprise. This allegation is sufficient to demonstrate that the RICO person, an individual employee of the corporation, is distinct from the RICO enterprise, the corporation itself.").

Defendants argue that Intervenors' Amended Complaint fails to distinguish the RICO enterprise from the defendants themselves.  (D.E. 101 at 13-14 (arguing that section 1962(c)

claims must be dismissed because "Intervenors have identified the RICO 'enterprise' as being identical to the three defendants").)  However, a review of the Amended Intervention Complaint shows that Intervenors clearly distinguish the roles of various entities participating in the enterprise with the RICO enterprise itself.

In this case, Intervenors allege a hierarchical RICO enterprise where Kevin T. Clayton directed the scheme that was covered in a shroud of secrecy by General Counsel Tom Hodges in which Defendants sold manufactured homes and secured the homes with fraudulent liens, packaged and sold the manufactured home contracts with the fraudulent liens to investors, and continued demanding payment under the original contract even after the fraudulent liens were released as "paid in full."  Intervenors allege that various RICO "persons" or entities were involved in this enterprise.[5]  Clayton Homes, Inc. and CMH Homes, Inc. entered into a manufactured home purchase and financing contract with Counter-Plaintiffs Flores and King. (D.E. 98 at 2.) Vanderbilt provided the financing for the manufactured home. (D.E. 98 at 2.) Kevin Clayton was named the trustee of these fraudulent deeds of trust. (D.E. 98 at 8-9.)  Tom Hodges, General Counsel for Vanderbilt, CMH Homes, Inc. and Clayton Homes, Inc. used his role as an attorney to provide a secretive shroud over the enterprise.  (D.E. 98 at 32 ("[E]very decision related to the filing of these mass secret releases were done under the secrecy of an alleged attorney-client/work product privilege with their General Counsel.").)  These allegations are sufficient to distinguish the entities participating in the enterprise from the enterprise itself.[6] The Court thus finds that the Intervenors have sufficiently pled a claim under Section 1962(c).

---

[5] "[A] legally different entity with different rights and responsibilities due to its different legal status" constitutes a "person" distinct from the "enterprise" for purposes of a §1962(c) claim. See Cedric Kushner Promotions, LTD. v. Don King, 533 U.S. 158, 163-164 (2001) (holding that a corporate employee, even if acting within the scope of his authority for a corporation, was distinct from the corporation and could therefore be subject to RICO liability).

[6] In their Motion to Dismiss, Defendants explain that Section 1964(c) "'distinctness' requirement may be satisfied where, for example, the RICO persons are alleged to be members of an association-in-fact enterprise with other non-defendants." (D.E. 101 at 13.)  In this case, Intervenors allege that several non-defendants were directly associated

### iv.    Section 1962(d)

As shown above, Intervenors have alleged violations of RICO Section 1962(c). Defendants will also be liable under subsection (d) if they are found to have conspired "to violate any of the provisions of subsection (a), (b), or (c) . . . ."  18 U.S.C. § 1962(d).  "In order to demonstrate a RICO conspiracy under § 1962(d), the [plaintiff] must demonstrate (1) that two or more people agreed to commit a substantive RICO offense and (2) that [the conspirator] knew of and agreed to the overall objective of the RICO offense."  Chaney v. Dreyfus Serv. Corp., 595 F.3d 219, 239 (5th Cir. 2010) (internal citations omitted).  "A person cannot be held liable for a RICO conspiracy merely by evidence that he associated with other . . . conspirators or by evidence that places the defendant in a climate of activity that reeks of something foul.  A conspirator must at least know of the conspiracy and adopt the goal of furthering or facilitating the criminal endeavor."  Id. (internal citations and quotation marks omitted).  Defendants argue that Intervenors' Section 1962(d) claim should be dismissed for several reasons, each of which is discussed in turn.

First, Defendants argue for dismissal because Intervenors "fail to state a primary claim under Sections 1962(a), (b), or (c)."  (D.E. 101 at 21.)  As noted above, the Court has found sufficient allegations as to violation of Section 1962(c).

Second, Defendants contend that "Intervenors have not sufficiently pleaded the necessary agreement between the Defendants to perform the predicate acts." (D.E. 101 at 21-22.)  This Court disagrees.  Intervenors allege that Defendants "knowingly" participated in this conspiracy

---

with this RICO enterprise.  As discussed above, Intervenors allege Tom Hodges used his role as an attorney to provide a secretive shroud over the enterprise. (D.E. 98 at 32.)  Intervenors also allege that the forgery itself was conducted by employees in the Corpus Christi store managed by John Wells and that John Wells "assisted in the fraudulent and illegal activity." (D.E. 98 at 17.)  Thus, the enterprise is sufficiently distinct from RICO persons because "[t]he RICO persons are not identical in name or function to the alleged enterprise [and t]he defendants are not the entire association in fact enterprise."  In re: MasterCard Int'l Inc., 132 F. Supp. 2d 468, 491-92 (E.D. La. 2001).

and "worked in concert as part of a conspiracy" in violation of 1962(d).  (D.E. 98 at 6, 8-9, 11, 31-32.)  This is more than a mere conclusory statement. See Crowe v. Henry, 43 F.3d 198, 206 (5th Cir. 1995) (dismissing RICO conspiracy claim because plaintiff failed to allege facts showing agreement between defendants to commit the predicate RICO violations).  As detailed above, Intervenors support their accusations of conspiracy by specifying the roles various conspirators played in the RICO enterprise.  Intervenors allege that Vanderbilt worked "in unison" with CMH Homes and Clayton Homes to provide a "kickback" for every manufactured home sale.  (D.E. 98 at 1, 3-4, 7-8.)  Intervenors allege that "it was critical to the profitability of the criminal enterprise of forging fraudulent real estate liens and defrauding investors, that the financing for manufactured home purchasers be controlled through [Vanderbilt]" so that the liens appeared proper. (D.E. 101 at 4.)  Intervenors allege that Kevin T. Clayton directed this activity and that General Counsel Tom Hodges used his role as an attorney to keep these agreements and transactions secret.  (D.E. 101 at 8-9, 12.)  Because Intervenors have sufficiently alleged violations of Section 1962(c) and that Defendants knowingly acted in unison in furtherance of this conspiracy, Intervenors have sufficiently alleged a cause of action under Section 1962(d).

Third, Defendants argue that the RICO conspiracy claim should be dismissed because "considerable doubt exists as to whether a parent corporation and its subsidiaries are even capable of conspiring with one another." (D.E. 101 at 22.)  Defendants fail to cite any Fifth Circuit precedent supporting this contention, and in fact recognize that the "Fifth Circuit has not addressed this issue."  (D.E. 101 at 22 n.9.)    Regardless, this argument is irrelevant in the context of this case.  According to Defendants' own certificate of interested parties, no Defendant has a parent/subsidiary relationship with another Defendant.  (D.E. 16.)  While some

Defendants are "indirect wholly-owned subsidiar[ies]" of Berkshire Hathaway, Inc., they are still considered separate legal entities.[7]

### 5.    Civil Conspiracy

The elements for civil conspiracy are: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as a proximate result." Chon Tri v. J.T.T., 162 S.W.3d 552, 556 (Tex. 2005). Defendants argue that Intervenors have failed to show the third and fourth elements of civil conspiracy, a meeting of the minds and the unlawful acts, or torts, underlying the conspiracy. (D.E. 101 at 23.) Intervenors respond that the necessary elements have been established as "without a meeting of the minds, all of the numerous players in this scheme would not have been able to successfully carry out their fraudulent transactions." (D.E. 106 at 20.) After reviewing the Amended Intervention Complaint, this Court finds that Intervenors have alleged every element of civil conspiracy.

Intervenors' Second Amended Complaint, as detailed above, goes into great length about how multiple corporations and parties knowingly worked "in unison" to profit from manufactured home sales transactions involving fraudulent liens. (D.E. 98 at, e.g., 2, 9, 31-32.) These allegations satisfy the first four elements of civil conspiracy: that there was an agreement by more than one person or entity to accomplish an objective (profit), with a meeting of the minds (knowingly worked in unison), and with one conspirator engaging in one or more unlawful acts (fraudulently filing liens). Thus, Defendants are incorrect that Intervenors failed to allege a meeting of the minds or the underlying tort of the conspiracy. Intervenors' allegations that Defendants knowingly acted in unison sufficiently pleads that there was a "meeting of the

---

[7] With respect to subsidiaries, the Fifth Circuit has stated that "a wholly-owned subsidiary[] is a separate legal entity possessing its own separate assets and liabilities." Capital Parks v. Southeastern Advertising & Sales Sys., 30 F.3d 627, 629 (5th Cir. 1994).

minds" to participate in a fraudulent scheme of selling manufactured homes to make a profit. See Pasley v. Pasley, 2005 Tex. App. LEXIS 6680, *12 (Tex. App. Amarillo Aug. 18, 2005) (finding that defendant "knowingly participating" in scheme sufficient to find "meeting of the minds"); also see Pairett v. Gutierrez, 969 S.W.2d 512, 516 (Tex. App. Austin 1998).

The Amended Intervention Complaint also clearly indicates that the underlying tort of the conspiracy is fraud. Intervenors' Amended Complaint alleges fraud by specifying several overt acts furthering the conspiracy, including the forging of the Tervinos' names on the lien documents, secretly releasing the lien as "paid in full," and continuing to accept payments under the allegedly released contract. (D.E. 98 at 27-28.) Intervenors also allege the final element of civil conspiracy, damages, by pleading that Defendants "caus[ed] Intervenors to suffer physical injury, financial injury, mental anguish, and emotional distress[]" by executing and filing the documents creating a lien on their property. (D.E. 98 at 28.)[8] Thus, Intervenors' Amended Complaint sufficiently alleges civil conspiracy to defeat Defendants' Motion to Dismiss.

### 6. Declaratory Relief Claim

In their Amended Intervention Complaint, Intervenors seek a declaratory judgment that "the amounts due on the finance contract between Cesar Flores and Alvin E. King and Defendants have been released in their entirety or otherwise 'paid in full' as indicated by Defendants in their releases filed in the real property records of Jim Wells County, Texas," or alternatively Intervenors "seeks a declaration that the finance contract is not enforceable against [Flores and King] because of release, waiver, estoppel and/or the doctrine of unclean hands." (D.E. 98 at 20.)

---

[8] While Defendants argue that Intervenors lack standing to bring a conspiracy claim based upon securities fraud (D.E. 101 at 23), the Court finds that Intervenors' conspiracy claim is based upon their own injuries, not injuries to investors, and any such allegations are provided for background only.

Defendants contend that the declaratory relief claim is "both improper and redundant," as Intervenors are seeking declaratory relief on the same cause of action that they have already brought before the Court.  (D.E. 101 at 24.)  Intervenors respond that they seek a declaratory judgment "concerning the effect of the lien releases filed by Defendants," specifically the effect of the "paid in full" language.  This is a threshold issue, necessary for determination of other issues in the case.  (D.E. 106 at 21.)

The Declaratory Judgment Act provides, "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."  28 U.S.C. § 2201(a).

The Court finds that the declaratory judgment request is appropriate in this case.  The declaratory relief sought is not duplicative or redundant, but is an important predicate issue in this case.  Defendants themselves have implicitly acknowledged this, having recently filed a Petition for Declaratory Relief with the Manufactured Housing Division of the Texas Department of Housing and Community Affairs.  (D.E. 98, p. 14-15.)  It is certainly reasonable to allow Intervenors to seek declaratory relief on this issue in this Court, given Defendants' activities at the state level.

In addition to their objections to a declaratory judgment based on the "paid in full" language, Defendants also argue that Intervenors have "failed to allege the facts necessary to sustain a declaratory judgment action based on waiver, equitable estoppel, or unclean hands." (D.E. 101 at 24 n.11.)  Intervenors do not specifically respond to this argument.

Considering first waiver, "[t]he affirmative defense of waiver can be asserted against a party who intentionally relinquishes a known right or engages in intentional conduct inconsistent with claiming that right."  Tenneco Inc. v. Enterprise Products Co., 925 S.W.2d 640, 643 (Tex. 1996).  No allegations suggest that Defendants waived any right; rather the allegations rest on Defendants' decision to continue collecting on the Contract even after the filing of the "paid in full" releases.  The waiver defense does not appear applicable.

The Court finds reliance on the doctrine of equitable estoppel equally misplaced, as the doctrine lets "a promisee enforce an otherwise unenforceable contract."  Sullivan v. Leor Energy, LLC, 600 F.3d 542, 549 (5th Cir. 2010).  As Intervenors seek to have the Contract be deemed unenforceable, not enforceable (D.E. 98 at 20), the doctrine of equitable estoppel would not appear useful in this case.

Finally, "[u]nder the doctrine of unclean hands, a court may refuse to grant equitable relief to a plaintiff who has been guilty of unlawful or inequitable conduct regarding the issue in dispute. . . . Under Texas law, the doctrine should not be applied unless the party asserting the doctrine has been seriously harmed and the wrong complained of cannot be corrected without the application of the doctrine."  Bollier v. Austin Gurdwara Sahib, Inc., 2010 WL 2698765, at *6 (Tex. App. – Austin 2010).  In this case, Intervenors seek actual and punitive damages.  (D.E. 98 at 33-34.)  As equitable relief is not sought, the doctrine of unclean hands is not applicable. Further, any wrong that Intervenors have incurred may be corrected without application of the doctrine, i.e., through monetary damages.

In sum, Intervenors may seek a declaratory judgment as to the meaning of "paid in full," but not as to waiver, equitable estoppel, or unclean hands.

IV.     Conclusion

For the reasons stated above, Defendants' Motion to Dismiss Intervenors' claims (D.E. 101) is DENIED IN PART and GRANTED IN PART.

The Court GRANTS Defendants' Motion to Dismiss as to the following causes of action: (1) RICO Sections 1962(a), 1962(b) (18 U.S.C. §§ 1962(a), (b)); (2) common law fraud based upon securities fraud or fraud by non-disclosure; (3) RESPA (12 U.S.C. §§ 2601 et seq.); and (4) declaratory judgment as to waiver, estoppel, and doctrine of unclean hands (28 U.S.C. § 2201(a)).

The following causes of action remain against Defendants: (1) fraudulent documents related to land (Tex. Civ. Prac. & Rem. Code § 12.002); (2) declaratory judgment as to meaning of "paid in full" (28 U.S.C. § 2201(a)); (3) common law unfair debt collection; (4) Texas Debt Collection Practices Act (Tex. Fin. Code § 392.001 et seq.); (5) money had and received; (6) fraud (other than fraud based upon securities fraud or fraud by non-disclosure); (7) civil conspiracy; and (8) RICO Sections 1962(c), 1962(d) (18 U.S.C. §§ 1962(c), (d)).

SIGNED and ORDERED this 25th day of August, 2010.

_____
Janis Graham Jack
United States District Judge