UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| VANDERBILT MORTGAGE AND | § | |
| FINANCE, INC., | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. C-09-312 |
| | § | |
| CESAR FLORES, *et al*, | § | |
| | § | |
| Defendants. | § | |

**<u>ORDER</u>**

On this day came to be considered (1) Intervenors Maria and Arturo Trevino's Motion for Partial Summary Judgment (D.E. 124); (2) Intervention-Defendants Vanderbilt Mortgage and Finance, Inc. and CMH Homes' Motion for Summary Judgment (D.E. 145); (3) Intervention-Defendant Kevin Clayton's Motion for Summary Judgment (D.E. 146); and (4) Intervention-Defendant Clayton Homes, Inc.'s Motion for Summary Judgment (D.E. 147). For the reasons explained below, the Intervenors' Motion for Partial Summary Judgment (D.E. 124) is DENIED. Intervention-Defendants Vanderbilt, CMH Homes and Clayton Homes Inc.'s Motions for Summary Judgment, (D.E. 145, 147) are DENIED IN PART and GRANTED IN PART. Intervention-Defendant Kevin Clayton's Motion for Summary Judgment (D.E. 146) is GRANTED.

I.      **Jurisdiction**

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, federal question, because Intervenors Maria and Arturo Trevino brought claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 ("RICO"),

and Intervention-Defendant CMH Homes, Inc. properly removed the case to this Court pursuant to 28 U.S.C. § 1441.  (D.E. 34.)

## II.    Background

The general factual and procedural background of this case is laid out in the Court's August 25, 2010 Orders on Intervention-Defendants' previous motions to dismiss.  (D.E. 148, 149.)  The facts on which the parties base their motions for summary judgment are as follows:

Intervention-Defendant CMH Homes, the retail arm of Intervention-Defendant Clayton Homes, Inc., operates a network of manufactured home retail centers across the United States. CMH offers its customers the opportunity to purchase a manufactured home via a "land in lieu" transaction.[1]  CMH advertised these "land in lieu" transactions to customers with poor credit as an easier way to purchase a manufactured home.  (D.E. 124, Exhibit A, p. 111-114.)[2] Intervention-Defendant Vanderbilt Finance and Mortgage, Inc. ("Vanderbilt"), the financing arm of Clayton Homes, Inc., provided the financing for these transactions.

Around January 5, 2002, Counter-Plaintiffs Cesar Flores and Alvin E. King purchased a manufactured home from CMH Homes in Corpus Christi in a "land in lieu" transaction. Upon signing their purchasing documents, they confirmed that two vacant lots located in Jim Wells County (Lots 34 and 35) and owned by the Trevinos would serve as additional security for their obligation to make payments on the manufactured home.  (D.E. 144, p. 4)[3]  The main

---

[1] In the typical "land in lieu" sale, real property owned by someone other than the individual purchasing the manufactured home can serve as additional security to guarantee the sale of the home in lieu of cash down payment.  (D.E. 124, p. 4; D.E. 144, p. 3.)  In this way, a friend or family member can "mortgage land they ow[n] to help their loved ones acquire a home."  (D.E. 144, p. 4.)

[2] CMH commercials stated: "Don't let our competitors fool you.  We are the only company that can provide you with a guarantee that if you or a family member owns land, that we can finance you a trailor[.]"  (D.E. 124, p. Exhibit A, p. 113.)  The tag-line at the Corpus Christi store was "a deed and a dollar is all we need."  (D.E. 124, p. Exhibit A, p. 112.)

[3] The deposition testimonies of King and Flores are unclear as to whether they knew that the Trevinos' property would serve as collateral on the purchase.  When asked whether there was any discussion about the need to use [his] sister's property and Mr. Trevino's property as collateral or security for

documents involved were the Retail Installment Contract ("the Contract") governing the sale of the home to Flores and King; the Deed of Trust ("DOT"), creating the security interest in the Trevino's property in favor of Vanderbilt; and the Builder's and Mechanic's Lien ("BML"), creating the security interest in favor of CMH.   On January 7, 2002, these documents were filed with the Jim Wells County clerk, purporting to place liens on the Trevino's property.

The DOT and the BML both contain the purported signatures of Maria and Arturo Trevino and were apparently notarized by Public Notary Benjamin Frazier.  (D.E. 144, Ex. 13 (DOT), 14 (BML).)  However, the Intervenors allege that they did not voluntarily pledge their property to secure the purchase of Flores and King's manufactured home.  Rather, they contend they were not present when the lien documents were signed, that their signatures were forged, and that their signatures were then falsely notarized by CMH employees.  (D.E. 124, p. 4; D.E. 98, p. 4; D.E. 144, Ex. 12 (Maria Trevino deposition), p. 38-39; Ex. 25 (Arturo Trevino deposition), p. 89.)

The Intervention-Defendants dispute the allegations that the Trevinos' signatures on the lien documents were forged.  They claim the signatures on the DOT and BML are the genuine signatures of Maria and Arturo Trevino and that no forgery took place.  They contend that the Trevinos participated voluntarily in the transaction placing liens on their property. (D.E. 144, p. 5.)  As to the Intervenors' contention that their signatures on these lien documents were falsely notarized by CMH employees, the Intervention-Defendants do not altogether deny these allegations and have produced no evidence to suggest they are untrue. Rather, Intervention-Defendants state that, in 2004, CMH's management in Tennessee learned

---

the loan [he was] undertaking" when he first met with a CMH sales associate, Flores responded, "No, sir."  (D.E. 124, Ex. 6, p. 63.)  When asked what was said about the property, if anything, at the second meeting with the CMH associate, Flores responded, "I really don't remember that that was discussed."  (D.E. 124, Ex. 7, p. 27.)

of "potential irregularities" in the use of notary stamps at the Corpus Christi store (referred to as "Lot 214") through multiple lawsuits from plaintiffs represented by the Trevinos' current lawyer.  (D.E. 144, p. 6.)  In response to these lawsuits, Vanderbilt and CMH took "immediate action," distributing formal, company-wide notary guidelines to their employees.  (D.E. 144, p. 6.)  Ultimately, Paul Nichols, President of Vanderbilt, and David Booth, President of CMH, decided to release the liens on all land pledged in lieu of cash down payments in all transactions at Lot 214.  (D.E. 144, p. 6.)  Neither home owners nor property owners were informed that the liens had been released.[4]  In addition, the Intervenors present evidence that after filing these releases, Vanderbilt re-purchased from investors all loans based on sales made at the Corpus Christi store.  (D.E. 156, Ex. L (Glucksberg deposition), p. 102-104) (Q: "[I]t's your understanding, based on talking to [David Jordan, the corporate representative of CMH and Vanderbilt who signed the lien releases,] that all of the loans that originated out of store 214 were repurchased out of the pools?" A: "Those that are the land in lieu related loans, yes.")

Based on these events, Maria and Arturo Trevino brought the following claims against Vanderbilt, CMH Homes, Clayton Homes, Inc., and Kevin T. Clayton (collectively, the "Intervention-Defendants"): (1) fraudulent liens under Tex. Civ. Prac. & Rem. Code §12.002 (2); declaratory judgment that Flores and King's debt under the Contract was "paid in full"; (3) common law unfair debt collection; (4) Texas Debt Collection Act ("TDCA"); (5) money

---

[4] The Intervention-Defendants assert that, "[p]ursuant to Vanderbilt's standard procedure, neither the landowners nor their customers were informed that the security interest in the land had been released."  (D.E. 144, p. 6.) But the Intervenors contend Vanderbilt did not follow standard procedures, arguing that Vanderbilt would normally have informed customers of the releases.  (D.E. 156, p. 11.)  They present some evidence to support this.  (D.E. 156, Ex. O (Clayton deposition), p. 166-168.)  Specifically, David Barton, an officer of Vanderbilt responsible for collections, was asked by counsel whether the recorded release of a deed and the recorded release of a mechanic's lien contract is typically mailed by Vanderbilt to the customer.  He responded: "Once it's received back from the county, I would imagine that's correct, yes, sir."  (D.E. 156, Ex. O, p. 168.)

had and received; (6) common law fraud; (7) civil conspiracy; (8) and RICO.  (D.E. 98, p. 19-33.)  They also requested damages based on mental anguish.  (D.E. 98, p. 20, 21.)

The Intervenors now move for Partial Summary Judgment on their fraudulent lien claim, asking the Court to find as a matter of law that the Intervention-Defendants filed fraudulent liens on the Trevinos' property in violation of Tex. Civ. Prac. & Rem. Code §§12.002 et seq.  (D.E. 124.)  The Intervention-Defendants also move for Summary Judgment on all of the Intervenors' claims.  (D.E. 145).

**III.   Discussion**

     **A.   Summary Judgment**

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate if the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).  The substantive law identifies which facts are material.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Ellison v. Software Spectrum, Inc., 85 F.3d 187, 189 (5th Cir. 1996).  A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; Judwin Props., Inc., v. U.S. Fire Ins. Co., 973 F.2d 432, 435 (5th Cir. 1992).

On summary judgment, "[t]he moving party has the burden of proving there is no genuine issue of material fact and that it is entitled to a judgment as a matter of law." Rivera v. Houston Indep. Sch. Dist., 349 F.3d 244, 246 (5th Cir. 2003); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party meets this burden, "the non-moving party must show that summary judgment is inappropriate by setting forth specific facts

showing the existence of a genuine issue concerning every essential component of its case."
Rivera, 349 F.3d at 247.  The nonmovant "may not rely merely on allegations or denials in its
own pleading; rather, its response must . . . set out specific facts showing a genuine issue for
trial."  Fed. R. Civ. P. 56(e)(2); see also First Nat'l Bank of Arizona v. Cities Serv. Co., 391
U.S. 253, 270 (1968).  The nonmovant's burden "is not satisfied with some metaphysical
doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by
only a scintilla of evidence."  Willis v. Roche Biomedical Labs., Inc., 61 F.3d 313, 315 (5th
Cir. 1995); see also Brown v. Houston, 337 F.3d 539, 541 (5th Cir. 2003) (stating that
"improbable inferences and unsupported speculation are not sufficient to [avoid] summary
judgment").  Summary judgment is not appropriate unless, viewing the evidence in the light
most favorable to the non-moving party, no reasonable jury could return a verdict for that
party.  Rubinstein v. Adm'rs of the Tulane Educ. Fund, 218 F.3d 392, 399 (5th Cir. 2000).

The Intervenors request partial summary judgment on their fraudulent lien claim
pursuant to Federal Rule of Civil Procedure 56(d)(2). (D.E. 124.)  Rule 56(d) provides: "[i]f
summary judgment is not rendered on the whole action, the court should, to the extent
practicable, determine what material facts are not genuinely at issue.  The court should so
determine by examining the pleadings and evidence before it and by interrogating the
attorneys.  It should then issue an order specifying what facts – including items of damages or
other relief – are not genuinely at issue. The facts so specified must be treated as established in
the action."  Fed. R. Civ. P. 56(d)(1). Under Rule 56(d)(2), "[a]n interlocutory summary
judgment may be rendered on liability alone, even if there is a genuine issue on the amount of
damages." Fed. R. Civ. P. 56(d)(2).  "A partial summary judgment order in accordance with
Rule 56(d) is not a final judgment but is merely a pre-trial adjudication that certain issues are

established for trial of the case." F.D.I.C. v. Massingill, 24 F.3d 768, 774 (5th Cir. 1994); see

Preston Exploration Co. v. Chesapeake Energy Corp., __ F. Supp. 2d __, 2010 WL 2357876,

at *1 n.1 (S.D. Tex. June 11, 2010) (citing Massingill).  "Rule 56(d) empowers the Court to

determine what material facts are not genuinely at issue, where summary judgment is not

rendered on the whole action, so as to clarify the triable issues that remain." Barrington Group

Ltd., Inc. v. Classic Cruise Holdings S. De R.L., 2010 WL 184307, at *4 (N.D. Tex. Jan. 15,

2010) (internal quotation marks omitted).

 **B.**  **The Intervenors' Claims On Summary Judgment**

  **1.**  **Texas Civil Practice & Remedies Code § 12.002**

  Both parties have moved for summary judgment on the Intervenors' fraudulent lien

claim under Section 12.002(a) of the Texas Civil Practice and Remedies Code.  Section

12.002(a) establishes the requirements for the fraudulent lien cause of action.  It provides:

 A person may not make, present, or use a document or other record with:

> (1)  knowledge that the document or other record is a fraudulent court
> record or a fraudulent lien or claim against real or personal property or
> an interest in real or personal property;
>
> (2)  intent that the document or other record be given the same legal
> effect as a court record or document of a court created by or established
> under the constitution or laws of this state or the United States or
> another entity listed in Section 37.01, Penal Code, evidencing a valid
> lien or claim against real or personal property or an interest in real or
> personal property; and
>
> (3)  intent to cause another person to suffer:
>
> > (A)  physical injury;
> > (B)  financial injury; or
> > (C)  mental anguish or emotional distress.

Tex. Civ. Prac. & Rem. Code § 12.002(a).  One who violates the fraudulent lien statute may

become liable to an injured person to the greater of $ 10,000 or the actual damages caused by

such violation in addition to incurring liability for court costs, reasonable attorney's fees, and even exemplary damages as determined by the court. § 12.002(b).

### a.    The Intervenors Have Standing to Sue Under § 12.003

The Court first addresses whether Intervenors have standing to sue under the fraudulent lien statute.  In enacting Section 12.002, "the Legislature intended to provide a civil action for injunctive relief and monetary damages to all persons owning an interest in real or personal property against which a fraudulent lien is filed."  Centurion Planning Corp., Inc. v. Seabrook Venture II, 176 S.W.3d 498, 506 (Tex. App. – Houston 2004).  Section 12.003 states that the persons who can bring suit under this section include, "in the case of a fraudulent lien or claim against real or personal property or an interest in real or personal property, the obligor or debtor, or a person who owns an interest in the real or personal property."  § 12.003(a)(8) (emphasis added).

Intervention-Defendants contend the Intervenors lack standing to sue under Section 12.003 because they no longer own an interest in the vacant lots subjected to the lien used to secure the manufactured home purchased by Flores and King.  (D.E. 144, p. 9.)  Intervenors concede that they no longer own the property at issue at the time they filed suit. (D.E. 144, p. 5; Ex. 12 (Maria Trevino Deposition), p. 18-21; Ex. 20 (deed transferring property to Flores.))  As such, Intervention-Defendants argue, the Trevinos no longer qualify as "person[s] who own[] an interest in [the] real or personal property" under Section 12.003.  See § 12.003.

The Intervenors object that this is an "absurd interpretation" of the statute.  They state that the "rather obvious purpose of the cause of action granted to a person with an ownership interest in the property is to provide a remedy for the acts constituting a violation of the

Statute. There is no reason why a party that subsequently sells the property should lose this remedy."  (D.E. 156, p. 13.)

As an initial matter, standing under Section 12.003 is not even limited to property owners.  In Taylor Elec. Services, Inc. v. Armstrong Elec. Supply Co., the Court of Appeals held "that one who is liable as an obligor or debtor on the underlying debt, whether a property owner of the encumbered property or not, may pursue a cause of action under the fraudulent lien or claim statute."  167 S.W.3d 522, 530-31 (Tex. App. – Ft. Worth 2005).  Although the statute lacks a definition of "debtor" or "obligor," the court defined the term "obligor" as "one that binds himself or gives his bond to another [or] one that places himself under a legal obligation," and defines "debtor" as "one indebted to another [or] ... one under obligation to another."  Id. at 530.  Thus, in Taylor the Court concluded that while the plaintiff did not actually own the property subject to the lien, he was an "obligor" or "debtor" with standing to sue under the statute because he was liable under his contract with the property owner to defend and indemnify it against any and all liens filed against the property.  Id. at 526, 531.

In this case, like the plaintiff in Taylor, the Trevinos were obligated and indebted under the liens filed on their property.  (D.E. 144, Ex. 13 (DOT), Ex. 14 (BML.))  The DOT provides that the conveyance of the Trevino's property is "made in Trust to secure payment of one (1) Retail Installment Contract . . . ."  (D.E. 144-13 at 2.)  It further provides that "[s]hould Grantor do and perform all of the covenants and agreements herein contained, and make prompt payment of said indebtedness as the same shall become due and payable, then this conveyance shall become null and void and further force and effect, and shall be released at the expense of Grantor . . . ." (Id.)  Similarly, the BML, between "Owner," identified as the Trevinos, and "Contractor," identified as CMH Homes, provides, "Owner agrees to pay

Contractor the sum of $40,815.19 (Contract Price) for the purchase of the home and all improvements associated therewith.  Owner shall pay the Contract Price pursuant to the terms of the Retail Installment Contract executed by Owner and Contractor . . . ."  (D.E. 144-14 at 2.)  The conveyance shall become "void" if "Owner performs all covenants and pays the Retail Installment Contract according to its terms."  (D.E. 144-14 at 3.)  Thus, the Intervenors qualify as "debtors" and "obligors" under Section 12.003 because they were obligated under the DOT and the BML to make payments pursuant to the Retail Installment Contract until the liens were released in 2005.  (D.E. 144 at 10.)

Moreover, unlike the plaintiff in Taylor, who did not actually own the property subjected to the allegedly fraudulent liens, here, the Trevinos also once owned the property subjected to the liens created by the DOT and the BML.  (D.E. 144, Ex. 13 (DOT), Ex. 14 (BML.))  During the period from January 2002, when the DOT and BML were recorded, to July 2002, when it was conveyed, the Trevinos qualified as both property owners, and debtors or obligors within the meaning of the statute.  There is no additional requirement in Section 12.003 that the Intervenors currently meet this status.

The Intervention-Defendants nonetheless contend that the Trevinos lack standing to bring their claim because their standing must be measured at the time of their intervention in this lawsuit; and the Trevinos no longer own their property and so are apparently no longer obligated to defend their title to the land or pay any debts under the DOT and the BML.  As such, they are no longer property owners, debtors or obligors under Section 12.003.  (D.E. 144, p. 9-10) (citing Kitty Hawk Aircargo, Inc. v. Chao, 418 F.3d 453, 458 (5th Cir. 2005)).  Intervention-Defendants cite only one case for this proposition.  This case is inapposite.  In Kitty Hawk, a case not involving Section 12.002, the plaintiff sought injunctive relief to avoid

various future harms.  Id. at 458-59.  In finding the plaintiff lacked standing, the Fifth Circuit simply applied the well-established rule for standing in federal courts that "[w]here, as here, a plaintiff is seeking injunctive or declaratory relief, the plaintiff must demonstrate that there is a substantial likelihood that it will suffer injury in the future."  Id. at 458.  In this case, the Trevinos are not seeking injunctive relief.  They seek damages as compensation for past harm caused by the liens.  Pursuant to Section 12.002(b), the Trevinos seek "$10,000 or actual damages if greater for each such violation [of Section 12.002(a)] and all costs, fees, exemplary and punitive damages as allowed by [the statute.]" (D.E. 98, p. 19.)  The fact that the Trevinos no longer own the property subject to the lien does not deprive them of the right to seek these damages under the fraudulent lien statute.

The Intervention-Defendants also contend the Intervenors lack standing because the liens on the Trevino's (former) property have been released.  As such, the Trevinos "are not obligated to defend any title against the [BML] or the [DOT] and [those documents] do not impair any title, because both instruments were admittedly released in 2005.  Neither CMH nor Vanderbilt have taken any action against [the Trevino's property], and neither company threatens to do so now."  (D.E. 144 at 10).  This argument fails for similar reasons.  Texas courts have clearly held that the release of a fraudulent lien does not preclude the ability of a plaintiff to claim damages under  Section 12.002(a).  In Esau v. Robinson, the Court of Appeals rejected defendant's argument that the plaintiff could not obtain attorney's fees and damages under Section 12.002(a) because the defendant had voluntarily removed the lien that encumbered the plaintiff's property.  See 2008 Tex. App. LEXIS 4260, *1 (Tex. App. Corpus Christi June 12, 2008).  The court explained:

> "In the case of a fraudulent lien against real property, a person who owns an interest in the property is allowed to enjoin such violations or to recover

damages.… <u>We refuse to hold that appellant's release of lien effectively precluded the court's ability to hear [Plaintiff's] claim for damages.</u>"

<u>Id</u>. at * 1 (citing § 12.003(a)(8)) (emphasis added).  Given this clear interpretation of Section 12.003, the Intervention-Defendants' argument that their release of the liens precludes the Trevinos' ability to recover damages fails.

In conclusion, this Court finds as a matter of law that the Intervenors have standing to pursue their fraudulent lien claim.  The Trevinos qualify as property owners, or debtors or obligors, with respect to the liens placed on their property.

### b.      The Fraudulent Lien Claim Is Not Time-Barred

The Intervention-Defendants have raised the statute of limitations as an affirmative defense to the Intervenors' fraudulent lien claim under Texas Civil Practice and Remedies Code §12.002 <u>et seq</u>.  (D.E. 144, p. 10-15.)  The Intervention-Defendants assert that the statute of limitations period on the Intervenors' claim was four years.  They assert that because more than seven years passed between the recordation of the allegedly fraudulent liens on January 14, 2002, and Maria Trevino's intervention in this lawsuit on October 26, 2009, the Intervenors' claim is time-barred as a matter of law.  (D.E. 144, p. 10.)

As an initial matter, Intervention-Defendants are correct that a four-year statute of limitations period applies to the Intervenors' claim.  In fraudulent lien causes of action brought under Section 12.002, a four-year statute of limitations applies pursuant to Tex. Civ. Prac. & Rem. Code §16.051, providing that when no corresponding action is expressly listed within statutes, a residual four-year statute of limitations applies.  <u>See</u> <u>Rivera v. Countrywide Home Loans, Inc.,</u> 262 S.W.3d 834, 839 (Tex. App. Dallas 2008) (citing <u>Ho v. Univ. of Tex. at Arlington</u>, 984 S.W.2d 672, 686 (Tex. App.--Amarillo 1998)).  Thus, under the applicable statute of limitations, the Trevinos had four years from accrual of their action to bring suit.

Nonetheless, when the Trevino's cause of action accrued depends on which accrual provision applies. Under Texas law, there are two accrual provisions that may apply. Under the "legal injury rule," a claim accrues "when a wrongful act causes some legal injury, even if the fact of injury is not discovered until later, and even if all resulting damages have not yet occurred." Rivera, 262 S.W.3d at 840 (citing Murphy v. Campbell, 964 S.W.2d 265, 270 (Tex. 1997)). Under this rule, the Trevinos' case would be time-barred. The evidence shows the injury occurred in January 2002 when the liens were placed on the Trevinos' property. Maria Trevino did not file her Intervention complaint until October 26, 2009, over seven years later. (D.E. 144, p. 4, 10.)

However, under the "discovery rule," a cause of action accrues once the claimant knows or is put on notice that he has been legally injured by the alleged wrong. TIG Ins. Co. v. Aon Re, Inc., 521 F.3d 351, 355 (5th Cir. 2008). "The discovery rule has been applied in limited categories of cases to defer accrual of a cause of action until the plaintiff knew or, exercising reasonable diligence, should have known of the facts giving rise to a cause of action." HECI Exploration Co. v. Neel, 982 S.W.2d 881, 886 (Tex. 1998) (citations removed). As the Supreme Court of Texas explained in HECI, for the discovery rule to apply, "the injury must be inherently undiscoverable and … objectively verifiable." Id.[5] An injury is inherently undiscoverable if, by its very nature, it is unlikely to be discovered within the applicable limitations period notwithstanding the exercise of due diligence. Wagner & Brown, Ltd. v. Horwood, 58 S.W.3d 732, 734-35 (Tex. 2001). Whether an injury is inherently

---

[5] "[A]n injury is 'objectively verifiable,' for purposes of the discovery rule deferring accrual of a cause of action, if the presence of injury and the producing wrongful act cannot be disputed, and the facts upon which liability is asserted are demonstrated by direct, physical evidence." DDD Exploration, Inc. v. Key Prod. Co., 2009 U.S. Dist. LEXIS 36100, * 16 (D. Tex. 2009) (citing Computer Associates International, Inc. v. Altai, Inc., 918 S.W.2d 453, 455 (Tex. 1996)). The parties do not dispute this element and agree that the liens were actually imposed on the Trevinos' property, as evidenced by the DOT and the BML creating those liens. (D.E. 144, Ex. 13 (DOT) and 14 (BML).)

undiscoverable is a question of law for the court to decide, TIG Ins. Co., 521 F.3d at 355, and is determined on a categorical basis, focusing on whether the plaintiff's general type of injury was discoverable, because such an approach "brings predictability and consistency to the jurisprudence." Apex Towing Co. v. Tolin, 41 S.W.3d 118, 122 (Tex. 2001). See also K3C Inc. v. Bank of Am., N.A., 204 Fed. Appx. 455, 462 (5th Cir. 2006) (per curiam) (citing HECI Exploration Co., 982 S.W.2d at 886).

The Intervenors urge this Court to apply the discovery rule to their fraudulent lien claim. (D.E. 162, p. 6-9.) "A defendant moving for summary judgment on the affirmative defense of limitations has the burden to conclusively establish that defense. Thus, the defendant must (1) conclusively prove when the cause of action accrued, and (2) negate the discovery rule, if it applies and has been pleaded or otherwise raised, by proving as a matter of law that there is no genuine issue of material fact about when the plaintiff discovered, or in the exercise of reasonable diligence should have discovered the nature of its injury. If the movant establishes that the statute of limitations bars the action, the nonmovant must then adduce summary judgment proof raising a fact issue in avoidance of the statute of limitations." See KPMG Peat Marwick v. Harrison County Housing Corp., 988 S.W.2d 746, 748 (Tex. 1999).

The Intervention-Defendants give two reasons why this Court should not apply the discovery rule. First, they argue that the liens on the Trevino's property were not inherently undiscoverable because they were filed in the public land records of Jim Wells County and as such were discoverable through the exercise of reasonable diligence. (D.E. 144, p. 13.) Second, Intervention-Defendants argue that application of the discovery rule to fraudulent lien claims, in general, would disserve public policy. (D.E. 144, p. 14.) The Court addresses each argument in turn.

i.      **The Trevinos' Injury Was Inherently Undiscoverable**

The Intervention-Defendants first argue that the discovery rule does not apply because the filing of  a lien is the type of injury that could be discovered through exercise of due diligence, given that documents creating the liens were filed in the public land records of Jim Wells County and were available for the Trevinos to discover at any time.  (D.E. 144, p. 13.) The Intervention-Defendants argue that the public availability of these records rendered the liens inherently discoverable because "[m]atters appearing in the public record are not, by definition, inherently undiscoverable, even if their appearance in the record does not charge the world with constructive notice."  (D.E. 144, p. 13.)

The Court does not agree with Intervention-Defendants' argument.  The Intervention-Defendants cite several cases where courts have relied, to some extent, on the availability of public records in concluding that a claim was not inherently undiscoverable under the circumstances.  (D.E. 144, p. 13-14) (citing HECI, 982 S.W.2d at 887; Archer Motor Sales Corp. v. Mazda Motor of Am., Inc., No. Civ. A. H-08-3587, 2009 WL 3012835, at *5 (S.D. Tex. Sept. 17, 2009); Choice Personnel No. Four, Inc. v. 1715 Johanna Square Ltd., 2007 WL 1153046, *7 (Tex.App.-Houston [1st Dist.], 2007)).  These cases fail to support Intervention-Defendants' broad proposition that the public availability of records makes an injury, by definition, not inherently undiscoverable.  (D.E. 144, p. 13.)

In HECI, the plaintiff's cause of action was based upon the defendant-lessee's alleged breach of an implied covenant contained in an oil and gas lease, requiring the defendant to notify royalty interest owners of his intent to sue an adjoining operator.  982 S.W.2d at 883. The court found information regarding defendant's intent to sue was discoverable by due

diligence, in part because it was published in the public records.  Id. at 886.  The court stated that, even if they do not necessarily provide "constructive notice" to interested parties, "filings and other materials publicly available from [in this case] the Railroad Commission are a ready source of information, and a cause of action for failure to provide that same information is not inherently undiscoverable."  HECI Exploration Co., 982 S.W.2d at 887 (citations removed.) However, this statement was directed specifically at the context of royalty interest owners suing lessees for failure to notify of their intent to sue neighboring landowners.  The court found that, under the circumstances, royalty interest owners with a financial stake in their property had failed to keep sufficient informed of their interests, given that they could have learned about the lessee's intent to sue either by asking the lessee or by searching the public records available at the Railroad Commission.  Id. at 886.  At most, this holding indicates that availability of public information is one factor in determining whether an injury could have been discovered by due diligence.

In Archer, No. Civ. A. H-08-3587, 2009 WL 3012835, at *5, the court took a similar approach, examining the facts to determine whether, under the circumstances, the plaintiffs should have discovered their causes of action sooner by exercise of due diligence.  The court ultimately found that the discovery rule did not apply to plaintiff's breach of contract claim based on a car dealer's sale of a car to another customer because, among other things, the parties were "diligent contracting parties," the car dealership was located on the public highway, and the offer to the other customer was a matter of public record with the Texas Department of Transportation.  Id.  As in HECI, this court's analysis indicates only that, in some circumstances, public availability of records that would indicate a violation of a legal

right can charge a plaintiff with a duty of reasonable diligence to check the public records to protect his interests.

Contrary to Intervention-Defendants' assertions, none of these cases establishes a sweeping rule that public availability of information relating to a plaintiff's claim renders the claim not "inherently undiscoverable." Indeed, with regard to the related doctrine of "constructive notice," the Fifth Circuit has explicitly held that parties are not charged with constructive notice of information merely because it appears in the public record. Kansa v. Rinsurance Co., 20 F.3d 1362, 1369-70 (5th Cir 1994).[6] Rather, the recording of a document in public records serves as constructive notice for limitations purposes only for those persons who are under an obligation to search the records. Lightfoot v. Weissgarber, 763 S.W.2d 624, 627 (Tex. App. San Antonio 1989); see also Cox v. Clay, 237 S.W.2d 798, 804 (Tex.Civ.App.-Amarillo 1950, writ ref'd n.r.e.) ("[I]t is settled by numerous decisions of our courts that [a duly recorded instrument] carries notice of its contents only to those who are bound to search for it....").

In certain cases, those with an interest in property have a heightened duty to search for information contained in the property's chain of title. For example, "'[a] purchaser of land has constructive notice of all information contained in his grantor's chain of title, and he is bound by every recital, reference and reservation contained in or fairly disclosed by any instrument which forms an essential link in that chain.'" Jones v. Texaco, Inc., 945 F.Supp. 1037 (S.D. Tex. 1996) (quoting NRC, Inc. v. Pickhardt, 667 S.W.2d 292, 293 (Tex.App.-Texarkana 1984,

---

[6] The Intervention-Defendants argue in a footnote that these constructive notice principles should be ignored in the wake of HECI. They argue that HECI "expressly holds that information appearing in the public record is not inherently undiscoverable, even if a party is not charged with constructive knowledge of that information." (D.E. 144, p. 14, n. 7) (citing HECI, 982 S.W.2d at 886-87.) As explained above, the Court disagrees with the Intervention-Defendants' interpretation. At best, HECI holds that the public availability of information respecting an alleged wrong is one factor for a court to consider in determining whether the party's injury should have been discovered through exercise of due diligence.

writ ref'd n.r.e.) (emphasis added).  However, current owners of property with no reason to suspect that their property will become the subject of a lien cannot be said to automatically have a duty to search the land records to discover such a lien.  Kansa, 20 F.3d at 1369-70; Lightfoot, 763 S.W.2d at 627; Cox, 237 S.W.2d at 804.

Applying these principles to the case at bar, the Court finds that, under the circumstances, the Trevinos' injury was inherently undiscoverable.  The Trevinos state in their depositions that the liens were placed on their land in January 2002 entirely without their knowledge.  (D.E. 98, p. 4; D.E. 144, Exhibit 12, p. 38-39 (Maria Trevino); Exhibit 25, p. 89 (Arturo Trevino).)  In October 2005 the Intervention-Defendants released the liens without informing the Trevinos either that their property had been subject to the liens or that the liens were now released.  (D.E. 98, p. 5-7; D.E. 144, p. 6).  Hugh Statum, Vice President of CMH, who signed many of the releases filed by Vanderbilt in 2005, testified himself that he did not expect landowners to inspect their property records to discover the releases had been filed.[7] (D.E. 156, Ex. E, p. 91-92.)

As this Court noted in its August 25, 2010 Order, by publicly filing the lien documents, Intervention-Defendants made them available for property owners or any member of the public, including the Trevinos, to discover during a title search.  (D.E. 149, p. 15) (citing Texas Local Gov't Code § 191.006 ("All records belonging to the office of the county clerk to which access is not otherwise restricted by law or by court order shall be open to the public at all reasonable times.  A member of the public may make a copy of any of the records."))  However, public recording of the liens does not mean property owners automatically had a

---

[7] Statum was asked by counsel whether he expected any of the hundreds of property owners whose liens were released to "go down and check the court records to figure out if someone has filed something on their land?"  Statum replied: "No, sir.  I would …think that any landowner who was involved in the transaction would be aware of the transaction."  (D.E. 156, p. 91-92.)

duty to perform a title search to discover them.  There are no special circumstances giving rise to such a duty in this case.  Unlike in <u>HECI</u>, 982 S.W. 2d at 886, where the court found that gas royalty interest owners had reason to be mindful of other operators in the area, property owners such as the Trevinos had no reason to suspect liens might be placed on their property. Unlike in <u>Archer</u>, 2009 WL 3012835, at *5, where the court noted that the parties were "diligent contracting parties" with strong incentives to protect their present contractual interests, landowners who are not presently involved in a transaction respecting their land have no such incentive.  Absent circumstances giving property owners some reason to perform a title search, there simply is no case law holding current landowners have a standing duty to check the public records to verify the state of their title.  <u>See</u> <u>Kansa</u>., 20 F.3d at 1369-70; <u>Lightfoot</u>, 763 S.W.2d at 627; <u>Cox</u>, 237 S.W.2d at 804.

Having considered these circumstances, the Court finds the Trevinos exercised reasonable diligence in discovering the liens on their property.  As such, their injury is generally of the type that could not be discovered by reasonable diligence and is "inherently undiscoverable."  <u>See</u> <u>HECI</u>., 982 S.W.2d at 886.[8]

### ii.  Application Of the Discovery Rule Would Not Disserve Public Policy

The Intervention-Defendants also argue the Court should not apply the discovery rule because application of the discovery rule to fraudulent lien claims would disserve public policy.  The Intervention-Defendants contend that because the Trevinos were not "actually harmed" by the liens placed on their property, any wrong alleged is "one that almost by definition occurs, if at all, in the public record."  (D.E. 144, p. 14.)  They argue that if the statute of limitations could always be tolled in such cases, victims could wait "nearly a decade

---

[8] As noted above, there is no dispute as to whether the injury was "objectively verifiable."

or more, until a lawyer or some other person mining the public records informed them of their 'injury,'" to bring a claim under the statute.  "[T]he land records would become a source not of instruments giving notice to the public, but of stale claims."  (D.E. 144, p. 14.)

The Intervention-Defendants' concern – that applying the discovery rule to <u>all</u> fraudulent liens filed in the public record would result in stale claims – is not implicated by this Court's decision.  The Court holds only that claims such as the Trevinos, in which the evidence suggests property owners had no other reason to suspect liens had been placed on their property, are "inherently undiscoverable."[9]  Applying the discovery rule in such cases would not distort the purpose of the recording system and would not disserve public policy.  Rather, it would further the purpose of the recording system to protect property owners from fraud by providing landowners with the means to deter the procurement of fraudulent claims on their land and with a form of compensation when such fraudulent claims occur.  The purpose of recording laws is "not to give protection to perpetrators of fraud." <u>Ojeda de Toca v. Wise</u>, 748 S.W.2d 449, 451 (Tex. 1998).  To the contrary, the purpose of recording laws is to "notify subsequent purchasers of the rights that the recorded instruments are intended to convey," Texas Jurisprudence (3d ed.), Records and Recording Laws § 19 (May 2010), and to protect "intending purchasers and encumbrances … against the evils of secret grants and secret liens and the subsequent frauds attendant upon them."  <u>Ojeda de Toca</u>, 748 S.W.2d at

---

[9] For purpose of the discovery rule, "the focus is on whether a type of injury, rather than a particular injury, was discoverable."  <u>Via Net v. TIG Ins. Co.</u>, 211 S.W.3d 310, 314 (Tex. 2006). However, this does not mean that all claims arising under a particular statute or cause of action must be treated identically for purposes of applying the discovery rule.  <u>See id</u>. at 314-15 ("Our attempts to bring predictability and consistency to discovery rule jurisprudence have focused on types of injury, not causes of action.") (citing e.g., <u>Pustejovsky v. Rapid-American Corp.</u>, 35 S.W.3d 643, 653 (Tex. 2000) (allowing separate limitations periods for separate diseases in products liability cases)); <u>see also</u> <u>Apex Towing Co. v. Tolin</u>, 41 S.W.3d 118, 121-22 (Tex. 2001) (noting that the discovery rule is applied distinctly among malpractice claims, depending on the circumstances of the claim at issue).

450-51 (quoting 66 Am.Jur.2d Records and Recording Laws § 48 (1973)). Thus, Intervention-Defendants' public policy argument fails as well.

To summarize, the Court finds the Trevinos' injury is generally of the type that could not be discovered by reasonable diligence and, as such, is "inherently undiscoverable." See HECI Exploration Co., 982 S.W.2d at 886. Because they failed to negate that the discovery rule applies, the Intervention-Defendants have failed to prove the affirmative defense of limitations. See Velsicol Chem. Corp., 956 S.W.2d at 530; KPMG Peat Marwick., 988 S.W.2d at 748. The Trevinos claim accrued when they discovered the liens on their property in 2009. The Trevinos filed suit within four years. Their claim is not time-barred as a matter of law.[10]

### c.      The Merits of the Intervenors' Fraudulent Lien Claim

Given that the Intervenors have standing to sue and their claims are not time-barred, this Court next must determine whether to grant either party's motion for summary judgment on the Trevinos' claim under Tex. Civ. Prac. & Rem. Code §§ 12.002(a)(1)-(2). Section 12.002 requires showing that Intervention-Defendants made, presented, or used a document with: (1) knowledge that the document was a fraudulent lien or claim against real or personal property or an interest in real or personal property; (2) intent that the document or other record be given legal effect; and (3) intent to cause another person to suffer: (A) physical injury; (B) financial injury; or (C) mental anguish or emotional distress. Tex. Civ. Prac. & Rem. Code § 12.002(a); see Aland v. Martin, 271 S.W.3d 424, 430 (Tex. App. – Dallas 2008). The Intervenors have the burden to prove all three elements of their claim. See Preston Gate, LP v. Bukaty, 248 S.W.3d 892, 896-97 (Tex. App.--Dallas 2008, no pet.).

---

[10] Because the Court finds that the discovery rule applies, the Court need not address the Intervenors' alternative argument that the Court should toll the statute of limitations under the doctrine of fraudulent concealment. (D.E. 162, p. 9-11.)

### i.      Element One: Knowledge Of Fraudulent Lien

The first element a plaintiff seeking summary judgment under Section 12.002 must prove is "knowledge that the document or other record is a fraudulent court record or a fraudulent lien or claim against real or personal property or an interest in real or personal property." § 12.002(a)(1).   The statute does not define "knowledge," but generally "knowledge" means "awareness or understanding of a fact or circumstance."  BLACK'S LAW DICTIONARY 950 (9th ed. 2009).   Courts have held in the context of § 12.002 that a defendant must have the requisite knowledge "at the time the lien was filed."  Aland, 271 S.W. at 431-32.

The Trevinos contend that "[i]t is undisputed that the Intervention-Defendants presented the Land Documents [the DOT and the BML] with the fraudulent notarization to the County Clerk for recording knowing that such Land Documents had not been properly authenticated and contained forged signatures."  (D.E. 124, p. 13.)  The Intervention-Defendants have not specifically addressed the issue of whether they knew the DOT and BML were forged or falsely notarized.   Rather, the Intervention-Defendants argue that the Intervenors have failed to prove the Trevinos' signatures on the lien documents were forged at all, and that false notarizing alone would not make the land documents qualify as "a fraudulent court record or a fraudulent lien or claim against real or personal property" (D.E. 144, p. 20) (quoting Section 12.002(a)).  They argue that "[if] the instruments were not fraudulent under section 12.002, none of the Intervention-Defendants can have acted with the knowledge requisite to establish a violation."  (D.E. 144, p.20.)

The Court agrees that the Trevinos have not succeeded in proving as a matter of law that their signatures were forged.  The Trevinos state in their separate testimonies that none of

the signatures on the documents are theirs.  (Ex. G, p. 31-44; Ex. H, p. 49-55.)  However, the Intervention-Defendants' handwriting expert, Larry Stewart, indicates that the Trevinos' signatures may not have been forged.[11]   In addition, the deposition testimony of a CMH employee indicates that he believes the Trevinos actually came into the Corpus Christi store and signed the lien documents in person.[12]   Based on this evidence, the Intervention-Defendants have succeeded in demonstrating that issues of fact remain as to whether the Trevinos' signatures were forged.  As such, issues of fact remain as to whether Intervention-Defendants had the requisite knowledge the lien documents were "fraudulent" in this respect. Summary judgment on this issue is inappropriate.

However, as to the Intervenors' contention that the liens were falsely notarized, there appears to be little dispute.  The Intervenors have presented convincing evidence of rampant misuse of notary stamps at the Corpus Christi store by CMH employees.[13]   The Intervention-

---

[11] Stewart has examined originals of four of the six questioned documents.  These include the original Builder's and Mechanic's Lien Contract between the Trevinos and CMH Homes and the original Deed of Trust between the Trevinos and Vanderbilt, both of which were allegedly signed by the Trevinos on Janurary 7, 2002  (D.E. 144, Ex. 15, p. 16-17.)  Stewart compared these to authenticated signatures of Maria and Arturo Trevino collected from "course of business documents" assumed to have been genuinely produced by them.  (D.E. 144, Ex. 15, p. 22.)  Stewart found it "highly probable" – which he uses to mean "virtually certain" – that Maria Trevino's signatures were authentic. (D.E. 144, Ex. 15, p. 23.)  As to Arturo Trevino's signatures, Stewart conceded that he found "numerous inconsistencies" between the questioned signatures and the known standards, but gave his opinion that "there are indications that the writer of the known writings of Arturo Trevino also wrote the signatures for Arturo Trevino on the Builder's and Mechanic's Lien Contract, the Deed of Trust, [and the other land documents]."  (D.E. 144, Ex. 15, p. 24.)

[12] Lance Kimball, a salesman for CMH Homes who handled the sale of the manufactured home to Flores and King, states in his Declaration that he has inspected the BML and DOT containing the Trevino's signatures, as well as photographs of Maria and Arturo Trevino.  He states that they are "vaguely familiar[]" and that "[b]ased on [his] customs and practices [of having landowners sign the instruments required for putting up their land as collateral on home sales] they are the persons who signed the Mechanics Lien and Deed of trust."  (D.E. 144, p. 5; Ex. 16, p. 2.)

[13] According to the deposition testimony of Benjamin Frazier, a former manager and notary public at the Corpus Christi store, employees at the Corpus Christi store (including store manager John Wells) used Frazier's notary stamp to notarize documents in hundreds of transactions involving the signatures of various property owners, and continued to do so after Frazier's departure from CMH Homes.  (D.E. 124, Ex. E, p. 55-67; D.E. 156, p. 10-11, Ex. F.)  In his testimony, former sales associate and assistant store manager, Bruce Robin Moore, attested that he personally signed some deeds of trust and mechanic's liens using Frazier's name and notary stamp.  (D.E. 124, p. 5-6; Exhibit B, p. 150, p. 159-160; D.E. 156, Ex. G, pp. 78-87.)  Moore was asked by counsel whether he forged the Trevino's signatures or used Frazier's notary stamp on the lien documents involved in this case.  Moore did not answer in the negative, but instead declined to answer based on the Fifth Amendment.  (D.E. 124, p. 8-9;

Defendants nonetheless argue that falsely notarized documents do not constitute "fraudulent" documents within the meaning of Section 12.002(a).  To support this contention, they note that in some cases a fraudulently notarized lien document may still be enforceable against a party to the transaction, so long as it is signed by the property owner.  (D.E. 144, p. 20, n. 10) (citing Alvarado v. Alvarado, 2002 WL 1072067, *5 (Tex. App.-Corpus Christi, 2002) (citing Tex. Property Code § 13.001(b)).

The Court does not agree with Intervention-Defendants' argument.  The fact that the transaction underlying the falsely notarized documents might still be valid as between the parties, see Tex. Property Code § 13.001(b), is irrelevant to the issue of whether fraudulently notarized documents are "fraudulent" instruments for purposes of Tex. Civ. Prac. & Rem. Code § 12.002(a).  "[Section 12.002(a)] expressly applies to any document or record that is 'a fraudulent lien or claim' against real or personal property and that is intended to be 'given the same legal effect' as a court record or document 'evidencing a valid lien or claim against real property.'"  Centurion Planning Corp. v. Seabrook Venture II, 176 S.W.3d 498, 505 (Tex. App. Houston 1st Dist. 2004) (quoting § 12.002(a)(1), (2)).  Although Section 12.002(a) does not define "fraudulent," Texas courts have interpreted "fraudulent" within the context of Section 12.002(a) according to its plain meaning: a "knowing misrepresentation of the truth or concealment of a material fact with intent to induce another to act to his or her detriment." See Walker & Assocs. Surveying v. Roberts, 306 S.W.3d 839, 849 (Tex. App. Texarkana 2010) (quoting Black's Law Dictionary 730 (9th ed. 2009)).

---

Exhibit B, p. 168-70; Ex. G, pp. 78-79, 80-81, 84-85, 86-87, 132-133.)  The Court notes that "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them[.]"  Baxter v. Palmigiano, 425 U.S. 308, 318 (U.S. 1976) (citing 8 J. Wigmore, Evidence 439 (McNaughton rev. 1961)).

Under this definition, documents creating liens on property owners' land that have been falsely notarized constitute a "fraudulent lien or claim."  Such documents are filed with the county clerk in order to establish a valid record of title.  Texas law requires these documents to be properly notarized or otherwise authenticated before they are recorded.[14] When documents purporting to create a lien on real property are falsely notarized, yet are filed with the County, they contain a false representation of fact – that they are properly notarized as required by Texas law.  Filing falsely notarized documents automatically indicates an intent to induce reliance upon their authenticity by the County Clerk, the property owners, or any member of the public performing a title search in order to determine the value and condition of the property.  Thus, the documents purporting to place liens on the Trevinos' property – specifically, the falsely notarized DOT and BML – are "fraudulent documents" within the meaning of Section 12.002(a).

As explained above, the first element of Section 12.002(a) requires not only that the Intervention-Defendants made, presented or used fraudulent documents, but that they did so with knowledge the documents were fraudulent at the time the liens were filed.  See Aland, 271 S.W. at 431-32.  As noted, the Intervention-Defendants have not specifically addressed whether they knew the documents were falsely notarized when the liens were placed on the

---

[14] "In order for a property transaction to be recorded in real property records, it must be signed and acknowledged by the grantor in front of two credible subscribing witnesses, or acknowledged and sworn to before an officer authorized to take affidavits, such as a notary public." Alvarado v. Alvarado, 2002 WL 1072067, *5 (Tex. App. Corpus Christi, 2002) (citing Tex. Prop. Code § 12.001(b)).  When a transaction is "not subscribed to by witnesses or acknowledged by a notary public at the time it was drafted," it is "incapable of being properly recorded [and] would be invalid against a creditor or subsequent purchaser of the property for valid consideration." Id. (citing §13.001(a)).  In addition, with specific respect to mechanic's liens filed against real property, Texas Property Code § 53.052 requires the claimant to file a signed and properly notarized lien affidavit containing, among other things, a sworn statement of the amount of the claim and a description of the property sought to be charged.  See Tex. Prop. Code § 52.052 ("the person claiming the lien must file an affidavit with the county clerk of the county in which the property is located[.]"); see also Blanco, Inc. v. Porras, 897 F.2d 788, 792 (5th Cir. 1990) ("An affidavit is statutorily defined in Texas as 'a statement in writing of a fact or facts signed by the party making it, sworn to before an officer authorized to administer oaths, and officially certified to by such officer under his seal of office.' ") (quoting Tex.Gov't Code Ann. § 312.011(1)) (emphasis in original).

Trevinos' property.  Regardless, the record is not devoid of facts indicating that Intervention-Defendants were aware of circumstances that should have alerted them to their employees' deficient notarization procedures.  According to the testimonies of CMH employees, it was their regular practice to notarize signatures on documents using Frazier's notary stamp, even in cases where the alleged signors had not actually signed the documents in the employees' presence.[15]  The manager of the Corpus Christi store, John Wells, approved the documents after the processing of each transaction.  (D.E. 124, Ex. B (Moore Deposition), p. 151.)  The documents were then sent to CMH's headquarters in Tennessee, where "someone" at headquarters would "review exactly what [CMH employees had] been doing."  (D.E. 124, Ex. B (Moore Deposition), p. 151-52.)  It was that person's job to review the documents and, presumably, to ensure they contained properly notarized signatures.  (D.E. 124, Ex. E (Frazier Deposition), p. 40.)

Not only did CMH management sign off on individual transactions, CMH did not take precautions to ensure these transactions were properly executed.  CMH instituted a notary verification requirement that did not require the individual who purportedly signed the land documents to appear before an independent lawyer or title company to sign them.  (D.E. 156, Ex. F (Frazier Deposition), e.g., p. 159, 312.)  Instead, CMH allowed its own employees to notarize lien documents directly at the Corpus Christi store.  (D.E. 156, Ex. F (Frazier Deposition), pp. 112-114, 158-160, 163-168.)  CMH did not have corporate notary procedures in place.  (D.E.  124, Ex. B (Moore Deposition), p. 150-152; Ex. D (Booth Deposition), p.

---

[15] Benjamin Frazier's testimony notes multiple such transactions, even when he was acting as a public notary. For instance, counsel asked Frazier, "while you were working for this company, you're out there notarizing documents of people that weren't in front of you to sign the document, correct?"  Frazier responded, "[c]orrect." (D.E. 156, Ex. F, p. 241). After Frazier left CMH, other employees, who were not themselves notaries, continued to notarize documents without the signors presence using Frazier's stamp.  (D.E. 124, Ex. E, p. 55-67; D.E. 156, p. 10-11, Ex. F.)

103).   CMH did not even have policies instructing its notary employees on the import of having property owners actually appear before them when notarizing a document.[16]   And yet, these same CMH sales associates received commissions whenever they made successful sales. (D.E. 124, Ex. E (Frazier Deposition), p. 40; DE 156, Ex. A, (Clayton Homes' 10-K Report), p. 8.)  They had a financial incentive to execute as many transactions as possible.

Lax notary procedures undoubtedly made it easier for CMH Homes to sell manufactured homes to customers using real property as collateral.[17]   But this also created a significant risk that employees would not take the necessary precautions to ensure all signatures of manufactured home purchasers and property owners pledging collateral were properly signed and notarized.   Under these circumstances, a reasonable fact-finder could conclude that Intervention-Defendants were aware, or should have been aware, that fraudulent notarizing was occurring at their retail store.[18]   At the least there remain issues of fact as to whether Intervention-Defendants had knowledge the lien documents were falsely notarized "fraudulent" liens against real property for purposes of Section 12.002(a).  Summary judgment on this issue is inappropriate.

---

[16] Benjamin Frazier apparently was unaware that it was required for the signors to appear in front of him and that CMH.  (D.E. 156, Ex. F, p. 245, 300-301.)

[17] The Intervention-Defendants concede that this notarization procedure aided CMH Homes' business model, stating:  "As part of a land in lieu transaction in Texas, the landowners executed a Deed of Trust ("DOT") in favor of Vanderbilt and a Builder's and Mechanic's Lien ("BML") in favor of CMH.  (Booth Decl. ¶ 6; Nichols Decl. ¶7.)  These documents were then notarized, often by a CMH employee to minimize cost to the customer[.]" (D.E. 144, p. 4) (emphasis added).

[18] Moreover, for purposes of establishing liability under Section 12.002, courts have held that knowledge can be imputed to a company based on the knowledge of its employees.  Taylor., 167 S.W.3d at 531.  In Taylor, the court found that defendant, an electrical supply company, had the requisite knowledge that a lien placed on church property was fraudulent based on the deposition testimony of a company employee involved in the transaction, who admitted that he knew the amount of the underlying debt was incorrect.  Id.  In this case, CMH sales associates who falsely notarized lien documents clearly knew the documents they executed in the course of their duties were improperly notarized.  As in Taylor, this establishes that Intervention-Defendants knew the documents were falsely notarized for purposes of Section 12.002.  Id.  See also FDIC v. Shrader & York, 991 F.2d 216, 223 (5th Cir. 1993) (under Texas law, knowledge of agents acting in the scope of their duties for the benefit of the principal is imputed to the principal "even though the agent's primary interest is inimical to that of the principal.") (citing Federal Deposit Ins. Corp. v. Ernst & Young, 967 F.2d 166, 170-171 (5th Cir. 1992) (holding that a corporate officer's knowledge was imputed to the board of directors of the corporation even though the officer was engaged in fraud because the officer's acts also generated profits for the corporation.))

### ii.      Element Two: Intent To Give Legal Effect

The second element of §12.001 requires showing Intervention-Defendants acted with the "intent that the document or other record be given the same legal effect as a court record or document of a court created by or established under the constitution or laws of this state or the United States [.]"  See §12.001(a)(2).  The Intervenors have satisfied this element.  It is undisputed that CMH Homes sales associates presented the DOT and the BML to the County Clerk to record the liens on the Trevino's property and create security interests in that property in favor of Vanderbilt and CMH, respectively.  (D.E. 124, p. 14; D.E. 144, p. 4-5.)  As a matter of law, the Intervention-Defendants intended that the lien documents be given legal effect.

### iii.      Element Three: Intent to Cause Financial Injury

The final element of § 12.001 requires that the Intervenors demonstrate the Intervention-Defendants acted with the "intent to cause another person to suffer: (A)  physical injury; (B)  financial injury; or (C) mental anguish or emotional distress."  § 12.002(a)(3).  Although it is not defined in § 12.002, the term "intent" generally means that "the actor desires to cause the consequences of his act or that he believes the consequences are substantially certain to result from his act."  Gavrel v. Lieberman, 2010 WL 1270334, *2 (Tex. App. – Ft. Worth Apr. 1, 2010) (citing Reed Tool Co. v. Copelin, 689 S.W.2d 404, 406 (Tex. 1985)).  Intent to cause injury under § 12.002 can be proven by direct or circumstantial evidence.  See Taylor, 167 S.W.3d at 532.

The Intervenors allege that the evidence demonstrates as a matter of law that Intervention-Defendants intended to cause financial injury to the Trevinos by filing liens on

their property.  To support their claim, the Intervenors point to the express terms of the BML and the DOT.  The BML states:

> "Owners [the Trevinos][19] agree to pay Contractor [CMH Homes] the sum of $40,815.19 (Contract Price) for the purchase of the home and all the improvements therewith."

(D.E. 124, p. 15; D.E. 144, Ex. 14.)  The BML goes on to state that should the Owners fail to pay the balance "Contractor can request Trustee (Kevin Clayton) to foreclose on this lien." (D.E. 124, p. 17; D.E. 144, Ex. 14.)

The DOT likewise purports to create a financial obligation by the Trevinos with respect to the manufactured home.  The DOT states:

> "Maria M. Trevino and Arturo Trevino...for the purpose of securing the indebtedness hereinafter described, and in consideration of the sum of [$10,000] … have granted, sold, and conveyed…unto Kevin T. Clayton, Trustee…all of the property described in attached Exhibit A [describing the Trevino's property.]"

(D.E. 124, p. 18; D.E. 144, Ex. 13.)  The DOT goes on to state that "in the event of default in the performance of any obligation under the Retail Installment Contract hereby secured, in accordance with the terms thereof…the Trustee shall sell the above described property."  (D.E. 124, p. 20; D.E. 144, Ex. 13.)

The Intervenors contend that the only purpose of these documents was to encumber the Trevinos' property with liens and to obligate the Trevinos to make payments to secure the indebtedness of Flores and King, even though the Trevinos were not in any way obligated to pay for the manufactured home.  (D.E. 124, p. 15-20.)  As such, they argue, "[b]y the express terms of the forged and fraudulent documents, prepared, created, used and recorded by the

---

[19] The document makes clear that the "owners" referred to are the Trevinos, not the owners of the manufactured home.  In his deposition, David Jordan (who signed the BML and DOT releases) agreed that the BML states that the Trevinos agree to pay the sum owed by Flores and King on the RIC, even though they had not signed the RIC.  When asked "why it is that …the owner as set out in the [BML] would owe $40,000 for…a home that they never signed a contract to buy?" Jordan responded: "I really don't…know."  (D.E. 124, Ex. P, p. 89.)

Intervention-Defendants, the Intervention-Defendants intended to cause financial harm to the Trevinos."  (D.E. 124, p. 19.)

The Intervention-Defendants respond that the mere fact that the lien documents purported to financially obligate the Trevinos and encumber their property is insufficient to support a finding of intent to cause financial harm.  (D.E. 144, p. 18.)  They contend that Texas courts have made clear that evidence that a lien document created a financial obligation and encumbered a plaintiff's property "is insufficient as a matter of law to prove that the Intervention-Defendants had the intent required by the fraudulent lien statute."  (D.E. 144, p. 16) (citing Aland, 271 S.W.3d at 433; Preston Gate, 248 S.W.3d at 897.)  Intervention-Defendants point out that neither Vanderbilt nor CMH Homes attempted to enforce the terms of the DOT or the BML, despite the fact that Flores and King were chronically late on their payments to Vanderbilt.  (D.E. 144, p. 18.)  To the contrary, CMH and Vanderbilt voluntarily released the liens when management learned of "potential notary irregularities at Lot 214." (D.E. 144, p. 18.)  Based on these circumstances, Intervention-Defendants assert the Intervenors have failed to make their case that Intervention-Defendants intended to financially injure the Trevinos.

The Court disagrees with Intervention-Defendants' argument.  Some Texas courts have held that in order to show intent to cause financial injury, the plaintiff must bring more evidence than simply the existence of a wrongful lien on an owner's property.  Specifically, in two cases the Texas Court of Appeals for the Fifth District overturned jury verdicts finding that Intervention-Defendants intended to cause plaintiffs financial harm by placing unwarranted liens on their property and refusing plaintiffs' demands to remove them.  See Preston Gate, 248 S.W.3d at 897; Aland, 271 S.W.3d at 433 (finding the evidence before the

jury was no "more consistent with an intent on the part of [defendant] to cause the requisite injury to [plaintiff] than with a lack of intent to cause such injury.") (citing Preston Gate, 248 S.W.3d at 897).  However, as this Court has already explained, Texas courts have interpreted the "intent" element in fraudulent lien claims to require only some additional evidence that Intervention-Defendants were aware of the harmful effect that filing such a lien could have on a landowner.  (D.E. 149, p. 9.)  See Taylor, 167 S.W.3d at 531 (upholding jury's finding of intent to cause financial injury when there was "at least some evidence that [defendant] was aware of the potential harm filing a lien on [the property] could have on [plaintiff.]")  If additional evidence of such an awareness is present, then the evidence of intent to cause financial injury is not necessarily deficient "as a matter of law."  Rather, the question of intent must be left for a finder of fact.

Applying these principles to the case at bar, the evidence is sufficient to preclude summary judgment for the Intervention-Defendants on the issue of intent to cause financial injury.  The Intervention-Defendants created, executed, and filed the BML and the DOT.  Intervention-Defendants desired to cause the consequences of these acts: namely, obligating the Trevinos to pay for the manufactured home of Flores and King and subjecting their property to the threat of foreclosure should the payments not be made.  It does not matter that the Intervention-Defendants never required the Trevinos to pay any of these debts and never foreclosed on the Trevinos' property.  The possibility of these occurrences existed at the time the liens were filed; otherwise, the filing of the liens would have been without purpose.  See Aland, 271 S.W. at 431-32 (intent judged from time lien filed.)  Nor does it matter that Vanderbilt ultimately released the liens.  See Esau, 2008 Tex. App. LEXIS 4260, *1 ("the mere filing of a release of lien would not fully dispose of the issue as to whether the lien was

initially fraudulently filed with intent to cause either physical or financial harm.") (citing § 12.002(a)).  Indeed, the fact that Intervention-Defendants ultimately released the liens without informing the Trevinos because they thought it was "the right thing to do" supports the conclusion that Intervention-Defendants recognized the injury such liens created.  (D.E. 144, p. 6.)  As in Taylor, all of these actions suggest that Intervention-Defendants recognized that filing liens created negative consequences for property owners.  As such, the evidence of intent to cause financial injury is sufficient to preclude summary judgment on this issue.

On the other hand, summary judgment for the Intervenors on the issue of intent would also be inappropriate.  In Taylor, intent to cause injury was found only after a jury trial on the merits.  See 167 S.W.3d at 531.  Here, there remains a genuine issue of material fact as to whether the Intervention-Defendants acted with intent to cause the Trevinos financial injury, appropriate for review by a finder of fact.

To summarize, summary judgment for either party on the merits of the Intervenors' fraudulent lien claim is inappropriate.  Issues of fact remain as to whether the Intervention-Defendants knew that the lien documents were forged or falsely notarized.  Issues of fact remain as to whether Intervention-Defendants intended to cause the Trevinos financial injury by filing forged or falsely notarized documents creating liens on the Trevinos' property.

### 2.    Declaratory Judgment That The Contract Was "Paid in Full"

The Intervenors seek a declaratory judgment that the amounts due on the Retail Installment Contract between Cesar Flores and Alvin E. King and CMH Homes have been released or otherwise 'paid in full' as a result of CMH Homes and Vanderbilt filing releases in the real property records of Jim Wells County, Texas.  (D.E. 98 at 20.)  The Intervention-Defendants seek a summary judgment determination that the Trevinos' lack standing to bring

this claim, given that they no longer own their property and, as such, will be under no obligations to make payments under Flores and King's Contract if the Court finds the Contract has not, in fact, been paid in full.  (D.E. 145, p. 8.)

The Declaratory Judgment Act provides, "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."  28 U.S.C. § 2201(a).  "To possess standing to sue under the Act, a party must have a 'legal interest[] threatened in an actual controversy.'"  Stanley v. Wal-Mart Stores, 839 F. Supp. 430, 435 (N.D. Tex. 1993) (quoting Collin County v. Homeowners Assoc. (Haven), 915 F.2d 167, 170 (5th Cir. 1990)).  "A party's legal interest must relate to a justiciable claim arising under the law for which the Court has jurisdiction."  Id.

The Court finds the Trevinos have standing to pursue a declaratory judgment as to whether the underlying debt on Flores and King's Contract was paid in full.  As the Court explained in its August 25, 2010 Orders on Intervention-Defendants' Motions to Dismiss (D.E. 148, 149), the effect of the "paid in full" language is a threshold issue in this litigation, necessary for determination of many claims and factual disputes.  (D.E. 149, p. 40.)  It is particularly relevant to the Intervenors' fraudulent lien claim because CMH's and Vanderbilt's intentions in releasing the liens on the Trevinos' property will help a fact-finder determine their intentions in executing the liens on the Trevinos' property in the first place.  As discussed above, whether the Intervention-Defendants intended to cause the Trevinos' financial injury is the primary element that the Trevinos must prove under § 12.002.  As such, the Trevinos'

have a legal interest in determining whether Flores and King's debt under the Contract has been paid in full, and their interest relates to a justiciable claim between themselves and the Intervention-Defendants.  Stanley, 839 F. Supp. at 435.

### 3.    Common Law Unfair Debt Collection

The Intervention-Defendants seek summary judgment on the Intervenors' claim for common law debt collection on the ground that Intervenors make no claim, and provide no evidence to support, that Vanderbilt attempted to collect any debt from them.  (D.E. 145, p. 9-10.)  The tort of unreasonable debt collection is an intentional tort, "but the elements are not clearly defined and the conduct deemed to constitute an unreasonable collection effort varies from case to case."  EMC Mortg. Corp. V. Jones, 252 S.W.3d 857, 868 (Tex. App. – Dallas 2008).  One court has explained, "efforts that amount to a course of harassment that was willful, wanton, malicious, and intended to inflict mental anguish and bodily harm" will constitute common law unreasonable debt collection.  Id.

Although Vanderbilt made significant efforts to collect on the debt allegedly owed by Flores and King on their manufactured home, (D.E. 125, p. 18; Ex. H), it is undisputed that Vanderbilt never moved to collect any debt from the Trevinos based on the liens on their property and never moved to foreclose on the Trevinos' property, even though Flores and King were delinquent in their payments.  (D.E. 145, Ex. 16 (Krupacs Decl.) ¶ 7; Ex. 17 (Statum Decl.) ¶ 7.))  The Intervenors do not contend otherwise, and certainly have made no showing that the conduct at issue was "wanton, malicious," and intended to inflict "bodily harm."  The Court grants Intervention-Defendants' motions for summary judgment as to the Intervenors' common law debt collection claim.

### 4.    Texas Debt Collection Practices Act

The Intervention-Defendants move for summary judgment on the Intervenors' claim under the Texas Debt Collection Practices Act ("TDCA").  The TDCA prohibits various forms of threatening, coercive, harassing or abusive conduct by debt collectors, see Tex. Fin. Code. §§ 392.301-392.306, against a "consumer," defined as "an individual who has a consumer debt." § 392.001(1).  A "consumer debt" is defined as "an obligation, or an alleged obligation, primarily for personal, family, or household purposes and arising from a transaction or alleged transaction."  § 392.001(2).

The Court agrees with the Intervention-Defendants that the Trevinos do not qualify as "consumers" under the TDCA.  They are not individuals with a "consumer debt" arising from personal, family or household purposes.  See Cushman v. GC Servs., LP, 657 F. Supp. 2d 834, 841 (S.D. Tex. 2009) ("having 'a consumer debt' is the only prerequisite to "consumer' status.") (citing Tex. Fin. Code § 392.001(1)).  The Trevinos concede that they never purchased the manufactured home for which the liens serve as collateral and do not argue that they voluntarily took on any other obligation with respect to the liens on their property.  (D.E. 156, p. 17.)  The Court grants Intervention-Defendants' summary judgment motion as to the Intervenors' TDCA claim.

### 5.    Money Had And Received

The Intervention-Defendants seek summary judgment on the Intervenors' money had and received claim.  (D.E. 145, p. 9-10.)  To prove a claim for money had and received, "a plaintiff must show that a defendant holds money which in equity and good conscience belongs to him."  Edwards v. Mid-Continent Office Distribs., L.P., 252 S.W.3d 833, 837 (Tex. App. Dallas 2008) (citing Best Buy Co., Inc. 248 S.W.3d 160, 2007 WL 4216615 at *2 (Tex. 2007) (per curiam)).  The Intervenors present no evidence to support they paid any money to

Vanderbilt or CMH, and they do not respond to the Intervention-Defendants' arguments for summary judgment on this claim.  The Court grants summary judgment on the Intervenors' money had and received claim.

### 6.    Common Law Fraud

Intervention-Defendants seek summary judgment on the Intervernors' fraud claim.  To establish common law fraud under Texas law, a plaintiff "bears the burden to prove the existence of the following: '[1] a material misrepresentation, [2] which was false, and [3] which was either known to be false when made or was asserted without knowledge of the truth, [4] which was intended to be acted upon, [5] which was relied upon, and [6] which caused injury.'" Johnson & Johnson Med., Inc. v. Sanchez, 924 S.W.2d 925, 929-30 (Tex. 1996); see also GeoSurveys, Inc. v. State Nat'l Bank, 143 S.W.3d 220, 226 (Tex. App. Eastland 2004).

In light of this Court's August 25, 2010 Orders on the Intervention-Defendants' Motions to Dismiss (D.E. 148, D.E. 149), the Trevinos' remaining fraud theories are: (1) that the Intervention-Defendants engaged in fraud by filing lien documents in the public record that were forged and falsely notarized (D.E. 149, p. 13-15; D.E. 156, p. 17-18.); and (2) that they engaged in fraud by secretly filing releases of these liens in the public record, while continuing to collect on the debt and without informing Flores and King or the Trevinos that the releases had been filed.  (D.E. 149, p. 15-17.)

Vanderbilt contends that the Intervenors cannot show the elements of material misrepresentation, reliance, or injury.  (D.E. 145, p. 10-14.)  The Court disagrees with respect to the Intervenors' first theory.  As explained above, issues of fact remain as to whether Intervention-Defendants forged and falsely notarized the BML and DOT creating liens on the

Trevinos' property.  If they were forged or falsely notarized, then filing these liens in the public record constituted misrepresentations of fact – that they contained the Trevinos' signatures and that these signatures were properly notarized as required by Texas law.  See Alvarado, 2002 WL 1072067, *5.  By recording these documents in the public records, the Intervention-Defendants necessarily intended to induce reliance upon them by any member of the public inspecting them.[20]  If the allegations of forgery and improper notarizing are true, then the Trevinos were injured because they were obligated under the BML and DOT based on a debt that they did not voluntarily incur.  (D.E. 124, p. 15; D.E. 144, Ex. 14, 13.)

As to the Intervenors' second theory, issues of fact remain as to whether Flores and King's debt was discharged by the releases.  As such, it remains for a fact-finder to determine whether filing the releases without informing Flores and King or the Trevinos, while continuing to collect on the debt from Flores and King, constituted fraud.  However, the evidence shows the Trevinos no longer owned their property when the releases were filed in October 2005, and that Vanderbilt never attempted to collect any debts from them after filing the releases.  Therefore, they cannot establish that they were injured by the alleged misrepresentations in the releases.

The Court grants Intervention-Defendants' motion for summary judgment on the Intervenors' fraud claim based on filing of the releases, but denies summary judgment on the Intervenors' fraud claim based on filing the allegedly fraudulent DOT and BML.

---

[20] Under Texas law, "[o]ne who makes a fraudulent misrepresentation may be liable to a third person, to whom the misrepresentation was not directly made, if the person making the misrepresentation had intent or knowledge that it should be exhibited or repeated to a third person and intended or had reason to expect the third person would act or refrain from acting in reliance upon the misrepresentation.  In other words, a misrepresentation does not have to be made directly to the particular person seeking relief.  It is sufficient to show that the misrepresentation was intended or expected to reach the third person and was made with the intent or expectation the third person would rely on it."  Burroughs v. APS Int'l, Ltd., 93 S.W.3d 155, 162 (Tex. App. – Houston [14th Dist.] 2002) (internal citations omitted).

### 7.   Civil Conspiracy

The elements for civil conspiracy are: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as a proximate result." Chon Tri v. J.T.T., 162 S.W.3d 552, 556 (Tex. 2005).  Intervention-Defendants argue that Intervenors have failed to show any unlawful acts underlying the conspiracy or a "meeting of the minds" on the objects of the conspiracy.  (D.E. 145, p. 15-16.)  Intervenors respond that the underlying tort was the filing of fraudulent liens on the Trevinos' property.  They contend that the evidence demonstrates that Vanderbilt, Clayton Homes, Inc., CMH Homes and Kevin Clayton all worked together to file fraudulent documents creating liens on the Trevinos' property, and that they would not have been able to do so if there were not a "meeting of the minds."  (D.E. 156, p. 19.)

The Court finds the summary judgment evidence is sufficient to raise issues of fact as to whether there was a "meeting of minds" among the named defendants to generate fraudulent liens on the Trevinos' property.   "A conspiracy may be established by circumstantial evidence." Pasley v. Pasley, 2005 Tex. App. LEXIS 6680, *12-13 (Tex. App. Amarillo Aug. 18, 2005) (citing Lesikar v. Rappeport, 33 S.W.3d 282, 302 (Tex. App.-Texarkana 2000, pet. denied)).  "An agreement between parties on a course of action need not be formal but may be tacit." Id. (citing J.T.T. v. Tri, 111 S.W.3d 680, 684 (Tex. App.-Houston [1st Dist.] 2003), rev'd on other grounds, 162 S.W.3d 552, 48 Tex. Sup. Ct. J. 632 (Tex. 2005)).   "It is also not essential that each conspirator have knowledge of the details…inferences of concerted action may be drawn from participation in the transactions and from the enjoyment of the fruits of the transactions." Id. (citing Lesikar, 33 S.W.3d at

302) (citing <u>International Bankers Life Ins. Co. v. Holloway</u>, 368 S.W.2d 567, 581-82, 6 Tex. Sup. Ct. J. 426 (Tex. 1963)) (emphasis added).

As described at length above, CMH Homes employees at the Corpus Christi store executed the "land in lieu" transactions, signing and notarizing the documents that created liens on property as collateral to support manufactured home sales. These transactions were approved by store manager John Wells. The documents were then sent to CMH's headquarters in Tennessee where another corporate employee signed off on them. CMH Homes was responsible for the policies and procedures that allowed the alleged forgery and false notarizing to occur – and, according to Intervenors – actually encouraged it in order to reduce the cost of its business. Vanderbilt provided the financing for all of these transactions, owned a security interest in the property used as collateral on these sales, and alleges that it was the sole assignee of the retail contracts on which the sales were based. Vanderbilt profited off of these transactions by collecting payments from home purchasers and by selling securities generated from the debts created by sales contracts that were backed by real property. Finally, Kevin T. Clayton was a member of the board of directors of CMH Homes and CEO of Clayton Homes, Inc. Clayton Inc.'s profits, as well as Clayton's personal success, depended on the activities of Clayton's subsidiaries, CMH and Vanderbilt.

While none of this evidence directly indicates an express agreement among these entities to forge and falsely notarize lien documents, it suggests a tacit agreement on the part of all players to carry on or allow fraudulent activities to occur, with the knowledge that they generated profits for the Clayton Homes business and for the individuals involved in it. <u>See</u> <u>Pasley</u>, 2005 Tex. App. LEXIS 6680, *12-13 (finding that defendant "knowingly participating" in financial transactions to his benefit created the inference of concerted action

sufficient to support jury verdict of conspiracy). Issues of fact remain as to whether the Intervention-Defendants had an express or tacit agreement to forge or falsely notarize documents creating liens on the Trevinos' property in order to generate profits. Summary judgment on the Intervenors' conspiracy claim is inappropriate as well.

### 8. RICO Claims

The Intervenors have alleged violations of each subsection of RICO, 18 U.S.C. §§ 1962(a) – (d). In light of this Court's August 25, 2010 Orders on Intervention-Defendants' Motions to Dismiss the Intervenors' Claims (D.E. 148, 149), the only remaining RICO claims at issue in Intervention-Defendants' Motions for Summary Judgment are the alleged violations of § 1962(c) and § 1962(d). Many of the arguments discussed below have already been addressed in the Court's Orders on Intervention-Defendants' Motions to Dismiss. (D.E. 148, D.E. 149.) However, the Court returns to these arguments in light of the new evidence on record to determine whether the Intervenors have met their burden to withstand summary judgment on these claims.

As an initial matter, the Court must determine the threshold issue of standing. The standing provision of civil RICO provides that "any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor . . . and shall recover threefold the damages he sustains." 18 U.S.C. § 1964(c). There is "no distinct 'racketeering injury' requirement." Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 495 (1985). However, the "plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property." Id. As the Fifth Circuit has explained, "speculative damages are not compensable under RICO," nor are "intangible property interest[s]." In re Taxable Mun. Bond Sec. Litig., 51 F.3d 518, 523 (5th Cir. 1995). It is well established that "injuries to

property are not actionable under RICO unless they result in tangible financial loss to the plaintiff." Fisher v. Halliburton, 2009 WL 5170280, at *5 (S.D. Tex. Dec. 17, 2009) (emphasis added); see In re Taxable Mun. Bond Sec. Litig., 51 F.3d at 523 (must show a "conclusive financial loss").

The Intervention-Defendants contend the Intervenors lack standing because they have not suffered out-of-pocket expenses due to alleged RICO violations.  (D.E. 145, p. 16-17.) The Intervenors concede that they have conveyed the property once subjected to allegedly fraudulent liens and have presented no evidence whatsoever that Intervention-Defendants' actions resulted in financial loss to them.  In fact, when deposed, Arturo Trevino was asked by counsel for the Intervention-Defendants whether, because of the liens filed on his property, he "suffered any losses of any kind."  Mr. Trevino conceded that he did not.  (Arturo Trevino Deposition, June 23, 2010 p. 90.)  Ms. Trevino similarly stated that she was not aware of any financial injury due to the liens on her property.  (Maria Trevino Deposition, March 9, 2010, p. 68.)  Simply put, Intervenors have not shown a "tangible" or "conclusive" financial loss. They therefore have no standing to assert a RICO cause of action.

As such, Intervention-Defendants' summary judgment motions with respect to the Intervenors' RICO cause of action under either Section 1962(c) or 1962(d) is granted.

### 9.      Claim for Mental Anguish Damages

Intervention-Defendants contend that the Intervenors have not met their burden on summary judgment to support their demand for mental anguish damages.  (D.E. 145, p. 24-25.)  The Intervenors respond that they have sufficiently alleged mental distress.  Maria Trevino alleges she "became very angry and was extremely upset" when she was first shown the DOT and the BML containing hers and Arturo Trevinos' signatures.  She alleges she was

concerned in part because she had already deeded her lots to her brother Gilbert, and was not sure what he would think if he found out there was a lien on the property that she and her husband had given to him.  (D.E. 145, Ex. 18, No. 7.)[21]  Arturo Trevino alleges he has suffered distress as a result of the Intervention-Defendants using his identity and property for profit. (Arturo Trevino Deposition, June 23, 2010, p. 90-92.)[22]

   The Court finds these bare allegations of mental anguish, without more supporting facts or evidence, insufficient as a matter of law.  "[D]amages for mental anguish must be supported by either "'direct evidence of the nature, duration, and severity of [plaintiffs'] anguish, thus establishing a substantial disruption in the plaintiffs' daily routine,' or other evidence of 'a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger.' " Dinn v. Hooking Bull Boatyard, Inc., 2009 U.S. Dist. LEXIS 60702, 25-26 (S.D. Tex. July 16, 2009) (citing Burlington Coat Factory Warehouse of El Paso, Inc. v. Flores, 951 S.W.2d 542, 548 (Tex. App.--El Paso 1997, no writ) (quoting Parkway Co. v. Woodruff, 901 S.W.2d 434, 444 (Tex. 1995))).  Neither of the Intervenors has seen a doctor or presented any other evidence regarding their alleged mental anguish.  They have not pointed to additional conduct by the Intervention-Defendants that might have caused them distress, other than filing liens on their property.   The Trevinos concede that they

---

[21] When initially asked in her deposition whether she had suffered any mental distress, Ms. Trevino referred the question to her lawyer rather than responding directly.  Intervention-Defendants contend Ms. Trevino cannot now "contradict" her deposition testimony with post-deposition interrogatory statements regarding her alleged distress.  (D.E. 145, p. 24) (citing Doe ex rel. Doe v. Dallas Indep. Sch. Dist., 220 F.3d 380, 386 (5th Cir. 2000)). However, unlike in the line of cases the Intervention-Defendants refer to, see e.g., S.W.S. Erectors, Inc. v. Infax, Inc., 72 F.3d 489, 495 (5th Cir. 1996), Ms. Trevino did not "manufacture" a dispute of fact as to her mental anguish by submitting a subsequent interrogatory "contradicting" her prior testimony.  Ms. Trevino never stated in her deposition she had suffered no anger or anxiety.  She simply referred the question of whether she had suffered mental anguish to her lawyer.  (Maria Trevino Deposition, March 9, 2010, p. 68.)
[22] Intervention-Defendants contend Mr. Trevino concedes his stress was not caused by CMH and Vanderbilt, but was the result of the litigation itself.  (D.E. 145, p. 25.)  However, Mr. Trevinos' statements do not necessarily indicate his stress was due solely to the events surrounding his lawsuit.  Mr. Trevino states in his deposition testimony that he suffered "stress and anger and worries" as a result of what was done to him.  (Arturo Trevino Deposition, June 23, 2010, p. 90.)  When asked to what conduct he referred to, Mr. Trevino answered "using my – my land – signature and land to profit from it."  (D.E. 144, Exhibit 25, p. 92.)

conveyed their property to Cesar and Gilbert Flores in 2003, and that they were unaware that the liens had been filed until the start of this litigation.  As for Ms. Trevino's concern for Gilbert Flores, current owner of the lots, the liens on the lots have since been released.

The Intervenors' citation to debt collection cases, in which Texas courts have been more lenient in allowing recovery for mental anguish damages, see Ledisco Financial Services, Inc. v. Viracola, 533 S.W.2d 951 (Tex. App. 1976), is inapposite.  As discussed above, the Trevinos have not alleged, or provided facts to support, that either CMH or Vanderbilt attempted to collect debts from them.  The Intervenors also argue that because they have brought a claim under Tex. Civ. Prac. & Rem. Code § 12.002, which requires proving the defendant acted with intent to cause another person to suffer physical injury, financial injury, or "mental anguish or emotional distress," this warrants damages for mental distress.  (D.E. 156, p. 23.)  However, Section 12.002 explicitly provides for damages in the amount of the greater of $ 10,000 or actual damages, in addition to court costs, reasonable attorney's fees, and exemplary damages as determined by the court. § 12.002(b).  It makes no mention of mental anguish damages.  Moreover, the Trevinos do not base their claim under §12.002 on the allegation that Intervention-Defendants intended to cause them mental anguish or emotional distress; rather they allege intent to cause financial injury.  (D.E. 156, p. 14.) Without further proof of mental anguish, the Trevinos are not automatically entitled to mental anguish damages simply because they bring claims under the fraudulent lien statute.

The Intervenors have failed to meet their burden on summary judgment to demonstrate they suffered mental anguish as a result of Intervention-Defendants' conduct.  The Court grants Intervention-Defendants' motion for summary judgment on the Intervenors' claim for mental anguish damages.

C.      **Liability of Clayton Homes**

Intervention-Defendants argue that even if the Court finds Vanderbilt and CMH Homes liable for any of the above claims, the Court cannot hold CHI, i.e. "Clayton Homes, Inc.," liable for the violations of its subsidiaries.  (D.E. 144, p. 22; D.E. 146, p. 3-4; D.E. 147, p. 3-4.)  It is a bedrock principle of corporate law that a parent corporation is not liable for actions taken by its subsidiaries.  See United States v. Bestfoods, 524 U.S. 51, 61 (1998); see also Bridas S.A.P.I.C. v. Gov't of Turkmenistan, 447 F.3d 411, 416 (5th Cir. 2006), cert. denied, 549 U.S. 1051 (2006) ("Bridas II").  However, under the alter ego doctrine, a parent company can be found liable if: "(1) the company exercised complete control over the corporation with respect to the transaction at issue, and (2) such control was used to commit a fraud or wrong that injured the party seeking to pierce the veil."  Bridas S.A.P.I.C. v. Gov't of Turkmenistan, 345 F.3d 347, 359 (5th Cir. 2003) ("Bridas I").

Intervention-Defendants contend that the Intervenors cannot show the alter ego doctrine applies to CHI's relationship with CMH Homes because there is no evidence CHI had "complete control" over CMH or that it specifically controlled CMH employees' execution of the documents creating liens on the Trevinos' property.  (D.E. 144, p. 22-23.)   The Court disagrees.  The issue of control cannot be decided as a matter of law at this stage.  Alter ego determinations are highly fact-based, requiring the fact-finder to consider the totality of the circumstances in which the instrumentality functions.  Bridas I, 345 F.3d at 359.  To determine whether a parent company has complete control over a subsidiary for purposes of applying the doctrine, courts look at a variety of factors, including whether: (1) the parent and subsidiary have common directors or officers; (2) the parent finances the subsidiary; (3) the parent pays salaries and other expenses of subsidiary; (4) the subsidiary receives no business except that

given by the parent; (5) the parent uses the subsidiary's property as its own; (6) the daily operations of the two corporations are not kept separate; (7) the directors of the "subsidiary" act in the primary and independent interest of the "parent"; (8) and the alleged dominator deals with the dominated corporation at arms length.  Tejas Inc. v. Siemers, 2009 U.S. Dist. LEXIS 76070, * 12-13 (W.D. Tex. Aug. 26, 2009) (citing Bridas I, 345 F.3d. at 360, n.11.)

In this case, the summary judgment evidence implicates several of these "control factors."   CHI is incorporated in Delaware.   Intervention-Defendants contend it does no business in Texas and is not involved in the day-to-day activities of CMH Homes' retail establishments or in Vanderbilt's financing activities.  (D.E. 144, p. 3; Ex. 3 (Ponce Decl. ¶¶ 5, 7, 8.)  However, there is evidence that CHI's and CMH's daily operations are not kept separate.  CHI's 10K Report to the SEC states that CHI makes and owns the manufactured homes sold by CMH's network of company-owned and independent retailers.  Upon order from the retailer, CHI completes production of the home and transports the home to the retail center through independent carriers.  (D.E. 156, Ex. A, p. 2.)  CHI made, owned, and transported the home that was sold to Flores and King at the Corpus Christi store.  (D.E. 156, Ex. K.)  In addition, CHI played a role in controlling how its retailers marketed CMH's services.[23]  CHI directly marketed its services to Texas residents.  (D.E. 156, Ex. H, advertising letter issued by "Clayton Homes, Inc.")  CHI provides administrative staff for company-owned stores.  (D.E. 156, Ex. A (10 K Report), p. 4.)  Through its finance subsidiary, Vanderbilt, CHI provides financing for CMH customers.  (D.E. 156, Ex. A (10 K Report), p. 3.)  The management of CMH and Vanderbilt act in the interests of CHI in order to

---

[23] CHI distributed a Learner's Guide to retail stores providing guidance on how to successfully market a sales center.  Specifically, it contains a marketing research model, suggestions for using research data, an approach to shopping the competition, blank data sheets, and suggestions for using competitive data.  (D.E. 156, Ex. B., "Learner's Guide.")

make profits for CHI and its shareholders.  (D.E. 156, Ex. A (10 K Report), p. 3.)  Kevin

Clayton, CEO of CHI, is also on the Board of Directors of CMH Homes.  (D.E. 144, Ex. 4.

(Clayton Decl. ¶i.))

      This evidence is sufficient to raise a genuine issue of material fact as to the extent of

CHI's control over CMH operations.  Whether the alter ago doctrine applies is a fact-intensive

inquiry appropriate for a jury to decide.  <u>Bridas I</u>, 345 F.3d at 359.

### D.  Liability of Kevin Clayton

      Intervention-Defendant Kevin Clayton contends that, even if Vanderbilt, CMH and

CHI are liable for the above claims, Kevin Clayton cannot be personally liable for any actions

in which he was not directly involved.  (D.E. 144, p. 23-25; D.E. 146, p. 3-4.)  The Intervenors

object that, contrary to his assertions that he had no involvement in the issues surrounding this

litigation, Clayton "took personal involvement with the unlawful activity that was occurring in

the Corpus Christi store[.]"  (D.E. 156, p. 6-7.)

      "It is well settled law that when corporate officers directly participate in or authorize

the commission of a wrongful act, even if the act is done on behalf of the corporation, they

may be personally liable."  <u>Moss v. Ole South Real Estate, Inc</u>., 933 F.2d 1300, 1312 (5th Cir.

1991) (citations omitted).  "Texas courts have routinely found that 'a corporate officer may

not escape liability where he had <u>direct, personal participation in the wrongdoing</u>, as to be the

'guiding spirit behind the wrongful conduct or the central figure in the challenged corporate

activity.'"  <u>Morrison v. Western Builders of Amarillo, Inc. (In re Morrison)</u>, 555 F.3d 473, 481

(5th Cir. 2009) (emphasis added).

      As the Court has noted elsewhere (D.E. 91, 158), there is some evidence suggesting

that Kevin Clayton was personally involved in the events giving rise to this lawsuit.  Clayton

is the President and CEO of CHI and a member of the Board of Directors of CMH Homes. (D.E. 144, Ex. 4. (Clayton Decl.) ¶ 1.)  Clayton attests that his duties as President and CEO of CHI are "to provide leadership and strategic oversight in order to position CHI at the forefront of the manufactured housing industry.  This includes assisting the executive management of CHI's operating subsidiaries [CMH and Vanderbilt] as appropriate, in order to advance CHI's overall corporate objectives of growth, profitability, and leadership in the industry."  (D.E. 144, Ex. 4 (Clayton Decl.) ¶ 3.   He clarifies that "the day-to-day responsibilities of running the subsidiaries and managing their operations are handled by the management and employees of each respective subsidiary."  (D.E. 144, Ex. 4 (Clayton Decl.) ¶ 3.)

Clayton is also the named trustee on many of the lien documents involved in this case, including those relating to the Trevinos' property.  (D.E. 144, Ex. 13, Ex. 14, Ex. 4 (Clayton Decl.) ¶ 10.)  As trustee on the lien documents, he commonly signed releases of the liens for various reasons, (D.E. 156, Ex. O (Clayton deposition), p. 54), though he did not sign the releases of the DOT and BML on the Trevinos' land.  (D.E. 144, Ex. 4 (Clayton Decl.) ¶ 13.)

In the wake of allegations at the Corpus Christi store, Clayton traveled to Corpus Christi several times, (D.E. 144, Ex. 4 (Clayton Decl.) ¶ 6; D.E. 156, Ex. O (Clayton Deposition), p. 135), though he attests that he never actually visited the Corpus Christi store while it was open.  (D.E. 144, Ex. 4 (Clayton Decl.) ¶ 1.)  Clayton was also involved in settling the lawsuits resulting from the alleged fraud by CMH employees.  (D.E. 156, Ex. O, p. 135).  On May 25, 2004, Clayton issued an employee-wide voicemail to CMH Homes sales associates addressing the recent law suits and reminding them to use proper procedures when notarizing documents in "land in lieu" transactions.  (D.E. 144, Exhibit A, p. 39-40, 43.)

Clayton was also apparently involved in dealing with complaints from customers claiming their signatures on BML's and DOT's had been forged.  For example, on March 22, 2004, he personally signed a release of a lien on real estate for a customer from Georgia. (D.E. 156, Ex. X; D.E. 156, Ex. O (Clayton Deposition), p. 49-53.)   The Intervenors allege that Clayton signed the release because the Georgia customer had complained of forgery in the execution of the lien – apparently contradicting Clayton's January 6, 2005 testimony that he knew of no complaints from outside Lot 214.  (D.E. 156, p. 7, Ex. U.)

The above evidence clearly establishes that Clayton was involved in dealing with the fall-out from the events at the Corpus Christi store.  But his actions are not unusual for a corporate executive addressing and attempting to rectify accusations of fraud on the part of company employees.   There is very little additional evidence that Clayton was directly involved in the allegedly fraudulent conduct of CMH employees or that he had a direct role in supervising those employees.  Clayton's 2004 voicemail to CMH employees indicates only that he recognized, after the fact, that some employees may have been engaged in false notarizing and that he was fulfilling his role as leader of the corporation to urge employees not to engage in fraud.[24]  As noted above, Clayton regularly signed releases of liens on real property in his role as trustee,[25] and the evidence suggests some of these customers had complained their signatures on DOT's and BML's were forged.   (D.E. 156, Ex. W

---

[24] For example, at one point Clayton stated in the voice mail: "If you're notarizing a document, then that means that your using it, and the, and the person across from you is exactly who they are; you've checked their ID, and you know that… We're all out there doing transactions every day, and we have to represent the company 100 percent ethically.  There isn't tolerance for fraud in the company.  And I – and we see very little of that, and I'm so proud of that.  But, but any cases of it, it has to be reported, and there's zero tolerance for it because it, it, it ruins the reputation and the livelihood of all 10,000 others of us.  So thanks for all you do, and, and, enforce that. It means all of our futures."  (D.E. 144, Exhibit A, p. 39-40, 43) (emphasis added).

[25] In response to counsel's question as to why Clayton might have signed a deed release, Clayton stated: "Often younger people get a home, and they didn't have the amount of down payment needed or they didn't have the credit that they needed to qualify, then they would have…usually a relative to put their land as security interest. And then after the people paid on time for "X" number of years, we would then do this partial release and release the land as collateral.  I don't know that that's the case right here.  But, for many reasons, I was signing releasing customers' land."  (D.E. 156, Ex. O (Clayton deposition), p. 52)

("Complaint List").)  However, this does not indicate Clayton was the "guiding spirit" or the "central figure" behind the allegedly fraudulent execution of those documents.  Moreover, he did not actually sign the releases of the liens filed on the Trevinos' property.  Rather, these releases were executed, in mass, after deliberations by Vanderbilt and CMH presidents, Peter Nichols and David Booth.  (D.E. 156, Ex. O (Clayton Decl.), p. 164-66; D.E. 144, p. 6.)

The Intervenors' contention that Clayton was lying in his 2005 deposition testimony when he said he was not aware of complaints from locations other than the Corpus Christi store is also not supported by the record.  In his August 24, 2010 deposition, Clayton was questioned about his March 2004 signature on the release of the Georgia customer's lien.  Clayton objected to counsel's suggestion that his signature on the release indicates that his 2005 statement that he knew of no complaints from outside Lot 214 was inaccurate.  (D.E. 156, Ex. O (Clayton deposition), p. 54-56.)  Clayton admitted to signing the release, but stated that it would be "a very common practice" for him to sign a lien release and that the reason for the release was not necessarily a complaint of forgery.[26]   (D.E. 156, Ex. O (Clayton deposition), p. 52.)  Even if it is true that this particular customer had complained of forgery or notary fraud,[27] there is no evidence Clayton knew about it when he signed the release.

The Court finds that, based on this evidence, no reasonable trier of fact could find Clayton's conduct constituted "direct, personal participation" in the allegedly fraudulent activities of CMH employees or in the alleged efforts of CMH and Vanderbilt's management to conceal those acts.  Mozingo, 752 F.2d at 174.  See also Anderson, 477 U.S. at 248

---

[26] Specifically, Clayton suggested that the reason for the release might have been that there was no longer a need for the real estate to serve as collateral to ensure payments of the underlying debt. (D.E. 156, Ex. O (Clayton deposition), p. 52)

[27] The Intervenors present some evidence that the customer did make a complaint that her signature had been forged.  They present a "Complaint List" listing hundreds of complaints of forgery of DOT's and BML's, some from states outside Texas.  (D.E. 156, Ex. W.)  However, the list does not include a date for the complaint in question, and the customer's address is listed as unknown.  (D.E. 156, Ex. W, p. 11 (Elizabeth Wilson complaint)).

(summary judgment is inappropriate "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.")   Kevin Clayton's Motion for Summary Judgment is therefore granted.

## IV.    Conclusion

For the reasons stated above, the Intervenors' Motion for Partial Summary Judgment (D.E. 124) is DENIED.   Intervention-Defendants Vanderbilt, CMH Homes and Clayton Homes Inc.'s Motions for Summary Judgment, (D.E. 145, D.E. 147), are hereby DENIED IN PART and GRANTED IN PART.   Specifically, the Court GRANTS Intervention-Defendants Vanderbilt, CMH Homes and Clayton Homes Inc.'s Motions for Summary Judgment with respect to the following causes of action: (1) common law unfair debt collection; (2) Texas Debt Collection Act; (3) money had and received; (4) common law fraud (based on filing the lien releases); (5) RICO claims under 18 U.S.C. §1962(c), §1962(d) and (6) claims for mental anguish damages.   The Court DENIES Intervention-Defendants Vanderbilt, CMH Homes and Clayton Homes Inc.'s Motions for Summary Judgment with respect to the following causes of action: (1) fraudulent lien claim under Tex. Civ. Prac. & Rem. Code §12.002; (2) declaratory judgment that Flores and King's debt under the Contract was "paid in full"; (3) common law fraud (based on filing the allegedly fraudulent liens); and (4) civil conspiracy.   Intervention-Defendant Kevin T. Clayton's Motion for Summary Judgment (D.E. 146) is hereby GRANTED.

SIGNED and ORDERED this 20th day of October, 2010.

Janis Graham Jack
Janis Graham Jack
United States District Judge