UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| VANDERBILT MORTGAGE AND | § | |
| FINANCE, INC., | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. C-09-312 |
| | § | |
| CESAR FLORES, *et al*, | § | |
| | § | |
| Defendants. | § | |

## ORDER

On this day came on to be considered Defendants/Counter-Plaintiffs Cesar Flores and Alvin E. King's Motion for Partial Summary Judgment on the issue of whether their debt has been "paid in full" (D.E. 125); and Plaintiff/Counter-Defendant Vanderbilt Finance and Mortgage Inc.'s Motion for Summary Judgment as to Flores and King's Counterclaims (D.E. 143). For the reasons stated herein, Defendants/Counter-Plaintiffs' Motion for Partial Summary Judgment (D.E. 125) is DENIED. Plaintiff/Counter-Defendant Vanderbilt's Motion for Summary Judgment (D.E. 143) is also DENIED.

## I. Jurisdiction

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, federal question, because Intervenors Maria and Arturo Trevino brought claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 ("RICO"), and Intervention-Defendant CMH Homes, Inc. properly removed this case to this Court pursuant to 28 U.S.C. § 1441. (D.E. 34.)

## II.      Factual and Procedural Background

The factual and procedural background relevant to the current summary judgment motions are as follows:

Defendants/Counter-Plaintiffs Cesar Flores and Alvin E. King entered into a Retail Installment Contract (the "Contract") with Intervention-Defendant CMH Homes for the purchase of a manufactured home.  Plaintiff/Counter-Defendant Vanderbilt Finance and Mortgage, Inc. ("Vanderbilt") provided the financing for the Contract.  When they signed the Contract at the Corpus Christi store of CMH Homes on January 5, 2002, Flores and King opted to finance the entire $40,815.19 purchase price, obligating themselves to make a total of $73,641.60 in payments.  (D.E. 142, p. 4; Ex. 1; Ex. 2, (Flores Deposition), p. 49.)  The debt was secured by two vacant lots in Jim Wells County, Texas owned by Intervenors Maria and Arturo Trevino, the sister and brother-in-law of Flores.   (D.E. 142, Ex. 1.)   A Deed of Trust ("DOT") and a Mechanic's and Builder's Lien ("BML"), filed in the records of Jim Wells County on January 11, 2002, created security interests in the Trevinos' property.  Specifically, the DOT created a security interest in favor of Vanderbilt; the BML created a security interest in favor of CMH Homes.   According to Vanderbilt, CMH Homes immediately assigned the Contract to Vanderbilt, and Vanderbilt paid CMH Homes $40,815.19 as consideration for the assignment on January 16, 2002. (D.E. 142, Ex. 1, p. 4; Ex. 8 (Krupac Decl. ¶ 3.))

The Counter-Plaintiffs now contend that many of the property owners whose property secured these debts did not voluntarily pledge their property to secure the purchases of manufactured homes.  Rather, they contend, CMH employees at the Corpus Christi store of CMH Homes (referred to as "Lot 214") forged and then falsely notarized the signatures of property owners, including the Trevinos' signatures, in order to create liens on their property

without adhering to proper verification procedures or ensuring they had property owners' permission to create the liens. (D.E. 98, p. 4; D.E. 144, Ex. 12, p. 38-39 (Maria Trevino deposition); Exhibit 25, p. 89 (Arturo Trevino deposition.)) Beginning in 2004, various lawsuits based on these allegations were brought on behalf of manufactured home purchasers and property owners.

In 2005 CMH and Vanderbilt released the liens created by BML's and DOT's for nearly 400 parcels of land, including the Trevinos' property. (D.E. 142, p. 4.) The Builder's and Mechanic's Lien Release ("BML Release") provides, in relevant part:

> CMH Homes, Inc. . . . declares that it is the true and lawful owner and holder of that certain note and indebtedness secured by a MECHANICS LIEN CONTRACT executed by Maria M. Trevino & Arturo Trevino, dated January 5, 2002, and recorded in OFFICIAL PUBLIC RECORDS . . . in the office of the COUNTY CLERK for JIM WELLS COUNTY, Texas to which THE MECHANIC LIEN CONTRACT or specific reference is hereby made; <u>and for a valuable consideration in hand paid, the said, CMH Homes, Inc. does hereby release the lien of said MECHANICS LIEN CONTRACT and has been paid in full.</u>

(D.E. 125, Ex. H.) (emphasis added)). The Deed of Trust Release ("DOT Release") provides:

> Vanderbilt Mortgage and Finance, Inc. . . . declares that it is the true and lawful owner and holder of that certain note and indebtedness secured by a deed of trust and/or mortgage executed by Maria M. Trevino & Arturo Trevino to Kevin T. Clayton, trustee, and dated January 5, 2002, filed for record in the office of the Register of Deeds for Jim Wells County, Texas . . . to which deed of trust and/or mortgage or specific reference is hereby made; <u>and for a valuable consideration in hand paid, the said Vanderbilt Mortgage and Finance, Inc., does hereby RELEASE the lien of said deed of trust and/or mortgage.</u>

(D.E. 125, Ex. I (emphasis added)). Notably, the DOT release does not contain the phrase that Vanderbilt has been "paid in full."

Flores and King, meanwhile, continued to live in their manufactured home until King moved out in the spring of 2009; Flores continued to live there until recently, when he moved in with his mother. (D.E. 145, p. 4.) Flores and King made 84 payments on their Contract until

they defaulted.  Payments in the amount of $25,000 were made after the BML and DOT releases were filed.  (D.E. 143, p. 14; Ex. 20, at Interrog. No. 5.))

On August 4, 2009, Vanderbilt brought suit to foreclose on Flores and King's home.  On September 18, 2009, Flores and King counter-sued, bringing the following causes of action: (1) common law unfair debt collection; (2) Texas Debt Collection Practices Act ("TDCA"); (3) fraud; (4); and claims under RICO.  (D.E. 1, Ex. B.)   Maria and Arturo Trevino subsequently intervened in the lawsuit, bringing similar causes of action and joining additional Intervention-Defendants, CMH Homes, Clayton Homes, Inc., Kevin T. Clayton, John Wells, and Benjamin Frazier (collectively, the "Intervention-Defendants.")  (D.E. 11, Ex. C; D.E. 98.)[1]  CMH Homes removed the entire action to this Court based on federal question jurisdiction under RICO and 28 U.S.C. § 1331.  (D.E. 1.)

The Counter-Plaintiffs now move for partial summary judgment on the specific issue of whether their debt to Vanderbilt under the Contract for their manufactured home has been "paid in full."  They contend that Vanderbilt released their debt in October 2005 when it executed releases of the attendant liens placed on the Trevinos' property, and that they were subsequently forced to make payments on a debt they no longer owed.  (D.E. 125.)  There is no dispute that the underlying debt has not actually been paid.  Flores and King admit that they have made only 84 payments of the 144 payments they owed on the Contract.  (D.E. 142, Ex. 14 (David Barton Decl.), ¶4; D.E. 142, Ex. 2 (Flores Depo.), p. 67-68.)  However, the Counter-Plaintiffs argue that the "paid in full" phrase in the BML Release has the effect of "releasing both the forged lien and deed of trust on the Trevinos' real property in Jim Wells County, and also releasing the debt purportedly secured by the forged real estate documents originally owed by Mr. Flores and Mr. King as "paid in full."  (D.E. 125, p. 4.)  They assert that the summary judgment evidence

[1] **The only remaining Intervention-Defendants are CMH Homes, Clayton Homes, Inc., and Kevin Clayton.**

"conclusively establishes that Clayton Homes intended to release, and did in fact, release the debt owed by Mr. Flores and Mr. King as 'paid in full,' as of October 8, 2005." (D.E. 125, p. 4.)

Vanderbilt disputes this characterization of the intentions behind the Releases and of the Releases' legal effect based on a number of theories which the Court addresses more specifically below. (D.E. 142, p. 2-3.) Vanderbilt has moved for summary judgment on all the Counter-Plaintiffs' claims which include (1) common law unfair debt collection; (2) Texas Debt Collection Practices Act ("TDCA"); (3) fraud; and (4) RICO. (D.E. 143.)

## III.  Discussion

### A.    Summary Judgment Standard

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate if the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).  The substantive law identifies which facts are material.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Ellison v. Software Spectrum, Inc., 85 F.3d 187, 189 (5th Cir. 1996).  A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; Judwin Props., Inc., v. U.S. Fire Ins. Co., 973 F.2d 432, 435 (5th Cir. 1992).

On summary judgment, "[t]he moving party has the burden of proving there is no genuine issue of material fact and that it is entitled to a judgment as a matter of law." Rivera v. Houston Indep. Sch. Dist., 349 F.3d 244, 246 (5th Cir. 2003); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the moving party meets this burden, "the non-moving party must show that summary judgment is inappropriate by setting forth specific facts showing the

existence of a genuine issue concerning every essential component of its case." Rivera, 349 F.3d at 247. The nonmovant "may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); see also First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 270 (1968). The nonmovant's burden "is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." Willis v. Roche Biomedical Labs., Inc., 61 F.3d 313, 315 (5th Cir. 1995); see also Brown v. Houston, 337 F.3d 539, 541 (5th Cir. 2003) (stating that "improbable inferences and unsupported speculation are not sufficient to [avoid] summary judgment"). Summary judgment is not appropriate unless, viewing the evidence in the light most favorable to the non-moving party, no reasonable jury could return a verdict for that party. Rubinstein v. Adm'rs of the Tulane Educ. Fund, 218 F.3d 392, 399 (5th Cir. 2000).

In this case, Defendants/Counter Plaintiffs Flores and King request partial summary judgment on the single issue of whether their debt was paid in full, pursuant to Federal Rule of Civil Procedure 56(d). (D.E. 125.) Under Rule 56(d)(2), "[a]n interlocutory summary judgment may be rendered on liability alone, even if there is a genuine issue on the amount of damages." Fed. R. Civ. P. 56(d)(2). "A partial summary judgment order in accordance with Rule 56(d) is not a final judgment but is merely a pre-trial adjudication that certain issues are established for trial of the case." F.D.I.C. v. Massingill, 24 F.3d 768, 774 (5th Cir. 1994); see Preston Exploration Co. v. Chesapeake Energy Corp., __ F. Supp. 2d __, 2010 WL 2357876, at *1 n.1 (S.D. Tex. June 11, 2010) (citing Massingill). "Rule 56(d) empowers the Court to determine what material facts are not genuinely at issue, where summary judgment is not rendered on the whole action, so as to clarify the triable issues that remain." Barrington Group Ltd., Inc. v.

Classic Cruise Holdings S. De R.L., 2010 WL 184307, at *4 (N.D. Tex. Jan. 15, 2010) (internal quotation marks omitted).[2]

### B.     Has the Counter-Plaintiffs' Debt Been "Paid in Full?"

The threshold issue underlying both the Counter-Plaintiffs' Motion for Partial Summary Judgment and all the claims at issue in Vanderbilt's Motion for Summary Judgment – and the primary issue before the Court – is whether Vanderbilt and CMH Homes released Flores and King's underlying debt on the Contract when they filed the BML Release and DOT Release in the fall of 2005, despite the fact that Flores and King's debt was never fully paid.  To answer this question, the Court first addresses the alleged assignment of the Contract to Vanderbilt, then considers the operative language in the releases.

### 1.     Assignment of the Contract to Vanderbilt

As an initial matter, the Court must determine which party in this action was entitled to release the debt owed on the Counter-Plaintiffs' Contract.  Vanderbilt contends that CMH assigned all rights to collect the debt owed under the Contract to Vanderbilt immediately after the transaction occurred, and that, as such, only Vanderbilt had the right to release this debt. (D.E. 142, p. 9.)  The Intervenors dispute that any assignment occurred.  (D.E. 162, p. 2.)  As discussed below, the Court finds that issues of fact remain as to whether an effective assignment to Vanderbilt occurred.

---

[2] Defendant argues that Plaintiff's Rule 56(d) partial summary judgment motion "runs afoul of Federal Rule of Civil Procedure 7, which requires him to specify the 'relief' he seeks, and is an impermissible use of Rule 56(d)." (D.E. 53 at 7.)  The Fifth Circuit has not yet spoken on this issue, and courts within the Circuit have considered motions for partial summary judgment.  See, e.g., Mid-Continental Cas. Co. v. Eland Energy, Inc., 2009 WL 3074618, at *3 & n.6 (N.D. Tex. Mar. 30, 2009) ("Sundown moves for partial summary judgment on certain 'points,' i.e., issues that govern the parties' claims and counterclaims, and it seeks to establish that certain material facts are not genuinely at issue.  This is authorized under Fed.R.Civ.P. . . . 56(d)(1).")  Without controlling authority that a Rule 56(d) motion is procedurally improper, the Court will consider this Motion as a motion for partial summary judgment.  The Court also finds that Plaintiff sufficiently states the relief he seeks under Rule 7(b)(1)(C), namely a ruling that "the debt at issue in this case was previously released as 'paid in full' and that the debt is not owed by Plaintiff after the date the debt was released." (D.E. 125, p. 1.)

"An assignment generally transfers some right or interest from one person to another. In Texas, the right to receive payment for a debt is generally assignable." Skipper v. Chase Manhattan Bank USA, N.A., 2006 WL 668581, at *1 (Tex. App. – Beaumont Mar. 16, 2006) (citing Cloughly v. NBC Bank-Seguin, N.A., 773 S.W.2d 652, 655 (Tex. App. – San Antonio 1989)). "Generally, 'after a debtor receives notice of a valid assignment, payment made by the debtor to the assignor or to any person other than the assignee is made at the debtor's peril and does not discharge the debtor from liability to the assignee.'" Holloway-Houston, Inc. v. Gulf Coast Bank & Trust Co., 224 S.W.3d 353, 361 (Tex. App. Houston 1st Dist. 2006) (quoting Buffalo Pipeline Co. v. Bell, 694 S.W.2d 592, 596 (Tex. App. Corpus Christi 1985); see also Tex. Bus. & Com. Code § 9.406 ("After receipt of the notification, the account debtor may discharge its obligation by paying the assignee and may not discharge the obligation by paying the assignor.").

Here, there is enough evidence of an assignment to Vanderbilt to establish a question of fact. The Contract states that Vanderbilt "hereby assigns within contract and all Seller's right, title and interest in it, and its collateral to Vanderbilt," the Assignee. (D.E. 142, Ex. 1, p. 5.)[3] The Contract that was assigned to Vanderbilt explicitly included the "PROMISE TO PAY," which provides: "Buyer promises to pay Seller the 'Unpaid Balance' as listed under 'Itemization of Amount Financed' above plus interest from the contract date at the rate of 10.99%." (D.E. 142, Ex. 1, p. 1.) As stated in the Contract, the assignment transferred "all" of the Contract, including CMH's right to collect payments to Vanderbilt. Amber Krupacs, Vice President of

---

[3] The Contract explicitly provides: "Seller agrees to this contract, and subject to acceptance by Vanderbilt Mortgage and Finance, Inc., at its designated office, assigns it to Vanderbilt Mortgage and Finance, Inc., in accordance with the assignment set forth herein." The assignment provides, "TO VANDERBILT MORTGAGE AND FINANCE, INC. (VANDERBILT): For value received, Seller hereby assigns within contract and all Seller's right, title and interest in it, and its collateral to Vanderbilt Mortgage and Finance, Inc. (Assignee), together with certain warranties and recourse obligations, if any, contained in the underlying agreement between Seller and Vanderbilt." (D.E. 142, Ex. 1, p. 5.)

Vanderbilt, states that on January 16, 2002, Vanderbilt paid CMH $40,815.19 as consideration for the assignment. (D.E. 142, p. Ex. 8 (Krupac Decl. ¶ 3.) CMH's ledger reflects payment to it by Vanderbilt for the assignment of the Contract in an entry labeled "Intercompany VMF Auto Entries" and dated January 16, 2002.[4] (D.E. 173, Ex. 2 (Statum Decl. ¶ 2, Ex. A.))

In order for the assignment to become effective, Flores and King must have been notified both that an assignment occurred and that consideration had been paid for the assignment. There is no evidence that Flores and King were directly notified either that an assignment had occurred or that Vanderbilt was paid consideration for the assignment. However, notice of the assignment can be actual notice or constructive notice, based on sufficient facts to put the obligor on inquiry. See Olshan Lumber Company v. Bullard, 395 S.W.2d 670, 672 (Tex. Civ. App. -- Houston 1965, no writ) (quoting 4 Corbin on Contracts Section 890, p. 577). Not only did Flores and King sign the contract, they made all of their installment payments on their manufactured home to Vanderbilt, not to CMH. When they defaulted on their payments, it was Vanderbilt, not CMH, who notified Flores and King that they were in default. It was Vanderbilt who took action to foreclose on their home. (D.E. 142, Ex. 14 (David Barton Decl.) ¶ 5; 142, p. Ex. 8 (Krupac Decl.) ¶ 8.) This evidence at least establishes a question of fact as to whether there was constructive notice of the assignment.

On the other hand, the Intervenors have presented evidence suggesting that the Contract was never effectively assigned to Vanderbilt. The record is clear that the primary purpose of securing the debts created by CMH Homes' retail installment contracts with liens on real property was to ensure that payments on the underlying contractual debt were made by customers with poor credit. Yet CMH Homes retained its security interest in the Trevinos'

---

[4] Vanderbilt's ledger also supposedly reflects its payment to CMH, (D.E. 173, Ex. 3 (Krupacs Decl. ¶ 2, Ex. A.), but the entry in their attached exhibit is blacked out.

property (the BML) – which was ostensibly intended to secure the underlying debt on Flores and King's Contract – until long after the alleged assignment of the Contract to Vanderbilt occurred. Nearly four years passed between the time of the alleged assignment in January 2002 and the filing of the BML Release in October 2005.  It is unclear why CMH would retain its security interest in the Trevinos' property for so long if the underlying debt had truly been assigned to Vanderbilt.

In addition, neither party disputes that Vanderbilt and CMH worked together in filing the Releases of these security interests.  Vanderbilt's and CMH Homes' management jointly made the decision to release the liens.  (D.E. 142, p. 5 ("Booth [President of CMH] and Nichols [President of Vanderbilt] decided to release the liens[.]"); D.E. 144, p. 6 ("Mr. Booth and Paul Nichols…assessed how to best protect the interests of their customers and of the landowners.").) The BML and the DOT Releases were both signed by the same corporate officer, David Jordan. (D.E. 157, Ex. S (Jordan Deposition), p. 85-86.)  Jordan is listed on CMH's BML Release as "Asst. Secretary for CMH Homes, Inc." and on Vanderbilt's DOT Release as "Asst. Secretary for Vanderbilt Mortgage and Finance, Inc."  (D.E. 125, Ex. H (BML Release), Ex I (DOT Release).)  The DOT Release and the BML Release both contain the "CMH Homes, Inc." letterhead.  (D.E. 125, Ex. I (DOT Release); Ex. H (BML Release).)  This evidence – showing CMH retained its liens on the Trevinos' and other individuals' property even after the alleged assignment occurred and was jointly involved in signing the mass lien releases – is inconsistent with an assignment of the Contract to Vanderbilt.  Rather, it suggests CMH considered itself as still having an interest in the underlying contractual debt that these liens were intended to secure.

In conclusion, the Court finds that, although Vanderbilt presents some evidence that CMH assigned the Contract to Vanderbilt, issues of fact remain as to whether an effective

assignment occurred.  As such, issues of fact remain as to whether Vanderbilt or CMH was entitled to release the debt created under the Contract.  Holloway-Houston, Inc., 224 S.W.3d at 361.

### 2.    Applicable Law to Determine if the Debt was Released.

#### a.  Generally

Mechanic's liens "are creatures of both the Texas Constitution and the Texas Legislature . . .  The requirements for the fixing and perfection of a statutory mechanic's lien are set forth in Chapter 53 of the Texas Property Code."  In re Kleibrink, 346 B.R. 734, 757-58 (Bkrtcy. N.D. Tex. 2006) (internal citations and quotation marks omitted).  Tex. Prop. Code § 53.152 provides the minimal requirements for releasing a mechanic's lien.[5]  See Addicks Services, Inc. v. GGP-Bridgeland, LP, 596 F.3d 286, 297 (5th Cir. 2010).  "The purpose of the mechanic's lien is to secure payment for those who furnish labor or materials in connection with the construction of improvements to real property to the extent of the increased value of those improvements to the owner's property. . . . [O]nce the owner has paid the full price to his original contractor, if he has complied with the statutes for doing so, no subcontractor can subject his property to a lien."  In re Waterpoint Int'l LLC, 330 F.3d 339, 343-44 (5th Cir. 2003) (citing Eldon L. Youngblood, Mechanics' and Materialmen's Liens in Texas, 26 Sw. L.J. 665, 676 (1972)).  The same principle is true for a deed of trust.  As one court has explained, "[a] deed of trust has no legal effect apart from the debt or obligation which it is designed to secure. Consequently, under Texas law, a deed of trust is usually extinguished upon payment of the indebtedness which it was created to secure."  Craig v. Ponderosa Development, LP, 392 B.R. 683, 689 (E.D. Tex. 2007)

---

[5] Tex. Prop. Code § 53.152 provides that "[w]hen a debt for labor or materials is satisfied or paid by collected funds, the person who furnished the labor or materials shall, not later than the 10th day after the date of receipt of a written request, furnish to the requesting person a release of the indebtedness and any lien claimed, to the extent of the indebtedness paid.  An owner, the original contractor, or any person making the payment may request the release." Tex. Prop. Code § 53.152(a)

(citing O'Dell v. First Nat'l Bank of Kerrville, 855 S.W.2d 1, 4 (Tex. App. San Antonio 1991), rev'd on other grounds, 856 S.W.2d 410 (Tex. 1993)).

"[A] release … is an absolute bar to any right of action on the released matter." Addicks Servs., 596 F.3d at 297-298 (quoting Dresser Indus. v. Page Petroleum, 853 S.W.2d 505, 508 (Tex. 1993). In order to establish the affirmative defense of release, the party asserting release is required to prove the elements of a contract. In the Interest of J.P., 296 S.W.3d 830, 835 (Tex. App. Fort Worth 2009) (citing Vera v. N. Star Dodge Sales, Inc., 989 S.W.2d 13, 17 (Tex. App. San Antonio 1998)).

### b.   Effect of Release When Underlying Debt Not Yet Paid

Consistent with the general principles outlined above, both the BML and the DOT at issue in this action recognize that complete release of the liens is proper upon full payment of the underlying debt.[6]  Moreover, it is undisputed that CMH and Vanderbilt executed releases of the BML and the DOT, respectively; that these Releases are valid on their face; and that they were appropriately filed in the County's public records.  (D.E. 142, p. 5.)  However, the evidence also conclusively demonstrates that full payment of Flores and King's underlying debt has not occurred.  Flores and King have made only 84 payments of the 144 payments they owed on the Contract.  (D.E. 142, Ex. 14 (David Barton Decl.), ¶4; D.E. 142, Ex. 2 (Flores Depo.), p. 67-68.) Counter-Defendant Vanderbilt argues that this means Counter-Plaintiffs have failed to meet their burden to prove the affirmative defense of release.  Vanderbilt states that, under Texas law, if a release says "paid in full," but the debt was not actually paid in full, the debt is not extinguished

---

[6] The BML states: "If Owner performs all the covenants and pays the Retail Installment Contract according to its terms, this conveyance shall become void and have no further effect, and at Owner's expense, Contractor shall release the lien created by this Contract." (D.E. 142, Ex. 7, p. 2.)  The DOT states: "Should Grantor do and perform all of the covenants and agreements herein contained, and make prompt payment of said indebtedness as the same shall become due and payable, then this conveyance shall become null and void and further force and effect, and shall be released at the expense of Grantor, by the holder thereof, hereinafter called Beneficiary . . . ."   (D.E. 142, Ex. 5, p. 1).

by the release. (D.E. 142, p. 15) (citing <u>First State Bank of Amarillo v. Jones</u>, 107 Tex. 623, 631 (Tex. 1916); <u>Evans v. Evans</u>, 766 S.W.2d 356, 357 (Tex. App.-Texarkana 1989)).  As such, it is impossible as a matter of law that the full debt was released by this language when Flores and King have not paid the full debt.

The Court disagrees with Vanderbilt's characterization of Texas law.  Defendants are correct that, in general, even when a release has been executed, "the underlying indebtedness is not released where the debt is not paid in the manner recited by the release and the note is never paid in full."  <u>See</u> 30 Tex. Jr. 3d Deeds of Trust and Mortgages § 123 (citing <u>Evans</u>, 766 S.W.2d 356).  However, Texas courts have established that "minimal consideration can be sufficient to support the release of a larger indebtedness <u>where the intent to release is shown</u>[.]"  <u>Evans</u>, 766 S.W.2d at 357 (emphasis added).  Courts in such cases may examine parol evidence to determine whether the drafter of the release actually intended to release the underlying note.  <u>Id.</u>  (citing <u>Lanier v. Faust</u>, 81 Tex. 186, 16 S.W. 994 (1891); <u>Keel v. Hoggard</u>, 590 S.W.2d 939 (Tex. Civ. App.-Waco 1979, no writ)).  Two cases involving similar circumstances to the present action are illustrative of this rule.

In <u>First State Bank of Amarillo v. Jones</u>, a bank executed a release of a deed of trust creating an interest in a debtor's land when only part of the underlying note had actually been paid.  107 Tex. at 627.  The Texas Supreme Court held that even though there was a valid release document, the release did not effectively extinguish the debt because the evidence conclusively demonstrated that the defendants had not actually intended to release the debt.  <u>Id</u>. at 631.[7]  The

---

[7] The court's full explanation in <u>First State Bank of Amarillo</u> is as follows:

> If the recital in the release which was executed by the bank, through its president, to the effect that the [debtor's] note which had been secured by deed of trust in the bank's favor had been paid in full, was in fact a mistake, and the note had not been paid in full, then

court pointed to the testimonies of various bank officials, including the president who signed the release, stating unambiguously that recital of full payment had been a mistake.  Id.  In contrast, the only evidence presented to disprove the mistake was "the recital of full payment in the instrument itself."  Id.  In light of this evidence on intent, the court found there was no release of the underlying debt, despite the language in the contractual release itself.  Id.

The court applied the same rule in Evans.  766 S.W.2d at 357.  The facts before the court were almost directly analogous to the case at bar.  The plaintiff was owed a debt by defendant and also held a lien on defendant's property.  Plaintiff subsequently executed a release of the lien on the property, even though the underlying debt had not been fully paid.  When the plaintiff sued to collect on the remaining balance due, the defendant argued that the balance due on the note had been released when plaintiff released the lien on the property.  Id. at 356.  But the court rejected the defendant's argument that the situation was controlled by the four corners of the lease unambiguously releasing the debt.  The court explained:

> The lien against the property has been released.  The question before this Court is whether the underlying indebtedness which the lien had originally secured has also been released by this document. The document categorically recites that the underlying indebtedness was paid in full:
>
>> for and in consideration of the full and final payment of all indebtedness secured by the aforesaid lien or liens, the receipt of which is hereby acknowledged, has released and discharged, and by these presents hereby releases and discharges, the above described property from all liens held by the undersigned securing said indebtedness.
>
> . . . [T]he undisputed testimony of both [lender and debtor] is that the note was never paid in full. Thus, the recitation in the release was rebutted by the testimony of all parties to the suit.  Minimal consideration can be sufficient to support the

the bank should not and would not lose its lien by reason thereof.  In such circumstances equity would reform the release so as to correct the mistake and speak the truth. On the issue of mistake, the evidence is uncontradicted that the recital of full payment was a mistake, and that the note had not been paid except in part.

107 Tex. at 631.

> release of a larger indebtedness where the intent to release is shown, but where
> the stated consideration is shown not to have been delivered, the debt is not
> extinguished. The [plaintiff] conclusively proved that the debt was not paid in the
> manner recited by the release. Under these circumstances, [defendant] was
> required to show that [plaintiff] intended to release the indebtedness despite his
> failure to fully pay the note. As a result of his failure to make this showing, there
> is no lien on the property, but the debt evidenced by the note is intact.

Id. (emphasis added).  In sum, the court found that, because the debt had not actually been paid in full, the release's recitation that full payment had been received did not resolve the issue of whether the release of the lien had the effect of extinguishing defendant's full debt.  Rather, defendant was required to show, through parol evidence or otherwise, that plaintiff "intended to release the indebtedness despite [plaintiff's] failure to pay the note." Id.  If defendant could make this showing, then the full debt would be released.  However, because defendant failed to do so, the release effectively extinguished the lien on defendant's property, but the underlying debt remained intact.  Id.[8]

Both First State Bank of Amarillo and Evans stand for the proposition that, when a release categorically recites that the underlying indebtedness was paid in full, but the debt has not actually been paid in full, the debt is not released unless the debtor can show the creditor otherwise intended to release the indebtedness despite his failure to fully pay the debt.  Evans, 766 S.W.2d at 357; First Bank, 107 Tex. at 631.  The ultimate question involves a factual determination as to the creditor's intentions in filing the release.

### 3.      Whether Flores and King's Debt Was Discharged

With these principles established, the Court now must determine whether to grant summary judgment for either party on the issue of whether Counter-Plaintiffs Flores and King's debt has been paid in full.  Counter-Plaintiffs argue CMH Homes' BML Release and

---

[8] One notable difference between Evans and the present case is that, in Evans, there were no allegations of fraud in execution of the contracts creating the liens or allegations that the releases were filed in secret. Rather, the court in Evans had before it no other evidence to suggest an intention to make a full release.

Vanderbilt's DOT Release unambiguously released the underlying debt owed on their Contract when they were executed on October 8, 2005 and properly filed with the County Clerk on October 14, 2005. (D.E. 125, p. 7.)   However, the existence of properly executed and filed releases alone will not resolve the issue on summary judgment because the underlying debt has not yet been paid.   Rather, the Court must determine whether the evidence establishes that Vanderbilt and CMH intended to release this debt.   Evans, 766 S.W.2d at 357; First Bank, 107 Tex. at 631.  Parol evidence is admissible, and in fact necessary, to elucidate their intentions in drafting the releases.   Evans, 766 S.W.2d at 357 (citing Keel, 590 S.W.2d 939 (Tex. Civ. App.-Waco 1979, no writ.))  As the party arguing for release, the Counter-Plaintiffs bear the burden of demonstrating intent to release their debt.   In the Interest of J.P., 296 S.W.3d at 835.

The Counter-Plaintiffs argue the summary judgment evidence "conclusively establishes" Vanderbilt's and CMH's intent to release the debt.  (D.E. 125, p. 4.) According to their version of events, Vanderbilt and CMH discovered around 2005 that their employees committed fraud in the execution of the underlying Retail Installment Contract and the documents placing liens on real property (the DOT and the BML).  After discovery of this fraud, Vanderbilt and CMH filed documents releasing all the mechanics' liens and deeds of trust executed at the Corpus Christi store, as well as the underlying debt on all Retail Installment Contracts associated with those mechanic's liens and deeds of trust. (D.E. 125, p. 4.)[9]  Vanderbilt argues the opposite – that the evidence establishes that Vanderbilt unequivocally never intended to release the debt, but only

---

[9] In their Reply in Support of their Motion for Partial Summary Judgment, the Counter-Plaintiffs argue more specifically that the reason CMH and Vanderbilt chose to release the underlying debt as well as the property liens was that they knew that discovery of notary fraud in the underlying transactions would negatively impact the value of the securities that Vanderbilt created from these debts and sold to investors in pools.  In consequence, they contend, Vanderbilt decided to discharge the debt and, as required under their agreement with investors, repurchase the loan out of the securitization pool.  (D.E. 162, p. 7-8; D.E. 157, Ex. D (Myron Glucksman Deposition), p. 100-101.)  They state that "[d]ischarging and repurchasing the entire debt was one way to "cure" a misrepresentation about the validity of the finance contracts made to the investors in the pool or resolve a problem with the enforceability of the loans that could result in potential liability to the pools' investors."  (D.E. 162, p. 8.)  The Counter-Plaintiffs offer no evidence to support this was Vanderbilt's specific motive in filing the releases.

intended to release the lien on the Trevinos' property.  (D.E. 142, p. 16.)  The parties have produced a variety of evidence to support their arguments regarding Vanderbilt's and CMH's intentions with respect to both the BML Release and the DOT Release.  The Court examines the contractual language of each Release in turn, and then examines the summary judgment evidence regarding Vanderbilt's and CMH's intentions in filing these releases.

a.        The BML Release

The BML Release refers to the Builder's and Mechanic's Lien executed on the Trevinos' property and states that "for a valuable consideration in hand paid, the said, CMH Homes, Inc. does hereby release the lien of said Mechanic's Lien Contract and has been paid in full."  (D.E. 125, Ex. 14) (emphasis added).  The Counter-Plaintiffs urge this Court to interpret this language as unambiguously releasing their debt as a matter of law.  (D.E. 125, p. 7.)  However, as explained above, the "paid in full" recitation in the BML Release is not, on its own, sufficient to conclusively demonstrate that the underlying debt was released when it was, in fact, not paid in full.  Evans, 766 S.W.2d at 357; First Bank, 107 Tex. at 631.

Vanderbilt argues that, given the assignment of the debt, CMH's intent to release the debt (if any) is "irrelevant," as only Vanderbilt could release the debt.  (D.E. 142, p. 13.)  That is, the "paid in full" language in the BML should have no bearing on whether the debts were released. The Court disagrees.  As explained above, issues of fact remain as to whether an effective assignment to Vanderbilt occurred.  Moreover, even if an effective assignment to Vanderbilt did occur, the language of the BML Release would not be "irrelevant."  Although it would not be legally operative with respect to the underlying debt, CMH's BML Release would still be relevant to the extent that it elucidates Vanderbilt's intentions in filing the DOT Release.  CMH's intentions would be particularly relevant given that, by all accounts, CMH and Vanderbilt

worked together in filing the Releases.  The fact that the BML Release was executed by CMH

Homes, not Vanderbilt, would simply make the BML Release a slightly less conclusive source of

evidence from which to infer an intent by Vanderbilt to release the underlying debt.

Nevertheless, the Court must examine all the evidence available on summary judgment to

determine whether such an intent, or lack thereof, is established from the "paid in full" language

in the BML Release.  Vanderbilt has presented an alternative possible explanation for why the

BML Release states that CMH has been paid in full.  Vanderbilt argues that "paid in full" refers

only to CMH's being paid in full by Vanderbilt when CMH assigned the debt to Vanderbilt in

2002 in exchange for consideration.  (D.E. 142, p. 9; Ex. 8 (Amber Krupacs Decl.), p. 1.)  As

said, issues of fact remain as to whether this assignment even occurred.   In any case,

Vanderbilt's explanation that "paid in full" references only CMH's receipt of payment from

Vanderbilt lacks credibility in light of the fact that the BML Release was executed long after

CMH had assigned Flores and King's debt to Vanderbilt.  If the assignment occurred in January

2002, it is not clear why CMH would have waited until October 2005 to file its BML Release

and acknowledge that it had been "paid in full" by Vanderbilt.  Moreover, the Counter-Plaintiffs'

explanation – that Vanderbilt and CMH decided to release the debts of their customers in the

wake of allegations of fraud by CMH employees in executing the transactions – is equally

credible.  Further inquiry is required in order to determine CMH's precise intentions in drafting a

BML stating that CMH was "paid in full."

### b.   The DOT Release

The DOT Release executed by Vanderbilt provides: "for a valuable consideration in hand

paid, the said VANDERBILT MORTGAGE AND FINANCE, INC. does hereby RELEASE the

lien of said deed of trust and/or mortgage."  (D.E. 142, Ex. I.)  It does not include the recital that

Vanderbilt has been "paid in full."  Vanderbilt argues that because Vanderbilt "never said, in writing or otherwise, that anything was 'paid in full' " this means the DOT Release must be read as "unambiguously" releasing only Vanderbilt's lien on the Trevinos' property.  (D.E. 142, p. 9.)  The Court disagrees.

The DOT Release does not "unambiguously" release only the liens on the Trevinos' property; rather, the language of the Release could also be interpreted to release Flores and King's underlying debt.  While it does not contain the "paid in full" recital, the DOT Release states that "for valuable consideration in hand paid," Vanderbilt releases "the lien of said deed of trust and/or <u>mortgage</u>."  (D.E. 125, Ex. I) (emphasis added).  Vanderbilt objects that the term "mortgage" does not refer to the debt itself, but refers only to the instrument, the deed of trust, creating Vanderbilt's security interest in the Trevinos' property.  (D.E. 142, p. 11).   But "mortgage" can refer (among other things) to any of the following: a "lien against property that is granted to secure an obligation (such as a debt) and that is extinguished upon payment or performance according to stipulated terms"; "[a]n instrument (such as a deed or contract) specifying the terms of such a transaction"; or, "the loan on which such a transaction is based." BLACK'S LAW DICTIONARY 1101-1102 (9th ed. 2009).  Moreover, as explained, minimal consideration can in some circumstances support a release even when the whole debt has not been paid.  <u>Evans</u>, 766 S.W.2d at 357.  Flores and King have made 84 of the 144 payments owed on their debt.  (D.E. 142, Ex. 2 (Flores Depo.), p. 67-68.)  As such, it simply is not clear from the face of the document what has been released in exchange for "valuable consideration in hand paid": the lien on the Trevino's property, or the mortgage on Flores and King's home.

Under Texas law, "if [a] contract is subject to two or more reasonable interpretations after applying the pertinent rules of construction, the contract is ambiguous, creating a fact issue

on the parties' intent." J.M. Davidson, Inc. v. Webster, 128 S.W.3d 223, 229 (Tex. 2003).  More importantly, as explained above, even if the Court were to interpret these contractual terms as unambiguously indicating a release of the underlying debt on Flores and King's home, the bare recital of a release would be insufficient to establish a discharge of the underlying debt in its entirety given that the debt was not actually fully paid, absent facts demonstrating Vanderbilt's or CMH's intent to do so.  Evans, 766 S.W.2d at 357.  In either case, the summary judgment evidence surrounding the 2005 releases must be examined to further elucidate Vanderbilt's or CMH's intentions in drafting the DOT Release.

### c.    Summary Judgment Evidence of Intent to Release Debt

The Court finds the summary judgment evidence does not conclusively support that Vanderbilt or CMH intended a release of the underlying debt in executing the Releases.  As an initial matter, declarations submitted by Vanderbilt flatly reject the contention that either Vanderbilt or CMH intended to release manufactured home purchasers' underlying indebtedness when they released the liens.  Mr. Nichols, Vanderbilt's President, states: "[t]he only intended purpose of the releases was to release any and all security interests existing on the land parcels. . . . Moreover, neither Vanderbilt nor CMH ever intended to cancel any indebtedness created by the [Retail Installment Contract] and related to the manufactured homes."  (D.E. 142, Ex. 9 (Nichols Decl.), p. 5.)  Vanderbilt's Vice President and Secretary Amber Krupacs similarly states: "Vanderbilt has . . . never discharged or canceled the debt owed to it by Mr. Ramirez, nor intended to discharge that debt."  (D.E. 142, Ex. 8, p. 3.)  Mr. Booth, CMH's President, likewise asserts: "neither Vanderbilt nor CMH ever intended to cancel any indebtedness created by the RIC [the Contract] and related to the manufactured homes."  (D.E. 142, Ex. 2 (David Booth

Decl.), p. 5.)   While these statements are self-serving, they demonstrate the existence of a genuine issue of material fact as to Vanderbilt's and CMH's intentions in releasing the liens.

Moreover, Vanderbilt presents additional evidence supporting lack of intent.  Vanderbilt contends that if it had intended to release the home owners' debts, certain procedures would have been followed.  Specifically, Vanderbilt contends that when a customer pays a debt in full, its standard practice is to stamp the Contract as "paid," and return it to the customer.  Internal Revenue Services regulations also require Vanderbilt to notify the customer and the IRS when a debt is partially forgiven as a partially forgiven debt is considered income to the borrower.  In this case, Vanderbilt did not follow this procedure.  Flores and King present no evidence that they received any notice of cancellation of indebtedness.  Rather, the only change to Flores and King's account after the filing of the release was a notation that the debt no longer involved land. (D.E. 142, p. 6-7.)

Vanderbilt also contends that, in order to perfect a release of Flores and King's debt on their manufactured home, it would have been required under Texas law to follow statutory procedures for removing Vanderbilt's security interest in the home –specifically, Vanderbilt would have been required to file certain forms with the Texas Manufactured Housing Division of the Texas Department of Housing and Community Affairs (TDHCA), pursuant to the Manufactured Housing Standards Act (MHSA).  (D.E. 142, p. 19) (citing Tex. Occ. Code. § 12.01.207(c)).  Vanderbilt contends that because Vanderbilt did not do so in this case, there could be no release, and Vanderbilt retains the right to collect on its debt and foreclose on Flores and King's home.

The Court disagrees with Vanderbilt's argument that its failure to file releases with the Manufactures Housing Division necessarily means the debt, and Vanderbilt's right to foreclose,

still exists.  Although the Counter-Plaintiffs' manufactured home is subject to the procedural requirements of the MHSA, see Tex. Occ. Code § 1201.207 (c), the relevant transactions – the DOT and the BML Releases – involved real property and were subject to the general rules respecting releases of mechanic's liens and deeds of trust discussed above.  See Tex. Prop. Code § 53.152(a) (delineating minimal obligation of contractor to release a lien upon receipt of consideration).  Vanderbilt filed releases with the County in accordance with the requirements for releasing mechanic's liens or deeds of trust on real property.  If these releases were valid contracts, then they are binding upon the parties subject to them.  See In re J.P., 296 S.W.3d at 835 ("A release is a contract subject to the rules of contract construction.")  Thus, Texas law procedures for releasing a lien on a manufactured home are not controlling on the issue of whether the releases discharged Flores and King's debt on their home.  Rather, as explained above, the issue remains whether, in filing the releases of the liens on the Trevinos' property, Vanderbilt also intended to release the debt underlying these liens.  Evans, 766 S.W.2d at 357.[10]

Nevertheless, the fact that Vanderbilt did not go through the procedures required by the TDHCA and the MHSA is still relevant to the issue of Vanderbilt's and CMH's intentions in filing the releases.  The Court finds that the inconsistency in Vanderbilt's procedures, combined with the statements of Vanderbilt and CMH management that no release of the debt was intended, preclude a finding on summary judgment that Vanderbilt or CMH intended to release Flores and King's debt in executing the Releases.  See Hershey v. Energy Transfer Ptnrs., L.P., 610 F.3d 239, 249 (5th Cir. 2010) (quoting In re Soybean Futures Litig., 892 F. Supp. 1025,

---

[10] The Court also notes that Vanderbilt's contention that its failure to follow Texas law procedures to release debts on manufactured homes demonstrates it never intended to make a full release lacks credibility in light of the fact that Vanderbilt apparently released the liens in order to rectify, or conceal, procedural defects in execution of the liens themselves.

1058 (N.D. Ill. 1995) ("'[A]s a general matter . . . questions of intent are inappropriate for resolution on summary judgment[.]'")

On the other hand, Counter-Plaintiffs have produced some contrasting evidence tending to establish Vanderbilt and CMH <u>did</u> intend to release the underlying debt by filing the DOT and BML Releases.  While this evidence is insufficient to establish their intent as a matter of law, it is sufficient to raise a genuine issue of material fact as to Vanderbilt's and CMH's intentions.  The Counter-Plaintiffs primarily rely upon the testimony of Mr. Booth, who testified on behalf of CMH Homes with respect to Vanderbilt's and CMH's decision to file the releases in the fall of 2005. (D.E. 125, Ex. G, p. 9.)  Booth's deposition does not directly indicate an intention on the part of Vanderbilt or CMH to release the debt.  But it does suggest that neither CMH's nor Vanderbilt's intentions in the filing the releases were entirely clear, even to the companies' management.  Indeed, Booth repeatedly stated that he simply <u>did not know</u> why the decision was made to file the releases.  For example:

> Q: "[I]sn't it true the reason why you included that the debt had been paid is because you were aware of the allegations of the fraud and the forgery that had occurred out of Store 214 [the Corpus Christi store of CMH]?"
>
> A: "I don't know why it was written the way it was written.  I didn't participate in that.  I don't understand that. I'm not a lawyer.  And so I couldn't . . . tell you why the language was different or what it means."

(D.E. 142, Ex. G, p. 122: 20-25, 123: 1-3).  Moreover, at one point, Mr. Booth referred to the decision to execute releases as the "decision to release the loan," rather than the "lien."  (D.E. 125, Ex. G, p. 9:21-25).

Mr. Booth's ambiguous statements in his deposition do not suffice to establish Vanderbilt's or CMH's prior intent to release the Counter-Plaintiff's debt, particularly in the context of other statements refuting any such intent to do so.  But the ambiguity of Mr. Booth's

responses is in stark contrast to the situation in <u>First State Bank of Amarillo</u>, where various bank officials, including the president of the bank who signed the release, unambiguously testified that the release of the full debt had been a mistake and that only a partial release was intended. "No person testified to the contrary. No one testified to the existence of any circumstance tending to show that it was not a mistake." <u>First State Bank of Amarillo</u>, 107 Tex. at 631. It also must be repeated that, unlike in either <u>First State Bank of Amarillo</u> or <u>Evans</u>, 776 S.W.2d at 357, this case involves allegations of fraud on the part of the lenders who created the debts at issue. The Counter-Plaintiffs' allegations that CMH and Vanderbilt intended to release the debts of home owners in order to nullify, or even conceal, the fraudulent conduct of CMH employees cast a shadow over any statements that Vanderbilt's corporate representatives now make to the contrary.

The Counter-Plaintiffs have also presented certain internal documents from CMH Homes that contribute to this ambiguity. They have discovered that CMH Homes issued "Land Release Checklists" for their customers. In some of these Checklists, CMH employees checked the box, "YES," next to the question, "is the account paid in full?" (D.E. 125, Ex. N, Ex. O.) When asked about one of these Land Release Checklists, Mr. Booth stated that he had never seen the document before and was not aware of the process under which it had been executed. (D.E. 125, Ex. G (Booth Decl.), p. 139: 14-16.) When asked whether the document "indicates the account has been paid in full," Mr. Booth responded: "I know what it says, but I don't know if that's what it means." (D.E. 125, p. 139: 25, 140: 1.) Neither the "paid in full" language on these Checklists nor the actions of the CMH employees who executed them unambiguously demonstrate an intent to release the underlying debt. But at the same time, CMH's management

is not entirely clear as to why the Land Checklist Releases were executed or as to what the "paid in full" language meant.  There remain factual questions to be resolved by a fact-finder.

Because issues of fact remain as to the "paid in full" issue, the Court denies both motions for summary judgment on this issue.

Having determined that issues of fact remain with respect to the threshold issue of whether the Counter-Plaintiffs' debt has been discharged, the Court now turns to Vanderbilt's Motion for Summary Judgment on the remainder of Flores and King's claims, beginning with their claim for unfair debt collection.

### C.    Common Law Unfair Debt Collection

Under Texas law, "[u]nreasonable collection is an intentional tort."  EMC Mortg. Corp. v. Jones, 252 S.W.3d 857, 868 (Tex. App. Dallas 2008).  "Although the elements are not clearly defined and the conduct deemed to constitute an unreasonable collection effort varies from case to case[,]" id. (citing, e.g., Pullins v. Credit Exchange of Dallas, Inc., 538 S.W.2d 681, 683 (Tex.Civ.App.-Waco 1976, no writ); Household Credit Servs., Inc. v. Driscol, 989 S.W.2d 72, 81 n.3 (Tex.App.-El Paso 1988, writ denied)), "[o]ne of the more precise legal descriptions delineates the conduct giving rise to the tort as 'efforts that amount to a course of harassment that was willful, wanton, malicious, and intended to inflict mental anguish and bodily harm.'"  Id. (quoting Montgomery Ward & Co. v. Brewer, 416 S.W.2d 837, 844 (Tex. Civ. App.-Waco 1967, writ ref'd n.r.e.)).

Counter-Plaintiffs contend Vanderbilt engaged in unfair debt collection by continuing to collect on their debt even after it was discharged, and that in doing so Vanderbilt affected their credit rating.  Vanderbilt made over 600 phone calls to Counter-Plaintiffs after the alleged

discharge in October 2005.  Flores and King's credit reports establish their credit suffered due to their default on the payments.  (D.E. 157, Ex. G.)

Vanderbilt contends summary judgment on this claim is warranted for two reasons.  First, Counter-Plaintiffs' claim is reliant on their claim that Vanderbilt discharged their debt in filing the October 2005 releases of the Deed of Trust and Builder's and Mechanic's Lien, and the summary judgment evidence shows this was not the case.  (D.E. 143, p. 7-10.)  Second, Vanderbilt contends Counter-Plaintiffs cannot demonstrate that its actions in collecting on the alleged debt constituted a course of harassment intended to cause mental anguish and bodily harm.  (D.E. 143, p. 11.)

The Court disagrees that summary judgment is warranted.  As explained above, issues of fact remain as to whether Vanderbilt and CMH fully discharged Flores and King's debt. Vanderbilt is correct that, if there were no evidence of a discharge, Vanderbilt's efforts would not be likely to qualify as "unreasonable" debt collection.  See Steele v. Green Tree Servicing, LLC, 2010 U.S. Dist. LEXIS 92756, *19 (N.D. Tex. Sept. 7, 2010) (finding defendant's debt collection efforts in foreclosing on plaintiff's home not unreasonable because "a reasonable fact-finder could only find that the [plaintiffs] were in default" and the plaintiffs presented no other evidence of unreasonable collection tactics."); Mitchell v. Chase Home Fin. LLC, 2008 U.S. Dist. LEXIS 17040, 2008 WL 623395, *6 (N.D. Tex. Mar. 4, 2008) (holding that defendants' collection efforts were not unreasonable where plaintiffs were in fact in default on their loan).

Texas courts, however, have found debt collection efforts to be tortious when lenders continued in their attempts to collect on a debt when they knew it had been discharged.  For example, in Pullins v. Credit Exchange of Dallas, Inc., the jury found defendant's debt collection practices to constitute "unreasonable collection efforts" when defendant's employees continued

to call plaintiff and send him "demand notices" even after the plaintiff told the collector his insurance should already have paid his debt and that his attorney was taking care of it.  538 S.W.2d 681, 682-83 (Tex. Civ. App. Waco 1976)   The court stated: "[w]e think all defendant's collection efforts after the date of payment by [plaintiff's] attorney to have been unreasonable. In fact after [plaintiff] advised defendant's employee the bill had been paid, defendant did not even contact [plaintiff] to determine whether the bill was in fact paid, and at least 4 collection contacts were made by defendant after such bill was in fact paid."  Id. at 683. (citing Signature Indorsement Co. v. Wilson, 392 S.W.2d 484; Moore v. Savage, 362 S.W.2d 298 (Tex. 1962)).

On the other hand, when defendants' collection efforts following full payment of a debt constitute mere negligence, courts have found the evidence insufficient to support a cause for tortious debt collection.  In Montgomery Ward & Co. v. Brewer, the court reversed a jury's award of damages to plaintiffs, a husband and wife who had sued a merchandizing company alleging tortious unfair debt collection, even though the company's employees had continued collection efforts after plaintiffs' account had been paid in full.  416 S.W.2d 837 (Tex. Civ. App. Waco 1967).  The court found that, despite plaintiffs' multiple letters informing the company that their debt had been paid, "[t]here [was] nothing in the record to indicate that the employees in the Credit Department who handled the account of [plaintiff] knew him; they had no malice or ill will toward him; certainly had no intention of doing him any harm, and their mistakes are free from being willful, wanton and malicious, and were not intended to inflict mental anguish or bodily harm upon him or his wife." Id. at 844.  Rather, the court found that, "[u]nder the record all the acts of the employees in the handling of the [plaintiffs'] account demonstrated that they were highly inefficient and negligent."  Id.

27 / 39

In this case, Vanderbilt's employees made <u>over 600</u> phone calls to Flores and their family members and King after the alleged discharge occurred.  (D.E. 157, Ex. H.)   They also visited Flores and King's home to request payment.  (D.E. 143, p. 12.)  Whether these acts could legally constitute tortious debt collection depends on whether Vanderbilt or its employees knew Flores and King's debt had been discharged and continued the collect the debt anyway with a malicious intent.  <u>Montgomery</u>, 416 S.W.2d at 844.  As explained, issues of fact remain as to whether the debt was discharged.   Whether, in light of a discharge, Vanderbilt's collection efforts amounted to "a course of harassment that was willful, wanton, malicious, and intended to inflict mental anguish and bodily harm' " is also a question appropriate for review by a fact-finder.  <u>EMC Mortg. Corp.</u>, 252 S.W.3d at 868 (quoting <u>Id</u>.).

### D.     Texas Debt Collection Practices Act

The Texas Debt Collection Practices Act ("TDCA") prohibits various forms of threatening, coercive, harassing or abusive conduct by debt collectors, <u>see</u> Tex. Fin. Code. §§ 392.301-392.306, including fraudulent, deceptive, or misleading representations (§392.304), such as "<u>misrepresenting the character, extent, or amount of a consumer debt</u>."  § 392.304(8) (emphasis added).   Vanderbilt qualifies as a "debt collector" under the TDCA because it is directly engaged in debt collection.  § 392.001.  Flores and King are "consumers" because they undertook a "consumer debt," defined as "an obligation, or an alleged obligation, primarily for personal, family, or household purposes and arising from a transaction or alleged transaction."  § 392.001(2).

Vanderbilt contends summary judgment is appropriate on the Counter-Plaintiffs' TDCA claim because they have failed to show their debt was discharged, and have presented no other evidence that Vanderbilt engaged in prohibited forms of debt collection other than that

Vanderbilt was never entitled to collect any debt at all.  (D.E. 143, p. 11-12.)  However, the TDCA explicitly provides that it is a violation of the act to misrepresent the amount of the debt owed.   § 392.304(8).   As explained above, there remains an issue of fact as to whether Vanderbilt and CMH discharged Counter-Plaintiffs' debt.  The Counter-Plaintiffs have pointed to sufficient evidence to permit a reasonable trier of fact to find Vanderbilt discharged their debt and continued to represent it was owed.  See Steele v. Green Tree Servicing, LLC, 2010 U.S. Dist. LEXIS 92756, * 18 (N.D. Tex. Sept. 7, 2010) (summary judgment for defendant on TDCA claim granted when the plaintiffs "pointed to no evidence that would permit a reasonable trier of fact to find that [defendants'] statement of their balance was incorrect.")  As such, summary judgment on the Counter-Plaintiffs' TDCA claims is also inappropriate.

E.     **Common Law Fraud**

To establish common law fraud under Texas law, a plaintiff "bears the burden to prove the existence of the following: '[1] a material misrepresentation, [2] which was false, and [3] which was either known to be false when made or was asserted without knowledge of the truth, [4] which was intended to be acted upon, [5] which was relied upon, and [6] which caused injury.'" Johnson & Johnson Med., Inc. v. Sanchez, 924 S.W.2d 925, 929-30 (Tex. 1996); see also GeoSurveys, Inc. v. State Nat'l Bank, 143 S.W.3d 220, 226 (Tex. App. Eastland 2004).

The Counter-Plaintiffs contend they have established all the elements of common law fraud.  They contend that Vanderbilt (1) materially misrepresented to Flores and King the amount of the debt due under their Contract, (2) that Vanderbilt knew the debt had been released, (3) that Vanderbilt intended to mislead Flores and King into believing they were still liable for their debt, (4) that Flores and King relied on these representations by continuing to pay their

debt, (5) and suffered damages as a consequence when they paid $25,000 to Vanderbilt after the

debt had been allegedly released in October 2005.  (D.E. 11, Ex. B, ¶ 9.01; D.E. 157, p. 19; Ex. .)

Vanderbilt objects that Counter-Plaintiffs have not met their burden on summary

judgment because they have failed to show they were not in fact liable for their debt.  As such,

Vanderbilt made no misrepresentation to them that their debt was due.  (D.E. 143, p. 13.)

However, the Court finds summary judgment is inappropriate on this claim as well.   As

explained above, whether the debt was discharged remains a point of contention suitable for

determination by a finder of fact.   Thus, it cannot be decided at this stage whether Vanderbilt

misrepresented the amount of debt owed by continuing to enforce and collect upon the debt

without telling Flores and King that the debt had been released.   Flores and King would

necessarily have relied upon Vanderbilt's representations during these collection efforts in

continuing to make payments on the debt because, Vanderbilt conceded, Flores and King had no

knowledge that the releases had been filed.  (D.E. 143, p. 13.)   Summary judgment on the

Counter-Plaintiffs' fraud claim is thus inappropriate, given that issues of fact remain as to

whether they owed a debt to Vanderbilt after the released were filed in October 2005.[11]

### F.    RICO Claims Under 18 U.S.C. § 1962(c)

Counter-Plaintiffs have alleged violation of RICO, 18 U.S.C. §§ 1962(c).  (D.E. 1, Ex. B,

p. 7-9.)[12]   This subsection states that a person who is employed by or associated with an

---

[11] Vanderbilt also contends that even if it were true the debt were released, Counter-Plaintiffs cannot show the element of reliance because "they were not aware of the BML and DOT lien releases until they met with their counsel and the foreclosure suit was filed."  (D.E. 143, p. 13.)  This is irrelevant to the Counter-Plaintiffs' fraud claim.  Counter-Plaintiffs argue that they "continued to rely on [Vanderbilt's] representations that the debt was still due and owing" – not Vanderbilt's representations, if any, in the BLM and DOT Releases that the debt had been discharged.  (D.E. 157, p. 19; D.E. 1, Ex. B, p.6.)  They contend that, because Vanderbilt continued to attempt to collect their debt, by calling them and visiting their home, even when Vanderbilt knew the debt was not due, they were led to pay $25,000 that they did not in fact owe.  (D.E. 157, p. 19; D.E. 1, Ex. B, p. 6.)

**[12] In their Response, the Counter-Plaintiffs state that the evidence also "shows the various Clayton entities conspired together to commit these acts in furtherance of the enterprise in further violation of 19 U.S.C. § 1962(d)."  (D.E. 157, p. 21.)  However, they did not plead violation of this subsection.  (D.E. 1, Ex. B, p. 7.)**

enterprise cannot conduct the affairs of the enterprise through a pattern of racketeering activity or collection of unlawful debt.  §1962(c).  Section 1962(c) is "the most commonly invoked RICO provision."  Mark v. J.I. Racing, Inc., 1997 WL 403179, at *3 (E.D.N.Y. July 9, 1997).  "Section 1962(c)… was intended to prevent the operation of a legitimate business or union through racketeering."  Id. (citing David B. Smith & Terrance G. Reed, Civil RICO, ¶ 5.01, p. 5-2 (1997).)  To prove a violation of this subsection the Counter-Plaintiffs must show: "(1) a person who engages in (2) a pattern of racketeering activity (3) connected to the acquisition, establishment, conduct, or control of an enterprise."  Crowe v. Henry, 43 F.3d 198, 203 (5th Cir. 1995); In re Mastercard Int'l, Inc., 313 F.3d 257, 261 (5th Cir. 2002) (citing Crowe).

### 1.      Pattern of Racketeering Activity – Predicate Acts

RICO provides an exhaustive definition of "racketeering activity," listing numerous activities that constitute "predicate acts" that will support liability of a defendant under RICO. 18 U.S.C. § 1961(1) ("'racketeering activity' means . . . ."); Johnson v. Hoffa, 196 Fed. Appx. 88, 90 n.3 (3d Cir. 2006) ("18 U.S.C. § 1961(1) catalogues an exhaustive list of 'racketeering activities' RICO encompasses.")  Counter-Plaintiffs allege multiple violations in support of their RICO "racketeering activity" allegations, including: 18 U.S.C. § 1028 (fraudulent identification documents), 1341 (mail fraud), 1343 (wire fraud), 1344 (bank fraud), 1956 (money laundering), and securities fraud.  (D.E. 1, Ex. B, p. 7-8.)   As explained in this Court's August 25, 2010 Order on the Intervention-Defendants' Motions to Dismiss nearly identical claims made by the Intervenors, (D.E. 148, D.E. 149), the only predicate acts that are supported by the allegations in the complaint are mail and wire fraud as well as money laundering.

---

**They filed no amended complaint alleging violation of subsection (d).  As such, the Court addresses only the alleged violation of subsection (c).**

### a.      Mail and Wire Fraud

To state a claim for mail or wire fraud to support a RICO violation under § 1341 or § 1343, a plaintiff must establish three elements: (1) a scheme or artifice to defraud or to obtain money or property by means of false pretenses, representations, or promises; (2) a use of the interstate mails or wires for the purpose of executing the scheme; and (3) a specific intent to defraud either by revising, participating in, or abetting the scheme." Hewlett-Packard Co. v. Byd:Sign, Inc., 2007 WL 275476, at *3 (E.D. Tex. Jan. 25, 2007).  The Counter-Plaintiffs allege that Vanderbilt, CMH Homes and their employees used the interstate mail or wires in the course of filing the allegedly forged and falsely notarized BML and DOT with the County, and in the course of secretly filing releases of these documents, which allegedly discharged their debt under the Retail Installment Contract.  (D.E. 1, Ex. B, p. 7-8.)  They contend this constituted a scheme to defraud or obtain money from them because it enabled Vanderbilt to discharge their obligation in order to conceal employee misconduct in execution of the Contract, and yet still collect on a debt that was not legally owed, thus appeasing investors who had purchased the debt created by the Contract.  (D.E. 157, p. 21-22, 13-14.)  Vanderbilt responds that this theory is flawed because at all times Flores and King were legally obligated to make payments on the Contract, and because there is insufficient evidence of specific intent to defraud.  (D.E. 143, p. 17; D.E. 173, p. 13.)

The outcome of these disputes depends on various issues of fact – specifically on whether the documents filed with the County were forged and fraudulent; on whether the debt was or was not released; and on whether the various individuals involved in releasing the debt, such as Vanderbilt's president Peter Nichols, intended that the releases would result in profits to

Vanderbilt under the Counter-Plaintiff's theory.  The evidence on record is sufficient to preclude judgment as a matter of law on these issues.[13]

### b.    Money Laundering

To establish the substantive offense of money laundering under 18 U.S.C. § 1956(a)(1)(A)(i), it must be shown that the defendant "(1) knowingly conducted a financial transaction; (2) which involved the proceeds of an unlawful activity; and (3) with the intent to promote or further unlawful activity."  U.S. v. Dovalina, 262 F.3d 472, 475 (5th Cir. 2001).  "To satisfy the promotion element of a money laundering conviction, [plaintiff] must show that a defendant conducted the financial transaction in question with the specific intent of promoting the specified unlawful activity.  Payment to co-conspirators for their participation in the conspiracy for the purpose of continuing the unlawful activity amounts to 'promoting the carrying on of the unlawful activity.'"  U.S. v. Lozano, 158 Fed. Appx. 632, 639 (5th Cir. 2005) (citing U.S. v. Valuck, 286 F.3d 221, 226 (5th Cir. 2002); U.S. v. Wilson, 249 F.3d 366, 378 (5th Cir. 2001)) (emphasis added).  The term "specified unlawful activity" includes all offenses listed in Section 1961(1), including mail and wire fraud.  18 U.S.C. § 1956(c)(7)(A).

Vanderbilt contends that Counter-Plaintiffs' money laundering claim under 18 U.S.C. § 1956 fails because the evidence does not support that Vanderbilt illegally obtained proceeds or used any funds to promote fraudulent activity with specific intent.  (D.E. 173, p. 14.)  The Court finds, however, that the evidence is sufficient to preclude summary judgment on the issue of whether Vanderbilt engaged in money laundering as a RICO predicate.  The Counter-Plaintiffs

---

[13] **The Counter-Plaintiffs also argue in their Response that Flores and King's application data, sent through the Intervention-Defendants' LINKS computer system, contained higher interest rates than those for which they were approved. (D.E. 157, p. 22.)  However, this argument was not pled in the original complaint, and no amended complaint was filed containing this argument.  As such, the Court does not address it.  In any case, the Counter-Plaintiffs have brought sufficient evidence of mail and wire fraud based on their other theories.**

allege that Vanderbilt and its associates, CMH Homes, Clayton Homes, Inc., and Kevin Clayton, engaged in money laundering by generating funds based on the illegal conduct described above – namely, filing forged and fraudulent documents and secret releases with intent to defraud Counter-Plaintiffs – and by "paying many of the co-conspirators huge bonuses" with proceeds from these funds in order to further their profit-generating activities.  (D.E. 1, Ex. B, p. 8; D.E. 157 p. 22).  Vanderbilt indisputably makes profits in the course of its financing business.  (DE 156, Ex. A, (Clayton Homes' 10-K Report)).  As said above, issues of fact remain as to whether Vanderbilt's profits were obtained as a consequence of a violation of § 1341 (mail fraud) or § 1343 (wire fraud).  Issues of fact also remain as to whether Vanderbilt paid its employees bonuses in order to promote these allegedly illegal activities.

### 2.        Standing and Proximate Causation

Vanderbilt contends Counter-Plaintiffs lack standing to sue under RICO because they have not suffered out-of-pocket expenses proximately caused by Vanderbilt's alleged RICO violations.  (D.E. 143, p. 13-14, 16-17.)  However, Counter-Plaintiffs do contend they have suffered out-of-pocket expenses as a result of Vanderbilt's alleged RICO violations.  They have paid $25,757.97 in payments on their home after the alleged release of their debt.  Vanderbilt's only response to this allegation of financial loss is that Flores and King's loan payments "are not damages because they are the result of a legitimate debt" and that the making of such payments "was not proximately caused by the alleged predicate acts."  (D.E. 143, p. 17.)  As discussed above, there remain issues of fact as to whether Flores and King's debt was released.  If the debt was indeed discharged, then Counter-Plaintiffs suffered cognizable losses under RICO, caused by Vanderbilt's conduct in continuing to collect on a released debt.  "The standing provision of civil RICO provides that "any person injured in his business or property by reason of a violation

of section 1962 of this chapter may sue therefor . . . and shall recover threefold the damages he sustains." Anderson v. Kutak, Rock & Campbell (In re Taxable Mun. Bond Sec. Litig.), 51 F.3d 518, 521 (5th Cir. 1995) (quoting 18 U.S.C. § 1964(c)).  Counter-Plaintiffs have shown they have standing to sue under RICO.

### 3.       Enterprise

"For purposes of § 1962(c) . . . the plaintiff must demonstrate not only that the enterprise is distinct from the series of predicate acts constituting racketeering activity, but also that the RICO 'person' who commits the predicate acts is distinct from the enterprise.  It is not enough to establish that a defendant corporation through its agents committed the predicate acts in the conduct of its own business." Whelan v. Winchester Production Co., 319 F.3d 225, 229 (5th Cir. 2003) (internal citations omitted); see also Abraham v. Singh, 480 F.3d 351, 357 (5th Cir. 2007). "Although a defendant may not be both a [RICO] person and an enterprise, a defendant may be both a person and a part of an enterprise.  In such a case, the individual defendant is distinct from the organizational entity." St. Paul Mercury Ins. Co. v. Williamson, 224 F.3d 425, 447 (5th Cir. 2000).

For example, in Abraham, the Fifth Circuit found that allegations identifying a company president as the RICO person distinct from the RICO enterprise, his company, were sufficient for purposes of Section 1962(c).  480 F.3d at 357.  The Court explained: "[i]n this case, plaintiffs have identified Chandler [the company president] as the RICO person and Falcon Steel [the corporation] as the RICO enterprise. This allegation is sufficient to demonstrate that the RICO person, an individual employee of the corporation, is distinct from the RICO enterprise, the corporation itself." Id.

In this case, Counter-Plaintiffs contend Vanderbilt constitutes an "enterprise" for purposes of 18 U.S.C. § 1961(4).  In the alternative, Counter-Plaintiffs contend that Vanderbilt formed an "association in fact" with its own employees and with other entities – namely, CMH Homes, Clayton Homes, Inc., and Kevin T. Clayton – and that this association constitutes an "enterprise" under Section 1962(c).  (D.E. 1, Ex. B, p. 7.)  Vanderbilt argues that Counter-Plaintiffs have failed to distinguish the RICO enterprise from Vanderbilt, the sole counterclaim defendant, and that there can be no "association in fact" between officers or employees of a corporation that forms an enterprise distinct from the corporation.  (D.E. 143, p. 15.)  The Court disagrees.

It does not matter that Counter-Plaintiffs name only Vanderbilt as a defendant, so long as they have sufficiently demonstrated that a RICO "enterprise" or "association in fact" enterprise exists.  See In re Mastercard Int'l Inc., 132 F. Supp. 2d 468, 491 (E.D. La. 2001) (holding that plaintiffs sufficiently alleged a RICO enterprise when plaintiffs named as defendants two banks, while describing the enterprise as consisting of one of the named banks and two non-defendant corporations).  The summary judgment evidence demonstrates that various entities and individuals – including Vanderbilt, CMH Homes, Clayton Homes, Inc., Kevin T. Clayton, as well as various corporate employees of these companies, including CMH sales associates, general counsel Tom Hodges, and the presidents of Vanderbilt and CMH – were engaged in a hierarchical enterprise in which they sold manufactured homes, secured the homes with allegedly fraudulent liens, and then continued demanding payment under the original contract even after the liens were allegedly released.  These business entities and corporate employees are RICO "persons" and are distinct from the enterprise itself – the association of these various

"persons."[14]   The RICO defendant, Vanderbilt, is "both a [RICO] person and a part of [this] enterprise."   St. Paul Mercury Ins. Co. 224 F.3d at 447 Vanderbilt is not the same as the RICO enterprise and "is not the entire association in fact enterprise."   In re: MasterCard Int'l Inc., 132 F. Supp. 2d 468, 491-92 (E.D. La. 2001). As such, the allegations and supporting evidence are sufficient to demonstrate a RICO enterprise exists, and survive the Counter-Defendant's motion for summary judgment.

To summarize, the Court finds the evidence on record is sufficient to preclude summary judgment on the Counter-Plaintiff's claims under RICO, 18 U.S.C. 1962(c), based on the predicate acts of mail and wire fraud and money laundering.

### G.      Claims for Mental Anguish Damages

The Counter-Plaintiffs seek mental anguish damages based on the distress Flores and King allegedly suffered when they were "continuously harassed" in the course of Vanderbilt's debt collection efforts, including over 600 collection calls to them after their debt had allegedly been paid in full.  (D.E. 1, Ex. B, p. 4-5.)  Vanderbilt objects that Flores and King have presented no evidence to support their allegation of mental anguish and that, as such, their claim for mental anguish damages fail as a matter of law.  (D.E. 143, p. 19-22.)  Alternatively, Vanderbilt seeks an order pursuant to Fed. R. Civ. P. 56(d)(1) that mental anguish damages are "not genuinely at issue," given the facts on record.  (D.E. 145, p. 20, n. 9.)  See Fed. R. Civ. P. 56(d)(1).

Mental anguish "is more than mere disappointment, anger, resentment, or embarrassment."   Thornton v. State Farm Lloyds, 2005 U.S. Dist. LEXIS 6542, * 18-19 (S.D. Tex. Mar. 18, 2005) (Parkway Co. v. Woodruff, 901 S.W.2d 434, 444, 38 Tex. Sup. Ct. J. 828 (Tex. 1995.  As a general matter, "damages for mental anguish must be supported by either

---

[14] "[A] legally different entity with different rights and responsibilities due to its different legal status" constitutes a "person" distinct from the "enterprise" for purposes of a §1962(c) claim.  Cedric Kushner Promotions, LTD. v. Don King, 533 U.S. 158, 163-164 (2001).

"'direct evidence of the nature, duration, and severity of [plaintiffs'] anguish, thus establishing a substantial disruption in the plaintiffs' daily routine,' or other evidence of 'a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger.' " <u>Dinn v. Hooking Bull Boatyard, Inc.</u>, 2009 U.S. Dist. LEXIS 60702, 25-26 (S.D. Tex. July 16, 2009) (citing <u>Burlington Coat Factory Warehouse of El Paso, Inc. v. Flores</u>, 951 S.W.2d 542, 548 (Tex. App.--El Paso 1997, no writ) (quoting <u>Parkway Co. v. Woodruff</u>, 901 S.W.2d 434, 444 (Tex. 1995))).

In his deposition testimony, Flores states that because he had to continue to pay his debt to Vanderbilt when it had been released, this put stress on him and his family. (D.E. 157, Ex. U, p. 118.) King states that as a result of the legal proceedings instituted by Vanderbilt against him he suffers "constant worry." (D.E. 157, Ex. V, p. 124.) Counter-Plaintiffs have presented no other evidence to support their allegations that they have suffered mental anguish as a result of Vanderbilt's collection efforts. However, statements of the afflicted party can in some cases be sufficient to support claims for mental anguish damages. <u>See South Tex. Freightliner, Inc. v. Muniz</u>, 288 S.W.3d 123, 135 (Tex. App. 2009) (upholding jury verdict on the issue of mental anguish damages in a malicious prosecution case when the only evidence of mental anguish was plaintiff's statements to his attorney that attending trial made him sad and angry, finding that this sufficed to provide "direct evidence of the "nature, duration, or severity" of plaintiff's mental anguish) (quoting <u>Parkway Co. v. Woodruff</u>, 901 S.W.2d 434, 444 (Tex. 1995)).

In addition, Texas courts have recognized a more lenient standard of proof may apply to claims for mental anguish in unfair debt collection cases. <u>See Campbell v. Beneficial Finance Co.</u>, 616 S.W.2d 373, 375 (Tex. Civ. App. Texarkana 1981). One court stated that unfair debt collection cases constitute a special class of tort that "expressly give a right of action for

oppression, harassment or abuse resulting from certain prohibited practices," and that the injury may often be "essentially mental and subjective" or involve "an unpermitted and intentional invasion of a personal right." Ledisco Financial Services, Inc. v. Viracola, 533 S.W.2d 951, 957 (Tex. App. 1976, no pet.)

Given that issues of fact remain as to the unreasonableness of Vanderbilt's efforts to collect on their debt, the Court cannot rule on the credibility of Flores and King's statements regarding their resulting mental anguish on summary judgment.  " Juries are to decide "the credibility of the witnesses and the weight to give their testimony[.]' " In the Interest of M.J., 2010 Tex. App. LEXIS 6272, 7-8 (Tex. App. Beaumont Aug. 5, 2010) (quoting City of Keller v. Wilson, 168 S.W.3d 802, 819 (Tex. 2005)).

## IV.    Conclusion

For the reasons stated herein, Defendants/Counter-Plaintiffs' Motion for Partial Summary Judgment (D.E. 125) is DENIED.   Plaintiff/Counter-Defendant Vanderbilt's Motion for Summary Judgment (D.E. 143) is also DENIED.

SIGNED and ORDERED this 20th day of October, 2010.

_____

Janis Graham Jack

United States District Judge