UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| VANDERBILT MORTGAGE AND FINANCE, INC., | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. C-09-312 |
| CESAR FLORES, *et al*, | § | |
| Defendants. | § | |

**ORDER**

Pending before this Court is Intervenors' Daubert Motion to Strike and/or Exclude Certain Opinions and Testimony of Defendants' Expert, R. Bryan Stone. (D.E. 154); and Defendants/Counter-Plaintiffs Motion to Exclude Certain Opinions and Testimony of R. Bryan Stone. (D.E. 155.) For the reasons stated herein, said motions are GRANTED.

**I. Jurisdiction**

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, federal question, because Intervenors Maria and Arturo Trevino brought claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 ("RICO").

**II. Background**

The factual and procedural background to this case are fully provided in this Court's August 25, 2010 Orders on Intervention-Defendants' Motions to Dismiss, (D.E. 148, D.E. 149), and this Court's October 20, 2010 Orders on the parties' motions for summary judgment. (D.E. 182; D.E. 183.)

At issue is whether to exclude certain portions of the proposed testimony of the Clayton Defendants' expert witness R. Bryan Stone. Stone is an expert in the customs and practices of

real estate, including title matters and lending transactions, particularly those involving manufactured housing. Stone is the owner of a title company firm and has been actively involved in the title business since 1988. (D.E. 177, Ex. 1 (Stone Dep.), p. 13-14, 71.) He has overseen the closing of thousands of commercial and residential transactions, including manufactured home transactions. He is also an attorney who has practiced banking law, including preparation of loan documents. (D.E. 177, Ex. B (Stone Report), p. 7.) Neither side disputes his qualifications to testify as an expert in these areas.

In their Motions to Exclude, the Intervenors and Counter-Plaintiffs request that the Court exclude paragraphs 4-18 of Stone's proposed testimony. (D.E. 154, p. 6-7; D.E. 155, p. 6-7.) The challenged portion of Stone's proposed testimony, as presented in his Expert Report, is as follows:

Stone will testify that the Retail Installment Contract ("RIC") obligating Flores and King to make 144 payments on their manufactured home granted CMH Homes ("Clayton") a security interest in the home and a security interest in the Trevinos' land to serve as further collateral. (D.E. 154, Ex. B (Stone Report), ¶¶ 4-5.) He will testify that Clayton assigned the Contract to Vanderbilt on or about January 16, 2002, and that Vanderbilt paid the purchase price of $40,815.19 in connection with the assignment. (Id. at ¶5, ¶ 16.)

Stone will then recount the filing of a Deed of Trust ("DOT") and a Builder's and Mechanic's Lien ("BML") creating liens on the Trevinos' property in the public records, and the filing of the releases of those documents in the public record in October 2005. (Id. at ¶¶ 8-10.) He will recount the customs and practices of lending and real estate with respect to the perfection of such security interests in real property, and with respect to the release of such security interests. (Id. at ¶¶ 6-10.)

Stone will then explain that in Texas the custom and practice – and the applicable legal rules – relating to real property liens is distinct from those relating to liens on manufactured homes. He will explain that "[b]ecause a manufactured home, by its very nature, is transportable, a different system has been established in Texas for creating title to a manufactured home and for perfecting a lien on a manufactured home." (Id. at ¶11.) He will explain that a lien filed on a manufactured home is perfected through filing of an application with the Texas Department of Housing and Community Affairs – Manufactured Housing Division ("TDHCA"), and that the only way to release a lien filed on a manufactured home is to fill out a Release of Lien (Form B) and submit it along with payment to the Department. (Id. at ¶¶ 11-13.) He will then conclude that, because Vanderbilt did not follow TDCHA procedures for releasing a lien on a manufactured home, the lien release would not be effective to release the lien on the home. (Id. at ¶ 15.)

Stone will also provide various other reasons why the BML Release cannot be effective to release the RIC, including that it was not executed by Vanderbilt, that neither Flores and King nor the RIC are mentioned in the BML Release, and that "merely releasing a lien does not operate to release the debt the lien secures." (Id. at ¶ 16).

## III. Discussion

### A. The Daubert Standard for Evaluation of Expert Testimony

Federal Rule of Evidence 702 governs the admissibility of expert testimony in federal court. That rule provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and

> methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

In Daubert v. Merrell Dow Pharms., the Supreme Court held that in federal courts "the [Federal] Rules of Evidence – especially Rule 702 – …assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert v. Merrell Dow Pharms., 509 U.S. 579, 597 (U.S. 1993). The trial court must act as a "gatekeeper" and make a preliminary assessment of whether the admissibility requirements have been met, before allowing experts to testify before a jury. Daubert, 509 U.S. at 592-93. The court's gatekeeper function applies to all expert testimony, not just testimony based in science. Seatrax, Inc. v. Sonbeck Int'l, Inc., 200 F.3d 358, 372 (5th Cir. 2000); Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999).

In general, "[a] trial court has considerable discretion to admit or exclude expert testimony under the Rule." Villaje Del Rio, Ltd. v. Colina Del Rio, LP, 2009 U.S. Dist. LEXIS 47714 (W.D. Tex. June 8, 2009) (citing Gen'l Elec. Co. v. Joiner, 522 U.S. 136, 138-139 (1997)). The proponent of the evidence has the burden of establishing these admissibility requirements by a preponderance of the evidence. Bourjaily v. United States, 483 U.S. 171 (1987); see also Moore v. Ashland Chem. Inc., 151 F.3d 269, 276 (5th Cir. 1998) (en banc).

**B. Analysis**

In their Motions to Exclude, the Intervenors and Counter-Plaintiffs request that the Court exclude paragraphs 4-18 of Stone's Expert Report, described in detail above. (D.E. 154, p. 6-7.) They give two arguments for why these portions of Stone's testimony should be excluded. First, they claim it is not supported by sufficient facts or data because Stone did not read the deposition testimonies of former CMH employees Benjamin Frazier and Bruce Robin Moore. Second, they

claim Stone's testimony is improper because he is providing "legal conclusions" and, as such, interferes with the role of the Court to tell the jury the applicable law and with the role of the jury to decide the ultimate issues in the case.

**1. Stone's Testimony Rests Upon A Reliable Factual Foundation**

The Intervenors claim Stone's proposed testimony is not supported by sufficient facts or data because Stone did not read the deposition of CMH employees Benjamin Frazier and Bruce Robin Moore. The Court disagrees.

As an initial matter, Frazier's and Moore's deposition testimonies are not even relevant to Stone's testimony. They relate to allegations that CMH employees forged and falsely notarized signatures on land documents at the Corpus Christi store. These allegations are at the heart of the Intervenors' fraudulent lien and fraud claims. But they do not relate to the separate issue of the legal effect of the security interests created by the land documents or to the issue of whether Flores and King's debt was subsequently "paid in full." The fact that Stone did not read Frazier and Moore's depositions does not significantly affect the weight to be given his opinions regarding retail installment contracts, security interests, and the creation and release of liens on real property.

Moreover, the record indicates that Stone bases his opinions on plentiful facts and data, see Fed. R. Evd. 702 (expert's testimony must be "based upon sufficient facts or data"), and on a variety of sources that are of a type reasonably relied upon by an expert in the fields of real estate, title, and secured lending. See Fed. R. Evd. 703 (sources underlying expert opinion must be "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.")[1] Even if Stone's failure to read Moore's or Frazier's testimonies

---

[1] Stone states that his opinions are based upon the following: the testimony of Flores and King (D.E. 154, Ex. B (Stone Report), ¶¶ 1, 3); the documents involved in the Flores and King transaction, including the Contract selling

were a reason to doubt the factual basis for his testimony, the jury is free to consider this failing in determining how much weight to give his testimony. Primrose Operating Co. v. Nat'l Am. Ins. Co., 382 F.3d 546, 562-63 (5th Cir. 2004) ("[A]s a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration…[It is] the role of the adversarial system, not the court, to highlight weak evidence."); see also Floyd v. Hefner, 556 F. Supp. 2d 617, 648 (S.D. Tex. 2008) (allowing professor of professional responsibility to testify as to whether legal representation was appropriate and whether there was a conflict of interest in a legal representation, even though the facts on which he based his testimony were disputed) (citing Primrose , 382 F.3d at 562); Montgomery v. Parker Towing Co., 2008 U.S. Dist. LEXIS 14532, * 6-7 (E.D. La. Feb. 25, 2008) (allowing admission of expert testimony even though expert report was "merely based" on a manual of industry customs and standards, given that his testimony was also based upon expert's experience as a safety professional in the marine industry.)

As such, the Court finds Stone's testimony is based on sufficient facts and data and upon sources "reasonably relied upon" in his field. It has sufficient factual foundation to be presented to the jury, in so far as it will assist the jurors in deciding the case and in so far as it is otherwise admissible.

---

Flores and King their home, the lien documents (BML, DOT), and the releases of the lien documents (D.E. 154, Ex. B, ¶¶ 1-5, 7-9, 14-16); the Texas Department of Housing and Community Affairs (TDHCA) policies and procedures for creating title to and perfecting liens upon manufactured homes (D.E. 154, Ex. B, ¶¶ 5, 10-15); the accounting records of CMH and Vanderbilt (D.E. 154, Ex. B, ¶¶5, 16); interviews with Clayton and Vanderbilt representatives (D.E. 154, Ex. B, ¶¶ 16, 18); a title search conducted by Guaranty Title, an independent title company in Alice, Texas, whose findings (including title records showing that Vanderbilt and CMH each recorded liens on the Trevinos' property and releases of these liens in the Official Records of Jim Wells County, Texas) are attached as an exhibit to Stone's report (D.E. 154, Ex. B, ¶¶ 8, 9, 10, Ex. 1); and his experience and training in the fields of real estate, title and secured lending and familiarity with the customs and practices of securing and releasing real and personal property liens in Texas. (D.E. 154, Ex. B, ¶¶ 5-7, 9-18.)

**2. Stone's Testimony Provides Inappropriate Legal Conclusions**

The Intervenors' and Counter-Plaintiffs' more convincing basis for excluding Stone's testimony is their contention that Fed. R. Civ. P. 704 prohibits expert witnesses from testifying on the law or deriving legal conclusions. The Clayton Defendants object that Rule 704 does allow witnesses to form opinions embracing ultimate issues to be decided by the trier of fact and that, as such, Stone's testimony should not be excluded under this rule. (D.E. 177.)[2] The Court disagrees.

Federal Rule of Evidence 704 provides that, in civil cases, "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Fed. R. Evd. 704(a). However, while it allows experts to opine on ultimate issues of fact, Rule 704 does not allow experts "to tell the jury what result to reach … Nor is the rule intended to allow a witness to give legal conclusions." Owen v. Kerr-McGee Corp., 698 F.2d 236, 240 (5th Cir. 1983) (court properly excluded attorney's question asking expert witness whether plaintiff was contributorily negligent) (citing United States v. Fogg, 652 F.2d 551, 557 (5th Cir. 1981); United States v. Milton, 555 F.2d 1198, 1203 (5th Cir. 1977); McCormick, Evidence § 12 (1972)). "[A]llowing an expert to give his opinion on the legal conclusions to be drawn from the evidence both invades the court's province and is irrelevant." Owen, 698 F.2d at 240; see also Marx & Co. v. Diners' Club, Inc., 550 F.2d 505, 509-510 (2d Cir. 1977) ( "[i]t is not for witnesses to instruct the jury as to applicable principles of law, but for the judge.")

[2] The Clayton Defendants also argue, with respect to the Trevinos' claims, that Stone does not opine on the "ultimate legal issue" in their case: whether the Clayton Defendants filed fraudulent liens. (D.E. 177, p. 9.) However, this argument does not apply to the Counter-Plaintiffs' objections because the "ultimate legal issue" in their case is whether the DOT and BML released their debt, which is the subject of the majority of Stone's expert report. Moreover, even if Stone does not opine on whether the Clayton Defendants filed fraudulent liens, as explained below, he nonetheless makes inappropriate conclusions regarding the legal effect of the relevant documents and invades the province of the Court by providing the jury with propositions of law.

With respect to expert testimony on contracts, in particular, federal courts have been clear that expert testimony is generally not permitted to interpret the terms of a contract or the legal effect of a contract.  Marx & Co., 550 F.2d at 510; see also DP Concrete Prods., LLC v. Am. Spring Wire Corp., 2010 U.S. Dist. LEXIS 5727, * 3-4 (W.D. La. Jan. 25, 2010) ("Federal courts have consistently held that expert testimony on issues of contractual interpretation is inappropriate and that such issues are reserved for the judge and jury.")  "In the absence of specialized trade usage, expert testimony regarding proper contract interpretation is inadmissible, as is expert testimony regarding the legal significance of the contract language."  Sparton Corp., 77 Fed. Cl. 1, 8 (Fed. Cl. 2007.) (citations removed); see also Tech. Corp v. S. Pac. Transp. Co., 225 F.3d 595, 611 (5th Cir. 2000); Phillips Oil Co. v. OKC Corp., 812 F.2d 265, 279-80 (5th Cir. 1987).

Expert testimony concerning the ordinary practices of a particular trade or business can be admissible "to enable the jury to evaluate the conduct of the parties against the standards of ordinary practice in the industry."  Marx & Co., 550 F.2d at 509.  However, when an expert purporting to testify regarding customary practices of a trade or business gives his opinion as to the legal standards which he believes govern the case, or goes on to apply those standards to the contract at issue, this must be excluded.  See id. (finding securities expert's testimony regarding parties' contract should have been excluded because he "testified not so much as to common practice as to what was necessary 'to fulfill the covenant [of the contract.]'")

In this case, Stone proposes to interpret the legal effect of several contracts at issue in this litigation – specifically, the RIC, the DOT and BML, and the DOT and BML releases.  The Clayton Defendants contend that Stone offers only opinions on the customs and practices of the real estate and lending industries, and that such opinions are admissible in so far as they will

assist the jury in determining the effect of the contracts at issue. (D.E. 177, p. 13-14.) Thus, Stone would not tell the jury how it should interpret the contracts. Rather, he would provide them with useful information on customs and practices of the industry or of the parties, in order to allow the jury to make a more informed decision. (D.E. 177, p. 13-14).

Some of Stone's proposed testimony is of this type. For example, Stone will state that when a buyer pays their debt on a RIC in full, Vanderbilt has a practice of stamping the RIC as "Paid" and then returning it to the buyer; and that Vanderbilt did not do so in this case. (D.E. 154, Ex. B (Stone Report), ¶ 18.) However, the majority of Stone's opinions are not limited to discussing Vanderbilt's customs and policies or general practices in the industry. Rather, Stone proposes to tell the fact-finder what the specific documents at issue mean and the legal significance of various facts to be adduced at trial.

For instance, one of the contested issues in the case is whether CMH assigned the RIC to Vanderbilt and whether Vanderbilt paid for the assignment. Stone will state that CMH did assign the RIC and was paid for the assignment. Based upon his own analysis of the transaction documents, he will conclude: "As of today's date, Vanderbilt is the holder of the RIC, and the first and only lien holder of the Home. Vanderbilt has a valid, perfected security interest in the Home." (D.E. 154, Ex. B (Stone Report), ¶5.) Another contested issue – the central issue in Counter-Plaintiffs Flores and King's case – is whether the DOT and BML releases discharged Flores and King's debt. Stone will conclude that because "Vanderbilt never filed a Release of Lien (Form B) with respect to the Home [with the TDCHA]…Vanderbilt's lien on the Home remains valid." (Id. at ¶ 12). In both instances, Stone derives his own opinion as to the legal standard which he believes applies, and goes on to apply that standard to the contract at issue. Federal courts have held such testimony to be inadmissible. Marx & Co., 550 F.2d at 509-10;

DP Concrete Prods., LLC, 2010 U.S. Dist. LEXIS 5727 at * 3-4; Sparton Corp., 77 Fed. Cl. at 8. Stone's proposed statements regarding the legal effect of the RIC and of the lien releases must be excluded.

Stone also proposes to interpret language in the contracts at issue. For example, he will explain the existence of the "paid in full" recital on CMH Homes' BML, stating that this cannot indicate a release of Flores and King's obligations because "Clayton was never paid in-full by Flores and King." Rather, "Clayton was paid in full by Vanderbilt on or about January 16, 2002, when Vanderbilt purchased the RIC from Clayton [.]" (D.E. 154, Ex. B (Stone Report), ¶ 16.) The Court has already held that whether "paid in full" refers to CMH's being paid in full by Vanderbilt, or whether it refers to CMH's having been paid by Flores and King, is a question of fact for the jury to decide. (D.E. 183, p. 21-22.) Expert testimony regarding proper contract interpretation or the legal significance of contractual language is inadmissible in the absence of distinct trade usage. Sparton Corp., 77 Fed. Cl. at 8. In this instance, Stone does not propose to provide the jury with a definition of what "paid in full" generally means in the industry. Rather, he proposes to instruct the jury as to what "paid in full" means in the BML release, thereby invading the role of the jury to make this determination.

Equally objectionable are Stone's proposed statements to the jury regarding what law to apply in their analysis of the lien releases. Stone will testify that filing a release of lien form with the TDCHA "is the only way to release a lien on a manufactured home in Texas." (D.E. 154, Ex. B (Stone Report), ¶ 12). He will also state the legal proposition that "merely releasing a lien does not operate to release the debt the lien secures." (Id. at ¶ 16.) "[E]xperts cannot assert what law governs an issue or what the applicable law means because that is a function of the court." Fisher v. Halliburton, 2009 U.S. Dist. LEXIS 118486, * 14-15 (S.D. Tex. Dec. 21, 2009)

(citing Askanase v. Fatjo, 130 F.3d 657, 673 (5th Cir. 1997); Goodman v. Harris County, 571 F.3d 388, 399 (5th Cir. 2009); Estate of Sowell v. United States, 198 F.3d 169, 171-72 (5th Cir. 1999); Snap-Drape, Inc. v. Comm'r, 98 F.3d 194, 198 (5th Cir. 1996)). Not only do Stone's proposed statements interfere with the role of the Court to determine the applicable law, they directly contradict the legal principles this Court has already stated apply. As explained in this Court's October 20, 2010 Order, the procedures required by the TDHCA are not controlling on the issue of whether Vanderbilt released the debt on the Counter-Plaintiffs' manufactured home. (D.E. 183, p. 25-26.) If Stone provides the jury with conflicting law, this will cause confusion and may lead them to apply the incorrect legal standard to the case.

In sum, because he opines on what law applies to the case and provides inappropriate legal conclusions, Stone's testimony, as stated in paragraphs 4 to 18 of his expert report, must be excluded.

## IV. CONCLUSION

For the reasons stated above, the Court GRANTS Intervenors' Daubert Motion to Strike and/or Exclude Certain Opinions and Testimony of Defendants' Expert, R. Bryan Stone, (D.E. 154), and GRANTS Defendants/Counter-Plaintiffs Motion to Exclude Certain Opinions and Testimony of R. Bryan Stone. (D.E. 155.)

SIGNED and ORDERED this 1st day of November, 2010.

Janis Graham Jack
Janis Graham Jack
United States District Judge