```
                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE SOUTHERN DISTRICT OF TEXAS
                        CORPUS CHRISTI DIVISION

VANDERBILT MORTGAGE AND        )    CIVIL ACTION
FINANCE, INC.,                 )
                 PLAINTIFF,    )    CA-C-09-312
                               )
VS.                            )
                               )    CORPUS CHRISTI, TEXAS
CESAR FLORES, ET AL,           )    NOVEMBER 15, 2010
                DEFENDANTS,    )    8:29 A.M.
                               )
AND                            )
                               )
ARTURO TREVINO,                )
      INTERVENOR/PLAINTIFF,    )
                               )
VS.                            )
                               )
CLAYTON HOMES, INC., ET AL,    )
      INTERVENOR/DEFENDANT.    )
                               )
.............................)
```

                      TRANSCRIPT OF TRIAL - DAY 4
        BEFORE THE HONORABLE JANIS GRAHAM JACK, JUDGE, with a jury
                      UNITED STATES DISTRICT COURT
                           SOUTHERN DISTRICT


THE PLAINTIFFS:                  MR. JORGE C. RANGEL
                                 THE RANGEL LAW FIRM
                                 615 N. UPPER BROADWAY, STE 2020
                                 CORPUS CHRISTI, TEXAS 78403

(APPEARANCES CONTINUED ON PAGE 2)




THE COURT RECORDER:              MS. VELMA GANO


PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE:  GARCIA
SERVICES, P.O. BOX 351, ROCKPORT, TEXAS 78381, 361-463-9790

```
APPEARANCES FOR:

THE PLAINTIFFS:              MS. CRISTINA E. RODRIGUEZ
                             BAKER BOTTS
                             910 LOUISIANA, STE 3624
                             HOUSTON, TEXAS 77002

                             MR. PATTON G. LOCHRIDGE
                             MR. CARLOS R. SOLTERO
                             McGINNIS, LOCHRIDGE & KILGORE
                             600 CONGRESS AVENUE, STE 2100
                             AUSTIN, TEXAS 78701

                             MR. EDWARD S. SLEDGE, IV
                             MR. THOMAS W. THAGARD, III
                             MAYNARD, COOPER & GALE
                             1901 SIXTH AQVENUE NORTH
                             SUITE 2400
                             BIRMINGHAM, ALABAMA 35203

THE DEFENDANTS:              MR. BALDEMAR F. GUTIERREZ
                             MR. J. JAVIER GUTIERREZ
                             THE GUTIERREZ LAW FIRM
                             700 E. THIRD STREET
                             ALICE, TEXAS 78332

                             MR. DAVID L. RUMLEY
                             MR. JEFF WIGINTON
                             WIGINTON RUMLEY
                             800 N. SHORELINE BOULEVARD
                             14TH FLOOR, SOUTH TOWER
                             CORPUS CHRISTI, TEXAS 78401
```

 1          (The proceedings began at 8:29 a.m., continued from

 2      11-12-10)

 3          THE COURT:  Anything to take up?

 4          MR. RANGEL:  A couple of matters, Your Honor.  May

 5  we approach the podium?

 6          THE COURT:  Please.

 7          MR. RANGEL:  Judge, there is a motion in limine that

 8  has been filed by Mr. Rumley and Mr. Gutierrez with respect

 9  to Mr. Flores' failure to file income tax returns for '06,

10  '07 and '08, and I wanted to get into that -- I believe

11  Mr. Flores is going to be testifying this morning -- under

12  608B and under the authority of the Bustamante case, 45 F3d

13  933 out of the Fifth Circuit.  It's clearly relevant to

14  credibility.  And they are going forward with their case in

15  chief this morning and I think that's something that clearly

16  it is entitled to.

17          THE COURT:  Mr. Gutierrez?

18          MR. B. GUTIERREZ:  Of course, we were not given any

19  notice that there would be some form of impeachment

20  concerning the failure to file an income tax return, and --

21          THE COURT:  What kind of notice were you expecting?

22          MR. B. GUTIERREZ:  Well, I think it goes to, I think

23  they are trying to either identify him or try to portray him

24  as someone that has violated the law in front of the jury.

25          THE COURT:  Well, has he made any income through

1   those years?

2          MR. B. GUTIERREZ:  I don't know he's made any

3   income, Your Honor.

4          MR. RANGEL:  We will lay the predicate for that

5   before, obviously, Judge.

6          THE COURT:  Okay.

7          MR. B. GUTIERREZ:  And we also object under 404B,

8   Your Honor, I mean --

9          THE COURT:  Okay, what does it have to do with the

10  case, though?

11         MR. RANGEL:  It goes to credibility, Your Honor.

12  And we served discovery responses where, requests for

13  admissions where he admitted with respect to the years '06,

14  '07 and '08 that he failed to file income tax returns.  And

15  they filed a motion in limine with respect to that weeks ago

16  and, filed during pretrial, so they were on notice that we

17  may try to use that.  Of course, we wouldn't bring it up

18  without first raising it with the Court due to the motion in

19  limine.  But it goes to credibility, like I said.  The

20  Bustamante case is right on point.  It goes to Mr. Flores'

21  character and truthfulness.

22         MR. B. GUTIERREZ:  Your Honor, he, Mr. Rangel had an

23  opportunity on his case --

24         THE COURT:  I'm sorry, why does that go, why is that

25  a credibility issue?  Explain it to me.

1          MR. RANGEL:  Well, because failure, under <u>Bustamante</u>

2     the failure to file income tax returns is the type of conduct

3     that goes to character and truthfulness.

4          MR. B. GUTIERREZ:  But he has admitted, you know, if

5     he was asked in requests for admissions, he has admitted that

6     he didn't file it.  You know, he wants to impeach him on

7     something that he has admitted in written discovery that was

8     sent to Mr. Flores.  And I think the only reason they want to

9     bring it up is to basically prejudice his claim against

10    Vanderbilt, his claim being that the repossession that they

11    are attempting is illegal, wrongful, and that the releases

12    were filed.  I mean he has admitted that he paid on the

13    contract, he has admitted he didn't pay the entire contract,

14    he has admitted that he didn't file any income taxes.  I

15    don't, I really don't understand how that can go to

16    credibility.  He has made those admissions, Your Honor.

17         MR. RANGEL:  He has made those admissions in

18    discovery but the jury does not know that he has made those

19    admissions and that's all we're trying to do.  I mean we're

20    not going to belabor the point, we just, I'm just going to

21    ask him, You did not file income tax returns for '06, '07 and

22    '08, because those are specific requests for admission that

23    he has admitted.

24         MR. B. GUTIERREZ:  This is not a case where we are

25    in tax court where they are trying to show that he has

1    violated the Tax Code in any way.  He has made admissions in

2    his, in written discovery that was sent to him.  Any evidence

3    that --

4              THE COURT:  Why don't we go ahead, let me read

5    Bustamante while we are discussing this.  You will have time.

6    Okay?

7              MR. RANGEL:  Very well, Your Honor, and I won't go

8    into it.  And may we go to the other point, Your Honor?

9              THE COURT:  Yes.

10             MR. RANGEL:  Okay.  Judge, today is going to move

11   very quickly.

12             THE COURT:  Yes.

13             MR. RANGEL:  We have been working with counsel in

14   terms of witnesses and so --

15             THE COURT:  I'm excited.

16             MR. RANGEL:  The parties are going to be resting and

17   we are going to have motions.  And they are prepared.  We're

18   going to have motions procedurally that we need to file after

19   each stage.

20             THE COURT:  I understand that.

21             MR. RANGEL:  And, obviously --

22             THE COURT:  And I will call you up here and you can

23   tell me the substance and then tell me that.  Whenever you

24   file them I will consider them filed at that moment.

25             MR. RANGEL:  Okay, so --

```
 1              THE COURT:  Is that all right?
 2              MR. RANGEL:  Right.  Just so long as the Court is
 3   okay with us proceeding that way.
 4              THE COURT:  Absolutely.
 5              MR. RANGEL:  And just to protect the record.  And
 6   Mr. Soltero --
 7              THE COURT:  The record is all important.
 8              MR. RANGEL:  Mr. Soltero will be arguing those
 9   motions and he requested I tell Your Honor.
10              THE COURT:  Thank you.
11              MR. RANGEL:  And that's all we have for the Court.
12              THE COURT:  Thank you.
13              MR. LOCHRIDGE:  We've got one matter of exhibits to
14   speed things along, Your Honor.
15              MR. B. GUTIERREZ:  Excuse me, Your Honor.  Could I
16   have a copy of the Bustamante case, because I take it that --
17              THE COURT:  It wasn't provided to me either, which I
18   would have --
19              MR. RANGEL:  I have it, Your Honor.
20              THE COURT:  No, what you need to -- I don't take
21   Xeroxes of cases.
22              MR. RANGEL:  I know, I --
23              THE COURT:  I find it very offensive, sorry.
24              MR. RANGEL:  That's why I didn't provide it to the
25   Court.
```

```
1              THE COURT:  But you should have filed a motion
2   citing it.
3              MR. SOLTERO:  We did, Your Honor.
4              MR. RANGEL:  We did.
5              MR. SOLTERO:  I believe it's in our motion in
6   limine.
7              MR. RANGEL:  It's in response --
8              THE COURT:  It is in the motion in limine and I read
9   the Bustamante case and I think you're right.  Now I
10  remember.  It's all coming back.
11             MR. SOLTERO:  It's in our response to the motion --
12             THE COURT:  It was a week and a half ago.
13             MR. B. GUTIERREZ:  Could I have a --
14             THE COURT:  But you need to lay the predicate,
15  Mr. Rangel.
16             MR. RANGEL:  I understand that, Your Honor.  I
17  understand that.
18             THE COURT:  And, further, I'm still sick so I'm
19  cranky.  Sorry.
20             MR. LOCHRIDGE:  Your Honor, we have got some
21  agreements on exhibits.
22             THE COURT:  Okay.
23             MR. LOCHRIDGE:  To try to move things along, and
24  I'll just read them, on the Clayton parties.
25        (Off the record discussion at counsel table)
```

```
 1              THE COURT:  Go ahead.

 2              MR. LOCHRIDGE:  We have agreed to the admission of

 3   Exhibits 4 --

 4              THE COURT:  These are Clayton exhibits?

 5              MR. LOCHRIDGE:  Yes, yes.

 6              THE COURT:  Go ahead.

 7              MR. LOCHRIDGE:  4, 5, 42, 139, 140, 141, 143 --

 8              THE COURT:  I'm sorry, 141 and 143?

 9              MR. LOCHRIDGE:  Yes, Your Honor.

10              THE COURT:  Or 43?  143?

11              MR. LOCHRIDGE:  143.

12              THE COURT:  Thank you, sir.

13              MR. LOCHRIDGE:  169, 176, 241, 242, which is a

14   revised one that they --

15              THE COURT:  What were the years of -- sorry --

16   Mr. Flores, wasn't he in the Bureau of Prisons in '07?

17              MR. RANGEL:  That was Mr. Trevino.

18              THE COURT:  Oh, sorry.

19              MR. RANGEL:  And he --

20              THE COURT:  Moving right along.  Thank you.

21              MR. RANGEL:  He failed to file income tax returns,

22   but that's the reason I am not urging that with respect to

23   him.

24              THE COURT:  Okay, thank you.  Okay, I got 242 is the

25   last one?
```

```
 1              MR. LOCHRIDGE:  Yes, Your Honor.

 2              THE COURT:  Is that it?

 3              MR. LOCHRIDGE:  And I believe that's it.

 4              THE COURT:  Thank you very much.

 5              MR. LOCHRIDGE:  And --

 6              THE COURT:  Those are admitted.  Wait a minute.

 7  Clayton's 4, 5, 42, 139, 140, 141, 143, 169, 176, 241 and 242

 8  are admitted.

 9       (Plaintiff's Exhibits 4, 5, 42, 139, 140, 141, 143, 169,

10         176, 241 and 242 admitted into evidence)

11              THE COURT:  And then?

12              MR. LOCHRIDGE:  I left, I'm sorry, I left one out,

13  Your Honor.

14              THE COURT:  Okay.

15              MR. LOCHRIDGE:  That's 194?  It's 96.

16              MR. RUMLEY:  Whatever, we, that one is --

17              MR. LOCHRIDGE:  With certain redactions that we

18  would revisit.

19              MR. RUMLEY:  Okay, as long as it's redacted.

20              MR. LOCHRIDGE:  It is.  It is.  It's, let me

21  explain.

22              MR. RUMLEY:  Suit affecting parent/child

23  relationship.

24              MR. LOCHRIDGE:  No, no.

25              MR. RUMLEY:  Right.
```

```
 1            MR. LOCHRIDGE:  No, I'm sorry.  It's 96 for all the
 2   exhibits, the exemplars.  And 96, we have reached an
 3   agreement, that had some plea agreements and we have redacted
 4   that so it's nothing more than a signature, and we've spoken
 5   with the expert, which he will refer to that as a court
 6   record.
 7            THE COURT:  Well, show it to Mr. Rumley right now.
 8   Have you got it?
 9            MR. LOCHRIDGE:  We have done that and I think, he
10   can speak for himself, I think he's in agreement.
11            MR. RUMLEY:  I'm in agreement, Your Honor.
12            THE COURT:  96 is admitted.
13       (Plaintiff's Exhibit 96 admitted into evidence)
14            MR. LOCHRIDGE:  And then we go to Exhibit -- that's
15   it.
16            MR. RUMLEY:  And then, Your Honor, for Flores/King/
17   Trevino, Defendant's Exhibit 491, which is, it's already been
18   admitted but we have identified it as a separate exhibit so
19   you don't have a bunch of sub-groups, which is a CV of Janet
20   Masson.
21            THE COURT:  I'm sorry, say that again, the number?
22            MR. RUMLEY:  Number 491.
23            THE COURT:  491, admitted.
24       (Defendant's Exhibit 491 admitted into evidence)
25            MR. RUMLEY:  CV of Masson.  And then --
```

```
 1              THE COURT:  Wouldn't -- okay, go ahead.

 2              MR. RUMLEY:  Defendant's Exhibits 487, 488, 489 and

 3  490, which are already in evidence but we --

 4              THE COURT:  Admitted.

 5        (Defendant's Exhibits 487, 488, 489 and 490 admitted

 6        into evidence)

 7              MR. RUMLEY:  Thank you.

 8              MR. B. GUTIERREZ:  Your Honor --

 9              MR. LOCHRIDGE:  I'm sorry.  One last exhibit.  And

10  I'm sorry to piecemeal, I thought I had a good list.  287,

11  which is the CV for Mr. Stewart.

12              MR. RUMLEY:  No objection.

13              THE COURT:  I'm sorry, say that again?

14              MR. LOCHRIDGE:  287.

15              THE COURT:  287 is admitted.

16        (Plaintiff's Exhibit 287 admitted into evidence)

17              MR. B. GUTIERREZ:  Your Honor, and we have these

18  exhibits concerning the depositions that were played on

19  Friday, Your Honor.

20              THE COURT:  Say that again?

21              MR. B. GUTIERREZ:  These are the exhibits that were

22  displayed and used with the testimony of the witnesses that

23  testified on Friday.

24              THE COURT:  Any objection, Mr. Lochridge?

25              MR. LOCHRIDGE:   I think Mr. Soltero bird-dogged that
```

1    one, Your Honor.

2              THE COURT:  Okay.  Mr. Soltero?

3              MR. SOLTERO:  As long as they weren't sustained at

4    the time, we don't object.

5              THE COURT:  The ones I sustained were the ones that

6    were put together.

7              MR. SOLTERO:  Right.

8              MR. B. GUTIERREZ:  The only ones that were sustained

9    were the demonstratives, which are not supposed to be --

10             THE COURT:  So what are the numbers on those?  I'll

11   start writing them down.

12             MR. B. GUTIERREZ:  95.

13             MR. SOLTERO:  Can we do that for the next one?

14             MR. B. GUTIERREZ:  You can just view them.

15             THE COURT:  Well, hand them to him as you, you tell

16   me the numbers and hand them to Mr. Soltero.

17             MR. B. GUTIERREZ:  95, Your Honor, Exhibit 95.

18             THE COURT:  Keep going.

19             MR. B. GUTIERREZ:  Exhibit 96, Exhibit 97, Exhibit

20   462, Exhibit 98, Exhibit 99, Exhibit 101, Exhibit 102,

21   Exhibit 114, Exhibit 230- --

22             THE COURT:  Hand them to him.  What was the last

23   one?

24             MR. B. GUTIERREZ:  Exhibit 232, Your Honor.

25             THE COURT:  Okay.

1          MR. B. GUTIERREZ:  Exhibit 225, Exhibit 226, Exhibit

2     227, Exhibit 230, Exhibit 231, Exhibit 233, Exhibit 234,

3     Exhibit 466, Your Honor.

4          THE COURT:  Okay.  Now, let's bring in the jury.

5     And you can tell me, Mr. Soltero, during the course of these

6     proceedings, since this is not your witness.

7          MR. SOLTERO:  Okay.  Yes, Your Honor.

8          THE COURT:  I am still going to re-read Bustamante.

9          MR. RANGEL:  And, Judge, we also cited to the Court

10    Hatchett, 918 F2d 631-641.  It's in Document 198, page 10 of

11    15.

12         THE COURT:  918 F2d what?

13         MR. RANGEL:  918 F2d 631-641.

14         THE COURT:  Thank you, got it.

15      (Jury enters at 8:43 a.m.)

16         THE COURT:  Thank you.  You may be seated.

17    Mr. Gutierrez?

18         MR. B. GUTIERREZ:  Yes, Your Honor.

19         THE COURT:  Go ahead.

20         MR. B. GUTIERREZ:  Cross-plaintiffs call Ms. Amber

21    Krupacs by video deposition.

22              DEFENDANT'S PROFFER OF EVIDENCE

23       (Video deposition playing)

24         "AMBER KRUPACS, DEFENDANT'S WITNESS, SWORN"

25                        EXAMINATION

Krupacs - by Defendants (Videotape)

1  BY MR. RUMLEY:

2  Q   "Ma'am, can you identify yourself for us?

3  A   "Amber Krupacs.

4  Q   "Do you know whether or not there is any type of an

5  unwritten policy in place with respect to how long you-all

6  keep deeds of trust that are involved in a land in lieu

7  transaction?

8  A   "With an active account, an active account we retain the

9  deed of trust for as long as the account is active.

10 Q   "If a land in lieu transaction is part of a

11 securitization and, for example, it's prepaid, that the loan

12 was prepaid, how long is the deed of trust maintained within

13 Vanderbilt?

14 A   "When an account goes into inactive status it would

15 depend on the reason, so if the customer had made all of

16 their contractual payments then we would retain, we would

17 take the deed of trust and we would release it, if they had

18 made their contractual payments, we would release it and we

19 would record that release at the relevant county, and upon

20 receiving it back we would then send it to the customer and

21 we would -- that's what we would do with it, we would send it

22 to the customer.

23 Q   "When a deed of trust is involved in a land in lieu

24 transaction that has been securitized, is the, the original

25 deed of trust, is that maintained, or is a copy of it, or how

1  does that work?

2  A    "For a deed of trust, it could be a copy, could be a copy

3  of the recorded deed that we would retain in the investor

4  files.  So we would have a copy or the original, depending on

5  what that particular county returned.

6  Q    "Okay.  And so, contained within the investor file for

7  that particular securitization, if we are talking about a

8  land in lieu transaction, the deed of trust that would be

9  maintained in an active status transaction would either be a

10  copy or the original, correct?

11  A    "Yes.

12  Q    "All right.  And then there is no policy in place with a,

13  within any type of a time frame as to when that is destroyed

14  or sent back after that account becomes inactive?

15  A    "Well, when the account is paid in full and it's

16  satisfied all of it, it's paid its contractual payments, when

17  it's paid its contractual payments, again, we would send it

18  to the county to release the deed.

19  Q    "Release the deed of trust?

20  A    "Yes.  Upon payment of all the payments.

21  Q    "Give us an idea of your background, your school, your

22  work history and that sort of thing.

23  A    "School, I went to Drexler University, Philadelphia.  I

24  started working with a public accounting firm after college.

25  Then I came to Clayton Homes.

Krupacs - by Defendants (Videotape)

1  Q   "Let me stop you there.  Did you get a degree in

2  accounting?

3  A   "I did.

4  Q   "Do you remember what year you graduated?

5  A   "1987.

6  Q   "And then after that did you attend any other education?

7  A   "No.

8  Q   "And then what year did you go to work for Clayton Homes?

9  A   "1993.

10 Q   "And what position did you start there with?

11 A   "Tax manager.

12 Q   "And how long were you tax manager?

13 A   "I was tax manager through 2001.

14 Q   "And then, how did your title change in 2001?

15 A   "In 2001 I moved to Vanderbilt Mortgage and Finance as a

16 vice-president.

17 Q   "And do you remember when in 2001 you became vice-

18 president?

19 A   "It was approximately September.

20 Q   "And has your position changed since then?

21 A   "No.

22 Q   "You are still vice-president at Vanderbilt?

23 A   "Yes.  I also became secretary when I came down in 2001.

24 Q   "Have you been an officer of any of the other Clayton

25 companies?

Krupacs - by Defendants (Videotape)                    18

```
1   A   "I have been an officer of Clayton Homes.

2   Q   "When you say Clayton Homes --

3   A   Inc.

4   Q   -- that's Clayton Homes, Inc.?

5   A   "Yes.

6   Q   "And when were you an officer?

7   A   "I was an officer there from approximately 1998 until

8   present.  And a secretary for a portion of the time.  And I

9   was vice-president from '98 through the present.

10  Q   "Vice-president of Clayton Homes, Inc.?

11  A   "Yes.

12  Q   "Do you remember when you were secretary?

13  A   "'98, but I'm not sure when it ended.

14  Q   "Okay.  Are you an officer of any other Clayton company?

15  A   "Presently, no.

16  Q   "Give us an idea of what your responsibilities are as

17  being vice-president of Clayton Homes, Inc.

18  A   "Clayton Homes, Inc., would be responsible for assisting

19  with arranging financing for the company.

20  Q   "And give us an idea of how you do that.

21  A   "Today the financing is provided substantively by

22  Berkshire, one of the Berkshire Hathaway subsidiaries.

23  Q   "And before that time, before Berkshire was involved, how

24  did they obtain their financing?

25  A   "We would have financed the company through bank credit
```

1   lines, private placements, bank syndications, as well as a

2   securitization program.

3   Q    "Give us an idea of how the securitization program

4   assisted with the financing of Clayton Homes, Inc. up until,

5   I assume, the time that Berkshire acquired them, correct?

6   A    "Were there a couple of questions there?

7   A    "Well, I'm trying to define the time period.  It's my

8   understanding there's a difference, correct, between when

9   Berkshire provided the financing and when the securitization

10  provided the financing for Clayton Homes, Inc.?  Is my

11  understanding correct?

12  A    "Up through -- the last securitization that we issued was

13  2003-A.  That was the last one we issued and then since we've

14  been funded through Berkshire Hathaway.

15  Q    "Give us an idea of how the securitization, up and

16  through, say, from 1999 through 2003-A, how that would

17  provide Clayton Homes, Inc. with financing.

18  A    "A trust would be formed, a securitization trust would be

19  formed.  The assets of the trust would be approximately six

20  to 10,000 Vanderbilt mortgages, loans and mortgages.  The

21  trust would create bonds and bond investors would invest in

22  the bonds with the intention or with the intent of receiving

23  their investment back through principal payments over time as

24  well as earning an interest rate, a coupon on the bond that

25  they were acquiring.  Those proceeds that would be received

Krupacs - by Defendants (Videotape)                    20

1   from the investors would then fund additional originations

2   for Vanderbilt Mortgage.

3   Q    "The assets that are contained in the trust would be

4   things like manufactured home contracts, mortgages, that sort

5   of thing, correct?

6   A    "Correct.

7   Q    "Do you have an understanding that back during the 2005

8   time period that there were a number of releases that were

9   filed releasing deeds of trust, mechanic's liens, in South

10  Texas?

11  A    "In general, I know we filed some.

12  Q    "Can you explain to the jury what the pooling and

13  servicing agreement is, generally?

14  A    "The pooling and servicing agreement, in summary,

15  outlines the provision of creating the securitization trust,

16  of creating, the process of creating the bonds, of

17  administering the bonds long-term, and the payment structure

18  that has to be adhered to to pay the bonds, or return to the

19  bondholders their original investment and the interest that

20  they would earn on them, as -- it does many things.  Those

21  are just some of them, in summary, the high level things.

22  Q    "Sure.  How do you, how do you report, under your

23  obligations, under the underwriting agreements and your

24  obligations under the servicing and pooling agreements, the

25  change, for example, if a land in lieu transaction was

1  originally sold as a land in lieu and since then the land has

2  been released?

3  A    "Under the pooling and servicing agreements they are

4  silent as to that type of communication.

5  Q    "When you have a situation of a land in lieu where a

6  deed, land is actually put up as collateral, correct?

7  A    "Yes.

8  Q    "Do you communicate in any form or fashion if that land

9  has been released to any of the investors?

10  A    "I don't recall us doing that, no, but I don't also

11  recall us being required to do that under the pooling and

12  servicing agreement.

13  Q    "Will you agree with me that if you have a loan that you

14  are securitized and it is backed by real property versus just

15  the home, that that is worth more to an investor than just

16  simply a loan without the real estate as collateral?

17  A    "In a Vanderbilt transaction it really would not be.

18  Vanderbilt has always taken responsibility for each and every

19  loan that is put into the securitized pool; therefore, if a

20  loan ever defaults in a Vanderbilt transaction, Vanderbilt

21  reacquires or repurchases that loan from the pool, so the

22  investor, it really does not matter what it is because he is

23  always going to get full principal.  That would matter if you

24  weren't going to get full principal for your loan, yes.  But

25  in this case, since in a Vanderbilt transaction they always

1   get full principal returned to them, it does not matter.

2   Q   "From a very simplistic view, from kind of like the, I

3   don't know if it's the chicken or the egg, but you have a

4   consumer who presumably purchased a manufactured home, they

5   obviously didn't pay cash so they took out a loan, and so

6   money is owed to CMH, who is the seller of the home, and that

7   person would obtain financing through Vanderbilt?

8   A   "Or others, but --

9   Q   "Or others.  So in that scenario Vanderbilt would

10  actually, based on a ledger entry, pay CMH Homes for the home

11  and the customer would be indebted to Vanderbilt, is that --

12  A   "Vanderbilt would pay what was needed on the transaction

13  to -- it wouldn't necessarily -- Vanderbilt wouldn't

14  necessarily be paying CMH for the home, because that would be

15  Vanderbilt buying the home.  So Vanderbilt is not paying CMH

16  for the home.  What they are doing is lending the money to

17  the customer to buy a home.

18  Q   "But they are not actually lending the money, they are

19  having an installment contract where the customer is making

20  monthly payments?

21  A   "Well, they did lend the money to -- they lent the money

22  to the customer.  They did lend money to the customer to buy

23  their home.

24  Q   "What are the other risk factors?

25          MR. RANGEL:  "In the document?

Krupacs - by Defendants (Videotape)

1          MR. RUMLEY: "Yes.

2          THE WITNESS: "It talks about partial prepayments,

3    which we have already talked about, and prepayments resulting

4    from refinancing by obligors.  We mentioned that briefly.  If

5    a lot of customers are finding alternative lenders, then they

6    are able to refinance, and those would show as payments in

7    full.  We talked about liquidations on defaulted contracts.

8    Repurchase of contracts by the seller due to defective

9    documentation or breaches of representation of warranties in

10   the pooling and servicing agreement would affect it.  And the

11   optional purchase by the seller or servicer of all the

12   contracts in connection with termination of the trust fund.

13   BY MR. RUMLEY:

14   Q    "It says repurchases of contracts by the seller due to

15   defective documentation or breaches of representation of

16   warranties in the pooling and servicing agreement.  What is

17   that referring to?

18   A    "That would usually happen towards the beginning of a

19   securitization where it would be, you were expecting to get

20   the recorded mortgage back and you didn't, so you can't

21   supply the recorded mortgage in the time frame that's

22   specified in the agreements.  That would be one.

23   Q    "What happens in a situation where you would learn that

24   the underlying documents were forged or fraudulent?  Is that

25   a situation where the seller or Vanderbilt would come in and

1   repurchase that?

2   A   "If it was beyond alleged, it was proven, Vanderbilt, I

3   believe, would repurchase that.

4   Q   "And how is that documented?

5   A   "It would show up, again, on the investor report, the

6   monthly, and it would be shown on the line that would talk

7   about the prepayments in full, is the line it would have

8   there, is where those proceeds go on all repurchases.

9   Q   "Okay.  How about within Vanderbilt, is there, do you --

10  I would assume that you delineate out those versus the ones

11  that have been prepaid or defaults?

12  A   "I'm not sure I understand the question.

13  Q   "How do you record within Vanderbilt which of those loans

14  that were repurchased due to defective documents, forgery,

15  fraud, something like that?

16  A   "We would not have a designation in the system.  The

17  designation we would have, if we have a particular loan that

18  is the subject of litigation, we do have a status code that

19  we put on that particular loan.  Other than that, there would

20  be no other designation on it.

21  Q   "Okay.  And it would be reported to the investor just as

22  a prepayment?

23  A   "Yes, it would.  On the monthly report.  Because

24  Vanderbilt would repurchase the loan, give them their

25  principal back, or their investment, and so it would show up

1    there."

2        (Video stops)

3            MR. THAGARD:  Your Honor, may we approach for a

4    second?

5            THE COURT:  Yes, sir.

6        (Bench conference on the record)

7            THE COURT:  Does somebody have an expert witness

8    sitting in the back?

9            MR. THAGARD:  Sitting where?

10           THE COURT:  Our security officer said that there's

11   an expert witness sitting in the back.

12           MR. THAGARD:  It's their expert?

13           MR. B. GUTIERREZ:  It's Mr. Stewart I think is back

14   there.

15           MR. THAGARD:  Oh, okay.

16           THE COURT:  Can you, is there any problem with that?

17   I just, the CSO just always asks me if there are any other

18   witnesses.  Was he told (indiscernible)?

19           MR. B. GUTIERREZ:  He was.

20           THE COURT:  Okay.  Now.

21           MR. THAGARD:  The next four questions and answers

22   deal with litigation in --

23           THE COURT:  What lines?

24           MR. THAGARD:  Litigation from 214.  It's been

25   highlighted there.  And the settlements.  And therefore we

1   find those objections and answers objectionable under 402,

2   403, unreasonably prejudicial.

3           MR. B. GUTIERREZ:  It's not identifying any

4   particular settlement, it's just giving a scenario --

5           THE COURT:  Well --

6           MR. B. GUTIERREZ:  -- that -- sorry.

7           THE COURT:  With respect to those there's no

8   settlement, so that's -- okay.

9           MR. THAGARD:  It has to do with this repurchase.  If

10  the loans are, if the loans are discharged or prepaid then

11  they are repurchased, and that's, the evidence in this case

12  is this loan was repurchased.

13          THE COURT:  Did you object to that?

14          MR. THAGARD:  Yes, ma'am, I have an objection on the

15  record.

16          THE COURT:  All right.  Let's see that objection.

17          MR. THAGARD:  The reason I'm making it, this is

18  their clip on the -- I didn't take that next one, there is no

19  objection.

20          THE COURT:  That's the time to make your objections

21  is when you're taking a deposition to object.

22          MR. THAGARD:  Your Honor, I think all objections,

23  and by agreement, all objections were reserved for trial

24  except as to form.

25          THE COURT:  Is that right?

1          MR. RUMLEY:  It was taken pursuant to the Federal

2   Rules, yes.  Or -- sorry, Judge, I've just drawn a blank.  I

3   don't know.

4          THE COURT:  Do you-all agree with that?

5          MR. RUMLEY:  Someone that's a lot smarter than me.

6          MR. THAGARD:  That was the agreement of the parties,

7   Your Honor.

8          MR. B. GUTIERREZ:  They didn't ask me, Judge.

9          THE COURT:  Is there an agreement on objections, is

10  that what you're talking about?

11         MR. THAGARD:  Sure.  We weren't making objections at

12  the deposition.

13         MR. RANGEL:  That was even as to form.

14         THE COURT:  Was it at the beginning of this?

15         MR. THAGARD:  That was the agreement throughout all

16  of this litigation, Your Honor.

17         MR. RANGEL:  These were taken under the rules, Your

18  Honor, and the objections --

19         THE COURT:  The ones I have seen, I think they were

20  all made at the time.  I think that you keep changing the

21  rules.  I don't understand what rules you're talking about,

22  sorry.

23         MR. THAGARD:  They have taken the position that we

24  can't, there are several things where they say we can't make

25  any objections except as to form.

```
 1              MR. RUMLEY:  They have objected to us saying -- we
 2    objected to leading objections and coaching the witness.
 3              MR. THAGARD:  They said you can't, you have no
 4    objections except as to form.
 5              MR. RUMLEY:  You-all wanted that, you-all didn't
 6    take exception.
 7              THE COURT:  Where was that agreement?  Can you show
 8    me that?
 9              MR. THAGARD:  Meaning that the -- they get plenty of
10    evidence.
11              THE COURT:  On this objection, let me hear what
12    Mr. Rangel has to say.
13              MR. RANGEL:  Yes, Your Honor?
14              THE COURT:  Now he wants to object at trial when
15    nothing was objected to so they could have changed it, right?
16              MR. RANGEL:  My understanding, Judge, when we were
17    taking these depositions, that we needed to make objections
18    as to form; otherwise, if there was objections they wouldn't
19    be waived but that under the rules substantive objections
20    would be made at time of trial.
21              THE COURT:  That doesn't make any sense.
22              MR. RANGEL:  However, they did continue to make,
23    they --
24              THE COURT:  Do you have an agreement to show me
25    that?
```

1          MR. RANGEL:  Judge, I've got where that's recited.

2    I think we had an understanding all along that they were

3    being taken under the rules, under the Federal Rules.

4          THE COURT:  I am not understanding.

5          MR. RUMLEY:  We agreed to take them under the rules,

6    I just don't know which rules.

7          THE COURT:  What rules?

8          MR. RUMLEY:  Federal Rules.

9          MR. SPEAKER:  Texas Rules?

10         MR. RANGEL:  No.  Under the Federal Rules.

11         THE COURT:  I haven't seen the Federal Rules on

12   this.

13         MR. RANGEL:  These depositions, Your Honor, by

14   agreement, and this is agreement, a clip can be used in the

15   federal cases that are pending and the state cases, and so we

16   were taking them under the Federal Rules and the Texas Rules.

17   And I can, I believe Mr. Rumley can confirm this but

18   certainly under the Texas Rules objections as to form have to

19   be made at the time of the deposition or they're waived, but

20   not the, but not the others.

21         MR. B. GUTIERREZ:  Perhaps an example of their not

22   wanting to waive objections is, for example, when they, when

23   we deposed a certain individual --

24         THE COURT:  Federal Rule of Civil Procedure on

25   objections, and it says that --

1          MR. RANGEL:  30?

2          THE COURT:  It says that the objections must be

3    made, must be noted on the record.  30.  "An objection at the

4    time of the examination, whether it's evidence, to a party's

5    conduct, to the qualification or the manner taken, any other

6    aspect of the deposition, must be noted on the record."

7    That's the Federal Rules.  If you made some other agreement,

8    why don't I leave this out right now and you-all try to find

9    the agreement, if you made some contrary agreement to the

10   Federal Rule.

11         MR. RANGEL:  And I will represent to the Court that

12   we do have an agreement that these depositions can be used --

13   I'm sorry.  I will represent to the Court that these

14   depositions were being taken for use both in Federal Court

15   and there are a couple of State Court cases.

16         THE COURT:  I understand that, but when you say you

17   took them pursuant to the Rules of Federal Procedure --

18         MR. RANGEL:  Well, what I'm saying is they were

19   taken --

20         THE COURT:  All objections have to be made at the

21   time.

22         MR. RANGEL:  They were taken under both the Federal

23   Rules and the Texas Rules.

24         THE COURT:  Look, my problem is this, under Federal

25   Rules you have got to make your objections at the time of the

1   deposition to preserve them.  Now, if you made some other

2   agreement --

3         MR. RANGEL:  We will track down that other agreement

4   that they could be -- in fact, I think it was one, an order

5   entered by the Court that they could be used in both the

6   state and federal litigation.

7         THE COURT:  Yeah, but they have still got to be

8   taken under both, you know, under our rules.

9         MR. RANGEL:  Our position, taken under both rules,

10  Your Honor.

11        THE COURT:  You can take them under both rules, but

12  oral objections weren't made at the time of the deposition.

13  It doesn't make any sense.

14        MR. THAGARD:  Our only objection to this whole

15  deposition, it's to hold up their claim.

16        MR. B. GUTIERREZ:  Mr. Rumley took the deposition

17  and he's looking to see if there's an agreement and he

18  doesn't find one.

19        THE COURT:  Why don't we leave this out right now.

20  You can add to it.  I'll just tell the people that we need

21  to, I do need to do some research on the objection.  How's

22  that?

23     (Bench conference ends)

24        THE COURT:  The Clayton Homes has made an objection

25  about a part of the deposition.  I'm going to leave it out

1    right now while I do, while all the parties do some research

2    on that particular objection, because I'm just not sure

3    enough right now to rule on it.  So I'm going to leave that

4    out.  It may come in later.  Thank you.

5        (Video playing)

6    BY MR. RUMLEY:

7    Q    "Would the land in lieu documents that we talked about

8    that would be involved in the pool, the securitization, would

9    they be stored in the vault?

10   A    "If they were deemed to be not converted to real

11   property, then they would be stored in the vault.

12   Q    "Okay.  And then if you flip to the next page there's

13   another release and it says, "Release of installment

14   contract."  Is this, do you know what this document is?

15           MR. RANGEL:  "Are you looking at 9651?

16           MR. RUMLEY:  "Yes.

17           THE WITNESS:  "(Perusing document)  I don't.  I

18   don't know when they would use it.

19   BY MR. RUMLEY:

20   Q    "You see it says 'Investor name, investor address'?

21   A    "I see it, uh-huh.

22   Q    "You don't know if this is the document that's used in a

23   situation where you're repurchasing a land in lieu type

24   document?

25   A    "Well, I don't know -- these would be driven, all these

1  forms that we've just looked at that are forms, in other

2  words, 96.44, 96.45, 96.47 and 96.51, would all be used after

3  someone other than document personnel had determined and

4  changed the coding in the system.  So these would be in

5  response to someone else coding it and their, them receiving

6  notification that it's occurred.  They wouldn't be driving

7  this process.  They would just be responding to a process

8  with maybe these forms.  But, no, I'm not sure when 96.51

9  would be used.

10  Q    "Okay.  How does Vanderbilt obtain its financing today?

11  A    "Vanderbilt obtains its financing today through a

12  Berkshire subsidiary.  The subsidiary issues bonds which --

13  so instead of Vanderbilt issuing bonds, the subsidiary issues

14  bonds.

15  Q    "And when you repurchase a loan, who actually, how does

16  the money exchange hands?

17  A    "Vanderbilt would send money to the certificate account

18  which is defined in these documents, would send funds for the

19  unpaid principal balance and any accrued and unpaid interest

20  to the certificate account, and it would be dispersed to the

21  bondholders appropriately under this document within -- at

22  the beginning of the following month when all the other

23  monies were distributed.

24  Q    "And with respect to how that would be disclosed to the

25  bondholders or the trustee, it would just be shown or

Krupacs - by Defendants (Videotape)

1   reflected as a prepayment, correct?

2   A    "It would be shown on the investor report, on the monthly

3   investor report, on the line that has the prepayments.

4   Q    "If a, if it's determined that Vanderbilt no longer has a

5   valid security interest in real property, do they go ahead

6   and repurchase the loan?

7   A    "For just that stated reason?  We would not go ahead and

8   repurchase the loan because the customer is still obligated

9   for paying on the home, and so the -- well, the customer

10   would still be paying the regularly scheduled monthly

11   payment.  And that's really what the bondholder and everyone

12   else is interested in is the normal monthly payments.  They

13   get normal monthly payment which is used to then, of course,

14   pay the bondholder off on their investment and pay their

15   interest and everything else, so --

16   Q    "So -- sorry.

17   A    "No, we would not have repurchased it for that."

18       (Video stopped)

19           MR. B. GUTIERREZ:  That concludes our offer.

20           MR. THAGARD:  Your Honor, we would like to offer

21   additional designations from the deposition.

22           THE COURT:  Go ahead.

23                   PLAINTIFF'S PROFFER OF EVIDENCE

24       (Video deposition of Amber Krupacs playing)

25                           EXAMINATION

Krupacs - by Plaintiffs (Videotape)

1  BY MR. RUMLEY:

2  Q   "When was the -- well, let me ask you this:  Were you

3  involved, or how were you involved with those securitizations

4  back, '99 to 2003 time frame?

5  A   "I would have been involved with high-level review of the

6  documents in the transaction, but not a direct

7  responsibility, an indirect responsibility, up through 2001.

8  Starting with 2001, Septemberish, I would have had a much

9  more direct role.  So, prior to 2001 my role would have been,

10 again, cursory review of the documents.

11 Q   "And when you say documents, would those be documents

12 related to the assets that were in the trust or would they be

13 related to the securitization documents?

14 A   "Securitization documents solely.  The pooling servicing

15 agreement, the prospectus.

16 Q   "And how about after 2001, how did, how did your role

17 change?

18 A   "The role changed in 2001.  I assumed, again, a much more

19 direct relationship, would be involved with, still being the

20 primary person responsible for reading the prospectuses, the

21 pooling agreements, the -- would be responsible for pricing,

22 having the pricing calls when you were selling the bonds,

23 structuring discussions, what type of bonds to issue.  Far

24 more detail.

25 Q   "When you have a loan that you're going to securitize,

Krupacs - by Plaintiffs (Videotape)

1  you're going to sell that loan to investors, the loan is more

2  valuable if it is backed by real property versus just the

3  home, correct?

4  A   "Not necessarily, no.  It would depend on other

5  characteristics of the loan.

6  Q   "Like what?

7  A   "Down payments.  It would depend on the credit quality of

8  the customer.  So there would be other characteristics that

9  would make a difference, whether it was a single-wide,

10 whether it was a double-wide, whether it was in a park or it

11 wasn't in a park.

12 Q   "If you have, all of those are equal, the only difference

13 is one is backed by real property and one is not, which one

14 is more valuable to an investor?

15 A   "In a Vanderbilt transaction neither is more valuable

16 because they're going to get full principal either way.

17 Q   "And is that what you tell your investors?

18 A   "Investors are aware that Vanderbilt buys all the loans

19 back if they go into default.

20 Q   "Can you explain to me how, how does a deal like that get

21 priced?  Explain to the jury how it is that you put together

22 this deal and how does it ultimately get priced.

23 A   "A securitization trust is formed and Vanderbilt would

24 contribute assets to the securitization trust.  The

25 securitization trust would give Vanderbilt, would -- the

1  securitization trust would create bonds and would give the

2  bonds to Vanderbilt in exchange for the loans, the six to

3  10,000 loans.  Then Vanderbilt would take the bonds and they

4  would sell them, almost a simultaneous thing, they would sell

5  them with a securitization trustee.  I'm sorry, I got lost

6  there.  They would sell them to an underwriter and the

7  underwriter would then sell them to investors.

8  Q   "Okay.

9  A   "Bond investors.  A deal gets priced -- you have these

10  various bonds that have been created and through the

11  prospectuses the, an offering memorandum, the deal is shown

12  by underwriters, or the bonds are shown by underwriters to

13  potential investors.  Those potential investors then express

14  interest to the underwriters, I would buy this bond at, and

15  they price them in yield, so they don't say -- how they're

16  usually priced, and you'll see this further in this book, is

17  it shows off of either treasuries or off of swaps.  So it

18  says, I would buy this bond if I can get an interest rate

19  equal to treasury plus 100 basis points.  That's how they

20  price them.  And they have those discussions, and once the

21  best prices are achieved they then would call us and they

22  would say, We're ready to price today at such-and-such a

23  time.  And we would get on the phone with them and we would

24  actually through a pricing quote, We're going to sell the A-1

25  bonds for treasuries plus 35 or -- it's usually, in the A-1

Krupacs - by Plaintiffs (Videotape)

1  bond, LIBOR plus 35 basis points.  Okay.  And we would agree

2  to it.  And then we would go to the next bond, the next bond,

3  the next bond, until all the bonds were priced.

4  Q   "And the information that would be provided to the

5  various investors would be provided to them directly by the

6  underwriter?

7  A   "That is correct.

8  Q   "Who actually prepares the prospectus and the

9  supplemental prospectuses, if there is one?  Is that

10  something that Vanderbilt would do, or is that something that

11  the underwriter actually prepares, or is it both?

12  A   "The underwriter leads the process of preparing the

13  prospectus.  Vanderbilt has to supply certain information to

14  go in the prospectus.  And there are other parties that

15  participate in the preparing of the prospectus.  Various

16  accounting firms validate certain of the information in the

17  prospectus.  There's other counsel.  There's multiple

18  counsels that also participate in supplying things to the

19  prospectus.

20  Q   "Okay.  And you would never have any direct

21  communication, and by you, I'm referring to you as

22  Vanderbilt, would never have any direct communication with

23  any of those investors with respect to these investments,

24  correct?

25  A   "We would not as literally selling this particular bond

Krupacs - by Plaintiffs (Videotape)

1   type of conversation.  We may have had conversations.  It's

2   possible if any investor would have wanted to ask us a few

3   questions, we would have then had a conference call with

4   them.  We -- sometimes investors would come once a year and

5   visit us and ask questions.

6   Q    "If a customer prepays their loan, then an investor would

7   earn less money on that investment?

8   A    "Because he would have -- he would earn less -- he would

9   get less interest on this particular bond, but he would

10  possibly take the -- since he now got the principal back, he

11  got his investment back faster than he anticipated, he could

12  take that investment and reinvest it.  To the extent the

13  markets were better then, in other words, yielding higher, he

14  would be thrilled if that was the situation.

15  Q    "But the idea as to why it's a risk factor is because, I

16  mean, yeah, you could pull your money out and then all of a

17  sudden the stock market goes up, but why it's a risk factor

18  is because if a customer prepays their loan, it affects the

19  amount of investment that the investor is going to get back.

20  A    "No, he's going to get the same amount of investment

21  back.  He is going to get his investment back or his

22  principal element he is going to get back.  So that's not

23  what the risk is.  Either way, whether they prepay it today

24  or they pay it over the next 20 years, he's getting his

25  investment back.  What he's -- what is an influence there is

1  how much interest he's going to make on that investment.

2  Q   "He's going to get less interest on the investment --

3  A   "Yes.

4  Q   "-- if a customer prepays it?

5  A   "Yes.

6  Q   "Okay.  And so, for example, if you have this, this

7  securitization, and half the people somehow pay off all their

8  loans, then the interest that the investors would get off of

9  this securitization would be less than if they all took 20

10 years to pay off their loans?

11 A   "They would earn less on this particular bond, but that's

12 not to say they would earn less on this investment, because

13 then they would take the same money that they had invested

14 here and reinvest it someplace else, which could actually be

15 yielding better.

16 Q   "Or it could be worse?

17 A   "Absolutely, which is why they're listing it as a risk,

18 because it could go either way.  Same thing could happen if

19 people pay off too slow.  People -- when bond investors are

20 buying these things, they do not assume that everyone is

21 going to pay to maturity, because they have enough historical

22 record to know that everybody does not pay to maturity.  So

23 they also know it's not that either.  So they know it's

24 someplace in between.

25 Q   "Okay.

1    A    "These are educated, informed buyers who have their own

2    models for doing this."

3        (Video stops)

4            MR. THAGARD:  Your Honor, that concludes our

5    proffer.

6            THE COURT:  Thank you.  Next witness?

7            MR. THAGARD:  May we approach?

8            THE COURT:  Yes.

9        (Bench conference on the record)

10            MR. THAGARD:  Your Honor, the next witness they are

11   going to call is a man who was retained by us, he's a

12   securitization expert.  You will remember they had some

13   securities claims which you dismissed and they had, they had

14   an expert, Henning.

15            THE COURT:  They had what?

16            MR. THAGARD:  They had an expert named Henning.

17            THE COURT:  Okay.

18            MR. THAGARD:  And we had a counter-expert named

19   Glucksman, and they have, we filed a Daubert motion on

20   Henning and they have withdrawn Henning, and now they are

21   trying to call our securitization expert, Glucksman, not to

22   testify on his opinions as to securitization but to testify

23   on background facts and matters involving Texas lien law,

24   which he is not an expert on.

25            THE COURT:  Texas what?

```
 1            MR. THAGARD:  Texas lien law, sort of mortgages and
 2    releases, and he's not an expert on that.  And he's a, at
 3    best a poor secondary source for questions they could --
 4            THE COURT:  Your expert?
 5            MR. THAGARD:  Well, he's not an expert on the
 6    predicate facts of this case or Texas lien law.  Everybody
 7    agrees to that.  And they are asking --
 8            THE COURT:  What do you want to use him for?
 9            MR. RUMLEY:  He does not, we don't ask him anything
10    about the lien.  What they don't like about him is he
11    testifies that he spoke with Clayton Homes and that they
12    repurchased all, every one of the 214 loans.
13            THE COURT:  Back from Vanderbilt?
14            MR. RUMLEY:  Yes.  No, they repurchased them from
15    the securitization, from the pool, and she just said that
16    they would repurchase them if the loan was discharged.
17    That's the whole thing.  And he comes in and says we
18    repurchased, they repurchased every one of them out of 214.
19            MR. THAGARD:  That's been cleared up, and what they
20    want to get into --
21            MR. RUMLEY:  It hasn't.
22            THE COURT:  How has it been cleared up?
23            MR. THAGARD:  Well, it's, the whole testimony was a
24    statement, misstatement by, that he says that Mr. Jordan told
25    him they repurchased in 2005.
```

1          THE COURT:  Did you list him as a witness?

2          MR. RUMLEY:  Yes, and we listed him as an expert

3   witness because we like him so much.  And he asked his own

4   expert questions and tried to clear this up, so it's not like

5   this is some kind of a surprise.

6          MR. THAGARD:  And he cleared, and he cleared it up.

7          THE COURT:  Well, you can call him back.

8          MR. THAGARD:  On the record.  And then he, then he

9   gave an errata sheet.

10          MR. RUMLEY:  That's like five pages.

11          MR. THAGARD:  And they want to read the information,

12   they want to read the original answers instead of the errata

13   sheet answers.  The errata sheet answers under Rule 30E

14   become the testimony.

15          THE COURT:  He made corrections?

16          MR. THAGARD:  Yes.  He made corrections, he --

17          MR. RUMLEY:  He made substantive changes like the

18   light was red but now it's green.

19          MR. THAGARD:  Which is, 30E allows him to correct

20   his mistake, and --

21          THE COURT:  You can play him as corrections.

22          MR. THAGARD:  Those would be for impeachment and I'm

23   not calling him.  They are trying to read in his original

24   answers which he corrected on the record that day and then

25   later gave an errata sheet correcting those, and they want to

1    play those as the original answer which they are no longer.

2    Under 30A they have been replaced.  And I was calling him.

3              THE COURT:  Overruled.  Thank you.

4         (Bench conference ends)

5              MR. J. GUTIERREZ:  Your Honor, we call Myron

6    Glucksman by deposition testimony.

7              THE COURT:  Thank you.

8              MR. J. GUTIERREZ:  Mr. Rumley is going to read his

9    responses.  There is no video.

10             THE COURT:  Okay.

11             MR. RUMLEY:  May I go up there?

12             THE COURT:  Please.

13                  DEFENDANT'S PROFFER OF EVIDENCE

14        (Deposition read by Mr. J Gutierrez and Mr. Rumley)

15             MYRON GLUCKSMAN, WITNESS, BY DEPOSITION

16             MR. J. GUTIERREZ:  After being duly sworn, question:

17   BY MR. J. GUTIERREZ:

18   Q   "Sir, if you could identify yourself for us.

19   A   "Myron Samuel Glucksman.

20   Q   "Okay.  How much time have you spent on this case?

21   A   "Approximately 60 hours."

22             MR. J. GUTIERREZ:  Your Honor, do you want me to

23   indicate the page and line or just --

24             THE COURT:  That would be good, yes.

25             MR. J. GUTIERREZ:  Okay.  Page 8, starting at line

Glucksman - by Defendants (Deposition)

1  25.

2  BY MR. J. GUTIERREZ:

3  Q   "And we'll get through this in just a little bit, but do

4  you recall when you were, through the documents, when you

5  were first contacted in this matter?

6  A   "I believe it was August 2nd.

7  Q   "And we're sitting here on August 23rd, so from August

8  2nd to the 23rd you have put in about 60 hours?

9  A   "Yes, sir.

10  Q   "All right.  And I thought I read somewhere that you

11  charge 850 an hour?

12  A   "Yes, sir."

13        MR. J. GUTIERREZ:  Ending at line 9.  Starting page

14  32, line 10.

15  BY MR. J. GUTIERREZ:

16  Q   "Have you ever worked with Mr. Thagard before?

17  A   "No.

18  Q   "For his firm?

19  A   "No.

20  Q   "Have you ever done any work for Clayton Homes before?

21  A   "No, not that I can recall.

22  Q   "Or Vanderbilt?

23  A   "Not that I can recall."

24        THE COURT:  Could you move up closer to the

25  microphone, please, Mr. Rumley.  Thank you.

Glucksman - by Defendants (Deposition)

1   Q   "Do you have any idea how they found you?

2   A   "Yes.

3   Q   "How?

4   A   "My attorney in the National Century Financial case

5   recommended me."

6           MR. J. GUTIERREZ:  Ending at line 22.  Starting at

7   page 39, line 10.

8   BY MR. J. GUTIERREZ:

9   Q   "All right.  Going back to your sentence, prior to it

10  being acquired by an affiliate of Berkshire Hathaway in 2003,

11  and 'it' being Vanderbilt, correct?

12  A   "Yes, sir.

13  Q   "Vanderbilt financed its activities for the use of

14  securitizations?

15  A   "Yes.

16  Q   "Okay.  And just in a real general sense for a jury to

17  understand, what Vanderbilt would do is they would package up

18  a number of retail installment contracts, land/home, land in

19  lieu contracts.  They would even make, they would even maybe

20  buy some from 21st Century or whatever and they would package

21  them up and they would sell them as a security?

22  A   "Yes."

23          MR. J. GUTIERREZ:  Ending at line 25.  Starting at

24  page 55, line 18.

25

Glucksman - by Defendants (Deposition)                47

1  BY MR. J. GUTIERREZ:

2  Q   "All right.  Let me -- we have been talking about Section

3  3.02 and pooling and servicing agreements and I have handed,

4  I am not going to mark it since it's already been marked and

5  we've killed enough trees, but just so the record is clear,

6  we are looking at the January 25th, 2002 pooling and service,

7  servicing agreement, which would apply to the 2002-A

8  securitization, correct?

9  A   "Yes."

10          MR. J. GUTIERREZ:  Starting at page 58, line 6.

11 BY MR. J. GUTIERREZ:

12 Q   "Okay.  For example, the land in lieu, the retail

13 installment contract, the deed of trust, mechanic's lien

14 contracts that are involved in the Flores/Trevino case, that

15 would be one of the contracts that's involved in that pool of

16 contracts, correct?

17 A   "Yes.

18 Q   "And so what we are essentially, and so what essentially

19 we are looking at is a group, for example, loans that

20 originated out of store 214, loans from other parts of the

21 country, and those loans are what make up the assets of this

22 trust?

23 A   "In fact, in 2002-A I believe the loans are from 47

24 states.

25 Q   "Okay.  Okay.  And so then with respect to 2002-A, does

Glucksman - by Defendants (Deposition)

1   that indicate the amount, the amount of those loans?

2   A   "I think they aggregate something like 253 million.

3   Q   "Okay.  So is that the amount of money that is due on

4   those contracts or those loans?

5   A   "Yes."

6           MR. J. GUTIERREZ:  Ending at line 25.  Starting at

7   page 59, line 1.

8   BY MR. J. GUTIERREZ:

9   Q   "Okay.  So the loans that make up this pool would be

10  somewhere in the neighborhood of 253 million that's still

11  owed, correct?

12  A   "Yes.

13  Q   "Okay.  And then what Vanderbilt would do is they would

14  pool this together and then they would go sell it like we've

15  talked about, correct?

16  A   "They would sell it to investors.  They sell different

17  bonds relating to this pool to different investors.

18  Q   "Okay.  And did they in fact sell this to investors?

19  A   "Yes.

20  Q   "And do you know how much money they raised?

21  A   "Approximately what they put on the cover of the

22  prospectus supplement net of expenses and underwriting

23  discounts.

24  Q   "What is it, roughly?

25  A   "A little bit, close to 250 million."

Glucksman - by Defendants (Deposition)

1          MR. J. GUTIERREZ:  Ending at line 19.  Starting page

2     60, line 13.

3     BY MR. J. GUTIERREZ:

4     Q    "And then your understanding is that they would use that

5     money, the 250 million, that they would use that to go ahead

6     and fund their continuing operations?

7     A    "Yes.

8     Q    "So that they could go out maybe the next month and sell

9     more loans out of store 214, correct?

10    A    "Yes."

11         MR. J. GUTIERREZ:  Ending line 20.  Starting page

12    62, line 19.

13    BY MR. J. GUTIERREZ:

14    Q    "All right.  Okay.  If we go to Section 3.02.

15    A    "Okay.

16    Q    "And this is the section that talks about representations

17    and warranties regarding each contract?

18    A    "Right."

19         MR. J. GUTIERREZ:  Ending line 23.  Starting page

20    63, line 5.

21    BY MR. J. GUTIERREZ:

22    Q    "Okay.  And each contract would be the contracts that

23    make up the pool of the trust, correct?

24    A    "That's correct.

25    Q    "And so, and so when we're talking about each contract,

Glucksman - by Defendants (Deposition)

1  each contract would include the retail installment contract

2  related to Mr. Flores and Mr. King?

3  A  "That's correct.

4  Q  "And then it says, quote, 'Vanderbilt represents and

5  warrants to the trustee,' end quote.  Who was the trustee?

6  A  "I think it was JPMorgan.

7  Q  "Okay.

8  A  "Yes, JPMorgan Chase.

9  Q  "Okay.  So Vanderbilt represents and warrants to JPChase

10  Bank and the certificate holders -- and the certificate

11  holders would be the investors?

12  A  "Yes.

13  Q  "As to each contract, which would include Flores and

14  King, right?

15  A  "Yes.

16  Q  "And then it identifies, I think you said, was it 24

17  items?

18  A  "Yes.

19  Q  "All right.  And do you believe that Vanderbilt's

20  obligation to the trustee or the investors to tell them when

21  any of these representations become false or become untrue,

22  when they have to --

23  A  "Well --

24  Q  "-- when they have to disclose that to them?

25  A  "Well, 3-0, 3.05 talks to that obligation.

Glucksman - by Defendants (Deposition)

1   Q   "Okay.  What is your understanding of when they are

2   obligated to disclose to the trustee or the shareholder any

3   of the representations and warranties made under 3.02 that

4   later become not true?

5   A   "Right.  Well, under 3.05A it is not later than one

6   business day after the first determination date, which is a

7   monthly date, which is more than 90 days after Vanderbilt

8   becomes aware or receives written notice from the servicer or

9   trustee of a breach of a rep or warranty.  So that's when

10  they have that obligation to do something.

11  Q   "And does that obligation end at some point?  Or is it a

12  continuing obligation?

13  A   "That is a continuing obligation unless they've cured

14  it."

15          MR. J. GUTIERREZ:  Ending line 23.  Starting at page

16  67, line 11.

17  BY MR. J. GUTIERREZ:

18  Q   "If you go to page number 30 of the prospectus, it's

19  titled land and home contracts, mortgage loans.

20  A   "Yes.

21  Q   "Do you see that?

22  A   "Yes.

23  Q   "The very last sentence, it says, 'Although a deed of

24  trust is similar to a mortgage, a deed of trust has three

25  parties, the borrower,' which would be Vanderbilt -- I mean

Glucksman - by Defendants (Deposition)

1   which would it be?

2   A    "Flores.

3   Q    "The person buying the home, right?

4   A    "Yes.

5   Q    "The lender is the beneficiary, which would be

6   Vanderbilt?

7   A    "That's correct."

8        MR. J. GUTIERREZ:  Ending line 1, page 68.  Starting

9   page 68, line 15.

10  BY MR. J. GUTIERREZ:

11  Q    "Okay.  But what this is telling the potential investor

12  is that in a mortgage loan, land and home contracts, deed of

13  trust is similar to a mortgage.  Deed of trust has three

14  parties, the borrower, which is the purchaser of the home;

15  the lender, which is Vanderbilt; and then whoever the trustee

16  is in the deed of trust, correct?

17  A    "That's correct, yes.

18  Q    "Then it says, 'Under the deed of trust the borrower

19  conveys title to the property irrevocably until the debt is

20  paid in trust, generally with a power of sale to the trustee

21  to secure payment of the loan.'  Did I read that right?

22  A    "Yes.  That's like a mortgage.  Instead of a two-party,

23  two parties for a mortgage, we have three parties with a deed

24  of trust.

25  Q    "With the third party just being the trustee?

Glucksman - by Defendants (Deposition)

1   A    "That's correct.

2   Q    "And so what this is telling a potential investor is,

3   under the deed of trust the borrower conveys title to the

4   property irrevocably until the debt is paid, right?

5   A    "That's what it says.

6   Q    "And then it says generally the power of sale to the

7   trustee to secure payment of the loan.  And so once the debt

8   is paid in full, then the deed of trust is released, correct?

9   A    "That's what typically happens."

10         MR. J. GUTIERREZ:  Ending line 18 on page 69.

11  Starting at page 72, line 8.

12  BY MR. J. GUTIERREZ:

13  Q    "Well, when they -- you have a general understanding that

14  a mortgage or a deed of trust is placed on real property in

15  order to secure payment on a loan, right?

16  A    "Yes."

17         MR. THAGARD:  Object.  Your Honor, may we approach?

18         THE COURT:  Yes.

19      (Bench conference on the record)

20         MR. THAGARD:  These next two questions and answers

21  ask Mr. Glucksman what his general understanding is of the

22  application of mortgage law in Texas.

23         THE COURT:  Sustained.

24         MR. THAGARD:  Thank you.

25      (Bench conference ends)

Glucksman - by Defendants (Deposition)

1           MR. J. GUTIERREZ:  Starting at page 101, line 14.

2    BY MR. J. GUTIERREZ:

3    Q   "In a scenario where Vanderbilt or Clayton Homes, for

4    whatever reason, chooses to discharge the debt, whether or

5    not they find something in the underlying transaction or

6    something they -- under those circumstances, they would

7    repurchase the loan out of the pool?

8    A   "That's correct.

9    Q   "And that is, going to your report, that's one way that

10   they could cure misrepresentation, correct?

11   A   "That's correct."

12          MR. J. GUTIERREZ:  Ending line 23.  Starting page

13   102, line 3.

14   BY MR. J. GUTIERREZ:

15   Q   "Well, let me ask you this:  Have you looked at the

16   number of loans that have been repurchased out of the 2002-A

17   pool?

18   A   "I've looked at only the number, I believe, of the 214

19   loans, yes.

20   Q   "Have all of them been repurchased out of the pool?

21   A   "I believe so."

22          MR. J. GUTIERREZ:  Ending line 10.  Starting page

23   102, line 17.

24   BY MR. J. GUTIERREZ:

25   Q   "Okay.  But it's your understanding, based on talking to

1   Mr. Jordan, that all of the loans that originated out of

2   store 214 were repurchased out of the pools?

3   A   "Those that are the land in lieu related loans, yes.

4   Q   "All right.  And one of those situations where, for

5   whatever reason, the debt is discharged, that's a situation

6   where they would repurchase them out of the pool, correct?

7   A   "Well, if the debt is discharged, I would think that they

8   would repurchase the loan, yes.

9   Q   "And do you know if that's what happened with respect to

10  the land in lieu transactions?

11  A   "I don't know for sure what they did with those loans.

12  Q   "Was that what Mr. Jordan said or Ms. Krupacs?

13  A   "I believe they repurchased all those 214 loans, yes.

14  And therefore they would have sent the proceeds to the

15  trust."

16          MR. J. GUTIERREZ:  Ending line 15 on page 103.

17  Starting on page 121, line 25.

18  BY MR. J. GUTIERREZ:

19  Q   "How much money, in just the -- you have looked at five

20  securitizations, right?

21  A   "Yes."

22          MR. THAGARD:  Your Honor, we object as irrelevant,

23  the amount of money they made on five securitizations.  It

24  doesn't involve the Flores/King loan and there's only one

25  loan, one securitization involving the Flores/King loan.

1          MR. J. GUTIERREZ:  Your Honor, it just goes to

2    motive.

3          THE COURT:  I'm sorry, let me see counsel at the

4    bench.

5       (Bench conference on the record)

6          THE COURT:  Again, this problem was not objected to

7    at the time of the deposition, so you have to stop that.

8          MR. J. GUTIERREZ:  Yes.

9          MR. THAGARD:  There's no objection at the time of

10   the deposition as to that question.

11         MR. J. GUTIERREZ:  It was relevant as to the amounts

12   of money.

13         THE COURT:  Just so we're clear about this.

14         MR. THAGARD:  All right.  There's an agreement among

15   the parties.

16         THE COURT:  I don't see an agreement but, you know,

17   let's leave that out and let you bring it back in and figure

18   it out over lunchtime, okay?  Because I don't understand --

19   you know, I don't, I'm really not really not sure that I get

20   what your agreement is.  If you are going to use these in

21   Federal Court you've got to follow the Federal Rules of

22   Procedure.  But I'll look at your agreement.

23      (Bench conference ends)

24         MR. J. GUTIERREZ:  Starting page 121, line 25.

25

Glucksman - by Defendants (Deposition)

```
1   BY MR. J. GUTIERREZ:

2   Q   "How much money, in just the -- you have looked at five

3   securitizations, right?

4   A   "Yes.

5   Q   "How much money has Vanderbilt received in those five

6   securitizations?"

7        MR. THAGARD:  Same objection, Your Honor.  I think

8   that's what we just covered.

9        MR. J. GUTIERREZ:  And it was overruled as far as I

10  understand it because no objection at the deposition, Your

11  Honor.

12       THE COURT:  We are going to save those as we did the

13  previous things, okay?

14       MR. J. GUTIERREZ:  Okay.  Starting at page 126, line

15  10.

16  BY MR. J. GUTIERREZ:

17  Q   "Okay.  Your handwriting on that document that you've

18  looked at right there --

19  A   "Yeah.

20  Q   "Is that just your notes from your conversation from

21  Ms. Krupacs?

22  A   "No, this is actually from Mr. Jordan and it refreshes my

23  recollection as to the total loans repurchased that were both

24  from 214 and those that were not from 214.

25  Q   "Which is how much?
```

Glucksman - by Defendants (Deposition)

1   A   "Well, there were about 140 or so from 214 and there

2   were, it looks like, over 1,000 or so more that were non-lot

3   214 loans.

4   Q   "If you look, it has 2002-A, 33, the number of land in

5   lieu, and then it's got --

6   A   "Right."

7           MR. J. GUTIERREZ:  Ending line 25, page 126.

8   Starting page 127, line 1.

9   BY MR. J. GUTIERREZ:

10  Q   "-- 1.3 million and change?

11  A   "That was the principal amount, face amount of the 33

12  loans.

13  Q   "And those 33 loans would have been land in lieu out of

14  store 214?

15  A   "That's correct.

16  Q   "So Vanderbilt actually repurchased or paid 1.3 to the

17  2002-A pool relating to those 2,000 -- to those 214 loans?

18  A   "They repurchased, my understanding, they repurchased the

19  33 loans with 1.375 million.  That's the principal.  And they

20  also repurchased 200, an additional 241 loans representing

21  8.1 million or so in principal.

22  Q   "Okay.  The 1.3 million and change for the store 214

23  loans that were in the 2002-A pool, when did they repurchase

24  those?

25  A   "I believe in 2005.

Glucksman - by Defendants (Deposition)

1  Q   "How about with respect to the 2000-C --"

2        MR. THAGARD:  Your Honor, the next set of questions

3  again involves the same issue I raised with regard to the

4  other five securitizations, and so we would --

5        THE COURT:  Sustained.

6        MR. J. GUTIERREZ:  Starting at page 128, line 1.

7        MR. THAGARD:  I think --

8        MR. J. GUTIERREZ:  Starting at page 129, line 5.

9  BY MR. J. GUTIERREZ:

10 Q   "All right.  And Mr. Jordan didn't tell you why they

11 repurchased them, or did he?

12 A   "Well, yeah, I guess it just says something about due to

13 defaults without.

14 Q   "But we now they didn't all default, right?  You don't

15 have any information that everybody in store 214 defaulted in

16 2005?

17 A   "I'm just looking at the note here, so I don't know if I

18 assumed that or I heard that.  But I think it's fair to say I

19 don't know all the reasons why they repurchased those loans.

20 Q   "Okay.  But one of the reasons why you would repurchase a

21 loan is to try to correct a misrepresentation, right?

22 A   "A potential misrepresentation, yes."

23        MR. THAGARD:  I would ask that you finish reading

24 the answer.

25        THE WITNESS:  "But also, at least for the certainty

Glucksman - by Defendants (Deposition)                60

1   for the non-214 loans, some of them were just defaults write-

2   offs which the company had no obligation to repurchase but

3   repurchased as a matter of course of conduct."

4           MR. J. GUTIERREZ:  Starting page 130, line 1.

5   BY MR. J. GUTIERREZ:

6   Q   "Right.  Like if they wrote off a loan for whatever

7   reason, they would repurchase it, right?

8   A   "Company, the interesting thing about VMF is they

9   purchased, they repurchased loans that were, that were

10  written off, that defaulted, and they didn't have an

11  obligation to do that if that was the only issue, but that

12  was their course of conduct.

13  Q   "Okay.  And based on your understanding of their course

14  of conduct, it looks like, with respect to 214, sometime in

15  2005, that's when they repurchased all these loans, right?

16  A   "It's my understanding.  I may be incorrect, but that was

17  my understanding."

18          MR. J. GUTIERREZ:  Pass the witness, Your Honor,

19  subject to me being able to recall the excerpts of other

20  portions.

21          THE COURT:  Thank you.

22          MR. THAGARD:  Your Honor, we would like to read in

23  our part.

24          THE COURT:  Go ahead.

25          MR. THAGARD:  All due respect, Mr. Rumley, I'd like

1    somebody else to read it.

2                    PLAINTIFF'S PROFFER OF EVIDENCE

3         (Deposition read by Mr. Thagard and Mr. Sledge)

4              MR. THAGARD:  Beginning at page 11, line 7.

5    BY MR. THAGARD:

6    Q    "Okay.  With respect to the other documents on the CDs,

7    the thousands of pages of discovery in the cases, all those

8    types of documents, did you review any of those with respect

9    to your work on this case?

10   A    "Yes.

11   Q    "Okay.  Do you remember which ones?

12   A    "Yes.  And then I looked at the deal books.

13   Particularly, since they were all the same, almost all the

14   same in terms of structure, I focused on one or two, and I

15   looked at the prospectus supplement in detail, looked at the

16   underlying prospectus in less detail because I'm familiar

17   with both prospectus supplements and base prospectuses.  And

18   then I reviewed the pooling and servicing agreement, again,

19   focusing on those particular sections such as Section 3,

20   Section 7, Section 9, for articles, articles that I thought

21   were relevant, particularly relevant to this case.  And then

22   my standard approach is also to look at rating agency

23   letters.  I looked at both the outside counsel and in-house

24   or local counsel opinions and there was, you know, one or two

25   emails, you know, this Fitch email that we may or may not

1   talk about concerning an upgrade of the deals.  And that was

2   enough for me to get going and begin to draft my report."

3          MR. THAGARD:  Going to page 17, beginning with line

4   18.

5   BY MR. THAGARD:

6   Q   "All right.  And so just for a jury to think about it,

7   for someone who doesn't have all of your background, just

8   something very simple would be if an investor is trying to

9   figure out, I'm going to put some money in the stock market,

10  right, I'm going to put some money in a CD, and the CD is

11  less risky, typically including, you know, the stock market,

12  in a very simplistic view, is that what we're talking about?

13  A   "You could use that analogy as long as it's, you know, a

14  CD from a bank that has government, has FDIC insurance, but,

15  you know, you're talking about two different asset classes

16  here.

17  Q   "Right, but I'm just --

18  A   "But, yes, in terms of risk, if they were looking to buy

19  a savings bond, that would be pretty safe.  No matter what

20  the papers say, the Government of the United States is highly

21  likely to pay back the money that you invest in a savings

22  bond for five or ten years.  You'll get back your money and

23  you'll get back interest.  And that's equivalent to AAA.  So

24  we are not saying necessarily that these bonds are exactly

25  the same as that, but the ratings are the same.  And so from

1    a credit risk point of view, those Vanderbilt bonds that were

2    rated AAA are basically just as safe, from a rating agency's

3    perspective, as the savings bonds that you can buy at your

4    local bank from the government."

5              MR. THAGARD:  Page 34, line 9.

6    BY MR. THAGARD:

7    Q    "Okay.  When you wrote your report, both as an expert in

8    securitization and based on your knowledge as an attorney,

9    did you set out all the opinions that you intend to give in

10   this case in your report?

11   A    "I have one additional opinion since I've written the

12   report.

13   Q    "Okay.  What's that?

14   A    "The opinion, which wasn't clear at the time I wrote the

15   report but now it's clear, that the release of the land in

16   lieu leases are not, don't implicate Section 3.02 of the

17   pooling and servicing agreement.

18   Q    "The release of the land in lieu?

19   A    "A release of a land in lieu lien is not covered by any

20   of the 24 rep and warranties listed in Section 3.02.

21   Q    "What's that based on?

22   A    "Based on 3.02K and V that, I believe, clearly indicate

23   that security interests that they're referring to are the

24   security interests on the homes and of any land on which the

25   home is situated as part of the mortgage, as opposed to any

Glucksman - by Plaintiffs (Deposition)                    64

1   liens on other collateral that supports the overall credit

2   for the borrower.

3   Q   "All right.  And where did you receive that information

4   to form a new opinion?

5   A   "It was really taking a closer look at 3.02.  Again, I

6   had, you know, eight days or so to read all these documents.

7   And so, as I indicate in the report, I assumed that the land

8   in lieu release, for the purposes, for the limited purposes

9   of this report, were a breach, a potential breach, and

10  therefore how would I deal with that.

11  Q   "All right.  And so now you're saying that the assumption

12  you made in your report is an incorrect assumption?

13  A   "No.  I'm saying that the assumption I made in my report

14  is correct, that if you assume that the land in lieu releases

15  are a potential breach then my conclusions are what they are.

16  It's not material, and whatever my conclusion was.  And, but

17  I'm saying that now I'm very confident that those releases

18  did not cause any breach in the pooling and servicing

19  agreement."

20          MR. THAGARD:  Page 51, line 11.

21  BY MR. THAGARD:

22  Q   "Other than looking at this land in lieu release out of

23  store 214, have you done anything to determine, to look at

24  the contracts, look at the deeds of trust, look at the

25  lending processes of this coverage, to determine whether or

1  not there are any issues with respect to binding obligations

2  under the loans?

3  A   "No, but I did ask if the deals had been paying out and I

4  did take notice of the Fitch letter.  Whether it was 2007,

5  2010, I forget.  I think it was 2010 that indicated that they

6  were ready to upgrade some deals, including one of the

7  deals -- at least in that deal they were going to reaffirm --

8  including one of the deals, the five-year, and that gave me a

9  good sense that the company has been, the securities, the

10  bonds, had been paying off."

11        MR. THAGARD:  Page 117, line 14.

12  BY MR. THAGARD:

13  Q   "In the context of securitization, is the appraised value

14  of real property, is that important?

15  A   "In the context of this deal, what's important is the

16  value of the manufactured home, because that's what the

17  contract and the cash flow that's going to pay back the

18  investors, that's where the cash flow is going to come from."

19        MR. THAGARD:  Page 133, beginning on line 10.

20  BY MR. THAGARD:

21  Q   "Mr. Glucksman, just to make sure the record is clear on

22  a number of things, I think you testified earlier that the

23  discharge of a loan might be a reason to repurchase it,

24  correct?

25  A   "Yes.

Glucksman - by Plaintiffs (Deposition)

1  Q   "Okay.  Under the pooling and servicing agreement, there

2  might be one of many reasons that might retrigger a

3  repurchase obligation, right?"

4           MR. J. GUTIERREZ:  Objection, leading.

5           MR. THAGARD:  Your Honor, they called this witness.

6  I'm just redirecting or --

7           THE COURT:  Is there an objection in this?

8           MR. J. GUTIERREZ:  There is, there's an objection in

9  here, it's leading and he was their expert.

10           MR. THAGARD:  Your Honor, they called this witness.

11  Under 611C, I'm adversely crossing.

12           THE COURT:  Sustained.  And you did it in the

13  deposition?

14           MR. J. GUTIERREZ:  Yes, Your Honor.

15           THE COURT:  Sustained.

16  BY MR. THAGARD:

17  Q   "And you have no opinion or knowledge supporting

18  Mr. Rumley's inference --"

19           MR. J. GUTIERREZ:  Where are you starting from,

20  Mr. Thagard?

21           MR. THAGARD:  I've gone to 22.

22           MR. J. GUTIERREZ:  Okay.

23  BY MR. THAGARD:

24  Q   "Okay.  And you have no opinion or knowledge supporting

25  Mr. Rumley's inference that the debt on any of the lot 214

1   land in lieu loans was ever discharged?"

2          MR. J. GUTIERREZ:  Objection, leading.

3          THE COURT:  Sustained.  Overruled.  I'm sorry.

4          MR. THAGARD:  Can I read that again, Your Honor?

5          THE COURT:  Yes, sir.

6   BY MR. THAGARD:

7   Q   "Okay.  And you have no opinion or knowledge supporting

8   Mr. Rumley's inference that the debt on any of the lot 214

9   land in lieu loans was ever discharged?

10  A   "I don't know whether they were or they weren't.

11  Q   "Do you have any knowledge one way or the other whether

12  the debt on the lot 214 land in lieu loans was discharged or

13  not?

14  A   "No."

15         MR. J. GUTIERREZ:  Objection.

16         MR. THAGARD:  Going to page 135, beginning line 123

17  (sic).

18  BY MR. THAGARD:

19  Q   "I ask this because there was a long series of questions

20  by Mr. Rumley about the lot 214 loans being repurchased.  Do

21  you know when those lot 214 loans were repurchased, if at

22  all?

23  A   "Thank you for asking that because it gives me a chance

24  to correct the record.  I don't know when they were

25  repurchased.  I just assumed for the purposes of my report

1    analysis that they were all repurchased in 2005.

2    Q    "So Mr. Rumley's questions about your notes there, would

3    you like to clarify your testimony with regard to the lot 214

4    loans, would you pull that piece of paper out?

5    A    "Yes.

6    Q    "And what the point, purpose of your notes were?

7    A    "It was really to understand the total dollars that

8    Vanderbilt was repurchasing from the trust in relation to the

9    loans that were land in lieu loans for each of these various

10   trusts, and that's all it was.

11   Q    "And do you have an opinion as to whether --

12   A    "Well, this went to my opinion that -- all right.

13   Q    "Finish your answer.  Finish your answer.  Finish your

14   question.  Finish your answer.

15   A    "Yeah, this was, to the extent that all these loans were

16   repurchased, even assuming they were all repurchased in 2005,

17   these would not be material in terms of disclosure for the,

18   for the securitizations."

19           MR. THAGARD:  All right.  And would you read in the

20   certification on page 140, please?

21           MR. SLEDGE:  "I, Myron Samuel Glucksman, have read

22   the foregoing deposition and hereby affix my signature that

23   same is true and correct, except as noted above."

24           MR. THAGARD:  126, all right, 126, beginning at line

25   10.

Glucksman - by Plaintiffs (Deposition)

1  BY MR. THAGARD:

2  Q    "Okay.  Your handwriting on that document --" excuse me.

3  "Okay.  Your handwriting on that, the document that you're

4  looking at right there, is that just your notes from your

5  conversation with Ms. Krupacs?

6  A    "No, this actually compares the total of all loans

7  repurchased in 2005 with the principal balance of all lot 214

8  loans in the securitization pools.

9  Q    "Which is how much?

10  A    "This compares the about 140 or so loans from lot 214 in

11  the pools and there were, it looks like over 1,000 or so or

12  more that were non-lot 214 loans."

13          MR. THAGARD:  Page 127, beginning at line 7.

14  BY MR. THAGARD:

15  Q    "So Vanderbilt actually repurchased or paid that 1.3

16  million to the 2., to the 2002-A pool related to those 214

17  loans?

18  A    "I do not know what lot 214 loans, if any, Vanderbilt

19  repurchased in 2005 or in any other year.  These notes

20  reflect the assumption I made for purposes of measuring

21  materiality."

22          MR. THAGARD:  That concludes our proffer, Your

23  Honor.

24          THE COURT:  Thank you.  You may stand down.  Call

25  your next witness.

```
 1              THE MARSHAL:  Your Honor, the jury, they want a
 2   break.
 3              THE COURT:  Twenty-minute morning break.  Would you
 4   please stand for the jury.
 5        (Jury exits at 9:54 a.m.)
 6              THE COURT:  Okay.
 7              MR. RANGEL:  How long a break do we have, Your
 8   Honor?
 9              THE COURT:  Twenty.  Anything to take up outside the
10   presence of the jury?
11              MR. RANGEL:  Judge, just following up on --
12              MR. RUMLEY:  Your Honor, I'll point out to the
13   Court, we did agree, and it's noted in the Glucksman
14   deposition, that the deposition was to be taken pursuant to
15   Texas and Federal Rules of Civil Procedure.  Now, the issue
16   is, is whether or not, obviously the federal --
17              THE COURT:  Well, you are here in Federal Court.
18              MR. RUMLEY:  The federal are more restrictive, so --
19              THE COURT:  Apparently.
20              MR. RUMLEY:  And so it's still our position that if
21   they, if they followed the Texas Rules then obviously they
22   didn't follow the federal procedure and since we are in
23   Federal Court federal procedure applies, so we would again
24   assert that any objection not made would be waived.
25              MR. RANGEL:  Your Honor, I think there's some
```

1    confusion here.  Federal Rule 32 --

2            THE COURT:  B.

3            MR. RANGEL:  B.  "An objection --" objections to

4    admissibility.  "Subject to Rules 28B and 32D3, an objection

5    may be made at a hearing or trial to the admission of any

6    deposition testimony that would be inadmissible if the

7    witness were present and testifying."  Judge, we've been

8    taking depositions for years and the only objections that are

9    asserted are as to form.  I mean --

10           THE COURT:  Sorry, I've never seen them like that in

11   Federal Court.  They are all objected to and I rule on them

12   at the final pretrial conference.

13           MR. RANGEL:  32B3, "An objection to a deponent's

14   confidence -- or to the confidence, relevance or materiality

15   of testimony -- is not waived by a failure to make the

16   objection before --"

17           THE COURT:  "Unless the ground for it might have

18   been corrected at that time."

19           MR. RANGEL:  Yes, but we, if the objection is to

20   relevance, I mean, how could it be corrected, Judge?  I mean

21   we take depositions and --

22           THE COURT:  I'm sorry, now I forgot what the

23   objection was to the --

24           MR. THAGARD:  Your Honor, the objection was as to

25   the testimony about the other five securitizations are

```
1    irrelevant.  There's only one securitization in which the
2    Flores/King loan was a part.
3              THE COURT:  I sustained.
4              MR. THAGARD:  That applies to all the remaining
5    testimony.
6              MR. SOLTERO:  Your Honor, I think we are prepared on
7    the exhibits.
8              MR. RUMLEY:  I believe we are.  Your Honor --
9              THE COURT:  Oh, okay, thank you.  Are any of those
10   objected to?
11             MR. SOLTERO:  Yes, Your Honor.
12             THE COURT:  Tell me which ones.
13             MR. SOLTERO:  Your Honor, there's, the following --
14   some of them have several objections.  One objection goes to
15   a large number of them, which is the fact that these are all
16   pattern witnesses.  I know Your Honor has already ruled.  I'm
17   just preserving the objection.
18             THE COURT:  That's all right.
19             MR. SOLTERO:  And that would be to 95, 96, 97, 462,
20   98, 99.
21             THE COURT:  Wait a minute.  95, 96, 97, 462.
22             MR. SOLTERO:  98, 99, 101, 102, 232, 225, 226, 227,
23   230, 231 and 233.
24             THE COURT:  And those are the ones that I let them
25   examine --
```

```
 1              MR. SOLTERO:  Two --

 2              THE COURT:  -- and overruled your objection at that

 3   time?

 4              MR. SOLTERO:  Yes, Your Honor.

 5              THE COURT:  Okay.

 6              MR. SOLTERO:  And in particular, most of these have

 7   to do with like deed of trust releases and that sort of a

 8   deal.

 9              THE COURT:  I understand.  Overruled.  So I am

10   admitting 233, 231, 95, 96, 97, 462, 98, 99, 102, 103, 232,

11   225, 226, 227 and 230.

12        (Defendant's Exhibits 95 through 99, 102, 225 through

13          227, 230 through 233 and 462 admitted into evidence)

14                MR. SOLTERO:  And, Your Honor, hold on.  462 and

15   101, we have an additional objection, which is --

16              THE COURT:  Oh, I'm sorry.

17              MR. SOLTERO:  That's --

18              THE COURT:  Tell me again.  462?

19              MR. SOLTERO:  Yes, just 462 and 101, there's an

20   additional objection.

21              THE COURT:  Go ahead.

22              MR. SOLTERO:  Those two, unlike the others which are

23   basically documents and there's a question about the notary

24   or what have you, these are like entire customer files and so

25   there's no relevance to that.
```

```
 1              THE COURT:  Sustained.

 2              MR. SOLTERO:  Okay.  And that would be 462 and 101?

 3              THE COURT:  101.

 4              MR. SOLTERO:  Okay.

 5              THE COURT:  So those are no longer admitted.

 6         (Defendant's Exhibits 101 and 462 not admitted into

 7          evidence)

 8              MR. SOLTERO:  Okay.  And then as to 114,

 9     Mr. Gutierrez and I have reached an agreement which is the

10     first page that was shown to the jury of Mr. Frazier's --

11              THE COURT:  Can be admitted?

12              MR. SOLTERO:  Can be admitted.  The rest not.

13              THE COURT:  So 114 is only page 1?

14              MR. SOLTERO:  Yes, Your Honor.

15              THE COURT:  Then that's admitted.

16         (Defendant's Exhibit 114 admitted into evidence)

17              MR. SOLTERO:  And then we have an objection to 234,

18     which is a printout from the Secretary of State, I think, of

19     Mr. Moore's notary record, and my basis is relevance, what

20     relevance does this have.  We have had the testimony on it,

21     why do we need the document?

22              MR. B. GUTIERREZ:  We played it, there was no

23     objection, my recollection, there was no objection to this

24     exhibit either at deposition or during the playing of the

25     deposition.
```

```
 1              MR. SOLTERO:  He is correct.

 2              THE COURT:  Okay.  So 234 is admitted.

 3          (Defendant's Exhibit 234 admitted into evidence)

 4              MR. SOLTERO:  And then --

 5              THE COURT:  466 is the only remaining one.

 6              MR. SOLTERO:  Yes, Your Honor.  No objection to that

 7    one.

 8              THE COURT:  466 is admitted.

 9          (Defendant's Exhibit 466 admitted into evidence)

10              THE COURT:  Thank you-all very much.

11              MR. B. GUTIERREZ:  Could I just read them to make

12    sure, Your Honor, that we have them?

13              THE COURT:  466, 234, 233, 231, 95, 96, 97.  462 is

14    sustained.  98, 99, 102, 114, 232, 225, 226, 227 and 230 are

15    admitted.

16              MR. B. GUTIERREZ:  Thank you, Your Honor.

17              THE COURT:  Anything else?

18              MR. SOLTERO:  I don't believe so, Your Honor.

19    Actually, yes, actually, and we can wait until we've got

20    Mr. Gutierrez, the other one comes back.  Your Honor, we

21    have, Mr. Gutierrez and I have been discussing the charge

22    quite a bit and we have exchanged redlines of what -- from

23    the Court's charge.  How would Your Honor like us to provide

24    that to the Court?  Would you like that electronically or

25    would you like a printed-out version of the redlines?
```

Flores - Direct

```
 1            THE COURT:  Either way.  If you've got it
 2   electronically I'll take it now.
 3            MR. SOLTERO:  Okay.  I think I can get it sent to
 4   Ms. Scotch.
 5       (Recess at 10:01 a.m. until 10:25 a.m.)
 6            THE COURT:  Let's bring in the jury.
 7       (Jury enters at 10:25 a.m.)
 8            THE COURT:  Thank you.  You may be seated.  You may
 9   proceed.
10            MR. B. GUTIERREZ:  Yes, Your Honor.  We would call
11   Mr. Cesar Flores.
12              CESAR FLORES, DEFENDANT'S WITNESS, SWORN
13            THE CLERK:  Thank you.  Please be seated.
14            MR. B. GUTIERREZ:  May I proceed?
15            THE COURT:  You may proceed.
16                           DIRECT EXAMINATION
17   BY MR. B. GUTIERREZ:
18   Q   Good morning, Mr. Flores.
19   A   Good morning.
20   Q   You have testified during the trial of this cause, is
21   that correct?
22   A   Yes, sir.
23   Q   Question, Mr. Flores:  You and Mr. King, Mr. Alvin King,
24   were the only persons -- well, strike that.  Were you and
25   Mr. King the only persons that paid any consideration, any
```

Flores - Direct

1   money on your loan and on your contract?

2   A   Yes, sir.

3   Q   How much money did you pay after the releases were filed

4   in October of 2005?

5   A   I believe it was 26,269, possibly, and some change.

6   Q   Did the collection calls continue, did the collection

7   calls from Vanderbilt continue after the releases were filed

8   in 2005?

9   A   Yes, sir.

10  Q   Did field chases continue after 2005?

11  A   Yes, sir.

12  Q   And did you have individuals from the Clayton store go to

13  your residence to try to collect the debt after the releases

14  were filed in 2005?

15  A   Do you mean individuals as far as employees, direct

16  employees at that time, or people that maybe might have been

17  employed by them?

18  Q   Yes.

19  A   Yes, sir, we did.

20  Q   When you made payments on your contract, were those

21  payments, did any of those payments -- were any of those

22  payments made through Western Union MoneyGrams, Mr. Flores?

23  A   Yes, sir.

24  Q   Was the U.S. Mail used occasionally to make payments on

25  your contract?

Flores - Direct

1    A    Yes, sir.

2    Q    Did you at times use the telephone to make payments on

3    your contract?

4    A    I believe we did, sir.

5    Q    We have been here for a few days now.  Could you, could

6    you tell us how this litigation has affected you in any way,

7    first of all?

8    A    It's affected me in a couple of ways.  First of all, the

9    stress.  The embarrassment.  I have had to deal with things

10   this last year that I have never dealt with before.  So it's

11   been hard.

12   Q    You have heard the testimony of folks from Vanderbilt,

13   people from CMH Homes, and you have seen documents displayed

14   on this Elmo on the screen, the releases.  When was it that

15   you first discovered that these releases had been filed,

16   Mr. Flores?

17   A    I believe when I first came looking, came to you looking

18   for help.

19   Q    And now that you've heard the testimony, for example, we

20   heard from Mr. Nichols about the deplorable conditions at one

21   of his stores, store 214; we heard the testimony from

22   Mr. Booth testify that a decision in 2005 had been made to

23   release all outstanding loans that had land associated with

24   it; now that you've heard the testimony from these

25   individuals, how does that make you feel?

```
 1              MR. RANGEL:  Your Honor, I object to the form of the
 2   question.  It misstates, mischaracterizes the testimony.  For
 3   example, he --
 4              THE COURT:  Sustained.
 5   BY MR. B. GUTIERREZ:
 6   Q   Can you tell us anything else about what you've been
 7   through, what you're going through, concerning this
 8   litigation and how it has affected you?
 9   A   Well, it's affected me in a few ways.  First and
10   foremost, probably financially.  I'm a hairstylist, so I work
11   off of strict commission.  If I'm not at work, I'm losing,
12   I'm not making money.  I don't get paid for, for any time
13   absence.  I'm just, I'm also losing clients.  The other
14   stylists at the salon are having to take them in, so they are
15   prebooking with them I've noticed.  I have suffered from
16   anxiety attacks which I never dealt with before, which is why
17   I currently stay with my mom.  It's a little bit of comfort
18   being with her.
19   Q   How about emotionally?
20   A   Emotionally, it's, again, been very trying.  You know, to
21   some people this might be just a trailer home.  To me it's my
22   home.  It's also, you know, I'm fighting for not just myself
23   but a child that I take care of.
24   Q   And who is this child?
25   A   She is my great-niece.  She was born back in May of '07.
```

Flores - Direct

1    Q    And who are her parents?

2    A    Her parents are my nephew and his ex-girlfriend.

3    Q    And with respect to the collection efforts, specifically

4    after 2005, how and in what, how have -- how did the

5    collection efforts affect you in any way?

6    A    It's affected me.  You know, it's made me a little angry.

7    You know, they are correct in that phone calls were made to

8    neighbors and relatives, but more information than I felt

9    needed to be shared was shared.  For example, having the girl

10   who lives across the street from me come knocking on --

11        MR. RANGEL:  Your Honor, I would object to any

12   hearsay testimony.  He's about to testify to what somebody

13   else told him.

14        THE COURT:  If you are about to say something that

15   someone else told you, you can't say that.

16        THE WITNESS:  I cannot?  Okay.  Yes, sir.  Having

17   just, just knowing the knowledge that people knew that I was

18   behind on payments was a little humiliating.  I, you know,

19   I've worked hard all my life for what I have.  Nothing's ever

20   been handed to me.  So the fact that I got to a point in my

21   life where I could not make payments because I could not

22   financially afford them, for one, was hard to accept, and

23   two, to know that others, you know, strangers know that my --

24        MR. RANGEL:  Again, Your Honor, object.  He's

25   referring to hearsay testimony.

```
 1              THE COURT:  Sustained.

 2              THE WITNESS:  It's been hard, it's been difficult.

 3              MR. B. GUTIERREZ:  Mr. Flores, I believe that's all

 4    the questions I have.

 5              THE WITNESS:  Yes, sir.

 6              MR. RANGEL:  May I proceed, Your Honor?

 7              THE COURT:  Yes, sir.

 8                          CROSS-EXAMINATION

 9    BY MR. RANGEL:

10    Q   Mr. Flores, if I understand your testimony, you are

11    seeking money damages for stress that you have suffered as a

12    result of this litigation.  Is that correct?

13    A   Yes, sir.

14    Q   And you understand that Vanderbilt filed this lawsuit to

15    repossess the home against you and Mr. King because you had

16    defaulted in your payment, correct?

17    A   Yes, sir.

18    Q   And in this lawsuit you have filed a counterclaim.  You,

19    yourself, in fact have filed a lawsuit against Vanderbilt,

20    correct?

21    A   Correct.

22    Q   And that's part of this litigation that you say is

23    causing you stress for which you want to be awarded money

24    damages, correct?

25    A   Correct.
```

1    Q    Now, back, let's say, to the spring of 2009.  You were

2    having some difficult times before the litigation, correct?

3    A    Yes, sir.

4    Q    There were stresses resulting from the fact that you and

5    Mr. King were having a hard time making the payments,

6    correct?

7    A    Yes, sir.

8    Q    And additional stresses came about when Mr. King left,

9    correct?

10   A    Yes, sir.

11   Q    And, of course, that's all before the litigation, right?

12   A    Yes, sir.

13   Q    And also way before the litigation, you had other

14   stresses in your life resulting from the fact that you had

15   some personal family losses, correct?

16   A    Yes, sir.

17   Q    I believe your father passed away, correct?

18   A    He passed away in June of '02.  My sister passed away in

19   January of '07.  In between those two deaths my sister's

20   husband, my brother-in-law, was killed in a car accident.  I

21   want to say it was possibly the year before.  I don't know

22   the exact date.

23   Q    And these events, and I'm sorry for your loss, but that

24   had nothing to do with Vanderbilt, correct?

25   A    No, sir.

Flores - Cross

```
1   Q   Those were just things that happened in your life that
2   resulted in stresses in your life, correct?
3   A   They resulted, they resulted in sadness and stress, yes.
4   Q   And as I understand it, Mr. Flores, you are also seeking
5   damages for what you say are amounts that you paid to
6   Vanderbilt that you feel you didn't have to pay, correct?
7   A   I believe so, yes.
8   Q   And, of course, and it's related to these releases that
9   we've been talking about, correct?
10  A   Yes, sir.
11  Q   And it's your testimony that you did not find out about
12  those releases until you went to see Mr. Gutierrez in the
13  fall of 2009, is that --
14  A   I believe so, yes, sir.
15  Q   All right.  But -- oh, by the way, but those releases,
16  you're talking about the deed of trust release and the
17  builder's and mechanic's lien release, those documents that
18  were filed in October of 2005, correct?
19  A   I believe so.
20  Q   You didn't pay any money for those releases, did you?
21  A   No, sir.
22  Q   Mr. Flores, you indicated that you have worked hard over
23  the years, correct?
24  A   Yes, sir.
25  Q   You have been in business for a number of years, correct?
```

```
1    A    Yes, sir.

2    Q    And what is your current business, Mr. Flores?

3    A    I'm a hairstylist.

4    Q    For whom do you work?

5    A    Oh, I work for Gloria's Hair Productions in Alice.

6    Q    Okay.  And you have been steadily employed for a number

7    of years, correct?

8    A    There was a time shortly after my sister passed away that

9    I, I took some time off from work.  There was just a lot to

10   deal with at that time and I worked, live in Alice and worked

11   in Corpus, and so I took a few months off work.

12   Q    But other than that you have been steadily employed for

13   the past number of years, correct?

14   A    Yes, sir.

15   Q    For example, when you were looking, when you and Mr. King

16   were looking to buy this mobile home, you submitted income

17   information, correct?

18   A    Yes, sir.

19   Q    And in fact your employer at the time also submitted

20   income information, correct?

21   A    I believe so, yes.

22   Q    If we could pull up --

23        MR. B. GUTIERREZ:  Excuse me, Your Honor.  May we

24   approach?

25        THE COURT:  Yes.
```

Flores - Cross

1          (Bench conference on the record)

2          MR. B. GUTIERREZ:  Excuse me, Your Honor.  I believe

3    he is getting to a point where he wants to start talking

4    about Mr. Flores' not filing any income tax returns for a

5    certain period of time -- let me just finish -- and we renew

6    our objections under relevance grounds, 402 and 403.  We

7    don't believe that the evidence is relevant.  Could be

8    probative, could be probative.  We believe that any probative

9    value, that him not filing income tax returns would

10   substantially prejudice his claims as a party in this case.

11         MR. RANGEL:  Judge, all I'm doing is laying the

12   predicate.  I'm not going to ask that question until the, if

13   he's not going to bring an independent source in.

14         THE COURT:  Yes, you're going over to the place, the

15   question now?

16         MR. RANGEL:  Sure.  And, Judge, under that

17   Bustamante case, 403 is not a factor in the prejudice that --

18         MR. B. GUTIERREZ:  For the Court Appeals it's not --

19         MR. RANGEL:  That is not a factor in considering

20   whether or not to admit this.

21         MR. B. GUTIERREZ:  But for the Court of Appeals it's

22   not --

23         THE COURT:  This is a weight question.

24         MR. RANGEL:  It's a 64B, yes.

25         THE COURT:  It is a federal question, whether or

Flores - Cross

1    not.

2                 MR. RANGEL:  Yes.

3                 THE COURT:  And I have discretion under that.

4                 MR. RANGEL:  Yes.  Yes, Your Honor.

5                 MR. B. GUTIERREZ:  Correct, Judge.

6                 THE COURT:  And I --

7                 MR. B. GUTIERREZ:  But, Judge, credibility is so key

8    in this case.

9                 THE COURT:  I know, but let me tell you what I see

10   as distinguishable, possibly, and you can tell me

11   (indiscernible) Bustamante.  Bustamante was a criminal case.

12   All these cases, Hatchett and Bustamante were criminal cases.

13   Bustamante, the judge allowed in income tax records, one of

14   the records, because he had been accused of bribery and that

15   was key, but he didn't report the bribes, he didn't pay taxes

16   on the bribes, and I see that as a key to Bustamante.  Under

17   Hatchett, Hatchett was a lawyer who was prosecuted for

18   failure to file income tax returns, and his partner who also

19   failed, law partner who also failed to file tax returns was

20   credited, was discussing the practices of the law firm.  I

21   think it was really relevant in that case.  It goes to show

22   his lack of concern about the importance of filing tax

23   returns.  So I am not a hundred percent convinced.  I will

24   let you argue more about it.  Under 608, I'm just not

25   convinced this is relevant to this matter.

Flores - Cross

```
 1            MR. RANGEL:  Okay.  Judge, if it were an isolated
 2   incident, but he failed to make '05, '06, '07, '08, and --
 3            THE COURT:  I understand, but I'm just saying, I
 4   couldn't find any other cases about that issue of failing to
 5   file tax returns except --
 6            MR. RANGEL:  And these are the cases we cited.
 7            THE COURT:  And I will accept those two cases, and I
 8   would let it in on, if it's appellate.  When character
 9   witnesses come in to testify on behalf of defendants, I think
10   it has to do with what they consider to be criminal and what
11   they don't consider criminal.  And in our system we still
12   have, we can still go back and amend our tax returns, file
13   old ones, pay the penalties and interest, and it won't be a
14   criminal matter, and I don't see it as a criminal matter or
15   evidence of bad character.  It can be really stupid, but --
16            MR. RANGEL:  And we are not suggesting it's a
17   criminal matter.  We are just suggesting that that is
18   evidence that goes to his honesty on an individual's income
19   tax return.
20            THE COURT:  I see it in those two cases, absolutely,
21   but I'm not sure I see it on this one.
22            MR. B. GUTIERREZ:  Okay.  Thank you, Your Honor.
23            MR. RANGEL:  I just, so I should not, I should not
24   pursue this predicate then, if I understand what you're
25   saying, and the constraints.
```

1          THE COURT:  If you want to ask him what his income

2    was, that's okay.

3          MR. RANGEL:  That's what I was thinking, I just --

4          THE COURT:  I don't see any reason --

5          MR. RANGEL:  And I will --

6          MR. B. GUTIERREZ:  Excuse me.  On what, Judge?

7          MR. RANGEL:  Just on income.

8          THE COURT:  Yes.

9          MR. RANGEL:  I'm going to just touch on that.  So

10   is, right now is the Court, can I further develop a

11   predicate?

12         THE COURT:  Yes.

13         MR. RANGEL:  Before the Court makes a final

14   determination?

15         THE COURT:  Yes.

16         MR. RANGEL:  Okay.

17      (Bench conference ends)

18         MR. RANGEL:  I would call up CP8 at 172.

19         MR. B. GUTIERREZ:  Before it's displayed, excuse me,

20   we object to questions outside the scope of direct

21   examination, Judge.  Excuse me, direct examination.

22         MR. RANGEL:  Judge, he asked him questions about

23   working, earning money.

24         THE COURT:  Overruled.  Thank you.

25

Flores - Cross

1  BY MR. RANGEL:

2  Q   Mr. Flores, you were here when we were talking about VOE

3  and VOI.  That's verification of employment and verification

4  of income.  Do you recall that?

5  A   Yes, sir.

6  Q   And in connection with your purchase of this mobile home,

7  this document was submitted.  Who is Willie Monta?

8  A   I have no idea.

9  Q   Well, who is Salon Diva, what's Salon Diva?

10  A   Salon Diva is a salon I worked at.

11  Q   Yeah.  You worked there in -- before you bought the

12  mobile home this is where you worked, right?

13  A   I believe I worked there shortly -- during the process I

14  went from Salon Diva to Ma Salon.

15  Q   Anyway, this pertains to you, correct?

16  A   I, it appears to, yes.

17  Q   And so --

18         THE COURT:  May I see counsel at the bench for just

19  one minute.

20     (Bench conference on the record)

21         THE COURT:  I must tell you, that's the salon I used

22  to go to for years.  I didn't realize that and I don't

23  recognize this gentleman.

24         MR. B. GUTIERREZ:  No problem, Judge.

25         MR. RANGEL:  We don't have a problem with that.

Flores - Cross

1              THE COURT:  I think I need to say I went there when

2    it was over in Wyatt Plaza.

3              MR. B. GUTIERREZ:  Judge, we --

4              THE COURT:  I needed to call that to your attention.

5              MR. B. GUTIERREZ:  I don't have a problem with that.

6              MR. RANGEL:  Don't have problems with it at all.

7              THE COURT:  But never this gentleman.

8              MR. B. GUTIERREZ:  And he hasn't indicated to us

9    that he recognizes you.

10             THE COURT:  Okay.  Not my hair or anything, right?

11       (Bench conference ends)

12   BY MR. RANGEL:

13   Q    So, in this document, Mr. Flores, Mr. Monta is stating

14   that Cesar Flores worked at Cesar's Hair Palace as a

15   beautician and makes approximately $1,550 a month and has a

16   year-to-date income of $17,681, is that correct?  Is that

17   what the document shows?

18   A    Yes, sir.

19   Q    Well, and by the way, how do you spell your name?

20   A    C-E-S-A-R.

21   Q    You spell it Ceaser, right?

22   A    C-E-S-A-R.

23   Q    Right.  And so you have used that spelling from time to

24   time?

25   A    The spelling on the screen or the monitor?

1  Q    Yes.

2  A    No, sir, I never have.

3  Q    So are you saying that Mr. Monta is incorrect in

4  referring to you as Ceaser Flores?

5  A    I did not prepare this form, sir, so, I mean Cesar Flores

6  is my name, Cesar Flores, but I don't spell it the way it's

7  spelled on the form.

8  Q    Very well.  So, this was one verification of income that

9  was submitted when you were in the process of purchasing the

10  mobile home, correct?

11  A    I believe so.

12  Q    And another one was the credit application that you

13  submitted, correct?

14  A    Correct.

15  Q    And that is CP9 72-73.  I believe yours is on the left.

16  And if we move over to the right I think the -- there we go.

17  And in this credit application that you submitted you

18  indicated that your gross salary was $1400 a month, right?

19  A    Correct.

20  Q    Which was lower than the amount that Mr. Monta had

21  submitted which was $1,550 a month, correct?

22  A    Yes, sir.

23  Q    And after you purchased the mobile home, you continued to

24  be in business, correct?

25  A    Yes, sir.

Flores - Cross

1   Q   You continued working different places as a hairstylist,

2   correct?

3   A   There were two places that I worked at, yes, sir.

4   Q   Yeah.  And except for that period of time when you took

5   some time off a couple of months when your sister passed, you

6   were working continuously, correct?

7   A   Yes, sir.

8   Q   And you were working, and you were earning income

9   continuously?

10  A   Yes, sir.

11  Q   In fact, you earned income continuously, including the

12  period 2005, 2006, 2007, 2008, correct?

13  A   Yes, sir.

14  Q   During those four years you were earning money and making

15  money, correct?

16  A   I was working, yes, sir.

17          MR. RANGEL:  May we approach, Your Honor?

18          THE COURT:  Yes.

19      (Bench conference on the record)

20          THE COURT:  Yes, sir?

21          MR. RANGEL:  Judge, I believe I have laid the

22  predicate that he was making money.

23          THE COURT:  Yes, I'm just going to rule

24  (indiscernible).

25          MR. RANGEL:  Okay, thank you.

Flores - Cross

```
 1        (Bench conference off)
 2   BY MR. RANGEL:
 3   Q    And these stresses that you identified that you have,
 4   they're related to the litigation, is that correct?
 5   A    I'm sorry?
 6   Q    The stresses that you talked about that you have, those
 7   are related to this litigation that you are involved in,
 8   correct?
 9   A    The stresses that I have now, yes, sir.
10   Q    All right.  So, as I understand it, Mr. Flores, you are
11   here in court seeking money damages from Vanderbilt and you
12   are also asking that you be given a mobile home for which you
13   have not paid in full.  Is that correct?
14   A    I believe that I am here fighting for my home.
15   Q    But you acknowledge that you didn't make the 144
16   payments, correct?
17   A    Yes, sir.
18   Q    And so you want Vanderbilt to give you that home even
19   though you have not made all those payments, correct?
20   A    I believe -- correct.  I believe --
21        MR. RANGEL:  Objection.  Nonresponsive.  He said
22   correct, that he was not.
23        THE COURT:  Thank you.  Anything else?
24        MR. RANGEL:  Pass the witness, Your Honor.
25        THE COURT:  Thank you.  Anything further?  I didn't
```

Flores - Redirect/Recross
King - Direct

1   ask Mr. Rumley?

2          MR. RUMLEY:  No, Your Honor, nothing from me.

3                    REDIRECT EXAMINATION

4   BY MR. B. GUTTIEREZ:

5   Q   And just so we're clear, the litigation we're talking

6   about is a lawsuit that was filed by Vanderbilt against you

7   personally as well as Mr. King, is that correct?

8   A   Yes, sir.

9          MR. B. GUTIERREZ:  That's all we have, Your Honor.

10                   RECROSS-EXAMINATION

11  BY MR. RANGEL:

12  Q   But the litigation also includes the lawsuit that you

13  have filed against Vanderbilt, correct?

14  A   Yes, sir.

15         MR. B. GUTIERREZ:  Pass the witness, Your Honor.

16         THE COURT:  Thank you.  You may stand down, sir.

17  Call your next witness.

18         MR. B. GUTIERREZ:  We call Mr. Alvin King.

19             ALVIN KING, DEFENDANT'S WITNESS, SWORN

20         THE CLERK:  Would you have a seat, please, and watch

21  your step.

22         MR. B. GUTIERREZ:  May I proceed, Your Honor?

23         THE COURT:  Yes.

24                    DIRECT EXAMINATION

25  Q   Mr. King, you have testified earlier in this litigation,

1   is that correct?

2   A   Yes, sir.

3   Q   Okay.  We asked you some questions about your involvement

4   concerning the purchase of this mobile home that is the

5   subject of this litigation, is that correct?

6   A   Yes, sir.

7   Q   I'd like to ask you a few questions about yourself and

8   how the lawsuit that has been brought against you by the

9   Vanderbilt Mortgage and Finance Company has affected you

10  personally or emotionally.  Can you tell us a little bit

11  about that, Mr. King?

12  A   Personally it has affected me mentally, emotionally,

13  several, you know, several different things that -- first of

14  all, you know, buying the mobile home.  You go to a place to

15  buy a mobile home and you think you can trust those people,

16  and from learning from the litigation and everything that was

17  here, I don't feel that that's the case.  There was a lot of

18  things that went on that shouldn't have went on and we were

19  never aware of that.  This has affected me in many ways also

20  as far as work, losing time paid because of having to take so

21  many days off.  It's just, it's really affected me in many

22  ways.

23  Q   Emotionally, can you tell us anything about that?

24  Mentally, emotionally?

25  A   Emotionally, my personal life coming public.  Also

1    emotionally, to remember all the struggles that myself and

2    Cesar had over the years that we were paying for the mobile

3    home, how sometimes we worked day and night to fight to save

4    our home.  And, you know, it was stated that we take care of

5    our customers; I don't feel I was taken care of.

6             MR. B. GUTIERREZ:  That's all I have, Your Honor.

7    Pass the witness.

8                        CROSS-EXAMINATION

9    BY MR. RANGEL:

10   Q   As I understand it, Mr. King, the damages resulting from

11   this stress, these stresses that you're talking about, you

12   are referring to the stresses that are related to this

13   lawsuit in which you are involved, correct?

14   A   Yes, sir.

15   Q   And, as you know, Vanderbilt filed this lawsuit against

16   you and Mr. Flores after the payments were no longer being

17   made, correct?

18   A   Correct.

19   Q   And then, after Vanderbilt filed the action to repossess

20   the mobile home against you and Mr. Flores, you, yourself

21   filed a counterclaim, a lawsuit, correct?

22   A   Yes, sir.

23   Q   And so that's part of this litigation that you're talking

24   about that is generating stresses for you, correct?

25   A   Yes, sir.

King - Cross

1    Q    You also indicated that you did not believe that

2    Vanderbilt has taken care of you, correct?

3    A    Correct.

4    Q    And it is true, Mr. King, is it not, that over the years

5    you and Mr. Flores were late many times, correct?

6    A    Correct.

7    Q    And it is true also that you were the one that primarily

8    made the calls to the call center to see if you could work

9    something out, correct?

10   A    Correct.

11   Q    And you heard Ms. Kim Russell testify here from the

12   stand, from where you're sitting, and she said that she

13   worked with you many, many times, correct?

14   A    She did work with me many times but she was not my only

15   account representative.  There were many others.  Yes, she

16   did work with me but the things that she stated that the

17   company offers were never offered to us.

18   Q    It is true that there were many, many, many months when

19   you were late in your payments, correct?

20   A    Yes, sir.

21   Q    And it is true that there were many, many months where

22   Vanderbilt, through representatives like Ms. Russell,

23   accepted late payments and continued to work with you so you

24   could stay in your home, correct?

25   A    Yes, sir.

1  Q   And you will agree that there were stresses while you-all

2  were living in the mobile home related to difficulties from

3  you not being able to make the payments and just general

4  stresses that come in life when people are living together,

5  correct?

6  A   Correct.

7  Q   And certainly Vanderbilt is not responsible for those

8  ordinary stresses that come from just living, correct?

9  A   Not all of it.

10  Q   And you two did not, you're saying that you didn't know

11  about these releases that were filed in '05 until you went to

12  see Mr. Gutierrez in the fall of 2009, correct?

13  A   Correct.

14  Q   And, by the way, you haven't paid any money, any money to

15  anyone for those releases that you are relying on, correct?

16  A   No, sir.

17  Q   Is that correct?

18  A   I don't believe so.

19  Q   Correct?

20  A   Correct.

21  Q   Like Mr. Flores, you are in court seeking money damages

22  while at the same time asking that you be given title to this

23  mobile home even though you have not fully paid for it,

24  correct?

25  A   Correct.

```
 1              MR. RANGEL:  Pass the witness.

 2              THE COURT:  Thank you.

 3                      REDIRECT EXAMINATION

 4   BY MR. B. GUTIERREZ:

 5   Q   But you paid on your mobile home before the releases were

 6   filed, you were paying for the mobile home before the

 7   releases were filed, you were paying for the mobile home at

 8   the time the releases were filed, and you continued to pay

 9   for the mobile home even after the releases were filed, is

10   that correct?

11   A   Yes.

12              MR. RANGEL:  Objection to form.  Leading,

13   multiplicity of questions.

14              THE COURT:  Sustained.

15   BY MR. B. GUTIERREZ:

16   Q   Did you, Mr. King, and Mr. Flores, did both of you pay

17   consideration, pay money on your mortgage and on your

18   contract to, on your mortgage and on your contract before the

19   releases were filed?

20   A   Yes, sir.

21   Q   Did you continue to pay money in consideration after the

22   releases were filed?

23   A   Yes, sir.

24   Q   With respect to the stresses concerning the collection

25   efforts that were made by the Vanderbilt Company, can you
```

1  recall some of those collection efforts that were made by the

2  Vanderbilt people after the releases were filed?

3  A    Like, like Kim said, I mean she would work, she would

4  work with us from time to time.  She did get stern at times

5  when, you know, we were behind and I was having trouble, you

6  know, coming up with the money.  There were other account

7  representatives that were not so nice and that's why I asked

8  for her a lot of times, because she would talk to you where

9  the other people would pretty much tell you that if you

10  didn't make the payment, you know, they were going to take

11  the house.

12  Q    How about personal, personal contact, people going to

13  where you work or where you live, did that happen?

14  A    I do know that they called my work.  I don't recall them

15  ever coming to my work.  I do recall them coming to the, to

16  the house.  They would call my work.  They were asked several

17  times not to call at work and still continued to call.

18  Q    And how did they behave during those collection efforts

19  that, where they made them at, personally at your house?

20  A    There was a couple of times that it went okay but there

21  were some times that we had collectors come out there and

22  they would holler at you, they would talk very ugly to you, I

23  mean to the point that the neighbors would come out to see

24  what was going on, and threaten you if you didn't pay, make

25  your payment, that they were going to take, they were going

1    to take your house.

2              MR. B. GUTIERREZ:  Pass the witness.

3                      RECROSS-EXAMINATION

4    BY MR. RANGEL:

5    Q   So you will agree, Mr. King, that Kim Russell worked with

6    you and in fact you sought her out when you were calling

7    them?

8    A   Yes, sir.  I never said that she didn't work with me, but

9    there were times that she was stern.

10   Q   And even when she was stern she was willing to work with

11   you?

12   A   Most of the time.

13   Q   And, by the way, you left the mobile home in April of

14   2009, right?

15   A   I moved to live with my mother, yes, I did.

16   Q   And you were -- you didn't make any more payments,

17   correct?

18   A   I believe I made a payment in April.

19   Q   But after you left the mobile home with no intention to

20   return, as far as you were concerned it was going to be

21   Mr. Flores' responsibility because he was going to be living

22   there, correct?

23   A   Mr. Flores was going to be paying the payments because he

24   was going to be living there.

25   Q   But, under the retail installment contract that both of

1  you signed, both of you were obligated to make those

2  payments, correct?

3  A    Correct.

4           MR. RANGEL:  Pass the witness, Your Honor.

5           THE COURT:  Thank you.

6           MR. B. GUTIERREZ:  No further questions, Your Honor.

7           THE COURT:  Thank you, sir.  You may stand down.

8  Call your next witness.  Mr. Gutierrez?

9           MR. B. GUTIERREZ:  Excuse me, Your Honor.

10           THE COURT:  Next witness?

11           MR. B. GUTIERREZ:  We close.

12           THE COURT:  You close?  I'll see counsel at the

13  bench then.

14      (Bench conference on the record)

15           MR. B. GUTIERREZ:  I'm sorry, Judge, correction, we

16  rest.  We rest, I'm sorry.

17           THE COURT:  Rest?

18           MR. B. GUTIERREZ:  Yes, I'm sorry.

19           THE COURT:  Thank you.

20           MR. SOLTERO:  Your Honor, Vanderbilt makes two

21  motions at this time, one on the defensive claims, the

22  counterclaims filed by Mr. Flores and Mr. King, and we'll

23  also be reurging the one we filed previously, filing another

24  motion.  The first one I have a courtesy --

25           THE COURT:  The two filed over the weekend, I saw

1   the responses, those are denied.  Next?

2           MR. SOLTERO:  Yes, Your Honor.  This is a courtesy

3   copy for Your Honor.

4           THE COURT:  Thank you.

5           MR. SOLTERO:  We'll be filing it electronically.

6   Here's a courtesy copy for counsel.

7           MR. B. GUTIERREZ:  Thank you, Mr. Soltero.

8           MR. SOLTERO:  This is on Mr. Flores' and Mr. King's,

9   their counterclaims.  On that, Your Honor, if I may, we move

10  on all of their counterclaims.  Specifically, we move on the

11  issue of the release.  As a matter of law there's legally

12  insufficient basis for a reasonable jury to conclude that

13  they were paid in full and that there was a release.  They

14  failed to meet the essential elements of releases:

15  Specifically, one, that Vanderbilt intended to release the

16  indebtedness despite their failure to fully pay, which is

17  undisputed.  Number two, there was no meeting of the minds

18  between Vanderbilt and either Mr. Flores or Mr. King on a

19  release.  Number three, there's no consideration to support

20  the release.  In order to establish the affirmative defense

21  of release Mr. Flores and Mr. King had to have proved the

22  elements of a contract, which they did not do in this case.

23  In addition, Your Honor, as we put in our motion in writing

24  which we incorporate fully, releases are strictly construed.

25  Mr. --

1           THE COURT:  Well, if Vanderbilt had an assignment,

2      then wasn't there a contract?

3           MR. SOLTERO:  I'm sorry, Your Honor?

4           THE COURT:  If Vanderbilt had an assignment, wasn't

5      there a contract between Flores and King and Vanderbilt?

6           MR. SOLTERO:  There was, Your Honor, but not a

7      subsequent release of that contract.

8           THE COURT:  I see what you're talking about.

9           MR. SOLTERO:  And absolutely, Judge, we believe that

10     the assignment issue is a matter of law in Vanderbilt's

11     favor.  As one Texas Supreme Court case has said, the rule is

12     simple, unless a party is named in a release, he is not

13     released.  And that's the McMillan case, Texas Supreme Court,

14     1971.  More recently, the Duncan versus Cessna and Victoria

15     Bank versus Brady cases all talk about people --

16          THE COURT:  You see, the confusing part of this is

17     that on the release, on the releases the note that was signed

18     by Flores and King was referenced and they are the only ones

19     who signed any note, and that was the referenced note.

20          MR. SOLTERO:  But, Your Honor, that is not released.

21     There is nothing indicating that the loan was discharged.

22          THE COURT:  All I'm saying is -- I understand your

23     argument.

24          MR. SOLTERO:  Yes, Your Honor, and --

25          THE COURT:  There are just some cases that ought to

1    go to jury.  They're fine at disposition.

2            MR. SOLTERO:  I understand, Your Honor.  We know

3    that -- so that's our argument on --

4            THE COURT:  I got your motion, I consider it timely

5    filed at the appropriate place after the defendants and

6    counterclaimants have rested, and that is Flores and King.

7            MR. SOLTERO:  Yes, and --

8            THE COURT:  But file it electronically.

9            MR. SOLTERO:  I will, Your Honor.  If I may finish,

10   there's also no intent, no proof of intent to release, and it

11   would be an unjust enrichment.  Moving on to the second cause

12   of action, Your Honor, on unfair debt collection.  We just

13   heard from Mr. King --

14           THE COURT:  Can I just, while the jury is here can I

15   just read this later and we'll continue on and carry it

16   forward?

17           MR. SOLTERO:  Yes, Your Honor.

18           THE COURT:  Thank you.  Unless you have some

19   argument that's not in the motion.

20           MR. SOLTERO:  No, Your Honor, we incorporated it in

21   full.

22           THE COURT:  Thank you.

23           MR. SOLTERO:  We also, Your Honor, at this time

24   would like to file our motion for judgment as a matter of law

25   at the close of Flores' and King's evidence on collection

```
 1   claims against Flores and King; in other words, reurging, or

 2   a new motion that is on the same grounds as the previous one.

 3           THE COURT:  Thank you.

 4           MR. SOLTERO:  Also, we will file that

 5   electronically.  And here's a copy for counsel.

 6           THE COURT:  You've got some more stuff there.

 7           MR. SOLTERO:  Yes, Your Honor, that --

 8           THE COURT:  That's for later?

 9           MR. SOLTERO:  Your Honor, Judge, and I would

10   incorporate all the arguments in our written motion in full.

11   If Your Honor would like, I could go into them in detail.

12           THE COURT:  Thank you.  I'd like to read them.

13           MR. SOLTERO:  Okay.

14           THE COURT:  Thank you.

15           MR. RANGEL:  Judge, we have a witness, I believe, in

16   turn.

17           THE COURT:  Well, don't we have to have the

18   Trevinos?

19           MR. RUMLEY:  I'm going to call Mr. Trevino, and then

20   my handwriting expert.

21           MR. RANGEL:  Well, I think the procedure, what we're

22   trying to figure out, they have rested and then --

23           THE COURT:  Well, King and Flores have rested on

24   their cross-claims and defenses.

25           MR. RANGEL:  Right, and before we close, we have --
```

1          THE COURT:  You may close after Mr. Rumley has put

2     on his evidence as to the two Trevinos.

3          MR. RANGEL:  Okay.  Let me confer with counsel.

4          THE COURT:  Thank you.

5          MR. J. GUTIERREZ:  Your Honor, just in terms of

6     timing, there's not a lot of time left in this trial.

7          THE COURT:  There's what?

8          MR. J. GUTIERREZ:  There's not a lot of time left in

9     this trial.

10          THE COURT:  Oh.

11          MR. J. GUTIERREZ:  Do you want us to do written

12     responses to these motions or can we argue some points to the

13     Court if the Court wants --

14          THE COURT:  However you want to do it is all right

15     with me.

16          MR. SOLTERO:  And Your Honor, just to be clear, I

17     understand what's happening is we are not resting on our, or

18     we have a defense we can put on to their counterclaim, the

19     witness we're recalling, but Your Honor is indicating that

20     the intervention case goes first?

21          THE COURT:  I'm sorry, maybe I have the wrong --

22          MR. RANGEL:  My understanding on how we are going to

23     proceed is that --

24          THE COURT:  You should put on your defense, the King

25     and Trevino.

```
 1              MR. RANGEL:  Right.

 2              THE COURT:  And have him do that, and then

 3   Mr. Rumley --

 4              MR. RANGEL:  And we have one witness.

 5              THE COURT:  That's fine.

 6              MR. RANGEL:  And then we will rest and close and

 7   then he will, Mr. Rumley will open with his intervention.

 8              THE COURT:  Is that fair enough to you?

 9              MR. RUMLEY:  We didn't --

10              THE COURT:  I think that's probably correct.

11              MR. RUMLEY:  We didn't talk about it but --

12              THE COURT:  I think that's the procedure we're

13   following.

14              MR. RUMLEY:  Okay.

15              MR. B. GUTIERREZ:  I didn't, I have understood it

16   was going to be after -- excuse me.  Baldemar Gutierrez.  I

17   had understood in talking to Mr. --

18              THE COURT:  They're done.  When they rest and close

19   they're done, and they can't put on any response to

20   Mr. Rumley.

21              MR. RANGEL:  No, no, no, no, no.

22              THE COURT:  (Indiscernible) under 1795.

23              MR. RANGEL:  Let me make one short quick response.

24              THE COURT:  I think this is correct.  I think

25   procedurally this is correct.
```

1      (Bench conference ends)

2           THE COURT:  Thank you all.  So, Mr. Flores and

3   Mr. King have rested, and do you have any rebuttal witnesses

4   just for the King/Flores counterclaim and defense?

5           MR. RANGEL:  We do, Your Honor.

6           MR. THAGARD:  Your Honor, we'd call Kim Russell back

7   to the stand.

8           THE COURT:  Thank you.

9      (Court conferring off the record with clerk)

10          THE COURT:  Could you come forward, please, ma'am.

11   And I have asked Ms. Gano to reapply the oath.

12          KIM RUSSELL, PLAINTIFF'S WITNESS, SWORN

13          THE CLERK:  Would you have a seat, please, and watch

14   your step.

15                    REBUTTAL TESTIMONY

16                    DIRECT EXAMINTION

17   BY MR. THAGARD.

18   Q    Thank you, Ms. Russell.

19   A    Thank you.

20   Q    You're an account representative for Vanderbilt, correct?

21   A    Yes, sir.

22   Q    Okay.  And we talked the other day.  One of the things

23   Vanderbilt does if it can't get in touch with a customer is

24   to call the neighbors and relatives, correct?

25   A    Yes.  Yes, sir.

Russell - Direct

1    Q    Okay.  And is it Vanderbilt's policy to protect the

2    customer's personal information during those calls?

3    A    Yes, sir.

4    Q    And are you trained not to disclose that personal

5    information?

6    A    Yes, sir, we are trained not to talk anything about the

7    loan itself to anyone that it's not okay to speak with, just

8    a general, leave a general message for that customer to call

9    us back.

10   Q    And when these calls are placed, those calls are written

11   down by the account representative, correct?

12            MR. B. GUTIERREZ:  Objection, leading, Your Honor.

13            THE COURT:  Sustained.

14   BY MR. THAGARD:

15   Q    Are records made of each and every one of those calls?

16   A    Yes, sir.

17   Q    And have you had an opportunity to review those calls?

18   A    Yes, sir.

19   Q    Okay.  Have you seen any evidence in Vanderbilt's records

20   that any personal information of either Mr. Flores or

21   Mr. King was told to any neighbor or relative?

22   A    No, sir.

23   Q    Is it proper to call people at work?

24   A    We can do that if we are unable to reach the customer by

25   their cell phone or their home number or any numbers that

1   they've given us.  There is also a place for their place of

2   employment number, that we can call there.

3   Q   And in this case did Mr. King specifically asked to be

4   called at work?

5   A   To me he asked several times for me to call at work.

6   Sometimes that was the best way to reach him, and especially

7   if he was busy doing something with the funeral home.

8   Q   And how do you remember that specifically, that he asked

9   you to call him at work?

10  A   Normally I will call a customer on their cell phone or

11  their home phone.  That's how we're trying to do.  Those

12  numbers are the first contact numbers that we try.  I

13  remember calling the place of employment because he worked at

14  a funeral home, so I just remember calling that.  It's

15  something I remember.

16  Q   He specifically asked you to call him at work?

17  A   Yes, sir.

18  Q   Many times?

19  A   There were a few occasions.  I mean I don't remember

20  every instance but I do know that he was, he did ask, leave

21  the phone number on my voice mail even a couple of times to

22  call him at his work.

23  Q   And did you find other instances in the file where he had

24  asked other people to call him at work?

25  A   I did see that, yes, sir.

1    Q    There has been some testimony that people from Vanderbilt

2    were ugly or hollering.  Have you reviewed the call notes?

3    A    Yes, sir.

4    Q    Okay.  And is it the policy to record and make a note of

5    any complaint?

6    A    Yes, sir.

7    Q    And reviewing all of the complaints from all of the

8    calls, how many complaints -- or reviewing all the notes for

9    all the calls, how many of the complaints, how many

10   complaints did you ever receive over seven years from

11   Mr. Flores and Mr. King?

12   A    The one instance where Mr. King called in to discuss, I

13   think perhaps alternate payment arrangements, he did make

14   mention of an account representative that he felt was rude to

15   him when he called.

16   Q    And the account representatives are trained to write down

17   in the notes any complaints that are made?

18   A    Yes, sir.

19   Q    All right.  And so if Mr. Flores or Mr. King had ever

20   made a complaint, you would expect to find it?

21          MR. B. GUTIERREZ:  Excuse me.  Objection, leading,

22   Your Honor.

23          THE COURT:  Sustained.

24   BY MR. THAGARD:

25   Q    All right.  If Mr. Flores or Mr. King had ever called,

1   where would you expect to see a record of that?

2   A    In our documentation from the events of a call, we would

3   have to note pretty much what happened on each and every

4   phone call.

5   Q    And did you see any record of that?

6   A    No, sir.

7   Q    And over what period of time was that?

8   A    Seven years that the loan was there, still there.

9          MR. THAGARD:  Your Honor, may we approach?

10         THE COURT:  Yes.

11      (Bench conference on the record)

12         MR. THAGARD:  We would like again to tender a call

13  note.  They have brought them into the record by Mr. Flores

14  and Mr. King combining -- or claiming that ugly calls were

15  made, that they were treated poorly, and other, that there

16  were many calls made and calls were made at work, and a --

17         THE COURT:  That were related to her?

18         MR. THAGARD:  Yes.

19         THE COURT:  Overruled.  Thank you.

20         MR. THAGARD:  I've got one other request I'd like to

21  make.

22         THE COURT:  Or denied.  Sorry.

23         MR. THAGARD:  Okay.  I would like to offer one note,

24  the one note that was written by --

25         THE COURT:  Any note that she took you can --

Russell - Direct

```
 1              MR. THAGARD:  I can get in?

 2              THE COURT:  You can talk about, yes, sir.

 3              MR. THAGARD:  Okay.  And can I offer it into

 4    evidence?  All of it is one note written by her on the lot

 5    36, that's all I ask for.

 6              MR. B. GUTIERREZ:  You see, they keep coming back to

 7    36 -- it wasn't even covered -- in order to --

 8              MR. RUMLEY:  And this is unrelated to their rebuttal

 9    of Flores.  They want to get in this thing about supposedly

10    the land was put up as collateral, and we went through this

11    at --

12              THE COURT:  Let me see it, let me see the note.

13              MR. THAGARD:  Okay, I've got it here.

14              MR. RUMLEY:  We went through this at length.  You've

15    got the same screen that they have?

16              THE COURT:  This is my, I do all the lighting with

17    this thing on, the computer switching, the VCR, everything

18    for her.  She has one also.  This is the light outside, this

19    is the light in you-all's.  This is my screen that I can put

20    on the same thing as yours.  This is the note, I've got it up

21    there.

22              MR. THAGARD:  It's a note from July 14th.  It's on

23    the bottom there.  It goes to the next page.  It was written

24    by Kim Russell.  If you look at the very bottom, the last

25    entry, and look at the next page, is the note.
```

1          THE COURT:  The bottom --

2          MR. THAGARD:  It's the next page.

3          MR. RANGEL:  It's at the bottom and the next page.

4          MR. THAGARD:  It's the part, see the Kim Russell one

5    at the very bottom?

6          THE COURT:  Uh-huh.

7          MR. THAGARD:  And then it goes to the next page.

8          THE COURT:  Okay.  I think it's okay if you just use

9    that to refresh her memory and let her testify about it.

10         MR. RUMLEY:  But, Your Honor, we would object again

11   under 403.  They have already been through this.  This is

12   cumulative and this is, has nothing to do with rebuttal, to

13   rebutting what, his evidence he put on.  Nothing to do with

14   it.

15         THE COURT:  Mr. Rumley, it's only Mr. Gutierrez who

16   can start objecting to this, but I'll listen to it.  So I'm

17   going to let them do that.  Thank you.

18      (Bench conference ends)

19         MR. THAGARD:  I would like to show the witness a

20   document.  May I approach the jury?

21         THE COURT:  Yes.

22         MR. THAGARD:  It's going to be CP10 at 361 and 360.

23   Can you do that?

24   BY MR. THAGARD:

25   Q   Ms. Russell, did you receive a call from Mr. Flores and

1   Mr. King --

2          MR. B. GUTIERREZ:  Excuse me, Your Honor.  We object

3   to counsel asking questions that are outside our evidence,

4   direct evidence from Mr. Flores.

5          THE COURT:  Thank you.  Overruled.

6   BY MR. THAGARD:

7   Q   Did you receive a call from Mr. Flores and Mr. King on

8   July 14th of 2003?

9   A   Yes, sir.

10  Q   And was that call made to you?

11  A   Yes, sir.

12  Q   Okay.  And did you make records of that call?

13  A   Yes, sir.

14  Q   Do you -- can you please tell us again the substance of

15  that call that you personally remember from Mr. Flores and

16  Mr. King?

17  A   He had told me at that time that he -- well, the initial

18  purpose of the call was to let me know that the July payment

19  had not been sent yet, so obviously we were going to make

20  alternate arrangements for that payment.  He then proceeded

21  to ask me about refinancing the mobile home, what he needed

22  to do in regards to that.  He said that the sales center

23  person, I guess his sales person told him that after a year

24  he could refinance the loan and he had questions in regards

25  to that, so he wanted to be instructed on how to go about

1   doing that.

2   Q   And -- would like for you to pull up 360, please.   And

3   what did you, what was he specifically asking that you do to

4   assist with the refinance?

5   A   He wanted to know about releasing one of the lots that

6   they had placed for, one of the pieces of property that they

7   had placed for collateral on that loan.   Not remembering

8   every detail he wanted to know because they wanted to, I

9   think, get it out of Mr. Flores' name and put it in someone

10  else's, so they needed to know how they needed to go about

11  getting that off of that loan itself.

12  Q   And this was July of, July 14th of 2003?

13  A   Yes, sir.

14  Q   Okay.   And did he tell you that they had put lot 30 --

15  lot 35 and lot 36 on the loan?

16  A   Yes, sir.   There were two lots.   He wanted to release

17  only one of them, wanted me to find out what he would need to

18  do to have that happen so that they could look into

19  refinancing it.

20  Q   Do you remember which lot specifically he wanted released

21  from the loan?

22  A   I think that it was 36 but I'm not really sure of the

23  exact number.   One of the two he definitely wanted off of the

24  loan.

25  Q   I want you to, I'll ask you to look at the document on

1    your screen and see if that refreshes your recollection?

2    A    Yes, sir.  He needed to get 35 released because it was in

3    Cesar's name.

4         MR. THAGARD:  That's all we have, Your Honor.

5         THE COURT:  Thank you.

6                        CROSS-EXAMINATION

7    BY MR. B. GUTIERREZ:

8    Q    Let me make sure I understand what you've told, what

9    you've told us, questions from Mr. Thagard.  Did you say

10   after you testified a few days ago that you went back and

11   looked at all of the collection notes?

12   A    I haven't looked at anything prior to leaving here on

13   Friday.  I, this was before I came down.

14   Q    You have reviewed the collection, collection notes.

15   That's what I have, you said reviewed the collection notes.

16   A    Every page, sir.

17   Q    Please, if you could, please direct us, so that we can

18   maybe put it on the screen, to any collection note that you

19   reviewed that shows that you called the Trevinos, the

20   landowners that are involved in this lawsuit, that you called

21   them to try to collect the debt from them.

22   A    Sir, I wouldn't be collecting the debt from the

23   landowner.  If I had the number for the landowner, I would

24   definitely be calling that number as well.

25   Q    Well, I believe you have testified that you called

1    neighbors, you called employers, you called relatives.  Can

2    you please pull out so that we can see whether or not you

3    ever called the Trevinos that their land had been pledged and

4    that if they didn't make a payment for Mr. Flores or Mr. King

5    they could lose their land?  Do you have, can you publish any

6    of those collection notes?

7    A    They did not sign the retail installment contract so I

8    would be contacting them about a payment.  I still cannot

9    release information to them about the loan, sir.

10          MR. B. GUTIERREZ:  Objection, nonresponsive, Your

11   Honor.

12          THE COURT:  Listen to the question carefully,

13   please --

14          THE WITNESS:  Yes, Your Honor.

15          THE COURT:  -- and just respond to the question.

16   Thank you, ma'am.

17   BY MR. B. GUTIERREZ:

18   Q    Very simple.  Can you pull out any collection note, can

19   you pull out any collection note of all the -- because you

20   said you reviewed every single page.

21   A    Yes, sir.

22   Q    I want you to pull out any collection note that you have

23   where you didn't call a neighbor, you didn't call a relative,

24   you didn't call an employer, you didn't call Mr. Flores, you

25   didn't call Mr. King, but that you called the landowners to

1    tell them that their land was in jeopardy because Mr. Flores

2    and Mr. King were defaulting, were in arrears, or had not

3    paid on their contract.

4    A    No, sir, I don't recall calling them at all.

5    Q    Now, how is it that you can come in here and testify

6    under oath this business about them wanting for you to

7    release a lot because it was in Mr. Flores' name?  Is that

8    what you're telling this jury, that there was some land that

9    was in Mr. Flores' name back in 2003, Ms. Russell?

10   A    Yes, sir, that was the events of the call.

11   Q    Can you please, can you please pull out that document

12   that shows that Mr. Flores, that Mr. Cesar Flores owned any

13   of that property?

14   A    I don't have that document in front of me, sir.  I'm just

15   going on what he told me on the conversation.

16   Q    Do you think it was right, do you think it was the right

17   thing to do to keep it secret from Mr. Flores, from Mr. King,

18   that these releases had been filed?

19   A    Sir, I don't think it was kept secret.

20   Q    Okay.  Do you think it was right to continue collecting

21   money from them after these releases were filed?

22   A    Yes, sir, they owned the loan.

23            MR. B. GUTIERREZ:  That's all I've got.

24            MR. THAGARD:  Your Honor, may we approach?

25            THE COURT:  Yes, sir.

1              (Bench conference on the record)

2              MR. THAGARD:  I think they opened the door by cross-

3     examining her on that note.  I think we would offer that

4     again, that note into evidence.

5              THE COURT:  Overruled.  Thank you, sir.

6              (Bench conference ends)

7              MR. THAGARD:  We have nothing further.  Oh, I do

8     have one, one thing, Your Honor.

9                         REDIRECT EXAMINATION

10    BY MR. THAGARD:

11    Q    In your review of the file and the notes, is there any

12    evidence that anyone from Vanderbilt ever called the Trevinos

13    once, ever?

14    A    Not that I recall, sir, no.

15             MR. THAGARD:  No questions.

16             THE COURT:  Thank you.  You may stand down.

17             THE WITNESS:  Thank you, Your Honor.

18             THE COURT:  Call your next witness.

19             MR. RANGEL:  Vanderbilt does not have any more

20    witnesses on the --

21             THE COURT:  All right.

22             MR. RANGEL:  So we rest and close on the

23    repossession and the defense of the counterclaim and we have

24    a motion.

25             THE COURT:  And you are preserving your same motions

 1   at this time?

 2          MR. SOLTERO:  Your Honor, if we may approach

 3   briefly?

 4          THE COURT:  Yes.

 5      (Bench conference on the record)

 6          MR. SOLTERO:  Your Honor, it's, we move, Your Honor,

 7   we move again for judgment as a matter of law on all claims.

 8          THE COURT:  So you have the same motion you just

 9   gave me before?

10          MR. SOLTERO:  Yes, Your Honor.  We have a separate

11   filing that's --

12          THE COURT:  Another one?

13          MR. SOLTERO:  At the close of the evidence.

14          THE COURT:  Thank you.

15          MR. SOLTERO:  Which we will file electronically.

16   And I understand Your Honor wants us to argue it later

17   because you're carrying them but we are prepared to argue

18   now.  All the elements of Wilder, counterclaims fail.

19          THE COURT:  Thank you.  I'll carry this forward.

20      (Bench conference ends)

21          THE COURT:  Mr. Rumley?

22          MR. RUMLEY:  Yes, Your Honor?

23          THE COURT:  Do you have any witnesses?

24          MR. RUMLEY:  Yes, Your Honor.  Your Honor, we call

25   Arturo Trevino.

Trevino - Direct

```
 1            ARTURO TREVINO, INTERVENOR'S WITNESS, SWORN
 2            THE CLERK:  Thank you.  Please be seated.
 3                         DIRECT EXAMINATION
 4   BY MR. RUMLEY:
 5   Q   Good morning, Mr. Trevino.
 6   A   Good morning, sir.
 7   Q   You testified a few days ago, and I want to talk to you a
 8   little bit this morning about your damages, and your damages
 9   that you are asking this jury to award, okay?
10   A   Yes, sir.
11   Q   One thing that, just to make sure we're clear, the
12   documents, the deed of trust and the mechanic's lien
13   contract, do you know when those were filed with respect to
14   your property?
15   A   When they were filed?
16   Q   When they were filed.  When the deed of trust and the
17   mechanic's lien, do you know when they were filed?  Do you
18   know the date?
19   A   Like, I don't, I don't know, I don't know what you're
20   trying to tell me, sir.
21   Q   The, you understand that the deed of trust, the
22   mechanic's lien contract, the two documents --
23   A   Yes, sir.
24   Q   -- that you testified earlier that contained your forged
25   signature, do you understand that those documents were filed
```

1   in 2002?

2           MR. RANGEL:  Judge, I object to the form of the

3   question.

4           THE COURT:  Sustained.

5   BY MR. RUMLEY:

6   Q   Do you understand, sir, that those were filed in 2002?

7   A   Yes, sir.

8   Q   You didn't find out that those documents had been filed

9   related to your property until when, sir?

10  A   2009.

11  Q   All right.  Now, back in 2002 when these documents were

12  filed, did you own lots 35 and 36?

13  A   Yes, sir.

14  Q   And did you own those lots along with Maria?

15  A   Yes, sir, 50/50 on those, all that.

16  Q   And I was going to ask you, how, was it 50/50 or how was

17  that ownership broken down?

18  A   We were 50/50 on it.

19  Q   Okay.  And through this case have you understood that the

20  defendants have used that property with respect to filing

21  these documents?

22  A   Yes, sir.

23  Q   Did you ever give Clayton Homes or Vanderbilt permission

24  to use your property?

25  A   No, sir.

1    Q   Are you asking the jury to award you money for these

2    defendants using your property without your permission?

3    A   Yes, sir.

4    Q   Through the course of this case -- let me show you

5    Defendant's Exhibit 15 which is in evidence.  Mr. Trevino,

6    have you, have you learned through this litigation that these

7    companies actually went and did an appraisal on your

8    property?

9    A   Yes, sir.  Yes, sir.

10   Q   Okay.  And can you tell the jury what Clayton Homes

11   appraised your property at?

12   A   Twenty thousand.

13   Q   All right.  Now, you, when did you become aware that they

14   filed these releases that we have been talking about for the

15   last several days?

16   A   Just recently.

17   Q   Okay.  Are you asking the jury to award, to award money

18   to you for the defendants using your land from 2002 up until

19   the time that they released those liens?

20   A   Yes, sir.

21   Q   And what amount of money are you going to ask, are you

22   asking the jury to award?

23   A   I'll leave it up, I'll leave it up to the jury to decide

24   on that, sir.

25   Q   Okay.  All right, thank you, sir.

1          MR. RUMLEY:  Pass the witness.

2                          CROSS-EXAMINATION

3    BY MR. RANGEL:

4    Q    Good morning, Mr. Trevino.

5    A    Good morning, sir.

6    Q    You and Mrs. Trevino owned lots 35 and 36 because those

7    lots had been given to both of you by Mrs. Trevino's late

8    sister and brother-in-law, correct?

9    A    Correct, sir.

10   Q    And in July of 2003, July 24th, 2003, you and

11   Mrs. Trevino conveyed to Gilberto Flores, Mrs. Trevino's

12   brother, lot 35, correct?

13   A    Correct.

14   Q    So as of July 2003 you and Mrs. Trevino no longer owned

15   lot 35, correct?

16   A    Correct, sir.

17   Q    Then, in April of 2005 you and Mrs. Trevino conveyed to

18   Cesar Flores lot 36, correct?

19   A    Correct.

20   Q    So as of April 2005 you and Mrs. Trevino did not own lot

21   36 or lot 35, correct?

22   A    Correct.

23   Q    Now, you are aware, Mr. Trevino, are you not, that these

24   releases that you've been hearing about throughout the trial

25   were filed in October of 2005, correct?

1  A    Correct.

2  Q    About the time, at the time that those releases were

3  filed, you and Mrs. Trevino didn't own those lots, correct?

4  A    Correct, sir.

5  Q    And you heard Mr. Rumley ask you about the original deed

6  of trust and builder's and mechanic's lien that were involved

7  with the purchase of the mobile home by Cesar Flores and

8  Alvin King, correct?

9  A    Correct.

10 Q    And the evidence has shown that those were filed, the

11 deed of trust and builder's and mechanic's lien were filed in

12 January of 2002, correct?

13 A    Correct.

14 Q    Between January of 2002 and the time that you conveyed

15 lot 35 to Gilbert Flores in July of 2003 and the time that

16 you conveyed lot 36 to Cesar Flores in April of 2005, you and

17 Mrs. Trevino never attempted to sell those two lots to

18 anybody else, correct?

19 A    Correct.

20 Q    And you never attempted to convey those lots to anybody

21 else, correct?

22 A    Correct.

23 Q    When you and Mrs. Trevino decided that you wanted to

24 convey lot 35 to Gilberto Flores, you were able to do that,

25 correct?

```
1   A    Correct.

2   Q    The deed of trust and the builder's and mechanic's lien

3   that were on file did not keep you from doing that, correct?

4   A    Correct.

5   Q    Same thing, when you and Mrs. Trevino decided to convey

6   lot 36 to Cesar Flores in April of 2005, you were able to do

7   that, correct?

8   A    Correct.

9   Q    The deed of trust and the builder's and mechanic's lien

10  that were on file did not keep you from doing that, correct?

11  A    Correct.

12  Q    And you understand, Mr. Trevino, that the deed of trust

13  and the builder's and mechanic's lien were on file in order

14  to help Cesar Flores and Alvin King to purchase their mobile

15  home, correct?

16  A    Yes, sir, but I never, I never signed the, signed it

17  over.

18  Q    I understand, and I was going to follow that up.  And I

19  understand that your position is that you and Mrs. Trevino

20  never signed the deed of trust and the builder's and

21  mechanic's lien, correct?  Correct?

22  A    Correct, sir.

23  Q    But you do understand that they, the reason that they

24  were on file was in connection with the purchase of a mobile

25  home by Cesar Flores and Alvin King, correct?
```

1    A    Well, without my permission.

2    Q    I understand that, but that was the reason that they were

3    on file?

4    A    Yes, sir.

5    Q    In other words, they were on file in order to try to help

6    Mr. Flores and Mr. King buy the mobile home, correct?

7    A    Correct.

8    Q    And it is true, is it not, Mr. Trevino, that, your

9    testimony is that the first time you found out about the

10   builder's and mechanic's lien, the deed of trust and the

11   releases, was in, when you went to see Mr. Gutierrez in the

12   fall of 2009, correct?

13   A    Correct.

14   Q    And the reason you went to see Mr. Gutierrez is that

15   Mrs. Trevino called you and told you to go see Mr. Gutierrez,

16   correct?

17   A    Correct, sir.

18   Q    And it's your understanding that the reason that

19   Mrs. Trevino went to see Mr. Gutierrez is that Cesar Flores

20   had called her to go see Mr. Gutierrez, correct?

21   A    I guess so.  I'm not sure.

22   Q    When you say that you are seeking damages for the use of

23   that property, the property was used -- and I know you

24   disagree with the term, you didn't sign, but the property was

25   used by Mr. Flores and Mr. King to be able to buy a mobile

1   home, right?

2   A   That's correct.

3           MR. RUMLEY:  Your Honor, objection, this calls for

4   speculation from this witness.  He doesn't know --

5           MR. RANGEL:  Well, he --

6           MR. RUMLEY:  -- why these defendants filed these

7   documents.

8           MR. RANGEL:  Judge, this is cross-examination.  He

9   has heard the testimony and Mr. Rumley was asking him about

10  using the property.  The fact of the matter is it was used in

11  order to buy the mobile home.  Vanderbilt or CMH Homes did

12  not use it, it was Mr. Flores and Mr. King.

13          MR. RUMLEY:  Same objection.

14          THE COURT:  Overruled.

15          MR. RANGEL:  May I re-ask the question, Your Honor?

16          THE COURT:  Yes.

17  BY MR. RANGEL:

18  Q   Mr. Trevino, it is your understanding that the property,

19  lots 35 and 36, were used in order to enable Mr. King and

20  Mr. Flores to purchase the mobile home, correct?

21  A   Correct.

22  Q   And it is true, is it not, Mr. Trevino, that no one

23  from -- you had never had any contact with anybody from

24  Vanderbilt in connection with the debt that was owed by

25  Mr. King and Mr. Flores, correct?

```
1    A    Correct.

2              MR. RANGEL:  Pass the witness, Your Honor.

3              MR. B. GUTIERREZ:  I have no questions, Your Honor.

4              MR. RUMLEY:  No further questions, Your Honor.

5              THE COURT:  Thank you.  You may stand down.  Call

6    your next witness.

7              MR. RUMLEY:  We call Janet Masson.

8              THE CLERK:  Would you come forward, please.

9              JANET MASSON, INTERVENOR'S WITNESS, SWORN

10             THE CLERK:  Would you have a seat, please, and watch

11   your step.

12                         DIRECT EXAMINATION

13   BY MR. RUMLEY:

14   Q    Ma'am, could you introduce yourself to the ladies and

15   gentlemen of the jury?

16   A    Yes.  My name is Janet Fenner Masson.

17   Q    And, Ms. Masson, can you tell them, what's your

18   occupation?

19   A    I am a forensic document examiner.

20   Q    And what does a forensic document examiner do?

21   A    We examine documents to answer questions about their

22   physical composition.  Sometimes we are called handwriting

23   experts because a lot of what we do is examine handwriting to

24   identify who wrote it or to determine whether it was not

25   written by the person who wrote samples of known handwriting.
```

1    We examine signatures, cursive writing, hand printing,

2    handwritten numerals and that sort of thing for

3    identification purposes.  But we also examine papers and

4    photocopy processes and printing processes and papers and

5    inks and all sorts of other aspects of the document to

6    determine how it was made and, you know, when, sometimes,

7    some instances, when it was made and what processes it may

8    have been through in its manufacture.

9    Q    And what type of training have you received in order to

10   do that document examination?

11   A    As a background for the profession, I have a bachelor's

12   degree from the University of Texas at Austin.  Then I served

13   an internship under a well known expert in the field, Lucille

14   P. Lacey, who was a document examiner in Houston for many

15   years.  My internship consisted of two years of full-time

16   on-the-job training under Ms. Lacey.  I never learned to call

17   her Lucille, it was always Ms. Lacey.  And then I continued

18   to work with her as her associate and finally as her partner

19   for an additional six years, all that time really continuing

20   to train with her.  Then, in, after eight years I opened my

21   own practice and that's, that was in 1985, so that was about

22   25 years ago.

23   Q    And are you a member of any professional organizations?

24   A    Yes, sir, I am.

25   Q    And which ones?

1   A    I'm a member of the American Society of Questioned

2   Document Examiners, which is a national organization of,

3   strictly of document examiners in the U.S. and Canada,

4   although we have international members as well, corresponding

5   members they're called.  And then I'm also a fellow in the

6   American Academy of Forensic Sciences in the questioned

7   document section.  That's an organization, a much larger

8   organization that includes medical examiners, pathologists,

9   you know, the odontologists who are the dentists who will

10  identify bodies from teeth and that sort of thing,

11  criminalistics section, toxicology which examines blood and

12  body fluids to determine composition, look for poisons and

13  drugs and that sort of thing.  But it also includes a

14  questioned document section.  That's forensic document

15  examiners.

16  Q    Okay.  And explain to us what, how the questioned

17  document section, how that is specialized within that group.

18  A    In each of the sections of the Academy you have to have

19  specific kinds of training and education in order to qualify

20  to be a member of that organization.  In order -- or of that

21  section.  In the Academy, to be a member of the questioned

22  document section you have to have had training and experience

23  in the identification of handwriting and other aspects of

24  documents.  There are some other people who do some work with

25  documents but they don't do the handwriting aspect, and those

1   generally go into criminalistics.  Those are, for instance,

2   people who specialize in doing chemical testing of inks and

3   photocopier toners and that sort of thing.  That's

4   principally the group that will go into criminalistics

5   because they haven't, they are not the full spectrum document

6   examiners, and particularly they don't examine handwriting is

7   the thing that is generally missing.

8   Q    And in the American Academy of Forensic Science, are you

9   in the questioned document section?

10  A    Yes, sir, I am.

11  Q    During the course of this case did you come to understand

12  that Clayton Homes has hired a guy named Larry Stewart?

13  A    Yes, Mr. Stewart.

14  Q    And is Mr. Stewart in this American Academy of Forensic

15  Science?

16  A    Yes, I believe so.

17  Q    Is he in the questioned document section?

18  A    No, he's an ink chemist.  He's in the criminalistics

19  section.

20  Q    All right.  And if an individual is experienced in

21  handwriting analysis, comparing signatures, what section of

22  the American Academy would they fall under?

23  A    They would go into questioned documents.

24  Q    All right.  Are you certified by any organization?

25  A    Yes, sir.

Masson - Direct

1    Q    Which organization?

2    A    The American Board of Forensic Document Examiners.   I

3    took their examination in 1983 and have been certified

4    continuously since then.

5    Q    And what does that mean to be certified by that

6    organization?

7    A    In order to meet the requirements for certification you

8    must first have a bachelor's degree from a recognized

9    university.  Then you must undergo a minimum of a two-year

10   full-time training program under someone who -- in a

11   recognized laboratory or under a recognized document

12   examiner.  You also must do the full range of document

13   examinations.  And then, after that time period, you must

14   continue to work in the field for at least two years

15   additionally, that time being under the supervision of

16   someone who reviews all of your casework to make sure that

17   you are working in a professional manner and that you are

18   coming to the right conclusions about what you examine.  You

19   have to have testified in court by this time and you have to

20   then apply for review by the board, the board of directors,

21   and they, and provide letters of recommendation about, by

22   people who know your work.  Then they, if you pass that level

23   then you will go into the testing process which includes

24   completion of a, successful completion of a written, oral and

25   practical board examination.  Then, once you have

Masson - Direct

```
1    successfully completed all of those, the board will determine
2    whether you can become certified.
3    Q    And are you board certified?
4    A    Yes, sir, I am.
5    Q    And how long have you been board certified?
6    A    Since 1983.
7    Q    Over the course of your career have you given
8    presentations on the subject of handwriting analysis?
9    A    Yes, all -- and various aspects of document examination.
10   Q    And if we look at -- I have marked your resume as Exhibit
11   491 that's in evidence.  If we look, there's a number of,
12   there's a number of professional activities, ma'am, that's
13   listed on your resume.  Can you tell us which ones are
14   related to the work that you have done in this case?
15   A    Well, a lot of these are things that are essentially
16   serving on committees or boards of organizations.  For
17   instance, the top one, I was a member of the evaluation and
18   testing committee for the American Society of Questioned
19   Document Standards.  In order to become a regular member of
20   that organization, you now have two ways you can do it, but
21   one of the ways is to go through a testing procedure, so I
22   was on the committee that evaluated the results of tests by
23   various people who were wanting to become regular members.
24   The second one was an award that I received.  The third one,
25   I was Associate Editor of Forensic Science International,
```

Masson - Direct

1    which meant that I reviewed a lot of articles that were

2    submitted for publication.  The Executive Committee of the

3    American Academy was more a bureaucratic job, if you want to

4    call it that.

5    Q   And then it looks like that you served as an officer for

6    the American Board of Forensic Document Examiners?

7    A   Yes, I was a director on that board for six years.  I

8    served as the secretary and the president of the

9    certification board for the profession.

10   Q   In your resume there's a number of articles and

11   professional papers that you have written.  Do any of those

12   deal with the type of work that you did in this case?

13   A   Yes, sure.

14   Q   And is there any one, any article in particular that

15   relates to the type of work that you did in this case?

16   A   Well, there were a couple of them.  One of them had to do

17   with determining the possibility, in a case that was a, where

18   a signature was determined to be a tracing or a simulation,

19   whether you could determine who actually did that tracing or

20   simulation.  So that was something that I think relates to

21   this case.  I've done studies of signatures written in

22   awkward writing positions and under usual, unusual

23   circumstances, such as writing, signing a signature, for

24   instance, on the hood of a car, or when you have just

25   something rolled up in your lap and you're signing it.

1   Occasionally we will get cases where, for instance, there's a

2   request for money, a check endorsed while someone is at the

3   drive-in bank, you know?  A lot of people don't really have

4   something to sign on, so they may just sign on an odd writing

5   surface.  So I have done, that is, talked about unusual

6   circumstances of signing signatures.  I have done signatures,

7   studies of signatures written with different writing

8   instruments, so that can be something involved in this case.

9   You know, just all sorts of cases involving not only

10  microfilm and handwriting and photocopying processes and

11  signatures, probably a lot of them are on signatures

12  themselves.  But --

13  Q    And --

14  A    -- I've done all sorts of research.

15  Q    And you have an office in Houston, Texas, is that right?

16  A    Yes, sir.

17  Q    And do you have any type of special laboratory equipment

18  that you use when you do handwriting analysis?

19  A    Yes.

20  Q    And what type of equipment do you have in your office and

21  what type of equipment do you use when you're examining

22  handwriting?

23  A    Well, one of the first things we use, of course, is a

24  microscope.  I mean we use our eyes, unaided eyes, but we

25  also use microscopes and various magnifying devices.  We use

1   a video spectral comparator, which is used for essentially

2   comparing inks.  It uses the infrared spectrum of light and

3   it also uses ultraviolet light, depending on which spectrum

4   you're looking at.  That can be used to compare papers

5   particularly, or look for chemical erasures and stains and

6   things on documents.  I use electrostatic detection

7   apparatus.  It's a, my particular one is a Foster & Freeman

8   manufactured piece of equipment that detects indentations in

9   the paper.  For instance, if you have a pad of paper and you

10  write on the top sheet, well, if the top sheet is missing, a

11  document examiner can process the second or third or fourth

12  sheet down a lot of times and determine what was written on

13  that earlier sheet.  It uses electrostatic imaging to create

14  an image of the underlying, of the indentations into the

15  page.  I use all sorts of measuring devices for looking

16  particularly at typewriting.  I use lighting sources for

17  looking -- grazing light.  That's another way of looking at

18  the indentations in the paper to see what those indentations

19  might be of.  I use transmitted light to look for, say,

20  watermarks in paper, look for the presence of staple holes.

21  Use grazing light also on the back of a document to look at

22  how heavy the pressure was in writing.  So, I use typewriter

23  test plates that are checking alignment of typing and

24  printing processes.

25  Q   And you were hired by my firm in this case, correct?

1    A    Yes, sir.

2    Q    And what were you asked to do?

3    A    I was asked to examine some signatures on various

4    documents that were submitted and to determine whether each

5    of the signatures was written by the same person who wrote

6    samples of a known signature of that person.

7    Q    And did you use standardized methodology that's accepted

8    in your field of document examination?

9    A    I did, yes.

10   Q    Two of the documents that you looked at, you looked at

11   the original builder's and mechanic's lien contract?

12   A    Yes, sir, I did.

13   Q    And you also looked at the original deed of trust?

14   A    Yes, sir.

15   Q    When did you, when did you examine those documents?

16   A    I first made an examination of photocopies back in the

17   summer, and then October 11th the two original documents were

18   brought to my office and I examined them at that time.

19   Q    And can you explain to the jury what you did when you

20   examined those documents?

21   A    Well, when I examined the originals, of course, what I

22   did was examine them with the unaided eye and through the

23   microscope.  I made high quality scanned images of all of the

24   documents.  I examined them with grazing light and with

25   transmitted light to look for things like watermarks and to

1    look for indentations into the documents.  I processed most

2    of them with electrostatic imaging, particularly when I saw

3    any evidence that there might be some indentations into the

4    paper.  I examined those with electrostatic imaging.  I

5    examined pretty much all of the handwriting on the documents

6    with a microscope.  I compared some inks with the video

7    spectral comparator.  And I think that's pretty much what I

8    did.

9    Q    And as a result of your examination of the deed of trust

10   and the builder's and mechanic's lien contract, did you

11   arrive at an opinion with respect to the signatures appearing

12   on there of Maria Trevino and Arturo Trevino?

13   A    Yes, I did.

14   Q    And can you explain to the jury what your opinion is?

15   A    Yes.  In my opinion the Maria M. Trevino signature on the

16   builder's and mechanic's lien in question and on the deed of

17   trust, neither one of those signatures was written by the

18   same person who wrote known samples of the known signature of

19   Maria M. Trevino that were provided to me.  And with regard

20   to the Arturo Trevino signature, it's also my opinion that

21   the Arturo signature, Arturo Trevino, excuse me, signatures

22   on those two documents were not written by the same person

23   who wrote the known signatures of Arturo Trevino on samples

24   of known signatures of Mr. Trevino.

25   Q    And, Ms. Masson, did you create a chart that describes

1    the variances and the things that you saw in your examination

2    to help explain your opinion?

3    A    I prepared some illustrations that can be used to

4    illustrate to the jury what I found and the reasons for my

5    opinion.

6    Q    All right.  Let me show you what's been entered into

7    evidence, Exhibit 487, and if you can, if you can explain,

8    explain what this document shows and how this demonstrates

9    your opinions with respect to Maria Trevino.

10   A    Yes, sir.  At the top -- see if this will -- there we go.

11   The first two signatures, the first one is the Maria M.

12   Trevino signature on the builder's and mechanic's lien

13   contract.  The second one is the signature on the deed of

14   trust.  Then below that are illustrated samples of genuine

15   signatures of Ms. Trevino, on answers to interrogatories, on

16   a driver's license, on some checks, and I believe this one

17   right here, the, one, two, three, four, fifth one down is on

18   another deed of trust.  So this is a sample of her genuine

19   signatures written over time, and they were all written in

20   the normal course of business, so they give an example of

21   what her signature looks like in general.

22   Q    And how do you use these signatures in relation to

23   looking at the two signatures in question to determine

24   whether or not those are genuine or not?

25   A    Well, the first thing we do is look at her genuine

1   signatures to see what the range of variation is and how it

2   is that she signs her name.  No one will sign their signature

3   in exactly the same way twice.  They will not -- we're not

4   machines and so it will not be exactly the same, there will

5   be variations from one to the next, but you will have a

6   pattern to the way that you sign your name.  So what I look

7   at is see what that pattern is and see what the features are

8   that are in her natural signature.  And then I look at the

9   signatures that are in question, examine them through the

10  microscope and with the unaided eye, and compare the features

11  in those signatures with the samples of genuine signatures to

12  determine whether the signatures in question are within the

13  range of variation found in her genuine signature or outside

14  of that range of variation.  The features that we look at are

15  not only the writing design of the letters but also the

16  writing quality.  And the writing quality is really key in

17  this case because the natural signatures of Ms. Trevino are

18  written with a lot of speed, they have tapered beginning and

19  ending strokes, there's a lot of spontaneity to the

20  signatures.  And that's definitely in contrast to the

21  signatures in question which are very slowly drawn, they're

22  slow, hesitant signatures.

23  Q   And if we look at the signature that appeared on the deed

24  of trust, can you use your pointer and point out what you're

25  talking about when you're noting these variances?

1   A    Well, first, if you look at the signatures, at first

2   glance they look somewhat like the style or design of the

3   genuine signatures.  That tells me that they are, that either

4   the signatures are genuine or they are someone's attempt to

5   make it look like a genuine signature.  That's what we call a

6   simulation.  That is someone is trying to copy a genuine

7   signature.  When you look in these known signatures, in the

8   known signatures, though, you find certain features that

9   appear over and over again that are different in the

10  questioned signatures.  One of the things, for instance, is

11  the design of the letter T in the name Trevino.  You can see

12  the shape of the bottom of the letter T is quite different

13  from the shape of the bottom in the genuine letters T.  Now,

14  in this instance, on this check, which is the fourth

15  signature down, you can see that she uses a printed form of T

16  rather than a cursive form of T.  But otherwise, when she

17  uses a cursive form of T, it has a different design to the

18  bottom than you find in the genuine signatures.  If you also

19  look at the R-E-V portion of the signatures in question, they

20  are really nothing like the design of the R-E-V portion in

21  the known signatures of Ms. Trevino.  If you look at this

22  part that I have highlighted right here in the R, it looks

23  like a misinterpretation of the person who was trying to copy

24  the signature.  It almost looks, in the questioned signature

25  on the builder's and mechanic's lien, like a letter C.

1   Ms. Trevino does not make that design at all in her writing

2   of the name Trevino.  And also, in the ending of the V here

3   is not like Ms. Trevino makes it.  In addition, if you look

4   at the Maria, the ending A in the deed of trust is not like

5   the samples found in the known signatures where she has an A

6   that's actually closed on the right side, or almost closed.

7   It is clearly understandable as a letter A.  If you look at

8   the one in question, the writer didn't complete that letter

9   A, it didn't go up and close the letter A.  So there are some

10  subtle features in the writings that are not like as found in

11  the known signature of Ms. Trevino, but even more key is the

12  writing quality.  And I have an enlargement that we'll show

13  in a second that shows the signatures in question and what is

14  so remarkable about the writing quality, the speed with which

15  the writing is executed.

16  Q   Let me show you Exhibit 488 which is in evidence, and can

17  you explain, explain to the jury what you mean by writing

18  quality and how that demonstrates that these are not the

19  signatures of Maria Trevino?

20  A   Yes.  When Ms. Trevino writes her signature it's written

21  with a lot of spontaneity and a lot of speed.  The pen is

22  moving very quickly, very rapidly.  Signatures, when people

23  write signatures it's almost an unconscious act.  You just,

24  you just scrawl out a signature, you know, and it's a

25  habitual pattern.  Most people are not even familiar with

Masson - Direct

1   exactly what goes into it, they just know how to write it,

2   and it's a very quick pattern.  In these signatures, though,

3   and particularly in the signature on the deed of trust, it is

4   a very slow, hesitant drawn signature.  If you look at it --

5   and both of these, first, at the top of this letter R here,

6   you can see there's a stop of the pen right there, like the

7   person stopped and wasn't quite sure what to do and then went

8   back and finished the R.  You will notice in the A down here

9   there is a very odd bobble in the writing position or the

10  writing movement.  And on the signature down here you can see

11  the starts and the stops are very blunt.  The pen is not

12  moving quickly and coming off the paper at a rapid speed.

13  You look at this portion right here, this is a very slow,

14  deliberate movement.  It is not, cannot be interpreted as an

15  R-E-V, which is what it's supposed to be.  I believe whoever

16  was trying to copy this just was trying to follow some sort

17  of line and misinterpreted what is in there.  The same thing

18  in this area.  This is a very odd design that is not like you

19  find in the genuine signature of Ms. Trevino.  And the ending

20  of the Trevino, right through here you can see the very blunt

21  ending here where the pen just stops in the paper and the ink

22  kinds of spreads into the paper fibers, because the movement

23  is so slow and so deliberate.  So this is, in my opinion,

24  evidence that these signatures were written by somebody who

25  was trying to kind of copy a genuine signature, not very

Masson - Direct

1    successfully.  But these signatures and, of Ms. Trevino are,

2    just on the face --

3             THE COURT:  Would you remove that arrow, whoever has

4    got the arrow there.

5             MR. RUMLEY:  It might be --

6             THE COURT:  She's using a little red dot.

7             THE WITNESS:  I'm using a red dot, yes.  I'm sorry.

8             THE COURT:  Okay, go ahead.

9             MR. RUMLEY:  I don't know how to --

10            THE WITNESS:  Maybe if I hit clear, will that --

11            THE COURT:  It should.

12            MR. RUMLEY:  Is there a mouse?  It could be a mouse.

13            THE COURT:  It's -- thank you.

14            MR. RUMLEY:  Thank you.

15   BY MR. RUMLEY:

16   Q    All right.  So let me, let me see if I get what you're

17   saying, is typically when someone signs their name, you're

18   signing your name and it's a fluid type movement?

19   A    Yes, a very spontaneous movement.

20   Q    And if someone is trying to copy someone's signature,

21   it's more of a slow and deliberate movement because you're

22   trying to copy something that you're not used to signing.  Is

23   that a fair assessment?

24   A    In most cases, yes, that's correct.  It will be a drawn

25   appearance.  And it's almost like they're doing a connect-

 1    the-dot picture.  If you remember when you were a kid and you

 2    would go from dot 1 to dot 2 to dot 3 to draw something out,

 3    that's sort of what happens a lot of times when someone is

 4    trying to simulate or copy someone else's signature.  And all

 5    of the research has shown that when someone is trying to copy

 6    someone else's signature, they either will have flaws in the

 7    design of the writing, that is, they'll have the letters

 8    wrong, or they will have to slow down to a great degree to

 9    try to copy the writing as someone else does it.  And

10    typically you will have defects in both of them.  Not only

11    will it be more slowly written but also you will have letter

12    designs that aren't quite right.  And that's what you have in

13    this case.  At first blush, from a distance, without any sort

14    of microscopic examination, it may look sort of like a

15    genuine signature, but then when you get into the details

16    there are numerous differences in the features of the

17    writing, that is, the design of letters, but also, these are

18    very slow written, deliberate signatures that even on the

19    face of them should call into question the authenticity of a

20    signature because they are not good, they are not fluent

21    signatures.

22    Q    And as a document examiner, are there different levels of

23    certainty in which you reach an opinion about whether or not

24    the signature is authentic or not?

25    A    Yes.

1    Q    And can you explain to the jury what those levels are and

2    explain what your level of certainty is with respect to your

3    opinion of the Maria Trevino signatures on these two

4    documents?

5    A    Yes, sir.  Essentially, document examiners, the ASTM

6    standard for the expression of opinions about handwriting are

7    on a nine-point scale, the middle of that scale being no

8    conclusion, meaning I can't determine whether the signature

9    is by this person or is not.  And we sometimes have to say I

10   don't know whether they wrote it or not.  Then on either side

11   of that you go to indications, indications that the signature

12   was written by the person or indications that they were not.

13   That typically is a very low level of certitude.  That's a

14   level that's just saying I think the evidence is slightly

15   more persuasive one way than another but it's just not -- and

16   a lot of times it's not even considered to be more likely

17   than not, it's just some features that may put us on one side

18   or the other of no conclusion.  The next level is probable.

19   That's saying that the signature probably is by this person

20   or probably is not by this person.  Typically, there is some

21   limit to the conclusion.  Either you may not have all of the

22   letters of the signature -- for instance, if I'm looking at a

23   signature of someone whose name is Mary Smith and all of the

24   samples of genuine signatures I have are of her writing Mrs.

25   Carl Smith, then I may not know how she would write the name

1    Mary, but the Smith is so consistent with hers or so

2    different that I have an opinion that it's likely genuine or

3    probably genuine or probably not genuine.  The next level is

4    highly probable.  That is a, that is an opinion that is a

5    very strong opinion.  And there may be some slight concern

6    but it's essentially a very strong opinion that either the

7    signature is genuine or is not genuine.  And then there's the

8    level of definite, a definite opinion saying I have no

9    reservation about the opinion, the opinion is, the evidence

10   is very persuasive that this is the correct answer.  In this

11   case my opinion is definite that these signatures were not

12   written by the same person who wrote the known signatures of

13   Ms. Trevino.

14          THE COURT:  Okay.  This is lunch break.  We will

15   come back at 1:15.  Would you please stand for the jury.

16       (Jury exits at 12:15 p.m.)

17          THE COURT:  You can stand down.  Thank you.

18   Anything to take up?  Okay.

19          MR. RANGEL:  Just in terms of I guess scheduling for

20   this afternoon, Your Honor, in terms of --

21          THE COURT:  Well, how many more witnesses do we

22   have?

23          MR. RANGEL:  Ms. Masson and then Maria Trevino and

24   then we will have Kimball by deposition and Larry Stewart,

25   our handwriting expert.

```
1              THE COURT:  So we will finish today?

2              MR. RANGEL:  Yes.

3              THE COURT:  And then we will start a charge

4   conference when we are done, and we will tell the jury to

5   come back at 1:00 o'clock tomorrow, and we may need to go

6   back tomorrow morning as well to talk about the charge.  Or

7   not.  We'll see how we do today.

8              MR. RANGEL:  I think that works.

9              MR. LOCHRIDGE:  I think that's a good plan, yes,

10  Your Honor.  I vote for that.

11             THE COURT:  You vote for that?  This is not a

12  democracy.

13             MR. LOCHRIDGE:  I know it's not.

14             THE COURT:  Okay.  One time only.

15             MR. LOCHRIDGE:  But it's South Texas, I got to vote

16  on a couple of --

17             THE COURT:  I let you, that's true, early and often.

18             MR. RUMLEY:  He voted for the wrong one.

19             MR. LOCHRIDGE:  Early, often, and --

20             THE COURT:  All right.  We will start back then,

21  tomorrow at 1:00.  It will give you-all time to organize your

22  closing arguments and exchange any PowerPoints you want to

23  use during closing.

24             MR. RUMLEY:  How long are we going to get?

25             THE COURT:  I had said an hour.  Is that enough?
```

1              MR. LOCHRIDGE:  I think that's fine, Your Honor.

2              THE COURT:  Mr. Rumley?

3              MR. RUMLEY:  Yes, Your Honor.

4              THE COURT:  Mr. Gutierrez?

5              MR. J. GUTIERREZ:  Yes.

6              MR. RANGEL:  They're going to split the hour and

7    we'll split the hour also.

8              THE COURT:  Okay.

9              MR. RUMLEY:  I didn't ask, but --

10             MR. RANGEL:  No.

11             THE COURT:  All right.  Then I will see you-all back

12   at 1:15.  Has anybody emailed us the redline charge thing?

13             MR. SOLTERO:  No, Your Honor.  What, I thought I

14   could do it from here but I can't, so I'm going to go back

15   during lunch hour --

16             THE COURT:  Okay.

17             MR. SOLTERO:  -- and do not only ours but also

18   Mr. Gutierrez's.

19        (Lunch recess at 12:17 p.m. until 1:29 p.m.)

20             THE COURT:  Ready?

21             MR. GUTIERRIEZ:  Yes, Your Honor.

22             THE COURT:  Can I bring the jury in or is there

23   anything --

24        (Court conferring off the record with clerk)

25             THE COURT:  Would you bring in the jury.  Do we

Masson - Direct

1    have -- Mr. Padilla?

2              THE MARSHAL:  Yes, Your Honor.

3              THE COURT:  Thank you.

4         (Jury enters at 1:30 p.m.)

5              THE COURT:  Thank you.  You may be seated.

6              MR. RUMLEY:  May I proceed, Your Honor?

7              THE COURT:  Please.

8         JANET MASSON, INTERVENOR'S WITNESS, RESUMES STAND

9                   DIRECT EXAMINATION CONTINUES

10   BY MR. RUMLEY:

11   Q   Ms. Masson, before we left, before the lunch break we

12   were talking about the signatures of Maria Trevino on the

13   builder's & mechanic's lien contract and the deed of trust,

14   and I believe that you were talking about the different

15   levels of certainty.  And with respect to the signatures that

16   appear on the builder's and mechanic's lien contract and the

17   deed of trust, can you tell the jury what your level of

18   certainty is as to whether or not those are the signatures,

19   genuine signatures of Maria Trevino?

20   A   My opinion is, expresses a definite opinion.  That's the

21   highest level of certitude that we have.

22   Q   And what is your definite opinion?

23   A   It's my definite opinion that the Maria M. Trevino

24   signatures on the deed of trust and the builders and

25   mechanic's lien contract in question in this matter were not

Masson - Direct

1   signed by the same person who wrote the known signatures of

2   Maria M. Trevino.

3   Q    All right.  I want to move now to the signatures of

4   Arturo Trevino that appear on the builder's and mechanic's

5   lien contract and the deed of trust, and we're looking at

6   Exhibit 489 which has been admitted into evidence, and can

7   you go through this with us, ma'am, like you did with Maria

8   Trevino and tell us how you arrived at your opinion?

9   A    Yes.  Illustrated on this exhibit at the top is the

10  Arturo Trevino signature on the builder's and mechanic's lien

11  contract.  The second one is the deed of trust that's in

12  question.  Below that is a sampling of genuine signatures for

13  Arturo Trevino that were provided to me, some of which were

14  written on documents in the normal course of business and

15  some of them, these last three signatures were signatures

16  that he wrote during his deposition at the request of the

17  attorneys.  And in this case, as in the Maria Trevino

18  signature case, the signatures in question, especially that

19  on the deed of trust, were very slowly and deliberately

20  written.  As I say, it's more pronounced on the deed of trust

21  than it is on the builder's and mechanic's lien.  But in

22  comparing these signatures to the genuine signatures of

23  Mr. Trevino I found, first, a difference in the writing

24  spontaneity and the writing quality.  That is, the

25  signatures, the known signatures were written with a lot of

1    speed, a lot of spontaneity, without hesitation.  You can see

2    a lot of times when he ends the signatures there's a very

3    rapidly written flourish here.  It goes over, presumably to

4    go over and kind of appear as an I dot on the name Trevino,

5    but there's this big flourish at the end and so there's a lot

6    of speed there.  And the questioned signatures you don't find

7    that level of speed.  But then also, if you look at them,

8    Mr. Trevino writes sometimes with a traditional cursive form

9    of the letter A in Arturo and sometimes with a printed form

10   of A.  We saw that with Ms. Trevino when she used the cursive

11   form of T but then one instance where she used a printed

12   form.  That's a very common sort of variation that a lot of

13   people will have in their signatures.  In the signatures in

14   question they are both with this cursive form, I mean, I'm

15   sorry, the hand-printed form, but you'll see typically when

16   Mr. Trevino has the printed form, the two letters are, the

17   sides of the letter A are essentially parallel to each other.

18   They -- or sometimes they are a little bit tented.  That is,

19   they are a little bit farther apart at the bottom than they

20   are at the top.  In this signature at the top -- oops, I hit

21   the wrong button on my pointer.  There you go.  It's wider at

22   the top than it is at the bottom.  And then also, if you look

23   at the name Arturo, the top signature doesn't have a crossbar

24   of the letter T.  That's not something that this writer

25   leaves off of his signature.  And in fact, when he writes the

Masson - Direct

 1  letter T, as can be seen -- I'm not getting my pointer to

 2  work -- as can be seen on the third signature down, he writes

 3  the word, the A-R-T, and then he crosses the T and goes over

 4  and makes the U from that.  So the sequence is he writes A-R-

 5  T, then he writes a crossbar and goes over to write the U.

 6  In this case -- so it's odd that someone would completely

 7  leave that T crossbar off because in fact that's part of the

 8  sequence of writing the name there.  And also, if you look at

 9  the signature, the letter T is somewhat different from the

10  way he makes his genuine letters T in the known signatures.

11  The name Trevino, in almost every case that we had a genuine

12  signature, you can understand as the name Trevino.  There's

13  an R-E-V-I and then sometimes the N-O are kind of slurred

14  together, but you can read it as the name Trevino.  In the

15  two questioned signatures you really can't.  You cannot make

16  out those letter designs.  Then we have another illustration

17  here of a signature, of the enlargement of the two signatures

18  in question, and you can see what I'm talking about on the

19  line quality.

20  Q    Let me show you, ma'am, what's been admitted as Exhibit

21  490 and -- is your pointer gone?

22  A    Let me see.  There it comes, okay.  Here, as I was

23  talking -- oh, I think I was putting it on the screen here --

24  as, you can see that this portion of the T is not nearly as

25  smooth as you find in the genuine signatures.  Also in the

1    crossbar of the T in the top signature, the same sort of

2    thing.  Look at the very blunt ending stroke of the name

3    Trevino where the pen stops and the ink actually spreads into

4    the paper fiber.  It has a very even line width, as well, in

5    the signature, and typically that's when there's even

6    pressure throughout the writing.  A normal writing pressure

7    for a natural, spontaneous signature is that when you're

8    going downward you write with heavier pressure, as you're

9    going upward it will be lighter pressure, and there will be a

10   real difference in the pressure with which you are writing.

11   Natural movement is that downward you're writing heavier and

12   upward you're writing lighter.  Here, if you look at this,

13   it's a very even pressure throughout the signature, very much

14   a slow, drawn signature, it's a very deliberate signature.

15   So, in my opinion, this signature is not natural writing,

16   it's not spontaneous, and it's an attempt by someone to try

17   to copy a signature of Mr. Trevino, it's not a genuine

18   signature of Mr. Trevino.

19   Q    And with respect to that opinion, what level of certainty

20   did you find with respect to that opinion?

21   A    It's a definite opinion.

22   Q    And explain again what the definite opinion is with

23   respect to the scale of certainty.

24   A    Well, the scale of certainty starts with no conclusion

25   and then goes -- which means I don't know -- then goes to the

Masson - Direct

1    level of indications which is a very low level of certitude,

2    then to the level of probable and then to highly probable and

3    then to definite.  Definite meaning I have no reservations or

4    qualifications to the opinion.  The opinion is that the

5    evidence absolutely is supported by the evidence in this case

6    that this signature is not by the same writer as the known

7    signatures.

8    Q   And the jury is going to get to hear, hear a little bit

9    later this afternoon from Larry Stewart, and do you know

10   Mr. Stewart?

11   A   I do, yes.

12   Q   And how do you know Mr. Stewart?

13   A   Well, I know him as an ink chemist.  I've met him at

14   meetings, talked to him about ink problems at meetings, and

15   so I've known him and talked to him at conferences for, you

16   know, quite some time.

17   Q   And did you get a chance to review his deposition?

18   A   I did.

19   Q   And his report?

20   A   Yes.

21   Q   And did Mr. Stewart find the same or similar variances

22   with, in the signatures found on the deed of trust and the

23   builder's and mechanic's lien that you did?

24   A   That was my interpretation of his report, that he did

25   find the same problems with the design of the signature and

Masson - Direct

1   the line quality.

2   Q    But he drew a different conclusion from those variances?

3   A    Yes.

4   Q    And with respect to the signatures of Arturo Trevino, do

5   you know what opinion Mr. Stewart gives with respect to those

6   signatures?

7   A    His report states that there are indications that the

8   signature is genuine, which is again the low level of

9   certitude, very close to an I don't know or no conclusion

10  answer.  But he essentially discounts the problems and just

11  says that there are indications it's genuine.

12  Q    And so if you have, if you arrive at an opinion based on

13  the level of certitude of indications, is that a situation

14  where your opinion is less than probable?

15  A    Absolutely, yes.

16  Q    So if you, Ms. Masson, were to come up with an opinion

17  based on indications, that would be an opinion that is not

18  more likely than not, correct?

19          MR. LOCHRIDGE:  Your Honor, I'm going to object to

20  counsel leading the witness.

21          MR. RUMLEY:  I'll restate it, Your Honor.

22  BY MR. RUMLEY:

23  Q    With respect to the level of certitude, indications is a

24  lower level of certainty than a more probable or more likely

25  than not?

1    A    In my interpretation of that level, yes, it does not meet

2    more likely than not.  It takes a level of probable to meet

3    that standard.

4    Q    Okay.  And with respect to your opinion on the signature

5    of Arturo Trevino, your opinion is based on a definite

6    opinion?

7    A    It is, yes.

8    Q    Okay.  And then with respect to Maria Trevino, the

9    signatures that appear on the builder's and mechanic's lien

10   contract and the deed of trust, do you know whether or not

11   Mr. Stewart also finds the same or similar variances between

12   the known signatures and the signatures found on those two

13   documents for her?

14   A    From reading the report that's what I understand, yes.

15   Q    And is it your understanding that he arrives at a

16   different conclusion?

17   A    Yes.

18   Q    And with respect to that conclusion, do you know whether

19   or not Mr. Stewart arrives at a definite opinion?

20   A    It's stated in his report as highly probable that the

21   signature is genuine.  He states that there is, that the

22   differences are within her range of variation which, frankly,

23   I disagree with.  It's not in anything I saw.

24   Q    All right.  Now, with respect to your work in this case,

25   you have submitted an invoice for your work?

1    A    Yes, sir.

2    Q    And do you know -- I'm not sure if 687 is in evidence.

3              MR. RUMLEY:  Your Honor, we would offer Exhibit 687.

4              MR. LOCHRIDGE:  We have no objection, Your Honor.

5              THE COURT:  687 is admitted.

6         (Defendant's Exhibit 687 admitted into evidence)

7    BY MR. RUMLEY:

8    Q    Ma'am, do you know what your total charges are with

9    respect to the work that you've done in this case?

10   A    Well, I bill at the rate of $200 an hour and, for actual

11   time involved in the case, and I think that the total will

12   come in around, somewhere around 10,000, probably.

13   Q    Okay.

14   A    Because of the number of hours.  I mean I've been deposed

15   twice and done all the examinations and two reports and a lot

16   of work, a lot of time.

17   Q    Okay.  So it looks like in Exhibit 687 that you have, you

18   charged about 6,000 and then up until today testifying, your

19   bill will be around $10,000?

20   A    That's what I believe, yes.

21   Q    Okay.  With respect to your opinions on the signatures of

22   Maria Trevino and Arturo Trevino to the deed of trust and the

23   builder's and mechanic's lien contract, are those opinions

24   based upon a reasonable degree of probability?

25   A    They are, yes.

Masson - Direct/Cross (by Lochridge)

1   Q    And in fact they are above a reasonable degree of

2   probability, correct?

3   A    Yes.

4   Q    And when you performed your work and you did your

5   analysis of the signatures in this case, did you use a

6   methodology that is well accepted within your field?

7   A    Absolutely, yes.

8   Q    All right.  Thank you, ma'am.

9            MR. RUMLEY:  I'll pass the witness.

10            THE COURT:  Thank you.  Mr. Lochridge?

11            MR. LOCHRIDGE:  Yes, Your Honor.

12            THE COURT:  You may continue when it's convenient.

13            MR. LOCHRIDGE:  Take me just a minute to load up

14   here, Your Honor.  May I proceed, Your Honor?

15            THE COURT:  Please.

16            MR. LOCHRIDGE:  Thank you.

17                          CROSS-EXAMINATION

18   BY MR. LOCHRIDGE:

19   Q    Ms. Masson, you've given two reports in this case, is

20   that correct?

21   A    Yes, sir, I have.

22   Q    All right.  And I think you've spent, because I went

23   through the invoices, a total of about 19 hours on this

24   project, does that sound about right?

25   A    I would think it's more than that.  I mean you've had me

1   in deposition more than ten hours, so I believe it's more

2   than that.

3   Q   Aw, don't blame me for all that.  I just visited with you

4   for about two or three hours, didn't I?

5   A   You did, yes, but you weren't the only one.

6   Q   Well, I guess at the time you arrived at your original,

7   that's what I was thinking, at the time that you arrived at

8   your original opinion you had spent about, oh, 15 or 16 hours

9   in the matter, is that correct?

10  A   I haven't reviewed my bill but my bill should reflect.

11  Q   Can we go to the Elmo, please?  It shows in July of 2010

12  you had prepared your, preparation of written report of

13  findings, and just doing the math there I total up about 17,

14  18, 19 hours.

15  A   Okay.

16  Q   All right.  So you had arrived at your, the bulk of your

17  opinions after having worked only 19 hours, right?

18  A   That was for the first report, yes.  That was before I

19  saw the original documents, of course.

20  Q   And then, and then we went and looked at the original

21  documents and revised your report, I think in almost every

22  case becoming more certain in whatever it is your opinions

23  had been before, correct?

24  A   I examined, the original documents were brought to me, to

25  my laboratory, and in I think at least one case I had an

Masson - Cross (by Lochridge)

1   inconclusive finding previously and when I saw the original I

2   had an opinion, but the rest of them I believe were

3   strengthened by examination of the original documents.

4   Q   Now, as I understand from your background you have, you

5   worked for about eight years individually with a mentor of

6   some kind, is that correct?

7   A   With Ms. Lacey, yes, sir.

8   Q   Ms. Lacey.  And then after that you went on, out on your

9   own as a handwriting expert for hire, correct?

10  A   As a questioned document examiner.

11  Q   Questioned document examiner for hire?

12  A   Yes, sir.

13  Q   Okay.  Have you ever worked for the FBI?

14  A   Not as an employee.

15  Q   Have you ever been employed by the Secret Service?

16  A   Not as an employee, no.

17  Q   All right.  You mentioned -- well, I'll get to that in a

18  minute.  Now, you've gone over two questioned documents, the

19  builder's and mechanic's lien and the deed of trust, but you

20  also reviewed three other documents for authenticity of the

21  signatures, didn't you?

22  A   I think they are listed in my report as Q23, 3, 4 and 5,

23  but one of them was several powers of attorney, so.

24  Q   Right.  And we'll get to those in just a minute.

25  A   Okay.

1    Q    But you didn't talk at all about three-fifths of your

2    report or a good part of your report which was to review the

3    signatures on a real estate lease, correct?

4    A    I examined that, yes, sir.

5    Q    Some powers of attorneys signed by Mr. Flores and

6    Mr. King, correct?

7    A    Either signed by or with their name, with their, with

8    their name written as signatures.

9    Q    With their written, name written in a signature form?

10   A    Yes, sir.

11   Q    And then also a property agreement?

12   A    I had, I believe, a photocopy of that.

13   Q    Right.

14   A    I never saw the original.

15   Q    Okay.  So there were three other documents.  And in each

16   case of the builder's and mechanic's lien contract, the deed

17   of trust, the real estate lease, the property agreement, and

18   the powers of attorneys, the supposed signators, Mr. King,

19   Mr. Flores and Mr. and Mrs. Trevino, had denied their

20   signatures completely, correct?  In each instance?

21   A    I think that they denied many of them.  I'm not, I don't

22   remember all the nuances of their testimony.

23   Q    Okay.  We can go through their depositions if you want,

24   but is it your recollection that they denied having signed

25   any of those documents and in fact in several instance said

1  they had never even seen them before?  Do you recall that?

2  A   I recall they said that in several instances, yes.

3  Q   Okay.  Now, you talked a little bit -- and we'll get to

4  that in just a minute.  You talked a little bit about

5  Mr. Stewart and then we looked at his report, and you read

6  his deposition and you looked at his report, and I think they

7  asked you this on your deposition, you concluded that he

8  followed the proper methodology, correct, in analyzing the

9  signatures?

10 A   Well, until it got to the assessment of the evidence, I

11 thought he did, yes.

12 Q   Yes, so his methodology -- you've got a disagreement on

13 the conclusions, but the methodology that Mr. Stewart

14 employed was the proper methodology for reviewing handwriting

15 exemplars and trying to learn of the genuineness of a

16 handwriting, of a signature, correct?

17 A   I don't believe I had a problem with methodology, that's

18 correct.

19 Q   Okay.  And we talked a little bit, you talked a little

20 bit with your, with counsel about scale.  I believe 242 is

21 it.  Can we put 242 on the screen, please?  This is a nine-

22 point scale handwriting opinion and this is -- and we'll talk

23 about how it's laid out here.  This is the same nine-point

24 scale that you were referring to, correct?

25 A   Yes, sir.

1   Q   And we show, the way this is set up is we show the

2   neutral area in the middle just like it were a scale, but no

3   conclusion or cannot determine, correct?

4   A   Yes, sir.

5   Q   All right.  And then it's depicted, if you're going to

6   the right-hand side you're going towards a positive

7   identification that the signature was written by the same

8   person that wrote the known signatures, correct?

9   A   Yes, that's what the scale shows.

10  Q   And as you go to the left it's going in the opposite

11  direction towards a positive, or elimination of someone as

12  the writer, correct?

13  A   Yes.

14  Q   All right.  And equidistant is you've got the

15  indications, which is a lesser degree of certainty than

16  probable, correct?

17  A   Yes, it is.

18  Q   And then over here highly probable, which after our

19  deposition I purposely put very close to the identification

20  or the positive identification, right?

21  A   That is correct, yes.

22  Q   And you're the one that taught me that.

23  A   I did, yes.

24  Q   There's really very little difference between the

25  conclusion for a handwriting expert that it's highly probable

1  someone wrote something as the definitely wrote something,

2  correct?

3  A   Highly probable is a very strong opinion.  I don't know

4  about there being very little difference but it's very close,

5  it is close.

6  Q   Yeah, I think, I forget exactly how you said it in your

7  deposition but it is right up next to the definite level of

8  certainty, correct?

9  A   Yes, I think Mr. Stewart describes it as almost certain

10 in his report and I would agree with that.

11 Q   You would agree with that, that it's almost certain?

12 A   Yes, I would, yes.

13 Q   So if you were to look at some signatures and come up

14 with a definite finding and he were to come up with a highly

15 probable, would you agree with me that that is very, very

16 close in agreeing with you and Mr. Stewart?

17 A   As long as they were on the same side of no conclusion, I

18 would.  That's --

19 Q   Yeah.  I suppose --

20 A   In this case that's not what happened, but --

21 Q   Well, but it is what happened with almost all the

22 documents you've looked at, isn't it?

23 A   Well, there was a critical, critical couple it didn't.

24 Q   Right.  Interesting point.  The other three documents

25 that you looked at, the lease agreement, the powers of

Masson - Cross (by Lochridge)

1    attorney, and I think there were three of them, and the

2    property agreement, you and Mr. Stewart lined up just almost

3    on top of one another, isn't that right?

4    A    On the -- was it the property, you called it property

5    agreement?

6    Q    Right.

7    A    I don't believe I ever reached an opinion about that one.

8    Q    Okay.  Well, let's look at the lease agreement then.

9    A    Okay.

10   Q    Will you pull up 96.023?  And do you need a copy of your

11   opinion in front of you or do you have all this pretty well

12   committed to memory?

13   A    I hope I have it committed.

14   Q    Okay.

15   A    I mean I hope I remember it.

16   Q    All right.  Let's draw up the signatures here at the top,

17   and let's look at Maria Trevino's.

18   A    Yes.

19   Q    All right.  Now, you came to the conclusion, I believe,

20   that that was definitely her opinion, right?  I mean her

21   signature.

22   A    I believe on the lease agreement I stated the opinions as

23   very probable.

24   Q    As highly probable.

25   A    Highly probable or very probable, yes.

Masson - Cross (by Lochridge)

1   Q   And Stewart said it was definite, correct?

2   A   I don't remember.  I don't have his report committed to

3   memory, so.

4   Q   Okay.  Let's go to 026.  Pull up Maria Trevino's

5   signature.  And this is one where you concluded it was highly

6   probable, correct?

7   A   I believe that's correct.

8   Q   Okay.  Let's go to 027.  Oh, let's, before we leave, see

9   that big looping part of the T?

10  A   Uh-huh.

11  Q   You saw that same kind of looping T on either the deed of

12  trust or the builder's and mechanic's lien, didn't you?

13  A   You saw the top but not the bottom.

14  Q   The top one.

15  A   But not the bottom.  The bottom was, on those two

16  documents was not like the bottom of that T.

17  Q   But you had that same looping T, and she made her Ts in

18  different ways, didn't she?

19  A   A couple of different ways, but she didn't have the

20  bottom like on those two documents.

21  Q   And one of the ways is the top part looping, as in this

22  real estate lease.  We find that also in the deed of trust,

23  correct?

24  A   The top part, yes.

25  Q   All right.

Masson - Cross (by Lochridge)

1   A   Not the bottom part.

2   Q   Let's go to 027.  Here is her signature which you found

3   to be at the very far highly probable that she wrote it.

4   It's got a good bit of variation from her other known

5   signatures, doesn't it?

6   A   Actually it's just the slant, the way it goes up off the

7   baseline is the only thing, which is, sometimes happens when

8   someone is in a writing position, you know, maybe leaning

9   over a desk and signing or something.

10  Q   But, in any case, you found that highly probable that she

11  signed that real estate lease?

12  A   That she did, yes, sir.

13  Q   Okay.  Let's go to 029 and bring up, there it is, the

14  fourth time, and here for the fourth time you arrived at the

15  conclusion that it was highly probable that that was her

16  signature, correct?

17  A   Yes, sir.

18  Q   And you know that at her deposition she's testified that

19  that's not her signature and she never had even seen the real

20  estate lease until her deposition.  Are you aware of that?

21  A   I think so.  I've read her deposition but it's been

22  several months.

23  Q   So then in your view, from looking at that, you don't

24  believe Ms. Trevino, do you?

25  A   I believe that it's very probable that she did sign those

Masson - Cross (by Lochridge)

1  signatures, yes.

2  Q   And it's very probable then she was not telling the truth

3  when she's asked that question in court and at deposition?

4  A   I can't say what she was thinking or what -- you know,

5  all I can talk about is signatures.  That's my area of

6  expertise.  It's not what people are thinking or what

7  they're --

8  Q   Well, without regard to what her intent was, you would

9  agree with me that you viewed as highly probable that she was

10  wrong when she testified under oath about the real estate

11  lease agreement?

12  A   That she as mistaken, yes.

13  Q   Now, let's look at Cesar Flores.

14  A   Okay.

15  Q   You've looked at some of his signatures on the lease

16  agreement.  Do you remember that?  Let's go, stick with 0, go

17  back to 023.  I don't know if you considered the printed,

18  sort of half-printed, half-cursive Cesar Flores.  Did you

19  consider that as one of the signatures you looked at?

20  A   No, sir.

21  Q   Okay.  Let's go to 023.  I mean 027.  There we go.  That

22  was his signature, right?

23  A   That's his signature, yes.

24  Q   Yeah, and you found that, once again on our scale, way

25  over by the far right, highly probable that that in fact was

1   his signature?

2   A   Yes.

3   Q   Okay.  Let's go to page 28.  We see his signature again.

4   And once again you concluded that it was highly probable that

5   that was his, that is his signature, correct?

6   A   Yes, that's not the same writer who wrote the questioned

7   signatures.

8   Q   And let's go to page 28, go to page 28.  That's 31 there.

9   Here we see his signature for the third time in this document

10  and once again you were virtually convinced that that was

11  written by him, correct, highly probable?

12  A   It's a highly probable opinion, yes, that that signature

13  was written by the same person who wrote the known signatures

14  of Cesar Flores.

15  Q   And you know that he, too, denied in this courtroom and

16  at his deposition that that was his signature, you're aware

17  of that?

18  A   My memory is that he did not believe it was, that's

19  correct.

20  Q   And denied ever even having seen the real estate lease

21  before his deposition, do you recall that?

22  A   I don't recall that one way or the other.

23          THE COURT:  I'm sorry, did you say real estate

24  lease?

25          MR. LOCHRIDGE:  Yes, real estate lease.

1          THE COURT:  Okay.  Thank you.

2          MR. LOCHRIDGE:  Real estate -- I may have slipped in

3  power of -- real estate lease is what I meant to be talking

4  about.

5          THE COURT:  You did, you said that, I'm sorry.

6          MR. LOCHRIDGE:  I'm sorry.

7  BY MR. LOCHRIDGE:

8  Q    Okay.  And you recall that Mr. Stewart agreed with you

9  that in fact it's highly probable that's Mr. Flores'

10  signature, right?

11  A    I don't remember what his level of certitude was, but I

12  know it was on that side of no conclusion.

13  Q    Okay.  And so the two of you both agreed that when

14  Mr. Flores was testifying in this court and on his deposition

15  that that is not his signature and that he had never seen the

16  document before, you think that's incorrect testimony,

17  correct?

18  A    I think he's mistaken.

19  Q    Yes.

20  A    Yes.

21  Q    He told something that wasn't true?

22  A    Well, you're -- I don't know how to answer that other

23  than to say I think the evidence in the handwriting is that

24  that is very probably his signature.

25  Q    Would indicate that what he said was not true?

Masson - Cross (by Lochridge)

1   A   Well, yes, that he was mistaken.

2   Q   All right.

3   A   Uh-huh.

4   Q   And he was mistaken on the power of attorney as well,

5   wasn't he, when he testified that he hadn't signed the power

6   of attorney.  Let's look at one, because -- page 33, 96.33,

7   pull up the Cesar Flores.  This is the first of three power

8   of attorneys that you looked at, correct?

9   A   I believe so.  That's --

10  Q   All right.

11  A   That's one of them.

12  Q   And this one I think you concluded that that was

13  definitely his signature.  You concluded that in your

14  supplemental?

15  A   I believe that's correct.  The supplemental report, yes.

16  Q   And once again, you recall he testified that he had never

17  even seen this power of attorney before?

18  A   I don't recall the nuances of whether he had never seen

19  it.  I remember that he didn't believe he had signed it.

20  Q   And you disagree with that, you believe that's incorrect

21  testimony?

22  A   I believe the evidence in the handwriting, which is what

23  I can testify about, is that that signature is by the same

24  person who wrote the genuine signatures.

25  Q   Who wrote the signatures that he does own up to it being

Masson - Cross (by Lochridge)

1  his own signatures?

2  A   Well, that were signatures written in the normal course

3  of business on other documents.

4  Q   By Mr. Flores?

5  A   Yes.

6  Q   What page is that?  Is that 35?  30?  Okay.  Let's look

7  at 96.035.  This is another power of attorney, comes from the

8  files of CMH Homes, that bears the purported signature of

9  Cesar Flores.  Do you see that?

10  A   I see the name, yes.

11  Q   And you concluded that it was highly probable that in

12  fact that is his signature, correct?  That it matched his

13  known writings?

14  A   I'm not sure whether that's the one that I never saw the

15  original of.  It is --

16  Q   Yes, you did not change your opinion at the supplemental,

17  in your supplemental report.  That comes from your original

18  report --

19  A   Okay.

20  Q   -- where you concluded that it's highly probable,

21  virtually definite, that that's his, Mr. Flores' signature,

22  correct?

23  A   I recall almost certain.

24  Q   Almost certain.

25  A   But if that's the one that I only saw the photocopy of

1    then, yes, that's correct.

2    Q    Right.  Because when you saw the photocopy you were able

3    to say that definitely was his signature, right, like you saw

4    in the one before?

5    A    When I saw the original.

6    Q    Yes.

7    A    Yes.

8    Q    When you saw the original

9    A    When I saw the original of that.

10   Q    And so once again he denied signing that under oath and

11   once again you think his testimony under oath is wrong,

12   correct?

13   A    I think it's mistaken, yes.

14   Q    And Mr., you recall Mr. Stewart agreed with you as to

15   Mr. Flores' signature, it being highly probable that in fact

16   that is his signature?

17   A    I don't remember his level of certitude.  I remember that

18   we were, we were on the same side of no conclusion regarding

19   the, most of the power of attorney signatures.

20   Q    All right.  Okay.  Let's go to Alvin King, and you

21   reviewed some documents that he had purportedly signed, he

22   had denied having signed, correct?  Some powers of attorney?

23   A    I don't have as good a memory of his deposition.  I don't

24   know whether I didn't read it as carefully or --

25   Q    Okay.

Masson - Cross (by Lochridge)

1   A    I know Mr. Flores and Trevinos, the Trevinos, I read more

2   carefully.

3   Q    All right.  Let's switch to the Elmo, please, just so

4   there's no mistake.  This is page 57 of his deposition.

5           THE COURT:  I'm sorry, has that been admitted?

6           MR. LOCHRIDGE:  No, this is, this is his deposition

7   testimony, Your Honor.

8           THE COURT:  I'm sorry, has that been admitted?  Do

9   you want to show it to the jury?

10          MR. LOCHRIDGE:  I have not, it has not been marked

11  as an exhibit.  I think we can just show it before the -- if

12  I could approach the witness or we could put it on this.

13          THE COURT:  I'll put on the closed.

14          MR. LOCHRIDGE:  Okay.

15  BY MR. LOCHRIDGE:

16  Q    Can you see that?

17  A    Yes, sir, I can.

18  Q    Do you see where I've got it highlighted?

19  A    Yes, I do.

20  Q    Do you see where he denies that the signature on what had

21  been marked Exhibit 115 is his?

22  A    Yes.  He says that they are not, that he did not sign

23  Exhibit 115.

24  Q    Okay.  Let's go, let's put 96.034 on the screen, please.

25  And here we have two of Alvin King's signatures, both of

Masson - Cross (by Lochridge)

1    which he denied under oath having signed, and your conclusion

2    upon looking at the known signatures is that in fact he

3    definitely did sign those, correct?

4    A    I believe that's correct.

5    Q    All right.  And you recall Mr. Stewart also concluded

6    that he definitely did sign those powers of attorneys that

7    are reflected at 96, page 34?

8    A    Again, I don't remember his level of certitude but I

9    believe we were on the same side of no conclusion.

10   Q    And you definitely believe Mr. King was telling something

11   that was untrue when he testified under oath saying he had

12   never seen that document before and it's not his signature?

13   A    Well, again, I believe the evidence is that he was

14   mistaken.

15   Q    All right.  Let's look at another power of attorney which

16   is 96, Exhibit 96, page 35.  Again, we've got another power

17   of attorney coming from the files from CMH Homes that appears

18   to bear Alvin King's signature, and you concluded that it was

19   in fact highly probable that he wrote that, that he signed

20   that power of attorney, correct?

21   A    I believe that's correct.

22   Q    And once again you would disagree with his denial under

23   oath that he never signed that power of attorney, correct?

24   A    Again, I think he's mistaken.

25   Q    Let's go to Arturo Trevino.  Let's go to Exhibit 96, page

1    23, the real estate lease again.  Here we've got Arturo

2    Trevino's signature, correct?

3    A    Yes, sir.

4    Q    With the A made not in the cursive way but in sort of

5    the, what would you call that, the --

6    A    Printed form.

7    Q    Printed form?

8    A    Yes, sir.

9    Q    Just a, this is a printed form A on the builder's and

10   mechanic's lien and the deed of trust?  It was a printed form

11   A, it wasn't a cursive A?

12   A    It was a printed form A, yes.

13   Q    All right.  And this Arturo Trevino bearing the printed

14   form A, you concluded that it was highly probable that he

15   signed it, correct?

16   A    Yes, sir.

17   Q    All right, let's go to page 26 of the real estate lease.

18   Here we've got Arturo Trevino.  Once again your conclusion,

19   highly probable that is in fact his signature, correct?

20   A    On the original, yes.

21   Q    All right.  And let's go to page 27.  Once again we see

22   Arturo Trevino's signature and once again you conclude the

23   same, highly, in your opinion highly probable that is in fact

24   his signature, correct?

25   A    Yes, sir.  Yes, sir.

Masson - Cross (by Lochridge)

1  Q   And if you could go to 194, page 52.  We have just

2  extracted the four signatures from the real estate lease, and

3  for all of those four signatures you concluded highly

4  probable that in fact he did sign it, right?

5  A   Yes.  It's very natural writing, speeding, you know,

6  spontaneity, a lot of spontaneity.

7  Q   Despite the fact that he testified under oath at least

8  twice that he did not sign it?

9  A   Well, I just think he's mistaken about those.

10  Q   As well as the others, correct?

11  A   Not all of the others.

12  Q   Just the deed of trust and the builder's and mechanic's

13  lien, right?

14  A   That's correct.

15  Q   He's telling the truth there but on all these, on the

16  real estate lease he, in your view, is mistaken?

17  A   Yes, sir.

18  Q   And all these documents we find in Clayton and CMH Homes

19  files, right?  Are you aware of that, that's where these came

20  from?

21  A   I believe it was an attorney from that side that brought

22  them to my lab, so I guess you have them.

23  Q   Okay.  Now, on these powers of attorney, there were a

24  couple of powers of attorney where you concluded definitely

25  that they were not written by, in Mr., in the case of

1    Mr. Flores, correct?

2    A    Yes, sir.

3    Q    Let's go to 96, page 34.  Let's turn it around.  Now, we

4    looked at this earlier on Alvin King's and you concluded that

5    you were either definite or highly probable that that was his

6    signature, right?

7    A    Yes, sir.

8    Q    But you were definite that that is not Cesar Flores'

9    signature on page, Exhibit 96.034, right?

10   A    Yes, I don't believe either one of those were, in my

11   opinion, authentic signatures of Mr. Flores.

12   Q    And once again Mr. Stewart agreed with you, correct?

13   A    Again, I don't remember his level of certitude but I

14   believe that we were on the same side of no conclusion.

15   Q    Okay.  And let's go to 96, page 33.  Okay, let's, we've

16   got 96.33.  Now, this is one where you were pretty well

17   convinced that Cesar Flores had signed, correct?

18   A    Yes.

19   Q    All right.  But you thought that probably Alvin King did

20   not?

21   A    That's correct.

22   Q    And I think Stewart had no conclusion as to Alvin King.

23   Do you recall that?

24   A    I think that's accurate.

25   Q    Okay.

Masson - Cross (by Lochridge)

1   A    I think so.

2   Q    Well, let's, going back to the other one where it's Cesar

3   Flores and it's misspelled, and you were definite that that

4   was not his signature, and I think Stewart was very close to

5   that, you are not telling this jury that those are forgeries,

6   are you?

7   A    Document examiners don't talk in terms of forgery, we

8   talk in terms of whether they are by the same writer as the

9   known signatures.

10  Q    In fact, you are not testifying that any of the, any of

11  the signatures you have reviewed are in fact forgeries,

12  correct?

13  A    That's a legal term.   I don't talk about that, I talk

14  about the genuineness of the signature.

15  Q    Is it correct that you are not here testifying that any

16  of these signatures you have reviewed are forgeries?

17  A    That's not a term I use, so that's correct.

18  Q    Okay.

19  A    At least I don't use it in reports and testifying.

20  Q    Because, for example, one might have permission to write

21  someone else's name, right?

22  A    I have permission to sign my husband's name --

23  Q    And we went over this --

24  A    -- to the backs of checks, so.

25  Q    We went over this at your deposition where sometimes you

Masson - Cross (by Lochridge)

1   write your, you endorse your husband's check on the -- and

2   cash it in your account, because you have his permission to

3   sign, right?

4   A   Yes.

5   Q   Okay.  And you don't know whether or not with regard to

6   Cesar Flores or Alvin King that they gave Clayton or CMH

7   Homes permission to sign certain documents that were used in

8   the titling of a motor home, you don't know anything about

9   that, do you?

10  A   I do not know anything about that, no.

11  Q   It very well could be that in the real estate, the retail

12  installment contract that Flores and King signed, they gave

13  Clayton or CMH Homes the right to sign their names to certain

14  documents used to title the motor home.  You don't know

15  anything about that?

16  A   I don't have any opinion about that.  I don't --

17  Q   Okay.

18  A   It's not my area of expertise.

19  Q   Now, you, in the work that you did, you did something

20  called an indentation analysis, you recall that?

21  A   Yes, sir.

22  Q   Now, you could spend time, some time about that, and you

23  wrote about that in your reports somewhat?

24  A   In the observation section, yes.

25  Q   But nothing that you found in the indentations indicated

Masson - Cross (by Lochridge)

1  to you one way or the other whether or not a particular

2  forgery signature was a legitimate signature or not, right?

3  It didn't inform your opinions as to whether or not any

4  particular signature was a signature of the purported writer?

5  A   It didn't provide me any information that would, that

6  would influence the opinion about the handwriting itself.

7  Q   Okay.  Now --

8  A   Or the authenticity of the handwriting.

9  Q   Okay.  The data, let's talk about what the data is that

10  you as a questioned document examiner uses.  Your data first,

11  I think, is to look at the known signatures, is that right?

12  A   Yes.

13  Q   And you want to gather together as many of the known

14  signatures as you can, to have as broad a database as you

15  can, in order to get an idea of how this person signs their

16  name, right?

17  A   Yes, yes.

18  Q   Okay.  Because we've seen that there's broad variation in

19  how people sign their names and you've admitted to that,

20  right?

21  A   There can be.  Some people will be very consistent

22  writers, others will have extreme variation.  In this case

23  there was sort of an average level of variation.

24  Q   All right.  But you were provided with some known

25  signatures that you decided not to review in your study,

Masson - Cross (by Lochridge)

1    correct?

2    A   There was one signature that apparently there was some

3    disagreement about, about whether it was authentic or not, so

4    I did not use that.

5    Q   There was -- let's talk about that.  There was a

6    signature on a warranty deed --

7    A   Yes.

8    Q   -- which was 96.116.  Go to 118, please, and just pull up

9    the two signatures.  Now, in this particular case, both

10   Mr. Trevino and Mrs. Trevino testified at their deposition

11   repeatedly that those were their signatures, right?

12   A   Yes, sir, I believe so.

13   Q   Okay.  Yet you used Maria Trevino's signature but you did

14   not use Arturo Trevino's signature, correct?

15   A   That's correct.

16   Q   All right.  You also didn't use his signature on some,

17   what we're calling court documents that were provided to you

18   during the course of your, prior to your deposition.  Do you

19   recall that?

20   A   There were some documents presented to me the night

21   before the deposition.

22   Q   Right.  And this was your first deposition taken in

23   August of this year, right?

24   A   That sounds right.

25   Q   Okay.  Could we go to 96.159, please?  While that's,

Masson - Cross (by Lochridge)

1    while they are pulling that document up, these were three

2    documents of Arturo Trevino's signature to some court records

3    that there was no question as to their authenticity, correct?

4    A    When the documents were presented to me there were more

5    than that, I believe, there were four or five, some of which

6    had a different name entirely, and so it was never made clear

7    to me whether any, whether they were acknowledged as

8    authentic or not.

9    Q    The three documents I'm referring to, and I can bring

10   them up in unredacted form but I think that counsel will

11   agree that they are authentic signatures, were court

12   documents that were given to you prior to your first

13   deposition, which was two months ago, but you did not use in

14   your analysis, right?

15   A    Again, for specific reasons, I did not go back and

16   re-examine them.

17   Q    Okay.  And you didn't talk to the lawyers that had hired

18   you to find out what the story is on these what appear to be

19   known signatures, right?

20   A    Well, again, they were in a group of more than the three,

21   I believe, and some of which had a different first name.

22   Q    I'm just talking about the three that had Arturo Trevino.

23   There was no doubt about their name.

24   A    Well, the night before the examination I was given a

25   group that was more than the three, and it was never

Masson - Cross (by Lochridge)

1    clarified to me whether, which of them were admitted to be

2    genuine, so I did not pursue it further than that.

3    Q    In the two months that you had between that and your

4    second deposition that I took, you made no effort to get back

5    in touch with Mr. Rumley to find out what's the story on

6    these Arturo Trevino signatures, correct?

7    A    I had no additional information, that's correct.

8    Q    So you didn't go back and try to find out, I need some

9    more information on these known signatures, you didn't go

10   back to Mr. Rumley or anyone else and say, Give me the true

11   scoop here, correct?

12   A    No, sir.  I don't believe they were ever discussed again.

13   Q    Well, I talked to you about them at your deposition in

14   August.

15   A    Well, until my deposition, yes.

16   Q    In October, where you said you hadn't considered them.

17   A    Right, that I had had no additional information about

18   them to that date.

19   Q    Okay.  And let's just look at them briefly.  We may see

20   them again later.  That's 159.  Look at 160.  And here we see

21   the A in the printed style with the crossbar similar to the A

22   we see on the builder's and mechanic's lien and the deed of

23   trust, correct?

24   A    It's the same printed form, yes.

25   Q    Right.  And there's some indication that it was written

Masson - Cross (by Lochridge)

1   slowly and deliberately, isn't there, in the A?

2   A   Not particularly.  I mean this is from a copy of a copy.

3   It's not on the original document as it was on the builder's

4   and mechanic's lien and the deed of trust.

5   Q   Well, you had concluded before you saw the originals of

6   the documents that we might have a non-authentic signature

7   because of slow and deliberate movement, right?

8   A   Because of that as well as differences in the design.

9   For instance, no crossbar on the T, you have a crossbar on

10  the T there.

11  Q   But on the question of slow and deliberate, you were

12  willing to reach an opinion that it's slow and deliberate and

13  therefore perhaps not authentic without seeing the original,

14  correct?

15  A   I reached a qualified opinion.

16  Q   Right.

17  A   And expressed my concern about seeing the original.

18  Q   And here we see in the A, we see indicia of slow and

19  deliberate writing, correct?

20  A   I don't know.

21  Q   But it doesn't matter now because you haven't considered

22  that in your analysis, correct?

23  A   I did not consider that particular signature, that's

24  correct.

25  Q   Okay.  And if you had, you might have thought, well,

1    there is some evidence out there of slow and deliberate

2    writing in the hand of Arturo Trevino, correct?

3    A    No.

4    Q    No.

5    A    Look at the ending.

6    Q    Now, while we're talking about slow and deliberate, when

7    you see this kind of writing that leads you to believe that

8    it's slow and deliberate, there are other potential causes

9    for that, aren't there?  For example, the writing surface

10   might give you the same indications?

11   A    Not typically of slow and deliberate, no.

12   Q    The mental condition of the person writing it, whether or

13   not they are tired, whether or not they are, they have been

14   drinking, whether or not they are on drugs, things like that,

15   those could play into the role of whether or not it appears

16   to be slow and deliberate, correct?

17   A    Well, as far as alcohol and drugs, those tend to be, tend

18   to cause a person to be, have a more slurred, more scrawled

19   signature and it can cause an abnormal signature, but they

20   don't tend to be more slow and deliberate, they tend to be

21   just scrawled out there and, if anything, written with more

22   abandon rather than with this slow, careful deliberation.

23   Q    But there are many reasons why someone might be writing

24   something slowly and deliberately, correct?  It's an

25   important document.  They want to do it right.

1  A   Well, they will tend to form letters more carefully

2  sometimes in a -- for instance, sometimes on a will you'll

3  see something where somebody writes their name where it's

4  really readable whereas on a, like a delivery ticket,

5  somebody brings a UPS package to your door, they just scrawl

6  out a signature that you can't even read, but that's not what

7  happened in this case.  I mean, actually, as we pointed out,

8  the Trevino was not even readable on two --

9  Q   Right.

10 A   -- on a couple of the signatures in question.

11 Q    Besides not reviewing these particular known exemplars,

12 you made no effort to go, what I would call, to the extrinsic

13 evidence in the case.  You know what the issues in this case

14 are, right?  You have been told that by the lawyers?

15 A   Not particularly.  I know, you know, that there's a lien

16 and a deed of trust and --

17 Q   You didn't look to see, to try to find out, for example,

18 that there was other evidence that in fact the Trevinos were

19 aware of the deed of trust and the builder's and mechanic's

20 lien, you made no attempt to uncover that or even to learn

21 it, right?

22 A   I'm a document examiner.

23 Q   Not your job.

24 A   I'm not an attorney or an investigator, I'm a document

25 examiner.  I examine handwriting, paper, ink, printing

1    processes.

2    Q    Now, one of the things that you said on your deposition

3    and you said here today, that what you found -- and let's, we

4    can pull that down from the screen.  I think in your

5    deposition you said that the signatures on the deed of trust

6    and the builder's and mechanic's lien, your words were, "were

7    remarkably similar to the known writings."  Do you recall

8    testifying to that?

9    A    They were remarkably similar to each other.  No, I don't

10   remember testifying that they were remarkably similar to the

11   known writing.  I said they were pictorially similar to the

12   known writing.

13   Q    I think I asked you about tracings.  Do you recall that?

14   A    Yes.

15   Q    Okay.  And you answered about tracings that you thought

16   they were close enough, the difference was so subtle, so

17   slight, that these might actually be tracings.  Do you recall

18   that?  Do you recall that?

19   A    What I was referring to, I'm not sure, maybe I didn't

20   communicate it correctly, but was they were, particularly

21   with the Maria Trevino signatures, similar to each other.  If

22   you put one on top of the other, those two signatures were

23   very similar, which made me wonder whether they could have

24   both been either simulations or tracings from a single model,

25   whether somebody had a single model they were trying to copy.

Masson - Cross (by Lochridge)

1   Q   Okay.  But I think that's the point is that with, in

2   connection especially with Maria's, that the, they were so

3   similar to another, other known signatures of Maria, that it

4   possibly could have been tracings, someone trying to trace

5   over a signature of Maria Trevino that they already had, but

6   you concluded that there was no actual evidence of tracing

7   but that they were in fact remarkably similar.  Do you recall

8   that?

9   A   They had, yeah, they had some of the same problems, like

10   that T was wrong on both of them in the same way, as if

11   somebody was copying one model.

12   Q   Do you recall saying in your deposition that, "They

13   certainly are, particularly with the Maria Trevino

14   signatures, are remarkably similar"?  Do you recall

15   testifying to that?

16   A   I don't recall testifying to that but I agree with it.

17   Q   Okay.

18   A   If that helps.

19   Q   And I think you said earlier, and I wrote it in my notes,

20   that it looked to you like it was an attempt to try to copy a

21   signature.

22   A   Yes, what we call a simulation.

23   Q   A simulation, okay.

24   A   But slowly drawn attempt to copy her.

25   Q   All right.  So what you saw in the deed of trust

1  signatures and the builder's and mechanic's lien signatures

2  was an attempt by someone, in your opinion, perhaps to try to

3  copy an existing signature of Maria Trevino or Arturo

4  Trevino, right?

5  A   Yes.

6  Q   Okay.

7  A   I'm not sure I didn't lose your train of thought through

8  the middle, though.

9  Q   Let me make sure -- this is important.

10  A   Okay.

11  Q   Let me make sure that I got your testimony.  I've written

12  it here a couple of times.  That you think it was an attempt

13  to try to copy their signatures, right?

14  A   I believe they are simulations, yes.

15  Q   Okay.  In order to copy someone's signature you've got to

16  have a signature to go by, correct?

17  A   Yes.

18  Q   Okay.  And were you given an example of a signature that

19  they might have gone by, whoever it is that wrote these,

20  signed these signatures?

21  A   Well, of course, in my opinion the lease was, very

22  probably had genuine signatures right there and --

23  Q   And they denied signing that.

24  A   Well, I understand they denied it, but I also understand

25  that they were in your client's possession.

1    Q    Uh-huh.

2    A    So.

3    Q    So, if you believe the Trevinos, if you believe the

4    Trevinos and the Floreses, they didn't sign that, they didn't

5    sign anything, right?  Right?  Isn't that what they testified

6    to, they didn't sign anything?

7    A    No, I don't think -- I mean Mr. Flores and Mr. King

8    testified that they did sign documents.

9    Q    They signed the retail installment contract.

10   A    Well, I don't remember what the specifics were but there

11   were documents that they signed.

12   Q    But they all, but Trevino, the two Trevinos denied

13   signing anything, denied ever even going to CMH Homes,

14   correct?

15   A    I don't remember whether they testified they didn't go

16   there.  I don't --

17   Q    Yeah.  Well, the jury, the jury heard that testimony.

18   A    Okay, I mean that's --

19   Q    But the only testimony you're aware is their clear

20   testimony that they denied signing the real estate lease or

21   any documents that you looked at, correct?

22   A    I don't remember that they acknowledged their signature

23   on any of the documents.  That's the best way I know to

24   express it.

25   Q    Okay.  Now, is it your testimony -- well, I, can we put

Masson - Cross (by Lochridge)

1  Exhibit 242 up on the screen, please?  When we're over here

2  on the right and you are identifying that someone definitely

3  did write the document, such as you've done several times

4  with regard to Flores and King, that's a specific

5  identification that, I know the person that wrote these known

6  signatures wrote that, right?

7  A   Have the same writing, the same writing.

8  Q   The same writing.  And when you say highly probable, it

9  is right up next to in your scale of credibility, correct?

10 A   Well, scale of certitude, yes.

11 Q   Of certitude.

12 A   Yes, sir.

13 Q   Okay.  But when you go to the left and you say, well,

14 there are some indications that you didn't, here she didn't

15 write what's there, probably did not write what's there, now

16 we get over there to highly probably didn't write.  Now, when

17 you say elimination or definitely did not write, are you

18 saying that of all the people in the whole wide world,

19 anybody could have written those signatures except Arturo or

20 Maria Trevino?  Is that your testimony?

21 A   I'm saying they did not write them.  That's my opinion,

22 yes.

23 Q   But it could be anyone else in the world, it's just not

24 them, is that your testimony?

25 A   It depends on the case.  In this case, because they're

Masson - Cross (by Lochridge)

1    simulations, I cannot tell you who wrote them.

2    Q    Okay.

3    A    If they are natural writing but just, you know, if

4    somebody takes one of my checks and goes and signs my name to

5    it but they don't know how I write, then I can probably tell

6    you not only that I didn't but, if I have writing of that

7    person, who did.  That's not the situation here, though.

8    Q    In your view it's a simulation?

9    A    Yes.

10   Q    And, but you are not here to tell this jury, in fact I

11   think you said on deposition you can't say that Mr. King or

12   Mr. Flores didn't simulate Mr. Trevino and Mrs. Trevino's

13   signature, can you?

14   A    I cannot tell you who wrote it.  I cannot --

15   Q    Okay.

16   A    Yeah, I cannot tell you who wrote them.

17   Q    If it is in fact a simulation and not written by

18   Mr. Trevino and Mrs. Trevino, you can't tell this jury who it

19   is that did it, can you?

20   A    That's correct.  I can tell you --

21   Q    And it may --

22   A    Go ahead.

23   Q    And it may very well have been someone who had permission

24   to write their name, correct?  Correct?

25   A    I can't agree with that.

1   Q   Well, wait a minute.  Why can't you agree with that?  Why

2   couldn't they -- why is it suddenly that someone with

3   permission isn't included in the group of people that could

4   have simulated it?

5   A   Well, they can be included in that group.

6   Q   Okay.

7   A   But I'm just -- your insinuation was that was probably

8   who did it, and if you have someone's permission to sign

9   something I don't think you're going to go through that real

10  careful simulation process.  That's --

11  Q   You might do that if you didn't have permission, is that

12  right?

13  A   I suspect you might.

14  Q   And, but then again, you might if you just simply wanted

15  to be able to tell somebody that's Mrs., that's my sister's

16  signature, and have that person believe it, you might want to

17  simulate it, correct?

18  A   Kind of like that's my mama's signature on that --

19  Q   Yes.

20  A   -- permission slip at school?

21  Q   Exactly, exactly.

22  A   I don't know.  I mean --

23  Q   But that, you --

24  A   Having never simulated my --

25  Q   It sounds like you've got experience in simulating

Masson - Cross (by Lochridge/by Gutierrez)

1   signatures.

2   A    I had mine simulated once, but.

3   Q    And you've been actually in the shoes that maybe someone

4   is standing in now, that they simulated a family member's

5   signature for their own purposes, correct?

6   A    And there was a price to pay, too.

7   Q    Yes, that is true, there is a price to pay.

8   A    There is a price to pay, yes.

9            MR. LOCHRIDGE:  And I have no further questions.

10           THE COURT:  Anyone else?

11           MR. B. GUTIERREZ:  Yes, yes, Your Honor.  May we

12   confer?

13           THE COURT:  Go ahead.

14       (Mr. Lochridge and Mr. B. Gutierrez conferring off

15        the record)

16                        CROSS-EXAMINATION

17   BY MR. B. GUTIERREZ:

18   Q    Before we get away from this discussion about

19   simulation --

20   A    Yes.

21   Q    You don't know, Ms. Masson, if a man by the name of Robin

22   Moore has testified that he did a lot of simulations of

23   someone else's signature, you don't know that?

24           MR. LOCHRIDGE:  Your Honor, I'm going to object to

25   this because Robin Moore was clear that he never signed any

1    customer's --

2              MR. B. GUTIERREZ:  I'm not talking about customers.

3              MR. LOCHRIDGE:  -- or landowner's signatures.

4              MR. B. GUTIERREZ:  I'm not talking about customers.

5              THE COURT:  All right.  Go ahead.

6    BY MR. B. GUTIERREZ:

7    Q   You don't know, do you, that there's a man that's

8    testified that he made a lot of simulations of someone else's

9    signature, you don't know that, right?

10   A   I read some of Mr. Moore's deposition.  I don't remember

11   the specifics of it, though.

12   Q   And you don't know that there is an individual that

13   they're going to call later this afternoon that will also

14   testify that he on many occasions did a simulation of someone

15   else's signature, specifically the signature of Benjamin

16   Joseph Frazier?  You don't know that, right?

17   A   I know that there are a lot of signatures out there by

18   different writers of Mr. Frazier's signature.

19             MR. B. GUTIERREZ:  I'm looking for Exhibit Number 5.

20   Those are the powers of attorney and they should be here.

21   There you go.

22   BY MR. B. GUTIERREZ:

23   Q   You mentioned, and I think you, in trying to answer

24   Mr. Lochridge's question concerning my client's testimony in

25   deposition and perhaps here in this trial concerning whether

1  or not they had signed particular documents, and I think you

2  used the word, well, you know, they're mistaken, I think you

3  used the word mistaken.

4  A    Yes.

5  Q    If Mr. Flores and Mr. King had testified that, number

6  one, they had never met an individual by the name of Benjamin

7  Frazier; if they had testified that when they went to the

8  closing there was three individuals there, himself, Mr. King,

9  Flores and the sales person, an individual by the name of

10  Lance, I think they identified him by the name of Lance and I

11  believe the record is going to indicate that his true name is

12  Christopher Lance Kimball, who I believe they are able to

13  call later today; if they testify, that is the only

14  individual that we dealt with, that is the only individual

15  that presented any documents to us to execute, to sign; could

16  that be an explanation why, when they were presented power of

17  attorneys, power of attorneys that show a notary block and a

18  notary signature of the man by the name of Benjamin Frazier,

19  could that be an explanation of why they could be mistaken or

20  why they said that's not my signature, or said I don't

21  remember seeing this document, could that be an explanation?

22         MR. LOCHRIDGE:  Objection, Your Honor, leading the

23  witness.

24         THE COURT:  Sustained.

25

1  BY MR. B. GUTIERREZ:

2  Q   Mr. Lochridge also asked you that if the, if the RIC, the

3  retail installment contract, in the fine print, in the fine

4  print of the document that Mr. Flores and Mr. King have

5  admitted to executing and signing, they gave the authority or

6  they gave the permission to anyone to sign their, their

7  signature on any document that that could mean, maybe be an

8  explanation for some of the variances in some of the

9  signatures?  Do you remember that question?

10  A   Sort of.

11  Q   Okay.  Of course, if that was in fact true, perhaps the

12  easiest thing would be for anyone from Vanderbilt to come

13  forward and say, Well, I signed this document with the

14  permission of Mr. Flores and Mr. King, right?

15          MR. LOCHRIDGE:  Your Honor, again, leading the

16  witness.  I object.

17          MR. B. GUTIERREZ:  Just asking what her opinion is.

18          THE COURT:  Sustained.

19          MR. LOCHRIDGE:  Thank you.

20     (Mr. B. Gutierrez and Mr. Rumley conferring off

21       the record)

22  BY MR. B. GUTIERREZ:

23  Q   Let me show you Exhibit Number 7.  What I'm going to try

24  to do, Ms. Masson, is I'm going to, I'm going to represent to

25  you -- this is, this is Exhibit Number 7.  This is the

1   builder's and mechanic's lien contract.  Let me just, let me

2   see if I can get this.

3           MR. LOCHRIDGE:  Here is this Exhibit 5 if you want

4   it.

5           MR. B. GUTIERREZ:  Could I have a moment first?

6       (Off the record discussion at counsel table)

7   BY MR. B. GUTIERREZ:

8   Q   I'm going to show you the documents that you testified

9   and wrote your report on, which was back to the deed of trust

10  which is Exhibit Number 6, and the builder's and mechanic's

11  lien contract which is Exhibit Number 7, and this is, these

12  are the documents, the two documents you opined that it was

13  your opinion that those were not the signatures of the, of

14  Maria Trevino and Arturo Trevino, is that correct?

15  A   Yes, sir.

16  Q   And then we have this document, there's, it's Exhibit

17  Number 5, and it shows one, two, it looks like it shows three

18  separate power of attorneys, okay?  There's that one, the

19  front, that's the first one, first page, and go to the second

20  page, we have two more power of attorneys, okay?

21  A   Okay.

22  Q   Now, I know that you were asked to look at the signatures

23  of the Trevinos, the signatures of Mr. Flores, the signatures

24  of Mr. King, but I now want you to just look, because

25  Mr. Lochridge was making a point about look at this and look

1    at this slant and look at this loop, and I just want you to

2    look at these notary blocks, and the jury will look at them,

3    I just want you to look at them.  And we go to the first

4    page, and the individual that is identified as the notary on

5    January 5th is a man by the name of Benjamin Frazier, right?

6    A    Yes, that's what the stamp shows.

7    Q    And now we look at the, and maybe I can just kind of do

8    it side-by-side, this is going back to the Number 7, Exhibit

9    Number 7, document's dated January the 7th, then we look at

10   the deed of trust, and just like Mr. Lochridge was trying to

11   point out different variances in the signature, I mean you

12   haven't been asked to give opinions about this but can you

13   see just by looking at the documents, there appear to be some

14   differences?

15          MR. LOCHRIDGE:  Your Honor, if she hasn't been asked

16   to give opinions on this in her report we're going to object,

17   and she hasn't.

18          THE COURT:  And she hasn't?

19          MR. LOCHRIDGE:  Has not.

20          THE COURT:  Mr. Gutierrez?

21          MR. B. GUTIERREZ:  I just was, it's cross-

22   examination, Your Honor, to the questions by Mr. Lochridge

23   concerning the comparisons of the Trevino signature and the

24   comparisons of the Arturo and Maria Trevino signature, Your

25   Honor, and just simple questioning, if there is --

```
1              THE COURT:  Sustained.

2              MR. LOCHRIDGE:  Thank you.

3              THE COURT:  Go ahead, please.

4    BY MR. B. GUTIERREZ:

5    Q   You know that all of these documents that you've looked

6    at were actually in the custody of Vanderbilt Mortgage and

7    Finance, that they were produced to us during this

8    litigation, you know that, right?

9    A   The originals were, yes.  Yes.  It's my understanding.

10   Q   Did you know that the individual that is identified in

11   those notary blocks that you just saw a few minutes ago, do

12   you know he's testified that someone forged his signatures on

13   this document?

14   A   From reading his dep- --

15             MR. LOCHRIDGE:  Your Honor, it goes beyond her

16   testimony in this court.

17             THE COURT:  Sustained.

18   BY MR. B. GUTIERREZ:

19   Q   If we had a, if we had a recording of the closing of the

20   transaction that we could listen to, we could certainly tell

21   who signed the power of attorney, true?

22             MR. LOCHRIDGE:  Your Honor, object.  Goes way beyond

23   her testimony.

24             THE COURT:  Sustained.

25             MR. B. GUTIERREZ:  That's all I have.  Thank you,
```

1   Your Honor.

2                     REDIRECT EXAMINATION

3   BY MR. RUMLEY:

4   Q    Ms. Masson, a few more questions.  Can you explain to the

5   jury, when you were talking about and Mr. Lochridge was

6   asking you about pictorial similarity, can you explain to the

7   jury what you were talking about and what you meant in your

8   deposition?

9   A    Yes.  Pictorial similarity is something that essentially

10  at first glance looks very similar.  For instance, as far as

11  handwriting goes, when you look at the handwriting of a lot

12  of young women they will do that what I call bubble writing,

13  that very round and styled writing with the little circle I

14  dots and the circle periods and that sort of thing.  Well,

15  when a document examiner -- or when a lay person looks at

16  that and they have writing of three or four young women who

17  all write that style of writing, they may think it's all by

18  one person.  What you have to do is get into the very subtle

19  features that will differentiate the writing of one person

20  from that of another person.  We also have that, sometimes

21  document examiners confront that when we have writing of

22  people of certain nationalities, like writers who first learn

23  to write, excuse me, Chinese may have a lot of similarity at

24  first glance when you look at their writing, but actually

25  when you get into the subtle details, the writing of

Masson - Redirect

1   different people can be differentiated by the set of

2   individual writing characteristics that define that person's

3   writing.  So that's what I'm talking about is pictorially,

4   like the writing of teenage girls, you may look at it and see

5   a lot of similarity just from your first glance, but that

6   does not necessarily mean anything about whether they are by

7   the same writer or not.

8   Q    And if we look at Exhibit 48, is this, is this what you

9   were referring to in your deposition as to being pictorially

10  similar?

11  A    Well, I'm saying that these are, at first blush they are

12  pictorially similar to the genuine signatures of Ms. Trevino.

13  You look at it and, first, it is the name Maria M. Trevino.

14  And I think I put that on there.  And if you take, for

15  instance, just the name Maria -- here we go.  Ah, it's

16  working.  There you go -- and compare it to just the name

17  Maria that she writes, it may look somewhat similar, but when

18  you get into the subtle writing features, the R is not

19  exactly like hers, there's, along this part here, this is not

20  a real smooth line, and you get into the subtle features of

21  the writing and you will find over and over differences.

22  Plus in this case the writing quality is so significant

23  because of the slow, slowly drawn characteristic of the

24  signature, of these two, these two signatures.

25  Q    Now, if, based on your training and your experience,

1   Ms. Masson, if someone has permission to sign someone else's

2   name, would you typically see a simulation of their, of that

3   person's signature?

4   A    In most cases you don't, or you see one that is just

5   closer to their own signature.

6   Q    And so typically if someone gives, your husband gives you

7   permission to sign his name, you would not typically, the

8   writer wouldn't typically try to simulate or copy that

9   signature, they would sign it.  Is that what you're saying?

10  A    Right.  Yes, not in this slowly drawn manner.  If your

11  spouse makes a printed, like in my case, say my spouse makes

12  a printed R, his first name being Ralph, and I typically

13  write a cursive one, I might make a printed R, but the rest

14  of it is going to my own natural writing.  I mean typically

15  I, when I sign a check with his name I write it in my own

16  handwriting.

17  Q    All right.  And we talked about this earlier but when you

18  look at the signatures of Maria Trevino on these two

19  documents, do you see evidence of it being slow and

20  deliberate?

21  A    In, in, on the builder's and mechanic's lien contract and

22  on the deed of trust, those are very slow, hesitant,

23  carefully drawn signatures.

24  Q    All right.  And based upon that, based upon those

25  features that you find in that, would you believe that more

1   likely than not that the person, whoever signed it did not

2   have that person's permission?

3            MR. LOCHRIDGE:  Objection, leading.

4            THE COURT:  Overruled.

5            THE WITNESS:  I don't make a, I don't make any

6   determination about permission.  That's beyond my area of

7   expertise.

8   BY MR. RUMLEY:

9   Q   Okay.  And during the -- when you prepared your first

10  report and you gave your deposition, you did look at a number

11  of notary or purported notary signatures of Benjamin Frazier,

12  right?

13  A   Yes, sir.

14  Q   You heard Mr. Lochridge mention just a little bit ago

15  that you never mentioned or referenced or looked at Benjamin

16  Frazier's and that's not true, is it?

17  A   It's not.

18           MR. LOCHRIDGE:  Well, it's also not what I said,

19  Your Honor.  He's misstating what I said.

20  BY MR. RUMLEY:

21  Q   I mean did you look at a number of deeds of trust and

22  mechanic's lien contracts to look at the purported signature

23  of Benjamin Frazier?

24  A   Yes, sir.

25  Q   And can you tell the jury, in looking at those documents,

1    what you found when looking at those purported signatures?

2    A    There were at least three different writing patterns and

3    maybe four different writing patterns.  There were at least

4    three and potentially four, at least four people writing that

5    name on various documents as notary.

6    Q    And did it appear, or did you do an analysis, analysis to

7    determine whether or not the individuals who were signing Ben

8    Frazier's names, whether or not they were trying to simulate

9    it or whether or not they were signing it?

10   A    I thought there was a loose effort made to make it look

11   like his signature, yes.

12   Q    When you were examining the original documents in this

13   case, did you find anything kind of out of the ordinary with

14   respect to those originals?

15   A    To the lien contract and the deed of trust?  Yes.

16   Q    For example, if we take the deed of trust, did you, when

17   you were examining -- well, let me back up.  The lawyers for

18   Clayton Homes actually came to your office and brought what

19   they told you to be the original documents for the deed of

20   trust?

21   A    That's correct.

22   Q    Can you tell the jury, when you looked at the original

23   documents, if there was anything, an anomaly in the original

24   that kind of stuck out in your mind, that made you wonder

25   whether or not this was truly the original?

1   A    Yes.

2   Q    And can you explain to the jury and --

3           MR. RUMLEY:  Your Honor, can I approach the witness

4   and hand her the original deed of trust?

5           MR. LOCHRIDGE:  Your Honor, we're going to object to

6   this.  There's not a word about any of this in her report,

7   there being some anomaly in the originals.

8           MR. RUMLEY:  It's discussed in the artifacts of her

9   report.  In fact, Mr. Lochridge asked her about it.

10          THE COURT:  Overruled.  Go ahead.

11          MR. RUMLEY:  May I present this to the witness?

12          THE COURT:  Yes.

13  BY MR. RUMLEY:

14  Q    One of the things, if you look at the original,

15  Ms. Masson, can you tell the jury whether or not the

16  handwriting, the non-preprinted form, if all of that is

17  original ink?

18  A    It is not.

19  Q    So what does that tell you?

20  A    Well, some of the writing on this document, for instance

21  the make, model and serial number of the, of the item being

22  purchased, some of the amounts is in, it's a toner, it's a

23  photocopy, and then some of it is original ink, so it was odd

24  that it was partly photocopied, part of the entries that

25  should have been original handwriting were actually

1   photocopies of handwriting and part of it was original ink.

2   Q   If you were to look at, if you look at that document, and

3   the jury is going to be able to take the original document

4   back, is all of the handwriting contained on the deed of

5   trust original handwriting, original ink?

6   A   No, it is not.

7   Q   Have you seen or has, have any of these lawyers or

8   Clayton Homes presented you with a true original deed of

9   trust with all --

10          THE COURT:  Could you get, please, sir, to the

11  podium.

12  BY MR. RUMLEY:

13  Q   -- with all ink or all original handwriting?

14  A   Not of the deed of trust, no.

15  Q   Is there anything else in the deed of trust, in the

16  original deed of trust, that stuck out in your mind as just

17  an anomaly of what you would believe to be an original

18  document?

19  A   Well, on the second page -- I processed this with the

20  electrostatic imaging to look for the indentations of writing

21  and I found indentations of writing, some of which is on the

22  first page of the deed, but originally -- there was, there

23  were indentations of a name where -- on the first page it

24  says that the undersigned, Maria M. Trevino, Arturo Trevino

25  are written here, but underneath it, it looked like it was

1    originally just Maria M. Trevino, not, the Arturo was not,

2    did not indent into there.  Now, the original writing from

3    this also does indent, as what's on here now.  But it was

4    just an odd, odd finding.

5    Q    Anything else on the document that you found as an

6    anomaly of an original document?

7    A    I don't remember anything else particularly, other than,

8    of course, the big key being the signatures.

9    Q    Let me hand you --

10             MR. RUMLEY:  Your Honor, may I approach the witness?

11             THE COURT:  Please.

12   BY MR. RUMLEY:

13   Q    The original --

14             THE COURT:  You can only question in front of the

15   microphone.

16   BY MR. RUMLEY:

17   Q    Hand you the original builder's and mechanic's lien

18   contract and the same questions, ma'am, is there anything,

19   when you inspected the original document that was provided by

20   Clayton Homes, is there anything that you found that led you

21   to believe that that is not actually an original document?

22   A    Well, again, you had some original writing on the front

23   and then some that's a photocopy image.  And, actually, I

24   think that the one that had the "and Arturo Trevino" may have

25   been the builder's and mechanic's lien contract, not the deed

Masson - Redirect

1    of trust, the one where it had not had the Arturo Trevino

2    into the second page.  Let me correct that.

3    Q   As far as the indentations that you found, did you find

4    any indentations of the purported signatures of Arturo

5    Trevino or Maria Trevino on any of the documents?

6    A   I did not, no.

7    Q   Did you find the notary name, printed name, and the

8    notary signature indented into any of the other pages of

9    either of those documents?

10   A   I believe they do indent into the first and second pages.

11   Q   And what does that tell you as a document examiner?

12   A   Well, that tells me that the notary page was on top of

13   the document when the notary signature and these names were

14   written.

15   Q   And when you look at that indentation, if the signatures

16   of Arturo Trevino or Maria Trevino were signed with that page

17   over the other ones, would you expect to see an indentation

18   of those signatures onto whatever pages were below?

19   A   Yes.

20   Q   And you did not find, in examining all the originals, any

21   indentations of their signatures?

22   A   That's correct.

23   Q   And so, does that allow you to conclude that whoever

24   signed the Trevinos' names did so without that page on top of

25   any of the other pages?

1    A    That it's unlikely it was on top of any of the other

2    pages when those signatures were put on there, yes.

3    Q    Okay.  As far as different ink, can you tell if there is

4    different color ink on the original documents?

5    A    Well, some of it is obviously blue and some is, is black,

6    I believe.  I'm not sure.  The signatures of the Trevinos

7    reacted similarly to all the tests that I could do, which are

8    non-destructive, non-chemical tests of the, of those two

9    signatures, but other than that I don't remember what I found

10   as far as the writing on the front.

11   Q    Okay.  As far as the printed names of Arturo Trevino and

12   Maria Trevino on those documents, were those indented into

13   any of the other pages?

14   A    From the first page?

15   Q    Yes, ma'am.

16   A    Yes, I believe they indented into the second page.

17   Q    How about with respect to the signature?

18   A    No, they did not indent.

19   Q    All right, ma'am.  That's all I have, thank you.

20           THE MARSHAL:  Your Honor, the jury would like a

21   break.

22           THE COURT:  Twenty minutes.  Would you please stand

23   for the jury.

24       (Jury exits at 3:03 p.m.)

25           THE COURT:  Anything to take up outside the presence

1    of the jury?  Did you want water up there?

2             THE WITNESS:  I'm fine, thank you.

3             THE COURT:  Okay.

4        (Recess at 3:03 until 3:24 p.m.)

5             THE COURT:  Are you-all ready?

6             MR. LOCHRIDGE:  Yes, Your Honor, we are.

7             MR. RUMLEY:  Yes, Your Honor.

8        (Jury enters at 3:24 p.m.)

9             THE COURT:  Thank you.  You may be seated.

10   Mr. Gutierrez, or Mr. Rumley, are you-all finished?

11            MR. RUMLEY:  I pass.

12            THE COURT:  Mr. Gutierrez?

13            MR. B. GUTIERREZ:  Yes, Your Honor.

14            THE COURT:  Mr. Lochridge?

15            MR. LOCHRIDGE:  Just a few more questions, Your

16   Honor.

17            THE COURT:  Sure.

18                         RECROSS-EXAMINATION

19   BY MR. LOCHRIDGE:

20   Q    Mrs. Masson, you have there in front of you the originals

21   of the deed of trust and the builder's and mechanic's lien?

22   A    Yes, sir.

23   Q    And you were talking about some indentations that you had

24   found.  I wasn't sure I followed all that.  But I think we

25   went over those indentations or at least generally at your

1   deposition, and my recollection is that you found

2   indentations but it didn't play any role whatsoever in your

3   opinion as to the authenticity of the signatures.  Is that

4   correct?

5   A   Yes, that's correct.

6   Q   You couldn't draw any conclusions from them, they were

7   just some indentations indicating when things may have been

8   signed and what was under it at the time, right?

9   A   Well, they were just indentations.  It didn't necessarily

10  indicate anything other than that they didn't match, they

11  didn't always match what was on the first page.  The

12  indentations into the second page were not always of the

13  information that was on the first page.

14  Q   Okay.  Meaning that the first page may have been signed

15  over something else at that time or over a hard surface and

16  not on top of the document at all?

17  A   Or that the first page, there had been a different first

18  page at some time.

19  Q   Okay.  And if you'd look at that, that brings me to the

20  next question.  You talked about there being different ink

21  and so forth there on the first page?

22  A   Yes.

23  Q   And does it appear as though that they had partially

24  filled it out and then made some mistakes and whited it out

25  and then put some different colored ink in there where the

1    numbers are?

2    A    Well, if they whited it out they did it, they photocopied

3    it and then rewrote over it, but there are several different

4    kinds of things in here so -- I don't know exactly what

5    happened.

6    Q    Okay.  Let me just, though, so that --

7            MR. LOCHRIDGE:  May I approach just to pick up the

8    document, Your Honor?

9            THE COURT:  Yes, sir.

10           MR. LOCHRIDGE:  Could we go on the Elmo?  Maybe we

11   are.  Okay.

12   BY MR. LOCHRIDGE:

13   Q    What I was trying to see here, where I've got my finger

14   here pointing to the $40,815 and so on, that appears to be in

15   original ink over what had been written in prior and then

16   copied, is that correct?

17   A    Yes, this part right in here is original blue ink and

18   this here, but there is some evidence that, that at least on

19   an earlier generation there was another amount written in

20   here, and I guess on the earlier copy it was whited out --

21   Q    Right.

22   A    -- and then it was copied and -- but then there's some

23   that's original ink.

24   Q    It's that last that I was trying to point out because it

25   got the numbers mixed up here with the 40,000 written out but

1   they forgot to change where it had been put in numeral form

2   and it appears they tried to fix that but hadn't completely

3   fixed it.

4   A    Or, I mean I'm not going to say what they were trying to

5   do, but the amounts don't agree, you're correct.

6   Q    Okay.  Now, the last thing I want to ask you about is --

7   if  you could put 96.30-, page 33, up on the screen, please?

8   All right.  And this is one where you concluded that the

9   Cesar Flores was definitely his signature, correct?

10  A    I don't remember if it was definite or highly probable

11  but it, but certainly a strong degree of certitude that it

12  was the --

13  Q    I think in your supplemental report you went from highly

14  probable to definite.

15  A    To definite, okay.

16  Q    Does that sound correct?

17  A    It could be.

18  Q    Okay.  And then on Alvin King I think you said probably

19  not, wasn't very strong but a probably not.

20  A    I said, I think it went from inconclusive to probably

21  not, is my memory.

22  Q    All right.  And did you draw any conclusion from the fact

23  that Cesar Flores' signature was, in your mind, definitely

24  his own but Mr. King's might not have been his, did you draw

25  any conclusions from that fact?  That you had a document with

1   one definitely signed by Mr. Flores and then one probably not

2   signed by the other?

3   A    All I can do is report on the handwriting.

4   Q    Okay.

5   A    That's all I, all I can do.

6   Q    All right.  And then we've got sort of the reverse on

7   page, Exhibit 96.34.  Did you turn it?  And I believe on this

8   one you said definite on both of them.  You said definitely

9   Alvin King signed it, correct?

10  A    I believe so.

11  Q    And I think is true on the other one.  And then

12  definitely Cesar Flores did not sign it, right?

13  A    That's my memory, yes.

14  Q    And do you draw any conclusions from the fact that you've

15  got definites for one and not the other on these

16  corresponding powers of attorney?

17  A    Yes, I draw the conclusion that Mr. King did sign it and

18  Mr. Flores did not.

19  Q    And vice-versa on the other?

20  A    Right, that's my conclusion.

21  Q    Okay.  But each one has an original signature of one of

22  the parties to the retail installment contract?

23  A    And a non-genuine signature of the other.

24          MR. LOCHRIDGE:  Nothing further, Your Honor.

25          THE COURT:  Thank you.  Anything further?

1          MR. RUMLEY:  Nothing further, Your Honor.

2          MR. B. GUTIERREZ:  Nothing further, Judge.

3          THE COURT:  Thank you, ma'am.  You may stand down.

4  Call your next witness.

5          MR. LOCHRIDGE:  Yes, Your Honor, we call Larry

6  Stewart.

7          THE COURT:  I thought it was Mr. --

8          MR. LOCHRIDGE:  Oh, I'm sorry.

9          THE COURT:  I thought it was -- it's his case.

10         MR. LOCHRIDGE:  I'm jumping way ahead of myself,

11 Your Honor.

12         THE COURT:  All right.

13         MR. LOCHRIDGE:  I apologize.

14         MR. RUMLEY:  Your Honor, however, we rest, so

15 Mr. Lochridge must have read my mind.

16         THE COURT:  Well, there you were right and didn't

17 even know it.

18         MR. LOCHRIDGE:  Every blind hog finds an acorn once

19 in a while.

20         MR. SOLTERO:  Your Honor, may we approach?

21         THE COURT:  Yes, thank you.

22     (Bench conference on the record)

23         THE COURT:  You have microphones.  This is you-all's

24 microphone here.

25         MR. SOLTERO:  Your Honor, actually, there --

1    THE COURT:  Isn't it incredible what we can do just

2  sitting here?

3    MR. RUMLEY:  You should see my briefs.

4    MR. SOLTERO:  Your Honor, there's actually two

5  motions.  One is Vanderbilt and CMH's Rule 50 motion for

6  judgment as a matter of law on all claims of the Trevinos, at

7  the close of the Trevinos' evidence, which we incorporate

8  right now fully by reference, and I'll hit some of the high

9  points.  The second one is Clayton Homes, Inc.'s Rule 50

10  motion for judgment as a matter of law on all of the claims

11  of the Trevinos at the close of the evidence by the Trevinos.

12  In other words one of just the Clayton Homes entity, which

13  there's been no evidence about anything they have done.  The

14  other one pertaining to Vanderbilt and CMH as well, which I'm

15  tendering to the Court, and also we're filing electronically

16  with a proposed order.

17    THE COURT:  I consider that you're electronic filing

18  even if it's not this minute, it's done contemporaneous with

19  your oral motion.

20    MR. SOLTERO:  Thank you very much.  May I briefly go

21  over these or --

22    THE COURT:  Yes.

23    MR. SOLTERO:  And I know that Your Honor likes to

24  read it.

25    THE COURT:  I would prefer it, but --

```
 1            MR. SOLTERO:  I just want to make sure I get this
 2   full record made.
 3            THE COURT:  What about your Clayton Homes, what
 4   about the Clayton Homes?
 5            MR. RUMLEY:  We've proved that up throughout their
 6   case and then their CHI overall with the documents that are
 7   in evidence.  All of the paid out departments say Clayton
 8   Homes, Inc.  The appraisal in this case says Clayton Homes,
 9   Inc.  All of the documents.
10            THE COURT:  Okay, go ahead.
11            MR. SOLTERO:  And, Your Honor, none of that has
12   anything to do with the claims that they have brought in this
13   case.  They charge fraud.  Let's start with first the common-
14   law fraud.  They never reviewed anything, never relied on
15   anything.  There's no actual or justifiable reliance of any
16   kind by the Trevinos.  There's -- we move for a directed
17   verdict on whether there's legally sufficient evidence of a
18   material misrepresentation, that there was any reliance, as I
19   just mentioned, that there was any damages that proximately
20   were caused or proximately caused by any alleged
21   misrepresentation.  As a matter of fact, there's been no
22   evidence of any damages.  Your Honor has already ruled as a
23   matter of law that there's no mental anguish damages.  So
24   they have no damages as far as their common-law fraud claims.
25   And we otherwise incorporate the motion in full on that
```

1   point.  As to civil conspiracy, Judge, companies that are

2   interrelated can't conspire with themselves normally.  In

3   addition --

4           THE COURT:  I didn't, I think, I thought they were

5   separate entities.  I get so confused.

6           MR. SOLTERO:  Well, they are separate entities but

7   they are related, and generally, parents generally --

8           THE COURT:  So what one -- does the other

9   incorporate?

10          MR. SOLTERO:  No, not exactly, Your Honor, it's just

11  that some --

12          THE COURT:  Well, let me tell you, it's going to

13  have to be three, if you're telling me these are three

14  separate entities, they can conspire with each other.  Now,

15  employees can't conspire, cannot inspire with their employer

16  corporation, but if these are employees of the other

17  corporation let me know about it.

18          MR. SOLTERO:  Well, the only employees, the only

19  company that employed anybody who filed any liens would be

20  CMH Homes, Inc., so none of the others had anything to do

21  with the filings of liens.

22          THE COURT:  Wasn't the person who signed on them, on

23  the releases, was an officer of two of these?

24          MR. SOLTERO:  Well, Your Honor, Your Honor has

25  granted summary judgment on the release of the claims if they

1    have anything arising with the October 2005 releases.

2            MR. RUMLEY:  Actually, I --

3            THE COURT:  I figure that there's still something

4    left.

5            MR. SOLTERO:  And so there's no basis, there's no

6    underlying tort for the civil conspiracy claim.

7            THE COURT:  Okay.

8            MR. SOLTERO:  There's no meeting of the minds, it's

9    been proved, no object to be accomplished, no unlawful

10   purpose or lawful purpose by unlawful means, no damages

11   because of proximate cause, and so they failed to present

12   legally sufficient evidentiary basis for a reasonable jury to

13   find that the defendants were aware of any harm or wrongful

14   conduct or a basis for a finding of conspiracy.  Similarly,

15   Your Honor, we move for a directed verdict under the Chapter

16   12 property code, fraudulent lien statute.  There's

17   insufficient, legally insufficient evidence for a jury to

18   find a violation of that under all three prongs.  They failed

19   to present legally sufficient evidence that the documents or

20   other records at issue were fraudulent liens, that the

21   defendants knew that the documents were the record for

22   fraudulent liens, particularly so with largely two defendants

23   who didn't have any agents involved with the filings of

24   liens.  The Trevinos failed to present a legally sufficient

25   evidentiary basis to conclude that there was a fraudulently

```
 1   filed.  And there's also insufficient basis to conclude that
 2   the Trevinos have suffered any kind of financial or other
 3   injury.  And there's no predicate for punitive damages under
 4   any other claims or causes of action, and there has certainly
 5   been no finding that would justify a submission on clear and
 6   convincing gross negligence, either one of the prongs for
 7   fraud or malice, so we would move for a directed verdict on
 8   all the punitive damage claims.  Similarly with any other
 9   claim for actual damages.  Your Honor, I would mention that
10   we also move for a directed verdict on the declaratory
11   judgment claims where they try to assert claims on behalf of
12   Flores and King that they can't because they don't have
13   standing to do.  And finally on statute of limitations,
14   unequivocally the only claims remaining involve, of the
15   Trevinos, involve liens from 2002.  Ms. Trevino filed suit in
16   2009, Mr. Trevino intervened in 2010.
17            THE COURT:  I think I've already gone there.
18            MR. SOLTERO:  And, Your Honor, we believe that the
19   discovery rule, that --
20            THE COURT:  I've already made a ruling on the
21   discovery rule.
22            MR. SOLTERO:  Yes, Your Honor, we, and we would --
23            THE COURT:  Move on.
24            MR. SOLTERO:  Well, we contend that it would not
25   apply and that they have not shown any evidence of reasonable
```

1    diligence.  So for all these reasons and within our motion,

2    Judge, we would move for a directed verdict.

3         THE COURT:  Well, I am the one with no reasonable

4    intelligence or --

5         MR. SOLTERO:  No, Your Honor, you are.  I'm trying

6    to make sure I'm making a proper record, and --

7         THE COURT:  I understand, but you've made it with

8    your filed documents.

9         MR. SOLTERO:  Yes, Your Honor.

10        MR. RUMLEY:  Your Honor, we would, on behalf of the

11   Trevinos we would move for a judgment as a matter of law on

12   1202.  We've proved all three elements by the defendants

13   themselves.  For example, Mr. Booth testified that the intent

14   behind the document is if the customer doesn't pay you're

15   going to take the land under the terms.  He questioned them,

16   "At the moment those documents are filed that is the intent,

17   is to make the Trevinos pay or risk losing their land,

18   correct?"  David Booth testified 1202 doesn't, doesn't

19   require that they actually file, but it's used the documents,

20   each of the three companies, Clayton companies used the

21   documents in some form or capacity.  There's no evidence that

22   these documents were properly notarized.  And so we believe

23   as a matter of law that the documents are fraudulently

24   notarized and we believe that the Court in the summary

25   judgment has already found --

1            THE COURT:  He's disagreeing with you.

2            MR. RUMLEY:  I can understand.  The Court already

3    found that our element number 2 was already proved as a

4    matter of law, but even in the event the Court doesn't find

5    that we put on --

6            THE COURT:  Well, I have given that thought, but.

7            MR. RUMLEY:  We put on sufficient evidence that they

8    filed the lien, I don't think there's any dispute that they

9    filed the lien in an effort to record their interest in the

10   land.  I don't think there's any dispute --

11           THE COURT:  He'd prefer the land that the jury would

12   (indiscernible).

13           MR. RUMLEY:  And so, and so that the issue, the only

14   issue was whether or not the document was fraudulent with

15   respect to the notary.  We believe that it's fraudulent as a

16   matter of law.  They have not put on any evidence that it was

17   properly notarized.  In order for a lien document to be filed

18   in the State of Texas it must be properly notarized.

19           THE COURT:  That's true, but it doesn't mean there

20   isn't a lien that could be enforced against the Trevinos if

21   their signatures are not forged.

22           MR. RUMLEY:  But if the testimony is is their

23   intent, the intent as to the defendant, we believe through

24   the testimony of Paul Nichols and David Booth that they both

25   expressed their intent in filing those and the purpose for

```
 1  those, and so we would move for a judgment as a matter of

 2  law.

 3           THE COURT:  Thank you.

 4           MR. SOLTERO:  We would just respond at that point,

 5  Your Honor, that that should be denied.  Some of the reasons

 6  Your Honor mentioned and in our motion -- in our motion for a

 7  judgment as a matter of law, and the evidence we presented,

 8  there were no fraudulent liens.

 9           THE COURT:  Thank you.

10           MR. SOLTERO:  Thank you.

11      (Bench conference ends)

12           THE COURT:  I'll carry those forward.  Thank you.

13  Now, you want to call a witness?

14           MR. LOCHRIDGE:  Yes, Your Honor.

15           THE COURT:  Thank you.

16           MR. LOCHRIDGE:  Mr. Larry Stewart.

17           THE CLERK:  Please come forward.

18            LARRY STEWART, PLAINTIFF'S WITNESS, SWORN

19           THE CLERK:  Thank you.  Please be seated.

20           THE COURT:  You may proceed, Mr. Lochridge.

21           MR. LOCHRIDGE:  Thank you, Your Honor.

22                      DIRECT EXAMINATION

23  BY MR. LOCHRIDGE:

24  Q    Would you introduce yourself to the jury, please,

25  Mr. Stewart?
```

Stewart - Direct

1    A    Yes, sir.  My name is Larry Stewart.

2    Q    Where do you live?

3    A    I live in Central California in a city called San Luis

4    Obispo.

5    Q    All right.  And what do you currently do for a living?

6    A    I run my own company.  I'm the chief forensic scientist

7    for Stewart Forensic Consultants, named after myself.

8    Q    Let's dig back into your background a little bit.  Where

9    were you born and raised?

10   A    I was born in Asheville, North Carolina.  I lived there

11   about 12 years.

12   Q    And where did you go to school?

13   A    You mean higher education?

14   Q    Yes.

15   A    I have three college-level degrees.  I have an associate

16   of arts degree from Florida Technological University, which

17   is in Orlando, Florida.  I have a bachelor of science in

18   forensic science degree from the University of Central

19   Florida, which is also in Orlando, Florida.  And then I have

20   a master's of forensic sciences degree from Antioch

21   University, which is in Yellow Springs, Ohio.

22   Q    All right.  I believe 287 is in.  I'm going to show it up

23   on the Elmo so that you won't have to remember all this.

24   This is your resume, so to speak?

25   A    Yes, sir.

1  Q   Okay.  And we've been through a little bit of your

2  education here, in particular a bachelor of science in

3  forensic science and a master of forensic science.  Can you

4  tell us in more detail what kind of education you had in the

5  forensic sciences?

6  A   Yes.  There's not a specific college-level degree for

7  most of the subject areas of forensic science.  There's

8  general degrees.  I got into the field when it wasn't

9  popular, it wasn't on television, it was just another,

10  another possible field and it was an alternate to chemistry

11  for me.  So I got my first degree, the bachelor of science

12  degree in forensic science, and that taught me how to use a

13  microscope properly, taught me the different scientific

14  equipment that could be used in solving crime.  And then I

15  continued with that with the master's degree and there just

16  got it at a higher level.  I had specific courses on

17  questioned documents and specific courses on aspects of

18  documents during that training as well.

19  Q   And in the courses on questioned documents did you get

20  into handwriting analysis?

21  A   Certainly.

22  Q   Is that part of being an expert in the questioned

23  documents field?

24  A   That is one segment of being an expert in questioned

25  documents, correct.

1    Q    Now, looking here at the very specialized courses that

2    you've had -- let me turn the page -- we see that you've had

3    ink and paper analysis seminar with the United States Air

4    Force?

5    A    Yes.

6    Q    What was that all about?

7    A    That's looking at a document to determine whether or not

8    the document is fraudulent or not.  Was the ink, did it exist

9    at the date the document is dated, is the paper altered, did

10   they do anything to create a fraudulent document.

11   Q    The next deals with high-pressure liquid -- I cannot get

12   that word.

13   A    The word is chromatography.

14   Q    Chromatography?  Okay.  Mass spectrometry.  Tell us what

15   you learned there.

16   A    That's a course of chromatography and mass spectrometry.

17   Chroma means color and tography is the science of, so it's

18   basically looking at the components in ink and paper and

19   documents to try to figure out, again, are they fraudulent or

20   not.

21   Q    Then the next one that I have highlighted is the

22   questioned document course for the United States Secret

23   Service.  Did that deal with the aspects of handwriting and

24   questioned documents?

25   A    Certainly, yes.

Stewart - Direct

1   Q    What about the next three that I've highlighted there,

2   names that I can't possibly pronounce, in June and September

3   and January of '86. '94 and 2000?

4   A    The first two there, the Fourier Transform Infrared

5   Spectroscopy Course and the Scanning Electron Microscopy

6   Course, are specialized courses on fancy microscopes.

7   Q    You could have just put fancy microscopes.

8   A    I could have, yes.

9   Q    All right.

10  A    The next one is the ASCLD lab inspector training course.

11  ASCLD stands for the American Society of Crime Laboratory

12  Directors.  That is an organization that I am a member of and

13  it is the organization that polices the forensic laboratories

14  around the country, and that particular training course

15  taught me how to go to those laboratories around the country

16  and decide whether or not they are using proper techniques

17  for doing things like questioned document analysis.

18  Q    And including handwriting analysis?

19  A    Yes, sir.

20  Q    All right.  Now, let's turn to your work experience.

21  We'll leave out being a lab tech at the University of Central

22  Florida and move to 1979, that's 30 years ago, you became a

23  forensic chemist with the Bureau of Alcohol, Tobacco and

24  Firearms?

25  A    Yes, sir.

1    Q    What were your responsibilities there in the area of

2    questioned documents?

3    A    That was a three-year period with the Bureau of Alcohol,

4    Tobacco and Firearms.  Part of the time was spent doing

5    chemistry in different areas of forensic science.  Part of

6    that was spent looking at document analysis and doing

7    chemistry on documents.

8    Q    Then in July of 1982 to June of 2005, looks like

9    basically most of your career, who were you with?

10   A    The United States Secret Service.

11   Q    And walk us through your progression through the United

12   States Secret Service insofar as it deals with forensic

13   science and handwriting, questioned documents issue?

14   A    Certainly my entire career there has dealt with forensic

15   analysis of documents.  It started as a counterfeit

16   specialist.  I was tasked with determining if a piece of

17   money was counterfeit or if an identity document was

18   counterfeit.  And that jurisdiction handles all of that for

19   the country, so any kind of false identity document or false

20   monetary document is part of the jurisdiction of the Secret

21   Service.  So I was tasked in becoming an expert in that and I

22   did that.  I expanded from that and developed a credit card

23   library for them so that we could actually look at

24   counterfeit credit cards and figure out who produced them and

25   how they were produced.  From there I became what's called

Stewart - Direct

1    the, a questioned document examiner.  So to do that with the

2    Secret Service I had to go through a two-year training

3    program with them.  They had a number of experts in the field

4    of questioned document analysis and I had the luxury of

5    training under some of the best in the world.  That two-year

6    training program yielded me with a certificate from them

7    certifying that I was an examiner of questioned documents,

8    which includes handwriting.

9    Q    Then it goes into the lead instrumental analysis section

10   and instrumental and computer analysis sections.  Tell us

11   what you did there in the area of questioned documents.

12   A    That was when I was becoming a supervisor and they placed

13   me in a portion of the questioned document branch that

14   handled the instrumental or chemistry analysis of documents,

15   and then later on it included documents that were created by

16   computer.

17   Q    Next, which I didn't highlight, senior document examiner,

18   national expert for the United States Secret Service.  What

19   was your role there with regard to questioned documents?

20   A    That was another senior role.  That was, there's only one

21   of those in the country, and that particular role had me

22   heading up a section of the questioned document laboratory

23   that dealt with document fraud when documents were created

24   using ink and paper.

25   Q    Okay.  Then you became chief of the questioned document

1  branch in the United States Secret Service?

2  A   Yes, sir.  There I was in charge of the entire questioned

3  document branch, so I was in charge of the handwriting

4  examiners, the people who use chemistry for the examinations,

5  and the people that use computers for the examinations.

6  Q   I'll skip to laboratory director, chief forensic

7  scientist for the United States Secret Service.  What did you

8  do in that role with regard to questioned documents?

9  A   Well, I was their chief forensic scientist.  I was the

10 head forensic scientist for the Secret Service.  In that role

11 I was also in charge of the questioned document branch.  I

12 had a reviewing capacity of all of the reports that went out,

13 all the technical aspects and the administrative aspects

14 within the branch, questioned document branch, and then I

15 also carried my own caseload, I also did cases still.

16 Q   And then going through, it looks like you've been an

17 instructor in various studies regarding questioned documents,

18 is that correct?

19 A   Yes, sir, I've been an instructor in many of the

20 different federal agencies in this country.  I've also

21 instructed for foreign agencies and many universities and

22 colleges.

23 Q   And it looks like you have spoken around the country on

24 issues involving questioned documents?

25 A   Yes, sir, around the country and around the world as

Stewart - Direct

1   well.

2   Q    Just picking them out randomly, at UCLA, the forensic

3   examination of financial and identity documents, the American

4   Society of Questioned Documents, examiner fees.

5   A    Yes, sir.

6   Q    Okay.  Now, looking at your certifications, I see that

7   you are certified with the Secret Service as an accredited

8   examiner of questioned documents, and what does that mean?

9   A    Well, that means I went through their two-year training

10  program and did all of their tests and went through and

11  examined cases and they determined that I was an examiner of

12  questioned documents and they certified me as such.  I have a

13  certificate on my wall that's got the number 2 on it, which

14  means I was the second person ever certified by them as an

15  examiner of questioned documents.

16  Q    And since that time to today have you been involved in

17  the examination of questioned documents including handwriting

18  analysis?

19  A    Yes, sir, I have.

20  Q    I see that you were elected to the board of directors,

21  the American Society of Crime Laboratory Directors?

22  A    Yes, sir.

23  Q    And certified forensic consultant for American College of

24  Forensic Examiners Institute.

25  A    That's correct.  That's the second certification that

1    required testing by an independent college to determine

2    whether or not I had the attributes necessary to be a

3    forensic consultant.

4    Q    I'm not going to go much further, but you were elected to

5    the board of directors for the American Board of Forensic

6    Examiners last year?

7    A    Yes, sir.

8    Q    All right.  Now, have you written in the area of

9    questioned documents?

10   A    Yes.  I've written and published numerous articles on

11   questioned documents and forensic science in general, and

12   I've published two books on the subject as well.

13   Q    All right, I'm not going to go through all those.  At the

14   bottom here the two books that you've written are "Identity

15   Theft" and "Document Examination."

16   A    Yes, sir.

17   Q    Now, have you testified over the years involving

18   questioned documents in some fairly notable cases?

19   A    Yes, sir, I believe I have.

20   Q    For example, the Jon Benet Ramsey case, did you testify

21   or were you involved in examining questioned documents in

22   that case?

23   A    I was involved in examining the kidnap letter in the

24   case, but I was brought into the case about a year after the

25   case started.  My laboratory was requested to do a

1   handwriting analysis and also anything we could on the kidnap

2   letter.  We produced reports and it ended up going to a grand

3   jury but there was no indictment.

4   Q    Okay.  I see where you worked on the Unabomber case.

5   A    Yes, sir.

6   Q    Can you tell us what the nature of the work you did there

7   as a questioned document examiner?

8   A    There were bombs that were sent by the Unabomber that

9   were not exploded, they didn't explode when the person

10  received them.  It was a Postal Service case at that point

11  because these bombs were sent through the Postal Service and

12  that made it a federal crime, so I was asked by the Postal

13  Service to examine some of these unexploded bombs as far as

14  the packaging material to try to figure out who the Unabomber

15  was.  In that case I was able to track it down to a specific

16  make and model of the machine that was used to make the label

17  on the return packaging, and that actual machine was found in

18  his shack when he was found.  He ended up pleading guilty so

19  there was no trial.

20  Q    I see that you worked on the John Wilkes Booth diary

21  matter.  Did that involve questioned documents?

22  A    Yes, it did.  The John Wilkes Booth diary was found a

23  number of years back but it was missing nine pages that were

24  around the time that was critical in the case, and so my

25  laboratory was brought into that case and we were asked to

1    look at the document as it existed now and try to figure out,

2    if we could, anything that was on those nine pages that may

3    figure out what happened during the time that Lincoln was

4    shot and Booth was found.

5    Q    And was that an indentation analysis type of job?

6    A    It involved that as well as other aspects, yes.

7    Q    Okay.  What about the Ivan the Terrible case, John

8    Demjanjuk?

9    A    John Demjanjuk was a person who was identified by people

10   as being known as Ivan the Terrible.  He had a trial in

11   America approximately 30 years ago, I believe, where he was

12   found guilty of that.  He was living in America after World

13   War II.  And that trial was overturned by the Israeli

14   government when he was tried there and so he was allowed back

15   into the U.S. government, or U.S. country, to live here.  The

16   Department of Justice then decided that they wanted to try

17   him again, so because of double jeopardy rules they couldn't

18   try him on the same, for the same reasons, so they tried him

19   based on his identity documents that he used to come into

20   this country back after World War II, and that's when I came

21   into the case.  I was asked to look at his identity

22   documents, determine if it truly belonged to him and had been

23   altered or changed in any way.  My agency did the examination

24   of the document, the identity document for purposes of the

25   ink, the paper, the handwriting, staple holes, a photograph

1  that was on it, all different aspects of the document were

2  examined.  The case, he was found guilty and then he was sent

3  to Germany where he's going under trial now.  And I was asked

4  by the Department of Justice from this country as well as the

5  German federal government to go and attend that trial and

6  testify as an expert, which I did this past June.

7  Q   And were you in charge of the handwriting and ink and

8  paper analysis that went into that particular case?

9  A   It was all done under my direction, yes.

10  Q   I'm not going to go -- you also were involved in the

11  Martin Luther King and Kennedy assassination re-

12  investigation?

13  A   Yes, I was.

14  Q   The Martha Stewart case?

15  A   Yes, sir.

16  Q   The 9/11 terrorist attack case, the D.C. sniper

17  investigation, those are all investigations that you played a

18  role in, is that correct?

19  A   Yes.

20  Q   Some of these while you were with the Secret Service and

21  some after you had left?

22  A   That's correct.

23  Q   All right.  Now, let's go to this case.  Before we do

24  that, what are the types of instruments -- and you were here

25  for Mrs. Masson's testimony, weren't you?

242

Stewart - Direct

1  A   Yes, I was.

2  Q   You were sitting back in the back.  She described some of

3  the equipment that she had in her laboratory.  What kind of

4  equipment do you have access to, either in your laboratory or

5  at the university, to do handwriting and questioned documents

6  work?

7  A   I have access to the same equipment that she spoke of.

8  In the field sometimes you have a different brand name but it

9  does the same function.  And then I have access to many other

10 types of instruments that can sometimes be used in document

11 analysis through the university.  I am a part-time teacher at

12 the Cal Poly, which is California Polytechnic University, in

13 the city that I live in, and there I teach forensic science

14 for them, and as part of that I get access to their

15 equipment, so I can use some of the more expensive equipment

16 that it would not be possible for someone in private practice

17 to own without spending a half million or a million dollars

18 for it.  I get access to that through the university.

19 Q   Now, in this particular case, what were you asked to do?

20 A   I was originally asked to review the work that was done

21 by Ms. Masson and to look at a number of questioned

22 documents, documents that one side or another in the case

23 weren't sure if they were truly signed by an individual, so I

24 was asked to look at those documents in addition to examine

25 the work done by Ms. Masson.

1  Q   And could you just tell the jury what the general

2  methodology is when you as a handwriting expert is assigned

3  the task of trying to authenticate various signatures?  What

4  is the protocol?

5  A   Well, you can't really believe anybody in a case, so you

6  have to kind of start from a point of neutrality, and that's

7  the way I always conduct my examinations.  I don't know who

8  is telling the truth and who is not, so I start with not

9  knowing and I look for evidence that sways me one direction

10 or not.  To do that I use known documents, in other words,

11 documents where somebody has admitted that they signed, as a

12 comparison tool.  So you put all of those together that you

13 can, all of the known documents that you find together, and

14 you look at how the person writes, what is their method of

15 writing, how varied is their writing, how closely do they

16 write each time or how much different do they write each

17 time, and you make notes of all that, and then you bring in

18 the questioned writing and you decide does this questioned

19 writing fall inside these known writings or is it outside and

20 I don't know what's going on.  So that's how I handled this

21 case.

22 Q   And you saw the demonstrative that we had on the nine-

23 point scale of handwriting opinions?

24 A   Yes, I did.

25 Q   All right.

1           MR. LOCHRIDGE:  Could you pull up 288?  We're going

2    to do it on the Elmo here, I think.  Just a second.

3    There may be some question, Your Honor.  We would offer

4    Exhibit 288.  I don't think that there's an objection.

5           MR. RUMLEY:  No objection.

6           THE COURT:  It's been admitted.  Oh, no, I'm sorry.

7    288?

8           MR. LOCHRIDGE:  Yes, Your Honor.

9           THE COURT:  It's admitted.

10      (Plaintiff's Exhibit 288 admitted into evidence)

11          MR. LOCHRIDGE:  Thank you.

12   BY MR. LOCHRIDGE:

13   Q   This is pretty much the same thing we were looking at

14   with Ms. Masson, we've just put some colors on it.  And could

15   you just give us a thumbnail sketch of what the nine-point

16   scale means to you as a handwriting expert?

17   A   Yes, sir.  If you look at the middle of that scale you'll

18   see the no conclusion.  That's where I start.  I start with

19   not knowing who wrote something and who didn't write it when

20   it comes to the questioned examination.  I then look for

21   evidence that takes me either to the left or the right of

22   that middle, and that evidence comes from a number of

23   different sources.  You look for the uniqueness of the

24   writing.  In other words, we're all taught as, since we speak

25   English we're taught in grammar school how to write the

1  capital A and how to write a lower case A and then all of the

2  characters, and in those first few formative years we're

3  actually taught to copy those letters off of a board and

4  we're graded on how well we copy them.  It's not until after

5  that that we start developing uniqueness in our writing, and

6  uniqueness in our writing comes from our maturity as an

7  individual, our education, how much writing we do, and all of

8  those things go into making individual characteristics in

9  writing that can be identifiable.  You have to be very

10  careful in it, though, because there's a lot of things that

11  has to go into making a good handwriting opinion.  There's a

12  lot of inconsistencies in handwriting opinions out there and

13  that degree of carefulness is very important.  If you look at

14  this nine-point scale, to the left and the right of no

15  conclusion you have indications, either did or did not write

16  something.  As Ms. Masson indicated, that is, that is an

17  opinion that means that we found something that indicates to

18  us they either did or didn't write it, there's some

19  characteristic there that means that to us.  I disagree with

20  one aspect of what I heard in that I believe it does mean

21  more likely than not.  She said that it did not.  But it

22  certainly has to mean that.  You're finding something that

23  indicates to you that either the person did or did not write

24  it, so it has to be more likely than not.  From there you go

25  to probably did write or probably did not write, and although

1    handwriting examiners are notorious for not wanting to put

2    percentages on things, that means quite a bit more likely

3    than not, or that it's quite a bit more likely or quite a bit

4    more likely than not that the person did write it.  And when

5    you get to the highly probable rating, that is typically

6    referred to as virtually certain, so you're up there almost

7    positive but not quite that the person either did or did not

8    write the signature or the writing.  And then you're left at

9    the very ends with an identification or definitely did or

10   definitely did not write.

11   Q    Now, you heard Mrs. Masson talk about not having

12   considered several known writings of Mr. Trevino in her

13   testimony.  Is that consistent with the proper methodology of

14   a handwriting expert?

15   A    In my opinion, no, it's not something that I would have

16   allowed in my laboratory.  It's, you not only look at

17   everything you're provided but many times you ask for

18   additional information if there's not enough there.

19   Q    Now, I want to go through some of Maria Trevino's writing

20   but I want to do this in some detail to show kind of each

21   step of what you do, because you have, you've spent a lot of

22   time on this project, haven't you?

23   A    Many, many hours on this case, yes.

24   Q    I think you were hired in the summer and do you, we've

25   got your invoices here somewhere but do you have an idea of

1   how many hours you've spent studying these signatures?

2   A   I was hired in June and I believe I've worked

3   consistently on an average of about a week and a half every

4   month since then.

5   Q   And we can do the math on that but it's over a hundred

6   hours that you've worked on this case analyzing these, this

7   handwriting?

8   A   That's correct.

9   Q   Okay.  Well, let's, I want to try to go through it

10  crisply as we can because we've got a lot to cover.  Let's go

11  to 194.24.  First of all, before we do that, or as we do

12  that, you have --

13          MR. LOCHRIDGE:  May I approach, Your Honor?

14          THE COURT:  Yes, sir.

15  BY MR. LOCHRIDGE:

16  Q   Okay.  I've given you a copy of Exhibit 194, and is that

17  a notebook that you put together?

18  A   Yes, sir, it is.

19  Q   All right.  And is it a series of demonstratives where

20  you lifted the signatures out of various documents that have

21  been presented to the jury in this case?

22  A   Yes, it is.

23  Q   Okay.  And if we'll, we're at 24, and what I'd like for

24  you to do is just, I want to learn how you do your job.  And

25  we've got here four different exemplars, you see that?

1    A    Five, but yes.

2    Q    Okay, five.  Now, let's make sure we know, and we won't

3    do this with each one, but the first one is called K-9.  Now,

4    that means known 9, is that right?

5    A    Yes, sir.  When I did my examination I took these boxes

6    full of known documents after I'd gone through them all, and

7    known meaning that the signatures were not in question, the

8    person admitted that they signed it, so I put those and I

9    gave them numbers all starting with K for known.  So I don't

10   have them all depicted on these forms but you're looking at

11   the first one there is K-9, that's one of them that I looked

12   at.

13   Q    And the jury will have another notebook that you prepared

14   which is Exhibit 96 that will have all of these, it will have

15   the questioned documents in it, and those go by Q-1 through

16   5, is that right?

17   A    Yes, sir.

18   Q    And then it'll have, the jury will have the known

19   documents which go, I think K-1 through K-30 or thereabouts,

20   right?

21   A    Yes, sir.

22   Q    Okay.  Now, can you, we'll just do this once or twice,

23   can you go to 96.90, please?  In fact you could do it in a

24   split screen if possible.  All right.  So when the jury gets

25   back there, 96.90, which is K-9, which is the driver's

1   license for Maria Trevino?

2   A   That's correct.

3   Q   Okay.  Now, can we get the split screen up here to 24,

4   194.24?  All right.  And so we see the driver's license and

5   the signature is now carried over for this page here, right?

6   A   Yes, sir, I did a high resolution scan and then

7   transferred it to the other page.

8   Q   Okay.  Now, tell us, this isn't just a Xerox copy, this

9   is more than that, is that right?

10  A   No, sir, I want the best quality image possible so I scan

11  it in at the best resolution scan that I can do and then I

12  put that into a computer without having the computer do any

13  manipulation of the data.

14  Q   Okay.  All right.  Let's just go ahead and go, leave 24

15  up there and, for example, and I'll just do this once or

16  twice, K-12 is Exhibit 96.100, pull that up here, and go to

17  page 103 and pull up Maria's now.  All right.  So I'm just

18  trying to track, so the jury can track when they get back to

19  the jury room with these notebooks where you're coming up

20  with these signatures and if they're from known signatures

21  that no one is arguing about, okay?

22  A   That's correct.

23  Q   All right.  Now, let's just leave 24 up and the rest take

24  off.  Okay.  Now, once you begin to gather your known

25  signatures, what's the next step that you take?

Stewart - Direct

1   A   Well, to make it easy for me, since you saw these on

2   different documents and sometimes they are very small and

3   hard to see, I scan them in like we spoke of and I put them

4   in my computer and then I bring them out and put them on

5   pages like you see here.  I am careful to try to make them

6   all the same size, or approximately the same size, so that

7   you're looking at apples to apples, if you will.  So those,

8   some of those have been enlarged, some of them have been made

9   smaller, to try to make them appear to be the same size

10  relationship on that document.

11  Q   Let's put K-25 up here next to these.  Which is 194.25,

12  I'm sorry.  Okay.  I want to take you through what you taught

13  me is your, the next step in your program is once you've got

14  some of these exemplars you then begin to study them, and

15  that's what we see in 25, we see a bunch of arrows and lines.

16  Can you tell the jury what you're doing here as you're

17  studying these documents?

18  A   I'm drawing attention to different features in the

19  writing.  Now, these are the known documents, again.  These

20  are documents that were admitted to have been written by

21  Ms. Trevino.  And so, assuming she's telling the truth, this

22  is the expanse of the way that she writes.  So we go through

23  them and look at her signatures and we look at how varied

24  they are, how close they are or how much difference there are

25  between them, and there you can start seeing some of the

1  things that I'm pointing out, different ways of making the

2  characters and the letters, different heights, different

3  beginning strokes.  I've got arrows pointing to some.  I've

4  got straight lines where I'm talking about angles or how far

5  something is off of the line, for instance.  And I'm

6  beginning to make notes, if you will, of my observations.

7  Q   And that's what these blue arrows are, you're pointing

8  out, you're doing your, this is your work product saying this

9  is an interesting swirl at the end of the O, a little bit

10  different on the K-12 versus what's on the K-9.  You're

11  beginning now to fill up your databank, is that correct?

12  A   That's right, and that databank is based on how different

13  this writing is from how we were taught in grade school to

14  write.  You know, how much difference is there in that

15  capital M of Maria compared to how we were taught to write a

16  capital M in block writing and cursive writing in school.

17  Q   Okay.  And this takes us through several of the

18  documents.  Let's pull up 194.27.  All right.  This is

19  referring to known documents 10, 11 and 25, which the jury

20  will see K-10 is a warranty deed dated April of '05, K-11 is

21  a warranty deed, and K-25 are answers that Ms. Trevino signed

22  to what's called interrogatories in this lawsuit.

23  A   That's correct.

24  Q   Okay.  So let's just go back and just point out to the

25  jury again the significance of the line going up from left to

1   right, headed northward on K-10.  What are you showing us

2   here?

3   A   That blue line that's at the top going from the first

4   capital M over the to the capital T of Trevino, what I'm

5   showing there is a habit that this writer has, doesn't mean

6   they always do it but it's a habit that they have where they

7   start writing small and it gets bigger and bigger by the time

8   they get to the capital T.  You will see that habit quite

9   often with this writer where the beginning word is low and

10  then it gets bigger as it goes along.  The capital M in Maria

11  is smaller than the capital M in the middle initial and

12  that's smaller than the capital T in Trevino.  So that's what

13  that line represents.  The line to the left of Maria that

14  goes vertical by the capital M is showing the height

15  relationship of that letter.  It's also showing that that

16  letter goes down below the baseline.  Now, the baseline is

17  the line that's on the document that you are supposed to

18  write your signature on.  So one of her habits in this case

19  is that she writes her capital M and part of that sometimes

20  goes below the baseline.  You'll see that that changes when

21  she gets to the next letter, the A, that's on top of the

22  baseline.  And those are just some of the things that I'm

23  pointing out.  The arrow that's below the capital T in

24  Trevino is pointing to the loop and how that letter is

25  formed.  And then there's another arrow above the V in

 1  Trevino that's showing how that letter almost looks like a U
 2  as opposed to how we were taught to write a V.
 3  Q   All right.  Let's go to 194, page 29.  But before we
 4  leave there -- you've left there?  That's fine.  Here you've
 5  picked some more known writings.  K-13 are some miscellaneous
 6  documents that have been produced in the litigation.  I think
 7  K-15 -- okay, let's stop, roll back up K-14.  You've kind of,
 8  here this, you know, what about this A here that's open at
 9  the top and swirling towards the initial M for her middle
10  name?
11  A   That is a habit that Maria sometimes has.  Ms. Masson
12  reported that she didn't see that broken A at the top, but if
13  you look at that document, K-14, you see it, and if you look
14  at, I believe K-13 has it.  There's just a number of known
15  documents that do have those features and if you look at
16  enough of the known documents you will start to see them.
17  Q   Okay.  Let's call up 194.47.  Okay.  And 194.47, what do
18  we have on that page?
19  A   Well, now, that's different now.  Now we're looking at a
20  questioned signature.  That's a signature that the sides on
21  the case can't agree on.  In this particular case our task
22  was to determine whether or not that signature was in fact
23  written by Maria Trevino or somebody else.  So after I'm done
24  examining all of the known signatures of Maria, I then have
25  highlighted the features that I think are important on them.

Stewart - Direct

1    Then I bring out the questioned document, in this case the

2    builder and mechanic's lien document, and I'm looking at that

3    signature now for the first time, and I'm looking to see does

4    it have those features or does it have different features.

5    If it does have those features, how many of them does it

6    have, are the letters spaced the same way, is the slant the

7    same way, how were these signatures formed, and do those

8    signatures that are questioned fall within the range of

9    variation of this writer.  So you take everything she's

10   admitted to and you say, okay, this is the range of variation

11   of the writer, this is how she writes, does this questioned

12   signature fall within that or is it outside of it.  So when I

13   start putting the blue arrows on the questioned signature

14   like you have there, that indicates something that I found

15   that is in agreement, it is consistent with something I found

16   in her known writings.  If it was different I would have it

17   as a red marking.  So blue means it's consistent, if it's got

18   a red marking that's something that I found that's different

19   that I have to then look to see if I can explain or not.

20   Q    Okay.  Let's bring up Q-2, please, on the same page.

21   Okay, here's the deed of trust, and you're showing the same

22   angularity with the writing, the --

23   A    I'm showing, I'm showing that it starts low with the

24   capital M in Maria, it gets a little bit higher with the

25   middle initial Maria, and then it gets higher with the T in

1  Trevino.  That's the same characteristic that I showed in

2  much of her known writings.  If you go back to the beginning

3  one, the Q-1 that you have there, you'll see I have the same

4  line at the top showing the tendency to go from small to

5  large, but then I have a number of arrows there, too, showing

6  some of the other features such as the beginning stroke of

7  that first M and the break between the I and A in Maria, and

8  then the break between the T and the rest of the word in

9  Trevino.  Those were all consistent with what I found in her

10  known writings.

11  Q   Okay.  Let's go to 194.49.  And before we leave let's

12  have a full view of this 194.47.  Where it's got Q-1, Q-2,

13  that's the builder's and mechanic's lien, the deed of trust

14  and the property owner's agreement, and in each one of those

15  you are pointing out to the jury some of the things that you

16  have found in her known writings, is that right?

17  A   That's correct.  You look at the writing and you see if

18  it has the features that are found in the known writings and

19  that's what I have marked with the blue.

20  Q   Okay.  Now let's go to 194.49, please.  These are the

21  four signatures that you found of Maria Trevino on the real

22  estate lease agreement, right?

23  A   That's correct.

24  Q   And this is one where you and Mrs. Masson basically

25  agreed, is that correct?

1          THE WITNESS:  Your Honor, may I pull out my sheet

2    that has the agreements and disagreements between us two?

3          THE COURT:  Anybody object?

4          MR. RUMLEY:  Sorry?

5          THE COURT:  Anybody object?

6          MR. RUMLEY:  No, Judge.

7          THE COURT:  I'm sorry?

8          MR. RUMLEY:  I don't have any objection.

9          THE COURT:  I can't hear you.

10          MR. RUMLEY:  I don't have any objection.

11          THE COURT:  Yes, sir.

12          THE WITNESS:  Thank you, Your Honor.  Your question

13    about that again, please?

14    BY MR. LOCHRIDGE:

15    Q    Yes.  Did you and Mrs. Masson agree on Maria Trevino's

16    signatures on the real estate lease agreement?

17    A    Substantially yes, we were right in the same range, we

18    were both right around an identification or a definitely did

19    write.

20    Q    All right.  And you, your agreement, I mean your

21    conclusion was definite and hers was highly probable, right

22    next to definite, is that correct?

23    A    I believe so, yes.

24    Q    Okay.  And again, you're pointing out in blue all the

25    similarities that caused you to reach this conclusion, is

Stewart - Direct

1   that correct?

2   A    That's correct.

3   Q    You've got the beginning of the M, the length of the T in

4   Trevino, just pointing out the ones -- let's go to the next

5   one, the next one.  Could you tell us what you are pointing

6   out there?  This would be the third signature on the real

7   estate lease.

8   A    Yes.  This is again a questioned signature on the real

9   estate lease where the two sides are arguing about who wrote

10  it, and the arrows there I'm showing are showing features in

11  that writing that I found were consistent with writing that

12  she admitted to writing, or it was known to have been written

13  by her, such as the way that that capital M in Maria is made,

14  the break in Trevino before the V in Trevino, and then the

15  width of the ending stroke of Trevino.  I found those to be

16  consistent with some of her known writings.

17  Q    All right.  Let's go to 194.59.  And let's put it up as a

18  single exhibit, please.  Now, what are you doing here in

19  194.59?

20  A    Well, there I put them on the same page, not only for me

21  to be able to see it but to show the Court as well.  I put

22  the questioned signature at the top, in this case the

23  questioned signature from the builder and mechanic's lien for

24  Maria Trevino, and then below that I put a number of the

25  known signatures, not all of them, but I put known signatures

1    that had these features that I was looking to see if it were

2    in her writing.  So in this case I've got four of the known

3    signatures shown there.  I could show you many more.  I've

4    got four on there because that's what fits on the page.  And

5    we can go through and look at the blue arrows on the

6    questioned writing at the top and we can go down to at least

7    one of those four signatures below it and find that that

8    habit is within that person's writing style that's found

9    within their known writing.  There you're showing the

10   questioned signature at the top and you're showing K-10 below

11   that, or known writing 10, and if you look at the break in

12   the capital -- or break in the lower case A of Maria, you'll

13   see that in the second lower case A in Maria on the known

14   document there's a break in that A, so it's within that

15   writer's ability and habit to do that.  To say that they

16   don't close that A is incorrect.  There's also an arrow at

17   the end of Trevino where I'm showing the big loop at the end.

18   That is also found in that questioned signature, a big loop

19   at the end.

20   Q   Let's go to the next known.

21   A   There we have known document K-13 and I'm showing the

22   break between the capital M in Maria and the A, it's not a

23   continuous line, it breaks there.  Well, it does the same

24   thing in the questioned signature above it.  And if you bring

25   it down slightly you'll see there's a loop at the top of the

Stewart - Direct

1    T in Trevino, it almost looks like a capital L, and you find

2    that in the questioned signature there as well.

3    Q    Okay.  Let's go to the next, K-15.

4    A    There we've got known document K-15 and in that case the

5    V for Trevino almost looks like a U or, as Ms. Masson

6    described it, as a C.  You can't really make out the letters

7    but you can certainly see that letter.  And that is similar

8    to what you're seeing up above it where the V in Trevino

9    looks almost like a C or a U.

10   Q    Let's go to K-25.

11   A    There you're looking at the beginning of the capital M in

12   Maria and how that stroke is made.  It starts as like a

13   little loop from below and then comes up.  And it's very

14   similar to what's found in that questioned signature.

15   Q    All right.  Now, as a result of your having reviewed all

16   of her known signatures, not just some of them but all the

17   ones that you had, against the questioned document builder's

18   mechanic's lien contract, what opinion did you arrive at as

19   to whether or not you thought that was an authentic signature

20   of Ms. Trevino?

21   A    I reached the highly probable opinion that she did write

22   it.  There were a couple of little things that I couldn't

23   explain and so that's why I wasn't definite, but I said

24   highly probable that she did write it.

25   Q    And do you deal in percentages when you talk about that?

1    A    They train us not to.

2    Q    Okay.  All right.  Let's go to 194, page 61.  This is the

3    builder's -- this should be the deed of trust.  All right.

4    Did you do the same analysis here?

5    A    Yes, that's the deed of trust and I did that analysis the

6    same way.

7    Q    All right.  You pointed out on the questioned signature

8    in blue arrows items that you can find in the known

9    signatures?

10   A    Yes.  There you are looking at the questioned deed of

11   trust signature for Maria Trevino against the K-9 signature,

12   which I believe was her driver's license.  You'll see that

13   she has a habit of sometimes dotting her I in Maria, and you

14   see that in both cases.

15   Q    Sometimes she does, sometimes she doesn't?

16   A    Correct.

17   Q    Let's go to the next exemplar, K-10.

18   A    This is another way that she's signed her name in the

19   past, and here you have a number of the same features that

20   are found in the questioned writing.  In the questioned

21   writing on the deed of trust, the first A in Maria is closed

22   at the top, the second A is not closed.  You've got the same

23   characteristic on K-10, first A is closed at the top, second

24   A is not closed.  And you've got the capital M, which is the

25   middle initial for Maria, off of the baseline, it is up high

1    off of the baseline, much higher than the baseline is.

2    You've got that there as well.  And then in the word Trevino

3    you have a break after the V, between that and the I, which

4    you also have in the questioned writing.  You, at the end of

5    Trevino after the V, it's very difficult to see what letters

6    are there in this case.  You can't make out an I, an N, and

7    an O.  You have kind of like a series of U's or M's there.

8    And that is consistent with what you find up above it in the

9    questioned writing.  And then the big loop at the end, you've

10   got that as well.  You also have the other characteristics.

11   I'm not pointing them all out to you here but you have the

12   characteristic of starting low and going high between the

13   capital M of Maria, middle initial, and then the capital T in

14   Trevino.

15   Q   Let's bring up K-11.  Pointing out the loop at the top of

16   the T --

17   A   Yes.

18   Q   -- and comparing that to the loop in the top of the T of

19   Trevino on both handwritings?

20   A   Correct, it almost looks like an L.

21   Q   All right.  And let's look at K-15 now.

22   A   K-15 is showing how sometimes when she makes her letter V

23   for Trevino it looks like a C with that curve at the top, as

24   an example of one of her known documents where she is known

25   to be the author of where she does it that way.

1  Q   Now, after having reviewed this, and again, you just

2  didn't look at these, you looked at all the known signatures

3  for Maria, did you come to an opinion one way or the other

4  about the likelihood that Maria Trevino in fact signed the

5  deed of trust?

6  A   Yes, I said it's highly probable that she did sign the

7  deed of trust, just like the builder's and mechanic's lien

8  form, and that is an opinion that means I'm virtually

9  certain.   There's some feature in it that I wasn't able to

10 answer.   I couldn't find every feature but I found enough of

11 them to make me feel virtually certain that it's the same

12 writer.

13 Q   Now, do you have any explanation for why you've got

14 Mrs. Masson over here saying in this case definite and you

15 over here saying virtually definite, virtually sure?   How

16 could you be so far apart?

17 A   It's two reasons.   First off, handwriting analysis is not

18 an exact science.   This isn't chemistry, this isn't DNA

19 analysis.   This is people that are trained to look at

20 handwriting and decide if, of everybody in the world, is this

21 the writer that wrote this document, and if you imagine doing

22 that that's pretty difficult.   There's a lot of people in

23 this world.   In the case we have here, we have a couple of

24 things that differ between my examination and Ms. Masson's.

25 I appear to have looked at a lot of known documents that were

1  written by these people and admitted to by them, either

2  through course of business or by their own admission that

3  they wrote, and I found the characteristics that I consider

4  to be individual between these writings and the questioned

5  writings, so I placed weight on that.  She did not find those

6  consistencies, she did not look at all the known writings,

7  and then she placed a lot of importance on what she called

8  slow and deliberate writing.  Now, I'm trained that you're

9  very careful in using the word deliberate.  Deliberate kind

10 of implies that somebody was deliberately trying to falsify

11 this thing.  I agree that there are elements of this

12 signature that appear to be slowly written.  I agree that

13 there are elements of it that look like it has tremor or it

14 has bumpiness in it.  What I was trained to do is then figure

15 out what caused that, is there an explanation that makes

16 sense or do we jump all the way over to forgery.  I don't

17 jump to forgery because I see a lot of explanation here of

18 possibilities.  It could have been on a rough surface, it

19 could have been that the person was standing up, it could

20 have been that they were nervous, that they had caffeine that

21 day, maybe they were a drug user, I don't know, but there are

22 enough explanations that made me realize that that aspect of

23 it wasn't as important as the numerous points of

24 identification that are consistent.  If I tried to duplicate

25 somebody else's signature, unless I traced it, it wouldn't be

Stewart - Direct

1   that close.

2   Q    Now --

3   A    And there's no evidence here of tracing.

4   Q    She, I think, testified that she found that the documents

5   were strikingly similar, or something along those lines, with

6   some of the known writing, yet she still found contrary to

7   what you did on the basis of the slow and deliberate.  How

8   can the slow and deliberate account for such close similarity

9   in both of your minds between the two, the questioned and the

10  known, account for a definite opinion that it can't possibly

11  be Maria Trevino?

12  A    In my opinion it can't, you can't go that far.  Even if

13  Ms. Masson thought that there was a lot of weight applied to

14  the tremor or the slower what she called deliberate writing,

15  to jump to the leap that no one in the world could have

16  written this except somebody other than Maria Trevino I think

17  is way too far.

18  Q    Now, I want to go through some of the others but because

19  of the hour I want to go through it in summary fashion, all

20  right?  I want to turn to Mr. Flores.  And, first of all,

21  before we get into them, did you go through the same rigorous

22  protocol with his signatures as you did with Mrs. Trevino?

23  A    Yes, I did.

24  Q    And did you look at all of his known writings that you

25  had and compare them to one another, find the variances and

1  then look for the similarities and the questions?

2  A   Yes, I did.

3  Q   All right.  And these will be in the two exhibits for the

4  jury to look at but I want to go to the conclusion page, and

5  let's go to 194.41.  These are Mr. Flores' signatures on the

6  real estate lease, correct?

7  A   Correct.

8  Q   And you're pointing out all the similarities, and I'm not

9  going to belabor this because as I recall you and Mrs. Masson

10  both agreed that it was highly probable that in fact Cesar

11  Flores did sign the real estate lease?

12  A   That's correct.

13  Q   And that's in your, you've done the comparison, double-

14  checked that?

15  A   That's correct.

16  Q   Okay.  And you heard her testimony to that effect, right?

17  A   Yes, I did.

18  Q   Okay.  Let's go to 194.45.  Okay.  These are the powers

19  of attorney, correct?

20  A   That's correct.

21  Q   And there were three of them, right?

22  A   Yes.

23  Q   All right.  The first one has Cesar Flores' name, and I

24  believe you came up with the conclusion that he definitely

25  did sign the power of attorney that's part of Q-5?

1   A    That's correct.

2   Q    All right.  Let's throw 96, let's have a split screen and

3   put 96.033 to the left.  Or to the right, here to the side.

4   Okay.  So that's the power of attorney, that's 96, Exhibit

5   96.33, and you came up with a definite conclusion that Cesar

6   Flores, despite his testimony, in fact did sign that

7   document?

8   A    Correct.

9   Q    And Mrs. Masson agreed with you, correct?

10  A    Yes.

11  Q    Okay.  Now let's go to 90-, over to the side, 96.035, on

12  the right-hand side.  And this is another Cesar Flores on

13  another power of attorney and I think you concluded that it

14  was definite, is that correct?

15  A    I believe that is the number three power of attorney and

16  my conclusion was the same as Ms. Masson, which is highly

17  probably that he did sign it.

18  Q    Okay, highly probable.  Okay.  Now let's look at the

19  96.034, the other power of attorney.  Now, this is one where

20  you concluded that it was highly probable that he did not

21  sign it, correct?

22  A    That's correct.

23  Q    And are the red arrows pointing out the differences that

24  led you to that?

25  A    Yes.  As I said before, the red arrows are places that I

1    found differences that couldn't be explained, could not be

2    found in his known writing, so those unexplained differences

3    had to be weighed.

4    Q   Okay.  Let's go to Alvin King.  Again, we'll do this in

5    summary fashion.  But did you study Alvin King's signatures

6    just like you had the others, looked at all of them and same

7    methodology?

8    A   Yes, I did.

9    Q   All right.  Let's go to 194, page 39.  And then on the

10   split screen 96, page 33.  Okay.  Let's look at this first

11   one, Alvin King, and this is one where you've got some blue

12   lines and some red lines.

13   A   Yes, sir.

14   Q   All right.  And the blue points out the similarities and

15   the red the things that do not appear to be there, correct?

16   A   That's correct.

17   Q   And you arrived at a decision of no conclusion, stuck in

18   the middle?

19   A   Right.  There were just about an equal number of problems

20   with the signature as there were things that seemed to match,

21   so I just don't know.

22   Q   Okay.  Let's go back and look at 96.034.  This has two

23   signature of Alvin King, and you can see your analysis here

24   in the documents, and did you agree with Mrs. Masson that

25   definitely Alvin King signed that power of attorney in two

1  places?

2  A   Yes.

3  Q   Okay.  And your opinion gibed with hers precisely that,

4  despite his sworn testimony to the contrary, he in fact did

5  definitely sign that power of attorney --

6  A   That's correct.

7  Q   -- in two places?  Okay.  Let's go, put 96.035 up on the

8  screen, please.  Now, your conclusion for this power of

9  attorney that is at 96.035 I believe was highly probable that

10  it is his signature, correct?

11  A   That's correct, I'm virtually certain that it's his

12  signature, as was Ms. Masson.

13  Q   All right, so you-all's opinion lined up that, despite

14  his sworn testimony, he did sign that agreement?

15  A   That's correct.

16  Q   All right.  Let's go to Arturo Trevino.  And I want to

17  just go straight to the -- well, Arturo Trevino is

18  interesting because he had a number of known signatures that

19  Mrs. Masson did not look at, correct?

20  A   That's correct.

21  Q   Okay.  Let's look at 194.31, please.  This K-22 is a

22  series of court records that she did not consider, and you're

23  pointing out some of the aspects that you find there that in

24  fact you found in the questioned signatures, isn't that

25  correct?

1    A    I believe I heard you say it incorrectly.  Those are

2    three that I did consider that Ms. Masson did not consider.

3    Q    Right.

4    A    And, yes, the blue marks do indicate things of

5    consistency between those known signatures that were written

6    on court documents compared to the questioned signature found

7    on the builder and mechanic's lien and the deed of trust.

8    Q    Okay.  Let's look at the other known signatures that she

9    did not consider.  That's on those other same court records,

10   and you're pointing out the angularity of the beginning A and

11   the loop in the T of Trevino?

12   A    Yes.  If you look at the, how that beginning A angles and

13   then you compare it against the K-11 up above, you see that

14   sometimes this individual writes completely different than

15   other times, sometimes to the right, sometimes to the left,

16   it's all over the place, and so you have to consider that

17   when you're looking at something that's in question to decide

18   whether or not they wrote it.  I'm showing there that he

19   writes with two completely different slants.

20   Q    Okay.  Let's go to 194.53, which is the real estate lease

21   that he denied having signed.  Here we have the four

22   signatures and you've pointed in the blue indications that he

23   in fact did sign it, is that correct?

24   A    That's correct.

25   Q    And do you recall Mrs. Masson concluded that it was

1   highly probable that he did sign that real estate lease

2   agreement?

3   A   That's correct.  She said highly probable that he did and

4   I said that there are indications that he did.

5   Q   You said indications.  So you actually came out a little

6   bit closer towards the middle on this particular one, is that

7   correct?

8   A   That's correct.

9   Q   And can you tell us why?

10  A   Well, you can see a number of places that do appear

11  consistent but then you see some things that are slightly

12  odd, and if you look at the page 7, the last one on the real

13  estate lease there, if you look at the way Arturo just drops

14  off at the end, you really can't make out any of the letters

15  at the end of the word Arturo.  Most of the time when he

16  writes you can make out the letters.  I'm not saying that's

17  not him that wrote that, I'm just saying it's a little bit

18  different than he normally writes.  So it's something that I

19  had to consider.  You can go through a number of features

20  like that and find subtle things that need to be considered

21  before you decide did he or did he not write this, and in my

22  opinion there are indications that he did write it, but I

23  can't be totally positive.

24  Q   Is it your view that it's more likely than, more probable

25  than not that he did write, sign his name to the real estate

Stewart - Direct

1   lease?

2   A   Yes, it is more probable than not that he did.

3   Q   Okay.  Let's go to Exhibit 194, page 55.  This is the

4   builder's and mechanic's lien with his signature and several

5   of the known signatures, and, again, the blue arrows point

6   out the similarities?

7   A   That's correct.

8   Q   Okay.  Okay.  Let's go to the next one below K-17.

9   There.  You've pointed out the similarities in the A?

10  A   Yes, it's similar to the way that we did the previous

11  test on Maria.  I have the questioned signature at the top

12  which is the builder and mechanic's lien signature, and

13  that's the one that they can't agree on whether he signed it

14  or not, and then below that you've got a known document that

15  he has admitted signing, or is known that he signed.  And I'm

16  showing there in the A that there's a, it's pretty wide as

17  far as the, the way the A is made at the top.  Ms. Masson

18  described it as being vertical.  And you see a lot of that

19  there.  He starts, he starts in the middle of the line for

20  the capital A, goes down and then goes back up again to

21  create the capital A, and he does that in both cases there.

22  And then he's got a cross member for the A that starts over

23  on the left side of the A, slightly angles down.  It does

24  that in both cases.

25  Q   So your, what was your opinion as to the likelihood that

1  that is in fact Arturo Trevino's signature on the builder's

2  and mechanic's lien?

3  A   I said that there are indications that he did sign it.

4  There are, in my opinion, more indications that he did sign

5  it than the other direction, which was the direction

6  Ms. Masson went in.  I agree that he didn't cross his T, and

7  I agree that it looks a little bit erratic the way he made

8  Trevino there, but I found those features in his writing.

9  The things that I could not address are where Ms. Masson was

10  talking about the slow and deliberate.  And, again, I have a

11  problem using the word deliberate.  I think it's more like

12  slow and there's some kind of tremor, there's some kind of a

13  problem with the writing.  That problem could be induced by

14  physical means such as writing on an uneven surface or a

15  rough surface, or it could be by other means such as

16  caffeine, drugs, something else, nervousness, something else.

17  We weren't able to determine what happened here in this case,

18  and so to me there are more indications than not that this

19  person did write this signature.

20  Q   So let me ask you, what is your view as to whether or not

21  it is more likely than not that that is in fact Arturo

22  Trevino's signature on the mechanic's lien contract?

23  A   By using an opinion of indications that he did write it,

24  that means that it's more likely than not that he did.

25  Q   Now, let's go to the last exhibit, 194, page 57.  This is

1    the deed of trust.  And again, you followed the same

2    methodology that you have all along, is that right?

3    A    That is correct.

4    Q    Okay.  Let's look at, for example K-29, let's look at the

5    T in Trevino there.

6    A    It's actually pointing to the one above.

7    Q    The one above, yeah, I'm sorry.  K-20, yeah, that one.

8    A    There I'm just showing that the bottom part of the T in

9    Trevino is made in a similar way.  It's got that big bowl at

10   the bottom and it's kind of curved on the way up and straight

11   on the way back.

12   Q    Let's put up side-by-side 194.37.

13   A    If I -- while you have K-29 there at your disposal that's

14   one of the features that I did use for the, looking at the

15   writing.  If you look at the A in Arturo on K-29, you'll see

16   that that kind of looks uneven and rough as well.

17   Q    That's the lower one?

18   A    No, the capital A.

19   Q    That one there?

20   A    No, the one above it, I'm sorry.  I'm sorry, the K, the

21   first one on K-29.  There's two --

22   Q    This one?

23   A    No, no.  Go down one.  That one.

24   Q    There we go.

25   A    If you look at that A, on the right side of that capital

1   A, you'll see that it's all broken up there, it's a lot of

2   tremor, a lot of roughness in that writing.  Well, that's a

3   known signature.

4   Q   Okay.  So, if you go back to the known signature you find

5   the same kind of thing that one, that Mrs. Masson took to be

6   slow and deliberate and therefore a problem?

7   A   Correct.

8   Q   All right.  Now let's look at 37 down here in the bottom

9   right-hand corner, and in particular I want to look at the R

10  there.  You see how the R is squared at the top?

11  A   The first one in Arturo is squared at the top and the

12  second one is pointed.

13  Q   Okay.  And let's look at the mechanic's lien, the

14  questioned signature.  Deed of trust, I'm sorry.  It's got

15  the same square-topped R, do you see that?

16  A   It's got --

17         MR. B. GUTIERREZ:  Objection, leading, Your Honor.

18  BY MR. LOCHRIDGE:

19  Q   How do the R's compare --

20         THE COURT:  Overruled.

21         THE WITNESS:  The first R in the deed of trust is

22  kind of squared at the top and the second one is pointed,

23  similar to what you find in that known writing of his.

24  BY MR. LOCHRIDGE:

25  Q   Now, in reviewing the various known signatures of Arturo

1  Trevino and comparing them against the signature on the deed

2  of trust, do you recall what your opinion was as to whether

3  or not it was more likely than not that Mr. Trevino in fact

4  did sign that deed of trust?

5  A   My opinion was that there are indications that he did

6  sign it, and Ms. Masson said he definitely did not sign it.

7  Q   Okay.

8  A   In my opinion there are more indications that he did sign

9  it than in the other direction.

10  Q   All right.  Now, did I ask you to review a demonstrative

11  exhibit that I had prepared using the nine-point scale of

12  handwriting and then placing on that exhibit indications of

13  the various opinions that you have expressed here and

14  Mrs. Masson has expressed here this afternoon as to the point

15  on the scale that the two of you arrived at in looking at

16  these various questioned documents, the powers of attorney,

17  the real estate lease, the builder's and mechanic's lien and

18  the deed of trust?

19  A   Yes, I did review that.

20  Q   And do you have a copy of it there with you?

21  A   Yes, I do.

22  Q   And is that an accurate depiction in a demonstrative way

23  of where your respective opinions fall on the nine-point

24  scale of handwriting opinions?

25  A   Yes, it is.

1           MR. LOCHRIDGE:  Your Honor, we would offer Clayton

2    Exhibit 289.

3           MR. RUMLEY:  Your Honor, we would object to this

4    demonstrative exhibit to the extent it comments on testimony

5    of the various witnesses in the case.

6           THE COURT:  Sustained.  Can you do it without the

7    comments?

8           MR. RUMLEY:  We have no objection to the nine-point

9    scale, which I think is already entered, but --

10          MR. LOCHRIDGE:  The only comment deals with what has

11   been undisputed from the witness stand, is that the King,

12   Flores and Trevinos deny all these signatures as being

13   theirs.

14          MR. RUMLEY:  Your Honor, that --

15          MR. LOCHRIDGE:  That's the only, that's the only --

16          THE COURT:  Okay, please --

17          MR. RUMLEY:  That is not true.

18          THE COURT:  -- if you can delete that.  Thank you.

19          MR. LOCHRIDGE:  Okay.  We'll delete it overnight and

20   tender it in the morning as Exhibit 289.

21          THE COURT:  Thank you, sir.

22   BY MR. LOCHRIDGE:

23   Q   Mrs. Masson, while testifying that the questioned

24   signatures of Maria Trevino and Arturo Trevino were, at least

25   as to Maria Trevino, remarkably similar, she said that there

1  was no evidence of tracing.  Did you find any evidence of

2  tracing?

3  A   I looked for evidence of tracing and did not find that.

4  And my recollection is a little bit different of what

5  Ms. Masson said.  In her deposition that I attended, I

6  believe she indicated that there was a possibility of tracing

7  and then today there's no possibility in tracing.

8  Q   So you agree with her on that point as well, that there

9  is no evidence of tracing of these documents, these

10  questioned signatures on the deed of trust and the builder's

11  and mechanic's lien?

12  A   Correct.  Tracing meaning that you hold a document up to

13  a window and you put another piece of paper over it and you

14  trace over it.  There's no evidence of that.

15  Q   Okay.  Do you see any evidence of someone having a, what

16  I would call a go-by, in trying to, I think she said

17  simulate, did you see any evidence of that?

18  A   I saw no evidence of that.  I'm trained to look for that.

19  If you have someone's writing sitting beside you and you're

20  trying to duplicate it, then you'll be looking over at the

21  left and you're writing with your right or whatever hand that

22  you are, and many times the writing gets a little bit bigger,

23  it gets a little bit odd looking, and you can see some of the

24  slow and deliberate nature that Ms. Masson is talking about

25  where you're trying to basically draw each of the characters.

1  I did not see that type of slow and deliberate.  I saw tremor

2  and unevenness in the writing, and I could actually show

3  examples of that where the actual direction of the writing

4  changes a little bit.  That indicates to me more likely than

5  not that you've got some kind of an uneven surface or uneven

6  way that you're writing, that you're hitting some kind of an

7  obstacle and it's causing a deflection in the writing.

8  Q   And then finally, just to wrap up on the deed of trust,

9  as to, and the builder's and mechanic's lien as to Maria

10 Trevino, I see that your opinions are what?

11 A   That Maria highly probably did sign the builder and

12 mechanic's' lien and that she highly probably did sign the

13 deed of trust.  I'm virtually certain that she signed both of

14 them.

15 Q   All right.  And as for Arturo, I think you testified that

16 you believe that there were indications on each?

17 A   There are indications that he did sign both of them, yes.

18 Q   And if we could go to the Elmo?  And so, as to these two

19 sets of opinions on those two documents, you and Mrs. Masson

20 are just basically at two ends of the spectrum?

21 A   Yes, we are.

22 Q   But as to the rest, virtually all of the rest of the

23 opinions as to the lease agreement, the powers of attorney

24 and so forth, your opinions line up almost exactly?

25 A   That's correct.

1   Q   Even on those where Mr. King and Mr. Flores and Mr. and

2   Mrs. Trevino all denied having signed it or even seen the

3   documents?

4   A   That's correct.

5   Q   You-all generally conclude that in fact they did.

6   A   That's correct.

7            MR. LOCHRIDGE:  Pass the witness.

8            THE COURT:  Thank you.  You may proceed, Mr. Rumley.

9            MR. RUMLEY:  Thank you.

10                        CROSS-EXAMINATION

11   BY MR. RUMLEY:

12   Q   Good afternoon, Mr. Stewart.

13   A   Good afternoon.

14   Q   Real quick, I had a question -- I took your deposition,

15   correct?

16   A   Part of it, correct.

17   Q   And during your deposition you understood that you were

18   under oath, right?

19   A   Yes, sir.

20   Q   And just like you are here today, true?

21   A   That's correct.

22   Q   And when I took your deposition and I asked you about

23   your opinions with respect to the signature of Arturo Trevino

24   in the mechanic's lien contract and in the deed of trust, you

25   indicated to me that there were indications that it was his

1    signature, correct?

2    A    Arturo for the builder and mechanic's and deed of trust,

3    I indicated that there are indications that he did sign it,

4    correct.

5    Q    All right.  And this chart right here, this Exhibit 288,

6    is this the chart that you put together?

7    A    No, sir.

8    Q    And do you agree with this chart?

9    A    Yes, sir.

10   Q    You agree that this is a nine-point scale of handwriting

11   opinions?

12   A    Yes, I do.

13   Q    And this is the nine-point scale that you would have used

14   when you were looking at the signatures on the documents,

15   right?

16   A    Well, we would use a scale, not this form that was

17   created by the attorneys.

18   Q    Well, is this form accurate?

19   A    It was -- I produced a form that was similar to that and

20   Ms. Masson suggested that it be changed and it was changed

21   accordingly.

22           MR. RUMLEY:  Objection, nonresponsive.

23           THE COURT:  Would you listen carefully, sir, to the

24   question and try to just answer the question.

25

Stewart - Cross

1   BY MR. RUMLEY:

2   Q   I'm just asking you, Mr. Stewart, is this nine-point

3   scale, this 288 that Mr. Lochridge put together, is this

4   accurate?

5   A   Yes, it appears to be.

6   Q   All right.  And if we look, and I think, I think you just

7   told the jury that rather than indications that it is

8   Arturo's signature that it's now your opinion that it's more

9   likely than not.  Is that, did I hear that right?

10  A   No, sir.

11  Q   Okay.  So it's not your testimony to this jury that on

12  the deed of trust and the mechanic's lien contract that more

13  likely than not Arturo signed those two documents, correct?

14  Am I right?

15  A   No, sir, you're not right.  Any --

16  Q   It's true, is it not, sir, that if we --

17          THE COURT:  Don't interrupt his answers, please.

18  BY MR. RUMLEY:

19  Q   If we look at this chart --

20          MR. LOCHRIDGE:  May he be allowed to finish his

21  answer?

22          THE COURT:  He's probably forgotten the question,

23  but yeah.

24          MR. LOCHRIDGE:  Okay.  Well, maybe the next one.

25

Stewart - Cross

```
 1  BY MR. RUMLEY:
 2  Q   Let me ask you, Mr. Stewart, you found indications with
 3  respect to Arturo Trevino, true?
 4  A   I found indications that he did sign the builder and
 5  mechanic's lien and the deed of trust, and --
 6  Q   Which is --
 7  A   -- indications means in our field that it's more likely
 8  than not that the person signed it.
 9           MR. RUMLEY:  Objection, nonresponsive.
10           THE COURT:  Please listen just to the question and
11  answer the question.
12  BY MR. RUMLEY:
13  Q   Sir --
14           THE COURT:  Do you want to ask it again?
15           MR. RUMLEY:  Yes, ma'am.
16  BY MR. RUMLEY:
17  Q   Sir, with respect to Arturo Trevino on the deed of trust
18  and the mechanic's lien you found, it's your opinion that
19  there's indications that he signed those two documents, true?
20  A   That's true.
21  Q   All right.  And if we look, the next level of certainty
22  is probable, true?
23  A   That's correct.
24  Q   All right.  And you understand that probable is more
25  likely than not, correct?
```

Stewart - Cross

```
 1   A    That's another form of more likely than not, yes.

 2   Q    Right.  And so if your testimony is is that indications

 3   is somehow more likely than not, then why didn't you just say

 4   that he probably did write it?

 5   A    Because if you look at the nine-point scale there are

 6   various delineations there.  Indications did write is closer

 7   to not being able to tell, probably did write is closer

 8   towards an identification, and we have to go through and look

 9   at the evidence at hand and decide where it fits.

10   Q    All right.  So you did not, you did not find and it is

11   not your opinion that Arturo Trevino probably did write the

12   signatures on the deed of trust, true?

13   A    That is not my opinion, no.

14   Q    And it is not your opinion that Arturo Trevino probably

15   did write the signature on the mechanic's lien contract,

16   true?

17   A    That's not where it falls on the scale, so true.

18   Q    Okay.  Now, one of the things that we went over or that

19   you went over at the beginning of your testimony is your

20   background.  Do you recall that?

21   A    Correct.

22   Q    And a number of questions were asked about your

23   experience in handwriting analysis.  Do you recall those

24   questions?

25   A    Yes, sir.
```

1    Q    You have given testimony in a number of depositions,

2    correct?

3    A    Yes.

4    Q    And you have given testimony in a number of cases before

5    courts, right?

6    A    Approximately 300 times, yes.

7    Q    And is it true, sir, that your opinion has been excluded

8    before by a court?

9    A    Not to my knowledge, no.

10   Q    Is it true that you testified in a case in Florida this

11   past year?

12   A    Yes.

13   Q    The Lake Forest case?

14   A    Yes.

15   Q    Is it your testimony that your testimony was not excluded

16   by the court for being unreliable?

17   A    Yes, it's my testimony.  I've testified before that

18   court.

19   Q    Isn't it true, sir, that the court found your opinions in

20   the Lake Forest case to be so inconclusive as to be useless

21   under the Frye standard?

22   A    I don't know what the ruling of the court was.  I know

23   that I testified in the case, I was not excluded from the

24   case and I reached opinions on the case.

25   Q    Are you aware that your opinions were excluded?

Stewart - Cross

1   A   As I just told you, I'm not, I do not, I'm not aware of

2   that, no.

3   Q   Have your opinions been excluded any other time?

4   A   Not to my knowledge.

5   Q   Now, you had mentioned --

6        MR. RUMLEY:  Well, Your Honor, may we approach?

7        THE COURT:  Yes, sir.

8      (Bench conference on the record)

9        MR. RUMLEY:  Limine item, he brought up the Martha

10  Stewart case.  Larry Stewart --

11       THE COURT:  The what?

12       MR. RUMLEY:  Martha Stewart.

13       THE COURT:  And what?

14       MR. RUMLEY:  He was indicted for perjury for his

15  testimony in the Martha Stewart case.  He brought up the

16  Germany testimony.  There's a current investigation as to

17  perjury charges that are pending.  Both of those items are in

18  his limine and so I'm --

19       THE COURT:  Are those --

20       MR. LOCHRIDGE:  No.  Your Honor, he was, he was

21  acquitted in the Martha Stewart case, totally collateral to

22  his testimony here.  I didn't get into any of it at all.

23       MR. RUMLEY:  He asked him.

24       MR. LOCHRIDGE:  And the deal in Germany is nothing

25  more than allegation, he hasn't been convicted of anything.

1   There's a --

2         MR. RUMLEY:  But there's a current investigation.

3         MR. LOCHRIDGE:  There's a --

4         MR. RUMLEY:  By the Germans.

5         MR. LOCHRIDGE:  By the Germans.

6         THE COURT:  By what?

7         MR. LOCHRIDGE:  By the Germans.  It's some kind of

8   witch hunt over there.

9         MR. RUMLEY:  He testified and --

10        THE COURT:  I wondered about that, the whole article

11  in the New York Times was about the Ivan the Terrible, what a

12  mistake that was that he was misidentified.  Okay, but if

13  you -- what is it that you're doing?

14        MR. RUMLEY:  In which he testified and now they're

15  prosecuting him for perjury.

16        MR. LOCHRIDGE:  He is, it's a -- well, no, I'm not

17  going to use any adjectives -- a witch hunt over there that

18  is a complete distraction here.  Just nothing more than an

19  allegation made by some crazy German.  How can that come in

20  here?

21        MR. RUMLEY:  They filed a limine on it and then he

22  went ahead and asked for the jury, "You were an expert in the

23  Martha Stewart case?"

24        MR. LOCHRIDGE:  No, I just said, "You were involved

25  in it?"  But either way, I didn't raise it, I didn't raise

1   that.  To go off on that reservation would be extremely

2   prejudicial to this man.

3             THE COURT:  I think I would have left that out, sir,

4   if you didn't want it to come in.

5             MR. LOCHRIDGE:  But that didn't, that didn't open

6   the door, Your Honor, it really didn't.

7             THE COURT:  I'm afraid it did.

8             MR. LOCHRIDGE:  So, I mean, an acquittal?  He gets

9   to say that he was indicted when he was acquitted?  Is there

10  anything -- I mean, in America when you're acquitted you're

11  not, you don't win, you're found --

12            MR. RUMLEY:  You're just found not guilty.

13            MR. LOCHRIDGE:  You're found not guilty, yes.

14            MR. RUMLEY:  A grand jury indicted him, the grand

15  jury --

16            MR. LOCHRIDGE:  How can that be, they come in here

17  and impeach him when he stood up for his rights and was

18  acquitted?  I mean that's terrible.

19            MR. RUMLEY:  I wasn't going to ask about it but he,

20  I was shocked that he said that he was an expert in Martha

21  Stewart.

22            THE COURT:  I was, I didn't know that that was a

23  problem.

24            MR. LOCHRIDGE:  Well, I didn't, but I didn't

25  (indiscernible) at all.

1          THE COURT:  Well, you mentioned it, I mean all the

2     big-time things that he was involved with.

3          MR. LOCHRIDGE:  It may --

4          THE COURT:  So I think it's fair to say, look, not

5     about indictment but did you get into some trouble with the

6     Martha Stewart case, ask him about that.

7          MR. LOCHRIDGE:  Oh, no, just, just was your

8     testimony challenged.

9          THE COURT:  Thank you.  No.

10         MR. LOCHRIDGE:  That's it, that's it.

11         MR. RUMLEY:  It's a perjury, it's lying under oath.

12         MR. LOCHRIDGE:  But he was acquitted, for crying out

13    loud.

14         MR. RUMLEY:  Lying under oath is --

15         MR. LOCHRIDGE:  It would be devastating to this man

16    being struck like that.

17         THE COURT:  Why?

18         MR. LOCHRIDGE:  I mean you get falsely accused, you

19    defend yourself, you get acquitted and then that follows you

20    around the rest of your life?

21         THE COURT:  Well, why bring it up?

22         MR. LOCHRIDGE:  Well, if I opened the door I

23    withdraw it, but I don't believe I --

24         THE COURT:  It's too late.

25         MR. LOCHRIDGE:  I don't believe I opened the door.

```
 1          THE COURT:  All those name brand things.  The Ivan
 2   the Terrible thing.
 3          MR. RUMLEY:  I know.
 4          THE COURT:  You have to just look at that whole
 5   thing.  I mean in this country he was determined to be not
 6   credible.
 7          MR. LOCHRIDGE:  Not that --
 8          THE COURT:  Which is why he was sent back to this
 9   country.
10          MR. LOCHRIDGE:  No, no.
11          MR. RUMLEY:  And there's a current investigation.  I
12   deposed him over it.  I deposed him over it for three pages
13   and they file a motion in limine and then he asks him about
14   it.
15          MR. LOCHRIDGE:  I didn't get into any detail at all
16   about those.
17          MR. B. GUTIERREZ:  And I believe they asked him
18   about it, Your Honor, just to try to bolster his credentials.
19          THE COURT:  That's the only reason he said that.
20          MR. B. GUTIERREZ:  And now that, you know, they've
21   opened the door --
22          THE COURT:  You can ask him if he got into some
23   difficulties during his testimony in the Martha Stewart case
24   and in the Ivan the Terrible case.  I'm surprised you brought
25   that up, and I had just read about it.
```

1          MR. RUMLEY:  Can I get in trouble with the court?

2    Can I say he's in trouble with the court?

3          MR. LOCHRIDGE:  No, because he didn't get in any

4    trouble, he got acquitted.

5          MR. RUMLEY:  Yes, he did.  There's a pending

6    investigation.  Well, what do you want me to say, with the

7    U.S. Attorney's office, with the prosecutor?

8          MR. LOCHRIDGE:  No, no.  That was completely off

9    base.  A man gets acquitted for something and then he's got

10   an allegation in a witch hunt.

11         MR. B. GUTIERREZ:  His qualification came into issue

12   because of that.

13         MR. LOCHRIDGE:  Qualifications are always at issue,

14   but an acquittal is not, don't get into that.

15         THE COURT:  Well, that's a pretty big deal.

16         MR. LOCHRIDGE:  It is a pretty big deal.

17         THE COURT:  I think you can say did you have a spot

18   of trouble?

19         MR. RUMLEY:  A spot of trouble?

20         THE COURT:  Did you get in trouble due to your

21   testimony in the Martha Stewart as well as the Ivan the

22   Terrible thing.

23         MR. RUMLEY:  I know.  Okay.

24      (Bench conference ends)

25

Stewart - Cross

1  BY MR. RUMLEY:

2  Q   Mr. Stewart, with respect to the testimony you gave in

3  Florida, is today the first time you've heard from anyone

4  that your testimony was excluded by a judge for being

5  unreliable?

6  A   Yes, and I'm --

7  Q   This is the first time?

8  A   And I'm not sure that, I'm not certain that you're

9  correct.

10 Q   Isn't it true, sir, that the lawyer for Clayton Homes had

11 identified a number of cases that you were involved in, and a

12 number of those cases were when you were with the Secret

13 Service, right?

14 A   Many of them were, yes.

15 Q   Isn't it true that you testified in the Martha Stewart

16 trial?

17 A   Yes, I did.

18 Q   And isn't it true that your testimony in the Martha

19 Stewart trial got you in trouble, correct?

20 A   No, I would not say that.

21 Q   How about, you testified in the Ivan the Terrible case?

22 A   Correct.

23 Q   Did your testimony in the Ivan the Terrible case get you

24 in trouble?

25 A   I would not call it trouble.  The one side of an, an

1    opposing side in the case argued before the court that he

2    felt that I had not told the truth.  The court then

3    investigated that over about a four-month period and decided

4    that he was not, that was not the case, that I had in fact

5    told the truth.

6    Q    Is there a current investigation ongoing in Germany over

7    your testimony?

8    A    No, the court has actually gone through that testimony,

9    realized that I did tell the truth and issued a report

10   accordingly.

11   Q    Is there any other cases, depositions or situations,

12   Mr. Stewart, where your testimony has been called into issue

13   by a court?

14   A    Not that I'm aware of, no.

15   Q    Have you testified in Canada?

16   A    On a number of occasions, yes.

17   Q    Has there been an investigation in Canada over your

18   testimony?

19   A    Not that I'm aware of, no.

20   Q    Has there been any other situation where your credibility

21   has come into issue by a court?

22   A    Well, you keep saying any other; I'm not even aware of

23   what you're talking about.

24          MR. RUMLEY:  Your Honor, can I show this just to the

25   witness, witness first?

```
 1              THE COURT:  Yes.  Wait.  Okay.

 2              MR. RUMLEY:  The witness only.

 3              THE COURT:  Okay.

 4   BY MR. RUMLEY:

 5   Q   Can you see that, Mr. Stewart?

 6   A   Yes.

 7   Q   Are you aware the Lake Forest Master Community

 8   Association versus Orlando Lake Forest case?

 9   A   I have worked for the Lake Forest Master Community

10   Association case, yes.

11   Q   All right.  And if we come down, do you see the

12   highlighted part on this document?

13   A   Yes.

14   Q   And were you hired as an expert to establish that the

15   page was not written on the date of the meeting?

16   A   No, I was hired by one side of the case to decide whether

17   or not the document was or was not.  I was not hired to find

18   one direction.

19   Q   Do you see, sir, where -- do you understand what the Frye

20   standard is?

21   A   Yes.

22   Q   Are you unaware, if you read this last sentence, are you

23   unaware that the court found --

24              MR. LOCHRIDGE:  Your Honor, I'm going to object,

25   this is not in evidence and hasn't been shown to me.
```

1          MR. RUMLEY:  I'm showing it to him.

2          MR. LOCHRIDGE:  No, to me.

3          THE COURT:  Show it to him, please.

4   BY MR. RUMLEY:

5   Q   Do you understand, Mr. Stewart, that the other side filed

6   a motion to exclude you as an expert?

7   A   I assume they did.  It happens in most cases where they

8   try to exclude me as an expert.

9   Q   All right.  If you could read this highlighted part and

10  see if this refreshes your memory as to whether or not the

11  court excluded your opinions.

12  A   Okay, I, from reading one sentence on there I have no

13  idea if the court excluded an opinion.  I was certainly

14  allowed to testify in the case before the court and there was

15  no argument while I was there in court concerning that.  You

16  are showing me one sentence without letting me read the

17  entire document.  I'd like to read before that and after it

18  and then answer your question, if I may.

19  Q   Sure.

20          THE COURT:  You can give it to him.  Ms. Scotch.

21          THE WITNESS:  (Perusing document)  Okay.  I've read

22  this and I disagree with your comments regarding it.

23  BY MR. RUMLEY:

24  Q   Do you disagree with the fact that the court excluded

25  your opinion?

1   A    The court did not exclude my opinion.  I testified before

2   the court.  You are reading a finding after hearing both

3   sides, and if you read the entire document concerning that

4   portion, they are specifically talking about a technique that

5   was used to do chemical analysis on an ink and they're saying

6   that that technique was not shown to have met the Frye rule

7   standard.  So that, that is the court ruling about a

8   technique that was used and then deciding not to use it.

9   Q    And the court, the court excluded the testimony, correct?

10  A    No, I testified in front of that court.

11  Q    Correct, but this says, "The testimony is so inconclusive

12  as to be useless."  Did I read that right?

13  A    It doesn't say it's excluded.

14  Q    Mr. Stewart, the -- is there any other -- you have

15  testified in Canada, correct?

16  A    As I said before, numerous times, yes.

17  Q    All right.  But you are unaware of any, any type of

18  investigation occurring in Canada, true?

19  A    I'm aware of a number of investigations in Canada, none

20  concerning me.

21  Q    All right.  I want to go to a couple of things.  The

22  American Academy of Forensic Sciences, are you a member of

23  that organization?

24  A    Yes, I'm a fellow of that organization.

25  Q    And it's true, is it not, that you are not in the

1    questioned document section, correct?

2    A    I never applied to be in the questioned document section,

3    correct.

4            MR. RUMLEY:  Objection, nonresponsive, Your Honor.

5            THE COURT:  Listen carefully to the question and

6    just answer the question, please, sir.

7            THE WITNESS:  Yes, Your Honor.  I'm trying to

8    answer.  I am not in that section.

9    BY MR. RUMLEY:

10   Q    You are not in the questioned document section, true?

11   A    That's correct.

12   Q    You are in the criminalistics section, correct?

13   A    That's correct.

14   Q    The American Board of Forensic Document Examiners, are

15   you board certified, that organization?

16   A    I am not a member of that organization, no.

17   Q    But you were for years, correct?

18   A    No, I've never been in the American Board of Forensic

19   Document Examiners.

20   Q    And you have -- have you ever applied to be in that

21   organization?

22   A    No, I have not.

23   Q    The American College of Forensic Examiners, you talked

24   about that earlier, do you recall that?

25   A    Yes, I did.

1   Q   This organization has gone through some, have gotten a

2   bad rap, do you agree, in the past?

3   A   I'm trying to answer your question responsively.  I know

4   that you have suggested a bad rap as a result of your

5   questions to me in deposition.  I contacted the organization

6   and received a response from them that indicates otherwise.

7   I was unaware of any bad rap of that organization.

8   Q   Are you familiar with the various articles that are out

9   about that organization?

10  A   You showed me some at the deposition.

11  Q   It's true, is it not, that in order for you to be a

12  member of that organization you just apply, correct?

13  A   No, sir.  What you showed me and, at the deposition, were

14  people writing about the organization saying in the early

15  years that was a practice.  It's my understanding and based

16  on what I went through, that certainly isn't the practice

17  now.  I went through not only a lengthy process but actually

18  had to be tested before I could become a member.

19  Q   Do you have to take a test to get in?

20  A   You don't have to.  I chose to and I became certified by

21  them.

22  Q   But you can self-score yourself to get into that

23  organization, true?

24  A   No, sir.  I had to have a university do a scoring of the

25  test, and I did not even see the test once I took it until I

Stewart - Cross

1    got the result.

2    Q    Sir, can you self-score yourself on the points?

3            THE COURT:  Can you what?

4    BY MR. RUMLEY:

5    Q    Self-score yourself to get in, yes or no?

6    A    As far as I know, no.  I certainly couldn't.

7    Q    With respect to yourself, you agree with me that you

8    advertise quite a bit, correct?

9    A    Yes.

10   Q    Lawyer Magazine, Expert Pages, correct?

11   A    I am not aware of Lawyer Magazine.  I do advertise with

12   Expert Pages.

13   Q    Do you remember running ads in the Lawyer Magazines?

14   A    No, sir, I don't recall that.

15   Q    Do you remember what you told me at your deposition?

16   A    Regarding Lawyer Magazine?

17   Q    Yes.  The question was asked, "The last four years do you

18   recall running ads in ABA Journals, California Legal

19   Journals?"  What was your answer?

20   A    I don't recall, but I don't recall ever advertising with

21   those groups, no.

22   Q    Well, do you recall advertising in any of those journals?

23   A    I advertise, or I have given talks in local lawyer groups

24   in my area and I believe that they have indicated that in

25   their journals, but I don't recall ever advertising in their

1   journals.

2   Q   Now, one of the things in this case, it's true, is it

3   not, that Clayton Homes contacted a service that has experts

4   and that's how you were hired in this case, correct?

5   A   That's correct.

6   Q   It's a deal where lawyers call and they put experts in

7   contact with the lawyers, true?

8   A   Almost.  It's a deal where the organization goes through

9   and decides whether or not they want to represent an expert,

10  and they do that based on that expert's ability, background,

11  et cetera.

12  Q   And these expert services go out and they advertise you

13  as an expert, correct?

14  A   I don't know what their procedure is.  They ask

15  permission to advertise you and then I gave them that

16  permission.

17  Q   One of the things I think at the very beginning is, I

18  think the testimony is, is that you have somewhere over 100

19  hours in this case?

20  A   I would say at least.

21  Q   It's a lot more than 100, true?

22  A   I don't believe it's a lot more.  It's averaged

23  approximately a week and a half a month for six months.

24  Q   Well, if we look at Exhibit 326 that's in evidence, if we

25  go -- Mr. Stewart, this is the first bill for July, do you

Stewart - Cross

1   see that?

2   A   Yes, sir.

3   Q   And 26 hours, correct?

4   A   Yes.  It's a little blurry, but yes.

5   Q   If we go to the next invoice for August, we have 112,

6   112-1/2, correct?

7   A   Okay, so as of August it was over a hundred, yes.

8   Q   All right.  And then if we go to September, how many

9   hours?

10  A   That's 160 hours.

11  Q   Right.  So as of September how many hours do you have in

12  it?

13  A   I --

14  Q   Twenty plus 112 plus 160.  How many is that?

15  A   I don't know, you're flipping through it, so whatever

16  that adds up to.  Those are not my bills, those are bills

17  from Gerson Lehrman on my behalf, they are not charging my

18  rate and it does not subtract travel and expenses, which has

19  been a predominant part of this case.

20          MR. RUMLEY:  Objection, nonresponsive.

21          THE COURT:  Would you please answer the question,

22  please, sir.

23          THE WITNESS:  I'm trying, Your Honor.

24  BY MR. RUMLEY:

25  Q   If we look in October, how many hours did you have in

Stewart - Cross

1    October?

2    A    Twenty point 5-0.

3    Q    And the October, the October bill is just for your time

4    in September, correct?

5    A    I don't have the Gerson Lehrman bill in front of me.  I

6    invoice them and then they invoice the client, so I don't

7    know.

8    Q    Well, how many hours did you spend in October working on

9    this case?

10   A    I have no idea today.  You have the records.

11   Q    Well, there's no time in here for October.  That would be

12   a November bill, I assume?

13   A    I bill Gerson Lehrman at the end of the month for the

14   previous month.

15   Q    All right.  Well, how much time have you spent in

16   October --

17   A    I have no --

18   Q    -- on this case?

19   A    I have no idea.  But I went back and I checked prior to

20   the deposition, I averaged it out to be approximately a week

21   and a half a month for the six months, that's what I

22   testified to.

23   Q    Okay, so how many hours would that be in October?

24   A    I don't know how many hours I did in October.

25   Q    How about in November?

Stewart - Cross

1    A    I don't know what I've done in November.  This is the

2    middle of the month, so I know it took me ten hours to travel

3    here and then I've been here all day, so that's 18 right

4    there.

5    Q    Would it surprise you, sir, if your bill is over

6    $125,000 --

7    A    It wouldn't --

8    Q    -- for your work?

9    A    It wouldn't surprise me if Gerson Lehrman's bill was that

10   much.  Again, I charge at a lower rate, and it does not take

11   out travel and expenses which are quite extensive.  I've done

12   a large number of hours in this case.

13              MR. RUMLEY:  Objection, nonresponsive, Your Honor.

14   I just asked him if he'd be surprised if it was over 125.

15              THE COURT:  Would you please respond?

16              THE WITNESS:  Yes, Your Honor.

17   BY MR. RUMLEY:

18   Q    Sir, Clayton Homes pays this expert service for your

19   time, is that how it works?

20   A    I believe so.

21   Q    And it would not surprise you if that bill is well over

22   $125,000 by now, true?

23   A    It surprises -- it would surprise me.  I don't know what

24   the bill is at this point.

25   Q    If we look at, going back to your work history, you agree

Stewart - Cross

1  with me that when you were at the Secret Service that you

2  never analyzed handwriting for the Secret Service, correct?

3  Is that true?

4  A   I'm having a difficult time answering that one and

5  staying within your question.  I have analyzed handwriting

6  for the Secret Service.  I have never issued a report for

7  them on handwriting analysis.

8  Q   Well, my question was very simple.  Did you, it is true

9  that you never analyzed handwriting for the Secret Service,

10 correct?

11 A   No, that's not true.

12 Q   Well, if we look at your deposition, Mr. Stewart,

13 "Question:  You didn't analyze handwriting, correct?"

14         MR. LOCHRIDGE:  What page?

15 BY MR. RUMLEY:

16 Q   What was your answer?

17 A   Well, it says, "I thought your question was, was I

18 trained to analyze handwriting there and certify, and my

19 answer to that are yes.  Did I analyze it professionally for

20 the agency?  No, I did not."

21 Q   And that's a true statement, right?  You did not analyze

22 handwriting for the agency, correct?

23 A   That's why I'm having a difficult time answering your

24 question.  If you want me to explain I can answer.

25 Q   No, sir, I want you to answer my question.

Stewart - Cross

1   A    I can't based on the way you've posed the question.

2   Q    Did you analyze handwriting for the agency, yes or no?

3   A    I can't answer it with that limited question.

4   Q    Sir, I'm just asking you, did you professionally analyze

5   handwriting for the Secret Service when you were there, yes

6   or no?

7   A    I can't answer yes or no.  If I can --

8            THE COURT:  Why is that?

9            THE WITNESS:  Because I did analyze it for the

10  agency.  I did not issue --

11           THE COURT:  Well, that's a yes, so just answer yes.

12           THE WITNESS:  Okay.

13  BY MR. RUMLEY:

14  Q    And then if we read the next question, "That's something

15  that you didn't do at the agency, correct?"  And what was

16  your answer?

17  A    "At the time at the agency, no, I did not, I supervised

18  those" -- you took it away, I can't read it.  "I supervised

19  both of those two gentlemen."

20           MR. LOCHRIDGE:  What page are you on?

21           THE WITNESS:  Again, if I can explain it would make

22  more sense, but.

23           MR. LOCHRIDGE:  What page are you on?

24           MR. RUMLEY:  Page 95.

25

1   BY MR. RUMLEY:

2   Q   So is it true or not true, sir, did you analyze

3   handwriting for the agency?

4   A   Again, I can't, I have to answer that with a statement.

5   I did analyze handwriting for the agency but I never issued a

6   report on that.

7   Q   Is it true that you had individuals within handwriting

8   within the agency that did the handwriting analysis?

9   A   Under my direction, yes.

10  Q   When we talked about the signatures that you looked at in

11  this case -- and by the way, I think you told us earlier that

12  you looked at a lot more signatures or many more signatures

13  than Masson.  Is that what your testimony is?

14  A   I believe so, yes.

15  Q   With respect to Maria Trevino, isn't it true that you

16  looked at two signatures, two more signatures than Masson?

17  A   I don't have the number in front of me, so I don't know.

18  Q   Well, does that sound about right, two, two more?

19  A   Again, I don't want to guess.  I don't know.

20  Q   It would be inappropriate for you as someone who comes in

21  here as an expert to hunt and pick known signatures for

22  something just to support your opinion that that is a known

23  signature, correct?

24  A   Of course.

25  Q   All right.

1      THE COURT:  Are you near a closing place so we can

2  start, pick this up tomorrow morning?

3      MR. RUMLEY:  Okay.  I was just getting ready to do

4  an exhibit so now's the time.

5      THE COURT:  It's a good time?

6      MR. RUMLEY:  Yes.

7      THE COURT:  Okay.  We'll come back tomorrow at 8:30.

8  Or would you-all rather make it 9:00 tomorrow?  8:30.  Would

9  you please stand for the jury.

10     (Jury exits at 5:34 p.m.)

11     THE COURT:  Anything to take up outside the presence

12  of the jury?  Okay.  Here's what I was talking about on Ivan

13  the Terrible.  It's highlighted.  I just printed it out from

14  the New York Times.  It was two days ago.

15     MR. J. GUTIERREZ:  And it was in the paper about

16  all --

17     THE COURT:  Pardon?

18     MR. J. GUTIERRIEZ:  That was just in the paper about

19  a military division --

20     THE COURT:  Two days ago, yeah, about the Nazi war

21  criminals that were given safe haven in the United States.

22     MR. J. GUTIERRIEZ:  If I may address the Court?

23     THE COURT:  Yes.

24     MR. J. GUTIERRIEZ:  In terms of -- well, there's

25  Mr. Soltero.  What is our schedule?

1          THE COURT:  It's just the highlighted part,

2    Mr. Lochridge.

3          MR. J. GUTIERRIEZ:  What is the Court's preferred

4    schedule for discussing the jury charge after the close of

5    evidence tomorrow, before closing arguments or during lunch

6    tomorrow?

7          MR. SOLTERO:  Your Honor, we can be off the record.

8          THE COURT:  Is this the last witness?  One more?

9          MR. RANGEL:  One more video deposition, and I'm sure

10   counsel are going to work tonight to see if it can be

11   shortened.

12         MR. SLEDGE:  Right, Judge.  I think we are totally

13   at about two hours and 15 minutes with that videotape and

14   we're going to try to keep trimming it a little bit.

15         MR. RUMLEY:  The what now?

16         MR. SLEDGE:  Kimball's videotaped deposition.

17         THE COURT:  Well, the other concern also, that I may

18   have to call the U.S Attorney about this witness.  I mean

19   when you asked me if he had been, gotten in any trouble at

20   all for the Martha Stewart testimony and it turns out he was

21   indicted for perjury even though he was acquitted, I would

22   consider that some trouble.

23         THE WITNESS:  I don't believe that was the question.

24         THE COURT:  Yes, it was, very clearly.

25         THE WITNESS:  Okay.  I'd personally like to have

1    that re-read, but.

2         THE COURT:  Pardon?

3         THE WITNESS:  I personally would like to have that

4    re-read because that's not what I heard the question to be.

5         MR. LOCHRIDGE:  We can worry about this in the

6    morning, Your Honor.

7         THE COURT:  We can.  Did you get a copy of that?

8         MR. J. GUTIERRIEZ:  I'll share a copy with him.

9         THE COURT:  Do you have it?

10        MR. J. GUTIERRIEZ:  I read the article, that's fine.

11        THE COURT:  But I don't know if he was part of the

12   Justice Department that mistakenly misidentified Ivan the

13   Terrible.  Because that was in the United States, that's why

14   he was deported to Germany.  They had nothing to do with

15   what's going on in Germany now.

16        MR. J. GUTIERRIEZ:  Right, now it's somebody else.

17        THE COURT:  That's a different crime altogether he's

18   been charged with in Germany.  The Ivan the Terrible

19   misidentification occurred with the Justice Department in

20   this country.

21        MR. J. GUTIERREZ:  Yes.

22        THE COURT:  So I mention that because that was very

23   unclear.  No, you can give it to --

24        MR. J. GUTIERRIEZ:  Ivan the Terrible was a

25   misnomer, basically, for that person.

1           THE COURT:  He was misidentified as Ivan the

2    Terrible but it turns out he was a guard someplace else.

3           MR. RUMLEY:  Did we figure out the schedule for

4    tomorrow?

5           THE COURT:  8:30.  And when that's concluded, try to

6    chop down as much as you can, we'll have a charge conference.

7    What I have asked Mr. Feldman and Ms. Hardy to do was to put

8    together -- we're off the record.

9        (The proceedings adjourned at 5:37 p.m. until 11-16-10)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| WITNESSES FOR DEFENDANTS: |  |  |  |  |
| Amber Krupacs | 15 |  |  |  |
| (By video deposition) |  |  |  |  |
| Myron Glucksman | 44 |  |  |  |
| (By deposition) |  |  |  |  |
| Cesar Flores | 76 | 81 | 94 | 94 |
| Alvin King | 94 | 96 | 99 | 101 |
|  |  |  |  |  |
| WITNESSES FOR PLAINTIFFS: |  |  |  |  |
| Amber Krupacs | 35 |  |  |  |
| (By video deposition) |  |  |  |  |
| Myron Glucksman | 61 |  |  |  |
| (By deposition) |  |  |  |  |
| Larry Stewart | 229 | 279 |  |  |
| IN REBUTTAL: |  |  |  |  |
| Kim Russell | 109 | 118 | 121 |  |
|  |  |  |  |  |
| WITNESSES FOR INTERVENOR: |  |  |  |  |
| Arturo Trevino | 123 | 126 |  |  |
| Janet Masson | 131 | 162 | 206 | 216 |

| MOTIONS: |  |  |  |
|---|---|---|---|
| Mr. Soltero | 102 | Denied | 102 |
| Mr. Soltero | 103 | Carried forward |  |
| Mr. Soltero | 105 | Carried forward |  |
| Mr. Soltero | 122 | Carried forward |  |
| Mr. Soltero | 222 | Carried forward |  |
| Mr. Rumley | 227 | Carried forward |  |

(Continued on next page)

INDEX (Continued)


EXHIBITS

Admitted

Defendant's:
| 95  | Christie Medina Deed of Trust | 73 |
| 96  | Christie Medina Builder's & Mechanic's Lien | 73 |
| 97  | Form Power of Attorney in Medina matter | 73 |
| 98  | Hernandez Deed of Trust | 73 |
| 99  | Hernandez Builder's & Mechanic's Lien | 73 |
| 102 | Statement of Home Location, Form A | 73 |
| 114 | Frazier Personal File, Clayton Homes | 74 |
| 225 | TDHCA Manufactured Housing Form A | 73 |
| 226 | William & Olinda Medina Arbitration Agreement | 73 |
| 227 | Standard Appraisal Form Re: William Medina | 73 |
| 230 | Hernandez Cost of Sales Summary | 73 |
| 231 | TDHCA Manufactured Housing Form T | 73 |
| 232 | E. Herrera Deed of Trust 12/27/02 | 73 |
| 233 | E. Herrera Builder's & Mechanic's Lien Contract | 73 |
| 234 | Notary Public Commissions, Bruce R. Moore | 73 |
| 466 | Arbitration Agreement-Cesar Flores & Alvin King | 75 |
| 487 | Laminated signature - Maria Trevino (8) | 12 |
| 488 | Laminated signature - Maria Trevino (2) | 12 |
| 489 | Laminated signature - Arturo Trevino (7) | 12 |
| 490 | Laminated signature - Arturo Trevino (2) | 12 |
| 491 | Masson CV | 11 |
| 687 | Masson Letter dated August 18, 2010 | 161 |

Plaintiff's:
| 4   | 1/2/02 Original of Real Estate Lease | 10 |
| 5   | 1/5/02 Three Originals of Power of Attorney | 10 |
| 42  | 7/24/03 Special Warranty Deed | 10 |
| 96  | Expert Report of Larry Stewart | 11 |
| 139 | 4/11/05 Warranty Deed | 10 |
| 140 | Powers of Attorney | 10 |
| 141 | 1/3/02 Flores & King's faxed credit app. | 10 |
| 143 | 1/6/02 Property Owners Agreement | 10 |
| 169 | Trevino Property Owners Agreement | 10 |
| 176 | Real Estate Lease | 10 |
| 241 | Janet Masson Invoices | 10 |
| 242 | 9 Point Scale Revised | 10 |
| 287 | CV of Larry Stewart | 12 |
| 288 | 9 Point Scale of Handwriting Opinions | 244 |

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above entitled matter.


  /s/ Judith M. Garcia                    February 10, 2011