UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION


| | | |
|---|---|---|
| VANDERBILT MORTGAGE | ) | CASE NO:  CA-C-09-312 |
| AND FINANCE, INC., ET AL., | ) | |
| | ) | CIVIL |
| Plaintiffs, | ) | |
| | ) | Corpus Christi, Texas |
| vs. | ) | |
| | ) | Wednesday, November 10, 2010 |
| | ) | ( 8:17 a.m. to  8:31 a.m.) |
| CESAR FLORES, ET AL., | ) | (11:19 a.m. to 12:32 p.m.) |
| | ) | ( 1:38 p.m. to  2:36 p.m.) |
| Defendants. | ) | ( 2:41 p.m. to  5:35 p.m.) |


JURY TRIAL – DAY 1

BEFORE THE HONORABLE JANIS GRAHAM JACK,
UNITED STATES DISTRICT JUDGE


(JURY SELECTION UNDER SEPARATE COVER)

Appearances:            See Next Page

Court Recorder:         Velma Gano; FTR

Courtroom Clerk:        Sondra Scotch

Court Security Officers: Robert Padilla
                         Adolph Castillo

Transcriber:            Exceptional Reporting Services, Inc.
                        P.O. Box 18668
                        Corpus Christi, TX 78480-8668
                        361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

**APPEARANCES FOR:**


Plaintiffs:                    JORGE C. RANGEL, ESQ.
                               615 Upper N. Broadway
                               Suite 2020
                               Corpus Christi, Texas 78403-2683

                               CRISTINA ESPINOZA RODRIGUEZ, ESQ.
                               Baker Botts
                               910 Louisiana
                               Suite 3624
                               Houston, Texas 77002-4995

                               PATTON G. LOCHRIDGE, ESQ.
                               CARLOS R. SOLTERO, ESQ.
                               McGinnis Lochridge, et al.
                               600 Congress Ave.
                               Suite 2100
                               Austin, Texas 78701

                               EDWARD S. SLEDGE, IV., ESQ.
                               THOMAS W. THAGARD, III, ESQ.
                               1901 Sixth Ave. North
                               Suite 2400
                               Birmingham, AL 35203-2618

Defendants:                    BALDEMAR F. GUTIERREZ, ESQ.
                               J. JAVIER GUTIERREZ, ESQ.
                               700 E. Third St.
                               Alice, Texas 78332

Intervenor Plaintiffs:         DAVID L. RUMLEY, ESQ.
                               Wiginton Rumley Dunn, LLP.
                               800 N. Shoreline Blvd.
                               14th Fl., South Tower
                               Corpus Christi, Texas 78401

<u>INDEX</u>

| <u>PLAINTIFFS' WITNESSES</u> | <u>DIRECT</u> | <u>CROSS</u> | <u>REDIRECT</u> | <u>RECROSS</u> |
|---|---|---|---|---|
| CESAR FLORES | | | | |
|   BY MR. RANGEL | 61/103 | | 136/143 | |
|   BY MR. B. GUTIERREZ | | 120 | | 142/144 |
| ALVIN KING | | | | |
|   BY MR. RANGEL | 146 | | 167/176 | |
|   BY MR. B. GUTIERREZ | | 164 | | 172/177 |
| KIM RUSSELL | | | | |
|   BY MR. THAGARD | 179/192 | -- | -- | -- |
| (VOIR DIRE) | | | | |
|   BY MR. THAGARD | 180/186/190 | | | |
|   BY MR. RUMLEY | 182/189 | | | |

| <u>PLAINTIFFS' EXHIBITS</u> | <u>RECEIVED</u> | <u>WITHDRAWN</u> |
|---|---|---|
| 242 | 7 | |
| 243 | 7 | |
| 244 THROUGH 284 | 8 | 9 |
| 33 | 107 | |
| 17 | 223 | |

4

1    **Corpus Christi, Texas; Wednesday, November 10, 2010; 8:17 a.m.**

2                              **(Call to Order)**

3          **(Outside the presence of the jury)**

4              **THE COURT:**  Call the case, please.

5              **THE CLERK:**  Yes, your Honor.

6              Court calls Civil Action C-09-312, *Vanderbilt*

7    *Mortgage and Finance, Inc., et al. versus Flores, et al.*

8              May I have appearances, please?

9              **MR. B. GUTIERREZ:**  Baldemar Gutierrez, your Honor,

10   for Cesar Flores and Alvin King.

11             **MR. RUMLEY:**  Your Honor, David Rumley on behalf of

12   Arturo and Maria Trevino.

13             **MR. LOCHRIDGE:**  Your Honor, Pat Lochridge on behalf

14   of Vanderbilt Mortgage Finance, Clayton Homes, Inc., and CMH.

15             **THE COURT:**  Okay.  Anything to take up before we

16   bring the jury in?

17         **(Pause; voices and whispers off the record)**

18             **MR. LOCHRIDGE:**  I do have one question, your Honor --

19             **THE COURT:**  Yes, sir.

20             **MR. LOCHRIDGE:**  -- insofar as the strike process.

21             **THE COURT:**  Yes.

22             **MR. LOCHRIDGE:**  After -- is it the Court's practice

23   after we've done -- both sides have done their voir dire to

24   then bring individuals up at the close of voir dire for cause,

25   discussions with the Court, or do we do those as we think we

1    may have one?

2            **THE COURT:**  We do those as we think we need them.

3            **MR. LOCHRIDGE:**  But as we go, or at the end?

4            **THE COURT:**  Well, I assume that you won't -- you mean

5    you want to bring them up individually?

6            **MR. LOCHRIDGE:**  Yeah; if the Court wants us to bring

7    them up individually, do we just make a note and say --

8            **THE COURT:**  Unless there's something you want to say

9    outside the presence of the other panel, it should be done as

10   you're going along.

11           **MR. LOCHRIDGE:**  All right.

12           **THE COURT:**  And then you can come up and make your

13   motions to strike.

14           **MR. LOCHRIDGE:**  At the close of all the voir dire.

15           **THE COURT:**  For cause.  Yes, at the close of

16   everything.

17           **MR. LOCHRIDGE:**  At the close of everything.

18           **THE COURT:**  Yes.

19           **MR. LOCHRIDGE:**  Okay.

20           **MR. RANGEL:**  Your Honor, there was an issue regarding

21   some exhibits that have been admitted and -- but Ms. Rodriguez

22   was going to raise that with the Court.

23           **MS. RODRIGUEZ:**  Your Honor --

24           **THE COURT:**  For admitted exhibits?

25           **MR. RANGEL:**  Well, she will explain.

1      **MS. RODRIGUEZ:**  Your Honor, there are some

2  housekeeping issues.  Would the Court like to take those up now

3  or after voir dire?

4      **THE COURT:**  Now.

5      **MS. RODRIGUEZ:**  Okay.  Your Honor, you may recall at

6  the pretrial conference the Court, I believe, admitted the

7  attachments to the Clayton parties' expert reports, which were

8  Exhibits 95, 96, 97.  We have since broken them out on the

9  exhibit list for the convenience of the Court and the jurors

10 and now need to move for those -- for admission of those

11 exhibits itemized individually.  And those would be, your

12 Honor, Exhibits 244 through 286.

13     **THE COURT:**  And plaintiffs?  Defendant?  Sorry.

14     **MR. B. GUTIERREZ:**  Mr. Rumley will address the Court

15 on that.

16     **THE COURT:**  I thought I admitted them all together.

17     **MS. RODRIGUEZ:**  You did, your Honor.  We have simply

18 broken them out with individual exhibit numbers.

19     **THE COURT:**  They're already admitted, so let's just

20 move on.

21     Next?

22     **MS. RODRIGUEZ:**  And, your Honor, one other bundle,

23 Exhibits 242, 243.  They were added after a late-taken

24 deposition.  We'd like to move those into evidence.  There is

25 no objection.

1        **MR. RUMLEY:**  No objection.

2        **THE COURT:**  Plaintiffs' two --

3        **MS. RODRIGUEZ:**  Forty-two and --

4        **THE COURT:**  -- forty-two?

5        **MS. RODRIGUEZ:**  -- and 243.

6        **THE COURT:**  And forty-three.

7        **MS. RODRIGUEZ:**  As well as 244 through 286, your

8   Honor.

9        **THE COURT:**  I'm sorry; 242, 243.

10        **MS. RODRIGUEZ:**  And then -- and then, your Honor --

11        **THE COURT:**  Admitted.

12        **(Plaintiffs' Exhibits Numbers 242 and 243 were received in**

13   **evidence)**

14        **MS. RODRIGUEZ:**  And then 244 through 286, your Honor.

15        **THE COURT:**  Any objection?

16        **MR. RUMLEY:**  Your Honor, we had previously objected

17   to Exhibit 285, which is the Bryan Stone report, Texas

18   Department of Housing and Community Affairs document.  And that

19   would be 285 and 286.

20        **THE COURT:**  Okay.

21        **MR. RUMLEY:**  So, we would object to --

22        **THE COURT:**  Two eighty-five and 286?

23        **MR. RUMLEY:**  We object to both of those exhibits.

24        **THE COURT:**  So, 244 through 284 are admitted.  Is

25   that all right?

1          **MR. RUMLEY:**  Yes, your Honor.

2          **THE COURT:**  Okay.

3      **(Plaintiffs' Exhibits Numbers 244 through 284 were**

4  **received in evidence)**

5          **THE COURT:**  Anything else?

6          **MS. RODRIGUEZ:**  No; just that, for the record, 285

7  and 286 we had agreed to admit them as the attachments to the

8  report.

9          **THE COURT:**  Well, they're not agreed now, so they're

10  not admitted.

11          **MS. RODRIGUEZ:**  I will then hand everything else

12  other than those two to Ms. Scotch.

13          **THE COURT:**  Okay.

14          **MS. RODRIGUEZ:**  Thank you, your Honor.

15          **THE COURT:**  And, then, you all had some problems with

16  depositions?  I've struck all your concerns about the

17  depositions.  I refer you back to my original order that says

18  depositions may be read or shown in case -- in case of video to

19  the jury, but not admitted as separate exhibits.  All

20  objections made during the depositions are heard at final

21  pretrial conference, which you all were not prepared to do.

22  All depositions must be reviewed by the parties prior to the

23  final pretrial conference so that unnecessary deposition

24  testimony is excluded.  Parties must tender the parts of

25  depositions to be used at trial to opposing parties before the

```
 1   final pretrial conference.  Now, that is set in stone, not

 2   done, so whatever you don't agree on is not coming in.

 3              MR. RUMLEY:  Your Honor, we have an issue with

 4   Exhibit 266, which is the criminal records on Arturo Trevino.

 5   We've previously objected to them and --

 6              THE COURT:  Okay.  You know what?  We'll just take

 7   off --

 8              MR. UNIDENTIFIED:  Two sixty-six --

 9              THE COURT:  -- 244 through 284, since apparently

10   those were not agreed to, and I'm not going to go through them

11   each --

12              MS. RODRIGUEZ:  I think --

13              THE COURT:  -- one by one.

14       (Plaintiffs' Exhibits Numbers 244 through 284 were

15   withdrawn from evidence)

16              MS. RODRIGUEZ:  I think if we can --

17              THE COURT:  So, move on to the next issue.

18              MS. RODRIGUEZ:  That's it from the exhibits, your

19   Honor.

20              THE COURT:  Okay.  Thank you.

21              Anything else?

22       (No audible response)

23              THE COURT:  Okay.  During -- I don't know if you all

24   had anybody downstairs during the qualification, but

25   Juror 27 -- do you have your seating charts?  It doesn't
```

10

1   matter.  Juror 27 threw her back out a couple of days ago, is

2   waiting to see her doctor and physical therapist, says she's

3   miserable and cannot sit.  She did not sit during

4   qualification.

5           Any objection to striking her?

6           **MR. LOCHRIDGE:**  No.

7           **MR. RUMLEY:**  No objection.

8           **MR. LOCHRIDGE:**  No objection here, your Honor.

9           **THE COURT:**  Okay.  It's unanimous.  Twenty-seven is

10  gone.

11          A12 is a state game warden.  He also has a sick

12  three-year-old and a one -- this doesn't make any sense.  And a

13  one-year at the house?  He's requesting an excuse as he's a

14  primary caregiver?  I mean, what -- could you e-mail Ms. Chavez

15  and see if he's the primary caregiver or who's taking care of

16  the children?

17          Same with A23.

18          A32 is going through what he describes as a messy

19  divorce, said his wife is abusive, and that he left home a few

20  days ago and is living out of his truck.

21          **MR. RUMLEY:**  No objection from us.

22          **MR. LOCHRIDGE:**  No objection.

23          **THE COURT:**  You don't want the truck man here?  Okay.

24  A23 -- I'm sorry -- A32 is struck by agreement, and we'll put

25  him back on the next month's jury docket.

1          A1 says she has a bladder problem, has to go to the

2     bathroom often, does not have a doctor's excuse, says it's due

3     to age.  I usually just tell people to raise their hands and

4     we'll take another break.  But you can make a note that A1 has

5     this problem, unless you want to strike her by agreement.

6               **MR. LOCHRIDGE:**  I'll just join her when she raises

7     her hand.

8               **THE COURT:**  Pardon?

9               **MR. LOCHRIDGE:**  That will help.

10              **THE COURT:**  You can go, yes; but separately.

11         **(Laughter)**

12              Anything else?

13              **MR. B. GUTIERREZ:**  Yes, your Honor.  One concern,

14    your Honor, and that concerns the deposition of Benjamin Joseph

15    Frazier, your Honor.  He is unavailable.  We --

16              **THE COURT:**  Now, that's the one who took the Fifth

17    Amendment during this case.

18              **MR. B. GUTIERREZ:**  No, ma'am.

19              **MR. RUMLEY:**  No, your Honor.

20              **THE COURT:**  Oh.

21              **MR. B. GUTIERREZ:**  This is the one that --

22              **MR. RUMLEY:**  It's the notary.

23              **MR. B. GUTIERREZ:**  -- the individual that testifies

24    that his signature had been forged.

25              **THE COURT:**  So, I just told you about the

1  depositions.  If you can't agree on what comes in, it's not

2  coming in.

3          **MR. B. GUTIERREZ:**  Well --

4          **THE COURT:**  I was very clear that that has to be done

5  at the final pretrial conference.  The jury is downstairs

6  waiting.

7          **MR. B. GUTIERREZ:**  Yes, your Honor.

8          **THE COURT:**  We do not have time to go through this

9  now or during the trial.

10          **MR. B. GUTIERREZ:**  I anticipated calling him, your

11  Honor, next week, which would be next Monday, and -- and we

12  had --

13          **THE COURT:**  Better get him here, then.

14          **MR. B. GUTIERREZ:**  We had -- ma'am?  We --

15          **THE COURT:**  Better get him here.

16          **MR. B. GUTIERREZ:**  But we had discussed with counsel

17  that we would go over this this week, your Honor.

18          **THE COURT:**  I just told you, if it's not agreed to,

19  it's not coming in.

20          **MR. B. GUTIERREZ:**  He is outside the subpoena power,

21  your Honor.  Mr. Frazier is.

22          **THE COURT:**  Just saying.  I'm very clear in my rules

23  here.

24          **MR. B. GUTIERREZ:**  Yes, your Honor.

25          **THE COURT:**  You know, because we don't have time to

13

1   do this now in the middle of trial.  That's what the final

2   pretrial conference is for.  In fact, I told you all that at

3   the final pretrial conference.  I said -- they said, "When do

4   you want to take up the objections to depositions?"  I said,

5   "We do them in the final pretrial conference."

6           MR. B. GUTIERREZ:  Yes, your Honor, but they didn't

7   bring up their objections.  It was --

8           THE COURT:  Are there no objections to his testimony?

9           MR. B. GUTIERREZ:  Well, I mean, they didn't bring

10  them up is what I'm --

11          THE COURT:  Okay.

12          MR. B. GUTIERREZ:  -- and that's why I need some

13  clarification from the Court, because we -- we intend to play

14  Mr. Frazier's deposition.

15          MR. LOCHRIDGE:  Your Honor --

16          MR. B. GUTIERREZ:  And --

17          THE COURT:  Are there objections in his deposition?

18          MR. LOCHRIDGE:  Yes, your Honor.  There are

19  objections to Mr. Frazier's deposition.

20          MR. RUMLEY:  Your Honor, Mr. Frazier's testified that

21  his signature was forged on the deed of trust and mechanic's

22  lien contract in this case, in this exact case.  And he's

23  unavailable; he's beyond the subpoena range.

24          THE COURT:  Okay.  Well, then -- then, if they didn't

25  bring up the -- if they didn't bring up the objections timely,

14

1   all objections are waived.  So, they go forward like that.

2           **MR. B. GUTIERREZ:**  Thank you, your Honor.

3           **THE COURT:**  Same with all the depositions.

4           **MR. B. GUTIERREZ:**  Thank you, your Honor.

5           **MR. RANGEL:**  Judge, they were made timely.  They were

6   filed.

7           **THE COURT:**  I am trying to tell you clearly as I can

8   that they were to be brought up at the final pretrial

9   conference.  You all -- and I told you again at the final

10  pretrial conference they had to be brought up, all objections

11  to depositions.  You asked me when they were due then.  Do you

12  want to hear it back?  And I said at the final pretrial

13  conference.  I have it in writing.  Final pretrial conference.

14  If they're not brought up, they're waived.

15          **MR. B. GUTIERREZ:**  Thank you, your Honor.

16          **THE COURT:**  And you offer what you want to offer, and

17  then the other side offers what they want to offer.

18          **MR. B. GUTIERREZ:**  Yes, your Honor.

19          **THE COURT:**  What else?

20          **MR. B. GUTIERREZ:**  We're ready for the jury.

21      **(Pause)**

22          **THE COURT:**  I don't care if he's got arresting power.

23  What does that have to do with anything?  A12?

24          Okay.  You all decide what you want to do with A12.

25  He says -- I don't know what this has to do with anything.

15

1  He's the one who says he's got a sick three-year-old.  And he

2  says he's the primary caregiver and that a neighbor is staying

3  with the child now.

4          **MR. B. GUTIERREZ:**  We have no objections, your Honor.

5          **THE COURT:**  Twelve.  Anybody?

6          **MR. RUMLEY:**  No objections, your Honor.

7          **THE COURT:**  Plaintiffs?

8          **MR. LOCHRIDGE:**  No objection, your Honor.

9          **THE COURT:**  A12 is struck; and A23 also is a primary

10 caregiver and has a child under 10 who she picks up after

11 school.

12         **MR. B. GUTIERREZ:**  No objection.

13         **MR. LOCHRIDGE:**  No objection, your Honor.

14         **THE COURT:**  A23 is struck.

15         Anything else?

16         **MR. B. GUTIERREZ:**  No, your Honor.

17         **MR. LOCHRIDGE:**  We're ready to go, your Honor.

18         **THE COURT:**  Everybody ready?

19         **MR. B. GUTIERREZ:**  Yes, your Honor.

20         **MR. RUMLEY:**  Yes, your Honor.

21         **THE COURT:**  All right.  Then we'll bring out the

22 jury.

23         Now, how much space do we need for the jury?

24         **MR. RUMLEY:**  I think there was a question as to how

25 many.

16

1          **THE COURT:**  How many what?

2          **MR. RUMLEY:**  How many there are going to be in --

3   what is it -- one through seven?

4          **THE COURT:**  Yeah; I'm asking Ms. Scotch how much

5   space we need.  We've got about, I think, 43 jurors?  Forty-

6   four?  Forty-two?  We just struck four or five.

7      **(Pause)**

8          Forty-two.

9          **MR. LOCHRIDGE:**  With the ones that were struck, will

10  there be spots left or will people move up?

11         **THE COURT:**  No; it will be on your chart.

12     **(The Court conferred with the clerk)**

13         **THE COURT:**  Okay.  Does this woman work outside the

14  home, Ms. Scotch?

15         **THE CLERK:**  Let me find out.

16     **(The Court conferred with the clerk)**

17         **--** Does she work outside the home?

18         **THE COURT:**  Yeah.

19         One more excuse just came up for 20; said that she

20  and her mother, the grandmother, have joint custody of a three-

21  year-old.  And the grandmother is in college till 2:00.

22         **MR. B. GUTIERREZ:**  No objections from us, your Honor.

23         **MR. LOCHRIDGE:**  No objection, your Honor.

24         **THE COURT:**  Okay.  Strike her.  So, that takes us to

25  41.

1            So, where do you want the people seated on the back

2     there?

3            **MS. UNIDENTIFIED:**  We're doing four rows back on one

4     side and three rows back on the other.

5            **THE COURT:**  Four rows back on the left side; three

6     rows back on the right side?

7            **COURT SECURITY OFFICER PADILLA:**  Three on this side,

8     your Honor, and then four on this side.

9            **THE COURT:**  Okay.

10           **MR. LOCHRIDGE:**  And how many will be in each?

11           **THE CLERK:**  Seven.  Seven in a row.

12           **MR. LOCHRIDGE:**  Seven?

13           **THE CLERK:**  Seven.

14           **THE COURT:**  Seven rows?

15           **MR. LOCHRIDGE:**  And there will be gaps for the ones

16    who were excused?

17           **THE CLERK:**  Yes.

18           **THE COURT:**  Actually, we'll give you a seating chart

19    with the X's on them.

20           **MR. LOCHRIDGE:**  Oh, okay.  Great.

21           **THE MARSHAL:**  All rise.

22        **(Recess was taken from 8:31 a.m. until 8:47 a.m.)**

23        **(Jury selection from 8:47 a.m. until 11:02 a.m.**

24    **transcribed under separate cover; resume transcription at 11:19**

25    **a.m.)**

18

1      **(Outside the presence of the jury)**

2           **THE COURT:**  Are you all ready for the jury to come

3    in?

4           **MR. B. GUTIERREZ:**  Yes, your Honor.

5           **MR. LOCHRIDGE:**  Yes, your Honor.

6           **THE COURT:**  Oh, the notes?  Everybody okay with

7    notes?

8           **MR. B. GUTIERREZ:**  No problem with us.

9           **THE COURT:**  Okay.

10          **THE CLERK:**  Do you want me to just set them down?

11          **THE COURT:**  Pardon?

12          **THE CLERK:**  Do you want me to set them down?

13          **THE COURT:**  Sure.

14      **(Pause)**

15          **MR. LOCHRIDGE:**  Your Honor, may I approach?

16      **(Voices and whispers off the record)**

17          **THE COURT:**  We'll do it at the break.  Is that okay?

18          **MR. LOCHRIDGE:**  Yeah.  It's a minor matter.

19          **RECORDER:**  Do you want to go off the record?

20          **THE COURT:**  No, because they're coming in.

21          **THE MARSHAL:**  All rise for the jury.

22      **(The jury entered the courtroom at 11:20 a.m.)**

23          **THE COURT:**  Thank you.  You may be seated.

24           We've put some notebooks there, just to tell you that

25    if you would like to take notes during the trial, you may do

1   so.  On the other hand, you are not required to take notes if

2   you prefer not to do so.  Each of you should make your own

3   decision about this.  If you decide to take notes, be careful

4   not to get so involved in note-taking that you become

5   distracted from the ongoing proceedings.  Your notes should be

6   used as memory aids only.  You should not give your notes

7   precedence over your independent recollection of the evidence.

8          If you do take notes, you should rely upon your own

9   independent recollection of the proceedings, and notes are not

10  entitled to any greater weight than memory or impression of

11  each juror as to what the testimony may have been.  Whether you

12  take notes or not, each of you must form and express your own

13  opinion as to the facts.  If you do take notes, you may not

14  share your notes with any other juror.

15         Are you ready to proceed with opening statements,

16  Mr. Rangel?

17         **MR. RANGEL:**  Yes, your Honor.

18         **THE COURT:**  Thank you.

19         **MR. RANGEL:**  May it please the Court, Counsel.

20         Good morning.  I was introduced earlier today, and my

21  name is Jorge Rangel.  I am one of the attorneys representing

22  Vanderbilt, CMH Homes, and CHI.

23         There are a number of parties here, and I wanted to

24  explain why we are here.  Vanderbilt filed this lawsuit to

25  repossess the mobile home that it sold to Mr. King and

1    Mr. Flores because Mr. King and Mr. Flores broke their promise.

2    When they bought the mobile home, they promised to pay for it.

3    they signed a contract.  And there is no question that they

4    signed the contract.  The purpose of this opening statement is

5    to give you a roadmap of what we believe the evidence is going

6    to show.  Ultimately the evidence will come from the witness

7    chair and from the documents that the Court will allow into

8    evidence.  But we are here seeking to repossess the mobile

9    home.  And in that sense we, Vanderbilt, is the plaintiff.

10   Vanderbilt has the burden of proof on our claim seeking to

11   repossess the mobile home.

12         Mr. King and Mr. Flores answered and filed a

13   counterclaim against my client.  They have the burden of proof

14   on their claim.  And then the Trevinos -- Arturo and Maria

15   Trevino -- intervened and filed a lawsuit, a claim against

16   Vanderbilt, CMH Homes, and CHI.  I know it's involved and it's

17   complicated, but the Court will give you the instructions and

18   explain where the burden of proof is.

19         Really, we have three stores that will be presented

20   to you.  The first one deals with the purchase of the mobile

21   home by Mr. King and Mr. Flores.  It was about nine years ago

22   that Mr. King and Mr. Flores decided that they wanted to buy a

23   mobile home and live in it together.  It was late December,

24   2001.  They were driving around and they saw the CMH homes

25   facility, and they stopped, they looked, and they identified

1   two of the homes, and one that they were interested in.

2          They came back for a second visit.  They found the

3   one they wanted.  They chose the one they wanted.  They signed

4   the contract, and they agreed to pay for it.  Before they

5   signed the contract, they knew that they had to make 144

6   payments of about $500 each.  They signed a number of documents

7   there.  But there is no question that before they signed the

8   contract they knew that they were taking on a serious

9   obligation.  And they knew that if eventually they would

10  default and not be able to pay for it, that Vanderbilt would

11  have the right to repossess.

12         Now, the home was purchased from CMH Homes, the

13  retailer.  You will see the contract on its face shows that it

14  was assigned, that it was transferred, to Vanderbilt.

15  Vanderbilt was financing the transaction.  So, once it was sold

16  to Mr. King and Mr. Flores, going forward, Mr. King and

17  Mr. Flores were going to deal directly with Vanderbilt.  They

18  were going to make the payments to Vanderbilt.  They would

19  communicate with Vanderbilt.  They knew that their obligations

20  going forward would be to Vanderbilt.

21         Now, before they were approved for the financing,

22  they submitted credit applications.  They submitted income

23  information.  The evidence is going to show that at the time

24  Mr. Flores was working as a hairdresser and Mr. King was

25  working at a funeral home.  They submitted income information

1  that will show that they qualified for the purchase of a mobile

2  home, which was about $40,000.

3          Now, there was something unique about this particular

4  transaction.  Ordinarily, when you buy a home, you have to make

5  a down payment.  Well, CMH Homes had a program in place that

6  would eliminate the need to make a down payment.  It was called

7  a "land-in-lieu" program, land in lieu of having to make a down

8  payment.  In other words, if a customer -- prospective

9  customer -- wanted to buy a mobile home, did not have the money

10 to make a down payment, even though would qualify for the

11 purchase of the home, if the customer would identify land that

12 was available that could be used as additional collateral for

13 the purchase of the mobile home, then that land would be --

14 would provide the basis for the down payment.  And that's what

15 happened here.

16          Mr. Flores's sister, Maria Trevino, and her husband,

17 Arturo Trevino, owned two lots in Jim Wells County:  Lot 35 and

18 Lot 36.  And as part of the transactions, part of the purchase

19 of the mobile home, those two lots were pledged as additional

20 security for the purchase of the mobile home.  Eventually the

21 mobile home was placed on Lot 36, which was a vacant lot.

22          Now, at the time of the transaction, Mr. King and

23 Mr. Flores signed a retail installment contract.  And the

24 retail installment contract, which is in evidence and you will

25 see, identified the obligation.  The contract also referred to

1    the land being pledged as security.  In addition to the

2    contract, there was a deed of trust and a builder's and

3    mechanic's lien filed.  And there is -- that's one of the

4    issues in this case, that Maria Trevino and Arturo Trevino

5    claim that they did not sign the deed of trust and the

6    builder's and mechanic's lien.  The deed of trust and the

7    builder's and mechanic's lien covered or provided for a lien on

8    the land.  And I think it's very important that you keep that

9    in mind, and the evidence will show this.

10          We're talking about the mobile home and the

11   indebtedness to the mobile home, and the indebtedness was taken

12   on by Mr. King and Mr. Flores.  That is addressed in the retail

13   installment contract.  The lien on the land, that was through

14   the deed of trust and the builder's and mechanic's lien, that

15   related to the land, and those documents carry the signatures

16   of the Trevinos and, of course, they are contesting that they

17   signed them.  And there will be evidence that will deal with

18   that, and we will bring in an expert that will address those

19   signatures, just like the Trevinos will bring their own expert

20   to deal with the issues on those signatures.

21          So, on January 16th of 2002, after all of the

22   paperwork had been signed, Vanderbilt -- Vanderbilt -- accepted

23   the assignment and paid CMH Homes, the seller of the mobile

24   home, for that assignment; paid, made an intercompany transfer,

25   of about $40,000.  So, at that point CMH Homes is out of the

24

1   picture and then the payments are being made to Vanderbilt.

2          After that assignment, Mr. King and Mr. Flores

3   continued -- or started and continued to make the payments.

4   The first payment was in March of 2002.  And the evidence is

5   going to show that they lived and made payments on that mobile

6   home for seven years.  Seven years.  They started making

7   payments in March of 2002, and the evidence is going to show

8   that they stopped making payments in the spring of 2009.

9          Throughout that seven-year period, Vanderbilt --

10  there's going to be evidence about contacts that Vanderbilt had

11  with Mr. King and Mr. Trevino when there were issues about

12  payment.  And that -- we're going to have a representative from

13  Vanderbilt who will come and testify about the discussions and

14  communications that Vanderbilt had with Mr. King and

15  Mr. Flores.  But throughout that period they were making the

16  payments.  There were some issues along the way, but they were

17  worked out.

18         Unfortunately, in the spring of 2009, the payments

19  stopped.  And what happened?  For personal reasons, Mr. King

20  and Mr. Flores could no longer get along, and Mr. King moved

21  out.  Mr. King, in effect, abandoned the mobile home, abandoned

22  his obligation, and really left it up to Mr. Flores to go

23  forward to pay on the mobile home.  Shortly thereafter notices

24  were sent to Mr. Flores and Mr. King indicating that they were

25  in default.  Notices were sent notifying of an intent to

1    accelerate the debt.  Notices were sent indicating that the

2    debt had been accelerated and again encouraging them to make

3    arrangements.

4           The evidence is going to show that Vanderbilt --

5    Vanderbilt -- would prefer for an owner, a homeowner, to stay

6    in the home.  The last thing that Vanderbilt wants to do -- the

7    last thing that Vanderbilt wants to do -- is repossess a home.

8    And that's why the evidence is going to show that they worked

9    real hard at trying to help Mr. Flores stay in the home,

10   because by that time Mr. King had left and moved to Refugio.

11   But when no payments were received, then Vanderbilt had no

12   choice but to file the lawsuit, in accordance with the terms of

13   the contract, the contract that was voluntarily and knowingly

14   signed by Mr. King and Mr. Flores.

15          You will hear them from the witness stand admit that

16   they signed that contract, that that is their signature.  There

17   is no question about their signature.  And, so, Vanderbilt

18   exercised its right to seek repossession, and that's why

19   Vanderbilt is the plaintiff and that's why Vanderbilt is here

20   trying to seek repossession.

21          So, then, you probably are asking yourself:  Well,

22   wait a minute; if they agreed to make 144 payments, if they

23   only made 84 payments, if they agreed that they owed the money,

24   or at least they agreed that they didn't make all the payments,

25   that they had not paid in full for the mobile home, what is

26

1    their defense?  Well, that gets us into the second story.

2           The first story is the transaction, the history of

3    the payments, and ultimately not paying.  So, when Vanderbilt

4    files the lawsuit in August of 2009, the response we get from

5    Mr. King and Mr. Flores is:  We don't owe the money.  We don't

6    owe the money because there was a document filed -- there were

7    a couple of documents filed in October of 2005, which means --

8    which, in effect, resulted in us not having to pay the money

9    anymore.

10           And, so, what are they referring to?  That gets us

11   into the second story, or the second part of this lawsuit.

12   What happened is that at the CMH retail store there were some

13   issues that came up with notary practices.  And you've heard in

14   some of the questioning -- although there is no evidence about

15   that -- you heard in some of the questioning that there were

16   some issues with notary practices, sloppy practices.  There

17   were some allegations; there were some claims about how the

18   notaries were exercising their duties and responsibilities.

19   And that was happening at the sales center 214.

20           Well, when that information got to Tennessee, you're

21   going to hear evidence directly from the president, Kevin

22   Clayton, of CHI.  Mr. Clayton is the son of the founder of

23   Clayton Homes.  And when he became aware of that, he left a

24   company-wide voice mail explaining -- explaining that that was

25   unacceptable and setting out that the company was going to do

1   something about it.  And, in fact, new notary practices and

2   policies were instituted.

3          Well, what else was done?  The complaints and the

4   problems at store 214 related to liens on the land.  Remember I

5   had told you of this land-in-lieu program, in addition -- that

6   there was a deed of trust and builder's and mechanic's lien to

7   deal with the land in this land-in-lieu program.  Since -- and

8   there were questions.  There were questions about -- that had

9   been raised about those documents.

10          You're going to hear evidence.  You're going to hear

11  evidence that the president, Mr. Nichols, of Vanderbilt and the

12  president of CMH -- CMH Homes, Mr. Booth, decided, look, since

13  there are questions being raised about these documents dealing

14  with the land, what we are going to do is release the liens on

15  the land.  The land only.  And that's what was done.  Releases

16  were filed, including releases on the land, Lots 36 and 35,

17  those lots that belonged to Maria and Arturo Trevino.

18          And, so, the intent -- and you will hear this

19  directly from the two decision makers -- the intent in filing

20  those releases was to release the liens on the land.  In no way

21  was it ever intended that those releases would release the

22  indebtedness, the underlying indebtedness, that was owed by

23  Mr. King and Mr. Trevino.  So, that's why I was saying a while

24  ago that -- how did they come back and say, "Well, we don't owe

25  the money"?  You heard Mr. Gutierrez state in one of his

1    questions this morning -- he made reference to the debt being

2    satisfied.  The evidence is going to be very clear here that

3    the debt has not been satisfied.  Mr. King and Mr. Flores have

4    not paid in full those 144 payments.  What they are saying is

5    that these releases of the liens on the land somehow release

6    their indebtedness.  And the evidence is going to be clear that

7    that is not what happened.

8         In fact -- and these two exhibits have already been

9    admitted into evidence -- I'm going to call up CP13 and CP12.

10   **(Pause)**

11        CP13.  This is one of those releases that I was

12   telling you about, and this is the mechanic's lien release.

13   And the word "release" is there, and this is what Mr. King and

14   Mr. Flores are seizing on, that this somehow released their

15   debt.  And they point to the language "paid in full."  So,

16   they're saying, "That language states that our debt has been

17   released and that, in effect, we've paid it in full."  That

18   is -- the evidence is going to be absolutely clear that that

19   did not happen.  That did not happen.

20        And to the extent they're going to be relying on this

21   document, I want you to note that nowhere in that document are

22   the names of Cesar Flores or Alvin King.  In fact, the only

23   names that are there are Maria Trevino and Arturo Trevino, the

24   landowners.  The landowners.  Which is consistent with what the

25   evidence is going to show, that the purpose of that release was

29

1   to release the lien on the land only.  The lien on the land.

2           And also keep in mind that Mr. King and Mr. Flores

3   had signed a retail installment contract.  That was where their

4   debt was.  Nowhere in that document is there any reference to

5   the retail installment contract.  In fact, there is a reference

6   to a contract, and it says "mechanic's lien contract."  So, on

7   its face there is nothing that shows that the underlying

8   indebtedness that Mr. King and Mr. Flores owed had been

9   released.

10          And, then, finally, this release was signed by CMH

11  Homes, Inc.; CMH Homes, Inc., the original seller of the home.

12  By this time the contract that was signed by Mr. King and

13  Mr. Flores had been assigned to Vanderbilt.  It had been

14  assigned to Vanderbilt.  So, the debt was owed to Vanderbilt.

15  Nowhere in this document is there anything that says that

16  Vanderbilt is releasing the indebtedness.  So, to be clear, to

17  the extent that they're going to be relying on this document to

18  say that somehow their debt has been released, there is no

19  basis for it.

20          The other document that they're going to point -- oh,

21  and keep -- look at the property description.  Lot 35 and 36,

22  Block 1, Gallimore Additon.  Those are the two lots that were

23  pledged as security with respect to the purchase of a mobile

24  home.  There is nothing in there that refers to the retail

25  installment contract or to the indebtedness.

30

1          They're also going to point to the deed of trust

2    release, which is CP Number 12.  And this was signed by

3    Vanderbilt, but this was with respect to the deed of trust,

4    again relating to the land.  Nothing -- again, there is nothing

5    in this document, the evidence will show, and you can see it,

6    that refers to Cesar Flores or Alvin King.  There is nothing in

7    this document that refers to the retail installment contract.

8    In fact, the names of Maria Trevino and Arturo Trevino are

9    there, not the names of Cesar Flores and Alvin King.

10         So, again, that is consistent with what Mr. Nichols

11   and Mr. Booth are going to testify, that these two releases

12   were filed in order to release liens on land.  The problem that

13   had been identified at sales center 214 dealt with paperwork

14   relating to the land, the problem related to the land.

15   Therefore, the solution to the problem was to release whatever

16   lien that was created by the deed of trust and the builder's

17   and mechanic's lien on the land.  And, frankly, it's that

18   simple.  Mr. King and Mr. Flores are taking these two documents

19   and saying, "Those documents mean that we do not have to pay

20   our debt, because it's been paid in full."  The evidence is

21   going to be clear that that did not happen.

22         So, I mean, the documents speak for themselves, but

23   you also are going to hear from the individuals who were

24   involved with the decision to deal with the problems at 214.

25   And there will be -- it will be absolutely clear -- absolutely

31

1    clear -- that the intent was to release the land only, not the

2    underlying indebtedness.

3              So, as you listen to the testimony regarding their

4    interpretation of what these documents mean, just focus on the

5    language; focus on the testimony by the witnesses; and focus on

6    your common sense.

7              Now, the third part of this story has to do with

8    Arturo and Maria Trevino.  As I mentioned, the first part had

9    to do with the transaction, the purchase of a mobile home.  The

10   second part had to do with the problems at Lot 214 that we

11   addressed by these releases.  Well, the third part is, after we

12   filed a lawsuit against Mr. King and Mr. Flores, Maria and

13   Arturo Trevino intervened into the lawsuit and say, "Well, wait

14   a minute.  We didn't know anything about these liens on our

15   land, so we're going to file a lawsuit against Vanderbilt, CMH

16   Homes, and CHI."

17             Well, you will be able to listen to the evidence in

18   terms of whether they, in fact, knew about those documents

19   being filed.  There's going to be the issue about the

20   signatures.  But you're going to find that the suggestion that

21   there was -- nobody knew anything, that Cesar Flores and Alvin

22   King did not know anything about the property being used as

23   collateral, is not going to be supported by the evidence.

24             There is going to be evidence of these documents that

25   were signed.  And, more importantly, you're going to see

1  evidence two days before the mobile home was purchased -- two

2  days before -- the contract was signed January 5th, 2002.  On

3  January 3rd, 2002, a fax was received by CMH Homes from the HEB

4  store in Alice.  And that fax consisted of the application for

5  Mr. King, Mr. Flores, credit information, personal history.

6  And what else was in that fax?  The fax contained a copy of the

7  deed to Lots 35 and 36 to Maria and Arturo Trevino.  And the

8  deed was -- contained the description, the precise description,

9  that ended up in the documents.  And the reason I'll emphasize

10  that is because there was a misspelling in the property

11  description.  That misspelling ended up in the documents that

12  were signed.

13       And Mr. King need Mr. Flores, the evidence is going

14  to show, have taken the position that they didn't know anything

15  about that fact; they don't know who sent their personal

16  information to CMH Homes.  They don't know who sent that

17  property description.  And as you listen to that evidence, you

18  have to ask yourself, using your common sense, "Does that make

19  sense"?

20       There's going to be evidence presented that, in

21  fact -- that, in fact -- Mr. King and Mr. Flores knew --

22  knew -- that those lots had been pledged as additional

23  security.  There's going to be evidence from questions that

24  they were asking when talking to Vanderbilt with respect to the

25  status of the liens on those lots.

1          So, you have to ask yourselves:  How could it be

2    possible that they would buy this mobile home, participate in

3    this land-in-lieu program, and somehow say that they had no

4    knowledge -- they had no knowledge -- that these lots had been

5    pledged as security?  Ultimately you are going to have to

6    decide the credibility of those statements.

7          And, so, in the end, really, it's a very simple case.

8    It started with Vanderbilt filing an action to repossess the

9    home, which it had a right to do, it has a right to do under

10   the contract.  And then, after that, we hear this theory that

11   Mr. King and Mr. Flores are no longer obligated because their

12   debt has been released.  And they're going to point to those

13   two documents that I've showed you that they're in evidence,

14   and you will see.  And as you go through those documents, ask

15   yourself:  Where is the basis for the claim that the

16   indebtedness has been released?  The evidence is going to show

17   that there is no basis.

18         Similarly, with respect to the claims about the

19   signatures, you will have to ask yourself:  Does it make sense

20   when you look at the history of the transaction, the history as

21   to how that property description was sent to CMH Homes?  And,

22   so, when you listen to the arguments and the evidence that they

23   are presenting, that those are not their signatures or that

24   they didn't know anything about it, you will have to consider

25   all of the evidence and determine whether from a standpoint of

34

1   common sense and from a standpoint of credibility that makes

2   any sense.

3            Ultimately, you will make your decision based on the

4   instructions that the Court's going to give you and based

5   upon --

6            **THE CLERK:**  Five minutes.

7            **MR. RANGEL:**  -- based on the evidence that you will

8   hear.  But you need to keep in mind -- and listen to the

9   witnesses, and, particularly, listen to the witnesses who were

10  involved in the decision to release those liens.  One thing

11  that will be absolutely clear is that the intent in filing

12  those releases had to do with releasing the lien on the land

13  and that in no way were those releases intended to release the

14  indebtedness.

15           So, as you consider everything -- and you will hear

16  from the other side shortly -- wait to till you hear all of the

17  evidence, listen to the evidence, and then answer those

18  questions:  Is what they are saying something that's credible,

19  that makes sense?  And as they present their arguments -- I'm

20  going to sit down in a minute and they're going to get up and

21  they're going to tell you this is what the evidence is going to

22  show from their standpoint.  But nothing they say will change

23  the facts.  The facts are that Mr. King and Mr. Flores agreed

24  to pay for a mobile home, they stopped paying, they have not

25  paid, Vanderbilt is entitled to repossess that home, and those

1   releases that were designed to address a problem that dealt

2   with liens on land at Lot 214 did not release the indebtedness.

3           Thank you very much for your attention, and we look

4   forward to presenting evidence to you.

5           **THE COURT:**  Thank you.

6       **(Pause)**

7           **MR. J. GUTIERREZ:**  May it please the Court.

8           Good morning.  Now that Mr. Rangel has said his piece

9   on behalf of the Clayton Homes organization, it's my turn to

10  tell you the rest of the story.

11          A company may not demand payment from someone if

12  there is no money due them.  If a company releases a debt, it

13  may no longer collect on it.  And if a company tries to collect

14  on a debt that has been released, it's responsible for all the

15  harm it causes to the person it tried to collect from.

16          Let me tell you the story of the Clayton Homes

17  organization in Corpus Christi.  The companies of Vanderbilt

18  Finance and Mortgage, Clayton Homes, Incorporated, and CMH

19  Homes, Inc. are based in Tennessee.  Together they make up what

20  I'll refer to as the Clayton Homes organization.  They're in

21  the business of selling mobile homes.  And sometime in the late

22  nineties or early two thousands they were heavily involved in

23  promoting a sales program in this area.  This program proved to

24  be very successful for them.  The program was called the "land-

25  in-lieu" sales program.

36

1          The land-in-lieu program was a sales promotion to

2    mobile home customers.  The program guaranteed anyone,

3    regardless of their credit, a mobile home if they brought a

4    deed of land with them to Clayton Homes.  The land could belong

5    to anyone.  It didn't need to belong to the person who wanted

6    to buy the mobile home.  Clayton Homes guaranteed that you'd be

7    approved for a mobile home if you brought a deed of lien to

8    them.  They advertised this program on TV, radio, and

9    newspaper.  And, as you can imagine, this program was very

10   appealing to people who wanted to buy a mobile home.

11          The evidence will show, however, that to make this

12   program work even better, Clayton Homes built a compensation

13   structure that encouraged its sales managers and its

14   salespersons to work really aggressively to sell these mobile

15   homes.  They were guaranteed bonuses on the sale of these

16   mobile homes.  The evidence will show that this program was

17   very successful and very appealing, but the evidence will also

18   show that there was a dark side to this program.

19          The evidence will show that the salesmen and the

20   sales managers, the same individuals who owned -- who earned

21   bonuses on the sale of the homes, they were also entrusted with

22   the responsibility of notarizing all the documents in these

23   transactions and verifying that all the signatures were true

24   and correct.  That is, instead of the closings, the purchases

25   of the mobile homes taking place at a title company with an

1    independent third party, like a lawyer or someone from the

2    title company, the deals were closed at the Clayton Homes store

3    as per Clayton Homes policy.

4         And the evidence will show that notary fraud occurred

5    in these stores.  The evidence will show that salesmen falsely

6    notarized documents.  And it wasn't just sloppy practices like

7    Mr. Rangel said.  They were fraudulent practices.  There were

8    forgeries involved.  And you will hear and you will see

9    evidence of this notary fraud from witnesses that will testify

10   that it happened to them.  The evidence will show that this

11   fraud was a hidden component of that land-in-lieu program.

12        Now, recall that the land-in-lieu program instructed

13   would-be purchasers to bring a deed of land with them when they

14   go to Clayton Homes.  The evidence will show that customers

15   were told that the purpose for bringing the deed of land was so

16   that Clayton Homes knew where to put the mobile home after it

17   was bought.  Many customers didn't own land, like I've said

18   before.  So, typically, they'd ask a family member or a friend

19   for permission to place the mobile home on their land.  When

20   they'd get that permission, the mobile home purchaser would

21   take a copy of that deed with them to the Clayton Homes store

22   and Clayton Homes would know where to put the mobile home.

23        But the evidence will show that Vanderbilt and CMH

24   were placing fraudulent liens on that land.  You will see, you

25   will hear evidence, that neither the mobile home purchasers nor

38

1   the landowners who had given their permission knew that this

2   was happening.  They did not know that liens were being taken

3   on their land.

4          The evidence will show that the liens were placed on

5   that land as collateral for the mobile home; so that if the

6   mobile home purchaser defaulted, not only would they lose their

7   mobile home, the landowners -- who had simply given permission

8   to place the mobile home on their land -- the landowners would

9   also lose their land.

10          And why was Clayton Homes using land as collateral in

11   the first place?  The evidence will show that the Clayton Homes

12   organization was packaging all of these loans and selling them

13   to investors, and loans backed by land are more valuable than

14   loans not backed by land.

15          Ultimately, in 2003, landowners and purchasers began

16   discovering liens on this land, began discovering notary fraud,

17   legal action was taken, and in response to that these companies

18   made a bold decision.  In 2005, the Clayton Homes organization

19   decided:  We're going to close the Corpus Christi store; we're

20   getting out of Corpus Christi.  But that's not all that they

21   did.

22          In October of 2005, Clayton Homes companies released

23   liens on nearly every piece of property it had taken a lien on

24   emanating from the Corpus Christi store.  Hundreds of liens

25   were released.  Releases were filed in October of 2005, and

1    they looked like this.  This is Exhibit Number 11,

2    Plaintiffs' -- that is, the Clayton -- the Flores/King parties'

3    Exhibit Number 11.  And this, in fact, is the same document

4    that Mr. Rangel showed you.  It indicates a loan number.  That

5    number is a loan number.  It indicates that CMH Homes -- it

6    references Maria Trevino, Arturo Trevino, landowners.  It

7    states that for valuable consideration in hand paid, CMH Homes

8    does hereby release the lien of said mechanic's lien contract

9    and has been paid in full.

10         Now, earlier it was said that there is no reference

11   to any contract, any purchasers' names.  This number refers to

12   a loan.  It refers to a retail installment contract, and this

13   is -- this is Exhibit -- Clayton Parties Exhibit Number 1,

14   646307; 646307.

15         Releases were filed, like this one, Exhibit Number

16   12, deed of trust release.  Vanderbilt, for valuable

17   consideration, does hereby release lien of said deed of trust;

18   also referencing Cesar Flores, also referencing the same loan

19   number.  Thank you.

20         CMH Homes's president will testify that Vanderbilt

21   filed these releases because of allegations of notary fraud in

22   Corpus Christi.  They'll testify that after they closed the

23   store the decision was made to release all outstanding loans.

24   The evidence will show that not only was Mr. Booth involved in

25   this decision, the board of directors of his company was

1   involved; the board of directors for Vanderbilt; Vanderbilt's

2   president, Mr. Nichols; the general counsel; their top lawyer,

3   Tom Hodges, was also involved in that decision.  These top-

4   level executives authorized the releases that say "paid in

5   full," like you've seen, that say that the deed of trust is

6   released.  They authorized releases referencing contracts.

7            So, did purchasers of Clayton Homes' Corpus Christi

8   store stopped paying on their mobile homes when these documents

9   were filed in 2005?  After all, the documents stated "paid in

10  full."  Well, the evidence will show that purchasers and

11  landowners were never told that these releases were filed.

12  Clayton Homes didn't mail copies of these releases to

13  purchasers and landowners.  And the Clayton Homes organization

14  admits that it did not notify purchasers and landowners that

15  these releases were filed.

16           Thus, the evidence will show that the Clayton Homes

17  organization promoted the land-in-lieu program, allowed its

18  salesmen to act as notaries, learned that those salesmen had

19  committed notary fraud, released these liens, didn't tell the

20  customers, and that even after these liens were released, they

21  continued to collect money from their customers.  And, in fact,

22  on customers who failed to make their payments, even after

23  these releases were filed, they filed lawsuits against those

24  customers.

25           Vanderbilt sued two such people, and that's why

1  you're here today.  You're here because Vanderbilt has sued

2  Cesar Flores and Alvin King, those two young men, to take away

3  their mobile home.  You're here because Vanderbilt is suing

4  them for thousands of dollars.  And I am here because I'm

5  defending them; because the evidence will show that Flores and

6  King went to Clayton Homes to buy a mobile home.  The evidence

7  will show that Ms. Trevino and Mr. Trevino gave Alvin and Cesar

8  permission to use their land to place the mobile home on.  The

9  evidence will show that CMH and Vanderbilt forged the Trevinos'

10  names to deeds of trust, placed liens on the Trevinos' land,

11  didn't tell any of these people that liens were taken on that

12  land.  And the evidence will show that, just like in all the

13  other cases that I described, Vanderbilt and CMH filed releases

14  in October of 2005 releasing Flores and King from their

15  obligation, stating that the contracts were paid in full.  But

16  the evidence will also show, of course, that Vanderbilt and CMH

17  didn't tell Flores and King that it had filed these releases.

18  Instead, they continued to collect money, close to $30,000,

19  from Flores and King, and they even now have filed a lawsuit

20  against Flores and King.

21          In order to prevail, Vanderbilt has to prove

22  something right off the bat.  Remember Vanderbilt didn't sell

23  the mobile home; CMH did.  CMH sold the mobile home, and

24  Vanderbilt said, "Well, CMH assigned the contract to us."

25  They're going to tell you about intercompany transfers and

1    documentation; but at the end of the day, Vanderbilt will be

2    unable to explain to you why, if they had the right under this

3    contract, why CMH Homes continued to assert its rights under

4    the contract.  No assignment ever occurred.  They have the

5    burden to prove it, and the evidence will show that they cannot

6    meet that burden.  They do not have the right.  They do not

7    have the right to take the mobile home away from Flores and

8    King.

9            Now, whether or not there was an assignment,

10   Vanderbilt still can't take away the mobile home, because

11   they've released them from any obligation, like I've told you

12   about.  The releases state -- and I'll go back to Exhibit

13   Number 11; Flores/King/Trevino Exhibit Number 11.  The releases

14   state:  paid in full.  For valuable consideration in hand paid,

15   CMH Homes has been paid in full, referencing 646307, which, not

16   coincidentally, corresponds with Exhibit 1.  And you will have

17   this with you in the jury room, the retail installment

18   contract, buyers Cesar Flores, Alvin King; 646307.  Paid in

19   full.

20           Just to be double sure that they meant paid in full

21   and they meant that this was released, they referenced 646307

22   on Exhibit Number 12 referencing Cesar Flores by name:

23               "For valuable consideration in hand paid, Vanderbilt

24               does hereby release the lien of said deed of trust

25               and/or mortgage."

1           The evidence will show that these documents mean that

2   these companies are abandoning their right to collect money and

3   to take the mobile home away from Flores and King.  Why does it

4   mean this?  Like Mr. Rangel said, the documents speak for

5   themselves, ladies and gentlemen.  The documents reference a

6   loan number.  They state "paid in full."  They have to mean

7   paid in full.

8           Now, they'll argue that they're just releasing claims

9   to the land, not the money owed under the contract.  But you'll

10  hear and you'll see evidence that if Clayton Homes had intended

11  only to release the land, they could have filed documents that

12  didn't say "paid in full."  They've done that before.  They

13  intended to release the debt.

14          And because Vanderbilt and Clayton Homes released the

15  debt and continued to collect money, Flores and King have

16  rights against Vanderbilt.  Flores and King have a right to

17  assert an unfair debt collection case against these companies,

18  a fraud case against these companies.  Why?  Because Vanderbilt

19  knew that these documents were filed.  They hid these

20  documents, did not tell these people that these documents were

21  filed, they continued to collect money.  Not only that, they

22  made collection calls, threatening letters, threats to

23  foreclose, even though they had asserted in documents

24  referencing loan numbers, referencing their names, that they

25  have been paid in full.  And for that, Vanderbilt must pay back

1   Flores and King for what they did.  They must pay back the

2   money they took after these documents were filed in secret, the

3   motivation of which was because of the notary fraud that was

4   happening in Corpus Christi; notary fraud that was so great

5   that the whole Corpus Christi store was closed.

6           Now, lastly, the evidence will show that Vanderbilt

7   violated the Racketeer Influenced and Corrupt Organizations

8   Act, also known as the "RICO Act."  Racketeering --

9           **THE CLERK:**  Fifteen minutes.

10          **MR. RUMLEY:**  Thank you, Ms. Scotch.

11          Racketeering?  A "racket" means organized criminal

12  activity, a fraudulent scheme or business.  The evidence will

13  prove that Vanderbilt, Clayton Homes, Inc., its salesperson,

14  the entire organization, was an enterprise engaged in a racket

15  of mail and wire fraud.

16          What was the mail and wire fraud?  They used the

17  mail, they used the wires to file these documents.  They used

18  the mail and the wires to take liens on the land to begin with;

19  and they used the mail and the wires to make collection calls,

20  threats, and are even using the courthouse to file a fraudulent

21  lawsuit against Flores and King.

22          The other racket they were involved in under the RICO

23  Act was money laundering.  How did money laundering occur?  Ill

24  gotten gains.  Money taken from these people after these

25  releases were filed for ill-gotten gains in violation of the

45

1   RICO act.  So, at the end of the case, I ask you:  Yes; the

2   documents will speak for themselves.  Yes; use your common

3   sense.

4          Mr. Rumley will now say his piece on behalf of

5   intervenors.

6          **THE COURT:**  Thank you.

7          You may proceed.

8          **MR. RUMLEY:**  Good morning.

9          No one really explained what an opening statement is.

10  Opening statement is the chance for the lawyers to talk to you

11  and tell you what they believe the evidence is going to show.

12  And I think it's real interesting; you heard from Mr. Rangel,

13  and he describes his case as three stories.  I think there is

14  some truth to that.

15         You heard story number two -- and I wrote this

16  down -- and Mr. Rangel was referring to the deed of trust

17  releases and the mechanic lien releases.  And you remember him

18  saying -- and I wrote this down -- these don't even mention the

19  contract.  These don't even mention Cesar Flores or Alvin King.

20  Do you remember him saying that?  That's why what comes out of

21  my mouth right now is not evidence.  What comes out of this

22  man's mouth is not evidence.  But what is evidence?  These are

23  evidence.  This is already in evidence.  And when we look at

24  Exhibit Number 11, you see right here 646307.  That's the

25  contract.  That's the contract.  This is evidence.  What he

1   says is not evidence.

2       If we look at what Mr. Rangel was saying, he was

3   saying about this assignment that CMH in '05 didn't own the

4   loan.  Well, if you look -- this is David Jordan.  He's an

5   officer of CMH.  And if you look right here, it says CMH

6   declares that it is the true and lawful owner and holder of a

7   certain note and indebtedness.  Guess what note and

8   indebtedness they're referring to?  Six four six three-o-seven,

9   the installment contract.  And guess what?  It's paid in full.

10  Paid in full.  And he signed this under the authority of the

11  board of directors.

12      What else?  The deed of trust.  Mr. Rangel said the

13  deed of trust release -- this release -- did not mention Cesar

14  Flores, did not mention a contract.  You heard him say it.

15  Look.  Cesar Flores; contract; 646307.  And guess what?  They

16  released the mortgage.

17      What you see is evidence.  What comes out of the

18  lawyers' mouths is not evidence.

19      This is a case about forgery.  Forgery.  This all

20  boils down to forgery.  Forgery of landowners' signatures,

21  forgery of notary signatures.  And that's one thing that you

22  didn't hear from them.  You didn't hear from them.  Their sales

23  associate, their assistant store manager, was also a notary.

24  And you heard a little bit about this land-in-lieu, where they

25  allowed these people to notarize documents.  Notarize

47

 1   documents.  Well, guess what they didn't tell you?  Guess what

 2   the rest of the story is.  Benjamin Frazier, signature on these

 3   documents, is forged, too.  Their own notary, their own store

 4   manager's signature was forged.

 5            What the evidence is going to show in this case --

 6   and you mentioned there's a deed of trust.  And this has been

 7   admitted as Exhibit Number 6.  This is the deed of trust.  In

 8   this deed of trust there are signatures.  And if we look, the

 9   signature of Maria Trevino, Arturo Trevino; those are not their

10   signatures.  Those signatures have been forged.

11            If we look at Exhibit Number 7, which is this

12   builder's and mechanic's lien contract, again, if we look at

13   the signatures, these signatures are forged.  They did not sign

14   these documents.

15            And someone during jury selection asked -- they

16   raised their hand and said, "Wait a minute" -- when I was

17   asking that question, and I think it was confusing, and talking

18   about evidence -- and someone said, "Well, what about the

19   notary?"  I mean, if the document's notarized, why don't we

20   just ask the notary?  Okay?  For sure we can talk to the

21   notary, the man that notarized, supposedly, my clients signing

22   these documents.  Let's just talk to the notary.  You didn't

23   hear about it from them.

24            If we look at this page, you'll see a notary stamp

25   right here, Benjamin Frazier.  And you'll hear from Benjamin

48

1   Frazier.  You'll hear from Benjamin Frazier, but I would lend a

2   bet that you're going to hear from him when we put on our case.

3   The Benjamin Frazier who was a assistant store manager, his

4   signature right here is forged.  He's going to testify his

5   signature was forged.  This signature right here is forged.

6   His signature is forged.  If we look at the deed of trust,

7   he'll testify that this signature is forged.  He'll testify

8   this signature is forged.  He'll testify this signature is

9   forged.

10          And what you're going to hear from Mr. Frazier -- we

11  asked him:  "Mr. Frazier, if your signature is forged, as a

12  notary, can you testify that the Trevinos signed this

13  document?"  He said no.  He even went and said, even if it is

14  his signature -- and you'll see some documents where he says,

15  "Yeah, I notarized that document."  Even when he signed his own

16  name, he's going to say, "I can't tell you whether or not that

17  individual signed the document."  Well, wait a minute; you're a

18  notary.  He says, "Well, I didn't know, as a notary, that I was

19  supposed to actually witness someone signing the document."

20          So, for years -- for years -- he was notarizing

21  signatures he never saw; they were forging his signature

22  throughout the store; and this -- that -- is why this company

23  released hundreds -- hundreds -- of deeds of trust; hundreds of

24  these mechanic lien contract.

25          Now, you may ask yourself:  How can this happen?  How

1    in the world can this happen?  How can they forge deeds of

2    trust?  How can they forge mechanic lien contract with a forged

3    notary?  How can that get filed in our --

4         **THE COURT:**  Could you get to the podium, please, by

5    the microphone?

6         **MR. RUMLEY:**  How can that get filed in the county

7    records?  It's real easy.  All you do is you take the document,

8    you pay a filing fee, and it's recorded.  It's as easy as that.

9         How could it happen with this company?  Well, they

10   mentioned there's Clayton Homes, Inc.  That is the parent

11   company.  And it's a one-stop shop.  They manufacture the home,

12   they sell the home, they finance the home, they insure the

13   home.  Vanderbilt is owned by Clayton Homes, Inc.  And what the

14   evidence is going to show, when you own your own bank -- when

15   you own your own bank -- you get to create the rules.  Right?

16   You get to create the rules.

17        So, what rules did they create?  You didn't have to

18   close at a title company.  No title company.  Your sales

19   associates could close the transaction, even though they

20   enjoyed a financial interest in the transaction.  They could

21   notarize it even though they enjoyed a financial interest in

22   the transaction.

23        Vanderbilt -- Vanderbilt -- and you'll hear from

24   Mr. Nichols right here.  He'll testify.  He admitted that the

25   only thing within this company that was in place to prevent

1   their salespeople from forging landowners' signatures is their

2   own notaries.  Is their own notaries.  He'll admit that, but

3   guess what?  This company had no policies in place for

4   notaries.  They knew their employees were notaries; they paid

5   for them to become notaries; but they had no policies.  And

6   Mr. Rangel did say that they created new policies.  Yeah, they

7   created them after they got caught.  After they got caught.

8        You ask yourself why.  Why would they do it?  This is

9   why they would do it.  Sales associates were paid on a

10  commission.  They were paid a draw, which means that if they

11  weren't selling homes, they became in debt to the company.

12  And, so, it was sell, sell, sell.  You had sales associates

13  getting up to 26 percent of the gross profit of the sale.  You

14  had the store manager getting 50 percent of the gross profit of

15  the sale.  The sales associate, the store managers, the people

16  charged with verifying signatures; it was a sell, sell, sell.

17       CMH; what did they get out of it?  They wanted to

18  sell homes.  They wanted to sell homes.  Vanderbilt; what did

19  Vanderbilt -- why would Vanderbilt do this?  Well -- and this

20  was brought up a little while ago.  Vanderbilt is the bank.  It

21  is the mortgage company.  But guess what?  They don't have

22  money.  What they do is they pool all these loans together and

23  they go sell them to investors.  Investors pay them money.

24  They use that money and they reinvest it and do it again.

25  That's how they make their money.

1          And what they figured out is, is that if you're going

2   to sell a loan to an investor, if you're going to take an

3   investment in a loan, you're going to pay more money for a loan

4   for a manufactured home that has wheels that could be moved

5   like a vehicle -- you're going to pay more money for that loan

6   if it's backed by real property.  If it's backed by real

7   property, you're going to pay more money.  That's why

8   Vanderbilt had these relaxed lending standards, because they

9   knew they could get more money by selling these land-in-lieu

10  loans.

11          Now, in this case my clients' signatures were forged.

12  And you're going to hear -- you're going to hear from my

13  clients, and they're both going to say their signatures were

14  forged.  You're going to hear from Ben Frazier.  You're also

15  going to hear from Janet Masson, who is a handwriting expert

16  from here in Houston.  And she's going to testify that she

17  compared the signatures and the signatures on the deed of trust

18  and mechanic's lien contract are not their signatures.

19          You're also going to hear from a fellow named Larry

20  Stewart.  And Larry Stewart is going to come all the way from

21  California.  Mr. Stewart is their handwriting expert.  They

22  found Mr. Stewart through an expert service that puts lawyers

23  and experts together.  And listen carefully when Mr. Stewart

24  testifies, because they look at the signatures and they look

25  and all this stuff, and Mr. Stewart agrees with the differences

1    found on the Trevino signatures on the deed of trust and the

2    mechanic's lien.  He agrees that there's differences from their

3    genuine signatures.  He just comes up with a different opinion.

4    He just comes up with a different opinion.

5              And when you're judging his credibility, one of the

6    things, ask yourself -- just ask yourself -- this company has

7    paid Larry Stewart more than $125,000 just in this case.

8    Hundred and twenty-five thousand dollars.  A hundred and

9    twenty-five thousand dollars for him to come and look at two

10   signatures and come up with the opinion and come testify.  And

11   guess what?  He just started working at the end of June.

12   Perhaps if this company had notary practices, if they had a

13   notary that was following the law, they wouldn't have to spend

14   $125,000 on an expert.

15             The statute that my clients are suing under is the

16   fraudulent lien statute.  And what it says is that a company or

17   a person or a party cannot file a fraudulent lien, in a

18   nutshell.  And we -- our allegations against them are that the

19   deed of trust and the mechanic's lien contract are fraudulent

20   documents and that they filed these fraudulent documents to

21   record a fraudulent lien.  And we believe the evidence is that

22   these documents are fraudulent for two reasons:  One, the

23   signatures of my clients were forged; and, number two, the

24   notary was forged.  The documents were fraudulently notarized.

25             You'll see testimony from Mr. Frazier, who says, "My

1    signature was forged."  Those documents -- and I think that's

2    why we didn't hear anything.  I don't think there is any

3    dispute that those documents are fraudulently notarized.

4    Mr. Frazier is going to tell you that.  I asked him who forged

5    them.  You're going to hear from a guy named Robin Moore.  He's

6    a sales associate.  You're going to hear from a guy named

7    Kimball.  Both of those sales associates will testify that they

8    impersonated Frazier as a notary -- even though they're not

9    notaries -- that they impersonated him and forged his

10   signature.  They'll admit to it.  They'll admit to it.  These

11   were the practices that were in place at this company that led

12   them to file these mass releases.

13          And the important thing, when you're looking at the

14   statute and the questions that the Court will submit at the end

15   of the case, is -- relates to -- and this is one thing they

16   didn't talk about, but it's one thing that I'm sure you're

17   going to hear probably this afternoon, is this idea of no harm,

18   no foul.  No harm, no foul.  Yeah, we had bad notary practices;

19   yeah, our notary signatures were forged; yeah, there may have

20   been some landowner signatures were forged; but we released

21   them.  We released the liens.  No harm, no foul.  That's the

22   only way they can defend the conduct of their employees.

23          And what the fraudulent lien statute does is it

24   actually combats this "no harm, no foul."  It combats exactly

25   what they're going to try to do.  And the important thing is

54

1    the statute does not say, does not require, that damages be

2    proved.  What it causes is to look at what the defendants

3    intended when they filed the documents.  And that's very

4    important.  Did these defendants intend to cause my clients

5    harm when they filed the fraudulent documents?  That is the

6    question you're going to be asked.

7              And very quickly -- and I think they'll -- they'll --

8    they -- he agreed --

9              **THE CLERK:**  Five minutes.

10             **MR. RUMLEY:**   -- my clients did not sign the retail

11   installment contract.  They're not obligated to pay on the

12   contract.  Yet the documents, the very documents that they

13   filed, the fraudulent documents they filed, if you see, Maria

14   Trevino, hereinafter called "grantor," and it comes down and it

15   says $40,000; the installment contract is made in trust to

16   secure payment of one retail installment contract, $40,000,

17   executed by grantors.  My clients didn't sign the installment

18   contract.  They agree with that.  If we look at the mechanic's

19   lien contract, it has my clients listed as the owner.  If you

20   come down here, it says owner agrees to pay contractor $40,000.

21             These documents themselves, the fraudulent documents

22   themselves, establish their intent.  They intended, when they

23   forged these documents and they filed these fraudulent notary

24   documents, when they filed them with the court, they intended

25   to cause my clients harm.  They intended to obligate them to

1    pay for the note or lose their land.  But not only did they

2    intend that when they did that, what they did is they took this

3    loan and they sold it to investors.  This loan was sold to an

4    investor.  And when they sold it to the investor, they wanted

5    the investor to believe that it was backed by real property.

6    Why?  Because they got more money for it.  They got more money

7    for it.

8            At the end of this case -- and Mr. Rangel mentioned

9    it, about common sense.  Common sense.  And one of the things

10   that the Court's not going to instruct you on is -- is you're

11   going to set aside your biases, your prejudice, but not your

12   common sense.  You don't have to check your common sense at the

13   courthouse desk.

14           And when you're looking at this evidence, ask

15   yourself:  If there wasn't fraud and forgery, if it wasn't

16   rampant, why do they now close at a title company?  They now

17   make them close at a title company.  If there wasn't fraud and

18   forgery and it wasn't rampant, why do they now have policies

19   and procedures?  If fraud and forgery wasn't rampant, why do

20   they no longer have this land-in-lieu program?  No more.  If

21   you're going to give your land up as collateral, guess what?

22   You're going to sign the contract.  That's what we should do.

23           The bottom line is, is that this company has come

24   in -- and you'll see evidence; and this is the common sense.

25   Why would this company spend over $150,000 on experts in this

1   case to foreclose on a $20,000 debt?  It's the no harm, no

2   foul.  They're coming and they're looking for a jury verdict;

3   hey, we did it; no harm, no foul.  And that's why we're asking

4   for punitive damages in this case.  We want you to hear the

5   evidence, learn of the conduct of this company, that they come

6   into Corpus Christi, they commit these acts, they close their

7   store and they pull out, and now they want to come in and get a

8   verdict that says no harm, no foul.

9           We would ask at the end of the evidence -- at the end

10  of the evidence, you find that this company committed fraud,

11  that they've caused damages.  We would ask that you award a

12  punitive damage award that tells them:  This is wrong.  There

13  is no such thing as no harm, no foul.  This is wrong.  Don't do

14  it again.

15          Thank you.

16          **THE COURT:**  Thank you.

17          I think it's time for a lunch break now.  I wanted to

18  get the opening arguments in.  And what happens now is that

19  each party will put on their evidence, and then we'll have

20  closing arguments, and then you can deliberate.  But that's six

21  days down the road.  So, we should have about six days' worth

22  of evidence.  And we're going to break for lunch till about

23  1:40; and I'll see you back here then.  Would you please

24  remember my instructions; and everyone stand for the jury.

25          And escort them out through the door, please,

1    Mr. Castillo.

2            **THE MARSHAL:**  All rise.

3        **(The jury exited the courtroom at 12:28 p.m.)**

4        **(Outside the presence of the jury)**

5            **THE COURT:**  Thank you.  You may be seated.

6            Anything to take up outside the presence of the jury?

7            **MR. B. GUTIERREZ:**  None from us, your Honor.

8            **MR. UNIDENTIFIED:**  Nothing.

9            **MR. LOCHRIDGE:**  I just have one small matter, Judge.

10           **THE COURT:**  Yes, sir.

11           **MR. LOCHRIDGE:**  This doesn't need to be on the

12   record.

13           **THE COURT:**  Okay.  Off the record.

14       **(Off the record at 12:29:13 p.m.; On the record at**

15   **12:29:58 p.m.)**

16           **THE COURT:**  If you all could come back about 1:35,

17   please.  And preliminary about the proposed charge; what do you

18   think?

19           **MR. UNIDENTIFIED:**  Mr. Soltero?

20           **MR. LOCHRIDGE:**  Mr. Soltero is --

21           **THE COURT:**  Nobody has read it?  Okay.  Never mind.

22           **MR. LOCHRIDGE:**  He's ready for the charge.

23           **MR. UNIDENTIFIED:**  We've read it.

24           **MR. SOLTERO:**  We've read it, Judge.  There's going to

25   be a number of issues we're going to have to take up.

1          **THE COURT:**  Do you all think you can maybe work

2    together on this and --

3          **MR. SOLTERO:**  We'll do that.  But we're still going

4    to have a lot of additional things --

5          **THE COURT:**  Such as?

6          **MR. SOLTERO:**  Well, such as, Judge, on -- again, it

7    depends what goes to the jury.  I mean, the RICO is a big part

8    of it, and the punitive damages.  That's a whole lot of them.

9    But first is proximate cause is not correctly defined.  That's

10   just, like, one thing that comes to mind immediately.  There

11   are additional instructions that are -- some that are non-

12   pattern that we believe are appropriate.  Duty to read; when

13   you are charged with documents, and that you read what the

14   contents of documents.  I think there's other issues.  But I

15   can get with Mr. (indiscernible).

16         **THE COURT:**  That's fine.

17         **MR. SOLTERO:**  And --

18         **THE COURT:**  The problem is, did they sign the

19   documents?  If you signed them, then you're charged with

20   reading them.

21         Oh, and Mr. (indiscernible), the reason I said, "That

22   didn't make any sense," is that many people would interpret

23   that if the Trevinos take the stand and say, "This is not my

24   signature," that's direct evidence, not circumstantial.

25         **MR. RUMLEY:**  I understand.

1          **THE COURT:**  And that was why it was confusing to me,

2    and probably to the jurors, who are much more skilled in law

3    than we are.

4          **MR. RUMLEY:**  It sounded a lot better in my head, your

5    Honor.

6          **THE COURT:**  It did.  It did.  As do those wonderful

7    tunes.

8          Anything else?

9          **MR. J. GUTIERREZ:**  Yes.

10         **THE COURT:**  All right.  Thank you.

11         **MR. J. GUTIERREZ:**  I had one --

12         **THE COURT:**  Yes, sir.

13         **MR. J. GUTIERREZ:**  -- one point on the charge, your

14   Honor.  That is that the question -- the first question is

15   whether or not there is an assignment, and Flores and King

16   believe that there has been no assignment --

17         **THE COURT:**  Okay.

18         **MR. J. GUTIERREZ:**  -- then it can't be foreclosed on.

19         **THE COURT:**  Okay.  So, you all just do your own --

20   you know, use that as a thing, you know, sort of a framework,

21   and tell me what the right instructions are for proximate

22   cause, et cetera.  Okay?

23         **MR. B. GUTIERREZ:**  Yes, your Honor.

24         **THE COURT:**  And was there or was not an assignment,

25   and, if so, go to -- skip to question such-and-such.

60

1          **MR. B. GUTIERREZ:**  Yes, your Honor.

2          **THE COURT:**  All right.  Thank you all.

3          **MR. UNIDENTIFIED:**  Thank you.

4          **THE COURT:**  But try to work it out together.

5          **MR. B. GUTIERREZ:**  We will, Judge.  We'll get

6   together tonight.  We were thinking of getting together this

7   evening, your Honor, visiting with Mr. Soltero.

8          **THE COURT:**  That would be wonderful.

9          **MR. B. GUTIERREZ:**  Yes.

10          **THE COURT:**  Just wonderful.

11          **MR. B. GUTIERREZ:**  We'll work on it.

12          **THE COURT:**  Thank you.

13      **(A recess was taken from 12:32 p.m. to 1:38 p.m.)**

14      **(Outside the presence of the jury)**

15          **THE COURT:**  You may be seated.  Anything to take up

16   outside the presence of the jury?

17          **MR. B. GUTIERREZ:**  No, your Honor.

18          **THE COURT:**  You may be seated.  Is the jury out here?

19          **THE MARSHAL:**  Yes, your Honor.

20          **THE COURT:**  Could you bring them in, please?

21          **THE MARSHAL:**  Yes, your Honor.

22      **(Pause)**

23          All rise for the jury.

24      **(Jurors enter courtroom at 1:41 p.m.)**

25          **THE COURT:**  Thank you.  You may be seated.

 1          Call your first witness, please.

 2               **MR. RANGEL:**  Your Honor, we would call Cesar Flores.

 3               **THE COURT:**  Would you administer the oath, please?

 4               **THE CLERK:**  Yes, your Honor.

 5          Please raise your right hand.

 6            **CESAR FLORES, PLAINTIFFS' WITNESS, SWORN**

 7          Thank you.  Would you please be seated.

 8               **MR. RANGEL:**  May I proceed, your Honor?

 9               **THE COURT:**  You may proceed.  Thank you.

10                      **DIRECT EXAMINATION**

11     **BY MR. RANGEL:**

12     Q    Mr. Flores, please state your full name.

13     A    Cesar Flores.

14     Q    And where do you live, Mr. Flores?

15     A    I live in Alice, Texas.

16     Q    And what address is that?

17     A    I'm currently at 1706 Carmen Street.

18     Q    And you are the same Cesar Flores who along with Alvin

19     King purchased a mobile home from --

20          **(Voices heard off the record)**

21               **THE COURT:**  Could you move closer?  Just lean your

22     right arm onto the -- yes, and then that puts you right into

23     the microphone, sir.

24               **THE WITNESS:**  Thank you.

25               **THE COURT:**  Thank you.

Flores - Direct / By Mr. Rangel                    62

1    **BY MR. RANGEL:**

2    Q    And you are the same Cesar Flores who along with Alvin

3    King purchased a mobile home back in January of 2002 from

4    CMH Homes; is that correct?

5    A    Yes, sir.

6    Q    Okay.  And Maria Trevino is your sister, correct?

7    A    Correct.

8    Q    And Arturo Trevino is your brother-in-law.

9    A    Correct.

10   Q    And Andrea Flores is your mother?

11   A    Yes, sir.

12   Q    And Heberto (phonetic) Flores, Jr. is your brother.

13   A    Yes, sir.

14   Q    Now, where does your brother live?

15   A    He currently lives at 1702 Carmen Street in Alice.

16   Q    And where does your mother live?

17   A    At 1706 Carmen Street in Alice.

18   Q    Okay.  So you are living with your mother right now.

19   A    I am currently staying with her right now.

20   Q    And the house where your brother Heberto lives is next

21   door to the lot where the mobile home is located, correct?

22   A    Correct.

23   Q    And the mobile home is located at Lot 36.

24   A    Yes, sir.

25   Q    Okay.  Now, Mr. Flores, do you understand that this is a

Flores - Direct / By Mr. Rangel                63

1  lawsuit to repossess that mobile home?

2  A    I do.

3  Q    Okay.  And it is true, is it not, Mr. Flores, that back on

4  January 5th, 2002, you signed a contract to purchase that

5  mobile home?

6  A    Yes, I did.

7  Q    And that contract is CP 1, which I would call up at this

8  time.

9       **(Pause)**

10        And do you recognize this to be the contract,

11  Mr. Flores?

12  A    Yes, I do.

13  Q    And the contract at the top states that you and Alvin King

14  are the buyers, correct?

15  A    Correct.

16  Q    And then at the time that you purchased the mobile home

17  the address that you gave CMH Homes was 1702 Carmen, correct?

18  A    That's what's on the application.  I don't recall giving

19  that address.

20  Q    Is that where you were living at the time?

21  A    I was living at the time there, yes.

22  Q    But that is the address that is on the contract.

23  A    Correct.

24  Q    And right above your name do you see where it says

25  "assignee"?

Flores - Direct / By Mr. Rangel          64

1   A    Yes, I do.

2   Q    And on the face of this contract it says that the assignee

3   is Vanderbilt Mortgage and Finance, Inc., correct?

4   A    Correct.

5   Q    Now, let's go to the page where your signature is.  I

6   believe it's on Page 4.

7        That is your signature, correct?

8   A    Yes, sir.

9   Q    You signed this contract, correct?

10  A    Yes, sir.

11  Q    And Mr. King also signed the contract, correct?

12  A    I believe he did.

13  Q    And I think your signature also appears on Page 2.

14       **(Pause)**

15       That is your signature, correct?

16  A    Yes, sir.

17  Q    And that is Mr. King's signature, correct?

18  A    I believe it is.

19  Q    Now, this contract, Mr. Flores, did not require that your

20  signatures on the contract be notarized, correct?

21  A    No, it did not.

22  Q    Now, going to the first page again, the first paragraph,

23  if you'll read with me the second sentence:

24       "The seller will submit this contract to Vanderbilt

25       Mortgage and Finance, Inc., P.O. Box 9800, Maryville,

Flores - Direct / By Mr. Rangel                65

1                Tennessee; and if approved, the contract will be

2                assigned to Vanderbilt Mortgage and Finance, Inc."

3                Correct?

4    A    Yes, sir.

5    Q    That was in the contract that you signed, correct?

6    A    It's on there, yes, sir.

7    Q    Okay.  Now, before you signed the contract you knew the

8    amount of your obligation to Vanderbilt, correct?

9    A    Can you -- before I signed the contract I knew the

10   amount --

11   Q    You knew that you had to make 144 monthly payments,

12   correct?

13   A    Yes.  That day they showed that to me.

14   Q    And you knew that the payments were going to be about

15   $500 each.  If you look further in the contract, each of the

16   payments was going to be $511.40, correct?

17   A    Yes.

18   Q    And the first payment was due, if you look over to the

19   right, on March 1st, 2002, correct?

20   A    Correct.

21   Q    As of today, Mr. Flores, you have not made the 144

22   payments have you?

23   A    They have not been made, no.

24   Q    At some point you stopped making the payments, correct?

25   A    Correct.

Flores - Direct / By Mr. Rangel                66

1   Q    And that coincided with when Mr. King moved out, correct?

2   A    It was about that time, yes, sir.

3   Q    And Mr. King moved out in March-April of 2009, correct?

4   A    It was around that time, yes, sir.

5   Q    And so because you have not made the 144 payments you have

6   not paid the full amount that was owed under the contract,

7   correct?

8   A    Correct.

9   Q    In other words, you have not paid the contract in full,

10  correct?

11  A    Correct.

12  Q    You still owe payments under the contract, correct?

13  A    I don't believe I do.

14  Q    And the reason you do not believe you do is because you

15  believe that those documents that we talked about earlier

16  released your obligation, correct?

17  A    Correct.

18  Q    And if you're mistaken about that, you still owe the

19  money, correct?

20  A    Correct.

21  Q    Now, let's go back to December of 2001.  It was late

22  December when you and Mr. King decided that you wanted to buy a

23  mobile home together, correct?

24  A    Not necessarily so.  In late December, I came to a point

25  in my life where I knew that I wanted to move out of where I

Flores - Direct / By Mr. Rangel                67

1   was living with my mother.  Whether I was going to buy a mobile

2   home or not was not decided on at that time.

3   Q    But it was in late December that you and Mr. King went to

4   the CMH Homes retail sales store in Corpus Christi, correct?

5   A    Yes, sir.

6   Q    And you had had some discussions with Mr. King about

7   possibly buying a home, whether it was a mobile home or a home

8   where you all could live together, correct?

9   A    Well, we had talked about just moving out.  So it was

10  either buying, renting.  We were looking at all of our options

11  at that time.

12  Q    And one of the options was to buy a mobile home, correct?

13  A    That it could become available, yes.

14  Q    In fact, one day in December you all were driving around

15  Corpus Christi and you saw the CMH Homes retail sales store and

16  you stopped.

17  A    Correct.

18  Q    And you stopped to look at the homes there, correct?

19  A    Yes, sir.

20  Q    Now, before you went to Corpus Christi that day and looked

21  at the mobile home you had not had any prior discussions with

22  your mom or with your sister Maria about buying a mobile home,

23  correct?

24  A    No, sir.

25  Q    Is that correct?

Flores - Direct / By Mr. Rangel                68

1    A    Yes, sir.

2    Q    And when you went to the sales center that day you and

3    Mr. King walked around the lot, correct?

4    A    Correct.

5    Q    And as you walked through you identified a couple of homes

6    that perhaps you were interested in, correct?

7    A    As we were walking around we were just looking at all of

8    the homes.  We hadn't identified two particular ones at that

9    point.

10   Q    At some point during that first visit did you identify one

11   or two of the homes that perhaps you were interested in?

12   A    We were shown two homes that we became interested in; so,

13   yes.

14   Q    And, in fact, one of those two homes ended up being the

15   one that you purchased, correct?

16   A    Correct.

17   Q    So you had a discussion with a sales representative there

18   at the sales store about buying a mobile home, correct?

19   A    Correct.

20   Q    And you don't recall the specifics of that conversation,

21   correct?

22   A    No, I don't.

23   Q    After that first visit had you made up your mind that you

24   liked one of those two homes?

25   A    Yes, sir.

Flores - Direct / By Mr. Rangel                69

1  Q    And you still were not prepared to commit to buy one of

2  the homes during that first visit, correct?

3  A    Correct.

4  Q    You asked some questions about how much -- about how much

5  your monthly payments were going to be, correct?

6  A    I don't remember that I asked that question that day.  I

7  think I might have.

8  Q    Certainly that was one of the things you were interested

9  in before you knew -- you had to know how much you were going

10 to pay --

11 A    Sure.

12 Q    -- to see whether you could afford it, correct?

13 A    Correct.

14 Q    Now, during that first visit did you have any discussions

15 with the sales representative about this land-in-lieu program?

16 A    During that meeting, that first meeting?

17 Q    Yes, sir.

18 A    I really don't remember the specific conversation.  I know

19 that land-in-lieu was never used in that conversation.  It was

20 more like if we had a place or a piece of property to put the

21 trailer, we could get approved and have the trailer put there.

22 Q    I mean was it your understanding -- I mean did the

23 question of making a down payment come up?

24     **(Pause)**

25 A    I'm sure it did.  I just don't remember.

Flores - Direct / By Mr. Rangel                    70

1   Q    And on that day you were not prepared to make a down

2   payment on the purchase of a mobile home, correct?

3   A    It hadn't really been a goal of mine at that point; so,

4   no, I was not prepared.

5   Q    Okay.  And you didn't have any savings at the time did

6   you?

7   A    I did not have a savings account, no, sir.

8   Q    Okay.  And when you left the store, the sales center, that

9   day did you have an understanding as to whether or not you

10  would have to come up with a down payment?

11  A    The understanding that I had was if we had a piece of

12  property, we could put the manufactured home on there and we

13  would not have to give a down payment in regards to money.

14  Q    Okay.  And certainly, Mr. Flores, you would agree with me

15  that every mobile home that's purchased has to be on a piece of

16  property.

17  A    Correct.

18  Q    And your understanding of the conversation is that so long

19  as you could identify a piece of property to place that mobile

20  home on you wouldn't have to make a down payment, correct?

21  A    Correct.

22  Q    And certainly I guess that would apply to every sale of a

23  mobile home, no down payment would be required if the buyer

24  just had a place to put it, correct?

25  A    Can you rephrase that again for me?

Flores - Direct / By Mr. Rangel          71

1  Q    Yes.  I mean if what you say is correct, that so long as

2  you have a piece of property on which to place the mobile home,

3  no down payment would be required.  That would mean that every

4  purchaser of a mobile home that has a place to put a mobile

5  home would not have to make a down payment, correct?

6  A    I can't speak for every other trailer, but I can speak for

7  mine.

8  Q    And so your understanding in terms of your situation is

9  that so long as you had a place to put the mobile home on, you

10  would not have to make a down payment, correct?

11  A    Correct.

12  Q    During that first visit did you have a discussion with the

13  salesman about land being used as collateral or additional

14  security in the purchase of the mobile home?

15  A    No, sir.

16  Q    And there was absolutely no discussion about that.

17  A    The only discussion that I can remember is that we were

18  told if we had a place to put the manufactured home or the

19  mobile home we would basically be approved.  I don't remember

20  details as far as what the conversation consisted of.

21  Q    And you would be approved to buy it without having to make

22  a down payment, correct?

23  A    Correct.

24  Q    Okay.  Now, before you went to the sales center that day

25  you knew that your sister Maria and her husband Arturo owned

Flores - Direct / By Mr. Rangel                      72

1   Lots 35 and 36 there in Alice, correct?

2   A    Before I went?

3   Q    Yes.

4   A    I did not know.

5   Q    When did you first find out that your sister owned Lots 35

6   and 36?

7   A    Well, I had an idea that it was theirs.  I just at that

8   point hadn't really asked questions or really even bothered, so

9   I wasn't 100 percent certain that it was theirs.  So it wasn't

10  until after our initial meeting at Clayton Homes that I went

11  home and spoke to my sister and her husband in regards to what

12  was said that it became -- I was sure that that property was

13  theirs.

14  Q    So after you came back from Corpus Christi and went to

15  Alice and you went and spoke with your sister Maria, she

16  confirmed to you that she and Arturo, her husband, Mr. Trevino,

17  in fact, owned Lots 35 and 36, correct?

18  A    Yes, sir.

19  Q    And you were living at 1702 Carmen, correct?

20  A    Correct.

21  Q    And 1702 Carmen was parked on one of those lots, correct?

22  A    Correct.

23  Q    Lot 35.

24  A    Yes, sir.

25  Q    Okay.  So you returned and then you contact your sister

Flores - Direct / By Mr. Rangel                73

1   and for the first time discuss with her the fact that you're

2   thinking of buying a mobile home, correct?

3   A    Yes.  I saw the lot.  I spoke -- after that initial

4   meeting, you know, I spoke to her and mentioned -- might have

5   mentioned even to my mom, and that's how it all came about.

6   Q    I mean and this lot had been vacant for some time next to

7   where you lived with your mother, 1702 Carmen.

8   A    Correct.

9   Q    And are you telling this jury that you had no idea or no

10  understanding that that lot, that vacant Lot 36 next to your

11  mom's home, belonged to Maria and Arturo Trevino?

12       **MR. B. GUTIERREZ:**  Objection, your Honor.  That has

13  not been the testimony of Mr. Flores.

14       **MR. RANGEL:**  Judge, he has answered that question.

15  Judge, I get to ask him questions.

16       **THE COURT:**  Go ahead.

17  **BY MR. RANGEL:**

18  Q    Is it your testimony, Mr. Flores, that all the time that

19  you had lived with your mother at 1702 -- how long was that?

20  A    I don't recall.  I mean the house was built when I was

21  young, and I lived there growing up.

22  Q    Ten, 15 years?

23  A    Probably longer than that.  About -- I don't know when the

24  house was built.  But there at 1702 Carmen Street when I was

25  born there was an older home there, and then my father built

Flores - Direct / By Mr. Rangel          74

1   the newer home.  So I've been there pretty much all my life.

2   Q    Okay.  And all your life there living at 1702 Carmen you

3   knew that there was a vacant lot next to the house, correct?

4   A    Well, the way that the property is set up is all three

5   lots are fenced in together.  It's not fenced away from the

6   other two lots.  So growing up it was never -- I was never

7   concerned with who that belonged to, because to me it was --

8   they're all fenced in together.  So it all seemed like one big

9   lot to me.

10  Q    Okay.  So you had no knowledge that that lot next to

11  1702 Carmen belonged to Maria and Arturo Trevino.

12  A    Growing up or -- I mean I eventually had -- you know, I

13  became aware of it; you know, I had an idea but I wasn't sure.

14  Q    Okay.  When did you become aware of it?

15  A    I became aware of it when I became interested in trying to

16  get the manufactured home.

17  Q    So the first time you became aware that Lot 36 was owned

18  by your sister and her husband was in December of 2002?

19  A    Without a --

20  Q    I'm sorry, 2001.

21  A    Without a doubt that it was theirs around that time.  But

22  like I said, I had an idea.  I wasn't really worried about who

23  it belonged to at that time.

24  Q    Well, when you came back to Corpus Christi you contacted

25  your sister, correct?

Flores - Direct / By Mr. Rangel                    75

1    A    Correct.

2    Q    And the reason you contacted your sister is that you were

3    looking for a place to put the mobile home on, correct?

4    A    Yes, sir.

5    Q    And certainly at the time you contacted your sister you

6    had some understanding that --

7    A    Yes.

8    Q    -- she owned the lot; otherwise, why have a conversation

9    with her, correct?

10   A    Yes, sir.

11   Q    Okay.  And so you contacted your sister.  And did you have

12   a meeting with her and her husband, Mr. Trevino?

13   A    I went over to where they were living at the time and

14   spoke to them briefly about it.

15   Q    And at the time they were living in Premont, correct?

16   A    Yes, sir.

17   Q    And so your testimony is that the first time you discussed

18   with your sister and Mr. Trevino the fact that you were looking

19   at buying a mobile home and that you wanted to place it on that

20   empty lot next to where you lived was after you returned from

21   Corpus Christi, after that first visit, correct?

22   A    Correct.

23   Q    Okay.  So did you tell your sister if I can find a place

24   to locate the mobile home I will not have to make a down

25   payment?

1    A    Something to that degree, yes, sir.

2    Q    And you told her -- you asked her whether you could have

3    her permission and Mr. Trevino's permission to place the mobile

4    home on that lot, correct?

5    A    Yes.  Yes, sir.

6    Q    And both of them agreed.

7    A    Yes, sir.

8    Q    Okay.  And so after you got that information, did you

9    report back to Mr. King?

10   A    Yes, sir.

11   Q    And you told him that you had spoken with your sister and

12   that she and her husband had given you permission to place the

13   home on that lot, correct?

14   A    Yes, sir.

15   Q    And did you then have some contact with the salesman at

16   the sales center about that?

17   A    I believe I did.

18   Q    One of the open issues when you left after the first visit

19   was that you had to find a place to put it, right?

20   A    Correct.

21   Q    And once you confirmed that you did, you called the

22   salesman and told him:  I have found a piece of property so I'm

23   ready to have some more discussions.

24   A    I believe I did.

25   Q    And, in fact, on January 5th, you went back to the sales

Flores - Direct / By Mr. Rangel            77

1    center and that's when you signed the contract that we saw on

2    the screen a few minutes ago, correct?

3    A    I believe so.

4    Q    And there were a number of documents that you signed there

5    that day, correct?

6    A    Yes, sir.

7    Q    And, in fact, you did not have to make a down payment,

8    correct?

9    A    Correct.

10   Q    And did you even ask as to whether or not you had to make

11   a down payment?

12   A    I believe I was just notified, so I didn't -- I don't

13   believe or remember asking.

14   Q    Okay.  And you told the salesman that you had the property

15   or the location where the mobile home was going to be placed.

16   A    I'm sorry?

17   Q    You told the salesman that the mobile home was going to be

18   placed on this lot that is next to where I live, 1702 Carmen,

19   correct?

20   A    I believe at some point I did.

21   Q    Okay.  During that second visit, which was on January 5th,

22   2002, did you at any time discuss with the salesman the land-

23   in-lieu program?

24   A    No, sir.

25   Q    And your testimony is that there was no discussion during

Flores - Direct / By Mr. Rangel          78

1    the first meeting and no discussion during the second meeting,

2    correct?

3    A    Correct.  I don't remember land-in-lieu ever being

4    mentioned or used in regards to the conversation.

5    Q    And the only discussion that you recall regarding the down

6    payment was if you found a piece of property where to place it,

7    you would not have to make a down payment, correct?

8    A    Correct.

9    Q    Now, at the time -- I guess late December or early -- late

10   December 2001 or early January 2002 when you all were looking

11   at the mobile home you were living in Alice, correct?

12   A    Yes, sir.

13   Q    And in connection with the purchase of the mobile home you

14   had to fill out a credit application, correct?

15   A    Yes, sir.

16   Q    And, in fact, you and Mr. King filled out a credit

17   application, correct?

18   A    Yes, sir.

19   Q    And you submitted that credit application to CMH Homes,

20   correct?

21   A    Yes, sir.

22   Q    Because I mean you were not going to pay cash for it,

23   right?

24   A    Right.

25   Q    You knew that you had to finance it, correct?

Flores - Direct / By Mr. Rangel                    79

1   A    Correct.

2   Q    Finance the purchase of the mobile home, correct?

3   A    Yes, sir.

4   Q    And you received a credit application at CMH Homes --

5   A    No, sir.

6   Q    -- during the first visit.

7   A    No, sir.

8   Q    When did you receive the credit application?

9   A    I don't remember exactly when.  After speaking with

10  Mr. King I believe it was either faxed or emailed to us.  So I

11  did not leave that first initial visit with an application.

12  Q    But certainly before you went for the second visit you

13  submitted a credit application.

14  A    Yes, sir.

15       **MR. RANGEL:**  I will call up CP Exhibit 9 at 72, 73.

16  Q    Mr. Flores, is that the credit application that you and

17  Mr. King filled out?

18  A    It appears to be, yes.

19  Q    And the information on the left is your personal

20  information, correct?

21  A    Correct.

22  Q    Information on the right is Mr. King's.

23  A    Correct.

24  Q    And if you look at the very top, you see the fax

25  transmittal?

Flores - Direct / By Mr. Rangel                    80

1   A    Yes, sir.

2   Q    And that was faxed from HEB Store 223 in Alice on

3   January 3rd, 2002 at 12:09, correct?

4   A    Well, it has that information.  It doesn't say where it

5   was faxed from or to.  But it does have that information up

6   there.

7   Q    I mean you're familiar with fax information in terms of

8   the source where --

9   A    Sure.

10  Q    And so just looking at that document, it appears that it

11  was faxed from HEB Store Number 223 in Alice on January 3rd,

12  2002 at 12:09, correct?

13  A    Yes, sir.

14  Q    Okay.  And that fax, in fact, consisted of several pages.

15       **MR. RANGEL:**  We'll call up 73.

16  Q    And that's part of the fax, correct?

17  A    Correct.

18  Q    So the two pages of the fax at Pages 72 and 73 are the

19  credit application, right?

20  A    Correct.

21  Q    Okay.  But there are two other pages to the fax.

22       **MR. RANGEL:**  If we'll call up CP Exhibit 9 at 71

23  and 46.

24  Q    And again, looking at the top, that was faxed from HEB 223

25  Alice, January 3rd, 2002 at 12:10, which is one minute after

Flores - Direct / By Mr. Rangel                81

1   the other one, correct?

2   A     Correct.

3   Q     And this part of the fax is a -- appears to be a warranty

4   deed, correct?

5   A     Yes, sir.

6   Q     And the deed is from David Cantu and Jesusa Cantu,

7   correct?

8   A     Yes, sir.

9   Q     And Jesusa Cantu was your sister, correct?

10  A     Yes, sir.

11  Q     And David Cantu was your brother-in-law.

12  A     Yes, sir.

13  Q     And, unfortunately, both of them are deceased.

14  A     Yes, sir.

15  Q     And if we look into the body of the deed, to whom is the

16  property that we'll get to in a minute being conveyed?  Is it

17  being conveyed to Arturo Arnulfo (phonetic) Trevino and Maria

18  Margarita Trevino?

19  A     Yes, sir.

20  Q     And that is your sister, Maria Trevino, and your brother-

21  in-law, Arturo Trevino, who are sitting in this courtroom,

22  correct?

23  A     Correct.

24  Q     And if we'll look further down, the property that is being

25  conveyed, Lot 35 and 36, Block 1, Gallimore Additon.

Flores - Direct / By Mr. Rangel                82

1          Do you see how they spelled Additon?  A-d-d-i-t-o-n?

2   A    Okay.  Yes, sir.

3   Q    And that, in fact, Lot 36 is where the mobile home ended

4   up, correct?

5   A    Yes, sir.

6   Q    Okay.  And the date I think, if we look further down, the

7   date on this is January 2nd, 2000 -- I believe that's 2001.  Is

8   that what it looks like, Mr. Flores?

9   A    Yes, sir.

10  Q    Okay.

11          **MR. RANGEL:**  So and let's look at CP 9 at 46.  At 71.

12          **(Pause)**

13  Q    Okay.  This is the other page that goes with that warranty

14  deed, correct?

15  A    Yes, sir.

16  Q    And again, it's coming from HEB 223, Alice, January 3rd,

17  2002, at 12:11, correct?

18  A    Yes, sir.

19  Q    So this fax consisted of the credit application that you

20  and Mr. King filled out, correct?

21  A    Yes, sir.

22  Q    And a copy of the warranty deed conveying from the Cantus

23  to the Trevinos Lots 35 and 36, correct?

24  A    Yes, sir.

25  Q    And that fax consisting of four pages was faxed to

Flores - Direct / By Mr. Rangel                    83

1   CMH Homes on January 3rd, 2002, correct?

2   A    Yes, sir.

3   Q    And did you fax that?

4   A    No, sir.

5   Q    Did anybody fax it at your instructions?

6   A    Yes, sir.

7   Q    Who faxed it?

8   A    Alvin King.

9   Q    Remember when I took your deposition and I asked you

10  whether you had anything to do with that fax?

11  A    Yes, sir.

12  Q    And you said that you did not know, correct?

13  A    Yes, sir.

14  Q    And you said you did not know who had, correct?

15  A    Correct.

16  Q    And then, in fact, I specifically asked you do you know

17  whether Mr. King did, and you said you couldn't say, correct?

18  A    Correct.

19  Q    But now your testimony is that Mr. King faxed it.

20  A    Yes, sir.  At the time that you asked me at the deposition

21  I did not remember, I could not remember.  But after having a

22  little bit of time to speak with Mr. King, we have -- I've been

23  able to recall exactly what happened or what happened that day.

24  Q    So it is your testimony now that the application was sent

25  to CMH Homes -- I'm sorry -- the fax was sent to CMH Homes by

Flores - Direct / By Mr. Rangel                    84

1   Mr. King.

2   A    Yes, sir.

3   Q    And it was sent to CMH Homes in connection with the

4   discussions you were having with CMH Homes about buying the

5   mobile home.

6   A    I would believe so.

7   Q    Okay.  And were you the one that gave to Mr. King a copy

8   of the deed from the Cantus to the Trevinos?

9   A    To be honest, I don't remember.  But I'm sure I did.

10  Q    And from whom did you obtain a copy of that warranty deed?

11  A    I would have obtained it from my sister and her husband,

12  Maria and Arturo.

13  Q    Okay.  And the reason you would have -- this was after you

14  had spoken to them about placing the mobile home on the lot,

15  correct?

16  A    Correct.

17  Q    And the reason that you had obtained it from your sister

18  and Mr. -- well, from your sister, Maria Trevino, is so that

19  you could fax it to CMH Homes along with your credit

20  application in connection with the discussions for the purchase

21  of the mobile home, correct?

22  A    Yes, sir.

23  Q    And so somebody from CMH Homes had told you, we need a

24  property description in connection with this purchase, correct?

25  A    Again, I don't remember exactly, but I'm assuming that

Flores - Direct / By Mr. Rangel                    85

1    they did.

2    Q    Okay.  And did the salesman at the lot tell you why that

3    he needed the property description?

4    A    I wish I could remember but I don't.  The only thing I can

5    remember is that they would need it so they had an idea of

6    where the trailer was going.

7    Q    And it's still your testimony, Mr. Flores, even after

8    seeing this warranty deed that during those discussions with

9    the salesman at the sales center there was no discussion about

10   land-in-lieu of a down payment.

11   A    No, sir.

12   Q    Okay.  And when they told you, somebody at the sales

13   center told you that they needed a property description, your

14   understanding was that the only reason they needed the property

15   description is so that they would know where the home was going

16   to be located?

17   A    I would think so, sir, yes.

18   Q    After you sent the -- after Mr. King sent the credit

19   application and the property description, you proceeded to go

20   to the sales center and execute the contract, correct?

21   A    On January the 5th, yes, sir.

22   Q    Okay.  And the property description, it's Lot 35 and 36 of

23   Block 1, Gallimore Additon, correct?

24   A    Yes, sir.

25   Q    Okay.

Flores - Direct / By Mr. Rangel                    86

1              **MR. RANGEL:**  If we will pull up CP 1, first page.

2     Right there.

3     Q     Buyer.  You are the buyer, right?

4     A     Yes, sir.

5     Q     Gives seller a security interest in the goods or property

6     being purchased.

7              That was the mobile home, correct?

8     A     Correct.

9     Q     And then real property located at 3536 Gallimore, Alice,

10    Texas 78232, correct?

11    A     Correct.

12    Q     And the 35 and 36, that's very similar to the 35 and 36

13    that's on the warranty deed, correct?

14    A     I don't know of a 3536 Gallimore, Alice, Texas address.  I

15    have no idea where that's located.

16    Q     But you do know of Lots 35, 36, Gallimore in Additon in

17    Alice, Texas, right?

18    A     Addition.  Yes, sir.

19    Q     Okay.  So in this contract that you signed you stated that

20    you were giving CMH Homes a security interest in real property,

21    correct?

22    A     It seems that way, yes.

23    Q     And again, there's an uncanny resemblance between what's

24    typed there, 3536 Gallimore, Alice, Texas, and the property

25    description in the warranty deed, correct?

Flores - Direct / By Mr. Rangel                87

1  A     Correct.

2  Q     Mr. Flores, is it still your testimony that you never knew

3  that that property was being used as collateral in connection

4  with the purchase of the mobile home until this lawsuit was

5  filed?

6  A     Yes, sir.  There's really no way that I could have given

7  permission for Lot 35 to be used since there's a home on there

8  already.  So I did not know.

9  Q     But there was no home on 36.

10 A     No, sir, there wasn't.

11 Q     Isn't what happened, Mr. Flores, is that when you went to

12 purchase the mobile home the salesman told you:  Look, we have

13 this land-in-lieu program.  If you can come up with some

14 property, give us a property description, get that property as

15 collateral, you won't have to make a down payment.  Correct?

16 A     No, sir.

17 Q     And isn't it true that when you got that information, you

18 went and spoke with your sister; your sister said, sure; and

19 she gave you the property description; Mr. King sent the

20 property description so it could be incorporated into the

21 documents dealing with the real estate, correct?

22 A     I got the information from my sister.  I gave it to

23 Mr. King.  He faxed it over to them.  So they had a description

24 and the application of the property.

25 Q     And before you signed this contract you had an opportunity

Flores - Direct / By Mr. Rangel                88

1  to read it, correct?

2  A    I'm sure I did.

3  Q    Okay.  And when you got to this portion in the contract

4  which you signed, which says that "buyer gives seller a

5  security interest in real property" -- do you know what "real

6  property" is?

7  A    Yes, sir.

8  Q    What's "real property"?

9  A    Real property is land.

10 Q    Okay.  So you were -- in the contract you agreed to give a

11 security interest in land located at 3536 Gallimore, Alice,

12 Texas, correct?

13 A    That's what it says on there, yes, sir.

14 Q    Well, you signed the contract.

15 A    Yes.

16 Q    When you got to that portion of the contract, did you ask

17 the salesman "what is this?"

18 A    I didn't.  I must have overlooked that.  I didn't ever

19 realize that it was 3536 Gallimore.

20 Q    Okay.  But you agree that you are bound by every term of

21 that contract that you signed.

22 A    To the best of my knowledge, yes.

23 Q    So before you signed the contract you knew you could

24 afford it.

25 A    I'm sorry?

Flores - Direct / By Mr. Rangel                    89

1   Q    Before you signed the contract you knew you could afford

2   it, could afford the purchase of the mobile home.

3   A    Yes.

4   Q    Okay.  And you knew that if -- you knew you had to make

5   those payments.

6   A    Yes, sir.

7   Q    And you knew that if you did not make the payments, then

8   the home could be repossessed.

9   A    Yes, sir.

10  Q    In fact, that's in the contract, too.

11  A    I believe so.

12  Q    And the contract also provides that it would be assigned

13  to Vanderbilt, correct?

14  A    I believe so.

15  Q    Well, let's look.  Let's pull up the language.

16       **(Pause)**

17            The second sentence.  "Seller will submit this

18  contract to Vanderbilt Mortgage and Finance and if approved the

19  contract will be assigned to Vanderbilt Mortgage and Finance,"

20  correct?

21  A    Yes, sir, that's what it says.

22  Q    And, in fact, you were approved, right?

23  A    Yes, sir.

24  Q    You were approved because you starting making the payments

25  to Vanderbilt, correct?

1   A    That's who we were sending our payments to, yes.

2   Q    I mean every single payment that you made from March 2002

3   until April of 2009 went to Vanderbilt, correct?

4   A    Correct.

5   Q    You knew that that contract had been assigned to

6   Vanderbilt, correct?

7   A    I did not know it had been assigned.  We got a payment

8   book and just sent our payments to them.

9   Q    Well, the contract said it was going to be assigned if you

10  were approved, right?

11  A    Correct.

12  Q    And it was approved, right?

13  A    Yes, it was.

14  Q    And so it was assigned to Vanderbilt, correct?

15  A    According to the contract it was.

16  Q    And during the time that you were making payments you

17  would have from time to time communications with people at

18  Vanderbilt, correct?

19  A    No, sir.  My communication with them was very -- I mean

20  almost non-existent.  Mr. King was the one who --

21  Q    Oh.

22  A    -- communicated with them.

23  Q    Mr. King was the person who spoke with the people at the

24  call center, correct?

25  A    Yes, sir.

Flores - Direct / By Mr. Rangel                91

1  Q    Whenever there were questions relating to the contract or

2  the obligations, Mr. King would make that call.

3  A    I believe so, yes.

4        **MR. RANGEL:**  Judge, may we approach on a limine

5  matter?

6        **THE COURT:**  Yes, sir.

7      **(Bench conference on the record begins at 2:22:10 p.m.)**

8        **THE COURT:**  (Indiscernible / static noise)

9        **MR. RANGEL:**  Judge, there's a motion in limine which

10 the Court has granted, number five, filed by (indiscernible)

11 Trevino and I cannot ask any questions about payment history,

12 collection efforts, demand for payment, late payments or

13 anything to do with payment history of (indiscernible) prior to

14 October 8th, 2005.  And I want to ask --

15       **THE COURT:**  (Indiscernible / static noise)

16       **MR. RANGEL:**  Well, this is a summary --

17       **THE COURT:**  Oh, okay.

18     **(Indiscernible / static noise / Pause)**

19       **MR. RUMLEY:**  It's number five, your Honor.

20     **(Pause)**

21       **THE COURT:**  Okay.  Your argument?

22       **MR. RANGEL:**  Your Honor, they have -- several issues.

23 They have put into issue this question of assignment.  And

24 obviously, if they were making all the payments and there were

25 issues along the way --

1          **THE COURT:**  Thank you.

2      **(Bench conference ends at 2:24:59 p.m.)**

3          Take a 15-minute break.

4          **THE MARSHAL:**  All rise for the jury.

5          **THE COURT:**  Would you please stand for the jury?

6      **(Jurors exit courtroom at 2:25 p.m.)**

7          You can stand down, sir.

8      **(Witness steps down)**

9          Yes?  Now we're here.

10         **MR. RANGEL:**  Judge, this is relevant on a number of

11     points.  They have injected the issue of --

12         **THE COURT:**  Assignment.

13         **MR. RANGEL:**  -- assignment.  And our position is that

14     it was assigned.  I think he's almost judicially admitted that

15     it was assigned, it was in the contract, and that the only

16     dealings they had were with Vanderbilt.  Whenever there were

17     issues with respect to payment, whenever they needed something,

18     they would call Vanderbilt.

19         And this afternoon, your Honor, we are prepared to

20     bring a Vanderbilt representative who is going to testify about

21     the history of all those calls.  And so I think the jury is

22     entitled -- we are entitled to put on that evidence to further

23     confirm that they knew.  The Court, your Honor raised the issue

24     of notice.  I mean they knew.  They had notice that it was

25     assigned to Vanderbilt because they were dealing with

1    Vanderbilt throughout the payment history.

2            Secondly, your Honor, it goes to the issue of

3    credibility.  The position that Mr. Flores and Mr. King have

4    taken in this litigation is that they had absolutely no

5    knowledge, no knowledge that the land had been pledged as

6    collateral.  And we know, starting with the contract there, the

7    deed and all that.

8            But more importantly -- and again, we'll prove this

9    up this afternoon, your Honor -- there were calls made by

10   Mr. Flores and Mr. King at the call center inquiring as to

11   whether one of those lots could be released, could be released.

12   That shows that they had knowledge that the land had been

13   pledged, which is totally inconsistent with the position that

14   they're taking in this lawsuit.

15           **THE COURT:**  Thank you.  Your response?

16           **MR. B. GUTIERREZ:**  Yes, your Honor.  First of all,

17   prejudicial.

18           **THE COURT:**  How is it prejudicial?

19           **MR. B. GUTIERREZ:**  They're trying to --

20           **THE COURT:**  I can see how it would be prejudicial

21   but -- okay, beyond that.

22           **MR. B. GUTIERREZ:**  If I may approach the Court and

23   show you the documents that they're going to refer to.

24           **THE COURT:**  It's right there.

25           **MR. B. GUTIERREZ:**  Okay.  The other objection, of

1    course, is --

2              **THE COURT:**  What documents are you talking about?

3              **MR. B. GUTIERREZ:**  These are collection notes that we

4    believe --

5              **THE COURT:**  Okay.  Well, put it on the overhead.  And

6    what do you want to tell me about it?

7              **MR. B. GUTIERREZ:**  That these come --

8              **THE COURT:**  What are these --

9              **MR. B. GUTIERREZ:**  These are notes that were prepared

10   by someone.  We don't know who prepared them.  The information

11   that is in this note is what Mr. Rangel wants to ask Mr. Flores

12   about.  Clearly, hearsay.  We don't know who prepared these

13   notes.  They were produced by Vanderbilt Mortgage.

14             **THE COURT:**  So these have not been admitted, these

15   documents?

16             **MR. RANGEL:**  And I'm not going to -- your Honor, I'm

17   not going to ask specifically about this document.  I just want

18   to lay the predicate --

19             **THE COURT:**  Okay.

20             **MR. RANGEL:**  -- because there's going to be --

21   Ms. Kim Russell will be here this afternoon to testify about

22   the call notes, to testify of the conversation she had with

23   Mr. King about these issues.

24             **THE COURT:**  Well, is anybody going to testify that

25   Mr. Flores talked to them about releasing the lots?

1          **MR. RANGEL:**  Well.

2          **MR. THAGARD:**  Yes.

3          **THE COURT:**  Your codefendants -- your cocounsel is

4     saying yes.  Who is going to testify that they talked to

5     Mr. Flores?

6          **MR. THAGARD:**  Kim Russell will testify to that call

7     note right there.

8          **THE COURT:**  Okay.  What I'm asking -- did she, Kim

9     Russell, talk to Mr. Flores?

10         **MR. THAGARD:**  She talked to him on that day.

11         **THE COURT:**  Okay.

12         **MR. RANGEL:**  We can look at that note.  When

13    counsel -- cocounsel is saying she talked to him that day,

14    let's look at what it says, your Honor.

15         **THE COURT:**  I'm not interested in the document.  I

16    want to know if there is going to be someone in who says I

17    talked to Mr. Flores on this day and this is what he said.

18         **MR. RANGEL:**  Kim Russell is going to be here this

19    afternoon to talk about the history of calls that she had with

20    Mr. Flores and Mr. King.

21         **THE COURT:**  As long as that's her own personal calls.

22         **MR. RANGEL:**  Yes.

23         **THE COURT:**  She took those calls from Mr. Flores.

24         **MR. RANGEL:**  Yes.

25         **THE COURT:**  I got it.  I thought you were saying that

1    she was going to testify about records.

2         **MR. RANGEL:**  Well, she's also going to testify -- I

3    mean this is a business record, your Honor.  And we'll lay the

4    predicate as to how these are kept --

5         **THE COURT:**  Okay.

6         **MR. RANGEL:**  -- in business records --

7         **THE COURT:**  Okay.

8         **MR. RANGEL:**  But insofar as the motion in limine, I'm

9    not going to ask him about the call notes.  I just want to be

10   able to get in -- ask him questions about the history of

11   communications with Vanderbilt.

12        **THE COURT:**  Yes, yes.  Go ahead.  And the objection

13   is?

14        **MR. B. GUTIERREZ:**  Hearsay.

15        **THE COURT:**  From your client?

16        **MR. B. GUTIERREZ:**  From the individual that he's

17   wanting to ask him about, some individual that is not here in

18   court, your Honor.

19        **THE COURT:**  All right.  Overruled.  I think I've got

20   it.

21        Juror Number 1 needed a bathroom break, by the way,

22   which is why we're on a break.  Now you can continue to enjoy

23   the rest of the break.

24        **MR. RANGEL:**  Thank you, your Honor.

25        **(Pause)**

1          **MR. THAGARD:**  Your Honor, when is our break over?

2          **THE COURT:**  Pardon?

3          **MR. THAGARD:**  When is our break over?

4          **THE COURT:**  About 30 seconds.

5     **(Laughter)**

6          I don't remember when I sent everybody out for

7     15 minutes.  Ms. Gano will know exactly.

8          **MR. UNIDENTIFIED:**  Yes, your Honor.

9          **THE CLERK:**  2:25.

10          **THE COURT:**  2:25.  So you have ten minutes.

11          We're off the record?  I'm going to have to revisit

12     the deposition thing.

13          **MS. UNIDENTIFIED:**  I'm on.

14          **THE COURT:**  I have to revisit the deposition thing.

15     We're just going to have to do the -- because I don't know who

16     noticed when of whom when about what part of the depositions

17     that we're going to use.  So I will go ahead and hear the

18     objections, laborious as it is, against my policy, against the

19     written orders of the Court, hear the objections as they come

20     up, okay?  So just make sure when the objection is made that we

21     stop and hear it and I'll rule, okay?  I don't want to keep the

22     depositions out and I don't want to give -- let people not have

23     their opportunity.

24          **MR. RUMLEY:**  Your Honor, I saw over the break there

25     was an order striking the designations that were filed after

```
 1    the pretrial.  We don't have a problem with that.

 2            THE COURT:  I don't care about your -- just read in

 3    what you want to read in or play in what you want to play in,

 4    and I'll take the objections as they come up, for both sides.

 5            MS. RODRIGUEZ:  Your Honor, there may be some

 6    overarching categories.

 7            THE COURT:  Don't ever do it again.

 8            MS. RODRIGUEZ:  Your Honor, there may be a --

 9            THE COURT:  You can laugh.  It's okay.

10            MS. RODRIGUEZ:  It's hard to know.

11            THE COURT:  I know.  Thank you.

12            MS. RODRIGUEZ:  We'd actually agreed to work on this

13    this weekend.  And, your Honor, there are some overarching

14    objections that if the Court takes up perhaps early in the

15    morning next week --

16            THE COURT:  Overarching?

17            MS. RODRIGUEZ:  That might address several of these

18    issues.  For example --

19            THE COURT:  Overarching?

20            MS. RODRIGUEZ:  That would deal with more than one

21    witness, your Honor.  For example, regarding who is actually

22    unavailable and, thus, is allowed to testify by deposition.

23    That would cover two or three witnesses without having to do a

24    line-by-line objection.

25            THE COURT:  Okay.  Tell me those.
```

99

1          **MS. RODRIGUEZ:**  There are a couple of the so-called

2    other transaction witnesses, your Honor, who live in the area.

3    And Mr. Rumley had identified those by deposition or at some

4    point, I believe.  They are clearly not --

5          **THE COURT:**  Okay.  Do you have a showing that they

6    are unavailable?

7          **MS. RODRIGUEZ:**  No, your Honor.

8          **THE COURT:**  Who does?  Give me the names.  Let's just

9    put the names on the record.

10          **MS. RODRIGUEZ:**  I believe it's Anita Perez.

11      **(Voices heard off the record)**

12          **MR. SLEDGE:**  Your Honor, there are seven other

13    transaction witnesses.  Out of those seven only two of them we

14    understand, based on their deposition testimony, are outside

15    the subpoena range.

16          **THE COURT:**  Are outside.  Okay.

17          **MR. SLEDGE:**  That's Guadalupe Rosenbaum and Ms. Lucia

18    Dusek.

19          **THE COURT:**  Are outside the subpoena range.

20          **MR. SLEDGE:**  Correct.

21          **THE COURT:**  Okay.  Who is inside the subpoena range?

22    Tell me.

23          **MR. SLEDGE:**  Everybody else.  All five that would --

24          **THE COURT:**  You have to -- that doesn't help me.

25          **MR. SLEDGE:**  Yes.  Yes, your Honor.

1          **THE COURT:**  This is a test.

2          **MR. SLEDGE:**  That would be Anita Perez; that is one

3   of them.  Veronica Rodriguez; that is another one.  Alicia

4   Canales is another, and Ricardo Canales is the other, the last

5   one.

6          **THE COURT:**  Four.

7          **MR. SLEDGE:**  That's right, your Honor.

8          **THE COURT:**  Are those -- do you have some evidence --

9          **MR. SLEDGE:**  And pardon me.  And Minerva Martinez.

10  I'm sorry.

11         **THE COURT:**  Five.

12         **MR. SLEDGE:**  Five.

13         **MR. UNIDENTIFIED:**  We've -- excuse me; I'm sorry.

14         **THE COURT:**  Are you intending to have those people

15  appear by deposition?

16         **MR. B. GUTIERREZ:**  No, your Honor.  The persons that

17  we plan to call by deposition would be Minerva Martinez; we

18  were planning to.  Veronica --

19         **THE COURT:**  Are those people out of the subpoena

20  range?

21         **MR. B. GUTIERREZ:**  No, they're not, your Honor.

22         **THE COURT:**  Then why -- but have you got evidence to

23  show their unavailability?

24         **MR. B. GUTIERREZ:**  Well, my only statement to the

25  Court is that when we -- well.

1      **THE COURT:**  Do you have evidence to show their

2  unavailability?  This is a "yes" or a "no."

3      **MR. B. GUTIERREZ:**  At this time I do not, your Honor.

4      **THE COURT:**  Then you better get some.

5      **MR. B. GUTIERREZ:**  Okay.  I understand.  I thought --

6      **THE COURT:**  Get some subpoenas out.

7      **MR. B. GUTIERREZ:**  Yes, your Honor.

8      **THE COURT:**  Because they are objecting.

9      **MR. B. GUTIERREZ:**  I understand.  And the individuals

10  are, like I said for the record:  Minerva Martinez, Veronica

11  Rodriguez --

12      **THE COURT:**  Are you asking her help?

13      **MR. B. GUTIERREZ:**  Well, I'm trying to remember the

14  other person.  There's another person.  I believe it was

15  just --

16      **(Voices heard off the record)**

17      Excuse me.  Guadalupe Rosenbaum.  We'll call him but

18  he's out of the subpoena range.  The only two persons are

19  Minerva Martinez and Veronica Rodriguez.

20      **THE COURT:**  Thank you.

21      **MR. B. GUTIERREZ:**  I will get subpoenas and hope that

22  they can be available.

23      **THE COURT:**  Thank you.

24      **MR. B. GUTIERREZ:**  And if not I'll report to the

25  Court.

1          **THE COURT:**  All right.  Thank you.

2          Any other overarching problems?

3          **MS. RODRIGUEZ:**  May I suggest, your Honor, if

4   feasible for the Court that on Monday morning we revisit some

5   of these issues after we meet over the weekend as suggested by

6   Mr. Rumley?

7          **THE COURT:**  Yes.

8          **MS. RODRIGUEZ:**  That might save some time.

9          **THE COURT:**  Okay.  I went back to the proximate cause

10  thing.  That's the Fifth Circuit definition of "proximate

11  cause."

12         **MR. SOLTERO:**  Your Honor, there's a Texas Supreme

13  Court case in 2007, *Ford Motor Company versus* (indiscernible),

14  and there's a more recent case from this year --

15         **THE COURT:**  Maybe you all can agree to that and I

16  won't have to worry about it.

17         **MR. SOLTERO:**  I think we will.

18         **THE COURT:**  Okay.  Because if it's a Texas cause of

19  action, we use those definitions.

20         **MR. SOLTERO:**  That's precisely the --

21         **THE COURT:**  Thank you.  I'm sorry.

22         **MR. B. GUTIERREZ:**  We're still planning to visit this

23  evening, your Honor.

24         **THE COURT:**  And all weekend.

25  //

1          **MR. B. GUTIERREZ:**  Yes, your Honor.

2          **THE COURT:**  You've got five minutes left on the

3   break.  Sorry.  Now we're off.

4      **(Recess taken from 2:36 p.m. to 2:41 p.m. / Parties**

5   **present / Jurors not present)**

6          **THE COURT:**  Everyone back?

7          **MR. UNIDENTIFIED:**  Would you like me to approach --

8          **THE COURT:**  Okay.  I assume everybody is back.  Would

9   you check and see if the jurors are ready, Mr. Padilla?

10      **(Pause)**

11          **THE MARSHAL:**  All rise for the jury.

12      **(Jurors enter courtroom at 2:41 p.m.)**

13          **THE COURT:**  Thank you.  You may be seated.

14          **MR. RANGEL:**  May I proceed?

15          **THE COURT:**  You may proceed, sir.

16          **MR. RANGEL:**  Thank you, your Honor.

17              **DIRECT EXAMINATION (CONTINUED)**

18   BY MR. RANGEL:

19   Q   Mr. Flores, during the time that you and Mr. King were

20   making payments to Vanderbilt, I mean you've had some

21   difficulties doing that, correct?

22   A   Yes, sir.

23   Q   And from time to time -- you said it was primarily

24   Mr. King -- Mr. King on both of your behalf would call the call

25   center at Vanderbilt to try to work out some arrangements so

Flores - Direct / By Mr. Rangel          104

1   late payments could be accepted, correct?

2   A    I would believe so.  I'm not sure.

3   Q    Well, I mean it is true that over the seven-year period

4   that you made payments and you lived in the home, Vanderbilt

5   definitely would try to work with you whenever you were late.

6   A    I believe so.

7   Q    And you were late many, many, many times, correct?

8   A    Yes.  Yes, sir.

9   Q    And one of the ways that -- I mean that Vanderbilt would

10  work with you is by talking to Mr. King on the phone about what

11  arrangements could be made, correct?

12  A    I believe so.

13  Q    And you knew from the beginning that all of the payments

14  were going to go to Vanderbilt.

15  A    Once we got our payment book in the mail, that's when I

16  knew where they would be going.

17  Q    And the payment book came early in 2002.

18  A    I believe it came about maybe a month or two after we

19  closed on the manufactured home.

20  Q    All right.  And, in fact, early on you got a welcome

21  letter from Vanderbilt welcoming you as a customer.

22          **MR. RANGEL:**  Could we pull up CP 154?

23  Q    Correct?

24      **(Pause)**

25          The date on this letter is January 5th, 2002,

1    correct?

2    A    Yes, sir.

3    Q    And that's the date that you signed the contract, correct?

4    A    Yes, sir.

5    Q    And so from the day you signed the contract you were on

6    notice that the payments were going to go to Vanderbilt and you

7    were going to be a customer of Vanderbilt, correct?

8    A    I was not aware of that.  I did not become aware of it

9    until we got the payment book in the mail.

10   Q    But this letter was in the materials that were given to

11   you, because you brought it to your deposition, correct?

12   A    If that was part of the contract, the initial contract, we

13   didn't get a copy of that when we left.  Yeah, the initial

14   contract.  So we would have not received that.

15   Q    At some point you did get that.

16   A    It doesn't look familiar to me.

17   Q    I'll represent to you, Mr. Flores, that you brought those

18   documents --

19   A    Okay.

20   Q    -- to your deposition.

21   A    Then, yes, I believe --

22   Q    I got these documents from you.

23   A    Okay.

24   Q    Okay?

25   A    Uh-huh.

Flores - Direct / By Mr. Rangel          106

1  Q    So from early on you were on notice that you were going to

2  be a Vanderbilt customer, correct?

3  A    Yes, sir.

4  Q    And you started making payments in March of 2002, correct?

5  A    Yes, sir.

6  Q    And, in fact, from time to time you would use Western

7  Union to send in payments, correct?

8  A    I believe so.

9  Q    And, in fact, from time to time you would go the HEB store

10 from where that fax came to make payments from there, correct?

11 A    That's where there's a Western Union, so it could be

12 possible.

13 Q    And, in fact, you may have made the first payment from

14 there, correct?

15 A    I don't recall.

16 Q    Do you remember whenever you would make a payment you

17 would get a receipt and have your signature on it?

18 A    If we sent a money order or Western Union money gram, I'm

19 sure we did.

20        MR. RANGEL:  Judge, I want to offer into evidence

21 something that has not been admitted, CP 33 at 117, 18.

22        THE COURT:  So what's the number?

23        MR. RANGEL:  CP 33 at 117, 18.

24        THE COURT:  I'm not understanding anything but the

25 number is 33.  Is it 33?

1          **MR. RANGEL:**  Yes, your Honor.

2          **THE COURT:**  Is it Plaintiffs' 33?

3          **MR. RANGEL:**  Yes.

4          **THE COURT:**  Any objection?

5          **MR. B. GUTIERREZ:**  No objection.

6          **THE COURT:**  Plaintiffs' 33 is admitted.

7          **(Plaintiffs' Exhibit Number 33 was received in evidence)**

8          Just for ease of the way I understood this, is that

9     all of the Plaintiffs together have one list of exhibits and

10    the Defendants, Intervenors, Counter Plaintiffs have one list

11    of exhibits.

12         **MR. RANGEL:**  Your Honor, just for the record, there's

13    one Plaintiff.  Vanderbilt is the only Plaintiff.

14         **THE COURT:**  Okay.

15         **MR. RANGEL:**  But the Clayton parties have -- the

16    Clayton parties, which includes Vanderbilt, you're correct; one

17    list of exhibits.

18         **THE COURT:**  Whatever.

19         **MR. RANGEL:**  But there's only one Plaintiff.

20         **THE COURT:**  It's good to say I'm correct.

21         **MR. RANGEL:**  You're correct.

22         **(Laughter)**

23         I'll say it again.

24         **THE COURT:**  All right.  So when you said "C" I

25    thought you were -- okay.

1          **MR. RANGEL:**  The Clayton parties.

2          **THE COURT:**  The Plaintiffs' parties.  Thank you.

3          **MR. RANGEL:**  Plaintiff parties' 33.

4          **THE COURT:**  Thank you very much.

5          **MR. RANGEL:**  If we would call up, your Honor, CP 33

6    at 117, 118.

7    **BY MR. RANGEL:**

8    Q    Do you recognize that as one of those receipts,

9    Mr. Flores, with your --

10   A    Yes, sir.

11   Q    That's your signature at the bottom, correct?

12   A    Yes, sir.

13   Q    And this is just one example of many receipts where you

14   all would send money grams from the HEB store, Wal-Marts and

15   other places, correct?

16   A    Correct.

17          **(Pause)**

18   Q    Now, when you ran into difficulties in the spring of 2009

19   after Mr. King left, you started receiving collection letters

20   from Vanderbilt, correct?

21   A    I don't recall that I did.

22   Q    Okay.  CP, Clayton parties' Exhibit 146.

23          **(Pause)**

24          Do you recognize that -- strike that.

25          This is a notice of default and right to cure default

Flores - Direct / By Mr. Rangel          109

1    letter, correct?

2    A    Yes, sir.

3    Q    And it's addressed to you, correct?

4    A    Yes, sir.

5    Q    And it's dated May 5th, 2009.

6    A    Yes, sir.

7    Q    And I believe there's an envelope attached to it right

8    behind it.

9         **(Pause)**

10         I don't guess there is.

11         **(Pause)**

12         There it is.  That's the envelope that was attached

13   to that notice, correct?

14   A    Yes.  It appears to be.

15   Q    And it's addressed to you, correct?

16   A    Yes, sir.

17   Q    And it's addressed at 1700 Carmen Street, Alice, Texas,

18   correct?

19   A    Correct.

20   Q    And that's where you were living on the date of that

21   letter, correct?

22   A    I believe I was.

23   Q    I'm sorry?

24   A    I believe I was.

25   Q    Okay.  And so the envelope containing that notice was

Flores - Direct / By Mr. Rangel          110

1    properly addressed.

2    A    Yes, sir.

3    Q    And in May of 2009, you and Mr. King were behind in your

4    payments, correct?

5    A    In May of 2009?

6    Q    Yes, sir.

7    A    I believe we were according to the letter.

8    Q    Okay.  And it's your testimony that you don't recall

9    receiving that letter, correct?

10   A    I don't recall receiving it.

11   Q    But you were -- 1700 Carmen is the address where you would

12   receive communications from Vanderbilt, correct?

13   A    Yes, sir.

14   Q    In fact, you would receive these monthly loan statements

15   at that address, correct?

16   A    I believe so.

17   Q    And you certainly received monthly loan statements at

18   1700 Carmen, right?

19   A    I'm sorry?

20   Q    You received the monthly loan statements at 1700 Carmen.

21   A    I believe so.

22   Q    But with respect to this notice you do not recall

23   receiving it, correct?

24   A    If it was certified mail, I didn't receive it.

25   Q    Do you know whether it was certified mail?

1  A    It doesn't look familiar to me, so I would not know for

2  sure if it was or not.

3  Q    Okay.  And certainly if you received a certified mail and

4  you got a notice that it was certified mail, you could just

5  choose to ignore it, right?

6  A    That's a possibility.

7  Q    And I mean but when you got regular mail from Vanderbilt

8  that was not certified, you would accept that.

9  A    I believe -- I accepted all my mail that was left there.

10  Q    So as long as the mail was addressed to Cesar Flores at

11  1700 Carmen you would accept it.

12  A    Yes, sir.

13  Q    Including mail from Vanderbilt.

14  A    Well, it just depended.  If I was -- I worked in Corpus

15  and lived in Alice.  So I was in Corpus pretty much from

16  9:00 o'clock in the morning to 7:00 or 8:00 at night.  So a lot

17  of times my mom would get my mail for me, so that's how I

18  received my mail.

19  Q    But there's no question that mail addressed to you at

20  1700 Carmen was properly addressed to the notice of address

21  that you had provided to Vanderbilt.

22  A    Yes.

23  Q    Because all the communications you had received from

24  Vanderbilt starting early on were at 1700 Carmen, right?

25  A    Right.

Flores - Direct / By Mr. Rangel          112

1    Q    Okay.  So the next notice, Clayton parties' Exhibit 147.

2         **(Pause)**

3              And this is another notice directed to you, correct,

4    Mr. Flores?

5    A    Yes, sir.

6    Q    And it's a notice of intent to accelerate your debt,

7    correct?

8    A    Yes, sir.

9    Q    And the date on that upper right-hand corner appears to be

10   June 16th, 2009, correct?

11   A    Correct.

12   Q    And I believe this one also has an envelope attached to

13   it.  And is it addressed to Cesar Flores at 1700 Carmen Street,

14   Alice, Texas 78332?

15   A    The address is correct.

16   Q    And on that date that that letter was sent you were living

17   at that address.

18   A    This was in June?

19   Q    June 16th, 2009.

20   A    I believe I was.

21   Q    Okay.  And just like with -- your testimony is that you

22   don't recall receiving this letter.

23   A    If it was left in the mailbox, my mom got it for me and I

24   received it.  If it wasn't then, no, I didn't.

25   Q    And according to the envelope it certainly was sent to you

Flores - Direct / By Mr. Rangel          113

1   at the address you had on record with Vanderbilt for

2   correspondence, correct?

3   A     Yes, sir.

4            **MR. RANGEL:**  Then if we'll pull up CP Exhibit 150.

5   Q     And this is a notice of acceleration, correct?

6   A     Yes, sir.

7   Q     And it's directed to Cesar Flores, correct?

8   A     Yes, sir.

9   Q     And it's dated 6-29-09, correct?

10  A     Yes, sir.

11  Q     And I believe this one also has an envelope.

12           And is it addressed to Cesar Flores at 1700 Carmen

13  Street, Alice, Texas?

14  A     Yes, the address is correct.

15  Q     And on that date, June 29th, '09, you were living at

16  1700 Carmen.

17  A     I believe I was.

18  Q     And that was the address that you had on record on file

19  with Vanderbilt back in Tennessee for purposes of Vanderbilt

20  being able to communicate with you.

21  A     I believe so.

22  Q     And is it your testimony that you don't recall receiving

23  this letter?

24  A     It does not look familiar to me.

25           **MR. RANGEL:**  On the issue of assignment, I would call

Flores - Direct / By Mr. Rangel          114

1   up CP 3, Exhibit 211, Page 3, Paragraph 6.01.

2       **(Pause / Whispers heard off the record)**

3           I'm sorry.  CP Exhibit 211, Page 3, Paragraph 6.01.

4   Q    You understand, Mr. Flores, that you have filed some

5   pleadings in this case, correct?

6   A    Yes, sir.

7   Q    And referring to CP Exhibit 211 at Page 3, Paragraph 6.01,

8   your lawyers on your behalf made the statement, "Clayton

9   assigned the contract to Vanderbilt," correct?

10  A    It appears to say that.

11          **MR. RANGEL:**  Your Honor, I would ask the Court to

12  take judicial notice of that pleading and that judicial

13  admission.

14          **THE COURT:**  Of the pleadings in this court?

15          **MR. RANGEL:**  Yes, your Honor.

16          **THE COURT:**  I don't think I need to take judicial

17  notice of pleadings in this court.

18          **MR. RANGEL:**  Okay.  Just okay.

19          **THE COURT:**  I'll just remember them.

20          **MR. RANGEL:**  Okay.

21          **THE COURT:**  Thank you.

22          **MR. RANGEL:**  Very well.

23  BY MR. RANGEL:

24  Q    Now, going back to the closing, Mr. Flores, there were

25  other documents that were signed that day, correct?

Flores - Direct / By Mr. Rangel          115

1    A    I believe so.

2    Q    Okay.  And I've asked you questions about some of those

3    documents during your deposition, correct?

4    A    Correct.

5    Q    Okay.

6         **MR. RANGEL:**  I would call up CP Exhibit 9 at 55, 63.

7    Q    And this is a real estate lease dated 1-7-02, correct?

8    A    Oh, yes, sir.

9    Q    And then there is a signature on Pages 5, which is

10   Bates 59; 6, Bates 69, Bates 63, correct?

11        **(Pause)**

12        And there's a signature line there for Cesar Flores,

13   correct?

14   A    Yes, sir.

15   Q    And it's your testimony that you did not sign your name to

16   that document at that place, correct?

17   A    I don't remember signing it.

18   Q    Well, is it your testimony under oath that you did not

19   sign your name to this document?

20   A    I don't remember signing it.

21   Q    Okay.  Well, would I be correct in saying that?

22   A    It appears to be my signature.  I just don't remember

23   signing it.

24   Q    Okay.  Well, that's different from what you said during

25   your deposition.

1          **MR. RANGEL:**  I would call up video clip number nine.

2          **MR. B. GUTIERREZ:**  Excuse me, your Honor.

3          **THE COURT:**  Yes, sir?

4          **MR. B. GUTIERREZ:**  Before they play that I think

5   Mr. Rangel needs to give him an opportunity to answer before he

6   attempts to impeach him with prior testimony.  He has not --

7          **THE COURT:**  Sir, is this a admitted exhibit?

8          **MR. RANGEL:**  It's his deposition, your Honor.

9          **THE COURT:**  And what are you doing with it?

10          **MR. RANGEL:**  I'm seeking to impeach him, because his

11   answer that he just gave is different from when he gave the

12   deposition.

13          **THE COURT:**  Well, what you need to do is you need to

14   know how to use that.

15          **MR. RANGEL:**  Well, I read him the question, your

16   Honor.

17          **THE COURT:**  And he said?

18          **MR. RANGEL:**  A different answer.

19          **THE COURT:**  Okay.  Then that's all you can do I

20   believe.

21          **MR. RANGEL:**  But I have not been able to impeach him

22   with his prior testimony.

23          **THE COURT:**  I'm sorry what you need -- well, what do

24   you want to do exactly?

25          **MR. RANGEL:**  I want to play the video clip of --

Flores - Direct / By Mr. Rangel          117

1          **THE COURT:**  No.

2          **MR. RANGEL:**  -- his testimony showing that his

3    answers --

4          **THE COURT:**  That isn't how that works.

5          **MR. RANGEL:**  Okay.  Very well.

6    **BY MR. RANGEL:**

7    Q    So, Mr. Flores, with respect to your signature on that

8    document, is it your testimony that it is or it is not your

9    signature?

10   A    It is not my signature.

11   Q    Thank you.  Then let's go to the second part is Exhibit 7

12   at 29.  And this document is a power of attorney and it also

13   has a signature for Cesar Flores, correct?

14   A    Yes, sir.

15   Q    Okay.  And is it your testimony that that is not your

16   signature?

17   A    I don't remember signing it.  When I first saw this, the

18   power of attorney, with Mr. Gutierrez and then again at my

19   deposition, it was presented with two other power of attorneys,

20   one of which I have no doubt was not my signature.  I was a

21   little suspicious.  Again, the address on this form does not

22   coincide with the address in regards to the manufactured home.

23   Q    Okay.  But my question is:  Is it your signature on this

24   document?

25   A    I don't think it is.

Flores - Direct / By Mr. Rangel          118

1  Q    Then there was another power of attorney, Clayton parties'

2  Exhibit 5 -- I'm sorry -- Exhibit 8 at 104.  And this is

3  another document.

4          Is that your signature?

5  A    It doesn't look familiar to me.  I don't recall it being

6  my signature.

7  Q    Okay.  So your testimony is it's not your signature.

8  A    Right.

9  Q    Then I don't believe I had asked you about Clayton

10 parties' Exhibit 5, which is the same CP Exhibit 7 at 30.

11         And this is another document that has signature lines

12 for Cesar Flores in two places, correct?

13 A    Yes, sir.

14 Q    And your testimony is, is that's not your signature,

15 correct?

16 A    That is definitely not my signature.

17 Q    Thank you.  Mr. Flores, it is your testimony that you have

18 not paid in full the debt that you took on when you signed that

19 contract when you bought the mobile home, correct?

20 A    Is it my testimony that we have not paid in full?

21 Q    Correct.

22 A    I believe that my contract with Vanderbilt and Clayton

23 Homes has been satisfied.

24         **MR. RANGEL:**  Object to non-responsive, your Honor.

25         **THE COURT:**  I don't know.

1          **MR. RANGEL:**  May I rephrase the question?

2          **THE COURT:**  Go ahead.

3          **MR. RANGEL:**  Okay.

4     **BY MR. RANGEL:**

5     Q    You agreed to make 144 payments, correct?

6     A    Correct.

7     Q    You have not made the 144 payments, correct?

8     A    No.

9     Q    You have made only 84 payments, correct?

10    A    Correct.

11         **MR. RANGEL:**  Judge --

12         **THE COURT:**  Yes, sir.

13         **THE COURT:**  -- I will pass the witness subject to

14    being able to recall him when they take the affirmative role on

15    their counterclaim and I can cross examine him.  And there are

16    some things about the counterclaim that have not --

17         **THE COURT:**  Thank you.

18         **MR. RANGEL:**  That have not been raised that I would

19    like to ask later.

20         **THE COURT:**  Thank you, sir.

21         **MR. B. GUTIERREZ:**  May I, your Honor?

22         **THE COURT:**  You may proceed.

23    //

24    //

25    //

**CROSS EXAMINATION**

1

**BY MR. B. GUTIERREZ:**

2

Q    Mr. Flores, good afternoon.

3

A    Good afternoon.

4

Q    I was noticing that most, if not all, of those documents

5

that Mr. Rangel was showing you appear to spell your name

6

Ceaser as opposed to Cesar Flores.

7

        Tell us your name for the record.

8

A    Cesar Flores.

9

Q    And how do you spell "Cesar Flores"?

10

A    C-e-s-a-r.

11

Q    Okay.  Have you ever used -- strike that.

12

        Have you ever signed documents Ceaser Flores?

13

A    Never.

14

Q    Where did you grow up, Mr. Flores?

15

A    In Alice.

16

Q    What kind of an education do you have?

17

A    I went all the way through elementary and middle school,

18

junior high.  My junior year in high school I dropped out and

19

received my GED.

20

Q    The collection letters that were shown to you and that the

21

jury saw a few minutes ago -- they're in evidence -- that

22

Mr. Rangel was asking you showed a mailing address.  You don't

23

recall receiving them.

24

        Do you remember those questions?  Do you remember

25

1    those documents that were on the screen the jury just looked at

2    them?

3    A    Yes, sir.

4    Q    Did you notice that each one of those documents referenced

5    a loan number and account number?  Do you remember?

6    A    I don't remember.

7    Q    Do you remember in opening statement when Mr. Gutierrez

8    was talking about the retail installment contract?

9    A    Yes, sir.

10   Q    Exhibit Number 8.  And, of course, I'm not going to pull

11   out those letters, but this is the number that I was

12   referencing to, the loan number that was in those collection

13   letters.  Do you remember that?

14   A    Yes, sir.

15   Q    Okay.  Same account number.

16   A    Yes, sir.

17   Q    All right.  Same account number that appears in the deed

18   of trust release and -- this would be Exhibit 12.  Same account

19   number here referencing Cesar Flores.

20   A    Yes, sir.

21   Q    Is that correct?

22   A    Yes, sir.

23   Q    Same account number that was in the mechanic lien release;

24   is that correct?

25   A    Yes, sir.

1    Q    Is that why you have answered the question of -- the

2    question from Mr. Rangel a few minutes ago concerning paid in

3    full the way you did?

4    A    Yes, sir.

5    Q    I believe he asked you, you agree -- you agree,

6    Mr. Flores, that you have not paid your contract in full.  And

7    you disagree with that, right?

8    A    Yes, sir.

9         **MR. RANGEL:**  Judge, I'm going to object to the

10   leading question.

11        **THE COURT:**  Sustained.

12   **BY MR. B. GUTIERREZ:**

13   Q    And when did you first become aware that this document,

14   this deed of trust release referencing your account,

15   referencing your loan, had been filed by the Clayton parties,

16   Vanderbilt Mortgage, as well as CMH Homes?

17   A    When I came to visit with you.

18   Q    After you were sued?

19   A    Yes, sir.

20   Q    Okay.  This contract, retail installment contract, that

21   Mr. Rangel showed you and he pointed to this area here,

22   (indicating), about real property, do you remember those

23   questions?

24   A    Yes, sir.

25   Q    Did you or Mr. King own any property at the time that you

Flores - Cross / By Mr. B. Gutierrez          123

1   purchased this mobile home?

2   A     No, sir.

3   Q     Did your sister, Maria Trevino, ever go with you to the

4   Clayton Homes Store 214 here in Corpus Christi?

5   A     No, sir.

6   Q     Did your brother-in-law, Arturo Trevino, ever go with you

7   to the Corpus Christi Clayton Homes Store 214?

8   A     No, sir.

9   Q     Did you ever tell them that they needed to go to the store

10  to sign any papers?

11  A     No, sir.

12  Q     They gave you permission to put your mobile home on some

13  of their property?

14  A     Yes, sir.

15  Q     Mr. Rangel also asked you and used the phrase or the words

16  "land-in-lieu."  Do you remember that?

17  A     Yes, sir.

18  Q     And I believe you've already told us that this word

19  "land-in-lieu" was not discussed.

20  A     No, sir.  Not at the time of...

21  Q     I believe what you have testified is that the sales person

22  assured you you would be approved if you had a place where you

23  could put your mobile home.

24  A     Correct.

25  Q     And did he request proof from you that you had a place

1    where you could put your mobile home?

2    A    I believe he did.

3    Q    Is that why you faxed -- is that why you caused this,

4    (indicating), document to be faxed to the Clayton Homes store

5    so they could know that you had a place where you could place

6    your mobile home?

7    A    I believe so.

8    Q    And did you do this after you spoke to your sister and

9    your brother-in-law?

10   A    Yes.

11   Q    And did you do this after you were given permission to

12   place this mobile home that you were wanting to buy, did you do

13   this after you were given permission by your sister and

14   brother-in-law?

15   A    Yes, sir.

16   Q    Now, when you went to close the deal -- and I believe the

17   documents and the retail installment contract indicates that

18   this closing took place on January the 5th of 2002, okay?

19   A    Yes, sir.

20   Q    When you went to the closing -- we'll call it the

21   "closing" -- who was at the closing?  Who were the persons that

22   were at the closing?

23   A    Alvin King, myself and the sales person.

24   Q    Okay.  Do you remember the name of the sales person?

25   A    I do now.

Flores - Cross / By Mr. B. Gutierrez          125

1   Q    Okay.  And what is his name?

2   A    I believe his first name was Lance.  I don't know the last

3   name.

4   Q    Okay.  Was any other person there with you at this

5   closing?

6   A    No, sir.

7   Q    Have you ever met or do you know an individual by the name

8   of Benjamin Frazier?

9   A    No, sir.

10  Q    Okay.  A few minutes ago Mr. Rangel was asking you about

11  some power of attorneys.

12  A    Yes, sir.

13  Q    Okay.  One of those power of attorneys has a signature

14  that is spelled Ceaser Flores.  Did you see that?

15  A    Yes, sir.

16  Q    Okay.  And I believe you told -- you have told us that --

17  I think your words were "I definitely did not sign that."  Do

18  you remember that?

19  A    Yes, sir.

20  Q    Did you notice that in that document there was a signature

21  of another individual besides a signature that purports to be

22  Mr. King's?  Did you notice that there was a signature from a

23  Benjamin Frazier as a notary?  Did you see that?

24  A    Yes, sir.

25  Q    Was that man anywhere at this closing that took place on

Flores - Cross / By Mr. B. Gutierrez          126

1    January 5th of 2002?

2    A    Not while Mr. King and myself were there.

3    Q    Did you know, Mr. King, that this man who you have already

4    told us that you have never met that you don't know, did you

5    know that Mr. Frazier who at the time that he was being

6    represented by this attorney here, testified that his signature

7    had been forged --

8         **MR. RANGEL:**  Judge, I'm going to object to him

9    injecting testimony in the form of a question in a did-you-know

10   question.  I object.  That's improper use...

11        **THE COURT:**  Sustained.

12        **(Pause)**

13   **BY MR. B. GUTIERREZ:**

14   Q    When you signed this retail installment contract, when you

15   and Mr. King signed this retail installment contract, did the

16   closer, did the individual that was closing this deal, ever

17   tell you that your contract was going to be assigned to

18   Vanderbilt Mortgage?

19   A    No, sir.

20   Q    A few minutes ago we saw a, what Mr. Rangel referred to I

21   believe as a welcome letter.  Do you remember that?

22   A    Yes, sir.

23   Q    Okay.  And is there anywhere -- did you see anywhere in

24   that letter anything that said that the contract that you and

25   Mr. King signed had been assigned to Vanderbilt Mortgage?

1   A    No, sir.

2   Q    In fact, if we -- and the jury will look at the

3   document -- if you look at the document, it talks about a

4   servicing contract, right; that Vanderbilt was servicing your

5   loan; is that correct?

6   A    I believe so.

7   Q    Okay.  Did you ever receive any letter, any notice, after

8   you signed your contract from the people that you were buying

9   the contract notifying you, giving you notice that your

10  contract that you had signed, that you and Mr. King had signed,

11  had been assigned to Vanderbilt Mortgage?

12  A    No, sir.

13  Q    Was that ever discussed at the closing?

14  A    No, sir.

15  Q    Okay.  I want you to assume with me, Mr. Flores, that the

16  President of CMH Homes, he is here today, Mr. David Booth, has

17  testified --

18          **MR. RANGEL:**  Your Honor, again I would object to

19  asking the witness to assume --

20          **THE COURT:**  Sustained.

21  **BY MR. B. GUTIERREZ:**

22  Q    Was your closing recorded?  Was there a recording made of

23  your closing?

24  A    We were told that there would be, so I believe so.

25  Q    Okay.  And who told you this?

1    A    The salesman, the gentleman.

2    Q    And have you seen the request that we made of Vanderbilt

3    to produce that recording?

4    A    Yes, sir.

5    Q    What have they told us?

6    A    I believe their response was that they could not find it.

7    Q    After you signed the contract, you and Mr. King signed

8    this retail installment contract, you made all of your payments

9    of 2002; is that correct?

10   A    I believe so, yes.

11   Q    You made all of your payments of 2003?

12   A    Yes, sir.

13   Q    You made all of your payments of 2004?

14   A    Yes, sir.

15   Q    You made all of your payments of 2005?

16   A    Yes, sir.

17   Q    You made all of your payments of 2006?

18   A    Yes, sir.

19   Q    You made all of your payments of 2007?

20   A    Yes, sir.

21   Q    You made all of your payments of 2008?

22   A    Yes, sir.

23   Q    And I believe that Mr. Rangel is correct you stopped

24   paying in the spring of 2009.

25   A    Correct.

Flores - Cross / By Mr. B. Gutierrez          129

1  Q    Where were you living in the fall -- where were you living

2  in October of 2005?

3  A    I was there at 1700 Carmen Street at the mobile home.

4  Q    I believe Mr. Rangel talked to you about calls that were

5  being made by the Vanderbilt people to you and Mr. King,

6  collection calls if we could call them that.  Remember that,

7  those questions?

8  A    Yes, sir.

9  Q    Okay.  They were calling, and I believe you have admitted

10 that they would call you because of lateness of payment,

11 payments not being made on time, those sort of calls?

12 A    Yes, sir.

13 Q    They were calling you asking you to make a payment, they

14 were calling you to pay them money; is that correct?

15 A    Yes, sir.

16 Q    Did anyone at Vanderbilt ever call you and tell you that

17 they had decided to release the mortgage on your mobile home?

18 A    No, sir.

19 Q    Did anyone at Vanderbilt ever tell you while these calls

20 continued after 2005, did anyone at Vanderbilt ever tell you

21 that as of October 8th of 2005 they were going to consider your

22 retail installment contract as having been paid in full?

23        **MR. RANGEL:**  Objection, your Honor.  It assumes facts

24 not in evidence.

25        **THE COURT:**  Sustained.

Flores - Cross / By Mr. B. Gutierrez          130

1   **BY MR. B. GUTIERREZ:**

2   Q    Did anyone at Vanderbilt Mortgage ever call you and tell

3   you that they had decided to release your mortgage because of

4   many instances of fraud and forgery in many, if not all, of the

5   sales originating out of Store 214?

6          **MR. RANGEL:**  Objection.  Assumes facts not in

7   evidence and these are argumentative questions, your Honor.

8          **THE COURT:**  Sustained.

9          **(Pause)**

10  **BY MR. B. GUTIERREZ:**

11  Q    In a few minutes if we look back at your retail

12  installment contract, do you remember the amount of interest

13  that you were being charged?

14  A    If I'm correct, 10 percent interest.  I'm not 100 percent

15  sure.

16  Q    At one point after you sent in your credit application

17  that Mr. Rangel showed to the jury a few minutes ago you were

18  told that you had been approved, right?

19  A    Yes, sir.

20  Q    Did anyone at Clayton Homes -- did anyone at Clayton Homes

21  or Vanderbilt ever tell you that instead of being approved for

22  (indiscernible / coughing) point 99 percent that you had been

23  approved for a lesser interest rate?

24  A    No, sir.

25  Q    Let me show you a document that comes out -- well, let me

**EXCEPTIONAL REPORTING SERVICES, INC**

Flores - Cross / By Mr. B. Gutierrez          131

1   show you the front of the document.  This comes out of Exhibit

2   Number -- I believe this is CP, Clayton parties' Number 8.

3   This is a credit application report.  This is regarding you and

4   Mr. King, okay?  Do you see that?

5   A    Yes, sir.

6   Q    And if we go to -- if we go to what is identified as

7   Bates 88 of that exhibit, you'll notice that you had actually

8   been approved for a different payment plan than the -- what was

9   it, 144 payments at 10.99 percent?

10  A    Yes, sir.

11  Q    Had you seen this document before today?

12  A    Never.

13  Q    How does that make you feel that even though you went

14  there in good faith hoping to get a good deal, thinking you got

15  a good deal, but you had actually been approved for a lesser

16  interest rate?

17  A    It upsets me.

18       **(Pause)**

19  Q    When you closed the deal, I believe Mr. Rangel was asking

20  you whether or not you had signed a lot of papers.  Do you

21  remember that?

22  A    Yes, sir.

23  Q    One of the documents that you signed was, I believe they

24  refer to it as a -- as I'm asking you these questions I'm

25  trying to see if I can find the documents -- I think it's

Flores - Cross / By Mr. B. Gutierrez          132

1    referred to a HUD statement.  And another one I believe is a

2    good-faith statement, okay.  I'm going to show you first the

3    HUD statement that, again, comes out of Clayton parties'

4    Exhibit Number 8, and we'll look at the first page, which is

5    aside from all of these documents spelling your name Ceaser --

6    do you see that?

7    A    Yes, sir.

8    Q    This is a document -- and I'm going to go to signature

9    spaces where you and Mr. King signed -- but this is clearly a

10   document that was executed there, signed there, at the Clayton

11   Homes' store when you closed your deal on January the 5th of

12   2008.

13   A    Yes, sir.

14   Q    And if we look at the document, it outlines the different

15   expenses -- it's not too clear, but you can see at the top

16   settlement charges; it has the amount; actually starts with the

17   contract price here, (indicating); has the amount.  And as we

18   go it talks about the gross amount that's going to be due from

19   Flores and King right here, (indicating).  I say the

20   "borrowers"; you're the borrower.

21          And there's the second page here, (indicating).

22   Here's where you and Mr. King signed, January 5th, there in

23   this -- where were you, there at the Clayton Homes store?

24   A    Yes, sir.

25   Q    At an office?

Flores - Cross / By Mr. B. Gutierrez          133

1    A    Yeah.  They had like a -- I believe it was like a little

2    manufactured office type thing.

3    Q    Now, in a few minutes we're going to look at some other

4    documents, the documents having to do with the Trevinos.

5         But when you were there they were supposed to go over

6    this and show you what expenses you were going to be

7    responsible for, right?

8    A    Yes, sir.

9    Q    Now, if we look at -- do you see where it says "government

10   recording and transfer charges"?  Do you see that?

11   A    Yes, sir.

12   Q    Let me see if I can...

13        **(Voices heard off the record)**

14        If we see where it says "government and recording and

15   transfer charges," if we look to the far right, it doesn't show

16   any charges.  It doesn't show that they were charging any

17   amount of money to file any documents with at least for any

18   deeds or any mortgages or any releases.

19        Do you see that?

20   A    Yes, sir.

21   Q    If there had been a charge perhaps for a deed or a

22   mortgage or something and you knew you had not signed any type

23   of deed or mortgage, that would be a red flag would it?

24   A    Yes, sir.

25   Q    You would ask a question, right?

Flores - Cross / By Mr. B. Gutierrez          134

1  A    Yes, sir.

2  Q    You trusted this individual to act and behave and act in

3  good faith, right?

4  A    Yes, sir.

5          MR. RANGEL:  Judge, I'm going to object to the

6  leading questions.

7          THE COURT:  Sustained.

8  BY MR. B. GUTIERREZ:

9  Q    Let's look at another document.  This is the good-faith,

10 good-faith estimate, another document, Bates 252.  It comes out

11 of the Clayton parties' exhibits.  And if we go down to --

12         MR. RANGEL:  Excuse me, counsel.  Could you identify

13 it for the record?

14         MR. B. GUTIERREZ:  Bates 252 out of Clayton parties

15 number --

16         THE COURT:  What we need to do is know exactly what

17 the trial exhibit is.

18         MR. B. GUTIERREZ:  The trial Exhibit Number 8, your

19 Honor.

20         THE COURT:  Okay.  Thank you, sir.

21         MR. B. GUTIERREZ:  Yes.

22         THE COURT:  I misheard.  Thank you very much.

23 BY MR. B. GUTIERREZ:

24 Q    Okay.  Again, we look at an estimate.  That's supposed to

25 be an estimate of what you could stand to pay, right?

Flores - Cross / By Mr. B. Gutierrez          135

1    A    Yes, sir.

2    Q    And do you see if they estimated that they would charge

3    you any fees for recording any documents at the city or at the

4    county or anywhere?  Any fees there?

5    A    No, sir.

6    Q    If there were some fees there, would that have maybe

7    raised a red flag that something was going on?

8    A    It possibly would have.

9    Q    Let's see if we can look at the...

10        **(Pause)**

11        Let me show you Exhibit Number 6.  This is a deed of

12   trust.  It has the name of Maria Trevino, Arturo Trevino.

13        Do you see that at the very top?

14   A    Yes, sir.

15   Q    And before I ask you some questions about this page, let's

16   go to the very last page of this document.  And I'll ask you --

17   it shows that someone paid $20 to file this document, right?

18   A    Yes, sir.

19   Q    To record this document, right?

20   A    Yes, sir.

21   Q    And does it show where this document should be returned to

22   at the bottom?

23   A    Clayton Homes.

24   Q    Look at -- this is Page 6 of that document, and it shows a

25   recording stamp on there where it went; is that correct?

Flores - Redirect / By Mr. Rangel          136

1  A    Yes, sir.

2      **(Pause)**

3          **MR. B. GUTIERREZ:**  Your Honor, at this time I would

4  like to pass the witness, Mr. Flores, and reserve the right to

5  recall him in our case-in-chief, your Honor.

6          **THE COURT:**  Of course.  Thank you, sir.

7          Mr. Gowan?

8          **MR. RUMLEY:**  Mr. Rumley.

9          **THE COURT:**  I'm sorry, Mr. Rumley.  I can't believe

10  I --

11          **MR. RUMLEY:**  I kind of look like Mr. Gowan.

12          **THE COURT:**  You don't.  I'm very sorry.

13          **MR. RUMLEY:**  Your Honor, no questions at this time.

14          **THE COURT:**  Mr. Rumley, all right.

15          **MR. RANGEL:**  A few follow-up, your Honor?

16          **THE COURT:**  Yes, sir.

17          **MR. RUMLEY:**  He's a better golfer.

18          **THE COURT:**  I'm sorry.  I blame it on my cold.

19                          **REDIRECT EXAMINATION**

20  **BY MR. RANGEL:**

21  Q    Mr. Flores, if we would look at Clayton parties' Number 8,

22  that first page that Mr. Gutierrez showed you.

23      **(Pause / Voices heard off the record)**

24          **THE COURT:**  What are you looking for?

25          **MR. RANGEL:**  The first --

1       **THE COURT:**  Eight.

2            **MR. RANGEL:**  CP 8, the first page that Mr. Gutierrez

3  showed him.  He didn't refer to the Bates stamp.  That's what

4  I'm having trouble identifying.  It's the first page that he

5  showed him where he -- perhaps Mr. Gutierrez can help me out --

6  the one that showed the credit report.

7       **(Counsel confer off the record)**

8            It's the first page of the document.

9       **(Counsel confer off the record)**

10           May I confer with counsel, your Honor?

11      **THE COURT:**  Surely.

12      **(Pause / Counsel confer off the record)**

13           **MR. RANGEL:**  I apologize, your Honor.

14      **(Pause)**

15           I can't find it just now but I'll get it.

16      **THE COURT:**  Why don't you continue to have somebody

17  in your group look for it --

18           **MR. RANGEL:**  Yes.

19      **THE COURT:**  -- and you can come back to it.

20      **MR. RANGEL:**  That's it.  He found it.

21      **THE COURT:**  See, there you go.

22      **(Laughter)**

23  BY MR. RANGEL:

24  Q    Mr. Flores, this is the credit application report that

25  Mr. Gutierrez showed you, correct?

Flores - Redirect / By Mr. Rangel          138

1   A    Yes, sir.

2   Q    And this was generated in connection with your application

3   to get approved for financing from Vanderbilt, correct?

4   A    Correct.

5   Q    And this was generated at the time, around the time that

6   you were buying the mobile home, correct?

7   A    I'm not sure.

8   Q    Okay.  Well, let's look -- let's look at the very last two

9   sentences at the top.  Transaction title.  What does it say?

10  A    Land-in-lieu.

11  Q    And it's still your testimony that there was no discussion

12  about land-in-lieu when you were buying this mobile home,

13  correct?

14  A    Correct.  And I never saw this.

15  Q    Okay.  Then notes.  We have nice land here.  It has been

16  in the applicant's family for a long time.  No problem with

17  budget; they are ready to close.

18          You were the applicant, right?

19  A    Yes, sir.

20  Q    And the land that is being referred to is the Lot 36 where

21  the mobile home was going to be placed, correct?

22  A    Correct.

23  Q    And, in fact, that Lot 36 had been in your family for a

24  long time, correct?

25  A    Yes, sir.

Flores - Redirect / By Mr. Rangel          139

1  Q    And the only way they could have known that is because you

2  as a member of the family would have told CMH Homes about that,

3  correct?

4  A    I'm sure.

5  Q    Okay.  And so the documentation here reflects that it was

6  land-in-lieu and the land that was being provided in lieu of a

7  down payment was the land that had been in your family for a

8  long time, correct?

9  A    Correct.

10 Q    You also -- Mr. Gutierrez asked you some questions about a

11 tape recording.

12       During the closing of the transaction did you ever

13 see the salesman take out a tape recorder?

14 A    I don't remember.  I don't believe I did.

15 Q    In fact, you did not, correct?

16 A    I don't remember.

17 Q    Okay.  In your deposition you said "no."

18 A    Well, I mean I don't remember.  I don't remember him

19 pulling something out and setting it on the desk.

20 Q    And did you ever see the salesman start a tape recorder?

21 A    No.

22 Q    Did you ever see him turn off a tape recorder?

23 A    Not that I can remember.

24 Q    To your knowledge was the transaction tape recorded?

25 A    We were told it would be, but I can't say that I sat there

Flores - Redirect / By Mr. Rangel          140

1    and remember seeing him turn it on.

2    Q    I mean if you didn't see a tape recorder turned off or on

3    or a tape recorder on the table, more likely than not it was

4    not tape recorded, correct?

5    A    I don't know.

6    Q    Okay.  We'll go back to CP 1.

7              **THE COURT:**  Is something wrong with Juror Number 8?

8    Were you sleeping?

9              **JUROR NUMBER 8:**  (Indiscernible)

10             **THE COURT:**  Pardon?

11             **JUROR NUMBER 8:**  Sorry.

12        **(Pause)**

13             **THE COURT:**  How much did you miss?

14             **JUROR NUMBER 8:**  Nothing.

15             **THE COURT:**  Okay.  Go ahead.

16   **BY MR. RANGEL:**

17   Q    Going to Page 2, Mr. Flores, on the Paragraph G,

18   Itemization, or the block -- the left.  The reference there is

19   to appraisal fee, correct?

20   A    Yes, sir.

21   Q    That relates to the appraisal on the land that was being

22   used as collateral for the purchase of the mobile home,

23   correct?

24   A    I would assume so.

25   Q    There is nothing else to be appraised, right, except for

Flores - Redirect / By Mr. Rangel          141

1   the land, correct?

2   A     I believe so, uh-huh.

3   Q     And finally, Mr. Flores, Mr. Gutierrez pointed out that

4   you didn't have any notice that this contract was being

5   assigned to Vanderbilt, correct?

6   A     Correct.

7   Q     Again, if you look at Page 1 of the contract, very top, it

8   says "assignee, Vanderbilt Mortgage and Finance, Inc.,"

9   correct?

10  A     Correct.

11  Q     And the second sentence says that the seller will submit

12  the contract to be assigned to Vanderbilt once you were

13  approved, correct?

14  A     It does, yes.

15  Q     And you were approved, correct?

16  A     Yes.

17  Q     And the reason you were approved is because you started

18  making payments to Vanderbilt, correct?

19  A     Was that the reason I was approved?

20  Q     Let me restate the question.

21  A     Okay.

22  Q     You started making payments to Vanderbilt, correct?

23  A     Correct.

24  Q     So it stands to reason that you were approved by

25  Vanderbilt so you can make the payments to Vanderbilt, correct?

Flores - Recross / By Mr. B. Gutierrez          142

1  A    I thought Clayton Homes approved me.  I mean I didn't know

2  who did the approving at that time.

3  Q    Well, the contract says it was going to be assigned to

4  Vanderbilt, correct?

5  A    It does say that, yes.

6  Q    So you're on notice from the time that you signed the

7  contract that it was going to be assigned to Vanderbilt,

8  correct?

9  A    It does say that on there.

10 Q    And throughout the period of time that Mr. Gutierrez laid

11 out when you were making payments, you were making all those

12 payments to Vanderbilt, correct?

13 A    Yes.

14        **MR. RANGEL:**  Your Honor, I'll pass the witness

15 subject to being able to --

16        **THE COURT:**  Yes, sir.

17        **MR. RANGEL:**  -- cross examine when Mr. Gutierrez

18 recalls him.

19        **THE COURT:**  Sure.  Anything further, sir?

20        **MR. B. GUTIERREZ:**  Just a few questions.

21        **THE COURT:**  Sure.

22                    **RECROSS EXAMINATION**

23 BY MR. B. GUTIERREZ:

24 Q    You have already testified that that credit report, credit

25 application that we saw a few minutes ago that comes out of

Flores - Redirect / By Mr. Rangel          143

1    Exhibit 8, the first time that you saw that, the first time

2    that you discovered that this people had actually approved you

3    for a lesser interest rate than what they had charged you,

4    right?

5    A    Yes, sir.

6         MR. B. GUTIERREZ:  We'll reserve the rest of our

7    questions, your Honor, at this time.

8         THE COURT:  Thank you.

9                    FURTHER REDIRECT EXAMINATION

10   BY MR. RANGEL:

11   Q    Mr. Flores, you told Mr. Gutierrez that you had never

12   signed a document that spells your name Ceaser, C-e-a-s-e-r,

13   correct?

14   A    Correct.

15   Q    Looking at Exhibit CP Number 1, buyer's name, how is your

16   name spelled?

17   A    C-e-s -- C-e-a-s-e-r.

18   Q    So the document had that spelling, correct?

19   A    The document had that spelling, yes.

20        MR. B. GUTIERREZ:  Excuse me, your Honor.  May I

21   object to --

22        THE COURT:  Yes.

23        MR. B. GUTIERREZ:  -- misstating the evidence and

24   misstating the testimony of my client, Mr. Flores.  Mr. Flores

25   specifically said he has never signed Ceaser Flores.

Flores - Recross / By Mr. B. Gutierrez          144

1          **MR. RANGEL:**  That was not my question, your Honor.

2   My question was whether this document -- this contract has his

3   name spelled Ceaser, this contract that he signed.  So I was

4   not misstating his testimony.

5          **THE COURT:**  Well, I think the jury understands, don't

6   you think, Mr. Gutierrez?

7          **MR. B. GUTIERREZ:**  Yes, your Honor.

8          **THE COURT:**  Okay.

9   BY MR. RANGEL:

10  Q    And are you known as Ceaser by some of your friends and

11  family?

12  A    Some people call me Cesar; some people call me Ceaser,

13  Cesar.  I mean it just depends on who I'm around.

14  Q    Okay.

15  A    But to my family and pretty much all my life I've either

16  been referred to as Cesar or Ceaser.

17  Q    Thank you, Mr. Flores.

18          **MR. B. GUTIERREZ:**  One question.

19                 **FURTHER RECROSS EXAMINATION**

20  BY MR. B. GUTIERREZ:

21  Q    A few minutes ago Mr. Rangel showed you a document,

22  remember a few minutes ago, charging on appraisal fees, do you

23  see, $400?

24  A    Yes, sir.

25  Q    Did you know that the appraisal on this property was not

1    prepared until almost two weeks after you had signed your --

2            **MR. RANGEL:**  Your Honor, I would object.  He is

3    testifying about a question.

4            **MR. B. GUTIERREZ:**  Exhibit 8 will show the appraisal

5    report from Tiller and Associates (phonetic) dated January

6    16th, your Honor.  That's in evidence.

7            **THE COURT:**  Overruled.

8            **MR. B. GUTIERREZ:**  That's all the questions I have at

9    this time.  We will reserve our questions.

10           **THE COURT:**  All right.  Thank you very much.  You may

11   stand down.

12           Are you finished everyone with Mr. Flores?

13           **MR. RANGEL:**  Subject to being recalled.

14           **THE COURT:**  At this time.  Thank you, sir.  You may

15   stand down.

16           **THE WITNESS:**  Thank you, your Honor.

17      **(Witness steps down)**

18           **THE COURT:**  Call your next witness.

19           **MR. RANGEL:**  Alvin King.

20           **THE CLERK:**  Would you come forward, please?  Would

21   you raise your right hand?

22            **ALVIN KING, PLAINTIFFS' WITNESS, SWORN**

23           Have a seat, please, and watch your step.

24           **THE COURT:**  You may proceed.  Thank you.

25           **MR. RANGEL:**  Thank you, your Honor.

1                         **DIRECT EXAMINATION**

2     BY MR. RANGEL:

3     Q    Please state your name for the record.

4     A    Alvin E. King, III.

5     Q    And, Mr. King, where do you live?

6     A    I live here in Corpus Christi, Texas.

7     Q    How long have you lived in Corpus Christi?

8     A    About a little over a year.

9     Q    Okay.  At some point did you live in Alice, Texas?

10    A    Yes, sir.

11    Q    When did you live in Alice, Texas?

12    A    I lived in Alice, Texas -- actually, I was going to school

13    in Houston and living in Alice, Texas from the end of 2001 to

14    the middle of 2009.  For a short period of time I lived in

15    Houston, was going to school and working there, and then moved

16    into the mobile home that we purchased following getting out of

17    mortuary school.

18    Q    Okay.  And you are a mortician?

19    A    Yes, sir.

20    Q    Okay.  And you are the same Alvin King who purchased this

21    mobile home that we've been talking about all day with

22    Mr. Flores from CMH Homes, correct?

23    A    Yes, sir.

24    Q    And you went to the sales center in late December '01 with

25    Mr. Flores to look at the mobile home.

King - Direct / By Mr. Rangel          147

1   A    Yes, sir.

2   Q    And the two of you had discussed buying a mobile home

3   together.

4   A    Me and Mr. Flores had discussed either buying a mobile

5   home, buying a house, renting an apartment.  We had discussed

6   several different options.

7   Q    And one day in late December you were driving around

8   Corpus Christi and you drove by the CMH Homes lot and you

9   stopped and you looked around.

10  A    Yes, sir.

11  Q    And there were -- you had two visits there, correct?

12  A    Yes, sir.

13  Q    And you understand that this is a lawsuit originally filed

14  by Vanderbilt in connection with that mobile home, correct?

15  A    Yes, sir.

16  Q    And on January 5th, 2002, you and Mr. Flores signed the

17  contract to purchase the mobile home, correct?

18  A    Yes, sir.

19  Q    And we've seen it up there.  It's CP Number 1.

20       **(Pause)**

21            Do you recognize that as the contract, Mr. King?

22  A    Yes, sir.

23  Q    And then I believe on the following pages your signature

24  appears in two places, correct?

25  A    Yes, sir, I believe so.

King - Direct / By Mr. Rangel          148

1   Q    It appears here, (indicating); and that is your signature,

2   correct?

3   A    Yes, sir.

4   Q    And you signed your name there, correct?

5   A    Yes, sir.

6   Q    And I believe it also appears on Page 4.  That is your --

7   the second signature is your signature, correct?

8   A    I believe that to be my signature.

9   Q    And there's no doubt that you signed it.

10  A    Yes, sir.

11  Q    Just like Mr. Flores signed it, correct?

12  A    Yes, sir.

13  Q    And these are authentic signatures that did not need to be

14  notarized, correct?

15  A    I don't believe so.

16  Q    They were not notarized, correct?

17  A    No, sir.

18  Q    But you specifically recall signing the document.

19  A    Yes, sir.

20  Q    Now, under the contract you and Mr. Flores agreed to make

21  144 monthly payments, correct?

22  A    Yes, sir, we did.

23  Q    And you made payments for a period of time; in fact, you

24  lived in it for seven years and you made payments, then you

25  stopped making payments, correct?

King - Direct / By Mr. Rangel          149

1   A     Correct.

2   Q     And you stopped making payments in the spring of 2009; is

3   that correct?

4   A     Yes, sir.

5   Q     And at the time that you stopped making the payments you

6   had not made all 144 payments, correct?

7   A     No, sir.

8   Q     And to this day you have not made the 144 payments.

9   A     No, sir.

10  Q     In fact, you've made, the record will reflect, 84

11  payments, correct?

12  A     If that's what the record says.

13            **THE COURT:**  I'm sorry.  You need to speak up please,

14  sir.  Thank you.

15  **BY MR. RANGEL:**

16  Q     And you heard Mr. Flores testify that he has not made 144

17  payments, correct?

18  A     Yes, sir.

19  Q     And, in fact, you and Mr. Flores have not paid in full for

20  that mobile home, correct?

21  A     I believe that because of documents that mobile home has

22  been paid in full.

23  Q     You personally have not paid in full --

24  A     No, sir.

25  Q     -- for the mobile home, correct?

1    A     No, sir.

2    Q     And neither has Mr. Flores, correct?

3    A     No, sir.

4    Q     And you don't know of anybody who's paid the 144 payments

5    for you, correct?

6    A     No, sir.

7    Q     During that first visit when you went to the mobile home

8    sales store you were not in a position to make a down payment

9    were you?

10   A     No, sir.

11   Q     And neither was Mr. Flores, correct?

12   A     I wouldn't --

13   Q     As best you can recall.

14   A     I don't believe so.

15   Q     You recall when you were visiting with that salesman

16   during the first visit that there were various options

17   discussed, right?  Financing options?

18   A     I don't remember exactly what options were discussed at

19   that time.  I know we stopped to look at the two mobile homes.

20   Q     And you and Mr. Flores had basically picked out the two

21   mobile homes that you would be interested in buying one of them

22   if you could make a deal, right?

23   A     Yes, sir.

24   Q     And during that first visit was there a discussion of

25   whether you would have to make a down payment?

King - Direct / By Mr. Rangel        151

1   A     The only thing that I remember is, them talking about is

2   if we did have a piece of property, which we did not at that

3   time, to place the mobile home on that we could be approved and

4   that we would not have to have a down payment.

5   Q     Okay.  So your understanding is that so long as there was

6   a piece of property for you to place the mobile home you would

7   not have to make a down payment, correct?

8   A     Yes, sir.

9   Q     And, of course, that would apply in every situation

10  whenever somebody is buying a mobile home, correct?

11  A     I don't know.  I know that's what they told us.  How would

12  I know --

13  Q     Okay.

14  A     -- about any others?

15  Q     So are you saying that there was no discussion of having

16  to put up land as collateral in order to avoid having to make a

17  down payment?

18  A     No, sir.

19  Q     Is it your testimony that there was no discussion about

20  this land-in-lieu program?

21  A     No, sir.

22  Q     Now, at that first visit was it your understanding that

23  Mr. Flores had already spoken with his sister about locating

24  the property on her lot?

25  A     I believe in my deposition I put that the first visit.  It

King - Direct / By Mr. Rangel          152

1   was not until after the first visit.

2   Q    Okay.  So you were incorrect when you testified in your

3   deposition?

4   A    Yes, sir.  And it wasn't until after our first visit that

5   I believe Mr. Flores talked to his sister about the land.

6   Q    And you realize that when you gave your deposition you

7   were under oath.

8   A    Yes, sir.

9   Q    And under oath you told me when I asked you the question

10  that at the first visit at the sales lot by that time

11  Mr. Flores had already spoken with Maria Trevino about locating

12  the lot, correct?

13  A    Yes, sir.

14  Q    And now your answer today is different, correct?

15  A    Yes, sir.

16  Q    Now, you heard Mr. Flores testify that you were the one

17  who faxed those documents from the HEB on January 3rd, 2002,

18  correct?

19  A    Yes, sir.

20  Q    From whom did you obtain those documents?

21  A    I believe we both filled out the application and he gave

22  me the document from his sister for me to fax.

23  Q    So Mr. Flores is the one who had obtained the copy of the

24  deed that the jury has already seen, correct?

25  A    I believe so.

King - Direct / By Mr. Rangel          153

1   Q    And then you filled out the application, your part of the

2   credit application, and Mr. Flores filled out his part and then

3   you faxed everything in, correct?

4   A    Yes, sir.

5   Q    And did Mr. Flores tell you why he had obtained a copy of

6   the deed to Lots 35 and 36 from his sister?

7   A    I believe that -- I do believe or do recall that he -- we

8   needed that to show them what -- where we were going to be

9   placing the mobile home.

10  Q    And as far as you're concerned that was the only reason

11  that he was providing that property description.

12  A    Yes, sir.

13  Q    Had you had any discussions with the salesman where the

14  salesman told you bring me a property description?

15  A    No, sir.

16  Q    Okay.  That was something between Mr. Flores and the

17  salesman.

18  A    Yes, sir.

19  Q    And obviously, under the contract you agreed to make those

20  payments, which you have not made, correct?

21  A    Correct.

22  Q    You lived in the mobile home until April of 2009.

23  A    Correct.

24  Q    And then you left to go to Refugio?

25  A    For a short time.

King - Direct / By Mr. Rangel          154

1  Q    And you went to live with your mother?

2  A    Yes, sir.

3  Q    And so you -- is that the last time that you lived in the

4  mobile home?

5  A    Yes, sir.

6  Q    And you have not gone back to live there?

7  A    No, sir.

8  Q    You've abandoned the mobile home since then?

9  A    I do not feel that I've abandoned the mobile home being

10 that I -- that somebody lived there.

11 Q    But as -- I'm sorry.

12 A    I left Cesar in charge of the mobile home.

13 Q    But as far as you living in the mobile home, you have not

14 lived there since April of 2009.

15 A    Yes, sir.

16 Q    And that's when you stopped making the payments.

17 A    Correct.

18 Q    And when you left you had no intention to go back and you

19 have not gone back, correct?

20 A    I have not gone back.  I can't say that I didn't have any

21 intentions of going back.

22 Q    Do you have any intention of going back to living in the

23 same mobile home with Mr. Flores?

24 A    Not at this time.

25 Q    And you haven't had that intention since you left,

King - Direct / By Mr. Rangel          155

1    correct?

2    A    No, sir.

3    Q    Is that correct?

4    A    Correct.

5    **(Pause / Voices heard off the record)**

6    Q    Mr. King, you signed this contract and agreed to be bound

7    by all of its terms, correct?

8    A    Correct.

9    Q    And at the time according to the contract there is a

10   specific reference to the contract being assigned to

11   Vanderbilt, correct?

12   A    I believe so.

13   Q    So when you signed the contract because you agreed to be

14   bound by everything, you were on notice of that, correct?

15   A    I did not know at the time they were assigning it.  I know

16   that that's what the contract states, but I don't know that

17   they ever assigned it to them.

18   Q    Well, you do know that you all started making payments to

19   Vanderbilt; the first payment was in March, right?

20   A    Correct.

21   Q    And you continued making payments to Vanderbilt for seven

22   years until the spring of 2009 when you moved out, correct?

23   A    Yes, sir.  That's who sent us our payment book.

24   Q    Okay.  And so you made the payments to Vanderbilt because

25   it was your understanding that you owed the money to

King - Direct / By Mr. Rangel          156

1  Vanderbilt, correct?

2  A    It was not my understanding.  I paid the payments to

3  Vanderbilt because that's who the payment book was sent from.

4  Q    Are you telling this jury that you're making payments to

5  an entity that perhaps you didn't owe the money to at the time?

6  A    It was Vanderbilt Mortgage.

7  Q    All right.  That's to whom -- I mean that's to whom you

8  were making the payments.

9  A    Yes, sir.

10  Q    And over the period of time that you made those payments,

11  you and Mr. Flores had difficulties from time to time, correct?

12  A    Correct.

13  Q    And you heard Mr. Flores testify that when there were

14  difficulties you would be the individual who would primarily

15  call the call center in Tennessee, correct?

16  A    Correct.

17  Q    And you did that.

18  A    Correct.

19  Q    And when you spoke with individuals at the call center, I

20  mean they wanted to work with you, correct?

21  A    Correct.  Most of the time.

22  Q    And most of the time they did work with you, right?

23  A    Yes, sir.

24  Q    I mean there were times when you were late and you would

25  call that -- you said this is reason I'm late; we'll make the

EXCEPTIONAL REPORTING SERVICES, INC

King - Direct / By Mr. Rangel        157

1    payment next month or next week, and they worked with you.

2    A    Correct.

3    Q    In fact, there's one specific individual that sometimes

4    you would ask to speak with her, correct, by the name of Kim?

5    A    Whoever -- yes, sir.

6    Q    Do you remember the name Kim?

7    A    Yes, sir.

8    Q    I mean you spoke with her many times, right?

9    A    Correct.

10   Q    And she was always very professional, right?

11   A    I believe so.

12   Q    And she was always willing to work with you, right?

13   A    Yes, sir.

14   Q    And she did, right?

15   A    Most of the time, yes, sir.

16        Can you all not hear me?

17   Q    Now, when you moved out of the home in March of 2009, you

18   knew you were behind in the payments.

19   A    Yes, sir.

20   Q    And you told Mr. Flores:  Look, I am moving out and it's

21   going to be your responsibility to make the payments, correct?

22   A    Yes, sir.

23   Q    Because he was going to be living in the mobile home,

24   correct?

25   A    Yes, sir.

King - Direct / By Mr. Rangel          158

1    Q    And so you all had an understanding and agreement amongst

2    yourselves?

3    A    Yes, sir.

4    Q    But you never advised Vanderbilt of that agreement did

5    you?

6    A    I don't remember -- I don't recall.  I know I had spoke to

7    Vanderbilt one time but I don't remember exactly what the

8    conversation was about.

9    Q    And when you moved, you left from 1700 Carmen and moved to

10   Refugio, you did not give written notice to Vanderbilt that you

11   had changed your address, correct?

12   A    No, sir.

13   Q    In the contract you saw the reference to Lots 35 and 36,

14   Gallimore, Alice, Texas.

15        **MR. RANGEL:**  Let's pull it up again, please.

16   A    I believe.

17   Q    Buyer gives seller a security interest in real property

18   located at 3536 Gallimore, Alice, Texas, correct?

19   A    I see that.

20   Q    And you see that you were one of the buyers, correct?

21   A    Yes, sir.

22   Q    And you agreed to give a security interest in real

23   property, correct?

24   A    I did not agree -- I signed the contract but I did not

25   agree that that was what was happening, because I didn't own

King - Direct / By Mr. Rangel          159

1   any property.

2   Q    But that is in the contract that you signed.

3   A    Well, that says 3536 Gallimore, Alice, Texas.

4   Q    But does it say --

5   A    I don't believe there's that -- an address there.

6   Q    I'm sorry.  I'm sorry, Mr. King.

7   A    Go ahead.

8   Q    But you did agree to give a security interest in real

9   property.

10  A    That's what the contract states.  I never made any

11  agreements to give any property because I didn't have any

12  property to give.

13  Q    Okay.  But you did agree to be bound by all the terms of

14  that agreement.

15  A    I did sign the contract, yes, sir.

16  Q    You're in business; are you not?

17  A    Yes, sir.

18  Q    And you told me in your deposition you know what a

19  contract is, and when you sign a contract you agree to be bound

20  by it, right?

21  A    Yes, sir.

22  Q    Now, you know one of the issues that we've been talking

23  about today is the Lots 35 and 36 being pledged as security or

24  as collateral for the purchase of the mobile home, right?

25  A    Yes, sir.

King - Direct / By Mr. Rangel          160

1  Q    And you saw the deed that referred to Lots 35 and 36,

2  Gallimore Addition, Lot 1, Alice, Texas, right?

3  A    I believe so, yes, sir.

4  Q    That you faxed over.

5  A    Yes, sir.

6  Q    And it's your testimony, is it not, Mr. King, under oath

7  that you had no idea that land was involved in connection with

8  the purchase of the mobile home, correct?

9  A    Correct.

10 Q    That you had no idea that Lots 35 and 36 had been pledged

11 as security for the purchase of the mobile home.

12 A    That's correct.

13 Q    And that you didn't find out about that until Vanderbilt

14 sued you and Mr. Flores to repossess the home, correct?

15 A    Correct.

16 Q    But isn't it true, Mr. King, that during one or more of

17 those calls that you made to the call center in Tennessee you

18 specifically asked about having one of those lots released?

19 A    I don't ever recall speaking to Vanderbilt about that.

20 Q    And are you saying that you don't recall or that you

21 didn't do it?

22 A    I don't ever recall talking to Vanderbilt about releasing

23 any lots.

24 Q    Certainly if you had done that, that would be evidence

25 that you knew that lots were pledged, right?

King - Direct / By Mr. Rangel          161

1   A    Correct.

2   Q    And so if that is true, then you're not being truthful

3   when you say that you didn't know anything about it, correct?

4   A    What I'm saying is I've never talked to Vanderbilt about

5   releasing a lot.  The only thing I ever talked to Vanderbilt

6   about was about being behind on our payments.

7   Q    You never called Vanderbilt and talked about refinancing

8   to release one of the lots.

9   A    Yes, I did.  I did also call about refinancing but not to

10  release the lot.

11  Q    Okay.  Did you ever call Vanderbilt at the call center to

12  inquire about the deed of trust that had been filed in

13  connection with the purchase of the mobile home?

14  A    No, sir, because I was not aware of that.

15  Q    You would agree with me, Mr. King, that if, in fact, you

16  have not made all of the payments that you agreed to make under

17  the contract, Vanderbilt would have the right to repossess the

18  home?

19  A    Yes, sir.

20  Q    During the closing you specifically recall that there were

21  other documents that you signed, correct?

22  A    Yes, sir.

23  Q    Let me rephrase that.  There were other documents that

24  were presented for signature at the closing.

25  A    Yes, sir.

King - Direct / By Mr. Rangel          162

1  Q    And you recall I asked you about some of those documents

2  during your deposition.

3  A    Yes, sir.

4  Q    Okay.

5       **MR. RANGEL:**  I'd like to call up CP Exhibit 7 at 29.

6  Q    And this is a power of attorney document, correct?

7  A    Yes, sir.

8  Q    And there is a place for your signature there, correct?

9  A    Yes, sir.

10 Q    And it's your testimony that's not your signature.

11 A    Correct.

12 Q    Okay.

13      **MR. RANGEL:**  We'll call up CP Exhibit 7 at 30.

14 Q    And that document also has a couple of places for your

15 signature, correct?

16 A    Yes, sir.

17 Q    And it's your testimony that those are not your

18 signatures, correct?

19 A    Correct.

20 Q    That you didn't sign your name there, correct?

21 A    No, sir.

22 Q    Is that correct?

23 A    That's correct.

24 Q    Okay.  Then there is a CP Exhibit 8 at 107, Bates 107,

25 108.

King - Direct / By Mr. Rangel                      163

1        **(Pause)**

2              And there's a couple of places that's Alvin King.

3    That is your signature, correct?

4    A    I believe so.

5    Q    That's what you told me in your deposition.

6    A    Yes, sir.  That's my signature.

7    Q    Mr. King, do you still stand by the obligations you

8    undertook under that contract that you signed?

9    A    Can you repeat the question?

10   Q    Do you still stand by the obligations that you undertook

11   when you signed that contract?

12   A    Do I still stand by them now?

13   Q    Yeah.

14   A    No, sir.

15   Q    Okay.  Even though you have not made all of the payments,

16   you do not stand by what you promised to do in that contract.

17   A    No, sir.

18   Q    At the time that you signed the contract certainly you

19   agreed to be bound by everything in the contract, correct?

20   A    Yes, sir.

21        **MR. RANGEL:**  Judge, I will pass the witness subject

22   to being able to cross examine him on --

23        **THE COURT:**  Thank you.

24   //

25   //

1                    **CROSS EXAMINATION**

2    **BY MR. B. GUTIERREZ:**

3    Q    Mr. King, good afternoon.  I just have a few questions at

4    this time, and it pertains to the retail installment contract

5    that we've been looking at now for a while.  We looked at it

6    with Mr. Flores, and both myself as well as Mr. Rangel asked

7    you some questions about that contract; is that correct?

8    A    Yes, sir.

9    Q    All right.  The question that I would ask you is who

10   was -- what persons were at this closing that took place

11   according to these documents on January 5th of 2002?

12   A    Myself, Mr. Flores and the sales person.

13   Q    And do you remember the sales person's name?

14   A    I believe that I remember him now.  I couldn't recall

15   before, but I do believe I know him now.

16   Q    Could you speak up just a little bit?  If you'd get closer

17   to the mike.

18         What is it that you recall?  Do you recall his name

19   or --

20   A    I believe his name was Lance.

21   Q    Okay.  And if we go back to the retail installment

22   contract that we've been looking at for a while, which is again

23   for the record Exhibit 8, Mr. Rangel had asked some

24   questions -- had asked some questions of Mr. Flores.  One of

25   the questions dealt with some of the expenses.  Let me see if I

King - Cross / By Mr. B. Gutierrez          165

1   could zoom in on this again.

2            And one of the expenses that he was talking about was

3   an appraisal fee.  Do you see that?

4   A    Yes, sir.

5   Q    Okay.  And I think one of the questions that I asked

6   Mr. Flores, I think one of the last questions I asked him, was

7   whether or not he was aware that -- and I think I might have

8   used -- I think I might have said did you know that the

9   appraisal was prepared like a couple of weeks later?  And I

10  think I might have misrepresented the date.  I think I said

11  January 16th.

12           And do you see the date there, January 15th?

13  A    Yes, sir.

14  Q    Okay.  How many days after -- how many days after you

15  closed the deal, you and Mr. Flores, does this report appear to

16  have been prepared for the Clayton Homes people here in Corpus

17  Christi?

18  A    I believe we closed on the 5th.  That's dated the 15th, so

19  it would be ten days.

20  Q    So you were sitting back here when I showed the good-faith

21  estimate to Mr. Flores, right?

22  A    Yes, sir.

23  Q    Now we see a contract where you were being charged some

24  fees where any work was done, right?

25  A    Yes, sir.

King - Cross / By Mr. B. Gutierrez          166

1    Q    Have you --

2          MR. RANGEL:  Excuse me, Judge.  Just so we keep

3    track, if we could have the Bates number or if you're referring

4    to an exhibit --

5          MR. B. GUTIERREZ:  I'm sorry.  It's Exhibit 181,

6    Clayton parties.

7    BY MR. B. GUTIERREZ:

8    Q    This is an exhibit, Mr. King, that is actually a Clayton

9    parties' exhibit, which has been admitted, 181; and it has a

10   Bates, for the benefit of Mr. Rangel -- excuse me; let me get

11   this.

12         THE COURT:  Just do the trial exhibit, please.

13         MR. B. GUTIERREZ:  Okay.

14       (Pause)

15   BY MR. B. GUTIERREZ:

16   Q    You noticed the name of Mr. Benjamin Frazier, did you not,

17   on some of those documents?

18   A    Yes, sir.

19   Q    Have you ever met a Mr. Benjamin Frazier?

20   A    No, sir.

21   Q    Did you ever receive copies of this retail installment

22   contract?

23   A    No, sir.

24   Q    Was your closing recorded by this individual that you now

25   recall the first name as Lance?

King - Redirect / By Mr. Rangel                 167

1    A    We were told that we were going to be recorded.  I never

2    saw the actual tape recorder.  But he did at one point say that

3    he was going to record the ending of our paper work and

4    everything.

5             Can you hear me okay?

6             **MR. B. GUTIERREZ:**  At this time, your Honor, we will

7    pass the witness and reserve our questions for Mr. King during

8    our case-in-chief.

9             **MR. RANGEL:**  I just have a few more, your Honor.

10            **THE COURT:**  Thank you.

11            **MR. RANGEL:**  If we could pull up CP Exhibit 145.

12       **(Pause)**

13                      **REDIRECT EXAMINATION**

14   BY MR. RANGEL:

15   Q    Mr. King, this is a notice of default and right to cure

16   default addressed to you dated 5-05-09, correct?

17   A    Yes, sir.

18   Q    And I believe there's an envelope.  And it's 1702 Carmen,

19   correct?

20   A    Yes, sir.

21   Q    And that was the address that was given to Vanderbilt when

22   you and Mr. Flores purchased the mobile home because 1700 was

23   an empty lot, correct?

24   A    I believe so.

25   Q    And that's the address that's reflected on the retail

King - Redirect / By Mr. Rangel          168

```
 1   installment contract.

 2   A    I believe so.

 3   Q    Okay.  And it's your testimony you didn't receive this

 4   letter, correct?

 5   A    No, sir.

 6   Q    Okay.  And it's also your testimony that you never

 7   personally changed the 1702 Carmen address with Vanderbilt.

 8   A    I would believe so because I believe I got documents from

 9   them at 1700 Carmen Street.  But I'm not for sure.

10   Q    On the date of this letter, May 5th, '09, you had already

11   left Alice and moved to Refugio.

12   A    Yes, sir.

13   Q    And the address where you were living in Refugio was what?

14   A    I lived with my mother.

15   Q    What was that address?

16   A    My mailing address was P.O. Box 326, Refugio, Texas.

17   Q    What was the physical address?

18   A    The physical address was 211 East Federation.

19              THE COURT:  Oh, we don't give physical addresses.

20              MR. RANGEL:  I'm sorry.

21   BY MR. RANGEL:

22   Q    There was a physical address separate from your --

23   A    Yes, sir.

24   Q    Okay.

25              MR. RANGEL:  Then if we could call up CP Exhibit 148.
```

King - Redirect / By Mr. Rangel          169

1  Q    And this is to Alvin King dated 6-16-09, notice of intent

2  to accelerate your debt.  And I believe there's an envelope

3  attached to this.

4          And again, it's your testimony you didn't receive

5  this letter, correct?

6  A    No, sir.

7  Q    And it's addressed to Alvin King, 1702 Carmen, correct?

8  A    Yes, sir.

9  Q    On the date of that letter, June 16th, '09, you had

10  already moved to Refugio to live with your mother.

11  A    Yes, sir.

12  Q    Okay.  And again, you had not notified Vanderbilt of that

13  change in address, correct?

14  A    No, sir.

15  Q    Is that correct?

16  A    That is correct.

17          **MR. RANGEL:**  If we could call up CP Exhibit 149.

18  Q    And this is a notice of acceleration to Alvin King, date

19  6-29-09; is that correct?

20  A    Yes, sir.

21  Q    And I believe there's an envelope attached to this.  And

22  Alvin King, 1702 Carmen, Alice, Texas.

23          And by the date of this letter you had already moved

24  to Refugio to live with your mother.

25  A    Yes, sir.

King - Redirect / By Mr. Rangel          170

1  Q    And up until this point you still had not notified

2  Vanderbilt of the change in address, correct?

3  A    No, sir.

4  Q    And finally, there's a letter, CP Exhibit 151.  And this

5  letter is dated July 8th, 2009, correct?

6  A    Yes, sir.

7  Q    And it's addressed to you at 211 East Federation Street,

8  Refugio, Texas.

9         Is that the address where you were living on that

10 date?

11 A    Yes, sir.  But that was not a mailing address.  No mail

12 comes to that address.

13 Q    Did you receive this letter?

14 A    No, sir.

15 Q    And did you see that the letter was an attempt by

16 Vanderbilt to help you stay in your home?

17 A    I assume that's what the letter was.

18 Q    Okay.

19 A    I didn't receive it, so.

20      MR. RANGEL:  And finally, we call up CP 181 at

21 Page 146.

22 Q    And I believe this is the document Mr. Gutierrez showed

23 you a few minutes ago.

24      Do you recall Mr. Gutierrez asking you questions as

25 related to the appraisal?

King - Redirect / By Mr. Rangel          171

1    A    Yes, sir.

2    Q    And this was in connection with the purchase of the mobile

3    home by you and Mr. Flores, correct?

4    A    I assume so.

5    Q    And look at the very top, summary of appraisal of the

6    property located at Lot 35, 36, Block 1, Gallimore Addition,

7    Alice, Texas, correct?

8    A    That's what the document states.

9    Q    And those are the very lots that have been identified in

10   the deed from the Cantus to the Trevinos that you faxed to

11   CMH Homes on January 3rd, 2002, correct?

12   A    Yes, sir.

13   Q    And so this reflects that in connection with the purchase

14   of the mobile home by you and Mr. Flores an appraisal was done

15   of that property, correct?

16   A    That's what the document states.

17   Q    All right.  And then in the retail installment contract

18   there's an appraisal fee for $400 relating to the appraisal of

19   that property, correct?

20   A    Yes, sir, I do believe so.

21   Q    So on its face the appraisal fee was related to these two

22   lots that were part of the transaction where you and Mr. --

23   A    I would assume so.

24   Q    Correct?

25   A    I would assume so.

King - Recross / By Mr. B. Gutierrez          172

1  Q    I mean that's the only reason there would be an appraisal

2  fee for land in connection with the purchase of the mobile

3  home, correct?

4  A    I assume so.

5          **MR. RANGEL:**  Pass the witness, your Honor, reserving

6  the right to cross --

7          **THE COURT:**  Thank you.

8          **MR. B. GUTIERREZ:**  Just a few more questions, your

9  Honor.

10                    **RECROSS EXAMINATION**

11 **BY MR. B. GUTIERREZ:**

12 Q    Does it appear to you, Mr. King, that they were doing

13 things at Clayton Homes after you had closed your deal; they

14 were appraising properties ten days later after you had already

15 closed your deal?  Is that right?

16 A    Yes, sir.

17 Q    I mean I believe they've admitted that -- I think it's

18 agreed that the deal was closed on January 5th of 2002; is that

19 right?

20 A    Yes, sir.

21 Q    In fact, if we looked at this suspect -- if we could call

22 them suspect deed of trusts, Exhibit Number 6, this was another

23 document --

24          **MR. RANGEL:**  Your Honor, I would object to the

25 sidebar comment.

1          **MR. B. GUTIERREZ:**  We withdraw that.

2          **THE COURT:**  Sustained.

3   **BY MR. B. GUTIERREZ:**

4   Q    If we look at this document, this deed of trust, let's see

5   what date is on this deed of trust and see whether or not it

6   was at the time that you closed the deal or was it after you

7   had left the Clayton Homes' store on January 5th of 2005?

8   A    It was after.  That document reads January 7th.

9   Q    Documents were being generated it looks like, being

10  executed, after you and Mr. Flores had bought a mobile home.

11  A    Yes, sir.

12  Q    Appraisals were being done; documents were being signed by

13  someone.

14          Did you ever meet this man, John Wells?

15  A    No, sir.

16  Q    I think you've already told us you've never met this

17  individual.

18  A    No, sir.

19  Q    By the way, if we look at that -- if we look at and then

20  the jury would look at -- if we look at the signatures here, do

21  they look like the signatures that are on those power of

22  attorneys that you finished giving some testimony about a few

23  minutes ago?

24  A    I don't believe --

25  Q    The jury will look at them but --

King - Recross / By Mr. B. Gutierrez          174

1   A    I don't believe so.

2   Q    All right.  Now, that's the deed of trust.  Let's see when

3   this deed of trust was recorded.  And this is a submitted

4   document at the courthouse of Jim Wells County.  It shows it

5   was filed by Clayton Homes January the 11th at 1:02 p.m.; was

6   recorded in the official records of the Jim Wells County

7   courthouse on January 14th, one day, one day before that

8   appraisal report that Mr. Rangel just showed you, right?

9   A    Yes, sir.

10  Q    After you and Mr. Flores had closed your deal at the

11  Clayton Homes store; is that right?

12  A    Sir?

13  Q    Excuse me.  You closed your deal on the 5th.  These

14  documents are being generated, filed days after your closing,

15  right?

16  A    Yes, sir.

17  Q    Let's look at the builder's and mechanic's lien contract

18  that -- let's see.  And this is Exhibit Number 7.  Let's see

19  what date is on that builder's and mechanic's lien contract to

20  see whether or not it was at the time that you closed the deal

21  or after you had bought your mobile home.

22       It's the date of January the 7th, right?

23  A    Yes, sir.

24  Q    Let's see when it was filed.

25       **(Pause)**

King - Recross / By Mr. B. Gutierrez          175

1           Filed on the same day, the same time as the deed of

2    trust was filed, January 11th, 2002, and recorded the same day

3    that the deed of trust was recorded; is that correct?

4    A    Correct.

5    Q    Another file stamp there, (indicating), and the name

6    Clayton Homes at the bottom.  Do you see that?

7    A    Yes, sir.

8         **(Pause)**

9    Q    Do you see this document?  I'm not sure if Mr. Rangel -- I

10   believe he might have referred to this document.  This is

11   Exhibit 438.  This is -- see where it says installation report,

12   manufactured home installation report, at the top?  Do you see

13   that right here, (indicating)?

14   A    Yes, sir.

15   Q    Your mobile home had already been installed on January

16   the 7th.  See where it says "date installed"?  See that,

17   January the 7th?

18   A    Yes, sir.

19   Q    Do you see that?

20   A    Yes, sir.

21   Q    Your manufactured home that you had purchased on

22   January 5th had already been installed in Alice, Texas on

23   property that had been provided to you by the Trevinos.

24           And it is after that date that some of these

25   documents are being executed and filed at the courthouse; is

King - Redirect / By Mr. Rangel                176

1    that correct?

2    A    Yes, sir.

3         **MR. B. GUTIERREZ:**  That's all the questions I have at

4    this time, your Honor.  We'll reserve the rest of our questions

5    until our case-in-chief.

6         **THE COURT:**  Thank you.

7         **MR. RUMLEY:**  No questions.

8         **THE COURT:**  No questions?

9       **(Pause)**

10        **MR. RANGEL:**  If we could call up CP 1.

11                    **FURTHER REDIRECT EXAMINATION**

12   BY MR. RANGEL:

13   Q    The second sentence, Mr. King, says:  "Seller will submit

14   this contract to Vanderbilt and if approved the contract will

15   be assigned to Vanderbilt," correct?

16   A    Yes, sir.

17   Q    And you and Mr. Flores signed the contract on January 5th.

18   A    Yes, sir.

19   Q    And on January 3rd is when you had submitted the credit

20   application, correct?

21   A    Yes, sir.  I believe that's what the fax said.

22   Q    And so you're not familiar with the process that was

23   followed to get you approved for financing, correct?

24   A    No, sir.

25   Q    You don't know the exact date when the actual approval by

King - Recross / By Mr. B. Gutierrez          177

1  Vanderbilt occurred, correct?

2  A    No, sir, I don't believe so.

3  Q    But under the terms of the contract it was going to be

4  submitted to Vanderbilt for approval, correct?

5  A    Yes, sir, I believe so.

6  Q    And Vanderbilt was going to be providing the financing,

7  correct?

8  A    That's what the contract reads.

9  Q    All right.  And once you and Mr. Flores were approved by

10 Vanderbilt, that's when you started making your payments to

11 Vanderbilt, correct?

12 A    Correct.

13 Q    But you don't have any personal knowledge of how that

14 approval process, that appraisal process, worked within

15 Vanderbilt, correct?

16 A    No, sir.

17 Q    Thank you, Mr. King.

18                **FURTHER RECROSS EXAMINATION**

19 **BY MR. B. GUTIERREZ:**

20 Q    What you do know of the approval process is that you were

21 actually approved for a lesser interest rate than you were led

22 to believe when you signed the retail installment contract,

23 right?

24 A    Correct.

25          **MR. RANGEL:**  Objection.  Leading, your Honor.

1          **THE COURT:**  Are we done with this witness?

2          **MR. B. GUTIERREZ:**  Yes, your Honor.

3          **THE COURT:**  All right.  Thank you.  You may stand

4   down.

5          Call your next witness.

6      **(Witness steps down)**

7      **(Pause / Voices heard off the record)**

8          Who is testifying?  Do you have a witness?

9          **MR. LOCHRIDGE:**  Yes.  If we can bring him in from out

10  in the hall.

11         **MR. THAGARD:**  May we approach the bench, your Honor?

12         **THE COURT:**  Yes.  Counsel, please come up quickly.

13     **(Pause)**

14         Okay.  We're on the record, so please be quiet.

15  Excuse me.  Please be quiet.  We're on the record.

16     **(Bench conference on the record begins at 4:34:30 p.m.)**

17         **THE COURT:**  That's a first.  Yes?

18         **MR. THAGARD:**  Your Honor, I just wanted to clear up

19  with the motion in limine.  Ms. Russell is going to testify to

20  the collection notes and --

21         **THE COURT:**  Who?

22         **MR. THAGARD:**  Ms. Russell, Kim Russell.  She's our

23  account representative.

24         **THE COURT:**  Okay.

25         **MR. THAGARD:**  We'll try to get them admitted as a

Russell - Direct / By Mr. Thagard          179

1    business record.  They have objected to them and so we --

2              THE COURT:  Did she make the records herself?

3              MR. THAGARD:  A lot of them.  But it's a business

4    record.  She'll testify to some of them that she made herself,

5    but we also believe that the rest of them come in as a business

6    record and she can testify to them as statements by party

7    opponents.

8              THE COURT:  I don't know if that's going to happen,

9    but put her on and let her testify about her conversations at

10   least with Mr. Flores.  Is this who is testifying now?

11             MR. THAGARD:  Yes.  And should I offer that?

12             THE COURT:  Thank you.

13        (Bench conference ends at 4:35:40 p.m.)

14             Would you come forward, please?

15             THE CLERK:  Please raise your right hand.

16             KIM RUSSELL, PLAINTIFFS' WITNESS, SWORN

17             Thank you.  Please be seated.

18                       DIRECT EXAMINATION

19   BY MR. THAGARD:

20   Q    Ms. Russell, can you tell us your name, please?

21   A    Kim Russell.

22   Q    Okay.  And who are you employed by?

23   A    Vanderbilt Mortgage.

24             THE MARSHAL:  Excuse me.  Your Honor, he would like

25   (indiscernible) break.

1          **THE COURT:**  All right.  We'll take a ten-minute

2     break.  Would you please stand for the jury?

3          **(Jurors exit courtroom at 4:36 p.m.)**

4          **MR. THAGARD:**  Your Honor, we can take up their

5     objection to the call notes now or we can wait --

6          **THE COURT:**  That's fine.  What is the objection?  If

7     they prove them up as business records, what is the objection?

8          **MR. B. GUTIERREZ:**  Hearsay, your Honor.

9          **THE COURT:**  Well, all business records are hearsay.

10    Can you help him, please?

11         **MR. B. GUTIERREZ:**  There has been --

12         **THE COURT:**  Just a moment.  Can you help?

13         **MR. RUMLEY:**  Your Honor, we don't believe they

14    qualify under the exception --

15         **THE COURT:**  Okay.  Let's just go through the business

16    records then and see if you can do that.  Go ahead.

17         **MR. THAGARD:**  Okay.

18                    ***VOIR DIRE EXAMINATION***

19    BY MR. THAGARD:

20    Q    Ms. Russell, as an account representative do you regularly

21    make note and phone calls with customers?

22    A    Yes, sir.

23    Q    And do all Vanderbilt account representatives?

24    A    Yes, sir.

25    Q    And are you trained to do that?

1   A    Yes, sir.

2   Q    Are you trained to type in each and everything that's told

3   to you during that conversation?

4   A    Yes, sir.

5   Q    Okay.  And you're trained to type in the good, the bad and

6   ugly, correct?

7   A    Yes, sir.

8   Q    If they make a complaint, you type it in, correct?

9   A    Yes, sir.

10  Q    Okay.  And is that data kept by Vanderbilt?

11  A    Yes, sir.

12  Q    Okay.  And is that data used by Vanderbilt on a regular

13  basis?

14  A    Every day.

15  Q    And is that data used by you to see what people have said

16  in the past?

17  A    Yes, sir.  Every day.

18  Q    Is that data used to help train people to review their

19  past calls?

20  A    Yes, sir.

21  Q    And to help with training.  Are these -- some of these

22  notes were made personally by you, correct?

23  A    Yes, sir.

24  Q    And they're kept in the regular course of Vanderbilt's

25  business.

Russell - Direct / By Mr. Rumley                    182

1   A    Yes, sir.

2   Q    Okay.  And these notes are used to keep a history of the

3   communications with the customers.

4   A    Yes, sir.

5   Q    Okay.  And Vanderbilt can review the notes -- all right,

6   we've done that.

7            Are these notes the most accurate recordation

8   available to Vanderbilt of all the communications that took

9   place between Vanderbilt and Mr. Flores and Mr. King during the

10  course of the loan?

11  A    Yes, sir.

12  Q    Okay.

13           **MR. THAGARD:**  Your Honor, we would offer them into

14  evidence under Federal Rule of Evidence 803(6) as a business

15  record.

16           **THE COURT:**  Pardon?

17           **MR. RUMLEY:**  May I ask some questions?

18           **THE COURT:**  Yes, you may.

19                    *VOIR DIRE EXAMINATION*

20  BY MR. RUMLEY:

21  Q    Ma'am, just a few questions.

22           The notes that the lawyer for Clayton Homes asked you

23  about, have you reviewed each of those notes?

24  A    Yes, sir.

25  Q    Have you spoken to each of the individuals who actually

Russell - Voir Dire / By Mr. Rumley        183

1    took those notes?

2    A    Only a couple, but I read those notes every day.

3    Q    But you can't testify as to the truth of any of the notes

4    that any of the other account reps took with respect to any of

5    the collection calls made, right?

6    A    Yes, sir, I can.

7    Q    Have you talked to each person that made a collection call

8    and verified that the note they made in 2003 is accurate?

9    A    Sir, I'm required to know everything that is documented in

10   those notes in the event that that customer calls in and I

11   retrieve that call.  I should have to be prepared to know what

12   those previous notes state, and they are taken real time so

13   as --

14        THE COURT:  Listen carefully to the question.

15        THE WITNESS:  Yes, your Honor.

16        THE COURT:  He's asking you how on earth you could

17   know that each one in there is true and correct.

18        THE WITNESS:  To the best of what I'm reading, I'm

19   going to know what the notes entail because they --

20        THE COURT:  No, no, no.  You're not listening to what

21   he's saying.  I mean I don't know what --

22        MR. RUMLEY:  Anybody can write --

23        MR. THAGARD:  I don't know why it's relevant, your

24   Honor.  We --

25        THE COURT:  It isn't.  But I'm just surprised that

Russell - Voir Dire / By Mr. Rumley        184

1   she's not going to answer truthfully to this.  It isn't

2   relevant to the admission of business records, but she is

3   clearly not telling the truth, and that is really upsetting.

4   It's one thing that sets me off is people making up things they

5   think they want to say, what their employer wants them to say.

6          So go ahead, Mr. Rumley.  Continue on.

7   **BY MR. RUMLEY:**

8   Q   Ma'am, with respect to the records that were maintained in

9   this -- with respect to this customer, did you actually

10  maintain them?

11  A   I only maintained the records that I documented.  I did

12  not speak to every account rep that took notes on those

13  accounts.  However, if I get a call in from a customer and it's

14  not my customer, I'm going to review the previous notes that

15  the reps took in order to service that loan.

16         **THE COURT:**  Everybody understands that.  All he asked

17  you was that you can't vouch for the truth and veracity of --

18         **THE WITNESS:**  No, your Honor.

19         **THE COURT:**  -- each one of the notes you didn't put

20  in there.

21         **THE WITNESS:**  No, your Honor.

22         **THE COURT:**  How hard is that to say?

23         **THE WITNESS:**  It's not, your Honor.

24         **THE COURT:**  Then why didn't you do it to begin with?

25         **THE WITNESS:**  I apologize, your Honor.

Russell - Voir Dire / By Mr. Rumley          185

1          **THE COURT:**  I mean it's a huge deal, you know.

2   You're supposed to be an honest witness and you're under oath.

3          **THE WITNESS:**  Yes, your Honor.

4          **THE COURT:**  You've got to listen carefully to what's

5   asked.

6          Go ahead.

7   **BY MR. RUMLEY:**

8   Q    With respect to the notes that we're talking about,

9   there's actually a reference on there for the individual

10  account rep, correct?

11  A    Yes, sir.

12  Q    And so we can see which account rep took which note.

13  A    Yes, sir.

14  Q    The purpose of taking those notes is for what?

15  A    To document the events of the call, what happened.  And

16  that way the next person that takes that call or needs to

17  research it will know what happened, what's going on.

18  Q    And how within the business are those notes verified?  Are

19  the calls recorded?

20  A    Yes.  Yes, sir, they are.

21  Q    And are the calls recorded compared with the notes?

22  A    Yes, sir, they are.  They're documented real time, so when

23  the customer is on the phone the account rep is noting what's

24  going on.

25  Q    Is every call recorded?

1  A    I can't answer completely if I know for a fact every call

2  is monitored.  We do, however, use recorded calls for training

3  purposes.

4  Q    We've taken depositions of David Barton.  Do you know him?

5  A    Yes, sir.

6  Q    Is he your boss?

7  A    Yes, sir.

8  Q    If he's testified that not 100 percent of the calls are

9  recorded, is he telling the truth?

10  A    If he says that they've not been, yes, he is because he

11  would know.

12  Q    Are there any recordings of the calls that are compared

13  with your notes in order to see that they're truthful, that

14  they're accurate?

15  A    I am not aware of any recordings of any of the notes that

16  I made, sir.

17  Q    So you can't tell this Court or me that any of the notes

18  are accurate other than this is what's on a piece of paper,

19  correct?

20  A    Yes, sir.

21          **MR. THAGARD:**  Your Honor, if I may.

22          **THE COURT:**  Yes.

23                  *FURTHER VOIR DIRE EXAMINATION*

24  **BY MR. THAGARD:**

25  Q    Ms. Russell, these notes constitute a data compilation,

1   correct?

2   A     Yes, sir.

3   Q     Okay.  And these --

4          THE COURT:  Well, apparently they're not complete is

5   what -- is that true?  Somebody testified that not every single

6   conversation is recorded.

7          MR. THAGARD:  Well, every single conversation is

8   written down, your Honor.  The company records calls

9   infrequently so they're able to monitor.  You know, when you

10  get a call and you call in and they say we might record this

11  and we might not, some are audio recorded in order to see what

12  was said and to verify that everybody is following policies and

13  procedures.

14  BY MR. THAGARD:

15  Q     But Ms. Kim, is it true that every time a customer calls

16  in, the account representative types an entry into the call

17  notes?

18  A     Yes, sir.

19  Q     And she recalls -- and they type in exactly what was said.

20  A     Yes, sir.

21  Q     Okay.  And that is an act of the company, correct?

22  A     Yes, sir.

23  Q     Okay.  And it's made at the time of the call, correct?

24  A     Yes, sir.

25  Q     Okay.  And it's made -- it's entered into the system.

1  This information is entered into the system by a person who's

2  on the phone with the customer, correct?

3  A    Yes, sir.

4  Q    So that person has knowledge.

5           THE COURT:  Apparently, Juror Number 8, the one that

6  keeps falling asleep, says he's got back pain, a headache and

7  he's tired.

8           MR. RUMLEY:  It sounds like me.

9           THE COURT:  I was thinking the same thing.  So he can

10 suffer with the rest of us.  Is that everybody's conclusion?

11          MR. RANGEL:  We defer to the Court.

12          THE COURT:  Pardon?

13          MR. RANGEL:  We defer to the Court.

14 BY MR. THAGARD:

15 Q    So it's made, it's typed in by a person with knowledge of

16 what's going on at the call?

17 A    Yes, sir.

18 Q    And it's typed in at the time of the call.

19 A    Yes, sir.

20 Q    And does Vanderbilt keep these notes in the course of its

21 regular business activity?

22 A    Yes, sir.

23 Q    And is it the regular practice of Vanderbilt to make these

24 records?

25 A    Yes, sir.

Russell - Voir Dire / By Mr. Rumley          189

1   Q   Okay.  And you're familiar with everything you've just

2   testified to.

3   A   Yes, sir.

4            **MR. THAGARD:**  Your Honor, we would offer them as a

5   business record.  There's no reason to doubt their veracity.

6            **THE COURT:**  Did you want to take her on voir dire?

7            **MR. RUMLEY:**  Yes.  Just a few more.

8                     ***FURTHER VOIR DIRE EXAMINATION***

9   **BY MR. RUMLEY:**

10  Q   Ma'am, it's not your job to be a custodian of these

11  records, correct?

12  A   I use the records daily; so, yes, it is.

13  Q   But do you --

14           **THE COURT:**  What do you mean?  What do you mean

15  you're the custodian of the records?  What does that mean to

16  you?

17           **THE WITNESS:**  That I have access to them and that I

18  do business with them, enter them in the system.  I read them,

19  I review them and I work with them every day.

20           **MR. THAGARD:**  Your Honor --

21           **THE COURT:**  It's not necessary for that either.  It's

22  just she just keeps stretching the truth.  How many of us would

23  stand up and say we're custodian of the records unless they

24  were our own records?  Any qualified witness can talk about --

25  can prove these up.  But, you know, the stretching is getting

Russell - Voir Dire / By Mr. Thagard          190

1   to be annoying.

2                    *FURTHER VOIR DIRE EXAMINATION*

3   **BY MR. THAGARD:**

4   Q    Have you ever been -- have you ever testified before in

5   any capacity?

6   A    No, sir.

7   Q    Okay.  Have you ever been in a court of law before?

8   A    No, sir.

9   Q    Okay.

10          **MR. THAGARD:**  And, your Honor, even if you were not

11  to rule them in as a business record, we have a lot of other,

12  you know, exceptions.  They're statements against interest by a

13  party opponent, not against interest -- they're statements by a

14  party opponent and they're also recordations of present sense

15  impressions.

16          **THE COURT:**  Go ahead.  Do you have any more

17  questions?

18          **MR. RUMLEY:**  I don't have any more questions, your

19  Honor.

20          **THE COURT:**  And what is your position?

21          **MR. RUMLEY:**  My position is they have not shown under

22  the records of regularly conducted activity that she is the

23  custodian, nor have they established that she's qualified to

24  testify that this group is a business record.  She has said

25  that maybe her calls, but not as a group.  She is clearly not a

1    custodian.  It's not her job to maintain them.

2            THE COURT:  I don't think she has to be a custodian,

3    but I think that you may be -- she stretched a little too far

4    here on too many times unnecessarily.  So why don't you just

5    have her testify about what she talked to Mr. Flores about?

6            MR. THAGARD:  Well, your Honor --

7            THE COURT:  Apparently, that's the big deal isn't it,

8    that she remembers specifically talking to Mr. Flores about

9    A, B and C?

10           MR. THAGARD:  That is a big deal, but I'd like to

11   make a proffer of the other things that the records will show,

12   the call notes in their totality, your Honor.

13           THE COURT:  Well, we don't do proffers here.  You can

14   attach them to an appeal.  So --

15           MR. THAGARD:  Can I argue what they would show, what

16   these records would show, all the things they would show?

17           THE COURT:  I do not find them to be a trustworthy

18   business record because I don't find her to be a credible

19   witness.

20           So call the jury back in.

21           MR. RANGEL:  And, Judge, just for the record, there's

22   conversations with Mr. King and Mr. Flores, not just

23   Mr. Flores.

24           THE COURT:  Okay.  Whatever conversations she had she

25   can talk about.

Russell - Direct / By Mr. Thagard                192

1          **(Pause / Voices heard off the record)**

2              **THE MARSHAL:**  All rise for the jury.

3          **(Jurors enter courtroom at 4:49 p.m.)**

4              **THE COURT:**  Thank you.  You may be seated.  And Juror

5     Number 8, try to sit up and listen and tonight get a good

6     night's sleep.  This is not vacation, okay?  Thank you.

7              Go ahead.

8                    **DIRECT EXAMINATION (RESUMED)**

9     **BY MR. THAGARD:**

10    Q    Would you tell the jury your name, please?

11    A    Kim Russell.

12    Q    Okay.  And who are you employed by?

13    A    Vanderbilt Mortgage and Finance, Incorporated.

14    Q    Okay.  And what is your job title?

15    A    I am currently a team leader in the collections

16    department.

17    Q    And have you ever been in a courtroom before?

18    A    No, I have not.

19    Q    Have you ever testified before?

20    A    No, I have not.

21    Q    Are you nervous?

22    A    Yes, a little bit.

23    Q    Can you tell us where you were born, please?

24    A    Killeen, Texas.

25    Q    And where were you raised?

Russell - Direct / By Mr. Thagard        193

1  A    I moved to Maryville, Tennessee where my father's family

2  lived.

3  Q    Before being employed by Vanderbilt where did you work?

4  A    I was a -- I started out in Holiday Inn hotels and I moved

5  my way up to managing a Holiday Inn Express hotel.

6  Q    And where was that?

7  A    In Alcoa, Tennessee.

8  Q    And so you managed the Holiday Inn Express.

9  A    Yes, sir.

10 Q    Okay.  And after that what did you do?

11 A    I applied for a position at Vanderbilt Mortgage.  I wanted

12 a more steady position to where I wasn't on call 24 hours a

13 day, and so I applied at Vanderbilt and I was hired there in

14 April 2002.

15 Q    Okay.  And what do you do for Vanderbilt?

16 A    I am a team leader, which is a manger over a collections

17 group.  I have nine people on my team, and we service

18 approximately 8,000 loans collecting mortgage payments.

19 Q    And what position did you start out at at Vanderbilt?

20 A    As an account representative.

21 Q    And when was that?

22 A    April the 22nd of 2002.

23 Q    And were you promoted?

24 A    Yes, sir.

25 Q    Okay.  And when were you promoted?

Russell - Direct / By Mr. Thagard        194

1   A    Approximately two years later in 2004 I moved to a senior

2   account representative position, that is, an immediate

3   supervisor over a group of account reps.

4   Q    Okay.  And since then you've been promoted to team leader.

5   A    Yes, sir.  In July of 2007.

6   Q    Okay.  And how many people do you supervise?

7   A    I have nine people currently.

8   Q    And who do you report to?

9   A    I have a senior portfolio manager, and he reports to the

10  collections manager.

11  Q    And are you assigned -- as a account representative are

12  you assigned to particular accounts?

13  A    Yes, sir, I do have -- I service FHA loans currently.

14  Q    Okay.  But when you were an account representative would

15  you be assigned to specific accounts?

16  A    Yes, sir.  We call them a "bucket."

17  Q    Okay.  And, in fact, were you personally assigned to the

18  account of Mr. Flores and Mr. King?

19  A    Yes, sir, I was.

20  Q    And did you speak to them on the phone personally?

21  A    Yes, I did.

22  Q    Did you speak to them a lot?

23  A    Quite a bit.  Mr. King more --

24  Q    Okay.

25  A    -- than Mr. Flores, but I did speak with them.

Russell - Direct / By Mr. Thagard          195

1   Q    Okay.  And have you ever met Mr. King or Mr. Flores

2   before?

3   A    No, sir.

4   Q    Would you like to meet them?

5   A    Sure

6          **MR. THAGARD:**  Mr. King, would you raise your hand?

7          **THE COURT:**  Would you mind just going ahead with the

8   questions, please?

9   **BY MR. THAGARD:**

10  Q    Tell us about the training you received as an account

11  representative.

12  A    When I was initially hired on as a team member we would go

13  through one week of classroom training where we would learn

14  about the system, just basic requirements and ways of doing

15  things.  And really it's maneuvering the system.  The AS400 is

16  what they call it.

17  Q    Right.  Okay.

18          **MR. THAGARD:**  And I'm going to call up, please,

19  Exhibit 207.

20  Q    And is this a portion out of one of you all's training

21  manuals?

22  A    Yes, sir.

23  Q    Okay.  And at the bottom it says Lenders' Desk Practices.

24  That's one of your training manuals, correct?

25  A    Yes, sir.

Russell - Direct / By Mr. Thagard                196

1    Q    And you studied that, correct?

2    A    Yes, sir.

3    Q    And at the bottom it gives a date that that training

4    manual was in place, correct?

5    A    Yes, sir.

6    Q    Okay.  And does it show there --

7              **MR. THAGARD:**  If you'll highlight -- let's go to --

8              **MR. B. GUTIERREZ:**  Excuse me, your Honor.  It's my

9    understanding that this exhibit has not been admitted.

10             **THE COURT:**  What number is this?

11             **MR. THAGARD:**  Exhibit 207.

12             **THE COURT:**  Has that been admitted?  Is that your

13   exhibit?

14             **MR. THAGARD:**  Yes, ma'am.

15             **THE COURT:**  It has not been admitted.  And let me see

16   counsel at the bench.

17        **(Bench conference on the record begins at 4:54:36 p.m.)**

18             **THE COURT:**  That's your Exhibit 207?

19             **MR. THAGARD:**  Yes, ma'am.

20             **MR. UNIDENTIFIED:**  It's admitted.

21             **THE COURT:**  Okay.  Then it is admitted.  You need to

22   review those.

23             **MR. UNIDENTIFIED:**  Your Honor?

24             **THE COURT:**  I've got 197 to 211 admitted.

25             **MR. J. GUTIERREZ:**  Your Honor, I'm very sorry.  I

Russell - Direct / By Mr. Thagard               197

1    glanced at the wrong paper.  It's my mistake.  It is admitted.

2              THE COURT:  All right. Thank you.

3              MR. J. GUTIERREZ:  Sorry.

4         (Bench conference ends at 4:54:52 p.m.)

5              THE COURT:  Okay.  It was my mistake.  It has been

6    admitted.  I have to review my numbers from time to time and

7    make sure I've got them.

8              You may proceed, counsel.  Thank you.

9              MR. THAGARD:  And I'll just pull up Page 3 of 207.

10   And if you highlight that there, it talks about some training.

11   BY MR. THAGARD:

12   Q    And if you'll just tell us about the training that an

13   account representative would received in 2003.

14   A    By taking a required five-day class comprised of online

15   training courses, a collections manual and classroom

16   instruction.  It also emphasizes the Fair Debt Collection

17   Practices Act.

18   Q    Okay.  And are these five of the courses that you would

19   have taken?

20   A    Yes, sir.

21   Q    Okay.  And as part of the training are you also required

22   to sit in with senior account reps?

23   A    Yes, sir.

24   Q    Will you tell the jury about that?

25   A    Every day during our week of training we would have

Russell - Direct / By Mr. Thagard          198

1   opportunity to move to the floor to usually the group that we

2   were going to be assigned to.  And we would sit with a seasoned

3   account rep to listen in on phone calls they were making at

4   that point just to kind of get more familiar with the way

5   things worked.

6   Q    And is your training ongoing?  Do you have regular and

7   continual training?

8   A    Yes, sir, it is.

9   Q    Okay.

10  A    We have a 90-day program that's in place that we go

11  through a folder for 90 days.  And week by week a senior

12  account rep would get with us and go over different procedures

13  every week, every day, and then even after that.  If there's

14  questions that come up, we do ask those and we find out answers

15  to those as they come.

16  Q    I'm going to take you to Page 15, please, Plaintiffs' 207.

17        **MR. THAGARD:**  Highlight that.

18  Q    I'm going to ask you to look at this.  Is this one of the

19  intermediate courses that you take?

20  A    Yes, sir.

21  Q    Okay.  Where is this course provided?

22  A    It's on the Clayton University online that we have.

23  Q    All right.  Have you taken this course?

24  A    Yes, sir, I have.

25  Q    And can you read the course description to us please,

Russell - Direct / By Mr. Thagard          199

1   ma'am?

2   A        "Intermediate collector skills, building customer

3            loyalty.  Loyal customers are the life blood of a

4            company.  Keeping and attracting new customers allows

5            a company to thrive.  Participants in this course

6            will learn the importance of customer loyalty to them

7            personally as well as to Vanderbilt Mortgage and

8            Finance.  Developing the skills to effectively

9            address customer needs makes the individual more

10           valuable to the company.  Regardless of job title,

11           organizational position or experience some of our

12           most important work is to attract, satisfy and

13           preserve customers; in short, to build customer

14           loyalty."

15  Q    And is this consistent with the training you received for

16  the past seven years or so, nine years at Vanderbilt?

17  A    Yes, sir.

18  Q    All right.  And is customer loyalty something that's

19  emphasized?

20  A    Yes, sir, it is.

21  Q    And why is that?

22  A    We want customers to feel good about being with Vanderbilt

23  and also to refer Vanderbilt to their friends, to their family.

24  You know, just for them to have a good relationship with us.

25  Q    Okay.

Russell - Direct / By Mr. Thagard          200

1          **MR. THAGARD:**  I'm going to get you to pull up

2    Page 29, please, of the same exhibit.

3    Q    And as account representative do you receive certain

4    training regarding fraud prevention?

5    A    Yes, sir.

6    Q    Okay.  And can you tell me about that, please?

7    A    The fraud prevention training procedures, Vanderbilt

8    Mortgage and Finance, Incorporated has a zero tolerance policy

9    for fraud.  This is due to its uncompromised quest to be a

10   company that is renowned for its ethical business practices and

11   strives for 100 percent accuracy on all the MF loans.  A

12   company-wide fraud hotline -- and it's 1-866-Need CMH -- was

13   recently established for team members to report any form of

14   fraud, misconduct or unethical behavior.  This training has

15   been incorporated in the new retail sales representative

16   training CDs.

17   Q    And is this consistent with the training you received as a

18   Vanderbilt account representative?

19   A    Yes, sir.

20   Q    Okay.  Are they serious about this zero tolerance for

21   fraud?

22   A    Yes, sir.

23   Q    And is the hotline still there?

24   A    Yes, sir, it is.

25   Q    Okay.

Russell - Direct / By Mr. Thagard            201

1          **MR. THAGARD:**  I'd like to bring up Page 146, please,

2    of the manual.

3    Q    And if you look at the bottom there, it says --

4          **MR. THAGARD:**  Can you pull up that last -- the bottom

5    date?

6    Q    It shows that this is 2007.  Is it your experience that

7    Vanderbilt regularly updates its training?

8    A    Yes, sir.

9    Q    Okay.  And in 2007, had some training been added?

10   A    Yes, sir.  Two additional courses.

11   Q    Are you regularly required -- how regularly do you all

12   have training meetings?

13   A    We as account reps have a monthly account rep training to

14   go over things, refresher courses, any new policies that are

15   put in place.  We have that once a month.

16   Q    And do you regularly have to take courses on -- have

17   Clayton online --

18   A    Yes, sir, we do.

19   Q    -- University?  Okay.

20         **MR. THAGARD:**  And I'd like to pull up Plaintiffs' 76,

21   please.

22   Q    Okay.  And tell us what this document is.

23   A    This is our account representatives' procedures manual.

24   It's --

25   Q    Is this a document that's given to you?

Russell - Direct / By Mr. Thagard          202

```
 1  A    Yes, sir.

 2  Q    And are you required to study it?

 3  A    Yes, sir.  We do look at it.

 4  Q    And you're required to abide by it?

 5  A    Yes, sir.

 6  Q    Okay.  And when is the account representative given this

 7  manual?

 8  A    The first day of training.  That afternoon after they fill

 9  our paper work, they're given the manual.

10  Q    Okay.

11       MR. THAGARD:  Would you please pull up Page 20...

12  Q    See there, see the introductory page.  We see a picture of

13  Paul Nichols.

14       Is Paul Nichols in the courtroom?

15  A    Yes, sir.

16  Q    Okay.  All right.

17       MR. THAGARD:  And if you will highlight that, please.

18  Q    All right.  Could you read that for us please, ma'am?

19  A    Yes, sir.

20       "In either instance, Vanderbilt is charged with

21       providing excellent customer service while helping

22       our customers maintain their loans on a current

23       basis.  This is done through timely telephone contact

24       and strict follow-up on promises made by customers

25       for payment.  Our contact with each of our customers
```

1          will be held to the highest standards of moral,

2          ethical and legal conduct.  The following rule of

3          thumb sets the tone for a code of ethics.  I want

4          employees to ask themselves whether they are willing

5          to have any contemplated act of fear the next day on

6          the front page of their local paper to be read by

7          their spouse, children and friends with the reporting

8          done by an informed and critical reporter."

9   Q    And is this something that's constantly reinforced at the

10  company?

11  A    Yes, sir, it is.

12          **MR. THAGARD:**  Can you please pull up Page 235?

13  Q    And are you trained on what type of practices are not

14  allowed --

15  A    Yes.

16  Q    -- by the account representatives?

17  A    Yes, sir, we are.

18          **MR. THAGARD:**  And can you take that down.

19  Q    And can you just give us a summary.  You don't need to

20  read it, but tell us the type of things that you are trained

21  not to do.

22  A    We can't call a customer before 8:00 a.m. their time or

23  after 9:00 p.m. their time.  We can't send any kind of letters

24  in the mail that are saying that we're going to take, you know,

25  legal action when we're not, harass the customer in any way.

1   If they ask not to be called at their place of employment, we

2   are to honor that.  In some instances they may send a letter in

3   writing not to be asked to be called at home any longer, and we

4   do honor that as well.

5   Q    And do you take your job as an account representative very

6   seriously?

7   A    Yes, sir.

8   Q    Okay.  And part of your job is to call customers, correct?

9   A    Yes, sir.

10  Q    Okay.  And is it important for you to keep those customers

11  over time?

12  A    Yes, sir.

13  Q    And when you do call customers you keep records, correct?

14  A    Yes, sir.

15  Q    All right.  And what are you trained to do when you're

16  speaking with a customer?

17  A    Document the events of the call.  As we're talking with

18  the customer just pretty much tell on the notes on the system

19  what's going on and what's happening on the account.

20  Q    And so are all the account representatives are they taught

21  to type in everything that goes on in the call?

22  A    Yes, sir.

23  Q    The good, the bad, the ugly?

24  A    Absolutely.  Yes, sir.

25  Q    Okay.  And are you trained to take these notes?

1   A    Yes, sir.

2   Q    And are you trained after you take the notes, can they be

3   altered?

4   A    No, sir.

5   Q    Okay.  And are you trained to take accurate notes?

6   A    Yes, sir.

7   Q    And the notes were made at the time of the call, correct?

8   A    Yes, sir.

9   Q    Okay.  And the notes are kept -- and what are the purposes

10  of the notes?

11  A    We are an inbound call center as well.  So if a customer

12  wants to call in to discuss their account, another rep might

13  retrieve that call.  And so the notes are there to help that

14  representative be able to provide any sort of service that

15  customer may need and not have to put them on hold or try to

16  find an account rep that is theirs that might not be there at

17  that point.

18  Q    And can you review the notes to review the skills of your

19  people underneath you?

20  A    Yes.

21          **MR. RUMLEY:**  Your Honor, I at this point object to

22  leading.

23          **THE COURT:**  Sustained.

24          **MR. RUMLEY:**  He's been leading --

25  //

Russell - Direct / By Mr. Thagard                206

1   **BY MR. THAGARD:**

2   Q    Are there any other purposes for the notes?

3   A    Training purposes to make sure, you know, documentation.

4   When you're typing real time to a customer, you have to

5   abbreviate a lot so that you can make sure you get everything

6   in that you need to that's being discussed.  So when we are

7   typing the conversations, we use it as training purposes to

8   kind of get everyone on the same page with the abbreviations

9   that we commonly use on the notes on the accounts.

10  Q    And are you actually trained with the abbreviations so

11  they'll be consistent?

12  A    It's part of the training, yes, sir.

13          **MR. THAGARD:**  I'd like to pull up Plaintiffs' 76,

14  Pages 34 and 35.

15  Q    Are those some of the -- just by way of example, are those

16  some of the abbreviations you are trained to make?

17  A    Yes, sir.

18  Q    And are you trained on how to read these abbreviations?

19  A    Yes, sir.

20  Q    Okay.  And does your job include on a regular basis

21  reading and reviewing these abbreviations?

22  A    Yes, sir.

23  Q    Does Vanderbilt regularly audit the calls of the

24  collectors?

25  A    Yes, sir.

Russell - Direct / By Mr. Thagard          207

1  Q    And what's the purpose of that?

2  A    Training purposes, again, to make sure we're complying

3  with everything that needs to be done on the account.  The

4  biggest purpose for training, if someone is, you know, needing

5  help on how they're doing something, then the training is

6  helpful to them.

7  Q    Okay.  And do they periodically record calls?

8  A    Yes, they do.

9  Q    And what's the purpose of that?

10 A    Training purposes, as well.  I as a team leader am

11 required to evaluate.  Each one of my reps gets six calls

12 recorded every month.  And we sit down together every month and

13 we go over the calls, listen to them together and I help them

14 with any kind of training or techniques that they might be

15 needing to improve on.

16 Q    And what is your number one goal as a Vanderbilt account

17 representative?

18 A    To help the customer stay in their home, get up to date,

19 keep their payments up.

20         **MR. THAGARD:**  And can we please pull up

21 Plaintiffs' 79?

22 Q    Do you recognize this document?

23 A    Yes, sir.  It's a collector training manual.

24 Q    Okay.  And again, tell us the purpose of it, please.

25 A    This is used in training and ongoing out of training.

Russell - Direct / By Mr. Thagard          208

 1   It's a reference for our account representatives to go back to.

 2   It's, basically, their training.

 3          **MR. THAGARD:**  Let's pull up Page 21 of this, please.

 4   And highlight that for us.

 5   Q    And could you read that for us, please?

 6   A    Yes, sir.

 7          "Vanderbilt's collection team is committed to their

 8          mission to service all loans in a manner that

 9          maximizes profitability and return on investment for

10          our stockholders.  Our mission implies that we come

11          to work every day for the benefit of our customers,

12          our team members and our shareholders.  As a

13          collector for Vanderbilt Mortgage remember the

14          following:  We want all of our customers to keep

15          their homes.  We want to assure company profitability

16          by minimizing delinquencies and repossessions."

17   Q    Okay.  And is that consistent with the training you've

18   received for the past nine years at Vanderbilt?

19   A    Yes, sir.

20   Q    Is it consistent with your number one goal?

21   A    Yes, sir.

22   Q    Okay.

23          **MR. THAGARD:**  Can we pull up -- let's go to

24   Plaintiffs' 76, please, Page 1...

25   Q    Do you recognize that document?

Russell - Direct / By Mr. Thagard          209

1   A    Yes, sir.  That's the account representatives' procedures

2   manual.

3          **MR. THAGARD:**  And can you please pull up Page 250?

4   And if you could highlight the first part right there.  Yeah,

5   okay.

6   Q    And can you read that for us, please?

7   A    Yes, sir.

8          "Repossession provision strategies, understanding how

9          to control the cost of repossessions and

10         foreclosures.  VMF suffers substantial financial

11         losses each year due to repossessions and

12         foreclosures.  It is every team member's

13         responsibility to help control these costs.  AR

14         should learn how to identify potential problem loans

15         and encourage resolution to the customer's issues

16         before they reach the point of no return."

17         **MR. THAGARD:**  Can we pull up that?

18  Q    And will you read the sentence beginning "for every home"?

19  A    Yes, sir.

20         "For every home that is repossessed another three to

21         five new homes must be sold or approximately 60

22         payments must be collected from other loans to

23         compensate for the loss and revenue.  Recent

24         statistics reflect an average loss of $32,810 for

25         each home that is repossessed and a recovery average

Russell - Direct / By Mr. Thagard          210

1              of $11,811.60 per home.  This means we have an

2              average loss of $20,998.40 per repossession."

3   Q    And can you read that, (indicating)?  Can you read the

4   last sentence under customer relations, please?

5   A    Yes, sir.

6              "Explain to the customer the importance of

7              establishing a good pay history and coach them how to

8              prioritize their debts.  Show them that you are

9              trying to help them solve their problems.  If you

10             establish the fact that the customer can no longer

11             afford the home, it is your job to intervene and find

12             the best possible way to save the home from

13             repossessing."

14  Q    Okay.  So is it in Vanderbilt's financial interest to

15  repossess a home?

16  A    No, sir.

17  Q    And is this why they highlight the importance of avoiding

18  repossessions?

19  A    Yes, sir.

20  Q    Okay.

21             **MR. THAGARD:**  And can you pull up Page 259, please?

22  Q    Can you explain to us what the "Homeowner's Assistance

23  Program" is, please?

24  A    Yes, sir.  We call it HAP for short at Vanderbilt.  It's a

25  program that we've put into place where instead of giving them

Russell - Direct / By Mr. Thagard                211

1    an extension, that means we would put that payment to the end

2    of their loan.  Vanderbilt would basically pay part of the

3    customer's delinquent payment.  So if they came up with half or

4    at least half of their past due payment, then Vanderbilt would

5    pay the remaining portion to bring their loan up to date or

6    current.

7    Q    Okay.  And whose money is Vanderbilt using to pay those

8    monthly payments with?

9            **MR. RUMLEY:**  Objection.  Leading.

10           **THE COURT:**  Sustained.

11   **BY MR. THAGARD:**

12   Q    Can you explain how if a customer doesn't make those

13   payments, who is making them?

14   A    Vanderbilt takes money and they apply it to the customer's

15   loan.

16   Q    And why?  What have they done?

17   A    We want to give the opportunity for the customer to get

18   back up to date and to help keep their home.

19   Q    And can you read --

20           **MR. THAGARD:**  Highlight that last piece, please.

21   Q    And who does this program apply to?

22   A    This program is only for customers that are in the home,

23   can afford to pay and will maintain contact with us.  It is

24   important to keep in mind that Vanderbilt is actually paying

25   part of the customer's loan payment in this situation, so this

Russell - Direct / By Mr. Thagard                212

1   can be a relatively expensive solution for the company and,

2   thus, should be used with discretion.

3   Q    Okay.  Now, for a period of time you were assigned to the

4   Flores-King account, correct?

5   A    Yes, sir.

6   Q    Okay.  And do you specifically remember speaking to

7   Mr. Flores and/or Mr. King?

8   A    Mr. King more.  I spoke with Mr. Flores maybe once or

9   twice.

10  Q    Okay.  And how many accounts do you -- do you work a lot

11  of accounts in a given year?

12  A    Yes, sir, I do.  A bucket usually consists of 800 to 1,000

13  accounts.

14  Q    Okay.  But you remember Mr. Flores and King?

15  A    Yes, sir.

16  Q    Can you explain to us why, what it is that makes you

17  remember them specifically?

18  A    I feel like I had a really good relationship with

19  Mr. Flores and Mr. King.  They would call in, or Mr. King

20  would, to talk about his payment on the house, make alternate

21  arrangements with me because he was late for whatever reason.

22        But moreover, we have to limit our calls to just a

23  few minutes because we have so many to do.  However, Mr. King

24  would talk with me a lot.  And I enjoyed that with -- about he

25  had a rabbit farm; they had prize rabbits that they raised and

Russell - Direct / By Mr. Thagard          213

1   sold, you know, to kind of help with their expenses; you know,

2   just giving me updates on his new job at the funeral home or,

3   you know, how Mr. Flores' hair salon was doing.  It was more of

4   a let's make alternate arrangements, and then we kind of caught

5   up on, you know, maybe things that were going on with them.

6   Q    Did they sometimes call up and ask to speak with you

7   specifically?

8   A    Yes, sir.

9   Q    Okay.  And did there ever come a time when you had to give

10  up their account?

11  A    Yes, sir, I did.

12  Q    And did they still call and ask to speak with you

13  specifically?

14  A    Yes, sir.

15  Q    On a scale of one to ten, what sort of -- ten being good,

16  one being bad -- what sort of relationship would you say that

17  you had with Mr. King and Mr. Flores?

18  A    I feel like it was very good, a eight or a nine.

19  Q    Okay.  Were they polite?

20  A    Yes, sir.

21  Q    Okay.  And do you have any sort of specific memories that

22  you remember about them?

23  A    They had a unfortunate incident where they had a truck

24  veer off the road and hit their house, and so I kind of helped,

25  you know, work through that with them letting them know who to

Russell - Direct / By Mr. Thagard                214

1   contact.  And Mr. King had stated that they may be behind on

2   their payment for that reason.  And we worked out other

3   arrangements because of that.

4   Q    Okay.

5          MR. THAGARD:  Your Honor, the -- let's pull up

6   page --

7   Q    Oh, let me tell you.  Are you personally familiar with --

8   I'll tell you what do.  Let's switch to -- I'm going to take

9   you, pull up...

10          Did you have an opportunity to review the notes of

11   the calls that you personally had with Mr. King and Mr. Flores?

12   A    Yes, sir.

13   Q    Okay.  And I'm going to pull up Kim Russell Exhibit 21.

14          MR. RUMLEY:  Your Honor, I'm going to object.  I

15   think this was an issue we took up.

16          MR. THAGARD:  Your Honor, may we approach?

17          THE COURT:  Yes.

18      **(Bench conference on the record begins at 5:16:05 p.m.)**

19          MR. THAGARD:  I'm going to show her a call note that

20   she was personally involved in which is -- and have her testify

21   as to what the conversation is.

22          THE COURT:  Why can't you just use -- ask her what

23   they talked about?

24          MR. THAGARD:  I can but I just would like to

25   corroborate that.

Russell - Direct / By Mr. Thagard          215

1          **THE COURT:**  It's not admitted is it?

2          **MR. THAGARD:**  Your Honor --

3          **THE COURT:**  Is that admitted?

4          **MR. THAGARD:**  No, your Honor, it's not.  And he

5   wasn't going to show it.  I'm sorry, I thought you said we

6   could admit stuff that she did personally --

7          **THE COURT:**  No --

8          **MR. THAGARD:**  -- as opposed to --

9          **THE COURT:**  I said she could testify about that.

10         **MR. THAGARD:**  Okay.  All right.  I'm sorry.

11       **(Bench conference ends at 5:16:36 p.m.)**

12         **THE COURT:**  Thank you.  Proceed.

13       **(Pause)**

14   **BY MR. THAGARD:**

15   Q    Was there a time in -- one thing, you haven't been privy

16   to this testimony, but there's a dispute in the case with

17   regard to whether or not Mr. Flores and Mr. King knew whether

18   that Lots 35 and 36 had been pledged in support of the retail

19   installment contract.

20         **MR. THAGARD:**  And please pull up Plaintiffs'

21   Exhibit 1.

22   Q    And do you regularly refer to and use retail installment

23   contracts as part of your job as an account representative?

24   A    Yes, sir.

25   Q    Okay.  And beginning here, the second page, the second --

Russell - Direct / By Mr. Thagard                216

1    can you read that second sentence for me, please?

2    A    Yes, sir.

3              "The seller will submit this contract to Vanderbilt

4              Mortgage and Finance, Incorporated, P.O. Box 9800,

5              Maryville, Tennessee 37802; and if approved, the

6              contract will be assigned to Vanderbilt Mortgage and

7              Finance, Incorporated by or promises to advise seller

8              in writing of any change of buyer's mailing address

9              while this contract is in effect."

10             **MR. THAGARD:**  And would you get that down?

11   Q    And did Mr. Flores and Mr. King make their payments to

12   Vanderbilt?

13   A    Yes, sir.

14   Q    And that's what you were talking with them about, correct?

15   A    Yes, sir.

16   Q    Okay.

17             **MR. THAGARD:**  And if you highlight the bottom there.

18   Q    Do you know how many payments they were supposed to make?

19   A    144 payments.

20   Q    Okay.  And how many payments did they make?

21   A    Just by review of the notes, 84 payments, I think.

22   Q    Okay.  And how many of those were late?

23   A    Approximately 40 to 50 payments were late.

24   Q    Okay.  And how many were over 30 days late?

25   A    I want to say 48 if I recall correctly.

Russell - Direct / By Mr. Thagard          217

1   Q    Okay.  And here can you -- the retail installment contract

2   indicates that the buyer gives the seller a security interest

3   in real property located at 3536 Gallimore, Alice, Texas.

4        **(Mr. Thagard confers off the record)**

5           Did there come a time --

6        **(Mr. Thagard confers off the record)**

7           Did there come a time when you had an opportunity to

8   have a conversation with Mr. Flores or Mr. King about Lots 35

9   and 36?

10  A    Yes, sir.

11  Q    Okay.  And tell me what you remember about that

12  conversation.

13  A    From reviewing my notes, I recall back in July of, I think

14  it was 2003, Mr. King called in and he had questions about

15  releasing one of the lots from the loan, something about having

16  to change it to someone else's name and needed the release done

17  and wanted to know what he needed to do to have that happen.

18  Q    Okay.  And let's take that back and go piece by piece.

19          Who called in?

20  A    Mr. King.

21  Q    Okay.  And when did he call in?

22  A    I think it was July of 2003, the middle of the month.

23  Q    And what did he want to speak to somebody about?

24  A    He had asked initially about refinancing the loan because

25  he was questioning on getting one of the lots that they had up

Russell - Direct / By Mr. Thagard          218

1   for collateral on the deed released because they needed to do a

2   transfer to another party's name.

3   Q    Did he indicate specifically that he had put Lots 35

4   and 36 on the loan?

5   A    Yes, sir.

6   Q    Okay.  And what was he asking for Vanderbilt to do?

7   A    Release one of the lots.  He wanted me to find out what it

8   would take to do that.

9   Q    And do you remember which lot that was?

10  A    I don't exactly know.  I think it was 35, but I'm not for

11  sure.

12  Q    Okay.  And what did you say to him?

13  A    I advised him that I would have to check on it, it wasn't

14  my decision to make on what needed to be done, and that I would

15  get with my manager and get back with him when I had an answer

16  for him.

17  Q    Okay.  And what happened next?

18  A    I proceeded to check with -- I had a credit manager at

19  that point.  I proceeded to let her know what he was interested

20  in doing.  She at that point went to her manager to find out

21  what needed to be done to get that accomplished.

22  Q    Okay.  And what did she find out needed to be done?

23  A    The information that she relayed to me was that we would

24  release one of the lots for $10,000.

25  Q    Okay.  And did you have an opportunity to call and speak

Russell - Direct / By Mr. Thagard          219

1    with Mr. King about that?

2    A    Yes, sir.  She advised me to relay that information to the

3    customer, at which point I did call and leave a message for

4    Mr. King.  He then proceeded to return the call to me

5    eventually.  We kind of played phone tag for a while.  And at

6    that point I did advise him that for the 10,000 they would

7    release one of the lots for him.

8    Q    And this was in July, in July of 2003?

9    A    Yes, sir.

10   Q    Okay.  And did he tell you why he wanted to get Lot 35 off

11   of the loan?

12   A    Initially, I think that he had stated that it was in

13   Cesar's name and they needed to get it out of their name into

14   someone else's name.  I don't know all the particulars.  It was

15   long ago.

16   Q    And did -- you may have covered this.  Did they agree -- I

17   mean did they agree to pay the $10,000?

18   A    Mr. King at that point proceeded to say he didn't have the

19   money, that kind of money at that point and just leave it as is

20   for right now.

21   Q    Okay.  Is there any question in your mind that Mr. King

22   knew that Lots 35 and 36 had been pledged as collateral for the

23   debt in this case?

24   A    There's no question that he did know.

25       **(Pause)**

Russell - Direct / By Mr. Thagard          220

1   Q    Now, a minute ago we looked at assignment language in the

2   retail installment contract.

3           Are you also familiar with documentation that is

4   provided to the customer at the time of the sale with regard to

5   whether or not who they should send their payments to?

6   A    Yes, sir.  A welcome letter is sent out.

7           MR. THAGARD:  Can you pull up Plaintiffs' 154,

8   Page 8, please?

9   Q    And is this what's called a welcome letter?

10  A    Yes, sir.

11  Q    Okay.  And when is this provided to the customer, to your

12  knowledge?

13  A    Vanderbilt mails that.  They usually mail it right when

14  the deal comes through to Vanderbilt and before their --

15  obviously, before their first payment is due so they'll know

16  where to send it.

17  Q    Okay.  And when was Mr. Flores and Mr. King's first

18  payment due?

19  A    March the 1st of 2002.

20          MR. THAGARD:  Can you go back to the bottom of that

21  document here...

22      **(Mr. Thagard confers off the record)**

23  Q    Are you also familiar with whether or not Mr. Flores and

24  Mr. King were sent monthly statements in 2008 and 2009?

25  A    Yes, sir.  We changed to monthly statements from coupon

1  booklets approximately then.

2  Q    Okay.

3         MR. THAGARD:  I'd like to show Plaintiffs' 19,

4  please, an example of the statements we sent them.  Can you

5  highlight that?

6  Q    And does that indicate that the statement -- who does that

7  indicate the statement is from?

8  A    Vanderbilt Mortgage and Finance, Incorporated.

9  Q    And who does that indicate the amount money is due to?

10 A    Vanderbilt Mortgage and Finance, Incorporated.

11 Q    And in all the years that you worked with Mr. Flores and

12 Mr. King and all the times that you spoke with them, did they

13 ever one time express a concern that they were making payments

14 to Vanderbilt?

15 A    No, sir.

16 Q    In your opinion, were Mr. Flores and Mr. King aware that

17 this debt had been assigned to Vanderbilt?

18 A    Yes, sir.

19        MR. THAGARD:  Your Honor, I'm going to show the

20 witness an exhibit which has not been admitted yet.

21        THE COURT:  Go ahead.

22        MR. THAGARD:  Can you pull up Plaintiffs' 17, please?

23 BY MR. THAGARD:

24 Q    Now, Ms. Russell, do you recognize this document?

25 A    Yes, sir.  It's a payment history.

Russell - Direct / By Mr. Thagard          222

1   Q    Okay.  And is it essentially a printout of some computer

2   data?

3   A    Yes, sir.

4   Q    Okay.  And is this data compiled in the regular course of

5   Vanderbilt's business?

6   A    Yes, sir.

7   Q    Is the data compiled as the payments are made and

8   recorded?

9   A    Yes, sir.

10  Q    Okay.  Is the data immediately updated each and every time

11  a payment is made?

12  A    Yes, sir.

13  Q    Okay.  Is the data maintained in the regular course of

14  Vanderbilt's business?

15  A    Yes, sir.

16  Q    Does Vanderbilt use this data to keep a history of

17  payments with its customers?

18  A    Yes, sir.

19  Q    Do you and your people use this and rely on this data on a

20  regular basis as a part of your duties as an account

21  representative?

22          **MR. THAGARD:**  Your Honor, we'd like to offer the

23  payment history into evidence as a business record under

24  Federal Rule of Evidence 803(6), please.

25          **MR. RUMLEY:**  No objections from Flores and King.

**EXCEPTIONAL REPORTING SERVICES, INC**

Russell - Direct / By Mr. Thagard          223

1          **THE COURT:**  And that number is?

2          **MR. UNIDENTIFIED:**  No objection.

3          **MR. THAGARD:**  It is 17.

4          **THE COURT:**  Plaintiffs' 17 is admitted.

5      **(Plaintiffs' Exhibit Number 17 was received in evidence)**

6   BY MR. THAGARD:

7   Q    Is there a -- I believe you testified that of 84 payments

8   Mr. Flores and Mr. King were late on 82 of them?

9   A    Yes, sir.  I think, approximately.

10  Q    And how many times were they over 48 days late?

11  A    48 to 50.

12  Q    Okay.  And how many days late does somebody have to be

13  before Vanderbilt can begin repossession proceedings?

14  A    Thirty days past due.

15  Q    So how many times could Vanderbilt have begun repossession

16  proceedings against Mr. Flores and Mr. King?

17  A    If we wanted to, the 48 times they were over 30 days late.

18  Q    Why didn't you do so?

19  A    That's not our position to do.  We don't want to repossess

20  homes.  We want to keep them in their house, so our alternative

21  is to give other options.

22  Q    Okay.  Were Mr. Flores and Mr. King sometimes difficult to

23  get a hold of?

24  A    Yes, sir.

25  Q    Did they regularly return their messages?

1  A    No, sir.

2  Q    Okay.  What if somebody is late on a payment 48 times over

3  30 days?  What does an account representative do?

4  A    I mean at that point we're trying to just contact the

5  customer at any of the numbers that they provide to us, make

6  contact to find out what's happened and try to make alternate

7  arrangements with them.

8  Q    And explain to the jury what an "alternate arrangement"

9  is.

10 A    If they can't make their payment on the date that they

11 sign the contract for, such as the 1st or the 15th, an

12 alternate arrangement would be talking with them to find out

13 what's happened and then to make an arrangement that's fitting

14 for them and also for Vanderbilt to get their payment in later

15 than they, you know, signed the contract for.

16 Q    Okay.  And did Mr. Flores and King enter into a lot of

17 alternate arrangements with Vanderbilt?

18 A    Yes, sir.

19 Q    And you personally?

20 A    Yes, sir.

21 Q    Okay.  And did they break a lot of those alternate

22 arrangements?

23 A    Yes, sir.

24 Q    Was that a regular routine of theirs?

25 A    Yes, sir.

1  Q    Okay.  And when they did that, they would get a broken

2  promise letter, correct?

3          **MR. B. GUTIERREZ:**  Objection.  Leading.

4          **THE COURT:**  I'm sorry?

5          **MR. THAGARD:**  What would happen?

6          **MR. B. GUTIERREZ:**  Objection.  Leading.

7          **MR. RUMLEY:**  Objection.  Leading.

8          **MR. THAGARD:**  I'll withdraw it, your Honor.

9          **THE COURT:**  Okay.

10 **BY MR. THAGARD:**

11 Q    What would happen when they would break an alternative

12 arrangement?

13 A    We would try to contact them by telephone to find out what

14 happened; something could have come up.  We do have an option

15 to send a letter stating that they did not keep their promise

16 with us.  It's computer generated.  And we can send that to

17 them as well to find out what happened if we're unable to get

18 them by the telephone.

19 Q    Okay.  And so there were 47 times in which you could have

20 started repossession proceedings but didn't, correct?

21 A    I think it was 48.  Yes, sir.

22 Q    Forty-eight.  Okay.  And did there finally come a time in

23 which Vanderbilt found it had to repossess the home?

24 A    Yes, sir.

25 Q    Okay.  And can you talk to us about the events leading up

1   to that?

2   A     From my review of the notes, there was a point that

3   Mr. King called in and he had left the home.  He said he had

4   moved out he was going to help Mr. Flores with one other

5   payment but he would not be helping after that.  We didn't

6   receive the payment from him.  We could not reach Mr. Flores.

7   We tried to reach him through family members or neighbors or

8   friends, unable to do so.  So we at that point decided that we

9   had to send the notice of default.

10  Q     Okay.  And when somebody tells you they're moving out of

11  the home, is that a problem?

12  A     It is because we consider that they're abandoning their

13  interest in that property.

14  Q     Okay.

15          **MR. THAGARD:**  And please pull up Plaintiffs' 1 and

16  then go to Page 3, please.

17  Q     This is the retail installment contract, Page 3.  Can you

18  read that highlighted language for us please, ma'am?

19  A     Yes, sir.

20            "Under no circumstances is buyer entitled to a notice

21            of default if buyer has either abandoned or

22            voluntarily surrendered the manufactured home."

23  Q     To your knowledge did Mr. King provide a forwarding

24  address?

25  A     No, sir.

Russell - Direct / By Mr. Thagard          227

1    Q    Do you know from your -- can we go back to...

2         At the time of the default how many days' late --

3    notice of the default, how many days' late were Mr. Flores and

4    Mr. King?

5    A    Remembering back to looking at the actual notice, they

6    were due for March payment, March the 1st.

7    Q    Okay.

8    A    And the letter was sent in May, on May the 5th I think is

9    when we ordered that letter.

10   Q    And were you all regularly calling Mr. Flores and King?

11   A    Yes, sir.

12   Q    Why were you -- were you calling them like very

13   frequently?

14   A    Well, at that point we were trying to make contact before

15   we had to actually send the notice to find out, you know, what

16   was going on, if they wanted to try to keep the home, bring it

17   back up to date or if we could perhaps help them sell it if

18   they weren't able to make the payments on it.

19   Q    And so what were you trying to get in touch with them for?

20   A    To see what happened and to try to help them keep that

21   house if that's what they wanted to do.

22   Q    Okay.  Now, at this point Mr. Flores and Mr. King had been

23   living in the home for over seven years, correct?

24   A    Yes, sir.

25   Q    Okay.  And did there come a time in which you had to send

Russell - Direct / By Mr. Thagard          228

1  the default?

2  A    Yes, sir.

3  Q    Okay.  And do your records indicate that a default was

4  actually ordered?

5  A    Yes, sir.

6  Q    Okay.  And while you didn't have to send Mr. King a

7  notice, did you make every effort to?

8  A    Yes, sir.  We tried to skip trace to find his address so

9  that we could give him notification on what was going on and

10 that we were sending that default out.

11 Q    And when an account representative decides it's finally

12 time to default, can they make that decision on their own?

13 A    An account rep cannot make that decision.  They can

14 request the letter.  Senior account representatives, their

15 supervisor, makes the decision if it's best at that point to go

16 forward.

17 Q    And did your review of the file indicate that approval had

18 been obtained?

19 A    Yes, sir.

20 Q    By a senior supervisor?

21 A    Yes, sir.

22        MR. THAGARD:  And I'd like to pull up

23 Plaintiffs' 146, please.

24        THE COURT:  Are you close to finishing, Counsel?

25        MR. THAGARD:  Your Honor, I need to go through this

1   notice, which I could do tomorrow.  It's sort of laborious.

2   I've got to, you know --

3           **THE COURT:**  It's 5:35 and I think it's time, maybe,

4   that we break for the evening.  So we'll start back promptly at

5   8:30 in the morning.  Please get here a little bit earlier than

6   that.

7           Would you please stand for the jury?

8       **(Jurors exit courtroom at 5:34 p.m.)**

9           Thank you.  You may be seated.  And you may step

10  down.

11      **(Witness steps down)**

12          Anything to take up outside the presence of the jury?

13          **MR. RANGEL:**  No, your Honor.

14          **MR. UNIDENTIFIED:**  No, your Honor.

15      **(Pause)**

16          **MR. RUMLEY:**  May we be excused?

17          **THE COURT:**  Yes.  You're excused.  Come back about

18  8:20 in the morning, please.

19          **MR. RUMLEY:**  Thank you.

20      **(This proceeding was adjourned at 5:35 p.m.)**

21

22

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                _____February 8, 2011 _

TONI HUDSON, TRANSCRIBER