UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| VANDERBILT MORTGAGE | ) | CASE NO:  CA-C-09-312 |
| AND FINANCE, INC., ET AL., | ) | |
| | ) | CIVIL |
| Plaintiffs, | ) | |
| | ) | Corpus Christi, Texas |
| vs. | ) | |
| | ) | Friday, November 12, 2010 |
| | ) | |
| CESAR FLORES, ET AL., | ) | (8:25 a.m. to 12:10 p.m.) |
| | ) | (1:31 p.m. to  5:03 p.m.) |
| Defendants. | ) | |

JURY TRIAL - DAY 3

BEFORE THE HONORABLE JANIS GRAHAM JACK,
UNITED STATES DISTRICT JUDGE

Appearances:              See Next Page

Court Recorder:           Velma Gano; FTR

Courtroom Clerk:          Sondra Scotch

Transcriber:              Exceptional Reporting Services, Inc.
                          P.O. Box 18668
                          Corpus Christi, TX 78480-8668
                          361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>**APPEARANCES FOR:**</u>

Plaintiffs:                      JORGE C. RANGEL, ESQ.
                                 615 Upper N. Broadway
                                 Suite 2020
                                 Corpus Christi, Texas 78403-2683

                                 CRISTINA ESPINOZA RODRIGUEZ, ESQ.
                                 Baker Botts
                                 910 Louisiana
                                 Suite 3624
                                 Houston, Texas 77002-4995

                                 PATTON G. LOCHRIDGE, ESQ.
                                 CARLOS R. SOLTERO, ESQ.
                                 McGinnis Lochridge, et al.
                                 600 Congress Ave.
                                 Suite 2100
                                 Austin, Texas 78701

                                 EDWARD S. SLEDGE, IV., ESQ.
                                 THOMAS W. THAGARD, III, ESQ.
                                 1901 Sixth Ave. North
                                 Suite 2400
                                 Birmingham, AL 35203-2618

Defendants:                      BALDEMAR F. GUTIERREZ, ESQ.
                                 J. JAVIER GUTIERREZ, ESQ.
                                 700 E. Third St.
                                 Alice, Texas 78332

Intervenor Plaintiffs:           DAVID L. RUMLEY, ESQ.
                                 Wiginton Rumley Dunn, LLP.
                                 800 N. Shoreline Blvd.
                                 14th Fl., South Tower
                                 Corpus Christi, Texas 78401

1                              <u>INDEX</u>

| PLAINTIFFS' WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| PAUL NICHOLS | | | | |
|   BY MR. RANGEL | 18 | | 147 | |
|   BY MR. RUMLEY | | 52/98 | | -- |
|   BY MR. B. GUTIERREZ | | 136 | | 156 |
| MARIA TREVINO | | | | |
|   BY MR. RANGEL | 170 | -- | -- | -- |

| DEFENDANTS' WITNESSES BY VIDEO DEPOSITION | DIRECT | CROSS |
|---|---|---|
| BENJAMIN JOSEPH FRAZIER | 197 | 245 |
| BRUCE ROBIN MOORE | 250 | 298 |
| DAVID BARTON | 301 | -- |
| HUGH STATUM | 309 | 322 |

| DEFENDANTS' EXHIBITS | RECEIVED |
|---|---|
| 206 | 66 |
| 197 | 117 |
| 199 | 117 |

4

1    **Corpus Christi, Texas; Friday, November 12, 2010; 8:25 a.m.**

2                        **(Call to Order)**

3          **(Outside the presence of the jury)**

4          **MR. RUMLEY:**  Your Honor, we do have one matter that

5    we need to --

6          **THE COURT:**  Are we on the record?

7          **THE CLERK:**  Yes, your Honor.

8          **THE COURT:**  I'm going to call the case again,

9    *Vanderbilt versus Flores and King*.

10         **THE CLERK:**  Okay.  May I have appearances, please?

11         **THE COURT:**  I can see everybody's here, Mr. Lochridge

12   and Mr. Rumley and Mr. Gutierrez.  Tell me what your matter is

13   -- and Mr. Rangel.

14         **MR. RUMLEY:**  Your Honor, one of the witnesses they're

15   calling today is Bryan Stone.  Mr. Stone is the expert and the

16   Court issued an order excluding Opinions 4 through 18 and if we

17   read the report of the opinions that have not been excluded,

18   the first paragraph --

19         **THE COURT:**  Would you put it on Elmo?  Thanks.

20         **MR. RUMLEY:**  The first paragraph just says, "On or

21   about January 5th, Alvin King purchased a new manufactured

22   home."  That is already a stipulated fact.  So that would not

23   be helpful to the jury.  Certainly we don't need any expert --

24         **THE COURT:**  Have I admitted his report?

25         **MR. RUMLEY:**  No --

1          **THE COURT:**  Okay.

2          **MR. RUMLEY:**  -- but you limited his opinions, your

3    Honor, to Paragraphs 1, 2 and 3 --

4          **THE COURT:**  Right.

5          **MR. RUMLEY:**  -- and so if he's going to talk about

6    this opinion, if it's not helpful, there's no need for expert

7    testimony.  It's already an admitted fact.  The second opinion

8    that was not excluded is the seller of the home was CMH.

9    Again, the same thing as a factual statement, certainly nothing

10   under 702 requires him to talk about that.  The third one, the

11   total sales price and that they didn't make the payments.

12   Again, under 702, there's no need for an expert.  That's

13   already an admitted fact.

14          And then the remaining paragraphs that were not

15   excluded relate to the documents that we talked about

16   yesterday, the warranty deed and that sort of thing.  Again,

17   all of this testimony -- none of it is under 702 that requires

18   any specialized or expertise knowledge.  It's simply that they

19   want him to get up and identify these documents that we talked

20   about and they've excluded yesterday for no other reason other

21   than, I guess, bless them with what's --

22          **THE COURT:**  Well, 19, I excluded those -- the

23   documents --

24          **MR. RUMLEY:**  Correct.

25          **THE COURT:**  -- because they just talked --

1          **MR. RUMLEY:**  And yesterday --

2          **THE COURT:**  -- they admitted -- I mean, there's

3   nothing to discuss --

4          **MR. RUMLEY:**  Right.

5          **THE COURT:**  -- because they admitted that they were

6   transferred --

7          **MR. RUMLEY:**  And so our objections --

8          **THE COURT:**  -- and before the lien was released.

9          **MR. RUMLEY:**  -- our objection to these would -- in

10   addition to 702, that none of this requires any specialized

11   knowledge or any expertise, that it's also -- under 403 it

12   would be cumulative because as the Court just said, it came in

13   yesterday.  The Court allowed Mr. Rangel to question my client.

14   He did and it came out and, again, we believe that it would

15   prejudicial under 403 because of the standing issue that it

16   gives -- it has the likelihood to mislead the jury on what my

17   elements are in the case far outweighing any probative value of

18   having Bryan Stone come in repeat testimony that's already in

19   the record.  So we would request that --

20          **THE COURT:**  So what would he -- why do you need him?

21          **MR. LOCHRIDGE:**  Your Honor, I alluded to this as in

22   pretrial conference.  In the Court's order, the Court points

23   out that there is some custom and practice testimony that is

24   different than him saying the effects of a legal document.  We

25   fully understand the Court's order as to that and we'll abide

1   by it of course but in the Court's order, the Court notes that

2   some of Mr. Stone's proposed testimony is of the custom and

3   practice type of testimony and we intend to limit him to

4   exactly that, as to not the effect of a legal instrument but

5   simply the custom of practice for filing leases with the deed

6   records of the county, whether or not people send releases to

7   owners of property --

8          THE COURT:  But doesn't everybody already know that?

9   I mean, what -- that's not an area for expertise, is it?

10          MR. LOCHRIDGE:  Well, I think it's -- I think there's

11   an area of some dispute here in that they're making a point

12   that we didn't send the builder's mechanic's lien release

13   immediately after the document -- the retail installment

14   contract was assigned to Vanderbilt.  They're making a point of

15   that.  They're making a point of the fact we didn't send the

16   release to the landowners.  That's their custom and practice

17   that lenders don't do that and so we want to be able to put on

18   that evidence to rebut the arguments that they are making, that

19   what we did was completely consistent with the custom and

20   practice of lenders.

21          THE COURT:  You know, I don't see on earth how that

22   could be custom and practice that you don't send the release of

23   the lien to the people that you say are indebted when they

24   never paid a penny.  The Floreses never -- the Trevinos never

25   paid a penny --

1        **MR. LOCHRIDGE:**  Right.

2        **THE COURT:**  -- and you released a lien.

3        **MR. LOCHRIDGE:**  Right.  And the custom --

4        **THE COURT:**  How usual is that?  What's the custom and

5   practice in that?

6        **MR. LOCHRIDGE:**  What he'll testify is that

7   traditionally lenders do not send releases of liens to the

8   landowners.  That's just the way it is.  It might not be a good

9   custom or practice but that's just the way it is.

10        **THE COURT:**  No, I'm talking about -- that's when they

11  pay in full but your -- these people, the Trevinos never paid a

12  penny.

13        **MR. LOCHRIDGE:**  I understand that.

14        **THE COURT:**  And they're saying that they -- that it

15  was forged.  I mean, it's very peculiar.  So if he wants to

16  testify to that custom and practice, I think that that's a

17  cross-examination issue of interest.

18        **MR. RUMLEY:**  And I would just point out, your Honor,

19  that is the exact argument they made in their -- he's going to

20  testify to custom and practice on Page 9 and the Court said,

21  yeah, that's what their argument is but when you try to apply

22  what his custom and practice is to the conduct of this

23  Defendant, it doesn't match.  All he's trying to do is get an

24  expert to make an opinion on the effect of these documents and

25  the effect of the assignment and the effect of this release and

9

 1    those opinions have been excluded and to the extent that

 2    Mr. Stone would testify to these customs and practices or

 3    whatever he's talking about, that's outside of his report and

 4    so they should be excluded under Rule 26.

 5          **THE COURT:**  Where does he talk about custom and

 6    practices in his report?

 7          **MR. RUMLEY:**  It doesn't.

 8          **MR. LOCHRIDGE:**  Your Honor --

 9          **MR. RUMLEY:**  The paragraphs -- and I'll be happy to

10    provide this to the Court.

11          **THE COURT:**  No, I was -- let Mr. Lochridge show me.

12          **MR. LOCHRIDGE:**  In Paragraph 10 on Page 3 --

13          **THE COURT:**  Show it to me.

14          **MR. LOCHRIDGE:**  May I approach?

15          **THE COURT:**  Just put it on the overhead.

16          **MR. LOCHRIDGE:**  In Texas, the custom -- I don't need

17    to read the report.

18          **MR. RUMLEY:**  And this opinion was excluded, your

19    Honor.

20          **THE COURT:**  Yeah, I excluded that opinion.

21          **MR. LOCHRIDGE:**   Your Honor, I recognize that.  I'm

22    not wanting to argue with the Court but the Court in its order

23    indicated that some of Stone's testimony --

24          **THE COURT:**  No, not that paragraph but tell me where

25    he wants to testify in his report about customs and practices.

10

1          **MR. LOCHRIDGE:**  This is where he's talking about the

2    customs --

3          **THE COURT:**  No, no, no.  I excluded that paragraph.

4          **MR. LOCHRIDGE:**  All right.  On Page 9, your Honor, he

5    talks about the custom and practice of filing a deed of trust

6    in the deed records of the county where the property is

7    located.

8          **THE COURT:**  Okay.  He can testify about that.

9          **MR. RUMLEY:**  That was excluded.

10         **THE COURT:**  Oh, was that 9 --

11         **MR. RUMLEY:**  Paragraph 9 --

12         **MR. LOCHRIDGE:**  Your Honor --

13         **THE COURT:**  -- Paragraph 9.  It was 3 through 9 -- 3

14   through 11 that I excluded.

15         **MR. RUMLEY:**  Yes.

16         **MR. LOCHRIDGE:**  I don't want to mislead the Court.

17   He did not -- there's nothing in the paragraphs that you did

18   not exclude when he talks about custom and practices.

19         **THE COURT:**  So it's --

20         **MR. LOCHRIDGE:**  I'm not trying to pull a fast one on

21   the Court.

22         **THE COURT:**  I know you wouldn't, Mr. Lochridge, but

23   tell me in the nonexcludable paragraphs what it is you want him

24   to testify to.

25         **MR. LOCHRIDGE:**  That he can testify as to the

1    transfer --

2            **THE COURT:**  Just show me in his report --

3            **MR. LOCHRIDGE:**  Yes, your Honor.

4            **THE COURT:**  -- in the nonexcludable -- nonexcluded

5    paragraphs what you want him to testify to other than his name.

6            **MR. LOCHRIDGE:**  He can testify about the transfer

7    within this document --

8            **THE COURT:**  Now, we don't need him to testify about

9    that.  That's done and I agree with that.  That's cumulative.

10           **MR. LOCHRIDGE:**  He would testify about the three

11   transfers in Paragraphs 19, 20 and 21 which were not excluded

12   showing that the transfer of those documents and showing that,

13   in fact, they did not own an interest in the property --

14           **THE COURT:**  They've already said that.  That is

15   cumulative.  I agree with that.  What else do you want?

16           **MR. LOCHRIDGE:**  I've summed up now but I would have

17   him do the custom and practice on filing releases, the custom

18   and practice --

19           **THE COURT:**  Okay.  Now, I've excluded that.  That was

20   the paragraphs that I excluded.

21           **MR. LOCHRIDGE:**  I understand and I don't want to be

22   arguing with the Court but in your order you said the sum of

23   his testimony is dealt with in the realm of custom and practice

24   and that's where I want to go with his testimony.  I'm not

25   trying to reargue the Court's order.

1           **THE COURT:**  Okay.

2           **MR. RUMLEY:**  Your Honor, again our position is

3    Paragraphs 1 through 3 were not excluded.  Those are admitted

4    facts.  They made the same argument about custom and practice

5    and those paragraphs were excluded.  To come up with any new

6    testimony, it's going to be excluded under Rule 26 and as the

7    Court noted, the last paragraph should specifically be

8    cumulative, your Honor.

9           **THE COURT:**  It is cumulative but tell -- I understand

10   what you're saying, Mr. Lochridge.  What custom and practice do

11   you want him to testify to?

12          **MR. LOCHRIDGE:**  The custom and practice would be that

13   upon the -- a holder of a builder's mechanic's lien when paid

14   off doesn't -- customarily oftentimes doesn't immediately file

15   the release of the lien.  That's one.  The second is --

16          **THE COURT:**  That's when they're paid off.  What if

17   they don't get paid off?

18          **MR. LOCHRIDGE:**  I think that what he'll say is that

19   traditionally you don't -- the holders of the mechanic's and

20   materialmen's lien oftentimes will not file that release until

21   years later.  When -- in a typical situation, a homebuilder

22   builds a home, files a mechanic's and materialmen's lien to

23   protect --

24          **THE COURT:**  But we don't have that here.

25          **MR. LOCHRIDGE:**  Well, we do in a sense because here

1    the home is already built --

2            **THE COURT:**  Okay.

3            **MR. LOCHRIDGE:**  -- but it's installed and put on the

4    property before the assignment to the lender and the company

5    CMH Homes needs to be protected under Texas law for that period

6    of time and so they filed a mechanic's and materialmen's lien

7    similar to a homebuilder but it's -- the home is built prior

8    and installed but you have -- legally you have the same

9    situation and they filed that.  Traditionally contractors will

10   not file their lien immediately and they might, you know, be

11   later on when you're trying to refinance or something like

12   that, you'd go back and you'll say, this lien hasn't been

13   filed.  It's not unusual for the contractor, in this case the

14   dealer of the mobile home situation, to --

15           **THE COURT:**  Does he have expertise in mobile homes?

16           **MR. LOCHRIDGE:**  He has -- he runs a title company.

17   He's a real estate lawyer running --

18           **THE COURT:**  But this had nothing to do with a title

19   company.

20           **MR. LOCHRIDGE:**  Except that he sees this all the time

21   in connection with the filing of builder's and mechanic's liens

22   and they don't get filed immediately.

23           **THE COURT:**  Well, no, I don't -- if he has some

24   expertise in a title company on mobile homes, then he can

25   testify about custom and practice.  Does he have expertise in

14

1    mobile homes?

2         **MR. LOCHRIDGE:**  Yes, he testified and it's in his

3    report that he does have expertise in mobile homes.  I'm not

4    sure what's in his report but he does --

5         **THE COURT:**  I didn't see that in the report.

6         **MR. LOCHRIDGE:**  I misspoke.  I don't think it's in

7    his report.  I think maybe it's --

8         **MR. RUMLEY:**  Your Honor, then we object that he

9    didn't -- it's not disclosed and the other thing is we talked

10   about cumulative.  They brought -- they've brought now four

11   corporate reps and they're putting on another corporate rep to

12   talk about the custom and practice and so to have some expert

13   come up who doesn't -- hasn't even read the depositions, number

14   one -- at least he didn't at the time of his deposition -- to

15   come up and talk about some custom and practice of a title

16   company in Corpus Christi, that's why -- that's the exact same

17   argument they made in response to my Daubert motion and the

18   Court said, yes, there is custom and practice but you're going

19   too far and excluded them.

20        And it's my position, your Honor, that your order is

21   your order and we reviewed the order and we should be able to

22   rely on it and now they're going to -- they're bringing in this

23   expert on some surprise deal trying to revisit paragraphs that

24   had been excluded and in addition, the testimony has already

25   come in and for him to come up and talk about custom and

1  practice of four others --

2        **THE COURT:**  With a title company and I didn't see in

3  the report that he had expertise in custom and practice on

4  mobile homes.  They don't go through a title company

5  apparently.

6        **MR. RUMLEY:**  In their --

7        **THE COURT:**  The testimony we have today, they don't

8  go through a title company.  So custom and practice with a

9  title company probably has no bearing on this case.

10       **MR. LOCHRIDGE:**  Your Honor, oftentimes they do

11  because in many mobile home transactions, the customer will

12  finance the mobile home and the real estate at the same time.

13       **THE COURT:**  Well, that didn't happen here.

14       **MR. LOCHRIDGE:**  That's -- well, that's not what

15  happened here but you still have situation that can end up with

16  a builder's mechanic's lien and customarily those things aren't

17  released --

18       **THE COURT:**  I don't see any relationship between this

19  case and what he would have to testify to and especially if you

20  didn't disclose that he was an expert in builder's and mechanic

21  liens on mobile homes.  Was that disclosed?

22       **MR. LOCHRIDGE:**  I don't --

23       **MR. RUMLEY:**  Land in lieu or --

24       **MR. LOCHRIDGE:**  Hold on a minute.  I can answer the

25  question.  That is not set out specifically in his report.

16

1    His -- I'd have to look at his CV to see what was in the CV

2    that was submitted.

3              THE COURT:  You want to call another witness while

4    you do that?

5              MR. LOCHRIDGE:  We're not calling him first.  He'll

6    be later this morning --

7              THE COURT:  Okay.

8              MR. LOCHRIDGE:  -- and I'll see what we have in the

9    way of -- on his CV, your Honor.

10              MR. RANGEL:  One other point, your Honor.

11              THE COURT:  We excluded -- my law clerk just reminded

12    -- Paragraphs 4 through 18 which is pretty inclusive.

13              MR. LOCHRIDGE:  I'm sorry.  I missed the first part

14    of what you said.

15              THE COURT:  I -- we excluded Paragraphs 4 through 18.

16              MR. LOCHRIDGE:  Yes, your Honor.

17              THE COURT:  And 1, 2 and 3 don't have any value

18    because we don't need an expert for that.  So after 18, what is

19    there?

20              MR. RUMLEY:  That's the --

21              MR. LOCHRIDGE:  It's the transfer and conveyances of

22    the land.

23              MR. RUMLEY:  Which is cumulative.

24              THE COURT:  But that is cumulative.  So there's

25    nothing -- so let's move on.  I'll revisit it at the first

```
 1   break, okay?

 2           MR. LOCHRIDGE:  Okay.  Thank you very much, your

 3   Honor.

 4           THE COURT:  So we can all get organized in our

 5   thoughts again, okay?

 6           MR. LOCHRIDGE:  Yes, your Honor.

 7           THE COURT:  Let's bring in the jury, please.  Maybe

 8   they've walked out on us.  I started out -- we started out

 9   really cold in here because of all the bodies.  So if it

10   continues throughout the morning this cold and anybody objects,

11   let me know.

12           THE CLERK:  All rise for the jury.

13      (Jurors entered the courtroom at 8:43 a.m.)

14           THE COURT:  Thank you.  You may be seated.  Would you

15   call your first witness, please?

16           MR. RANGEL:  Judge, Plaintiff Vanderbilt calls

17   Mr. Paul Nichols.

18           THE CLERK:  Please raise your right hand.

19        PAUL NICHOLS, PLAINTIFFS' WITNESS, SWORN

20           THE CLERK:  Thank you, please be seated.

21           MR. RANGEL:  May I proceed, your Honor?

22           THE COURT:  Please.

23   //

24   //

25   //
```

1                           **DIRECT EXAMINATION**

2      **BY MR. RANGEL:**

3      Q     Good morning, Mr. Nichols.

4      A     Good morning.

5      Q     Will you please state your full name?

6      A     Paul Wayne Nichols.

7      Q     And where do you live, Mr. Nichols?

8      A     In Knoxville, Tennessee.

9      Q     And what do you do in Knoxville, Tennessee?

10     A     I'm the president of Vanderbilt Mortgage.

11     Q     Can you provide the jury with a brief biographical

12     background?

13     A      I was born in Tennessee and grew up in Florida.  I lived

14     in Dallas a couple times in the early 80s.  I went to

15     undergraduate school in Florida and graduate school in

16     Tennessee, married 33 years and a 23-year-old daughter.

17     Q     Tell us a little bit about your educational background.

18     What degrees did you get?

19     A     I have a Bachelor's degree from the University of Central

20     Florida in finance and management and an MBA from the

21     University of Tennessee.

22     Q     And tell us -- tell the jury a little bit about your

23     employment history.

24     A     Well, I don't know how far you want to go back.  I got out

25     of college and went to work for the Treasury Department

Nichols - Direct / By Mr. Rangel                    19

1   auditing banks.  I was in the real estate -- ran a real estate

2   business for about five years in Florida.  I moved to Dallas,

3   Texas and went to work for GE Capital in the early 80s in the

4   manufactured housing business.  Did that and lived there a

5   couple different times and they moved me around pretty much

6   every year to Oklahoma, Kansas, Alabama.  I eventually left GE

7   Capital and went to work for a company called Homeowners

8   Funding in south Georgia which does manufactured home lending

9   and did that for about four years and then went to work for

10  Vanderbilt Mortgage in 1992.

11  Q    What did you start doing for Vanderbilt?

12  A    I was in charge of the loan originations and credit

13  functions when I first went to Vanderbilt Mortgage.

14  Q    And at some point, did you become president of Vanderbilt?

15  A    In June of 2003, yes, sir.

16  Q    And today, are you the president of Vanderbilt?

17  A    Yes, sir, I am.

18  Q    Mr. Nichols, you were here yesterday when Mr. Rumley asked

19  Ms. Russell about your deposition testimony in January 2005?

20  A    Yes, sir.

21  Q    And the question came up as to whether you had told the

22  truth about Vanderbilt recording account representatives' calls

23  for training purposes.

24  A    Yes, sir.

25  Q    Do you recall that?

Nichols - Direct / By Mr. Rangel                    20

1   A    Yes, sir, I do.

2   Q    And did you tell the truth?

3   A    Yes, sir, I did.

4   Q    Will explain it?

5   A    In 2005, the collections supervisors had the ability to

6   plug in and listen to live calls that account reps were doing

7   for training purposes so they could hear how their people were

8   doing.  We didn't purchase the recording equipment until late

9   2005 and it went into place in early 2006.  So it kind of --

10  there was a timeframe there when they could listen live to

11  calls before it went to the actual recording of the calls.

12  Q    And so when you testified in January of 2005 under oath,

13  were you telling the truth?

14  A    Yes, sir.

15  Q    Okay.

16        **MR. RANGEL:**  Call up DOT Release CP, X12.  CP-12.

17  **BY MR. RANGEL:**

18  Q    Mr. Nichols, does the body of the release mention the name

19  Cesar Flores or Alvin King?

20  A    No, sir, it does not.

21  Q    At the top, left-hand corner, is there a reference to a

22  number and to Cesar Flores?

23  A    Yes, sir.

24  Q    What is that?

25  A    It's for account filing to make sure the documents get in

Nichols - Direct / By Mr. Rangel                    21

1    the right file.

2    Q    What do you mean by that?

3    A    The documents associated with the loan have an account

4    number so that they can stay together.

5    Q    Does it have any meaning beyond internal filing purposes?

6    A    It does not, no, sir.

7    Q    Okay.  By including the reference number up there and the

8    name of Cesar Flores, did that in any way indicate that the

9    amount was in any way releasing the indebtedness?

10   A    It does not.  This document releases the lien on the land.

11   Q    Okay.  You also heard some testimony regarding the

12   interest rate that was approved for Mr. Flores and Mr. King,

13   did you?

14   A    Yes, sir.

15   Q    There was a suggestion that the interest rate that was

16   approved -- that was finally charged was higher than the one

17   that was approved; is that correct?

18          **MR. RUMLEY:**  Your Honor, objection, leading.

19          **THE WITNESS:**  It -- oh, excuse me.

20          **THE COURT:**  Just a moment.  Excuse me.  Did you want

21   to rephrase that?

22          **MR. RANGEL:**  Sure.

23          **THE COURT:**  Thank you.

24   //

25   //

Nichols - Direct / By Mr. Rangel                    22

1   **BY MR. RANGEL:**

2   Q     Was the interest rate that was charged to Mr. King and

3   Mr. Flores higher than the interest rate that was approved?

4   A     No, sir, it was not.

5   Q     Can you explain that to the jury?

6   A     Yes, sir.  The document that we saw was what was

7   submitted from the sales center and the terms that they

8   requested the loan at, 240 months and 9.99.

9          **MR. RANGEL:**  Let's call up CP8 at 58.

10  Q     Are you familiar with this document, Mr. Nichols?

11  A     Yes, sir.  It's the conditional approval for the loan with

12  -- if all the stipulations are met.

13  Q     What do you mean by "conditional approval"?

14  A     We had -- below that is a list of stipulations that the

15  customer will have to furnish certain information, verification

16  of income, verification of employment, deeds of trust,

17  et cetera.

18  Q     And the 9.9 reference, what was that?

19  A     That was what the sales center sent in and requested, 240

20  months at 9.99 percent.  They wanted the longest term they

21  could get, of course, and after the credit manager reviewed the

22  file and the documents, he approved it at a hundred and -- I

23  can't -- if you scroll down on this, I think you can see how it

24  was approved at a hundred and 44 months at 10.99 percent.

25  Q     Is that the approved rate?

1    A    It is, yes, sir.

2    Q    And is that different from the 9.9 that had been

3    requested?

4    A    That's what the sales center requested.  That's what they

5    were trying to get.

6    Q    But the final approved rate was 1099?

7    A    Yes, sir, it was.

8    Q    Okay -- 10.99.

9         **MR. RANGEL:**  Let's call up CP1, the Retail

10   Installment Contract.

11   Q    And what is the approved rate?

12   A    10.99.

13   Q    And is that consistent with the previous exhibit that was

14   shown to the jury?

15   A    Yes, sir, it is.

16   Q    So the approved rate was what was actually approved and it

17   was not higher than this?

18   A    It was not.  It was -- what they wanted is not what they

19   got.

20   Q    Okay.

21        **MR. RANGEL:**  Let's show CP8 at 88.

22   Q    Are you familiar with this document, Mr. Nichols?

23   A    Yes, sir.  It's a printout from the application processing

24   system of the information that was submitted from the home

25   center to Vanderbilt.

Nichols - Direct / By Mr. Rangel                    24

1  Q    And is this the document that Mr. Gutierrez showed

2  Mr. Flores?

3  A    It is, yes, sir.

4         **MR. RANGEL:**  And if you'll highlight the term and

5  rate at the bottom, right-hand.

6  Q    Was that the approved rate, 9.99?

7  A    It was not.  It was the requested.

8  Q    In terms of chronology, when is this document created in

9  relationship to when the actual rate that was used is approved?

10  A    This document was printed out when the loan package was

11  being put together after the approval and it records the -- how

12  it was originally requested.

13  Q    So what is the difference between the 9.9 rate that was

14  requested and the one that was finally approved, which is 10.9?

15  A    It -- 1 percent.  I mean, it was approved at 10.99 which

16  was on the retail installment contract.

17  Q    And the rate that was approved was the rate that was in

18  the contract?

19  A    Yes, sir.

20  Q    Okay.  There were also some questions about activity that

21  occurred after Mr. Flores and Mr. King signed the retail

22  installment contract on January 5th, 2002.  Do you recall that?

23  A    Yes, sir.

24  Q    Generally, can you explain to the jury the process that

25  happens after the retail installment contract is signed and

1  what actually happens before Vanderbilt actually accepts the

2  assignment and the contract?

3  A    Once the sales center has the approval, they can -- with

4  the stipulations on it, they have the customer sign the

5  contract so that he is obligated to go through the deal, I

6  believe is how I would view it but it's a process.  It's like a

7  little mini construction process.  They've still got to deliver

8  the house and install it and hook up utilities and whatnot.

9  And so they go through that process and then while that process

10  is happening, they're also collecting the stipulations, the

11  deed of trust, the verification of income, all the things that

12  the credit manager required for the approval of the loan and so

13  those things are happening simultaneously.  Appraisals have

14  been ordered.  Different things are going on and then once

15  everything all comes together with all the different

16  information, then you have a completed loan package.

17  Q    And here the contract was signed on January 5th, 2002 and

18  ultimately Vanderbilt accepted the assignment on January 16th,

19  2002; is that correct?

20  A    I believe that's the date we saw, yes, sir, January 16th.

21        **MR. RANGEL:**  Can we call up CP8 at 172?

22  Q    First, what is VOE and VOI?

23  A    Verification of employment and verification of income.

24  Q    And this -- is this something that is happening between

25  the time that the contract is signed and the time that

Nichols - Direct / By Mr. Rangel                    26

1    Vanderbilt accepts the assignment?

2    A    Yes, sir.  The home center is working with the customers

3    to obtain the proof of income and --

4    Q    And what is this document which is highlighted at the top,

5    please?

6    A    It shows where Mr. Flores works and his income.

7    Q    And this was a document that was received in the process

8    of -- between January 5th, 2002 and January 16th, 2002?

9    A    Yes, sir, it was.

10           **MR. RANGEL:**  Let's look at CP8 at 173.

11   Q    And what is this document?

12   A    It's a form filled out by Mr. King's employer.  It appears

13   -- showing his income and salary.

14   Q    And is this part of the verification -- of income

15   verification of employment process that's continuing between

16   January 5th, 2002 and January 16th, 2002 when Vanderbilt

17   accepted the assignment?

18   A    Yes.

19           **MR. RANGEL:**  Call up CP8 at 174.  Let's go back.

20   Q    Again, what is VOE and VOI?

21   A    Verification of income and verification of employment.

22   Q    Okay.  And we'll go to the top.  There's a fax

23   transmittal.  What's the date on the fax transmittal?

24   A    January the 11th, 2002.

25   Q    And is Mr. King's name on there?

Nichols - Direct / By Mr. Rangel                    27

1    A    It appears to be a paycheck stub, yes, sir.

2    Q    And right under the fax, the -- I believe the word

3    "international" is in there?

4    A    Yes, sir.   It looks like it's cut off but it looks like

5    it says "international."

6    Q    Is that consistent with the previous document that the

7    jury just saw --

8    A    Yes, sir.

9    Q    -- from -- asking for verification of employment?

10   A    I believe it is.   I don't remember the exact wording on

11   the previous page.

12   Q    And this -- does this appear to be income verification for

13   Mr. King?

14   A    It does, yes, sir.

15   Q    And the date, again is that between January 5th, 2002 and

16   January 16th, 2002, that process that you described to the

17   jury?

18   A    This one looks like it was sent on the -- January 11th.

19   Q    Okay.  Mr. Nichols, were you here in the courtroom

20   yesterday when Mr. Shelton testified regarding the execution of

21   the builder's and mechanic's lien release?

22   A    Yes, sir.

23   Q    And can you explain to the jury why CMH was the proper

24   party to sign the BML release?

25   A    Because the original mechanic's lien contract was in the

Nichols - Direct / By Mr. Rangel                    28

1  name of CMH.

2  Q    And did the assignment from CMH to Vanderbilt in any way

3  affect that?

4  A    The assignment of the retail installment contract did not

5  affect the BML, no, sir.

6  Q    Can you explain to the jury what Mr. Shelton was talking

7  about regarding the assignment and the execution of the

8  builder's and mechanic's lien?

9          MR. RUMLEY:  Your Honor, we would object to his

10 interpretation of evidence that the jury has already heard.

11         MR. RANGEL:  Judge --

12         MR. RUMLEY:  It's an inappropriate question for him

13 to comment on the testimony of another witness.

14         MR. RANGEL:  Judge, I've made that objection many

15 times with respect to commenting on depositions.

16         THE COURT:  Overruled.

17         THE WITNESS:  Could you say it one more time?  I'm

18 sorry.

19 BY MR. RANGEL:

20 Q    Sure.  Can you explain to the jury what Mr. Shelton was

21 talking about in relationship to CMH Homes still being able to

22 sign the mechanic's lien release?

23 A    CMH Homes could still sign the release because the

24 original mechanic's lien contract was in CMH's name.

25 Q    And was there a different situation that Mr. Shelton was

Nichols - Direct / By Mr. Rangel                    29

1    talking about?

2    A    There was.  There was a builder's mechanic lien we saw

3    that Vanderbilt had signed and that's because the builder's and

4    mechanic's lien contract that was recorded evolved over time to

5    include a version that had in the contract itself an assignment

6    of Vanderbilt and that's why Vanderbilt could assign that

7    particular builder's and mechanic's lien.

8    Q    And is that the situation that we have with these

9    documents here with respect to the assignment to Vanderbilt

10   requiring Vanderbilt to sign?

11   A    I'm sorry.

12   Q    Okay.  I mean, the situation you described to the jury, is

13   that different from the situation that we have here?

14   A    Yes, sir.  This builder's and mechanic's lien was in the

15   name of CMH Homes.

16   Q    Okay.  Can you provide to the jury a little background

17   about Vanderbilt in terms of what it does?

18   A    Vanderbilt finances manufactured homes for CMH Homes, Inc.

19   We -- they -- we have one customer.  They are it.  We finance

20   about 60 percent of the homes they sell with a variety of loan

21   programs.  It's our only business that we're in.

22   Q    And does CMH Homes finance all of its transactions

23   through Vanderbilt?

24   A    It does not, no, sir.

25   Q    Okay.  Are you a bank?

Nichols - Direct / By Mr. Rangel                30

1   A    We are not a bank, no, sir.  We are a mortgage lender.

2   Q    And you saw a document -- you see a document up there with

3   a reference to the bank.  What was that?

4   A    I suspect it was CMH retail literature trying to kind of

5   pump up the sales forces that they had in connection with the

6   bank but they really meant Vanderbilt Mortgage, the lender.

7   Q    Okay.  And Vanderbilt is not a bank?

8   A    We are not a bank, no, sir.

9   Q    Could you explain to the jury how a typical financing

10  situation works with Vanderbilt and CMH Homes?

11  A    Typically it all starts with the credit application at the

12  home center.  The home center -- the customer finds a house he

13  likes.  The home center submits the credit application to

14  Vanderbilt.  Vanderbilt looks at the credit application, the

15  customer's credits and debts, income, job time and makes a

16  decision on how they would finance the home, tells the sales

17  center what they would do.  The sale center starts gathering

18  that information kind of like we saw before, has the customer

19  sign the documents, sends the documents into Vanderbilt.  If

20  everything is there, we pay retail for the contract.  Retail

21  assigns the contract to Vanderbilt.

22  Q    Typically the purchasers make a cash down payment?

23  A    Generally they make a cash down payment, not always.

24  Q    And are there alternatives to a cash down payment?

25  A    Yes, there is.  As we've talked about here today, the land

Nichols - Direct / By Mr. Rangel                    31

1    in lieu of a cash down payment program.

2    Q    And does the customer have the option to finance or pay

3    cash for the mobile home?

4    A    He always has the opportunity to pay cash, yes, sir.

5    Q    Okay.  And what are your primary responsibilities as

6    president of Vanderbilt?

7    A    Through a group of direct reports to me, I am responsible

8    for all the functions that occur in the mortgage company, loan

9    servicing, the loan origination, the underwriting, accounting,

10   customer service, insurance tracking groups.  There's a variety

11   of things, as you can imagine, that go on in a mortgage company

12   and so I'm ultimately accountable for those people.

13   Q    Generally what happens when a customer does not make the

14   payments on his or her loan?

15   A    Of course we're going to go through the things that

16   Ms. Russell talked about and try to work out anything we can

17   generally to try to come up with a payment plan arrangement to

18   help keep the customer in a house.  We do not want the house

19   back, absolutely do not.

20   Q    As you're aware, Mr. Nichols, Vanderbilt filed this action

21   to repossess the mobile home against Mr. King and Mr. Flores.

22   A    Yes, sir, we did.

23   Q    Is that something that Vanderbilt likes to do?

24   A    We do not like to get the houses back, no, sir.

25   Q    What does Vanderbilt prefer to do?

1   A    We prefer to work out a payment arrangement and help the

2   customer stay in the house and collect payments.

3   Q    And when that does not happen, what choice does Vanderbilt

4   have?

5   A    Well, as a last resort, we would file for a writ of

6   possession.

7   Q    And is that what happened here?

8   A    Yes, sir, it is.

9   Q    Okay.  Let's talk a little bit about the relationship

10  between Vanderbilt and CMH Homes and see -- what is that

11  relationship -- are those different companies?

12  A    They are different companies.  I am president of

13  Vanderbilt Mortgage and Mr. Booth is president of CMH Homes.

14  It's two separate corporations.

15  Q    And are you -- are -- is Vanderbilt and CMH Homes indirect

16  subsidiaries of CHI?

17  A    Yes, sir, we are.

18  Q    Okay.  And CHI is the Parent?

19  A    The ultimate for us, yes.

20  Q    Okay.  Mr. Nichols, the jury has heard a lot of testimony

21  about land-in-lieu transactions.  Can you explain to the jury

22  generally what that is?

23  A    Generally -- and it's -- the majority of land-in-lieu

24  transactions are first-party, land-in-lieu transactions meaning

25  the customer buying the house is also the person that owned the

1    land that they're pledging in lieu of giving a cash down

2    payment but in this transaction it was a -- just to be clear,

3    it was a third-party landowner.

4    Q    Would you explain that to the jury, please?

5    A    That -- a third-party landowner -- as a father, I might

6    put up a acre for my daughter to get a house if I didn't have

7    the cash down payment -- a third-party transaction.  If I owned

8    the land myself and was buying the house, I'd put it up and I'd

9    also be responsible on the retail installment contract whereas

10   the third party is not responsible for the debt on the retail

11   installment contract but they are at risk of losing the land.

12   So a third-party landowner might be -- or a -- he might be

13   willing to lose the land but not want to obligate themselves

14   for the total amount of the debt.

15   Q    In that situation, is the third-party landowner a signer

16   on the retail installment contract?

17   A    They are not.

18   Q    And is the third-party landowner obligated for the debt

19   under the retail installment contract?

20   A    They're not obligated at -- for the debt but they are at

21   risk of losing the land if the customers don't pay.

22   Q    In a land-in-lieu transaction, how does the fact that land

23   is pledged as additional collateral affect Vanderbilt's

24   decision whether or not to accept the assignment of the real

25   estate contract?

Nichols - Direct / By Mr. Rangel                    34

1   A    Well, it's just -- it's the land is in lieu of a cash down

2   payment which binds -- it makes you think that the person

3   buying the house is committed and willing to make the payments.

4   So it's additional collateral for the loan.

5   Q    And why does Vanderbilt require some form of collateral in

6   financing its transactions?

7   A    Well, the -- you want security for the loan and it's

8   usually the house in a -- but if it has a -- if it's a land-in-

9   lieu deal, it will be the house and the land.

10  Q    And here with the retail installment contract that was

11  signed by Mr. King and Mr. Flores, did you have two types of

12  collateral?

13  A    Yes, sir, we did.

14  Q    What were those two types?

15  A    We had the home which I believe was a Skyline mobile home,

16  if I recall some of the documents we saw and then we had the

17  land that went with the deed of trust.

18  Q    And how does Vanderbilt protect the priority of the land

19  that is pledged on the -- in the contract?

20  A    That would be the deed of trust that the sales center has

21  signed and files in the local county courthouse records.

22       **MR. RANGEL:**  We'll call up CP3 -- CP210.

23  Q    And is this the deed of trust that you were talking about

24  in this particular transaction?

25  A    Yes, sir.

Nichols - Direct / By Mr. Rangel                    35

1   Q    Okay.  And in this deed of trust, you have the names of

2   Maria Trevino and Arturo Trevino.  Do you?

3   A    Yes, sir.

4   Q    Okay.  And looking at the additional collateral in the

5   middle, is that the Skyline mobile home that you were talking

6   about?

7   A    Yes, sir.

8   Q    And what happens to this deed of trust after it's signed?

9   A    It's filed in the local county courthouse public records.

10  Q    Now, to be clear, what company is -- between Vanderbilt

11  and CMH Homes is handling the original execution of the

12  contract at the time that the customer purchases the mobile

13  home?

14  A    I'm sorry.  I didn't --

15  Q    Is that being -- is that handled by CMH Homes?

16  A    CMH Homes is preparing the documents and recording the

17  documents, yes, sir.

18  Q    Okay.  How and when does Vanderbilt get involved in the

19  CMH home sale?

20  A    After the -- of course initially was the credit approval

21  process and then eventually all the documents will come

22  together and the sales processing group will review them to see

23  that all of them are there and that the stipulations that the

24  credit manager wanted are met, the VOEs and VOIs that we saw

25  and then if there was -- I think in this transaction there was

Nichols - Direct / By Mr. Rangel                    36

1   an appraisal that eventually came in.  So once all the

2   documents were there and they met, everything the credit

3   manager wanted and they've appeared completely in order from

4   the -- for the sales processor that looks at the documents,

5   they would fund the transaction.

6   Q    And what factors does Vanderbilt consider in deciding

7   whether or not to provide the financing for a mobile home

8   that's being sold by CMH Homes?

9   A    Some of the things we talked about earlier, of course,

10  reviewing the credit of the customer and verifying that they

11  have jobs and income and can budget and pay for the home.

12  Q    And once Vanderbilt accepts the assignment of retail

13  installment contract and approves the funding, does Vanderbilt

14  have an interest in helping the customer stay in the home?

15  A    We always have an interest in the customer staying in the

16  home, yes, sir.

17  Q    All right.  Does Vanderbilt make money when it seeks to

18  repossess a home?

19  A    We do not, no.

20  Q    So is it in Vanderbilt's interest to help the customer

21  stay in the home?

22  A    I think Ms. Russell helped substantiate that in trying to

23  help the customer stay in the house, yes, sir.

24  Q    Okay.  Well, let's talk about this particular repossession

25  action involving Mr. King and Mr. Flores.  Did Vanderbilt sue

Nichols - Direct / By Mr. Rangel                    37

```
1    Mr. King and Mr. Flores?

2    A    Yes, sir, we did.

3    Q    To repossess the home?

4    A    Yes, sir.

5    Q    Did Vanderbilt sue Maria Trevino or Arturo Trevino?

6    A    We did not.

7    Q    Were Maria Trevino and Arturo Trevino signers to the

8    retail installment contract?

9    A    They were not.

10   Q    Were they obligated for the debt in the retail installment

11   contract?

12   A    They were not.

13   Q    From the beginning with respect to this transaction,

14   Mr. Nichols, what kind of transaction insofar as collateral did

15   Vanderbilt consider this to be?

16   A    We considered this to be a land-in-lieu-of-down-payment

17   transaction with the lots as collateral for the down payment.

18   Q    Is there documentation in the file to reflect that this is

19   a land-in-lieu transaction?

20   A    Yes, there are the warranty deeds and the -- or excuse me

21   -- the deed of trust and the builder's and mechanic's liens.

22   Q    And are there other internal references to the land in

23   lieu?

24   A    The credit application, the approval and the appraisal

25   requirements and those type of things.
```

1  Q    Is there documentation in those files that this was a

2  third-party land-in-lieu transaction?

3  A    Yes, sir.  That would be the deed of trust was in someone

4  else's name other than the people's name that was on the retail

5  installment sales contract.

6  Q    And the jury has seen this exhibit many times, CP1, the

7  retail installment contract?

8  A    Yes, sir.

9  Q    And is this the contract that identifies Mr. Flores and

10  Mr. King as the purchasers of the mobile home?

11  A    It is, yes, sir.

12  Q    And is this the document that identifies the fact that

13  Mr. King and Mr. Flores were going to finance the purchase of

14  the mobile home?

15  A    Yes, sir.

16  Q    Okay.  And does this document on Page 2 reflect that there

17  was no down payment?  At the very top.

18  A    Yes, sir.

19  Q    The second line.

20  A    Yes, sir.

21        **MR. RUMLEY:**  Your Honor, objection to leading.  The

22  document speaks for itself.

23        **THE COURT:**  Overruled.

24  //

25  //

1    **BY MR. RANGEL:**

2    Q    What does the second line show in terms of cash down

3    payment?

4    A    It just shows that there was no cash down payment.

5    Q    Does this contract also contain the payment terms?

6    A    It does.

7    Q    And does this contract contain the interest rate that was

8    approved?

9    A    Yes, sir.

10   Q    Okay.  So generally what are the different roles in the

11   transaction -- this particular -- what were the different roles

12   between CMH Homes and Vanderbilt?

13   A    CMH Homes was the seller of the home and installer of the

14   home and utilities and whatnot.  They recorded the various

15   documents and sent the package to Vanderbilt in conjunction

16   with the credit approval and met the stipulations and then once

17   everything was completed, we paid CMH Homes and took assignment

18   of the contract.

19   Q    And the jury has seen blank assignment language in the

20   contract many times.  I'm not going to go through it again but

21   how -- did Vanderbilt at some point accept the assignment of

22   this contract?

23   A    Yes, there when we paid the loan amount to the CMH Homes.

24   Q    And is there documentation to reflect that?

25   A    Yes, sir.  I believe the installment sales contract says

Nichols - Direct / By Mr. Rangel                    40

1   -- has the assignment language in it, yes, sir.

2   Q    Is there documentation in Vanderbilt's file showing that

3   Vanderbilt paid CMH Homes for the assignment?

4   A    There is, yes, sir.

5            **MR. RANGEL:**  We'll pull up CP46.

6   Q    It's hard to read, Mr. Nichols, but can you explain to the

7   jury what that shows?

8   A    Those are the accounting entries on the Vanderbilt side

9   and moving the money to CMH Homes.

10  Q    And the amount that is shown there, is that the amount

11  that is also shown on the retail installment contract?

12  A    Yes, sir, I believe it is.

13  Q    And is this -- this transaction, is this the transaction

14  that occurred on January 16th, 2002 when Vanderbilt accepted

15  the assignment?

16  A    Yes, sir, it is.

17  Q    Was, in fact, CMH Homes paid in full for that assignment

18  by Vanderbilt?

19  A    Yes, sir, they were.

20           **MR. RANGEL:**  And we'll pull up CP45.  The very

21  bottom.

22  Q    Looking at the last line, what does that say?

23  A    It's the total, 40,815.19.

24  Q    What does "Intercompany VMF auto entries" mean?

25  A    It's the accountant's way of moving money from Vanderbilt

Nichols - Direct / By Mr. Rangel                41

1    to CMH Homes, Inc.  It's an intercompany transfer.

2    Q    And is the amount of $40,815.19, the same amount that is

3    in the retail installment contract that was signed by Mr. King

4    and Mr. Flores?

5    A    Yes, sir, I believe it is.

6    Q    When Vanderbilt accepted the assignment of the contract,

7    did Vanderbilt become the owner of the debt?

8    A    Yes, sir, we did.

9    Q    And was Vanderbilt the owner of the debt when it filed

10   this lawsuit last year?

11   A    Yes, sir, we were.

12   Q    And is Vanderbilt the owner of the debt today?

13   A    Yes, sir, we are.

14   Q    And did that occur when Vanderbilt accepted the assignment

15   from CMH Homes?

16   A    We became the owner of the debt when we accepted the

17   assignment, yes, sir.

18   Q    The jury, Mr. Nichols, has heard about Sales Center 214

19   and you've been here during the testimony.

20   A    Yes, sir.

21   Q    And did you, in fact, at some point have a discussion with

22   Mr. Booth about the problems that surfaced at Sales Center 214?

23   A    Yes, sir, we did.

24   Q    And what was your understanding of the problems that had

25   surfaced or had been identified at Sales Center 214?

Nichols - Direct / By Mr. Rangel                    42

1   A    The notary practices at the sales center were deplorable.

2   The -- in -- the notary practices were deplorable at the sales

3   center, the -- as regards the land documents.

4   Q    Were you happy about what you found out about those notary

5   practices?

6   A    No, sir.

7   Q    Were they acceptable?

8   A    They were not acceptable, no, sir.

9   Q    Did it give you some concern?

10  A    It gave us a lot of concern, yes, sir.

11  Q    And in talking with Mr. Booth, Mr. Booth of course the

12  president of CMH Homes, what did you-all decide to do to

13  address those deplorable notary practices at Sales Center 214?

14  A    We thought the thing to do was release the lien on the

15  land -- on all the land-in-lieu transactions and that's what we

16  did about it.

17  Q    And why was it, Mr. Nichols, that you and Mr. Booth

18  decided to do that, to release the liens on the land in those

19  transactions?

20  A    There was no way to determine which notary was correct on

21  the land documents.

22  Q    And was the nature of the problem with respect to the

23  notary practices focused on the land-in-lieu transactions or

24  transactions that involved land?

25  A    They were focused on the land-in-lieu transactions, yes,

Nichols - Direct / By Mr. Rangel                    43

1    sir.

2    Q    And so to you and Mr. Booth, it didn't make sense to focus

3    the solution on the land?

4    A    Yes, sir, we believed that was the best thing to do.

5    Q    Why do you -- and of course you heard Mr. Booth testify --

6    believe that that was the right and fair thing to do?

7    A    Because you couldn't determine which notary -- which

8    notarized land-in-lieu document was accurate and which was not.

9    Q    In deciding to release the liens on the land in those

10   transactions, did you in any way intend to release the debt or

11   the indebtedness in the real estate contract involved?

12   A    No, sir, we did not.

13   Q    In filing the deed of trust release here and the

14   mechanic's lien release here with respect to the contract

15   signed by Mr. King and Mr. Flores, did you in any way intend to

16   release them from that debt or that indebtedness?

17   A    We did not, no, sir.

18   Q    What was your intention in filing the deed of trust

19   release and the builder's and mechanic's lien release?

20   A    Just release the liens on the land.

21   Q    In making that decision and filing the deed of trust

22   release and builder's and mechanic's lien release, is that

23   something that could negatively impact Vanderbilt financially?

24   A    Certainly both us and CMH Homes are giving up collateral

25   that --

Nichols - Direct / By Mr. Rangel                    44

1          **THE COURT:**  Could you speak up, please, sir?

2          **THE WITNESS:**  Yes, ma'am.  Yes, your Honor.

3          We -- normally you would have cash down payments.  So

4     if you didn't have cash, then basically it's kind of giving up

5     the equity you would have had from the customer.

6     **BY MR. RANGEL:**

7     Q    And was the effect of filing those releases just to

8     release the liens on the land on those transactions?

9     A    It was, yes, sir.

10    Q    And in particular with the transaction involving Mr. King

11    and Mr. Flores, was that the intent to release the lien on the

12    land?

13    A    Yes, sir, it was.

14    Q    Okay.  In the transaction involving Mr. King and

15    Mr. Flores, the land collateral, was that just -- was that

16    separate from the collateral in the mobile home?

17    A    Yes, sir.  Just from my perspective, the installment

18    contract and title is how you secure your interest in the house

19    and the deeds of trust and the builder's and mechanic's liens

20    are how you secure your interest in the land.

21    Q    And in filing the deed of trust release and builder's and

22    mechanic's release, did that in any way release the lien or

23    security interest in the mobile home?

24    A    No, sir.

25    Q    Was the debt that Mr. King and Mr. Flores incurred

Nichols - Direct / By Mr. Rangel                    45

1    separate from the collateral on the land that had been pledged

2    as additional collateral?

3    A    Yes, sir.  They -- their debt was for that, yes, sir.

4         **MR. RANGEL:**  Let's pull up CP12, the deed of trust.

5    Q    This is the deed of trust release that was filed by

6    Vanderbilt; is that true?

7    A    Yes, sir.

8    Q    And anywhere in that deed of trust release, is there any

9    reference to "paid in full"?

10   A    Not that I see, no, sir.

11   Q    Okay.  And the jury has seen the builder's and mechanic's

12   lien release that had language "paid in full"?

13   A    Correct.

14   Q    The builder's and mechanic's lien release was filed by CMH

15   Homes?

16   A    Yes, sir.

17   Q    And the paid-in-full reference in there, was that

18   referring to the money that Vanderbilt paid CMH Homes when it

19   accepted the assignment?

20   A    Yes, sir, it was.

21   Q    Did it refer to the debt by Mr. King and Mr. Flores?

22   A    No, sir, it did not.

23   Q    To this day, have Mr. King and Mr. Flores paid Vanderbilt

24   in full for the debt that they agreed to pay when they signed

25   that retail installment contract?

Nichols - Direct / By Mr. Rangel                    46

1  A    They have not, no, sir.

2  Q     And it's your understanding that they agreed to pay a

3  hundred forty-four payments and they have not made those

4  hundred and four payments --

5  A    That is correct.

6  Q    -- hundred and forty-four payments, correct?

7  A    Correct.

8  Q    During the time that you and Mr. Booth were discussing the

9  decision to file these releases, did you-all at any time have

10 any discussion that you wanted to keep the filing of these

11 releases secret?

12 A    We did not, no, sir.  We made the decision to release the

13 lien, issued the orders and it fell -- went through the

14 process.

15 Q     And is it your understanding that the builder's and

16 mechanic's lien release and the deed of trust release were

17 filed in the public records at the courthouse?

18 A    Yes, sir, they are.

19 Q     And in this particular transaction in the public records

20 of the Jim Wells County courthouse?

21 A    Yes, sir.

22 Q    If you had intended to keep the filing of these releases

23 secret, would you have filed it in the public records?

24 A    No, sir, we would not.

25 Q    Now, there's also been an issue as to notifying the

1   landowners of the filing of the release.  The record shows that

2   the landowners, the Trevinos were not notified.

3   A    That's correct.

4   Q    And what was the thinking behind that?

5   A    I'm not sure there was a lot of thinking behind that.  It

6   went through the process and the process as we saw yesterday on

7   a partial release is that the landowner was not notified.

8   Q    And did you and Mr. Booth make a -- have a specific

9   discussion saying we are not going to notify the landowners?

10  A    No, sir, we did not.

11  Q    Okay.  What was the focus of the discussion that you and

12  Mr. Booth had?

13  A    Release the liens on the land and that's the instructions

14  we gave and that's what happened.

15  Q    Are you aware of any requirement that the landowners be

16  notified when you have a partial release like this?

17  A    I'm not aware of any specific requirement.

18  Q    And, Mr. Nichols, what's your understanding as to the

19  number of parcels of land that were released back in the fall

20  -- October of 2005 as a result of discussions that you and

21  Mr. Booth had?

22  A    Just under 400 pieces of dirt, yeah -- 400 pieces of real

23  estate.

24  Q    And those 400 pieces of real estate, were those out of

25  Sales Center 214?

Nichols - Direct / By Mr. Rangel                    48

1   A    They were all from 214.

2   Q    All right.  And that's where you had identified the

3   deplorable notary practices?

4   A    Yes, sir, it was.

5   Q    Related to the land?

6   A    Yes, sir.

7   Q    Are there indications in VMF's files that confirm that it

8   was not VMF's intent to release the debt?

9   A    Yes, sir, there are.

10  Q    For example, what is the Texas Department of Housing and

11  Community Affairs?

12  A    That's the Texas state department that handles mobile home

13  titles from our --

14  Q    All right.

15       **MR. RANGEL:**  Pull up CP6.

16  Q    Can you identify this document for the jury, Mr. Nichols?

17  A    It's the Certificate of Title on a manufactured home -- I

18  believe this one that we're talking about.

19  Q    And is this sent to the Texas Department of Housing and

20  Community Affairs by Vanderbilt?

21  A    I think Texas -- they actually create this from the

22  documents we sent them for titling and then send it back to us

23  Q    Okay.

24       **MR. RANGEL:**  And we'll get the full screen up.

25  Q    Is there a first lien there?

Nichols - Direct / By Mr. Rangel                     49

1    A     Yes, sir, there is.

2          **MR. RANGEL:**   And we'll highlight the first lien up --

3    right there.   Highlight.   There we go.

4    Q     And what -- does that show that Vanderbilt Mortgage and

5    Finance has the first lien on the mobile home?

6    A     It does show that we're the lienholder on the manufactured

7    home, yes, sir.

8    Q     To your knowledge, has Vanderbilt ever released that title

9    lien with the Texas Department of Housing and Community

10   Affairs?

11   A     It has not, no, sir.

12   Q     If Vanderbilt had intended to release the debt or the

13   indebtedness of Mr. King and Mr. Flores, would it have released

14   that lien?

15   A     Yes, sir.

16   Q     And the fact of the matter is you never released that

17   lien?

18   A     We did not, no, sir.

19   Q     And why not?

20   A     Because they still owed the debt on the retail installment

21   contract.

22   Q     And the intent was to release what?

23   A     Only the land.

24   Q     Okay.   There have been some references to discharging of

25   the debt, the charge-off debt and to consider it paid off.   If

Nichols - Direct / By Mr. Rangel                    50

1   Vanderbilt had done this in this case, what would it have done

2   in addition to making that decision?  What filings would it

3   have made?

4   A    If we had discharged this debt?

5   Q    Yes.

6   A    Well, we would have released our lien on this title.  We

7   would have stamped the installment sales contract paid, sent

8   those things to the customer.

9   Q    And would you have notified the IRS about anything?

10  A    At the end of the year, we would have sent the customer a

11  1099 and we would have sent a 1099 to the IRS.

12  Q    Why?

13  A    It's an IRS rule that we're required -- if we discharge a

14  debt, we send a 1099 to the IRS.

15  Q    What's a 1099?

16  A    I believe it's a miscellaneous income form from the IRS

17  perspective.

18  Q    If Vanderbilt had discharged the debt owed by Mr. King and

19  Mr. Flores, would that have been a form of income to Mr. King

20  and Mr. Flores?

21  A    I'm not a tax expert but the IRS requires us to send them

22  the form and then they would file their taxes.

23  Q    Did Vanderbilt send the IRS a 1099 with respect to this

24  indebtedness by Mr. King and Mr. Flores?

25  A    We did not, no, sir.

1  Q    If Vanderbilt had discharged the debt by Mr. King and

2  Mr. Flores, would you have stopped collection efforts?

3  A    Yes, sir, we would have.

4  Q    In this case, did you stop collection efforts?

5  A    We did not, no, sir.

6  Q    And why did you not stop collection efforts?

7  A    Because they still owed for the home they were living in.

8  Q    Okay.  And did Vanderbilt stamp the retail installment

9  contract "paid" after he filed these releases?

10  A    No, sir.

11  Q    Why not?

12  A    Because we only released the lien on the lands.

13  Q    There's been some reference and Mr. Jordan testified here

14  yesterday that he signed the release for both CMH Homes and for

15  Vanderbilt.  Was he authorized to sign for both -- separate

16  companies?

17  A    Yes, sir.  He's an assistant secretary of both

18  corporations.

19  Q    Okay.  And the jury has seen that the builder's and

20  mechanic's lien release that has the language "paid in full"

21  was signed by Mr. Jordan on behalf of CMH Homes; is that

22  correct?

23  A    Yes, sir.

24  Q    All right.  At the time that that release was signed in

25  October 2005, had the debt already been assigned to Vanderbilt

1   and accepted by Vanderbilt?

2   A    Yes, sir.  We considered the debt assigned to us back when

3   we funded it in 2002.

4   Q    So if the debt was assigned to Vanderbilt, could CMH Homes

5   release the debt that had been previously assigned to

6   Vanderbilt?

7   A    No, sir.

8   Q    Would you tell the jury, Mr. Nichols, what your intent --

9   and you were involved in the decision and Vanderbilt's intent

10  was in connection with the filing of the deed of trust release

11  and builder's and mechanic's lien?

12  A    Our intent was to release the lien on the approximately

13  400 pieces of real estate off of Sales Center 214.

14  Q    Was it ever Vanderbilt's intent to release Mr. King and

15  Mr. Flores from the debt and the indebtedness that they had

16  voluntarily accepted when they purchased the mobile home?

17  A    There was no intent to do that, no, sir.

18          **MR. RANGEL:**  Pass the witness, your Honor.

19          **THE COURT:**  Thank you.  Mr. Rumley?

20                      **CROSS EXAMINATION**

21  **BY MR. RUMLEY:**

22  Q    Good morning, Mr. Nichols.

23  A    Good morning.

24  Q    How are you, sir?

25  A    I'm fine, sir.  Thank you.

1  Q     There was some mention earlier about you gave a

2  deposition, right?

3  A     Yes, sir.

4  Q     And I took your deposition and the date of your deposition

5  was January 18th, 2005?

6  A     That sounds correct, yes, sir.

7  Q     And it is true that during your deposition you testified

8  that you did not report any of the calls with the customers,

9  correct?

10 A     That's correct.

11 Q     And so when Ms. Russell was testifying about these calls

12 in 2003-2004, they would not have been recorded, would they?

13 A     They were not recorded.  They were documented, as she

14 explained, in the system.

15 Q     But there was no recording, correct?

16 A     There was none, no, sir.

17 Q     All right.  But your testimony today is that at some time

18 late 2005, that's when you began recording these calls?

19 A     We purchased the equipment late 2005 and I think they

20 started recording in early 2006.

21 Q     All right.  And I'm right that you don't have any of those

22 recordings to share with us today that relate anything to this

23 case, true?

24 A     We do not, no, sir.

25 Q     All right.   You mentioned -- and I wrote this down -- the

Nichols - Cross / By Mr. Rumley                    54

1   notary practices in Store 214 was deplorable.

2   A    Yes, sir.

3   Q    What do you mean by "deplorable"?

4   A    Evidently they were passing the notary stamp around and

5   other people were using it and signing the notary's name.

6   Q    Do you know whether or not, sir, it is legal for someone

7   to impersonate a notary user stamp and sign their name?

8   A    I don't know if it's -- it doesn't sound legal.  It does

9   not -- I'm not a lawyer but it doesn't sound right.

10  Q    Well, you understand the difference between my wife calls

11  me up and I'm here in trial and she calls and says, hey, can I

12  sign your name to this and I give her permission to sign my

13  name -- that's different than if you are a public official, a

14  notary of the state of Texas?  You understand that, right?

15  A    That would -- I would think so, yes, sir.

16  Q    And one of the things that -- one of the jobs of

17  Vanderbilt is to review the credit application, review the

18  documents that make up the credit application which would be

19  the various documents signed by the customer and notarized,

20  correct?

21  A    Yes, sir.

22  Q    It would also include a deed of trust, mechanic's lien,

23  those types of documents, correct?

24  A    Yes, sir.

25  Q    And it is the job and responsibility of that person within

Nichols - Cross / By Mr. Rumley                55

1    Vanderbilt to review those documents and make sure that they're

2    signed, right?

3    A    Correct.

4    Q    And that they're properly notarized, correct?

5    A    They're going to look at the notary signature and see that

6    it looks proper from their perspective, yes.

7    Q    Right.  I mean, obviously you're the lender, correct?

8    A    Yes, sir.

9    Q    And you're not going to want to lend money on a

10   transaction that could be fraudulent, right?

11   A    We would not, no, sir.

12   Q    And so one of the things that you do as a lender to make

13   sure that you're not going to loan money for a fraudulent

14   transaction is to make darn sure that the documents are

15   properly notarized, true?

16   A    The loan processor is going to review the documents and

17   see that they're all notarized and signed, yes, sir, but the

18   question of whether they're going to know that the notary that

19   stamped it and signed it was legitimate, they would not know

20   that, no, sir.  They're going to go on the face value of what

21   they see.

22   Q    And let's talk about that.  The deplorable notary

23   practices that occurred in Store 214, they relate to a notary

24   named Benjamin Frazier, correct?

25   A    Yes, sir.

Nichols - Cross / By Mr. Rumley                 56

1    Q    And isn't it true, sir, that Benjamin Frazier was fired in

2    2002 for this notary practices, correct?

3    A    That is not my understanding, no, sir.

4    Q    What isn't your understanding?

5    A    I think he was fired because he violated a rule that --

6    Texas had a law change and I don't remember the exact thing but

7    you had to put the house -- when you put a house on a piece of

8    land that the customer owned, you had to do certain things with

9    the title and I don't believe he did that.  So I think that was

10   why -- I'm not perfectly sure.  Mr. Booth would know

11   specifically but I believe he was fired for that -- a different

12   violation.

13   Q    There's no other notary that's involved in these

14   practices, correct?

15   A    I don't think so, no, sir.

16   Q    Everything you've seen and everything the jury is going to

17   see when they hear from Mr. Frazier is it's his notary that was

18   being used?

19   A    Yes, sir.

20   Q    It was his notary that was this -- these deplorable

21   practices, correct?

22   A    Yes, sir.

23   Q    And you do recognize that Mr. Frazier was fired in 2002,

24   right?

25   A    He was fired in 2002, yes, sir.

Nichols - Cross / By Mr. Rumley                    57

1   Q    And you know that Kevin Clayton, the CEO of this company,

2   sent out a voice mail in 2004, right?

3   A    He did, yes, sir.

4   Q    And in that voice mail, he told everybody in the company

5   that the allegations -- the problems with Store 214 relate to

6   the notary practices of an employer who was fired a year ago,

7   correct?

8   A    I believe he said that, yes, sir.

9   Q    What other employee was fired at Store 214 other than

10  Mr. Frazier?

11  A    I don't know but I don't -- I think he kind of combined

12  two stories -- I mean, or two different events, the notary

13  practice and the simultaneously the sales person was fired.

14  Q    Well, can you tell the jury -- identify one other person

15  at Store 214 that was fired?

16  A    I cannot, no, sir.  I'm not that familiar with that on a

17  store level.

18  Q    Now, if we look at the timeline, you gave your deposition

19  in January of 2005, correct?

20  A    Yes, sir.

21  Q    And when you gave your deposition and we went through

22  this, you were aware of the notary practices that were

23  occurring in Store 214, correct?

24  A    We were aware of the allegations and it continued to grow,

25  yes.

Nichols - Cross / By Mr. Rumley          58

1   Q    And they continued to grow.  What do you mean by that?

2   A    Well, I guess we continued to firm up some of the

3   allegations in that perspective.

4   Q    Well, we'll get to this in a little bit but you actually

5   testified in your deposition that if there was an allegation

6   that the signature was forged and there was a fraudulent

7   transaction, one of the things you would do is call the

8   customer, right?

9   A    I may have said that, yes, sir.

10  Q    Well, did you say it?

11  A    I don't recall, sir.

12          **MR. RUMLEY:**  Your Honor, can I show this just to the

13  witness to refresh his memory?  Page 57, Line 23.

14  **BY MR. RUMLEY:**

15  Q    Mr. Nichols, I want you to read this to yourself and ask

16  you if this refreshes your memory as to whether or not -- and I

17  can't see.  So if I'm --

18  A    I'm not sure what line I'm looking for and what page.

19  Q    Right here.

20  A    Oh.

21  Q    Is my finger on the screen?  Let me know when to turn the

22  page.

23  A    Yes, sir, I see.  That's what I said.

24  Q    Okay.  And so back -- and obviously when you gave your

25  deposition, you were under oath, right?

Nichols - Cross / By Mr. Rumley                59

1  A    Yes, sir.

2  Q    And what you told me in 2005 that if you learned that

3  these allegations that a signature had been forged, you would

4  contact the customer?

5  A    I think I said, "without a doubt" in the deposition there,

6  that without a doubt --

7  Q    What you said, sir, is you would talk to the customer and

8  if the allegation was without a doubt -- if you thought

9  something was inappropriate without a doubt, what would you do?

10  A    We'd call the customer is what I said.

11  Q    No, you would release the lien for the customer; am I

12  right?

13  A    I didn't read that far down.  I'm sorry.

14  Q    Let's look at what you said.

15        **MR. RUMLEY:**  Your Honor, can this go to the jury now?

16  He denied it.  So I'm going -- I think we can go to the jury

17  now on it and impeach him with his own testimony.

18        **THE COURT:**  Any objection?

19        **MR. RANGEL:**  Judge, he just said he had not read that

20  far down.  If he could read it, then he can respond to it

21  but --

22        **THE COURT:**  Show it to him and let him read it.

23        **THE WITNESS:**  We would talk to the customer and if it

24  was without a doubt we thought something was inappropriate, we

25  would release the lien for the customer.

EXCEPTIONAL REPORTING SERVICES, INC

1   BY MR. RUMLEY:

2   Q    For the customer.

3   A    Yes.

4   Q    Right, the customer isn't the landowner.  Your customer is

5   the one that signed the contract, right?

6   A    Generally they're one in the same.  Most land-in-lieu

7   transactions, the landowner and the customer are the same

8   person.

9   Q    What you told me in 2005 before you filed these hundreds

10  of releases is that if there was an allegation, what you'd do

11  is you would call the customer, you would talk to them and you

12  would investigate whether or not the allegations were true,

13  false, whatever and then if it was without a doubt true, then

14  what you would do is you would release the lien for the

15  customer, right?

16  A    That's what I said, yes, sir.

17  Q    And the other thing that you said that if you determined

18  that the deed of trust was not valid for any reason -- and you

19  agree with me that deed of trust and mechanic's lien contract,

20  those documents have to be notarized, right?

21  A    They have to be notarized.  I don't know if they have to

22  be notarized to be valid but --

23  Q    Do they have to be notarized for Vanderbilt?

24  A    Yes, sir, they do.

25  Q    In order for them to be -- for you to consider them, they

Nichols - Cross / By Mr. Rumley                    61

1    have to be notarized, right?

2    A    Yes, sir.

3    Q    So if they're not notarized, then they're not valid,

4    right?

5    A    From Vanderbilt's perspective but in the legal world, I'm

6    not sure what that means.

7    Q    And I understand you're not a lawyer, right?

8    A    I am not.  No, sir, I am not a lawyer.

9    Q    And --

10   A    Let's make that clear.

11   Q    -- but you're the president of Vanderbilt, this big

12   mortgage company, right?

13   A    Yes, sir, I am.

14   Q    And just so we're clear, in order for a deed of trust or

15   mechanic's lien contract to be valid to Vanderbilt, they must

16   be properly notarized, right?

17   A    That's correct, yes, sir.

18   Q    And one of the things -- you told me that if you

19   determined that the deed of trust was not valid for any reason,

20   what would you do?

21   A    We'd release the lien.

22   Q    Would you take care of the customer?

23   A    I would release the lien on the -- that was associated

24   with that deed of trust.

25   Q    Do you remember what you told me in 2005 before you filed

Nichols - Cross / By Mr. Rumley                62

1   all these releases?

2   A    Not specifically, no, sir.

3          **MR. RUMLEY:**  Your Honor, this is for the witness

4   only.

5          **THE COURT:**  Yes, sir.

6          **MR. RUMLEY:**  I'm sorry, Page 40, 21.

7   **BY MR. RUMLEY:**

8   Q    Now, sir, start right there at Page 40, Line 21 and read

9   the question and your answer.

10  A    Yes, sir, I see it.

11  Q    All right.  And does that refresh your memory as to what

12  you testified to in 2005?

13  A    Yes, sir.

14  Q    And what you testified to is that if you found that a deed

15  of trust is not valid for whatever reasons, what steps would

16  you take and you said, we're going to make every effort to

17  satisfy and take care of our customer --

18  A    That's correct.

19  Q    -- right?

20  A    And -- may I explain something?

21         **MR. RANGEL:**  Judge, that was not the complete answer

22  that he gave.

23  **BY MR. RUMLEY:**

24  Q    You can read the whole thing.

25         **MR. RUMLEY:**  I have no objection, your Honor, reading

1    the whole --

2              **THE COURT:**  Okay, go ahead.

3              **MR. RUMLEY:**  Do you want me to show it to the jury or

4    do you want him just to read it?

5              **THE COURT:**  You can read it I that's what he wants.

6    **BY MR. RUMLEY:**

7    Q    Sir, let me just read the question to you, right.  "And

8              assume with me you've determined that the deed of

9              trust is not valid for whatever reason, what types of

10             steps would Vanderbilt take?"  And what was your

11   answer?

12   A    "Depending on the circumstances, we're going to

13             investigate it and find out what the situation is on

14             the thing and, I mean, take the appropriate action to

15             resolve it for the customer and I'm not sure what

16             action would be because I'm not sure what the

17             circumstances might be."

18   Q    And then continuing on.

19   A    "We're going to make every effort to satisfy and take care

20   of our customer."

21   Q    The customer, right?

22   A    Yes, sir, and -- can I qualify it, your Honor?  The

23   customer in most land-in-lieu transactions are one in the same.

24   Third-party land-in-lieu transactions are a little different

25   when there's a third party involved.  They're not our customer.

Nichols - Cross / By Mr. Rumley                    64

1  Q    Did I ask you in your deposition whether or not you

2  notified the landowner too?

3  A    No, sir, you didn't.

4  Q    Would you notify the landowner?

5  A    I don't know, sir.  I'm -- from what perspective in --

6  Q    That you were filing these releases.  Would you notify the

7  landowner that you're filing these releases?

8  A    No, I don't think that was required.  I mean, we've talked

9  about that.  I mean, we released the liens on the land.  I'm

10  sorry.  I'm tracking with you.

11  Q    Well, we'll get to the release in a minute.  Clearly,

12  Mr. Nichols, you were aware back in 2001, 2002, 2003, 2004 that

13  notaries within the sales center were notarizing documents,

14  correct?

15  A    There was allegations that the notary practice was not

16  correct, yes, sir.

17  Q    I'm not sure that was my question.  My question was, you

18  were aware that employees of CMH were notarizing documents,

19  right?

20  A    In general, yes.  That's part of what they do, yes.

21  Q    And you were aware because once it gets back into the

22  funding system that the sales associates were actually

23  receiving commissions, correct?

24  A    Yes, sir.

25  Q    And you were aware that none of these transactions were

Nichols - Cross / By Mr. Rumley                    65

1    being closed at a title company, correct?

2    A    That's correct, yes, sir.

3    Q    And you were aware that the documents were being notarized

4    by individuals that had a financial interest in the

5    transaction, correct?

6    A    Yes, sir.

7    Q    Now, one of the things that you -- and by "you," I mean

8    Vanderbilt.  One of the things that you do before you start --

9    before you sue someone, one of the things is you're supposed to

10   go through the file and look for red flags, true?

11   A    They would go through and make sure that all of the

12   documents were right and the names were correct.

13              **MR. RUMLEY:**  We would offer Defendants' Exhibit 206.

14              **MR. RANGEL:**  No objection, your Honor.

15   **BY MR. RUMLEY:**

16   Q    Mr. Nichols, you-all have a operations manual, right?

17   A    Yes, sir.

18   Q    And I assume as president of the company, you've seen it

19   before?

20   A    We have lots of manuals and I've seen some of all of them

21   but I would not say I know every detail of every manual, no,

22   sir.

23   Q    All right.  Well, let me show it to you then.

24              **THE COURT:**  I'm sorry --

25              **MR. RUMLEY:**  Your Honor, we'd offer Exhibit 206.

Nichols - Cross / By Mr. Rumley                     66

1          **THE COURT:**  Was that objected to?

2          **MR. RANGEL:**  No, your Honor.

3          **THE COURT:**  206 is admitted.  Sorry.

4      **(Defendants' Exhibit Number 206 was received in evidence)**

5          **MR. RUMLEY:**  Thank you.

6    **BY MR. RUMLEY:**

7    Q    All right, Mr. Nichols, let me come down here to the

8    bottom.  Do you see where it says, "Vanderbilt Mortgage

9    Operations Manual"?

10   A    Yes, sir, I do.

11   Q    Okay.  And we'd come up here and -- are you familiar with

12   that manual?

13   A    I'm not intimately familiar with that manual, no, sir.

14   Q    But it is a manual that you're aware that's in place

15   within the company?

16   A    It certainly appears so, yes, sir.

17   Q    And it certainly appears a manual in place in the company,

18   someone should be following it, right?

19   A    I would think so, yes.

20   Q    You would think someone within the company would be

21   charged with the responsibility to follow it, true?

22   A    It appears that the legal reps in that group, yes, sir.

23   Q    Okay.  And one of the things that they do -- you read --

24   it says, "A legal representative's primary duty when reviewing

25            a delinquent account is to uncover problems that

Nichols - Cross / By Mr. Rumley                    67

1          could solve legal action.  This is referred to as

2          'looking for red flags.'"  Do you see that?

3  A    Yes, sir.

4  Q    And you're -- are you familiar with that procedure?

5  A    I'm familiar with the word "red flags," yes, sir.

6  Q    Were you familiar with whether or not someone within your

7  company needs to review the file before you bring legal action?

8  A    I would assume that someone in the legal department

9  reviewed the filed before it went.

10 Q    And you agree with me that that would a good thing for a

11 company to do, right?

12 A    Yes, sir.

13 Q    Make sure your ducks are in a row before you sue someone?

14 A    That's correct.

15 Q    And we come down to one of the things they're supposed to

16 look for is misrepresentation within the transaction --

17 A    Yes, sir.

18 Q    -- right?  And then if they discover any problems, they're

19 supposed to summarize it and put it in a report?

20 A    That's correct.

21 Q    And then together they must decide either to propose --

22 either to proceed with legal action or return the file to

23 legal, correct?

24 A    Yes, sir.

25 Q    All right.  Now, it is true -- well, you-all filed the

Nichols - Cross / By Mr. Rumley                68

1   suit in 2009?

2   A    I believe it was 2009, yes, sir.

3   Q    As of 2009, there were policies already in place within

4   this company that prevented individuals from notarizing a

5   document in which they have a financial interest, correct?

6   A    Yes, sir.

7   Q    And so we're clear, there was no policy in place in 2002

8   that prevented someone from notarizing a document in which they

9   had a financial interest, correct?

10  A    No, sir.

11  Q    But after this -- deplorable notary practices were

12  discovered in Corpus, companywide policy came out that said you

13  cannot -- no longer notarize a document if you have a financial

14  interest, right?

15  A    That's correct, yes, sir.

16  Q    We know, do we not, sir, that Benjamin Frazier's notary

17  stamp at least appears throughout not only the deed of trust

18  and mechanic's lien but throughout the transaction file, right?

19  A    I assume there's some other documents notarized in the

20  file, yes, sir.

21  Q    Well, I mean, you knew you were coming here to testify,

22  right?

23  A    Yes, sir.  Yes, sir.

24  Q    And you were coming here on behalf of Vanderbilt?

25  A    I am, yes, sir.

Nichols - Cross / By Mr. Rumley                    69

1   Q    And you've looked at the loan file, right?

2   A    I --

3   Q    Haven't you looked at the loan file?

4   A    I've looked at pieces of the loan file, yes, sir, I have.

5   Q    If -- you agree with me that there are documents in the

6   loan file, in the customer's file that are notarized, correct?

7   A    There are, yes, sir.

8   Q    And if this legal representative is reviewing the file

9   looking for red flags, they would see Benjamin Frazier's notary

10  appearing throughout the transaction file, right?

11  A    They would, sir.

12  Q    And clearly by 2009, you would know about the allegations

13  about Benjamin Frazier, right?

14  A    Yes, sir.

15  Q    In fact, when I took your deposition in 2005, Benjamin

16  Frazier had already been deposed not once but twice, correct?

17  A    I believe that's correct, yes, sir.

18  Q    And you knew from reading those depositions that he had

19  already testified that his signature had been forged as a

20  notary on numbers of documents, right?

21  A    Yes, sir.

22  Q    Well, when you decided to sue Flores and King, why didn't

23  anybody say, wait a minute, we can't do that because it

24  violates our policy and procedure?

25          **MR. RANGEL:**  I would object to the extent he's

 1  getting into any attorney-client communication or privilege.

 2  **BY MR. RUMLEY:**

 3  Q    I'm limiting it, sir, to this red-flags policy and

 4  procedure of reviewing the documents, not what your lawyers

 5  told you or anything.

 6          **THE COURT:**  Okay.

 7          **MR. RUMLEY:**  Just so we're clear.

 8          **THE COURT:**  Thank you.

 9  **BY MR. RUMLEY:**

10  Q    Do you understand, Mr. Nichols?  I'm not asking you what

11  your lawyers have told you or anything.  I'm asking you as the

12  president of Vanderbilt who has a policy in place to review

13  files for red flags before you turn around and sue someone,

14  okay.  My question to you is, you were aware that someone

15  within the company was aware that Benjamin Frazier's notary

16  appears throughout the transaction documents and he was also

17  receiving a financial interest in this transaction, true?

18  A    That is correct, yes, sir.

19  Q    Then how is that it happened?  Isn't that a red flag?

20  A    I don't think the installment sales contract is notarized,

21  sir.

22  Q    But there's a number of documents within the transaction

23  file that must be signed and must be notarized or you would

24  have never approved the loan, true?

25  A    That's correct, primarily all associated with the real

Nichols - Cross / By Mr. Rumley                    71

1   estate.

2   Q     Then let's identify them.  There's two power of attorneys

3   or three?

4   A     Yes, sir.

5   Q     Two?

6   A     Usually two, I think.

7   Q     Two?

8   A     Yes, sir.

9   Q     Okay.  Two power of attorneys, those must be signed, must

10  be properly notarized or you would never fund the loan, true?

11  A     That's correct.

12  Q     All right.  And you know those notaries -- those power of

13  attorneys have Benjamin Frazier's notary stamp on them, right?

14  A     I would assume so, yes, sir.

15  Q     We don't know if he signed them but they appear on it,

16  right?

17  A     They do, yes, sir.

18  Q     And we know that Benjamin Frazier has a financial interest

19  in this transaction, true?

20  A     Yes, sir.

21  Q     Isn't that a red flag?

22  A     I would say from the account rep's perspective, no, but --

23  Q     Well, shouldn't someone up the chain that gets this

24  report?

25  A     I would say no, it was the standard practice.  It was a

Nichols - Cross / By Mr. Rumley                          72

 1    home-only loan.  It went through the normal channels of

 2    being --

 3    Q    Sir, would you -- this -- would Vanderbilt -- would this

 4    company really foreclose and take someone's home if you

 5    discovered the documents were fraudulently notarized?  Would

 6    you do that?

 7    A    I don't think the documents impacted the retail

 8    installment contract that he promised to pay for the home he

 9    was living in, sir.

10    Q    That's not my question, okay?  The jury understands that.

11    I think everybody understands.  We've seen the retail

12    installment contract at least a dozen times, okay.  We

13    understand that that document is not notarized but you and I

14    agree that if they just signed the retail installment contract,

15    you're not going to fund the loan and you're not going to

16    approve the loan, true?

17    A    That's correct.

18    Q    You're not going to fund the loan.  You're not going to

19    approve the loan unless there's a number of other documents

20    that are required to be notarized and are signed, properly

21    notarized and sent to you, right?

22    A    That's correct, yes, sir.

23    Q    And before you do that, that's one of the jobs that

24    Vanderbilt is to review all those and make sure they're

25    properly notarized, correct?

Nichols - Cross / By Mr. Rumley                73

1    A    Yes, sir.

2    Q    All right.  And going back, if you were aware -- and by

3    "you," sir, I mean Vanderbilt Mortgage.  If Vanderbilt Mortgage

4    is aware that a document in a transaction file is fraudulently

5    notarized, would you continue to try to take their home?  Would

6    you do that?

7    A    I think we would proceed under the retail installment

8    contract, yes, sir.

9    Q    So you would continue to sue him?

10   A    Yes, sir.

11   Q    Even if you knew and you were aware that a document was

12   fraudulently notarized by one of your employees?

13   A    I don't know that it was fraudulently notarized, sir.

14   Q    You understand Ben Frazier has testified his signature is

15   forged on these documents, right?

16   A    I -- yes, sir, I do know that, yes, sir.

17   Q    Okay.  So knowing Benjamin Frazier testified -- and only

18   he can say it's my signature or it's not, right?

19   A    Correct.

20   Q    Knowing Benjamin Frazier has testified that the very

21   documents in this case that you're suing over are fraudulently

22   notarized, you think it is appropriate to sue people to take

23   their home?  Yes or no?

24           MR. RANGEL:  Judge, I would object because

25   Mr. Nichols is saying that they're suing on the real estate

Nichols - Cross / By Mr. Rumley          74

1  contract and Mr. Rumley --

2          THE COURT:  Overruled.

3          THE WITNESS:  I think under the terms of this

4  contract, it was appropriate, yes, sir.

5  BY MR. RUMLEY:

6  Q    You are bound by the Berkshire Hathaway ethics policy, are

7  you not?

8  A    Yes, sir.

9  Q    And contained within the Berkshire Hathaway ethics policy

10 is Warren Buffet's rule of thumb, correct?

11 A    It is, yes, sir.

12 Q    And can you explain what Warren Buffet's rule of thumb is?

13 A    Would not want something -- not want an event that you

14 would not want publicized in the newspaper by an informed

15 reporter.

16 Q    We're looking for it but isn't it -- in his rule of thumb,

17 in essence -- and it makes sense.  Before you act -- when

18 you're making a conscious decision to do something or not do

19 something, what he says is think about whether or not that act

20 is going to be on the front page of your newspaper for your

21 family, your friends, your loved ones, for all to read with a

22 reporter of critical acclaim or something like that, right?

23 A    I believe that's correct, yes, sir.

24 Q    All right.  Using his rule of thumb -- and you agree that

25 you're held to that ethical standard, right?

Nichols - Cross / By Mr. Rumley                    75

1    A    Yes, sir, we are.

2    Q    And using that rule of thumb, would you, Mr. Nichols, on

3    behalf of Vanderbilt want this to be on the front page of your

4    paper before your friends and your family and some -- Diane

5    Sawyer interviewing you?  Would you do the act knowing that to

6    be true?

7    A    I believe we're proceeding appropriately from what we know

8    about the transaction.

9              **THE COURT:**  Okay.  I want you to listen carefully --

10             **THE WITNESS:**  Okay.

11             **THE COURT:**  -- to what he said and answer the

12   question.

13             **THE WITNESS:**  Yes, your Honor.

14             **MR. RUMLEY:**  Go ahead.

15             **THE COURT:**  Answer the question.

16             **THE WITNESS:**  I'm sorry.  Could you repeat it one

17   more time?

18   **BY MR. RUMLEY:**

19   Q    Sure.  If, Mr. Nichols, were you aware, okay, of the

20   decision.  Here's the act, okay.  The act is deciding to sue

21   someone to take their home.  Okay, that's the act.  That's what

22   you're deciding in your own mind, the act to sue someone to

23   take their home.  When you're aware the documents are

24   fraudulently notarized in the transaction, if that act was on

25   the front page of the newspaper for your loved ones, for your

1  family and for your friends -- for the world to see and you

2  have an acclaimed reporter, critical reporter Diane Sawyer

3  interviewing you, would you make the decision to continue to

4  sue these people and take their home?

5          **MR. RANGEL:**  Judge, I would object.  It assumes facts

6  not in evidence to be -- if you're suing under the retail

7  installment contract, that is not --

8          **THE COURT:**  Overruled.

9          **THE WITNESS:**  I would not want a story like that, no,

10  sir.

11  **BY MR. RUMLEY:**

12  Q    Has -- have you, sir -- from January 2005 when you were

13  deposed, have you made any reports of any of the ethical

14  conduct that's taken place pursuant to that policy?

15  A    No, sir, other than our corporate management.

16  Q    Ms. Russell, obviously you knew her or you know her?

17  A    I know her better now through deposition, yes, sir -- or

18  not her -- but her testimony.

19  Q    You know her after her coming in and testifying?

20  A    I mean, I knew she was an account rep before but I didn't

21  know her that -- personally.  I did not know her personally,

22  no, sir.

23  Q    One of the things that I think she said over and over is

24  the number one goal of an account rep, the collection account

25  rep is to keep the people in the home?

1  A    Yes, sir, it is.

2  Q    Do you remember her telling the jury that?

3  A    I do, yes, sir.

4  Q    And do you believe that that's true?

5  A    I believe it is true and all the efforts and she went with

6  with these customers kind of substantiate that, sir.

7  Q    All right.  And certainly if what she told the jury is

8  true and is what you as the president of this company is

9  telling the jury is true, then certainly your manuals like

10 collection techniques should also hold true, right?

11 A    That's correct.

12 Q    I mean, it would inappropriate for you, sir, as president

13 of this company to come in and tell this jury, our main goal is

14 to keep people in these homes when your manual, the manual

15 that's used to train your collections says something otherwise,

16 right?

17 A    Yes, sir.

18 Q    That wouldn't be appropriate for you to tell the jury

19 that, would it?

20 A    It would not, no, sir.

21 Q    Have you seen this manual before?

22 A    I believe it's the one that was up the other day?

23 Q    Had you seen it before this trial?

24 A    I've seen lots of manuals, sir.

25 Q    Well, this is Clayton Party's Exhibit 80 and if we look --

Nichols - Cross / By Mr. Rumley                    78

1  just to refresh your memory, Mr. Nichols, this is -- it says,

2  "Vanderbilt Mortgage and Finance" up there at the top, true?

3  A    Yes, sir.

4  Q    And we come down and it says, "Collection Techniques, A

5  Guide to the Collection Call"?

6  A    Yes, sir, I see it.

7  Q    And this is a manual that is put into place for the

8  account reps like Ms. Russell, correct?

9  A    Yes, sir.

10 Q    And one of the things that we saw earlier is the -- is

11 what they're doing when they make these calls is they're

12 panning for gold, right?

13 A    I believe that was an acronym for -- if you read what PAN

14 stood for, as I saw it the other day, right.

15 Q    It's an acronym for getting the money, for collecting

16 money, right?

17 A    It -- and that's what collectors are charged with, yes,

18 sir.

19 Q    And that's their goal, not to keep them in the house but

20 to get money, right?

21 A    No.  It's a combination, sir, and it's a difficult

22 balancing act for an account rep.

23 Q    All right.  Let's see what you train your reps on.  Do you

24 see right here?  Am I reading that right?  Does it say "goals"?

25 A    Goals.

Nichols - Cross / By Mr. Rumley                    79

1   Q    And it says, "Professional collectors know the value of

2            goals.  Goals help you know where you're going and

3            place you in a better position to judge whether or

4            not you're getting there."  Did I read that right?

5   A    Yes, sir.

6   Q    Have you seen this before?

7   A    I have not seen this, no, sir.

8   Q    If we look the number one goal, what does that say?

9   A    "I will collect more dollars."

10  Q    One of the most common goals set by collectors improve on

11  the last month's collections for it to collect a projected

12  number of accounts.  That's the number one goal, right?

13  A    That's part of his goal, yes, sir.

14  Q    His or her goal, right?

15  A    Yes, sir.

16  Q    And, in fact, you pay them based on achieving that goal?

17  A    They have an incentive bonus for achieving goals, yes,

18  sir.

19  Q    Right.  If they're not out there collecting on these, then

20  it's going to affect them financially, true?

21  A    Yes, sir, it will.

22  Q    And then the second one, "I will increase my customer

23  contacts," that's the second goal, right?

24  A    You need to talk to the delinquent customers, yes, sir.

25  Q    Well, actually it says, "increase my number of contacts."

Nichols - Cross / By Mr. Rumley                    80

1   So it's increase the number of people you're calling, right,

2   and that's the second goal, correct?

3   A    Well, I have to call more customers to collect more

4   dollars, yes, sir.

5   Q    Third one, "I will reduce the time spent with each

6   customer."  That's the third goal.

7   A    An account rep is required to manage their time and make

8   lots of calls every day, sir.  So that means they can't spend

9   25 minutes on each call.

10  Q    They shouldn't be on the phone talking about their

11  customer's rabbits or something like that.  They need to be

12  collecting money, correct?

13  A    They are going to have some calls with customers and learn

14  customers have issues and our guys try to work with them.

15  Q    And what you train them as a third goal is to limit the

16  time, right?

17  A    We do train -- you've got to manage your time, yes, sir.

18  Q    And the number one focus of their call when they call

19  these people is money, correct?

20  A    Their number one goal is to work out acceptable payment

21  arrangements, yes, sir.

22  Q    Focus on the money and show me the money.  That's the

23  number one goal of these account reps that call these people,

24  correct?

25  A    If you're in the collection business, yes, sir, you're

Nichols - Cross / By Mr. Rumley                    81

1    interested in the payments.

2    Q    And it is a policy within this company -- or at least it

3    was because I believe it's changed but they can call neighbors,

4    right?

5    A    Yes, sir, they can.

6    Q    They can call family members, right?

7    A    Yes, sir.

8    Q    And you even -- they even have a program in place where

9    they can run an Accurint search on neighbors, correct?

10   A    They are permitted to do that to locate the customer if

11   they can't get a hold of them.

12   Q    And an Accurint search is like a background check on

13   someone, correct?

14   A    I think an Accurint search shows addresses and telephone

15   numbers for customers.

16   Q    It shows a lot more too.  Doesn't it show your employers?

17   It shows a bunch of information about them, criminal record, a

18   run -- it's a lot of information on a person?

19   A    I don't think it shows all that, sir, but I'm not that

20   familiar with it but I don't think we would pay for criminal

21   background checks.

22   Q    You run Accurint checks, correct?

23   A    We run Accurint checks and I believe it gives a limited

24   amount of information on where we might contact the customer.

25   Q    But they're authorized to run these Accurint checks on

Nichols - Cross / By Mr. Rumley                    82

1    someone's neighbor, right?

2    A    I do not know, sir.

3    Q    They can go to the spouse's employer and call there,

4    right?

5    A    If the spouse is on the contract, yes, sir.

6    Q    They can call -- well, they can call neighbors, correct?

7    A    Yes, sir.

8    Q    Obviously a neighbor is not going to be on the contract

9    but they can call them.

10   A    They --

11   Q    That's one of the techniques, true?

12   A    They can call the neighbor to see if the neighbor to see

13   if the customer is still in the house.

14   Q    They can call spouse's employer.  They can call the

15   customer's employer, correct?

16   A    Yes, sir, I believe all that's permitted to call and find

17   the customer.

18   Q    And then if all those things don't work, you can -- they

19   can institute what's called a "field visit" and they actually

20   send someone to go knock on their door, right?

21   A    Yes, sir, we do.

22   Q    And if for some reason they're not home, they can go knock

23   on their neighbor's door?

24   A    They can knock on a neighbor's door and ask them if the

25   customer still lives in the house.

Nichols - Cross / By Mr. Rumley                83

1  Q    And that is perfectly 100-percent appropriate in your mind

2  as president of this company, correct?

3  A    Yes, sir, it is.

4  Q    Do you know any other bank or any other thing that sends

5  people and come knocking on your doors?

6  A    All manufactured housing servicers do that, sir, to my

7  knowledge.  I didn't -- I believe that they do, yes, sir.  I

8  don't know about banks or --

9  Q    Which other ones go knocking on people's doors?

10 A    Well, I would think --

11 Q    You would think.  Do you understand think and know --

12         **MR. RANGEL:**  Judge, may he -- or may --

13         **THE COURT:**  Don't argue, please.

14         **MR. RANGEL:**  Objection, allow the witness --

15         **THE COURT:**  Don't interrupt.  Let him complete his

16 answer, please, sir.

17         **MR. RUMLEY:**  Go ahead.

18         **THE WITNESS:**  I think there are other loan companies

19 that do send out field collectors even in the site-built

20 mortgage world, sir.  I think that is a practice that's

21 certainly in place today.

22 **BY MR. RUMLEY:**

23 Q    Sir, do you understand there's a different between think

24 and know?

25 A    Yes, I do.  I can't absolutely know but I believe it is a

Nichols - Cross / By Mr. Rumley                84

1    common practice when you can't get a hold of customers.

2    Q    And you can't tell me and this jury one other -- one other

3    mortgage company that actually calls the number of people that

4    you-all do or actually goes and knocks on their door

5    (indiscernible)?

6    A    I cannot swear to another mortgage company, no, sir.

7    Q    We talked about this land-in-lieu program and we all agree

8    that the landowner doesn't have to sign off on the retail

9    installment contract, correct?

10   A    Yes, sir.

11   Q    And -- except they do today?

12   A    They do today, yes, sir.

13   Q    You-all changed that policy, right?

14   A    Yes, sir, we did.

15   Q    And you told me back in 2005 the reason why you didn't

16   require a third-party landowner to sign off on the retail

17   installment contract is because they don't agree to pay for the

18   home, right?

19   A    That's correct.

20   Q    You never intended in this land-in-lieu program to make

21   the landowner pay or be obligated for the loan, right?

22   A    If the landowner and the homeowner are one in the same,

23   yes.  They would both be obligated I believe.

24   Q    And I'm talking about a situation like we have in this

25   case, sir, a third-party land-in-lieu.  You never, never

1   intended that this third party land-in-lieu person, someone

2   putting this land up would be obligated to pay the loan, right?

3   A    We did not intend for them to pay the loan.  They're at

4   risk of losing the land should the customers not pay on the

5   retail installment contract.

6   Q    You have looked at the deed of trust and the mechanic lien

7   contract, right?

8   A    Yes, sir.

9   Q    And there's no doubt in your mind that these documents

10  were filed by someone within CMH?

11  A    They were.

12  Q    And they were filed in order to record Vanderbilt's

13  interest in the real property, correct?

14  A    Yes, sir.

15  Q    And they were filed with the intent to record CMH's

16  interest in the real property, correct?

17  A    Yes, sir.

18  Q    No doubt in your mind that you-all filed these and you

19  intended --

20          **THE COURT:**  You need to stand by the microphone and

21  now the jurors want a break.  So we'll take a 20-minute morning

22  break.  Thank you.

23          **THE CLERK:**  All rise for the jury.

24      **(Jurors exited the courtroom at 10:14 a.m.)**

25          **THE WITNESS:**  Your Honor, may I bring water to the --

1          **THE COURT:**  Yes, sir.  You may stand down also.

2          **MR. RANGEL:**  Twenty minutes, your Honor?

3          **THE COURT:**  Yes, sir.  Anything to take up outside

4   the presence of the jury?

5          **MR. SOLTERO:**  Yes, your Honor, briefly.  We have been

6   working very hard on limiting --

7          **THE COURT:**  On the charge?

8          **MR. SOLTERO:**  Well, yes, on the charge but last time

9   we worked on the deposition designation.

10         **THE COURT:**  On the what?

11         **MR. SOLTERO:**  The deposition designation, who they

12  intend to call and we've made significant progress.  We have

13  some objections we would like to take up with the Court at some

14  point but apart from that, because Mr. Moore is taking the

15  Fifth and he was an employee or an agent of the company at the

16  time, we are requesting a limiting instruction at the time he

17  takes his Fifth Amendment in the deposition.  I have a trial

18  brief on it, your Honor, that I would like to provide to the

19  Court together with a -- one case that discusses that.  If I

20  could provide that?

21         **THE COURT:**  You may.

22         **MR. SOLTERO:**  I've already given a copy of all.

23         **MR. J. GUTIERREZ:**  Which case is it?

24         **MR. SOLTERO:**  It's the *Gutierrez* case.

25         **MR. J. GUTIERREZ:**  Is it cited in your brief?

87

1          **MR. SOLTERO:**  It is.

2          **MR. RANGEL:**  And we -- will he file that, your Honor?

3          **MR. SOLTERO:**  Yes, we'll be filing it.

4          **THE COURT:**  Are these just -- you don't just hand me

5   a bunch of cases.  Who did that?

6          **MR. SOLTERO:**  No, Judge, it's just one case which is

7   the *Gutierrez* case.

8          **THE COURT:**  Hand that back.

9          **MR. RUMLEY:**  Your Honor, and we're going to ask for

10  an additional instruction on the inference because we believe

11  the case law in the case that's cited in the Court's -- Supreme

12  Court's -- I mean, the summary judgment order talks about the

13  inference in a civil case and so we would ask for an

14  instruction on the inference of what the answer would have been

15  based on the case that the Court cited in your order.

16         **MR. SOLTERO:**  And, your Honor, we cited in the brief

17  that we submitted previously the Supreme Court of the United

18  States has said that there can be an inference but that's when

19  it's a party takes the Fifth and here we were dealing with a

20  nonparty, nonemployee, nonagent at the time he testified.  It's

21  extremely prejudicial and will result in an unfair trial to

22  have kind of inference foisted upon our client when he's not,

23  number one, a party and, number two, was not an employee, agent

24  or under our control at the time he invoked the Fifth

25  Amendment.

1      **MR. RUMLEY:**  Your Honor, and we can provide

2  deposition testimony to the Court that he was directly under

3  their control.  They hired and paid Mr. Rivera to be his

4  lawyer.  He was clearly under their control.  They hired him --

5  their own Counsel paid for by Clayton Homes, correct?

6      **MR. SOLTERO:**  He was not under our control.

7      **MR. RUMLEY:**  He was -- Mr. Rivera was paid -- hired

8  by Clayton Homes to represent Mr. Moore when he took the Fifth.

9  If that's not under their control, I'm not sure what is and he

10  was a party at the time he took the Fifth.  He was a party in

11  the *Lemos* case and Mr. -- Ms. --

12      **MR. SOLTERO:**  But not --

13      **MR. RUMLEY:**  -- and he was present at the deposition

14  even though Benjamin Frazier was not a party in the *Lemos* case

15  and participated in the deposition.

16      **THE COURT:**  I'm going to allow that in.  Thank you

17  very much.  You're excused.

18      **MR. UNIDENTIFIED:**  Thank you, your Honor.

19      **(A recess was taken from 10:18 a.m. to 10:32 a.m.)**

20      **(Outside the presence of the jury)**

21      **THE COURT:**  Are you-all ready?

22      **MR. RANGEL:**  Just one brief point not with

23  Mr. Nichols.

24      **THE COURT:**  Yes.

25      **MR. RANGEL:**  After Mr. Nichols, we're going to call

1   Maria Trevino, Judge, and I would --

2           THE COURT:  Who?

3           MR. RANGEL:  Maria Trevino.

4           MR. RUMLEY:  My client.

5           THE COURT:  Oh, okay, the other lady.

6           MR. RANGEL:  Right.  And when I was going through

7   everything last night, Judge, I realized that the warranty deed

8   to the brother Gilbert and warrant deed of Hudson, already have

9   this.  They're in evidence.  And I'm just going to show them

10  and that's all.

11          THE COURT:  Good thing you found that out.

12          MR. RUMLEY:  We would still object under 403.

13  Yesterday I tried to show --

14          THE COURT:  I thought they were in evidence.

15          MR. RANGEL:  They're in evidence.

16          MR. RUMLEY:  Yesterday I tried to show the witness

17  the securitization documents that were already in evidence and

18  an objection on appropriate was sustained.  It's the same --

19  just because of the method --

20          THE COURT:  Well, I shouldn't have done that.

21          MR. RUMLEY:  Huh?

22          THE COURT:  I shouldn't have done that.

23          MR. RANGEL:  And I'm not going to prolong it, Judge.

24  I'm just going to show it, confirm the date and all that but

25  they're in evidence.  I didn't realize that they were in

90

1    evidence.

2              **MR. RUMLEY:**  But so were the securitization

3    documents.  I --

4              **MR. RANGEL:**  That's a different issue and the Court

5    -- when Mr. Trevino -- Ms. Trevino gets up, I just did not want

6    to --

7              **THE COURT:**  Well, why are you doing it though?

8              **MR. RANGEL:**  Just to confirm -- so the jury can

9    confirm the date and the property descriptions.

10             **THE COURT:**  Well, why don't you just ask her?

11             **MR. RANGEL:**  Well, Judge, I did that with Mr. Trevino

12   and he said, well, sometime and sometimes it's --

13             **THE COURT:**  But it was before the lien was

14   released --

15             **MR. RANGEL:**  Right.

16             **THE COURT:**  -- and that's the significant point,

17   isn't it?

18             **MR. RANGEL:**  Yeah.  But -- I mean, I -- Judge, I

19   mean, they're entitled to ask the questions.

20             **THE COURT:**  Oh, right.  You're just so pushy,

21   Mr. Rangel.

22             **MR. RANGEL:**  Thank you, your Honor.

23             **MR. LOCHRIDGE:**  And then the other issue --

24             **THE COURT:**  Isn't that a compliment?

25             **MR. RANGEL:**  Any --

```
 1            THE COURT:  Mixed?

 2            MR. RANGEL:  -- any comment from the judge I take as

 3   a compliment.

 4            MR. UNIDENTIFIED:  I feel the same way, your Honor.

 5            THE COURT:  You were much nicer to me when you were

 6   the judge.

 7            MR. LOCHRIDGE:  The other thing, your Honor, would be

 8   to -- for me to make the issue -- the point I want to make with

 9   you with Mr. Stone.  It may -- will come after Mrs. Trevino.

10   So that might be at the lunch break.  I can do it then.

11            THE COURT:  Do you want to do it now?  Tell me what

12   -- you know, I'm not inclined to let him talk about anything.

13            MR. LOCHRIDGE:  Right.  Your Honor, I'll address it

14   right now so the --

15            THE COURT:  Okay.

16            MR. LOCHRIDGE:  The question was raised as to his

17   qualifications by the Court and I don't think they're even

18   disputed in the Court's order.  It notes that neither side

19   disputes its qualifications to testify as an expert in these

20   areas including manufactured home transactions and he's outside

21   and he is about -- he has closed a number of manufactured home

22   transactions.  He's the owner of -- and the operator of a title

23   company as well as a real estate lawyer and he is involved in a

24   lot of those and he's already been recognized as an expert.

25            Now, the reason we need to talk to -- have him come
```

1    in here and talk about custom and practice, your Honor, and not

2    legal interpretation of documents as a custom of practice.

3    They have made a big deal about two issues of intent.  There

4    are two issues of intent that are important in this case and

5    one is the intent of the assignment and the other is some sort

6    of intent to hide things from Mrs. Trevino and Mr. Trevino.

7            They make -- let me take the second one first.

8    They're making a big deal about the fact that we didn't send a

9    copy of the release to the Trevinos, the owners of the property

10   and that's some sort of intent to defraud them.  That's part of

11   their case.  That is a custom and practice across the board of

12   people -- of lenders who -- they routinely do not send --

13   routinely do not send releases of instruments that are filed

14   with the county clerk.  That's just the way it is.  That's what

15   he'll say is the custom and practice.

16           That's the way it is here.  There's no legal

17   requirement to do it and that's what he'll testify to.  That's

18   the custom and practice and there's nothing sinister about not

19   having sent a copy of a release to a landowner after you

20   release the record in the public records.  That's very

21   important to us on this question --

22           **THE COURT:**  Mr. Rumley?

23           **MR. RUMLEY:**  If that was his opinion and if it was so

24   important to them, then why didn't he put it in the report?

25           **THE COURT:**  Is it in the report?

1          **MR. LOCHRIDGE:**  It's -- in the report he refers to

2   the practices of the filing of a mechanic's --

3          **THE COURT:**  No, I -- okay.  Now, that --

4          **MR. LOCHRIDGE:**  The custom and practices, your Honor.

5   Now, he goes on --

6          **THE COURT:**  I excluded all that --

7          **MR. LOCHRIDGE:**  Okay.  He goes on --

8          **THE COURT:**  -- 3 through 18, I think.

9          **MR. LOCHRIDGE:**  Your Honor, he --

10         **THE COURT:**  Show me in the paragraphs that I did not

11  exclude what he wants to testify to.

12         **MR. LOCHRIDGE:**  Okay.  The -- and what the Court --

13  as I read the Court's order, excluded legal conclusion,

14  interpreting documents and so forth but he says -- in Paragraph

15  10, he talks about it's a custom and practice --

16         **THE COURT:**  Okay, 10 is gone.  Three through 18 are

17  gone.

18         **MR. RUMLEY:**  Four through 18.

19         **THE COURT:**  I'm sorry, 4 through 18 are gone.  The

20  first three, there's no point in testifying to but 4 through 18

21  are gone.

22         **MR. LOCHRIDGE:**  Your Honor, the point I'm trying to

23  make and I'm just not articulate enough to make it is that

24  within the paragraphs that you excluded --

25         **THE COURT:**  I didn't -- I did not allow him to

94

1   testify to anything in 4 through 18.

2          **MR. LOCHRIDGE:**  That's fine.

3          **THE COURT:**  I thought if there was something else

4   identified in his report on customs and practices, he can talk

5   about it.

6          **MR. LOCHRIDGE:**  All right.  And there are things --

7          **THE COURT:**  But, I mean, that's what all your people

8   are talking about.

9          **MR. LOCHRIDGE:**  But -- and they're saying that they

10  are not truth tellers and so I think it's important that we

11  come in here with someone who is objective and deals with this

12  every day.

13         **THE COURT:**  Okay.  I have excluded that testimony.

14  So where else in the report outside of 4 through 18 does he

15  want to testify?

16         **MR. LOCHRIDGE:**  I'm not trying to be -- in the

17  Court's order, you gave -- you indicated that there are things

18  where he talks about custom and practice and that that is

19  useful for the jury and that's all that we would like him to

20  testify about is custom and practice.  The Court did exclude 4

21  through 18 which was filled with, in addition to custom and

22  practice, interpreting the effective legal documents.  That's

23  what I understood the Court's order to be.  I'm not going to do

24  that but the custom and practice would be all right and that's

25  what we're trying to do.

1        **MR. RUMLEY:**  Your Honor --

2        **MR. LOCHRIDGE:**  I'll -- but I will the Court, because

3   I don't want to mislead the Court, that in the -- his report,

4   that custom and practice opinion is included in those

5   Paragraphs 4 through 18.  That's true.  It -- but -- and the

6   Court excluded 4 through 18.  My point is that we would like

7   for him to be able to talk about true custom and practice as

8   opposed to the legal effect of documents even though that

9   description of his testimony was in Paragraphs 4 through 18.

10       **MR. RUMLEY:**  Your Honor, this -- on Page 8 of the

11  Court's order, the Clayton Defendants contend that Stone offers

12  only opinions on the custom and practices of real estate

13  lending industries and such opinions are admissible.  That's --

14  it's the same argument.  They're making the same argument.

15  It's the same argument and those 4 through 18 were excluded.

16  The opinions in 1 through 3 are facts that are already in.

17  They're just trying to get around the Court's order and they

18  shouldn't be permitted to do so and Mr. Stone is coming up with

19  some new opinions that are outside of the excluded ones, then

20  they should be excluded because they're not timely noticed.

21       **MR. LOCHRIDGE:**  And the argument that we made -- and

22  I'm reading from the order on the top of Page 9 that we argue

23  that he would provide them with useful information on customs

24  and practices of the industry of the parties in order to allow

25  the jury to make a more informed decision and the Court

1    acknowledges, "Some of Stone's proposed testimony is of this

2    type."  For example, Stone will state when buyer pays their

3    debt in full, Vanderbilt has a practice and so forth.

4    "However, the majority are not limited to talking about

5    customs, the practices and so forth" and that's what I'm trying

6    to deal with here, your Honor, is to let him testify about

7    custom and practices but not about the reader's interpretation

8    of the document.

9            MR. RUMLEY:  And that's -- in the Court's order,

10   that's why 1 through 3 -- they were allowed to talk about 1

11   through 3 and then 19 through --

12           THE COURT:  Well, there's no need to have an expert

13   talk about Vanderbilt's regular practices.  Vanderbilt can do

14   that.

15           MR. LOCHRIDGE:  Yes, but he will do is he will say

16   that those are consistent with the custom and practices in the

17   industry and there's nothing sinister about that.

18           MR. RUMLEY:  That opinion is --

19           MR. LOCHRIDGE:  I'll say one other -- my concern is

20   that we're throwing the baby out with the bath water here in

21   the things that he should be allowed to testify about versus

22   the things that the Court concludes he should not and I urge

23   the Court to let us put him on to testify about custom and

24   practice I've described.

25           THE COURT:  Mr. Rumley?

1        **MR. RUMLEY:**  Your Honor, they made this exact

2   argument in response to my Daubert motion.  The Court reviewed

3   the opinions and they attached the deposition of Mr. Stone and

4   his report and the Court went through and the Court

5   acknowledged their argument that an expert may address those

6   issues but then the Court when considering his deposition as a

7   whole -- his report as a whole made the determination that

8   Paragraphs 4 through 18 were excluded.

9        **THE COURT:**  Yes.  Okay.  Let's call the jury back.

10  Thank you.

11       **MR. LOCHRIDGE:**  Has the --

12       **THE COURT:**  Bring in the jury.

13       **MR. LOCHRIDGE:**  -- Court overruled my --

14       **THE COURT:**  I'll talk to you again about it over the

15  lunch hour --

16       **MR. LOCHRIDGE:**  Okay.

17       **THE COURT:**  -- but I just don't see why he should be

18  allowed to testify.

19       **MR. LOCHRIDGE:**  I appreciate the opportunity to visit

20  with you over the lunch hour.  Thank you, your Honor.

21       **THE COURT:**  Thank you.

22       **THE CLERK:**  All rise for the jury.

23       **(Jurors entered the courtroom at 10:42 a.m.)**

24       **THE COURT:**  Thank you.  You may be seated.  You may

25  proceed.

1                    **CROSS EXAMINATION (RESUMED)**

2    **BY MR. RUMLEY:**

3    Q    Mr. Nichols, I think before we broke for our morning

4    break, I was asking you about in these third-party land-in-lieu

5    transactions, the ones that you-all don't -- you don't do

6    anymore, right?

7    A    We do not, no, sir.

8    Q    And you agree with me that that is a sound decision that

9    if someone is really willing to give up their property that

10   that person should be required to also sign off on the

11   contract, correct?

12   A    Well, the person could simply give the land to the person

13   that wanted to buy the house.

14   Q    Well, I mean, they could give it to them or they can

15   co-sign on the note, right?

16   A    They could co-sign on the note if they wanted to go

17   through the credit approval process but they may not want to

18   obligate them for the debt.  They could just give the lot to

19   the grandchild or child.

20   Q    All right.  And I want to make sure we're clear.  You told

21   the jury that the intent on the mechanic's lien and the deed of

22   trust -- you never intended that the landowner would be

23   obligated to make the payments under the contract, right?

24   A    That's correct.

25   Q    You never intended that the landowner would be obligated

1   to pay for the home?

2   A    That is correct.

3   Q    But you yourself looked at the documents, right?

4   A    Yes, sir.

5   Q    If we look at Exhibit Number 7, this is the builder's and

6   mechanic's lien contract, correct?

7   A    Yes, sir.

8   Q    And you recognize this is the document that Mr. Frazier

9   has testified that his signature was forged, right?

10  A    I recognize the document, yes.

11  Q    And you recognize that to be true, correct?

12  A    I'm -- that his signature was forged on the contract?

13  Q    Yes, sir.

14  A    If that's what he's testified, yes, sir, I'd recognize it.

15  Q    Well, I thought you told us you read his deposition.

16  A    I reviewed a lot of depositions and I don't remember every

17  line item but if that's what he said.

18  Q    And these signatures right here, you understand, sir, that

19  those were forged, right?

20  A    If that's what he said, yes, sir, they are.

21  Q    Is that what he said?

22  A    I do not recall everything in his depositions, no, sir.

23  Q    Well, wouldn't that be something that's pretty significant

24  if you got the document and someone's testified their signature

25  is forged?

Nichols - Cross / By Mr. Rumley                    100

1   A     Sir, there's hundreds of pages of depositions and

2   documents.  If that's what the deposition said and he said

3   they're forged, then I would agree with you it was forged.

4   Q    If we go -- and if that signature is forged, do you

5   consider that to be a fraudulent document?

6   A    I consider it to be an unnotarized document.  I don't know

7   if that makes it fraudulent or not.  I -- that may be a lawyer

8   question but I'd say that it's not notarized correctly.

9   Q    We've already figured out you're not a lawyer, right?

10  A     Yes, sir.

11  Q    I'm asking you as a lender, as a mortgage company.  If

12  that signature is forged -- if he testifies and it's forged, do

13  you consider it to be a fraudulent document?

14  A     No, sir.  I consider it to be a bad notarized document

15  because if the people that owned it signed it, the only thing

16  wrong with it is that it was notarized bad.

17  Q    But you understand that my client said the signatures were

18  forged, right?

19  A    I understand they said that, yes, sir.

20  Q    And there's no -- that's the purpose of the notary is to

21  verify that someone signed the document, right?

22  A     Yes, sir.

23  Q    And if you were aware that a document was fraudulently

24  notarized, you would not have funded the loan, true?

25  A     That's correct.

Nichols - Cross / By Mr. Rumley          101

1    Q    So hindsight -- if hindsight is 20/20 or Monday morning

2    quarterback, if you knew what you did today, you wouldn't have

3    funded this loan, true?

4    A    Had we known it at that time, we would not have, no, sir.

5    Q    Okay.  And if we look -- and again we did this right

6    before the break.  This is a document that would have been

7    filed by CMH, correct?

8    A    Yes, sir, it is.

9    Q    All right.  But this would have been a document that would

10   have recorded CMH's interest in the real property, correct?

11   A    Yes, sir.

12   Q    All right.  And if we look, they have listed Maria Trevino

13   and Arturo Trevino.  Did I read that right?

14   A    Yes, sir.

15   Q    And if we come down and -- and CMH would have prepared

16   this document, true?

17   A    They would have, yes, sir.

18   Q    All of the stores have the ability to just print this off

19   of a computer off a link system, correct?

20   A    That is correct.

21   Q    And then the individuals within the store, the sales

22   associate, the store manager, they would fill this out, right?

23   A    Correct.

24   Q    And then they would take it down and file it?

25   A    Correct.

1   Q    But it's not a document they would have prepared.  It's a

2   document that comes from Tennessee, true?

3   A    It's a document that we've developed over time, yes, sir.

4   Q    All right.  And so presumably whoever developed it knew

5   what they were doing and all that kind of good stuff, right?

6   A    Yes, sir.

7   Q    All right.  And see if I'm reading this right and I know

8   you're not a lawyer but it doesn't it say, Mr. Nichols, "Owner

9   agrees to pay contractor" -- and if we go -- contractor is CMH,

10  right?

11  A    Yes, sir.

12  Q    "Owner agrees to pay contractor the sum of $40,815.19, the

13          contract price, for the purchase of the home and all

14          improvements."  Did I read that right?

15  A    Yes, sir.

16  Q    So they never agreed to pay for the contract, true?

17  A    They were at risk of losing their land if the customers

18  didn't pay for the contract.  They --

19          **MR. RUMLEY:**  Objection, nonresponsive.

20  A    Well --

21  Q    Sir, did they -- did --

22          **THE COURT:**  Listen carefully to the question and just

23  respond to the question.

24          **THE WITNESS:**  Yes, your Honor.

25  //

Nichols - Cross / By Mr. Rumley                 103

1    BY MR. RUMLEY:

2    Q    Did the Trevinos agree to pay CMH the sum of $40,815.19,

3    the contract price, the purchase price of the home?

4    A    That's what the document says, yes, sir.

5    Q    Did they agree to it?

6    A    Yes, sir.

7    Q    They did sign the retail installment contract, right?

8    A    Well -- and this document is designed for the first party

9    where usually the landowner and the owner are all the same --

10   Q    When this document --

11   A    -- but the --

12   Q    I'm sorry.  Go ahead.

13   A    So it may -- the document may not read exactly correct.

14   Q    Right.  But this document was filed, correct?

15   A    Yes, sir, it was.

16   Q    And when this document was filed, CMH contended that the

17   Trevinos agreed to pay $40,000 and change, right?  That was

18   their intent?

19   A    I don't think that was their intent, no, sir.

20   Q    Well, that's what it says.

21   A    Well, I know that's what it says but I'm not sure that was

22   the intent.  The intent was to pledge the land for the down

23   payment on the house.

24   Q    You agree with me, sir, that it says owner agrees to pay

25   contractor $40,000?

Nichols - Cross / By Mr. Rumley                104

1   A    I do agree with you that's what it says, yes, sir.

2   Q    The intent of that language when it was filed was that the

3   Trevinos would pay the $40,000 and change or lose their land,

4   true?

5   A    I don't believe there was any intent that the Trevinos

6   would pay this amount, sir.

7   Q    Well, doesn't that -- isn't that exactly what it says?

8   A    That is what it says but that was not the intent.

9   Q    Then what was the intent?

10  A    The intent was to protect the retail sales center because

11  of the homestead exemption rule in Texas.  I'm not familiar

12  with that but there's -- it requires a builder's and mechanic's

13  lien before they put the house on the property.

14  Q    Then why does it say that?

15  A    It's a -- not a clear document, sir.

16  Q    Do you agree with me it doesn't say that?

17  A    It does not say that, no, sir.

18  Q    And you heard these lawyers over here asking Mr. Trevino

19  and these two guys over here -- if you sign something, you

20  recognize it and you understood it, right?

21  A    Yes, sir.

22  Q    And this document that you-all prepared --

23  A    Yes, sir.

24  Q    -- someone who his capable, more qualified than me to

25  prepare a legal document prepared this document, right?

1   A    Yes, sir.

2   Q    And they're the ones -- CMH is the ones that chose the

3   language --

4   A    Yes, sir.

5   Q    -- right?  And only them -- only the individuals who

6   prepared the documents chose the words -- only them can tell us

7   what they meant when they wrote those words, right?

8   A    They chose the form document, yes, sir.

9   Q    Otherwise, all we're left with, Mr. Nichols -- because you

10  didn't prepare it, right?

11  A     I did not.

12  Q    All we're left with and all the jury is left with is what

13  the language in this contract says demonstrates the intent

14  behind the contract, true?

15  A    It -- I'm not certain that's the intent but that's what

16  the document says.

17  Q    But you can't tell me what the intent is because you

18  didn't draft it?

19  A    I cannot.  I cannot, no, sir.

20  Q    The best evidence is the document itself, right?

21  A    Yes, sir, it is.

22  Q    If we look at Exhibit Number 6, you've seen this document

23  before too, have you not -- deed of trust?

24  A    Yes, sir.

25  Q    And on the deed of trust in this case, you understand,

1    sir, that this signature, this signature and this signature

2    Mr. Frazier has testified someone forged his signature as a

3    notary?

4    A    If that's what he testified, yes, sir, it's forged.

5    Q    Well, you read his deposition, right?

6    A    Yes, sir, I reviewed his deposition.

7    Q    Did he say that?

8    A    If that's what his deposition said, yes, sir, that's what

9    he said.  I'm not trying to be evasive.  I just -- I don't

10   remember every word in the deposition.  I'm sorry.

11   Q    Is it -- would it be significant to you, sir, if the

12   lender who lends money based on the document that his signature

13   was forged?

14   A    Yes, sir.

15   Q    If we look on the deed of trust, it has "Maria Trevino,

16   Arturo Trevino hereinafter called grantor."  Did I read that

17   right?

18   A    Yes, sir.

19   Q    And the same questions, Mr. Nichols, with respect to this

20   deed of trust.  You didn't prepare it, true?

21   A    That's correct.

22   Q    You don't know who prepared it, right?

23   A    I do not know who prepared it.

24   Q    Obviously someone within this Clayton Homes company, a

25   well-qualified person prepared the document, right?

1   A     Yes, sir.

2   Q     They knew what they were doing when they chose the

3   language in the contract, right?

4   A     Yes, sir.

5   Q     And you as president of Vanderbilt knew that this document

6   was going to be filed in the county records to record an

7   interest in someone's property, right?

8   A     This standard form, yes, sir.

9   Q     And since you didn't draft the document, you can't tell us

10  what the intent was behind the language, true?

11  A     I cannot tell the intent behind the language.

12  Q     The best way to figure out the intent of the drafter of

13  this document is to read the language in the document, correct?

14  A     Yes, sir.

15  Q     And if we look -- if we look down here, it says this

16  conveyance, however, is made in trust to secure payment of one

17  retail installment contract of even date.  We've already

18  figured out they're not on even dates, are they?

19  A     They are not, no, sir.

20  Q     Herein the principal sum of -- and then you've got 40,000

21  written out here and then you've got 73,000 here?

22  A     Yes, sir.

23  Q     That should actually match, shouldn't it?

24  A     I believe it should, yes, sir.

25  Q     If someone was doing their job and actually reviewed these

Nichols - Cross / By Mr. Rumley                    108

1  documents, that should have been corrected?

2  A    Yes, sir, it should have.

3  Q    So is that pretty good evidence that someone wasn't doing

4  their job?

5  A    I'd say it's an error that someone missed in a stack of

6  documents, yes, sir.

7  Q    An error that shouldn't have been missed if you're going

8  to loan money, right?

9  A    Yes, sir, we'd like to think that everyone of them would

10 be right but they make mistakes, yes, sir.

11 Q    And the job to review this is not only the CMH person at

12 the Corpus Christi store but the CMH person in sales processing

13 and the VMF person in sales processing in Maryville, Tennessee,

14 correct?

15 A    It is.  It is, yes, sir.

16 Q    So it appears that at least three people missed this,

17 right?

18 A    Yeah, I can't explain why it's different, no, sir.

19 Q    All right.  If we continue on, it says, "Executed by

20 Grantor.  Installment contract of even date in the principal

21 sum of, executed by Grantor."  We go up here.  Grantor is the

22 Trevinos.  That is not true, is it?

23 A    It is not true, sir, no.  The --

24 Q    Do you have any --

25 A    -- the document was designed for the landowner and the

1    homebuyer to be the same.

2    Q    You don't know what the document was designed for because

3    you didn't draft it, right?

4    A    I did not but it reads that way, yes, sir.

5    Q    What it reads is that you file this of record and it tells

6    anybody who looks at it that the Trevinos signed the retail

7    installment contract which is not true, is it?

8    A    It is not true, no, sir.

9    Q    And it is true, is it not, Mr. Nichols, that this contract

10   was sold through securitizations, right?

11   A    It was probably subsequently sold through a

12   securitization, yes, sir.

13   Q    And so the jury understands, what Vanderbilt would do --

14   what your company would do is they would package together all

15   of these loans and then they would sell them to investors,

16   correct?

17   A    In short, yes.

18   Q    And it would go through a bond -- they would be sold

19   through a bond, right?

20   A    Yes, sir.  The cash flow is cut up into bonds and the --

21   Q    And an investor would buy the bond because -- or they

22   would buy the bond based upon their perception of whether or

23   not a loan is going to pay out or not, correct?

24   A    They buy their bond based upon the perception of the whole

25   pool of loans and how it would perform over time.

1   Q    Right.  And when you buy a pool of loans like they did

2   that this one is included in, the investor is hoping that a

3   hundred percent of the people pay their loans, right?

4   A    Certainly.

5   Q    And if a hundred percent pay their loans, then they're

6   doing good in their investment, right?

7   A    They get paid what the bond rate would be, yes, sir.

8   Q    But if a hundred percent of them default, then they lose

9   money, right?

10  A    No, sir.

11  Q    They do not lose their -- lose any money?

12  A    It has been our practice since 1992 for any loan that

13  defaulted in a pool of loans, we purchased it back and paid the

14  investor in full.

15  Q    And we're going to -- we'll get to that.  It's true, is it

16  not, sir, that if a loan is discharged for any reason, that is

17  a situation where you'll repurchase the loan out of the pool,

18  right?

19  A    We would pay the investor in full and buy the loan back

20  out of the pool and then take whatever action with the loan was

21  appropriate.

22  Q    Right.  And so if a loan is repurchased, that's a

23  situation where the loan was discharged, correct?

24  A    No, sir.

25  Q    If a loan is discharged, aren't you obligated to buy it

Nichols - Cross / By Mr. Rumley                    111

1    from the investor -- buy it back?

2    A    We are not obligated to buy back any loans from the

3    investor.  It's been our practice.

4    Q    Okay.  It's been your practice that if you repurchase --

5    if you discharge a loan for whatever reason, it's your practice

6    that you repurchase the loan out of the securitization, out of

7    the investment vehicle, true?

8    A    Yes, sir.

9    Q    All right.  Let me show you what has been marked as -- or

10   what has been entered in evidence as Clayton Exhibit 47.  The

11   loan that was part of this case was sold through a Series 2002A

12   securitization, correct?

13   A    Yes, sir.

14   Q    And this is what is called a -- right up here -- a

15   "prospectus supplement," correct?

16   A    It is, yes, sir.

17   Q    And what a prospectus supplement is that is the literature

18   that Vanderbilt would give to potential investors, right?

19   A    To bond buyers, yes, sir.

20   Q    And the bond buyers, the investors would have reviewed the

21   documents associated with this offering, correct?

22   A    The document -- the prospectus, they would have reviewed

23   the prospectus, yes, sir.

24   Q    And attached to the prospectus, for example, is a list of

25   the various installment contracts, correct?

Nichols - Cross / By Mr. Rumley          112

1   A    I don't know if there's a list of the contracts.  That's
2   -- I think it's more giant pool summary data.
3   Q    It clearly would have told the investors that this is a
4   loan that is backed by real property, correct?
5   A    There's probably 6 or 8,000 loans in that pool and it
6   probably gives them stratifications of the way the pool is, how
7   many loans have land, how many are own only, that type
8   information.
9   Q    Right.  But with respect to this loan, it would have told
10  the investors that it was backed by real property, correct?
11  A    It would have been in the category of loans with land,
12  yes, sir.
13  Q    All right.  And it is true that even after you filed these
14  releases, you never told the investors that the land was
15  released, true?
16  A    That's true.  There's no requirement for us to tell the
17  investors.
18  Q    There is a requirement, is there not?
19  A    I don't think so.  I mean, the pooling servicing
20  agreements are quite long and lengthy and there's reps and
21  warrants we make in there but I don't know that there's
22  anything specific if I release a piece of dirt on a loan that I
23  have to tell the investor.
24  Q    How about Section 3.02?  Do you know if Section 3.02 tells
25  you that if a representation becomes known to be false that you

                    Nichols - Cross / By Mr. Rumley          113

1   have to tell the investor?

2   A    I'm not familiar with that particular section, no, sir.

3   Q    This is the amount, $251 million that you-all made off of

4   this pool, correct?

5   A    We did not make $251 million off of it.

6   Q    You were paid 251 million for this pool of loans, correct?

7   A    We were because we had lent out $251 million worth of

8   loans.

9   Q    Right, but you received 251 million from this auction,

10  correct?

11  A    Yes.

12  Q    And this is 2002A.  There were more than one offering in

13  2002, correct?

14  A    Yes, sir, there were.

15  Q    There were four?

16  A    Probably one about a quarter, yes, sir.  It was our method

17  of funding loans.

18  Q    In 2002, did you make about -- did you receive about a

19  billion dollars from packaging up these loans and selling them

20  to investors?

21  A    I received a billion dollars because I borrowed a billion

22  dollars and this money paid back the borrowing?

23  Q    Who did you borrow it from?

24  A    We borrow from banks and credit lines.

25  Q    And then what you would do with this -- for example, this

Nichols - Cross / By Mr. Rumley          114

1  251 million or the billion that you got in 2002 is you would

2  use that money to then go out and fund future loans, correct?

3  A    Well, we would first pay off the credit lines that allowed

4  us to make the loans.

5  Q    But you would use the money from the securitizations to

6  fund your ongoing operations, correct?

7  A    It was a rolling funding mechanism.  The money from the

8  AVS transaction paid off the short-term credit line.  You

9  borrow more money on short-term credit lines, made more loans,

10 funded them through the AVS, paid off the short-term line.

11 It's a rolling method of funding yourself.

12 Q    Mr. Nichols, my question just very simply, you would use

13 that money to fund your ongoing operations, correct?

14 A    It generated the cash to help us fund the ongoing

15 operations.

16 Q    And so, for example, the money you received in 2002, you

17 would have used that money to continue financing new-home sales

18 in 2003, correct?

19 A    We would have paid off the loans that borrowed the money

20 from to make the home loans, right, and if -- and then we would

21 have borrowed more money on the short-term line, make more

22 loans, issue the AVS for the long-term funding to pay off the

23 short-term loans.

24 Q    Right.  And this is the way you raised capital in order to

25 fund your operations?

Nichols - Cross / By Mr. Rumley                    115

1   A    Yes, sir, it is.

2   Q    Okay.  Today you get your money elsewhere.  Back then,

3   that is how you raised your money to fund your ongoing

4   operations, correct?

5   A    From 1992 through 2003, that's the way we funded our

6   operation, yes, sir.

7   Q    All right, thank you.  Now, I think you testified on a

8   number of times that when you -- you reviewed the releases that

9   were filed, right?

10  A    Yes, sir.

11  Q    We looked at Exhibit Number 11.

12  A    Yes, sir.

13  Q    It has mechanic lien release, right?  And then Exhibit

14  Number 12 is the deed of trust.  It says, "Deed of trust

15  release," right?

16  A    Yes, sir.

17  Q    And I think even though that says, mechanic lien released,

18  deed of trust released, that what you're telling the jury is

19  that you were really just filing a release of the lien; is that

20  right?

21  A    It released the lien on the land, yes, sir.

22  Q    Is that -- that's what you thought was being filed as a

23  release of lien, right?

24  A    That's -- was our intention that those documents would

25  release the lien on the land.

Nichols - Cross / By Mr. Rumley                116

1   Q    Why didn't you just file a release of lien?

2   A    I believe that's what those documents are.

3           **MR. RUMLEY:**  Your Honor, we would offer Exhibit 197

4   and Defendants' 199.

5           **MR. RANGEL:**  May we approach, your Honor.

6           **THE COURT:**  Yes, sir.

7       **(Counsel approached and bench conference began at**

8   **11:04 a.m.)**

9           **MR. RANGEL:**  Judge, these documents were covered by

10  the motion in limine to the extent that they relate to other

11  transactions.

12          **MR. RUMLEY:**  They're releases of liens signed by him.

13  He just denied the release of lien.  They're signed by him.

14          **MR. RANGEL:**  214?

15          **MR. RUMLEY:**  I don't know.  They're signed by

16  Nichols.

17          **MR. RANGEL:**  They're not out of 214.

18          **MR. RUMLEY:**  Yes, they are.

19          **MR. RANGEL:**  214 is what I was asking.

20          **THE COURT:**  (indiscernible) one by him?

21          **MR. RUMLEY:**  He just denied it.  Here they are,

22  Stewart Title.  It's 214.

23          **MR. RANGEL:**  We would object on the grounds of

24  relevancy and we would object --

25  //

Nichols - Cross / By Mr. Rumley          117

1        **THE COURT:**  Overruled.  Thank you.  197 and 199 are

2   admitted.

3        **(Defendants' Exhibits Numbers 197 and 199 were received in**

4   **evidence)**

5        **(Bench conference concluded at 11:06 a.m.)**

6        **MR. RUMLEY:**  Your Honor, we'd offer 197 and 199.

7        **THE COURT:**  I just admitted them.  Thank you.

8        **MR. RUMLEY:**  Thank you.

9   BY MR. RUMLEY:

10  Q    Mr. Nichols, if you had just wanted to "release the lien,"

11  why didn't you just file a release of lien?

12  A    I don't know what the difference is, I guess.

13  Q    Well, I think the jury has heard that these are just forms

14  that are just printed out, right?

15  A    The release of lien that they've used in this document is

16  the standard one that the document control group used to

17  release liens on this group of land, is my understanding.

18  Q    Okay.  Well, let me make sure I heard what you just said.

19  The release that's involved in this case is the standard

20  release that was used for this 214 project, right?

21  A    It was, yes, sir.

22  Q    Okay.  So the jury -- the jury -- it's not the standard

23  release that this company uses.  It's the standard release that

24  was used for the 214 project, right?

25  A    That's -- no, sir.  I may have worded that poorly.  As far

Nichols - Cross / By Mr. Rumley          118

1   as I know, that's the standard release that they use in that

2   department.

3   Q    Well, you saw the Canales releases where it said -- it

4   didn't have the paid in full.  It said -- and there's still a

5   bona fide obligation.  You saw that, right?

6   A    I did see it.  I don't know who created it.  I know they

7   misspelled bona fide.  Yes, sir, I did see that.

8   Q    Well, Mr. Jordan signed it, right?

9   A    He did sign it, yes, sir.

10  Q    He's a capable, qualified individual?

11  A    He is.

12  Q    He's an officer with the authority to sign for the board

13  of directors of this company?

14  A    There -- I don't know.  There may have been lawyers

15  involved in that particular release.  It was different.  I'm

16  not certain.

17  Q    But regardless of whether it's different, if you read that

18  release, there is no doubt in your mind that those people were

19  still obligated to pay on that -- on the loan, right?

20  A    That's correct.

21  Q    If we look at Exhibit 197, is this -- does this document

22  look familiar to you, Mr. Nichols?

23  A    It does not, no, sir.

24  Q    It says, "Release of lien," right?

25  A    It does, yes, sir.

1   Q    Would this be a document -- if you, Mr. Nichols, just

2   wanted to release the lien, is this the form that you would

3   use?

4   A    I do not know what this document is or who -- what its

5   purpose is, sir.  I am not familiar with it.

6   Q    Well, do you recognize that signature?

7   A    Yes, sir, it's mine.

8   Q    You signed that.

9   A    Yes, sir.  I sign a lot of documents.

10  Q    Well, in fact, you signed it before a notary, did you not?

11  A    I did, yes, sir.

12  Q    And when you signed this document, you intended to release

13  the lien, right?

14  A    I did, yes, sir.

15  Q    Why didn't you just file one of these in this Project 214?

16  A    Because I don't know what transaction this one was

17  involved with, sir.

18  Q    No, sir.  The reason why you included "Paid in full" is

19  because, as you told me, in 2005 you wanted to take care of the

20  customer if there was fraud in the transaction; isn't that

21  true?

22  A    No, sir, that's not true.  We released the liens on the

23  land.

24  Q    Then why didn't you file a release of lien, the form at

25  this company?

Nichols - Cross / By Mr. Rumley                120

1   A    It's -- I don't know.  It's one of many forms that's

2   probably available in the company.  I don't know what that

3   count was based on.

4   Q    Isn't it true, sir, that you have the authority if you so

5   chose to release a loan, right?

6   A    If I wanted to, I could discharge a debt, yes, sir.

7   Q    And Mr. Barton, he is -- what position is he within

8   Vanderbilt?

9   A    He is the collection manager.

10  Q    And he has the authority to discharge debt, right?

11  A    Up to a certain limit, yes, sir, he does.

12  Q    And you and Mr. Booth are the ones that made the decision

13  to file this 214 release, correct?

14  A    It is true, yes, sir.

15  Q    And you have the authority if you wanted to to just

16  distinguish all these -- to extinguish all of these loans,

17  correct?

18  A    I would --

19  Q    If you wanted to, you could do it?

20  A    I could -- well, I would consult with my CEO before I

21  released 400 customers from their loan obligation.

22  Q    You would -- would you discuss that with Mr. Booth?

23  A    We'd probably all talk about that, yes, sir, we would.

24  Q    Now, why would you talk to Mr. Booth about it?  If he's

25  already been paid in full, why would -- what's his dog in the

Nichols - Cross / By Mr. Rumley                    121

1    fight?

2    A    Because he may be partially responsible for the loss that

3    the company is going to take.

4    Q    How could he be partially responsible for the loss the

5    company is going to take if this whole assignment thing had

6    taken place and he'd already been paid?  He's paid.

7    A    He was paid but there was a recourse arrangement on how

8    the loans paid out.

9    Q    What does that mean?

10   A    That means if the loan defaulted, he shared in the loss

11   when they repossessed.

12   Q    If the customer defaults, does the store owe Vanderbilt

13   money?

14   A    They could, yes, sir.

15   Q    How can that happen?  If this assignment thing goes

16   through -- it's my understanding as the story goes is that if

17   an assignment takes place, Vanderbilt pays CMH.

18   A    That is correct.

19   Q    Okay.  And so if a customer defaults on the loan, if the

20   story goes as you say, the customer owes the money to

21   Vanderbilt, right?

22   A    The customer owes the money to Vanderbilt, yes, sir.

23   Q    But somehow CMH is still obligated?

24   A    They want to help dispose of the home and bear the cost of

25   selling the repossession, yes, sir.

Nichols - Cross / By Mr. Rumley                    122

1    Q    So who pays who money?

2    A    They would pay Vanderbilt.

3    Q    As the story goes on this assignment, even if there is an

4    assignment, sir, they're -- they don't actually write a check

5    or pay anything, correct?

6    A    I'm sorry?

7    Q    There's not a -- if there is an assignment, Vanderbilt

8    does not send a check to CMH?

9    A    We --

10   Q    There's no --

11   A    -- as we've seen, we transfer the funds for the

12   installment sales contract to CMH Homes, Inc., yes, sir.

13   Q    But it's not like you write a check.  It's just literally

14   a ledger entry, right?

15   A    It is equivalent to writing a check and moving the money

16   from my account to your account.

17   Q    Well, it's -- because it's Clayton Homes, Inc. and Clayton

18   Homes, Inc. owns CMH and Vanderbilt.  So it's just literally a

19   movement of money, right?

20   A    It is a movement of money.  In the old days, it was done

21   by check.

22   Q    The -- we heard yesterday about this vault.  The original

23   documents are stored in the vault?

24   A    Yes, sir.

25   Q    We heard it's kind of like a bank thing where they keep

1   money?

2   A    It's simply a walk-in, fireproof vault.

3   Q    And those -- the original documents are stored in the

4   vault, right?

5   A    Yes, sir.

6   Q    And then if the -- I think we heard that if the

7   installment contract is paid in full, then they're released

8   from the vault; is that right?

9   A    There is a procedure that the document control group goes

10  to get documents.

11  Q    If there is a release of the installment contract from the

12  vault, that would mean that the -- it's been paid in full,

13  right?

14  A    No, sir, not just simply moving it out of the vault to

15  someone else.

16  Q    If you release the contract from the vault, would that

17  indicate it's been paid in full?

18  A    No, sir, it would not.

19  Q    Why would you take an original document out of the vault

20  if it hadn't been paid in full?

21  A    Maybe going to a Bankruptcy Court judge that wants the

22  original.  The -- maybe a judge in a repossession wants to see

23  it.  There's a variety of reasons that original documents get

24  moved around.

25  Q    Well, what other reasons other than if -- you agree with

Nichols - Cross / By Mr. Rumley                    124

1    me that if it's paid in full, the installment contract is

2    released from the vault, right?

3    A    If the customer pays the account in full, it's eventually

4    going to come out and get stamped, yes, sir.

5    Q    All right.  Or if you decided to discharge the loan for

6    whatever reason, it would be released from the vault, correct?

7    A    They would get -- if I decided to discharge it, they would

8    eventually get the original installment sales contract, yes,

9    sir.

10   Q    It would be released from the vault, right?

11   A    It would be moved out of the vault and go through the

12   proper places.

13   Q     Let me show you Clayton -- or actually Defendants'

14   Exhibit 9.  Now, Defendants' Exhibit 9 -- do you see right

15   here, sir, October 3rd, 2005?

16   A    I do, yes, sir.

17   Q    And it says "Release," right?

18   A    Yes, they're going to release the original document out of

19   the vault and give it to one of the document control people.

20   Q    Sir, did I ask a question?

21   A    I'm so sorry.  I'm --

22           **MR. RUMLEY:**  Objection, nonresponsive.

23           **THE WITNESS:**  I'm sorry.

24   //

25   //

Nichols - Cross / By Mr. Rumley                125

1   **BY MR. RUMLEY:**

2   Q    Sir, it's dated October 3rd, 2005, right?

3   A    Yes, sir.

4   Q    That's about the time that all these releases were filed

5   in this Project 214?

6   A    That's correct.

7   Q    All right.  And we come down, "Attention Document

8   Control," right?

9   A    Yes, sir.

10  Q    And it says, "Release of the installment contract"?

11  A    That's what it says, yes, sir.

12  Q    Right?  And you just told me and this jury a little bit

13  ago that one of the reasons why the installment contract would

14  be released from the vault is if you decided to discharge it,

15  correct?

16  A    That's correct.

17  Q    If we come down, here's the loan number, 646307, correct?

18  A    Yes, sir.

19  Q    And "Investor," this is whoever the investor was that

20  invested in this loan?

21  A    That's correct, yes, sir.

22  Q    And then you have, "Customer Name, Mr. Flores," right?

23  A    Yes, sir, it is.

24  Q    All right.  And you come down here, "Deed of trust, DOTM"

25  which stands for the mechanic lien?

Nichols - Cross / By Mr. Rumley                126

1  A    That's correct.

2  Q    All right.  And Norma Brown, who is she?

3  A    I do not know, sir.

4  Q    Terry Hood?

5  A    Works in the legal group.

6  Q    All right.  So someone within the legal group of

7  Vanderbilt?

8  A    Yes, sir, in corporate.

9  Q    Clayton Homes, Inc.?

10  A    Clayton Homes, yes.

11  Q    Okay.  Clayton Homes, Inc., Terry Hood, someone in legal

12  would have, it looks like, requested and then Ms. Norma Brown

13  from Vanderbilt Mortgage would have requested the release of

14  the installment contract for Mr. Flores.  Did I read that

15  right?

16  A    It's a form.  What they requested it looks to me like is

17  the DOT and the mechanic's lien, if you see the bottom of the

18  form.

19  Q    Well, it says, "Release of the installment contract."

20  Is that not what it says, sir?

21  A    It's -- it's a -- yes, sir, it's a form.  That's all it

22  is.

23  Q    Well, it's a form to release the installment contract from

24  the vault, correct?

25  A    It's a form to get documents out of a vault.  That's all

                    Nichols - Cross / By Mr. Rumley            127

1    it is.

2              **MR. RUMLEY:**  Objection, nonresponsive.

3              **THE COURT:**  Please listen carefully to the question.

4              **THE WITNESS:**  Yes, your Honor.  I'm sorry.

5    **BY MR. RUMLEY:**

6    Q    Sir, it is a release -- release of the installment

7    contract, correct?

8    A    No, sir, it is not.

9    Q    So when it says, "Release of installment contract" and

10   identifies the loan number, identifies Mr. Flores, that's just

11   -- it's just wrong?

12   A    It released the document out of the vault to somebody

13   else.  That's all it did.  It did not pay in full any document.

14   Q    In 2005, right?

15   A    Yes, sir.

16   Q    And your testimony is the releases that contain the paid

17   in full, that wasn't your decision as you told me in January of

18   2005 to take care of the customer when there's no doubt in your

19   mind that there was fraud in the transaction, correct?

20   A    I'm sorry.  Could you repeat the question?

21   Q    Yes, sir.  This is exactly what you told me in 2005 in

22   your deposition that if you discovered without a doubt that

23   there was a signature forged in a transaction or fraud within

24   the transaction, this is the way that you chose to take care of

25   the customer, right?

Nichols - Cross / By Mr. Rumley                128

1    A    We chose to take care of the customer by releasing the

2    deed of trust and the mechanic's lien.

3    Q    How does that take care of the customer?

4    A    Because the customer is the one in the majority of these

5    cases that was also the homebuyer.

6    Q    Sir, I'm talking about this case.  It doesn't do anything

7    for the customer, right?

8    A    And the customer in this case got the house.  We financed

9    it for him.  He didn't pay for it.  We released the liens on

10   the land.

11   Q    How did you take care of the customer in this case?

12   A    In the terminology in this one, the Trevinos would have

13   been the customer on the deed of trust.

14   Q    For whatever reason, sir -- well, let me ask you.  You

15   didn't choose the language in the Project 214 releases,

16   correct?

17   A    I did not, no, sir.

18   Q    Do you know who chose to put in the paid-in-full language?

19   A    I do not.  So I assume it was a standard document

20   downstairs.

21   Q    But you don't know that to be true?

22   A    I do not know, no, sir.

23   Q    And what we do know is for whatever reason, just this

24   release of lien was not filed, correct?

25   A    That is correct.

Nichols - Cross / By Mr. Rumley                129

1  Q    Isn't it true that when there is an assignment that takes

2  place that it's actually filed at the courthouse?

3  A    Not for installment sales contracts, no, sir.

4          **MR. RUMLEY:**  Your Honor, may we approach?  May we

5  approach?

6          **THE COURT:**  Yes.

7      **(Counsel approached and bench conference began at 11:18**

8  **a.m.)**

9          **MR. RUMLEY:**  He just testified that they don't file

10  an assignment in the court records.  Right here this is -- this

11  is their standard practice after they got caught.  When --

12  after I sued them in '05, they started filing the assignment of

13  lien.  It just contradicts exactly what he just said.  So I

14  have a deed of trust, a mechanic's lien.  On the -- and on the

15  very day that the mechanic lien is signed, the assignment is

16  filed in the county records.

17          **MR. RANGEL:**  May I see?

18          **THE COURT:**  Yes, sir.

19          **MR. UNIDENTIFIED:**  These are copies.

20          **MR. RANGEL:**  Judge, these are unrelated transactions,

21  unrelated transactions.

22          **THE COURT:**  It has nothing to do with fraud or

23  perjury.

24          **MR. RANGEL:**  I'm sorry?

25          **THE COURT:**  It has nothing to do with fraud or

Nichols - Cross / By Mr. Rumley                130

1    perjury if he's not handling money.  This is relevant if he

2    says he never files assignments --

3          **MR. RUMLEY:**  He just denied that they actually filed

4    the assignments.

5          **MR. RANGEL:**  Well, they didn't file the assignments

6    in connection with those in the 214 project.

7          **MR. RUMLEY:**  Okay.

8          **THE COURT:**  Why don't you ask him again, please,

9    before we get to the documents?

10         **(Bench conference concluded at 11:20 a.m.)**

11   BY MR. RUMLEY:

12   Q    Mr. Nichols, going back to the question I just asked,

13   isn't true that if an assignment takes place that an assignment

14   is actually filed in the county records?

15   A    An assignment of what, sir?

16   Q    Of a mechanic's lien contract.  Isn't it true that -- let

17   me back up.

18   A    Yes, sir.

19   Q    It's my understanding that your testimony and as the story

20   goes is that this mechanic's lien contract was assigned to

21   Vanderbilt, correct?

22   A    It's my understanding that we would consider all the

23   rights assigned in that.

24   Q    And when that occurs, isn't it true that an assignment of

25   that lien is filed in the county records, correct?

                    Nichols - Cross / By Mr. Rumley              131

1    A    I don't know that that's true, sir.  I'm sorry.

2              THE COURT:  You can show them those.

3              MR. RUMLEY:  Your Honor, we would offer Exhibit 486.

4              THE COURT:  No, I just said will you show it to the

5    witness.

6              MR. RUMLEY:  Oh, just to the witness?

7              THE COURT:  Yes, please.

8    BY MR. RUMLEY:

9    Q    Let me show you, Mr. Nichols, Exhibit 486.

10   A    I can't see the top of it.  I'm not sure -- can it --

11   Q    I'm sorry.  I can't see what you're seeing.  So I --

12   A    I'm kind of seeing the first paragraph.  That's better,

13   yes --

14   Q    Is that good?

15   A    Yes, sir, it is.  Can you slide it --

16   Q    Tell me if you want me to move it.

17   A    -- can you slide it that way just a little?  Yeah, that's

18   pretty good right there.  Yes, sir, that is an assignment of a

19   mechanic's lien, I believe.

20   Q    And this would have been a document that was filed by CMH,

21   right?

22   A    It would have.  I believe it's the document we talked

23   about this morning that Mike Shelton talked a little bit about

24   yesterday that Vanderbilt signed the release on.  I think

25   that's what this is.

Nichols - Cross / By Mr. Rumley                132

1   Q    Well, this is an assignment of the contract, right?

2   A    The assignment of the builder's and mechanic's lien?

3   Q    Correct.

4   A    Yes, sir.

5   Q    Isn't it true that the standard practice within this

6   company --

7          **MR. RANGEL:**  Judge, may we approach before he

8   pursues?

9          **THE COURT:**  Yes.

10         **(Counsel approached and bench conference began at 11:23**

11  **a.m.)**

12         **MR. RANGEL:**  Judge, I don't believe that this

13  document is on their exhibit list.

14         **MR. RUMLEY:**  It's not.  It's a rebuttal.  He just --

15  think he would deny it.

16         **MR. RANGEL:**  Wait a minute.  He's not -- this

17  document is not on the exhibit list, your Honor.  He can't --

18  he just can't pull documents that he has not previously

19  identified.

20         **MR. RUMLEY:**  Your pretrial order says every exhibit

21  needs to be identified except for unanticipated rebuttal

22  documents.

23         **MR. RANGEL:**  But this is not rebuttal.  This is cross

24  examination, your Honor.  He cannot --

25         **MR. RUMLEY:**  (indiscernible).

1          **MR. RANGEL:**  Well, he can't spring documents that he

2     has not previously identified on us.

3          **MR. RUMLEY:**  These were produced -- these are

4     attached to the summary judgment as evidence of -- on the

5     assignment issue.  This is not a surprise.

6          **MR. RANGEL:**  It is a surprise.  It's not identified

7     in the exhibit list.

8          **MR. RUMLEY:**  It's because it's -- well, I didn't

9     intend to use it.  I didn't think he was going to get up here

10    and deny that they actually file an assignment of lien.  They

11    do it in every case.

12          **MR. RANGEL:**  No, they don't do that in every case.

13    He has not denied it.  He has not -- this is -- he has not

14    denied that this document -- sure, this is the document that

15    was filed but this does not relate --

16          **THE COURT:**  Why don't we just start asking when he

17    started filing the release of liens on defaults?

18          **MR. RUMLEY:**  You mean assignments?

19          **THE COURT:**  I mean assignments of liens on defaults

20    -- assignment of mechanic's liens on defaults.

21          **MR. RANGEL:**  It was not -- that -- go ahead.  This is

22    not identified in the witness -- in the exhibit list, your

23    Honor.

24          **MR. RUMLEY:**  Well, I can -- I agree.  We didn't

25    identify it on the exhibit list because I didn't anticipate and

Nichols - Cross / By Mr. Rumley            134

1   the Court's order is everything except for --

2          THE COURT:  I understand that.  You know, we don't do

3   this.  Everything you think -- you (indiscernible) you've got

4   to see if these people knew (indiscernible) know exactly who

5   tells the truth and who doesn't.  I think the exhibits

6   (indiscernible).

7          MR. RUMLEY:  Well, we just -- we found these right

8   before the summary judgment.

9          MR. RANGEL:  Well, Judge --

10         MR. RUMLEY:  We found these right before when I was

11  trying to do the summary judgment --

12         THE COURT:  Okay.

13         MR. RUMLEY:  -- but --

14         MR. RANGEL:  Judge, in Federal Court it's trial by

15  ambush.  The Court --

16         THE COURT:  Thank you.  I remember that.

17         MR. RANGEL:  You know, he can't spring documents.  We

18  bent over backwards --

19         THE COURT:  We really need to -- we can talk more

20  over the lunch hour.  Give --

21         MR. RUMLEY:  I don't have any more.  I don't have any

22  more arrows in my quiver, Judge.

23         THE COURT:  Okay.

24         MR. RANGEL:  You know, this is unfair, your Honor.

25         THE COURT:  You may start at (indiscernible).

Nichols - Cross / By Mr. Rumley                    135

1            **MR. RUMLEY:**  Okay.

2         **(Bench conference concluded at 11:25 a.m.)**

3    **BY MR. RUMLEY:**

4    Q    Mr. Nichols, when is it that your company started filing

5    these assignments of liens?  When an assignment is made where

6    Vanderbilt pays CMH for the contract and that contract is

7    assigned that we've heard throughout this case -- when is it

8    that you-all started to file these assignments of liens in the

9    courthouse?

10   A    I believe the builder's and mechanic's lien contract

11   changed from the old version.  It changed over time until it

12   included an assignment in the same document and it was all

13   recorded at the same time.

14   Q    So today --

15   A    To my -- the best of my knowledge, that was how it works.

16   Q    So today you would have actually filed an assignment if an

17   assignment took place?

18   A    I believe that's still the document being used today, yes,

19   sir.

20   Q    And that would have been true back in 2005?

21   A    I do not know when the documents changed over, no, sir.

22   Q    Well, when is it when you would start -- when you started

23   to file these assignments of mechanic's liens?

24   A    I do not know, sir.

25            **MR. RUMLEY:**  Your Honor, that's all the questions I

EXCEPTIONAL REPORTING SERVICES, INC

Nichols - Cross / By Mr. B. Gutierrez                136

1    have.

2              **THE COURT:**  Thank you.

3                         **CROSS EXAMINATION**

4    **BY MR. B. GUTIERREZ:**

5    Q    Mr. Nichols, good morning.

6    A    Good morning, sir.

7    Q    This -- the deed of trust and the mechanic's lien contract

8    that the jury has looked at for the last two days, Exhibit

9    Number 7 --

10             **MR. B. GUTIERREZ:**  Excuse me, your Honor.

11             **THE COURT:**  Wait a minute.   I've got it -- is this

12   admitted?

13             **MR. B. GUTIERREZ:**  Yes, ma'am.

14             **THE COURT:**  Okay, sorry.

15             **MR. B. GUTIERREZ:**  Yes, your Honor.

16   **BY MR. B. GUTIERREZ:**

17   Q    The builder's and mechanic's lien contract has been

18   labeled Exhibit Number 7 plus the deed of trust, Exhibit Number

19   6.  These two documents, Mr. Nichols, were the results of the

20   deplorable conditions that Vanderbilt found at Store 214 here

21   in Corpus Christi; is that right?

22   A    Yes, sir.

23   Q    And these same documents that the jury has looked at now

24   for close to three days --

25   A    Yes, sir.

Nichols - Cross / By Mr. B. Gutierrez          137

1   Q     -- are the same documents that Vanderbilt used to generate

2   millions of dollars by selling loans that were purportedly

3   secured by land through these documents; is that right?

4   A     No, sir.

5   Q     You described for us and -- and as well as the jury a

6   first-party land-in-lieu transaction and a third-party land-in-

7   lieu transaction and you explained that in a third-party land-

8   in-lieu transaction such as the transaction that has now become

9   the basis of this lawsuit that in that situation, the landowner

10  was not obligated to pay a debt.  You've already told us that,

11  right?

12  A     Yes, sir.

13  Q     If you knew that, why did you as president of Vanderbilt

14  accept these documents that we have looked at for close to

15  three days that places a responsibility and a false obligation

16  on the Trevinos in land only?  Why were you accepting this type

17  of documents to generate money for your companies?

18  A     We didn't know that when -- at the time that loan was

19  funded, nobody knew about the documents.

20  Q     If you look at the fine print -- if you look at the

21  documents carefully, not only were they obligating and

22  misrepresenting, by the way, that obligation -- not only were

23  they obligating the Trevinos to pay for a debt they had not

24  contracted for according to your sworn testimony, they were

25  also threatening the Trevinos that if they did not pay this

Nichols - Cross / By Mr. B. Gutierrez          138

1    obligation, they would take their land -- you would take their

2    land, right?

3    A    I don't believe anyone threatened the Trevinos or called

4    them or asked for money or contacted them in any way, sir.

5    Q    Are you saying that these documents that are the result of

6    the deplorable conditions that you found at Store 214 did not

7    -- did not say that if they did not pay the obligation, they

8    would lose their land?  Is that what you're saying under oath?

9    A    I'm saying that if they didn't pay -- if Mr. King and

10   Mr. Flores didn't pay for the home, the Trevinos were at risk

11   of losing the land, yes, sir.

12   Q    That's what this document says?  You don't pay, Mr. and

13   Mrs. Trevino, we can take your land?

14          **MR. RANGEL:**  Objection, your Honor.  That's not what

15   he said.

16   **BY MR. B. GUTIERREZ:**

17   Q    I'm sorry.  What did you say, Mr.  Nichols?

18   A    I said if Mr. and Ms. -- Mr. Flores and Mr. King did not

19   pay for the home, the Trevinos were at risk of losing their

20   land.  I believe that's what I said.

21   Q    Well, the documents speak for themselves, do they not?  I

22   mean, the deed of trust tells the Trevinos that if the

23   purchaser of the mobile home does not pay the debt, they stand

24   the risk of losing their land, right?

25   A    They ran -- yes, sir, that's what it says.

Nichols - Cross / By Mr. B. Gutierrez                139

1   Q    Well, actually it directs them to pay an obligation --

2   this document directs the Trevinos to pay an obligation, to pay

3   $40,000, to pay $17,000 and if they don't -- if they default --

4   if they default, they can lose their land, right?

5   A    I'm not sure exactly what you're saying --

6   Q    Okay.

7   A    -- but from my perspective if the customers don't pay for

8   the house, the people that pledged the land would be at risk of

9   losing the land.

10  Q    Have you read this paragraph here?

11  A    I have not.

12  Q    Okay.  Can you see this?  "In the event of default in the

13            performance of any obligation under the retail

14            installment contract hereby secured in accordance

15            with the terms hereof or of a breach of any of the

16            covenants herein contained to be performed by

17            grantor" -- the grantor we already know is indicated

18  to be in this document Maria Trevino and Arturo Trevino,

19  correct?

20  A    Yes, sir.

21  Q    -- "then in any such event, beneficiary may elect to

22            declare the arrears due and payable that was given

23            all credits required by law and in the event of

24            default on the payment of the net indebtedness due or

25            declared due, it shall thereupon or at any time

1          thereafter be the duty of the Trustee" -- this would

2    be Kevin T. Clayton, right?

3    A     Yes, sir.

4    Q     -- "or his successor or substitute as hereinafter provided

5    at the request of the beneficiary" -- who was the beneficiary,

6    Vanderbilt?

7    A     I believe so, yes, sir.

8    Q     -- "which request is conclusively presumed to enforce this

9          trust and after advertising the time, place and terms

10         of the sale of the above described and conveyed

11         property then subject to the lien hereof and mailing

12         and filing notices as required by the Texas Property

13         Code as then amended, the trustee shall sell the

14         above described property."  That's what it says,

15   right?

16   A     Yes, sir.

17   Q     We saw some documents there that showed that this

18   particular loan was part of an investment pool, right?

19   A     It was, yes, sir.

20   Q     The transactions related to the land-in-lieu program that

21   you were marketing and promoting out of Store 214 required you,

22   Vanderbilt, as well as CMH Homes to exchange documents over the

23   mail, right?

24   A     The documents at the sales center completed would be

25   mailed to us, yes, sir.

Nichols - Cross / By Mr. B. Gutierrez          141

1    Q    And after funding took place, you were wiring funds to --

2    would it be Clayton Homes, CHI and other parties, right?

3    A    Well, it wouldn't be wires.  They'd be intercompany

4    entries.

5    Q    Okay.  And you used -- I mean, you used the wires -- and

6    by "wires," I'm talking telephone, faxes, emails, your link

7    system to complete this land-in-lieu transaction; is that

8    correct?

9    A    Yes, sir, all of those things.

10   Q    You also used the word "partial release," that these

11   releases were partial releases, right?

12   A    Yes, sir, partial release of collateral for the loan.

13   Q    Yeah.  And you agree with me that none of the documents

14   we've seen today shows anywhere that you at any time used that

15   language in any document, the words "partial release"; is that

16   correct?

17   A    That is correct.  Could I elaborate?  That the -- if it's

18   okay.  The partial release from the Vanderbilt's perspective is

19   that we have the collateral of the house and we have the

20   collateral of the loan.  We call it a partial release because

21   we release the lien on the land.  That's the only reason we

22   call it "partial" but the documents that we released the liens

23   on the land with would have released all the deeds of trust and

24   mechanic's lien.  I just -- I'm trying to be -- make sure we're

25   talking about the same thing, sir.

Nichols - Cross / By Mr. B. Gutierrez                142

1   Q    The TDHCA document that was shown to us, the Texas

2   Department of Housing and Community Affairs document that was

3   shown earlier and identified as Vanderbilt -- as having a

4   mortgage lien, do you remember that?

5   A    It's a titled lien on the mobile home, yes, sir.

6   Q    But it clearly says "Mortgage lien," right?

7   A    I -- whatever TMTH in -- TMHD -- the Texas Association

8   puts on there is what's on, yes, sir.

9   Q    And the deed of trust release releases the mortgage lien,

10  right?  And the same language that you saw on that Texas

11  Department of Housing and Community Affairs document that says

12  Mortgage lien, it says Vanderbilt Mortgage and Finance Company.

13  Do you remember that?  That's the same word that --

14  A    I guess -- could we see what we're talking about?  I'm

15  sorry.

16       **(Discussion off the record)**

17  Q    Let's look at it on the screen.

18  A    I just want to make sure we're both talking about the same

19  thing.

20  Q    Right.

21       **(Discussion off the record)**

22  Q    It talks about mortgage lien in favor of Vanderbilt

23  Mortgage and Finance.  Do you see that?

24  A    That's preprinted on the state form, yes, sir.

25  Q    Yeah.  And -- thanks -- and if we look at the deed of

Nichols - Cross / By Mr. B. Gutierrez                143

1    trust release, it talks about a release of the mortgage, right?

2    A    Yes, sir, referring to the land but that's not the way you

3    release a lien on a title.

4    Q    I think one of the questions that Mr. Rangel was asking

5    you concerned this recording and this filing of this lien or

6    notice of lien with the Texas Department of Housing and

7    Community Affairs.  Do you remember that?

8    A    The document we just looked at?

9    Q    Yes, sir.

10   A    I remember the document we just looked at, yes, sir.

11   Q    If you had recorded a release with that, that would have

12   given notice to Mr. Flores and Mr. King that their mortgage had

13   been released, right?

14   A    If I had -- we had signed off on the document --

15   Q    Yes, sir.

16   A    -- we just saw --

17   Q    Yes.

18   A    -- and sent it to the Texas Department of Housing --

19   Q    Yes.

20   A    -- that would have meant we had considered the loan paid

21   in full --

22   Q    Well --

23   A    -- which we did not do.

24   Q    And that would have given notice to Mr. Flores and

25   Mr. King that their lien had been released on their mobile

Nichols - Cross / By Mr. B. Gutierrez          144

1    home?

2    A    Their lien was not released on the mobile home.   They

3    still owed for the house they were living in.

4    Q    I understand but if you done that, sir -- that's what I'm

5    telling you -- it would have advised -- it would have told them

6    -- it would have given them notice that you had released the

7    lien, right?

8    A    If I done that, I would have considered the loan paid in

9    full which we did not consider the loan paid in full.

10   Q    Well, what you didn't do is you didn't notify them when

11   you filed the deed of trust release and the mechanic lien

12   release.  You didn't send them notice of that, did you?

13   A    We did not, no, sir.

14   Q    And you talked about the IRS and filing a 10 -- what was

15   it, a 1099?

16   A    If we discharge a debt, we're required to file a 10099

17   with the IRS.

18   Q    What do you think the I -- the Internal Revenue Service

19   would have done if you filed a discharge of the debt and are

20   required to file a 1099?

21   A    The IRS requires us if we discharge debt to file a 1099.

22   That's just the rules, sir.  I'm not familiar with all the

23   tax --

24   Q    And then the 1099 goes to the customer and lets them know

25   that you discharged the debt, right?

Nichols - Cross / By Mr. B. Gutierrez                145

1    A    Had we discharged the debt, they would have got that, yes,

2    sir.

3    Q    And that would have uncovered this mass of secret releases

4    that you had been filing, right?

5    A    Sir, there was no --

6              MR. RANGEL:  Objection, it's argumentative.

7              THE COURT:  Sustained.

8    BY MR. B. GUTIERREZ:

9    Q    And just going back to a question by Mr. Rumley concerning

10   your testimony of 2005 where you testified that if you found a

11   deed of trust not to be valid that you would do everything to

12   satisfy and take care of your customer, right?

13   A    Yes, sir, I did say that.

14   Q    But you didn't do that in this case.  You sued my clients,

15   right?

16   A    That's because -- I want to explain, all right.

17   Q    Well --

18   A    No, I think it warrants an explanation.

19             MR. B. GUTIERREZ:  Objection.  I object to --

20             THE COURT:  Just a moment.

21             MR. B. GUTIERREZ:  -- Mr. Rangel's client being

22   nonresponsive.

23             THE COURT:  Okay.  Just listen to the question, sir,

24   and answer the question.

25             THE WITNESS:  Yes --

**THE COURT:** Thank you.

**THE WITNESS:** -- yes, your Honor. I'm sorry. Could you repeat the question?

**BY MR. B. GUTIERREZ:**

Q You testified back in 2005 that if you found a deed of trust not to be valid that you would do everything you could to satisfy and take care of your customer?

A Yes, sir.

Q You didn't do that in this case. You sued my client even --

A When I -- that question to me -- the question and the landowner are one in the same but --

Q You think -- are you saying that a deed of trust in this case is valid or not valid?

A The deed -- to my knowledge, it's got a bad notary on it, yes, sir.

Q So you don't have an opinion one way or another that it's valid or not valid?

A As we've established, I'm not a lawyer. I don't know what makes it valid. I just know the notary stamp is bad or the notary signatures are bad --

Q You --

A -- but I don't know that if the notary is bad but the customers would have signed it and I don't know if they did or not, does that make it invalid? I'm not sure. That's, I

Nichols - Redirect / By Mr. Rangel          147

1   guess, what all of the lawyers and everybody else is trying to

2   figure out.

3   Q    You've looked at them for close to three days now, right?

4   A    I have, yes, sir.

5   Q    So do you find them deplorable?

6   A    I find the notary practice awful, yes, sir, I do.

7   Q    No, I'm talking about the documents.  The documents that

8   you just looked at, do you find them deplorable or they're

9   actually trying to enforce some kind of obligation on people

10  that you say --

11  A    I find that inappropriate and incorrect, yes, sir.

12          **MR. B. GUTIERREZ:**  That's all I have.

13          **THE COURT:**  Thank you.

14          **MR. RANGEL:**  May I proceed, your Honor?

15          **THE COURT:**  Yes, sir.

16                    **REDIRECT EXAMINATION**

17  **BY MR. RANGEL:**

18  Q    Mr. Nichols, would you explain to the jury how you

19  understood that question regarding taking care of the customer

20  and in what context you were answering that question?

21  A    Normally the customer and the landowner are one in the

22  same for us is what normally happens.  Third-party land pledges

23  are -- they're a little out of the ordinary for us and so if I

24  -- I think what I said to Mr. Rumley was that if we found the

25  deed of trust was bad, we'd try to make it good with the

Nichols - Redirect / By Mr. Rangel          148

1    customer and in that case, we would probably do the same thing

2    we did here, release the lien on the land.  I didn't say I was

3    going to give him a free house.  The retail installment

4    contract is still valid and the customer got the house.  They

5    should pay for it.

6         I mean, I don't want to make it sound too simple but

7    I guess that's kind of how I viewed it.  If the deed of trust

8    was bad, we'd try to fix that problem, release it and tell the

9    customer and send it to him or whatnot.  And could we have done

10   this process better?  Yeah, maybe we could have but we did it

11   the best we could at the time.  It was an unusual event and we

12   tried to resolve it the best we could.  That's what we did.

13   Q    Mr. Nichols, has Vanderbilt at any time considered Mr. and

14   Mrs. Trevino to be obligated under the retail installment

15   contract?

16   A    No, sir, we have not.

17   Q    And the language that Mr. Gutierrez and Mr. Rumley showed

18   you in DOT 10 --

19        **MR. RANGEL:**  -- I'm sorry, 209 BML.  Next page.

20   Under the BML -- I guess I'm missing where the amount is.

21   Maybe we can find it -- on the first page?  There it is.  I'm

22   sorry.

23   Q    Owner agrees to pay contractor the sum of $40,850.19.

24   This form, would you explain to the jury the difference between

25   a first party and a third-party transaction and how this form

Nichols - Redirect / By Mr. Rangel                    149

1    comes into play?

2    A    Normally the owner of the land and the buyer of the home

3    are the same.  So this would state that the owner of the land

4    who is going to be on the retail installment contract is going

5    to pay CMH Homes for the home.  That's after it's set up,

6    delivered, well, septic, power poles, all those things happen.

7    That's -- to me, that's what this document is about and Texas

8    is the only state we use it in.  It's -- and I don't completely

9    understand the purpose.  It has something to do with the Texas

10   homestead law that before you make an improvement to a

11   homestead, this form is required.  Retail -- CMH Retail files

12   the document to protect themselves until the loan is fully

13   funded.  That's all my understanding is of this document and --

14   Q    And --

15   A    I'm sorry.

16   Q    -- and if you look at that -- this document from the

17   standpoint of being a third-party land-in-lieu, does that

18   language really make sense?

19   A    It does not.  It's really the wrong document.  This

20   doesn't look right.

21   Q    And why does it not make sense?

22   A    Because the landowner and the third party is only pledging

23   the land, if I understand your question right.  That's -- to

24   me, that's the only thing he's pledging.

25   Q    And has Vanderbilt ever considered Mr. and Mrs. Trevino to

1  be obligated under the retail installment contract for that

2  amount which was the amount in the retail installment contract?

3  A     We have not considered that, no, sir, at all.

4  Q     And, in fact, this lawsuit that Vanderbilt has filed to

5  repossess the mobile home, against whom has the lawsuit been

6  filed?

7  A     Mr. Flores and Mr. King.

8  Q     And why have Mr. Flores and Mr. King been sued in this

9  lawsuit by Vanderbilt?

10 A     Because they did not pay for their home.

11 Q     Did Vanderbilt sue Mr. and Mrs. Trevino to repossess the

12 home?

13 A     We did not, no, sir.

14 Q     And why is that Vanderbilt did not sue Mr. and Mrs.

15 Trevino to repossess the home because the obligation under the

16 retail installment contract has not been paid?

17 A     Because we had released the lien on the land previously.

18 Q     And was that the extent of the obligation that Mr. and

19 Mrs. Trevino had in this transaction?

20 A     Yes, sir.

21 Q     The suit to repossess is because of nonpayment under the

22 retail installment contract?

23 A     That's correct, yes, sir.

24 Q     And who was obligated to make the payments under the

25 retail installment contract?

Nichols - Redirect / By Mr. Rangel                    151

1    A    Mr. Flores and Mr. King.

2    Q    Were Mr. and Mrs. Trevino obligated to make the payments

3    under the retail installment contract?

4    A    No, sir, that's not my understanding.

5    Q    And if you look at the Builder's and Mechanic's Lien

6    Contract --

7              **MR. RANGEL:**  Go to the last page.  I'm sorry, the --

8    right above the signatures.  There -- the previous page.  Is

9    this the reordered one?

10   Q    Would you agree, Mr. Nichols, that when looking at a

11   document, the entire document needs to be looked at in order

12   for it to -- for the reader of the document to understand what

13   the document means and says?

14   A    I'm sorry.  I'm not tracking with you.

15   Q    Okay.  When looking at document -- Mr. Rumley was asking,

16   well, if you look at this language and that particular language

17   tells you what the document intends or means.  Do you remember

18   Mr. Rumley asking you that question?

19   A    Yes, sir.

20   Q    What I'm asking you -- I mean, is it your understanding

21   that you've got to look at the entirety of the document to

22   understand what it means?

23   A    Yes, sir, you should.

24   Q    And the document -- the Builder's and Mechanic's Lien

25   Contract -- has this language on the last page, "This

1   conveyance is made in trust to accrue the payment of an

2   indebtedness of" -- what names are in there?

3   A    Cesar Flores and Mr. Alvin King.

4   Q    -- "as evidence by a certain retail installment contract

5   in the amount of $40,858.19" -- is that what it says?

6   A    Yes, sir.

7   Q    So if you look at the entirety of this document, does it

8   make clear that it was Mr. Flores and Mr. King who owed the

9   money under the retail installment contract and not Mr. and

10  Mrs. Trevino?

11  A    That is correct, yes.

12  Q    You look at the entirety of the document?

13  A    Yes, sir.

14  Q    And is that the fair thing to do?

15  A    To read the whole thing, yes, sir.

16          **MR. RANGEL:**  Let's pull up CP8, Release from the

17  Vault document.

18      **(Discussion off the record)**

19  Q    Mr. Nichols, is this the document that Mr. Rumley was

20  asking you questions about?

21  A    Yes, sir.

22  Q    And it has "Release" at the top.  What does that mean in

23  the context of this document?

24  A    It's just to get something out of the vault.

25  Q    And Mr. Rumley -- and what are those two -- you have DOT

1   and ML.  What does "DOT" stand for?

2   A    The deed of trust and the mechanic's lien.

3   Q    And if you look -- again, if you look at the entirety of

4   the document, not just focusing on the reference -- and we

5   talked about every document is going to have a reference.  If

6   you look at the entirety of the document going to Paragraph 5

7   where an X is marked -- Mr. Rumley didn't show this.  What is

8   it showing where the X is marked?

9        MR. RUMLEY:  Your Honor, objection, leading and

10  argumentative with his own witness.

11       MR. RANGEL:  Judge, I'm just -- he questioned him --

12       THE COURT:  Overruled.

13       THE WITNESS:  I believe the document was just

14  requesting to get the deed of trust and the mechanic's lien.

15  BY MR. RANGEL:

16  Q    And how do you know that's what the document says?

17  A    That's what it says.

18  Q    Okay.  Paragraph 5, what is "DOT"?

19  A    Deed of trust.

20  Q    What is DOTM?

21  A    I think it's their acronym for mechanic's lien.

22  Q    And so if you look at the entirety of the document, not

23  just focusing on the reference, what is this document telling

24  you?

25  A    They're just getting two documents out of the vault is

Nichols - Redirect / By Mr. Rangel                    154

1    what --

2    Q    And what two documents are they getting out?

3    A    The mechanic's lien and the deed of trust.

4    Q    Does this release in any way say that the indebtedness

5    under the contract is being released?

6    A    No, sir.

7    Q    You were asked questions about the notary practices in

8    which you found them to be deplorable; is that correct?

9    A    Yes, sir.

10   Q    And that's what you had told the jury, right?

11   A    It is, yes, sir.

12   Q    Now, the retail installment contract -- to your knowledge,

13   has there ever been any question that the signature of

14   Mr. Flores and the signature of Mr. King are genuine and

15   authentic?

16   A    It's my understanding they signed the document, yes, sir.

17   Q    And they've testified in court here before this jury that

18   they signed that document and those are their signatures --

19          **MR. RUMLEY:**  Your Honor, objection, leading.

20          **MR. RANGEL:**  I apologize.

21   **BY MR. RANGEL:**

22   Q    What have they testified to regarding their signatures on

23   that document?

24   A    That they were legitimate.

25   Q    And were -- was there any necessity on the document for

Nichols - Redirect / By Mr. Rangel                    155

1    those signatures to be notarized?

2    A    There's no notary requirement, no, sir.

3    Q    So going back to the decision to release the lien on the

4    land, why did -- was it limited to the lien on the land?

5    A    Because the notary practice ran to bad land documents.

6    The bad notary practices are on the land documents is how we

7    viewed it.

8    Q    Did that have anything to do with the signatures of

9    Mr. King and Mr. Flores on that retail installment contract?

10   A    No, sir.  They borrowed the money.  They got the house.

11   They agreed to pay it back.

12         **THE COURT:**  If you could find a place to kind of wrap

13   up.

14         **MR. RANGEL:**  Yes, your Honor.

15   **BY MR. RANGEL:**

16   Q    Is there anything in the questions that you were asked by

17   Mr. Rumley and Mr. Gutierrez that changes your testimony as to

18   the intent behind the decision that you and Mr. Booth made and

19   the intent behind the filing of the deed of trust release and

20   builder's and mechanic's release?

21   A    No, sir.

22   Q    And that intent was what?

23   A    To release the lien on the loans -- to release the lien on

24   the land associated with the land-in-lieu transactions.

25   Q    And why was it to release the lien on the land?

Nichols - Recross / By Mr. B. Gutierrez        156

1   A    Because the retail installment contract still secured the

2   obligation on the house.

3            MR. RANGEL:  Pass the witness, your Honor.

4            THE COURT:  Thank you.

5            MR. RUMLEY:  No questions, your Honor.

6            MR. B. GUTIERREZ:  I have one question.

7                    RECROSS EXAMINATION

8   BY MR. B. GUTIERREZ:

9   Q    Mr. Nichols, would you have funded this contract without

10  this -- what we described as deplorable documents?

11  A    We would not have, no, sir.

12           MR. B. GUTIERREZ:  That's all I have.  Thank you.

13           THE COURT:  Thank you.  You may stand down.   Come

14  back about 1:15.  Thank you very much.  Would you stand for the

15  jury?

16           THE CLERK:  All rise for the jury.

17      (Jurors exited the courtroom at 12:02 p.m.)

18           THE COURT:  You can stand down.  Thank you.

19           THE WITNESS:  Oh, thank you, ma'am.  Thank you, your

20  Honor.

21      (Witness stepped down)

22           THE COURT:  Anything to take up?

23           MR. LOCHRIDGE:  Your Honor, I have my continuing plea

24  on Mr. Stone which we could either do before or after lunch.

25           THE COURT:  I just don't know what the area for

1    expertise is that would beneficial for the jury in this

2    particular case.

3              **MR. LOCHRIDGE:**  Yes, your Honor.  And the areas of

4    expertise is that he is -- got -- he has expertise in the sale

5    of manufactured homes --

6              **THE COURT:**  But is that in his report?

7              **MR. LOCHRIDGE:**  Well, it was note -- yes, it was

8    noted that in his -- his resume talks about his years of

9    experience in the real estate industry and as a title company

10   and he was recognized --

11             **THE COURT:**  I understand that but this particular --

12   it's understood that these particular mobile homes never go

13   through -- never closed at a title company.

14             **MR. LOCHRIDGE:**  He is -- but the point -- here's the

15   point that I'm trying to get through is that he has experience

16   as a title company officer and how releases are filed, whether

17   or not -- very important and any --

18             **THE COURT:**  Okay.  I guess I'm not understanding what

19   that has to do with this because these people got a release of

20   lien and they say they didn't even owe anything.  I mean, and

21   they never paid a penny.  So why -- if they got a release of

22   lien, why wasn't it mailed to them?  Why weren't they notified?

23             **MR. LOCHRIDGE:**  And that's exactly the point that

24   he'll testify about and that is, number one, there's no

25   requirement to send out a release, number one, no legal -- and

1    number two --

2              THE COURT:  Well, I understand that but these --

3              MR. LOCHRIDGE:  -- no one does it.  No one in the

4    industry does it.

5              THE COURT:  Okay.

6              MR. LOCHRIDGE:  And they're trying to say that that's

7    an evidence of a terrible mass --

8              THE COURT:  Well, it was --

9              MR. LOCHRIDGE:  -- mass secret release.

10             THE COURT:  You know what?  You know what, I think

11   you can let -- I think I'll let him testify about it's not

12   customary.  I think that'll -- I think that you can deal with

13   that very appropriately.

14             MR. RUMLEY:  Well, I mean, my argument goes back --

15   just because he argues this thing -- they filed a brief in the

16   Daubert.  We rely on the Court's word.

17             THE COURT:  I understand that.

18             MR. RUMLEY:  I even asked Mr. Stone, you're a lawyer.

19   You understand your obligations under Rule 26.  He says, right.

20   And you feel like when you drafted this report, you complied

21   with Rule 26 and he did and that's his testimony.  The Court --

22   they briefed this.  They've argued this now five times.  The

23   Court has excluded his opinions and to allow it to come in just

24   because he continues and continues and continues to ask, it

25   doesn't change the --

1          **THE COURT:**  I understand that but I don't see any

2    reason why he can't testify to the one question, it's not

3    customary to send out copies of the releases to the debtor.

4          **MR. RUMLEY:**  Because then if I cross, then I somehow

5    will open the door and 4 through 18 come in, your Honor, and --

6          **THE COURT:**  Huh-huh --

7          **MR. RUMLEY:**  -- it's just -- it's unfair.

8          **THE COURT:**  -- that's what I'm --

9          **MR. RUMLEY:**  I mean, I understand the --

10         **THE COURT:**  I don't know why you wouldn't want it in

11   actually.  It'd be great cross examination.

12         **MR. RUMLEY:**  Because there's nothing in his report,

13   not even any excluded paragraphs about these mass releases.

14         **THE COURT:**  I'm just saying you can ask him all about

15   nonnotarized documents, how valid are they.  You can ask him

16   about all those kind of things.

17         **MR. RUMLEY:**  To these things, he'll just say

18   whatever.  I mean, that's the problem, Judge.  He's a paid

19   expert.  They've had five witnesses up here to tell their Story

20   1 and Story 2.  They have a paid lawyer come in like he's some

21   authority on the law because he's a lawyer.  I mean, I could go

22   hire two lawyers and have them come up and say it's not

23   appropriate to file mass releases.  It goes back to the exact

24   same argument that they've made before and that Mr. Lochridge

25   has made now five times and he tried to set out opinions.  They

1  did their -- they gave it their college try and the Court

2  excluded --

3          **THE COURT:**  I have excluded already.  I'm going to

4  stay with the exclusion.  I just don't know why Mr. Rumley

5  doesn't want it in, to tell you the truth.  It seems like such

6  a bonus for him but I'm going to leave it out.

7          **MR. LOCHRIDGE:**  So where are we right now?

8          **THE COURT:**  We're without Mr. Stone.

9          **MR. LOCHRIDGE:**  Period, paragraph.  I've heard the

10 Court.

11         **MS. RODRIGUEZ:**  Your Honor --

12         **THE COURT:**  Yes.

13         **MS. RODRIGUEZ:**  -- one housekeeping item on the

14 exhibits.

15         **THE COURT:**  None overarching.

16         **MS. RODRIGUEZ:**  Not overarching and very narrow and

17 focused, your Honor.  Exhibit 96 and I think the party that

18 moved for admission is the attachments to the report of our

19 handwriting expert Larry Stewart and Mr. Rumley raised an issue

20 about redacting the portions of the plea agreements of

21 Mr. Arturo --

22         **THE COURT:**  Where he got those things, yeah.

23         **MR. RUMLEY:**  But I just haven't looked at them.

24         **MS. RODRIGUEZ:**  We have redacted that --

25         **THE COURT:**  Well, has it been given to Mr. Rumley?

1      **MS. RODRIGUEZ:**  I have shown them just in passing to

2  him --

3      **THE COURT:**  You mean like under his nose passing?

4      **MS. RODRIGUEZ:**  Under his nose, your Honor.

5      **THE COURT:**  Okay.

6      **MR. RUMLEY:**  Judge, I have many things to do and the

7  last -- I haven't even looked at them.

8      **THE COURT:**  Okay.  He needs to look at those before

9  they come in.

10      **MS. RODRIGUEZ:**  Okay.  But other than that, we'll

11  tender them after lunch.  I'm sure --

12      **THE COURT:**  Well, I don't know if he wants to spend

13  lunch looking at them.  He may want to spend lunch talking to

14  Mr. Stone.

15      **MS. RODRIGUEZ:**  I'll prevail on it.

16      **THE COURT:**  Okay.

17      **MS. RODRIGUEZ:**  Thank you, your Honor.

18      **THE COURT:**  Thank you.

19      **MR. LOCHRIDGE:**  And (indiscernible) was a little

20  sensitive talking to Mr. Stone and (indiscernible).

21      **THE COURT:**  Mr. Rumley.

22      **MR. RUMLEY:**  There's one thing and I guess

23  Mr. Soltero posed.  I think -- I believe that they're going to

24  call one more witness and they're going to rest and then we

25  intend to play Mr. Gutierrez's intends to play Mr. Frazier and

1    Mr. Moore and we worked out nearly everything but just a couple

2    of points and I don't know if the Court wants to -- I'm not

3    speaking for them that they're going to rest.  I'm just -- I

4    don't know when the Court wants to hear those objections rather

5    than -- they worked until 2:00 or 3:00 in the morning last

6    night trying to work out those cuts and I think there's just

7    two or three areas that the Court needs to hear.

8             **THE COURT:**  Okay.

9             **MR. RUMLEY:**  But Mr. Soltero, I don't see him --

10            **MR. RANGEL:**  He's here.

11            **MR. RUMLEY:**  Okay.

12            **MR. RANGEL:**  He's making a --

13            **THE COURT:**  Okay.  I know I'm inconsistent.  I'm

14   uncomfortable about leaving out Mr. Stone about customs and

15   practices for releases.  That's the only thing he can testify

16   to.  I don't see anything wrong with that.  I'm going to let

17   him do it just for the -- just for customs and practices of

18   releases.  I don't know what it has to do with this case

19   because he doesn't do mobile homes.  He certainly doesn't do

20   them separately.  They don't close through a title company.

21   I'm going to do it.  That's it.  That's it.

22            **MR. RUMLEY:**  Okay.

23            **THE COURT:**  Don't cry.

24            **MR. RANGEL:**  Your Honor, in turn for planning

25   purposes, we plan to call Maria Trevino as a witness.

1          **THE COURT:**  You should -- Mr. Stone should be about
2  five minutes.
3          **MR. RANGEL:**  And then after that, Mr. Stone and then
4  VMF will rest on the possession case and I understand then
5  Mr. Gutierrez will proceed on the counterclaim and Mr. Rumley
6  will (indiscernible).
7          **THE COURT:**  Thank you.  Do you have a written motion
8  for directed verdict?
9          **MR. SOLTERO:**  We do actually have one where and plan
10  -- we have several.  We plan to file one --
11          **THE COURT:**  I'm going to tell you what I'm going to
12  do --
13          **MR. SOLTERO:**  Yes, your Honor.
14          **THE COURT:**  -- is that I'm going to -- you file your
15  written motion.  I'm going to carry it forward so we can
16  continue on the case.  Okay?  And then I'll spend the weekend
17  looking at it.
18          **MR. SOLTERO:**  We'll get those on file.  I'll try
19  and --
20          **THE COURT:**  Okay.
21          **MR. SOLTERO:**  -- either during the break or at the
22  end of the day -- at least the first one.
23          **THE COURT:**  Don't whine.
24          **MR. RUMLEY:**  I'm not whining and I'm not crying.  I'm
25  just -- I want to be able to understand the Court's ruling.  So

```
 1   is he still limited to Paragraphs 1, 2, 3 --

 2          THE COURT:  He is only limited to customs and

 3   practices about lien releases.  That's it.  That's it.  And

 4   Mr. Rumley, I think my order may have been unclear on that.  I

 5   think you may be right about the intention.  I think my order

 6   was unclear.  Sorry.  He's going to sulk the whole lunch hour.

 7   Thank you.  You're excused.

 8          MR. RANGEL:  The Court said 1:00?

 9          THE COURT:  1:15.

10          MR. RANGEL:  Thank you, your Honor.

11      (A recess was taken from 12:10 p.m. to 1:31 p.m.)

12      (Outside the presence of the jury)

13          THE COURT:  You need to slow down, Ms. Hawks.

14          Okay, are we ready?

15          MR. RANGEL:  Yes, your Honor.

16          THE COURT:  We really do have the greatest

17   interpreters here.  I mean I talk a mile a minute and they're

18   right up with me.  So whenever they -- the thing that says talk

19   slower from the interpreter, I always say oh, it's their fault,

20   of course.

21          MR. RUMLEY:  Your Honor, the one issue that we would

22   like to bring up --

23          THE COURT:  Yes, sir.

24          MR. RUMLEY:  -- I think we've worked out all of the

25   objections to Robin Moore, but they're still talking about Ben
```

1    Frazier, but my understanding is, is Joe intends to play a

2    deposition and edit it at the same time and we don't want to

3    stop and start, so if you would like to hear those objections

4    now so that we can get a ruling and he can start editing them

5    while they finish up the rest of their case.

6            **THE COURT:**  You want me to give you a ruling while

7    we're putting on testimony?

8            **MR. RUMLEY:**  No, hear their objections to Robin

9    Moore's cuts so that he can start editing it out those

10   portions.

11           **THE COURT:**  I'm not taking objections to the cuts;

12   I'm taking objections to the testimony.  And those we'll take

13   up as they go along.

14           If somebody filed something about optional

15   completion, there's no such doctrine in Federal Court.  So you

16   give your slices and they give their slices and that's how it

17   works.

18           **MR. RUMLEY:**  It wasn't my optional completeness.

19           **THE COURT:**  No, I know.

20           **MR. LOCHRIDGE:**  So we'll stop --

21           **THE COURT:**  It was Mr. Stone's.

22           **MR. LOCHRIDGE:**  Speaking of Mr. Stone --

23           **THE COURT:**  Yes.

24           **MR. LOCHRIDGE:**  -- I've spoken with Mr. Rumley about

25   this and here's where we are, your Honor.  I want to respect

1   the Court's order.

2          **THE COURT:**  I shouldn't let it go on at all.

3          **MR. LOCHRIDGE:**  Well, that's where we're going to end

4   up, I think.

5          **THE COURT:**  Okay.

6          **MR. LOCHRIDGE:**  So I want to make sure that the Court

7   is going to permit him on -- if we could put him on, you know,

8   allow us only to go into the question.

9          **THE COURT:**  This is the problem:  He filed his

10  report.  I said they're legal conclusions in Paragraphs 4

11  through 18, which left you nothing to put on.  I said there may

12  be some customs and practices that he could testify to.  I

13  anticipated that you are all would then file another report

14  talking about the customs and practices so that the Defendants

15  could object or not.  That never happened.  So then I felt

16  guilty about not letting you put on a custom and practice about

17  a lien release, which I shouldn't feel guilty about.  But

18  that's what I would let you put on.

19         **MR. LOCHRIDGE:**  And I just want to make sure that I

20  am understanding the Court.  When we left at lunch what I

21  understood we could -- all we would be able to talk about would

22  be the custom and practice regarding the --

23         **THE COURT:**  Release.

24         **MR. LOCHRIDGE:**  -- the sending of release to the

25  owner of the land that's been --

1          THE COURT:  Exactly.

2          MR. LOCHRIDGE:  And that was the limit of it.

3          THE COURT:  Yes.  And that was a stretch on my part.

4          MR. LOCHRIDGE:  And I'm not trying to reargue, I just

5     want to make sure it's clear for the record that that would be

6     a limit on his testimony and other custom and practice

7     testimony we would otherwise want to put on --

8          THE COURT:  I'll tell you why, yes --

9          MR. LOCHRIDGE:  -- we're not going to be allowed.

10         THE COURT:  -- because you didn't specify the custom

11    and practices.  If you had done that after my ruling I could

12    have thought about it again.

13         MR. LOCHRIDGE:  I'm not arguing with the Court, I

14    just want to make sure that it's clear in the record.

15         THE COURT:  It's a messy record anyway, but we do our

16    best with it.

17         MR. LOCHRIDGE:  At least we're clear on this.  Okay,

18    then all I would be able to do is talk about the sending of the

19    releases -- the custom and practices regarding sending of

20    releases --

21         THE COURT:  That is what you said you wanted to

22    testify to --

23         MR. LOCHRIDGE:  And that would be --

24         THE COURT:  -- I mean you wanted him for.

25         MR. LOCHRIDGE:  That would be what I would be limited

1    to.

2         **THE COURT:**  Yes.  That's what you told me you wanted

3    him for.

4         **MR. LOCHRIDGE:**  Well, we would put him on as custom

5    and practice as to whether or not you have to notify -- the

6    custom and practice as to notifying the consumer under

7    retail --

8         **THE COURT:**  Oh, that's not in his report, so forget

9    about that.

10        **MR. LOCHRIDGE:**  I'm just telling you the probative

11   item --

12        **THE COURT:**  We'll move on.  I got it.

13        **MR. LOCHRIDGE:**  Okay.

14        **THE COURT:**  You're very kind, Mr. Lochridge.

15        And somehow, Mr. Rumley, I figured it would work out

16   this, with all your whining and worry.

17        **MR. RUMLEY:**  Actually what Mr. Lochridge said is

18   my --

19        **THE COURT:**  I hope your mother's still not here.

20        **MR. RUMLEY:**  Your Honor, she was here the other day.

21   But she said my puppy eyes didn't work for me, but apparently

22   worked for Mr. Lochridge, so --

23        **THE COURT:**  I don't think so.

24        **MR. RUMLEY:**  -- I succeeded in something.

25        **MR. LOCHRIDGE:**  We have a Labrador against a Golden

169

```
 1   Retriever, Judge, and both of us are dogs.
 2            THE COURT:  I like them both the same.
 3            Okay, are we ready to bring the jury in?
 4            MR. UNIDENTIFIED:  Yes, your Honor.
 5        (Pause)
 6            THE MARSHAL:  All rise for the jury.
 7        (Jurors enter courtroom at 1:36 p.m.)
 8            THE COURT:  Got your blanket?
 9            Thank you all, you may be seated.
10            Is it too cold in here for anybody?
11        (Laughter)
12            Okay, okay.
13        (Laughter)
14            How about raising it a couple of degrees?
15            And I'm also sorry for the delay.  I had three
16   hearings scheduled over lunch and it took longer than I had
17   anticipated, hearing on other matters.
18            Okay, I have the temperature -- we had it set down
19   low because I thought will all the people it would get warmer
20   and it has not gotten warmer.  So thank you.  So she's emailing
21   down to get it reset.
22            Ready?
23            MR. RANGEL:  Plaintiff Vanderbilt calls Maria
24   Trevino, your Honor.
25            THE COURT:  Thank you.
```

1          Would you come forward, please, Ms. Trevino?

2          **MARIA TREVINO, PLAINTIFFS' WITNESS, SWORN**

3          **THE COURT:**  You may proceed.  Thank you.

4                    **DIRECT EXAMINATION**

5    **BY MR. RANGEL:**

6    Q    Good afternoon, Mrs. Trevino.

7    A    Good afternoon.

8    Q    We met and I took your deposition several months ago?

9    A    Yes, sir.

10   Q    Mrs. Trevino, are you the wife of Arturo Trevino?

11   A    Yes, sir.

12   Q    And are you the sister of Cesar Flores?

13   A    Yes, sir.

14         **THE COURT:**  Would you give your full name, please?

15         **THE WITNESS:**  Maria Margarita Trevino.

16   **BY MR. RANGEL:**

17   Q    And Mrs. Trevino, where do you live?

18   A    At 1705 South Cameron.

19   Q    In Alice, Texas?

20   A    In Alice, Texas.

21   Q    And how long have you lived there?

22   A    About two years.

23   Q    And you and Mr. Trevino have been separated for a number

24   of years, is that correct?

25   A    That's correct.

Trevino - Direct / By Mr. Rangel                          171

1    Q    He lives in Premont?

2    A    Correct.

3    Q    Mrs. Trevino, your involvement in this case arose from the

4    fact that you and Mr. Trevino had intervened in the case and

5    filed a lawsuit against my client, correct?

6    A    Correct.

7    Q    Vanderbilt, which filed this lawsuit against Alvin King

8    and Cesar Flores, did not sue you or Mr. Trevino, correct?

9    A    Correct.

10   Q    Sometime in December of 2001 you became aware that your

11   brother, Cesar Flores, and Alvin King were looking to purchase

12   a mobile home, is that correct?

13   A    That's correct.

14   Q    And did your brother, Cesar Flores, contact you regarding

15   that?

16   A    Yes, sir.

17   Q    When he contacted you did he tell you that he wanted to

18   discuss with you and perhaps Mr. Trevino whether he could

19   locate that mobile home on that empty lot on Carmen Street that

20   we've been talking about, Lot 36?

21   A    Yes, sir.

22   Q    And did in fact Mr. Cesar Flores, your brother, meet with

23   you to discuss that?

24   A    Yes.

25   Q    When he met with you did he also meet with Mr. Trevino?

1   A    Yes.

2   Q    And was that meeting -- where was that meeting?

3   A    In Premont, in my house.

4   Q    At that time you were living in Premont with Mr. Trevino?

5   A    Yes.

6   Q    And when Mr. Flores asked you if he could place or locate

7   the mobile home on that empty Lot 36 did you tell him that it

8   was okay?

9   A    Yes.

10  Q    And did Mr. Trevino also tell him that it was okay?

11  A    Yes.

12  Q    During that meeting did Mr. Cesar Flores tell you that he

13  needed a property description for the lot?

14  A    No.

15  Q    At some point did he tell you that he needed a property

16  description?

17  A    No.

18  Q    At some point did you give him a copy of a warranty deed

19  that showed that Lots 35 and 36 had been conveyed to you and

20  Mr. Trevino by your late sister and your late brother-in-law,

21  the Cantus?

22  A    I'm not sure, sir.

23       **MR. RANGEL:**  Okay, we'll call up CP-41.

24  //

25  //

1   **BY MR. RANGEL:**

2   Q    Mrs. Trevino, do you recognize this as the deed wherein

3   your later brother-in-law, David Cantu, and your late sister,

4   Jesusa Cantu, conveyed Lots 35 and 36, that's Block 1,

5   Gallimore Additon, to you and Mr. Trevino?

6   A    Yes, sir.

7   Q    Did you at some point give a copy of this deed to either

8   Cesar Flores or Alvin King?

9   A    I don't remember, sir.

10  Q    You were in the courtroom when your brother testified that

11  a copy of this deed had been faxed on January 3rd, 2002 to

12  CMH Homes, do you recall that?

13  A    Yes, sir.

14  Q    And he testified that he had not done it, but that Alvin

15  King had faxed it to CMH Homes on January 3rd of 2002, do you

16  recall that?

17  A    Yes, sir.

18  Q    Sitting here today, sitting here today, do you have any

19  recollection of having any discussion with Cesar Flores or

20  Alvin King regarding that deed?

21  A    I can't remember, sir.

22  Q    Would that have been a document that you had in your

23  possession in your files back in December 2001, around the time

24  that Mr. Flores and Mr. King were talking about buying this

25  mobile home?

Trevino - Direct / By Mr. Rangel                    174

1    A    Yes.

2    Q    Do you have any recollection of Cesar Flores asking you

3    for a copy of the deed?

4    A    I can't remember.

5    Q    Do you have any recollection of discussing with Cesar

6    Flores -- by the way, did you ever have any conversation with

7    Alvin King regarding the placement of that mobile home on your

8    empty Lot 36?

9    A    Not really.

10   Q    To the best of your recollection any discussion you had

11   was with your brother, Cesar Flores?

12   A    Correct.

13   Q    Now, after you told Mr. Flores that you would give your

14   permission for the mobile home to be placed on the lot did you

15   come to find out that that had happened?

16   A    That the trailer was put on the lot?  Yes, sir.

17   Q    And how did you find that out?

18   A    I went to go visit.

19   Q    And so when you went to visit it was there?

20   A    Yes, sir.

21   Q    And when you went to visit was Mr. King there also?

22   A    Yes, sir.

23   Q    Now, Lot 36 is next to Lot 35 and Lot 34, correct?

24   A    Correct.

25   Q    And on Lots 35 and 34 there is a house, right?

1   A    Yes.

2   Q    And the address for that house is what, 1702 Carmen?

3   A    1702 Carmen.

4   Q    And the address for Lot 36 is 1700 Carmen, correct?

5   A    Yes.

6   Q    Now, back in December of 2001 and January of 2002 who was

7   living at the house with the address of 1702 Carmen?

8   A    My mother.

9   Q    And before Cesar Flores purchased this mobile home was he

10  living there also?

11  A    Yes, sir.

12  Q    Anybody else besides your mother and Cesar Flores living

13  at that home address at that time, 1702.

14  A    My sister.

15  Q    I'm sorry?

16  A    My sister.

17  Q    Which sister?

18  A    Jesusa.

19  Q    After you saw that the home -- mobile home has been

20  located at 1700 Carmen did you have occasion to go back there

21  at anytime?

22  A    What do you mean, sir?

23  Q    Well, did you go visit Mr. Flores later at that address?

24  A    Yes.

25  Q    Would you consider that you were close to your brother,

1  Cesar Flores?

2  A    Yes, sir.

3  Q    Back in that period of time were you visiting him

4  regularly?

5  A    No, we lived in separate towns.

6  Q    Did he ever discuss with you anything related to the

7  mobile home after he located it there?

8  A    No, sir.

9  Q    Did he ever tell you anything about the status of his

10 payments on the mobile home, Vanderbilt?

11 A    No, sir.

12 Q    You didn't have any discussion regarding that?

13 A    No.

14 Q    At some point, and I believe it was in July of 2003, you

15 and Mr. Arturo Trevino decided to convey Lots 34 and 35 to your

16 brother, Gilbert Flores, correct?

17 A    Correct.

18        **MR. RANGEL:**  We'll call up CP-8 at 29193.

19 **BY MR. RANGEL:**

20 Q    Mrs. Trevino, is this the special warranty deed dated

21 July 24th, 2003 in which you and Mr. Trevino conveyed Lots 34

22 and 35, Block 1, Gallimore Additon, to your brother, Gilbert

23 Flores?

24 A    Yes.

25        **MR. RANGEL:**  And we'll go to the next page.  I

1    believe there are some signatures there.

2    **BY MR. RANGEL:**

3    Q    And there's a signature for Maria Margarita Trevino;

4    that's you, right?

5    A    Yes, sir.

6    Q    And you signed that deed, correct?

7    A    Yes, sir.

8    Q    And there's a signature for Arturo Trevino; and do you

9    recognize that to be Mr. Trevino's signature?

10   A    Yes, sir.

11   Q    And why did you decide in July of 2003 to convey Lots 34

12   and 35 to your brother, Gilbert?

13        **(No audible response)**

14        **MR. RUMLEY:**  Your Honor, may we approach?

15        **THE COURT:**  Yes.

16        **(Begin bench conference at 1:49 p.m.)**

17        **MR. RUMLEY:**  This is a limine item.  It's the taxes.

18        **MR. RANGEL:**  That was my (indiscernible)

19        **THE COURT:**  (Indiscernible)

20        **MR. RUMLEY:**  (indiscernible) is.  You know we weren't

21   even supposed to show the exhibit.

22        **MR. RANGEL:**  No, no, no.

23        **THE COURT:**  I told you (indiscernible)

24        **MR. RANGEL:**  And I'm not intending to get into that;

25   I'm just showing that she wanted to give it to her.

1          **MR. RUMLEY:**  But the reason is taxes.

2          **MR. RANGEL:**  No, I'm not interested in getting into

3    that.

4          **MR. RUMLEY:**  That's what she's going to say.

5          **THE COURT:**  Then don't ask.

6          **MR. RANGEL:**  I won't ask.

7          **THE COURT:**  Because it says that (indiscernible)

8    consideration --

9          **MR. RANGEL:**  That's what I want, that's what I'm

10   gonna do.

11         **THE COURT:**  (Indiscernible).  Thank you.  Thank you,

12   Mr. Rangel.

13         **(End bench conference at 1:49 p.m.)**

14   **BY MR. RANGEL:**

15   Q    And after you conveyed -- after you and Mr. Trevino

16   conveyed Lots 34 and 35 to your brother, Gilbert, then around

17   that time did he move into the house at 1702 Carmen?

18   A    I think so.

19   Q    Do you recall around this time, July 2003, having any

20   conversation with either Alvin King or Cesar Flores about

21   seeking the release of one of those lots in any respect?

22   A    No, sir.

23   Q    And your testimony I believe is that in July of 2003 you

24   were not aware, you were not aware that Lots 36 and 35 had been

25   pledged as collateral for -- in connection with the purchase of

1   the mobile home by Cesar Flores and Alvin King, correct?

2   A    Correct.

3   Q    In fact, when you conveyed Lots 34 and 35 to your brother,

4   Gilbert, you had, your testimony is, no knowledge that the deed

5   of trust lien was on file or the builder's and mechanic's lien

6   was on file, is that correct?

7   A    Correct.

8   Q    And nothing prevented you or kept you from being able to

9   convey Lots 34 and 35 to your brother, Gilbert, correct?

10  A    Correct.

11  Q    And prior to you conveying Lots 34 and 35 to your brother,

12  Gilbert, you had not made any attempt to sell it or to convey

13  it to anybody else, is that correct?

14  A    That's correct.

15  Q    Later in the spring of 2005 you and Mr. Trevino decided to

16  convey Lot 36 to your brother, Cesar, is that correct?

17  A    That's correct.

18  Q    And I believe you also did that by a deed --

19       **MR. RANGEL:**  Let's call up CP-8-29496.

20  **BY MR. RANGEL:**

21  Q    And is this a copy of the warranty deed that you and

22  Mr. Trevino signed on or about April 11th, 2005 in which you

23  conveyed Lot 36 to your brother, Cesar Flores?

24  A    Yes, sir.

25       **MR. RANGEL:**  And if we go to the next page, I believe

1    there are some signatures there.

2              Maybe the next page.

3    **BY MR. RANGEL:**

4    Q    And there's a signature for Maria M. Trevino and is that

5    your signature, Mrs. Trevino?

6    A    Yes, sir.

7    Q    And there's a signature for Arturo Trevino and is that

8    your signature?  I'm sorry, his signature.

9    A    I would assume, yes, sir.

10   Q    Do you recall that both of you signed this?

11   A    Yes, sir.

12   Q    Okay.  Now, at the time that you conveyed Lot 36 to your

13   brother, Cesar, the mobile home was already there, correct?

14   A    Correct.

15   Q    In April of 2005, right?

16   A    Yes, sir.

17   Q    And again at the time that you conveyed Lot 36 to your

18   brother, Cesar, it's your testimony that you were not aware

19   that there had been a deed of trust lien and a builder's and

20   mechanic's lien filed with respect to Lots 35 and 36 back in

21   January of 2002, is that correct?

22   A    Correct.

23   Q    And at no time prior to the time that you conveyed Lot 36

24   to your brother, Cesar, had you attempted to sell or convey Lot

25   36 to anyone?

Trevino - Direct / By Mr. Rangel                    181

1   A    No, sir.

2   Q    Is that correct?

3   A    That's correct.

4   Q    Now, Mrs. Trevino, when you conveyed Lots 35 and 34 to

5   your brother, Gilbert, and you wanted to convey that so he

6   could have those lots, right?

7   A    Right.

8   Q    And in connection with conveying that property, Lots 34

9   and 35, to Gilbert did you go to the courthouse to look into

10  the records of that property?

11  A    No, sir, I didn't.

12  Q    Nothing prevented you from going to the courthouse to do

13  that, correct?

14  A    Correct.

15  Q    When you conveyed Lot 36 to your brother, Cesar, in April

16  of 2005 did you go to the courthouse to look into the records

17  regarding that lot?

18  A    No, sir, I did not.

19  Q    And nothing prevented you from doing that, correct?

20  A    Correct.

21  Q    Mrs. Trevino, obviously you have been sitting through the

22  testimony, and of course when we took your deposition, you are

23  in fact aware now that there had been a deed of trust and a

24  builder's and mechanic's lien filed in connection with Lots 35

25  and 36 back in January of 2002, correct?

Trevino - Direct / By Mr. Rangel                          182

1    A     Correct.

2    Q     And then you are aware also that in October of 2005 there

3    was a deed of trust release and a builder's and mechanic's lien

4    release filed at the courthouse in Jim Wells County, correct?

5    A     I'm aware of that, yes, correct.

6    Q     And at the time that the deed of trust lien that was filed

7    in October of 2005 and at the time that the builder's and

8    mechanic's lien, both of the releases, at the time that both of

9    those releases were filed in October of 2005 you were not the

10   owner of Lot 35 and you were not the owner of Lot 36, is that

11   correct?

12   A     That's correct.

13   Q     And it's your testimony that you did not find out about

14   those lien releases until after this lawsuit was filed and you

15   contacted a lawyer, correct?

16   A     Correct.

17   Q     And in fact your testimony is that the way you found is

18   that your brother, Cesar Flores, called you to tell you that he

19   and Alvin King had been sued by Vanderbilt seeking to repossess

20   the mobile home, correct?

21   A     Correct.

22   Q     And that's when he told you go see Mr. Gutierrez, correct?

23   A     Correct.

24   Q     And your testimony is that when you did that, that's when

25   you found about these two liens that were filed in October of

1    2005, is that correct?

2    A    Correct.

3    Q    It is true, Mrs. Trevino, that at no time has anybody from

4    Vanderbilt ever contacted you seeking payment on the debt on

5    the mobile home?

6    A    Correct.

7    Q    Vanderbilt never attempted to collect from you, correct?

8    A    Correct.

9    Q    And so the very first time that you found out, according

10   to your testimony, that this deed of trust had been filed and

11   this builder's and mechanic's lien contract had been filed was

12   sometime in late last year, in November or October of 2009,

13   that's your testimony, right?

14   A    Yes, sir.

15   Q    And you have no knowledge, according to your testimony,

16   that they had been on file, correct?

17   A    Correct.

18   Q    And the same thing with those two releases that I'm

19   talking about, correct?

20   A    Correct.

21   Q    And you are aware, Mrs. Trevino, that there are a number

22   of documents involved in this lawsuit that bear the name of

23   Maria Trevino and the signature of Maria Trevino, correct?

24   A    Correct.

25             **MR. RANGEL:**  Call up CP-209.

1   **BY MR. RANGEL:**

2   Q    And this is the builder's and mechanic's lien contract

3   that has your name and the name of Mr. Trevino that we

4   discussed during your deposition, correct?

5   A    Yes, sir.

6   Q    And this document has a signature page, correct?

7   A    Yes, sir.

8   Q    And we'll turn to the signature page, and there is a

9   signature line and printed Maria M. Trevino with the signature

10  of Maria M. Trevino, correct?

11  A    Yes, sir.

12  Q    And it's your testimony that's not your signature,

13  correct?

14  A    Yes, sir.

15          **MR. RANGEL:**  And call up CP-210.

16  **BY MR. RANGEL:**

17  Q    And this is the deed of trust that we also -- that I also

18  discussed with you during your deposition, correct?

19  A    Yes, sir.

20  Q    And then this has a signature page, and this -- on Page 5

21  there's a signature line for Maria M. Trevino and with the

22  signature of Maria M. Trevino, correct?

23  A    Yes, sir.

24  Q    And it's your testimony that that is not your signature,

25  you didn't sign that, correct?

1  A    Yes, sir.

2  Q    And with respect to the one I just showed you, this one,

3  there's a signature line for Mr. Arturo Trevino.  Are you

4  sufficiently familiar with Mr. Trevino's signature to be able

5  to say whether or not that's his signature?

6  A    Not anymore, sir.

7         **MR. RANGEL:**  Then call up CP-9 at 6563.

8  **BY MR. RANGEL:**

9  Q    This is another document called a Real Estate Lease that

10  you and I discussed at your deposition, is that correct?

11  A    That's correct.

12  Q    And we'll go to the signature page, and this has a

13  signature line for Maria M. Trevino and a signature for

14  Maria M. Trevino, correct?

15  A    Yes, sir.

16  Q    And it's your testimony that that is not your signature,

17  that you didn't sign your name there, is that correct?

18  A    I don't remember signing these papers, sir.

19  Q    And there may be other signature pages, let's see, yes,

20  another signature page on that document that also has Maria M.

21  Trevino's signature, and is it your testimony that that is not

22  your signature and that you didn't sign that?

23  A    I don't know, sir.  I don't remember signing this paper.

24  Q    Can you tell just by looking at it whether that's your

25  signature?

Trevino - Direct / By Mr. Rangel                        186

1   A    It looks like my signature.

2   Q    It looks like your signature?

3   A    Yes.

4   Q    And Arturo Trevino, the signature for Arturo Trevino, are

5   you sufficiently familiar with Mr. Trevino's signature to be

6   able to say whether or not that's his signature?

7   A    No, sir.

8   Q    And I think there might have been another page with

9   signature lines on it.  And then there are two signature lines,

10  one for Maria M. Trevino and one for Arturo Trevino, and is it

11  your testimony that that is not your signature and that you

12  didn't sign your signature there?

13  A    I don't remember signing it, sir.

14  Q    Just looking at the signature, does that look like your

15  signature?

16  A    It looks like my signature.

17  Q    Mrs. Trevino, having sat through the testimony for the

18  last couple of days and of course your deposition, has any of

19  this refreshed your recollection regarding the events of

20  December of 2001 and January of 2002 regarding the purchase of

21  the mobile home?

22  A    No, sir.

23  Q    You still have no recollection having given a copy of that

24  warranty deed to either Gilbert Flores -- I'm sorry, Cesar

25  Flores or Alvin King?

1   A    I'm not sure, sir.

2   Q    Do you have any recollection of any conversation that you

3   had with Cesar Flores regarding what needed to be done in order

4   for him to be able to purchase the mobile home?

5   A    No, sir.

6   Q    Do you have any recollection of him telling you that you

7   and Mr. Trevino would have to sign some documents in order for

8   him to be able to move into the mobile home?

9   A    No, sir.

10  Q    Are you saying that did not happen or just that you don't

11  have a recollection of it?

12  A    It didn't happen.  I know that he had to have a place to

13  put the mobile home and I told him, yeah, you can put the

14  mobile home there, there is no problem.

15  Q    And that's as much as you remember about the conversation?

16  A    Yes, sir.

17  Q    And you have no recollection of him asking for a copy of

18  the warranty deed showing that you and Mr. Trevino owned

19  Lots 35 and 36?

20  A    I can't remember, sir.

21         **MR. RANGEL:**  Mrs. Trevino, thank you very much.

22         I reserve the right to cross examine her --

23         **THE COURT:**  Yes, sir.

24         **MR. RANGEL:**  -- in their case-in-chief.

25         **THE COURT:**  Thank you.

1              **MR. RANGEL:**  Thank you, your Honor.

2              **MR. RUMLEY:**  I'll reserve mine, your Honor.

3              **MR. B. GUTIERREZ:**  I have no questions, your Honor.

4              **THE COURT:**  You may stand down.  Thank you.

5          **(Witness excused)**

6              Call your next witness.

7              **MR. RANGEL:**  Judge, at this point --

8          **(Counsel confer)**

9              Judge, at this time Plaintiff Vanderbilt rests its

10   case, the repossession case, and asks to address the Court.

11             **THE COURT:**  Oh, really, we could just -- I just would

12   block that in as an address and you file the motions and I will

13   consider them made timely.  Would that be the appropriate way

14   to do this?

15             **MR. SOLTERO:**  Yes, your Honor.  We're making the

16   motion now, but I understand that we'd be filing it in a timely

17   manner.

18             **THE COURT:**  Let me just see counsel at the bench,

19   Mr. Rangel.

20         **(Begin bench conference at 2:06 p.m.)**

21             **THE COURT:**  (indiscernible) to say that you're making

22   a motion with no evidence (indiscernible) insufficient evidence

23   on each area of these classes of action.

24             **MR. RANGEL:**  Only on the repossession case,

25   your Honor.

1          **THE COURT:**  Okay, so that's your case?

2          **MR. RANGEL:**  Only on the repossession.  I'll just

3    leave it there.

4          **MR. J. GUTIERREZ:**  I was going to say my peace when

5    the Court's ready.

6          **THE COURT:**  Go ahead.

7          **MR. J. GUTIERREZ:**  Your Honor, for Ms. Gano's

8    benefit, this is Javier Gutierrez, Defendants are moving for

9    judgment as a matter of law as well on the issue of assignment.

10   There's no evidence of assignment.  Directed verdict, judgment

11   as a matter of law on the issue of assignment, which Plaintiff

12   had the burden on.

13         **MR. RANGEL:**  Judge --

14         **MR. RUMLEY:**  Based on the testimony of --

15         **THE COURT:**  I'll have to think about that too.  I'm

16   going to carry (indiscernible) piece forward.  (indiscernible)

17   asking for a directed verdict based on?

18         **MR. RANGEL:**  In the trial brief, your Honor.

19         **THE COURT:**  Directed verdict based on?

20         **MR. RANGEL:**  The fact that --

21         **THE COURT:**  -- repossession (indiscernible) matter of

22   law.

23         **MR. RANGEL:**  That we proved -- yes, the mobile home,

24   that we proved all the elements of it.

25         **THE COURT:**  Do you object to that?

1          **MR. J. GUTIERREZ:**  Your Honor, we object --

2    your Honor, we object on the grounds that there's no proof of

3    an assignment.  If there's no proof of an assignment then

4    Vanderbilt has no standing.

5          **MR. RANGEL:**  And of course we would say that there is

6    plenty of proof.

7          **THE COURT:**  I'm not sure about that.  I'll carry

8    these motions forward.  You're going to file -- I would assume

9    you're going to file simultaneously for the motions?

10         **MR. RANGEL:**  Yes, your Honor.

11         **THE COURT:**  Your written motion.

12         **MR. J. GUTIERREZ:**  Your Honor, when may we file our

13   motion for judgment as a matter of law on the issue of

14   assignment?  Would it be timely filed if it's filed this

15   evening or tomorrow?

16         **THE COURT:**  That would be fine.

17         **MR. J. GUTIERREZ:**  Okay.

18         **THE COURT:**  I will consider that you've made it now

19   and you can follow up on a supplemental (indiscernible) written

20   motion.

21         **MR. RUMLEY:**  (indiscernible)

22         **THE COURT:**  For assignment, yes.

23         **MR. J. GUTIERREZ:**  Thank you, Your Honor.

24         **MR. RANGEL:**  And, your Honor, we would reserve the

25   opportunity to respond to that in writing.

1            THE COURT:  Yes.

2            MR. RANGEL:  Okay, so with that understanding,

3    considering that our motions for directed verdict as a matter

4    of law --

5            THE COURT:  I'm carrying them both.

6            MR. RANGEL:  Right, but considered filed now.

7            THE COURT:  I consider them timely filed, Plaintiffs'

8    motion for a directed verdict as to the repossession of the

9    mobile home --

10           MR. RANGEL:  And all the elements we have to prove.

11           THE COURT:  All the elements that you have to prove.

12   And the Defendants' motion for judgment as a matter of law

13   (indiscernible) assignment between CM --

14           MR. J. GUTIERREZ:  CMH and Vanderbilt.

15           THE COURT:  -- H and Vanderbilt.

16           MR. RANGEL:  And with that --

17           THE COURT:  And I'll let you file amended written

18   motions to supplement these oral motions at any time throughout

19   today.

20           MR. RANGEL:  With that --

21           THE COURT:  Till midnight.

22           MR. RANGEL:  VMF rests and then at this point I guess

23   they will proceed with --

24           THE COURT:  If (indiscernible) wants to have them

25   tonight, we do want to respond to each of them.  I'll let them

1    respond in writing also.  Do you want to do that by Monday?

2              **MR. RANGEL:**  That's fine.  So long as we --

3              **MR. J. GUTIERREZ:**  May I file mine tomorrow or is

4    tonight midnight the deadline to file the written JMOL on

5    assignment?  I'm just asking.

6              **THE COURT:**  How about you can file your supplemental

7    written motion by noon tomorrow?

8              **MR. J. GUTIERREZ:**  Okay.

9              **THE COURT:**  Everybody files their responses by Sunday

10   night midnight?

11             **MR. RANGEL:**  That's fine.

12             **THE COURT:**  So we'll have them to argue Monday, okay?

13             Any others before -- who's going to go next?  You

14   are?

15             **MR. J. GUTIERREZ:**  Yes.

16             **MR. RANGEL:**  And just to -- procedurally, if there's

17   a possibility that they may rest on their counterclaim today --

18             **THE COURT:**  All right.

19             **MR. RANGEL:**  -- and then --

20             **MR. J. GUTIERREZ:**  I don't think so.

21             **MR. SOLTERO:**  When we rest on the counterclaim we're

22   going to have a motion at that point in time.

23             **THE COURT:**  I will bring you up at that time as well,

24   so we don't miss any motions at all.

25             **MR. RUMLEY:**  There's no possibility --

1          THE COURT:  And make sure we don't do it so

2  (indiscernible).

3          MR. RUMLEY:  I don't think there's a possibility that

4  they're going to rest today, because we have an issue with

5  Glucksman and I agreed that we would --

6          THE COURT:  With what?

7          MR. RUMLEY:  With Glucksman, their expert, we want to

8  play some and -- we just haven't been able to work it out.  And

9  so they need Glucksman in their case on the RICO and so I don't

10  think we're going to get there.

11          THE COURT:  Okay, let's --

12          MR. RUMLEY:  But just to let the Court know.

13          THE COURT:  -- get started.

14     (End bench conference at 2:11:13 p.m.)

15          THE COURT:  Thank you.

16          Mr. Gutierrez, you may proceed.

17          MR. B. GUTIERREZ:  May we approach, your Honor?

18          THE COURT:  Pardon?

19          MR. B. GUTIERREZ:  May we approach?

20          THE COURT:  Yes.

21     (Begin bench conference at 2:11:26 p.m.)

22          MR. B. GUTIERREZ:  Mr. --

23          THE COURT:  Here's your microphone.

24          MR. B. GUTIERREZ:  Excuse me.

25          THE COURT:  Here's your microphone.

1          **MR. B. GUTIERREZ:**  Mr. --

2          **THE COURT:**  Here's my microphone.

3          **MR. B. GUTIERREZ:**  Just to report to the court,

4     Mr. Soltero and I were up --

5          **THE COURT:**  Mr. what?

6          **MR. B. GUTIERREZ:**  Mr. Soltero and I were going over

7     the deposition cuts till about 1:00 o'clock this morning and we

8     only had some issues concerning Frazier, but we're ready to go

9     play the deposition of Benjamin Frazier.

10          **MR. SOLTERO:**  Your Honor, this is the issue -- and it

11     may be a good time for the jury to take a short break, but --

12          **THE COURT:**  No, they've been in for -- they've only

13     been in for 40 minutes.

14          **MR. SOLTERO:**  Well, your Honor, first on Moore, the

15     only thing we haven't worked out is they're trying to get

16     exhibits that are OSI other -- we think that your Honor has

17     already ruled in --

18          **THE COURT:**  Okay.

19          **MR. SOLTERO:**  -- but we want to preserve our

20     objection.  We believe that should be excluded, the exhibits in

21     that testimony.

22          **MR. RUMLEY:**  But they're already in.

23          **MR. SOLTERO:**  Well, I believe some of it has already

24     come in, but --

25          **THE COURT:**  What has not come in?

1          **MR. SOLTERO:**  The documents haven't come in, for one,

2     the exhibits.  And so we would object to all the exhibits

3     coming in.  And I think it's cumulative, but --

4          **THE COURT:**  If they're already in, then they're

5     already in.

6          **MR. RUMLEY:**  I think he's just trying to preserve his

7     objection, but the Court's let them in.

8          **THE COURT:**  Okay.  Okay.

9          **MR. B. GUTIERREZ:**  But more -- excuse me, I'm sorry.

10          **MR. SOLTERO:**  Yeah, I mean our position, Judge, is

11    that the other transactions are not relevant under 404 --

12          **THE COURT:**  The what?

13          **MR. SOLTERO:**  The other transactions, as we brought

14    up in our motion, your Honor has already ruled --

15          **THE COURT:**  Okay.

16          **MR. SOLTERO:**  -- but we're objecting again because

17    now is the time that they are trying to offer it.

18          **THE COURT:**  Thank you.

19          **MR. SOLTERO:**  So we make objections to the exhibits

20    coming in with Mr. Moore and the testimony --

21          **THE COURT:**  (Indiscernible) discussion of forgery.

22          **MR. RUMLEY:**  Your Honor, just forgery of Ben

23    Frazier's name --

24          **THE COURT:**  That's fine.

25          **MR. RUMLEY:**  -- (indiscernible)

1       **THE COURT:**  That's fine.

2       **MR. B. GUTIERREZ:**  And we've gone through that and I

3   want to make sure that I don't get in trouble with the Court,

4   because there are some areas, but they address -- and it's

5   questions of Mr. Frazier, your Honor, and where he is looking

6   at documents and he is basically saying no, that is not my

7   signature.

8       **THE COURT:**  That's fine.

9       **MR. B. GUTIERREZ:**  Okay.  I'm sorry, go ahead.

10      **MR. SOLTERO:**  And we have a series of page and line

11   objections too.  I mean there's not that many, but first can I

12   get a ruling on the other witnesses and the exhibits?

13      **THE COURT:**  No because I don't know what we're

14   talking about, frankly.

15      **MR. SOLTERO:**  Okay.

16      **MR. UNIDENTIFIED:**  We'll just do it when we --

17      **MR. SOLTERO:**  Well, but they want to bring it right

18   now, so let me go get my list and we'll --

19      **THE COURT:**  No, I'm going to have to see -- it's

20   going as it is.  You have missed your time for objections for

21   depositions, all right, but I told you make your objections as

22   we're hearing it.  That's how it's going to work.

23      **MR. RUMLEY:**  And, your Honor, in fairness, and I

24   think you'll agree, we have removed all of the OSI stuff that

25   is excluded by your OSI.  We don't have anybody saying my

1  signature's forged, except for the notary.  Right?  I mean I

2  think we're -- -- we are all within the Court's previous

3  ruling.

4          THE COURT:  Okay, let's get started.  Thank you.

5     **(End bench conference at 2:14:33 p.m.)**

6          **MR. B. GUTIERREZ:**  Your Honor?

7          **THE COURT:**  Yes, sir.

8          **MR. B. GUTIERREZ:**  The Cross-Plaintiffs, Cesar Flores

9  and Mr. Alvin King, would call Benjamin Frazier by video

10 deposition.

11             **DEFENDANTS/CROSS-PLAINTIFFS' WITNESS**

12             **BENJAMIN JOSEPH FRAZIER BY VIDEO DEPOSITION**

13             **(Witness sworn)**

14                   E X A M I N A T I O N

15          BY MR. RUMLEY:

16          "Q.  Sir, could you introduce yourself for us?

17          "A.  Benjamin Joseph Frazier.

18          "Q.  And you've given your deposition a couple of

19          times in the --"

20          **THE COURT:**  Okay, wait a minute; take the words out

21 of there.  Take the words out, just the picture.

22     **(Restart video deposition)**

23          **THE COURT:**  Thank you.

24 //

25 //

1          **"(Witness sworn)**

2                             EXAMINATION

3          BY MR. RUMLEY:

4          "Q.  Sir, could you introduce yourself for us?

5          "A.  Benjamin Joseph Frazier.

6          "Q.  And you've given your deposition a couple of

7          times in the previous litigation, right?

8          "A.  Yes.

9          "Q.  In giving those depositions and meeting with

10         your lawyer here today, you understand what we're

11         doing here, correct?

12         "A.  Yes.

13         "Q.  That the oath that you just took is the same

14         oath as if we're sitting down there in Corpus Christi

15         before the judge and the jury, right?

16         "A.  Yes.

17         "Q.  And in order to tell the truth, obviously,

18         you've got to understand the question, right?

19         "A.  Correct.

20         "Q.  And so if you don't understand the question for

21         any reason, will you let me know before you answer

22         it?

23         "A.  Yes.

24         "Q.  And that way, if you -- if you answer the

25         question, we can all assume that you've both

1       understood it and answered it truthfully, all right?

2       "A.  Okay, yes.

3       "Q.  Well, I -- when you gave the two prior

4       depositions, you were under oath, right?

5       "A.  Yes, sir.

6       "Q.  And did you see anything in those depositions

7       when you read them recently that just stand out in

8       your mind as being wrong or inaccurate?

9       "A.  No, sir.

10      "Q.  You have had communications with David Booth,

11      correct?

12      "A.  Yes, sir.

13      "Q.  Both by telephone and by email?

14      "A.  Yes, sir.

15      "Q.  David Booth is not a lawyer, correct?

16      "A.  Correct.

17      "Q.  David Booth was the president of the company at

18      the time that you worked there, correct?

19      "A.  Correct.

20      "Q.  Let me show you Discovery Exhibit 222 and

21      Discovery Exhibit 223.

22      "Q.  You see, Mr. Frazier, this is a deed of trust.

23      And if we look right here, we have the names Maria

24      Trevino and Arturo Trevino.  Do you see that?

25      "A.  Yes, sir.

Frazier - Direct / By Video Deposition                200

1      "Q.  Okay.  If we look here, Mr. Frazier, you can see

2      right here it has Maria Trevino, which is the name we

3      just looked at on the front.  This is obviously --

4      this is you -- your notary stamp, correct?

5      "A.  Yes, sir.

6      "Q.  This signature right here, is that your

7      signature?

8      "A.  No, sir.

9      "Q.  All right.  Do you know who signed your name to

10     that document?

11     "A.  No, sir.

12     "Q.  Okay.  If we go down on this same document --

13     and this is -- so the jury understands what we're

14     looking at, this -- this would be what is called a

15     notary block, correct?

16     "A.  Yes, sir.

17     "Q.  During the time that -- that you were at Clayton

18     Homes as a sales associate, you were also a notary of

19     the State of Texas, correct?

20     "A.  Yes, sir.

21     "Q.  If we go down -- again, this is your notary

22     stamp, correct?

23     "A.  Yes, sir.

24     "Q.  And is that -- is that your signature?

25     "A.  No, sir.

Frazier - Direct / By Video Deposition                    201

1        "Q.  And do you know who would have signed -- signed

2        that name or used your notary stamp that day?

3        "A.  No, sir.

4        "Q.  If we go down here, John Wells -- and now, John

5        Wells at this time would have been the -- the manager

6        of the store, Store 214, correct?

7        "A.  Yes, sir.

8        "Q.  And again, this is your notary stamp.  And is

9        that your signature?

10       "A.  No, sir.

11       "Q.  All right.  Do you know -- do you know who it

12       was who signed your name to those three notary

13       blocks?

14       "A.  No, sir.

15       "Q.  This is Discovery Exhibit 223, and this is a

16       builder and mechanic lien contract involving the

17       Trevinos.  Do you see that?

18       "A.  Yes, sir.

19       "Q.  Flip to the notary page --

20       "Q.  Mr. Frazier, if we look, that, again, is your --

21       your notary stamp, correct?

22       "A.  Yes, sir.

23       "Q.  And does that appear to be your signature?

24       "A.  No, sir.

25       "Q.  If we go down, Arturo Trevino, again, your

Frazier - Direct / By Video Deposition                202

1          notary stamp, and is -- the signature above that

2          notary line, is that your signature?

3          "A.  No, sir.

4          "Q.  And do you know who -- who would have signed

5          your name to that document?

6          "A.  No, sir.

7          "Q.  There were a number of sales associates that

8          were working there at the store, correct?

9          "A.  Correct.

10         "Q.  And out of those sales associates, you were the

11         only one that -- that actually had a notary, correct?

12         "A.  Correct.

13         "Q.  And as a -- a sales associate for that

14         transaction, one of the ways you were compensated is,

15         you were paid a commission in that transaction,

16         correct?

17         "A.  As a sales associate, yes, sir.

18         "Q.  And so Clayton Homes allowed you to notarize

19         documents in which you maintained a financial

20         interest.  Is that true?

21         "A.  Yes, sir.

22         "Q.  And clearly, when all of those documents were --

23         were completed, they were then mailed to sales

24         processing there in -- in Maryville, Tennessee,

25         correct?

1          "A.  Yes, sir.

2          "Q.  And it was someone's job in -- in Tennessee to

3      review the packet and make sure that things were

4      notarized, that signatures were on the various

5      documents and that you had supplied them with a

6      complete packet, correct?

7          "A.  Correct.

8          "Q.  Well, they would have -- presumably, if they

9      were actually reviewing the documents, would have

10      seen that you were acting as a salesperson and the

11      notary, correct?

12          "A.  Correct.

13          "Q.  Clearly, in the transactions where you were also

14      the salesperson, you would not have been a

15      disinterested person to that document, correct?

16          "A.  Correct.

17          "Q.  One of the other practices that was occurring

18      during the transactions in two store -- in Store 214

19      during that time was, you all were notarizing

20      signatures even though that person didn't sign in

21      your presence, correct?

22          "A.  You all?

23          "Q.  You.

24          "A.  Correct.

25          "Q.  Because during that time you were notarizing

1        documents without that person being in front of you

2        signing the documents, correct?

3        "A.   Correct.

4        "Q.   And I realize this is back many years ago, but

5        sitting here today or since the time that I've

6        emailed those -- these -- the deed of trust and

7        mechanic lien involved in the Trevinos to you, have

8        you been able to determine who the sales associate

9        was for that transaction?

10       "A.   No, sir.

11       "Q.   Let me show you, Mr. Frazier, a document that's

12       previously marked as Discovery Exhibit 131.

13       "Q.   If we look up at the very top up here, it

14       identifies the -- the salesperson as -- as

15       Christopher Kimball.  Do you know whether or not

16       Mr. Kimball was the salesperson on this transaction,

17       or does this -- if you look at this -- this type

18       document, would that indicate that he was the actual

19       salesperson on this transaction?

20       "A.   I really don't remember the document and how it

21       played out, but…

22       "Q.   Mr. Kimball was a sales associate working there

23       at the store --

24       "A.   Yes, sir.

25       "Q.   -- during the time you were there?

1           "Q.  Let me ask you about the -- the next set of

2           documents relating to Christie --"

3      **(Pause playing video deposition)**

4         **MR. SOLTERO:**  Your Honor, we object to documents

5   about other transactions as far as that testimony as being

6   irrelevant under 401, unduly prejudicial under 403, cumulative

7   under 404, and we'd ask that it be excluded as well, the entire

8   testimony from here up until Page 58.

9         **THE COURT:**  Thank you.  Overruled.

10     **(Resume playing video deposition)**

11          "Q.  -- Medina.

12          "Q.  But this DeedSearcher -- DeedSearcher Title

13          Services, this is a company that you all used often

14          during -- during the time that you were working at

15          Store 214?

16          "A.  Correct.

17          "Q.  Lance Kimball, is that Christopher Lance

18          Kimball?

19          "A.  Yes, sir.

20          "Q.  Do you remember Christie Medina, Sylvia Medina,

21          or anything having to do with that transaction?

22          "A.  No.

23          "Q.  If we look -- Alejandro Medina?

24          "A.  No.

25          "Q.  Okay.  If we look up here at -- at a similar

1            document for Alejandro Medina, it identifies the

2            salesperson as Christopher Kimball.  Based on the

3            DeedSearcher and -- and this -- this invoice document

4            for sales processing, does it look to you like he was

5            the salesperson on the transaction?

6            "A.  It appears.

7            "Q.  And let me show you the -- the -- the deed of

8            trust, which I've marked as Discovery Exhibit 227 --"

9      **(Pause playing video deposition)**

10          **MR. SOLTERO:**  Your Honor, we object to this document

11   being admitted into evidence, 227.  It's a deed of trust in

12   another transaction.

13          **THE COURT:**  From the store in Corpus Christi?

14          **MR. SOLTERO:**  Yes, your Honor.

15          **MR. RUMLEY:**  This is Store 214 --

16          **THE COURT:**  I'm sorry, and, Mr. Gutierrez, is this --

17          **MR. B. GUTIERREZ:**  Yes, your Honor, this is a Store

18   214 document.

19          **THE COURT:**  Go ahead.

20          **MR. SOLTERO:**  Negative ruling?

21          **THE COURT:**  Yes, overruled.

22      **(Resume playing video deposition)**

23          "Q.  -- And if we look, you can see the -- the name

24          Christie Medina.  Do you see that?

25          "A.  Correct.

1          "Q.  All right.  And then we'll flip to --

2          "Q.  -- the notary page for this document, that,

3          again, is your stamp --

4          "A.  Correct.

5          "Q.  Correct?

6          And is -- and is that your signature?

7          "A.  No, sir.

8          "Q.  And that -- do you see the name Christi Medina?

9          "A.  Yes, sir.

10         "Q.  And then we come down here, and there's --

11         there's not a -- there's not a name in there.  But

12         again, that -- is that your signature?

13         "A.  No, sir.

14         "Q.  And that's your -- your stamp, correct?

15         "A.  Correct.

16         "Q.  The same question, do you have any idea who

17         would have signed your name to the -- as a notary?

18         "A.  No, sir.

19         "Q.  Let me show you Discovery Exhibit 228, which is

20         the builder's and mechanic lien in that --"

21     **(Pause playing video deposition)**

22         **MR. SOLTERO:**  Exhibit 228, the builder's and mechanic

23  lien, involving the Medinas, same objection.

24         **THE COURT:**  Thank you.  Overruled.

25     **(Resume playing video deposition)**

Frazier - Direct / By Video Deposition                    208

1        "Q.  -- same transaction.  Do you see that, Christie

2        Medina?

3        "A.  Yes, sir.

4        "Q.  Again, if we flip to the -- to the notary page,

5        do you see the name Christie Medina?  That's your

6        stamp?

7        "A.  Yes, sir.

8        "Q.  And is that your signature?

9        "A.  No, sir.

10        "Q.  If we come down here, you see the name John

11        Wells, who was the store manager, right?

12        "A.  Yes, sir.

13        "Q.  That is your stamp?

14        "A.  Yes, sir.

15        "Q.  And is that your signature?

16        "A.  No, sir.

17        "Q.  Do you have any idea who would have used your

18        notary stamp and signed your name?

19        "A.  No, sir.

20        "Q.  Let me show you, Mr. Frazier, what I'm marking

21        as Discovery Exhibit 229.

22        "Q.  This is another form power of attorney in the --

23        the Medina matter.  And let me ask you --"

24     **(Pause playing video deposition)**

25        **MR. SOLTERO:**  Your Honor, I would object to

1    Exhibit 229, same grounds.

2             **THE COURT:**  Overruled.  Thank you.

3         **(Resume playing video deposition)**

4             "Q.  -- your stamp is -- appears on that document,

5         correct?

6             "A.  Correct.

7             "Q.  And is that your signature?

8             "A   Yes, sir.

9             "Q.  And if we come over here, your stamp, and is

10        that your signature?

11            "A.  Yes, sir."

12            "Q.  Can you give the -- the jury and I an

13        explanation why it is that your signature would be on

14        a notary on these types of documents, the power of

15        attorney documents, but not on the deed of trust or

16        the mechanic's lien?

17            "A.  Sometimes they would be done at different times.

18            "Q.  But they're supposed to be done at the same

19        time, right?

20            "A.  Supposed to?  I -- I don't know.

21            "Q.  I mean, does it look like to you that -- that,

22        you know, the likely scenario is, is that maybe you

23        notarized the -- the power of attorney, and then at

24        some later point, someone went and-- and -- and

25        prepared the deed of trust and mechanic's lien and

Frazier - Direct / By Video Deposition                    210

1          then just took your stamp and -- and then signed your

2          name?

3          "A.  Correct.

4          "Q.  This is the -- the statement of location, right?

5          You're familiar with that document, generally?

6          "A.  Generally.

7          "Q.  If we go down, that is your stamp?

8          "A.  Yes, sir.

9          "Q.  Okay.  And is that your signature?

10         "A.  Yes, sir.

11         "Q.  All right.  Simply because you -- you notarized

12         the document doesn't -- doesn't mean that they

13         actually signed the document, correct?

14         "A.  Correct.

15         "Q   If we look, I've marked Discovery Exhibit 230,

16         which is the credit application report, and it's VMF-

17         Medina 86 through 127."

18     **(Pause playing video deposition)**

19         **MR. SOLTERO:**  Your Honor, I would object to

20     Exhibit 230 because -- same, 401, 403, 404.

21         **THE COURT:**  Thank you.  Overruled.

22     **(Resume playing video deposition)**

23         "Q.  This -- you've seen this document, this --

24         "MR. LOCHRIDGE:  This form?

25         "Q.  -- this form before, correct?

Frazier - Direct / By Video Deposition                      211

1          "A.  Yes.

2          "Q.  Okay.  And it lists right there, "Salesperson

3     Lance."  That would be Lance Kimball?

4          "A.  Yes, sir.

5          "Q.  All right. And if we go to a similar invoice,

6     the similar form that we looked at before, which is

7     VMF-MED 120, again in the Medina case, it identifies

8     the salesperson being Christopher Kimball, which is

9     also Lance, right?

10         "A.  Correct.

11         "Q.  Clearly, based on the document, you weren't the

12    salesperson, right?

13         "A.  Based on the document, that's correct.

14         "Q.  Okay.  And the -- the signatures -- or whoever

15    notarized the deed of trust and mechanic's lien was

16    not you, right?

17         "A.  Correct.

18         "Q.  Someone clearly took your stamp without your

19    permission or without your authority and -- and

20    signed your name, right?

21         "A.  Correct.

22         "Q.  Let me show you, Mr. Frazier, what I've marked

23    as Discovery Exhibit 231.  And this is a deed of

24    trust --"

25        **(Pause playing video deposition)**

Frazier - Direct / By Video Deposition                    212

1              **MR. SOLTERO:**  Your Honor, we object to Exhibit 231.

2      It relates to a different transaction.  It's unrelated under

3      401, 403, and 404, and also to the testimony accompanying it

4      from Page 61 through Page 65.

5              **THE COURT:**  Overruled.  Thank you.

6          **(Resume playing video deposition)**

7              "Q.  -- as you can see, with the names of Alfonso

8                  Hernandez and Juanita Hernandez.  Do you see that?

9              "A.  Yes, sir.

10             "Q.  Okay.  Again, if we flip to -- if we flip to

11                 the -- the notary page, you see that -- you see the

12                 name of Alfonso Hernandez right there, your notary

13                 stamp.  And is that your signature?

14             "A.  No, sir.

15             "Q.  Do you know who signed your name?

16             "A.  No, sir.

17             "Q.  If we go down to the bottom one, it says

18                 'Juanita,' and again, your notary stamp.  And is that

19                 your signature?

20             "A.  No, sir.

21             "Q.  And then if we go down, John Wells, who's the

22                 store manager, that's your stamp, but is that your

23                 signature?

24             "A.  No, sir.

25             "Q.  And do you have any idea who it is that took

Frazier - Direct / By Video Deposition                    213

1           your notary stamp and -- and signed your name to

2           those documents?

3           "A.  No, sir.

4           "Q.  If we look at what I've marked as Discovery

5           Exhibit 232, it's the builder's and mechanic's lien

6           involving the -- the --"

7        **(Pause playing video deposition)**

8        **MR. SOLTERO:**  Your Honor, same objection with regards

9   to -- that was 243, but it says 232.

10       **THE COURT:**  Thank you.  Overruled.

11       **(Resume playing video deposition)**

12          "Q.  -- same individuals.  Do you see that?

13          "A.  Yes, sir.

14          "Q.  Okay. If we go to the notary page, you can see

15          Alfonso Hernandez, your stamp.  And is that your

16          signature?

17          "A.  No, sir.

18          "Q.  The next one, Juanita Hernandez, your notary

19          stamp.  Is that your signature?

20          "A.  No, sir.

21          "Q.  And then again, John Wells, your notary stamp,

22          but is that your signature?

23          "A.  No, sir.

24          "Q.  Do you know who the -- the sales associate was

25          for the Hernandez transaction?

1     "A.  No, sir.

2     "Q.  Let me show you what I've marked as Exhibit 223,

3     which is the -- the cost of sales summary.  And

4     you're familiar with that form document, correct?

5     "A.  Correct.

6     "Q.  Let me show you what I've marked as Exhibit 223,

7     which is the cost of sales summary.  And you're

8     familiar with that form document, correct?

9     "A.  Correct.

10    "Q.  If we look, the salesperson is Bruce Moore, and

11    that's Bruce Robin Moore --

12    "A.  Correct.

13    "Q.  -- correct?

14          Do you know whether or not Mr. Moore is the

15    one that -- that signed your name as a notary?

16    "A.  No, sir, I do not know.

17    "Q.  Let me show you, Mr. Frazier, what I've marked

18    as Discovery Exhibit 234.

19    "Q.  And if we go down --"

20    **(Pause playing video deposition)**

21    **MR. SOLTERO:**  Object to 234, same grounds, 401 --

22    **THE COURT:**  Thank you.  Overruled.

23    **(Resume playing video deposition)**

24    "Q.  -- you can see the name Juanita Hernandez,

25    Alfonso Hernandez, your notary stamp.  And -- and is

Frazier - Direct / By Video Deposition                    215

1          that your signature?

2          "A.  No, sir.

3          "Q.  On that same document, if we flip to the next --

4          next page, do you see your -- your notary stamp?

5          "A.  Yes, sir.

6          "Q.  Can you tell whether or not that signature is

7          John Wells?

8          "A.  I -- I don't know.

9          "Q.  Okay.  How about -- how about that signature?

10         Is that your signature?

11         "A.  No, sir.

12         "Q.  And then how about this signature?

13         "A.  That's not my signature.

14         "Q.  And then how about this signature?

15         "A.  That's not my signature?

16         "Q   How about this signature?

17         "A.  No, sir.

18         "Q.  Let me have marked as Discovery Exhibit 235 --"

19         **(Pause playing video deposition)**

20         **MR. SOLTERO:**  Your Honor, we object to this on 401,

21  403, and 404.  Can we have a running objection on all the

22  documents?

23         **THE COURT:**  I'm going to overrule --

24         **MR. SOLTERO:**  I'll just make one objection one at a

25  time.

Frazier - Direct / By Video Deposition                216

1          **THE COURT:**  I'm afraid you will have to.  Overruled.

2     **(Resume playing video deposition)**

3          "Q.  -- statement of home location, Form A.

4          "Q   Do you see that?

5          "A.  Yes, sir.

6          "Q.  Okay.  We can go through each one of these, but

7          does this appear to look just like the one we just

8          went through?

9          "A.  It -- it looks identical, yes, sir.

10         "Q.  All right.  None of these purported signatures

11         of your name on Black 6 is your signature, correct?

12         "A.  No, sir.

13         "Q.  You have no idea who did it, correct?

14         "A.  No, sir.

15         "Q.  In -- in transactions where you were the

16         salesperson, you would -- well, tell -- tell us how

17         you would get the documents recorded -- and by

18         'documents,' I'm referring to the deed of trust and

19         mechanic's lien -- in a -- in a case where you're the

20         salesperson.

21         "A.  Generally file them at the county courthouse.

22         "Q.  Would you physically go to the country

23         courthouse and file them, or would you mail them, or

24         how would that --

25         "A.  We'd typically go, yes, sir.

Frazier - Direct / By Video Deposition                    217

1    "Q.  And when you would go, would you actually pay

2    the -- the recording fee out of your own checking

3    account, or would you use Clayton's checking account?

4    "A.  Generally, we'd use our own.

5    "Q.  You would write a check out of your personal

6    bank account?

7    "A.  Correct.

8    "Q.  And then would the document be mailed from there

9    to the store or mailed from there to Tennessee?

10   "A.  Mailed there to the store.

11   "Q.  During the time that -- that you were working

12   at -- at -- at Store 214, do you recall who all the

13   sales associates were that were working?

14   "A.  Yes.

15   "Q.  And can you name them for me?

16   "A.  John Burke, Eric Chappell, Lance Kimball, and

17   Robin Moore.

18   "Q.  I'll mark as 247, which is your personnel file

19   which was previously marked as Discovery Exhibit 84,

20   and it's Clayton Homes 3060 through 37 -- 3077.

21   "If we look at -- from your -- your personnel file,

22   it looks like you were hired August 10th, 1999.  Does

23   that sound about right?

24   "A.  That sounds about right.

25   "Q.  And -- and then you were actually fired, true?

1          "A.   True.

2          "Q.   And it looks like it has a termination date of

3          October 25th, 2002?

4          "A.   That sounds correct.

5          "Q.   Let me show you what I've marked as Discovery

6          Exhibit 249.  And this is one of the --"

7       **(Pause playing video deposition)**

8          **MR. SOLTERO:**  Your Honor, I object to this on

9    relevance and 403.  In particular, this has to do with

10   marketing advertising and there's been no evidence

11   (indiscernible) that the -- Mr. Flores or Mr. King saw any of

12   these advertisements.

13         **THE COURT:**  Sustained.

14         **MR. SOLTERO:**  Now we turn to Page 97:9 to 97:25.

15         **MR. UNIDENTIFIED:**  I'm sorry?

16         **MR. SOLTERO:**  97, Line 9, to 97, Line 25.

17      **(Resume playing deposition video)**

18         "Q.   And so you were -- obviously, as a sales

19         associate, you were out there hustling, trying to

20         make sales, right?

21         "A.   Correct.

22         "Q.   The way you make money is obviously if you're

23         selling homes?

24         "A.   Correct.

25         "Q.   And one way that you're able to sell homes is --

Frazier - Direct / By Video Deposition                    219

1         is bring any deed to anyone's land, and -- and we're

2         able to finance you through this land-in-lieu

3         program, correct?

4         "A.  Correct.

5         "Q.  And the individual who owned the land did not

6         even have to sign off as a co-signer on the

7         installment contract, correct?

8         "A.  Correct.

9         "Q.  Would you all call -- and -- and by 'you all,' I

10        mean you and John Wells, the two managers of the

11        store.  Would you -- would you call on people about

12        their payments?

13        "A.  Yes, sir.

14        "Q.  And would you go by their houses?

15        "A.  Yes, sir.

16        "Q.  You would actually act as a collection person

17        trying to collect on those payments, correct?

18        "A.  Yes, sir.

19        "Q.  Do you know whether or not you would actually

20        collect on all the transactions or just the

21        transactions in which you were the -- the sales

22        associate?

23        "A.  I believe we all did it.

24        "Q.  Okay.  You would receive reports back from --

25        from corporate, from Tennessee, indicating the

Frazier - Direct / By Video Deposition                    220

1      delinquencies --

2      "A.  Yes.

3      "Q.  -- correct?

4      And then you all would spend some time calling these

5      people telling them to get their payments in,

6      correct?

7      "A.  Correct.

8      "Q.  The documents in the land-in-lieu transaction

9      would be the -- the various -- the installment

10     contract, the documents that we've gone through here

11     today, deeds of trust, mechanic's liens, all of those

12     documents would be mailed from Store 214 to

13     Maryville, Tennessee, correct?

14     "A.  Correct.

15     "Q.  With respect to the -- the notarization of -- of

16     document, I think you -- you've been clear today, you

17     never gave anyone permission or authority to use your

18     stamp, right?

19     "A.  Correct.

20     "Q.  You didn't keep your stamp under lock and key,

21     but you didn't allow anybody to use it --

22     "A.  Correct.

23     "Q.  -- right?

24     "Q.  You testified that it was reasonable to assume

25     that whoever the sales associate that was doing

Frazier - Direct / By Video Deposition                221

1          the -- the transaction would be the individual who

2          would be using your stamp and signing your name.

3          "Q.  Is that true?

4          "A.  I don't know if those were my words or your

5          words.

6          "Q.  Well, let's see.  I mean, do you believe that to

7          be true?

8          "A.  Yeah.

9          "A.  Yeah, that's a reasonable assumption, yes.

10         "Q.  And clearly, the individual who's going to

11         benefit from the transaction is the sales associate

12         who is going to enjoy at least 16 percent gross

13         profit in -- in the sale, right?"

14         "A.  Correct.

15         "Q.  And it's reasonable, in your mind, as someone

16         who was there for several years and involved in the

17         transactions, that the individual who is using your

18         stamp without your permission, without your authority

19         and signing your name would be the sales associate,

20         correct?

21         "A.  Correct.

22         "Q.  What I have done, if you look, I've marked as

23         Discovery Exhibit 250, 251, and 252."

24     **(Pause playing of video deposition)**

25         **MR. SOLTERO:**  Your Honor, we object to 251 and 252,

Frazier - Direct / By Video Deposition                222

1    they're a compilation of other documents, they're not an actual

2    like deed of trust or a document, that's just a compilation of

3    things --

4              MR. B. GUTIERREZ:  They are the --

5              MR. SOLTERO:  -- and we object to them.

6              MR. B. GUTIERREZ:  They are the notary blocks from

7    some of the documents that had already been shown to

8    Mr. Frazier by Mr. Rumley and what we've done is compare the

9    notary signatures of Mr. -- the forged notary signature of

10   Mr. Frazier for his examination.

11             MR. SOLTERO:  We would object under 401, 403, and

12   404.  And it's cumulative.

13             THE COURT:  So these are not documents, they are

14   pieces of documents?

15             MR. B. GUTIERREZ:  Yes, taken from the documents

16   where Mr. Lance Kimball was the sales associate, for example,

17   or Mr. Robin Moore was the sales associate in a transaction.

18   Those are just demonstrative documents, your Honor.

19             MR. SOLTERO:  I believe they are portions of

20   documents that they put together.

21             MR. B. GUTIERREZ:  Out of these documents that he

22   just testified about.

23             THE COURT:  All right, I'm sorry, I'll sustain that.

24             MR. SOLTERO:  That would be 106:3 through 108:8.

25         (Resume playing video deposition)

1          "Q.  Let's look at the -- the first one, Elizandro

2          Herrera, which was your second deposition --"

3      **(Pause playing video deposition)**

4          **MR. SOLTERO:**  Your Honor, we object to this for the

5  same reasons, 401, 403, and 404 --

6          **THE COURT:**  For the earlier objections.

7          **MR. SOLTERO:**  Yes, your Honor.

8          **THE COURT:**  Okay, that's overruled.

9      **(Resume playing video deposition)**

10         "Q.  -- Page 68.

11         "A.  Right.

12         "Q.  You had indicated that is not your signature.

13         Is that -- is that still true today?

14         "A.  Yes.

15         "Q.  Okay.  And we look over, and this is the

16         signature on the mechanic's lien, which is the same

17         page, Page 68, number two deposition.  Is that your

18         signature?

19         "A.  No, sir.

20         "Q.  Okay.  Oh, I guess that's the -- if you look at

21         the date, Mr. Frazier, it's actually dated

22         December 27th, 2002.  That's several months after you

23         were no longer there, right?

24         "A.  Yes, sir.

25         "Q.  Do you know, when you left, when -- when they

Frazier - Direct / By Video Deposition                    224

1              fired you, did you leave your stamp there?

2              "A.  I don't recall, but I must have.

3              "Q.  Certainly after you left, you didn't give

4              anybody permission to continue to use your stamp --

5              "A.  No, sir.

6              "Q.  And if we go down, here's Elizandro Herrera, and

7              then you see Robin Moore.  Do you know whether or not

8              Mr. Moore became a notary after you left?

9              "A.  I think it was shortly aft -- before I left.

10             "Q.  Okay.  And then if you look right --"

11        (Pause playing video deposition)

12             MR. SOLTERO:  Your Honor, I object because I think

13   this may be part of the demonstrative, 251 and 252.

14             MR. B. GUTIERREZ:  That's not correct, your Honor.

15   It is a document, 214.

16             MR. SOLTERO:  Your Honor, we withdraw that objection.

17             THE COURT:  Thank you.

18        (Resume playing video deposition)

19             "Q.  -- here, do you see your stamp?

20             "A.  Yes, sir."

21             "Q.  And Mr. Moore's stamp?  Do you see that?

22             "A.  Yes, sir.

23             "Q.  And then it looks like someone -- someone signed

24             your --

25             "A.  Yeah, that's not my signature.

1          "Q.  That's not your signature?

2          "A.  No, sir.

3          "Q.  Okay.  Okay.  We go down to the next one,

4          Orlando Morin; that's not your signature?

5          "A.  No, sir.

6          "Q.  All right.  We go over here, Orlando Morin;

7          that's not your signature?

8          "A.  No, sir.

9          "Q.  John Wells --"

10         **THE COURT:**  Hold on.

11      **(Pause playing video deposition)**

12        **MR. SOLTERO:**  Your Honor, this is the demonstrative

13   that has several unrelated transactions altogether, so I would

14   object to using this document in the questions under 401, 403,

15   it's not an authentic document; it's a compilation of these

16   other documents.

17         **THE COURT:**  Sustained.

18        **MR. SOLTERO:**  And that would be from there until

19   112:116.

20      **(Counsel and technician confer)**

21      **(Counsel confer)**

22      **(Resume playing video deposition)**

23         "Q.  Do you know whether or not that refreshes your

24         memory, or are you still -- I mean, I'll show you.

25         "A.  Okay.

Frazier - Direct / By Video Deposition                226

1          "Q.  If we look, again going to your second

2          deposition on Page 132, it says, 'I'm -- I'm going to

3          mark, as Discovery Exhibit 258, a deed of trust

4          purportedly signed by Porfirio Benavides.'

5          "And then we go down, 'Do you know if you were the

6          salesperson?'

7          'No, I was not.'

8          'Do you know who was?'

9          'No.'

10         'Exhibit 258 is the deed of trust.  Let me show you

11         the notary page.  And is that your signature?'

12         'No, sir.'

13         'Do you know who signed it?'

14         'No, sir.'

15         And then actually, we can -- we can look at it, but

16         if you -- if you go on, the actual original document,

17         you can see right here, it says, 'Does that appear to

18         you that someone cut -- cut out a signature and tried

19         to past in on there?'

20         "A.  Okay.

21         "Q.  Do you remember that?

22         "A.  A little bit.

23         "Q.  Okay.  Does that refresh your memory as t

24         whether or not you think that's yours, or you're

25         still on the fence or --

1           "A.  I'm -- yeah.  That's kind of close, though.

2           "Q.  Okay.  If we go to Page 134, the builder's and

3           mechanic's lien contract for Mr. Benavides, it says,

4           'I'll just show you the notary page.  Is that your

5           signature?'

6           Your answer was: 'No, sir.'

7           Right?

8           "A.  Yes, sir.

9           "Q.  'And how about the bottom one; is that your

10          signature?'

11          'No, sir.'

12          And again, 'Do you know who signed it?'

13          'No, sir.'

14          So back -- back then when you gave your deposition,

15          you agreed with me that you said no, it's not your

16          signature; today, you're on the fence?

17          "A.  Correct.

18          "Q.  All right.  So with -- with those clarifications

19          in --"

20      **(Pause playing video deposition)**

21          **MR. SOLTERO:**  This is testimony from the exhibits

22  that your Honor excluded, 251 and 252; from there until

23  Page 115, Line 18.

24      **(Resume playing video deposition)**

25          "Q.  If we go to Alma Soliz --"

1          **(Pause playing video deposition)**

2               **MR. SOLTERO:**  Your Honor, I object; that is also part

3     of that.  I didn't realize --

4               **THE COURT:**  Okay.

5               **MR. SOLTERO:**  -- this is the same document.  So 116

6     to 116:6, also the same document that the Court's excluded.

7               And, your Honor, I'd make the same objection with

8     regards to the next, 257, as to testimony on Page 121

9     through 122.

10              **THE COURT:**  These are the compilation documents?

11              **MR. SOLTERO:**  Yes, your Honor, I believe they are.

12              **THE COURT:**  Sustained.

13              Is that true?

14              **MR. B. GUTIERREZ:**  I believe so, your Honor.

15              **THE COURT:**  That's sustained.

16         **(Counsel confer)**

17         **(Resume playing video deposition)**

18              "Q.  The salesperson in all of these transaction

19              is -- is Christopher Lance Kimball."

20         **(Pause playing video deposition)**

21              **MR. SOLTERO:**  Your Honor, we make the same objection.

22     I think that continues on until -- we're going to object up

23     until Page, I believe, one -- until 128:19, I believe.

24              **THE COURT:**  For the composite documents?

25              **MR. SOLTERO:**  Yes, your Honor --

1          THE COURT:  Okay.

2          MR. SOLTERO:  -- he's questioning about that same

3     document.

4        (Counsel confer)

5          THE COURT:  Temperature better?  Okay.

6          MR. CASTILLO:  Your Honor, the jurors are asking for

7     a break.

8          THE COURT:  It's time to break.  Twenty minutes?

9          Would you please stand for the jury?

10       (Jurors exit courtroom at 2:51 p.m.)

11         THE COURT:  You got your motion filed quickly,

12    Vanderbilt.

13         MR. RUMLEY:  I did, your Honor?

14         THE COURT:  No, sorry.

15         Anything to take up outside the presence of the jury?

16         MR. SOLTERO:  I don't think so, your Honor --

17         MR. UNIDENTIFIED:  I don't believe so, your Honor.

18         MR. SOLTERO:  It would be the same thing we've been

19    soing --

20         THE COURT:  Okay.

21         MR. SOLTERO:  Well, outside the presence of the jury

22    we'd request a limiting instruction in connection with the

23    Fifth Amendment.

24         THE COURT:  With what?

25         MR. SOLTERO:  With Mr. Moore taking the Fifth

 1   Amendment when it gets played.

 2           **THE COURT:**  Oh, no, I already ruled on that.  That's

 3   coming in.

 4           **MR. SOLTERO:**  Right, I know it's coming in, but we

 5   request --

 6           **THE COURT:**  Oh, you want a limiting instruction.

 7   Okay, wait a minute.  Here we go.  What do you want?

 8           **MR. SOLTERO:**  Your Honor, what we want is set forth

 9   in that limiting instruction, an instruction to the jury

10   that --

11           **THE COURT:**  I thought you said in limine.  I

12   misunderstood.

13           **MR. SOLTERO:**  No, limiting.  And, your Honor, if I

14   may get the paper and get it exactly right.  It's on the second

15   page of the brief that I gave you.  It's basically --

16           **THE COURT:**  "The Fifth Amendment is personal and not

17   one a corporation can assert.  Implication would be relevant

18   only Moore's ...

19           **MR. SOLTERO:**  To his credibility, not to any

20   liability of the Clayton parties.  And he never worked for

21   Vanderbilt or Clayton Homes, that --

22           **THE COURT:**  Where was he?

23           **MR. SOLTERO:**  He was at CMH Homes, not Clayton Homes.

24           **MR. RUMLEY:**  If I may, your Honor?

25           **THE COURT:**  The one entity, the separate and distinct

1   entity?

2          **MR. RUMLEY:**  Actually his employment form says

3   Clayton Homes, Inc.  If we all want to be -- we can pull out

4   his employment form --

5          **THE COURT:**  Okay, I'm not going to give that one.

6          **MR. SOLTERO:**  And that the claim of coverage is not a

7   substitute for relevant evidence and he was not an employee,

8   agent, or subject to the control of any of the Clayton parties

9   when he --

10         **THE COURT:**  That's not true.  Oh, when he made it,

11  but he --

12         **MR. SOLTERO:**  When he invoked his constitutional

13  Fifth Amendment right, he hadn't worked for us for over five

14  years.

15         **THE COURT:**  Okay, go ahead.

16         **MR. SOLTERO:**  And then finally, Judge, that it could

17  just as easily be inferred  that the witness's refusal to

18  answer questions was consistent with a desire to protect his

19  own interest as opposed to -- frankly, we didn't control him

20  because if we controlled him he wouldn't have taken the Fifth.

21  We wouldn't -- that doesn't help us.

22         **MR. J. GUTIERREZ:**  Your Honor, Mr. Rumley argued

23  earlier Mr. Moore was represented by an attorney paid for by

24  his prior employer.

25         **THE COURT:**  Is that right?  You got him an attorney?

```
 1              MR. RUMLEY:  In his deposition.

 2              MR. SOLTERO:  I believe yes.

 3              THE COURT:  Now you're saying he wasn't under your

 4   control?

 5              MR. RANGEL:  Judge, just for the record, that's

 6   correct.  Mr. Augie Rivera was --

 7              THE COURT:  Oh, the nephew.

 8              MR. RANGEL:  -- was hired to represent --

 9              THE COURT:  I see.

10              MR. RANGEL:  -- right.

11              THE COURT:  And who found Mr. Augie Rivera?

12              MR. RANGEL:  He was paid by -- who found him?

13              THE COURT:  No, no, I know you found him, but -- who

14   paid?

15              MR. RANGEL:  I believe he was paid by CMH Homes, but

16   he was a lawyer that was retained to represent him and he had

17   an attorney-client relationship and we certainly did not have

18   any --

19              THE COURT:  As long as all that comes in too, then

20   I'll do all the rest of this.

21              MR. RUMLEY:  We would request an instruction that

22   there's an interest on the Fifth Amendment, which is clear from

23   the Fifth Circuit in the cases cited to the Court's --

24              THE COURT:  It is.

25              MR. RUMLEY:  -- summary judgment order.  We would
```

1    request either now or at the charge stage, prefacing that they

2    should make some inferences to his answers.  And I don't think,

3    your Honor, that is inconsistent if the Court is going to give

4    this corporation thing, it's not inconsistent; that's simply

5    the law, in a civil case there's an inference that silence

6    is -- it is for protection.

7            MR. SOLTERO:  Mr. Rumley's incorrect about the law,

8    because what the law says is that's true for a party.  That is

9    not the case for non-parties.  And to try and impute that to a

10   non-party taking the Fifth, and individual, and trying to

11   impute that to somebody else, that is not a fair inference, and

12   that's why in the *Hargrove* (phonetic) case in the Fifth Circuit

13   said that the undue prejudice that results from somebody

14   invoking the Fifth can jeopardize the ability to get a fair

15   trial.  And that's why, because it's coming in --

16           THE COURT:  It's coming in, because he's a non-party

17   and it can come in.

18           MR. SOLTERO:  Right, and so at the bare minimum,

19   Judge, we believe that a limiting instruction to the jury on

20   the issues that I raised --

21           THE COURT:  I agree with you.  See what all you

22   can -- see what all you can agree to with this.

23           And I don't think -- the Fifth Amendment should be

24   perfectly obvious to the jury about what it infers for this

25   man, or what it cannot infer.  And it cannot be evidence

234

```
 1   against these people.  It can't.  I mean that's just not right.
 2   No matter who hired the lawyer.
 3           MR. RUMLEY:  Even though his --
 4           THE COURT:  A great choice, by the way, Mr. Rangel.
 5           MR. RUMLEY:  Just so we're clear, the inference that
 6   the jury can draw from him taking the Fifth Amendment can be
 7   evidence to show that CMH is liable by and through their
 8   employee.
 9           MR. SOLTERO:  No, that's exactly what it can't show.
10           THE COURT:  No, no, no.  No.
11           MR. RUMLEY:  The conduct, they are only liable by and
12   through their employees.  He was employed at the time that the
13   conduct is -- that he conducted in the deposition.
14           THE COURT:  Let me look at that case again, because I
15   don't think it can be used as evidence against Clayton Homes.
16   It can be used as evidence against his malfeasance, I think,
17   but not against Clayton Homes.
18           Now, you can argue all you want in closing arguments
19   to impute that to their employee, you know, their employee took
20   the Fifth about something he did while he was employed with
21   them.  You certainly can.
22           MR. J. GUTIERREZ:  And, your Honor, in the
23   instruction that he's proposing Moore was never employed by
24   Vanderbilt --
25           THE COURT:  I'm not giving that one.
```

1          MR. J. GUTIERREZ:  Okay, thank you, your Honor.

2          THE COURT:  I'm only considering the others.

3          MR. RANGEL:  And just for the record in terms of

4    counsel, Mr. Ron Barroso was retained by Mr. Moore and not paid

5    by -- He was a criminal defense lawyer so that was --

6          THE COURT:  There you have it.

7          MR. RANGEL:  -- individual to Mr. Moore and whatever

8    financial arrangements they made.

9          THE COURT:  I feel better about everything.

10         MR. RUMLEY:  We have on the record Ron says they

11   refused to pay him.

12         THE COURT:  Uh-oh.

13         MR. RUMLEY:  Correct?

14         MR. RANGEL:  Yes, we did not retain Mr. --

15         THE COURT:  Apparently.

16         MR. RANGEL:  -- Barroso for Mr. Moore.

17         MR. UNIDENTIFIED:  Disagree.

18         MR. UNIDENTIFIED:  We started 136 and --

19         MR. J. GUTIERREZ:  Your Honor, there's one other

20   instruction on here and I wasn't sure if the Court's going to

21   admit it.

22         THE COURT:  Tell me.

23         MR. J. GUTIERREZ:  It's the second to the last

24   (indiscernible) privilege.  It's not a substitute for relevant

25   evidence.

1          **THE COURT:**  I don't know what that means.

2          **MR. J. GUTIERREZ:**  Neither do I, and I don't think

3    the jury's going to understand that either.

4          **THE COURT:**  So I'm going to take that out, because I

5    don't understand it.

6          **MR. SOLTERO:**  But the others -- except for the one

7    about being not never employed by the --

8          **THE COURT:**  Yeah, I don't like that one.

9          **MR. SOLTERO:**  -- or the relevant evidence  but the

10   others ought to be given to the jury.  And I believe, Judge,

11   that it would be appropriate to do it at the time that the

12   deposition is read.

13         **THE COURT:**  I agree with you, but I want you all to

14   look at that and see if this is okay with you, for me to give

15   the rest of that limiting instruction.

16         **MR. J. GUTIERREZ:**  So is it going to be 1, 2, and 3?

17         **THE COURT:**  1, 2, 3, and 5 -- wait a minute, 1, 2, 3,

18   4, 5, 6 -- 1, 2, 3, and 6.

19         **MR. J. GUTIERREZ:**  Well, I definitely, you know,

20   object to Number 3 in terms of being an employee subject to the

21   control.  I mean his counsel was -- this wasn't just some

22   person on the street, Clinton Homes sought out to protect him

23   and to retain counsel for him --

24         **THE COURT:**  You know what, let's just put that he was

25   not an employee of the parties when he invoked the Fifth.

1          **MR. J. GUTIERREZ:**  Exactly --

2          **THE COURT:**  That's fine.

3          **MR. J. GUTIERREZ:**  -- when he invoked the Fifth.

4    That's fair, your Honor.

5          One last thing, the last one about just be easily

6    inferred, if we're not going to ask the jury to infer anything

7    from him taking the Fifth Amendment we shouldn't ask --

8          **THE COURT:**  I thought you were.

9          **MR. SOLTERO:**  Yeah, that's exactly what Mr. Rumley --

10         **(Voices overlap)**

11         **MR. SOLTERO:**  -- like that but I planned argument.  I

12    think that it has to be -- sorry, I apologize.

13         **MR. J. GUTIERREZ:**  That's okay.  Let me just finish

14    my point?  If the Court will not let us ask the jury to make

15    that inference, then the jury should not be allowed to make the

16    opposite inference, which is, well, his refusal to answer might

17    not -- might only be for his own interests, not his employer.

18    I mean if there's going to be no instruction to the jury to

19    make an inference then the jury shouldn't make inferences in

20    either direction.

21         **MR. SOLTERO:**  The problem with that, your Honor, is

22    that -- it's two-fold.  One is that they're going to get up and

23    argue that and, two, as your Honor pointed out, that's what

24    most people are going to think when somebody takes the Fifth

25    anyway.  And that's why it's important to have these limiting

238

 1   instructions to make it balanced and fair, to tell the jury

 2   that this is --

 3         THE COURT:  Okay, may I say -- may I tell you this, I

 4   think you may be right, and I'll tell you why, because this

 5   Number 6 instruction really says the same thing as the second

 6   instruction, it's just cumulative.  And if you don't believe me

 7   the first time, then I'm going to tell you the third time and

 8   the second time.

 9         See if you would like to rework the second one and

10   not have Number 6.

11         MR. SOLTERO:  I will -- what I would propose then,

12   Judge, on the fly is that we amend Number 2 to say the

13   implication should be relevant only to Moore's credibility and

14   cannot alone form the basis of any finding of liability against

15   the Clayton parties.

16         THE COURT:  I think that makes sense.  Give me the

17   exact words -- will the two of you, since -- you didn't stay up

18   till 2:00 a.m. with him, did you?

19         MR. J. GUTIERREZ:  A fracture.

20         THE COURT:  Okay, could the two of you then work on

21   that one sentence?

22         MR. SOLTERO:  Okay.

23         THE COURT:  And I'll give 1 and 2 --

24         MR. SOLTERO:  And 3 where stopping at employee, Moore

25   was not an employee --

1          **THE COURT:**  Yes --

2          **MR. SOLTERO:**  -- at the time --

3          **THE COURT:**  -- he was not employee of the parties at

4    the time he invoked the Fifth Amendment.

5          **MR. SOLTERO:**  Exactly.

6       **(Pause)**

7          **THE COURT:**  Can we go off the record now?  Are we

8    finished with that?

9          **MR. UNIDENTIFIED:**  Finally, your Honor.

10         **THE COURT:**  Thank you.

11      **(A recess was taken from 3:01 p.m. to 3:16 p.m.; parties**

12   **present)**

13      **(Outside the presence of the jury)**

14         **THE COURT:**  How much longer is this?

15         **MR. RUMLEY:**  About --

16         **MR. B. GUTIERREZ:**  Five minutes.

17         **THE MARSHAL:**  All rise for the jury.

18      **(Jurors enter courtroom at 3:16 p.m.)**

19         **THE COURT:**  You may be seated.

20         Okay, you may proceed.

21      **(Resume playing video deposition of Benjamin Joseph**

22   **Frazier)**

23                 E X A M I N A T I O N

24         "Q.  (BY MR. RUMLEY) The compensation for the sales

25         associate, this was -- that was in place back during

Frazier - Cross / By Video Deposition                    240

1        the time you were there, we've talked about these

2        before.  You have a base, a 16 percent, the 4 percent

3        financing with Vanderbilt, right?

4        "A.  Yes, sir.

5        "Q.  And then you have APR above minimum each

6        increment point quarter, you get an additional point

7        quarter percent with a maximum of 2 percent, correct?

8        "A.  I can't see the maximum part, but, yeah.

9        "Q.  Oh, I' m sorry.  Right?

10       "A.  Yes, sir.

11       "Q.  And so what that means is, if you -- you got the

12       customer to agree to a higher interest rate than what

13       they qualified for, you would get an additional

14       percentage of the adjusted gross profit up to a max

15       of 2 percent --

16       "Q.  -- correct?

17       "A.  Correct.

18       "Q.  And you agree with me a customer would never

19       agree to that unless -- if they were told -- if they

20       were told that they qualified for a lower rate --

21       "A.  Correct.

22       "Q.  One of the things that you testified during --

23       and I believe it might have even been deposition --

24       your first deposition or second deposition -- is that

25       you were required to do some audio closings.  Do you

Frazier - Cross / By Video Deposition                241

1        remember that?

2        "A.  Yes, sir.

3        "Q.  (BY MR. GUTIERREZ) Okay.  Do you know what

4        happened to the closings, the audiotaped closings,

5        that you did?  Do you know what happened to them?

6        "A.  No.  At this point, no.

7        "Q.  (BY MR. RANGEL) And I need to ask you, did you

8        physically destroy them yourself?

9        "A.  No, sir.

10       "Q.  Now, you also testified, and I believe it was in

11       your second deposition, that -- that you knew that

12       Robin Moore was signing the signature of John Wells.

13       "A.  I don't recall that answer.

14       "Q.  Okay.  Do you have the second deposition?  And I

15       believe in your second deposition Mr. Rumley was

16       asking you on Page 45.  And the -- the question that

17       is asked of you by Mr. Rumley is 'Did you know that

18       Robin Moore was signing Wells' name to documents?'

19               And what was your answer?

20       "A.  It appears to be 'Yes, sir.'

21       "Q.  It says 'Yes, sir,' right?

22       "A.  Yes, sir.

23       "Q.  And it -- it's not, it appears to -- to say yes,

24       sir.  I mean you -- you testified under oath that --

25       "A.  Correct.

Frazier - Cross / By Video Deposition                 242

1      "Q.  -- that you knew that Robin Moore was signing

2      John Wells' signature to documents, right?

3      "A.  Yes, sir.

4      "Q.  Okay.  And -- and you also testified under oath

5      that John Wells knew that as well.  Is that correct?

6      THE WITNESS:  I didn't see it.  You need to put it

7      back.

8      MR. RUMLEY:  Hmm?

9      MR. GUTIERREZ:  You need to put it back.

10     "Q.  (BY MR. GUTIERREZ) You also testified --

11     "A.  Yes, sir.

12     "Q.  -- that Wells knew that as well, right?

13     "A.  Yes, sir.

14     "A.  I testified five years ago, and I do not

15     remember now.

16     "Q.  Now, this -- these documents that we had -- or

17     Mr. Rumley has gone over with you this past several

18     minutes where you've testified that someone -- that

19     it's not your signature, those documents were

20     actually used and -- and are being used by

21     Vanderbilt --

22     "Q.  -- to secure -- to secure a mortgage on -- on

23     property.  Is that correct?

24     "A.  I don't know if they're currently being used.

25     "Q.  I mean, those documents that you testified

1        contain your forged signature, if we can assume --

2        isn't it fair to assume that Vanderbilt has used them

3        and is using them to create a lien on -- on both real

4        property and personal property?

5        "A.  Yes, sir.

6        "Q.  (BY MR. RUMLEY) Mr. Frazier, I'm going to mark

7        as Discovery Exhibit 294 what we've printed off from

8        the Secretary of State regarding the various sales

9        associates and -- and their notary records.

10       "Q.  And I just wanted to, if we flip to yours,

11       verify it says that -- that you were a commissioned

12       notary public August 24th, 1999, and it expired

13       August 24th, 2003.  Does that -- does that look

14       right?

15       "A.  That looks right, yes, sir.

16       "Q.  Mr. Frazier, when you were -- when you left

17       Clayton Homes, when you were -- when you were

18       terminated back in October of 2002, did they -- did

19       the folks at -- at Clayton Homes instruct you or

20       require you to leave all of your notary material,

21       books and everything, at the Clayton Homes Store 214?

22       "A.  No, sir.

23       "Q.  You took that stuff with you?

24       "A.  I -- I don't recall.  But I don't remember them

25       instructing me, no, sir.

1          "Q.  So -- well, obviously, you've seen the Elizandro

2          Herrera file -- and I forget the discovery exhibit --

3          which clearly shows your notary stamp on a document

4          months after you had been terminated, had been fired,

5          right?

6          "A.  Yes, sir.

7          "Q.  Okay.  So that -- we can pretty much assume that

8          your notary stamp stayed behind when you were fired.

9          Is that correct?

10         "A.  Yes, sir.

11         "Q.  (BY MR. GUTIERREZ) Did they require you to leave

12         the notary stamp?

13         "A.  No, sir.

14         "Q.  Okay.  Did you voluntarily leave the notary

15         stamp with Robin Moore?

16         "A.  No, sir.

17         **(End playing video deposition of Benjamin Joseph Frazier**

18    **by Defendants/Cross-Plaintiffs)**

19         **MR. B. GUTIERREZ:**  That's the end of our offer, your

20    Honor.

21         **THE COURT:**  All right, thank you.

22         You may --

23         **MR. SOLTERO:**  Your Honor --

24         **THE COURT:**  Do you have an offer?

25         **MR. SOLTERO:**  We do, and it's in two parts.

Frazier - Cross / By Video Deposition                245

1      **THE COURT:**  Please do.

2                  **FOR PLAINTIFFS**

3      **BENJAMIN JOSEPH FRAZIER BY VIDEO DEPOSITION**

4              E X A M I N A T I O N

5      "Q.  … salesperson on a transaction, specifically a

6      land-in-lieu transaction, run me through kind of

7      logistically what you would do; how would you do it;

8      what documents would you get, and run me through a

9      whole land-in-lieu transaction.

10     "A.  From the very beginning?

11     "Q.  Yes, sir.

12     "A.  Okay.  Basically, you have somebody come in.  We

13     qualify them at that point.  They -- basically,

14     during that qualify, they tell you how -- usually,

15     the advertisement -- normally, the advertisement

16     brought them in.  They walk in with a deed in their

17     hand.

18                  Basically, they pick out a house.  We'd go

19     through the application process, call them in a

20     couple days later, once we had closing paperwork

21     prepared, and got everybody to sign everything

22     properly, send it to deal processing.  And if we

23     needed any further paperwork, we would inquire with

24     the customer to get it.

25     "Q.  You understand that, as a notary, that the

1          individual has to appear before you before you can

2          notarize their signature?

3          "A.  I do now.

4          "Q.  You didn't back then?

5          "A.  Not exactly, no, sir.

6          "Q.  And at no time did you give anybody permission

7          to use your notary stamp, correct?

8          "A.  Correct.

9          "Q.  And do you remember Cesar Flores or Alvin King?

10         "A.  No, sir.

11         "Q.  Do you remember ever meeting them?

12         "A.  No, sir.

13         "Q.  Let me show you what's marked as Discovery

14         Exhibit 226.  And if we go to --

15         "Q.  -- well, first of all, do you know what this

16         document is, generally?

17         "A.  Generally, yes, sir.

18         "Q.  What generally is this form document?

19         "A.  I believe for titling.

20         "Q.  Okay.  This is the -- the document that when the

21         transaction is complete is -- is -- is mailed to

22         Austin, right?

23         "A.  I don't know, but…

24         "Q.  All right.  And if we look, you can see this is

25         Cesar Flores and Alvin King?

1        "A.  Yes, sir.

2        "Q.  Okay.  If we flip to the next page, your stamp

3        appears two times.  Do you see that?

4        "A.  Yes, sir.

5        "Q.  And is that -- is that your signature?

6        "A.  It appears to be, yes, sir.

7        "Q.  And then if we look, the third one on the

8        bottom, is that your signature?

9        "A.  Yes, sir.

10       "Q.  Okay.  If we flip to the -- the next page --

11       MR. RANGEL:  You mean the previous page?

12       MR. RUMLEY:  109.

13       "Q.  -- do you see your -- your stamp?

14       "A.  Yes, sir.

15       "Q.  And is that -- is that your signature?

16       "A.  Yes, sir.

17       "Q.  Did John Wells know that -- that other people

18       were using your stamp?

19       "A.  Not that I'm aware of.

20       "Q.  Well, delinquencies in collections actually

21       affect the amount of money that the -- the store

22       manager and the associate store manager make?

23       "A.  I don't believe that's true.

24       "Q.  Well, how did it affect the stores, then?

25       "A.  I think it was only if it was actually

```
 1        repossessed.
 2        "Q.  Okay.  Well, tell me how the repossession of a
 3        home affects the compensation of the store manager
 4        or -- or the assistant store manager.
 5        "A.  Because each store was full recourse where we'd
 6        have to buy it back.
 7        "Q.  And so if -- if Joe Smith falls behind on their
 8        payments and you all have to repossess their home,
 9        then that actually costs you, as the assistant store
10        manager, money?
11        "A.  Correct.
12        "Q.  Have you ever heard anything about the fact that
13        all of the transactions, the land-in-lieu
14        transactions, that came out of your store during the
15        time that you were there, that they went and filed
16        all these mass releases?
17        "A.  Yes, sir.
18        "Q.  And what did you hear about that?
19        "A.  You told me that they released all the -- the
20        liens.
21        "Q.  Did it surprise you?
22        "A.  Yeah.  Yes.
23        "Q.  During the time that you worked for Clayton,
24        were you basically in the business of placing folks
25        in homes?
```

Frazier - Cross / By Video Deposition                    249

1     "A.  Yes, sir.

2     "Q.  And how did you feel about your job with respect

3     to that?

4     "A.  Good.  We were giving people an opportunity to

5     have a home.

6     "Q.  And, for example, this land-in-lieu program that

7     Clayton had, you said that that was unique to

8     Clayton?

9     "A.  Correct.

10    "Q.  As a result of that program, that -- that

11    enabled Clayton to put folks into homes that

12    ordinarily would not have been able to qualify for a

13    home?

14    "A.  Yes, sir.

15    "Q.  And how did you feel about that?

16    "A.  Oh, very good.

17    "Q.  Why?

18    "A.  There's just certain times where you'd go out

19    and you'd see where people were living and give them

20    something better to live in, and it just made you

21    feel good about it.

22    "Q.  During the time that you worked at Clayton, did

23    you ever sign a customer's name to a document or a

24    landowner's name to a document?

25    "A.  No, sir.

Moore - Direct / By Video Deposition                250

1          "Q.  During the time that you worked with Clayton,

2          did you see -- ever see anybody else do that?

3          "A.  No, sir.

4      **(End playing video deposition of Benjamin Joseph Frazier**

5  **by Plaintiffs)**

6          **MR. SOLTERO:**  Your Honor, that concludes our proffer.

7          **THE COURT:**  Thank you.  Anything further?

8      **(No audible response)**

9          Would you call your next witness?

10         **MR. B. GUTIERREZ:**  We would call Bruce Robin Moore by

11 video deposition.

12         **THE COURT:**  Thank you.

13         **MR. SOLTERO:**  Your Honor, we would request a limiting

14 instruction on Mr. Moore's deposition.

15         **THE COURT:**  Should I wait till we get to the moment

16 of limiting.

17         **MR. SOLTERO:**  Yes, your Honor.

18         **THE COURT:**  Thank you.

19                    **DEFENDANTS' WITNESS**

20              **BRUCE ROBIN MOORE BY VIDEO DEPOSITION**

21         **(Witness sworn)**

22                  E X A M I N A T I O N

23         BY MR. RUMLEY:

24         "Q.  Sir, could you identify yourself for us?

25         "A.  Bruce Robin Moore, Jr.

1        "Q.  This not the first time you've given a

2        deposition, correct?

3        "A.  Correct.

4        "Q.  And when you gave the deposition, you told the

5        truth?

6        "A.  Yes, sir.

7        "Q.  Let me show you, Mr. Moore, what I've marked as

8        Discovery Exhibit 380.  And this was an exhibit to

9        your prior deposition that was previously marked as

10       Discovery Exhibit 180.  Let me ask you some

11       questions.

12       "Q.  It's my understanding that you were working, I

13       think, at the Martini Bar when you met John Wells?

14       "A.  Correct.

15       "Q.  And you and Mr. Wells hit it off, and you were

16       ultimately hired as a sales associate at the Clayton

17       store -- Clayton Homes store in Corpus Christi,

18       correct?

19       "A.  Correct.

20       "Q.  It shows a date of September 18th, 1999.  Does

21       that appear to be the date that you would have

22       started working there at the Clayton store?

23       "A.  Correct.

24       "Q.  Can you tell me and the jury one document that

25       you reviewed in preparation for your deposition

Moore - Direct / By Video Deposition                    252

1           today?

2           "A.  No.

3           "Q.  Did you look at signatures?

4           "A.  No.

5           "Q.  Did you look --

6           "A.  Yes, we did.  We reviewed some papers yesterday.

7           I don't know what they were, though.

8           "Q.  Whose signature was it?

9           "A.  They were notary signatures.

10          "Q.  Of Mr. Frazier?

11          "A.  Yes, sir.

12          "Q.  The signatures that you looked at, the notary

13          signatures for Mr. Frazier, were those signatures

14          that you had signed?

15          "A.  On advice of Counsel, I decline to answer based

16          on my Fifth Amendment."

17      **(Pause playing video deposition)**

18          **MR. SOLTERO:**  Your Honor, we would ask the Court for

19  appropriate limiting instructions.

20          **THE COURT:**  Yes, sir.

21          I'm going to instruct you that the Fifth Amendment is

22  personal and not a corporate -- not one a corporation can

23  asset.  The implication should be relevant only to Moore's

24  credibility and cannot alone form the basis of any finding of

25  liability against any one of the Clayton parties.  Moore was

EXCEPTIONAL REPORTING SERVICES, INC

1    not an employee of the parties when he invoked his

2    constitutional Fifth Amendment right against self-

3    incrimination.

4              You may proceed.  Thank you.

5         **(Resume playing video deposition)**

6              "Q.  You did sign Mr. Frazier's signature to one of

7              the documents, correct?

8              "A.  On advice of Counsel, I decline to answer based

9              on the Fifth Amendment.

10             "Q.  In fact, you signed Mr. Frazier's signature as a

11             notary to a number of documents, correct?

12             "A.  On advice of Counsel, I decline to answer based

13             on my Fifth Amendment.

14             "Q.  And when did you go over these documents?

15             "A.  We went over a couple yesterday and then just

16             over the past month or so randomly.

17             "Q.  Okay.  How about the ones yesterday; can you

18             tell me and the jury what any of the documents you

19             looked at yesterday that had Mr. Frazier's signature

20             on them?

21             "A.  It was a sheet with a bunch of notaries on them.

22             "Q.  Was your name on that document?

23             "A.  I don't recall."

24             "Q.  Did it appear to you that the handwriting for

25             Ben Frazier's name was your handwriting?

1        "A.  On advice of Counsel, I decline to answer based

2        on the Fifth Amendment.

3        "Q.  When is the last time you talked to Mr. Frazier?

4        "A.  He called me right after his deposition.

5        "Q.  Have you read his deposition?

6        "A.  Yes.

7        "Q.  Did you see anything in his deposition that you

8        disagreed with?

9        "A.  On advice of Counsel, I decline to answer based

10       on the Fifth Amendment.

11       "Q.  How about Chris Kimball; have you talked to him

12       lately?

13       "A.  I can't remember the last time I talked to

14       Lance.  It's been a couple of months.

15       "Q.  How about John Wells; when is the last time you

16       talked to Mr. Wells?

17       "A.  Back in '05, maybe.

18       "Q.  Since 2005 or since he's moved to Las Vegas, you

19       have not talked to him?

20       "A.  I talked to him a couple of times while he was

21       in Vegas.

22       "Q.  How about David Rodriguez?

23       "A.  Yes.

24       "Q.  Was he a sales associate --

25       "A.  No.

Moore - Direct / By Video Deposition                255

1    "Q.  -- at Store 214?

2    What was his job?

3    "A.  He worked on -- he did, like, office stuff and

4    did stuff for John.

5    "Q.  Is that the David that you were referring to in

6    your first deposition?

7    "A.  I don't remember which David.

8    "Q.  I was asking you about David who was responsible

9    for emails and that sort of thing.

10   "A.  Yes, that's the same David.

11   "Q.  And during the time that you were a notary for

12   Clayton Homes, there was no written policies in place

13   with respect to notary guidelines or anything having

14   to do with notarization of documents, correct?

15   "A.  Not that I remember.

16   "Q.  There was nothing in place at this company that

17   told you that you're not supposed to notarize a

18   document in which you had a financial interest,

19   correct?

20   "A.  Not that I'm aware of.

21   "Q.  And you did that when you were at Clayton Homes?

22   "A.  Notarize --

23   "Q.  You notarized documents in which you had a

24   financial interest?

25   "A.  Yes.

Moore - Direct / By Video Deposition                256

1      "Q.  Do you have an understanding today that one of

2      the prohibitive acts as a notary public is you are

3      not supposed to notarize a document in which you have

4      a financial interest?

5      "A.  Yes.

6      "Q.  Do you know why it is that Clayton Homes would

7      not have told you about that prohibitive act?

8      "A.  I have no idea.

9      "Q.  Clayton Homes certainly knew that you were a

10     notary, right?

11     "A.  I have no idea.

12     "Q.  Well, you turned in the documents to Tennessee

13     that had your notary stamp, right?

14     "A.  Correct.

15     "Q.  And we've talked about this in your prior

16     deposition, that you would turn that packet in and it

17     would go to loan processing or sales processing, and

18     they would audit the transaction before it was

19     funded, correct?

20     "A.  Correct.

21     "Q.  And one of the things they would look at is to

22     make sure the documents were notarized, right?

23     "A.  Correct.

24     "Q.  One of the things is they would make sure

25     everything was completed, correct?

1        "A.  Correct.

2        "Q.  Certainly, someone there would have seen the

3        notary stamp Bruce Robin Moore as a notary, correct?

4        "A.  Correct.

5        "Q.  Let me show you what I've marked as Discovery

6        Exhibit 381, which was previously marked at your

7        other deposition as Discovery Exhibit 181.  And this

8        is the personnel action request for your termination.

9        Okay?

10        "A.  Okay.

11        "Q.  And in this -- or on this document, it indicates

12        that last day worked was September 3rd, 2004,

13        correct?

14        "A.  Correct.

15        "Q.  Despite the fact that your employment ended with

16        Clayton Homes, you continued to go in and work at the

17        store, correct?

18        "A.  Correct.

19        "Q.  And one of things that you did when you went in

20        the store is you would go back in the office where

21        all the records were kept, correct?

22        "A.  I don't remember if I did or not.

23        "Q.  Let me show you, going back to your deposition,

24        Page 51, Line 17, see if this refreshes your memory

25        as to whether or not you did or didn't.

Moore - Direct / By Video Deposition                    258

1              It says, 'After September 3rd, '04, did you

2      and Mr. Wells go into the office in the Corpus

3      Christi store?'

4      And your answer was what?

5      "A.  'Yes.'

6      "Q.  Did you do anything to alter documents?

7      "A.  No.

8      "Q.  Destroy documents?

9      "A.  No.

10     "Q.  There was an individual in there named David,

11     and that's the David that we identified a little bit

12     ago, correct?

13     "A.  Correct.

14     "Q.  David Rodriguez?

15     "A.  Yes, sir.

16     "Q.  And when you went back in in October of '04,

17     after your employment was terminated, David was in

18     there working, correct?

19     "A.  I'm sure he was.  I don't remember.

20     "Q.  Okay.  Well, let's -- do you agree with me

21     generally, Mr. Moore, that your memory is better

22     closer in time to when the occurrence took place --

23     "Q.  -- generally speaking?

24     "A.  Yes.

25     "Q.  And, certainly, back when you gave this

1      deposition in 2005, your memory as to what happened

2      during that time was probably a lot better than it is

3      in 2010, five years later; would you agree with that?

4      "A.  Correct.

5      "Q.  If we read right here, on Page 52, we talk about

6      David.  And if you go right here, 'And he's the

7      computer guy?'

8      And your answer was:  'Yeah."

9      Did I read that right?

10     "A.  Correct.

11     "Q.  And is that your understanding; he was a

12     computer guy?

13     "A.  Yes, sir.

14     "Q.  What types of computers were in the office

15     during the time that you were there at Store 214?

16     "Q.  How many did you have?

17     "A.  Two, I think.

18     "Q.  And was an individual assigned to a computer or

19     could anybody use the computers?

20     "A.  I believe anybody could.

21     "Q.  Did Mr. Wells have one just for him, and then

22     the other one was for the sales associates?

23     "A.  Yes.

24     "Q.  And one of the things that you had on both of

25     the computers was an email system?

1      "A.  Yes.

2      "Q.  If we go down here, do you know whether or not

3      this David individual was erasing -- was he in there

4      erasing all the computers?

5      "Q.  In October?

6      "A.  I don't remember if he did or not.

7      "Q.  It was after your employment was terminated,

8      right?

9      "A.  In October of '04, yes.

10     "Q.  John Wells was terminated, correct?

11     "A.  Yes.

12     "Q.  Ben Frazier was terminated, correct?

13     "A.  Correct.

14     "Q.  And after you were terminated in September, you

15     went back in in October, and this David fellow, do

16     you know whether or not he erased the computers?

17     "A.  I don't know what -- I don't remember -- from

18     now I don't remember what he was doing.

19     "Q.  And if we go down further in that page, it says,

20     'One of the things is he dealt with emails, right?'

21     And your answer was:  'He did some work with emails,

22     yes.'

23     Is that your answer?

24     "A.  Yes.

25     "Q.  What work was he doing back in October 2005 with

1        the emails?

2        "A.  I don't remember.

3        "Q.  Do you know if he was erasing emails that you

4        and Mr. Frazier and Mr. Wells had with each other

5        during the time that you were working there at the

6        store?

7        "A.  No, I have no idea.

8        "Q.  Have you seen any of those emails?

9        "A.  No.

10       "Q.  You did email each other, correct?

11       "A.  Correct.

12       "Q.  During the entire time that you worked there at

13       the store, John Wells was the store manager?

14       "A.  Yes.

15       "Q   During the time that you worked there at the

16       store in Corpus Christi, you sold more homes under

17       this land-in-lieu program than any other program,

18       correct?

19       "A.  Correct.

20       "Q.  And the land-in-lieu program, just so the jury

21       understands, is where you can use any deed to any

22       property to finance a home, correct?

23       "A.  Correct.

24       "Q.  And you all advertised that, any deed to

25       anyone's land, right?

Moore - Direct / By Video Deposition                 262

1          "A.   Correct.

2          "Q.   It didn't have to be your land.  It could be a

3          neighbor's land, a relative's land, or anybody's

4          land, right?

5          "A.   Correct.

6          "Q.   And when you used this land-in-lieu program,

7          that was the easiest way to get the transaction done,

8          correct?

9          "A.   Correct.

10         "Q    And you knew that at the time?

11         "A.   Yes.

12         "Q.   Well, we talked about this earlier.  Once -- if

13         you're the salesperson on the transaction, you would

14         get the various applications and the various

15         documents signed, and then you would submit a package

16         to loan processing or sales processing in Tennessee,

17         correct?

18         "A.   Correct.

19         "Q.   And they would audit the deals, verify the

20         documents, verify that everything was filled out

21         properly, that sort of thing, correct?

22         "A.   Correct.

23         "Q.   During the time that you were a notary for

24         Clayton Homes, you notarized documents or notarized

25         signatures where the individual did not sign the

1          document in your presence?

2          "A.  On advice of Counsel, I decline to answer based

3          on my Fifth Amendment.

4          "Q.  At one point in time, you actually became a

5          notary public for the State of Texas, correct?

6          "A.  Correct.

7          "Q.  During the time that you were actually a notary,

8          that you were appointed by the Secretary of State to

9          serve as a notary, you notarized -- you acknowledged

10         signatures where the individual did not sign the

11         document in front of you, correct?

12         "A.  On advice of Counsel, I decline to answer based

13         on my Fifth Amendment.

14         "Q.  All right.  Back when we asked you -- when I

15         asked you that same question back in 2005, if you go

16         to Page 124, Line 2, we were talking about

17         Mr. Frazier and then the question was asked:

18         'Have you ever done that?'

19         And your answer:  'Done what?'

20         'Signed -- notarized a signature where the person

21         didn't sign it in front of you.'

22         And what was your answer?

23         "A.  On advice of Counsel, I decline to answer based

24         on the Fifth Amendment.

25         "Q.  All right.  And then if we go --

1          'Question:  Did you do that while you were working

2          for Clayton Homes?'

3          'Yes.'

4          'Question:  But you would go ahead and notarize a

5          document a signature when someone signed the document

6          outside of your presence?'

7          And what was your answer?

8          "A.  On advice of Counsel, I decline to answer based

9          on the Fifth Amendment.

10          "Q.  And then I asked:  'And I asked Mr. Frazier this

11          same question and let me ask you:  Was Mr. Wells

12          aware that you were doing this?'

13                    And what was your answer?

14          "A.  On advice of Counsel, I decline to answer based

15          on the Fifth Amendment.

16          "Q.  And then it goes down, 'And he didn't reprimand

17          you or anything?'

18          And your answer was:  'No.'

19          Correct?

20          "A.  Correct.

21          "Q.  But on the transactions that you were the sales

22          associate, you would make sure, before you went and

23          took the deed of trust, mechanic's lien to the

24          courthouse, that the document was notarized, correct?

25          "A.  Correct.

1      "Q.  Was it a common practice at the Corpus Christi

2      store for salespeople to use Ben Frazier's stamp,

3      notary stamp, and then forge his signature?

4      "A.  On advice of Counsel, I decline to answer based

5      on the Fifth Amendment.

6      "Q.  Was it commonplace for sales associates to forge

7      Ben Frazier's signature?

8      "A.  On advice of Counsel, I decline to answer based

9      on the Fifth Amendment.

10     "Q.  Well, if we look at Page 177 of your deposition,

11     question, Line 18:  'I mean, it sounds like to me it

12     was fairly common practice at the Corpus Christi

13     store for people to be signing each other's names; is

14     that true?

15     And your answer was:  'As far as Ben and John's name,

16     yes.'

17     Is that your answer?

18     "A.  On advice of Counsel, I decline to answer based

19     on the Fifth Amendment.

20     "Q.  Are you aware of any employees doing this?

21     MR. BARROSO:  I'm going to instruct you not to answer

22     that question.

23     THE WITNESS:  On advice of Counsel, I decline to

24     answer based on the Fifth Amendment.

25     "Q.  John Wells was fully aware that sales associates

1     were using Ben Frazier's notary stamp and then

2     forging his signature to deeds of trust and

3     mechanic's lien contracts, correct?

4     "A.  On advice of Counsel, I decline to answer based

5     on the Fifth Amendment.

6     "Q.  You have told Clayton Homes that you have used

7     Ben Frazier's notary stamp and forged his signature

8     to deeds of trust and mechanic's lien contracts,

9     correct?

10    "A.  On advice of Counsel, I decline to answer based

11    on the Fifth Amendment.

12    "Q.  You have signed Ben Frazier's name as a notary,

13    correct?

14    "A.  On advice of Counsel, I decline to answer based

15    on the Fifth Amendment.

16    "Q.  If you go to Page 134, Line 24, I asked you:

17    'Have you ever signed his name to a notary?'

18    And your answer was:  'Yes, I have.'

19    Do you see that?

20    "A.  Yes, I see that.

21    "Q.  Was it true when you said it?

22    "A.  On advice of Counsel, I decline to answer based

23    on the Fifth Amendment.

24    "Q.  When you would sign Ben Frazier's name as a

25    notary would you try to trace his signature, or would

1      you just sign it?

2      "A.  On advice of Counsel, I decline to answer based

3      on the Fifth Amendment.

4      "Q.  Do you think it's appropriate to pretend to be a

5      notary and sign a document that you're not a notary?

6      "A.  On advice of Counsel, I decline to answer based

7      on the Fifth Amendment.

8      "Q.  Did you ever forge anybody else's name to any

9      documents?

10     "A.  On advice of Counsel, I decline to answer based

11     on the Fifth Amendment.

12     "Q.  If we look, going to page 140 of your

13     deposition, here:  'Did you ever forge anybody else's

14     name?'

15     'Answer:  No.'

16     'Question: How about John Wells?'

17     Your answer:  'Oh, yes, I did sign John's name.'

18     'How many times?'

19     'I don't know.'

20     'What documents to you recall forging his name?'

21     'It depends.'

22     Was that testimony truthful?

23     "A.  On advice of Counsel, I decline to answer based

24     on the Fifth Amendment.

25     "Q.  Why would you forge Ben Frazier's signature to

1           documents as a notary?

2           "A.  On advice of Counsel, I decline to answer based

3           on the Fifth Amendment.

4           "A.  On advice of Counsel, I decline to answer based

5           on the Fifth Amendment.

6           "Q.  It's true, is it not, that both John Wells and

7           the individuals in Tennessee were aware that you --"

8       **(Pause playing video deposition)**

9           **THE COURT:**  Excuse me.

10          **MR. SOLTERO:**  Your Honor, I'm going to object to this

11  question.  One, we thought it had been removed from the clips

12  and, two, it's asking about other people.  Under Rule 602

13  there's no way he would have personal knowledge --

14          **THE COURT:**  Sustained.

15          **MR. B. GUTIERREZ:**  I thought we had agreed to that,

16  your Honor.

17          **THE COURT:**  Pardon?

18          **MR. B. GUTIERREZ:**  We had agreed to that.

19          **THE COURT:**  You don't object to that, do you?

20          **MR. RUMLEY:**  Your Honor, may we approach?

21          **THE COURT:**  Yes.

22      **(Begin bench conference at 3:49:11 p.m.)**

23          **MR. RUMLEY:**  This is -- this is -- in the summary

24  judgments the Court even quoted Mr. Moore's testimony where he

25  says that the people in Tennessee knew what was going on.

1          **THE COURT:**  Okay, sorry.  Okay, I think --

2          **MR. RUMLEY:**  (Indiscernible)

3          **THE COURT:**  Sorry.

4          **MR. RUMLEY:**  And I moved (indiscernible)

5      **(Voices overlap)**

6          **MR. RUMLEY:**  Okay.

7          **THE COURT:**  That's a good basis.

8      **(End bench conference at 3:49:37 p.m.)**

9          **THE COURT:**  Thank you all.  You may proceed.

10         Did you want to start it again or -- where are we?

11         Back it up to the question?

12     **(Resume playing video deposition)**

13         "A.  On advice of Counsel, I decline to answer based

14         on the Fifth Amendment.

15         "Q.  It's true, is it not, that both John Wells and

16         the individuals in Tennessee were aware that you were

17         forging Ben Frazier's as a notary to these documents?

18         "Q.  Correct?

19         "A.  On advice of Counsel, I decline to answer based

20         on the Fifth Amendment.

21         "Q.  Let's go to page 151 of your previous

22         deposition, starting with Line 5 -- or actually going

23         down to Line 12.

24         'Question:  And you agree with me that as part of the

25         course and scope of your employment with this company

1          was preparing deeds of trust, filling in the blanks,

2          getting people to sign, notarizing them, and filling

3          them with -- filing them with the courthouse,

4          correct?'

5          And your answer was:  'Correct.'

6          Was that correct?

7          "A.  Correct.

8          "Q.  'Question:  That's part of your everyday job?'

9          Your answer was:  'Yes.'

10         And that's true, right?

11         "A.  Correct.

12         "Q.  'And when you would do this, exactly what you've

13         been telling us you did in this case, not only would

14         you know what's going on, but your store manager,

15         John Wells, would review the packet before it's sent

16         to Tennessee, correct?'

17         And your answer was:  'Correct.'

18         Right?

19         "A.  That's correct.

20         "Q.  All right.  And we're talking about, if we go

21         back up to these, to these documents, these deeds of

22         trusts, mechanic's liens, where you signed Ben

23         Frazier's names on the notary, correct?

24         "A.  On advice of Counsel, I decline to answer based

25         on the Fifth Amendment.

Moore - Direct / By Video Deposition                271

1          "Q.  All right.  'But what we do know is that it

2          would then go to Tennessee.  Someone at Tennessee

3          would review exactly what you've been doing,

4          correct?'

5          And your answer was:  'Correct.'

6          Was that truthful?

7          "Q.  What was your answer?

8          "A.  They would -- people at Tennessee would look

9          over the paperwork.

10         "Q.  What was your answer, sir?

11         "A.  Answer there is:  'Correct.'

12         "Q.  'Question:  And they would approve it, and the

13         deal would get done?'

14         And your answer was:  'Yes.'

15         Correct?

16         "A.  Correct.

17         "Q.  So the people in Tennessee or the people in

18         sales processing were the ones that received the

19         package, correct?

20         "A.  As far as I know, yes.

21         "Q.  And they were aware of what was going on,

22         correct?"

23      **(Pause playing video deposition)**

24         **MR. SOLTERO:**  Your Honor, we object.  He is -- again,

25  602 is one that we had agreed to be excluded.

1              Your Honor, the question asks what somebody else

2    would know is objectionable under 602.

3              May we approach?

4         **(Begin bench conference at 3:52 p.m.)**

5              **MR. SOLTERO:**  The question is:  "And they were aware

6    of what was going on, correct?"  And his answer is:  "Correct,"

7    that they were aware of what was going on.

8              **THE COURT:**  Well, did he (indiscernible) you were

9    there cross examining him, weren't you?

10             **MR. SOLTERO:**  We had people there who cross --

11             **THE COURT:**  Okay.  Well, then if you got it

12   straightened out you can straighten it out.  And that's what

13   that --

14             **MR. UNIDENTIFIED:**  That's one of the ones --

15             **MR. RUMLEY:**  Yeah, because he actually answered this

16   one, didn't he so ...

17             **THE COURT:**  Thank you.

18        **(End bench conference at 3:53 p.m.)**

19        **(Resume playing video deposition)**

20             "Q.  Correct?

21             "A.  Yes.

22             "Q.  Let me show you what I've marked as Discovery

23             Exhibit 385, which was previously marked in your

24             deposition -- your earlier deposition as 213.

25             "Q.  If you flip, look at 385, this is a document

Moore - Direct / By Video Deposition                    273

1              that is filled out and then sent to the Texas

2              Department of Housing and Community Affairs in

3              Austin, correct?

4              "A.  Yes.

5              "Q.  If you flip to the second page of Exhibit 385,

6              if we look right here, that's Ben Frazier's notary

7              stamp, correct?

8              "A.  Correct.

9              "Q.  This B. --"

10      **(Pause playing of video deposition)**

11          **MR. SOLTERO:**  And your Honor, we object to this

12  document.  It is another transaction under 401, 403, and 404.

13          **THE COURT:**  Overruled.

14          This is 214, right, out of the Corpus Store?

15          **MR. SOLTERO:**  214, your Honor.

16          **THE COURT:**  Okay.

17      **(Resume playing of video deposition.**

18              "Q." -- F. -- these B.F.s -- look on this page.  Did

19              you, did you sign his name?

20              "A.  On advice of Counsel, I decline to answer based

21              on the Fifth Amendment.

22              "Q.  If you look at the front of that document,

23              Mr. Moore, you'll see that it was previously marked

24              as Discovery Exhibit 213.  Do you see that?

25              "A.  Yes, sir.

1          "Q.   Okay.  If we look at your previous deposition

2          and we go to Page 196, it says:  'Discovery

3          Exhibit 213 was marked for identification.'  Do you

4          see that?

5          "A.   Yes.

6          "Q.   And if we go down to Line 25:

7          'Question:  The document -- is that Ben's signature,

8          or did you just forge his name?

9          'Did you sign that name?

10         And your answer was:  'Yes.'

11         Was that truthful when you gave that?

12         "A.   On advice of Counsel, I decline to answer based

13         on the Fifth Amendment.

14         "Q.   Next question:  'How about that one?'

15         Your answer was:  'Yes.'

16         And was that truthful when you gave it?

17         "A.   On advice of Counsel, I decline to answer based

18         on the Fifth Amendment.

19         "Q.   'And you used his stamp, right?

20         And your answer was:  'Correct.'

21         Was that truthful when you gave that answer?

22         "A.   On advice of Counsel, I decline to answer based

23         on the Fifth Amendment.

24         "Q.   Next question:  'Right here, you used his stamp?

25         'Correct.'

1      Was that truthful when you testified that you used

2      his stamp right there?

3      "A.  On advice of Counsel, I decline to answer based

4      on the Fifth Amendment.

5      "Q.  Next one:  'And then you signed his name again?'

6      And your answer was:  'Yes.'

7      Was it truthful when you gave that answer?

8      "A.  On advice of Counsel, I decline to answer based

9      on the Fifth Amendment.

10      "Q.  'At that time you weren't even a notary, were

11      you?'

12      And your answer was:  'No.'

13      Is that true?

14      "A.  I don't remember.

15      "Q.  'And then what you did is:  You took this

16      document, and you sent it to the State, didn't you?'

17      And your answer was:  'Yes.'

18      "Q.  And you sent it to corporate in the mail?

19      "A.  What do you mean by mail, like U.S. Post Office

20      or FedEx?

21      "Q.  Did you mail it to Tennessee?

22      "A.  We sent it by Airborne Express to Tennessee.

23      "Q.  Who is 'we'?

24      "A.  Our office did.

25      "Q.  Some of the other documents, Mr. Moore, that you

1          would forge signatures on are arbitration agreements,

2          correct?

3          "A.  On advice of Counsel, I decline to answer based

4          on the Fifth Amendment.

5          "Q.  Let me show you what I've marked as Discovery

6          Exhibit 386.  And, Mr. Moore, this is an arbitration

7          agreement that was previously marked in your

8          deposition as 204.  Do you see that?

9          "Q.  Mr. Moore, do you see that was previously marked

10         as Discovery Exhibit 204?

11         "A.  Yes.

12         "Q.  All right.  And this is what we call an

13         arbitration agreement, right?

14         "A.  Correct.

15         "Q.  You've seen this before.  You've filled out

16         these agreements before?  Correct?

17         "A.  Correct.

18         "Q.  And if you look down here, is that -- the

19         handwriting on this document or that I'm pointing to

20         right here, did you -- is that your handwriting?

21         "A.  I don't know.

22         "Q.  If we look at Page 182, Line 22, to your

23         previous deposition:  '204, Discovery Exhibit 204,

24         arbitration agreement.  Did you sign Mr. Wells' name

25         to this?'

1        And your answer was:  'Yes.'

2        Did I read that right?

3        "A.  Yes, you read that right.

4        "Q.  One of the other documents that you had forged

5        Mr. Wells is appraisal forms; correct?

6        "A.  I don't remember appraisal forms.

7        "Q.  If we look --

8        "Q.  Discovery Exhibit 387.  And appraisal forms

9        would be forms that would be filled out and then sent

10       on to Tennessee; correct?

11       "A.  I'd have to look at it.  I don't remember what

12       they use that form for.  (Perusing document.)

13       "Q.  Have you seen that form before?

14       "A.  Yes.  Not this specific form.  I don't remember

15       this specific form, but I've seen the form before.

16       "Q.  Do you recognize the signature on that

17       appraisal?

18       "A.  It appears to be John Wells.

19       "Q.  Did you sign his name?

20       "A.  I don't remember.

21       "Q.  If we look, going back to your deposition,

22       Page 183, Line 25:  'Did John Wells do an appraisal?'

23       What was your answer?

24       "A.  'No.'

25       "Q.  'Question:  You did it yourself and signed his

1        name?'

2        And your answer was:  'Yes.'

3        Is that right?

4        "A.  It says yes there, yes.

5        "Q.  Let me show you what I've marked as Discovery

6        Exhibit 391.

7        "Q.  You've seen this document before, correct?

8        "A.  Correct.

9        "Q.  Cost of sales summary, that's the -- printed out

10       off the computer, and this calculates what your

11       commission is going to be, correct?

12       "A.  Correct.

13       "Q.  And it indicates here --

14       **MR. SOLTERO:**  Your Honor --

15       "Q.  -- 'Sales --"

16    **(Pause playing video deposition)**

17       **THE COURT:**  Just a moment.

18       **MR. SOLTERO:**  We object to that on 401, 403, and 404.

19       **THE COURT:**  Same document as previously, same type?

20       **MR. B. GUTIERREZ:**  Out of 214.

21       **THE COURT:**  Overruled.

22    **(Resume playing video deposition)**

23       "Q.  -- person, Bruce Moore,' and it has your

24       employee number, right?

25       "A.  Correct.

1          "Q.  Right.  And then we come down, and essentially

2          when you're a sales associate at this store your

3          compensation is 100 percent commissions basically?

4          "A.  Correct.

5          "Q.  And then you're paid a draw, right?

6          "A.  Right.

7          "Q.  Which means if you're not out there selling

8          homes, you actually become more and more in debt to

9          the company --

10         **THE COURT:**  Okay, hold up.

11         "Q.  -- correct?

12         "A.  Correct."

13      **(Pause playing video deposition)**

14         **THE COURT:**  Hold up.  We have a juror kind of dozing

15   off here; let's get everybody awake.

16         Okay, ready to go.  Everybody sit up; let's go.

17         Thank you.

18      **(Resume playing video deposition)**

19         "Q.  And so it's an incentive --"

20      **(Pause playing video deposition)**

21         **THE COURT:**  All you have to do stay awake for another

22   hour.  And we're going to stop early tonight at 5:00 o'clock,

23   by request of the lawyers and the parties.

24      **(Resume playing video deposition)**

25         "Q.  -- in place for you to be out there selling

1        homes, right?

2        "A.  Correct.

3        "Q.  Clearly, if you're selling homes, you're just

4        going to get more and more and more in debt?

5        "A.  Correct.

6        "Q.  And we go down, and one of the things when you

7        were a sales associate is you're paid a commission of

8        4 percent if you get the customer to finance with

9        Vanderbilt, correct?

10        "A.  Correct.

11        "Q.  And you understood that the easiest way to get

12        your customers approved is to do the land-in-lieu

13        transaction, correct?

14        "A.  Correct.

15        "Q.  Let me show you what --

16        "Q.  Let me show you what I've marked as Discovery

17        Exhibit 392.

18        "Q.  And this is another one of those statement of

19        location forms, correct?

20        "A.  Correct.

21        "Q.  It's sent to Austin, right?

22        "A.  Correct.

23        "Q.  Did you forge anyone else's signature on this

24        document?

25        "A.  On advice of Counsel, I decline to answer based

1          on the Fifth Amendment.

2          "Q.  Do you have an understanding that Clayton Homes

3          released hundreds of filed releases of deed of trust

4          and mechanic's lien contracts that originated out of

5          your store?

6          "A.  Yes.

7          "Q.  Do you agree that when you see a --

8          Mr. Frazier's signature being forged on a document

9          that it's pretty safe to assume it was the

10         salesperson on the transaction?

11         "A.  On advice of Counsel, I decline to answer based

12         on the Fifth Amendment.

13         "Q.  Well, let me ask you this:  On Page 134 of your

14         deposition, you were asked on Line 8:  'Do you know

15         who signed his name to the various notaries

16         throughout this transaction?'

17         And your response was:  'No, I do not.'

18         And the question:  'Can you think of who would have

19         done that?'

20         And your answer was:  'It could have been anybody in

21         the office.'

22         'Question:  I mean, who are the possibilities?'

23         And your response was:  'Salespeople.'

24         Was that, was that a truthful answer when you gave it

25         back in '05?

Moore - Direct / By Video Deposition                282

1      "A.  On advice of Counsel, I decline to answer based

2      on the Fifth Amendment.

3      "Q.  Do you know whether or not you ever used your

4      own notary stamp on a document but then signed Ben

5      Frazier's name?

6      "A.  I don't remember if I would have or not.

7      "Q.  Do you know whether or not you signed Ben

8      Frazier's name and used his stamp so many times that

9      it became a habit?

10     "A.  On advice of Counsel, I decline to answer based

11     on the Fifth Amendment.

12     "Q.  Were you involved in the Elizondo Herrera --

13     MR. GUTIERREZ:  Elizandro.

14     "Q.  -- Elizandro Herrera transaction?

15     "A.  I don't know.

16     "Q.  Timing wise, do you know when it is, Mr. Moore,

17     that you became a notary?

18     "A.  I believe it was in November of '02.

19     "Q.  And do you remember when Ben Frazier's

20     employment was terminated?

21     "A.  No, I do not.

22     "Q.  Did Ben Frazier leave his notary stamp back at

23     the office after his employment was terminated?

24     "A.  I have no idea.

25     "Q.  How is it that Ben Frazier's notary stamp

Moore - Direct / By Video Deposition                    283

1          appears on documents that were dated and filed after

2          his employment was terminated?

3          "A.  I have no idea.

4          "Q.  Did you ever use his stamp after he left?

5          "A.  Not that I'm aware of.

6          "Q.  If we look at Exhibit 395, you can see -- and

7          going -- this is from the Secretary of State; do you

8          see that?

9          "A.  Yes, uh-huh.

10         "Q.  Okay.  And we come down 3110 Traylor Boulevard,

11         is that your address -

12         "A.  Yes.

13         "Q.  -- in Rockport?

14         And it indicates Aransas County, which is Rockport,

15         right?

16         "A.  Yes.

17         "Q.  It says:  'Commission Notary Public Bruce R.

18         Moore, Jr., January 26, 2007 to present;' right,

19         you're currently a notary?

20         "A.  Correct.

21         "Q.  And then at the time you were at Clayton Homes,

22         it looks like November 22nd, 2002, up until 2006,

23         right?

24         "A.  Right.

25         "Q.  Okay.  Clearly, by December of 2002, Ben Frazier

1              was no longer at the store, correct?

2              "A.  I don't know.

3              "Q.  Let me show you Discovery Exhibit 393.  I only

4              have one copy.  But this is, you see, a deed of trust

5              for Mr. Herrera; do you see that?

6              "A.  Yes.

7              "Q.  If we --"

8          **(Pause playing of video deposition)**

9              **MR. SOLTERO:**  Your Honor, we would object again 401

10  -- yes, your Honor, object on 401 through 403 and 404 grounds.

11             **THE COURT:**  Overruled.  Thank you.

12         **(Resume playing of video deposition)**

13             "Q.  -- flip to the notary page, again, you see the

14             date December 27th, 2002?

15             "A.  Yes.

16             "Q.  And do you know -- by December 2002, you would

17             have been a notary, correct?

18             "A.  Correct.

19             "Q.  And it appears right here to be Ben Frazier's

20             notary stamp, correct?

21             "A.  Correct.

22             "Q.  And do you know whether or not you used

23             Mr. Frazier's stamp and then signed his name as

24             notary public?

25             "A.  On advice of Counsel, I decline to answer based

1            on the Fifth Amendment.

2            "Q.  I mean, you all had to have a notary in order to

3            do these transaction, correct?

4            "A.  Yes, we had to have a notary.

5            "Q.  Clearly, someone in Tennessee would have known

6            that Ben Frazier no longer worked at the store?

7            "A.  I have no idea.

8            "Q.  But should have, right?

9            "A.  I have no idea.

10           "Q.  I mean if someone is doing their job and

11           auditing the transaction, they should look at stuff

12           like notary stamp signatures, those sort of things?

13           "A.  I have no idea.

14           "Q.  And if we look at what I've marked as Discovery

15           Exhibit 394, which is the mechanic's lien contract

16           for Mr. --"

17       **(Pause playing video deposition)**

18           **MR. SOLTERO:**  Your Honor, I'm going to object to

19   Exhibit 394 on the grounds of 401, 403, 404.

20           **THE COURT:**  Overruled.

21       **(Resume playing video deposition)**

22           "Q.  -- Herrera, we see again December 2nd -- I mean

23           December 27th, 2002, the same date; do you see that?

24           "A.  Correct.

25           "Q.  And then we look, and this is your notary stamp,

Moore - Direct / By Video Deposition                286

1          correct?

2          "A.  Correct.

3          "Q.  And if we look over here, is that your

4          signature?

5          "A.  Yes.

6          "Q.  Do you know who it is that the deed of trust

7          would have Ben Frazier's notary stamp and this one

8          would have yours?

9          "A.  No idea.

10         "Q.  Do you think it's just a coincidence?

11         "A.  I have no idea.

12         "Q.  And if we look down, it looks like you actually

13         stamped it with Ben Frazier, and then realized that

14         you were a notary, and then used your notary stamp,

15         correct?

16         "A.  On advice of Counsel, I decline to answer based

17         on the Fifth Amendment.

18         "Q.  Well, if you look, doesn't it look like --

19         doesn't it look like to you, Mr. Moore, that you

20         stamped it Ben Frazier, forged his signature right

21         there and then realized that, 'Oh, I'm a notary.  I

22         can go ahead and notarize it myself'?

23         "A.  On advice of Counsel, I decline to answer based

24         on the Fifth Amendment.

25         "Q.  During the time that you worked at Clayton

1          Homes, you would go to these Clayton academies,

2          right?

3          "A.  I went there one time.

4          "Q.  and you would go to the academy there in

5          Tennessee, I guess?

6          "A.  Yes.

7          "Q.  And it would be a time where a bunch of sales

8          associates throughout the country go and share ideas

9          on ways to sell homes, right?

10          "A.  Correct.

11          "Q.  And people would come up with different ideas

12          and different ways of how you're able to sell homes

13          in your area, correct?

14          "A.  Correct.

15          "Q.  Did you ever share anyone -- share with anyone

16          at any of these academies how it is that you were

17          successful in selling a lot of homes in the Corpus

18          Christi store?

19          "A.  We talked about the land-in-lieu deals.

20          "Q.  When you were there and talking to the other --"

21      **(Pause playing video deposition)**

22          **MR. SOLTERO:**  Objection as to this clip as --

23          **THE COURT:**  Sorry?

24          **MR. SOLTERO:**  I would object to the clip, it calls

25  for speculation and --

1          **MR. RUMLEY:**  I agree.  I agree to it, your Honor.

2          **THE COURT:**  Sustained.

3      **(Counsel confer)**

4      **(Resume playing video deposition)**

5          "Q   (BY MR. GUTIERREZ) I have a few questions for

6          you.  One of the things that you have told us is that

7          you became a notary public IN November of 2002; is

8          that correct?

9          "A.  Correct.

10         "Q.  All right.  You went to work for Clayton Homes

11         in September of 199?

12         "A.  Correct.

13         "Q.  Is that correct?  And when you went to work for

14         Clayton Homes, Ben Frazier was already working there,

15         is that correct?

16         "A.  Correct.

17         "Q.  And Ben Frazier was a notary?

18         "A.  Correct.

19         "Q.  Okay.  I will represent to you that Mr. Frazier

20         has testified that he got terminated, he got fired in

21         October of -- October 25th of 2002.  Okay?

22         "A.  Okay.

23         "Q.  during the time that Mr. Frazier was there, he

24         was the only individual that was a notary; is that

25         true or not true?

1       "A.   I believe John was also a notary.

2       "Q.   John Wells would have been the manager, right?

3       "A.   Correct.

4       "Q.   Okay.  As far as salespersons were concerned,

5       certainly, you were not a notary during the time that

6       Ben Frazier was there, right?

7       "A.   Correct.

8       "Q.   Okay.  Eric Chapelle was not a notary during the

9       time that Benjamin Frazier was there?

10      "A.   I don't know when Eric became a notary.

11      "Q.   Okay.  Jay Burke, John Burke was not a notary

12      when Benjamin Frazier was there?

13      "A.   I don't remember when he got his notary.

14      "Q.   Christopher Lance Kimball was not a notary when

15      Benjamin Frazier was there?

16      "A.   I don't remember when Lance got his, either.

17      "Q.   What we do know is that you were not a notary

18      while he was there, right?

19      "A.   Correct.

20      "Q.   Your testimony in February of 2005, your

21      testimony under oath in February of 2005, was that

22      you had, on occasions, signed the signature of

23      Benjamin Frazier and used his notary stamp, you had

24      forged the signature of John Wells to appraisal

25      documents and appraisal forms, and you had also

1           forged the signature of John Wells to arbitration

2           agreement.

3           Was that, in summary, some of your testimony back in

4           February of 2005?

5           "A.  On advice of Counsel, I decline to answer based

6           on the Fifth Amendment.

7           "Q.  And you also testified that John Wells knew that

8           you were forging signatures?

9           "Q.  You testified to that in February of 2005, isn't

10          that true?

11          "A.  On advice of Counsel, I decline to answer based

12          on the Fifth Amendment.

13          "Q.  If you could, look at the documents, the

14          exhibits that are in front of you.  And look for the

15          arbitration agreement -- excuse me -- not -- both the

16          arbitration agreement, Mr. Moore, as well as the

17          appraisal form and --

18          Have you found them?

19          "A.  Yes, sir.

20          "Q.  Okay.  And I believe earlier you were shown

21          where you testified, first of all, that you were the

22          person that was doing the appraisals and not John

23          Wells; you were signing his name to the appraisals

24          but you were filling out the reports.

25          "A.  On advice of Counsel, I decline to answer based

1          on the Fifth Amendment.

2          "Q.  And earlier, when Mr. Rumley showed you that

3          form that's called standard appraisal form that has

4          customer name William B. Medina, that was the

5          appraisal form that you specifically identified in

6          your prior testimony of February 2005 where you

7          testified under oath that you had filled out this

8          appraisal report and you had signed John Wells' name

9          to it; is that true?

10         "A.  In my previous testimony?

11         "Q.  Your testimony of February of 2005.

12         "A.  I don't remember.

13         "Q.  In fact, you were also asked by Mr. Rumley --

14         so -- and down, Line 21:

15         He asked:  'So he didn't do an appraisal?'

16         He, meaning John Wells.

17         And your answer was:  'It was just fill in the

18         blanks.  He was aware of it.'

19         Do you remember that?

20         "A.  No, I don't remember that.

21         "Q.  Does that refresh your memory?

22         "A.  I don't remember that.  I mean, I'm reading it,

23         but I don't remember it.

24         "Q.  Well, it is true?  Is that true, what you --

25         what you testified to back in February of 2005?

1      "A.  On advice of Counsel, I decline to answer based

2      on the Fifth Amendment.

3      "Q.  Neither yourself nor Mr. Wells were professional

4      appraisers?

5      "A.  Correct.

6      "Q.  But if that was one of the requirements; that

7      is, that Vanderbilt needed in order to fund a loan,

8      to process a loan, they would need a professional

9      appraisal from you, it's very apparent that they were

10     funding deals and funding loans with just opinions

11     from John Wells, a sales manager, and/or in the

12     case -- in your case, Mr. Moore, from you?

13     Just send in opinions in an appraisal form of what

14     you thought and what your guess was of the fair

15     market value of property. Isn't that what Vanderbilt

16     was doing, accepting your opinions?

17     "A.  Yes.

18     "Q.  One of the cases that is pending in Federal

19     Court right now is a case that is styled Cesar Flores

20     and Alvin King against Vanderbilt, Clayton Homes, and

21     others.  Okay?

22     "A.  Okay.

23     "Q.  Are you with me?

24     There's some intervenors by the name of Maria

25     Trevino, who would by party plaintiffs as well, Maria

1        M. Trevino and Arturo Trevino.  Have you ever heard

2        those names before?

3        "A.  No, not that I can remember.

4        "Q.  How about Cesar Flores, Alvin King?

5        "A.  No.

6        "Q.  Now, before I show you a deed of trust --

7        "Q.  -- which has now been marked as Discovery

8        Exhibit 397, before I show you that document, there

9        is no doubt in your previous testimony but that you

10       were signing Ben Frazier's name, using his stamp on

11       document that were being filed at courthouses all

12       over South Texas?

13       "A.  On advice of Counsel, I decline to answer based

14       on the Fifth Amendment.

15       "Q.  Let me show you Discovery Exhibit Number --

16       MR. RUMLEY:  397.

17       "Q.  -- 397.

18       "Q.  This is a deed of trust, okay, and what is the

19       date -- can you see the date on there?

20       "A.  It looks like it says the 7th of January, 2002.

21       "Q.  January 7th of 2000 and what?  In 1 or 2002?

22       "A.  The top one says '2.

23       "Q.  Okay.  January 7th of 2002, were you still

24       working for Clayton Homes --

25       "A.  Yes.

1      "Q.  -- at that time?

2      Sir?

3      "A.  Yes.

4      "Q.  You were not a notary at that time, is that

5      correct?

6      "A.  Correct.

7      "Q.  Let me ask you:  Did you forge any of the

8      signatures on this page of this document?

9      "A.  On advice of Counsel, I decline to answer based

10     on the Fifth Amendment.

11     "Q.  On Page 17 of this same document, I'll ask you

12     again:  Did you forge any of the signatures,

13     Mr. Moore, that are shown on this, on this page?

14     "A.  On advice of Counsel, I decline to answer based

15     on the Fifth Amendment.

16     "Q.  I'm now going to show you what's been marked as

17     Discovery Exhibit 398.  And this is the mechanic lien

18     contract, also in what I have identified as the

19     Flores/King case, Trevino case.

20     And same question:  You were not a notary back on

21     January 7th of 2002, is that correct?

22     "A.  Correct.

23     "Q.  And the question that I -- that I have for you

24     is:  Mr. Moore, did you forge any of the signatures

25     on this page of this document?

1              "A.  On advice of Counsel, I decline to answer based

2          on the Fifth Amendment.

3              "Q.  Same question:  Did you forge any of the

4          signatures on this page, Mr. Moore?

5              "A.  No, I did not.

6              "Q.  Again, Mr. Moore, we already have your previous

7          testimony where you testified under oath, never

8          invoked your Fifth Amendment protection or privilege,

9          but did testify under that you were signing John

10         Wells' signature to document, including arbitration

11         agreements, as well as appraisal forms.

12         And I'm going to show you a document now, sir --

13             "Q.  -- Discovery Exhibit 399, an arbitration

14         agreement.

15         And I'll ask you:  Did you forge any of the

16         signatures on this document, Mr. Moore?

17             "A.  On advice of Counsel, I decline to answer based

18         on the Fifth Amendment.

19             "Q.  One of the things that you testified back in

20         February of '05 was that all during the time that you

21         were working for Clayton Homes -- that was from

22         September 28th, 1999, through the time that you were

23         fired on September 3rd of 2004, Clayton Homes had

24         nothing in place that would have prevented you from

25         doing exactly what you were doing, correct?

Moore - Direct / By Video Deposition                    296

1        "A.  I wasn't fired.

2        "Q.  You left voluntarily?

3        "A.  Yes.

4        "Q.  Okay.  That you left voluntarily.

5        "A.  I left voluntarily.  What was the other part of

6        your question?  I'm sorry.

7        "Q.  That Clayton Homes had nothing in place that

8        would have prevented you from doing what you were

9        doing.

10       "A.  I don't understand your question.

11       "Q.  Do you remember testifying to that?

12       "A.  I'm not understanding what you're saying by what

13       I was doing.

14       "A.  Well, you were signing person's names.  You were

15       signing Frazier's name.  You were signing John Wells'

16       name.  The only thing that you've, I think, denied is

17       forging customers' names, right?

18       "A.  On advice of Counsel, I decline to answer based

19       on the Fifth Amendment.

20       "Q.  (BY MR. RUMLEY) Certainly, at the time that you

21       were using Ben Frazier's notary stamp and signing his

22       names to documents you knew that you weren't a notary

23       public?

24       "A.  On advice of Counsel, I decline to answer based

25       on the Fifth Amendment.

Moore - Direct / By Video Deposition                    297

1           "Q.  But you as an employee, when you were filing

2           these documents, the deeds of trust, you were doing

3           so on behalf of Clayton Homes --

4           "Q.  Or CMH?

5           "A.  Yes.

6           "Q.  You'll agree with me, Mr. Moore, that if you

7           didn't do anything wrong, you would have absolutely

8           nothing to hide, correct?

9           "A.  On advice of Counsel, I decline to answer based

10          on the Fifth Amendment.

11          "Q.  This company never did anything at all to

12          discipline you for everything that we've talked about

13          here today, did it?

14          "Q.  True?

15          "A.  On advice of Counsel, I decline to answer based

16          on the Fifth Amendment.

17          "Q.  In fact, this company didn't even fire you,

18          correct?

19          "A.  Correct.

20      **(End playing video deposition of Bruce Robin Moore by**

21  **Defendants)**

22          **MR. B. GUTIERREZ:**  Your Honor, that concludes our

23  offer.

24          **THE COURT:**  Thank you.

25          **MR. SOLTERO:**  Your Honor, we have a brief proffer on

EXCEPTIONAL REPORTING SERVICES, INC

1    Mr. Moore.

2         **(Pause)**

3                      **FOR PLAINTIFFS**

4            **BRUCE ROBIN MOORE BY VIDEO DEPOSITION**

5         "Q.  (BY MR. RANGEL) During the time that you worked

6         for CMH Homes, did you at any time sign the name of a

7         customer or a landowner to any document?

8         "A.  No, sir.

9         "Q.  In several -- you've been asked questions about

10        several transactions, correct?

11        "A.  Yes, sir.

12        "Q.  And these transactions took place some years

13        ago, correct?

14        "A.  Yes, sir.

15        "Q.  Did these transactions take place some years

16        ago?

17        "A.  Yes, sir.

18        "Q.  And have you tried to respond to these questions

19        that you've been asked to the best of your ability?

20        "A.  Yes, sir.

21        "Q.  I will hand you what's been marked as Discovery

22        Exhibit Number 397, which is a deed of trust, and ask

23        you to go to Page 5 of the document.  Do you have the

24        document in front you?

25        "A.  Yes, sir.

Moore - Cross / By Video Deposition                    299

1      "Q.  And do you see two signature lines there, one

2      for Maria Trevino and one for Arturo Trevino?

3      "A.  Yes, sir.

4      "Q.  Did you sign the name of Maria Trevino or Arturo

5      Trevino to that document?

6      "A.  No, sir.

7      "Q.  I will hand you what's been marked as Discovery

8      Exhibit Number 398, which is a builder's and

9      mechanic's lien contract, and ask you to look at

10     Page 5 of the document.  Do you have the document in

11     front of you?

12     "A.  Yes, sir.

13     "Q.  On Page 5 are there two signature lines, one for

14     Maria Trevino and one for Arturo Trevino?

15     "A.  Yes, sir.

16     "Q.  Did you sign the name of Maria Trevino or Arturo

17     Trevino --

18     "A.  No, sir.

19     "Q.  -- to that document?

20     "A.  No, sir.

21     "Q.  I will hand you what's been marked as Discovery

22     Exhibit Number 399, which is an arbitration

23     agreement, and ask you if there are some signature

24     lines for Cesar Flores and Alvin King.

25     "A.  Yes, sir.

1          "Q.  Did you sign the names of Cesar Flores or Alvin

2          King to that document?

3          "A.  No, sir.

4          "Q.  During the time that you were employed by CMH

5          Homes and you worked at Lot 214, did you, at any

6          time, have any discussions or conversations with any

7          CMH Homes employee or representative outside of

8          Lot 214 regarding the notary practices that were

9          being followed at 214?

10         "A.  No.

11         "Q.  You never talked to anybody in Tennessee about

12         those practices, did you?

13         "A.  No.

14         "Q.  Did you ever talk to anybody in Tennessee with

15         Clayton Homes or any other entity about the notary

16         practices at Lot 214?

17         "A.  No."

18         **(End playing video deposition of Bruce Robin Moore by**

19   **Plaintiffs)**

20         **MR. SOLTERO:**  Your Honor, that concludes our proffer

21   for Mr. Moore.

22         **THE COURT:**  Thank you.

23         Call your next witness.

24         **MR. B. GUTIERREZ:**  We would call David Barton by

25   deposition.

Barton - Direct / By Video Deposition                301

1          **THE COURT:**  Go right ahead.

2                    **DEFENDANTS' WITNESS**

3              **DAVID BARTON BY VIDEO DEPOSITION**

4          **(Witness sworn)**

5                    E X A M I N A T I O N

6          BY MR. RUMLEY:

7          "Q.  Sir, could you identify yourself for us?

8          "A.  My name is David Barton.

9          "Q.  What year did you start working for Vanderbilt?

10         "A.  In 1990.

11         "Q.  An in 1990, what were you -- what position were

12         you fired for?

13         "A.  A collector.

14         "Q.  Has Vanderbilt ever outsourced any of its

15         collection calls?

16         "A.  No, sir.

17         "Q.  So if anybody calls any customer in an attempt

18         to collect on a debt for Vanderbilt, it would be

19         someone that is employed by Vanderbilt?

20         "A.  Yes.

21         "Q.  To this day Vanderbilt still finances new home

22         sales from company-owned stores throughout the United

23         States?

24         "A.  That is correct.

25         "Q.  Today, you no longer finance new home Clayton

1       Homes' sales from independent stores?

2       "A.  That's correct.

3       "Q.  Where did you go after you were doing the

4       independent financing for the independent stores?

5       "A.  I became the collections manager.

6       "Q.  what year would that be?

7       "A.  Approximately '98, '99.

8       "Q.  Okay.  And is that your position today?

9       "A.  Yes.

10      "Q.  Are you an officer or anything like that?

11      "A.  Of -- I am an officer of Vanderbilt.

12      "Q.  And what title is that?

13      "A.  Assistant secretary.

14      "Q.  What type of training are the account reps

15      given?  You hire them before they're out there

16      actually making phone calls.

17      "A.  They will go through a two-week training class

18      at our home office, and then once they're on the

19      floor, their training will continue with their

20      supervisor.

21      "Q.  And are the account reps provided with specific

22      training on the various laws or requirements in the

23      particular region that they're going to be working?

24      "A.  We provide them with training on, you know, what

25      to do, what not to do, you know, how to conduct

1    themselves on the phone and various things like that.

2    "Q.  At any point during the collection or the

3    calling on the delinquent accounts do they look for

4    red type -- red flag type items in the various

5    documents on the loan file?

6    "A.  I'm not sure what you mean by red flag type

7    items."

8    "Q.  Well --"

9    **(Pause playing video deposition)**

10    **(Counsel confer)**

11    **(Resume playing video deposition)**

12    "Q.  -- in your training manual, doesn't it talk

13    about looking for red flags?

14    "A.  It does.

15    "Q.  Well, then tell me what red flags means in the

16    training manual.

17    "A.  Red flags in the training manual is referencing

18    things about the customer's change in circumstances.

19    If -- you know, a lost of a job would be a red flag,

20    something of that nature.  So we train them to listen

21    for things of that nature, changes in the customer's

22    circumstances.

23    "Q.  And what's the purpose for looking for red

24    flags?

25    "A.  To determine if -- the customer's ability to

Barton - Direct / By Video Deposition                304

1          pay.  If they've had a loss of job, then, obviously,

2          their ability to pay would be affected.

3          "Q.  If they find some red flags, what are they

4          supposed to do?

5          "A.  They would ask the appropriate questions to the

6          customer.

7          "Q.  What about if a deed of trust is not notarized;

8          is that a red flag?

9          "A.  That's something that we would look for.

10         "Q.  If you discovered that a deed of trust was

11         forged; is that something that would be a red flag?

12         "A.  if we discovered it, yes.

13         "Q.  What if you discovered that someone forged the

14         signature of the notary; would that be a red flag?

15         "A.  If we discovered it, it would be something we

16         would certainly pay attention to, yes.

17         "Q.  And what would you do?

18         "A.  In this case the -- if there was --"

19     **(Pause playing video deposition)**

20         **MR. THAGARD:**  Your Honor, can we pause here?

21     **(Counsel confer)**

22     **(Resume playing video deposition)**

23         "Q.  At any point during the collection or the

24         calling on the delinquent accounts do they look for

25         red type -- red flag type items in the various

Barton - Direct / By Video Deposition                 305

1        documents on the loan file?

2        "A.  I'm not sure what you mean by red flag type

3        items.

4        "Q.  Well, what about if a deed of trust is not

5        notarized; is that a red flag?

6        "A.  That's something that we would look for.

7        "Q.  If you discovered that a deed of trust was

8        forged; is that something that would be a red flag?

9        "A.  If we discovered it, yes.

10       "Q.  What if you discovered that someone forged the

11       signature of the notary; would that be a red flag?

12       "A.  If we discovered it, it would be something we

13       would certainly pay attention to, yes.

14       "Q.  And what would you do?

15       "A.  In this case, the -- if there was forgery, we

16       would contact the people involved and -- the

17       customer, for example, and determine if, in fact, it

18       was forged.

19       "Q.  And then what would you do?

20       "A.  Based on what we found out, we could do -- if we

21       believed it to be valid, we would obviously do

22       nothing.  But if we found it to be -- if we believed

23       it to forged, then we would possibly release our lien

24       on the deed of trust, on the land.

25       "Q.  And would you then tell the customer?

1      "A.  Not necessarily.

2      "Q.  Why not?

3      "A.  Well, if we release the lien on the land, that

4      is a matter of public record.

5      "Q.  If you discover that the sales rep is the one

6      notarizing the documents, and he tells you, 'My name

7      was forged.  My signature was forged.  Someone

8      pretended to be a notary public on these documents',

9      okay, you know that to be true because he told you

10     that to be true.  Would you notify the customer?

11     "A.  I mean, in this hypothetical, if the -- I mean,

12     it would depend on a lot of circumstances.  I mean,

13     we wouldn't necessarily always contact the customer

14     to inform them, no.

15     "Q.  When would you?

16     "A.  I'm not -- I can't think of a reason necessarily

17     why we would.

18     "Q.  Why wouldn't you?

19     "A.  I mean, if it was determined that we -- that

20     there was a forgery or a problem with the deed, then

21     it would be a -- it would be just as likely that we

22     release our lien on the deed and send that to the,

23     send that to the county.

24     "Q.  If you go to Page 12 -- and you have an

25     understanding, right, of the Fair Debt Collection

1      Practices Act?

2      "A.  Yes, I do.

3      "Q.  And then this is saying what type of debt

4      collection practices are not allowed.

5      Harassment --

6      Q    -- what does the law say?  What can they do and

7      cannot do as far as harassing someone?

8      "A.  I mean, I could -- I mean, I could read this to

9      you.

10     "Q.  Well, we can read it.  I want you, as the -- as

11     the top person of this company, the collection

12     manager, to tell me and this jury what your reps can

13     and cannot do as far as harassing them.

14     "A.  Well, we can't harass them.  Harassment would

15     include phone calls of a repetitive nature, abusive

16     conversations on the phone, things of that nature.

17     "Q.  Do you agree with me that it would be --:

18     **(Pause playing of video deposition)**

19     **MR. THAGARD:**  Your Honor, we're going to lodge an

20  objection.  He stopped it early.

21     **(Resume playing of video deposition)**

22     "Q.  -- an unfair debt collection practice to attempt

23     to collect on a debt that has already been paid?

24     **(Pause playing of video deposition)**

25     **MR. THAGARD:**  Your Honor, we object, the question

1   calls for a legal conclusion.

2           **THE COURT:**  Would you repeat the question again,

3   please.

4           **MR. THAGARD:**  "Do you agree with me that it would be

5   an unfair debt collection practice --"

6           **THE COURT:**  Sustained.

7           **MR. THAGARD:**  We have an objection to this question

8   too, your Honor.

9           **THE COURT:**  What is it?

10          **MR. THAGARD:**  The question is:  "You agree with me

11  that it would be a misrepresentation in the collection of a

12  debt to tell the customer that they still owe when, indeed, it

13  has been paid in full?"  Same objection, calls for a legal

14  conclusion.

15          **THE COURT:**  Yes, sir.

16          **MR. B. GUTIERREZ:**  That's not a legal conclusion, you

17  know, asking for a legal conclusion.  He's asking if that's a

18  misrepresentation.  He testified --

19          **THE COURT:**  I don't think that that's a legal

20  conclusion.

21          **MR. B. GUTIERREZ:**  Thank you.

22          **THE COURT:**  So overruled.  Thank you.

23      **(Resume playing of video deposition)**

24          "WITNESS:  If the debt had been paid in full and we

25          knowingly told the customer that they still owed that

1          debt, then that would certainly be a violation of our

2          policies."

3      **(End playing video deposition of David Barton by**

4  **Defendants)**

5          **MR. B. GUTIERREZ:**  That concludes our offer, your

6  Honor.

7          **THE COURT:**  Thank you.

8          Do you have anything to offer on this?

9          **MR. THAGARD:**  No, your Honor, we do not.

10          **THE COURT:**  Thank you.

11          Call your next witness.

12          **MR. B. GUTIERREZ:**  We call Hugh Statum by deposition.

13          **THE COURT:**  Go ahead.

14                          **DEFENDANTS' WITNESS**

15                  **HUGH STATUM BY VIDEO DEPOSITION**

16          **(Witness sworn)**

17                          EXAMINATION

18          BY MR. RUMLEY:

19          "Q.  Sir, could you identify yourself for us?

20          "A.  My name is Hugh Talmadge Statum III.  I go by

21          Tab.

22          "Q.  Do you understand what we're doing here today?

23          "A.  Yes, sir.

24          "Q.  And so the jury understands, you are vice

25          president of the retail end of this Clayton family of

1          companies, correct?

2          "A.  Vice president of operations, yes, sir.

3          "Q.  The company in which you are an officer is the

4          company responsible for the stores that are out there

5          selling homes to customers, correct?

6          "A.  Yes, sir.

7          "Q.  And I understand that you yourself may not

8          personally oversee these stores and leave that to

9          regional managers and that sort of thing, but

10         ultimately, as vice president of the retail company,

11         you're over those regional managers, correct?

12         "A.  No, sir.  They do not report to me.

13         "Q.  Who do they report to?

14         "A.  They report to the zone vice presidents.

15         "Q.  Who do the zone vice presidents report to?

16         "A.  Mr. Booth.

17         "Q.  And so Mr. Booth would be the person that would

18         be ultimately over the operations of the retail

19         stores?

20         "A.  Yes, sir.

21         "A.  In between the two manufacturing --

22         "Q.  Okay.  Tell me what -- what your

23         responsibilities are as vice president of operations.

24         "A.  I'm responsible for the overall infrastructure

25         and -- and support systems and the people in the home

1    office that support the home centers out in the

2    field.

3    "Q.  Do you have any responsibility over supervising

4    or managing the day to day operations of the retail

5    stores?

6    "A.  No, sir.

7    "Q.  Do you recall looking at any of the issues that

8    were going on with the employees in Store 214?

9    "A.  No, sir.

10   "Q.  Were you involved at all in the changes in

11   policies and procedures that arose out of the -- out

12   of what the employees were doing in -- in Store 214?

13   "A.  I don't recall, I may have been.

14   "Q.  What -- what changes were made to the policies

15   and procedures from the conduct of the employees of

16   Store 214?

17   "A.  We would -- I believe that we came out with a

18   policy relating to notary guidelines and where the

19   transactions were actually to be closed.  Those are

20   the only two that I can think of.

21   "Q.  What were the changes with respect to notary

22   guidelines?

23   "A.  We advised that anyone who was receiving a

24   financial benefit from the transaction was not

25   supposed to be the notary on the transaction.

1        "Q.  My understanding that that policy, when it came

2        into effect, not only applied to Texas but it applied

3        to company-wide, all the states that you do business

4        in, correct?

5        "A.  That's my understanding, yes, sir.

6        "Q.  Do you understand why you've put in that -- that

7        policy that someone who has a financial interest

8        can't notarize a document?

9        "A.  Makes sense.

10       "Q.  Why does it make sense?

11       "A.  It's just -- you wouldn't want the same person

12       notarizing the document that was doing the

13       transaction.

14       "Q.  You signed a number of mechanic lien release --

15       releases, correct?

16       "A.  Yes, sir.

17       "Q.  All right.  Do you know whether or not the

18       documents that pertain to the file in which you filed

19       the release, whether or not those documents were

20       notarized by someone that had a financial interest in

21       the transaction?

22       "A.  I don't know.

23       "Q.  Was that one of the reasons why you released --

24       or you signed all these mechanic lien releases?

25       "A.  I don't know.

1    "Q.  Was there anything done to notify any of your

2    customers about the notary problems that were

3    occurring out of Store 214?

4    "A.  I don't know.

5    "Q.  If you were aware that an installment contract

6    or a deed of trust or mechanic's lien contract has

7    been forged what would you do to notify the customer?

8    "A.  If I was aware that a document had been signed

9    by someone other than the customer?

10   "Q.  Yes, sir.

11   "A.  How would we notify the customer?  If I became

12   aware of that I would have brought it to the

13   attention of the zone vice president for that area

14   and let him investigate what might have occurred

15   there.

16   "Q.  Would you notify the customer?

17   "A.  I wouldn't, no, sir.

18   "Q.  You wouldn't tell the customer?

19   "A.  Not me personally, no, sir.

20   "Q.  Should someone tell the customer?

21   "A.  I don't know.

22   "Q.  Would you want to be told if someone forged your

23   signature to a document and then went and filed it in

24   the country records?

25   "A.  If someone forged my signature and filed with

1    the county records, yes, sir, I would want to be

2    told.

3    "Q.  Do you believe that your customers should be

4    told if a company is filing documents in the country

5    court records that relate to their land?

6    "A.  I believe that the customer should be told about

7    documents that are being filed in relation to their

8    land?

9    "Q.  Yes, sir.

10   "A.  Yes, sir.

11   "Q.  If someone is going to file a document related

12   to their land in the country records, the customer

13   should be aware of it, right?

14   "A.  Yes, sir.

15   "Q.  If your company is going to file a release that

16   relates to their land or a release that relates to

17   the installment contract, that customer should be

18   told that you all are filing a release, correct?

19   "A.  I believe that a customer should be aware of any

20   activity that's going on with their transaction.

21   "Q.  If Clayton Homes wanted to communicate with

22   their customer they had the ability to do it,

23   correct?

24   "A.  I believe so, yes, sir.

25   "Q.  Again, we're looking at what's previously marked

1            as Discovery Exhibit 36.  This is the release that

2            was filed by Mr. Statum in the Medina matter, and it

3            says 'C --"

4       **(Pause playing video deposition)**

5            **MR. THAGARD:**  Your Honor, I'm going to object for the

6  same reason I did earlier, it's another transaction, 401, 403,

7  and 404.

8            **MR. B. GUTIERREZ:**  214 store transaction document.

9            **THE COURT:**  Overruled.  Thank you.

10      **(Resume playing video deposition)**

11           "Q.  -- 'MH Homes Inc. does hereby release the lien

12           of said mechanic's lien contract and has been paid in

13           full,' do you see that?

14           "A.  Yes, sir.

15           "Q.  What's been paid in full?

16           "A.  The mechanic's lien release is a release of the

17           obligation as it relates to the mechanic's lien

18           contract.

19           "Q.  What was paid in full -- has been paid in full,

20           what was paid in full?

21           "A.  The mechanic's lien contract is what that

22           release refers to.

23           "Q.  So the contract was paid in full?

24           "A.  The mechanic's lien contract was paid in full.

25           "Q.  So the contract was paid in full?

1        "A.  I don't know how else to say it.  That's a

2        mechanic's lien release of the mechanic's lien

3        contract.

4        "Q.  What is your understanding of what paid in full

5        means?

6        "A.  What is my understanding of the word what does

7        paid in full mean?

8        "Q.  Yes, sir.

9        "A.  Pretty simple words, paid in full.

10       "Q.  Means that's paid in full, right?

11       "A.  Paid in full.

12       "Q.  I think --

13       "Q.  If a loan is paid in full and a customer

14       continues to make payments then they're making

15       payments they no longer owe, correct?

16       "A.  That sounds logical to me, yes, sir.

17       "Q.  Do you know how many builder's or mechanic lien

18       releases were filed in South Texas with this exact

19       language saying has been paid in full?

20       "A.  No, sir.

21       "Q.  Has anyone told you the numbers?

22       "A.  No, sir.

23       "Q.  Would it surprise you if it's -- if it's --

24       **(Pause playing video deposition)**

25           **MR. THAGARD:**  Your Honor, we will object to this next

1    question.  Can we approach the bench, please?

2             **THE COURT:**  Yes, sir.

3         **(Begin bench conference at 4:48 p.m.)**

4             **THE COURT:**  The question is "Would it surprise you if

5    it's -- if it's more than a thousand,' talking about filing

6    releases.  There's --

7             **THE COURT:**  Sustained.

8         **(End bench conference at 4:49 p.m.)**

9             **MR. THAGARD:**  Your Honor, that goes to the next

10   question too.

11            **THE COURT:**  Same thing.  Thank you.

12        **(End bench conference at 4:49:11)**

13        **(Counsel confer)**

14        **(Resume playing video deposition)**

15            "A.  No, sir."

16            "Q.  -- I think we have three or four stacks of them

17            here -- that all of them were filed within a very

18            short time period and all of them related to

19            Store 214, can you give the jury an explanation why

20            it is that this company filed these mass releases

21            during the fall of 2005?

22            "A.  I have -- I don't have any personal knowledge of

23            exactly why the decision was made to file -- to

24            release these.

25            "Q.  Who made the decision?

1          "A.  I don't know.

2          "Q.  What did you hear?

3          "A.  I don't recall anything in particular.

4          "Q.  What about in general?

5          "A.  Other than I was aware of the -- vaguely aware

6          of some of the issues that were going on at Store 214

7          and then these releases were filed, that's about the

8          extent of my involvement.

9          "Q.  What issues were you vaguely -- did you vaguely

10         know about?

11         "A.  That some lawsuits had been brought related to

12         that location.

13         "Q.  What else?

14         "A.  That's it.

15         "Q.  Why would -- why would a company file all these

16         releases simply because a couple of lawsuits were

17         filed?

18         "A.  I don't know.  I didn't make that decision.

19         "Q.  Did CMH make a determination that fraud and

20         forgery was -- was occurring in Store 214?

21         "A.  Not that I'm aware of.

22         "Q.  Were you ever told about individuals who

23         testified under oath like you're doing here today,

24         that their signature was forged?

25         "A.  I don't recall it, no, sir.

1           "Q.  No one has ever told you that.

2           "A.  I don't believe so, no, sir.

3           "Q.  Would it concern you if there were a number of

4           individuals who testified under oath that their

5           signatures had been forged?

6           "A.  Would it concern me if customers' signatures --

7           if someone had signed a customer's name to a

8           document?

9           "Q.  Yes, sir.

10          "A.  Yes, sir.

11          "Q.  Would it concern you if we have individuals

12          within your stores who were forging signatures?

13          "A.  If they were signing customers' names, yes, sir,

14          that would concern me.

15          "Q.  Should employees be signing other employees'

16          names?

17          "A.  No, sir.

18          "Q.  For example, did you know that after

19          Mr. Frazier, who was a sales associate in this store,

20          had left after he had been terminated that the store

21          continued to use his notary stamp and they just

22          forged his signature --

23          "Q.  Were you aware of that?

24          "A.  I believe I was aware of that.

25          "Q.  Does that concern you?

1          "A.  Yes, sir.

2          "Q.  If the installment contract is paid in full then

3          they no longer owe on the home.

4          "A.  If a retail installment contract related to the

5          home is paid in full then I would think that they

6          would not owe on the home.

7          "Q.  I have marked as Discovery Exhibit 92 the front

8          page of the deposition of Bruce Robin Moore dated --

9          that took place February 24th, 2005.  And can you

10         confirm for me that Tom Hodges was present?

11         "A.  Yes, sir.

12         "Q.  Did you know that Mr. Moore testified in that

13         deposition that he actually forged signatures?

14         "A.  No, sir.

15         "Q.  If you were aware of that would that concern

16         you?

17         "A.  Yes, sir.

18         "Q.  Certainly if the general counsel of this company

19         is at the deposition and you heard that, that should

20         concern him?

21         "A.  Yes, sir.

22         "Q.  Do you know what action he took to try to remedy

23         that situation, if anything?

24         "A.  No, sir, I do not.

25         "Q.  From a -- an operational standpoint, do you know

Statum - Direct / By Video Deposition                    321

1        whether or not any of the conduct that was discussed

2        in any of these depositions was communicated to you?

3        "A.  I don't recall specifics of any of the

4        depositions being discussed with me, no, sir.

5        "Q.  Individuals testifying that they forged

6        signatures, you don't recall that ever being told to

7        you in any form?

8        "A.  No, sir.

9        "Q.  Me asking you or telling you or telling you that

10       today is the first time you've heard of that?

11       "A.  I do not recall being told that -- that anyone

12       had admitted or testified that they had forged a

13       document, no, sir.

14       "Q.  How about that they had forged signatures to

15       notary blocks?

16       "Q.  You never heard of that before today?

17       "A.  I was aware that there were issues with the

18       notary, yes, sir.

19       "Q.  Issues with the notary that they were forging

20       the signature of a notary --

21       "Q.  Are you aware of that?

22       "A.  Yes, sir.

23       "Q.  Is that appropriate?

24       "A.  No, sir.

25       "Q.  On those documents where the notary was forged

1        do you think you have an obligation to go tell the

2        customer?

3        "A.  I don't know, sir.

4        "Q.  You admit that there were notary problems going

5        on, right?

6        "A.  I believe that there were some notary issues

7        going on, yes, sir."

8    **(End playing video deposition of Hugh Statum by**

9 **Defendants)**

10       **MR. B. GUTIERREZ:**  That concludes our offer of Hugh

11 Statum.

12       **MR. THAGARD:**  Your Honor, we have a short proffer, a

13 short proffer.

14       **THE COURT:**  Go ahead.

15                   **FOR PLAINTIFFS**

16            **HUGH STATUM BY VIDEO DEPOSITION**

17       "Q.  Do you have any responsibility over supervising

18       or managing the day to day operations of the retail

19       stores?

20       "A.  No, sir.

21    **(Pause playing video deposition)**

22       **MR. THAGARD:**  Can we turn that up, please,

23 your Honor?

24       **THE COURT:**  Yes, sir.  Sorry.

25    **(Resume playing video deposition)**

Statum - Cross / By Video Deposition                    323

```
 1          "Q.  -- any responsibility over supervising or
 2          managing the day to day operations of the retail
 3          stores?
 4          "A.  No, sir.
 5          "Q.  And why wouldn't you pay on your house?
 6          "A.  Why wouldn't they pay for their home?
 7          "Q.  Yes, sir.
 8          "A.  I don't know.  They -- they bought the home.
 9          They should pay for it.  They agreed to pay for it.
10          "Q.  Unless it's paid for, right?
11          "A.  These mechanic's lien releases relate to the
12          landowner, which is separate from the home and the
13          homeowner.  They could or couldn't be the same person
14          who owns the home owns the land.  I haven't each one
15          individually.
16          "Q.  If the home is paid in full then they no longer
17          owe on the home, am I right?
18          "A.  If a home is paid in full then they would no
19          longer owe on the home.  Mechanic's lien release
20          doesn't deal with the home.
21          "Q.  Well, what you are aware of is following the
22          filing of those suits new policies and procedures
23          were put into place at this company where you
24          actually have notary guidelines now and you close at
25          the title company, right?
```

1            "A.   That's correct.

2            "Q.   And now there's actually a system that was put

3            into place by Berkshire Hathaway where you can call

4            the 1-800 number and report the fraud, correct?

5            "A.   I believe that Berkshire Hathaway had a system

6            that they used with all of their other companies.

7            It's not necessarily for fraud.  It's just report

8            anything that you might want to have discussed or

9            investigated.  And whenever we were acquired by

10           Berkshire Hathaway they asked that we put that same

11           1-800 number system in place."

12       **(End playing video deposition of Hugh Statum by**

13   **Plaintiffs)**

14           **MR. B. GUTIERREZ:**  May we approach?

15           **THE COURT:**  Yes.

16       **(Begin bench conference at 4:58 p.m.)**

17           **THE COURT:**  Are we done?

18           **MR. RANGEL:**  Yes, we're done for now.

19           **THE COURT:**  I didn't know if you were done.

20           **MR. RANGEL:**  We wanted to make sure we wouldn't get

21   in trouble with the Court, so we're done for today.

22           **MR. UNIDENTIFIED:**  For today.

23           **THE COURT:**  How much do you have?

24           **MR. B. GUTIERREZ:**  I have a few more witnesses and I

25   think we should --

1          THE COURT:  By deposition?

2          MR. B. GUTIERREZ:  I have probably two more by

3  deposition.

4          THE COURT:  How long?

5          MR. B. GUTIERREZ:  One is like 45 minutes and then --

6          THE COURT:  We're not doing that one.  Have you got a

7  three-minute one?

8          MR. B. GUTIERREZ:  No, sir -- I mean, no, your Honor.

9          THE COURT:  I call you her and you call me ma'am.

10         MR. B. GUTIERREZ:  Sorry, your Honor.  I apologize.

11         MR. LOCHRIDGE:  (Indiscernible) demand at work.

12         THE COURT:  Pardon?

13         MR. LOCHRIDGE:  A baseball game.

14         THE COURT:  You missed it.

15         MR. B. GUTIERREZ:  Judge, you said 5:00 o'clock; it's

16  5:00 o'clock now.

17         THE COURT:  (Indiscernible)

18     **(End bench conference at 4:59 p.m.)**

19         THE COURT:  I think we're done for today and for your

20  scheduling purposes I'm going to ask the lawyers if it's okay

21  if I tell the jury it looks like that we may conclude with the

22  evidence on Monday, or at the latest Tuesday morning.

23         MR. RANGEL:  We're working towards that, your Honor.

24         THE COURT:  And which means we'll try to have the

25  case to you Tuesday afternoon.  I'm going to give the lawyers

1   probably an hour each to do closing arguments and then I'll

2   read you the charge of the Court, but that's after the evidence

3   is concluded.

4          We need to take some time to do what we call a

5   charging conference to try to work out what kind of a charge

6   we're going to give you on Tuesday, and so we may take some

7   time Tuesday morning to do that.  In any event, we'll let you

8   know Monday how we are progressing.

9          I think the way I understand it there are a couple

10  more witnesses for this group.  Mr. Rumley then has three

11  witnesses.  And then the Clayton Homes/Vanderbilt people may

12  have another three or so.

13         **MR. LOCHRIDGE:**  Yes, your Honor.

14         **MR. RANGEL:**  Yes, your Honor.

15         **THE COURT:**  So it looks like we're moving along a

16  little quicker than we anticipated, just for your scheduling

17  purposes.

18         So we'll see you 8:30 Monday morning.

19         Would you please stand for the jury?

20      **(Jurors exit courtroom at 5:00 p.m.)**

21         **THE COURT:**  If you all could just wait a few moments

22  till the jury leaves.  Do you have anything to take up in the

23  meantime?

24         **MR. J. GUTIERREZ:**  Briefly, your Honor, the exhibits

25  that were displayed in the video depositions, I just wanted to

1    formally get those offered (indiscernible).  They should all be

2    admitted and I wanted to be sure --

3            THE COURT:  I didn't say they should all be admitted.

4    He's already testified to them.  But if they don't object, it's

5    fine with me.

6            MR. THAGARD:  Well, I --

7            THE COURT:  Does that call -- does that urge you to

8    object?  I didn't mean to do that.

9            MR. RANGEL:  We object.

10           MR. SOLTERO:  I think we did object to the million

11   documents.

12           MS. ESPINOZA RODRIGUEZ:  We did.

13           MR. SOLTERO:  Right.  The demonstratives were not

14   allowed in.

15           MR. UNIDENTIFIED:  Right, yes.

16       (Voices overlap)

17           THE COURT:  Pardon?

18           MR. B. GUTIERREZ:  We know what the Court ruling was

19   with respect to those demonstratives.  Those are not coming in.

20           MR. RUMLEY:  It's just the Store 214.

21           MR. B. GUTIERREZ:  The Store 214 documents that

22   Mr. Frazier (indiscernible).

23           MR. RUMLEY:  That were shown to the jury.

24           MR. LOCHRIDGE:  And the offer specifically

25   (indiscernible).

1          **THE COURT:**  I understand.  Yeah, I let him testify to

2    those.  I guess there's no harm in them coming in, as long as

3    the demonstrative ones don't come in.

4          **MR. LOCHRIDGE:**  As long as the demonstrative ones

5    don't come in, your Honor.  And beyond that, I think we need

6    to --

7          **THE COURT:**  Look at them and make sure --

8          **MR. LOCHRIDGE:**   -- go through the list with them.

9          **THE COURT:**  Look through that, because I frankly

10   didn't write down the numbers.

11         **MR. LOCHRIDGE:**  We've got the demonstratives here,

12   but the others we need to reconvene on but I don't think

13   (indiscernible)

14         **THE COURT:**  Okay.

15         **MR. J. GUTIERREZ:**  We'll confirm those.

16         **THE COURT:**  And Mr. Rumley can stay late tonight and

17   take care of that.

18         **MR. RANGEL:**  Judge, I just want to reconfirm the

19   briefing schedule.  Mr. Gutierrez has to file his brief by --

20         **THE COURT:**  Noon tomorrow.

21         **MR. RANGEL:**  I misunderstood.

22         **THE COURT:**  I told him by noon tonight.  He looked a

23   little peaked, so I thought -- peaked, so I thought I'd make it

24   noon tomorrow, then everybody else by midnight Sunday night.

25   Is that all right?

1          **MR. RANGEL:**  We'll be working this evening, your

2     Honor, and get it tended to.  We'll be able to file --

3          **MR. J. GUTIERREZ:**  So responses by Sunday night?

4          **THE COURT:**  I really don't want to rush you all with

5     this.  I don't know if you have other people in your office

6     besides the people here that are doing that.  No?

7          **MR. J. GUTIERREZ:**  Our team does not.

8          **THE COURT:**  Okay.

9          **MR. J. GUTIERREZ:**  This is our team of lawyers.

10         **THE COURT:**  What about you all, do you want some --

11         **(Laughter)**

12         **MR. RUMLEY:**  Could I borrow a lawyer?

13         **(Laughter)**

14         **MR. J. GUTIERREZ:**  Oh, yeah, we'll be happy --

15         **(Voices overlap)**

16         **THE COURT:**  Mr. Gutierrez was going to file a motion

17    by noon -- huh?

18              You're off, yes.  And Mr. Rumley's gone.

19              Good bye, Mr. Rumley.

20         **MR. RUMLEY:**  Thank you, your Honor.

21         **(This proceeding was adjourned at 5:03 p.m.)**

22

23

24

25

<u>CERTIFICATION</u>

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    <u>February 8, 2011</u>

          Signed                                   Dated


              *TONI HUDSON, TRANSCRIBER*