UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

VANDERBILT MORTGAGE AND FINANCE, INC., ET AL., Plaintiffs,

vs.

CESAR FLORES, ET AL., Defendants.

CASE NO: CA-C-09-312

CIVIL

Corpus Christi, Texas

Thursday, November 11, 2010

(8:21 a.m. to 12:16 p.m.)
(1:06 p.m. to 5:16 p.m.)

JURY TRIAL – DAY 2

BEFORE THE HONORABLE JANIS GRAHAM JACK,
UNITED STATES DISTRICT JUDGE

Appearances: See Next Page

Court Recorder: Velma Gano; FTR

Courtroom Clerk: Sondra Scotch

Transcriber: Exceptional Reporting Services, Inc.
P.O. Box 18668
Corpus Christi, TX 78480-8668
361 949-2988

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

**APPEARANCES FOR:**

| | |
|---|---|
| **Plaintiffs:** | **JORGE C. RANGEL, ESQ.**<br>**615 Upper N. Broadway**<br>**Suite 2020**<br>**Corpus Christi, Texas 78403-2683** |
| | **CRISTINA ESPINOZA RODRIGUEZ, ESQ.**<br>**Baker Botts**<br>**910 Louisiana**<br>**Suite 3624**<br>**Houston, Texas 77002-4995** |
| | **PATTON G. LOCHRIDGE, ESQ.**<br>**McGinnis Lochridge, et al.**<br>**600 Congress Ave.**<br>**Suite 2100**<br>**Austin, Texas 78701** |
| | **EDWARD S. SLEDGE, IV., ESQ.**<br>**THOMAS W. THAGARD, III, ESQ.**<br>**1901 Sixth Ave. North**<br>**Suite 2400**<br>**Birmingham, AL 35203-2618** |
| | **CARLOS R. SOLTERO, ESQ.**<br>**McGinnis Lochridge, et al.**<br>**600 Congress Ave.**<br>**Suite 2100**<br>**Austin, Texas 78701** |
| **Defendants:** | **BALDEMAR F. GUTIERREZ, ESQ.**<br>**J. JAVIER GUTIERREZ, ESQ.**<br>**700 E. Third St.**<br>**Alice, Texas 78332** |
| **Intervenor Plaintiffs:** | **DAVID L. RUMLEY, ESQ.**<br>**Wiginton Rumley Dunn, LLP.**<br>**800 N. Shoreline Blvd.**<br>**14th Fl., South Tower**<br>**Corpus Christi, Texas 78401** |

3

INDEX

| PLAINTIFFS' WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
| --- | --- | --- | --- | --- |
| KIM RUSSELL | | | | |
| BY MR. THAGARD | 9 | | 74 | |
| BY MR. RUMLEY | | 36 | | -- |
| BY MR. B. GUTIERREZ | | 62/73 | | -- |
| DAVID BOOTH | | | | |
| BY MR. RANGEL | 79 | | 208/220 | |
| BY MR. RUMLEY | | 109 | | 215 |
| BY MR. B. GUTIERREZ | | 175/193 | | 219 |
| MICHAEL SHELTON | | | | |
| BY MR. LOCHRIDGE | 221 | | 258 | |
| BY MR. RUMLEY | | 240 | | -- |
| BY MR. B. GUTIERREZ | | 254 | | -- |
| DAVID JORDAN | | | | |
| BY MR. LOCHRIDGE | 262 | | 290 | |
| BY MR. RUMLEY | | 275 | | -- |
| BY MR. B. GUTIERREZ | | 292 | | -- |
| ARTURO TREVINO | | | | |
| BY MR. RANGEL | 314 | | 336/345 | |
| BY MR. B. GUTIERREZ | | 331 | | 342 |

| PLAINTIFFS' EXHIBIT | RECEIVED |
| --- | --- |
| 163 | 78 |

**INDEX (CONTINUED)**

| DEFENDANTS' EXHIBITS | RECEIVED |
| --- | --- |
| 184 | 53 |
| 92 | 120 |
| 452 | 157 |
| 468 | 160 |
| 222 | 163 |
| 218 | 215 |
| 47 | 248 |
| 189 | 283 |
| 190 | 283 |

**Corpus Christi, TX; Thursday, November 11, 2010; 8:21 a.m.**

**(Call to Order)**

**(Outside the presence of the jury)**

**THE CLERK:** All rise.

**THE COURT:** Thank you. You may be seated.

How did you-all do on working with the charge?

**MR. J. GUTIERREZ:** Your Honor, we visited last night and we made a lot of progress but we need a little bit more time.

**THE COURT:** I mean I understand you don't have to agree that RICO is going to the jury and that sort of thing, but you made progress?

**MR. J. GUTIERREZ:** Yes, we did.

**THE COURT:** That's good.

**MR. SOLTERO:** We did, and where we left was, if it's okay with the Court, is that we're going to continue to work over the weekend, look at some of the authorities and see if we can narrow down some of the disputes. We're hoping to be able to report back early, like Monday, if that's okay with the Court.

And I don't know if the Court has kind of an informal charge conference where we can discuss things or whether --

**THE COURT:** Sunday afternoon.

**MR. SOLTERO:** Okay, fine.

**THE COURT:** No.

**MR. SOLTERO:** Or, you know, if that's the way your Honor does it, then we're willing to do that.

**THE COURT:** I like just to do it, you know, I don't like to stop and take a half a day for a charge conference. You know, we'll just pick a time in the evening and do it.

**MR. SOLTERO:** And I think, Judge, we can probably do it in about 20 or 30 minutes. I think we can still do --

**THE COURT:** That's even better.

**MR. SOLTERO:** -- do something that's pretty concrete and you just need to make decisions.

**THE COURT:** And just flip a coin with the rest.

**MR. SOLTERO:** Right. And then we'll obviously have to make our kind of formal objections and tender everything.

**THE COURT:** Okay.

**THE CLERK:** The Court calls Civil Action C-09-312; *Vanderbilt Mortgage and Finance, Inc., et al. versus Cesar Flores, et al.*

May I have appearances, please?

**MR. B. GUTIERREZ:** Baldemar Gutierrez for Mr. Flores and Mr. King, and we are present and ready to proceed, your Honor.

**MR. RUMLEY:** Your Honor, David Rumley on behalf of the Trevinos.

**MR. RANGEL:** Jorge Rangel and Pat Lochridge and others for Vanderbilt, CHI and CMH Homes.

 **THE COURT:** Wonderful.

**MR. LOCHRIDGE:** Thank you, your Honor.

**MR. RANGEL:** And we are ready to proceed, your Honor.

**THE COURT:** So you're almost done, a couple more witnesses?

**MR. RANGEL:** I think we'll have a full day today.

**THE COURT:** Really? Okay.

So the lady is back there; she's ready to go back. I guess we'll give the jury a bet. They're not all here, are they?

**(No audible response)**

**(Pause)**

**THE COURT:** We have eight? We're missing eight? Well, I'm not good with that.

**THE CLERK:** Number eight.

**THE COURT:** Oh, number eight. He's only been partially with us anyway.

**(Pause)**

**THE COURT:** Do you want to have the jury clerk start calling him?

**(No audible response)**

**THE COURT:** He's here? Really? Okay.

Do you-all want to get started early?

**MR. RUMLEY:** Yes, your Honor.

**THE COURT:** Okay, bring them in.

Ma'am, would you mind taking the stand again, please?

**MR. SOLTERO:** Your Honor, Mr. Rumley stepped out for a second. He'll be back temporarily --

**THE COURT:** Oh.

**MR. SOLTERO:** Should I bring her in now or wait for him.

**THE COURT:** Go ahead, and let him -- put the lady up here. That wasn't his witness anyway.

**(Kim Russell takes the witness stand; pause)**

**THE COURT:** Where is the mobile home, by the way?

**MR. RANGEL:** Same location, your Honor.

**THE COURT:** Okay.

**THE CLERK:** All rise for the jury.

**(The jury enters the courtroom at 8:27 a.m.)**

**THE COURT:** Thank you. You may be seated.

I also want to thank you-all for working on Veteran's Day. The lawyers wanted to move forward with the case as efficiently as possible, and I hope we can honor our veterans with just hard work today. So, thank you.

You may proceed.

**MR. THAGARD:** Good morning, Ms. Russell.

**THE WITNESS:** Good morning.

//

//

//

**DIRECT EXAMINATION RESUMED**

**BY MR. THAGARD:**

Q    Yesterday I asked you if you had ever testified before and you told me you hadn't, so you -- that answer is no longer true, is it?

A    No, sir, it's not true.

Q    Are you still nervous?

A    Yes, sir, a little.

Q    I want to make sure that the record is clear on a few things from yesterday.

        **THE COURT:**  Don't repeat yesterday.  Just go forward, please.

        **MR. THAGARD:**  I will.

**BY MR. THAGARD:**

Q    There's -- We -- Yesterday you testified that there was a time in which Mr. King called you and --

        **THE COURT:**  One more time.  Don't repeat what you said yesterday.

        **MR. THAGARD:**  I'll --

        **THE COURT:**  Just go forward.

        **MR. THAGARD:**  Yes, ma'am.

**BY MR. THAGARD:**

Q    There was a time yesterday in which you tes -- you called Mr. King and told him that if he paid you --

        **MR. RUMLEY:**  Objection, your Honor, asked and

 answered, cumulative.

**THE COURT:** Sustained.

**BY MR. THAGARD:**

Q There is a -- One of the activities you engage in as an account representative is skip tracing --

**MR. RUMLEY:** Objection, leading.

**THE COURT:** Sustained.

**BY MR. THAGARD:**

Q There were times in the account records in which you did things other than call people, correct?

**MR. RUMLEY:** Objection, leading.

**THE COURT:** Sustained.

**BY MR. THAGARD:**

Q What is skip tracing?

A If a customer's number is disconnected or not in service or we've lost contact with a customer, we use White Pages through the Internet or any free sites to find alternate numbers for the customer, such as maybe a neighbor or a possible relative, to leave a message for the customer.

Q And when do you engage in skip tracing?

A When we've lost all contact with a customer. For instance, occasionally numbers will be disconnected or their home number will be disconnected and so we will use that to leave a message for them to return our call.

Q And what sources do you use to try to find the

information?

A There are free sites on the Internet, White Pages, Google sites that you can go to, the phone book, you know, just to locate a possible neighbor on the street that they live on or even a possible relative.

Q And these calls to try to find a neighbor or a relative, what's the purpose of that skip tracing?

A To leave a general message with that neighbor or relative. If they agree that they know the customer, basically we just say that we're with Vanderbilt and give an 800-number and ask if they would mind leaving the message with the person, the customer.

Q And do you take steps to protect the privacy of your customers?

A Yes, sir.

Q And how do you -- What steps do you take to protect the privacy of the customer?

A We only leave who we are, our name, and I always leave my first and last name and that I'm with Vanderbilt and a toll-free 800 number. We don't identify ourselves as a mortgage company or that we're collecting a debt or anything of that nature. We don't release any information about the customer at all.

Q And are there times when you call a place of employment?

A Yes, sir.

Q And do you take the same steps there?

A Yes, sir.

Q And what do you do if trying to contact neighbors and relatives doesn't work?

A The next step if we've exhausted all our efforts to get them by telephone is we will send a field representative, who is a person that will go to the home actually and try to put the customer on the phone with us if there are no other numbers to reach them at.

Q And what do you call this step?

A Field chase.

Q And what steps do you take during a field chase to protect the privacy of a customer?

A If the customer is there, the field rep is to put the customer on the phone with a representative at Vanderbilt. They will usually have someone on the line as they are approaching the home if there is a car there, if they think someone is at home, so that it prevents the customer from having to wait to get someone on the line. If the customer is not at home, there is a blank envelope that doesn't have any identifying marks on it. There is a letter left in that envelope that's got the date on it and who the letter is to and basically to contact Vanderbilt with the 800-number.

Q Are you personally familiar with the field chasing technique?

A Yes, I am. As a team leader, one of my job expectations is once a year I am to on an actual field rep ride-along to where I shadow a field representative and see what they do day to day.

Q And was there a time after Mr. King had left the home and which you determined you needed to place an accounting default proceedings?

A Yes, sir.

**MR. THAGARD:** And can we please pull up Plaintiffs' 146?

**(The exhibit is displayed)**

**BY MR. THAGARD:**

Q Can you identify this letter for us please, ma'am?

A Yes, sir. This is a notice of default and right to cure default letter.

Q And who is it sent to?

A Mr. Cesar Flores.

Q And what was the date?

A May the 5th of 2009.

Q And how was it mailed?

A It is sent certified mail, sir.

Q And tell us about the procedures the company uses to -- its routine procedures for sending a letter like this.

A If it comes to the point that we need to send a notice, the account rep is -- they order the notice if we've exhausted

all efforts to find our customer, find out what their intentions are. The account representative, they order the letter through the computer. There is a senior account representative, which is their supervisor, and they review the letter, make sure everything is correct, and if they're in agreement that it is time for that letter to go out, they approve it. It's been generated to a mail room at our office where it's printed out and it's sent out certified from there.

Q Does that happen every time they need to generate a request for a letter like this?

A Yes, sir.

Q And that's Vanderbilt's ordinary mailing procedures?

A Yes, sir.

Q And generating and mailing these notices is part of Vanderbilt's regular operations?

A Yes, sir.

Q And in this event, was this notice of default based upon your review of the file and generated in the ordinary course of Vanderbilt's business?

A Yes, sir.

Q Now, a couple things that the letter is supposed to say. You showed us where it was sent registered mail, correct?

A Yes, sir.

Q And there are a couple of things that you're seeking that the letter says. Right there under number one, will you

highlight that for us, number one? And blow up that too a little bit. And tell us what the letter is seeking to have -- I guess what you're seeking to have paid there.

A To make the monthly payment beginning with the March 1st, 2009, payment in the total amount of $1,752.50.

Q Because they're over 60 days late at this point, right?

A Yes, sir.

Q How many payments is this seeking?

A It would be looking to receive three payments, March, April and May's payments.

Q Okay. And those were the -- The only thing you're seeking there is the amounts that were due?

A Yes, sir, yes, sir.

Q And you see at the bottom there are some late charges. What are those?

A Any accrued late fees we charge. After the 15th of the month there's a five dollar late fee applied to the loan. So the $150 would have been any late fee that was accrued during the time they had the loan.

Q And are you seeking to ask for any other payments in this letter?

A No, sir.

Q The letter also -- If you'd clear that -- does it state the nature of the default? I mean, does it say what they've done to get themselves in default?

A Yes, sir.

Q And is there a place in which the letter indicates what they need to do to cure the default?

A Yes, sir, to take the amount owed and to send it to Vanderbilt Mortgage and Finance, Incorporated, and it gives the address to send that to.

Q And if they do that within 30 days of receipt of the letter, then they will have cured the default?

A Yes, sir.

Q Does Vanderbilt really want to default in this form?

A No, sir.

Q All right. Is there -- So that's the action to cure. Is there a place in the letter in which Vanderbilt tells the customer what they're going to do if the default is not cured?

A Yes, sir. I think midway through, right there where it's highlighted, it tells what will happen if the notice is not cured.

Q And is there a place in the letter in which the customer's right to redeem is explained?

A Yes, sir, there is. It's, I think, right below the area of what would happen if they don't cure the default.

Q That's hard to read. Can you read that?

A 'You have the right' -- Yes, sir.

'You have the right to redeem the manufactured home before we resell it if you pay us the full amount due under the

contract.'

Q And as far as your note, is this Vanderbilt's standard letter, notice of default letter?

A Yes, sir.

**MR. THAGARD:** And can you pull up Plaintiffs' 36, please?

**(The exhibit is displayed)**

**BY MR. THAGARD:**

Q Can you tell us what this document is, please?

A This is a United States Postal Service track and confirm notification.

Q What does it -- Where can you get this?

A You can go under USPS dot com, the United States Postal Service's website.

Q And what information does it provide?

A If we are wanting to track a letter or find out where one is in route, we can go in, put the certified number in that belongs to that letter and it will let us know what process that letter is in.

Q How can you tell -- Do you compare the certified numbers on top?

A Yes, sir.

Q So this one ends in 0243.

**MR. THAGARD:** Can you go back to 146, please?

**(The exhibit is displayed)**

**BY MR. THAGARD:**

Q Is that the same number that you find on the top of the letter?

A Yes, sir.

Q And right there under the certified mail number?

A Yes, sir.

**MR. THAGARD:** Can you go back to 36, please?

**(The exhibit is displayed)**

**BY MR. THAGARD:**

Q Looking at this, what does this USPS tell us about what happened after that registered letter was mailed?

A A notice was left at the address on May the 8th at 11:04 a.m., and that's Alice, Texas. Then a notice was left again on May the 18th at 3:06 p.m. in Alice, Texas. And then it was noted 'unclaimed' on June the 6th at 2:44 p.m. in Alice, Texas. And then returned back to Vanderbilt on June 15th at 8:18 a.m. in Maryville, Tennessee.

Q So what does the 'unclaimed' mean?

A It wasn't picked up or -- When certified letters are mailed, a green card is left if the person is not home, letting them know to come to the post office to get their mail. The 'unclaimed' means that it wasn't retrieved.

Q And this was mailed to the 1700 address?

A Yes, sir.

**MR. THAGARD:** I'd like to pull up Plaintiffs' 145,

please.

**(The exhibit is displayed)**

**BY MR. THAGARD:**

Q Can you tell us what this letter is?

A This is a notice of default and right to cure default to Mr. Alvin E. King.

Q Did you have the obligation to send a notice to Mr. King?

A No, sir.

Q Why?

A He had called in and advised us that he had left the home and that he wasn't going to make any other payments after that last one.

Q Is it your policy to try to send them anyway?

A Yes, sir.

Q And did you-all undertake efforts to try to find the best address you could for Mr. King?

A We do. We have an Accurint system that will pull up a last verifiable address for a customer. Our goal is to find that customer to let them know what's going on because they may have -- if they know it's going to repossess they may have some interest in trying to save it at that point. So we want to talk to them before we send it.

Q And so who was this letter sent to?

A Mr. Alvin E. King.

Q And the date?

A May the 5th, 2009.
Q And are the contents of this letter the same as the previous notice to Mr. Flores?
A Yes, sir.
**MR. THAGARD:** Would you please pull up Plaintiffs' --
**BY MR. THAGARD:**
Q Let me ask you this: Was this notice mailed according to the same business procedures as Mr. Flores'?
A Yes, sir, certified.
Q Okay.
**MR. THAGARD:** Please pull up Plaintiffs' 39.
**(The exhibit is displayed)**
**BY MR. THAGARD:**
Q Tell us what this document is, please.
A This is another USPS dot com. It's a track and confirm for that certified letter that was sent to Mr. King.
Q Okay. And the number ends in 236, correct?
A Yes, sir.
Q Okay.
**MR. THAGARD:** Can we go back to 145, please?
**(The exhibit is displayed)**
**BY MR. THAGARD:**
Q Is that the same certified number?
A Yes, sir.
//

**MR. THAGARD:** Let's go back to 39, please.

**(The exhibit is displayed)**

**BY MR. THAGARD:**

Q Can you tell us from this document the history of what happened to that certified mail letter after you mailed it?

A Yes, sir. A notice was left on May the 8th at 7:51 a.m. in Alice, Texas. Then a notice was left on May the 20th at 8:18 in Refugio, Texas, that it was delivered on May the 21st at 7:54 a.m. in Refugio, Texas.

Q So was this letter forwarded from Alice to Refugio?

A The -- Yes, the history of it shows that it was forwarded -- a forwarding address.

Q And somebody -- It was actually delivered and accepted in Refugio?

A Yes, sir, according to the track and confirm.

Q And this was the letter to Mr. King?

A Yes, sir.

**MR. THAGARD:** Can you please pull up 147, Plaintiffs' 147?

**(The exhibit is displayed)**

**BY MR. THAGARD:**

Q And what is this letter?

A This is a notice of intent to accelerate your debt.

Q And who is this sent to?

A Mr. Cesar Flores.

Q Okay. And the last four letters of the certified number?
A Zero six four one.
Q And what was the date it was mailed?
A June the 16th of 2009.
Q So that's more than 30 days after the first letter, correct?
A Yes, sir.
Q I want to stop here for a second. Are you familiar with the efforts that Vanderbilt took to try to get in touch with Mr. Flores and Mr. King between the time it mailed the notice of default on May 5th and between the time -- and this June 16th date?
A Yes, sir.
Q What steps did Vanderbilt take to try to get in touch with Mr. Flores and Mr. King?
A Just because we send a letter, we don't stop trying to contact our customer. We call any numbers that they have provided to us, any neighbor numbers that have agreed to take a message, or relatives. We also, if necessary, we will spend the money to send another field chase to the home to see if we can reach them there as well.
Q How frequently are you calling during this time?
A We're probably calling on a pretty regular basis, especially if we're not getting an answer, getting a message, a machine or, you know, no answer. We just want to do anything

possible to reach them at this point in time because we're running out of time.

Q And what's the purpose for your calls?

A We want to help them save their home. If they can't afford the home, we want to talk with them. Maybe we can help them sell their home to avoid having it repossessed and have that on them, so we try everything possible to get in touch with them.

Q If they call you back and offer to make a payment, what happens?

A We will accept that payment, and in some instances we will agree to either do the homeowner's assistance program or extend their payments if they show that they have, you know, the ability to pay, they want to keep it. We want to do anything possible to bring them current.

Q So going back to this letter.

**MR. THAGARD:** Let's look at Plaintiffs' 35, please.

**BY MR. THAGARD:**

Q Before we do this, so we don't have to go back. What's the last number on that certified number?

A Zero six four one.

**MR. THAGARD:** Let's go to Plaintiffs' 35, please.

**(The exhibit is displayed)**

//

//

**BY MR. THAGARD:**

Q Can you identify this document for us?

A This is a track and confirm from the postal service matching that letter.

Q Is that 0641, the same number?

A Yes, sir.

Q Okay. And tell me what the history of this registered letter was. This is the one to Mr. Flores, right?

A Yes, sir.

Q Tell me what -- And it was mailed to the 1700 address?

A Yes, sir.

Q Tell me what happened to this letter.

A Yes, sir. The notice was left on June 22nd of 2009 at 11:33 a.m. in Alice, Texas. There was a second notice left on July the 3rd, 2009, at 2:27 p.m. in Alice, Texas. It was noted 'unclaimed' on July the 9th, 2009, at 3:10, Alice, Texas. And then it was delivered back to Vanderbilt on July 17th at 8:16 a.m.

Q So two notices were left for Mr. Flores?

A Yes, sir.

Q And did he accept the letter?

A According to the history, it was unclaimed.

**MR. THAGARD:** Let's go to Plaintiffs' 148, please.

**(The exhibit is displayed)**

//

**BY MR. THAGARD:**

Q And tell us what this letter is, please.

A This is also a notice of intent to accelerate your debt, and it's addressed to Mr. Alvin E. King.

Q And what's the date on it?

A June the 16th of 2009.

Q What are the last four letters of the certified mail receipt?

A Zero six three four.

Q Was this letter mailed in accordance with Vanderbilt's standard mailing procedures?

A Yes, sir.

Q Okay.

**MR. THAGARD:** Will you pull up Plaintiffs' 38, please?

**(The exhibit is displayed)**

**BY MR. THAGARD:**

Q Does that certified number match up?

A Yes, sir: 0634.

Q Okay. And what's the history of this letter?

A There was a notice left on June 22nd, 2009, at 7:18 a.m. in Alice. Notice left on June the 30th at 8:35 a.m. in Refugio. And then it was delivered on June the 30th at 4:29 p.m. in Refugio.

Q So it appears that the letter was forwarded to Refugio?

A Yes, sir.

Q It appears that somebody in Refugio accepted it?

A Yes, sir, the same day notice was left.

**MR. THAGARD:** I'd like to pull up Plaintiffs' 150, please.

**(The exhibit is displayed)**

**BY MR. THAGARD:**

Q Tell us what this document is, please.

A This is a notice of acceleration addressed to Mr. Cesar Flores.

Q And what's the last four digits of the certified number?

A Six nine one three.

Q And what's the date?

A June the 29th of 2009.

Q And what's the certified mail number?

A Six nine one three are the last four digits.

Q And was this letter mailed in accordance with Vanderbilt's standard mailing procedures?

A Yes, sir.

**MR. THAGARD:** I'd like to pull up Plaintiffs' 34, please.

**(The exhibit is displayed)**

**BY MR. THAGARD:**

Q Tell us what this is.

A This is a postal track and confirm matching that notice,

the 6913.

Q Can you tell us what the history of this letter was, please?

A There was a notice left on July 3rd at 12:22 in Alice. Another notice left on July the 18th at 12:19 in Alice. And then it was unclaimed on July 25th, 2009, at 1:04 in Alice.

Q This was mailed to the 1700 address?

A Yes, sir.

Q Which is where the home was, correct?

A Yes, sir.

Q Okay. And despite the fact that two notices were left, this certified letter was never claimed, was it?

A No, sir.

**MR. THAGARD:** I'd like to pull up Plaintiffs' 149, please.

**(The exhibit is displayed)**

**BY MR. THAGARD:**

Q Tell us what this is, please.

A This is also a notice of acceleration addressed to Mr. Alvin E King. The certified number is 6906, and it was mailed on June 29th, 2009, as well.

Q And the last four digits are 6906?

A Yes, sir.

Q And was this notice mailed in accordance with Vanderbilt's standard mailing procedures?

A Yes, sir.

**MR. THAGARD:** Would you please pull up Plaintiffs' 37?

**(The exhibit is displayed)**

**BY MR. THAGARD:**

Q Is the certified number the same?

A Yes, sir, 6906.

Q Can you tell us the history of this letter?

A Yes, sir. This notice was left on July 3rd at 12:22 in Alice. A second time on July 15th at 4:06 in Alice. Then it was sent 'unclaimed' on July 21st at 3:21 in Alice.

Q So it doesn't appear that this letter was forwarded?

A No, sir, it does not. It was delivered back to our offices on August the 1st.

Q During the time that you're sending all these letters, is Vanderbilt still trying to contact Mr. Flores or Mr. King?

A We still do everything possible to contact our customer during the time the letter is out, the dates on the letter. We make sure if we even need to give extra time, we're calling, any way possible. If we have to send another field chase out there, we will do that as well.

Q What you're trying to do is get them to call you back?

A Yes, yes, sir.

Q After this last letter that we just saw, this notice of acceleration, does Vanderbilt still want to -- does Vanderbilt

want to avoid repossession?

A Yes, sir.

Q Is there an opportunity to send them another letter?

A We send a help letter out. Perhaps maybe that will grab some attention to the customer, to have them call back in. Maybe we can still help them even though they've got that last letter, we can help them with the HAT program or the extension or a payment plan if they want to do that.

**MR. THAGARD:** Can you please pull up Plaintiffs' 152?

**(The exhibit is displayed)**

**BY MR. THAGARD:**

Q Is this a copy of the 'Let us help you' letter?

A Yes, sir.

Q It says: 'Let us help you keep your home'?

A Yes, sir.

Q And it's sent to Mr. Flores, correct?

A Yes, sir.

Q At the address at the home, correct?

A Yes, sir.

Q And could you read that highlighted section, please?

**MR. RUMLEY:** Your Honor, I'm going to object. The document speaks for itself and her just reading a document is not testimony.

**THE COURT:** Sustained.

**MR. THAGARD:** I'll withdraw it, your Honor.

**BY MR. THAGARD:**

Q Tell us what the letter is -- what the substance of the letter is and what you're trying to accomplish.

**MR. RUMLEY:** Objection, your Honor, speculation. She didn't draft the letter.

**THE COURT:** Sustained.

**BY MR. THAGARD:**

Q Is this a standard letter that's sent in the ordinary course of your --

**MR. RUMLEY:** Objection; same objection.

**THE COURT:** Go ahead.

**BY MR. THAGARD:**

Q Is this a standard letter sent in the ordinary course of your employment with Vanderbilt?

A Yes, sir.

Q Are you familiar with the substance of the letter?

A Yes, sir.

Q Can you tell us what the substance of the letter and the intent of Vanderbilt is?

A We understand that customers have difficult times, things come up, they get behind, and the letter is -- the sole purpose of the letter is to let them know, just call us and we will talk with them and figure out -- try to find some sort of option to help them keep that house.

Q Okay. Have you had an opportunity to review the payment

history we discussed yesterday?

A Yes, sir.

Q Okay.

**MR. THAGARD:** And can you please pull up Plaintiffs' 18?

**(The exhibit is displayed)**

**BY MR. THAGARD:**

Q From your review of the Vanderbilt files and records, what is the amount of money that is currently owed by Mr. Flores and Mr. King pursuant to the retail installment contract they signed?

A Twenty eight thousand seven hundred and ninety-three dollars and 87 cents.

Q Ms. Russell --

**MR. THAGARD:** We can take that down.

**(The exhibit is removed)**

**BY MR. THAGARD:**

Q Ms. Russell, one of the matters that's been raised in this case is whether or not Vanderbilt harassed Mr. Flores and Mr. King. Have you had an opportunity to review the file?

A Yes, sir.

Q And are you aware of any evidence of Mr. Flores or Mr. King complaining about the way they were treated by any Vanderbilt account representative?

A There was one instance where Mr. King voiced that he was

not happy with the way one of the reps spoke with him on the telephone. I think it was Mr. Flores that the rep spoke with.

Q And was that complaint directed directly to you?

A Mr. King called in asking for me, or I may have called him that day, I can't recall, and he did let me know what had happened.

Q And do you remember approximately when that was?

A I'm sorry, I do not remember the exact date.

Q And -- But you've reviewed the loan file, correct?

A Yes, sir.

Q And did you find any other evidence of Mr. Flores and Mr. King complaining about the way they were treated?

A No, sir.

Q And how long a period was that?

A Seven years.

Q When you make records at Vanderbilt about calls, are you expected to put in all the complaints?

A Yes, sir.

Q So if a customer complains, it should be put in there?

A Yes, sir.

Q So if somebody had made a complaint, you would expect to find it in the file?

A Yes, sir.

Q Were you ever mean or rude to Mr. Flores or Mr. King?

A No, sir.

Q Did you ever harass them?
A No, sir.
Q Did you ever threaten them?
A No, sir.
Q Another thing that has been raised in this case is a claim that Vanderbilt called Mr. King at work after he asked them not to. Have you had an opportunity to investigate that claim?
A Yes, sir, through the notes.
Q And what did you find?
A I could not find any instance where he asked us not to call his place of employment. He did ask me on a few occasions to call him there because that was the best way to reach him.
Q And did he ask you that personally?
A Yes, sir.
Q On how many occasions?
A There were several occasions. I can't remember exactly how many, but there were various times when he needed information or maybe his cell phone wasn't working that I did call him at work.
Q And that was pursuant to a specific request?
A Yes, sir.
Q And there were no instances in which he asked you -- you could find that he asked you not to call him at work?
A No, sir.
Q Have you had the opportunity -- You've had an opportunity

to review the call notes though?
A Yes, sir.
Q And did you see any evidence that any Vanderbilt account representative had violated any policy or procedure of Vanderbilt?
A No, sir.
Q In hindsight, did you see anything that you or anyone else at Vanderbilt would have done differently?
A No, sir.
Q Did you see any evidence that anyone at Vanderbilt ever abused or harassed Mr. Flores or Mr. King?
A No, sir.
Q Have you had an opportunity to review the things that Mr. King said about you in testimony?
A I've only read the depositions that were provided to me.
Q What was your reaction to them?
A I was a little upset because I felt like we did have a good relationship and that he felt comfortable sharing specific personal information with me about their business, about getting a job at the funeral home, about his rabbits. I mean he was very proud of those rabbits that they raised. I helped them through -- I felt like I helped them through a lot of their difficult times with not being able to make their payment and to, you know, make an alternate arrangement with them. I wanted every way possible to make sure that they made those

payments, kept that house. They loved it. They always commented to me, and Mr. King specifically, about how much he loved his house. And they were devastated when the truck veered off the road and hit their home.

Q Just a couple of other things. In your review of the call notes, did you ever find a record in which Mr. Flores or Mr. King asked Vanderbilt to send them a copy of their deed of trust?

A I reviewed one instance where they wanted a copy of their retail installment contract and also a copy of the deed of trust is what they specifically asked for.

Q And do you recall when that was?

A May. I don't recall the year, but around May, the latter part of May I think is the date I recall.

Q And was there another call in which Mr. King called you and said he had gotten some information from another mobile home seller that he would have to sell his land?

A He called in wanting to -- I think they wanted to buy a bigger home. Their fear was that they were told from a -- I think a mobile home center manager that -- or given some incorrect information -- that if they sold the house that they were currently living in, they would have to sell the land also that was with that home. We advised at that point that if that loan was paid in full that we would release our lien on that property, and then that land was -- they could do with what

they wanted to. That's not how that works if you want to purchase another home.

Q And this was the lot 36 that had been pledged on the loan?

A I think --

Q Or where the house was situated?

A Yes, sir.

Q And the point was, was that if they had made all 144 payments, the land would be released?

A Yes, sir.

**MR. THAGARD:** Your Honor, I pass the witness.

**THE COURT:** Thank you. Mr. Rumley?

**MR. RUMLEY:** Yes, your Honor.

**(Pause)**

**MR. RUMLEY:** Good morning.

**THE WITNESS:** Good morning.

**CROSS EXAMINATION**

**BY MR. RUMLEY:**

Q You and I have never met before, correct?

A No, sir.

Q You were asked a number of questions about whether or not you're nervous and that sort of thing. You had looked at all these documents before you came in here today, right?

A Yes, sir.

Q You were well prepared to come in here and tell your story?

A Yes, sir.
Q In fact, all these gentlemen over here, you've got the president of Vanderbilt right here, right?
A Yes, sir.
Q He's your, like, big boss?
A Yes, sir.
Q And you wanted to come in here and you wanted to do well for the company, right?
A I wanted to come in here and tell what I knew of the events of the account, yes, sir.
Q And you wanted to do well at that, right?
A I wanted to tell what I knew and what my knowledge was of the loan.
Q Well, let's talk about your knowledge. I think yesterday you told me and this jury that you would actually record these calls. These calls that you have been telling them about, that you actually record these calls?
A Sir, I don't know if every call is recorded. I do know that we do record calls and we use those for training purposes.

**MR. RUMLEY:** Objection, non-responsive.

**THE COURT:** Sustained.

**BY MR. RUMLEY:**

Q Ma'am, do you record the calls that you have with the customers, yes or no?
A Yes, we do record calls.

Q Okay. Who is Mr. Nichols?
A He is the president of Vanderbilt Mortgage.
Q And that's who you work for, right?
A Yes, sir.
Q Is he a truthful and honest person in your opinion?
A Yes, sir.
Q You said you read the depositions of Mr. Flores and Mr. King, right?
A Yes, sir.
Q Did you read any other depositions?
A Ms. Trevino and Mr. Trevino.
Q How about Mr. Nichols? Did you read the president of Vanderbilt's deposition?
A No, sir.
Q Why would he testify under oath that you never record any of these calls?

**MR. RANGEL:** Objection, your Honor, he cannot be asking questions about some other testimony.

**THE COURT:** I'm sorry, this is not your witness.

**MR. RANGEL:** I apologize.

**THE COURT:** You may be seated; thank you.

**MR. RANGEL:** I apologize.

**MR. THAGARD:** Your Honor, I object to him --

**THE COURT:** Overruled.

//

**BY MR. RUMLEY:**

Q Ma'am?

A Yes, sir.

Q Why would Mr. Nichols testify that you don't record any of these calls with the customers?

A I don't know why he would say that, sir.

Q Is that true or not true?

A I did not read his deposition, sir.

Q Let me show you, ma'am.

**MR. RUMLEY:** May I approach?

**THE COURT:** You can show her.

**MR. RUMLEY:** Your Honor and for counsel, it's page 50, line 18 of the deposition of Paul Nichols.

**BY MR. RUMLEY:**

Q Do you see that, ma'am?

A No, sir.

**MR. THAGARD:** Ma'am, it's inappropriate for him to cross examine her on the testimony of Mr. Nichols when she said she hasn't seen --

**THE COURT:** Overruled.

**BY MR. RUMLEY:**

Q Ma'am, do you see that?

A No, sir.

**MR. RUMLEY:** May I just approach the witness?

**THE COURT:** Just see what's wrong with it.

**MR. THAGARD:** And your Honor, I'd like to see a copy of that as well.

**THE COURT:** Oh, it's on the -- the switch --

**MR. RUMLEY:** It's page 50, line 18.

**THE COURT:** Okay, hold up. Switch it off. It's on the computer, so, hold up. Let's switch it off computer to overhead. Don't do that; pick it up.

**MR. RUMLEY:** Oh, I'm sorry.

**THE COURT:** Now. Now you can put it on there.

**MR. RUMLEY:** All right.

**BY MR. RUMLEY:**

Q Mr. Nichols is the president of Vanderbilt, right, Vanderbilt Mortgage, this mortgage company, correct?

A Yes, sir.

Q Can you start at page 15, I want you to read this to yourself, okay? Line 18, what the question was and what the answer is.

**(Witness complies)**

Q Can you see that?

**MR. THAGARD:** Your Honor, may I approach the ELMO so can follow along with what he's --

**THE COURT:** Yes, you may.

**MR. THAGARD:** Thank you.

//

//

 **BY MR. RUMLEY:**

Q Do you see that, ma'am?

A Yes, sir.

Q Is that true?

A We record calls, sir.

Q What did Mr. Nichols testify to?

A His answer was that we do not.

Q So who is telling the truth?

A We do record calls, sir.

Q Do you have any reason why Mr. Nichols wouldn't be telling the truth about that?

**MR. THAGARD:** Your Honor, again I object. He's now cross examining her on something that somebody else testified to, and she's given her answer.

**MR. RUMLEY:** Mr. Nichols was a corporate representative, your Honor, so he was testifying on behalf of Vanderbilt in this deposition.

**MR. THAGARD:** Your Honor, that was taken a long time ago, and she said she hasn't read it.

**THE COURT:** Overruled.

**BY MR. RUMLEY:**

Q Ma'am, do you have any explanation to the jury why it is that the highest level person within this company would testify that none of these calls are recorded?

A I do not know, sir.

Q And in fact, when you call people when you collect, actually you advise them that you may record the call, right?
A I don't tell them that personally, no, sir. I think it's on the recording if they call in, yes, sir.
Q And even though the recording advises them that the call may be recorded, it's not recorded, true?
A I don't know, sir, which ones are or not.
Q Well, when Mr. Nichols gave a deposition on behalf of Vanderbilt, did you read in that section where the customers are warned that the call may be recorded but it's not really recorded?

**MR. THAGARD:** Your Honor, he's testifying. She's testified that she hasn't read it.

**MR. RUMLEY:** It's an admission by Vanderbilt. He was a corporate representative and --

**MR. THAGARD:** The question is: Did she read it?

**MR. RUMLEY:** Okay, well --

**MR. THAGARD:** She's testified she hasn't read the deposition.

**BY MR. RUMLEY:**

Q Do you see that, ma'am?
A Yes, sir.
Q Okay. The very next question that we just read, can you read that?

**MR. THAGARD:** Same objection, your Honor.

**(Witness complies)**

**BY MR. RUMLEY:**

Q Is that a truthful statement?

A We do not advise them on the telephone when we are calling the customer or when they call in. The recording does that, sir.

Q And the fact that you don't actually record it, right?

A I don't know which ones are recorded, sir, or not.

Q Well, are any of the calls, collection calls that you have, recorded?

A Yes, sir.

**MR. THAGARD:** Your Honor, asked and answered.

**BY MR. RUMLEY:**

Q Do we have any of these recorded conversations?

A I don't know, sir.

Q You were asked a number of questions yesterday about these training programs and these manuals and that sort of thing. Do you remember those questions?

A Yes, sir.

Q And I think you were asked about CP Exhibit 77. Do you remember that?

A If you could bring it back up, sir. I don't recall the numbers or anything.

Q If we look --

**MR. RUMLEY:** And this is admitted, CP 77.

**THE COURT:** Sir, that's admitted.

**MR. RUMLEY:** It's been admitted, CP 77.

**BY MR. RUMLEY:**

Q Do you remember this manual, going over this manual at quite some length yesterday?

A Yes, sir.

Q All right. Now, when was this manual actually put into place?

A I don't know the original date of the manual. I know it's one that we use for training purposes.

Q If we look, the effective date of the manual that you-all went over at some length is January of 2009.

A Yes, sir.

Q All right.

**MR. THAGARD:** Your Honor, I object. The documents we went over yesterday were from 2003 and 2007, and the testimony was that those manuals are regularly updated. That's a misleading question.

**MR. RUMLEY:** I would ask that he stick to a legal obligation and not a speaking objection.

**THE COURT:** Sustained.

**BY MR. RUMLEY:**

Q Ma'am, this manual --

**THE COURT:** I'm sorry, Mr. Rumley's objection is sustained.

**BY MR. RUMLEY:**

Q Ma'am, this manual is from 2009, right?

A There are probably updates in that manual, sir, from 2009. We update it regularly.

Q Well let's talk about those updates. It's true, is it not, ma'am, that you-all are trained on techniques to collect money, right?

A Yes, sir.

Q And your number one goal as a collections person is to collect money, right?

A Yes, sir, and to help someone keep their house.

Q But it's to collect money, right?

A So that they can keep their house, sir.

Q Isn't it true that it's so important that you collect money that you're actually compensated in your bonus based on how well you can collect money, correct?

A We have a bonus structure, yes, sir.

Q And that bonus structure is based upon your success at collecting money, right?

A At reducing delinquency, yes, sir.

Q And you're actually trained to pan for gold, right?

A Sir, if I may explain? I am trained to talk with a customer, not to pan for gold. I don't know that terminology.

Q Well, let's look at Clayton Exhibit 80 which has been admitted. It's an admitted document.

**(The exhibit is displayed)**

Q You see this, right?

A Yes.

Q Vanderbilt Mortgage, this is the company you work for, right?

A Yes, sir.

Q And what does that say right there?

A 'Collection techniques'.

Q And that would be techniques on how to collect, right?

A Yes, sir.

Q And one of the things you're trained on, what's that?

A It says: 'Pan for gold'.

Q 'Persuading the customer to pay by appealing to them or negotiating arrangements', correct?

A Yes, sir, that's what it says.

Q And one of the techniques that you're trained to use to pan for gold is to use scare tactics, true?

A No, sir.

Q Would it be appropriate, ma'am, to use scare tactics on people when you're collecting?

A No, sir.

Q But you do agree you call their employer, right?

A Yes, sir.

Q You can call -- It's in there you call the spouse's employer, right?

A Yes, sir.

Q You call their neighbors, right?

A Yes, sir.

Q You can call other family members, right?

A Yes, sir.

Q And then if for whatever reason those don't work, you actually send someone to their house, right?

A Yes, sir.

Q And you send someone to their place of business, right?

A Yes, sir, if it's necessary. But the house is where the field representative goes.

Q Right. And the interesting thing is the field representative that you're talking about doesn't even work for Vanderbilt, does he?

A No, sir.

Q He works for CMH, the store, right?

A I think so, yes, sir.

Q Does that make any sense to you at all?

A I don't know the alignment of everything, sir. You'd have to ask someone over field representatives.

Q Well, we'll ask one of the presidents. But my understanding is the story goes that we heard during opening is that the money is actually owed to Vanderbilt and not CMH, right? Is that the story?

A The loans are paid to Vanderbilt, yes, sir.

Q It's true, is it not, that Vanderbilt services many loans?
A Yes, sir.
Q They service loans in which they don't own the debt, true?
A Loans that are acquired, loans that we bought from others, yes, sir, we do.
Q Like, they service loans with Chase Manhattan Bank, right?
A Yes, sir.
Q The money is owed to Chase Manhattan but Vanderbilt is just servicing them, right?
A Yes, sir, we have --
Q That means the customer fills out a deal and they write a check to Vanderbilt, right?
A Yes, sir.
Q That doesn't mean they owe the money to Vanderbilt, right?
A We are the servicer, so, yes, they're paying it to us.
Q Right, they're paying you but they don't owe you the money?
A We are the servicer, so they're paying us the money.
Q And for example, you mentioned these field calls with Mr. Flores and Mr. King, right?
A Yes, sir.
Q And just so we understand, what you did is the Clayton store, the CMH employees, not Vanderbilt employees, would go to their homes and try to collect, right?
A At that time, the sales managers either would hire

someone, I think, or they would go themselves to get them on the phone with us.

Q But those people would be CMH, right?

A But they're trying to help Vanderbilt to collect the loan that's owed to Vanderbilt.

Q Why would a salesperson care about whether or not a customer is going to make a payment?

A If I sold the home to the customer, I would care as well whether or not they were going to be able to keep their home.

Q I mean, ma'am, can you ever imagine that I'd go -- I go and I buy a car. The salesperson comes out and sells me a car and then, for whenever reason, I miss a payment and all of a sudden the salesperson comes knocking on my door saying where's the payment? Can you ever imagine that happening?

A Not with a vehicle, no, sir.

Q In fact, when you have these field reps come in, you guys actually train them to be good-cop/bad-cop?

A I don't know how they're trained, sir. That's not my department.

**MR. RUMLEY:** Your Honor, this is an unadmitted exhibit, Exhibit 184.

**(Mr. Rumley confers with Mr. Thagard)**

**MR. THAGARD:** I'm going to object to him examining the witness on this. This is not a Vanderbilt document. It was produced by CMH. It's part of a larger CMH manual.

**THE COURT:** I'm sorry, does that say Vanderbilt on there?

**MR. THAGARD:** It does. But it's part of a larger CMH manual.

**MR. RUMLEY:** Your Honor, this is the manual they produced when we examined the witnesses on it. My understanding is their only objection is that it's highlighted.

**MR. THAGARD:** What's highlighted?

**MR. RUMLEY:** Your Honor, we would offer Exhibit 184, which is a Vanderbilt Mortgage and Finance collections manual.

**THE COURT:** What's the objection?

**MR. THAGARD:** The objection is it's not a Vanderbilt document, your Honor. It's a CMH Homes document.

**THE COURT:** And it's Exhibit Number what?

**MR. RUMLEY:** One eighty-four.

**THE COURT:** Let me see it at the bench, please.

**(Bench conference begins at 9:16 a.m.)**

**MR. RUMLEY:** It talks about the bad-cop/good-cop and that the Vanderbilt person is the good cop; they're the bad cop. So she's the bad cop; CMH are the good cop. And it talks about the field chase.

**THE COURT:** All the (indiscernible) and customers come from VMH, Vanderbilt, and not -- you say senior manager, (indiscernible) manager.

**MR. RUMLEY:** And this document, your Honor, is also

already admitted, the good-cop/bad-cop on their side. I'll show you if you'll --

**THE COURT:** Show it to me.

**REPORTER:** Get that a little bit closer to you.

**MR. RUMLEY:** CP 70.

**(Pause - The Court reviews the exhibit)**

**MR. RUMLEY:** I think, your Honor, their objection is, is that we haven't included a thousand-page document. If you'll see CP 70, that is just a few pages out of this huge manual. And what they don't -- they don't --

**MR. THAGARD:** It's a manual about CMH Homes; it's (indiscernible), correct, David?

**MR. RUMLEY:** They don't want -- They want it to be big --

**THE COURT:** It says Vanderbilt on here.

**MR. THAGARD:** It does, your Honor.

**THE COURT:** It's in ink. And it says all letters to the customer should be from Vanderbilt.

**MR. THAGARD:** That's training that's received by the CMH retail people.

**THE COURT:** Did you supply this to defendant?

**MR. THAGARD:** Yes.

**MR. RUMLEY:** It has been produced, yes, ma'am.

**THE COURT:** And who produced it?

**MR. THAGARD:** We did, CMH Homes.

**MR. RUMLEY:** But she's --

**THE COURT:** You say 'we', but she's your witness from Vanderbilt.

**MR. THAGARD:** Correct.

**THE COURT:** Is that right?

**MR. THAGARD:** CMH Homes produced that document.

**MR. RUMLEY:** And the document has her being the bad cop.

**THE COURT:** So who created the document?

**MR. THAGARD:** CMH Homes.

**THE COURT:** How could they create a document with the Vanderbilt Mortgage and Finance?

**MR. THAGARD:** It's -- that's just part of the way the retailing and managing document reads, your Honor.

**THE COURT:** Okay, your objection -- You're not claiming it's not authentic?

**MR. THAGARD:** Ma'am?

**THE COURT:** You're not claiming it's not authentic?

**MR. THAGARD:** I'm sorry, I didn't hear you.

**THE COURT:** You're not claiming this is not authentic?

**MR. THAGARD:** Oh, no, ma'am. No objection to authenticity.

**MR. RUMLEY:** It's a CMH Homes manual.

//

**THE COURT:** Okay, 184 is admitted.

**(Bench conference concludes at 9:19 a.m.)**

**(Defendants' Exhibit Number 184 was received in evidence)**

**(Pause)**

**BY MR. RUMLEY:**

Q If you'd look right here, ma'am. What does that say?

A Vanderbilt Mortgage and Finance, Incorporated.

Q And you were telling us about these field calls, right?

A Yes, sir.

Q Where you would be an account rep, for example, right?

A Yes, sir.

Q A VMF account rep?

A Yes, sir.

Q And then the person that would go do the field call would be someone in the retail side of the store?

A That or someone we've hired, like an outside agency.

Q Okay. And it's true, is it not, that you are trained as this good-guy versus bad-guy?

A Is there a date on that document, may I ask?

Q November of 2003.

A Thank you.

Q Is that true?

A I have not trained that way, sir.

Q Well, does it matter what date it is? Is that an acceptable way, in your opinion, ma'am, to collect on a debt?

A I don't think it's acceptable, sir, but I've never seen that document before.

Q And it says, if we look here, the sales manager plays the good guy while the account rep, the senior account rep or manager, is the bad guy.

A I was never trained that way, sir.

Q Do you think that is an acceptable way to train the individuals within either Vanderbilt or CMH on collecting a debt?

A No, sir. And I was never trained that way and I don't know of anyone that was trained that way, sir.

Q What's your explanation of why it's in the manual?

A I don't know, sir. I've never seen that document.

Q I asked you before whether or not it was appropriate to use scare tactics. It's not, is it?

A No, sir.

Q Would this company train you or your other reps to use scare tactics?

A No, sir.

Q Let me show you -- We looked at this earlier, and this is collection techniques. This is Clayton Parties' 80; it's been admitted. Vanderbilt collection techniques, do you see that?

A Yes, sir.

Q And if we come down, they train you to use assertive behavior, correct?

A Yes, sir.

Q And then if we come down to here **(indicates)**, it says:

'Your success in collections will depend on your ability to maintain a business relationship with our customers. This relationship is founded on communications. If the customer feels threatened by you, they will avoid your calls. While aggressive scare tactics may work occasionally, you will eventually find it harder to contact the borrower because they will avoid you.'

Did I read that right?

A Yes, sir.

Q What aggressive scare tactics may work occasionally?

A I was never trained with using scare tactics, sir.

Q What's the explanation for it being in as a collection technique in the manual?

A I don't know. I'm sorry; I don't know, sir. I've never seen that in any of the manuals that I review.

Q Well, I mean you just read it in the manual.

A Yes, sir.

Q Right? And it's collection techniques for you and your company, right?

A Yes, sir.

**MR. THAGARD:** David, what page is that?

**MR. RUMLEY:** Sorry?

**MR. THAGARD:** What page is that?

**MR. RUMLEY:** Seventeen.

**BY MR. RUMLEY:**

Q Is there any circumstance at all, ma'am, when you're out there panning for gold to use scare tactics?

A I don't pan for gold and I do not use scare tactics, Mr. Rumley. I was never trained that way.

Q What manual were you trained off of?

A The account representative or the collections manual.

Q Not this one?

A I don't know what those -- the particular ones you're showing me because I've never seen them, sir.

Q Well, ma'am, this, if we look right here **(indicates)**, do you see this exhibit? This is actually Clayton Parties' exhibit. This is Vanderbilt's exhibit.

A Yes, sir.

Q And all the exhibits that you and Mr. Thagard went over to get ready for your testimony, you didn't go over collection tactics, did you?

A I looked at the manual, yes, sir.

Q You looked at this?

A I looked at several notes, sir, yes.

Q So you knew about the scare tactics, right?

A I'm not trained that way, Mr. Rumley.

Q Did you know that it was in here?

A I've never seen the notes before, sir.

Q If we look at Clayton Parties' CP 70, page 439, we have another manual. And do you see:

'Once a field call is approved, the most effective field call script is what we call the 'good-guy versus bad-guy'.'

Is that in this manual as a mistake, too?

A I've never read that part of the manual. I don't know which manual that is.

Q You agree with me that if a customer no longer owns the debt that it would be a violation to call and collect on it, true?

A Yes, sir.

Q And certainly there is no doubt in your mind that from October of 2005 up till 2009, you-all were calling Flores and King, right? You were making phone calls?

A Yes, sir.

Q And at any time, did you tell them that the debt was paid in full?

A No, sir.

Q Now, one of the things that account reps do is to look for red flags in a file, right?

A Yes, sir.

Q And one of the red flags that you look for is, for example, if there's forgery or fraud in the transaction, right?

A Red flags to me, sir, as an account representative means

if the customer has gotten a divorce, if they've gotten sick, if they've had medical issues or if they've been out of work.

Q One of the things before you start foreclosing on someone is you look and make sure the signatures are in the documents, right?

A We look for the signatures for the purpose of sending the notices correctly.

Q You look at the documents to make sure they're properly signed?

A Yes, sir. The contract, yes, sir.

Q And one of the things -- well, let me ask you this: Do you have the authority, if you figure out, if you learn that a signature was forged or a document was fraudulently notarized, do you have the authority to discharge any amount of the debt?

A No, sir.

Q Do you understand that -- Who is David Barton?

A He is the collections manager.

Q He's one of your bosses?

A Yes, sir.

Q Does he have the authority to discharge the debt if he had determined that there was forgery or notary fraud?

A I don't know who's in charge of it, sir.

Q Well, if Mr. Barton testified that he has the authority to discharge up to $20,000 if he found forgery or fraud, do you have any reason to disagree with that?

A I do not. I did not read his deposition, sir.
Q Well you agree with me that if there's fraud or forgery in the transaction that that's a situation where the debt can be discharged, right?
A I'm not an expert at that, sir.
Q I'm not asking you if you're an expert. I'm saying within the company, if you're calling someone and you find out that the document has been --is fraudulent or notary fraud or forged, is that a situation where you at least notify your superiors?
A If I have any idea, yes, sir.
Q And what you're telling this jury is you have no idea that if they find out that it's fraudulent or forged or notary fraud or any way that they would discharge the debt?
A I do not know that. My job is to collect the payments on the loan owed to Vanderbilt.
Q You agree that that would be a good policy, wouldn't it?
A Yes, sir, if I knew of anything like that.
Q Yeah. I mean if it was discovered that there was notary fraud or something in the transaction, that's a good policy, would it not, number one, to notify your customer and say, hey, we have these problems with the documents? That's a good policy, right?
A I would assume so, yes, sir.
Q And certainly if you were aware of notary fraud in

documents or forged documents or fraud, that's one of the things you would do is notify the customer, right?

A I would notify my supervisor. That is up to them as far as what course is taken at that point.

Q You wouldn't tell the customer?

A It's my job to collect the payments, sir. I have no clue of anything else.

Q All this stuff about rabbits and all that stuff, if you found out that a signature was forged, you wouldn't tell the customer?

A If I knew that, sir. I mean I -- my job is to collect the payments on the loan, so if I'm calling them to discuss the payments. That's my job.

Q I understand that's your job, ma'am. I'm just asking you: If you became aware that a signature was forged or there was notary fraud, would you tell the customer?

A Yes, sir.

Q And do you agree that it would be a good policy within this company that if they found out that a signature was forged in the transaction or there was notary fraud, a good policy is, is to discharge the debt, release the debt, right?

A No, sir, not under all circumstances.

Q Under what circumstances is it a good policy, ma'am, to discharge the debt when you find out that a signature is forged or a notary is forged?

**MR. THAGARD:** Your Honor, may I object? She's testified she doesn't make policy --

**THE COURT:** Sustained.

**MR. THAGARD:** -- and she doesn't know anything about it.

**BY MR. RUMLEY:**

Q You were asked about the payment history. Do you remember that?

A Yes, sir.

Q This is CP -- Clayton Parties' 17.

**(The exhibit is displayed)**

Q Do you see that?

A Yes, sir.

Q It says 'Repurchase'. Do you know what that means?

A I do not know for sure the exact definition of a repurchase. I know that we do investor changes a lot of times where we'll buy a loan back from an investor that we've sold it to.

Q Because this loan was actually sold to someone else, right?

A This was a Vanderbilt loan, sir. It was originated with Vanderbilt.

Q And was it sold to someone else?

A I don't know, sir.

Q Then who repurchased this loan in 2009?

A I don't know, sir.

Q Do you know or are you aware of circumstances where Vanderbilt is required or obligated to repurchase loans that they had previously sold to investors if they discover fraud or forgery in the transaction?

A No, sir, I don't.

Q That would be someone else?

A Yes, sir.

Q All right.

**MR. RUMLEY:** Thank you, ma'am. That's all I have.

**THE WITNESS:** Thank you.

**THE COURT:** Yes, sir?

**MR. B. GUTIERREZ:** May I proceed with asking questions?

**THE COURT:** Absolutely.

**MR. B. GUTIERREZ:** Good morning, Ms. Russell.

**THE WITNESS:** Good morning.

**MR. B. GUTIERREZ:** I have a few questions.

**THE WITNESS:** Yes, sir.

**CROSS EXAMINATION**

**BY MR. B. GUTIERREZ:**

Q Ms. Russell, you testified yesterday that you called Mr. Flores and Mr. King many times over pretty much a seven-year period, is that correct?

A Yes, sir.

Q How many accounts did you say you were handling during that time?

A If I remember correctly, the bucket that I was responsible for had approximately 800 accounts, I think.

Q How many other accounts -- How many other of those 800 accounts besides the account pertaining to Mr. Flores and Mr. King do you have this specific recollection about calls and conversations about events that took place back in 2002?

A Would you like names, sir?

Q No, I just want numbers.

A Probably a dozen that I had a good relationship with, but if I saw notes I would remember more.

Q You were not the only person that was calling Mr. Flores and Mr. King, is that correct?

A No, sir.

Q I believe there was a total of 60, 60 separate account representatives that were calling Mr. Flores and Mr. King, is that correct?

A I'm not sure of the amount, sir. I had their loan off and on for about four years.

Q You're Kim Russell, is that correct?

A Yes, sir.

Q Do you know Sherry Wright (phonetic)?

A The name is familiar, yes, sir.

Q Do you know Rebecca Stenz (phonetic)?

A No, sir.
Q Do you know Susan Galloway?
A Yes, sir.
Q Do you know Angela Hecklin (phonetic)?
A Yes, sir.
Q Tiffany Lewis?
A Yes, sir.
Q Did I ask you about Sherry Wright?
A Yes, sir, you did.
Q Sarah Moses?
A Yes, sir.
Q Annie Hatchel (phonetic)?
A Yes, sir.
Q Charlene Moore (phonetic)?
A The name sounds familiar.
Q Anne Richmond (phonetic)?
A Yes, sir.
Q Kirk Wilkinson (phonetic)?
A Yes, sir.
Q Deborah Carter?
A No, sir.
Q Donna Fox?
A No, sir.
Q Barr Buckley (phonetic)?
A Yes, sir.

Q Did I ask you about Rebecca Russell?
A No, sir, you did not, but yes, I know her, sir.
Q Sheila Pratt?
A Yes, sir.
Q Renia Henderson (phonetic)?
A Yes, sir.
Q Rebecca Profit (phonetic)?
A No, sir.
Q Melissa Duan, Doan?
A Doan? Yes, sir.
Q Michael Hood?
A Yes, sir.
Q Annie Robinson?
A No, sir.
Q Levy Ritchie (phonetic)?
A Yes, sir.
Q Dan Hatcher?
A No, sir.
Q Frenchie Mitchell (phonetic)?
A Yes, sir.
Q Sarah Hill Holland (phonetic)?
A Yes, sir.
Q Melissa Payne (phonetic)?
A No, sir.
Q Greg Trott (phonetic)?

A Yes, sir.
Q Keith McAnis (phonetic)?
A McAnis? Yes, sir.
Q McAnis. Jennifer Shad (phonetic)?
A Yes, sir.
Q Juanita Walton?
A Yes, sir.
Q Norma Wood?
A No, sir.
Q Kerry Hood (phonetic)?
A Yes, sir.
Q Rebecca -- I think I asked you about Rebecca Stenz, right?
A Yes, sir.
Q Susan Galloway?
A You asked -- Yes, sir.
Q S. Hollingsworth (phonetic)?
A Yes, sir.
Q Dennis Ogle (phonetic). I'm not sure how it's --
A Can you spell the last name for me, please?
Q O-g-l-e.
A Ogle.
Q Ogle?
A Yes, sir.
Q Regina Latham (phonetic)?
A Yes, sir.

Q Alison Simpson (phonetic)?
A Yes, sir.
Q Aaron Faulkner (phonetic)?
A Yes, sir.
Q Melissa Crabtree (phonetic)?
A Yes, sir.
Q Misty McMahon (phonetic)?
A Yes, sir.
Q Mitch Sloan (phonetic)?
A Yes, sir.
Q Candace Murphy?
A Yes, sir.
Q Todd Hickman?
A Yes, sir.
Q Annette Boreng (phonetic)?
A No, sir.
Q Danielle Gibson?
A Yes, sir.
Q David Banner?
A Yes, sir.
Q Kathy Peake (phonetic)?
A Yes, sir.
Q Christy Kwyat (phonetic)?
A Yes, sir.
Q Dennis Burk?

A No, sir.
Q Christy Wilson?
A Yes, sir.
Q David Wimberley?
A Yes, sir.
Q Eric Floyd (phonetic)?
A Yes, sir.
Q Ginger Mangen?
A Mangen; no, sir.
Q Kendall, and you knew her last name?
A I did.
Q Kendall Owens (phonetic)?
A Yes, sir.
Q Angelina Dugan (phonetic)?
A No, sir.
Q David Buddle?
A Can you spell it for me?
Q B-u-d-d-l-e.
A Yes, sir.
Q Pete Covington?
A Yes, sir.
Q Theresa Brown?
A Yes, sir.
Q Angie McMahon?
A Yes, sir.

Q Angie Robinson?
A No, sir.
Q Kevin Kern (phonetic)?
A Yes, sir.
Q The majority of those people work under you or with you?
A Either account representatives or legal or insurance.
Q Did you know that these people were calling Mr. Flores and Mr. King?
A Yes, sir.
Q When did you find out that hundreds of these releases had been filed concerning transactions that had occurred at the Corpus store here, store 214?
A I don't know the details, sir. I just know that there were some land releases done. I was already -- I don't know, sir.
Q But you did know that hundreds of releases were filed?
A Yes, sir.
Q Okay. And you also found out that aside from filing those mass releases, hundreds of releases out of the Corpus store, that the Corpus store was also shut down and closed, right?
A At some point I knew that they had closed. I don't know when, sir.
Q Some of the documents you talked about yesterday talked about emphasizing ethical behavior. Do you remember that?
A Yes, sir.

Q And how important it is that you get trained in conducting yourselves in an ethical manner. Do you remember that?
A Yes, sir.
Q If you discovered any fraud in any of the transactions, you know, any transaction accounts that you were collecting on, do you believe ethically that you should continue to collect money on those accounts?
A The situation -- it would depend. I don't know the circumstances on everything.
Q Do you think you should stop calling the individual?
A No, sir, not until I found out exactly what was going on.
Q Do you think that maybe you should recall that loan, that transaction, call the customer and explain what your findings are after you've had an opportunity to investigate it?
A If it was my job to do that, yes, sir.
Q Do you think it would be ethical to try to correct the fraud that has occurred?
A Yes, sir.
Q When you discovered that these hundreds of releases had been filed and that the Corpus store here had been shut down, had been closed, did it give you any concern that you were still collecting on this account?
A To be honest, sir, I collect on the loans that are owed to Vanderbilt, so the land is not really anything that I deal with on a day to day basis.

Q Well, some of the documents that were shown by Mr. Thagard and Mr. Rumley talked about the field chase. Do you remember that?
A Yes, sir.
Q And one of the things that those documents say is that not only do you go to their employment, you call their employers. I mean in this particular case, you were calling neighbors?
A Yes, sir.
Q You were calling relatives?
A Yes, sir.
Q But you never called the landowner. You never called Mr. Flores' sister, Maria Trevino, you never called the landowners, Mr. Arturo Trevino or Maria Trevino?
A Sir, I don't know if they were called or not, but they would be someone, if they were a point of contact and we had their number, that we would have called.
Q That wasn't my question. You never called the landowners?
A I don't recall, sir. I don't know if I called personally or not. I'm sure if the number was there I would have called.
Q Did you find any document anywhere where you called or anyone that works in your collection department, that you ever called the landowners?
A I can't remember, sir. There were so many numbers called; I don't know the names.
Q Isn't it true, Ms. Russell, that the reason that you

 didn't call the landowners is because you knew that there was some fraud and forgery going on not only in this transaction but hundreds of transactions, right?

A No, sir.

Q Do you remember a lady by the name of Anita Perez, a landowner --

A No, sir.

Q -- that called your office complaining that someone had forged her signature?

A No, sir.

Q You don't remember those calls?

A I do not, sir.

Q Out of the 800 accounts that you handled, you don't remember that one?

A No, sir.

Q Okay. Do you remember a lady by the name of --

**MR. THAGARD:** Your Honor, may we approach?

**THE COURT:** Yes.

**(Bench conference begins at 9:41:30 a.m.)**

**MR. THAGARD:** This line of testimony is clearly covered by the motion in limine.

**THE COURT:** It is.

**MR. THAGARD:** And we find it objectionable.

**MR. RUMLEY:** Other transactions that we've seen per your order --

**THE COURT:** No (indiscernible).

**MR. THAGARD:** -- they're not to examine.

**MR. RUMLEY:** Not to bring up before the jury.

**MR. THAGARD:** Any other things other than notary.

**THE COURT:** That's what I said. You don't remember that?

**MR. B. GUTIERREZ:** I had understood, your Honor, that I could ask questions concerning --

**THE COURT:** No, you're (indiscernible) questions --

**MR. B. GUTIERREZ:** I apologize to the Court.

**THE COURT:** -- that those transaction people are the transaction people, and that one would.

**MR. B. GUTIERREZ:** Two fourteen.

**THE COURT:** Two fourteen?

**MR. B. GUTIERREZ:** Yes, your Honor.

**THE COURT:** Only complaining about the notary.

**MR. B. GUTIERREZ:** I will withdraw the question on the record, your Honor.

**(Bench conference concludes at 9:42:30 a.m.)**

**MR. B. GUTIERREZ:** Your Honor, we would withdraw that question.

**CROSS EXAMINATION RESUMED**

**BY MR. B. GUTIERREZ:**

Q I believe, Ms. Russell, when you were looking at the payment history on Mr. Flores' and Mr. King's account that the

balance that you are suing Mr. Flores and Mr. King was, I believe, $29,000?

A Around $28,000 and something, yes, sir.

Q Okay.

**(Pause)**

**MR. B. GUTIERREZ:** Those are all the questions I have at this time, your Honor.

**THE COURT:** Thank you.

**REDIRECT EXAMINATION**

**BY MR. THAGARD:**

Q Ms. Russell, Mr. Rumley asked you some questions about whether Vanderbilt services loans owned by other institutions?

A Yes, sir.

Q Okay. Based on your review of the file, do you know whether Vanderbilt owned the Flores and King loan?

A It was a Vanderbilt loan, yes, sir.

Q So it wasn't owned by somebody else?

A No, sir.

Q The monies were due to Vanderbilt?

A Yes, sir.

Q And he read out a whole list of names of Vanderbilt people. I believe that was Mr. Gutierrez. And do you understand that some of those people had nothing to do with account representatives and collections?

A Yes, sir.

Q For instance, he mentioned a name of somebody out of the -- related to insurance, correct?
A Yes, sir.
Q And they were trying to help Mr. Flores and Mr. King process an insurance claim?
A Yes, sir.
Q Okay. Was that something you were involved in helping them with as well?
A Only to give them the advice when the truck hit the home of who to contact.
Q You pointed them in the right direction?
A Yes, sir.
Q Okay. And many of those manuals that Mr. Rumley showed you are not Vanderbilt manuals, are they?
A No, sir.
Q Now he showed you one.

**MR. THAGARD:** Would you please pull up Plaintiffs' 80, page 17? And highlight the underlined sentence, please.

**(The page is displayed and highlighted as requested)**

**BY MR. THAGARD:**

Q And that says:

'While aggressive scare tactics may work occasionally, you will eventually find it harder to contact that borrower because they will avoid you.'

Now, are they training you to avoid scare tactics?

**MR. RUMLEY:** Objection to form --

**THE WITNESS:** From that sentence, yes, sir.

**MR. RUMLEY:** -- your Honor. She answered before she hadn't even seen it before, so now he's asking her for opinion.

**BY MR. THAGARD:**

Q Are you trained to use scare tactics?

A No, sir.

Q Do you use scare tactics?

A No, sir.

Q Have you ever used scare tactics?

A No, sir.

Q Does the company encourage you to not use scare tactics?

A Yes, sir.

**(Pause)**

**MR. THAGARD:** Your Honor, we pass the witness.

**THE COURT:** Thank you, sir. Anything further, Mr. Rumley?

**MR. RUMLEY:** No, your Honor.

**THE COURT:** Mr. Gutierrez?

**MR. B. GUTIERREZ:** No, your Honor.

**THE COURT:** Thank you, ma'am; you may stand down.

**THE WITNESS:** Thank you, your Honor.

**(Kim Russell exits the witness stand)**

**THE COURT:** Call your next witness.

**MR. RANGEL:** David Booth.

**THE COURT:** Would you administer the oath, Ms. Gano?

**DAVID BOOTH, PLAINTIFFS' WITNESS, SWORN)**

**THE CLERK:** Have a seat, please, and watch your step.

**(David Booth takes the witness stand)**

**THE CLERK:** Your Honor, one of the jurors was asking to take a break.

**THE COURT:** Sorry?

**THE CLERK:** One of the jurors was asking if they could take a break.

**THE COURT:** We'll take a ten-minute break.

Would you please stand for the jury?

**(The jury exits the courtroom at 9:47 a.m.)**

**THE COURT:** Thank you. You may stand down. We'll just take a break.

**(David Booth exits the witness stand)**

**THE COURT:** Anything to take up outside the presence of the jury?

**MR. RANGEL:** Not at this time, your Honor.

**(Recess from 9:47 a.m. to 9:49 a.m.)**

**(Outside the presence of the jury)**

**THE COURT:** Hold up.

**MS. RODRIGUEZ:** Okay.

**THE COURT:** Now.

**MR. LOCHRIDGE:** Thank you very much, your Honor. Mr. Rumley and I have discussed that they're agreeable to our

admitting Clayton Parties' Exhibits 163 and 164, which are individual exhibits. They are in --

**THE COURT:** Wait a minute, Clayton 164 has already been admitted, and 164 through 168 but not 163.

**MR. LOCHRIDGE:** Then it's just 163; then it's just 163.

**THE COURT:** Is that right, Mr. Rumley?

**MS. UNIDENTIFIED:** Yes, that's right.

**MR. RUMLEY:** I think it's already been admitted in Exhibit 80, right, Mr. Lochridge?

**MR. LOCHRIDGE:** Yes, it's a part of a big thick exhibit, and this way we don't have to wade through that exhibit to find it, that Exhibit 163.

**MR. RUMLEY:** I have no objection, your Honor.

**THE COURT:** Exhibit 163 is admitted.

**(Clayton Parties' Exhibit Number 163 is received in evidence)**

**MR. LOCHRIDGE:** And 164 already was. Okay, thank you very much.

**(Recess continues from 9:50 a.m. to 9:57 a.m.)**

**REPORTER:** On the record?

**THE COURT:** Yes, please.

**(David Booth retakes the witness stand)**

**(Pause)**

**(The Court confers with the Clerk)**

**THE COURT:** Oh yes, please.

**THE CLERK:** All rise for the jury.

**(The jury enters the courtroom at 9:57 a.m.)**

**THE COURT:** Thank you. You may be seated.

Mr. Rangel, you may proceed.

**MR. RANGEL:** Thank you, your Honor.

Good morning, Mr. Booth.

**THE WITNESS:** Good morning.

**DIRECT EXAMINATION**

**BY MR. RANGEL:**

Q Would you please state your full name for the jury?

A David Mason Booth.

Q And where do you live, Mr. Booth?

A I live in Knoxville, Tennessee.

Q And how are you employed?

A I am president of CMH Homes.

Q And --

**MR. THAGARD:** Jorge, may I interrupt for a second?

**(Mr. Thagard confers with Mr. Rangel)**

**BY MR. RANGEL:**

Q Could you give us a little personal background as far as education, employment leading up to your present position?

A Yes, sir. I grew up in eastern North Carolina. I was born in Beaufort, North Carolina, and went to college at the University of North Carolina, Chappell Hill, and I got a

business degree in 1974. Worked for a bank for a short period, and then got into the mobile home business there locally near where I grew up actually, and was in that for 11 years. That began in 1976, was there for 11 years. And then I sold boats and insurance for a real short period, and then joined CMH in 1990. The first five years I was there I was vice president of sales, and for the last 15 years I've been president of the retail company.

Q Mr. Booth, before we get into more details of your testimony, I want to ask you some questions about CP Exhibit 13.

**(Pause - technical problem)**

**MR. UNIDENTIFIED:** Sorry, we're having a problem.

**MR. RANGEL:** We'll come back to that, Mr. Booth. We're having technical problems.

**BY MR. RANGEL:**

Q What is CMH Homes?

A We are a retail company. We sell and install mobile homes throughout the country.

Q Is there another name for a mobile home that is sometimes used?

A You may hear 'manufactured home', you may hear 'trailer'. Those will be the two that you hear most common. Mobile home is, I think, the most common.

Q And at present, what are your primary responsibilities?

A I oversee the retail company. I work with a number of different individuals that travel throughout the country that help to supervise the sales centers. And primarily we sell homes at each of those stores, and we install those. We try to insure that we buy good homes and then do a good job of delivering them and making customers happy.

Q You made reference to 'sales center'. Sales center 214, is that the same as Lot 214, the one we've been hearing about?

A Yes, sir. We use those terminologies interchangeably. But it just represents a specific sales center in a specific town.

Q Does CMH Homes ever use the name 'Clayton Homes'?

A Yes, sir. We operate under various trade names. Clayton Homes is a trade name for some of the retail stores. We also use Oakwood Homes. We've used Love Homes in the past. We have different ones.

Q And are you familiar with Vanderbilt Mortgage and Finance, Inc., another party in this litigation?

A Yes, sir.

Q And what is the relationship between CMH Homes with Vanderbilt and any other entity in the organization?

A We are one subsidiary of Clayton. Vanderbilt would be a separate subsidiary. We sell and install the homes, and Vanderbilt is one of the lenders that we use for financing those homes.

Q And when you say 'Clayton', are you referring to Clayton Homes, Inc.?

A Yes, sir.

Q So Vanderbilt and CMH Homes are subsidiaries of CMH?

A Yes, sir.

Q I'm sorry, CH, Inc., Clayton Homes, Inc.?

A Clayton Homes, Inc., yes, sir.

Q Is that also known as CHI?

A CHI, right.

Q Okay. Mr. Booth, we've heard some testimony regarding land-in-lieu transactions. Can you explain what those transactions are?

A Customers come to us, and they're all different. Each customer is different. Some customers have cash down payment that they plan to invest in the home. Some customers come to us that want to trade, maybe an older home. We've traded for a number of things over the years. We've traded for RVs, we've traded for cars and trucks, things like that, anything that has value, collateral value.

Q When you say 'you've traded', what do you mean by that?

A We accept -- just say that we have a customer that has an older home. We would establish a value for that home, and we would allow them X amount of value for that home as a down payment against the selling price of a new home.

Q Does CMH Homes ordinarily require a down payment --

A Yes, sir.

Q -- from its customers?

A Yes, sir.

Q For what reason?

A It just further protects the loan. The down payment is just an investment by the customer to insure that, one, they're serious about buying the home and they're committed to that, and it's just the collateral value they put down against the purchase price of the house.

Q And specifically with land-in-lieu transactions, how does that work in terms of collateral?

A In a land-in-lieu situation, you have a customer that did not have -- they may have cash. Some land-in-lieus have partial cash and land. In a pure land-in-lieu where there was no cash down payment, there would be a piece of property that had a value that either the customer owned or someone else might have owned that was willing to put that land up, and that land would become the collateral for the down payment.

Q And is the land in lieu of a down payment?

A Yes, sir.

Q Is that where the terms comes from?

A Yes, sir, I think so.

Q And so how does the land serve as the collateral?

A The land has a value, and so that value is established as the collateral value that the lender accepts as the down

payment.

Q Before 2006, could a customer pledge his or her own land as collateral?

A Yes, sir.

Q And how is it done now?

A That is the way we do it today. Prior to 2006, we would accept land that was not technically titled in the individual's name. It could be -- we call it 'third-party land'. It could be a relative, it could be a friend; someone that had land that was willing to pledge that as the collateral. In 2006, our lender required that the land be actually deeded to the purchaser of the home, and so it required that if, say, a grandfather wanted to provide an acre of land for the homebuyer, then they would deed the land into the name of the customer, prospective customer, and the customer would then put that land up as the collateral value.

Q So what is the difference between a first-party land-in-lieu and a third-party land-in-lieu?

A Okay. A first-party land-in-lieu, the actual homebuyer, the customer is buying the home, the land is deeded in their name and they're placing it up as collateral. A third-party, the customer is buying the home and then there's a third-party that's actually pledging land as the collateral.

Q And as you know, Mr. Booth, we are here in a repossession action, correct?

A Yes, sir.
Q And in this transaction, who were the customers?
A Mr. Flores and Mr. King.
Q And were they the landowners?
A No, sir.
Q Who were the landowners?
A Mr. and Mrs. Trevino.
Q And what kind of transaction did CMH consider this to be?
A A land-in-lieu transaction.
Q Why?
A Because there was no cash down payment. The land was pledged as the collateral down payment on the loan.
Q And does the file reflect that this was a third-party land-in-lieu transaction?
A Yes, sir.
Q In what respect?
A There was a warranty deed supplied that had the legal description of the land. What I saw in the deal is there was an appraisal charged. Everything about the loan was it was a land-in-lieu transaction. There was no cash down payment.
Q Is the documentation in the file consistent with a land-in-lieu transaction?
A Yes, sir.
Q Are there many references to land-in-lieu transaction in this case?

A Yes, sir --

Q In this file?

A -- I believe so.

**MR. RANGEL:** Call up CP Exhibit 1.

**(The exhibit is displayed)**

**BY MR. RANGEL:**

Q Mr. Booth, is this the real estate -- the retail installment contract that was signed by Mr. Flores and Mr. King?

A Yes, sir.

Q In the contract, does it show that Mr. Flores and Mr. King are the customers?

A Yes, sir.

Q And you'll note that buyers' names are in the order of Cesar Flores and Alvin King. Any particular reason they are in that order?

A Normally it just meant that one signed on the credit application first. That's normally how it would be established.

**MR. RANGEL:** And we'll turn to the signature page. I believe it's page four.

**(The page is displayed)**

**BY MR. RANGEL:**

Q And is that the order in which they signed?

A Yes, sir.

Q And if you look to the left of that page, you see 'Clayton Homes, Inc.' written in, and then 'Clayton, Corpus Christi'. Do you see that?
A Yes, sir.
Q And what is Clayton, Corpus Christi?
A Clayton, Corpus Christi is just the retail store that was here in Corpus Christi.
Q Is that the same as CMH Homes?
A Yes, sir.
Q And does the retail installment contract reflect that Mr. Flores and Mr. King financed the purchase of the mobile home?
A Yes, sir.
Q Where is that reflected? Is that on page one?
A Yes, sir, I believe it is. It shows that there were 144 payments of $511.40, and the payments were to begin in March of 2002.
Q Does the retail installment contract reflect that there was a down payment?

**(Pause - Witness reviews contract)**

A No, there was no cash down payment.
Q And if there had been a down payment, it would have been reflected as a cash down payment?
A Yes, sir.
Q Okay. Now, what security is shown in the contract?

A That there was real property located at 3534 Galimore (phonetic), Alice, Texas.

Q And what about the box above that?

A The home itself, we also had a security interest in that of course.

Q Two different security interests?

A Yes, sir.

Q Two different types of collateral?

A Correct.

Q Now, are there two different roles for CMH Homes and Vanderbilt with respect to a transaction like the one that Mr. King and Mr. Flores were involved in?

A Yes, sir.

Q And what are those roles?

A CMH Homes, we were the retailer, the dealer selling and home and installing the home. We submitted a credit application to Vanderbilt Mortgage in this case. They were the lender. They reviewed that and they made the credit decision. They informed us of the credit decision, under which conditions the loan would be financed, and then our job would have been to get all of that together, to package that up and submit it to them for final approval. And at such time as they approved the loan, then it would be assigned to them and they would pay us in full for the transaction.

Q And is that what happened here?

 A Yes, sir.

Q Now, how does CMH Homes protect itself after it installs the home but before the loan is approved? What does it file?

A Well first we have them sign the retail installment contract to make sure we have the security interest in the home. Then in addition to that, in Texas we had a mechanic's lien that was executed by the Trevinos, and so both those documents were completed, and that protected us during the installation process, any improvements that we might have been doing in a particular contract and until such time as we assigned it to Vanderbilt Mortgage.

Q Was this contract assigned to Vanderbilt Mortgage?

A Yes, sir.

Q Does the contract contain language of assignment?

A Yes, sir.

Q And what is that document that you said CMH Homes files to protect itself before the loan is approved?

A It's the builder's mechanic's lien.

**MR. RANGEL:** Call up CP Exhibit 2.

**(The exhibit is displayed)**

**BY MR. RANGEL:**

Q And is this the builder's and mechanic's lien contract that was filed in connection with this transaction involving Mr. King and Mr. Flores?

A Yes, sir.

Q And who were shown as the landowners in this transaction?

A Maria Trevino and Arturo Trevino.

Q Going back to the retail installment contract, at the very top when it says 'Assignee is Vanderbilt Mortgage and Finance, Inc.', what does that mean to you?

A That they were going to be assigned this contract, assuming it met all of their conditions, that they would service this -- I mean they would own this loan, they would become responsible for it, and they would collect the payments from the borrower.

Q And when you say 'they', whom do you mean?

A Vanderbilt Mortgage.

Q And does the opening paragraph also contain language to that effect?

A Yes, sir, it does.

Q The second sentence?

A 'Seller will submit this contract to Vanderbilt Mortgage and, if approved, the contract will be assigned to Vanderbilt Mortgage and Finance.'

Q And is that what happened here?

A Yes, sir.

Q Was the contract assigned to Vanderbilt?

A Yes, it was.

Q And we'll look at page five.

**(The page is displayed)**

Q What is the language under 'assignment by seller'?

**MR. RUMLEY:** I'm going to object, your Honor. The document speaks for itself.

**BY MR. RANGEL:**

Q Is there additional language in the contract, additional assignment language?

A Yes, sir.

Q Where is that language?

A There at the bottom of that contract.

**MR. RANGEL:** And I would ask that it be highlighted.

**(The area is highlighted)**

**THE WITNESS:** 'We assigned all our rights and title and interest to Vanderbilt Mortgage.'

**MR. RANGEL:** Call up CP Exhibit 45.

**(The exhibit is displayed)**

**BY MR. RANGEL:**

Q What is this?

A Sir, these are -- appear to be just accounting entries that were made at the time the deal was funded, where all of the information was booked into the various accounts and the retail company once we were funded by Vanderbilt Mortgage.

Q And were you in fact funded by Vanderbilt Mortgage?

A Yes, sir.

Q And did that happen on January 16th, 2002?

A Yes, sir, I believe so.

Q And what do you mean that CMH Homes was 'funded by Vanderbilt' on that date?
A We assigned the loan to them, and at that point in time they paid us in full.
Q When you say 'they paid you in full', what do you mean by that?
A I mean we were paid the total amount of what we had sold the home for.
Q And you were paid by whom?
A By Vanderbilt Mortgage.
Q And were you paid $40,815.19?
A Yes, sir, that's what this says.
Q And did that in any way affect the underlying indebtedness by Mr. King and Mr. Trevino to Vanderbilt?
A I think that's -- it was their obligation to Vanderbilt Mortgage to repay that amount of money they had agreed to.
Q So the payment by Vanderbilt to CMH Homes, was that for the assignment?
A Yes, sir.
Q Did that assignment mean that Mr. King and Mr. Flores would no longer have to pay the debt to Vanderbilt?
A No, sir.
Q What --
A I mean their responsibility was Vanderbilt. We had assigned all of our interest in the retail installment contract

to Vanderbilt.

Q So --

A Vanderbilt paid us in full.

Q But at that point, had Mr. King and Mr. Flores paid their indebtedness in full?

A No, sir. They probably had not paid anything at that time.

Q Under the contract -- I mean under the contract, the first payment was going to be due in March of 2002, correct?

A Yes, sir.

Q But Vanderbilt paid CMH Homes in January of 2002?

A Yes, sir.

**MR. RUMLEY:** Objection, leading.

**THE COURT:** Sustained.

**BY MR. RANGEL:**

Q What -- After CMH Homes is paid by Vanderbilt and the contract is assigned to Vanderbilt, what is -- what role does CMH Homes have with respect to that transaction?

A As far as the financed transaction, Vanderbilt takes over at that point and their relationship with the customer as far as the payments. We would still have service, warranty obligations to the customer as far as taking care of the home, making sure the home performed, answer any questions they had with that. That would have been our ongoing relationship with this customer.

Q Does CMH Homes occasionally help Vanderbilt with collections?

A Yes, sir.

Q Why?

A At that time in 2002/2003, we had a relationship with Vanderbilt where we called it 'recourse financing' where we agreed to -- if the home should ever become a repossession that we would take the home and resell it, and so we had that obligation. But even more importantly than that, we had a relationship with this customer. We had sold the home, we knew them and had met them at the store. We would have known where the home was located because we knew where it was delivered, and so from time to time, if -- and it wasn't very frequent but it did happen where if a collector could not locate a customer or could not make contact with a customer, they would notify our sales center. Our sales centers were instructed to try and locate the customer, find the customer and get them on the phone with Vanderbilt Mortgage.

Q At that point, I mean did that in a way change the fact that the indebtedness was owed to Vanderbilt?

A No, sir.

Q Was this something that happened after the contract had been assigned to Vanderbilt?

A Yes, sir, correct.

Q Mr. Booth, there has been a lot of evidence regarding

sales center 214 in Corpus Christi. Have you heard that?
A Yes, sir.
Q What was sales center 214?
A Sales center 214 was simply our retail home center. I call it home center -- lot, store -- that was located here in Corpus Christi.
Q And was there a time when you learned of problems at sales center 214?
A Yes, sir.
Q When was that?
A Late spring 2004, I guess, May/June of 2004.
Q And what was your understanding of those problems?
A There were a number of allegations primarily that revolved around notary practices and some of the administrative procedures there at the sales center.
Q Prior to that, had you or to your knowledge anybody at corporate management, were they aware of these sloppy notary practices?
A No, sir, we were not aware of that here in Corpus Christi.
Q And who is John Wells?
A John Wells was the sales center manager here in Corpus Christi.
Q Were his responsibilities limited to that sales center?
A Yes, sir. I mean he was -- that was the only place he had responsibility.

Q Did he have any responsibility in the management of CMH Homes or --

A No, sir, just -- he was directly responsible for the store here in Corpus Christi.

Q Did he have any responsibilities in Tennessee?

A No, sir.

Q Could Mr. Wells make any decisions for CMH Homes outside of the store center 214?

A No, sir.

Q In response to what you learned at that point of these notary practices, was there any change in company policies and procedures?

A Yes, sir, there were.

Q And what were some of those changes?

A Almost immediately -- Very soon after we learned of the allegations and could sort of get some understanding of what was alleged and what we were being told had happened, and we immediately put out notary guidelines throughout the country. We established what we thought were the best general notary guidelines that we could assemble. Every state was different as far as the guidelines, and so we put that out around the first of July.

Q What year?

A That was in 2004.

Q And what was your general understanding of the problems as

it related to the notary practices and the land that had been used as collateral in sales center 214?

A Our understanding at the time was that there was concern about the notary practice and had it been notarized properly; that the person that was pledging the land, whether or not they had actually appeared before the notary or not and had it executed.

Q So was your understanding that the problem was focused on these land-in-lieu transactions involving land?

A Yes, sir. My recollection is that basically everything centered around the land transactions.

Q So what was done to address the problem involving notary practices and land that had been used as collateral in those transactions out of sales center 214?

A Well, we immediately adjusted our notary practices as far as the training for that. And I wrote a memo for that. We also took steps to go to a third-party notary practice where we would subject or try to make it work with a third-party notary at the sales center. A number of the stores went to title companies. Some used attorneys. But it was just to get a third-party involved in the land closing process to insure that it was valid and objective.

Q Did you have any discussions with Mr. Paul Nichols, the president of Vanderbilt, with respect to the notary problems at sales center 214?

A Yes, sir, that was some time later. We had begun to -- or we had modified a number of different policies and practices that we had put in place. At the same time, we still had the concerns about the loans that had been done down here in Corpus Christi as far as the land that was pledged in those transactions. And so I met with Paul. Paul, of course, was at Vanderbilt at the time. Vanderbilt, you know, owned the liens and the obligations were to Vanderbilt. Of course, we had ultimately some exposure in that ultimately we suffered some of the loss at the time if a loan ever became a repossession.

Q What do you mean by that, Mr. Booth?

A Well, should a loan not perform, if for some reason the customer was not able to pay for the home, then ultimately the retail sales center would take possession of the home and do whatever repairs needed to be done, and then we would resell the house and thereby try to reduce some of the loss exposure on that. And so we had that direct cost back to the sales center. And so if we didn't have the land, then of course we had less collateral value.

And so what Paul and I had discussed was that all of the -- that I recall -- the controversy surrounding Corpus Christi revolved around the land transactions, and in particular the notary practices around the land transactions.

Q So what did you decide to do with respect to those land transactions?

A We felt that one way to end that controversy and to deal with that in the future was to simply release the liens on all of the land that was involved in the land-in-lieu transactions that we had done.

Q Was that at sales center 214?

A Yes, sir.

Q And did you -- did CMH Homes in fact file a release of the lien on the land in those transactions?

A Yes, sir, we did.

**MR. RANGEL:** Okay. Pull up CP Exhibit 13.

**(The exhibit is displayed)**

**BY MR. RANGEL:**

Q Is this the mechanic's lien release that was filed in connection with the land that was pledged as security in the transactions involving Mr. King and Mr. Flores?

A Yes, sir.

Q Looking to the left top, do you see that reference?

A Yes, sir.

Q Six four six three oh seven?

A Yes, sir.

Q What is that?

A In the retail company, we would have referred to that as the customer number that was established at the time the transaction began. Vanderbilt probably would call it an account number, but they were one and the same. It just cross-

referenced the customer to an account number that was maintained such that everything was filed with that deal -- everything that pertained to that file was filed under that number.

Q At the time that you and CMH Homes decided to file a mechanic's lien release and when you filed it, did you in any way intend to release the underlying indebtedness owed by Mr. Flores or Mr. King?

A No, sir.

Q And does the fact that you had a tracking number up there mean anything with respect to what your intent was and what you were releasing?

A No, sir. The intent was strictly to release the land. That's all we ever discussed. That's what the decision was. And the tracking number was just to make sure that this release got back to that file.

Q In fact, if you look in the body of the mechanic's lien release, are the names of Mr. Flores or Mr. King mentioned?

A No, sir, not at all.

Q What names are mentioned?

A Maria M. Trevino and Arturo Trevino.

Q And who were they in connection with this transaction?

A They were the property owners.

Q And in the body of the release, is there any reference to the retail installment contract that was signed by Mr. King and

Mr. Flores?

A No, sir.

Q What contract is referenced?

A The mechanic's lien contract that was signed.

Q And was the mechanic's lien contract signed by Mr. King or Mr. Flores?

A No, sir.

Q Was it signed -- Are the names that appear on the mechanic's lien contract those of Mr. and Mrs. Trevino?

A Yes, sir.

Q And their signatures are on that document?

A Yes, sir.

Q The mechanic's lien release has a reference to 'has been paid in full'. Do you see that?

A Yes, sir, I do.

Q What did you mean by that by including it in the release?

A I believe that it means that CMH Homes, our retail company, had been paid in full by Vanderbilt Mortgage.

Q Did it mean that it had been paid in full by Mr. King and Mr. Flores?

A No, sir.

Q Now just to be clear, what was the intent in preparing and filing this mechanic's lien release?

A Our discussion, from the moment that we began to move this way, was simply that we would release the liens on all of the

land involved in these transactions in Corpus Christi.

Q And only the lien on the land?

A Only the lien on the land.

Q Was that the only intent in what you were releasing?

A Yes, sir.

Q At any time, did you have any intent to release the indebtedness owed by Mr. King or Mr. Flores?

A No, sir.

**MR. RUMLEY:** Objection, leading, your Honor.

**MR. RANGEL:** I don't think that's leading.

**THE COURT:** Sustained.

**BY MR. RANGEL:**

Q What intent, if any, did CMH Homes or you have in connection with the indebtedness of Mr. King and Mr. Flores?

A We had -- At that point we had no involvement with that.

Q What do you mean by that?

A I mean Vanderbilt owned the loan itself. I mean the responsibility that the customers had was to Vanderbilt, it was not to the retail company.

Q So CMH Homes released an indebtedness that was owed to Vanderbilt?

A No, sir.

**MR. RUMLEY:** Objection, leading.

**MR. RANGEL:** Judge, that is not leading. I'm just asking a question that --

**THE COURT:** Overruled.

**BY MR. RANGEL:**

Q And why would releasing the land in those land-in-lieu transactions make sense in light of the problem that had been identified at sales center 214?

A We absolutely believed at that time that that was the right thing to do; that the controversy had begun surrounding those land transactions. There was no way at that time that we could unwind all of that and figure out for sure what had happened. The parties that had been involved on our end were gone; they were no longer with the company. And we felt like the fairest thing to do was to release that land, and that would end the controversy for the future.

Q Would the builder's and mechanic's lien release negatively impact CMH Homes?

A Yes, sir.

Q Would it negatively impact Vanderbilt?

A Yes, sir.

Q In what respect?

A Well, I mean, that collateral was given up. That interest in that collateral that had been pledged was given up.

Q And was that -- Was that release focused on the land in all the land-in-lieu transactions at sales center 214?

A That was my understanding, that it involved all of the land-in-lieu transactions.

Q Going forward, I mean those builder's and mechanic's lien releases, would they affect the sales center profitability in the future?

A Yes, sir, they could have.

Q How?

A Well, we would not have been able to recover that land in the case of a repossession. We would have surrendered any right we would have had to that land or Vanderbilt would have had to it, so there would have been no recovery on the land, and so we would not have faired as well in a repossession.

Q Was the property description that was contained in the builder's and mechanic's lien release the same property description that was in that warranty deed that was faxed to the sales center back on January 3rd, 2002?

A Yes, sir, it was the same.

Q Why does the sales center in a land-in-lieu transaction need a property description?

A You have to have the legal property description in order to file the liens ultimately against that property.

**MR. RANGEL:** In fact, if we could pull up CP 3, Exhibit 13, and the HME fax; CP 3, CP 3, 76 and 41, please.

**(The exhibits are displayed)**

**BY MR. RANGEL:**

Q On the left, Mr. Booth, is there a property description, and that's the warranty deed that -- on the left?

A Yes, sir, I see that.

Q That's the property -- is that the property description that was in the deed that was faxed to CMH Homes on January 3rd, 2002, by Mr. King?

A Yes, sir.

Q Notice the spelling of the last word. Does there appear to be a misspelling there?

A I've never seen that word before, so it could well have been, yes, sir.

Q Well, let's look at the property description that was in the builder's and mechanic's lien release. Is that the same property description?

A Yes, sir.

Q When a customer provides a property description to the sales center, is that property description used to place the mobile home where it's going to be placed?

A No, sir; you'd have to have the physical address of where the home is going. I mean as far as where you're going to deliver the home to, it wouldn't necessarily be the -- I don't know that you could use the legal property description to find it without going down to the courthouse and researching that property.

Q So from a practical standpoint, after a mobile home is sold and is going to be located and delivered somewhere, is the information that is given to the contractor who is going to

deliver it the legal description or is it the address?

A No, sir, it's going to be the address.

Q Does that make sense?

A And probably a map how to get there.

Q Does it make practical sense to give a legal description to the person or contractor who is going to locate or deliver the mobile home?

A No, sir. I think this would be the only time it would be used on these documents.

Q And this release, the builder's and mechanic's lien release that was filed with respect to the transaction involving Mr. King and Mr. Flores, where was it filed?

A It would have been filed there in the local county where the home was located.

Q Was it filed in the public record?

A Yes, sir. My understanding is that is the public record.

Q And if something is filed in the public record, does that mean it's being filed in secret?

A No, sir. I think the definition of the public record is it would be available to the public.

Q Is anything -- As far as you know, anything that's filed in the public record at the courthouse, is that public information?

A That's my understanding, yes, sir.

Q The builder's and mechanic's lien release, was it sent to

the customer or the landowner?

A No, sir, it was not.

Q Why?

A My understanding is that the process at Vanderbilt -- and Vanderbilt processed the releases -- when Paul and I met with Tom Hodges, the corporate counsel, and we made the decision to release the liens on the land. At that point then they carried it out through our normal department that handled the partial collateral releases on a standard basis. And I think they processed them the same way they normally did.

Q The builder's and mechanic's lien contract that was filed when the transaction was completed in January of 2002, was that the builder's and mechanic's lien that you released in October of 2005?

A Yes, sir.

Q Why was it not released earlier?

A Sir, I don't know why it wasn't released earlier. I guess it could have been. Right after we were -- when we were paid in full by Vanderbilt and they funded the loan for us, I guess that could have been released then, but I think it was the process at Vanderbilt that they simply -- they held that and released it at the same time they did the deed of trust when the customer had paid for the home.

Q How, for example, when you have a first-party land-in-lieu transaction as opposed to a third-party, how is the timing

affected by that in terms of the filing of any release?

A With respect to a first-party?

Q Yes. When is a release filed in a first-party land-in-lieu transaction?

A When is the release filed is when the customer totally paid for the home. When the indebtedness has been repaid, then it would be filed, I guess sent to the customer with the contract, retail installment contract, everything marked 'paid'.

Q Is that -- That didn't happen here, right?

A No, sir.

Q Insofar as you know, have Mr. King and Mr. Flores paid in full the contract or the indebtedness?

A My understanding is it had not been paid in full.

Q And just to be clear, what was your intent and the intent of CMH Homes when it filed the builder's and mechanic's lien release?

A Our intent was to release the land in these transactions and release those liens. And that's what Paul and I discussed, to simply release the liens on all of the land.

Q Did you ever have any intent to release the indebtedness of Mr. King or Mr. Flores?

A No, sir.

**MR. RANGEL:** Pass the witness, your Honor.

**THE COURT:** Thank you. Mr. Rumley?

**MR. RUMLEY:** Good morning, Mr. Booth.

**THE WITNESS:** Good morning.

**CROSS EXAMINATION**

**BY MR. RUMLEY:**

Q How are you, sir?

A Fine, sir.

Q You and I have met on a number of occasions, have we not?

A Yes, sir, we have.

Q I've taken your deposition two times?

A Yes, sir.

Q And you understand that when I took your deposition, you were under oath to tell the truth?

A Yes, sir.

Q And just like the oath that you're here today, you swore to tell the truth when you gave the depositions, right?

A Yes, sir.

Q And during the time that I took your depositions, I asked you that if you didn't understand my question for any reason to let me know, right?

A Yes, sir.

Q You and I made that agreement, correct?

A Yes, sir.

Q And that way -- And remember I told you that if you answer a question, that both me and the jury are going to believe that you're telling the truth, right?

A Yes, sir.

Q And you stand by the testimony you gave in your depositions, correct?

A Yes, sir.

Q I wanted to ask you about the releases that Mr. Rangel just asked you about, Exhibit Number 11, Defendants' Exhibit Number 11. Now, this is the release that you just talked about, right?

A Yes, sir.

Q Now, when I took your deposition a few months ago, you understand, sir, that I took your deposition as the corporate representative for this company, right?

A That was my understanding, yes, sir.

Q And you understand that obviously you can't -- someone can't ask a corporation questions and so we submit a subject, and then the corporation submits the individual who can best respond to that subject, true?

A Yes, sir.

Q And you were selected on behalf of Clayton Homes, CMH, to speak to the issue as to why you decided -- 'you' being CMH -- filed hundreds of releases in South Texas, correct?

A Yes, sir.

Q And isn't it true, Mr. Booth, that after you give a deposition, the court reporter types it all up and then you get a chance to review it, right?

A Yes, sir.

Q And if you're reading something and it just -- maybe the court reporter got it wrong or maybe you just didn't understand it, you have an opportunity to correct the deposition, true?

A Yes, sir.

Q And you did that, right? You read through the deposition?

A Yes, sir, I did read it.

Q And if you saw anything that was inaccurate, you corrected it, right?

A I think I did try to correct a few things that I saw.

Q And you did it in your -- it's called a 'rap sheet', right?

A I don't know what it's called, but I remember reviewing it.

Q Isn't it true, sir, that the testimony you gave was that when you filed these releases -- 'you' being CMH -- that it was the decision to release the loan --

A No, sir.

Q -- and not the land?

A No, sir, I don't --

**MR. RANGEL:** May we approach, your Honor? May we approach?

**THE COURT:** Yes.

**(Bench conference begins at 10:46 a.m.)**

**MR. RANGEL:** Judge, this is very serious. He's about

to try to impeach him with what is in the written deposition where the word 'loan', the audio clearly says 'land'. Something happened, and I'm not accusing anybody of anything, but if we're interested in the truth here, which I'm sure we are.

**THE COURT:** Did he sign the deposition?

**MR. RUMLEY:** Yes.

**MR. RANGEL:** He signed the letter, but the --

**THE COURT:** Did he correct it?

**MR. RUMLEY:** No, he just --

**MR. RANGEL:** He just went --

**THE COURT:** He had an opportunity to correct it though.

**MR. RANGEL:** But your Honor, the audio --

**MR. RUMLEY:** Your Honor, that's not what he said.

**THE COURT:** I'm sorry, he corrected it -- he had an opportunity to correct it and he signed it.

**MR. RANGEL:** Judge, the audio is clear. Can I play that?

**THE COURT:** You may play that in your redirect.

**MR. RANGEL:** I want to do that.

**THE COURT:** That is fair, okay?

**MR. RANGEL:** That's fair, because I want the jury to hear that.

**THE COURT:** Okay.

**(Bench conference concludes at 10:47 a.m.)**

**BY MR. RUMLEY:**

Q All right, sir. Do you remember when I took your deposition, you said: 'The decision to release the loan', correct?

A No, sir. I don't think I've ever said that. If I did, I misspoke. But I've always known it was the release of the land.

Q If we look, Mr. Booth, at page nine, it says, all right, I asked you:

'QUESTION: Are you here on behalf of the corporation with respect to the lien releases that were filed in the fall of 2005 related to store 214?'

And what was your answer?

'ANSWER: Yes, sir. The decision to release' -- that says 'the loan'.

Q And that was your testimony, right?

A I don't believe so, sir.

Q Well, when you read the deposition, after you got a chance and it was typed up, after you read it, did you see that? Did you read that line?

A I don't remember if I read that specifically, but I don't believe I would have said that.

Q Well, you understand that you had a chance to correct it, right, if it's wrong?

A I understand that, Mr. Rumley.

Q And you heard the lawyers asking Mr. King and Mr. Flores all kinds of questions about the fine print in the contract. You signed it, you read it, that's your -- that's what you say, right? You heard all those questions?

A I heard those questions, yes, sir.

Q I mean all this fine print in the contract, if it's in there and you sign it, then you're obligated for it. You heard them saying that, right?

A Yes, sir.

Q And the same should be true for you, right?

A If I sign a contract, yes, sir.

Q Or if you give testimony under oath and the testimony -- the typed transcript says 'loan' and you sign your deposition, you're swearing to the truth, right?

A I believed it to be accurate. I don't think it was, today.

Q Then why didn't you change it?

A I didn't catch it.

Q Certainly -- certainly, sir, if what you said in your deposition, 'the decision to release the loan', then we wouldn't be here today, would we?

A Sir, repeat that question, please.

Q Yeah. If you were truthful in your deposition when you said 'the decision to release the loan', then we wouldn't be

here today, would we?
A I was truthful in my deposition.
Q I understand. When you said: 'If the loan was released or discharged', we wouldn't be here today, would we?
A I don't know, but I mean that was not the decision. That was never the decision, to release the loans. It was always about the land.
Q Do you remember, and going to Exhibit Number 11, you and I discussed this language -- you understand that we discussed this language at length, 'has been paid in full', correct?
A Yes, sir.
Q And I think you just told the jury that you believe the language 'paid in full' was in there because CMH was paid in full by Vanderbilt.
A Yes, sir.
Q Is that what you told the jury?
A I believe that today, yes, sir.
Q Today?
A Today.
Q Why qualify your answer? Because you know you said it differently during your deposition?
A I think during my depositions I wasn't sure. I didn't know what it meant.
Q But you understand you were testifying for CMH at the time of your deposition, right?

A Yes, sir.

Q On the subject of this release, what this release means, right?

A Yes, sir.

Q And you told me in deposition:

'I don't know. I don't know what 'paid in full' means', right?

**MR. RANGEL:** Judge, if he's going to impeach Mr. Booth, he needs to confront him just like I was yesterday trying to do with a specific page and line that he is referring to.

**THE COURT:** Overruled.

**BY MR. RUMLEY:**

Q And Mr. Booth, you read your deposition obviously before today?

A Yes, sir.

Q You knew last night that you were going on the stand, right?

A Yes, sir.

Q And I assume last night you probably went through your deposition a couple of times?

A No, I did not last night, but --

Q But you've read it?

A -- I have read it, yes, sir.

Q Okay. And just so we're clear that what your lawyers

mentioned during the time when you gave your deposition, you told me that you don't know why 'paid in full' was included in the release.

A And that was true.

Q And I asked you what could possibly have been paid in full? And your official answer on behalf of this company was what?

A I don't remember now, sir, specifically. I don't think I knew.

Q Your answer was: 'I don't know', right?

A Right.

Q How could the president of CMH not know what the language is intended to mean in releases that were filed, hundreds in South Texas? How could you not know that?

A Sir, I didn't know.

Q Well, you yourself, Mr. Booth, actually signed a number of these releases that were filed in South Texas, correct?

A Sir, I don't remember how many I signed, but it was very few.

Q But you signed releases like this Exhibit Number 11. The release that was filed with respect to this case, you filed a bunch of them, right?

A Sir, there were a number of those filed. I think I signed one. I don't recall how many I signed but it was very, very few.

Q Do you remember going through them in your deposition?

A I remember we talked about one, yes, sir.

**MR. RUMLEY:** Your Honor, we would offer Defendants' Exhibit 92.

**MR. RANGEL:** Your Honor, may we approach? We object.

**THE COURT:** Yes.

**(Bench conference begins at 10:53 a.m.)**

**MR. RUMLEY:** These are the mechanic's lien releases that David Booth himself signed and they're being offered because he says that he signed them under oath. They're notarized and he swore to the truth of it, and so it's -- he swore to the truth of the language of 'paid in full'.

**MR. RANGEL:** Judge, this violating the motion in limine in terms of other parties, other transactions.

**MR. RUMLEY:** It's all related to store 214.

**MR. SLEDGE:** This is motion in limine three.

**THE COURT:** Are these for 214?

**MR. RUMLEY:** Yes.

**MR. SLEDGE:** This is related to motion in limine number three, other transactions as disputes. The only purpose for which he's trying to offer this evidence is propensity evidence. It has no probative value with respect to the transaction that we're here about.

**THE COURT:** This is your witness and only you can do the objections.

**MR. RANGEL:** He's --

**THE COURT:** Overruled.

**(Bench conference concludes at 10:54 a.m.)**

**BY MR. RUMLEY:**

Q All right, Mr. Booth. As president of a big company, I assume that before you sign a document that you make sure you fully understand the document, right?

A I do my best to understand it, yes, sir.

Q And by doing your best, you read it and, if you don't understand it, you ask questions, right?

A True, yes, sir.

Q Let me show you -- going back to my original question, you signed a number of the releases out of store 214 that were filed in the fall of 2005, correct?

A Yes, sir.

Q Do you know how many?

A No, sir.

Q I have 19. Does that sound about right?

A Sir, I don't recall how many I signed. I really don't.

Q Well, let's look at the first one.

**MR. RANGEL:** Judge, I would object to these on the grounds that any probative value regarding these transactions is overweighed by a prejudicial affect.

**THE COURT:** Thank you. Overruled.

//

**BY MR. RUMLEY:**

Q All right, Mr. Booth. Builder's and mechanic's lien contract release; this is the same release that was filed --

**THE COURT:** I'm sorry, have you offered these for admission?

**MR. RUMLEY:** Yes. This is what we were up --

**THE COURT:** No, you didn't.

**MR. RUMLEY:** We offer Defendants' 92. This is what we would offer.

**MR. RANGEL:** And for the record, we would object, your Honor, on the grounds that any probative value --

**THE COURT:** Exhibit 92 is admitted. You have the same exact -- Did you want to offer -- How many of these do you want to offer?

**MR. RUMLEY:** The entire Exhibit 92.

**THE COURT:** What are the numbers? Or is it all one exhibit?

**MR. RUMLEY:** It's all one Exhibit 92, your Honor.

**THE COURT:** Okay, 92 is admitted.

**(Defendants' Exhibit Number 92 was received in evidence)**

**BY MR. RUMLEY:**

Q All right, Mr. Booth, I want to ask you about a couple of things. First, this appears to be the same language that's included in the release that was filed with respect to this case, right?

A Yes, sir, I believe so.
Q And one of the questions, and we're going to get to this in a minute, you also work for Clayton Homes, Inc., right?
A Yes, sir.
Q You had mentioned I think to Mr. Rangel that you work for CMH, but you also work for Clayton Homes, Inc., correct?
A I'm an officer of Clayton Homes, Inc.
Q And Clayton Homes, Inc. is, I think, a parent company, right?
A Yes, sir.
Q They're up here, and then below them you have CMH Manufacturing, you have CMH Retail, you have Vanderbilt, and then you have whatever company buys insurance, correct?
A I think that's correct.
Q Okay. And as the parent company, Clayton Homes, Inc. oversees all of the subsidiary companies, correct?
A Yes, sir.
Q And one of the things Clayton Homes does is, you can see right here it says 'Clayton Homes, Inc.', right?
A Yes, sir.
Q And clearly you have authority to sign for Clayton Homes, Inc.?
A Yes, sir.
Q All right. And it looks like with respect to these folks, Guadalupe Barrera and Elma Barrera, you signed a release that

was filed, it looks like, in Jim Wells County, correct?

A The date on this is -- Is this the same date as the other releases?

Q If you look here, it says September 14th, 2005.

A Okay.

Q Right?

A Yes, sir.

Q And that's about the time, it was the fall of 2005 is when all these releases were filed, correct?

A It was in the fall, yes, sir.

Q Okay. And if we look right down here, we have a notary, right? And you understand what a notary is?

A Yes, sir.

Q The notary swears that you signed the document, right?

A Yes, sir.

Q And then what this is saying is that Mr. Booth appeared before the notary, right?

A Yes, sir.

Q And you understand that when you signed this, you did so under oath?

A Yes, sir.

Q Right? Just like here today, right?

A Yes, sir.

Q And when you signed this document, you agree with me that you're bound by the terms of the document, right?

A Yes, sir.

Q And right here it says that you're:

'A properly authorized officer acting under the authority of the board of directors'.

Did I read that right?

A Yes, sir.

Q If we look at the releases that were filed in this matter, Mr. Jordan, he is an officer of CMH, right?

A Correct, yes, sir.

Q And he's also an officer of Vanderbilt?

A Correct.

Q How can someone be an officer of both CMH and Vanderbilt?

A I think he's appointed that. He's corporate controller and he's an assistant secretary of both companies.

Q There's no --

A Both subsidiaries.

Q There's no conflict?

A No, sir.

Q In fact, just so the jury understands, if you were to go to Maryville, Tennessee, there's one building, right?

A It's one building, yes, sir.

Q And Vanderbilt is on the same floor as CMH?

A No, sir. Vanderbilt is on the bottom floor and CMH is located up -- we have a small group there on the top floor.

Q Okay. Everyone's in the same building?

A Yes, sir; the folks that are in Maryville, Tennessee, yes, sir.

Q All right. But as far as Vanderbilt, the company Vanderbilt, their main office, the main office of CMH, you-all are in the same building, right?

A Yes, sir.

Q If we look at this release, now I think what -- I think what you told me and the jury is that your testimony is that -- now -- is that 'paid in full' means that CMH was paid in full by Vanderbilt. Is that your testimony today?

A That's my understanding today, yes, sir.

Q From whom? How did you gain this knowledge from the time I asked you in your deposition to today?

A In talking with Mr. Nichols and others in our company, I understood that the assignment meant that we were paid in full when the deal was funded. CMH loans had been paid in full.

Q If we look right here, Mr. Jordan -- and I assume Mr. Jordan -- and we may hear from him in this case -- but is he a truthful and honest person?

A Yes, sir.

Q And when he swore to this release, he says:

'CMH Homes is the true and lawful owner and holder of that certain note and indebtedness'.

Did I read that right?

A Yes, sir, you did.

Q And the only note in the transaction is the installment contract, correct?
A True, yes, sir.
Q And that note is referenced by this number, right?
A That retail installment contract?
Q Yes.
A Yes, sir.
Q I mean that's the --
A It's a part of that file, yes, sir.
Q That's the note we're talking about, right?
A That is the note, yes, sir.
Q Yeah. And so Mr. Jordan is swearing under oath that CMH -- not VMF, CMH -- as of October 8th, 2005, is the lawful owner and holder of the note and the indebtedness, right?
A That's not correct.
Q That's what it says, right?
A That's what it says.
Q And he signed it under oath, right?
A Yes, sir.
Q And this was filed in the county records?
A Yes, sir.
Q Since October 8th, 2005, has anybody filed a corrected -- we've heard about these corrected deeds. Has anybody corrected that?
A It released the lien. There wouldn't have been any reason

to correct it.

Q Sir, it references the note in evidence, which is the retail contract, right?

A That's what it says, yes, sir.

Q And so if the retail installment contract, the note, has been released as paid in full, then we don't owe any more money.

A It was never released -- The retail installment contract was never released. That's not what that refers to.

Q How do you know?

A I just know that that was never the intent of the entire transaction. And I know that the retail installment contract was never released. I mean, the customer are still paying, or were paying, for the home.

Q Well, let's talk about that.

A Okay.

Q You did not provide any of the customers with copies of those releases, did you?

A No, sir.

Q No one did. Within Vanderbilt, Clayton Homes, Inc. or CMH, no one provided the customers with copies of these hundreds of releases, right?

A That's my understanding, sir.

Q Why not?

A I don't know, except that I -- what I understand is that

the procedure that the payout department follows is that if it's a partial release of the collateral that they file that with the retail installment contract until it's paid in full by the customer.

Q Sir, are there procedures in place when you're file these because you find out about all the notary irregularities as you call them?

A No, sir.

Q Okay. So why -- Do you agree with me that you owe the responsibility to your customer to be honest and truthful?

A I'm always honest and truthful with my customers.

Q Do you think your company should be?

A Yes, sir, I do.

Q All right. And you told the jury the reason why you filed hundreds of releases is because, I think you said, it was the right thing to do?

A And I believe it was the right thing to do.

Q If it was the right thing to do, why didn't you tell your customers? Why didn't you send Mr. Herrera a copy of the release and say, hey, look, here's the release? Why didn't you send it to him?

A Sir, my understanding is they were filed in the public record back in the county where they had been filed to begin with. They were released there, and so therefore they were released. The majority of the transactions were first-party

land-in-lieu transactions. The customer, the homeowner and the property owner were one and the same. They were still obligated under the retail installment contract, they were making payments. And at such time as they paid for the home, then they would have received the lien releases at that time. That was the process that Vanderbilt followed.

Q Sir, why didn't you mail them a copy? Why wouldn't you just mail them a copy? We're filing this release relating to your land. Here's the release.

A That was not the procedure.

Q I mean you heard Ms. Russell this morning and yesterday afternoon that you guys have all these different ways of calling them, calling their employer, calling neighbors. Why didn't anybody call these people and say, hey, we're filing this mechanic's lien release, this deed of trust release?

A I don't know.

Q It's because you didn't want them to know, right?

A No, sir. That was never discussed, that we didn't want anybody to know about it. Otherwise we wouldn't have filed it in the public record. We wouldn't have released them if we didn't want anybody to know it.

Q Why didn't you give them a copy?

A We just didn't.

Q The truth --

A That was not Vanderbilt's process.

Q The truth, sir, is the reason why you filed the mechanic's lien release and the reason why you filed the deed of trust release is because you uncovered that there was lots and lots of notary fraud within store 214, correct?

A That is not the truth, what you just said, I don't believe. Say it again.

Q The reason why you filed all these is because you discovered that there was notary fraud in numbers of transactions, right?

A We discovered that there were irregularities. There were allegations regarding the notary practices at that sales center. That was why we filed the land releases.

Q And you filed the releases because you wanted to protect yourself from liability, true?

A No, sir. We filed them because we could not untangle the mess. We didn't know who had signed. We didn't know which customers. Like I say, the majority of the deals were the homeowner and the landowner were the same. You know, in those situations, it was very apparent that they had pledged the land. In the third-party transactions, we weren't sure who had signed, whether it had been notarized properly or not. And it just seemed like the fairest thing to do was just simply release the land and end the controversy.

Q Sir, you released the land to protect yourself from future liability, correct?

A That's true.
Q And in an effort to protect yourself from liability, you made a decision not to send a copy to either the customer or the landowner, right?
A I did not make that decision.
Q You didn't make it --
A No, sir.
Q -- but someone did?
A I don't think the decision was not to send it. I think the decision was just to handle the process the way we normally handle partial releases.
Q You understand that the policy and procedure in place is to send a copy of the deed of trust release and the builder's and mechanic's lien release to the customer once it's recorded? Do you understand that that's Vanderbilt's policy?
A That was not my understanding of the policy.
Q Have you read Mr. Barton's deposition?
A I have not read Mr. Barton's deposition.
Q Have you seen the Vanderbilt procedures that say they're supposed to be sent to the customer?
A I did not see that in the procedures. The procedure I saw was that if it was a partial release, it was filed back with the retail installment contract until such time as it was paid in full by the customer. And then the entire package was stamped 'paid' and sent to the customer at that time. That's

what I read in the procedure manual.
Q Have you read the deposition of David Barton?
A No, sir, I did not.
Q And you don't work for Vanderbilt, right?
A No, sir, I do not.
Q He would know the procedures better than you?
A I think Mr. Barton would know the procedures better than me, yes, sir.
Q All right, and how about Hugh Statum? Do you know Mr. Statum?
A I know Mr. Statum.
Q And what's Mr. Statum's position?
A Mr. Statum works for CMH Homes, the retail company, as a vice president of operations.
Q He works for you?
A Yes, sir.
Q Did you read his deposition?
A Some time ago, yes, sir.
Q If Mr. Statum testified that he believes the customers should have received copies of these releases, do you agree or disagree with him?
A He was testifying after the fact, correct? That he believed that they should have received them?
Q Yes, sir. Do you agree -- If Hugh Statum testified that the customers should have received these, you-all should have

sent them to them, do you agree with him or disagree with him?

A I think in hindsight, it would have been fine to have sent it to them. I would not have objected if we had.

Q I want to talk to you briefly about lot 214. John Wells, Mr. Wells was the store manager, right?

A Yes, sir.

Q Ben Frazier, you know Mr. Frazier, right?

A I don't remember Mr. Frazier. I know he was a salesperson there at the sales center.

Q And he was not only the sales manager but he was a notary, correct?

A Yes, sir.

Q And have you read his deposition?

A Yes, sir, I have.

Q You've read his deposition in this case?

A Yes, sir.

Q All right. And I assume that when people make allegations of fraud and forgery against your company, that's something that concerns you, right?

A Yes, sir.

Q And you understand that Mr. Frazier has testified that his signature was forged on these documents, correct?

**MR. RANGEL:** Your Honor, may we approach? May we approach?

**THE COURT:** Yes.

**(Bench conference begins at 11:11 a.m.)**

**MR. RANGEL:** Judge, Mr. Rumley --

**THE COURT:** Are you missing the motion and my order?

**MR. RUMLEY:** Yes.

**THE COURT:** That's not here.

**MR. RUMLEY:** I mean we get testimony --

**MR. RANGEL:** Mr. Frazier --

**MR. RUMLEY:** Wait a minute, let me finish.

**MR. RANGEL:** Mr. Frazier testified --

**MR. RUMLEY:** Let me finish, please.

**MR. RANGEL:** Excuse me. Number 37, granted. Any question or comment to any trial witness about the competence of any other witness, the credibility of the testimony or an opinion as to the testimony, including deposition testimony, of any other witness. Your Honor, that's very clear in your motion in limine. You granted that. Mr. Rumley has -- Mr. Rumley has just gone way beyond without even affording us and the Court the courtesy of approaching the bench.

**THE COURT:** Okay -- Your question was --

**MR. RUMLEY:** Mr. Frazier has testified that his signature was forged on the deed of trust. I asked him --

**THE COURT:** But who signed it?

**MR. RUMLEY:** -- are you concerned -- Are you concerned if there are allegations made, and he said yes. Did you read his deposition? Yes. You understand that he has

testified that his signature is forged. It's not an opinion about credibility. Frazier testified my signature is forged. There's no question.

**MR. RANGEL:** Including deposition testimony, your Honor.

**THE COURT:** All right, let me tell you, it is now relevant, so he can testify.

**MR. RUMLEY:** Thank you.

**MR. RANGEL:** But Judge --

**THE COURT:** Go ahead. Wait.

**MR. RANGEL:** I understand the Court. My frustration, Judge, is that we have tried -- I stayed within the Court's motion in limine in examining Mr. Flores and Mr. King because I respect the Court's order. But Mr. Rumley --

**MR. RUMLEY:** This doesn't even apply.

**MR. RANGEL:** It does apply, but I understand the Court's ruling. I just, you know --

**THE COURT:** But I granted all the in liminies until it became relevant --

**MR. RANGEL:** I know, but we took it --

**THE COURT:** -- and then we took it up --

**MR. RANGEL:** -- to approached the bench --

**THE COURT:** We've taken it up once.

**MR. RANGEL:** -- your Honor.

**THE COURT:** We have, and he should have done that,

but that --

**MR. RANGEL:** That's -- that -- that's my only --

**THE COURT:** -- you're exactly right.

**MR. RANGEL:** That's my only point.

**THE COURT:** And that's about three strikes on them that have not -- they have not approached.

**MR. RANGEL:** That's my only point, you know --

**THE COURT:** And it's understood.

**MR. RANGEL:** -- I'm respecting the Court's ruling.

**THE COURT:** Do you suggest that I caution you further or talk about intent or --

**MR. RANGEL:** Mr. Rumley is an officer of the Court, your Honor, and I hesitate to ask --

**THE COURT:** You're all good lawyers.

**MR. RANGEL:** I know, but Mr. Rumley has ignored the Court's motion in limine.

**MR. RUMLEY:** This is -- I'm -- you know, that's absurd. I have not ignored anything, your Honor, and I take offense to his statements.

**THE COURT:** Okay.

**MR. RUMLEY:** If you read that limine, it does --

**THE COURT:** I just ruled in your favor.

**MR. RUMLEY:** I know, but that --

**THE COURT:** What do I need to do?

**MR. RUMLEY:** -- makes me, you know, he's attacking me

personally now.

**MR. RANGEL:** I am not attacking --

**MR. RUMLEY:** And I think it's unfair.

**MR. RANGEL:** I am raising a point as --

**THE COURT:** All right, he's raised a point of law that's very important. Now, go on to the -- and ask the question. Thank you.

**MR. RANGEL:** And just to be sure so we won't come up, he will be allowed to ask questions regarding the testimony of -- deposition testimony of any other witness?

**THE COURT:** That he read.

**MR. RANGEL:** Okay; that he read. I think he's got to lay the predicate.

**MR. RUMLEY:** He said he --

**THE COURT:** I think he said he read it.

**MR. RUMLEY:** For example --

**THE COURT:** And he's a notary for this guy, right?

**MR. RUMLEY:** No, I understand, but Mr. Statum and others where he said he hadn't read it, your Honor.

**MR. RANGEL:** I'm not arguing with the Court.

**THE COURT:** This is difficult for me too. For you-all, this is a very difficult case. You know, sometimes only the very -- most difficult cases go to trial. And it's hard to know as head of CMH how he didn't know.

**MR. RANGEL:** I understand the Court's ruling. All

I'm saying is let's respect the motions in limine.

**THE COURT:** I agree with you a hundred percent.

**MR. RANGEL:** Okay.

**MR. RUMLEY:** And your Honor, just so I -- I don't want to get strike four, I'm going to ask him about compensation and how the sales associates were compensated.

**THE COURT:** You may do that.

**MR. RUMLEY:** Okay.

**MR. RANGEL:** Okay.

**MR. RUMLEY:** And before Mr. Rangel will reply, Exhibit 69, CP 69, they've already admitted into evidence.

**THE COURT:** Yes.

**MR. RUMLEY:** And so -- And --

**THE COURT:** And you've actually already asked the lady about that --

**MR. RUMLEY:** And --

**THE COURT:** -- so there were no objections.

**MR. RANGEL:** In violation of the motion in limine. I mean, we --

**MR. RUMLEY:** It's in evidence, Exhibit 69.

**THE COURT:** Okay, you admitted it.

**MR. RUMLEY:** But I want to ask --

**THE COURT:** Compensation structure is in evidence the way I understand it.

**MR. RUMLEY:** I want to ask him in addition, his

testimony --

**THE COURT:** Why don't we go ahead and do this. Okay, what else are you thinking about?

**MR. RUMLEY:** His deposition is that the average store manager made less than 50,000. Mr. Wells made over $300,000. And I asked him if you have a responsibility to audit your stores to look for red flags, and he says yes. And I said, do you agree with me that if you have a store manager making 300 --

**THE COURT:** Go ahead. Go ahead.

**MR. RUMLEY:** And then --

**THE COURT:** Thank you.

**MR. RUMLEY:** And then the sales associates, their compensation, they're all based on commissions, 26 percent. Robin Moore and Kim Mallure (phonetic) were involved in this transaction. I would like to ask him about that.

**THE COURT:** And their guys, their compensation, the way I understand it from all this summary judgment stuff, whether or not loans were (indiscernible) is that right?

**MR. RANGEL:** Judge, we think it's irrelevant to the points that are before the Court.

**THE COURT:** I appreciate that, and I appreciate your advocacy for your client, Mr. Rangel.

**MR. RUMLEY:** So --

**MR. RANGEL:** Judge, just for the record, can I just

object --

**THE COURT:** Yes, you may.

**MR. RANGEL:** -- on the record.

**THE COURT:** Do you want to do it this way or do you want to do it --

**MR. RANGEL:** Well, I've already objected with respect to that question.

**THE COURT:** Okay.

**MR. RANGEL:** I'm just asking; the Court's overruled my objection.

**THE COURT:** Yes, sir.

**MR. RUMLEY:** One more just to make sure, the partnership agreement is in evidence, okay. The partnership agreement is in evidence, but they have a limine and so I'm going to ask him that John Wells was awarded a partnership based on his conduct. It's already in evidence.

**MR. RANGEL:** Objection.

**MR. RUMLEY:** The partnership agreement itself. I'm sorry.

**MR. RANGEL:** Judge, I would object to any questions because he is misconstruing and misinterpreting that partnership agreement. It's not traditional, and that's something --

**THE COURT:** I wonder if you could do that on redirect.

**MR. RANGEL:** Okay.

**THE COURT:** Thank you.

**MR. RANGEL:** Okay.

**(Bench conference concludes at 11:16 a.m.)**

**BY MR. RUMLEY:**

Q All right, Mr. Booth, I think when we took a short break, you've read the deposition of Ben Frazier, right?

A Yes, sir.

Q And Ben Frazier was not only the sales manager in store 214, but he was also the notary, right?

A Yes, sir.

Q And you understand that with respect to the deed of trust that's involved in this case that he has testified his signature is forged? You understand that, right?

A Yes, sir.

Q And you understand that his signature as the notary in the builder's and mechanic's lien contracts, that in this case he has testified his signature is forged, right?

A Yes, sir, I believe he did.

Q And for you as president of the company, when you learn of something like that, that one of your employees who's supposed to be a notary, who's supposed to have notarized signatures, that he testified himself 'my signature is forged on that document', does that concern you?

A Yes, sir.

Q And is that a situation where you believe that the company should do something to take care of the customer?
A I believe we did do something.
Q You believe -- to the customers?
A The Trevinos were the ones you were speaking of, and I think we -- we released their land.
Q Did you notify them that you were releasing the land?
A No, sir, I did not.
Q The notary practices in store 214, do you agree with me that they're not just limited to deeds of trust and builder's and mechanic's lien contracts, right?
A I've seen those allegations, yes, sir.
Q Well, but you also -- yesterday, the jury saw a number of documents in the transaction that are notarized, right?
A Yes, sir.
Q And those don't relate to the deed of trust or the mechanic's lien; those are actually documents in the transaction of the -- the loan file, for lack of a better word, right?
A We saw a power of attorney, I believe.
Q Right. And the question is, is there are documents within the loan file, within the customer's file, that are notarized, correct?
A There are.
Q And you knew and you discovered that these notary

practices were not just limited to deeds of trust and mechanic's liens, that they were involved in the transaction itself, correct?

A I didn't know that at the time, no, sir.

Q Well, you know today, right?

A I do today, yes, sir.

Q I mean you understand when you read the deposition of Ben Frazier that he also testified on -- we saw some of those powers of attorney yesterday?

A Yes, sir.

Q Ben Frazier testified that his signature as the notary was forged on those, right?

A I think he did testify that, but there was all -- I've read the other depositions as well from others that were different than Ben Frazier's.

Q Did you read Robin Moore's deposition?

A I did, yes, sir.

Q And when --

**MR. RUMLEY:** May we approach, your Honor?

**MR. RANGEL:** Yes.

**(Bench conference begins at 11:19 a.m.)**

**MR. RUMLEY:** I asked Robin Moore -- He said he read Robin Moore's deposition. Robin Moore was asked: Did you sign Ben Frazier's name to the deed of trust? And he pled the Fifth. We asked him: Did you sign Ben Frazier's name to the

mechanic's lien? He pled the Fifth. In a civil case, there's an inference. It's --

**THE COURT:** I suggest you read the charge, Mr. Rumley.

**MR. RUMLEY:** I understand, Judge, but we have --

**THE COURT:** It's a non-party.

**MR. RUMLEY:** I know, but this --

**THE COURT:** (indiscernible)

**MR. RUMLEY:** He was a party at the time of his deposition in the case in Duvall, and the discovery was --

**THE COURT:** But not in this case.

**MR. RUMLEY:** But it was consolidated under the Court's order and Ben Frazier's lawyer participated in the deposition. It was taken -- it was taken in this matter.

**MR. RANGEL:** Judge, we have a motion in limine, and this is very consequential. I would ask that we have an opportunity to argue this outside the presence of the jury.

**THE COURT:** I can do that.

**MR. RANGEL:** He's going to --

**THE COURT:** I mean you go on and question him. It's the last in limine when you call him and we'll talk about this.

**MR. RANGEL:** Okay.

**THE COURT:** Let's talk about this over the noon break.

**(Bench conference concludes at 11:20 a.m.)**

**BY MR. RUMLEY:**

Q All right, Mr. Booth. You did read the deposition of Mr. Moore, right?

A Yes, sir, I did.

Q All right. At the time -- Or prior to 2005, you agree with me that your company had salespeople as notaries, right?

A Yes, sir.

Q And prior to, I believe, whenever you received notices or when you uncovered what was going on, you didn't have any policies related to notaries, correct?

A No, sir, we depended on the states, as they appointed notaries, that it was up to them to teach and provide the education or the understanding that notaries had as to what their responsibilities were.

Q All right, but just so we're clear, you wanted at least one of your sales associates to be a notary, right?

A It didn't have to be a sales associate. We just needed a notary at the sales center. It could be an administrative person. In many cases it was. In some cases, it was the manager. In some cases, it was a salesperson.

Q Right. But you knew you had people in your store that were notarizing documents, correct?

A Yes, sir.

Q And you would reimburse them for whatever they had to pay to became a notary, right?

A Yes, sir, we did do that.

Q And you knew, and by 'you' I mean CMH and Vanderbilt, if you know, were fully aware that you had employees that were notarizing documents like deeds of trust, mechanic's liens, those types of things, correct?

A Yes, sir.

Q And back during this time, you had no policy in place that prevented them from notarizing a document in which they maintained a financial interest, true?

A That's true.

Q And you understand that that's a prohibited act, right?

A I understand that we prohibit it today.

Q But you didn't back then?

A No, sir.

Q I mean you understand the basic concept of a notary, right?

A Yes, sir.

Q They're supposed to be an impartial third person, they don't have a dog in the fight, you know, they are what they are, right?

A Yes, sir.

Q But you had sales associates that were notarizing documents in which they had a financial interest, correct?

A In some cases, yes, sir.

Q And so the jury understands, the way that the people

within the Corpus Christi store were paid was based on commissions, correct?
A The sales representatives were paid on commissions.
Q The store manager received a percentage of the gross profit of the store, correct?
A Yes, sir. He was on bonus of the profit.
Q And they would receive somewhere in the neighborhood of up to 50 percent, correct?
A The manager, yes, sir, could, up to 50 percent.
Q And the sales associates, they were paid a draw?
A Yes, sir, on a weekly basis.
Q And what a draw means is that they're paid a weekly check but they owe that money back, right?
A Yes, sir, against future commissions.
Q And so you have an incentive in there for your sales associates to sell homes, correct?
A Yes, sir.
Q And if a sales associate was successful in selling homes, they received up to, I think, 26 percent of the gross profit of the sale?
A During that period of time. It's changed. We review it every year, but during then, yes, sir, it was 26 percent.
Q Let me show you Clayton Exhibit --
A And that was 26 percent of the gross profit. You said gross profit I think, correct?

Q Yes, sir.
A Yes, sir.
Q Let me show you Clayton Exhibit 69, 2747. And this is compensation of sales professionals. Do you see that?
A Yes, sir.
Q And you've seen this document before, correct?
A I believe I have, yes, sir.
Q All right. And we talked about it in your depositions?
A I think so.
Q Okay. And we'll go quickly through this for the jury. If the salesperson was successful in selling a home, they would get a percentage of the adjusted gross profit, right?
A Yes, sir.
Q And they received a base of 16 percent?
A Correct.
Q Right?
A Correct.
Q And if they got the customer to finance with Vanderbilt, they got an additional four percent commission, right?
A Yes, sir.
Q And then APR above minimum each increment of 25 -- of a quarter percent. Can you explain what that is?
A I've talked about the recourse relationship earlier between CMH and Vanderbilt. So the store knew that they had recourse exposure on every loan that they did, and so we

allowed them back then, during that time, they could actually increase the rate, the interest rate, above the rate that Vanderbilt approved the loan if they felt there was more risk associated with the loan.

Q What this means is if your sales associate were able to get the customer to agree to a higher interest rate than what they actually qualified for, the sales associate got an additional bonus?

A Yes, sir.

Q Why would a customer ever agree to a higher interest rate than what they were approved for?

A Because that was the rate that was offered.

Q So they wouldn't actually tell the customer what they qualified for, true?

A We would have qualified them on that rate.

**THE COURT:** Listen carefully to the question please, sir.

**THE WITNESS:** Yes, ma'am.

**BY MR. RUMLEY:**

Q What this says, Mr. Booth, is if the salesperson is able to get the customer to agree to a higher interest rate than what they qualified for, they received a bonus, correct?

A Yes, sir.

Q Why would a customer ever agree to a higher interest rate than what they qualified for? They wouldn't, right?

A I agree.

Q So what this is saying, this is telling Ben Frazier, Robin Moore, those sales associates, is if you can get them to agree to a higher rate, you're going to get a larger percentage, right?

A Yes, sir, that's what it says.

Q So it's implied that they wouldn't ever tell the customer what they really qualified for, right?

A Sir, many lenders --

**THE COURT:** Listen carefully --

**THE WITNESS:** Yes, ma'am. I'm sorry, your Honor.

**THE COURT:** -- to the question. Just answer the question.

**THE WITNESS:** Okay.

**BY MR. RUMLEY:**

Q Is that right?

**THE COURT:** Can you do that, yes or no?

**THE WITNESS:** Yes, your Honor.

**BY MR. RUMLEY:**

Q Is that right?

A Yes.

Q So let's just take an example of I go into your store, Mr. Booth, and I give you all my financial stuff and you type everything in and you send it off to Mr. Nichols at Vanderbilt, and he spits back a report that says Mr. Rumley qualified for

9.99 percent, okay? You come to me as a sales associate and say, congratulations, Mr. Rumley, you've qualified for 10.99 percent. I say, great, I'm buying a home. You would get an extra one percent of the gross profit, right?
A Yes, sir.
Q For being dishonest?
A I don't consider that dishonesty, sir.
Q Wouldn't the truth be you would come to me and say, Mr. Rumley, you qualified for 9.99 percent interest, but if I can get you to agree to ten, ten and a half, I get more money. That would be the truth. That would be honesty, right?
A No, sir, that is not the way it worked.
Q Well, that's exactly how this worked.
A That's how they were compensated. That's not how it worked between the customer and the sales representative that presented the rate.
Q Right, because the customer would never agree to that. If you told me I qualified for 9.99, I'm not going to sign a loan for 10.99, true? You wouldn't, would you?
A I would consider the rate that was offered and accept it or not accept it.
Q If you went for a loan, Mr. Booth, and you had a choice between a 9.99 interest rate and a 10.99 interest rate, you, as a customer, which one would you pick?
A I'd take the 9.99.

Q And if I'm -- if you're the person that's going to profit up to one percent on that, what would you want the customer to do?
A The 10.99.
Q And by the way, you don't do this anymore either, do you?
A No, sir, we have changed that program.
Q And then we come down here to gross profit, and this would be the gross profit of the sale, right?
A Yes, sir.
Q And so the sales associate, the more money they could get the customer to pay for the mobile home, the larger percentage they got, right?
A Yes, sir.
Q Now, one of the things that you do, and not you personally but someone within CMH, is to audit the stores, correct?
A Yes, sir, we do have audit procedures.
Q And do you agree with me that you have a responsibility to audit the stores?
A Yes, sir.
Q And one of the things that you look at is advertising, true?
A Yes, sir.
Q And I took your deposition and you are actually the representative on advertising, correct?
A Yes, sir.

Q And you agree with me that this store in Corpus Christi had an advertising marketing plan that says: 'Bring any deed to anyone's land and you're guaranteed approval', correct?
A Yes, sir.
Q And you disagreed with that, right?
A I didn't like their advertising, no, sir.
Q Mr. Booth, we talked a lot about -- about the land-in-lieu program and the sales, and one of the reasons why you had notaries notarizing these deals and not title companies is because you understood that you needed to create a sense of urgency for the customers, correct?
A No, sir. It was more a function of the cost.
Q Well --
A I think the decision back then was that it would have cost more for the customer if we had to take it to a title company, and so therefore we closed the loans at the store. And it was more convenient for the customer.
Q You understand, sir, you have training manuals where you're training your sales associates to create urgency, right?
A Yes, sir.
Q We talked about this at length. You train them, when a customer comes in, create the sense of urgency because if you create a sense of urgency, they're more likely to buy, right?
A Yes, sir, I think --
Q And you have literature that says the moment that customer

walks out your door, as soon as they walk off that lot, it's less likely that they're going to buy the home, right?

A Yes, sir.

Q You want to keep them on the lot, and there's a sense of urgency and you want to create urgency so that they buy the home, right?

A Yes, sir, I think it's true.

Q And if we look at the finance and insurance manual, Exhibit 162 for CMH Retail, that's -- one of the jobs of the sales associates is underwriting, right?

A Yes, sir.

Q They're the ones that fill out the loan applications, they're the ones that put together the packet that is then submitted to sales processing in Tennessee, which is CMH, and then given to Vanderbilt, correct?

A Yes, sir.

Q And what CMH and Vanderbilt do in Tennessee is they review all of the documents, correct?

A Yes, sir.

Q And they're supposed to review the documents for signatures, right?

A Yes, sir.

Q They're supposed to make sure that they're properly notarized, right?

A Yes, sir.

Q And when they review all those, then they're supposed to approve the loan, correct?
A Yes, sir.
Q When all of those documents are in place in Tennessee, that's when the loan is approved, correct?
A That's when the loan is funded. The loan was approved some time prior to that when Vanderbilt approved the loan back to the sales center.
Q Okay.
A We fund it in Tennessee.
Q I understand. But all of the documents are in Tennessee related to the transaction before that transaction is allowed to close?
A Yes, sir.
Q Correct? And in a land-in-lieu transaction, that means that the deed of trust, mechanic's lien contract, those would all be part of the package before the loan is funded, right?
A Yes, sir.
Q And you know, Mr. Booth, that didn't happen in this case, right?
A No, sir, I don't know that.
Q What was the date of the installment contract?
A The date of the installment contract I saw yesterday was, I think, January the 5th.
Q January 5th. When was the deed of trust recorded?

A I don't remember the date it was recorded. I remember the date of the -- of the -- the builder's and mechanic's lien I think was the next -- the 7th, maybe two days later.
Q So how -- if they were recorded -- if they were signed and recorded a week later, those documents could never have made their way to Tennessee before the loan was funded and the deal was closed?
A I don't think the -- I think we established earlier today the deal was funded on the 16th of January.
Q When was the deal closed?
A The deal was closed as far as the retail installment contract, which is the debt part of the deal, on the 5th. That's what I saw yesterday.
Q And before a transaction is closed in a land-in-lieu, they are to have all of the documents?
A No, sir. I said all of that has to be done before it funds, not before it closes. We close -- The date they sign the retail installment contract can be considered part of the closing. That starts the closing process. But all of that does not have to be done until the deal funds with Vanderbilt Mortgage.
Q Isn't it true, sir, that before Vanderbilt will approve a transaction, they have to have recorded copies of the deed of trust and the mechanic's lien?
A No, sir, that's not true.

Q If the documents show that, you just disagree, right?

**(No audible response)**

Q Do you disagree with that?

A I disagree with the fact that all that has to be done before we can close the transaction at the sales center.

Q Do you agree with me that if it's a land-in-lieu, the deed of trust and the mechanic's lien all have to be filed -- signed, filed and recorded and verified that it was recorded -- before the deal is closed, true?

A That's not my understanding, no, sir. Just before it funds with Vanderbilt.

Q You understand that one of the marketing plans or the advertising in place was that your store managers would send out letters, correct? They were authorized to send out marketing letters --

A Prospect letters?

Q Prospect letters.

A That type of thing? Yes, sir.

**MR. RUMLEY:** Your Honor, we would offer Defendants' Exhibit 452, which is one of these prospect letters.

**MR. RANGEL:** Objection on relevancy grounds, your Honor.

**THE COURT:** Yes, sir?

**MR. RUMLEY:** It says -- It advertises the land-in-lieu, and it guarantees -- if they bring in any deed, it

guarantees approval or they get 500 bucks.

**MR. RANGEL:** Your Honor, we object that he's reading the document.

**MR. RUMLEY:** She asked for relevancy.

**THE COURT:** I'm sorry; overruled.

**BY MR. RUMLEY:**

Q Sir, you and I have talked about Mr. Frazier's letter, correct?

**THE COURT:** Yes.

**THE CLERK:** I'm sorry, your Honor.

**THE COURT:** I'm sorry, the number again?

**MR. RUMLEY:** We offer Exhibit 452.

**THE COURT:** Exhibit 452 is admitted.

**(Defendants' Exhibit Number 452 is received in evidence)**

**BY MR. RUMLEY:**

Q Do you remember this letter, Mr. Booth?

A I don't remember this letter, no, sir.

Q First of all, what we read right here, it says 'Clayton Homes, Inc.', right?

A That's what it says, yes, sir.

Q And does Clayton Homes, Inc., are they the ones that run the 214, or brand, of 214 sales center?

A No, sir, they're not.

Q Do you know it says Clayton Homes, Inc.?

A I have no idea.

Q But whatever we know is that this letter by Mr. Frazier, one of these prospector letters, had Clayton Homes, Inc. at the top, correct?
A Correct.
Q And if we come down, do you agree with me that if you bring in any deed to anyone's land that you're guaranteed, automatically guaranteed?
A I do not agree with that.
Q Was that what was in place back in 2002/2003?
A No, sir, that was never in place anywhere that I know of.
Q If we look at this letter, it says:

'If you have land to use, we will not require you to put any cash money down on one of our homes. The land does not have to be in your name. It can be in any shape and size. No matter what your credit is, if you have land or know someone that does, you can get a home. We are the only ones that offer this program.'

Can you see that?
A Yes, sir, I see it.
Q And is that a truthful statement as far as you-all are the only ones that offered this program, right?
A Yes, sir, that I'm aware of, yes, sir.
Q And no one else allowed someone's land to be pledged for someone else to buy a home unless they also co-signed on the loan, correct, except for you?

A I think we've seen examples of other lenders that did do that.

Q If we come down, it says right here: 'Ben Frazier, sales manager.' And Mr. Frazier, would he have been authorized as the sales manager to send out letters like this?

A Yes, sir.

Q Now, one of the things that you do, sir, is you audit the stores, correct?

A Our company audits the stores. I don't do it personally but our company does.

Q And how much does an average store manager make?

A Eighty, $90,000.

Q How much -- When Mr. Wells was there when they were doing this land-in-lieu program before the policies were implemented, before they had to close at the title company, how much was Mr. Wells making?

A It varied over the four or five years that he was there, pretty dramatically.

**MR. RUMLEY:** Your Honor, we would offer Exhibit 468.

**MR. RANGEL:** Objection, relevancy, your Honor.

**THE COURT:** Let me see counsel at the bench then.

**(Bench conference begins at 11:39:08 a.m.)**

**MR. RUMLEY:** It's their discovery response.

**THE COURT:** Overruled. Thank you.

**(Bench conference concludes at 11:39:26 a.m.)**

**BY MR. RUMLEY:**

Q Now Mr. Booth, if your average store manager is making $80,000, is there any amount of money that you look at that would raise a red flag --

**THE COURT:** It's admitted, thank you.

**(Defendants' Exhibit Number 468 is received in evidence)**

**BY MR. RUMLEY:**

Q -- that maybe something -- something needs to be looked into?

**(No audible response)**

Q Is that something that you-all look at?

A Yeah, we do look at it. We look at a number of things.

Q It looks like Mr. Wells in 2000 made $202,000?

A Yes, sir.

Q In 2001, he made $323,000?

A Yes, sir.

Q Is that a situation where the store manager at one of your stores is making four times as much as your average? Is that a situation where you want to look into it?

A No, sir, that's -- I mean that is commonplace. You'll have managers that will exceed by great amounts other managers.

Q Do you agree that's a lot --

A That's the history of our business.

Q That's a lot of money, right?

A That's a lot of money.

Q In 2002, $296,000?
A Yes, sir.
Q In 2003, $171,000?
A I can't -- You moved it.
Q Oh, I'm sorry.
A Yes, sir, that's correct.
Q And then 2004, $57,000?
A Correct.
Q And what happened in 2004?
A There was a great deal of negative local publicity surrounding the sales center.
Q Surrounding what?
A Allegations that had been made regarding the sales center.
Q What else happened in 2004, Mr. Booth?
A The whole team resigned ultimately. The whole team left sales center 214.
Q We'll get to that in a minute. But the other thing that happened is you put in new policies and procedures, right?
A We did.
Q You put in policies and procedures that prevented your sales associates who were getting up to 26 percent commission in the transaction, you prevented them from notarizing the documents in the transaction, right?
A Yes, sir.
Q You started making them close at title companies, right?

A Yes, sir.

Q And you agree with me that before those policies were in place that there was nothing that prevented a sales associate from forging a landowner's signature, or notarizing a landowner's signature who had been forged, other than the notary, right?

A That and ethics, honesty, all those things that I think are important to people.

Q Right. But you relied on your notary for that, right?

A We relied on the notary to notarize the signatures, yes, sir.

Q Mr. Frazier?

A Yes, sir.

Q And --

**MR. RUMLEY:** Your Honor, we'd offer Defendants' Exhibit 222, the commissions of the sales associates, their discovery answers.

**MR. RANGEL:** Same objection, your Honor.

**THE COURT:** Number is?

**MR. RUMLEY:** Two twenty-two.

**THE COURT:** Let me see counsel at the bench, please.

**(Bench conference begins at 11:42:38 a.m.)**

**(Pause - The Court reviews the exhibit)**

**THE COURT:** Overruled. Thank you.

**MR. RANGEL:** And the objection is overruled,

relevancy?

**THE COURT:** And it's admitted, yes, sir. Exhibit 222 is admitted.

**(Bench conference concludes at 11:42:58 a.m.)**

**(Defendants' Exhibit Number 222 was received in evidence)**

**BY MR. RUMLEY:**

Q Mr. Booth, during this time there's no doubt that Ben Frazier was notarizing documents in which he had a financial interest, correct?

A In some cases, I'm sure.

Q And the people in Tennessee charged with reviewing these documents, they would have seen that, correct?

A They would have seen his notarization, yes, sir.

Q And they would have known that he's the assistant store manager and getting a percentage in the transactions?

A They probably would not have known that.

Q Well they actually -- When you plug in the numbers, they actually calculate what the gross percentage is that goes to the sales associates, right?

A Well, that's the accountants in the retail company. That's not the same team that you're talking about that's reviewing the documents.

Q Well, someone in Tennessee knows who the salesperson is on the transaction?

A Yes, sir, they do.

Q Okay. So they know they're going to get a financial interest in the transaction?
A Yes, sir.
Q And they could look at that and compare the notary and say, wait a minute, that person has a financial interest, right?
A They could.
Q If we look -- I'll talk to you about a couple of people, Mr. Frazier, Mr. Wells and Mr. Moore. Now, John Wells also received commissions where he was the salesperson, right?
A Yes, sir.
Q Okay. If we look at Mr. Frazier, he made a little under $50,000 in 2000, right?
A I can't see his name now, but that's the right line, yes, sir.
Q I'm pointing. Okay. And then in 2001, he made $67,000?
A Yes, sir.
Q And then in 2002, he made $50,000, right?
A Yes, sir.
Q And then in 2002, Mr. Frazier was actually terminated, right?
A He was, yes, sir.
Q And do you know whether or not he was fired as a result of notary problems, notary practices?
A He was not.

Q You understand that Kevin Clayton, the CEO of the company, sent out a voice mail, right?
A Yes, sir.
Q And in that voice mail, he identified or he said that all of this relates to an employee who was fired more than a year ago?
A That's what he said, yes, sir.
Q And who was that employee? Mr. Frazier?
A I think he was referring to Mr. Frazier.
Q If Mr. Frazier was fired in 2002 for these notary problems, he was the notary, right?
A He was the notary.
Q And all of the transactions you've looked at all relate to him as the notary and whether or not he signed them or someone else used his stamp, correct?
A Yes, sir.
Q And it was common practice for the other sales associates to use his stamp, correct?
A I read testimony that said -- by several that said they had used his stamp.
Q And so people in the office who are not notaries would take his stamp and they would go notarize someone's signature, correct?
A I read where one said he did that.
Q I mean, and that's the notary problem that we're talking

about, correct?
A Yes, sir.
Q And that's not good, is it?
A No, sir, it's not.
Q And if you find out that information, don't you think you owe it to your customers to tell them?
A Sir, I think they knew that. I think they were aware that there were allegations surrounding it. You know, we're talking about information that you just referred to that I just learned reading depositions.
Q You understand, sir, that during the investigation that there was signatures that were falsely notarized, correct?
A That's what was alleged, yes, sir.
Q Well, but you know, you've looked at documents that show it to be true, right?
A Yes.
Q And I'll give you one good example. After Mr. Frazier was fired, we have documents where they're still using his notary stamp.
A Yes, sir, I know that.
Q Is that acceptable?
A No, sir.
Q That's a situation where you know, as president of this company, that notary fraud is going on, right?
A Yes, sir. After the fact, I knew.

Q You knew once you got sued, right?

A That's when we first became aware. We had never been aware that there were any allegations prior to that.

Q If documents are being notarized by Mr. Frazier, shouldn't someone have figured that out when the documents go to Tennessee?

A No, sir, I don't know that there's any way anybody could have figured that out in Knoxville looking at the signatures and the different information.

Q All right. You understand, Mr. Booth, that Mr. Frazier is testifying that his signature has been forged to a number of notaries, correct?

A I read in his deposition that, yes, sir.

Q One of the other ways that you have determined that the notary -- this notary fraud was going on in the store is you had notarizations, false notarizations of people that could never have signed the document, correct?

A Yes, sir, that's alleged, yes, sir.

Q But you have proof of that, correct?

A I don't have proof of that, no, sir.

**MR. RUMLEY:** May we approach?

**THE COURT:** Yes.

**(Bench conference begins at 11:48:48 a.m.)**

**MR. RUMLEY:** I'm limiting my questions to notary, the notary was forged, not the customers, but we have Agapita

Saenz, who is dead, and her signature was notarized by Mr. Frazier, and I have a certified copy of her death certificate and the deed of trust and mechanic's lien that show her signature was notarized.

**MR. RANGEL:** Judge --

**THE COURT:** Does he not know that? Could your client not know that?

**MR. RANGEL:** After the fact. I mean, from reading his deposition.

**MR. RUMLEY:** He just denied it.

**THE COURT:** He just -- he never knew. He did say after that.

**MR. RANGEL:** The way that Mr. Rumley is phrasing the question, he's suggesting he knew about that then. He didn't know about that then, but --

**THE COURT:** He's asking did you ever know that. He didn't say a specific time.

**MR. RANGEL:** Well, you know, in fairness, Judge, this is very, very inflammatory.

**THE COURT:** It is.

**MR. RANGEL:** It's very inflammatory. And this is a clear case where the prejudicial impact compared to the probative value is way, way --

**THE COURT:** If he had just answered a little bit differently, I would agree with you, but that's off the record.

**(Bench conference concludes at 11:49:57 a.m.)**

**MR. RUMLEY:** Your Honor, we would -- Defendants would offer Defendants' 68 and Defendants' -- I'll identify for the record the deed of trust of Agapita Saenz as Defendants' 68; the builder's and mechanic's lien contract of Agapita Saenz, Exhibit 69; and Defendants' Exhibit 70, which is the certified copy of the death certificate.

**MR. RANGEL:** Judge, we would object to these --

**THE COURT:** Sustained.

**BY MR. RUMLEY:**

Q Mr. Booth, when is it -- when is it that you changed the way the sales associates were compensated?

A Sir, that's evolved and changed over the years. I don't know what you're referring to.

Q With respect to the commission-based system that we talked about.

A The commission-based system was in place when I joined the company in 1990.

Q Are the sales associates still compensated for placing a loan with Vanderbilt?

A No, sir. That changed a year or so ago.

Q All right. I want to ask you, one of the things, one of the reasons I think you told us is the reasons for filing the releases was to protect the landowner. Did I write that down right?

A No, sir. What I said was the reason was to end the controversy surrounding the land.
Q Is one of the reasons why you filed the releases, sir, to protect the interests of the third-party landowners?
A Yes, sir.
Q Correct?
A Could have been, yes, sir.
Q And you gave a declaration to that extent, right?
A Yes, sir.
Q One of the reasons -- one of the reasons for filing these releases is to protect, like, for example, my clients, the Trevinos, correct?
A Yes, sir.
Q Because -- Well tell me, how does it protect them? How does filing that release protect them?
A Should there have been anything improper involved in the Trevinos' relationship with the company as far as the pledging of the land or the signing of the documents, et cetera, then it was the right thing to do was to release their land where there was no indebtedness, I mean, for the land. I mean, the lien was released.
Q And the way it protects them is, is that if there's a default, they don't get their land taken away, correct?
A Yes, sir, that's true.
Q Because you understand the purpose of the deed of trust

when you file one is to perfect your lien on their land, right?
A Yes, sir.
Q And the intent behind that document is, is if the customer doesn't pay, you're going to take the land under the terms of the deed of trust, right?
A Yes, sir.
Q That's the intent behind filing those documents?
A Additional collateral.
Q Right?
A Additional security.
Q And at the moment those documents are filed, that is the intent, is to make the Trevinos pay or risk losing their land, correct?
A Yes, sir.
Q And you recognize, Mr. Booth, that your former employee, your former sales manager in this case, has testified that on those very documents, the deed of trust and the mechanic's lien, that they are not properly notarized, correct?
A Yes, sir.
Q And you understand that that deed of trust and that mechanic's lien was filed by your company, correct?
A Yes, sir.
Q And by 'your company', I mean CMH, right?
A Yes, sir.
Q All right. And so CMH would have filed those documents, I

think there's a recording date sometime I think maybe a week after, January 16th or somewhere around there, correct?

A I don't know. I don't recall.

Q Well, those documents would have been filed by someone within CMH, correct?

A At the time that, okay, they signed the deed of trust and the mechanic's lien --

Q Yes, sir.

A -- contract? Yes, sir.

Q I mean you would have filed it, right?

A That's the way we did it, yes, sir. Local personnel would have done that.

Q The television commercials that you-all would run, would they have to be approved by the general manager?

A The general manager of Corpus Christi.

Q The general manager over the store?

A Yes, sir.

Q Was there ever a situation, do you recall, Mr. Booth, in one of the internal audits done of the store that kind of raised a red flag that maybe there was something not right going on there?

A We initiated an internal audit for that store. I do remember that.

Q Do you remember doing an internal audit in 2002, three years before these releases?

A Yes, sir.

Q And what was the internal audit?

A The allegations were that there was an improper relationship I think with a vendor or with a contractor, and that was investigated. We asked internal audit to go in there and do their thing at the sales center, and they did.

Q Mr. Wells, the store manager, was paying his dad to move homes, right?

A Yes, sir, he was a contractor.

Q And the red flag came up because his dad was paid, in 2002, $466,000 for moving homes in 2002, correct?

A He delivered and installed over a hundred homes that year for that store.

Q And that's the same year that John Wells made over $300,000?

A Yes, sir.

Q Wasn't that a red flag in 2002 that you have a store manager and his dad that are making over $800,000?

A No, sir. I mean the internal audit did not find there was any irregularity. They investigated -- He had four different places he did business. He set homes up for a number of the sales centers, not just Corpus Christi but for other sales centers all over South Texas.

Q I think you told me in the deposition that all that means to you is that the store was performing well, right?

A The store was performing well as far as everything we knew at the time.

Q All right. And you didn't see a drop in the amount of money that store was making until after you implemented a number of policies and procedures, correct?

A We had begun to implement policies and procedures.

Q After --

A We were still doing a lot of land-in-lieu financing all over the country.

Q But not with third-party land, right? You don't do that anymore?

A We did for two or three years after that, and then the third-party we stopped doing and put it in the name of the borrower.

Q And that's a good policy, isn't it?

A I think it is a good policy.

Q It's a good policy that if someone is going to put up their land for someone else to buy a home that you actually close the transaction at a title company, or before a lawyer or someone, just to verify everyone is who they say they are, everyone's signature is who they say it is, right? I mean, that's the good thing?

A I think it really is a good thing. I'm glad we do it that way today.

Q And back in 2002, you didn't do it that way?

A We did not.

**MR. RUMLEY:** Thank you, Mr. Booth. That's all I have.

**THE WITNESS:** Thank you, sir.

**THE COURT:** Thank you. Mr. Gutierrez?

**MR. B. GUTIERREZ:** Yes, your Honor.

**THE COURT:** I think that's the right order, isn't it?

**(No audible response)**

**CROSS EXAMINATION**

**BY MR. B. GUTIERREZ:**

Q Mr. Booth, one of the things or one of the first things that Mr. Rumley asked you about was your testimony back in -- back on June 3rd of 2010, concerning this business about releasing the loans, remember --

A Yes, sir.

Q -- you said that that was a mistake?

A Uh-huh.

Q Maybe we could look at this. This is what was shown. The question by Mr. Rumley was:

'QUESTION: Are you here on behalf of the corporation with respect to the lien releases that were filed in the fall of 2005 related to store 214?'

Q And you see your answer there. And I believe you've told us that that was either a mistake by the court reporter that was taking your testimony, but that you believe that that is a

mistake, right?

A Yes, sir, I do.

Q But that's not the only time that you told us, under oath, that you had made the decision to release all the loans from 214, is that correct?

A Sir, I don't remember ever --

Q Sir?

A I don't remember ever saying that we were going to release the loans.

**MR. B. GUTIERREZ:** Your Honor, may I present this to the witness, his testimony?

**THE COURT:** Yes.

**(Mr. Gutierrez provides a transcript to the witness)**

**BY MR. B. GUTIERREZ:**

Q Can you look at your deposition testimony?

**MR. B. GUTIERREZ:** And this is, for counsel's reference, this is from page 130, counsel, starting on line 19.

**BY MR. B. GUTIERREZ:**

Q Do you see the question?

A Yes, sir, I do see it.

Q Okay. And do you see your answer?

A Yes, sir.

Q Okay. Did you in fact, when you were asked during your deposition by Mr. Rumley about this decision that you made, that you told him under oath that it was you understanding that

as far as the releases were concerned from store 214, it related to any loan, any loan --

A Any loan that had land.

Q Let me finish my question.

A Oh, yes, sir; I'm sorry.

Q Any loan that had land associated with it? In other words, any transaction that was under your marketing program the land-in-lieu program, right?

A Sir, that was not my marketing program.

Q It was somebody's marketing program?

A Yes, sir.

Q Right. It was your company's marketing program?

A Sir, are you referring to the statement that you just read --

Q Yes.

A -- in the deposition?

Q Is that true or not true?

A No, sir, that's not true what you just said.

Q Then --

A The way I interpreted that question and answered that question, that we were talking about loans that had land associated with them. That was the land that we released.

**MR. B. GUTIERREZ:** Your Honor, may I be permitted to show this to the jury?

**MR. RANGEL:** Judge, he --

**THE COURT:** You know, maybe it's time to take a lunch break. Would you pick that up, please?

**MR. B. GUTIERREZ:** Yes.

**THE COURT:** We'll start back at 1:00 o'clock. Would you please stand for the jury?

**(The jury exits the courtroom at 12:02 p.m.)**

**(The Court confers with the Clerk)**

**THE COURT:** Now, where are we? Two things we were going to take up over the lunch hour?

**MR. RANGEL:** Yes, your Honor, the -- Well --

**THE COURT:** The gentleman that took the Fifth Amendment and then this particular area.

**MR. RANGEL:** Right, Judge. With respect to this particular area, I think obviously this sort of relates to the question Mr. Rumley had already asked him and we were going to have the opportunity to play the audio and his response was that playing it (indiscernible).

**THE COURT:** Yes.

**MR. RANGEL:** Now on this --

**THE COURT:** But I understood he said this another time.

**MR. RANGEL:** Judge, if the Court will review the questions and answers --

**THE COURT:** Yes, please, I will. You can just put it under there if you'd like. You don't want to get close to me

with my cold.

**MR. RANGEL:** It's question --

**MR. B. GUTIERREZ:** Page 130, your Honor, I believe it starts on line 19. And then --

**THE COURT:**

'QUESTION: How did you decide which ones you were going to release?'

**MR. RANGEL:** Judge, he's not saying that the loans are going to be released.

**THE COURT:** Okay, my understanding is it was any loan that had land associated with it.

**MR. B. GUTIERREZ:** Then the question --

**THE COURT:** I'm not -- So, you know what? It seems to me that he ought to be able to read that to him and say, 'Do you remember you said that?' You mark that down to clarify on redirect.

**MR. RANGEL:** And so long as I can put it in the context with the audio.

**THE COURT:** You can, because I -- you know, I understand that you may have -- Anyway, fix it up at redirect if you want.

**MR. RANGEL:** I will, your Honor.

**MR. B. GUTIERREZ:** There's just one other area and we might as well clear it up now.

**THE COURT:** Right. You said there was another place

where he said that.

**MR. B. GUTIERREZ:** It's on page 131. Just going to the page number on there. And if we look on page 131, line one.

'QUESTION: Were there any dates or just every single one?'

**MR. B. GUTIERREZ:** And his answer was:

'ANSWER: I think it was all the outstanding loans.'

**MR. B. GUTIERREZ:** And I want to ask him --

**THE COURT:** Okay, you can put that in context because I'm sure there will be a major context.

**MR. RANGEL:** Thank you, your Honor.

**THE COURT:** Now let's take up the Fifth Amendment issue.

You can stand down. Thank you, sir.

**MR. RANGEL:** Judge, if the Court please, may I approach? We have prepared a file brief that we submit -- I'm sorry.

**THE COURT:** I am insulated.

**(Laughter)**

**MR. RANGEL:** We would ask leave of the Court to file this trial brief on the --

**THE COURT:** On the issue of the Fifth Amendment?

**MR. RANGEL:** Yes, your Honor, on the issue involving Robin Moore and the --

**THE COURT:** My research says that it's discretionary

with me.

**MR. RANGEL:** That is my understanding, your Honor.

**THE COURT:** Is that the bottom line?

**MR. RANGEL:** But there are -- I think there are limitations --

**THE COURT:** But there are nuances that you want me to hear about. Why don't you just tell me what the brief says and I'll read it over the lunch hour too.

**MR. RANGEL:** Okay. Number one, Moore was not involved in the Flores/King/Trevino transaction, and that is very, very important.

**THE COURT:** He wasn't -- Say that again.

**MR. RANGEL:** He was not the salesman, your Honor.

**MR. UNIDENTIFIED:** That -- that's not true.

**THE COURT:** I thought he was a salesman at 214.

**MR. RANGEL:** But the transactions, the --

**THE COURT:** He was a salesman at 214.

**MR. RANGEL:** He was.

**THE COURT:** And he was the one allegedly who first said in the 2005 case that he had forged the name of the notary.

**MR. RUMLEY:** Yes.

**THE COURT:** And then he took the Fifth Amendment about it later.

**MR. RANGEL:** But in the context of this particular

case, he was not the salesman, your Honor.

**THE COURT:** Did he forge the name of the notary on this one?

**MR. RUMLEY:** That's what he -- that's the inference. We asked him -- I showed him the Trevino deed of trust and said: 'Did you forget this signature?', and he took the Fifth.

**MR. RANGEL:** That is not --

**MR. RUMLEY:** That's giving inference.

**MR. RANGEL:** No, that is not --

**MR. RUMLEY:** Because I asked him if he was involved in the Trevino transaction --

**MR. RANGEL:** That is --

**MR. RUMLEY:** -- and he took the Fifth.

**MR. RANGEL:** That is not correct because he took the Fifth -- I asked him later whether he had forged signatures. He said no.

**MR. RUMLEY:** No --

**MR. RANGEL:** Wait a minute, wait a minute. It was a gen -- the way the question was framed, he pled the Fifth Amendment. But when I asked him directly --

**THE COURT:** So he continued to answer questions after that?

**MR. RANGEL:** Later, later.

**THE COURT:** In the same deposition? He took the Fifth for part and answered the rest?

**MR. RANGEL:** Oh, he took -- I mean he did not take the Fifth on every question.

**THE COURT:** Where is he? Where is he?

**MR. RUMLEY:** He's here in Corpus.

**THE COURT:** Well why don't you subpoena him?

**MR. RUMLEY:** Well, because we had an agreement with them --

**THE COURT:** Apparently not.

**MR. RUMLEY:** -- and his criminal lawyer.

**MR. RANGEL:** Mr. Barroso.

**MR. RUMLEY:** His criminal lawyer does not want him to testify, your Honor.

And going to the Court's point, when Mr. Rangel asked him questions, he answered them. And he asked:

'Did you forge the Trevinos' signature?'

And he says no. So that -- he can play that. What we're entitled to play is:

'Did you forge the notary signature on the deed of trust? and he takes the Fifth. And that's -- that's -- there's lots of case law that says -- I mean silence in a civil case is some of the best evidence. I mean, if he wasn't involved in the Trevino transaction at all, then there was no reason to take the Fifth.

But the testimony is, is that there were a number of people would be involved in the transactions. There was --

**THE COURT:** Who's his criminal defense attorney?

**MR. RUMLEY:** Ron Barroso.

**THE COURT:** I don't know why you can't subpoena him.

**MR. B. GUTIERREZ:** We had agreed with counsel. He had agreed that we could play his deposition.

**THE COURT:** Well apparently Mr. Rangel is not agreeing now.

**MR. B. GUTIERREZ:** No. No, you don't.

**MR. RANGEL:** No. We agreed -- The issue was whether he was available or unavailable in terms of the deposition, and we said, look, we will not take the position that he's unavailable. He just had a baby last week, he and his wife.

**THE COURT:** Extraordinary.

**MR. RANGEL:** And -- But we said we are --

**THE COURT:** So he's not up and about yet?

**(Laughter)**

**MR. RANGEL:** He and his wife.

**THE COURT:** Okay.

**MR. RANGEL:** We were reserving the substantive objections, including going into the fact that he pled the Fifth Amendment, your Honor. He was not the salesman in this transaction. And sure, it's the discretion of the Court, but there are limits.

**MR. B. GUTIERREZ:** May I just add also, your Honor, that I specifically asked Mr. Moore if he had forged any of the

signatures shown in the document, showing the document that showed the signature -- purported signature of Maria Trevino and Mr. Arturo Trevino as well as Benjamin Frazier, and he took the Fifth Amendment.

**MR. RUMLEY:** And then he --

**THE COURT:** But yet he answered Mr. Rangel?

**MR. RUMLEY:** Yes, correct.

**MR. RANGEL:** Judge, the way the question was framed, and Mr. Barroso felt --

**THE COURT:** Why don't you let me look at the deposition that you want to offer.

**MR. LOCHRIDGE:** It's attached to the brief, your Honor.

**THE COURT:** Oh.

**MR. UNIDENTIFIED:** Not in its entirety.

**MR. LOCHRIDGE:** No, but the parts that we're talking about here are attached to the brief.

**THE COURT:** Well, I don't -- you know, I don't see how he can take the Fifth, actually, if he answers, partially answers, I just don't see how he can do that. I don't know why you don't just bring him in.

**MR. RUMLEY:** Because I think, your Honor, it's because in 2005 he testified over and over and over and over that he signed Ben Frazier's name. And so he has all these admissions that he signed Frazier's name.

**THE COURT:** What I'm not understanding is why you don't bring him in. Agreement with his defense attorney or not, you can't partially take the Fifth Amendment.

**MR. RUMLEY:** My understanding is, is there's a case that says if someone takes the Fifth Amendment that they're unavailable. The other reason, your Honor --

**THE COURT:** But he didn't. He answered Mr. Rangel's questions.

**MR. RUMLEY:** Right, about the Trevinos, but the part that we want an inference on is the part that he took the Fifth.

And the other thing I would add is that we consider that deposition, under Rule 32(a)(3), as a deposition of a party, so there is no unavailability requirement, because at the time this Court had consolidated, over my objection, the Duvall County case. And remember, we had the discussion about we have to have the discovery matters heard here. So his deposition was taken. And Mr. Frazier's lawyer, who wasn't a party to that case, actually participated during the deposition, so we believe the deposition is of a party.

**THE COURT:** Okay, I still don't see where he took the Fifth. You have not given me that part of the deposition.

**MR. RANGEL:** And your Honor, at the time --

**THE COURT:** Where is that?

**MR. RANGEL:** At the time that he took the Fifth, he

was not an employee of any of the Clayton Parties.

**THE COURT:** That is not -- that doesn't matter. But when -- and the tran --

**MR. RUMLEY:** Your Honor --

**THE COURT:** Give me the deposition.

**MR. RUMLEY:** -- this is --

**THE COURT:** The transaction and issue though, he was an employee.

**MR. RANGEL:** But he was not the salesman, your Honor. He was not the salesman on this transaction. Lance Kimball was the salesman.

**THE COURT:** Well, but the whole deal is did the Trevinos -- from Mr. Rumley's point of view, did the Trevinos sign this? And what he's -- If he took the Fifth about it, I need to know -- give me what he said.

**MR. RUMLEY:** And your Honor, and how it comes in --

**THE COURT:** Show it -- What page?

**MR. RUMLEY:** Your Honor, and also the deposition of Frazier, we asked him:

'Who do you believe forged your signature? Who do you believe did it?'

**THE COURT:** And what did he say?

**MR. RUMLEY:**

'ANSWER: Probably the salesperson.'

And we said:

'QUESTION: Well, was it a common practice?'

**THE COURT:** Who was the salesperson --

**MR. RUMLEY:** And he said:

'ANSWER: It could have been anybody.'

**THE COURT:** Who was the salesperson in this one?

**MR. RANGEL:** Lance Kimball was the salesperson.

**THE COURT:** Have you deposed him?

**MR. RANGEL:** Yes, and there's --

**MR. RUMLEY:** Yes.

**MR. RANGEL:** -- a video deposition.

**THE COURT:** And what did he say?

**MR. RUMLEY:** He says that he also forged or he signed Frazier's name. But he didn't take the Fifth.

**MR. RANGEL:** The focus -- I mean he said that the Trevinos signed the document, your Honor. Focus on Moore with respect to the notary practice, not with respect to the forging of the signatures.

**THE COURT:** I got it, but I want to see what he said, what was asked to him when he took the Fifth.

**MR. RUMLEY:** May I approach, your Honor?

**THE COURT:** Just give it to Ms. Scotch and tell her what page.

**MR. RUMLEY:** Page 166.

**MR. RANGEL:** And this is my question.

**THE COURT:** I got your questions attached to the

thing.

**MR. RANGEL:** Correct. What page is that?

**THE COURT:** One sixty-six? I'm sorry, are you sure it's 166?

**MR. B. GUTIERREZ:** I believe it's 167, your Honor.

**THE COURT:** Okay.

**MR. B. GUTIERREZ:** And beginning on line seven.

**MR. RANGEL:** Where's the depo? Where's the Moore depo, the full depo? The full depo. The full depo.

**MR. UNIDENTIFIED:** The 2010; 2010, not the 2005.

**MR. UNIDENTIFIED:** 2005.

**MR. RUMLEY:** Page 161.

**MR. RANGEL:** 2010.

**MR. B. GUTIERREZ:** And then you go to page 169, line --

**MR. RUMLEY:** It's actually page 168. This is a deed of trust; it looks like January 7th, 2002.

'QUESTION: Did you forge any signatures?

ANSWER: Advice of counsel, take the Fifth.'

**THE COURT:** Wait, wait, wait.

**(Pause - The Court reviews deposition transcript)**

'QUESTION: Did you forge any of the signatures on this page of this document?'

**THE COURT:** And that's the deed of trust?

**MR. RUMLEY:** Correct. And then we also asked about

John Wells because he testified that he forged John Wells' signature to the mechanic's lien contract. They have a CMH person signing them and he's testified in 2005 that he signed his name, and now that's -- at page 170 we're asking him about Wells' signature, and he takes the Fifth.

**MR. RANGEL:** I mean the focus is on the notaries, your Honor, not --

**THE COURT:** No, it's -- No, the focus was on any signatures on the deed of trust, and he took the Fifth to all of them.

**MR. RANGEL:** And you can look --

**THE COURT:** And then he subsequently answered you. So I don't see why you don't subpoena him, and I will order him to testify because he can't take the Fifth and partially answer like he did. That's not going to work. And you can bring in Mr. Barroso and anything you want. That's the way that goes.

**MR. RANGEL:** May we confer?

**THE COURT:** Yes, you can.

**MR. RANGEL:** Okay.

**THE COURT:** You can't take a little bit of the Fifth.

**MR. RANGEL:** Judge, he was not my client.

**THE COURT:** I realize that. And he had a criminal defense attorney who was very able.

**MR. B. GUTIERREZ:** But he was in 2005, he was their client.

**MR. SOLTERO:** He was --

**MR. RANGEL:** He didn't take the Fifth in 2005, your Honor. He answered the questions in 2005.

**MR. SOLTERO:** Judge, the *Harold* case says that when you have subsequent -- (indiscernible) of subsequent testimony here would be prior testimony.

**THE COURT:** Let me tell you this. That's not in this case. The 2005 case is not before me. What I have is this case right now, and he's taken a partial Fifth and then answered all kinds of things about forged signatures after that.

Now, if you want him to, I will compel his testimony or he can sit in the marshal's office until he decides how to proceed. But that, to me, is a partial -- you know, you can't do that. You can say your name, you can say where you live, and then you've got to be quiet if you want to take the Fifth. You can't just go answering, you know, cherry-pick around.

**MR. RANGEL:** We will confer, your Honor.

**THE COURT:** Okay. Now I'll go look that up again, but I'm quite stunned at this. I have done quite a bit of criminal law in here.

**(Laughter)**

**MR. RANGEL:** We recognize that, your Honor.

**THE COURT:** Well, I recognize one when I see one.

**(Laughter)**

**THE COURT:** That is a Fifth Amendment claim.

**THE CLERK:** All rise.

**THE COURT:** We'll be in recess until -- how about five of 1:00? Or do you-all want lunch? Is that it?

**(Laughter)**

**THE COURT:** One o'clock.

**(A recess was taken 12:16 p.m. to 1:06 p.m.)**

**(Parties and Counsel are present)**

**(Outside the presence of the jury)**

**THE COURT**: Okay. I'm wrong about the Fifth Amendment. You can take it a question at a time. It's just when we have people take it in here they do it outside the presence of the jury. In the criminal trials, they do it for everything.

**MR. RANGEL**: I have conferred with Mr. Rumley and Mr. Gutierrez and that issue is not going to come up again this afternoon.

**THE COURT**: Okay.

**MR. RANGEL**: We're going to see if we can work something out at the end of the day and then report to the Court. But that will not be an issue this afternoon.

**THE COURT**: Okay. Well, I was wrong.

**MR. RANGEL**: Judge, that's the first time.

**THE COURT**: I know. I mean, I just feel devastated.

**MR. LOCHRIDGE**: Can we take the afternoon off, your

Honor?

**THE COURT**: Yes. I have to work. You all can take the afternoon off. How's that? As a just reward.

Ready? Would you bring them in?

**THE CLERK**: All rise for the jury.

**(Jurors enter courtroom at 1:07 p.m.)**

**THE COURT**: Thank you. You may be seated.

**MR. B. GUTIERREZ**: May I proceed, your Honor?

**THE COURT**: You may proceed.

**CROSS EXAMINATION (RESUMED)**

**BY MR. B. GUTIERREZ:**

Q Mr. Booth, before we recessed for lunch we had looked at your testimony concerning that question that I believe we agreed was a mistake. The court reporter apparently had made a mistake, having you had answered it as if you had mentioned "released the loan." Do you remember that?

A Yes, sir.

Q Okay. And I believe you testified that you looked at it and you felt you hadn't said that and that was a court reporter's mistake. Do you remember that?

A Yes, sir.

Q Okay. But what I showed you, that's what we were talking about and this word here, the release of the loan, is where we are agreeing that that was a mistake. It should have said the "release of the land," right?

A Yes, sir.

Q And I think when we see the audio portion --

**THE COURT**: Hear the audio.

**MR. B. GUTIERREZ**: I'm sorry. Excuse me.

**THE COURT**: When we hear the audio.

**BY MR. B. GUTIERREZ**:

Q When we hear the audio, apparently we'll see that, you know, apparently that was a mistake.

A Yes, sir. I think so.

Q But what I was asking you -- and I believe, your Honor, that the Court has permission to publish this to the witness -- this prior testimony?

**THE COURT**: Yes, sir.

**BY MR. B. GUTIERREZ**:

Q And you've already seen the question. We showed it to you before the lunch break and do you dispute that you have testified under oath what is reflected there on line 22 and 23 of page 130 of your deposition?

A No, sir.

Q Is that true?

A That's what I said in the deposition, yes.

Q Well, what you said in your deposition is that you -- the decision that you had made was to release any loan that had land associated with it, right?

A No, sir. That's not the way I interpreted the question,

 no, sir.

Q Excuse me, sir, but that was your testimony.

A Yes, sir. That was my testimony.

Q In fact, Mr. Rumley at that deposition continued a couple of lines down and asked you what dates, what loans, was it just one loan, was it just the Trevino loan? He didn't mention Trevino -- he said, "Was it just one?" Do you remember that question?

A No, sir.

Q And do you remember testifying that it was all outstanding loans? Do you remember that?

A No, sir.

**MR. B. GUTIERREZ**: May I publish this to the witness, your Honor?

**THE COURT**: Yes.

**BY MR. B. GUTIERREZ**:

Q We go down to page 131, line 1. Do you see the question there by Mr. Rumley?

A Yes, sir.

Q Can you see your answer on line 2?

A Yes, sir.

Q Was your testimony truthful on that day?

A Yes, sir.

Q Did you, in fact, testify under oath that when you were asked by Mr. Rumley what loans -- or excuse me -- what you were

releasing and you said, "All the outstanding loans"?

**MR. RANGEL**: I object, your Honor. That's not what the testimony says.

**THE COURT**: I don't know what it says. Let me see it.

**MR. B. GUTIERREZ**: May we approach?

**(Begin bench conference at 1:12 p.m.)**

**MR. RANGEL**: Questions 1 and 2. There's nothing in there about releasing all loans.

**MR. B. GUTIERREZ:** You start at line 19, 130, and continue.

**THE COURT**: What did you say? What was the question?

**MR. B. GUTIERREZ:** If that's what he had testified and then he says, "No," that he didn't --

**MR. RANGEL**: No. He said, "Do you agree that you testified that you were releasing all loans?"

**THE COURT**: That were land related.

**MR. RANGEL**: Right. He's releasing the land on all loans, but he's not saying --

**THE COURT**: No. He just said, "It's my understanding it was any loans that had land associated with it."

**MR. RANGEL**: We've already covered that. He's going to the following -- line 1 on the following page.

**THE COURT**: Oh.

**MR. RANGEL**: If he asks him that question, he'll say

that's what's in the answer but he keeps changing the question on him and saying, "That's what you testified to."

**THE COURT**: All outstanding loans (indiscernible).

**MR. B. GUTIERREZ:** Well, he testified to loans -- releasing all loans.

**THE COURT**: That's not what it says. My understanding was that as it relates to land.

**MR. B. GUTIERREZ:** Exactly. Related to land.

**THE COURT**: Same thing.

**(End bench conference at 1:14 p.m.)**

**BY MR. B. GUTIERREZ:**

Q And we'll move on, Mr. Booth. But your testimony was that you were releasing all loans related to land, right?

A Referring to that deposition, sir?

Q Yes. To the deposition that you gave in June of 2010.

A No, sir. What I said was outstanding -- loans that had not been paid in full that had land. The land would be released.

Q Do I need to show you this again? You say, "Any loan that had land associated with it." Isn't that what you testified to?

A Sir, I didn't see the question prior to that. I didn't read the previous questions. I don't know the context. What I said is written there.

Q It's the same question, sir. It's the same question

there, line 1 --

**MR. RANGEL**: Judge, asked and answered. He has not backed away from the answers that are in the transcript and I would object to trying to re-characterize it. He is not contesting the answers that are in the transcript. It's a different interpretation to it and I would object.

**MR. B. GUTIERREZ:** I'm just asking the witness, your Honor, if he testified that when he was asked which -- concerning the releases -- which ones, "How did you decide which ones were being released?" And he testified, he said that any loan that had land associated with it.

**THE COURT**: Okay. Go ahead.

**MR. RANGEL**: The transcript speaks for itself, your Honor. He's not --

**THE COURT**: There's no word in there about transfer. Go ahead and ask the question.

**BY MR. B. GUTIERREZ:**

Q Do you see the question? Line 19, sir.

A I cannot see it on this screen.

**THE COURT**: Do you want to zoom it in a little bit on that one?

Q It's on this screen.

A Okay. Are we talking about line 22?

Q No. I said line 19, sir, page 130.

A 130.

Q Beside the highlight. Do you see the highlight?
A I see the question on line 19.
Q Okay. And do you see your answer?
A Yes, sir. I do.
Q And what was the answer?
A My understanding is it's any loan that had land associated with it.
Q That's what we've been trying to (indiscernible).
A Yes, sir. That's what I said.
Q It talks about loans and that's why I was asking you these loans that you're talking about were the land-in-lieu program loans that you all were marketing out at Store 214, right?
A Yes, sir. I was referring to the land-in-lieu transactions.
Q Let me show you the -- we've looked at the retail installment contract quite a bit now, but I wanted to ask you one question concerning this retail installment contract, which is Exhibit Number 8. Turn on the screen. And this is a retail installment contract. And I wanted to ask you -- if we go to page 4 of this retail installment contract -- who is this individual here?
A Brenda Eden.
Q Yes, sir. Who's that?
A She works in Knoxville in the corporate office in the sales processing area.

Q How long has she been there?
A Sir, I don't know how long she's been with the company, but --
Q She was there in 2005, right?
A Yes, sir.
Q In fact, she was in Knoxville in 2005 on January the 5th, 2005, right?
A I believe she was. She was working for us then.
Q So, certainly, this document -- this retail installment contract Number 8 -- could not have been given to my clients -- they've already testified they haven't received it -- but this lady, wherever she is in Knoxville, signed it in Knoxville, right? She had to have received that contract in Knoxville in order for her to receive it -- in order for her to sign it, right?
A Yes, sir.
Q So, as far as any assignment is concerned, certainly this was not any notice to Mr. Flores or Mr. King that there had been any assignment of this contract, retail installment contract Number 8.
A I think it said that at the very top of the document when they signed it.
Q Do you consider this to be the notice of assignment to Mr. Flores and Mr. King?
A At least one of the notices. It says that on the retail

installment contract that it's going to be assigned to Vanderbilt Mortgage.

Q That it's going to be assigned; does it say when it was going to be assigned?

A No, sir.

Q Wasn't that supposed to be part of the notice to the purchasers that you tell them when you're going to -- when the assignment occurs?

A No, sir. I don't know of any requirement for that.

Q You're not familiar with the Retail Settlement Practices Act?

A No, sir.

Q Other than this document Number 8 that I believe you now claim was notice of the assignment, do you know of any other written notice of assignment that was provided to my clients, Mr. Flores and Mr. King, concerning that assignment? Have you seen any other notice, any other letter that went and that was furnished to my clients, Mr. Flores and Mr. King, concerning an assignment of their contract to Vanderbilt Mortgage?

A No, sir. None other than the documents we saw yesterday that reflected that Vanderbilt Mortgage was working with them.

Q What documents? Well, to be a service contractor and be servicing the loan is one thing, right? I mean, that's actually what Vanderbilt was doing; they were servicing this loan.

A They also owned the loan.

Q Well, I mean, they were servicing the loan. That's the only thing that was sent to Mr. Flores and Mr. King, that they would be servicing their loan. That's why they got a payment book, a booklet.

A They were doing that, yes, sir.

Q They were servicing the loan. But they never got any notice from Vanderbilt or, for that matter, from CMH Homes that this contract that they had executed, had signed on January 5th, 2002, had been assigned, right?

A I don't know if they did or not, sir.

Q Is there a reason why you're looking to counsel table --?

A No, sir. No. I'm just looking straight out, sir.

Q Now, this document here talks about collateral. I believe Mr. Rangel went to the last page and -- talks about collateral there. Do you see that?

A Yes, sir.

Q The collateral according to the questions that were asked by counsel Mr. Rangel was supposed to be the manufactured home, right?

A Yes, sir.

Q And some land, right?

A Yes, sir.

Q Did you provide any notice to the landowners that there had been some collateral pledged on this note? I mean, I'm

asking you --

A The deed of trust and the builder's mechanic's lien.

Q Well, how about notice of this contract? Did they get notice? Did the landowners get any notice?

A I think there's a reference to that in the documents.

Q In what documents?

A In the builder's mechanic's lien and the deed of trust.

Q Have you studied the builder's and mechanic's lien contract?

A Yes, sir.

Q What does it say?

A I don't recall everything it says, but I think there was some reference there to the indebtedness.

Q Did you even send the Trevinos a copy of that mechanic's lien contract that you now claim they signed?

A Sir, they should have received a copy at the time they signed it.

Q Is that what you believe?

A Yes, sir. That was the process.

Q Sir?

A That was the normal process. They would have received it.

Q How about the deed of trust?

A The same thing, yes, sir.

Q In spite of testimony that you've heard from other witnesses?

A I read Mr. Lance Kimball's testimony and he testified that they were there. They signed them.
Q In fact, Mr. Kimball said that they were there on January the 5th, right?
A I don't remember the date.
Q They were there at the closing. Wasn't that his testimony?
A I don't remember the exact testimony. I just remember he said he met them and they signed the documents.
Q Except that those documents had a different date, right?
A Yes, sir. I've seen the documents. They were dated two days later.
Q One of your policies and you were talking about good policies earlier this morning and one of the policies that you had in place back in 2002 was a requirement that your sales associates make an audio recording of every closing, right?
A Yes, sir.
Q And, in fact, you've testified to that under oath, right?
A Yes, sir.
Q Did you know that a request has been made of the audio closing of this transaction and Vanderbilt Mortgage, your company, has told us that they had been unable to locate the tape.
A Yes, sir. That's my understanding.
Q Have you made any effort to locate it?

A Yes, sir. We sent a team in there to collect those tapes and to send them to Knoxville.
Q What happened to it?
A I don't know.
Q Do you think that if we had that tape it would clear up a lot of questions as to who was there and who was not there on January the 5th?
A I think it would indicate who was there on the 5th; not necessarily on the 7th.
Q Well, at the closing.
A There was not just one closing. There was a closing with the buyers of the home. There could have been subsequent meetings with the folks that were pledging the land.
Q Where is that tape?
A I don't know.
Q So, there's more than one tape, then, or what?
A Sir, I don't know. I wasn't there. That was ten years ago.
Q Should there be more than --
A Sir?
Q Should there be more than one tape -- audio closing tape?
A Not necessarily, no.
Q So, you would record one but you wouldn't record the other?
A Typically, they'd all be recorded at the same time.

Q You talked about hindsight? "We should have sent and we should have notified the landowners of the releases and the customers of the releases." Do you remember that testimony?
A Yes, sir.
Q What's preventing you from doing it now? This hindsight that you're talking about. When do you plan to do it?
A That's not my responsibility, sir.
Q How about this documents that are at the courthouse? We have a deed of trust, for example. This is just on the (indiscernible). A deed of trust; we have a mechanic lien contract that you know we are claiming are forged or fraudulent. You understand that, right?
A I'm saying there were questions concerning --
Q But you understand what our allegations are?
A I understand the allegations, yes, sir.
Q And, of course, you've released not only this deed of trust, not only this mechanic lien contract, but hundreds of them, right?
A Yes, sir.
Q What have you done concerning the actual document that's there at the courthouse? Are you going to or are you planning to take another step, maybe visit with the official that is in custody of the official property records from the different counties, where this suspect documents -- we can call them suspect, because you've already told us you don't know which

are bad and which are good, so you released them all -- have you decided what are you going to do with those, and I'll just call them suspect documents? Do they stay there for eternity?

Are you going to try to get together with some public officials and say, "You know what? We released something but we think we need to purge those so that you can get your records straight and remove all of this tainted, suspected documents." Do you plan to do anything like that?

A Sir, my understanding is that when we released the liens, the builder's mechanic lien --

Q Yes, sir.

A -- and the deed of trust lien, that those were received back in Knoxville. Vanderbilt received those, as I understand it, and they were filed in the files and they will be returned at such time as the loans are paid.

Q Mr. Booth, I believe those are all the questions I have, sir. Thank you.

A Thank you.

**MR. B. GUTIERREZ:** That's all the questions I have.

**THE COURT**: Thank you.

**MR. RANGEL**: May I proceed, your Honor?

**THE COURT**: You may.

//

//

//

**REDIRECT EXAMINATION**

**BY MR. RANGEL:**

Q Mr. Booth, do you remember this morning when Mr. Rumley presented that deposition testimony and suggested you weren't telling the truth when if the word loan appeared in the court record as opposed to land?

A Yes, sir.

Q And what did you tell Mr. Rumley.

A I told him I didn't believe I said that; that that was incorrect.

Q And the deposition -- your deposition that was taken on that day -- there was a court reporter taking down what you were saying, right?

A Yes, sir.

Q But additionally there was a videographer that was taping your sound and your picture, correct?

A Yes, sir.

**MR. B. GUTIERREZ:** Your Honor, we object to this line of questioning. I believe we stipulated that was an error. I felt I had cleared it up with Mr. Booth and so our objection is relevancy with respect to this line of questioning.

**MR. RANGEL:** Judge, the stipulation does not take away what was said this morning and we want to show the jury the audio that makes it clear that he said land. Just because they stipulated in order to say that, I think the jury's

entitled to see and hear him explain why Mr. Booth was so adamant that he hadn't said that. It's very short, your Honor.

**THE COURT**: Go ahead.

**MR. RANGEL**: I would ask the tech person to play the audio of the question and answer.

**(Playing excerpt of David Booth deposition)**

"Q All right, sir. Are you here on behalf of the corporation with respect to the lien releases that were filed in the fall of 2005 related to Store 214?

"A Yes, sir. The decision to release the land."

Is that true and correct representation of what you said that day?

A Yes, sir.

Q And what was it that you said with respect to what you were releasing?

A I said "release the land."

Q I will have now the tech person put up the written transcript of that question and answer.

"All right, sir. Are you here on behalf of the corporation with respect to the lien releases that were filed in the fall of 2005 related to Store 214?

"Yes, sir. The decision to release the land."

Is that still your testimony, Mr. Booth?

A To release the land? Yes, sir.

Q And when Mr. Gutierrez presented you with other questions

                      and answers, is your testimony that the intention was to release the land only.

A My intention was --

**MR. B. GUTIERREZ:** Objection, your Honor. Mr. Booth has testified --

**THE COURT**: Sustained.

**BY MR. RANGEL:**

Q What was your intent in filing the builder’s and mechanic’s lien release and the deed of trust release?

A To release the land on all transactions that were land-in-lieu.

Q Given the nature of the problem that had been identified at Sales Center 214, would it make any sense to release the indebtedness?

A No, sir.

Q Why not?

A Because there was no controversy surrounding the retail installment contracts that had been signed by the homeowners. It was simply the controversy, as I understood it, all revolved around the land transactions, the land that was pledged as partial collateral.

Q In fact, with respect to the retail installment contract that is Exhibit 1 here, involving Mr. King and Mr. Trevino, did you hear them admit that they had signed their signatures to that contract?

A Yes, sir.

Q And there was no dispute about that.

A No dispute about it.

Q And let's pull up the retail installment contract.

Mr. Gutierrez asked you questions about when the assignment would be effective. Is there something in the first paragraph that addresses that?

A Yes, sir. It says that the seller will submit his contract to Vanderbilt Mortgage and Finance and, if approved, the contract will be assigned to Vanderbilt Mortgage and Finance.

Q And was, in fact, this contract approved by Vanderbilt?

A Yes, sir. The deal was funded.

Q And at some point, did Mr. King and Mr. Flores receive payment booklets from Vanderbilt so they could make their payments to Vanderbilt?

A Yes, sir.

Q And did they do that according to the testimony that you heard?

A Yes, sir. That's what I heard.

Q I also would like to pull up CP-154, page 8.

Was this included in the package that was given to Mr. King and Mr. Flores?

A That's what I heard yesterday, yes, sir.

Q And is this notice to Mr. King and Mr. Flores that the

contract and the indebtedness had been assigned to Vanderbilt?

A Yes, sir. I think so.

Q And is it your understanding, based on what you heard, that all of the payments that Mr. King and Mr. Flores made starting in March of 2002 went to Vanderbilt?

A Yes, sir.

Q When you filed the deed of trust and the builder's and mechanic's lien, what was your intent in doing so?

A To record the lien on the land that had been pledged as partial collateral in this deal.

Q In filing those, did you have any intent to cause any financial harm or injury to Mr. and Mrs. Trevino?

A No, sir.

Q Were Mr. and Mrs. Trevino signers on the retail installment contract?

A No, sir.

Q Were they obligated to pay that debt under the retail installment contract?

A No, sir.

Q What was the extent of their obligation?

A Their land had been pledged. So, their land could have been at risk.

Q Before the builder's and mechanic's lien release and the deed of trust release were filed, was there ever any attempt to collect any money from the Trevinos?

A No, sir.
Q Was there ever any attempt to foreclose on that land?
A No, sir.
Q Has Vanderbilt ever attempted to foreclose on the land?
A No, sir.
Q Once the releases were filed in October of 2005, was there any remaining lien on that land?
A Not regarding this transaction; not to my knowledge.
Q The builder's and mechanic's lien had been released and the deed of trust lien had been released?
A That's correct.
Q And to this day, that's where it stands?
A Yes, sir.
Q Those liens have been released on that land?
A Yes, sir.
Q You understand, Mr. Booth, that this litigation started when Vanderbilt filed an action to re-possess the mobile home involved?
A Yes, sir.
Q And did Vanderbilt sue the Trevinos?
A No, sir.
Q Who has Vanderbilt sued in this case?
A Mr. Flores and Mr. King, I guess, that had signed on the retail installment contract.
Q Has either --

**THE COURT**: Sorry. The light wasn't coming on.

**BY MR. RANGEL:**

Q -- Mr. and Mrs. Trevino are parties in this case -- it's your understanding that they are parties in this case?

A The Trevinos? Yes, sir.

Q Has either Vanderbilt, CMH Homes or CHI sued the Trevinos?

A No, sir. Not to my knowledge.

Q Is it your understanding that it is the Trevinos who have sued?

A Correct.

Q With respect to the notaries, what expectation did you have as far as the notaries at the Sales Center 214 with respect to complying with whatever rules and regulations that the state law requires from them?

A I thought every notary at the time they became a notary, they applied, they were appointed as notaries. I thought they understood what their obligations were and in everything surrounding the notary practice it was their responsibility to exercise that in a proper way and to be responsible as notaries.

Q And the signatures of Mr. Flores and Mr. King on the retail installment contract, were those signatures notarized? Did they have to be notarized?

A No, sir. They did not.

Q Thank you, Mr. Booth.

A Thank you, sir.

**RECROSS EXAMINATION**

**BY MR. RUMLEY:**

Q Just a few more questions. One of the competitive advantages that Clayton Homes had over other manufactured companies is they owned their own bank, right?

A Yes, sir.

Q And that was something that was marketed, that your sales people would market to people is, "We own our own bank so we can do things that other people can't do." True?

A I've heard the statement, "We own our own bank."

**MR. RUMLEY**: Your Honor, I'd offer Defendants' Exhibit 218.

**MR. RANGEL**: No objection, your Honor.

**THE COURT**: 218 is admitted.

**(Defendants' Exhibit Number 218 was received in evidence)**

**BY MR. RUMLEY:**

Q Thank you. Mr. Booth, let me ask. Have you seen this document before? "The CMH Difference"?

A I think I have.

Q We talked about it during your deposition?

A Yes, sir.

Q Okay. If we look at -- I don't know if you want to call it the motto or CMH Difference, "We must understand the value of what we have. We must not take for granted what we have.

We must protect what we have. And we must tell others what we have." Do you agree with that proposition?

A Yes, sir.

Q If we go to the next page, one of the differences that you all were able to offer was -- and we talked about this -- compensation program. Managers 40 to 50 percent, where your competitors, the managers only got 28 percent. Do you see that?

A Yes, sir.

Q Right? And you agree with that, right?

A Yes, sir.

Q Sales people, up to 25 percent, no penciling. Would you agree with that?

A Yes, sir.

Q If we come down, the things we didn't talk about is in addition to receiving the money that we talked about, the compensation we talked about earlier, you all had programs where you would take your top salesman to Mexico or Hawaii or vacation spots, right?

A Yes, sir.

Q They were rewarded with other rewards other than compensation, right?

A Yes, sir. They were top achievers.

Q And one of the things that you all would do is have a sales academy where the sales people would go to the academy,

right?

A Yes, sir.

Q And those individuals would go there and they would share their ideas on how they were able to successfully sell homes, right?

A It was primarily training that we offered, but they visited with the sales people while they were there.

Q And John Wells, Ben Frazier, Robin Moore, Lance Kimball; do you know whether or not they all went to this academy and shared with others how they were able to be so successful in selling homes in 2002?

A I don't know if they all went. I know that some of them probably went.

Q But you all would go in groups and you would share ideas, right?

A Yes, sir. We'd have about 30 sales representatives at a time.

Q And if we come down here, team VMF, we have the statement, "We own the bank," right?

A Yes, sir.

Q And because -- actually, does CMH own the bank?

A No, sir.

Q Clayton Homes, Inc. owns the bank, right?

A That's correct.

Q We talked a little bit with Kim Russell about this bad

cop/good cop, bad guy/good guy?

A Yes, sir.

Q Your sales people, store manager, would actually go and help collect on the debts, right?

A Yes, sir. They would try to make contact.

Q And one of the things -- not only did you provide commissions to encourage sales of homes, but what you also did as a company is you placed financial consequences on the store if their customers didn't pay, correct?

A Yes, sir.

Q And so, in other words, if John Doe didn't make their payments, not only did it hurt Vanderbilt, who according to your testimony they owed the debt to, but it also affected the store, right?

A Yes, sir.

Q So, if they didn't make their payment, the store, John Wells, got less money, right?

A Yes, sir.

Q We also heard from Ms. Russell yesterday, or maybe it was this morning, that this company has a zero tolerance for fraud and forgery. Is that true?

A Yes, sir.

Q Is there a zero tolerance policy for fraud and forgery with this company regardless of the circumstances?

A Sir, there is a zero tolerance for fraud and forgery in

this company.

Q Do you remember what your answer was in your deposition?

A Yes, sir.

Q What was your answer?

A That you had to look at individual situations and make sure that you interpreted what had happened correctly.

Q And so your testimony is different today?

A I think that if it's confirmed that there was fraud and forgery, then it's zero tolerance.

Q Sir, there's either a zero tolerance for fraud and forgery or there's a policy of it depends on the circumstances. At this company, is there a zero tolerance for fraud and forgery?

A Yes, sir, there is today.

**MR. RUMLEY**: No further questions.

**THE COURT**: Mr. Gutierrez?

**MR. B. GUTIERREZ:** Yes, your Honor. I think, with your permission, I'm wondering if it would be easier if we'd pull up Exhibit 154. Is that okay?

**THE COURT**: Sure.

**MR. B. GUTIERREZ:** Could we -- 154, I believe it's page 8.

**RECROSS EXAMINATION**

**BY MR. B. GUTIERREZ:**

Q I think I just have maybe a couple of questions and that pertains to the question of the assignment, a question of

whether or not there was an effective assignment to my clients, Mr. Flores and Mr. King. Okay?

A Yes, sir.

Q One of the questions -- could we have the entire document?

One of the questions, I believe, from Mr. Rangel was -- and I might have misunderstood that -- are you claiming that this document, page 8 of 154, is a notice of assignment?

A No, sir.

Q Okay. This is not --

A I think it's just evidence of the assignment.

Q No. The question is, is this a notice of assignment to my clients, sir, Mr. Flores and Mr. King?

A Maybe not officially, no, sir.

Q Okay. That's all the questions I have. Thank you.

**THE COURT**: Mr. Rangel? Go ahead.

**FURTHER REDIRECT EXAMINATION**

**BY MR. RANGEL:**

Q Okay. Mr. Booth, given that from the first payment, Mr. King and Mr. Flores sent the payments to Vanderbilt for seven years, did that give them notice that there had been an assignment of the debt and the contract to them?

A Yes, sir.

**MR. RANGEL**: No further questions.

**MR. RUMLEY**: No more questions, your Honor.

**THE COURT**: Thank you, sir. You may stand down.

Call your next witness.

**MR. LOCHRIDGE**: Your Honor, we'd call Michael Shelton.

**(Pause)**

**MICHAEL SHELTON, PLAINTIFFS' WITNESS, SWORN**

May I proceed, your Honor?

**THE COURT**: Yes, sir.

**MR. LOCHRIDGE**: Thank you very much.

**DIRECT EXAMINATION**

**BY MR. LOCHRIDGE:**

Q Would you introduce yourself to the jury, please?

A Yes. My name is Michael Shelton and I'm currently the remarketing processing manager with Vanderbilt Mortgage and Finance.

Q Tell me a little bit about yourself. Where were you born and raised?

A I was born in Clinton, Tennessee; raised there until about the age of 20. But I lived in the same general area.

Q Is that in the Knoxville area?

A It is.

Q All right, sir. And you're married?

A Yes, sir.

Q Any kids?

A Yes, sir. I've got one son, nine years old.

Q Now, where did you go to college?

A I went to college at the University of Tennessee in Knoxville.
Q And did you graduate from there?
A Yes, sir, graduated from there.
Q Did you get -- what kind of degree did you get?
A I've got a degree in operations management.
Q Can you tell us just a little bit about what that means?
A It's a business degree. It's basically my study was in, you know, managing teams.
Q Managing the processes of a company; that sort of thing?
A Yes, sir. Managing processes, production, that type of thing.
Q When did you graduate from college?
A I graduated in 1997.
Q When did you go to work for Vanderbilt?
A Same year, 1997.
Q Right out of school?
A Yes, sir.
Q All right. And walk us through the jobs you've had since you've been at Vanderbilt now 13 years.
A Yes, sir. I started out with Vanderbilt as an account representative. I did that for about a year. It's a job where we would call on delinquent accounts. After that, I spent a year as a land home auditor for a refinance department. And basically I would audit the files that would come into us.

For about the next three years after that I was a credit manager, which is where I would review the credit information, make credit decisions to approve and decline loans. For the next four years, I was the document services manager. I managed a number of departments, but basically it was the mail room. It was a document center. We have an imaging department where we have images on our servicing system and there was a department that does lien releases and lien assignments.

Q Let me stop you right there.

A Sure.

Q So, that period of time where you were doing this document control, what were the years that you were doing that?

A It would have been from 2003 to 2007 -- early 2007.

Q Well, there's some land releases here that are dated 2005. The jury's heard a lot about it. And you were in charge of the document control at that point in time? Is that right?

A Yes, sir. I was in charge of the department that processed those releases.

Q And then you left that department in 2007 and what do you now do for Vanderbilt?

A Now I work as the remarketing processing manager and basically I manage a few support departments for a sales team. You know, we research taxes; we process title work; we pay invoices, that type of thing.

Q All right. I want to go back to the 2003, 2007 time frame or in particular the 2005 time frame.
A Yes, sir.
Q There you were document manager. Was that what you called your title?
A Yes, sir. That's correct.
Q Now, were you responsible in those days for where, for example, original documents were kept?
A Yes, sir. At the time, we would hold our original document files in the vault and it was held by our document control department, which I managed.
Q When you talk about original documents, are you talking about original deeds of trust, original retail installment contracts, original builder's and mechanic's lien contracts, all of the actual signed, original documents?
A Yes, sir.
Q And you kept them in a vault?
A Yes, sir.
Q Is that a vault like you see in the movies?
A It's a little different. It doesn't look quite like a bank vault, but we do have a locked and secured door. And basically, when you walk in there it's rows of files.
Q All right. Now, is one of the departments that you were in charge of in the 2005 time frame something called a paid out department?

A Yes, sir.

Q Okay. Would you tell the jury what the paid out department is, please, sir?

A Well, the paid out department, we did a few things. We released land; we would release liens on titles. We would also do lien assigns for any loans purchased by Vanderbilt we would assign to Vanderbilt. So, we did those type of things.

Q Okay. And in that period of time, were you responsible for having prepared and keeping track of releases of deeds of trust, for example?

A Yes, sir.

Q And were they prepared in your department?

A Yes, they were.

Q Could you put Exhibit 13 on the screen, please? Or Exhibit 12 on the screen? Just call up the top part of it.

This is a deed of trust release that the jury has seen dated October of 2005. Now, is this a form document that Vanderbilt has?

A It is, sir. It's a standard form we use.

Q They kept in a computer and you called it up and punched "print" and they print out?

A Yes, sir. The deed release clerks would fill in some of the information, but it's a standard format.

Q Now, are you one of the people that was authorized to sign the releases of deeds of trust and builder's and mechanic's

lien back in the 2005 time frame?

A Yes, sir.

Q And what is your understanding that a deed of trust release such as this is releasing?

A The deed of trust release releases the land. There's a deed of trust that's filed whenever the loan is originated and so that when we complete that release it releases it at the county, releases the land.

Q Let's go to Exhibit 13 on the screen, please.

That's a mechanic's lien release. Is that another form document that is prepared there at Vanderbilt?

A Yes, sir.

Q And is that similar to the deed of trust in the sense that it's on the computer and it's a form document?

A Yes, sir. In that sense it's similar.

Q All right. And when you would sign mechanic's lien releases, what was your intent in doing so?

A My intent is to release the land.

Q All right. Well, generally speaking, these would be involved somewhat with a retail installment contract, wouldn't they?

A Well, they would be filed after the loan originated. There'd be a retail installment contract, deed of trust, mechanic's lien; but they're actually separate documents and they do separate things.

Q Let me ask you something.

Could you just highlight the upper left hand corner there? It's got the re. There we go. And it's got a number 646307.

What does that number signify?

A It's the loan number for the account -- customer's account.

Q And is that number assigned to a loan by a customer? Is that correct?

A Yes, sir, it is.

Q Okay. Could you go back to Exhibit 12, please? And call up the same corner. No, bring the corner up where it shows the file reference. There we go.

And there you've got the same 646307 number and it's Cesar Flores' name. Do you see that?

A Yes, sir.

Q Now, what does that indicate for you -- for Vanderbilt there internally?

A Well, internally, we use the loan number to file the account. It shows the account rep that's working it; you know, what loan to pull up in the system when they file it in the vault; it shows where they filed it in the vault, those type of things.

Q By referring to this file marker, if you will, are you intending at all to -- when you file -- when they sign a deed

of trust release or a builder's and mechanic's lien release to release all the obligations that might be associated with that file?

A No, sir. And just to make clear, the deed of trust release, the only thing that it does is it releases the deed of trust that was filed to secure the lien, so it only releases the land.

Q Okay. Now, going back into the 2005 time frame, are you aware of a number of deed of trust releases and builder's and mechanic's liens releases that were filed -- that arose out of land-in-lieu transactions at the store in Corpus? Store 214?

A Yes, sir. I'm aware of that.

Q And did you have a hand in printing out some of the forms that would be used? Was that done in your department?

A Yes, sir. Our department handled it. What I did was I gave our instructions to the supervisor to release the land on any of the loans from Home Center 214 and basically the supervisor took it from there. Deed release clerks prepared the documents, sent them to the county to be filed.

Q And did you sign some of those documents?

A Yes, sir.

Q But you didn't -- you weren't -- it was Mr. Jordan that signed the documents in this particular case. Is that right?

A Yes, sir. That's correct.

Q Let's pull out the part in Exhibit 12, I believe, the

builder's and mechanic's lien release.

I want to focus on one thing -- two things. First of all, this is signed by CMH Homes, Inc. Is that right?

A Yes, sir.

Q And what was their role in this transaction with Flores and King, or with any customer?

A Well, CMH Homes, Incorporated was the dealer, so that the buyer, the person purchasing the home, they would buy the home from the dealer. And then, Vanderbilt was the financer.

Q Well, it says here -- if you could just highlight the page in full length -- and it says, "CMH Homes has been paid in full." Do you see that?

A I do.

Q What's your understanding of what that means?

A Well, my understanding of that is basically when the person buys the home from the dealership the dealership assigns that lien to Vanderbilt and the buyer completes a promise to pay on the retail installment contract to enter into the loan agreement with Vanderbilt. So, what Vanderbilt does is they pay off the dealer, CMH Homes, Incorporated, and that leaves the transaction between the customer and Vanderbilt.

Q So, CMH Homes is paid in full, but it's paid by Vanderbilt, not the customer. Is that correct?

A That's correct.

Q Now, you have a process -- well, let me go back to 2005.

You signed some of the releases of the deeds of trust and the builder's and mechanic's lien releases, but not the -- do you recall what the general instruction was to you to get these releases printed up and signed and filed?

A Yes. The instructions I received were that we wanted to release the land on all the loans that were from Home Center 214 and so I gave the instructions to the supervisor and they completed the releases.

Q Now, do you have a manual or a process for what you're supposed to do when you have a partial release such as this where you're only releasing part of the collateral versus a paid in full -- the contract -- the retail installment contract -- has been paid in full and releases are filed at that point in time? Are there procedures for what you do with the release?

A Yes, sir. We had a manual. It's the paid out manual and it basically tells the people that are doing the work, you know, how they're supposed to process that. And in this particular case, because we're going to continue securing the home and the loan's going to remain active, the instructions were to send the deed of trust release and the mechanic's lien contract release to the county, have them filed and then once they were returned we would send them to the vault.

Q Could you pull up Exhibit 59, please?

Is this the paid out department manual you're

referring to? The first page of this exhibit is 9631 -- Exhibit 59?

A Yes, sir.

Q Okay. Could you flip back to page 9728? And highlight the top part. Okay.

"Partial releases on active loans"; what does that mean?

A Well, it's similar to the situation we're talking to. It's where we were going to release, you know, either only a portion of the land or we're going to release the land but we're still going to continue to secure the home.

Q Can you give me some examples from your experience of when you would release just some of the land or some of the collateral, yet keep the retail installment contract in place?

A Yes. I can give you some general scenarios. There were times where if the customer had paid well enough and they basically requested us, they wanted to have the land released or even a portion of the land released; you know, maybe they wanted to cut out a piece for a family member or something like that, as long as it was approved by the appropriate manager, then we would prepare those releases in my department for that. And those would be an example of a partial release.

Or, you know, like in this scenario where we decided to release the land, you know, basically they would do that, as well. We would secure the home but release the land.

Q Okay. Now, these are standard operating procedures for what to do with a partial release?
A Yes, sir.
Q Okay. And the first is that they have to be authorized by the credit manager. Is that correct?
A Yes, sir.
Q And then they have to have a property description, correct?
A Yes, sir.
Q And the third is there must be a survey done to describe what property is being released. Can you tell me when that would happen, because we don't have a survey here?
A Yes, I can. What would happen is if you decided you were going to release all of the land, you didn't need a survey because you would use the same legal description that was completed at the time of closing. But if you decided to, say, you wanted to take ten acres and then cut out five acres of that, you'd need to do a survey. And that way, you'd have a good legal description for the five acres that you wanted to retain and also, you know, the five acres that you wanted to release.
Q All right. And then, the next it says -- let's highlight this, please. This is what you do with a partial release like we had in this case. "Do not mail the recorded document to the customer. It's sent to the investor to be put with the deed of

trust and/or mortgage." What does it mean by the "investor"? Is that the investor file?

A It is. It's the original document file that's held in the vault. So, in a scenario like this when they get the deed of trust release back, it's recorded, they would send it to the file to be held in the vault.

Q Now, in 2005, when you were told to prepare a bunch of these releases, were you given any specific instructions one way or the other about how the releases should be filed and sent back to the investor file or anything like that?

A No, sir. The only instructions we really received is that, you know, these are active loans. We're going to retain the security of the home and we want to release the land.

Q Was any directive given to you that you want to try to keep these releases secret or anything like that?

A No, sir.

Q You simply followed the standard operating procedure as to how you handled those releases? Fair enough?

A Yes, sir.

Q Now, I want to go through the process that you all have when you actually do have a paid in full retail installment contract; when it's been paid off and completely discharged. All right? Can we -- do you have a system for how you handle that situation?

A Yes, sir.

Q What is it called? Is it called "paid out"? Or how do you refer to it internally?

A I gotcha. Are you referring to the way the system reflects it?

Q The way the system works. What's the first thing that has to happen?

A I gotcha. Well, whenever a loan is paid out in full, the first thing that happens is the loan is coded "paid out." We have different statuses of the account that are on the system and what it does is it lets the team member, whoever goes into that loan, it lets them look at the loan and determine real quickly, you know, what the status of the loan is -- you know, active or paid out or that type of thing.

Q Could you put Exhibit Clayton CP-11 on the screen, please?

And what I'm going to do is walk you through your process here to see if we can find any indication that Vanderbilt intended to release the retail installment contract as paid in full, okay?

A Yes, sir.

Q Now, this looks like a computer screen that you have there. Could you tell the jury what we're looking at in Plaintiff' Exhibit 11?

A Yes, sir. What you're looking at is this is a screen shot. So, when the representative is in our system, you know, this is what they see. It's got some of the loan information.

Q It's pulled up as of October the 6th, 2009.

A Yes, sir.

Q Okay. And is that about the time this lawsuit was in play?

A I believe so.

Q Okay. And then, it's got the name of the account. Who's the name?

A Cesar Flores.

Q Is that the same name that we saw up in the left hand corner of one of those lien releases?

A Yes, sir, it is.

Q All right. And then, it's got the number. Is that the same number that we saw up there with those lien releases earlier?

A Yes, sir, it is.

Q Okay. So, now we've it identified. Now, it says here "legal action." What does that signify to you internally at Vanderbilt?

A Well, in this case, due to what's going on here today in court, that's why this is coded as a legal action. It basically is an indicator to, you know, any team member that had access to get into that that, you know, that it's an account that's in legal status.

Q Now, if this account had been paid 100 percent and Vanderbilt had considered it paid in full, what would we see

there where it says legal action?

A Instead of legal action, it would show paid out and it would be in bright red letters.

Q Okay. Now, let's go over here where it says "DOT 1." Can you highlight that, please?

Now, what does that mean internally at Vanderbilt?

A Well, internally we have three statuses that relate to land. DOT 1 stands for home only. If it was statused as a 2, that would stand for land-in-lieu. And what we mean by land-in-lieu is that's where in lieu of a cash down payment, the customer is putting up land in order to secure the loan. And if it were a 3, it would mean land/home and that's a situation where Vanderbilt is financing, you know, both the home and the purchase of the property.

Q And so, I guess, 1, meaning that the only security at this point in time that Vanderbilt has is what?

A Home only.

Q The home only?

A Yes, sir.

Q The mobile home itself?

A Yes, sir.

Q And that security interest is created by the retail installment contract?

A Yes, sir.

Q All right. Now, it's got a loan balance here. See where

it says "current"?

A Yes, sir.

Q Now, if Vanderbilt had intended for this to have been a paid out loan, paid in full, what would that line read?

A It would read as a zero if it were paid out because there would be no balance owed.

Q Okay. Now, let's see. Let's go over here where it says "insurer." What does that line tell us?

A Well, on this particular line, it shows that there's an insurance policy in effect on the home. And it looks like it expires January the 5th of 2010. And, you know, as the date -- it's October the 6th of 2009 -- so at that time it would have been a current policy in effect.

Q So, indicating that Vanderbilt was still concerned about whether or not the mobile home was insured, correct?

A Yes, sir.

Q And if Vanderbilt had released its security interest in the home and been paid off, does it have any interest one way or the other as to whether or not that house -- that home -- remained insured?

A No, sir, it didn't. If it's paid out we don't worry about whether it's insured or not.

Q Now, after a loan is paid off in full, does Vanderbilt then -- what does Vanderbilt then do with regard to the titling agency in Austin?

A Well, if the loan is paid out in full, what we would do is we would stamp -- well, related to TDHCA, the titling agency there in Texas, what we would do is we would take the title and we would send that -- mail it -- to the customer and it would have the lien released on the title.

Q And was that done in this case?

A No, sir.

Q And could we show Exhibit 103, please?

Can you identify Exhibit 103 for us, please, sir?

A Yes, sir. This is from Texas Department of Housing and Community Affairs' website. And basically they keep up-to-date records of current lien statuses and ownership of manufactured homes. And this is a record from that website.

Q And who does it show the lien holder to be?

A It shows it as Vanderbilt Mortgage and Finance.

Q Now let's go down to the date so we can see when this screen shot was taken -- bottom right hand corner.

In August of 2009, while this litigation was beginning to stir up, correct?

A Yes, sir.

Q Any indication at all that Vanderbilt has released its lien on this home -- this mobile home?

A No, sir.

Q Now, you mentioned also --

Could you go to the ELMO, please?

You mentioned also what you do with the retail installment contract once it's been paid in full? What do you do internally with the retail installment contract if it's, in fact, been paid in full?

A Yes, sir. If the loan's been paid in full, there's no balance owed, then basically the system is changed to status as a paid out account. When that happens, it generates a request to our document control department. That's the department that pulls the files from the vault. And so, it generates a request for them to pull the file. They then take it to the paid out department and then the paid out department, you know, they take the contract and they actually stamp it paid and then they mail it to the customer.

Q So, they would take the original retail installment contract and actually mark it paid or paid in full?

A Yes, sir.

Q Just like this? Something like that?

A Yes, sir.

Q Or just maybe just simply paid?

**THE COURT**: I'm sorry. Has that been admitted?

**MR. LOCHRIDGE**: No, your Honor. I'm just showing --

**THE COURT**: No, sir.

**MR. LOCHRIDGE**: -- what the --

**THE COURT**: No, sir. Thank you.

//

**BY MR. LOCHRIDGE**:

Q Was there any -- you've seen the original retail installment contract, haven't you?

A Sir, I haven't seen it in the file, no, sir.

Q The -- let's put Exhibit 1 up on the screen.

This is a copy of the original -- I believe the jury will get a chance to see the original retail installment contract -- and does it bear any paid or paid in full mark?

A No, sir.

Q Do you have any doubt in your mind about whether or not Vanderbilt ever intended to consider that loan paid in full?

A No, sir.

**MR. LOCHRIDGE**: Pass the witness, your Honor.

**THE COURT**: Thank you. Mr. Rumley?

**CROSS EXAMINATION**

**BY MR. RUMLEY:**

Q Good afternoon, Mr. Shelton.

A Good afternoon.

Q How are you doing?

A Doing well.

Q I've met you before, too, right?

A Yes, sir.

Q I've taken your deposition?

A Yes, sir.

Q And in that deposition you swore to tell the truth?

A Yes, sir.
Q Right? Just like you did here today?
A Yes, sir, I did.
Q Right? And you remember that I took your deposition because you signed a bunch of releases, right?
A Yes, sir.
Q And I think you referred to it as a project.
A Yes, sir, I did.
Q And you received that project from the legal department within Clayton Homes, right?
A Yes, sir.
Q And that would be from Mr. Hodges?
A Sir, I'm not sure who I received it from, but I do recall it was from the legal department.
Q Well, Tom Hodges is the general counsel, correct?
A Yes, sir.
Q For Clayton Homes, Inc., right?
A I'm not sure if he is or not, sir.
Q Well, which person within the legal department told you about this project?
A I don't recall.
Q What did they tell you about the project?

**MR. LOCHRIDGE**: Your Honor, counsel well knows that invades the attorney/client privilege. I object.

**THE COURT**: Sustained.

**MR. LOCHRIDGE**: Thank you.

**BY MR. RUMLEY**:

Q You told the jury a little bit ago that the reason why you never provided the customer or the landowner with copies of these releases was because there was a policy, a procedure. Is that right?

A Yes, sir.

Q Do you remember what your answer was when I took your deposition?

A Yes, sir.

Q What was your answer?

A Well, my answer in the deposition was that I didn't know.

Q So, sometime between the time I took your deposition and sometime up to today, somehow you figured out the answer, right?

A Yes, sir. Do you want me to explain how I learned that information?

Q I want you to tell me, sir, during the deposition, we talked about the deed of trust release, right?

A Yes, sir.

Q And the mechanic's lien releases, right?

A Yes, sir.

Q And you and I both agreed, I think, that honesty and integrity is important not only to you as a man but should be to a company, right?

A Yes, we did.

Q And if there's a situation, regardless of whatever it is, that arises to the level where a project is created for hundreds of releases are filed, do you believe that as a company that one way to demonstrate their honesty and integrity is to tell the customers? You agree with it?

A No, sir, I wouldn't agree with that. I think it would all depend on the circumstances whether we should or should not notify them.

Q Well, if a document is being released because there is a signature forged in a transaction, should the customer be told?

A I'm not sure the answer to that.

Q If a document -- a deed of trust -- is forged and you file a release because the deed of trust is forged, should you tell the customer?

**MR. LOCHRIDGE**: Your Honor, I'm going to object to that. It's a violation of the Court's order. There's no evidence of forgery in this case. I object it violates the Court's order.

**THE COURT**: All right. That's overruled.

**THE WITNESS**: I don't know the answer to that. If I may say, you know, it's something that in my position I'm not responsible for. I think I'd have to weigh the decision or, you know, weigh the circumstances to make a decision on it.

//

**BY MR. RUMLEY:**

Q But you're here to talk to the jury, right?

A Yes, sir.

Q If you found out, sir, that the notary signature on a deed of trust is forged, should you tell the customer?

A I don't know.

Q In fact, Mr. Shelton, I asked you in your deposition if Vanderbilt were to make a mistake, you don't know whether or not you should even tell the customer, right?

A Yes, sir. I said that.

Q In fact, I asked you if a customer accidentally -- accidentally -- made ten payments. The bank messes up and it shoots out ten payments -- accidentally makes ten payments, you said you don't know if you would even tell the customer. Is that right?

A I believe that I said that. Now, what I said, though, too was that we should not continue to accept payments from someone who's paid out their obligation.

Q Sir, the question was very clear, okay? If you could answer my question, please, sir?

A Yes, sir, I will.

Q If a customer accidentally -- for whatever reason -- accidentally made ten payments, would you tell the customer?

A Well, it's not my decision to make. I believe that we should. If they've paid too much money to us, we should notify

them and refund the money.

Q What was your answer in your deposition?

A It was, “I don’t know.”

Q So, now you believe that they should be told if they made ten payments, correct?

A Well, I would say if they pay us more money than what is owed.

Q Well, it’s true is it not, Mr. Shelton, that you don’t know whether or not the paid in full language in the release was included as a mistake, correct?

A That’s true.

Q You told us, I think, earlier that it was a standard form printed out or something, but the truth is, is that you don’t even know perhaps it was a mistake that it was in there, right?

A Well, it was a standard form and I’m not aware of any mistakes with that form.

Q Well, do you know whether or not paid in full was a mistake?

A I know the loan is not paid in full.

Q Do you know if the loan was discharged because of fraud and forgery?

A No, sir, not to my knowledge.

Q You understand -- do you know David Barton?

A Yes, sir.

Q If there’s a situation, sir, where you discover fraud and

forgery in a transaction, do you have the authority to discharge the debt?

A No, sir, I don't.

Q Do you know if David Barton does?

A I'm not sure if he does or not.

Q How about Mr. Nichols?

A I would say that Mr. Nichols would have that authority, sir.

Q And do you agree that that would be the right thing to do for a mortgage company if they figured out that there was fraud and forgery in the transaction, the right thing to do would be to discharge the debt?

A I don't think that I could agree to that, because without knowing all of the circumstances, I'm not sure that I could make that decision.

Q Well, those are the circumstances. You know the documents are forged and fraudulent. Is that a situation where a company like Vanderbilt should discharge the debt?

**MR. LOCHRIDGE**: Your Honor, I object. That's an incomplete hypothetical.

**THE COURT**: Well, it's his hypothetical. So, that's overruled.

**THE WITNESS**: Well, if we take the, you know -- I guess it would depend on what's forged, you know? I mean, if you could give me some more details about what was forged. I

mean, I'm not aware of any forgeries, so let me just say that and, I mean, I'll try and answer your questions as best I can, but, you know, if a document was forged, I would say it wouldn't be a valid document.

**BY MR. RUMLEY:**

Q Have you read the deposition of Benjamin Frazier?

A I've read portions of it, yes.

Q What did he say?

A If I remember correctly, he said that I guess that he had signed others' names on notary sections.

Q No. Actually, Mr. Frazier testified his signature was forged, right?

A Yes, that's correct.

Q And is that acceptable to you? Someone works with Vanderbilt?

A What do you mean works with Vanderbilt?

Q You work for Vanderbilt, right?

A Yes, sir, I do.

Q Is that acceptable to you to find out that your sales manager, your notary on documents is forged? Is that acceptable?

A No, sir. I mean, we wouldn't accept that.

Q Now, it's my understanding, Mr. Shelton, that if we accept what they're claiming about this assignment that it would be CMH is the one that would file the release of a mechanic's

lien, correct?

A Well, I think it would be based on whoever's listed on the builder's and mechanic's lien contract.

Q Well, it's true is it not that you signed on behalf of Vanderbilt a number of mechanic's lien releases?

A Yes, sir. I did.

Q Do you know why that is?

A Well, I don't know exactly. I mean, I would have to see the builder's and mechanic's lien contracts on those, but typically, what should be is, you know, if the builder's and mechanic's lien was in the name of CMH Homes, Incorporated, it would be signed by one of their representatives. If it was in the name of Vanderbilt or had been assigned to Vanderbilt, then it would be signed by a representative of Vanderbilt.

Q Do you agree with me that when --

Your Honor, defendants would offer Exhibit 47.

**MR. LOCHRIDGE**: We have no objection, your Honor.

**THE COURT**: Defendants' 47 is admitted.

**(Defendants' Exhibit Number 47 was received in evidence)**

**BY MR. RUMLEY:**

Q Mr. Shelton, you signed a number of releases, correct?

A Yes, sir.

Q And you signed a number of releases related to Store 214, this project, right?

A Yes, sir.

Q And if we look at Exhibit 47, this is what we've talked about, a deed of trust release, right?
A Yes, sir. I see a deed of trust release.
Q And clearly you had the authority from the board of directors to sign this on behalf of Vanderbilt, right?
A Yes, sir. To be clear, my boss, Robert Roulet (phonetic), had given me authority to sign these documents.
Q My question was did you have authority, sir?
A Yes, sir. That's my understanding.
Q And is this your signature?
A Yes, sir, it is.
Q And when you signed this document you did so under oath, right?
A Yes, sir.
Q And if we read right here, this deed of trust says it was released, the deed of trust and/or mortgage, right?
A Yes, sir.
Q And when you filed a deed of trust release that released the deed of trust for the mortgage, you had authority to do so, true?
A Yes, sir.
Q If we look at the next one, it's a mechanic lien release. Do you see that?
A Yes, sir, I do.
Q But here, Vanderbilt is the one signing the release.

A Yes, sir.

Q All right. And so, if the mechanic lien contract was in CMH's name, why would Vanderbilt be releasing that contract?

A Well, as I mentioned earlier, it's possible that the mechanic's lien contract had been assigned to Vanderbilt.

Q And if it hadn't been assigned, then what would you sign?

A Well, if the builder's and mechanic's lien contract were in the name of CMH Homes, Incorporated and had not been assigned to Vanderbilt, was not in Vanderbilt's name, it should have been signed by a CMH representative and should have stated CMH Homes, Incorporated.

Q Okay. So, if it had been assigned to Vanderbilt, then Vanderbilt would have signed the mechanic's lien release, correct?

A That's my understanding.

Q And is that something that's typical that if you have a situation where it is assigned, where CMH assigns it to Vanderbilt, then Vanderbilt would be the one that files the release of the mechanic's lien, correct?

A Could you say that again?

Q Yes. The situation where we looked at where Vanderbilt has filed the mechanic lien release --

A Yes, sir?

Q That's a situation, the reason why Vanderbilt would file the mechanic lien release is because the contract would have

been assigned, correct?
A That's possible.
Q I mean, that's the reason why they would do it, right?
A Well, there could be other reasons, but that's one scenario that I'm aware of.
Q Well, if we look, Mr. Shelton -- and again, you were under oath when you signed this, right?
A Yes, sir.
Q Okay. And it says right here, "Vanderbilt" -- in this document, it says, "Vanderbilt declares that it is the true and lawful owner and holder of that certain note and indebtedness secured by the mechanic's lien." Did I read that --?
A Yes, sir.
Q So, in this, what you're swearing under oath is that the note and the indebtedness had already been assigned from CMH to Vanderbilt, correct?
A Well, and to be clear, you know, on this particular release that we're looking at, I don't know exactly why it is that. And basically, what --
**MR. RUMLEY**: Objection, non-responsive, your Honor.
**THE WITNESS**: To be clear, I just want to let you know --
**THE COURT**: Would you listen, please, sir, to the question and just answer the question?
**THE WITNESS**: Yes, your Honor.

**THE COURT**: Would you repeat the question, please, sir?

**BY MR. RUMLEY**:

Q Mr. Shelton, my question is did you declare under oath that Vanderbilt is the true and lawful owner and holder of that certain note and indebtedness secured by the mechanic's lien contract? Did you swear to that? Yes or no?

A No, sir.

Q Isn't this your signature?

A It is, sir.

Q And didn't I read that verbatim?

A You did, sir.

Q But you're not swearing to it?

A No. The oath that I signed stated that I was who I say I am, Michael Shelton, and that the position I held at that time was document services manager.

Q You're not telling the truth on this document?

A No, sir. I didn't say that.

Q Well, in this document where Vanderbilt files this release, were they the owner and holder of the note?

A Yes, sir, they should have been.

Q Right. And that's your testimony, whether or not it's under oath when you signed this document or under oath today in front of this jury, right?

A Well, my testimony is that I signed this document and

that's what the document says. I think the document speaks for itself.

Q Well, and the reason why you signed it, Mr. Shelton, document service manager for Vanderbilt Mortgage and Finance, the reason why you signed this mechanic lien release is because at the time of this release, Vanderbilt was the true and lawful owner and holder of the certain note and indebtedness secured by the mechanic lien contract, right?

A Yes, sir.

Q Because if CMH had been the owner and holder of the note and indebtedness, you would have signed this document on behalf of CMH, true?

A If that would have been the case, I would not have signed it, because I'm not an employee of CMH Homes, Incorporated.

Q Well, someone would have, right?

A Yes, sir. An authorized representative for CMH Homes, Incorporated.

Q Okay. So, just so we make sure we're all on the same page.

A Yes, sir.

Q If CMH actually owned the note and the indebtedness, the mechanic's lien contract, a CMH person would have signed the mechanic lien release, correct?

A Yes, sir.

Q And like we see on this exhibit, because in this instance

Vanderbilt had been assigned the contract, Vanderbilt owned the debt and was holder of the note, Vanderbilt files the mechanic lien release, correct?

A Yes, sir.

Q Thank you, Mr. Shelton. That's all I have.

A Thank you.

**CROSS EXAMINATION**

**BY MR. B. GUTIERREZ:**

Q Following up with what Mr. Rumley just asked you and then we know by looking at this contract and what you've just told the jury that this clearly shows that the mechanic lien contract had never been assigned to Vanderbilt, right?

A Well, this document shows that CMH Homes, Incorporated is the holder of the mechanic's lien contract. It could have been assigned after that -- after this one was filed.

Q But certainly not before that, right?

A I would not think so, no.

Q Just for the record, your Honor, this is Exhibit Number 11.

The document that -- a couple of documents that we saw on the screen earlier when you were being asked questions by Mr. Lochridge dealt with I think it was a loan payout type of document that he was going over with you and I believe that there was an area that talked about litigation. Do you remember that on the document?

A No, sir. I don't recall that.

Q Okay.

**(Attorneys confer)**

This document right here. And I said litigation. It talked about legal action. Do you see that?

A Yes, sir. I do recall that.

Q And you said that there was a coding procedure when a loan has been paid in full. Do you remember that?

A Yes, sir.

Q If you had coded the account of Mr. Flores and Mr. King, if you had coded it paid out -- I think you said that that's the code, paid out?

A The code for --?

Q This that you would write on there or stamp on there paid out where it says "legal action"?

A Yes. If all the balances have been paid, it would have been coded paid out or should have been.

Q But if you did that then certainly there was no way that the people in collections could continue calling and trying to collect money from my clients, Mr. Flores and Mr. King, right?

A That's right. If the loan was paid out in full, they should not.

Q And if you had notified the Texas Department of Housing and Community Affairs that you had filed releases, then you would have been required to then send notice and send the

certificate of title to the mobile home to Mr. Flores and Mr. King, right?

A I'm not sure what you're asking.

Q Okay. That document that was shown to you from the Department of Housing and Community Affairs?

A Yes, sir.

Q Okay? Where you recorded your lien or it talks about sometime in 2009 it acknowledges that you all made sure that it was reflected that you continued to carry a lien on this mobile home. Do you remember that?

A Yes, sir. I do.

Q If you had sent any other information like, "Hey, you know, we released this lien back in 2005," I mean, that would have certainly given notice to the Flores' -- to Mr. Flores and Mr. King -- that they didn't have to pay on this account any more, right?

A Yes, sir. I would agree with your assumption that had we sent a title with our lien released to the TDHCA and they released the lien then yes, that would have the indication they would have had.

Q Then you wouldn't be able to continue to collect money from Mr. Flores and Mr. King, right?

A Yes, sir. I agree with that.

Q You talked about partial releases. Do you remember that?

A I do.

Q You're not saying that all this hundreds of releases that you filed were partial releases, are you?

A Yes, sir. We consider them partial releases, but to be clear, the reason we consider them partial releases --

Q Excuse me, sir. Are you considering them partial -- is that what you're saying now, that they're partial releases?

A Well, what I would say is the land is released in full, but we did not release the interest in the home.

Q You're saying that's a partial release, sir? You're referring Exhibit Number 11? Are you telling this jury that that was what you intended to do? That that's a partial release?

A Absolutely. The reason I call it a partial release --

Q No, no. I'm going to ask you --

**THE COURT**: But wait a minute. Just answer the question, please. Go ahead.

**BY MR. B. GUTIERREZ:**

Q Was there anything that could have prevented you from identifying here where it says a mechanic lien release as partial mechanic lien release? Is there anything that could have prevented you from doing that with this hundreds of releases that you filed?

A I'm not sure what your question is.

Q I thought it was pretty simple. Is there anything -- was there anything that would have prevented you from typing on

there, from printing on there, that form, and just saying partial mechanic lien release or partial deed of trust release?

A No, sir.

**MR. B. GUTIERREZ:** That's all the questions we have, your Honor.

**(Pause)**

**THE COURT**: Thank you. Mr. Lochridge?

**MR. LOCHRIDGE**: Thank you very much, your Honor.

**REDIRECT EXAMINATION**

**BY MR. LOCHRIDGE:**

Q Let's go to that last question about the partial release that you wanted to explain your answer. What do you mean by a partial release?

A Well, the reason I call it a partial release is because the loan secures a piece of real property land and also secures a home. And in this case, we're releasing the land in full and that's why the mechanic's lien contract release does not say partial, because that only releases the land and we're releasing the land in full.

But the reason we refer to it as a partial is because we're still keeping security in the home.

Q Now, you talked a little bit about who the signatory was on one of those particular mechanic's lien contracts.

But let's call up, I believe it's 13.

That's a mechanic's lien contract and the signatory

is CMH Homes, Inc., right?

A Yes, sir.

Q Is that the named party to the mechanic's lien contract?

A It should be, yes.

Q So, if you went to the county records you would find CMH Homes as the party to the mechanic's lien contract, correct?

A Yes, sir. It should reflect that.

Q And then, this release would tie back to who the contracting party was in the mechanic's lien contract, correct?

A Yes, sir. It should.

Q All right. And the fact that it's set up the way that is, is that any indication at all to you that the note, the retail installment contract, was not assigned to Vanderbilt?

**MR. B. GUTIERREZ:** Objection, your Honor. Mr. Shelton has already answered that question.

**THE COURT**: Sorry. Overruled.

**BY MR. LOCHRIDGE**:

Q Thank you.

A Could you ask me the question again, please?

Q Yes. This mechanic's lien release prepared the way it is, is that any indication at all to you that, in fact, the loan in the retail installment contract was not actually assigned to Vanderbilt?

A No, sir.

Q If we could put Exhibit 1 up on the screen, please? The

upper left hand corner, let's pull it up.

Who's the assignee?

A That's Vanderbilt Mortgage and Finance.

Q Okay. Let's go to the second line of the first paragraph.

"Seller will submit this contract to Vanderbilt Mortgage and Finance for assignment -- for approval." Is it your understanding that that's what happened?

A Yes, sir.

Q Is that what the records reflect in Vanderbilt?

A Yes, sir.

Q Go to the fourth page of this agreement. Above the CMH Homes, Inc. signature line. Pull out, "Seller agrees to this contract and is subject to acceptance by Vanderbilt Mortgage and its designated office and assigns it to Vanderbilt Mortgage Finance, Inc."

Is it your understanding that, in fact, this credit was accepted by Vanderbilt?

A Yes, it is.

Q Is that what the records of Vanderbilt show that you were in charge of?

A Yes, it does.

Q And if you'd put up Exhibit 11.

This is a Vanderbilt document indicating that it's the holder of the retail installment contract tracking the payments due and so forth?

A Yes, sir.

**MR. LOCHRIDGE**: No further questions, your Honor.

**THE COURT**: Thank you.

**COURT SECURITY OFFICER:** Your Honor, when is the break?

**THE COURT**: Twenty-minute break? Well, do you want two breaks, two ten-minute breaks, or a 20-minute break?

**JUROR NUMBER 3:** Ten.

**THE COURT**: Two ten's? Okay. Ten now. Thanks. Would you please stand for the jury?

**THE CLERK**: All rise for the jury.

**(Jurors exit courtroom at 2:44 p.m.)**

**MR. RUMLEY**: Your Honor, I don't have any more (indiscernible).

**THE COURT**: We're done with him?

**MR. LOCHRIDGE**: Yes, your Honor.

**THE COURT**: Okay. You can stand down.

**THE WITNESS**: Thank you, your Honor.

**(Witness excused at 2:44 p.m.)**

**(A recess was taken from 2:44 p.m. to 2:54 p.m.)**

**(Outside the presence of the jury)**

**THE COURT**: Are we ready yet?

**THE CLERK**: Yes, your Honor.

**THE COURT**: Would you bring them in? Everybody ready? Jury's coming in.

**THE CLERK:** All rise for the jury.

**(Jurors enter courtroom at 2:55 p.m.)**

**THE COURT:** Thank you. You may be seated.

**(Pause)**

You may proceed. Call your next witness. Sorry.

**MR. LOCHRIDGE:** We call David Jordan.

**DAVID JORDAN, PLAINTIFFS' WITNESS, SWORN**

**THE COURT:** You may proceed, please, sir.

**MR. LOCHRIDGE:** Thank you very much, your Honor.

**DIRECT EXAMINATION**

**BY MR. LOCHRIDGE:**

Q Mr. Jordan, would you state your name for the jury?

A David Jordan.

Q Tell us who you work for right now, Mr. Jordan?

A I work for CMH Services.

Q And for which of the CMH -- which of the various different entities do you perform services?

A I'm an officer of CMH Homes, Inc. and Vanderbilt Mortgage and Finance.

Q And why are you officers of both of those companies?

A Well, I started my career -- early in my career I was working with the retail group, CMH Homes, and I'm basically a back-up for the other two officers. If they need someone to sign things such as licensing -- mostly licensing -- for retail.

Then for Vanderbilt, I've been around a long time. I've worked in Vanderbilt for a long time before my current job. So, I have a lot of experience and so they also -- it was similar -- they need someone to sign document releases and licensing issues.

Q And what is the main job that you have now with regard to Clayton Homes, Inc.?

A I'm the corporate controller and what that is, is kind of the chief accountant for the consolidating financials. We consolidate all the financials for the various subsidiaries of Clayton and report those results to Berkshire Hathaway.

Q And so, currently you've got CMH Homes, which is a separate company over here on one side, correct?

A Yes.

Q And you've got Vanderbilt Mortgage, which is a lending company -- self-contained lending company -- over here on the other side. Is that right?

A Yes.

Q And their financial information goes upstream to their parent companies, correct?

A Yes, that's correct.

Q And you work with those financial documents?

A Yes.

Q Now, you haven't always had this job, have you?

A No, I have not.

Q Tell us where you were born and raised.

A I was born in west Tennessee, in Milan, Tennessee, which is about 100 miles northeast of Memphis. And I grew up there in a very small town, Bruceton, Tennessee is the name of it.

Q And did you ever get to college?

A Yes. I went to the University of Saint Martin for two years. Left there; moved to St. Louis and worked on the railroad as a conductor and trainman for five years. And then I moved back to Knoxville, Tennessee and attended the University of Tennessee in Knoxville; graduated in 1986.

Q When did you start to work for Vanderbilt or Clayton Mobile Homes?

A I started with Vanderbilt Mortgage in 1983 as a collector.

Q How many collectors were there at that time?

A Counting me, there were two.

Q You all would follow up on all the various loans that Vanderbilt had?

A Yes.

Q Did you move on from that position?

A Yes. I worked in Vanderbilt for a year, then I went to work in the retail division at that time; worked there for four years. While I was there I had graduated from college and then in 1988 I went to work at Vanderbilt Mortgage and really started the accounting function, the accounting department, there.

Q Now, I want to go straight to this question of releases. There are two releases here.

Let's go ahead and put both of them on the screen, please. They're Exhibits 12 and Exhibit 13. One's a release of deed of trust; the other's a release of a builder's and mechanic's lien.

Now, did you sign both of those releases?

A Yes, I did.

Q And have you signed similar releases in the past on behalf of either Vanderbilt or CMH Homes?

A Yes, I have.

Q And what is it that you intend to release when you sign a deed of trust release or a builder's and mechanic's lien release?

A The lien on the land.

Q Well, now, what about the retail installment contracts? Are those -- is one of those generally signed in connection with each purchase of a mobile home at CMH Homes?

A Yes. Yes, there's one.

Q And are you familiar with that contract?

A Yes, I am.

Q All right. By signing these releases in October of 2005, did you intend to release any of Vanderbilt's rights under the retail installment contract?

A No.

Q Did you intend to release Mr. Flores or Mr. King from their obligations of fully paying the retail installment contract?

A No.

Q Now, in the September, October 2005 time frame, were you made aware of the fact that a number of releases of land -- deeds of trust and builder's and mechanic's liens -- were going to be prepared and signed having to do with Store 214 in Corpus Christi?

A You know, I was aware of something going on in the Corpus Christi area and I can't remember exactly when I knew that the releases were done in conjunction with that.

Q Did you come to learn that the reason the releases were being prepared for your signature and the signature of others is that there had been issues with the notary practices in Store 214?

A Yes. I became aware of that later.

Q And was it your understanding that by releasing the land, Vanderbilt hoped to rectify any problems that might have arisen out of that?

**MR. RUMLEY**: Objection, leading.

**THE COURT**: Sustained.

**BY MR. LOCHRIDGE**:

Q What did you understand the purpose of releasing this land that had been pledged to secure some of these loans?

A My understanding was that -- or is -- that it was the fair thing to do; in case there were any improprieties, to just release all of the land and then everyone would have their land back.

Q Now, in connection with the signing of a retail installment contract -- and let's put Exhibit 1 up on the screen, please -- is there any notary signature required in connection with the signing of a retail installment contract?

A No.

Q And is it that contract that creates the obligation to pay on behalf of the customer, such as Mr. King and Mr. Flores?

A Yes, it is.

Q And is it this contract that creates the security interest in the mobile home that secures the loan, as Mr. King and Mr. Flores?

A Yes.

Q And are you aware of any notary irregularities with the signing of this contract?

A No, I'm not.

Q In fact, this contract's not notarized, is it?

A No, it isn't.

**MR. RUMLEY**: Objection, leading.

**THE COURT**: Sustained.

//

//

**BY MR. LOCHRIDGE**:

Q Is a (indiscernible) contract notarized?

A No, it's not notarized.

Q Now, you understand how the assignment of the contract and the money that's involved in the transaction flows as between customer CMH Homes and Vanderbilt?

A Yes.

Q Okay. Could you explain how that works for the jury, please?

A Yes. The customer agrees to buy a home; gets their credit approved; and so they sign a contract with the retail organization -- an installment sales contract. Then that contract is assigned to Vanderbilt, the lender, and the lender pays the retail company, CMH Homes, for that contract. And then Vanderbilt then collects those payments and services that obligation.

Q So, if you got the customer walking in, the customer wants a mobile home -- fair enough? That's what CMH does, right?

A Yes.

Q They make an agreement. What's it called?

A Retail installment sales contract.

Q And under that agreement, what does CMH Homes give to the customer?

A A home.

Q And what does the customer give CMH Homes?

A They give them a promise to pay --

Q To pay for the home.

A Uh-huh.

Q All right. And then, what does CMH Homes do with that promise to pay?

A They assign that to a lender.

Q All right.

A In this case, Vanderbilt.

Q In this case, Vanderbilt. So, they assign that promise to pay from the customer over to Vanderbilt, right?

A Yes.

Q And what do they get for having turned over that promise to pay from the customer to Vanderbilt?

A They get paid.

Q The money from Vanderbilt then goes --?

A It goes back to CMH Homes.

Q CMH Homes. All right. Now, and CMH Homes is paid in full at that point?

A Yes, they are.

Q Is Vanderbilt paid in full at that point?

A No.

Q Now, let's look at Exhibit -- I believe it's 45 and 46.

Can you pull up 45, please? Now, nobody in this courtroom can read that, except for maybe you. Can you pull up just the top part and then the bottom part -- just the top part

enough to identify it and then the bottom entry? Okay.

Now, this deal -- up in the upper left hand corner -- it's Cesar Flores. It's got the number 646307. Do you understand what that is?

A Yes.

Q What is that?

A That's their loan number.

Q Okay. And their loan file?

A Customer loan file number -- customer number.

Q And does that name and number follow this file forever inside Vanderbilt or CMH Homes?

A Yes, it does.

Q And let's look at the bottom entry. What does that entry tell us?

A That is the funding, if you will, from the mortgage company, Vanderbilt Mortgage, to the retail sales center where they got paid for the contract.

Q So, when I'm talking about a minute -- that's the money coming from Vanderbilt over to pay CMH Homes.

A Yes.

Q Now, in the old days, how was that handled?

A Well, years ago, the mortgage company would write a check and they'd write checks for all the deals that were done during the closing cycle. But now it's all done electronically through journal entries.

Q But in either case, what happens to the money?

A It flows from the mortgage company over to the CMH Homes retail company.

Q Let's look at Exhibit 46. Now, let's bring out the top entry so we can try to see it.

Now, the last bookkeeping entry was on the CMH Homes side. Is that right?

A Yes, that's correct.

Q Okay. What does this bookkeeping entry show?

A This shows the recording of the retail installment sales contract on Vanderbilt Mortgage finance books. So, you have at the top is the entry -- I hate to use an accounting term -- just an entry to book the receivable and then the bottom, the minus number there is the credit, the cash going out, if you will in the inter-company account to retail.

Q That's showing the money coming over to their sister company, CMH Homes, and now they own this retail installment contract.

A Yes.

Q It hasn't been assigned.

A Yes.

Q Okay. Now, let's look at Exhibit 1. That's the retail installment contract. And I'll just pull it up quickly because the jury's seen it many times the first paragraph, there at the top where it says "assignee."

Assignee is who?

A Vanderbilt Mortgage and Finance.

Q And that first -- second line indicates that it's going to be submitted to Vanderbilt Mortgage for approval, correct?

A Yes, that's correct.

Q All right. And from your review of the records it, in fact, was it approved and was it then assigned to Vanderbilt?

A Yes, it was.

Q Okay. Now, let's look at the fourth page of this agreement and let's pull up where it says "seller's agreement."

Do you see that?

A Yes.

Q And it says, "Seller agrees to this contract" -- seller being CMH Homes, correct?

A Yes.

Q "Subject to acceptance by Vanderbilt" -- assigns it to Vanderbilt, correct?

A Yes.

Q And the final sentence is, "Notice of acceptance is hereby waived." Do you see that?

A Yes, I do.

Q And now, this document was signed -- go back and let's look at the signature page. This document is signed by Clayton Homes -- CMH Homes, correct?

A Yes.

Q And who else signs this document? Let's go to the other side of the signature page.

It's also signed by Mr. Flores and Mr. King, correct?

A Yes.

Q And we've pointed out several places in this contract where they're being notified that this was to be assigned to Vanderbilt, correct?

A Yes.

Q And we've seen that the notice of acceptance is waived, correct?

A Yes.

Q All right. Now, then, let's go to the mechanic's lien contract that you signed -- or the mechanic's lien release that you signed, Exhibit 13. That's your signature, correct?

A Yes, it is.

Q Let's go to the notary part. The notary part says, "Before me, the undersigned authority" -- that's Ms. Gaines, a notary that works there in your office, correct?

A That's correct.

Q All right. "Personally appeared David Jordan, with whom I'm personally acquainted, and who, upon oath" -- let's see what you said under oath. You acknowledge yourself to be assistant secretary for CMH Homes, Inc. Now, is that true?

A It is true.

Q You were the assistant secretary?

A I was.

Q All right. (Indiscernible). And then, let's see what else you swore to. "And that he, as such officer" -- let's highlight the next line -- "being authorized so to do, executed the foregoing instrument for the purposes therein contained."

And were you so authorized?

A Yes, I was.

Q Okay. And what was your purpose on behalf of -- let's go back (indiscernible) on behalf of CMH Homes, what was your purpose in signing this release?

A To release the mechanic's lien for CMH Homes, Inc.

Q And at that point in time, the mechanic's lien still stood in the name of CMH. That's where it would be in the deed records that you'd find it, correct?

A Yes.

Q So, if one wanted to go and try to trace the title here, you would find CMH Homes being a party to the builder's and mechanic's lien contract, right?

**MR. RUMLEY**: Objection, leading.

**BY MR. LOCHRIDGE:**

Q Is that who you would find as --

A You would find CMH Homes.

Q And then, who would you find releasing the builder's and mechanic's lien contract?

A CMH Homes.

Q Now, would you find in those deed records anything about any party releasing the retail installment contract and the promise to pay that the Floreses and Kings had?

A No. You wouldn't find anything like that.

Q And do you know what generally happens when a customer pays in full his obligation -- his or her obligation -- to Vanderbilt?

A The contract -- the retail installment contract -- is I believe stamped and returned to the customer.

Q And have you seen any evidence that in this case that happened?

A No. That didn't happen here.

**MR. LOCHRIDGE**: Pass the witness, your Honor.

**THE COURT**: Thank you, sir.

**CROSS EXAMINATION**

**BY MR. RUMLEY:**

Q Good afternoon, Mr. Jordan. How are you doing?

A I'm fine, thank you.

Q I had an opportunity to take your deposition, too, correct?

A Yes.

Q The first part of your testimony you talked about being comptroller and you basically handle all the financials, how they flow up through Clayton Homes, Inc.?

A Yes.

Q And so, you would handle the financials, for example, the profits that would come from Vanderbilt, the profits that would come from the revenue or whatever in accounting terms -- the money flowing up from Vanderbilt, CMH, CMH Manufacturing, all of those, correct?

A Yes, that's correct.

Q And so, you'd be very familiar with the various finances of the subsidiary companies, true?

A Yes.

Q Now, one of the things the jury has heard at least from CMH is that the documents consistently say that they own their own bank. Does Clayton Homes, Inc. own its own bank?

A Not that I'm aware of.

Q Would be an accurate or a truthful representation for anyone to make that CMH owns their own bank?

**MR. LOCHRIDGE**: Your Honor, I'm going to object, relevancy. They've haven't pled anything along these lines as creating any problems with their clients about any representation regarding owning their own bank. It's irrelevant.

**THE COURT**: Sustained.

**MR. LOCHRIDGE**: Thank you.

**BY MR. RUMLEY:**

Q Is it true, sir, that -- well, let me ask you this. How is it that Vanderbilt raises its money?

A Currently, Vanderbilt gets its money from the parent, the ultimate parent of Clayton Homes, Berkshire Hathaway.

Q And I want to talk about back in 2002 -- 2001, 2002 -- that time period. How is it that Vanderbilt raised its money?

**MR. LOCHRIDGE**: Your Honor, again, I object on relevancy basis. They've foregone any claim regarding this.

**THE COURT**: Overruled.

**BY MR. RUMLEY**:

Q How is it that back in 2002, 2001, how is it that Vanderbilt raised its money?

A Vanderbilt had an ongoing asset back securities program that they sold their mortgages into.

Q And a very simple version of what that is, is that you all would package up the various loans and you would sell them to investors, correct?

A That is a very simple skinny way to say that, yes.

Q Right. And you agree with me generally that a loan that's backed by real property is more valuable than a loan that is unsecured, correct?

A Please ask that again.

Q You agree with me that a loan that is secured by real property is more valuable to an investor than a loan that's unsecured by real property?

A I think individually that's probably not exactly true, because a loan -- well, I don't think it's exactly true on an

individual basis.

Q Generally is it true that a loan that's secured by real property is more valuable than a loan that's unsecured?

A It depends on, I think, how you define value.

Q Less likely to default?

A I think generally that is true. It's less likely to default.

Q And not getting into the complexities of it, but these loans when they're sold to investors, they're actually sold in bonds, correct?

A The bonds are sold to investors that are backed by the cash flow coming off the pool -- large pool -- of loans, yes.

Q And it's true, is it not, that this loan -- the loan that's involved in this case -- was sold to investors in the 2002-A offering?

A Yes, I believe it was part of 2002-A asset back security.

Q All right. And it's your position -- well, let me ask you this, Mr. Jordan. When the loan is sold, like this loan in this case, when it's sold into this offering, it is identified as having collateral of real property, correct?

A It is.

Q And it's true, is it not, that a number of these loans -- these loans that are involved in these releases that were filed in Store 214 -- they were sold to investors, correct?

A Yes, that's correct. A few of them were.

Q And you understand essentially that the allegations in this case, it's we're contending that the releases that you signed and filed discharged the debt and your company is claiming that it just released the land. You understand that's generally the dispute, right?

A Yes.

Q Even if we take your position as true, that all these releases did is just release the collateral, did you notify the investors that the collateral had been released?

A Not that I'm aware of.

Q You didn't tell the customers about the releases, correct?

A I believe that's correct, yes.

Q There were the two releases you signed were not given to the customer, true?

A I believe that's true.

Q And they weren't given to the landowner -- to my clients -- true?

A I believe that's true, yes.

Q And you never told the investors who bought the loan, right?

A That's correct.

Q How much money did Vanderbilt make off of the 2002-A offering that included this loan?

**MR. LOCHRIDGE**: Your Honor, object again, relevancy. Goes way beyond what's at issue in this case.

**THE COURT**: Sustained. Oh, I'm sorry.

**MR. RUMLEY**: Your Honor, it's already admitted by them. It's Clayton Exhibit 47 is the 2002-A offering. It's already in evidence.

**MR. LOCHRIDGE**: Your Honor, I stand on my objection. This is irrelevant.

**THE COURT**: Sustained.

**MR. LOCHRIDGE**: Thank you.

**BY MR. RUMLEY:**

Q Mr. Jordan, I want to ask you about the mechanic release that you signed and it's Exhibit 11. And this is a release that you signed, true?

A Yes. Yes, it is.

Q Okay. And you signed it on behalf of CMH Homes and you did so under the authority of the board of directors, correct?

A Yes, that's correct.

Q You were authorized to sign it?

A Yes.

Q And if we look at this document that's dated October 8, 2005; do you see that?

A Yes.

Q Okay. And when we look at the document, it says, "CMH Homes, Inc., a corporation with an office place in Blount County, Tennessee, declares that it is the true and lawful owner/holder of that certain note and indebtedness secured by a

mechanic’s lien contract.”

When you signed this document, was that true?

A I believe they had already assigned the installment sales contract to the mortgage company -- Vanderbilt -- by that time.

Q Well, if the contract had already been assigned, then Vanderbilt would have filed this release, correct?

A I don’t think that’s right. I don’t believe that’s correct. The original holder of the mechanic’s lien would file that release.

Q Well, but this says is as of October 8th, 2005, CMH just declares that it is the true and lawful owner and holder of that certain note. Correct?

A That’s what it says and it should say in the past tense, but it doesn’t.

Q Well, I mean, you read it before you signed it, right?

A You know, I don’t remember signing this specific document.

Q Generally, do you read documents before you sign them?

A I note certain things about them. It’s a form so they’re all virtually the same.

Q Well, do you know, Mr. Jordan, whether or not you read these documents before you signed them?

A You know, I didn’t read every one of them before I signed them. I looked at certain things that would change and made sure that it was me and it had the title correct.

Q Do you agree to be bound by a document that you signed?

You signed this under the authority of the board of directors, right?

A Yes.

Q Do you agree to be bound by the document that you signed?

A Yes. I mean, of course, on this, yeah. We were wanting to release the land. That's what we did.

Q And you stand by it, right?

A Sure.

Q All right. And if we look -- going back to the mechanic lien release, it says "and has been paid in full," correct?

A Yes. It says that.

Q And if we look at the deed of trust release, it says "and does by here release the lien of said deed of trust and/or mortgage," correct?

A Yes, it says that.

Q Now, isn't it true, Mr. Jordan, that if you did not intend to release the obligation, that you would have put that in the release?

A It doesn't -- I don't believe it has to be in there.

Q Would you have put it in there, sir?

A It wasn't in the form that we used.

**MR. RUMLEY**: Your Honor, we would offer Exhibits 189 and 190.

**(Pause)**

**THE COURT**: Any objection?

**MR. LOCHRIDGE**: Your Honor, these deal with separate transactions subject to our motion and we object for that reason.

**MR. RUMLEY**: Your Honor, may we approach?

**THE COURT**: Yes.

**(Begin bench conference at 3:28 p.m.)**

**MR. RUMLEY**: These are additional releases that Mr. Jordan signed related to Lot 214. And in this release, rather than "paid in full," he puts in that there's still a bona fide debt. And so, it goes to impeachment on the "paid in full."

**MR. LOCHRIDGE**: And after that, your Honor, there's a different transaction --

**THE COURT**: I understand that.

**MR. LOCHRIDGE**: -- and different considerations are made and litigation's involved in which case --

**THE COURT**: And this is 214.

**MR. LOCHRIDGE**: It's 214, but it's different transactions and agreed through stipulation --

**THE COURT**: Thank you.

**(End bench conference at 3:29 p.m.)**

**THE COURT**: 189 and 190 are admitted.

**(Defendants' Exhibits Numbers 189 and 190 were received in evidence)**

//

**BY MR. RUMLEY:**

Q Mr. Jordan, let me show you Exhibit 189, Defendants' Exhibit 189, and this is -- you see right here -- the deed of trust release. Do you see that?

A Yes.

Q And it signed by Vanderbilt -- I'm sorry, yourself. You signed it on behalf of Vanderbilt, correct?

A I did, yes.

Q And again, the same things in place. You did so under the authority of the board of directors, right?

A Yes, I did.

Q And in this one, is it true, sir, that rather than including the paid in full language like in the releases that we just read involving this case, you have included "and that the sales agreement and/or contract continues to secure a bona fide obligation." Do you see that?

**MR. LOCHRIDGE**: Your Honor, I object. That's a misstatement. There is no paid in full language in the deed of trust release.

**MR. RUMLEY**: I'll correct myself, your Honor.

**THE COURT**: That's sustained.

**MR. LOCHRIDGE**: Thank you.

**BY MR. RUMLEY**:

Q If we look, Mr. Jordan, and Mr. Lochridge is correct, the deed of trust release says, "The lien of said deed of trust

does hereby release the lien of said deed of trust and/or mortgage," correct? And that's in the one that's involved in this case.
A Yes. I see that. Uh-huh.
Q Okay. And if we look at the one that you signed that's marked -- here it is, Exhibit 189 -- it says "and that the sales agreement," which would be the installment contract, true? Right?
A It would be a sales agreement.
Q "And that the sales agreement and/or contract" -- by the installment contract --
A Okay.
Q "Continues to secure a bona fide obligation." Did I read that right?
A Yes. I believe you did. Yes.
Q When you signed this document, you clearly intended that the debt was still due and owing, correct?
A Yes. Uh-huh. Yes, I did.
Q If we look at Exhibit 190, and this is a builder's and mechanic's lien contract release, correct?
A Yes, it is.
Q And again, you, Mr. Jordan, signed this on behalf of CMH Homes.
A I did.
Q Okay. And if we go and we compare Exhibit Number 11,

which is the mechanic lien release that you signed in this case, true?

A Yes, it is.

Q And the mechanic lien release you signed in this case says "and has been paid in full," correct?

A It does.

Q And if we look at 190, it says "and that the sales agreement and/or contract continues to secure a bona fide obligation," correct?

A Yes.

Q Do you understand the difference between the two?

A I understand the difference in the wording, sure. Yes.

Q You understand the difference between paid and full and still have a bona fide obligation?

A In the context of the documents? I'm sorry.

Q In the context of the documents.

A Yes. I understand the difference in what they mean.

Q And Vanderbilt actually provides you with definitions of various terms, correct, that you're supposed to use within the real estate documents of Vanderbilt?

A When you say "you," are you talking collectively or me or --?

Q You personally.

A I know they provide certain things and I'm not privy to those. I'm not on the operations side.

Q Well, you recall during your deposition me asking you what the term "satisfaction" means?

A Yes, I do.

Q And you told me that satisfaction means that all of the terms have been satisfied, correct?

A Yes. I believe I did say that.

Q And if we look -- and you remember looking at Defendants' Exhibit 81?

**(Pause)**

All right. Let me show you -- you agree with me, sir, that the definition of satisfied means that all the terms and conditions have been met, right? That's your definition?

A Yes. Yes.

Q And if we look at Exhibit 81, we have right here VMF Land and Home Financing Glossary of Real Estate Terms, correct?

A Yes. That's what it says, yes.

Q And these would be terms -- or the terms that are used within Vanderbilt on land sales that would tell you what they mean, right? How you're supposed to interpret them?

A Yes. I assume that's what that is.

Q And if we look, what Vanderbilt's definition of satisfaction is, is what?

A It says, "The release of a mortgage or deed of trust."

Q All right. And so, when Vanderbilt -- when they're talking about releasing a deed of trust, it means that the

terms have been met, correct? According to the definitions?

**MR. LOCHRIDGE**: Your Honor, I'm going to object. The definitions doesn't say it. It simply says "the release of a mortgage or deed of trust."

**MR. RUMLEY**: Let me restate it, your Honor?

**THE COURT**: Please.

**BY MR. RUMLEY:**

Q Mr. Jordan, you and I agree that your definition of satisfaction means all the terms have been met, right?

A Yes. I believe that was a definition.

Q And if all the terms have been met, then you would release the deed of trust and the mortgage, correct?

A Yes. If the customers made all their payments, we would release the --

Q Well, or -- and we talked about this. There are situations, are there not, where debt is charged off for whatever reasons?

A Yes, there are those situations.

Q There are situations where Mr. Nichols has authority to release a loan, right?

A Yes. He has that authority.

Q And you understand that Mr. Nichols is one of the individuals that made the decision to file all of these hundreds of releases in south Texas, true?

A Yes.

Q Mr. Jordan, back when I took your deposition, I asked you if as vice president of Vanderbilt and comptroller of this company you had no idea that Vanderbilt was continuing to collect payments from customers in the transactions where they had filed these releases, correct?

A I'm not a vice president of Vanderbilt.

Q Comptroller of Clayton Homes, Inc.

A Corporate controller.

Q Whatever your position is.

A Yeah.

Q You were not aware that Vanderbilt was continuing to collect payments from customers that had transactions involved where all these releases were filed, correct?

A Yes. I wasn't aware of any specific collection activity on any specific account in my position.

Q Thank you, sir. That's all I have.

**THE COURT**: Thank you. Anything further, sir?

**MR. B. GUTIERREZ:** I have no questions, your Honor.

**THE COURT**: Anything further?

**MR. LOCHRIDGE**: Just a handful, your Honor, if I might.

**THE COURT**: Go right ahead.

**MR. LOCHRIDGE**: Thank you very much.

//

//

**REDIRECT EXAMINATION**

**BY MR. LOCHRIDGE:**

Q You were asked about the Vanderbilt glossary. We've got the satisfaction, the release of a mortgage or deed of trust. Do you see that?

A Yes, I do.

Q And is that what you did when you signed that release of the deed of trust? You released the deed of trust, the lien?

A Yes, that's correct. Yes.

Q Does that have anything to do with the retail installment contract?

A No, it does not.

Q Now, I think you were just asked a question about whether or not you were aware that the people at Vanderbilt were still collecting on these retail installment contracts that hadn't been released. Would that have been something that you would have been aware of? I mean, is that part of your job?

A No. That's not part of my job, to monitor collection activity.

Q And if, in fact, the retail installment contract had not been discharged and Mr. Flores and Mr. King were still liable for it because they hadn't paid it off yet, what would you expect people in the collection part of Vanderbilt to be doing?

A I would expect them to be asking for payments and I would expect the owners of the homes to be making their payments.

Q Okay. Now, you were asked about a builder's and mechanic's lien contract that had some additional language in it. This is a builder's and mechanic's lien release, mechanic's lien contract and the sales agreement and/or contract continues to secure a bona fide obligation. In your view, is that language necessary in the builder's and mechanic's lien contract release?

A No. It is not necessary to include that.

Q Do you know whether or not this particular contract with Ricardo Canales was the subject of litigation?

A No, I really don't know if it was or not.

Q And whether or not these documents have been negotiated between lawyers representing people?

A No.

Q Okay. But going back to Exhibit 13, which is the release in this case that we're dealing with, again, is there any indication in there that the retail installment contract has been discharged and the Kings and Floreses don't owe what they promised to pay?

A No, there's no indication there. That's not what that document does.

Q Did you intend that the Kings and Floreses or any of these others that you signed that were still owed money under their retail installment contracts didn't have to pay it anymore? When you signed this release or any of the others like it, did

you intend that the original customers that signed that retail installment contract, they didn't have to pay any more and they got a free home?

A No, we didn't intend that at all.

**MR. LOCHRIDGE**: No further questions, your Honor. Thank you.

**MR. RANGEL**: May we approach, your Honor?

**THE COURT**: Yes.

**MR. RANGEL**: I'm sorry. I apologize. I apologize. I thought there were no more questions. I'm sorry, Mr. Gutierrez.

**CROSS EXAMINATION**

**BY MR. B. GUTIERREZ:**

Q The documents that were shown to you by both Mr. Rumley and Mr. Lochridge, two sets of deed of trust and two sets of mechanic's lien contracts; what was identified as the Ricardo Canales, Alicia Canales deed of trust and the Ricardo Canales and Alicia Canales mechanic lien contract that had that language; and the sales agreement and/or contract continues to secure a bona fide obligation. Remember that?

A Yes.

Q Okay. Now, clearly, we looked at those documents and we looked at the documents that are at issue in this case. Certainly, wouldn't you agree that that is the best evidence for this jury to decide the intent behind the language of the

document and what Vanderbilt intended to do and what CMH Homes intended to do, right?

**MR. LOCHRIDGE**: Your Honor, again, we object because he's comparing apples to oranges in a completely different context trying to get him to speculate about that. We object.

**MR. B. GUTIERREZ:** I'm just asking, your Honor --

**THE COURT**: If you can't answer just say you can't answer.

**BY MR. B. GUTIERREZ:**

Q You can answer.

A Could I hear that again, please? It was pretty long.

Q Talking about the best evidence for the jury to decide on what the intent of Vanderbilt was and what the intent of CMH Homes was, wouldn't the best evidence be to look at those documents and compare the Canales documents to the documents in this litigation?

**THE COURT**: Okay. Hold on. Is there an objection to that?

**MR. LOCHRIDGE**: I have the same objection to that, your Honor.

**THE COURT**: Sustained.

**MR. LOCHRIDGE**: Thank you.

**MR. B. GUTIERREZ:** That's all I have.

**MR. RANGEL**: May we approach, your Honor?

**THE COURT**: Yes, sir.

**MR. RANGEL**: Mr. Rumley?

**(Begin bench conference at 3:44 p.m.)**

**MR. RANGEL**: Judge, our next witness is going to be Mr. Arturo Trevino.

**THE COURT**: He can step down, can't he?

**MR. RANGEL**: Yes.

**THE COURT**: You can stand down, sir.

**(Witness excused at 3:44 p.m.)**

**MR. RANGEL**: And there are a couple of limine motions that we need to take up and one is criminal history.

**THE COURT**: One is what?

**MR. RANGEL**: Two criminal convictions; one in this court and one in Judge Head's court.

**THE COURT**: What kind of convictions -- well, obviously criminal convictions.

**MR. RANGEL**: Yeah. Drug trafficking and also illegal alien.

**MR. RUMLEY**: The second one's a misdemeanor.

**MR. RANGEL**: The first one is --

**THE COURT**: No, no. If it's in my court it's not a misdemeanor.

**MR. RANGEL**: They're felonies, both of them.

**THE COURT**: They're both felonies?

**MR. RANGEL**: You sentenced him to (indiscernible).

**MR. RUMLEY**: The first one was 15 years ago, so it's

beyond the rule. The second one was less than one year (indiscernible) and it doesn't involve a crime of (indiscernible).

**THE COURT**: If it was in my court and I sentenced him, it was a felony and until you --

**MR. RANGEL**: Wait a minute. What I would suggest to the Court that we wanted to take this up before --

**THE COURT**: Let's do the ten minutes.

**MR. RANGEL**: That's what I was going to --

**(End bench conference at 3:45 p.m.)**

**THE COURT**: Okay. We're going to take our second ten-minute break and then we're going to go until about 5:15 today, if that's all right.

**THE CLERK**: All rise for the jury.

**THE COURT**: Which gives you another 15 minutes.

**(Jurors exit courtroom at 3:45 p.m.)**

Give us the name, please. I'm going to run it. Please.

**MR. RANGEL**: Yes. The Cause Number in this court. It's the *United States of America versus Arturo Arnulfo Trevino*; Criminal Number C-95-107. His memorandum of plea agreement was filed in this court on June 30th, 1995.

**THE COURT**: I don't take pleas for misdemeanors, so it couldn't be a misdemeanor.

**MR. RANGEL**: And that was for drug trafficking, your

Honor. The other one is -- it was in this court, your Honor. The other one was in Judge Head's court. *United States of America versus Arturo Arnulfo Trevino*; Criminal Number C-07-208; the memorandum of plea agreement filed with clerk of the Court May 30th, 2007. And that was for transporting illegal aliens.

**THE COURT**: Okay. Pull those up, would you, please, with the dates?

**(Pause)**

**MR. RANGEL**: And both of them are in (indiscernible). Parties Exhibit 130 which has not been admitted, your Honor.

**(Pause)**

**THE COURT**: Can you print off the docket sheet for both?

And nobody's complaining no notice of this.

**MR. RANGEL**: No. They've had that. (Indiscernible) filed a motion in limine.

**MR. RUMLEY**: We have an objection that the exhibit that they filed is no proof any type of conviction. A memorandum and plea agreement is not admissible as a conviction. And we have additional objections under 609 and 403.

**THE COURT**: 609 what?

**MR. RUMLEY**: 609 and 403.

**THE COURT**: Okay.

**MR. RUMLEY**: 609 -- the first one is 15 years ago.

**THE COURT**: Well, it depends on when he was released; it's the later date. If he was released within the last ten years, that counts.

**MR. RANGEL**: And Judge, the record will reflect when he was released, but our position is even if it's over ten years, that the probative value outweighs. The Court has discretion under --

**THE COURT**: Let's see when he was released.

**(Pause)**

What have you got? Is this Judge Head or this mine? Where's the judgment? That's what I need. I don't need this.

**(Court confers with clerk)**

**MR. RUMLEY**: Your Honor, I have a copy of the judgment.

**THE COURT**: Huh?

**MR. RUMLEY**: I have a copy of the judgment.

**THE COURT**: For the one in here?

**MR. RUMLEY**: Yes, your Honor. This is in Judge Head's -- the recent one -- 2007.

**THE COURT**: 2007 is Judge Head's? Okay. Well, that's obviously within the last ten years.

**MR. RUMLEY**: But his term of imprisonment was less than --

**THE COURT**: Show me in 609 where it says that. What

are you thinking?

**MR. RANGEL**: It's considered a crime of dishonesty, your Honor, under 609(a)(2).

**MR. RUMLEY**: If the crime is punishable by death or imprisonment in excess of one year.

**THE COURT**: It doesn't mean that he was given that. It meant it was a crime punishable by that. It doesn't mean that he got it. It just means a crime punishable -- which means it's a felony in Texas.

**MR. RUMLEY**: We would still object under 403.

**THE COURT**: You can object under 403, but you can't under 609.

**MR. RANGEL**: The one in Judge Head's court is definitely admissible under 609(a)(2), your Honor.

**THE COURT**: Okay.

**MR. RANGEL**: In both of these, your Honor, credibly he is so central to this case and as have had --

**THE COURT**: Yes, so I've noticed.

**MR. RANGEL**: The jury has a right to hear this.

**THE COURT**: Oh, Will, look that up and make sure I'm right. Thanks. Because transporting is punishable by up to five years. Let me see the judgment. Yeah, transportation of unlawful alien is punishable by up to five years and he was sentenced to 11 months with three years supervised release.

Now, let me see mine. Okay.

**MR. J. GUTIERREZ**: Your Honor, may I address the Court on one point?

**THE COURT**: Pardon?

**MR. J. GUTIERREZ**: May I address the Court on one point?

**THE COURT**: Yes.

**MR. J. GUTIERREZ**: The property exhibit, your Honor, is a memorandum and plea agreement. It's not evidence.

**THE COURT**: You all had the judgment in your hand, so you obviously had notice of it.

**MR. J. GUTIERREZ**: No. I concede that, your Honor. My point is, is this is not evidence, admissible -- because it's not evidence of a conviction. The property exhibit that Mr. Rangel wants offered --

**THE COURT**: He doesn't need to offer an exhibit. He's going to impeach him with questions --

**MR. RANGEL**: That is correct, your Honor.

**THE COURT**: -- which is what I thought you were going to do with the guy awhile ago instead of introducing all those documents when I sustained the objection to the documents. But it's neither here nor there.

Okay. Let me see the drug --

**MR. RANGEL**: Trafficking.

**THE COURT**: Drug trafficking.

**MR. RANGEL**: That was the one in your court, your

Honor.

**THE COURT**: Yeah. I just need to pull it up. I don't know where she's gone.

**(Pause)**

In 1995, he was given 30 months. What's the rest of his -- has he been revoked at all?

**(Court confers with clerk)**

Thanks. We're okay with the -- yeah, thank you, Ms. Scotch. Well done, as usual.

**(Pause)**

**(Court confers with clerk)**

Are you serious? Oh, that's got to be the '07 case. I needed a release date for the '95 case.

Thank you. Yeah, I don't think there's any point in offering judgments.

**MR. RANGEL**: No, obviously, your Honor, I want to ask him -- which I did in his deposition.

**(Court confers with clerk)**

**THE COURT**: I guess -- it looks like in the '95 case, they were all released in '08, meaning from supervision. Let me see what his supervised release was.

**(Pause)**

Okay. So, there's no -- Mr. Feldman?

**(Court confers with law clerk)**

**MR. RUMLEY**: Your Honor, I have a cite that says it

starts at the end of confinement.

**THE COURT**: Pardon me?

**MR. RUMLEY**: I have a case citation that says it starts at the end of confinement.

**THE COURT**: But I don't know whether that supervised release is considered confinement under the impeachment rule. I just want to look that up.

**MR. RANGEL**: And our position is, Judge, is even if it's after ten years it is admissible under 609(b).

**THE COURT**: He's your witness?

**MR. RANGEL**: His client, but I'm going to call him now as an adverse party.

**THE COURT**: Oh, which one?

**MR. RANGEL**: Mr. Trevino, sorry. Arturo Trevino, one of the intervenor plaintiffs that has sued us.

**THE COURT**: I thought I recognized him. Okay. He wouldn't have been still on supervised release when he got the next conviction.

**MR. RANGEL**: The second conviction was in '07.

**THE COURT**: You know, can I have the pre-sentence investigation report for the '95 case?

**(Court confers with clerk)**

Mr. Rangel, under that it says it's not admissible unless the proponent gives to the adverse party sufficient -- which you did.

**MR. RANGEL**: "Unless the Court determines, in the interests of justice, that the probative value of the conviction supported by specific fact and circumstances substantially outweighs its prejudicial effect," if it's past ten years.

**THE COURT**: My concern is this and I'll tell you. He got 30 months on something that was a mandatory minimum of five years, which means he had to give substantial assistance and then I could have given him minor role.

**MR. RANGEL**: But your Honor, I think you have to consider what happened in that case with what happened later. I mean, we're talking about 200 pounds of marijuana and then the illegal trafficking. I mean, obviously, combined it raises issues of credibility that the jury needs to know about because it's clear that he was -- after the first conviction and sentenced by this Court -- I mean, that was not strong medicine enough and he proceeded to engage in additional illegal activity resulting in felony convictions in this federal courthouse where he is seeking to recover damages.

**THE COURT**: In contrast to another federal courthouse.

**MR. RUMLEY**: Your Honor, it has zero probative value and it's completely prejudicial and all they're trying to do is offer something that happened 15 years ago. And the cases make the distinction between admission in criminal cases and in

civil cases and there is zero probative value. And the prejudice that this is going to cause, this jury's going to make their mind up based on that conviction and not of the evidence. And that's the prejudice that's involved and that's the prejudice that's set out in 609.

**MR. RANGEL**: The probative value goes to credibility. Credibility of -- his credibility is going to be an issue when he gets up here and denies that his signature is in any of those documents, when he denies that he didn't know anything about that land being pledged.

And we're going to have Mr. Stuart come forward and say that high indication that he did sign. They're going to deny it. Their expert will say he did not sign.

Judge, if it was only one conviction, I could understand, but here we have two convictions. If that does not demonstrate a willingness to engage in illegal activity -- of course, the second one's in because with the ten years in the illegal alien trafficking; but when you combine his conviction in this court for 200 pounds of marijuana, Judge, we are entitled and, with all due respect, we understand that the Court has listened to all the objections and the motions and the Court is doing what the Court believes is fair and we think that in this instance --

**THE COURT**: I just don't know what's fair in this case. And I'll tell you why, because both times he came in and

pled guilty and at least the first time in my court. In my case, he cooperated truthfully. And so, the reason for impeachment is to talk about his character and his propensity to tell the truth. Isn't that what the impeachment would be? And he's -- as far as I'm concerned -- he's done nothing in these cases but to speak the truth.

**MR. RANGEL**: But Judge, he is --

**THE COURT**: I understand he committed a crime.

**MR. RANGEL**: Two crimes.

**THE COURT**: Two crimes, but I'm talking about that it's supposed to be used for whether or not he tells the truth.

**MR. RANGEL**: And certainly, Judge, the second conviction -- trafficking --

**THE COURT**: That's absolutely in.

**MR. RANGEL**: Okay.

**THE COURT**: The transporting illegal aliens, which many people feel is a much bigger crime than drug trafficking. But don't get me started on that. Not that drug trafficking is not a crime, but you know, these people are endangered; they make more money trafficking in people. Did you know that? You make more money trafficking in people than in drugs? And these people that are trafficked are kidnapped from one group to another and held hostage. It's very unpleasant.

Anyway, I think you ought to go with the one, which is significant. I may be wrong about this, Mr. Rangel, but --

**MR. RANGEL**: I respect the Court's ruling. I just think that given the facts and circumstances and the issue in this case that we're entitled to present evidence of both convictions to the jury.

**THE COURT**: You may be right, but my other concern is that they were 12 years apart. The convictions were 12 years apart. And so, I have a concern about that, as well. If there were 15 convictions or even three, you know, every five years for 15 years, I think I would treat it differently.

**MR. RANGEL**: I understand.

**THE COURT**: So, that's my ruling.

**MR. RANGEL**: Okay. We'll go with the second -- with the recent --

**THE COURT**: Absolutely. You're entitled to that.

**MR. RANGEL**: And there are two other matters, Judge.

**THE COURT**: And if he ever says he's never been on 281, you might get the other one on.

**MR. RANGEL**: There are two other issues that are covered by the limine. We have evidence that in the summer of 2003, Mr. and Mrs. Trevino conveyed Lot 35 to their brother, Gilbert Flores -- summer of 2003. And that coincides with the time about when Mr. King was calling and asking --

**THE COURT**: About releasing 36?

**MR. RANGEL**: Releasing one of the lots.

**THE COURT**: Okay.

**MR. RANGEL**: And so --

**THE COURT**: Are they both -- the both have a lien or just 36?

**MR. RANGEL**: Both of them had liens.

**THE COURT**: Okay. Allegedly.

**MR. RANGEL**: Right. And so, we want to show the conveyance from the Trevinos to Gilbert of Lot 35 in July 2003. Plus, in the spring of 2005, they conveyed Lot 36 to Cesar Flores. So, they no longer owned these two lots at the time that the releases were signed.

**THE COURT**: Mr. Rumley?

**MR. RUMLEY**: Your Honor, this is the argument they made in their summary judgment and that the Court found that they did have standing and my objection is --

**THE COURT**: No, it's not a question of standing. It's a question of -- go ahead.

**MR. RUMLEY**: It's my objection is under 403, because it's misleading. What they're going to say is at the time you filed this intervention you didn't own the land. Well, that's not what the statute says. The statute does not require them to own the land. And what they're going to do --

**THE COURT**: You know what? I don't think that the Lot 35 has any probative value. Thirty-six does, for damages. How much were they damaged if they transferred the property?

**MR. RANGEL**: Judge, the reason 35 is pertinent --

**THE COURT**: And I've already ruled that that is a damage. It's how much of a damage and the jury's entitled to hear that.

**MR. RANGEL**: At the time that they filed the lawsuit, they did not own Lot 36. They did not own Lot 35. At the time that the releases were filed, they didn't own either one of them. And the evidence is going to show that during the time that the lien was on file, that that did not keep them from conveying or selling. They never attempted to do that. They would convey 35 to Gilbert and convey 36 to Cesar. I think on the issue --

**THE COURT**: Yeah, but their testimony is they didn't even know there was a lien.

**MR. RANGEL**: Well, but there was no damage, no harm.

**THE COURT**: That's not true. Because under the statute it's not required to have that -- that is damage in itself, filing a false lien.

**MR. RUMLEY**: And that's why under 403 it's going to confuse the jury and mislead them if he presents it like that.

**THE COURT**: No. They need to know, I think, it's well within the jury's prerogative to know whether or not the people are still suffering with the land and can't transfer it. They've transferred it, the lien's been released. It doesn't mean no harm no foul, which is what they're going to say, because you get a measure of damage for a false lien. Period.

Okay. Are we settled on all these things?

**MR. RANGEL**: And we won't dwell on it, Judge. We just want to put that before the jury.

**MR. B. GUTIERREZ:** And your Honor, may I just ask a question?

**THE COURT**: Yes, sir.

**MR. B. GUTIERREZ:** Concerning the question that Mr.--

**THE COURT**: I don't think you're supposed to ask me questions. Go ahead.

**MR. B. GUTIERREZ:** I'm just concerned -- the question that Mr. Rangel is going to be permitted to ask Mr. Trevino with respect to the transporting of illegal aliens --

**THE COURT**: Yes.

**MR. B. GUTIERREZ:** -- well, will he be permitted to ask, "Have you ever been arrested?" I'm just --

**THE COURT**: No. That's not an impeachment question. It's a conviction of crime of moral turpitude, which means, you know, other than a felony; a crime of moral turpitude, which is a theft conviction as a misdemeanor; false swearing, you know, that sort of thing. And then, it's absolutely allowed to do the felony conviction within ten years.

**MR. RUMLEY**: I think what he's asking is, is he entitled to get into the whole thing or is he just -- he's entitled to say, "Were you convicted of this," and then that's the --

**THE COURT**: You can't. If he denies that he was convicted, that's a different story.

**MR. UNIDENTIFIED:** I'm sorry?

**THE COURT**: If he denies that he was convicted for transporting illegal aliens, I think that's a different story.

**MR. RANGEL**: I mean, I am able to get before the jury that he was convicted.

**THE COURT**: Yes. But you can't go into it. How many aliens and --?

**MR. RANGEL**: No, I'm not going to go into the details.

**THE COURT**: Okay.

**MR. RANGEL**: No.

**THE COURT**: Especially not details I gave you.

**MR. RANGEL**: Okay. So, that takes care of the matters so when we have Trevino I will admit into evidence the two warranty deeds and ask for --

**THE COURT**: Are we ready?

**MR. RANGEL**: Can I take a two-minute break, Judge.

**THE COURT**: Wait. You don't need to put into evidence the warranty deeds. You're going to call them as witnesses and they're going to say, "Yes, they've been transferred." That's it.

**MR. RANGEL**: Well, there's another issue with -- there's an issue of notarization on one of those two. I want

to find out. I think it's the one to Gilbert Flores. They conveyed Lot 35 to Gilbert Flores and it's supposedly signed by Mr. Trevino and Mrs. Trevino. The notary said, "Before me, on this date, appeared Cesar Flores and Alvin King." It doesn't say appeared Arturo Trevino and Maria Trevino. And I think there are issues of notary practices.

**THE COURT**: That has nothing to do with this case, that however defective their transfer was. And if you really had a good lien, it was still defective.

**MR. RANGEL**: So, the deeds do not come in but I can ask him about the conveyances?

**THE COURT**: Absolutely.

**MR. RANGEL**: Thank you, your Honor.

**THE COURT**: And if they deny them, that's another thing.

**MR. RANGEL**: May I have two minutes, Judge?

**THE COURT**: Yes.

**MR. LOCHRIDGE**: Your Honor, on that last point, those signatures will be used as --

**THE COURT**: I'm sorry?

**MR. LOCHRIDGE**: Those signatures of Mrs. Trevino, Mr. Trevino to the --

**THE COURT**: Oh, will be used for the --

**MR. LOCHRIDGE**: Will be used by the handwriting people.

**THE COURT**: Okay.

**MR. LOCHRIDGE**: And if that -- if you're still of that mind when we get there, we'll need to do some redacting of some kind, because they'll maybe use those handwritings exemplar as known -- but if they say that --

**THE COURT**: Well, do you have objections to the conveyances?

**MR. RUMLEY**: I have objections to those documents for the reasons that we talked about. I think their expert just, like, cut out that signature and is looking at --

**MR. LOCHRIDGE**: Yeah, there's two things. But it's also the --

**THE COURT**: I don't see any reason that he can't show the signatures without showing the document in its entirety. And just say, "I got this off of the transfer."

**MR. LOCHRIDGE**: Yes, your Honor. And some of the other --

**(Court confers with clerk)**

**THE COURT**: Thank you very much.

**MR. LOCHRIDGE**: On the plea agreement on the '95 conviction, there's also an exemplar that the handwriting expert uses. He will redact that to say it's a court document.

**MR. RUMLEY**: We still have an objection to that.

**THE COURT**: Why?

**MR. RUMLEY**: Well, because, I mean, how --?

**THE COURT**: How'd they get it? How did they get it, by the way?

**MR. RUMLEY**: But how are you going to explain that it's a genuine signature without going into the fact that it's (indiscernible)?

**THE COURT**: Are you going to deny it's a genuine --?

**MR. RUMLEY**: No. But their expert wants to use it only because -- this expert has probably 15 exemplar signatures, but he wants to use that one because it's a plea agreement.

**THE COURT**: Well, he's not going to.

**MR. LOCHRIDGE**: No. The reason --

**THE COURT**: He just says, "Look. I got this as part of the court documents." Doesn't say what court documents. and just take it out, take the signature out without mentioning it was on the plea agreement for the 1995 drug trafficking case.

**MR. LOCHRIDGE**: We're not going to do that, Judge. We're not going to flimflam it at all, but we are going to call it a court document because that's important to these examiners knowing it's an official document.

**THE COURT**: You can call it a court document.

**MR. LOCHRIDGE**: Okay.

**MR. RUMLEY**: No problem.

**THE COURT**: Okay. What else? Are we ready? Just

waiting for Mr. Rangel?

**MR. RUMLEY**: I'll be right back.

**THE COURT**: Go right ahead. Everybody gets to go but us.

In the '95 case, he was released on supervised release in '97, did you say?

**(Court confers with clerk)**

Close in 2001, okay. He was released on supervised release in '97.

**(Court confers with clerk)**

**(Pause)**

Okay. Bring in the jury, please.

**MR. RANGEL**: Your Honor, can he take the stand?

**THE COURT**: Pardon?

**MR. RANGEL**: Can Mr. Trevino take the stand right now, your Honor?

**THE COURT**: Call him in front of the jury.

**THE CLERK**: We're still missing Mr. Lochridge.

**THE COURT**: No, that's okay. Bring them in. He has special dispensation.

**THE CLERK**: All rise for the jury.

**(Jurors enter courtroom at 4:18 p.m.)**

**THE COURT**: Thank you. You may be seated.

**MR. RANGEL**: We would call Mr. Arturo Trevino.

**THE COURT**: Would you come forward, please, sir?

Would you administer the oath, Ms. Scotch?

**ARTURO TREVINO, PLAINTIFFS' WITNESS, SWORN**

**DIRECT EXAMINATION**

**BY MR. RANGEL:**

Q Good afternoon, Mr. Trevino.

A Good afternoon, sir.

Q Will you state your full name for the record?

A Arturo Arnulfo Trevino.

Q And where do you live, Mr. Trevino?

A Premont, Texas.

Q How long have you lived in Premont, Texas?

A About seven years.

Q And are you the same Arturo Trevino who has filed a claim against my clients, Vanderbilt, CHI and CMH Homes?

A Yes, sir.

Q And we met before when I took your deposition, correct?

A Yes, sir.

Q Now, are you married to Maria Trevino?

A Yes, sir.

Q How long have you been married to Maria Trevino?

A We were married for about six years. We've been -- we're separated now, but we've been married for, I don't know, 11 years.

Q And how long have you been separated?

A About four -- four or five years.

Q And so, you've been living separately for four or five years?

A Yes, sir.

Q And tell us a little bit about where you grew up, went to school?

A I grew up in Falfurrias, Texas; went to school in Falfurrias; got married back in '77; got divorced. Worked in the oil field.

Q And did you -- after going through the public school, did you graduate from high school, Mr. Trevino?

A Yes, sir.

Q In Falfurrias?

A Yes, sir.

Q After you graduated, what kind of jobs did you have?

A Insulator helper, tire shop, and oil field.

Q And you had a variety of jobs with different companies in south Texas?

A Yes, sir.

Q And what kind of work did you do in the oil field?

A Roughneck. Drilling for oil and gas.

Q And what were some of the companies that you worked for?

A I worked for Craig's Drilling out of Alice; Pride Oil Well; Diamond M; Grey Wolf. I can't recall the other ones.

Q Are you currently employed?

A No, sir. I'm working self-employed.

Q When was the last time that you were fully employed?
A Last year, back in early part of last year.
Q Back in 2007, Mr. Trevino, were you convicted for smuggling illegal aliens?
A Yes, sir.
Q And where did that conviction take place?
A What do you mean where? Here in Corpus?
Q Was in this courthouse?
A This courthouse, yes, sir.
Q And who was the presiding judge?
A Head.
Q And did you serve time in a federal facility?
A Detention center, Falfurrias.
Q Mr. Trevino, are you Cesar Flores' brother-in-law?
A Yes, sir.
Q And do you also know Mr. Alvin King?
A Yes, sir.
Q When did you meet Mr. King?
A I can't recall, but 2000, 2005. I can't recall.
Q Okay. Would you say that over the years, during the time that you've been married to Maria Trevino, that you've been close to Cesar Flores?
A No, sir.
Q You've seen him from time to time?
A Lately, I never seen him and never see him before. Once

in a while.

Q Going back to 2001, late 2001, did you become aware that he was interested in purchasing a mobile home?

A No, sir.

**THE COURT**: I'm sorry. When was this?

**MR. RANGEL**: I'm sorry?

**THE COURT**: When?

**MR. RANGEL**: December 2001.

**THE COURT**: Thank you. I'm sorry.

**BY MR. RANGEL**:

Q At some point, you became aware that Cesar Flores was interested or looking to buy a mobile home. Is that correct?

A Right.

Q And you found out about that because Maria Trevino called you and said that Cesar, her brother, wanted to place a mobile home on property that you and Maria owned. Is that correct?

A Correct.

Q In December 2001, you and Maria Trevino owned Lots 35 and 36 there in Alice, Texas in the Galimore area, right?

A Thirty-four, 35 and 36.

Q You owned three of them?

A Three of them.

Q Okay. And Lot 36 was empty.

A Correct.

Q And when Maria Trevino told you that Cesar Flores wanted

to place the mobile home on that Lot 36, she called you because she wanted to know whether it was okay with you, correct?

A Correct, sir.

Q And she told you that she had already spoken with her brother Cesar and she had told Cesar it was okay to place the mobile home on Lot 36, correct?

A Correct.

Q And did you tell Maria that it was okay with you, also?

A Yes, sir.

Q When Maria Trevino told you that she had spoken with Cesar about placing the mobile home on that lot, did she tell you that she was excited about it?

A I can’t remember.

Q But she told you it would be okay with her?

A Yeah.

Q And do you recall actually meeting with Cesar Flores to discuss whether he could place the mobile home on the lot or did he just meet or speak with Maria?

A I don’t remember.

Q Okay. And what was it that Maria Trevino told you as far as placing the mobile home on that lot?

A That it was okay if Cesar could put a trailer house there.

Q And incidentally, that Lot 36 and Lot 35 had been conveyed to you and Maria Trevino by Jesusa and David Cantu, correct?

A Correct.

Q And Jesusa Flores Cantu was Maria Trevino's sister and was Cesar Flores' sister?
A Correct.
Q So, after Maria Trevino told you that Cesar Flores wanted to place the mobile home on that lot, you said it was okay and did you have any more conversations with him about that?
A No, sir.
Q Did Maria Trevino tell you anything else about a conversation that she had with Cesar Flores?
A No, sir.
Q Did you have more than one conversation with Maria Trevino about that or was that the only conversation?
A I can't remember.
Q When was it that you became aware that the mobile home had actually been placed on the lot?
A I can't remember. It was already parked there when I saw it the first.
Q So, did you go to Alice to visit Cesar or did you just happen to be in town?
A I just happened to be in town, I think. I'm not too sure, but --
Q And did you have any conversation with Cesar about the mobile home after you had told Maria that it was okay for the mobile home to be placed there?
A No, sir.

Q Okay. When you did see the mobile home there, what did you see?
A A mobile home.
Q Did you see Mr. Flores? Did you see Mr. King?
A No.
Q Okay. Did Mr. Flores -- or did Maria Trevino tell you that Mr. Flores had said anything about having to sign any documents in order for -- in connection with the home being placed at the lot?
A No, sir.
Q Okay. I will pull up -- ask that CP Exhibit 209 --
Mr. Trevino, do you recognize this as a builder's and mechanic's lien contract that I showed you during your deposition?
A Yes, sir.
Q And if you'll go to the signature page. On that page, there is a signature line for Arturo Trevino and a signature line for Maria Trevino, correct?
A Correct, sir.
Q And right below your -- or the signs Arturo Trevino there is printed Arturo Trevino. Is that correct?
A Correct, sir.
Q And it's your testimony that that is not your signature, correct?
A Correct.

Q And it's your testimony that you didn't print your name underneath the signature of Arturo Trevino. Is that correct?
A Correct, sir.
Q And you don't know who did, correct?
A No, sir.
Q I mean, you're saying that you didn't sign that, but you don't know who signed your name and, in fact, that's not your signature, correct?
A That's correct, sir.
Q Incidentally, what is the date -- January 7th, 2002, correct?
A Correct.
Q Okay. We'll go to the property description. I think it's on the last page, property description.

Lot 35 and 36, Block 1, Galimore Addition; those are the two lots that we talked about earlier, correct?
A Correct, sir.
Q Now, sitting here today, you no longer own Lot 35 and Lot 36, correct?
A Correct.
Q In fact, in the summer of 2003, you and Maria conveyed Lot 35 to Maria's brother Gilberto Flores, correct?
A Correct.
Q I think July 2003?
A I can't recall.

Q Just about that time, correct?
A Correct.
Q And in the spring of 2005, you and Maria conveyed Lot 36 to Cesar Flores, correct?
A Correct.
Q And so, today you and Maria Trevino no longer own those two lots, right?
A Correct.
Q And when you filed your intervention lawsuit against my clients Vanderbilt, CHI and CMS Homes in 2009, you and Maria Trevino did not own Lots 35 and 36, correct?
A Correct.
Q Let's look at CP Exhibit 3. And this is another document that I showed you during your deposition. Is that correct, Mr. Trevino?
A Correct.
Q And we'll go to the signature page and there, there is a signature of Maria Trevino and a signature for Arturo Trevino, correct?
A Correct, sir.
Q And it's your testimony that you did not sign the signature of Arturo Trevino shown there, correct?
A Correct, sir.
Q And it's your testimony that you didn't print Arturo Trevino underneath that signature line of Arturo Trevino,

correct?

A Correct, sir.

Q And if you didn't do it, you don't know who did, correct?

A Correct.

Q Now, we'll turn to CP Exhibit 9 at 5563. And this is another document that you saw at your deposition, a real estate lease, correct?

A Correct, sir.

Q And we'll go to the signature page. And again, there is a signature for Arturo Trevino and a signature for Maria Trevino, correct?

A Correct.

Q And it's your testimony that the signature there -- the second signature which appears to say Arturo Trevino -- that you didn't sign your signature there, correct?

A Correct.

Q And you don't -- that is not your signature. You don't know who signed here.

A No, sir. Right.

Q Okay. And these documents I've been showing you with Maria Trevino, you're not sufficiently familiar with her signature to know whether that is her signature, right?

A Correct, sir.

Q Okay. Then I think there may be -- is that page 5? Same document, there's a signature line for Maria Trevino and Arturo

Trevino and it's your testimony that that's not -- you didn't sign your signature there. Is that correct?

A I don't think that's my signature.

Q You don't think it's your signature and if it's not your signature, you don't know who signed your signature, correct?

A Correct, sir.

Q And the same thing with Maria Trevino. You're not sufficiently familiar with her signature to know whether she signed it. Is that correct?

A Correct.

Q Now, when we took your deposition, Mr. Trevino, we asked you to sign your name on ten different pages, correct?

A Correct, sir.

Q And I think that's CP Exhibit 155. And is this the first page of the ten pages with your signature? You remember signing the documents?

A I remember signing.

Q Remember signing your name?

A Yes, sir, I remember.

Q And remember that I asked you that sometimes your name appears in some documents as Arturo Trevino, Arturo Arnulfo Trevino, Arturo A. Trevino, and I asked you when -- how you would sign your name whenever there was a middle initial or whether the middle name was spelled out. And what was your testimony then?

A That I usually decided -- like if you said Arturo Arnulfo, I'd put Arturo A. Trevino. And when they would say just Arturo Trevino, I would put Arturo Trevino.
Q So, it depends on whether you're being asked to sign a document that has Arturo Arnulfo Trevino or Arturo A. Trevino or just Arturo Trevino; however you've been asked --
A Correct, sir.
Q -- on the signature line, that's how you would sign it. Is that correct?
A Correct.
Q Is that correct?
A Yes, sir.
Q Okay. Now, let's go to property owner's agreement, CP Exhibit 9 at page 42. There do you see two signatures of Maria Trevino and Arturo Trevino?
A Yes, sir.
Q And it's your testimony that the signature of Arturo Trevino there is not your signature, correct?
A Think so.
Q You don't think that it's your signature?
A Well, I'm not sure, sir.
Q Okay. And if it's not your signature, you don't know who signed your signature, correct?
A Correct.
Q You're just not sure whether that's your signature. Is

that correct?

A Correct.

Q And the same thing with Maria Trevino? You're not sufficiently familiar with her signature to tell this jury whether or not that's her signature?

A Correct, sir.

**(Pause)**

Q If we'll call up the deed of trust. I think I showed you this document, Mr. Trevino, earlier and this was -- I think there's a date of January 7th, 2002. While this deed of trust document did not keep you from conveying Lot 35 to Gilbert Flores or Lot 36 to Cesar Flores, correct?

A Correct, sir.

Q You were able to do that, correct?

A Correct.

Q And between the time that this deed of trust was signed and filed in January of 2002, and the date that you conveyed Lot 35 to Gilbert Flores in 2003 and the date that you conveyed Lot 36 to Cesar Flores, you and Maria Trevino never attempted to sell or convey Lots 35 and 36 to anyone. Is that correct?

A Correct.

Q Pull up the builder's and mechanic's lien, please.

And again, the date on this builder's and mechanic's lien was January 7, 2002 and after this builder's and mechanic's lien was filed, between that date and January '02

and the date that you conveyed Lot 35 to Gilbert Flores in July 2003 and Lot 36 to Cesar Flores in the spring of 2005, you and Maria Trevino never attempted to sell or convey those two lots to anyone. Is that correct?

A Correct.

Q Pull up the builder's and mechanic's lien release.

This is another document that I showed you during your deposition, correct, Mr. Trevino?

A Correct.

Q And the date on this is October 8, 2005, correct?

A Correct, sir.

Q And it refers to Lot 35 and 36, correct?

A Correct.

Q These are the two lots we've been talking about; the lots that you and Maria Trevino owned that you conveyed to your brother-in-law Gilbert and brother-in-law Cesar, correct?

A Correct.

Q On the date that this mechanic's lien release was signed and filed -- October 8th, 2005 -- you and Maria Trevino were no longer the owners of Lot 35 and 36, correct?

A I don't know about Lot 36, but Lot 35, yes. I can't remember Lot 36.

Q Do you recall that you conveyed Lot --?

A Thirty-five. Thirty-six in 2005, but I don't know what month.

Q Okay. You do recall that it was the spring of 2005 that you conveyed Lot 36 to your brother Cesar.

A I can't recall if spring, but it was 2005.

Q Prior to October 8th, 2005?

A It could have -- I don't know, sir.

**MR. RANGEL**: Judge, may we approach?

**THE COURT**: Absolutely.

**(Begin bench conference at 4:42 p.m.)**

**MR. RANGEL**: Since he's uncertain, we'd like to offer the deed showing that they conveyed Lot 36 to Cesar Flores, I believe it was in April 2005. He's ambivalent about it.

**MR. RUMLEY**: We object under the same grounds, under 403, because it's confusing; it misleads the jury as to --

**THE COURT**: Why don't you just stipulate (indiscernible).

**MR. RUMLEY**: He has admitted that he conveyed --

**MR. RANGEL**: I just want to --

**MR. RUMLEY**: And that's why. Under 403, that's why I'm objecting, because he's using him in a prejudicial way versus just a fact.

**MR. RANGEL**: I'm just trying to pinpoint the --

**THE COURT**: When did he say it was transferred?

**MR. RANGEL**: He said in the spring.

**MR. RUMLEY**: He said in '05.

**MR. RANGEL**: No, but I've got to pinpoint the date.

It was in the spring of 2005. I want to pinpoint that it was prior to the date that was --

**MR. RUMLEY**: Spring is before October.

**THE COURT**: Just ask him if it was prior to the date.

**(End bench conference at 4:43 p.m.)**

**BY MR. RANGEL:**

Q Mr. Trevino, the mechanic's lien release, the date on that is October 8th, 2005, correct?

A Correct, sir.

Q Prior to that date, some months before, you had already conveyed Lot 36 to your brother-in-law Cesar Flores, correct?

A I think so, sir.

Q And also prior to that date in 2003, you had already conveyed Lot 35 to your brother-in-law Gilbert, correct?

A Correct.

Q Is that correct?

A Yes, sir.

Q So, on the date that this mechanic's lien release was filed on October 8th, 2005, you and Maria Trevino no longer owned Lots 35 and 36. Is that correct?

A Correct.

Q Pull up the deed of trust release.

Mr. Trevino, another document you saw at your deposition, correct?

A Yes, sir.

Q And the date on this deed of trust release again is October 8th, 2005. Is that correct?

A Correct.

Q And the property described Lots 35 and 36 of Block 1, Galimore Addition, correct?

A Correct.

Q Okay. Prior to October 8th, 2005, when this deed of trust release was filed, you had already conveyed Lot 35 to your brother-in-law Gilbert Flores in July 2003, correct?

A Correct.

Q And prior to this deed of trust release being filed on October 8th, 2005, you had -- months before in 2005 -- already conveyed Lot 36 to your brother-in-law Cesar Flores, correct?

A Yes, sir.

Q So, on the date that this deed of trust release was filed, October 8th, 2005, you and Maria Trevino no longer owned Lots 35 and 36. Is that correct?

A Right.

**MR. RANGEL**: Judge, subject to recalling the witness when he is called in Mr. Rumley's case in chief, I would pass the witness.

**THE COURT**: Thank you, sir.

//

//

//

**CROSS EXAMINATION**

**BY MR. B. GUTIERREZ:**

Q Mr. Trevino, did you or Maria Trevino ever go to a Clayton Homes store here in Corpus Christi?

A No, sir.

Q Do you know an individual, or have you ever met an individual, by the name of Benjamin Frazier?

A No, sir.

Q If we look at the deed of trust that you had told us --

**THE COURT**: Must be on computer. Thank you.

**BY MR. B. GUTIERREZ:**

Q And we can look at -- we've already seen the signatures. You've testified that's not your signature, but the date of the document, this is Exhibit Number 6, if we look at the language on there, it starts at the top, Maria M. Trevino, Arturo Trevino -- do you see that?

A Yes, sir.

Q And it refers to you as -- see where it says "grantor"?

A Yes, sir.

Q Have you ever met this individual, Kevin T. Clayton?

A No, sir.

Q Did you ever grant or sell or convey your property to this individual, Kevin T. Clayton?

A No, sir.

Q If we go further down, it says, "This conveyance" -- can

you read that?

A Yes, sir.

Q "… however, is made in trust to secure payment of one retail installment contract of even date." See where it says "even date"?

A Yes, sir.

Q It's talking about according to what it says there, January 7th. Do you see that?

A Yes, sir.

Q Did you ever sign any retail installment contract?

A No, sir.

Q Do you see how it says, "This conveyance, however, is made in trust to secure payment of one retail installment contract of even date herewith in the principal sum" -- and here, it looked like it says $40,815.19 -- or 98, I can't tell. Then it says $73,641.60. And it says "executed by" -- what does it say there?

A Grantor.

Q And it identifies you and Maria as grantor. Have you ever seen any contract -- did you ever sign any retail contract agreeing to pay this kind of money --

A No, sir.

Q -- to this individual or to anyone at Vanderbilt Mortgage and Finance?

A No, sir.

Q If we look at this page 1, right? That's page 1. See how this page ends in the sentence "provided," and then it says "period," right?

A Yes, sir.

Q Then we go -- let's go to page 2. Page 2, and as we go, continuing, it ends with "indebtedness secured by," and we flip over -- just go on, page by page, to see if they're in sequence, okay? "Shall at" -- and this is the page that I want to show you, page 4. Page 4 of this deed of trust and where it says, "As a condition of such consent, however." Then it starts with 8 -- doesn't appear to be -- does it make any sense?

A No, sir.

Q Have you ever seen this retail installment contract they're talking about?

A No, sir.

Q Will you look at Exhibit Number 7, the builder's and mechanic's lien contract? Do you see that?

A Yes, I do.

Q Now, it identifies yourself, Arturo, and Marie M. Trevino as owners. Do you see that?

A Yes, sir.

Q Then as we go to the bottom, it says, "Owner agrees to pay contract in the sum of $40,815.19," and it talks about contract price. See that?

A Yes, sir.

Q And then it ends here, says, "Owner shall pay the contract price pursuant to the terms of a retail installment contract executed by owner and contractor on even date herewith." Did you ever sign any retail installment contract or agree to pay this kind of money?

A No, sir.

Q Talks about "even date herewith." Let me see -- I think we've seen this before. The jury has seen it. This is January the 7th. Is that correct?

A Correct, sir.

Q You've already told us that you did not sign this document. You did not sign the deed of trust. Is that correct?

A Correct, sir.

Q The other document that was shown to you was a real estate lease.

**(Attorneys confer)**

**MR. RANGEL**: He was asking for the page number, your Honor. I was helping him.

**THE COURT**: It's no problem. Thank you.

**BY MR. B. GUTIERREZ:**

Q Where were you living back in January of 2005? Where were you living? Do you remember? In January?

A Of '05? Premont.

Q In Premont. What was your address in Premont?
A 504 North Donald.
Q Let me show you the real estate lease that Mr. Rangel was showing you awhile ago. Now, this purports to be a real estate lease where you and Maria -- and I've just been corrected. I asked you where you living in 2005. Where were you living in 2002?
A Premont.
Q Premont. The same address?
A No, sir.
Q Do you remember?
A I don't remember. Fifth Street somewhere northeast.
Q Okay. Okay. In looking at the real estate lease, you've seen some signatures. They've asked you if that's your signature. You don't think so. But the question that I have is that this document purports to identify you and Maria as landlords concerning some property that is identified as 1702 Carmen. Were you living at 1702 Carmen?
A No, sir.
Q Do you know who was living at 1702 Carmen? If you know.
A I think it was my sister-in-law, I think.
Q Did you own a home at 1702 Carmen? Do you remember?
A I can't remember, sir.
Q Do you know anything about this real estate lease?
A No, sir.

Q The only thing that you agreed back in 2002 -- January -- was to allow your brother-in-law, Mr. Flores, to place a mobile home that he was trying to buy or trying to purchase from Clayton Homes. Is that correct?

A Correct, sir.

Q Locate that mobile home on property that you and Maria Trevino owned, right?

A Correct.

**MR. B. GUTIERREZ:** That's all we have. Pass the witness.

**THE COURT**: Thank you, sir.

**MR. RUMLEY**: Your Honor, I'll reserve mine until my case.

**THE COURT**: Mr. Rangel?

**MR. RANGEL**: Just a brief follow-up.

**REDIRECT EXAMINATION**

**BY MR. RANGEL:**

Q Mr. Trevino, Mr. Gutierrez showed you a document, I believe it was the deed of trust.

Pull up the deed of trust and also the builder's and mechanic's lien were the last pages. If you'll go to the last two pages on the deed of trust. The previous page on each one. Okay. Let's highlight.

This is page 4 of the deed of trust, then. I believe Mr. Gutierrez was reading the language, "As a condition to such

consent, however." Then he jumped to the next page, correct? "Beneficiary shall have the right to approve the credit worthiness of any assignee or purchaser of any interest in the property agreement." Do you see that?

A Yes, sir.

Q Okay. Now, let's look at the last two pages of the builder's and mechanic's lien.

**MR. RANGEL**: I'm sorry, your Honor. May we confer?

**THE COURT**: Yes, sir.

**(Attorneys confer)**

**BY MR. RANGEL:**

Q Okay. Let's start over, Mr. Trevino. Go to the document that Mr. Gutierrez showed you. Going to the last two pages of each of those documents. Okay. Let's see that one. Last line.

Okay. The last line on that page of the builder's and mechanic's lien is, "This contract shall bind, inure to the benefit of and be exercised by successors in interest of all parties." Correct? That's the language that Mr. Gutierrez showed you, right?

A Yes, sir.

Q And then, you went to the next page. "Beneficiary shall have the right to approve the credit worthiness of any assignee or purchaser of any interest in the property herein described." And he showed you that, also, correct?

A Yes, sir.

Q And he's saying it doesn't make any sense, because the language on the previous page, if you read the next page, it doesn't follow, right?

A Correct.

Q Okay. Well, let's look at the document on the right. And again, looking at the last line on the previous page and the first line of the next page. "As a condition to such consent, however." Then let's go to the next page, signature page.

And then, again, it doesn't follow. "A -- if owner and maker are not the same person, the term owner shall include the maker." So, the point Mr. Gutierrez was trying to make is these documents don't make any sense, because the next to the last page is not in sequence with the last page, right?

A Yes, sir.

Q And Mr. Trevino, are you familiar sometimes when documents are put together that pages get transposed or mixed up? Have you had that experience from time to time?

A I don't know. I don't know where all those papers --

Q Okay. Well, let me show you what I mean. We'll pull up the re-ordered one.

**(Attorneys confer)**

Okay. And this is the same document that we just talked about, the deed of trust.

**MR. B. GUTIERREZ:** Excuse me, your Honor. We object

that it's not the same document. We object. It's not the same document.

**MR. RANGEL**: This is in evidence, your Honor. I'll explain to -- let me rephrase the question.

**THE COURT**: Thank you.

**BY MR. RANGEL**:

Q Remember I just showed you a deed of trust and showed how the last two pages were not in sequence and I showed you the builder's and mechanic's lien and showed you how the last two pages were not in sequence, as Mr. Gutierrez had showed you? Right?

A Correct, sir

Q Right?

A Yes, sir.

Q Okay. Then let's look at the deed of trust on the left doing the same thing. Read the last line and I read you this line awhile ago. "As a condition to such consent, however."

Now, let's go to the following page. "Beneficiary shall have the right to approve the credit worthiness of any assignee or purchaser of any interest in the property herein described." Do you see that?

A Yes, sir.

Q Now, it follows. The two pages follows are in sequence. The line that started on the previous page is completed by the next page, right?

A Right.

Q Now, let's look at the other document and look at number 7 from the previous document -- previous page. Right there at the bottom paragraph. Remember how Mr. Gutierrez shows you and said, "Well, here, you know, 7, "This contract shall bind, inure to the benefit of and be exercised by successors in interest of all parties."

And then, he showed you the next page, which showed that it didn't follow, correct?

A Correct.

Q Okay. And let's see what the next page is. And there is the document that he showed you, 8. Eight after 7. Do you see that, Mr. Trevino?

A Yes, sir.

Q So, do you see what happened here? That these documents when they were filed, the last pages were transposed from one document to another, but they're all there in both of those documents. Do you see that, Mr. Trevino?

**MR. RUMLEY**: Objection. Calls for speculation.

**BY MR. RANGEL**:

Q Is that what the documents show?

**MR. RUMLEY**: Objection, your Honor. That's not what the documents show. The documents show that they re-ordered them.

**MR. RANGEL**: No.

**THE COURT**: I'm sorry.

**MR. RUMLEY**: Objection. Speculation. They re-ordered the documents. Mr. Trevino doesn't know that they re-ordered the documents.

**MR. RANGEL**: Judge, this exhibit is in evidence. Mr. Gutierrez got up here and was trying to suggest that somehow this document was put together to mislead people. It's clear that the last two pages were transposed and the jury will have an opportunity to read this exhibit and see how that happened.

**MR. RUMLEY**: And my objection is speculation. Mr. Trevino was not there, does not know anything about the filing and doesn't know that they re-numbered the documents.

**MR. RANGEL**: I'm just asking if that's what this document, which is in evidence, shows, your Honor.

**THE COURT**: If you don't know, you can say you don't know.

**THE WITNESS**: I don't know.

**BY MR. RANGEL**:

Q Would you agree that this exhibit, which is Exhibit -- Exhibits 209 and 210 -- will speak for themselves in terms of what's in them, correct?

A I don't know, sir.

Q Okay. And the other two exhibits, Exhibits 2 and 3, again which are in evidence, will speak for themselves and the jury

will have an opportunity to compare the documents and see for themselves what's in the documents, correct?

A I don't know, sir.

Q Okay.

Judge, subject to being able to cross examine him again when he's presented, we pass the witness, your Honor.

**THE COURT**: Thank you, sir. Mr. Gutierrez, you may proceed.

**MR. B. GUTIERREZ:** Yes, just a few questions.

**RECROSS EXAMINATION**

**BY MR. B. GUTIERREZ:**

Q You never went to Clayton Homes; is that correct?

A That's correct, sir.

Q You never met anyone from Clayton Homes? Anyone employed by Clayton Homes?

A No, sir.

Q Did anyone ever go to your house in Premont from Clayton Homes?

A No, sir.

Q Did anyone take any documents, any papers for you to sign, anyone from Clayton Homes?

A No, sir.

**MR. RANGEL**: Objection, your Honor. All this has been asked and answered.

**THE COURT**: Sustained.

**BY MR. B. GUTIERREZ:**

Q Have you ever met an individual by the name of Christopher Lance Kimball?

A No, sir.

Q The documents -- I don't know if you noticed this about the documents that were just shown to you by Mr. Rangel. I think it's 209 and 210. This is the document that Mr. Rangel showed you, Exhibit Number 209. Do you see that?

A Yes, sir.

Q Okay. If we look at the Volume -- see Volume 774?

A Yes, sir.

Q This is the one that he showed you, page 629. It starts at 629. Is that right?

A Right, sir.

Q What I'm going to do is for the sake of time, we're just going to flip over. The next one would be 630?

A Correct.

Q 631?

A Yes, sir.

Q What's the next one?

A 632.

Q What's the next one?

A 641.

Q Okay. What's the next one?

A 634.

Q What's the next one?

A 636.

Q Let's look at Exhibit 410, the other document. It is a deed of trust that Mr. Rangel showed you, Exhibit 210. We'll go through the pages, also. Volume 774, page 637, right? Is that correct?

A Yes, sir.

Q Can you see this?

A 638, 639, 640, 633, 642, 643.

Q Those are all the questions I have.

**THE COURT**: Anything further?

**MR. RANGEL**: May we approach, your Honor?

**THE COURT**: Sure.

**(Begin bench conference at 5:10 p.m.)**

**MR. RANGEL**: I know the Court has indicated it wanted to finish up at 5:15. I have a few more questions for him, but it might take longer than five minutes and then I'm ready to call Mr. Nichols in the morning.

**THE COURT**: Well, why don't you give it a try and see how quickly it'll go.

**MR. RANGEL**: Okay. Because what I'm going to do is I want to go through the originals of these documents.

**THE COURT**: I mean, it is re, re, re. Go ahead.

**MR. RANGEL**: Thank you.

**(End bench conference at 5:11 p.m.)**

**THE COURT**: Would you proceed, please?

**MR. RANGEL**: Yes, your Honor.

**FURTHER REDIRECT EXAMINATION**

**BY MR. RANGEL:**

Q Put on the screen Exhibits 2 and 3.

Mr. Trevino, I will -- these two exhibits -- I'll represent that these copies of the original documents -- and again, I want to do the same, follow the sequence on the pages for the builder's and mechanic's lien on the left, starting at the bottom.

What page is that?

A 629.

Q Next page?

A 630.

Q Next page?

A 631.

Q Next page?

A 632.

Q Next page?

A 633.

Q Next page?

A 634.

Q Next page?

A 636.

Q Okay. And we'll go to the next document. Well, let's

stay on that one. Let's stay on that one. Let's go to page 634. ELMO.

Now, Mr. Trevino, I have on the ELMO here the original document that is in evidence. Do you see page 634?

A Yes, sir.

Q Okay. And then, the copy that you just saw shows page 636, correct?

A Yes, sir.

Q Okay. If we lift the recording information -- the piece of paper that was put there -- what page do we see there?

A 635.

Q So, they're all in sequence, right? It goes from 33 to 34 to 35.

A Yes, sir.

Q Let's do the same thing with the deed of trust. Go ahead and put it up there on the original.

Okay. The original shows 637. Next page 638; next page 639; next page 640; next page 641; next page 642. So, all of those in the original are in sequence, correct?

A Yes, sir.

Q Every page is accounted for based on what you've seen on the screen, correct?

A Yes, sir.

**MR. RANGEL**: Pass the witness subject to recalling him on their case in chief, your Honor.

**THE COURT**: Thank you.

**MR. B. GUTIERREZ:** I have no further questions, your Honor.

**THE COURT**: Then we will -- it is exactly 5:15 and we'll start in the morning again at 8:30. If you all could get here a little bit early. Thank you very much.

**THE CLERK**: All rise for the jury.

**THE COURT**: Would you please stand for the jury?

**(Jurors exit courtroom at 5:15 p.m.)**

You may stand down, sir.

**(Witness excused at 5:16 p.m.)**

Anything to take up outside the presence of the jury?

**MR. B. GUTIERREZ:** Not at this time, your Honor. I'm just going to wait for Mr. Rangel (indiscernible).

**THE COURT**: Okay. Eight thirty tomorrow. Get here a little bit early so we can --

**MR. RANGEL**: Eight thirty?

**THE COURT**: -- we're going to start with the jury at 8:30. If you all could get here about 8:20, like you did this morning? Thank you.

**THE CLERK**: All rise.

**(Proceeding was adjourned at 5:16 p.m.)**

**CERTIFICATION**

**I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.**

**February 8, 2011**

**TONI HUDSON, TRANSCRIBER**