UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| VANDERBILT MORTGAGE AND | § | |
| FINANCE, INC., | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. C-09-312 |
| | § | |
| CESAR FLORES, *et al*, | § | |
| | § | |
| Defendants. | § | |

## <u>ORDER</u>

Pending before the Court are the following post-trial motions:  Intervention-Defendants Vanderbilt and CMH Homes' Renewed Motion for Judgment as a Matter of Law or, in the alternative, for New Trial or, in the alternative, for Remittitur, with Respect to the Claims of the Trevinos (D.E. 296); Intervention-Defendant Clayton Homes, Inc.'s Motion to Vacate the Judgment and to Dismiss the Trevinos' Claim for Lack of Personal Jurisdiction, or in the alternative, For Judgment as a Matter of Law, or in the alternative, for New Trial, or in the alternative, for Remittitur with Respect to the Claims of the Trevinos (D.E. 297); Plaintiff/Counter-Defendant Vanderbilt's Motion for Judgment as a Matter of Law or, in the alternative, for New Trial or, in the alternative, for Remittitur, with Respect to the Claims of Flores and King (D.E. 298); and Plaintiff/Counter-Defendant Vanderbilt's Motion for Judgment as a Matter of Law on Vanderbilt's Affirmative Claims for Breach of Contract and for Writ of Possession or, in the alternative, for New Trial (D.E. 299).

The Clayton parties have requested hearings on each of these motions.  However, the Court finds no hearing is required.  For the reasons stated herein, all of the above motions are DENIED.

## I.      Background

On November 10, 2010, trial of the above-styled action began.  On November 18, 2010, the jury found in favor of Defendants/Counter-Plaintiffs Cesar Flores ("Flores") and Alvin King ("King") on each of their three claims against Plaintiff/Counter-Defendant Vanderbilt Mortgage and Finance, Inc. ("Vanderbilt").  The jury also found in favor of Intervenors Maria and Arturo Trevino ("the Trevinos") on their claim under the fraudulent lien statute, Tex. Civ. Prac. & Rem. Code § 12.002, finding that each of the three Intervention-Defendants, Vanderbilt, CMH Homes and Clayton Homes, Inc. ("CHI"), was liable for filing two fraudulent liens.  (D.E. 285.)

On February 28, 2011, the Court entered its Amended Final Judgment in the above styled action.  The Court awarded Flores and King $215,000 each based on their fraud claim against Vanderbilt, as well as prejudgment interest.  The Court awarded Maria and Arturo Trevino $60,000 each based on their fraudulent lien claim against Vanderbilt, CMH Homes, and CHI, as well as prejudgment interest.  (D.E. 284.)

Vanderbilt, CMH Homes and CHI (collectively, "the Clayton parties") have now filed four post-trial motions objecting to the jury's verdict and the Amended Final Judgment.  (D.E. 296, D.E. 297, D.E. 298, D.E. 299.)  The Counter-Plaintiffs and the Intervenors have timely responded.  (D.E. 300, D.E. 301.)

## II.     Vanderbilt and CMH Homes' Renewed Motion for Judgment as a Matter of Law or, in the alternative, for New Trial or, in the alternative, for Remittitur, with Respect to the Claims of the Trevinos (D.E. 296)

### A.      Rule 50(b) Renewed Judgment as a Matter of Law

Pursuant to Fed. R. Civ. P. 50(a), the court may grant judgment as a mater of law ("JMOL") during a jury trial once the jury has fully heard evidence on an issue if the court finds that a "reasonable jury would not have a legally sufficient evidentiary basis to find for the party

on that issue."  Fed. R. Civ. P. 50(a)(1); see also Phillips v. F.D. East, 81 Fed. Appx. 483, 485 (5th Cir. 2003) ("Judgment as a matter of law is granted properly when 'a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'") (quoting Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 149 (2000)).

"A party is entitled to judgment as a matter of law 'only if the evidence points but one way and is susceptible to no reasonable inferences which may support the opposing party's position.' " Hampton v. Dillard Dep't Stores, Inc., 247 F.3d 1091, 1099 (5th Cir.2001) (quoting Tyler v. RE/MAX Mountain States, Inc., 232 F.3d 808, 812 (10th Cir.2000)).  In deciding whether to grant a JMOL, the court does not "weigh evidence, judge witness credibility, or challenge the factual conclusions of the jury.  Judgment as a matter of law is appropriate ... if there is no legally sufficient evidentiary basis for a claim under the controlling law." Id. (quoting Brown v. Gray, 227 F.3d 1278, 1285 (10th Cir.2000)).

Even if the court denies a motion for JMOL during trial, the party may renew its motion following trial.  Pursuant to Rule 50(b), the court may grant judgment as a matter of law following a jury verdict on an issue so long as the motion is filed within 28 days of the entry of judgment.  Fed. R. Civ. P. 50(b)  The renewed motion for judgment as a mater of law may be accompanied by a Rule 59 motion for a new trial.  Fed. R. Civ. P. 50(b).[1]  "It is well established

---

[1] Rule 50(b) provides:

If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion.  No later than 28 days after the entry of judgment--or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged--the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59. In ruling on the renewed motion, the court may:

(1) allow judgment on the verdict, if the jury returned a verdict;
(2) order a new trial; or

that to preserve the right to file a Rule 50(b) motion the moving party must first request [judgment as a matter of law] at the close of all evidence." <u>Taylor Publ'g Co. v. Jostens, Inc</u>., 216 F.3d 465, 471 (5th Cir.2000).

### B.    Analysis

Vanderbilt and CMH Homes (hereafter, "the Clayton parties") have renewed their motion for JMOL on the Trevinos' claim under the fraudulent lien statute, Tex. Civ. Prac. & Rem. Code § 12.002.  The Court denied their prior motions for JMOL on November 15, 2010.  (D.E. 246.)

The Clayton parties given three reasons why the Court should grant judgment as a matter of law: first, the Trevinos lack standing under § 12.003; second, the Trevinos' fraudulent lien claim is barred by the statute of limitations; and, third, the Trevinos failed to prove by a preponderance of the evidence that Vanderbilt was involved in the filing of the liens at issue. Most of the arguments the Clayton parties raise in their motion have already been addressed in the record.  Nonetheless, the Court briefly discusses each basis for JMOL and addresses any novel arguments in more detail.

### 1.    Standing Under § 12.003

Section 12.003 states that the persons who can bring suit under this section include, "in the case of a fraudulent lien or claim against real or personal property or an interest in real or personal property, the obligor or debtor, or a person who owns an interest in the real or personal property."  § 12.003(a)(8).

In its order on summary judgment, the Court interpreted Tex. Civ. Prac. & Rem. Code § 12.003 as conferring standing on Intervenors Maria and Arturo Trevino.  (D.E. 182 at 10); § 12.003. The Clayton parties once again object that the Trevinos lack standing because they

---

(3) direct the entry of judgment as a matter of law.

Fed. R. Civ. P. 50(b).

conveyed their two parcels of property in the summer of 2003 and the spring of 2005, respectively, and because the liens on their property were released in October 2005.  Thus, by the time they filed this lawsuit, the Trevinos did not own the property and the liens had been released.  (D.E. 296 at 3-4.)

As the Court explained on summary judgment, the Trevinos qualify as "debtors" and "obligors" under Section 12.003 because they were obligated under the Deed of Trust (DOT) and the Builder's and Mechanic's Lien ("BML") to make payments pursuant to the Retail Installment Contract ("RIC") until the liens were released in 2005.[2]  (D.E. 144, Ex. 13 (DOT), Ex. 14 (BML.)); see also Taylor Elec. Services, Inc. v. Armstrong Elec. Supply Co., 167 S.W.3d 522, 530-31 (Tex. App. – Ft. Worth 2005) ("[O]ne who is liable as an obligor or debtor on the underlying debt, whether a property owner of the encumbered property or not, may pursue a cause of action under the fraudulent lien or claim statute.")

The fraudulent lien statute offers plaintiffs a claim for damages based on past injury, providing that a violator may become liable to an injured person for the greater of $10,000 or the actual damages caused by the violation. § 12.002(b).  The fact that the Trevinos no longer own the property subject to the lien does not deprive them of the right to seek damages under the fraudulent lien statute to rectify past harm.  See City of Los Angeles v. Lyons, 461 U.S. 95, 125 (1983) (plaintiffs may seek damages to redress past injury).

---

[2] The DOT provides that the conveyance of the Trevino's property is "made in Trust to secure payment of one (1) Retail Installment Contract . . . ."  (D.E. 144-13 at 2.)  It further provides that "[s]hould Grantor do and perform all of the covenants and agreements herein contained, and make prompt payment of said indebtedness as the same shall become due and payable, then this conveyance shall become null and void and further force and effect, and shall be released at the expense of Grantor . . . ."  (Id.)  Similarly, the BML executed between "Owner," identified as the Trevinos, and "Contractor," identified as CMH Homes, provides: "Owner agrees to pay Contractor the sum of $40,815.19 (Contract Price) for the purchase of the home and all improvements associated therewith.  Owner shall pay the Contract Price pursuant to the terms of the Retail Installment Contract executed by Owner and Contractor . . . ."  (D.E. 144-14 at 2.)  The conveyance shall become "void" if "Owner performs all covenants and pays the Retail Installment Contract according to its terms."  (D.E. 144-14 at 3.)

Moreover, Texas courts have specifically held that the release of a fraudulent lien does not preclude the ability of a plaintiff to claim damages under  Section 12.002(a).  See Esau v. Robinson, 2008 Tex. App. LEXIS 4260, *1 (Tex. App. Corpus Christi June 12, 2008) ("We refuse to hold that appellant's release of lien effectively precluded the court's ability to hear [Plaintiff's] claim for damages.") Given this clear interpretation of Section 12.003, the Clayton parties' argument that their release of the liens precludes the Trevinos' ability to recover damages fails.  As stated in the Court's Order on summary judgment, the Trevinos had standing to sue under the fraudulent lien statute. (D.E. 182.)

### 2.    Statute of Limitations

The Clayton parties re-urge their argument that the Trevinos' claim is barred by the statute of limitations.  (D.E. 296.)

In fraudulent lien causes of action brought under Section 12.002, a four-year statute of limitations applies pursuant to Tex. Civ. Prac. & Rem. Code §16.051, providing that when no corresponding action is expressly listed within statutes, a residual four-year statute of limitations applies.  See Rivera v. Countrywide Home Loans, Inc., 262 S.W.3d 834, 839 (Tex. App. Dallas 2008) (citing Ho v. Univ. of Tex. at Arlington, 984 S.W.2d 672, 686 (Tex. App.--Amarillo 1998)).  The Trevinos did not file suit until October, 2009, over four years after the liens were filed on their property in January 2002.  (D.E. 1.)

However, under the "discovery rule," a cause of action accrues once the claimant knows or is put on notice that he has been legally injured by the alleged wrong.  TIG Ins. Co. v. Aon Re, Inc., 521 F.3d 351, 355 (5th Cir. 2008).   "The discovery rule has been applied in limited categories of cases to defer accrual of a cause of action until the plaintiff knew or, exercising reasonable diligence, should have known of the facts giving rise to a cause of action."  HECI

Exploration Co. v. Neel, 982 S.W.2d 881, 886 (Tex. 1998) (citations removed).  As the Supreme Court of Texas explained in HECI, for the discovery rule to apply, "the injury must be inherently undiscoverable and … objectively verifiable."  Id.

In its order on summary judgment, the Court found that the Trevinos' claim was not time-barred because the discovery rule applies to the Trevinos' claim and that the Trevinos exercised reasonable diligence in filing their lawsuit. (D.E. 182 at 13-22.)  The Clayton parties object for the first time that the Trevinos failed to meet their burden to prove the discovery rule applies because they have not shown that their claim was both "inherently undiscoverable" *and* "objectively verifiable."  (D.E. 296 at 8.)

"[A]n injury is 'objectively verifiable,' for purposes of the discovery rule deferring accrual of a cause of action, if the presence of injury and the producing wrongful act cannot be disputed, and the facts upon which liability is asserted are demonstrated by direct, physical evidence."  DDD Exploration, Inc. v. Key Prod. Co., 2009 U.S. Dist. LEXIS 36100, * 16 (D. Tex. 2009) (citing Computer Associates International, Inc. v. Altai, Inc., 918 S.W.2d 453, 455 (Tex. 1996)).

The parties did not argue over the "objectively verifiable" element on summary judgment. (D.E. 182 at 13, n. 5.)  In any case, the evidence on summary judgment, as well as the evidence adduced at trial, clearly demonstrated that the liens were actually imposed on the Trevinos' property.  Direct, physical evidence of the liens included the DOT and the BML creating those liens, filed by Vanderbilt and CMH Homes, respectively.  (D.E. 144, Ex. 13 (DOT), 14 (BML).)  Accordingly, injury was "objectively verifiable" for purposes of the discovery rule.  DDD Exploration, Inc., 2009 U.S. Dist. LEXIS 36100 at * 16. The Court

declines to depart from its summary judgment holding that the discovery rule applies to the Trevinos' claims.

### 3.      Insufficiency of Evidence

The Clayton parties introduce a variety of additional grounds for judgment as a matter of law.  The Court finds none of them have merit.  The majority of these arguments — such as the Clayton parties' assertion that the Trevinos did not bring sufficient evidence to support that the liens were fraudulent, or that the liens were filed with intent to cause the Trevinos financial injury — were fully addressed on summary judgment, and there is no need to re-visit them. (D.E. 182.)

The Clayton parties do make one novel argument, asserting that the Trevinos did not plead or prove agency with particularity as required by Rule 9(b) with respect to Vanderbilt. They argue that the Trevinos did not demonstrate that the CMH Homes employees responsible for fraudulently notarizing and filing the liens acted under the actual or apparently authority of Vanderbilt.   (D.E. 296 at 10) (citing In re Enron Corp. Securities, Derivative & "Erisa" Litigation, 540 F. Supp. 2d 759, 765 (S.D. Tex. 2007) ("[Wh]en agency is an element of a fraud claim, agency must be pleaded with the particularity required under Rule 9(b).");  Whitney Nat'l Bank v. Med. Plaza Surgical Ctr., L.L.P., No. H-06-1492, 2007 WL 400094, at *3-4 (S.D. Tex. Feb. 1, 2007); Hitachi Capital Am. Corp. v. Andress, No. H-06-1959, 2007 WL 2752696, at *3-4 (S.D.Tex. Sept. 20, 2007)).

The Court disagrees.  The cases cited by Vanderbilt involve allegations of fraud that were dismissed at the pleading stage for failure to plead agency.  To the extent that Vanderbilt seeks to have this case dismissed for failure to satisfy Rule 9(b), this argument should have been brought at the pleading stage.  In any case, unlike in the cases cited by Vanderbilt, the Intervenors never

relied on "bare bones" allegations to support that Vanderbilt had an agency relationship with the employees responsible for creating and filing the fraudulent liens at issue.

At trial, Intervenors adduced plentiful evidence to support that CMH Homes employees acted with actual or apparent[3] authority of all three of the Clayton entities, including Vanderbilt, when they prepared and filed the fraudulent documents. Indeed, the jury learned that CMH Homes employees worked with and were directly responsible to Vanderbilt when preparing the documents to support land-in-lieu transactions. Testimony from Lance Kimball — one of the CHM Homes employees who regularly closed land-in-lieu transactions and the employee responsible for the sale of the mobile home to Flores and King — revealed that Vanderbilt would communicate with the sales associates responsible for each transaction, and either approve the documentation or indicate that more information or further verification was required.

> **Q**: [O]ne of the things that you would do during a transaction such as the land-in-lieu, is you would communicate directly with Vanderbilt? Correct?
>
> **A**: Through the approval process, yes.
>
> . . .
>
> **Q**: And, for example, you would provide them with the customer's information, and they would send stuff back, like, "we need this" or "we need appraisal," or something like that. Right?
>
> **A**: Right.

---

[3] Apparent authority arises through acts of participation, knowledge, or acquiescence by the principal that clothe the agent with the indicia of apparent authority. See NationsBank, N.A. v. Dilling, 922 S.W.2d 950, 952–53 (Tex.1996) (per curiam); Southwest Title Ins. Co. v. Northland Bldg. Corp., 552 S.W.2d 425, 428 (Tex.1977) ("Only the conduct of the principal, leading one to suppose that the agent has the authority he purports to exercise, may charge the principal through the apparent authority of an agent.").

(D.E. 275 (Lance Kimball Testimony on Cross-Examination by Mr. Rumley) at 119).[4]  The final packet containing the paperwork necessary to document each sale was shipped to Vanderbilt via Airbore Express.  (D.E. 275 at 110.)

Under these circumstances, it cannot be said that the Intervenors adduced insufficient evidence to make Vanderbilt liable for the employees' conduct in generating fraudulent documents in the course of making these transactions.  A jury could reasonably have found that each of the Clayton parties was liable under the Texas fraudulent lien statute for filing liens with knowledge that they were fraudulent and with the intent to cause financial injury to the owners of the property on which the liens were placed.  §12.002(a).

The Clayton parties' motion for JMOL on the Trevinos' claim is denied.  Reeves, 530 U.S. at 149.

### C.    Motion for New Trial

For various reasons, the Clayton parties urge the Court to set aside the final judgment in this case and order a new trial pursuant to Rule 59(a).  (D.E. 296.)

Rule 59(a) states, in pertinent part, that the court may, on motion, grant a new trial after a jury trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]"  Fed. R. Civ. P. 59(a).  A motion for new trial under Rule 59(a) should be based upon a manifest error of law or mistake of fact.  See Miller v. Constar Plastics, 2000 WL 1745005, *1 (E.D.La.); Theriot v. Parish of Jefferson, 966 F.Supp. 1435, 1452 (E.D.La.1997). Under that standard, a judgment should not be set aside except for substantial reasons.  Miller,

---

[4] For example, sometimes Vanderbilt would require an additional title search after the DOT and BML had been filed.  Lance Kimball testified as follows regarding the process of finalizing the paperwork for a land-in-lieu sale: "[A]fter the Deed of Trust and Mechanic's Lien was recorded, we would sometimes from *Vanderbilt*, most of the time, need another title search showing from them, a third party, that it had been sent.  Because not all the time the paperwork that you got back from the county would satisfy what *Vanderbilt* was wanting."  (D.E. 275 at 91) (emphases added).

2000 WL 1745005, *1 (citing 11 Charles Wright, Arthur Miller & Mary Kane, Federal Practice and Procedure, § 2804).  Moreover, "[c]ourts do not grant new trials unless it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done, and the burden of showing harmful error rests on the party seeking new trial." Sibley v. Lemarie, 184 F.3d 481, 487 (5th Cir.1999), cert. denied, 529 U.S. 1019 (2000).

Under these standards, the Court finds a new trial is not warranted for any of the reasons proposed by the Clayton parties.  The Court addresses each complaint in turn.

### 1.    Exclusion of Mr. Trevino's Prior Drug Conviction

The Court chose to exclude evidence of Arturo Trevino's 1995 felony conviction for drug trafficking. (Trial Tr. 294:9 –305:11, Nov. 11, 2010 (D.E. 274)).  The Clayton parties argue that the jury should have been allowed to consider the conviction in weighing Mr. Trevino's credibility.  However, the decision to exclude the conviction was not manifest error of law or mistake of fact. See Miller, 2000 WL 1745005 at *1.  Exercising its discretion under Rule 609(b), governing the use of convictions over ten years old to impeach a witness, the Court decided not to admit the 15-year-old conviction as the probative value of the conviction did not substantially outweigh its prejudicial effect.  See Fed. R. Evd. 609(b).  No substantial injustice was done to warrant a new trial.  Sibley, 184 F.3d at 487.

### 2.    Exclusion of Vanderbilt's Call Notes

The Clayton parties object to the Court's decision to exclude Vanderbilt's "call notes." The Court found the "call notes" were not admissible under the business records exception to the hearsay rule on the basis that they lacked the requisite trustworthiness.  See Fed. R. Evd. 803(6). The Court made this finding in part because the Court had concerns about the credibility of the

witness who would offer them on behalf of Vanderbilt, Ms. Kim Russell. (Trial Tr. 191:17-19, Nov. 10, 2010 (D.E. 271)).

The Court's decision to exclude the business records was not manifest error of law or mistake of fact. See Miller, 2000 WL 1745005 at *1.

First, the call notes were themselves based on telephone conversations, and constituted hearsay within hearsay without any exception for the inner layer of telephone conversations. Fed. R. Evd. 805 ("Hearsay included within hearsay is not excluded under the hearsay rule *if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules*.")

Second, the notes were properly excluded records under Rule 803(6). To be admissible under Rule 803(6), business records must: (1) be kept pursuant to some routine procedure designed to assure their accuracy; (2) be created for motives that would tend to assure accuracy; (3) must not themselves be mere accumulations of hearsay or uninformed opinion. United States v. Fendley, 522 F.2d 181, 184 (5th Cir. 1975). In addition, the court must not admit business records when "the source of information or the method or circumstances of preparation indicate lack of trustworthiness." See Fed. R. Evd. 803(6).

"The principal precondition to admission of documents as business records pursuant to Fed.R.Evid. 803(6) is that the records have sufficient indicia of trustworthiness to be considered reliable." Saks Int'l, Inc. v. M/V Export Champion, 817 F.2d 1011, 1013 (2d Cir.1987) (citing United States v. Mendel, 746 F.2d 155, 166 (2d Cir.1984), cert. denied, 469 U.S. 1213, 105 S.Ct. 1184, 84 L.Ed.2d 331 (1985); United States v. Lavin, 480 F.2d 657, 662 (2d Cir.1973)). The determination of whether a record is sufficiently reliable to warrant its admission is within the "sound discretion" of the district court. Potamkin Cadillac Corp. v. B.R.I. Coverage, Corp., 38

F.3d 627, 633 (2d Cir.1994) (citations omitted); see also Rosenberg v. Collins, 624 F.2d 659, 665 (5th Cir. 1980).

The Court properly exercised its discretion in excluding the call notes due in part to the Court's finding that the custodian presenting them was not a credible witness and that the notes lacked the requisite trustworthiness.  No substantial injustice was done to warrant a new trial. Sibley, 184 F.3d at 487.

### 3.        Exclusion of Expert Testimony

The Clayton parties object to the Court's decision to exclude the proposed testimony of their expert, Bryan Stone.  Stone proposed to testify regarding real estate law and the legal effect of various contracts at issue in the case.  The Court's decision to exclude the proposed testimony was not prejudicial error.  As the Court explained in its order excluding Stone's testimony, (D.E. 194), it is not appropriate for an expert to tell the jury what legal standards apply or to interpret the substance and effect of a contract.  See Owen v. Kerr-McGee Corp., 698 F.2d 236, 240 (5th Cir. 1983); see also Marx & Co. v. Diners' Club, Inc., 550 F.2d 505, 509-510 (2d Cir. 1977) ( "[i]t is not for witnesses to instruct the jury as to applicable principles  of law, but for the judge."); DP Concrete Prods., LLC v. Am. Spring Wire Corp., 2010 U.S. Dist. LEXIS 5727, * 3- 4 (W.D. La. Jan. 25, 2010) ("Federal courts have consistently held that expert testimony on issues of contractual interpretation is inappropriate and that such issues are reserved for the judge and jury.")

Moreover, the Court did allow Stone to testify as to the custom and practice of mailing lien releases to land owners because the Court found that, unlike the majority of Stone's proposed testimony, this would provide the jury with useful information on the Clayton parties' customs and practices and would allow the jury to make a more informed decision.  There was

no harmful error, and no substantial injustice was done to warrant a new trial.  Sibley, 184 F.3d at 487.

### 4.      Exclusion of Flores' Failure to File Income Taxes

The Clayton parties object to the Court's decision to refuse to allow the jury to hear evidence that Flores failed to pay his income taxes.  Specific instances of conduct by a witness may be inquired into on cross examination only if probative of truthfulness or untruthfulness, and in the discretion of the Court.  Fed. R. Evd. 608(b).  In this case, the Court found that Flores' failure to pay income taxes was not sufficiently probative of his character for truthfulness or untruthfulness to warrant admission, given substantial risk of prejudice and confusion of the issues.  See Fed. R. Evd. 608(b); see also Fed. R. Evd. 403.  This was not error and does not warrant a new trial.  Sibley, 184 F.3d at 487.

### 5.      Exclusion of King's and the Trevinos' Income Tax History

The Clayton parties also object to the Court's decision to refuse to allow the jury to hear evidence that King and the Trevinos failed to pay income taxes.  For the reasons stated above, this was not prejudicial error and does not warrant a new trial.  Sibley, 184 F.3d at 487.

In sum, none of the above objections, nor any of the other objections in the Clayton parties' motion for new trial, demonstrate that prejudicial error occurred warranting a new trial. Id.  The motion for new trial is denied.

### D.      Motion for Remittitur

In the alternative, the Clayton parties seek a reduction in the Trevinos' statutory damages award.  They contend, *inter alia*, that the Trevinos were not "injured persons" entitled to recover statutory damages under the fraudulent lien statute, Tex. Civ. Prac. & Rem. Code § 12.002(b)(1).

The Court already addressed this argument in the Amended Final Judgment and rejects it now for the same reasons.  (D.E. 284.)

The Court also does not accept the Clayton parties' re-urged argument that the Trevinos were only entitled to a statutory penalty of $20,000 between them — $10,000 for filing the BML and $10,000 for filing the DOT.  (D.E. 296 at 24.)  Although the Court implicitly rejected this argument when it decided to award the Trevinos' $60,000 each — $10,000 per violation, per plaintiff, per defendant — Court addresses this argument in detail here.

The fraudulent lien statute provides, in relevant part, that "*a person* who violates" Section 12.002(a) is liable "to *each injured person*" for the greater of $10,000 or "the actual damages caused by the violation." § 12.002(b).

The Clayton parties contend that, despite this statutory language, Section 12.002(b) does not mandate awarding damages to "each injured person" and does not mandate assessing those damages against each "person who violates" the statute.  They argue that, although Texas courts have not interpreted the meaning of "each injured person," Texas courts have applied the statute to award statutory penalties for each fraudulent lien filed against property, regardless of the number of plaintiff co-owners and regardless of the number of defendants.   (D.E. 296.)  The Clayton parties cite the following authorities to support their proposition:

In Chien v. Laws, No. 2001-27190 (113th Dist. Ct., Harris County, Tex. July 29, 2002), the trial court found one defendant liable to two plaintiffs, a husband and wife, for filing a fraudulent lien against the plaintiffs' home in violation of Section 12.002(a).   The court awarded the husband and wife *collectively* $10,000 in statutory damages under Section 12.002(b) "for the filing of a fraudulent lien claim against the property[.]"   Id.  The Clayton parties contend that,

under <u>Chien,</u> the Trevinos — who also jointly owned their property — should only collectively recover a single statutory damages award for each lien filed.[5]

In <u>Wilhite v. Hassell</u>, the trial court found that two defendants had filed five fraudulent liens against real property owned by the plaintiff.  The trial court awarded damages of $50,000 – $10,000 for each lien filed, even though there were two liable defendants.  <u>Hassell v. Wilhite</u>, 2005 Tex. App. LEXIS 8130 (affirming the judgment but not addressing the issue of damages under the fraudulent lien statute).  The Clayton parties contend that, under <u>Hassell,</u> the three Clayton parties should not each be charged with a statutory penalty, but should jointly be charged with a single penalty per lien.

The Court was not persuaded by these authorities when it entered its Final Judgment and is not persuaded now.  None of these cases actually addressed the issue before this Court: whether the Trevinos, as "injured persons" under the fraudulent lien statute, could recover $10,000 per violation from each "person who violate[d]" Section 12.002(a).  § 12.002(b).  In the absence of controlling authority to the contrary, the Court chose to do what the statutory language suggests, and gave each injured person $10,000 per violation from each liable party – namely, $60,000 each.

The Clayton parties' motion for remittitur is denied.

**III.    Clayton Homes, Inc.'s Motion to Vacate the Judgment and to Dismiss the Trevinos' Claim for Lack of Personal Jurisdiction, or in the alternative, for Judgment as a Matter of Law, on in the alternative, for New Trial, or in the further alternative, for Remittitur with Respect to the Claims of the Trevinos (D.E. 297)**

**A.    CHI's Motion to Vacate for Lack of Personal Jurisdiction**

---

[5] The Clayton parties also point to the general principle that joint owners of real property are in privity with one another.  (D.E. 296 at 24) (citing <u>Bradley v. Armstrong</u>, 130 F.3d 168, 179 (5th Cir. 1997)).  In <u>Bradley</u>, the Fifth Circuit held that a co-tenant could not bring a subsequent lawsuit already brought by one co-tenant because "any recovery that one cotenant by the entirety obtains redounds to the benefit of the other."  <u>Id</u>.  The court stated: "we find it highly unlikely that [the state of Mississippi] would deny the privity of tenants by the entirety, thus allowing two suits for an injury to the same property."  <u>Id</u>.

Clayton Homes, Inc. ("CHI") once again raises the defense of lack of personal jurisdiction under Rule 12(b)(2) and also argues that the Court's judgment against CHI on the Intervenors' claim under Tex. Civ. Prac. & Rem. Code §12.002 must be vacated for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 60(b).[6]   In the motion to vacate, CHI contends that when it previously raised the defense of lack of personal jurisdiction, the Court relied on RICO's nationwide service of process provision in deciding to exercise jurisdiction.  (D.E. 37.) Because the Intervenors' RICO claim was dismissed on summary judgment, (D.E. 182), CHI contends, there is no longer any basis for exercising personal jurisdiction over CHI.  (D.E. 297) (citing, e.g, Rolls-Royce Corp. v. Heros, Inc., 576 F. Supp. 2d 765, 773 (N.D. Tex. 2008) ("If dismissal of Rolls-Royce's RICO claims based on either of these affirmative defenses is proper, then Rolls-Royce cannot establish personal jurisdiction over defendants under 18 U.S.C. § 1965.")).

The Intervenors have responded to the motion, contending that independent basis exists for exercising personal jurisdiction over CHI even absent RICO nationwide service of process, and that in any case CHI waived its right to object that the Court lacks personal jurisdiction over it.  (D.E. 301.)

For the reasons stated below, the Court finds it had personal jurisdiction over CHI from the start of the lawsuit, as well as at the time judgment was entered, and that there are no personal jurisdiction grounds for vacating the judgment against CHI.

---

[6] Courts recognize that "voidness of a judgment for lack of personal jurisdiction can be asserted on a collateral challenge after entry of a default judgment[,]" and that a party may contend a judgment is "void" by way of a timely Rule 60(b)(4) motion. See "R" Best Produce, Inc. v. DiSapio, 540 F.3d 115, 123 (2d Cir. 2008) (emphasis added); see also Sloss Indus. Corp. v. Eurisol, 488 F.3d 922, 924 (11th Cir. 2007) ("Rule 60(b)(4) allows a litigant-even one who does not initially appear-to collaterally attack a judgment on the ground that it is void due to lack of personal jurisdiction.")

### 1.    Personal Jurisdiction

"In deciding whether personal jurisdiction is consistent with the Due Process Clause, a three-prong test is applied: (1) whether the defendant has minimum contacts with the forum state, i.e., whether it purposely directed its activities toward the forum state or purposely availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable." Nu Nuovo Pignone, SpA v. STORMAN ASIA M/V, 310 F.3d 374, 378 (5th Cir. 2002) (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)).

### a.    Minimum Contacts

A defendant establishes minimum contacts with a state if "the defendant's conduct and connection with the forum state are such that [they] should reasonably anticipate being haled into court there." Rudzewicz, 471 U.S. at 474, 105 S.Ct. 2174.  There must be some act whereby the defendant "purposely avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." Id. at 475.  "So long as a commercial actor's efforts are 'purposefully directed' toward residents of another State, [the Supreme Court has] consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there." Id. at 476.

In its Motion to Vacate, CHI states that "[i]t is undisputed that no other basis exists [besides pendant jurisdiction under RICO] for the assertion of personal jurisdiction over CHI." (D.E. 297 at 5.)  The Court disagrees.

CHI is currently incorporated in Delaware.  The Clayton parties contend it does no business in Texas and is not involved in the day-to-day activities of CMH Homes' retail

establishments or in Vanderbilt's financing activities.  (D.E. 144, p. 3; Ex. 3 (Ponce Decl. ¶¶ 5, 7, 8.)  However, regardless of whether the CHI entity is based in Texas or has any physical presence in Texas at all, there are plentiful *indica* supporting that CHI should reasonably have anticipated that it would be sued in a court in Texas, and that CHI purposely availed itself of the resources and protections of the state of Texas in conducting its business.  Rudzewicz, 471 U.S. at 474.  The mobile home at issue in this case — which was sold at a CMH Homes store in Corpus Christi, Texas by employees working on CHI's behalf and was delivered to a location in Texas — was owned by CHI when it was sold to Flores and King.[7]  See id. at 473 ("[t]he forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State[.]") (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S., 286, 297-298 (1980)).   The Retail Installment Contract effectuating the sale of the CHI mobile home was executed in Texas.  See McGEE v. INTERNATIONAL LIFE INS. CO., 355 U.S. 220, 223 (U.S. 1957) ("It is sufficient for purposes of due process that the suit was based on a contract which had substantial connection with that State.")

Furthermore, there is evidence that CHI marketed the land-in-lieu program to residents of Texas.  (D.E. 156, Ex. H, I (Clayton Homes, Inc. advertising materials)).  A January 7, 2002 "prospect letter" containing a  "Clayton Homes, Inc." letterhead and signed by Store Manager Ben Frazier solicits business from existing customers of CMH Homes' Corpus Christi, Texas

---

[7] CHI makes and owns the manufactured homes sold by CMH's network of company-owned and independent retailers.  Upon order from the retailer, CHI completes production of the home and transports the home to the retail center through independent carriers.  (D.E. 156, Ex. A (CHI's 10K report), p. 2.)  CHI owned the home that was sold to Flores and King at the Corpus Christi store.  (D.E. 156, Ex. K (Credit Application Report) at, e.g., 29)).

store.  (Id., Ex. H.)[8]  A similar letter to "Future Home Buyer" also advertises the "land in lieu

program" and also contains a "Clayton Homes, Inc." letterhead.  (Id. Ex. I.)  The address below

the Clayton Homes, Inc. names on both letters is located in Corpus Christi, Texas.  (Id., Ex. H,

I.)

CHI's involvement in promoting and advertising the land in lieu program to Texas

customers at substantial profit constitutes sufficient evidence of "purposeful availment" of the

state of Texas for personal jurisdiction purposes.  See, e.g., Guidry v. United States Tobacco Co.,

188 F.3d 619, 626 (5th Cir. 1999) (reversing district court's finding that it lacked personal

jurisdiction over tobacco trade association when there was some evidence that the defendant

"promoted" or "advertised" tobacco products in the forum state by, inter alia, placing ads in

national publications sold in that state).

"[W]here the defendant 'deliberately' has  engaged in significant activities within a State,

or has created 'continuing obligations' between himself and residents of the forum, he manifestly

has availed himself of the privilege of conducting business there, and because his activities are

shielded by 'the benefits and protections' of the forum's laws it is presumptively not

unreasonable to require him to submit to the burdens of litigation in that forum as well."

Rudzewicz, 471 U.S. at 475-476 (citations removed).

---

[8] The January 7, 2002 letter states:

> We have an extra-ordinary sale going on right now for the people who have already been here before.  You
> have seen it on TV.  If you have land to use we will not require you to put any cash money down on one of
> our homes.  The land does not have to be in your name, and can be any shape and size! No matter what
> your credit is, if you have land or know someone that does YOU CAN GET A HOME. We are the ONLY
> ones that offer this program.  If you have land you will get a house from us with $0 cash out of your
> pocket! Your land is your credit! Your parent's land is your credit! Your uncle's land is your credit! Your
> best friend's land is your credit.  You get the picture so come in and bring your deed!

(D.E. 156, Ex. H.)

CHI marketed its business to Texas residents.   CHI sold its property to Texas residents through contracts negotiated and executed in the state of Texas.   CHI gained substantial profits as a result of its business transactions in Texas.   As a matter of law, CHI had minimum contacts with the forum state sufficient to satisfy due process.  Id.[9]

### b.        Whether Controversy Arises Out of Minimum Contacts

A court may exercise specific jurisdiction over a defendant when the controversy arises out of or is related to the defendant's contacts with the forum state.  Freudensprung v. Offshore Tech. Servs., Inc., 379 F.3d 327, 343 (5th Cir. 2004).  There can be no dispute that this controversy — which revolves around the sale of mobile homes via CHI's "land in lieu" program through use of fraudulent documents — arises out of CHI's marketing and selling of mobile homes to Texas residents.

### c.        Fair Play and Substantial Justice

"Once it has been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'"  Rudzewicz, 471 U.S. at 476 (citations removed).

"When determining the fundamental fairness issue this court will normally examine (1) the defendant's burden; (2) the forum state's interests; (3) the plaintiff's interest in convenient and

---

[9]  Although a Texas appellate court recently held the trial court lacked personal jurisdiction over CHI, the circumstances are distinguishable.  See Galindo v. Prosperity Partners, Inc., 2009 WL 483219 (Tex. App. - Austin, 2009).  First, that case involved unrelated allegations that CHI, allegedly doing business as "Midland States Life Insurance Company," had induced the plaintiffs into usurious loans.  Id. at *1.  The case had nothing to do with CHI's involvement in the production of fraudulent documents to sell mobile homes in Texas.  Second, the plaintiffs proceeded on a "veil piercing" theory of personal jurisdiction, attempting to impute the actions of other entities and individuals to CHI.  The court found that plaintiffs produced "no evidence of any relationship between Clayton and another entity doing business in Texas that would allow the court to impute the entity's activity to Clayton."  Id. at *5.  The court did not perform a "minimum contacts" analysis; and plaintiffs contended they had not yet performed the discovery necessary to obtain evidence showing that CHI "purposely availed itself of the privilege of doing business in the state of Texas by using Midland States Life Insurance Company."  Id. at *3.  In this case, in contrast, the Court has plentiful evidence showing CHI purposefully availed itself of the privilege of doing business in the state of Texas and that the controversy arises out of CHI's contacts with the state of Texas.

effective relief; (4) the judicial system's interest in efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental substantive social policies." Gundle Lining Const. Corp. v. Adams County, 85 F.3d 201, 207 (5th Cir. 1996).

     Consideration of these factors shows it would not offend traditional notions of fair play and substantive justice to exercise personal jurisdiction over CHI. CHI is a national corporation with subsidiaries doing substantial amounts of business in Texas. CHI's corporate representative Kevin Clayton made frequent trips to Texas in the wake of the allegations of notary fraud. The burden to CHI of being sued in Texas is slight, and in any case "[does] not present the type of compelling reasons necessary to justify a finding that the exercise of jurisdiction over [CHI] is contrary to notions of fair play and substantial justice." See id. The Trevinos, whose resources are far more limited than CHI's, benefit substantially from litigation in this state. Texas certainly has an interest in litigating claims of fraud by its citizens in Texas. Rudzewicz, 471 U.S. at 473 ("A State generally has a 'manifest interest' in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors.") It is also far more efficient to litigate the case against CHI in Texas, where the majority of the fraud occurred, than in Delaware, where CHI is incorporated. Finally, it is generally in the interest of the several states to ensure that national corporations are held accountable for the production of fraudulent liens by their employees within any given state. Id.

     In conclusion, the Court finds it has personal jurisdiction over CHI and that neither CHI's affirmative defense under Rule 12(b)(2) nor its motion to vacate the judgment under Rule 60(b) has merit.[10]

---

[10] The Intervenors also argue that CHI waived its right to object to the Court's exercise of personal jurisdiction. (D.E. 301.) They argue that CHI has participated in litigating various lawsuits in Texas state courts involving the same allegations of fraud and forgery and that, in one of these state court cases, CHI sent a letter to counsel for the Intervenors in which it "agreed to submit itself to jurisdiction of Texas Courts in any future litigation with

**B.      CHI's Motions for Judgment as a Matter of Law, New Trial, and Remittitur**

In the alternative, CHI moves for judgment as a matter of law, new trial and remittitur for

all of the same reasons given in Vanderbilt's and CMH Homes's motion, (D.E. 296), addressed

above.  (D.E. 297.)  As explained, the Court finds none of them have any merit and that no

JMOL, new trial or remittitur is warranted.

**IV.     Vanderbilt's Renewed Motion for Judgment as a Matter of Law, or in the
         alternative, for New Trial, or, in the further alternative, for Remittitur, with
         Respect to the Claims of Flores and King (D.E. 298); Vanderbilt's Renewed Motion
         for Judgment as a Matter of Law on Vanderbilt's Affirmative Claims for Breach of
         Contract and for Writ of Possession, or in the alternative, for New Trial (D.E. 299)**

**A.      Vanderbilt's Motions for Judgment as a Matter of Law**

Plaintiff/Counter-Defendant Vanderbilt has renewed its motion for judgment as a matter

of law on Defendants/Counter-Plaintiffs Cesar Flores and Alvin King's three claims against

Vanderbilt —common law fraud, Texas Debt Collection Practices Act ("TDCA"), and Racketeer

Influenced and Corrupt Organizations Act ("RICO") — as well as on the Court's decision to

award a declaratory judgment that Flores and King's debt was released, (D.E. 284 at 5.)  (D.E.

298 at 2.)  In addition, Vanderbilt renews its motion for judgment as a matter of law on

Vanderbilt's original breach of contract claim against Flores and King.  (D.E. 299.)

On November 18, 2010, the jury found that Flores and King met their burden to show by

a preponderance of the evidence that Vanderbilt released their debt in October 2005.  (D.E. 245

at 5.)  The jury then went on to find that Vanderbilt's course of conduct in filing the secret

releases and continuing to collect on Flores and King's debt constituted (1) violation of the

TDCA, Tex. Fin. Code §392.304(8) (misrepresenting extent or amount of consumer debt), (D.E.

Intervenor's attorneys involving the same issues of fraud and forgery."  (D.E. 301) (referencing Ex. A to D.E. 24.)
CHI disputes that it waived its personal jurisdiction objection in *this* lawsuit.  (D.E. 25.)  The Court need not address
this issue because, as explained above, the Court finds it has personal jurisdiction over CHI in the present action.

245 at 8); (2) common law fraud, (D.E. 245 at 10); and (3) violation of RICO,18 U.S.C.
§1962(c), (D.E. 245 at 15.)

Vanderbilt asks the Court to enter judgment as a matter of law on the grounds that: (1) there was no legally sufficient basis for a reasonable jury to find for Flores and King on any of their claims; and (2) Flores and King failed to establish a prima facie case of Vanderbilt's liability on any of their claims.  (D.E. 298.)  Vanderbilt additionally asks the Court to enter judgment in favor of Vanderbilt on its breach of contract claim on the ground that there was insufficient evidence to support that Flores and King's debt was released; thus, Flores and King are liable for breach of contract damages and that Vanderbilt still owns the mobile home.  (D.E. 299.)

Vanderbilt presents no arguments in the renewed JMOL motions that were not addressed on summary judgment or in Vanderbilt's original motion for JMOL, (D.E. 223), which the Court orally denied on November 15, 2010.  (D.E. 246.)  Nonetheless, the Court briefly addresses the primary issues raised.

### 1.    Vanderbilt's Release of Flores and King's Debt

As this Court has previously explained, the threshold issue in assessing Vanderbilt's liability for all of the Counter-Plaintiffs' claims is whether the Counter-Plaintiffs' debt, incurred when they signed the Retail Installment Contract ("RIC") in January, 2002, was effectively released when Vanderbilt and CMH Homes filed the Deed of Trust ("DOT") Release and the Builder's and Mechanic's Lien ("BML") Release on October 14, 2005 — despite the fact that Flores and King's debt was never fully paid.

Vanderbilt argues there is insufficient evidence to support the jury's verdict that Vanderbilt released the Counter-Plaintiffs' debt when it filed the DOT Release.  The Court disagrees.

As explained on summary judgment, a debt may be released even though it has not been paid in full so long as there is sufficient evidence (including parol evidence) of an intent to release the debt.   Evans v. Evans, 766 S.W.2d 356, 357 (Tex. App.-Texarkana 1989). Vanderbilt is correct that only Vanderbilt had authority to release the Counter-Plaintiffs' debt as the jury found that an assignment occurred and that Vanderbilt therefore owned the Counter-Plaintiffs' debt.  (D.E. 245 at 1.)  However, there was sufficient evidence that Vanderbilt intended to release Counter-Plaintiffs' underlying debt when it released its security interest in the property.

The DOT Release provides: "for a valuable consideration in hand paid, the said VANDERBILT MORTGAGE AND FINANCE, INC. does hereby RELEASE the lien of said deed of trust and/or mortgage."  (D.E. 142, Ex. I.)   Vanderbilt asserts that this language is clear and demonstrates that only a release of the lien was intended.  (D.E. 298 at 4).  But the Court held on summary judgment, and reiterates here, that this language is ambiguous.  Although "mortgage" can in some contexts refer to a "mere lien on the property," see, e.g., Zeigler v. Sawyer, 16 S.W. 2d 894, 896 (Tex. Civ.App.--Amarillo 1929, writ ref'd), "mortgage" can also refer (among other things) to "the loan on which such a transaction is based."  BLACK'S LAW DICTIONARY 1101-1102 (9th ed. 2009).

The meaning of the DOT Release is further complicated upon reviewing the language of the BML Release.  The BML Release refers to the Builder's and Mechanic's Lien executed by CMH Homes on the Trevinos' property and states that "for a valuable consideration in hand

paid, the said, CMH Homes, Inc. does hereby release the lien of said Mechanic's Lien Contract *and has been paid in full*." (D.E. 125, Ex. 14) (emphasis added). As the Court explained on summary judgment, even if an effective assignment to Vanderbilt occurred, the language of the BML Release — which was filed on the same day and by the same corporate officer as the DOT Release — is still relevant in interpreting the language of the DOT Release. (D.E. 183.)

Under Texas law, "if [a] contract is subject to two or more reasonable interpretations after applying the pertinent rules of construction, the contract is ambiguous, creating a fact issue on the parties' intent." J.M. Davidson, Inc. v. Webster, 128 S.W.3d 223, 229 (Tex. 2003); see also Evans, 766 S.W.2d at 357 (parol evidence admissible to determine whether there was an intent to release a debt even though it was not paid in full). After examining all the evidence adduced at trial — including the DOT Release, the BML Release, as well as testimony from CMH Homes and Vanderbilt's management regarding the decision to file these releases — the jury found that Vanderbilt intended to release Flores and King's underlying debt, not only the liens on the property.

Vanderbilt once again raises the argument that a contractual release requires a "meeting of the minds  between Flores/King and Vanderbilt or an agreement including mutual intent to release Flores and King's debt." (D.E. 298 at 5) (citing, e.g., Campbell v. Abrazo Adoption Assocs., No. 04-07-00093-CV, 2007 WL 3271608, at *3 (Tex. App.—San Antonio Nov. 7, 2007, pet. denied) (citing Tamez v. Sw. Motor Transp., Inc., 155 S.W.3d 564, 569-71 (Tex. App.—San Antonio 2004, no pet.)); Vera v. N. Star Dodge Sales, Inc., 989 S.W.2d 13, 17 (Tex. App.—San Antonio 1998, no pet.) (to establish affirmative defense of release, must prove the elements of a contract)).

However, the Court disagrees that this standard applies to the situation at bar.  Flores and King could not have come to a "meeting of the minds" with Vanderbilt regarding whether to release their debt because Vanderbilt and CMH Homes filed the mass releases in October 2005 without informing either property owners like the Trevinos or owners of the mobile homes like Flores and King.  The evidence was sufficient to indicate that Vanderbilt and CMH Homes intentionally filed these releases in secret in order to avoid liability for the actions of employees who were falsely notarizing documents in order to sell more mobile homes and generate revenue for the Clayton Homes business.  Under these circumstances, the jury was reasonable in concluding that the Clayton entities acted with the intent to release the debts of their customers, regardless of whether there was a "meeting of minds" between Vanderbilt and Flores and King. Evans, 766 S.W.2d at 357

Vanderbilt points out that, following the releases, Vanderbilt continued its usual debt collection efforts, frequently telephoning and visiting Flores and King's home, in order to collect the money still allegedly owed on the mobile home.  Vanderbilt contends that these continued collection efforts constitute evidence that Vanderbilt did not intend to release the debt, stating: "releasing the debt and then continuing to collect on it is totally illogical[.]"  (D.E. 298 at 6.) The Court once again disagrees: continuing to collect on a debt that has been secretly released without knowledge of the debtors is highly logical.

Finally, Vanderbilt re-urges its argument that Vanderbilt's failure to file documents releasing the debt through the Texas Department of Housing and Community Affairs ("TDHCA") also shows lack of intent to release the debt.  (D.E. 298 at 6.)  However, Vanderbilt's failure to follow its ordinary procedures for releasing debts on mobile homes may have been simple corporate oversight, or — more likely given the circumstances — it was a

necessary course of action given that Vanderbilt apparently wished to keep the mass releases secret.  Again, the jury could reasonably have found from all the evidence that Vanderbilt intended to release the underlying debt, not only its security interest in the property, when it filed the DOT Release.  Evans, 766 S.W.2d at 357

Based on the evidence adduced at trial, Flores and King earned a declaratory judgment that their debt had been released and that they were entitled to possession of and title to their mobile home.  (D.E. 284 at 5.)  Because there was legally sufficient evidentiary basis for a reasonable jury to find that Vanderbilt released Flores and King's debt, Vanderbilt's motion for JMOL on this issue is denied.  Reeves, 530 U.S. at 149.  Likewise, the jury could reasonably have found that Flores and King were not liable for breach of contract since their debt had been released and they did not thereafter owe Vanderbilt further payments on their home. Vanderbilt's motion for JMOL on its breach of contract claim is denied.  Id.

### 2.    Jury's Finding of Liability on the Counter-Plaintiffs' Claims

Given the Court's conclusion that the evidence was sufficient to find Vanderbilt had released Flores and King's debt, Vanderbilt's arguments that Flores and King failed to prove the elements of their claims for statutory debt collection, fraud, and violation of RICO do not have merit.  The Court briefly addresses each claim.

First, Flores and King presented sufficient evidence that Vanderbilt was a "debt collector" engaged in debt collection under the TDCA, see Tex. Fin. Code § 392.001, and that Vanderbilt violated the TDCA by "misrepresenting the character, extent, or amount of a consumer debt" when it continued to collect on a debt that had, in fact, been released.  See § 392.304(8).  This constitutes a violation of the TDCA.  See § 392.304(8).

Second, Flores and King presented sufficient evidence that Vanderbilt committed fraud by falsely representing to them that their debt was still owed with the intent that they rely on the representation to their detriment, and that Flores and King did so rely by continuing to make payments amounting to over $25,000.  This constitutes fraud under Texas law.  See Johnson & Johnson Med., Inc. v. Sanchez, 924 S.W.2d 925, 929-30 (Tex. 1996).

Third, Flores and King presented sufficient evidence to support all of the elements of their claim under RICO, 18 U.S.C. §1962(c).  To prove a violation of 18 U.S.C. § 1962(c), a plaintiff must show: "(1) a person who engages in (2) a pattern of racketeering activity (3) connected to the acquisition, establishment, conduct, or control of an enterprise."  Crowe v. Henry, 43 F.3d 198, 203 (5th Cir. 1995); In re Mastercard Int'l, Inc., 313 F.3d 257, 261 (5th Cir. 2002) (citing Crowe).

The Court already determined on summary judgment that Flores and King had standing to sue under RICO,[11] and that Vanderbilt, jointly with the other Clayton parties, constituted an "enterprise" under RICO.[12]   A viable RICO claim also requires a "pattern of racketeering

---

[11] "The standing provision of civil RICO provides that "any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor . . . and shall recover threefold the damages he sustains." Anderson v. Kutak, Rock & Campbell (In re Taxable Mun. Bond Sec. Litig.), 51 F.3d 518, 521 (5th Cir. 1995) (quoting 18 U.S.C. § 1964(c)).  The court found on summary judgment that Flores and King were injured when they continued to make payments on a debt that had been released.  (D.E. 183 at 34-35.)

[12] To show a RICO enterprise under § 1962(c)  "the plaintiff must demonstrate not only that the enterprise is distinct from the series of predicate acts constituting racketeering activity, but also that the RICO 'person' who commits the predicate acts is distinct from the enterprise.  It is not enough to establish that a defendant corporation through its agents committed the predicate acts in the conduct of its own business."  Whelan v. Winchester Production Co., 319 F.3d 225, 229 (5th Cir. 2003) (internal citations omitted); see also Abraham v. Singh, 480 F.3d 351, 357 (5th Cir. 2007).  "Although a defendant may not be both a [RICO] person and an enterprise, a defendant may be both a person and a part of an enterprise.  In such a case, the individual defendant is distinct from the organizational entity."  St. Paul Mercury Ins. Co. v. Williamson, 224 F.3d 425, 447 (5th Cir. 2000). The Court stated in its order on summary judgment: "[T]he summary judgment evidence demonstrates that various entities and individuals – including Vanderbilt, CMH Homes, Clayton Homes, Inc., Kevin T. Clayton, as well as various corporate employees of these companies, including CMH sales associates, general counsel Tom Hodges, and the presidents of Vanderbilt and CMH – were engaged in a hierarchical enterprise in which they sold manufactured homes, secured the homes with allegedly fraudulent liens, and then continued demanding payment under the original contract even after the liens were allegedly released.  These business entities and corporate employees are RICO 'persons' and are distinct from the enterprise itself – the association of these various 'persons.'  The RICO defendant, Vanderbilt, is 'both a

activity," consisting of two or more "predicate acts."  See §1962(c); <u>Abraham v. Singh</u>, 480 F.3d 351, 355 (5th Cir. 2007).  The jury necessarily found that the Clayton parties, including Vanderbilt, engaged in two or more "predicate acts" — mail fraud, wire fraud, and/or money laundering — supporting a "pattern of racketeering activity."  (D.E. 245 at 15.)

To state a claim for mail or wire fraud to support a RICO violation under § 1341 or § 1343, a plaintiff must establish three elements: (1) a scheme or artifice to defraud or to obtain money or property by means of false pretenses, representations, or promises; (2) a use of the interstate mails or wires for the purpose of executing the scheme; and (3) a specific intent to defraud either by revising, participating in, or abetting the scheme." <u>Hewlett-Packard Co. v. Byd:Sign, Inc.</u>, 2007 WL 275476, at *3 (E.D. Tex. Jan. 25, 2007).

Based on the evidence and arguments adduced at trial, a reasonable juror could have found that Vanderbilt and the other RICO defendants engaged in a scheme with the specific intent to defraud or obtain money from Flores and King and that they used the interstate mail or wires to do so. <u>Hewlett-Packard Co.</u>, 2007 WL 275476, at *3.  Acting under the actual or apparent authority of the RICO defendants, CMH Homes employees filed fraudulent, falsely notarized and/or forged documents to sell mobile homes to people who could not afford them, using other people's land as collateral.  The debts created by those transactions were then assigned to Vanderbilt and sold to investors in the secondary market.  Upon learning of the irregularities in the documentation of the debts, CMH Homes and Vanderbilt filed secret releases of those debts, again using the mail or wires to do so.  This enabled Vanderbilt to conceal the employees' misconduct and appease investors, while still collecting on the debts from unwitting customers like Flores and King.  Although, as explained above, mail and wire fraud require

[RICO] person and a part of [this] enterprise.'"   (D.E. 183 at 36-37) (quoting <u>St. Paul Mercury Ins. Co.</u> 224 F.3d at 447.))

finding a specific intent to defraud, Hewlett-Packard Co., 2007 WL 275476, at *3, a reasonable juror could have inferred that Vanderbilt intended to defraud Clayton Homes customers by partaking in this scheme, and thereby engaged in both mail and wire fraud.  This constitutes a "pattern of racketeering activity" under §1962(c).  Abraham, 480 F.3d at 355.

Because a reasonable jury could have inferred from the totality of the evidence that Vanderbilt was liable on all three of Flores and King's claims, Vanderbilt's motion for JMOL is denied.  Reeves, 530 U.S. at 149.

**B.     Vanderbilt's Alternative Motions for New Trial and for Remittitur**

As to Vanderbilt's alternative motion for a new trial, these were all addressed above with respect to the Trevinos.  Again, the Court finds no new trial is warranted.

As to Vanderbilt's alternative motion for remittitur, the Court finds that reduction of damages is not warranted.  Neither the $15,000 in actual damages awarded to Flores and King as compensation, nor the $200,000 in punitive damages awarded to Flores and King as exemplary damages (reduced from $300,000 under Texas law), were excessive.  Actual damages in this case amounted to around $26,000: the amount Flores and King paid following release of their debt.  (D.E. 276 (trial transcript) at 66.)  With respect to the $200,000 in exemplary damages, an award of 12 times actual damages is not unconstitutional simply because it exceeds a single-digit ratio between punitive and compensatory damages.  "[B]ecause there are no rigid benchmarks that a punitive damages award may not surpass, ratios greater than those [the Supreme Court has] previously upheld may comport with due process where 'a particularly egregious act has resulted in only a small amount of economic damages.'"  State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 425 (2003) (quoting BMW of North America, Inc. v. Gore, 517 U.S. 559, 582, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996)).  Vanderbilt's motion for remittitur is denied.

## VII.    Conclusion

For the reasons explained above, the Court DENIES all of the Clayton parties' post-trial motions. (D.E. 296, D.E. 297, D.E. 298, D.E. 299).

SIGNED and ORDERED this 27th day of April, 2011.

_____

Janis Graham Jack

United States District Judge