# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

—————

No. 11-40602

—————

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 23, 2012

Lyle W. Cayce
Clerk

United States Courts
Southern District of Texas
FILED

OCT 05 2012

David J. Bradley, Clerk of Court

VANDERBILT MORTGAGE AND FINANCE, INCORPORATED,

Plaintiff-Intervenor
Defendant-Appellant,

versus

CESAR FLORES; ALVIN E. KING,

Defendants-Appellees,

ARTURO TREVINO; MARIA M. TREVINO

Intervenor
Plaintiffs-Appellees,

versus

CLAYTON HOMES, INCORPORATED; CMH HOMES, INCORPORATED,

Intervenor
Defendants-Appellants.

—————

Appeals from the United States District Court
for the Southern District of Texas

—————

Before DAVIS, SMITH, and DENNIS, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Vanderbilt Mortgage and Finance, Incorporated ("Vanderbilt"), sued to foreclose against appellees Cesar Flores and Alvin King for defaulting on their installment payments on a mobile home. Flores and King responded by claiming they had been released from any underlying debt on the retail installment contract; they counterclaimed that Vanderbilt had unlawfully continued to collect payments on the released debt. Arturo and Maria Trevino intervened with claims against Vanderbilt and CMH Homes, Incorporated ("CMH"), and their parent company, Clayton Homes, Incorporated ("CHI"), asserting, *inter alia* that those three companies had filed false liens on their land as collateral for Flores and King's retail installment contract. A jury found against defendants on all claims, and Vanderbilt, CMH, and CHI appeal.

## I.

Flores and King entered into a Retail Installment Contract with CMH for the purchase of a mobile home in 2002; Vanderbilt provided the financing. When they signed the contract at CMH's Corpus Christi, Texas, store, Flores and King opted to finance the entire $40,815.19 purchase price, obligating themselves to pay a total of $73,641.60. The debt was secured by two vacant lots in Jim Wells County, Texas, owned by the Trevinos, the sister and brother-in-law of Flores, through CMH's "land-in-lieu" program, which permitted purchasers to avoid making a down payment if a friend or family member offered land as collateral for the financing. A Deed of Trust ("DOT") and a Builder's and Mechanic's Lien ("BML") were filed in the county records on the Trevinos' property.[1]

---

[1] Specifically, the DOT created a security interest in favor of Vanderbilt, and the BML created a security interest in favor of CMH. CMH then assigned the retail installment con-
(continued...)

## II.

In 2004, various lawsuits were filed alleging that many of the property owners whose property secured debts incurred under the land-in-lieu program had not voluntarily pledged their property to secure the purchases of manufactured homes. Rather, employees at CMH's Corpus Christi store allegedly forged and then falsely notarized the signatures of property owners to create liens on their property without ensuring they had the owners' permission to create the liens. In 2005, CMH and Vanderbilt attempted to rectify the situation by unilaterally releasing the liens created by BMLs and DOTs for nearly 400 parcels of land, including the Trevinos' property.

Flores and King, meanwhile, continued to live in their mobile home and made eighty-four payments on the Retail Installment Contract until they defaulted; they paid $25,000 after the BML and DOT releases had been filed. In August 2009, Vanderbilt sued to foreclose on Flores and King's home. Flores and King counterclaimed, asserting that the BML and DOT releases operated to release not only the liens on the Trevinos' land but also the debt owed by Flores and King, which was secured by those liens. Accordingly, Flores and King alleged common-law unfair debt collection, violations of the Texas and Federal Debt Collection Practices Acts, fraud, and claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"). The Trevinos intervened, claiming violations of Chapter 12 of the Texas Civil Practice & Remedies Code ("Chapter 12"), which prohibits the filing of false liens,[2] and joining current appellants

---

[1] (...continued)
tract to Vanderbilt.

[2] Chapter 12 provides civil liability for persons who "make, present, or use a document . . . with: (1) knowledge that the document . . . is a . . . fraudulent lien or claim against real or personal property . . . ; (2) intent that the document . . . be given the same legal effect as a . . . document . . . evidencing a valid lien or claim . . . ; and (3) intent to cause another person to suffer[] . . . financial injury." TEX. CIV. PRAC. & REM. CODE § 12.002(a).

CMH and CHI, a holding company that is the parent company of CMH and Van-derbilt. CMH removed the action to federal court based on federal-question jur-isdiction under RICO and 28 U.S.C. § 1331.

The jury found against Vanderbilt, CHI, and CMH on all claims and coun-terclaims. As to Flores and King's claims, the jury apportioned causation 80% to Vanderbilt and 20% to Flores and King, awarding actual damages of $15,000 to each of Flores and King and $300,000 in exemplary damages to each. The jury found that the Trevinos had suffered no actual damages, but it awarded $10,000 in statutory damages per violation per defendant, for a total of $120,000. The district court denied various post-verdict renewed motions for judgment as a matter of law ("JMOL") and motions for a new trial but reduced the award of exemplary damages to Flores and King to $200,000 pursuant to the Texas exemplary-damages-cap statute. *See* TEX. CIV. PRAC. & REM. CODE § 41.008. In a separate order, the court awarded attorneys' fees of about $88,000 to the Tre-vinos and a contingent award of fees of about $81,000 to Flores and King should they prevail on appeal.

## III.

Vanderbilt, CMH, and CHI (the "companies") ask us to review the district court's ruling on renewed motions for JMOL, motions for a new trial, and motions for remittitur of damages. "We review the district court's denial of a renewed JMOL motion de novo." *Black v. Pan Am. Labs., LLC*, 646 F.3d 254, 258 (5th Cir. 2011) (citation omitted). "The decision to grant or deny a motion for new trial or remittitur rests in the sound discretion of the trial judge; that exercise of discretion can be set aside only upon a clear showing of abuse." *Con-sol. Cos. v. Lexington Ins. Co.*, 616 F.3d 422, 435 (5th Cir. 2010) (citation omit-ted). "A trial court abuses its discretion when it bases its decision on an errone-ous view of the law or a clearly erroneous assessment of the evidence." *Black*,

646 F.3d at 258-59 (quoting *United States v. Caldwell*, 586 F.3d 338, 341 (5th Cir. 2009)). Texas substantive law controls the state-law claims, and, in applying Texas law, "we must do that which we think the Texas Supreme Court would deem best." *Calbillo v. Cavendar Oldsmobile, Inc.*, 288 F.3d 721, 729 (5th Cir. 2002) (brackets, citation, and internal quotation mark omitted).

## IV.

The district court sustained the jury's rejection of Vanderbilt's claim against Flores and King for the unpaid debt on the mobile home under the Retail Installment Contract and also sustained the verdicts against Vanderbilt on Flores and King's counterclaims. Vanderbilt's arguments as to why it should have been granted JMOL on its affirmative claim and on each set of counterclaims against it center on the decisive question whether the DOT and BML releases released Flores and King's underlying debt on the mobile home.

The jury found that "Vanderbilt released the debt owed by Cesar Flores and Alvin King under the Retail Installment Contract as of October 14, 2005, when it filed the Deed of Trust Release." Vanderbilt filed a renewed JMOL challenging that finding, which the district court denied; the court reasoned that the language of the DOT release, read in light of the BML release, was ambiguous with respect to intent to release the underlying debt, creating a fact issue for the jury. Under Texas law, "[a] release is a contract subject to the rules of contract construction. Accordingly, in order to establish the affirmative defense of release, the party asserting the defense of release is required to prove the elements of a contract." *In re J.P.*, 296 S.W.3d 830, 835 (Tex. App.—Fort Worth 2009, no pet.) (citations omitted).

We do not agree that the DOT release, even if read in conjunction with the BML release, is ambiguous with respect to an intent to release Flores and King from the underlying debt on the mobile home. The release provides in substan-

No. 11-40602

tive part:

## DEED OF TRUST RELEASE

VANDERBILT MORTGAGE AND FINANCE, INC. . . . declares that it is the true and lawful owner and holder of that certain note and indebtedness secured by a deed of trust and/or mortgage executed by MARIA M. TREVINO & AUTURO [sic] TREVINO to KEVIN T. CLAYTON, trustee, and dated January 7, 2002, filed for record in the office of the Register of Deeds for JIM WELLS County, TEXAS . . . to which deed of trust and/or mortgage or specific reference is hereby made; and for a valuable consideration in hand paid, the said VANDERBILT MORTGAGE & FINANCE, INC., does hereby RELEASE the lien of said deed of trust and/or mortgage.

The DOT release is dated October 8, 2005, and signed by "David R. Jordan," "Asst. Secretary," on behalf of Vanderbilt. It indicates that it was prepared by Kimberly Blackwell of "CMH HOMES INC."

The BML release provides in substantive part:

## MECHANICS LIEN RELEASE

CMH HOMES, INC., . . . declares that it is the true and lawful owner of that certain note and indebtedness secured by a MECHANICS LIEN CONTRACT executed by MARIA M TREVINO & ARTURO TREVINO, dated JANUARY 5, 2002, and recorded in OFFICIAL PUBLIC RECORDS in Volume 774 Page 629, in the office of the COUNTY CLERK for JIM WELLS COUNTY, Texas to which THE MECHANIC LIEN CONTRACT or specific reference is hereby made; and for a valuable consideration in hand paid, the said CMH HOMES, INC. does hereby release the lien of said MECHANICS LIEN CONTRACT and has been paid in full.

Like the DOT release, the BML release is dated October 8, 2005, indicates it was prepared by Kimberly Blackwell of CMH, and is signed by Jordan as "Asst. Secretary," though Jordan's signature is on behalf of CMH rather than Vanderbilt.

Vanderbilt argues that the BML release is invalid and therefore cannot be considered in determining whether the DOT release is facially ambiguous, because the BML release was purportedly issued by CMH, even though the lien it purports to release had already been assigned from CMH to Vanderbilt. Even

assuming that the language of the BML release can be considered in construing the DOT release, the releases cannot reasonably be read to release Flores and King's underlying debt on the mobile home under the Retail Installment Contract and the security interest in the mobile home secured thereby.

Both releases unambiguously state that they are releasing the Trevinos from their obligations under the DOT and BML liens. Those liens, in turn, refer to the Retail Installment Contract, but only insofar as they indicate that the Trevinos' obligations under the liens would be triggered should the terms of the contract be violated. That is, the liens provided that the Trevinos' land would be on the line as collateral "in the event of default in the performance of any obligation under the Retail Installment Contract hereby secured."

The district court determined that the DOT release was ambiguous as to whether it released Flores and King's underlying debt, in part because of its use of the word "mortgage": The release states that Vanderbilt "is the true and lawful owner and holder of that certain note and indebtedness secured by a deed of trust *and/or mortgage* executed by" the Trevinos and that Vanderbilt "does hereby RELEASE the lien of said deed of trust *and/or mortgage*." The court noted that Black's Law Dictionary defines "mortgage" not only as "[a] lien against property that is granted to secure an obligation (such as a debt) and that is extinguished upon payment or performance according to stipulated terms" and "[a]n instrument (such as a deed or contract) specifying the terms of such a transaction" but also as, "[l]oosely, the loan on which such a transaction is based." BLACK'S LAW DICTIONARY 1101-02 (9th ed. 2009). The court also pointed to the statement in the BML release that CMH "does hereby release the lien of said MECHANICS LIEN CONTRACT and *has been paid in full*" as creating ambiguity as to whether that release was intended to mean that Flores and King's underlying debt had been paid in full, releasing the lien.

But that reading needlessly injects ambiguity into the plain terms of the

releases. Neither release purports to release the Retail Installment Contract, and neither purports to release any person other than the Trevinos from any obligation. Nor should a court interpret a legal term, such as "mortgage," found in a legal document, in its "loose" or colloquial fashion. The DOT release does refer to the "certain note and indebtedness" but specifically says that the indebtedness is "*secured by* a deed of trust and/or mortgage," and it is the "deed of trust and/or mortgage" that is being released. It is incorrect to interpret "mortgage" as the debt itself, because a debt cannot be *secured by* itself.

A fair reading of the documents as a whole makes plain that they purported to release only *the Trevinos* from any obligation under *the liens*. The district court erred in holding the releases ambiguous; instead, it should have held, as a matter of law, that the releases did not release Flores and King from their debt obligations. That erroneous legal determination not only permitted the jury to release Flores and King from their obligations under the Retail Installment Contract and prevent foreclosure, but also permitted their counterclaims to proceed—all premised on the erroneous notion that Vanderbilt had unlawfully continued to demand payment and collect on an already-released debt. Therefore, Flores and King's counterclaims fail as a matter of law, so we need not reach Vanderbilt's appeal of the denial of the motions for new trial and remittitur.

## V.

The companies challenge the judgment on the Trevinos' Chapter 12 claims; the companies request judgment in their favor, a new trial, or remittitur. They advance their arguments on several grounds.

## A.

The companies argue that the district court improperly applied Texas's

"discovery rule" for claim accrual in concluding that the Trevinos' claims were not time-barred. The companies maintain that the Trevinos' claims are barred by the applicable four-year statute of limitations, because the allegedly fraudulent liens were filed in 2002, and the Trevinos did not intervene with their Chapter 12 claims until 2009 and 2010.

> Generally, when a cause of action accrues is a question of law. As a general rule, a cause of action accrues and the statute of limitations begins to run when facts come into existence that authorize a party to seek a judicial remedy. In most cases, a cause of action accrues when a wrongful act causes a legal injury, regardless of when the plaintiff learns of that injury or if all resulting damages have yet to occur."

*Provident Life & Acc. Ins. Co. v. Knott*, 128 S.W.3d 211, 221 (Tex. 2003) (citations omitted). But the Texas Supreme Court also applies a "discovery rule," under which

> the cause of action does not accrue until the injury could reasonably have been discovered. The discovery rule is applied categorically to instances in which the nature of the injury incurred is inherently undiscoverable and the evidence of injury is objectively verifiable. An injury is not inherently undiscoverable when it is the type of injury that could be discovered through the exercise of reasonable diligence. Recognizing the social benefit in granting repose after a reasonable time, [the court] ha[s] described the rule as a very limited exception to statutes of limitations.

*BP Am. Prod. Co. v. Marshall*, 342 S.W.3d 59, 65-66 (Tex. 2011) (citations and internal quotation marks omitted). The Trevinos concede that their claims would be time-barred under the generally applicable "legal injury" rule for claim accrual, but they urge that the district court correctly applied the discovery rule.

We applied the Texas discovery rule of claim accrual in an analogous context in *Kansa Reinsurance Co. v. Congressional Mortg. Corp. of Tex.*, 20 F.3d 1362 (5th Cir. 1994): Under Texas law, "the recording of a document in public records serves as constructive notice for limitations purposes only for those per-

sons who are under an obligation to search the records."[3] The court applied Texas caselaw to conclude that "[o]nce [the plaintiff] acquired its interest as assignee of [the property from the defendant], it was not required to make continuous searches of the real property records for interests subsequently secured."[4]

The district court relied on *Kansa* in concluding that the Trevinos' Chapter 12 claims were inherently undiscoverable because the Trevinos, as land owners, had no duty, nor could be reasonably expected, constantly to review the county property records just in case some entity had filed a fraudulent lien. The companies rely principally on three post-*Kansa* Texas Supreme Court decisions, arguing that, because real property records, such as the allegedly fraudulent liens, are publicly available, the Chapter 12 violations that gave rise to the Trevinos' claims were not inherently undiscoverable.[5] Those decisions, however, are in harmony with *Kansa*.

In the most recent of them, *Marshall*, the plaintiffs complained of the defendant "lessee's failure to continue good faith efforts to develop an oil and gas lease." *Marshall*, 342 S.W.3d at 66. The court held that "[b]ecause the [plaintiffs] had a duty to exercise reasonable diligence in protecting their mineral interests, and since the low probability of success of [the defendant]'s continued operations could have been discovered with the exercise of reasonable diligence, the injury was not inherently undiscoverable." *Id.* at 67. The companies argue

---

[3] *Kansa*, 20 F.3d at 1370 (citing *Lightfoot v. Weissgarber*, 763 S.W.2d 624, 627 (Tex. Civ. App.—San Antonio 1989, writ denied); *Cox v. Clay*, 237 S.W.2d 798, 804 (Tex. Civ. App.—Amarillo 1950, writ ref'd n.r.e.)).

[4] *Id.* (citing several Texas opinions indicating, inter alia, that "the 'purpose of [the Texas] recording laws is to notify *subsequent* purchasers . . . and not to give protection to the alleged perpetrators of fraud'" (alterations in original)).

[5] *See BP Am. Prod. Co. v. Marshall*, 342 S.W.3d 59 (Tex. 2011); *Wagner & Brown, Ltd. v. Horwood*, 58 S.W.3d 732 (Tex. 2001); *HECI Exploration Co. v. Neel*, 982 S.W.2d 881 (Tex. 1998).

that *Marshall* suggests that the discovery rule does not apply where "information disclosing" the facts relevant to a claim "is available from . . . public records," even where the "public documents" in question are "technical" in nature. *Id.* at 66. Thus, by extension, the discovery rule does not apply in the instant case, because the liens were publicly available.

*Marshall*'s holding, however, was explicitly premised on its statement that the plaintiff oilfield lessors "had a duty to exercise reasonable diligence in protecting their mineral interests." *Id.* at 67. No similar duty exists here. The Trevinos correctly draw a distinction between the situation in *Marshall*, which involved an existing, known relationship between the parties, and the instant case, in which there is no relationship between the parties, no reason for the landowner to believe that any adverse claim has been made on his property, and no reason to be checking regularly to see whether such a filing has been made.

The companies counter with *Sherman v. Sipper*, 152 S.W.2d 319 (Tex. 1941), which held a fraud claim time-barred where a cloud on the title of the plaintiff's property would have been apparent from a review of the public land records:

> [W]here a person has a right in property, and he claims fraudulent statements were made concerning the title to such property, when the records relating to such title are open to him he must exercise reasonable diligence to discover such defect; and if by the exercise of such diligence he could have discovered such defect and would have known of his right, he is held to have known it, and limitation [*sic*] will run against his claim from the time he could have made such discovery by the exercise of ordinary diligence.

*Id.* at 321. But *Sherman* is also distinguishable insofar as it involved a purchaser of land rather than a current owner or seller. Indeed, in *HECI* the court specifically described *Sherman* as "holding in a fraud case that *purchasers* had constructive notice of matters reflected in real property records and that limita-

tions barred the claim."[6]

Certainly, *HECI* indicates that real property title records *can* constitute constructive notice to certain parties:

> The need for stability and certainty regarding titles to real property has led courts to hold that real property records can constitute constructive notice. For the same reasons, courts have imposed constructive notice in connection with in rem proceedings because such proceedings are intended to bind all persons. . . . Thus, we held in *Mooney* [*v. Hardin*, 622 S.W.2d 83 (Tex. 1981),] that a person interested in an estate admitted to probate is charged with notice of what the will provides and that a claim for fraud based on exclusion from a will must be brought within the applicable limitations period.

*HECI*, 982 S.W.2d at 887 (citing *Mooney*, 622 S.W.2d at 85). The court explained, however, that "when the rationale for imposing constructive notice is lacking, public records have not been held to create an irrebuttable presumption of notice." *Id.* (citations omitted). In making that statement, the court specifically cited precedent "holding that [an] amendment to [an] oil and gas lease executed and *recorded after [the] royalty owner acquired his interest was not constructive notice.*" *Id.* (emphasis added) (citing *Andretta v. West*, 415 S.W.2d 638, 642 (Tex. 1967)). By analogy, a lien filed and recorded on a property owner's property "after the owner acquired his interest" does not give that owner—as distinguished from a prospective purchaser or a subsequent grantee—constructive notice of the lien. This precise distinction from *Mooney* was drawn in

---

[6] *HECI*, 982 S.W.2d at 886-87 (emphasis added) (citing *Sherman*, 152 S.W.2d at 321); *see also id.* at 886 ("We do not suggest . . . that all records maintained by the Railroad Commission constitute constructive notice to royalty owners of their content, as is the case with recorded instruments in a *grantee's* chain of title." (emphasis added)). The companies cite *Poag v. Flories*, 317 S.W.3d 820 (Tex. App.—Fort Worth 2010, pet. denied), as an example of a case in which a Texas court has "applied the legal injury rule to a closely analogous slander of title claim, noting that public land records put claimants on constructive notice of title impairments." Like *Sherman*, however, *Poag* involved a claim by a *purchaser* who failed to inspect property records for defects in title, rather than a current owner or seller of a property interest. *See Poag*, 317 S.W.3d at 826-27.

*Kansa*, 20 F.3d at 1369.

Moreover, the *HECI* court made clear that the question whether a public record provides constructive notice is not the same as the question whether a claim premised on such a record is inherently undiscoverable. *See HECI*, 982 S.W.2d at 887. The determinative factor in *HECI* was the duty of mineral royalty owners to exercise due diligence in seeking out the relevant information, such as the existence of other operators, the existence of a common reservoir, or whether adjoining operators have inflicted damage or drainage. *See id.* at 886. The same concern with whether plaintiffs "have 'some obligation to exercise reasonable diligence in protecting their interests'" was central to the decision in *Wagner & Brown*, in which the court reasoned that, "[j]ust as a royalty owner should determine whether operations in a common reservoir are harming its interests, a royalty owner should exercise due diligence to determine whether charges made against royalty payments are proper and reasonable." *Wagner & Brown*, 58 S.W.3d at 736 (quoting and citing *HECI*, 982 S.W.2d at 886).

The companies claim that Trevinos had an obligation to examine the land records, because they conveyed the lots at issue in 2003 and 2005, after the DOT had been filed.[7] But the companies cite no Texas statute or case indicating that owners or sellers of general real property—as distinguished from holders of mineral royalty interests or property purchasers—are obligated to check county land records routinely. The situation before us is analogous to that in *Kelley v. Rinkle*, 532 S.W.2d 947, 949 (Tex. 1976), in which the court applied the discovery rule to a false-credit-report claim because "[a] person will not ordinarily have

---

[7] *Cf. Trousdale v. Henry*, 261 S.W.3d 221, 235-37 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). Unlike the Trevinos, the plaintiff in *Trousdale* "should have been suspicious enough to inquire about the" facts giving rise to her legal malpractice claim based on "information [she] knew that should have caused her to investigate more" and that "would have prompted a reasonable person to investigate further and, ultimately, to discover that her actions were dismissed and that she should consider filing a malpractice action." *Id.* at 236 & n.6.

any reason to suspect that he has been defamed by the publication of a false credit report to a credit agency until he makes application for credit to a concern which avails itself of the information furnished by the credit agency."

In sum, the district court correctly concluded that the filing of a fraudulent lien against a property interest is inherently undiscoverable with respect to the owner of the property interest under Texas law. Additionally, the Trevinos' claims are "objectively verifiable" so as to meet the second requirement for application of the discovery rule. *See S.V. v. R.V.*, 933 S.W.2d 1, 6 (Tex. 1996). The companies argue that the Trevinos "failed to meet their burden of proving that they suffered an objectively verifiable injury" because they did not "present any direct, physical evidence of actual harm or damage" resulting from the filing of the liens on their property. But, as explained below, the Trevinos are entitled to pursue a Chapter 12 claim absent any allegation of actual damages resulting from the filing of the fraudulent liens.

More importantly, the claims center on the terms of extant physical documents (the BML and the DOT), and the Trevinos' allegations of forgery relied on testimony from the Trevinos and the authorized notary as to whether the Trevinos had ever signed those documents; such evidence "provide[s] sufficient objective verification of [wrongful conduct], even if it occurred years before suit was brought, to warrant application of the discovery rule." *Id.* at 15. Thus, the district court correctly applied the discovery rule to toll the statute of limitations on the Trevinos' Chapter 12 claims.

## B.

The companies contend that the Trevinos lack statutory standing to maintain a cause of action under Chapter 12. Section 12.003(a)(8) of the Texas Civil Practice & Remedies Code gives standing to, "in the case of a fraudulent lien or claim against real or personal property or an interest in real or personal prop-

erty, the obligor or debtor, or a person who owns an interest in the real or personal property."

The companies reason that the Trevinos do not qualify, because (1) the fraudulent lien against them was released before they intervened, such that they were no longer "obligor[s] or debtor[s]" under the fraudulent lien, and (2) they had already conveyed their interests in the property before they intervened, such that they were no longer "person[s] who own[] an interest in the real . . . property." TEX. CIV. PRAC. & REM. CODE § 12.003(a)(8). Put another way, the companies urge that the Trevinos must prove that they met the requirements of Section 12.003(a)(8) *as of the time they intervened.*

Texas courts have rejected the argument that a Chapter 12 damages claim is mooted when a defendant unilaterally releases an allegedly fraudulent lien after the claim was filed but before trial or final judgment.[8] Although—unlike in the instant case—the lien at issue in *Esau* was still in existence at the time of filing, extending *Esau*'s reasoning to the present situation is warranted.

Generally, there is standing once a plaintiff has suffered a legally cognizable injury or wrong for which the law provides a cause of action to seek redress.[9] Though Texas courts hold that "standing is [generally] determined at the time a suit is filed," *Bowers v. Matula*, 943 S.W.2d 536, 539 (Tex. App.—Houston [1st Dist.] 1997), and as a result plaintiffs may lose standing if they seek to enjoin ongoing or future harms, standing for a party complaining of a concrete past violation of a statutory right does not evaporate merely because the defendant has since ceased to violate that right.

---

[8] *Esau v. Robinson*, 2008 WL 2375861, at *1-2 (Tex. App.—Corpus Christi June 12, 2008, no pet.) ("We refuse to hold that appellant's release of lien effectively precluded the court's ability to hear Robinson's claim for damages.").

[9] *See Meza v. Livingston*, 607 F.3d 392, 399-400 (5th Cir. 2010) (stating that "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice").

Ultimately, the companies' "statutory standing" argument is somewhat of a mongrel—an amalgam between the two pure-bred arguments of (1) mootness[10] and (2) lack of injury.[11] The case is not moot, because a live controversy continues as to whether the defendants' actions constituted a violation of Chapter 12, entitling the Trevinos to recover statutory damages. *See, e.g., K.P. v. LeBlanc*, 627 F.3d 115, 120 (5th Cir. 2010).

## C.

Regarding whether a plaintiff is required to show injury to prevail on a Chapter 12 claim, the "Liability" section of Chapter 12 provides:

(a) A person may not make, present, or use a document . . . with:

(1) knowledge that the document . . . is a . . . fraudulent lien or claim against real or personal property or an interest in real or personal property;

(2) intent that the document or other record be given the same legal effect as a . . . document . . . evidencing a valid lien or claim against real or personal property or an interest in real or personal property; and

(3) intent to cause another person to suffer[] . . . financial injury[] . . . .

(b) A person who violates Subsection (a) . . . is liable to each injured person for:

(1) the greater of:

(A) $10,000; or

---

[10] The argument for mootness would rely on the contention that the Trevinos' interest in their Chapter 12 claims were extinguished by their sale of the property or the filing of the release on the DOT.

[11] The argument for lack of injury would rely on the claim that the Trevinos are not entitled to any recovery under Chapter 12 because they suffered no actual damages and thus are not "injured person[s]" entitled to recovery within the meaning of section 12.003(a)(8).

(B) the actual damages caused by the violation;

(2) court costs;

(3) reasonable attorney's fees; and

(4) exemplary damages in an amount determined by the court.

TEX. CIV. PRAC. & REM. CODE § 12.002.  The companies assert that they cannot be "liable to" the Trevinos under § 12.002(b), because the Trevinos are not "injured person[s]" under that section, given that the Trevinos did not sustain any actual damages from the filing of the fraudulent lien.  The district court rejected that argument on the ground that "the language of Section 12.002(b) indicates that statutory damages are an alternative to actual damages."  We agree.

The companies can point to little textual or caselaw support for their argument that the Legislature's use of the term "injured person" requires a plaintiff to show actual damages to recover statutory damages under section 12.002-(b)(1)(A).  Instead, the plain reading of the statute—that, as the district court held, an award of $10,000 in statutory damages under subsection (b)(1)(A) is an alternative to the award of actual damages under subsection (b)(1)(B)—eviscerates any argument that actual damages are necessary to recover under the statute. The companies, by arguing that this reading renders the word "injured" in the phrase "injured person" surplusage, fail to consider that the Legislature merely meant that the person against whom a fraudulent lien is filed is "injured" thereby because his statutorily protected rights have been invaded.

The district court's interpretation is also supported by the structure of Chapter 12.  First, the elements of the claim do not require proof that the filing of the fraudulent lien actually caused financial or other injury, but only that the defendant "inten[ded] to cause" such injury.  TEX. CIV. PRAC. & REM. CODE § 12.002(a)(3).  Second, because Chapter 12 permits numerous public officials to sue to recover damages for the filing of a fraudulent lien, *id.* § 12.003(a)(1)-(6),

in addition to "the obligor or debtor" or property owner, *id.* § 12.003(8), it is sensible that Section 12.002(b) clarifies that "[a] person who violates" Chapter 12 "is liable to each injured person" as opposed to those other "persons" permitted to bring the action.

Neither does any of the caselaw cited by the companies support their contention that, for a plaintiff to recover, Texas courts interpret the phrase "injured person" to require actual damages. Indeed, some of the cases the companies cite demonstrate that statutory damages without any evidence of actual injury is found in other provisions of Texas law.[12] The district court did not err in holding that plaintiffs need not show actual damages to recover under Chapter 12.

## D.

The companies argue that Chapter 41 of the Texas Civil Practice and Remedies Code bars a court from awarding statutory damages under Chapter 12 absent a showing of actual damages because such damages would constitute "exemplary damages" which "may be awarded only if damages other than nominal damages are awarded."[13] The question whether Chapter 41 prohibits awarding Chapter 12 "statutory damages" absent a showing of actual damages

---

[12] *See Marauder Corp. v. Beall*, 301 S.W.3d 817, 822 (Tex. App.—Dallas 2009, no pet.) ("A statutory minimum recovery does not require proof of actual damages. . . . [N]othing in section 392.403 requires a person to prove actual harm or injury to recover the statutory damages. Thus, there is no relation between the statutory damages and the injury."); *Nguyen v. Yovan*, 317 S.W.3d 261, 271 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) ("[S]ection [5.077] of the Property Code does not require a purchaser to prove actual harm or injury to recover statutory damages."); *see also Flores v. Millennium Interests, Ltd.*, 185 S.W.3d 427, 434 (Tex. 2005) ("The Fifth Circuit . . . asks whether a purchaser must prove actual harm or injury to recover statutory damages for an incomplete annual [accounting] statement [required to be provided by a property seller to a purchaser under an executory contract]. We find nothing in the statute to suggest such a requirement.").

[13] *See* TEX. CIV. PRAC. & REM. CODE § 41.004(a); *id.* § 41.001(5) (defining "exemplary damages" as "any damages awarded as a penalty or by way of punishment but not for compensatory purposes").

hinges on whether the $10,000 minimum damages provision in Section 12.002-(b)(1)(A) should be considered "exemplary damages" for purposes of Chapter 41.

Although at first blush it may seem that Section 12.002(b)(1)(A) qualifies as "exemplary damages" under Chapter 41, such a conclusion is undermined by Section 12.002(b)(4), which *separately* permits "exemplary damages in an amount determined by the court," evincing the Legislature's intent that the $10,000 minimum-damages provision in Section 12.002(b)(1)(A) *not* be considered "exemplary damages." We agree with the Trevinos that the best reading of the damages permitted under Section 12.002(b)(1)(A) is that they are not exemplary damages but rather "statutory damages" of a generally compensatory nature even if not designed to compensate for any particular, actual harm suffered by the individual named in a fraudulent lien.

In this respect, Chapter 12 is strikingly similar to Chapter 123 of the Texas Civil Practice and Remedies Code, which prohibits the interception of communications without consent and provides "statutory damages" of up to $10,000 for each intercepted communication in addition to actual damages in excess of $10,000, punitive damages, attorneys' fees, and costs. TEX. CIV. PRAC. & REM. CODE § 123.004. In rejecting a defendant's argument that the "statutory damages" provision of Chapter 123 amounted to punitive damages, one federal court noted that the purpose of statutory damages was "deterring the public harm associated with the activity proscribed, rather than seeking to compensate each private injury caused by a violation. When designed to address 'public wrongs,' statutory damages need not be limited to actual loss or damages felt by a private party." *DirecTV, Inc. v. Cantu*, 2004 WL 2623932, at *4 (W.D. Tex. Sept. 29, 2004) (citation omitted).

The public harms compensated by statutory damages are especially easy to see in the context of Chapter 12. The filing of fraudulent liens undermines the reliability of the public records system on which so many rely, including land

owners, purchasers, local governments, title companies, insurers, and realtors. Fraudulent liens increase transaction costs for all market participants, even if harm to particular individuals is not readily discernable. As the Legislature has found, fraudulent liens have "clogged the channels of commerce." House Committee, Bill Analysis, HB1185, 75th Leg. (Tex. 1997). Accordingly, damages under Section 12.002(b)(1)(A) are not "exemplary damages" and thus are not subject to the limitations of Chapter 41.

Nor is Section 12.002(b)(1)(A) unconstitutional under the Texas or United States Constitution, as the companies claim. Under the Texas Constitution,

> a fine becomes constitutionally excessive only in an extraordinary case in which the fine becomes so manifestly violative of the constitutional inhibition as to shock the sense of mankind. The wide latitude the state has in imposing fines is exceeded and denies due process only where the penalty prescribed is so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable.

*Henderson v. Love*, 181 S.W.3d 810, 816 (Tex. App.—Texarkana 2005, no pet.) (citing *Pennington v. Singleton*, 606 S.W.2d 682, 690 (Tex. 1980)) (internal quotation marks omitted). "A primary consideration in determining whether a fine is excessive is whether it is fixed with reference to the object it is to accomplish." *Pennington*, 606 S.W.2d at 690. Given these standards, Texas's choice to award at least $10,000 for imposing fraudulent liens on another's property—which can cause much disruption in real-property commerce and impugns the validity of public records—is not so shocking and unreasonable as to violate the state constitution. Moreover, because the companies make no argument in support of their contentions that this award is unconstitutional, the issue is waived.

Neither does Chapter 12 violate the Excessive Fines Clause or Due Process Clause of the United States Constitution. In support of their due process argument, the companies cite *State Farm Mutual Automobile Insurance Co. v. Camp-*

*bell*, 538 U.S. 408 (2003), in which the Court invalidated a punitive-damages jury award of $145 million where the compensatory damage was only $1 million, and *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), in which the Court invalidated a similar award of $2 million in punitive damages where compensatory damages were only $4000. The companies note that the ratio between punitive and compensatory damages led to the invalidation in those cases; in the instant case, the ratio between the award ($120,000) and the actual damages ($0) is infinitely higher.

The cited cases are inapplicable, because they concern discretionary jury awards of punitive damages rather than a fixed statutory-damage provision. This discretion, the arbitrariness that might accompany it, and principles of fair notice are what led the Court to invalidate the award under the Due Process Clause. *See Campbell*, 538 U.S. at 416-17. No such discretion or problem with notice is applicable here, because the $120,000 award was mandated by statute as a minimum penalty.

Moreover, the "ratio test" pressed by the companies is only one factor in the Court's three-factor test: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Id.* at 418. The third factor, which evaluates the difference between a jury award and analogous civil penalties, reinforces the conclusion that decisions such as *Campbell* and *Gore* are inapplicable to a case involving the civil penalties themselves.

Nor is the Excessive Fines Clause a bar to recovery. Even assuming that the Clause has been incorporated against the states,[14] the fine in question—

---

[14] *See McDonald v. City of Chi.*, 130 S. Ct. 3020, 3035 n.13 (2010) ("[T]he only rights not
(continued...)

$10,000 for filing a fraudulent lien—is not "grossly disproportional to the gravity of a defendant's offense." *United States v. Bajakajian*, 524 U.S. 321, 334 (1998).

## E.

The companies mount one final challenge to the jury award, maintaining that the district court erred in interpreting Chapter 12 to permit a $10,000 statutory-damages award for the filing of each lien against each of the three defendants, and in favor of each of the plaintiffs, for a total of $120,000 in statutory damages. That argument, however, lacks support in both caselaw and the text of the statute. The text supports the district court's ruling that (1) the companies are liable for $10,000 to *each* plaintiff and (2) *each* of the companies is separately liable for $10,000 per lien per plaintiff.

The statute provides that "[a] person who violates Subsection (a)" by presenting a fraudulent lien "is liable to each injured person[]" for damages. TEX. CIV. PRAC. & REM. CODE § 12.002(a)-(b). That plain language—"is liable to each injured person"—is directly contrary to the companies' assertion that damages may be awarded only for each piece of property subjected to a fraudulent lien rather than to each claimant. Both Maria and Arturo Trevino were named on the allegedly fraudulent liens. None of the cases cited by defendants in support of their interpretation of the statute is relevant to this issue.

The companies' policy arguments also lack merit. They urge that if a partnership with one hundred partners owned a piece of property, under the district court's interpretation a person filing a fraudulent lien would be liable for $1 mil-

[14] (...continued)
fully incorporated [to the states] are (1) the Third Amendment's protection against quartering of soldiers; (2) the Fifth Amendment's grand jury indictment requirement; (3) the Seventh Amendment right to a jury trial in civil cases; and (4) the Eighth Amendment's prohibition on excessive fines. We never have decided whether . . . the Eighth Amendment's prohibition of excessive fines applies to the States through the Due Process Clause.") (citing *Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 276, n.22 (1989))..

lion in damages. But Texas law defines "person" to include a partnership, so the defendant's hypothetical would see the partnership receiving only $10,000. *See* TEX. GOV'T CODE § 311.005(2).

Additionally, neither the text of the statute nor any caselaw supports the companies' position that all persons who filed a single lien against a piece of property would be liable jointly for one $10,000 Chapter 12 award. Again, the statute provides that "[a] person" who violates the statute is liable under its damages provisions; there is no reference to joint liability. If there were sufficient evidence that each of the defendants violated the elements of Chapter 12 by making, presenting, or using each fraudulent lien, no part of the statute prohibits holding each liable.

## VI.

CHI appeals the district court's ruling that it had personal jurisdiction over CHI. The court denied CHI's Federal Rule of Civil Procedure 60(b)(4) post-judgment motion to vacate the judgment on this basis, concluding that there was specific personal jurisdiction over CHI because CHI marketed mobile homes and the land-in-lieu financing to Texas consumers, the Trevinos' claims arose out of those contacts, and the exercise of personal jurisdiction would not offend notions of fair play and substantial justice.[15]

"In general, whether in personam jurisdiction can be exercised over a defendant is a question of law and subject to *de novo* review by this court. This *de novo* standard, we have held, applies to personal-jurisdiction challenges under Rule 60(b)(4), just as it does in other contexts." *Jackson v. FIE Corp.*, 302 F.3d

---

[15] "Because Texas's long-arm statute reaches to the constitutional limits, the question [the panel] must resolve is whether exercising personal jurisdiction over the defendant offends due process." *Clemens v. McNamee*, 615 F.3d 374, 378 (5th Cir. 2010), *cert. denied*, 131 S. Ct. 3091 (2011).

515, 521 (5th Cir. 2002) (citations and internal quotation marks omitted). "[This court] review[s] the district court's findings of fact underlying its disposition of a rule 60(b)(4) motion for clear error." *Goetz v. Synthesys Techs., Inc.*, 415 F.3d 481, 483 (5th Cir. 2005). Our test for specific personal jurisdiction considers

> (1) whether the defendant has minimum contacts with the forum
> state, i.e., whether it purposely directed its activities toward the
> forum state or purposefully availed itself of the privileges of con-
> ducting activities there; (2) whether the plaintiff's cause of action
> arises out of or results from the defendant's forum-related contacts;
> and (3) whether the exercise of personal jurisdiction is fair and rea-
> sonable. The minimum contacts inquiry is fact intensive and no one
> element is decisive; rather the touchstone is whether the defen-
> dant's conduct shows that it reasonably anticipates being haled into
> court. The defendant must not be haled into a jurisdiction solely as
> a result of random, fortuitous, or attenuated contacts, or of the uni-
> lateral activity of another party or third person.

*McFadin v. Gerber*, 587 F.3d 753, 759 (5th Cir. 2009).

The denial of the Rule 60(b)(4) motion was based on three factual findings as to CHI's Texas contacts: (1) that CHI owned the mobile home sold to Flores and King; (2) that the Retail Installment Contract effecting the sale of the home was executed in Texas; and (3) that CHI marketed the land-in-lieu program to residents of Texas by a January 7, 2002, "prospect letter" and a similar letter to "Future Home Buyer," both of which bore "Clayton Homes, Inc." letterhead and a Corpus Christi, Texas, address below the "Clayton Homes, Inc." name.

The Trevinos also point to several documents, each titled an "Assumed Name Certificate," filed in 1997 with the Texas Secretary of State, by "James J. Clayton" on behalf of "Clayton Homes, Inc.," indicating that "Clayton Homes, Inc." would be conducting business in "all" Texas counties. The Trevinos contend that those documents mean that "CHI did business in Texas *as* 'CMH Homes, Inc.'"

CHI contends that those contacts were actually maintained by CMH and

that the district court's attribution of these activities to CHI ignored the defendants' distinct corporate identities. Undoubtedly, the minimum-contacts analysis is complicated by the convoluted overlapping of corporate identifiers, identities, and officers between CHI and CMH. That recurring confusion is evident in the assumed-name certificates and is particularly pronounced in CHI's 2002 Securities and Exchange Commission Form 10-K annual report, which repeatedly refers to numerous "Clayton" mobile home entities—including CHI, CMH, and Vanderbilt—as one "company."

After examining all the record evidence, we conclude that CHI has failed to demonstrate that the factual findings as to CHI's Texas contacts, on which the district court based its conclusion that CHI is subject to specific personal jurisdiction, were clearly erroneous because of the conflicting documentary evidence —and particularly in light of the fact that the confusion stems from CMH's and CHI's arguably misleading paperwork.[16] The district court did not err in exercising personal jurisdiction over CHI.

## VII.

The companies challenge various evidentiary rulings and the sufficiency of the evidence used to justify the verdict. The companies argue that a new trial was warranted because of the (1) exclusion of Arturo Trevino's fifteen-year-old drug conviction; (b) exclusion of expert testimony; (c) exclusion of Flores's failure to file income tax returns; and (d) exclusion of notes from certain telephone conversations. The defendants have failed to brief several of these arguments

---

[16] See ICEE Distributors, Inc. v. J&J Snack Foods Corp., 325 F.3d 586, 591 (5th Cir. 2003) ("Because [the plaintiff] prevailed in the district court, we must review the complaint and any factual disputes in favor of the exercise of personal jurisdiction, and all reasonable inferences from the facts thus established are drawn in favor of the prevailing plaintiff." (citations and internal quotation marks omitted)).

adequately and have therefore abandoned them.[17] In any event, the arguments lack merit.

Vanderbilt and CHI also aver that the district court erred in denying their renewed motions for JMOL, on the ground that the jury was not presented with sufficient evidence to sustain the findings of liability on the Chapter 12 claims. Again, establishing a violation of Chapter 12 required proof that the defendant "ma[d]e, present[ed], or use[d] a document . . . with: (1) knowledge that the document . . . [was] a fraudulent lien . . . ; (2) intent that the document . . . be given the same legal effect as a court record . . . evidencing a valid lien . . . ; and (3) intent to cause another person to suffer[] . . . financial injury." We

> review the district court's denial of a renewed JMOL motion *de novo*. This court must review the entire record, drawing all reasonable inferences in favor of the nonmoving party, but making no credibility determinations or weighing any evidence. Thus, although [the court] must review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. Reviewing the record in this light, [the denial of JMOL should be reversed] if the facts and inferences point so strongly in favor of [the defendant] that a rational jury could not arrive at a contrary verdict.

*Perez v. Tex. Dep't of Crim. Justice*, 395 F.3d 206, 215 (5th Cir. 2004) (citations and internal quotation marks omitted).

The district court rejected Vanderbilt's sufficiency argument on the basis that the Trevinos "adduced plentiful evidence to support that CMH Homes employees acted with actual or apparent authority of all three of the Clayton entities, including Vanderbilt, when they prepared and filed the fraudulent documents." The court cited testimony of Lance Kimball, one of the CMH employees who regularly closed land-in-lieu transactions and the employee responsible for

---

[17] *See Procter & Gamble Co. v. Amway Corp.*, 376 F.3d 496, 499 n. 1 (5th Cir. 2004); FED. R. APP. P. 28(a)(9)(A).

the sale of the mobile home to Flores and King, as "reveal[ing] that Vanderbilt would communicate with the sales associates responsible for each transaction, and either approve the documentation or indicate that more information or further verification was required." Specifically, Kimball testified that he "would communicate directly with Vanderbilt" through the approval process during a transaction such as the land-in-lieu and that he "would provide [Vanderbilt] with the customer's information, and they would send stuff back, like, 'we need this' or 'we need appraisal,' or something like that."

Additionally, Paul Nichols, the president of Vanderbilt, testified that "the notary practices in Store 214 w[ere] deplorable," in that "[e]vidently they were passing the notary stamp around and other people were using it and signing the notary's name." He stated that "one of the jobs of Vanderbilt is to review the credit application, review the documents that make up the credit application which would be the various documents signed by the customer and notarized," and also to review the "deed of trust, mechanic's lien, those types of documents." The jury reasonably could have inferred that Vanderbilt personnel—who were directly involved in arranging the land-in-lieu financing packages—were complicit in the fraudulent notarizing practices at the Corpus Christi store and were involved in preparing the fraudulent liens filed against the Trevinos with the intent that they would be given legal effect and would cause the Trevinos to incur financial injury.

CHI argues that the Trevinos failed to submit any evidence that CHI was involved in the filing of the BML or DOT liens, did so with the intent to cause the Trevinos to suffer injury, or was aware of, approved, or authorized any notary fraud. But as with Vanderbilt, a review of the record amply supports the conclusion that CMH employees filed the liens knowing that they had been fraudulently notarized and with the intent that they would be given the legal effect of obligating the Trevinos under the land-in-lieu program, thereby making

out the elements of a Chapter 12 violation. More importantly, there was sufficient evidence from which the jury could conclude that CMH employees acted under the apparent authority of CHI in carrying out these actions.

Although most of the evidence shows it was CMH employees who were most directly involved in the forging of the notary signatures, the jury was free to disregard or discredit evidence and various witnesses' testimony attempting to explain the corporate structuring arrangements and supposed misfilings and misunderstandings that led to CHI's name being used in association with CMH's dealings. Given the conflicting evidence regarding whether relevant actors were employed by or acting on behalf of CMH or CHI when conducting the activities that led to the filing of the fraudulent liens, and drawing all reasonable inferences in favor of the verdict, there was sufficient evidence to support the jury's finding that CHI was liable for violating Chapter 12.

## VIII.

For the reasons given, the judgment and award of damages with respect to the Trevinos' claims is AFFIRMED. The judgment as to Vanderbilt's claims against Flores and King, as well as Flores and King's counterclaims, is REVERSED and REMANDED for further proceedings as needed.